INGRID M. EVANS, ESQ. (SBN 179094)
**EVANS LAW FIRM, INC.**
3053 Fillmore Street #236
San Francisco, CA 94123
Phone: (415) 441-8669
Fax: (888) 891-4906
Ingrid@evanslaw.com

ALEXANDER G. CABECEIRAS, ESQ.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760
Fax: (212) 587-4169
alexc@dereksmithlaw.com
*PRO HACE VICE TO BE SUBMITTED*

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

---------------------------------------------------------X

MAURO BOTTA,

                Plaintiff,

    -against-

PRICEWATERHOUSECOOPERS LLP,
LAURA BUSTAMANTE,
TYE THORSON,
ROBERT HEATLEY,
STIG HAAVARDTUN,
ERGUN GENC,
TIMOTHY CAREY,
and STEVE MCCANN,

                Defendants.

---------------------------------------------------------X

Civil Case No: 3:18-cv-2615

**COMPLAINT**

**Plaintiff Demands a Trial by Jury**

1

**COMPLAINT**

Plaintiff MAURO BOTTA by his attorneys, DEREK SMITH LAW GROUP, PLLC and EVANS LAW FIRM, INC., hereby complains of Defendants PRICEWATERHOUSECOOPERS LLP, LAURA BUSTAMANTE, TYE THORSON, ROBERT HEATLEY, STIG HAAVARDTUN, ERGUN GENC, TIMOTHY CAREY, and STEVE MCCANN upon information and belief as follows:

## JURISDICTION & VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that the action involves a federal question.

2. This Court has supplemental jurisdiction over the related state law causes of action asserted in this complaint pursuant to 28 U.S.C. § 1367.

3. Venue properly lies in this District pursuant to 28 U.S.C. §1391 (b)(1) and (b)(2) and 28 U.S.C. §1931 (c). Defendant PRICEWATERHOUSECOOPERS LLP have offices located at Three Embarcadero Center, San Francisco, CA 94111.

4. Plaintiff has fully complied with all administrative prerequisite for the commencement of this action.

## PARTIES

5. At all times material, Plaintiff MAURO BOTTA ("BOTTA") was and is an individual male residing in San Jose, California.

6. At all times material, Defendant PRICEWATERHOUSECOOPERS LLP ("PWC") was and is a foreign registered limited liability partnership, duly existing by the virtue and laws of the State of Delaware, doing business in the State of California.

7. At all times material, LAURA BUSTAMANTE was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

2

**COMPLAINT**

8. At all times material, TYE THORSON, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

9. At all times material, ROBERT HEATLEY, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

10. At all times material, STIG HAAVARDTUN, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

11. At all times material, ERGUN GENC, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

12. At all times material, TIMOTHY CAREY was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

13. At all times material, STEVE MCCANN was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

## STATEMENT OF FACT

14. In or around 1999, Defendants hired Plaintiff BOTTA.

15. In or around 2004, Defendants transferred Plaintiff to their San Jose, California office.

*Company A Engagement*

16. At all times material, Plaintiff was assigned to assist Defendants' audit team in the audit of COMPANY A.

17. In or around April of 2013, COMPANY A was selected for a "peer review."

18. At all times material, a "peer review" involves a third party auditing firm inspecting Defendants' auditing work papers.

19. After a peer review, Defendants' auditing work papers were found to be "Non-Compliant with Auditing Standards."

20. Defendants' peer review was memorialized in an Internal Inspection Form (hereinafter referred to as the "Form").

21. In or around April of 2013, Defendants' Semiconductor Team-Leader BUSTAMANTE incorrectly put Plaintiff's name on the Form as "Leading Manager," on the COMPANY A Project.

22. At all times material, Plaintiff was not the Leading Manager on the COMPANY A Project.

23. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff reached out to COMPANY A's Partner to alert him that he was not the Leading Manager on the COMPANY A Project.

24. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff reached out to Defendants' Supervisor BUSTAMANTE. BUSTAMANTE admitted that the Form was incorrect, yet told Plaintiff "it's not worth the political capital to take it back." Plaintiff—who did not want to be associated with a failed project—pleaded with BUSTAMANTE to take corrective, honest action. BUSTAMANTE refused and instead told Plaintiff "it will not impact your evaluation, so it's not that big of a deal."

25. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff contacted Defendants' Human Resources representative.

