# EXHIBIT B

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

|  |  |  |
|---|---|---|
| Mauro Botta | ) | |
| *Plaintiff* | ) | Civil Action No.   3:18-cv-02615 |
| v. | ) | |
| PricewaterhouseCoopers LLP, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                                    SOAProjects Inc

_____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment.

| Place: PricewaterhouseCoopers LLP , Three Embarcadero Center, San Francisco CA 94111, or email jreiter@hueston.com | Date and Time: 12/10/2018 8:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      09/27/2018

         *CLERK OF COURT*
                                                      OR
_____          _____
        *Signature of Clerk or Deputy Clerk*                            /s/
                                                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
PricewaterhouseCoopers LLP _____ , who issues or requests this subpoena, are:
Joseph A. Reiter 523 W 6th St Suite 400 Los Angeles, CA 90014 jreiter@hueston.com (213) 788-4340

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  3:18-cv-02615

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A TO SUBPOENA**

**DEFINITIONS AND INSTRUCTIONS**

No category of DOCUMENTS specified herein is intended to, nor shall, supersede, exclude, or restrict the scope of any other category.

As used herein, the singular and masculine gender shall also mean the plural and feminine or neutral, as may be appropriate; the conjunctive includes the disjunctive and the disjunctive includes the conjunctive; and "each" or "all" includes each and every.

If any DOCUMENT responsive to this Request for Production of Documents is claimed to be privileged from discovery, provide as to each such DOCUMENT a statement of the facts sufficient to properly adjudicate the claim of privilege in the context of a motion to compel pursuant to Federal Rules of Evidence rule 502, *et seq.* Such statement shall include, but not be limited to, the following:

(a)     The name and last known job title, business address, and telephone number of any author of the DOCUMENT;

(b)     The name and last known job title, business address, and telephone number of the senders of any DOCUMENT;

(c)     The name and last known job title, business address, and telephone number of each natural PERSON to whom the original or any copies of the DOCUMENT were sent;

(d)     The name and last known job title, business address, and telephone number of each natural PERSON who received the original or any copies of the DOCUMENT;

(e)     The names and last known job titles, business addresses, and telephone numbers of all PERSONS to whom the contents of the DOCUMENT have been disclosed;

(f)     The date of the DOCUMENT;

(g)      The dates on which the DOCUMENT or any copies thereof were reviewed by those now or previously having possession of the DOCUMENT or any copies thereof;

(h)      A brief description of the nature and subject matter of the DOCUMENT;

(i)      The facts upon which YOU based the claim of privilege;

(j)      Each statute, rule, or decision which is claimed to give rights and privilege from discovery; and

(k)      The type of privilege which is claimed (for example, attorney-client or attorney work product).

## DEFINITIONS

a.      The term "PwC" shall refer to PricewaterhouseCoopers LLP, including each of its branches, divisions, affiliated entities, officers, partners, directors, employees, agents, or representatives.

b.      The term "COMPLAINT" shall refer to the Amended Complaint filed by Plaintiff Mauro Botta in this action on August 1, 2018. It is as attached hereto as Exhibit 1.

c.      The terms "DOCUMENT" and "DOCUMENTS" as used herein shall refer to any and all writings as defined by Federal Rules of Evidence rule 34 including, but not limited to, any writing and any other tangible things in YOUR custody, possession or control, or known to YOU whether printed, recorded, reproduced by any process, or written or produced by hand, including, but not limited to all communications, photographs, drawings, e-mails (personal or work) logs, text messages, test results, measurements, letters, reports, agreements, telegrams, maps, flyers, business cards, brochures, advertisements, memoranda, summaries of records, summaries of interviews, summaries of personal conversations, diaries, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, reports, and/or summaries of interviews, reports and/or summaries of

5403862

investigations, opinions or reports of consultants, brochures, pamphlets, drafts of any documents, revisions of drafts of any documents, invoices, receipts, and original or preliminary notes, and instant messages. As to each document, any comment or notation appearing on the same, but not a part of the original text is to be considered a separate "document."