26. In response, Defendants' Human Resources took no reasonable, immediate, or corrective action whatsoever.

*Feedback survey*

27. In or around May of 2014, Defendants' Executive Coach interviewed DEEPAK BHANDARKAR, JOHAN FURSTENBERG, LAURA BUSTAMANTE, MANDY DHILLON, RISHI JOBANPUTRA and TYE THORSON to provide feedback on Plaintiff's work performance. Defendants' feedback stated, among other things, "[Plaintiff] is an emotional Italian guy," "[Plaintiff] throws partners under the bus," and advised Plaintiff that "what [Defendants] deal with is not perfect, you just have to suck it up."

*Company B Engagement*

28. In or around 2012, Defendants assigned Plaintiff to work on the COMPANY B engagement.

29. In or around February of 2015, Defendants' Supervisor TYE THORSON ("THORSON") was the lead-Partner on the "COMPANY B" engagement.

30. At all times material, Defendants' Supervisor THORSON oversaw Plaintiff's work on the COMPANY B engagement.

31. Since 2012, Plaintiff brought up numerous problems with the COMPANY B engagement to Defendants' Supervisor THORSON.

32. In or around February of 2015, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, Defendants had made multiple errors in 2013, 2014, and 2015, when conducting the audit for COMPANY B. Historically and repeatedly, Defendants' Supervisor THORSON instructed Plaintiff to "make it look like COMPANY B discovered the deficiencies – not [Defendants]" during years prior to 2015.

33. In or around February of 2015, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, COMPANY B did not disclose, in full, all pertinent financial information that is and was necessary for Defendants to complete a true and accurate audit.

34. For example, during the 2013 audit, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, COMPANY B did not disclose to Defendants that COMPANY B had entered into a derivative contract. In fact, COMPANY B had no idea that the contract signed was a derivative. Thus, COMPANY B's internal controls failing to catch these types of mistakes presented a material weakness.

35. Defendants' Supervisor THORSON instructed Plaintiff to highlight in a memorandum how COMPANY B should have accounted for instruments related to supporting guidance. Plaintiff produced the requested memorandum.

36. Defendants' Supervisor THORSON instructed Defendants' Manager MAYANK GUPTA ("GUPTA") to print out Plaintiff's memorandum and "leave it on a cube at [COMPANY B]." THORSON stated that "[COMPANY B] can find the memo and make it their own."

37. Plaintiff took issue with Defendants' Supervisor THORSON's unethical practice: Defendants' duty was to point out when a publicly traded companies' "controls" were inadequate. Plaintiff saw that COMPANY B's internal controls were failing, inadequate, and not accurate. Yet, Defendants' Supervisor THORSON had specifically instructed Plaintiff to make it seem as the severity of the issue was not as material.

38. In or around February 2015, Plaintiff wrote a memorandum to Defendants' Supervisor THORSON outlining all COMPANY B's major control deficiencies and material omissions over the past three years.

39. Days later, Defendants' Quality Review Partner ROBERT HEATLEY ("HEATLEY") called Plaintiff. HEATLEY began to reprimand Plaintiff and told Plaintiff, among other things, "the document you sent to [THORSON] is a big deal. You're putting us at risk. Now Risk Management had to be involved because this is unprecedented. You will get a call later today from [THORSON] to discuss it."

40. Later that day, Defendants' Partner THORSON called Plaintiff and demanded that Plaintiff meet him in person. Plaintiff complied and met THORSON at a Marriot Hotel on Market Street in San Jose.

41. At the Marriot Hotel, Defendants' Partner THORSON told Plaintiff, among other things, "what you did was rare." "This will cause the company issues; we'll have to delay the [SEC] filing because of this process."

42. Plaintiff decided to escalate the issues with COMPANY B to Defendants' National Office.

43. In or around May of 2015, Defendants' and COMPANY B's Chief Financial Officer demanded that Plaintiff be removed from the COMPANY B engagement.

44. In or around May of 2015, Defendants' Market Team Leader KEVIN HEALY ("HEALY") and Supervisor CHRISTOPHER SMITH ("SMITH") formally told Plaintiff he was removed from the COMPANY B engagement.

*Company C Engagement*

45. In or around December of 2015, Defendants' Supervisor and Partner STIG HAAVARDTUN ("HAAVARDTUN") was the lead-partner on the COMPANY C audit.