d.      The terms "PERSON" and "PERSONS" includes without limitation individuals, corporations, partnerships, limited partnerships, limited liability companies, trusts, unincorporated associations, and all other governmental or non-governmental entities.

e.      The term "RELATING TO," in addition to its customary and usual meaning, shall mean having any connection, relation, or reference to and includes, by way of example and without limitation, discussing, identifying, containing, showing, evidencing, describing, reflecting, dealing with, regarding, pertaining to, analyzing, evaluating, estimating, constituting, comprising, studying, surveying, projecting, recording, summarizing, assessing, criticizing, reporting, commenting on, referring to in any way, either directly or indirectly, otherwise involving, in whole or in part. DOCUMENTS "RELATING TO" the subject matter specified in a document request include, without limitation, DOCUMENTS, underlying or supporting, or utilized in the preparation of, any DOCUMENTS responsive to each document request.

f.      The terms "YOU" and "YOUR" as used herein shall mean and refer to SOAProjects Inc., including each of its branches, divisions, affiliated entities, officers, directors, employees, agents, or representatives.

g.      The term "ARMANINO" shall refer to Armanino LLP, including each of its branches, divisions, affiliated entities, officers, partners, directors, employees, agents, or representatives.

h.      The term "FLUIDIGM" shall refer to Fluidigm Corporation, including each of its branches, divisions, affiliated entities, officers, directors, employees, agents, or representatives.

- 3 -

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**:

Mauro Botta's complete personnel file.

**REQUEST FOR PRODUCTION NO. 2**:

Any DOCUMENTS RELATING TO Mauro Botta's job performance.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS RELATING TO any disciplinary actions against Mauro Botta.

**REQUEST FOR PRODUCTION NO. 4**:

All DOCUMENTS RELATING TO any complaints, criticisms, or concerns, made or

raised by Mauro Botta about YOU, including but not limited to Yuko Wakasugi.

**REQUEST FOR PRODUCTION NO. 5**:

All DOCUMENTS RELATING TO complaints, criticisms, or concerns made or raised

by YOU regarding Mauro Botta.

**REQUEST FOR PRODUCTION NO. 6**:

All DOCUMENTS RELATING TO complaints, criticisms, or concerns made or raised

by any of YOUR clients regarding Mauro Botta.

**REQUEST FOR PRODUCTION NO. 7**:

All DOCUMENTS between YOU and ARMANINO regarding Mauro Botta.

**REQUEST FOR PRODUCTION NO. 8**:

All DOCUMENTS between YOU and FLUIDIGM regarding Mauro Botta.

5403862

**REQUEST FOR PRODUCTION NO. 9**:

All DOCUMENTS RELATING TO the termination of Mauro Botta's employment from and/or his relationship with PwC or ARMANINO.

**REQUEST FOR PRODUCTION NO. 10**:

All DOCUMENTS RELATING TO any alleged violations of the law, misconduct, unethical practices, or wrongdoing by YOU or any of YOUR clients discussed, identified, or raised by Mauro Botta.

**REQUEST FOR PRODUCTION NO. 11**:

All DOCUMENTS between YOU and Mauro Botta regarding PwC.

Dated:  November 15, 2018               HUESTON HENNIGAN LLP


                                        By:_____
                                              Joseph A. Reiter
                                              Attorney for Defendants

# EXHIBIT 1

1
INGRID M. EVANS, ESQ. (SBN 179094)
**EVANS LAW FIRM, INC.**

2
3053 Fillmore Street #236
San Francisco, CA 94123

3
Phone: (415) 441-8669
Fax: (888) 891-4906

4
Ingrid@evanslaw.com

5

6
ALEXANDER G. CABECEIRAS, ESQ.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905

7
New York, New York 10119
Phone: (212) 587-0760

8
Fax: (212) 587-4169
alexc@dereksmithlaw.com

9
APPEARANCE *PRO HACE VICE*

10

*Attorneys for Plaintiff*

11

12

13
**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14
**SAN FRANCISCO DIVISION**