46. In or around December of 2015, Defendants' Quality Review Partner ERGUN GENC ("GENC") oversaw the COMPANY C audit.

47. In or around December of 2015, Plaintiff discovered multiple issues with the COMPANY C audits from 2015 and years prior. Plaintiff found, among other things, issues in the revenue section within COMPANY C. For example, COMPANY C used an accounting convention to estimate its deferred revenue which was not analyzed for materiality impact. Also, Plaintiff noted that prior audits did not audit COMPANY C's inventory section according to auditing standards.

48. Upon discovering COMPANY C's inadequate revenue recognition, Plaintiff contacted Defendants' Partner HAAVARDTUN. Plaintiff shared his findings with HAAVARDTUN. HAAVARDTUN instructed Plaintiff to get "60 contracts," and project how large the error was. Plaintiff asked where the "60" number came from. HAAVARDTUN instructed Plaintiff to "find something in the guidance that justifies [Defendants] only looking at 60 contracts."

49. The following week, Plaintiff attempted to justify HAAVARDTUN's arbitrary number. Plaintiff was unsuccessful.

50. In or around early 2016, Plaintiff told Defendants' Partner HAAVARDTUN that—based on Plaintiff's research of the problems and the industry standards—every COMPANY C contract needed to be reviewed by Defendants. HAAVARDTUN and GENC disregarded Plaintiff's suggestion. Instead, HAAVARDTUN instructed Plaintiff to simply review 60 contracts. HAAVARDTUN told Plaintiff, in front of GENC, that "You have to be careful, there are important clients on the Board of [COMPANY C] – one of which is Wells Fargo."

51. Plaintiff, troubled by Defendants' Partner HAAVARDTUN's unethical and incompetent practices, brought the issue up to Defendants' National Office.

52. Thereafter, Defendants' National Office agreed with Plaintiff's assessment that 60 contracts were not supportable. As a result, Defendants and COMPANY C hired a statistician who instructed Defendants to examine over 400 contracts.

53. In or around early 2016, Defendants' Partner HAAVARDTUN demanded Plaintiff come to his office. Plaintiff complied. Once in HAAVARDTUN's office, HAAVARDTUN showed Plaintiff an e-mail from COMPANY C's Chief Accounting Officer stating "the new player [Plaintiff] needs to have a better understanding of the procedures and controls."

54. Throughout 2016, Plaintiff continued to point out material weaknesses and unethical behavior Defendants were engaged in.

55. In or around 2016, Defendants' Partner HAAVARDTUN told Plaintiff that many companies in Silicon Valley have material weaknesses, yet Defendants and others let those weaknesses slide, stating "We need to be fair to market shareholders… this is not uncommon for companies in Silicon Valley."

56. In or around 2016, during a meeting with Defendants' Partners HAAVARDTUN and GENC, Plaintiff pointed out COMPANY C had a "control failure." In response, HAAVARDTUN simply told Plaintiff to "raise the threshold of precision of the control to make it pass."

57. When Plaintiff professed his disagreement with Defendants' decision, Defendants' Partner HAAVARDTUN told Plaintiff "we cannot issue a material weakness otherwise we would not have been market competitive."

58. On or about April 21, 2016, three days after being terminated from the COMPANY C audit, Defendants gave Plaintiff a poor evaluation. Specifically, Defendants' Partner HAAVARDTUN gave Plaintiff a below average rating. HAAVARDTUN stated that Plaintiff was "Insufficient" and "Not operating at a Senior Manager Level."

*Own Business*

59. In or around April of 2016, in retaliation for reporting auditing issues, Defendants stopped offering Plaintiff new auditing jobs to work on.

9
**COMPLAINT**

60. As a result of Defendants' retaliatory black-listing, Plaintiff's "utilization rate" began to drop.

61. On or about October 26, 2016, Defendants' TIMOTHY CAREY ("CAREY") demanded Plaintiff meet with him and Defendants' Supervisor KEVIN HEALY ("HEALY") in his office. Plaintiff complied. Once inside, CAREY told Plaintiff he was to "stop speaking about 'your situation,' otherwise it will be easy to fire you." Plaintiff told CAREY and HEALY he felt he was being blacklisted. Once again, CAREY told Plaintiff that "[Defendants] still want to work with you, as long as you stop spreading this kind of narrative."