15
-------------------------------------------------------X

16
MAURO BOTTA,
          Plaintiff,

17
   -against-
Civil Case No: 3:18-cv-2615

18

19
PRICEWATERHOUSECOOPERS LLP,
**AMENDED
COMPLAINT**

20
LAURA BUSTAMANTE,
TYE THORSON,

21
ROBERT HEATLEY,
STIG HAAVARDTUN,

22
ERGUN GENC,
**Plaintiff Demands a**

23
TIMOTHY CAREY,
**Trial by Jury**
and STEVE MCCANN,

24
          Defendants.

25

26
-------------------------------------------------------X

27

28
1
**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

Plaintiff MAURO BOTTA by his attorneys, DEREK SMITH LAW GROUP, PLLC and EVANS

LAW FIRM, INC., hereby complains of Defendants PRICEWATERHOUSECOOPERS LLP,

LAURA BUSTAMANTE, TYE THORSON, ROBERT HEATLEY, STIG HAAVARDTUN,

ERGUN GENC, TIMOTHY CAREY, and STEVE MCCANN upon information and belief as

follows:

## JURISDICTION & VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in

that the action involves a federal question.

2. This Court has supplemental jurisdiction over the related state law causes of action asserted in

this complaint pursuant to 28 U.S.C. § 1367.

3. Venue properly lies in this District pursuant to 28 U.S.C. §1391 (b)(1) and (b)(2) and 28 U.S.C.

§1931 (c). Defendant PRICEWATERHOUSECOOPERS LLP have offices located at Three

Embarcadero Center, San Francisco, CA 94111.

4. Plaintiff has fully complied with all administrative prerequisite for the commencement of this

action.

## PARTIES

5. At all times material, Plaintiff MAURO BOTTA ("BOTTA") was and is an individual male

residing in San Jose, California.

6. At all times material, Defendant PRICEWATERHOUSECOOPERS LLP ("PWC") was and is

a foreign registered limited liability partnership, duly existing by the virtue and laws of the State

of Delaware, doing business in the State of California.

7. At all times material, LAURA BUSTAMANTE was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

8. At all times material, TYE THORSON, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

9. At all times material, ROBERT HEATLEY, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

10. At all times material, STIG HAAVARDTUN, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

11. At all times material, ERGUN GENC, was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

12. At all times material, TIMOTHY CAREY was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.

13. At all times material, STEVE MCCANN was and is an agent of and supervisor for Defendant PRICEWATERHOUSECOOPERS LLP.


**STATEMENT OF FACT**

14. In or around 1999, Defendants hired Plaintiff BOTTA.

15. In or around 2004, Defendants transferred Plaintiff to their San Jose, California office.

*Company A Engagement*

16. At all times material, Plaintiff was assigned to assist Defendants' audit team in the audit of COMPANY A.

17. In or around April of 2013, COMPANY A was selected for a "peer review."

18. At all times material, a "peer review" involves a third party auditing firm inspecting Defendants' auditing work papers.

19. After a peer review, Defendants' auditing work papers were found to be "Non-Compliant with Auditing Standards."

20. Defendants' peer review was memorialized in an Internal Inspection Form (hereinafter referred to as the "Form").

21. In or around April of 2013, Defendants' Semiconductor Team-Leader BUSTAMANTE incorrectly put Plaintiff's name on the Form as "Leading Manager," on the COMPANY A Project.

22. At all times material, Plaintiff was not the Leading Manager on the COMPANY A Project.

23. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff reached out to COMPANY A's Partner to alert him that he was not the Leading Manager on the COMPANY A Project.

24. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff reached out to Defendants' Supervisor BUSTAMANTE. BUSTAMANTE admitted that the Form was incorrect, yet told Plaintiff "it's not worth the political capital to take it back." Plaintiff—who did not want to be associated with a failed project—pleaded with BUSTAMANTE to take corrective, honest action. BUSTAMANTE refused and instead told Plaintiff "it will not impact your evaluation, so it's not that big of a deal."