62. Thereafter, Plaintiff began to try to bring in his own business to Defendants to keep his "utilization" rating high.

63. Specifically, Plaintiff brought in a consulting project for COMPANY D.

64. Despite bringing to Defendant a consulting project for COMPANY D, Defendant staffed the consulting project without Plaintiff.

65. Not assigning an employee to work on business they brought in was simply unheard of.

*SEC Reporting*

66. In or around November of 2016, Plaintiff filed a formal TCR with the Securities Exchange Commission ("SEC") outlining fraudulent activity, professional ineptitudes, and deceptive practices, among other things.

67. Specifically, Plaintiff disclosed to the SEC Defendants' fraudulent activities, gross incompetence, deceptive practices, material omissions, and other problems relating to audits of COMPANY A, COMPANY B, and others.

68. In or around January of 2017, Plaintiff met with staff members at Senator Dianne Feinstein's office and reported his request to the SEC and sought assistance in communicating with the SEC.

69. Shortly thereafter, the SEC contacted Plaintiff regarding his submission.

70. In or around April of 2017, Plaintiff received notice from Defendants regarding an SEC investigation into COMPANY B's audit.

71. At all times material, Defendants actually and/or constructively knew that Plaintiff was the "whistle-blower."

72. In or around June of 2017 through July of 2017, Defendants' in-house counsel continued to interview Plaintiff and Defendants' employees regarding Plaintiff's SEC complaint.

73. In or around June of 2017—three months after the SEC opened its investigation into Defendants' improprieties—Defendants' Supervisor ROBERT WARD and Market Team Leader TIMOTHY CAREY told Plaintiff he had to "find a new job due to a restructuring that the firm was doing." Plaintiff was in shock: a week before the termination notice, Defendants' Chief Executive Officer stated in a firm-wide-webcast stated that there were no more big changes coming.

74. Defendants' Supervisor WARD and CAREY told Plaintiff that, although being terminated, Plaintiff "had no end date" for Plaintiff's last day of employment.

75. In or around August of 2017, Defendants demanded Plaintiff attend a meeting to discuss concerns that Plaintiff expressed to CAREY. Therein, Defendants' Vice Chairman Kevin Baldwin and HR Leader SHAWNA HEWITT terminated Plaintiff and immediately escorted him out of the building.

76. At the meeting, Defendants presented Plaintiff a false, illegitimate reason for termination.

77. In or around September of 2017, Defendants' Supervisor THORSON sent Plaintiff a message: "Wow, that was quick, you certainly did it your way. - Don't know if u had it your way – but u did it ur way! [*sic*]"

### *Industry Black Listing*

78. In or around September of 2017, Plaintiff gained employment.

79. In or around January of 2018, Plaintiff met with staff members at Senator Dianne Feinstein's office and sought assistance to obtain an update of the SEC investigation.

80. In or around February of 2018, Defendant reached out to Plaintiff's current employer to state that Plaintiff was "incompetent." Defendant then demanded Plaintiff be removed from of a current project, as Defendant could not "sign-off on any work," Plaintiff does, due to his "incompetence."

81. Upon information and belief, Defendants' Supervisor STEVE MCMANN ("MCMANN")—who never worked with Plaintiff before—found Plaintiff to be "incompetent."

82. Upon information and belief, other Defendant managers and partners were defaming Plaintiff's professional abilities and instructing Defendants' Supervisor MCMANN, and others, to continue to black-list Plaintiff in the industry.

83. Upon information and belief, Defendants forbid Plaintiff from entering in their San Jose location. Defendants put Plaintiff's photo on Defendants' reception desk located near the waiting-area.

84. Plaintiff now lives in constant fear his current job is in jeopardy.

85. As a result of Defendants' retaliatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments.

86. At a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and extremely emotionally distressed.

87. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

88. Plaintiff hereby demands reinstatement.

89. The above are just some of the examples of unlawful, retaliatory conduct to which Defendant subjected Plaintiff.

**AS A FIRST CAUSE OF ACTION
FOR RETALIATION UNDER
SARBANES-OXLEY [18 U.S.C. § 1514A]**

90. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

91. 18 U.S. Code § 1514A provides: "No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other

13
**COMPLAINT**

manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—
>
> (A) a Federal regulatory or law enforcement agency;
>
> (B) any Member of Congress or any committee of Congress; or
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders."