25. Upon learning he was incorrectly named as "Leading Manager" on the COMPANY A Project, Plaintiff contacted Defendants' Human Resources representative.

26. In response, Defendants' Human Resources took no reasonable, immediate, or corrective action whatsoever.

### Feedback survey

27. In or around May of 2014, Defendants' Executive Coach interviewed DEEPAK BHANDARKAR, JOHAN FURSTENBERG, LAURA BUSTAMANTE, MANDY DHILLON, RISHI JOBANPUTRA and TYE THORSON to provide feedback on Plaintiff's work performance. Defendants' feedback stated, among other things, "[Plaintiff] is an emotional Italian guy," "[Plaintiff] throws partners under the bus," and advised Plaintiff that "what [Defendants] deal with is not perfect, you just have to suck it up."

### Company B Engagement

28. In or around 2012, Defendants assigned Plaintiff to work on the COMPANY B engagement.

29. In or around February of 2015, Defendants' Supervisor TYE THORSON ("THORSON") was the lead-Partner on the "COMPANY B" engagement.

30. At all times material, Defendants' Supervisor THORSON oversaw Plaintiff's work on the COMPANY B engagement.

31. Since 2012, Plaintiff brought up numerous problems with the COMPANY B engagement to Defendants' Supervisor THORSON.

32. In or around February of 2015, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, Defendants had made multiple errors in 2013, 2014, and 2015, when conducting the audit for COMPANY B. Historically and repeatedly, Defendants' Supervisor THORSON instructed Plaintiff to "make it look like COMPANY B discovered the deficiencies – not [Defendants]" during years prior to 2015.

33. In or around February of 2015, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, COMPANY B did not disclose, in full, all pertinent financial information that is and was necessary for Defendants to complete a true and accurate audit.

34. For example, during the 2013 audit, Plaintiff brought to Defendants' Supervisor THORSON's attention that, among other things, COMPANY B did not disclose to Defendants that COMPANY B had entered into a derivative contract. In fact, COMPANY B had no idea that the contract signed was a derivative. Thus, COMPANY B's internal controls failing to catch these types of mistakes presented a material weakness.

35. Defendants' Supervisor THORSON instructed Plaintiff to highlight in a memorandum how COMPANY B should have accounted for instruments related to supporting guidance. Plaintiff produced the requested memorandum.

36. Defendants' Supervisor THORSON instructed Defendants' Manager MAYANK GUPTA ("GUPTA") to print out Plaintiff's memorandum and "leave it on a cube at [COMPANY B]." THORSON stated that "[COMPANY B] can find the memo and make it their own."

37. Plaintiff took issue with Defendants' Supervisor THORSON's unethical practice: Defendants' duty was to point out when a publicly traded companies' "controls" were inadequate. Plaintiff saw that COMPANY B's internal controls were failing, inadequate, and not accurate. Yet, Defendants' Supervisor THORSON had specifically instructed Plaintiff to make it seem as the severity of the issue was not as material.

38. In or around February 2015, Plaintiff wrote a memorandum to Defendants' Supervisor THORSON outlining all COMPANY B's major control deficiencies and material omissions over the past three years.

6
**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

39. Days later, Defendants' Quality Review Partner ROBERT HEATLEY ("HEATLEY") called

Plaintiff. HEATLEY began to reprimand Plaintiff and told Plaintiff, among other things, "the

document you sent to [THORSON] is a big deal. You're putting us at risk. Now Risk Management

had to be involved because this is unprecedented. You will get a call later today from [THORSON]

to discuss it."

40. Later that day, Defendants' Partner THORSON called Plaintiff and demanded that Plaintiff

meet him in person. Plaintiff complied and met THORSON at a Marriot Hotel on Market Street in

San Jose.

41. At the Marriot Hotel, Defendants' Partner THORSON told Plaintiff, among other things, "what

you did was rare." "This will cause the company issues; we'll have to delay the [SEC] filing

because of this process."