92. Defendants engaged in unlawful retaliatory employment practices prohibited by 18 U.S. Code § 1514A, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a *bona fide* whistleblower.

93. Plaintiff hereby makes claims against Defendants under all applicable causes of action under 18 U.S. Code § 1514.

**AS A SECOND CAUSE OF ACTION
UNDER CALIFORNIA WHISTLEBLOWER
PROTECTION ACT [CA LABOR §1102.5 to 1105]**

94. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

95. California Labor Law, Chapter 5, §1102.5 provides:

> "(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.
>
> (b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or

noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment."

96. Pursuant to §1104 "In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees."

97. Defendants engaged in unlawful retaliatory employment practices prohibited by §1102.5, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a *bona fide* whistleblower; Plaintiff objected to unlawful practices, as promulgated by Federal Law, SEC regulations, SEC Administrative Guidance, and industry standards; Plaintiff refused to participate in fraudulent, negligent, and inaccurate work-related-activities; Plaintiff made numerous internal complaints about perceived unlawful practices and actual unlawful practices.

98. Plaintiff hereby makes claims against Defendants under all applicable causes of action under §1102.5.

**AS A THIRD CAUSE OF ACTION**
**RETALIATION UNDER THE LABOR CODE**
**VIOLATION OF CAL. LAB. CODE § 98.6**

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

16

**COMPLAINT**

100. In violation of California Labor Code § 98.6, Defendants retaliated against Plaintiff for having opposed, resisted, and complained of the acts alleged herein.

101. After Plaintiff complained of Defendants violations of various state and federal laws and regulations, Plaintiff was ignore, mistreated, and retaliated against by his direct supervisors, treated with hostility, and then was abruptly terminated.

102. The conduct of Defendants and/or their agents/employees as described herein was malicious, and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions. Defendants and/or their agents/employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining Defendants. Consequently, Plaintiff is entitled to punitive damages against Defendants.

### AS A FOURTH CAUSE OF ACTION
### FOR DEFAMATION

103. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

104. The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or cause special damage. *Taus v. Loftus* (2007) 40 Cal.4th 683, 720, 54 Cal.Rptr.3d 775, 151 P.3d 1185.

105. Defendants made defamatory, false, misleading, and inaccurate statements to Plaintiff's co-workers, colleagues, new employer, and others. Plaintiff suffered reputation, pecuniary, and non-economic damage as a result.

106. . These false and defamatory statements included express and implied: accusations that Plaintiff was an incompetent auditor, among other statements.

## A FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

108. Under New York law"[t]he elements of a cause of action for breach of contract are (1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage" *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 871–72, 48 Misc.3d 211, 215 (N.Y.Sup.,2015).

109. A contract existed between Plaintiff and Defendants. Plaintiff adhered to his contractual duties. Defendants breached the contract by, among other things, terminating Plaintiff by means that violated the parties' contract.

110. The contract in question calls for interpretation under New York Law.

## SIXTH CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

111. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

112. Plaintiff's wrongful termination from his employment with Defendants was based upon Defendants' violation of the Public Policy of the State of California as put forward in California Labor Code §§1102.5, and other statutes and provisions.

113. As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to suffer monetary losses incurred, and has suffered and continues to suffer emotional distress in an amount according to proof at the time of trial.

114. Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive

amounting to malice, and in conscious disregard of Plaintiff's rights.  The acts complained of were known to, authorized and ratified by Defendants.  Plaintiff is therefore titled to recover punitive damages from Defendants, and each of them, in an amount according to proof at the time of trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant for all available damages including but not limited to emotional distress, lost wages, back pay, front pay, punitive damages, statutory damages, attorneys' fees, costs, medical expenses, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 3, 2018
       San Francisco, California

**Respectfully Submitted,**

**/s/ Ingrid M. Evans_____**
Ingrid M. Evans, Esq. (SBN 179094)
**EVANS LAW FIRM, INC.**
3053 Fillmore Street #236
San Francisco, CA 94123
Phone: (415) 441-8669

Alexander G. Cabeceiras, Esq.
**DEREK SMITH LAW GROUP, PLLC**
*PRO HACE VICE TO BE SUBMITTED*
*alexc@dereksmithlaw.com*
1 Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760

*Attorneys for Plaintiff*

19
**COMPLAINT**