42. Plaintiff decided to escalate the issues with COMPANY B to Defendants' National Office.

43. In or around May of 2015, Defendants' and COMPANY B's Chief Financial Officer demanded

that Plaintiff be removed from the COMPANY B engagement.

44. In or around May of 2015, Defendants' Market Team Leader KEVIN HEALY ("HEALY")

and Supervisor CHRISTOPHER SMITH ("SMITH") formally told Plaintiff he was removed from

the COMPANY B engagement.

**Company C Engagement**

45. In or around December of 2015, Defendants' Supervisor and Partner STIG HAAVARDTUN

("HAAVARDTUN") was the lead-partner on the COMPANY C audit.

7
**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

46. In or around December of 2015, Defendants' Quality Review Partner ERGUN GENC ("GENC") oversaw the COMPANY C audit.

47. In or around December of 2015, Plaintiff discovered multiple issues with the COMPANY C audits from 2015 and years prior. Plaintiff found, among other things, issues in the revenue section within COMPANY C. For example, COMPANY C used an accounting convention to estimate its deferred revenue which was not analyzed for materiality impact. Also, Plaintiff noted that prior audits did not audit COMPANY C's inventory section according to auditing standards.

48. Upon discovering COMPANY C's inadequate revenue recognition, Plaintiff contacted Defendants' Partner HAAVARDTUN. Plaintiff shared his findings with HAAVARDTUN. HAAVARDTUN instructed Plaintiff to get "60 contracts," and project how large the error was. Plaintiff asked where the "60" number came from. HAAVARDTUN instructed Plaintiff to "find something in the guidance that justifies [Defendants] only looking at 60 contracts."

49. The following week, Plaintiff attempted to justify HAAVARDTUN's arbitrary number. Plaintiff was unsuccessful.

50. In or around early 2016, Plaintiff told Defendants' Partner HAAVARDTUN that—based on Plaintiff's research of the problems and the industry standards—every COMPANY C contract needed to be reviewed by Defendants. HAAVARDTUN and GENC disregarded Plaintiff's suggestion. Instead, HAAVARDTUN instructed Plaintiff to simply review 60 contracts. HAAVARDTUN told Plaintiff, in front of GENC, that "You have to be careful, there are important clients on the Board of [COMPANY C] – one of which is Wells Fargo."

51. Plaintiff, troubled by Defendants' Partner HAAVARDTUN's unethical and incompetent practices, brought the issue up to Defendants' National Office.

52. Thereafter, Defendants' National Office agreed with Plaintiff's assessment that 60 contracts were not supportable. As a result, Defendants and COMPANY C hired a statistician who instructed Defendants to examine over 400 contracts.

53. In or around early 2016, Defendants' Partner HAAVARDTUN demanded Plaintiff come to his office. Plaintiff complied. Once in HAAVARDTUN's office, HAAVARDTUN showed Plaintiff an e-mail from COMPANY C's Chief Accounting Officer stating "the new player [Plaintiff] needs to have a better understanding of the procedures and controls."

54. Throughout 2016, Plaintiff continued to point out material weaknesses and unethical behavior Defendants were engaged in.

55. In or around 2016, Defendants' Partner HAAVARDTUN told Plaintiff that many companies in Silicon Valley have material weaknesses, yet Defendants and others let those weaknesses slide, stating "We need to be fair to market shareholders... this is not uncommon for companies in Silicon Valley."

56. In or around 2016, during a meeting with Defendants' Partners HAAVARDTUN and GENC, Plaintiff pointed out COMPANY C had a "control failure." In response, HAAVARDTUN simply told Plaintiff to "raise the threshold of precision of the control to make it pass."

57. When Plaintiff professed his disagreement with Defendants' decision, Defendants' Partner HAAVARDTUN told Plaintiff "we cannot issue a material weakness otherwise we would not have been market competitive."

58. On or about April 21, 2016, three days after being terminated from the COMPANY C audit, Defendants gave Plaintiff a poor evaluation. Specifically, Defendants' Partner HAAVARDTUN

gave Plaintiff a below average rating. HAAVARDTUN stated that Plaintiff was "Insufficient" and "Not operating at a Senior Manager Level."

***Own Business***

59. In or around April of 2016, in retaliation for reporting auditing issues, Defendants stopped offering Plaintiff new auditing jobs to work on.

60. As a result of Defendants' retaliatory black-listing, Plaintiff's "utilization rate" began to drop.

61. On or about October 26, 2016, Defendants' TIMOTHY CAREY ("CAREY") demanded Plaintiff meet with him and Defendants' Supervisor KEVIN HEALY ("HEALY") in his office. Plaintiff complied. Once inside, CAREY told Plaintiff he was to "stop speaking about 'your situation,' otherwise it will be easy to fire you." Plaintiff told CAREY and HEALY he felt he was being blacklisted. Once again, CAREY told Plaintiff that "[Defendants] still want to work with you, as long as you stop spreading this kind of narrative."

62. Thereafter, Plaintiff began to try to bring in his own business to Defendants to keep his "utilization" rating high.

63. Specifically, Plaintiff brought in a consulting project for COMPANY D.

64. Despite bringing to Defendant a consulting project for COMPANY D, Defendant staffed the consulting project without Plaintiff.

65. Not assigning an employee to work on business they brought in was simply unheard of.

1

***SEC Reporting***

2  66. In or around November of 2016, Plaintiff filed a formal TCR with the Securities Exchange

3  Commission ("SEC") outlining fraudulent activity, professional ineptitudes, and deceptive

4  practices, among other things.

5

6  67. Specifically, Plaintiff disclosed to the SEC Defendants' fraudulent activities, gross

7  incompetence, deceptive practices, material omissions, and other problems relating to audits of

8  COMPANY A, COMPANY B, and others.

9

10  68. In or around January of 2017, Plaintiff met with staff members at Senator Dianne Feinstein's

11  office and reported his request to the SEC and sought assistance in communicating with the SEC.

12  69. Shortly thereafter, the SEC contacted Plaintiff regarding his submission.

13

14  70. In or around April of 2017, Plaintiff received notice from Defendants regarding an SEC

15  investigation into COMPANY B's audit.

16  71. At all times material, Defendants actually and/or constructively knew that Plaintiff was the

17  "whistle-blower."

18

19  72. In or around June of 2017 through July of 2017, Defendants' in-house counsel continued to

20  interview Plaintiff and Defendants' employees regarding Plaintiff's SEC complaint.

21  73. In or around June of 2017—three months after the SEC opened its investigation into

22  Defendants' improprieties—Defendants' Supervisor ROBERT WARD and Market Team Leader

23  TIMOTHY CAREY told Plaintiff he had to "find a new job due to a restructuring that the firm

24  was doing." Plaintiff was in shock: a week before the termination notice, Defendants' Chief

25

26

27

28

Executive Officer stated in a firm-wide-webcast stated that there were no more big changes coming.

74. Defendants' Supervisor WARD and CAREY told Plaintiff that, although being terminated, Plaintiff "had no end date" for Plaintiff's last day of employment as Plaintiff was being "fully utilized" by Defendants' partners.

75. Per Plaintiff and Defendants Employment Agreement, Defendants were required to give Plaintiff, at a minimum, three months' notice before terminating him.

76. In or around August of 2017, Defendants demanded Plaintiff attend a meeting to discuss concerns that Plaintiff expressed to CAREY. Therein, Defendants' Vice Chairman Kevin Baldwin and HR Leader SHAWNA HEWITT terminated Plaintiff and immediately escorted him out of the building.

77. At the meeting, Defendants presented Plaintiff a false, illegitimate reason for termination.

78. In or around September of 2017, Defendants' Supervisor THORSON sent Plaintiff a message: "Wow, that was quick, you certainly did it your way. - Don't know if u had it your way – but u did it ur way! [*sic*]"

### *Industry Black Listing*

79. In or around September of 2017, Plaintiff gained employment.

80. In or around January of 2018, Plaintiff met with staff members at Senator Dianne Feinstein's office and sought assistance to obtain an update of the SEC investigation.

**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

81. In or around February of 2018, Defendant reached out to Plaintiff's current employer to state that Plaintiff was "incompetent." Defendant then demanded Plaintiff be removed from of a current project, as Defendant could not "sign-off on any work," Plaintiff does, due to his "incompetence."

82. Upon information and belief, Defendants' Supervisor STEVE MCMANN ("MCMANN")— who never worked with Plaintiff before—found Plaintiff to be "incompetent."

83. Upon information and belief, other Defendant managers and partners were defaming Plaintiff's professional abilities and instructing Defendants' Supervisor MCMANN, and others, to continue to black-list Plaintiff in the industry.

84. Upon information and belief, Defendants forbid Plaintiff from entering in their San Jose location. Defendants put Plaintiff's photo on Defendants' reception desk located near the waiting-area.

85. Plaintiff now lives in constant fear his current job is in jeopardy.

86. As a result of Defendants' retaliatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments.

87. At a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and extremely emotionally distressed.

88. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

89. Plaintiff hereby demands reinstatement.

13
**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

90. The above are just some of the examples of unlawful, retaliatory conduct to which Defendant subjected Plaintiff.

**AS A FIRST CAUSE OF ACTION**
**FOR RETALIATION UNDER**
**SARBANES-OXLEY [18 U.S.C. § 1514A]**
**(AGAINST ALL DEFENDANTS)**

91. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

92. 18 U.S. Code § 1514A provides: "No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against

14
**AMENDED COMPLAINT**
Case No. 3:18-cv-2615-RS

shareholders, when the information or assistance is provided to or the investigation is

conducted by—

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person

working for the employer who has the authority to investigate, discover, or terminate

misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding

filed or about to be filed (with any knowledge of the employer) relating to an alleged

violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities

and Exchange Commission, or any provision of Federal law relating to fraud against

shareholders."

93. Defendants engaged in unlawful retaliatory employment practices prohibited by 18 U.S. Code

§ 1514A, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a

*bona fide* whistleblower.

94. Plaintiff hereby makes claims against Defendants under all applicable causes of action under

18 U.S. Code § 1514.


### AS A SECOND CAUSE OF ACTION
### UNDER CALIFORNIA WHISTLEBLOWER
### PROTECTION ACT [CA LABOR §1102.5 to 1105]
### (AGAINST ALL DEFENDANTS)

95. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this

Complaint.

96. California Labor Law, Chapter 5, §1102.5 provides:

"(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(c) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

(d) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment."

97. Pursuant to §1104 "In all prosecutions under this chapter, the employer is responsible for the acts of his managers, officers, agents, and employees."

98. Defendants engaged in unlawful retaliatory employment practices prohibited by §1102.5, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a *bona fide* whistleblower; Plaintiff objected to unlawful practices, as promulgated by Federal Law, SEC regulations, SEC Administrative Guidance, and industry standards; Plaintiff refused to participate in fraudulent, negligent, and inaccurate work-related-activities; Plaintiff made numerous internal complaints about perceived unlawful practices and actual unlawful practices.

99. Plaintiff hereby makes claims against Defendants under all applicable causes of action under §1102.5.

### AS A THIRD CAUSE OF ACTION
### RETALIATION UNDER THE LABOR CODE
### VIOLATION OF CAL. LAB. CODE § 98.6
### (AGAINST ALL DEFENDANTS)

100. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

101. In violation of California Labor Code § 98.6, Defendants retaliated against Plaintiff for having opposed, resisted, and complained of the acts alleged herein.

102. After Plaintiff complained of Defendants violations of various state and federal laws and regulations, Plaintiff was ignore, mistreated, and retaliated against by his direct supervisors, treated with hostility, and then was abruptly terminated.

103. The conduct of Defendants and/or their agents/employees as described herein was malicious, and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights and for the deleterious consequences of Defendants' actions.  Defendants and/or their agents/employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining Defendants. Consequently, Plaintiff is entitled to punitive damages against Defendants.

### AS A FOURTH CAUSE OF ACTION
### FOR DEFAMATION
### (AGAINST DEFENDANTS PRICEWATERHOUSECOOPERS LLP
### AND STEVE MCCANN)

104. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

105. The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or cause special damage. *Taus v. Loftus* (2007) 40 Cal.4th 683, 720, 54 Cal.Rptr.3d 775, 151 P.3d 1185.

106. Defendants made defamatory, false, misleading, and inaccurate statements to Plaintiff's co-workers, colleagues, new employer, and others. Plaintiff suffered reputation, pecuniary, and non-economic damage as a result.

107. .   These false and defamatory statements included express and implied: accusations that Plaintiff was an incompetent auditor, among other statements.

### A FIFTH CAUSE OF ACTION
### BREACH OF CONTRACT
### (AGAINST DEFENDANTS PRICEWATERHOUSECOOPERS LLP
### AND TIMOTHY CAREY)

108. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

109. Under New York law "[t]he elements of a cause of action for breach of contract are (1)

formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3)

defendant's failure to perform, (4) resulting damage" *U.S. Nonwovens Corp. v. Pack Line Corp.*,

4 N.Y.S.3d 868, 871–72, 48 Misc.3d 211, 215 (N.Y.Sup.,2015).

110. A contract existed between Plaintiff and Defendants. Plaintiff adhered to his contractual

duties. Defendants breached the contract by, among other things, terminating Plaintiff by means

that violated the parties' contract.

111. The contract in question calls for interpretation under New York Law.

**SIXTH CAUSE OF ACTION**
**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
**(AGAINST ALL DEFENDANTS)**

112. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

113. Plaintiff's wrongful termination from his employment with Defendants was based upon

Defendants' violation of the Public Policy of the State of California as put forward in California

Labor Code §§1102.5, and other statutes and provisions.

114. As a proximate result of Defendants' wrongful acts, Plaintiff has suffered and continues to

suffer monetary losses incurred, and has suffered and continues to suffer emotional distress in an

amount according to proof at the time of trial.

115. Defendants, and each of them, did the acts alleged herein maliciously, fraudulently and

oppressively, with the wrongful intent to injure Plaintiff, from an improper and evil motive

amounting to malice, and in conscious disregard of Plaintiff's rights. The acts complained of were

1  known to, authorized and ratified by Defendants.  Plaintiff is therefore titled to recover punitive

2  damages from Defendants, and each of them, in an amount according to proof at the time of trial.

3

4  **WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant for all

5  available damages including but not limited to emotional distress, lost wages, back pay, front

6  pay, punitive damages, statutory damages, attorneys' fees, costs, medical expenses, interest and

7  all other damages as are just and proper to remedy Defendants' unlawful employment practices.

8

9                                **JURY DEMAND**

10

11  Plaintiff hereby demands a trial by jury on all issues so triable.

12

13  Dated: August 1, 2018
          San Francisco, California

14                                                    **Respectfully Submitted,**

15

16                                          **/s/ Ingrid M. Evans, Esq.**
                                            Ingrid M. Evans, Esq. (SBN 179094)
17                                          **EVANS LAW FIRM, INC.**
                                            3053 Fillmore Street #236
18                                          San Francisco, CA 94123
                                            Phone: (415) 441-8669
19

20                                          **/s/ Alexander G. Cabeceiras, Esq.**
                                            **DEREK SMITH LAW GROUP, PLLC**
21                                          One Penn Plaza, Suite 4905
                                            New York, New York 10119
22                                          Phone: (212) 587-0760
                                            Fax: (212) 587-4169
23                                          alexc@dereksmithlaw.com
                                            APPEARANCE *PRO HACE VICE*
24

25

26

27

28                                 20
                            **AMENDED COMPLAINT**
                            Case No. 3:18-cv-2615-RS