EXHIBIT 3 REDACTED VERSION OF DOCUMENTSOUGHT TO BE SEALED

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 81542 / September 7, 2017

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3892 / September 7, 2017

ADMINISTRATIVE PROCEEDING
File No. 3-17651

| | |
|---|---|
| **In the Matter of**<br><br>ADRIAN D. BEAMISH, CPA,<br><br>**Respondent.** | **CORRECTED ORDER PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate to enter this Order Pursuant to Section 4C of the Securities Exchange Act of 1934[1] ("Exchange Act") and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions as to Adrian D. Beamish, CPA ("Respondent" or "Beamish").[2]

---

[1] Section 4C provides, in relevant part, that: "The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others . . . (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations thereunder."

[2] Rule 102(e)(1)(ii) provides, in pertinent part, that: "The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct."

## II.

Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over the Respondent and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[3] that:

**A.     Summary**

1.      Respondent Adrian D. Beamish repeatedly engaged in improper professional conduct during PricewaterhouseCoopers LLP's audits of Burrill Life Sciences Capital Fund III, LP, a $283 million San Francisco-based venture capital fund. PricewaterhouseCoopers LLP, was first engaged to conduct the audits of the venture capital fund's year-end 2006 financial statements. As detailed below, Beamish, as the engagement partner, failed to comply with the relevant professional standards in connection with his audits of the fund's 2009, 2010, 2011, and 2012 year-end financial statements.

2.      In the audit of the venture capital fund's year-end 2009 financial statements, Beamish became aware that the fund's founder, G. Steven Burrill, had arranged for the fund to pay millions of dollars to the fund's management company that Burrill owned and controlled. From 2009 through 2011, the management company characterized the payments as advances on future management fees that it would earn through the provision of future management services as the fund's manager. The payments were made many months—and even years—before the fees were to be earned. In each of these three years, Beamish failed to inquire whether the management company had the authority to take the unusual payments, nor did he scrutinize the rationale for the payments, which Burrill needed to pay his own personal expenses and to fund his other businesses. Significantly, in conducting the year-end 2012 audit, Beamish learned that the advanced management fee payments that had been paid greatly exceeded any potential future management fee obligations the fund might owe.

3.      Despite an advanced management fee balance rapidly growing over several years and not decreasing, and Beamish's own audit team's suggested financial disclosure language being rejected by management, Beamish improperly signed audit reports with unqualified opinions for the fund's year-end 2009, 2010, 2011, and 2012 financial statements, in violation of Generally Accepted Auditing Standards ("GAAS"). In addition, the fund's financial statements,

---

[3] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in any other proceeding.

2

for those same years, did not comply with Generally Accepted Accounting Principles ("GAAP"). Further, Beamish relied upon unreasonable bases as the supposed means for repayment of the advanced management fee balance.

**B.     Respondent**

4.      **Adrian D. Beamish, CPA,** age 46, is a resident of Los Altos, California. Beamish has been licensed as a Certified Public Accountant in California since November 2004, and has been a Chartered Accountant in England and Wales since 1995. Beamish was hired by PricewaterhouseCoopers' U.K. firm in 1995, and in 1998, he moved to PricewaterhouseCoopers' U.S.A. firm in San Jose, California, where he became an audit partner in 2006. Beamish conducts audits of both public and private entities for PricewaterhouseCoopers, and he specializes in the pharmaceutical life sciences and venture capital industries.

**C.     Related Persons and Entities**

5.      **G. Steven Burrill**, age 71, resides in San Francisco, California, and Eagle River, Wisconsin. From 1977 to 1993, Burrill was a partner at a large audit firm and focused on the biotechnology industry. Burrill began raising venture capital funds when he left the audit firm in 1993. In addition to venture capital funds, Burrill owned and controlled a number of affiliated businesses, including an investment adviser, a merchant banking firm, and a media company. On March 16, 2016, after the audits at issue here, Burrill, a CPA, was suspended from appearing or practicing before the Commission as an accountant and was barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization and prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter.

6.      **Burrill Capital Management, LLC ("BCM")** is a Delaware limited liability company and filed reports as an exempt reporting adviser with the Commission from April 2012 to January 2015, when it withdrew its registration. Burrill Capital Management is wholly owned by Burrill and had its principal place of business in San Francisco, California. Now defunct, BCM acted as the adviser to several venture capital funds operated by Burrill. Burrill also used BCM as the operating entity through which he directed resources to his affiliated businesses. As of its last filing in March 2014, BCM reported $358.6 million in total assets under management.

7.      **Burrill Life Sciences Capital Fund III, LP ("Fund III" or the "Fund")** is a Delaware limited partnership formed by Burrill in 2006. The Fund received $283 million in venture capital funds to invest in life sciences companies. The Fund retained BCM as its investment adviser. The Fund is a private entity subject to AICPA auditing standards, and its investors were all accredited as defined under Regulation D, 17 CFR § 230.501.

8.      **Burrill Life Sciences Capital Fund III Partners, LP ("General Partner")**, a Delaware limited partnership, was the General Partner of Fund III during the relevant time period. The General Partner's Investment Committee included Burrill and four others. The

3

General Partner was entitled to receive fees for managing the Fund, but also could designate an affiliate to receive the fees.

9.  **Burrill Capital, LLC ("Management Company")** is a Delaware limited liability company owned and controlled entirely by Burrill. As described further below, in its 2012 financial statements, the Fund stated that the Management Company was responsible for repaying the balance of the management fees that had been advanced to the General Partner.

10. **PricewaterhouseCoopers LLP ("PricewaterhouseCoopers" or "PwC")** provides audit, assurance, tax, transaction, and advisory services throughout the United States, and throughout the world via their members firms. Auditors from its San Jose, California office conducted the audits of Fund III for fiscal years 2006-2012.

**D.   Formation of Fund and Retention of PricewaterhouseCoopers as Auditors**

11. Burrill formed Fund III in 2006 to invest in life sciences companies. Established with a projected 10-year lifespan, Fund III was originally scheduled to expire in February 2016. Fund III is structured as a limited partnership. Investors in Fund III, which include public companies, pension funds, and institutional investors, are limited partners in the Fund. During the relevant period, Burrill Life Sciences Capital Fund III Partners, LP served as the Fund's General Partner. Five individuals, including Burrill, were members of the General Partner and their control of the General Partner was set forth in its partnership agreement.

12. The rights and responsibilities of the General Partner and the limited partners of Fund III are governed by a limited partnership agreement ("LPA"). The LPA delineates, among other things, the manner and amount of the General Partner's fees for managing the Fund. According to the LPA, the General Partner or its designee is entitled to two percent of committed capital for six years, payable on the first day of each fiscal quarter for management services to be rendered during that quarter. After the initial six years, the General Partner or its designee is entitled to two percent of the cost basis of the investments, plus reserves. As enumerated in the LPA, the General Partner would bear all normal expenses incurred in connection with the management of the fund, including salaries, travel, and rent, from the management fee. The LPA did not authorize the General Partner to take management fees more than one quarter in advance, and prohibited non-arm's length transactions between Fund III and the General Partner or its members without explicit approval of an advisory committee of limited partners.

13. The Fund's offering materials state that a major financial accounting firm would issue a report on the financial statements annually. In addition, the LPA similarly provided that the Fund would issue financial statements in accordance with GAAP, and would be audited annually by a public accountant of recognized national standing.

14. Beginning in 2006, the Fund issued annual financial statements and retained PricewaterhouseCoopers to serve as its auditor to conduct annual audits on the Fund. Beamish served as the PwC audit partner responsible for the audit team's compliance with the appropriate professional standards. As the engagement partner, Beamish had final authority over the planning, execution, and supervision of the audits and was responsible for audit reports issued by PwC on the Fund's financial statements.

15.     For the year-end 2009 through year-end 2012 audits, Beamish authorized PricewaterhouseCoopers to issue audit reports with unqualified opinions stating that the Fund's financial statements were presented fairly, in all material respects, in accordance with GAAP and that the audits were conducted in accordance with GAAS. In reality, however, the Fund's financial statements failed to comply with GAAP and the audits failed to comply with GAAS.

**E.      Burrill Took "Advanced Management Fees" to Fund Other Businesses**

16.     In late 2007, Burrill and his affiliated businesses began to face cash flow shortages. Burrill Capital Management, the adviser to Fund III and the entity through which Burrill operated and funded his affiliated businesses, maintained records showing that the expenses of the Burrill affiliates far exceeded the revenue that the businesses were generating. Even though he did not solely control the Fund's General Partner, Burrill unilaterally directed BCM's controller to take $400,000 from Fund III to make up for the cash shortfall in BCM. Burrill justified the withdrawal as an "advance on management fees" that the General Partner expected to earn in the first quarter of 2008. The advance was recorded as a "prepaid expense" on the books of Fund III.

17.     By mid-2008, Burrill, alone directing the General Partner, had begun to take routine and significant advances on management fees. Whenever BCM or Burrill's affiliated entities faced a cash shortfall, Burrill arranged to cover the shortfall by taking money from Fund III and recording it as a prepaid expense to BCM on the Fund's books. Advanced management fees from Fund III became a consistent cash source for the affiliates and for Burrill personally. Burrill used the money to pay for, among other things, salaries of employees of the related entities and his personal expenses. These advanced management fees appeared in the Fund's financial statements as "prepaid expenses" or "receivables," as described below.

**F.      During the Year-End 2009, 2010, and 2011 Audits, Beamish Failed
         to Scrutinize the Advanced Fees Appropriately**

18.     The amount of the advanced management fees taken by the General Partner was disclosed to the PricewaterhouseCoopers audit team. Through the audits, Beamish became aware that the balance of the advanced management fees increased by millions of dollars every year from 2009 through 2011:

- By the end of 2009, the advanced management fee balance totaled $4,927,374, representing almost one year of advanced management fees.

- By the end of 2010, the advanced management fee balance had grown to $9,259,317, or just under two years of advanced management fees.

- By the end of 2011, the advanced management fee balance had grown to $13,374,569, or nearly three full years of advanced management fees.

19.     These balances were significant, far surpassing PwC's internally-established threshold for materiality and were recognized by the PwC audit team, and by Beamish particularly, as unusual in the industry. According to the relevant GAAS standards that relate to

5

the consideration of the possibility of fraud, if an auditor becomes aware of significant and unusual transactions, the auditor should gain an understanding of "the business rationale of such transactions and whether that rationale (or lack thereof) suggests that such transactions may have been entered into to engage in fraudulent financial reporting or to conceal the misappropriation of assets." AU § 316.66.[4] Furthermore, in assessing the risk of material misstatement, the auditor should consider factors including whether there is a risk that "involves significant non-routine transactions that are outside the normal course of business for the entity, or that otherwise appear to be unusual." AU § 314.111.

20. Despite the significant and unusual nature of the payment of the advanced management fees, Beamish and the PwC audit team took no steps to try to understand the business rationale for the payments. And even though the balance of the advanced fees grew steadily during 2009, 2010, and 2011, Beamish did not inquire into the rationale for the advances, nor did Beamish inquire as to why the amount grew.

21. Had Beamish or his audit team made appropriate inquiries as required by professional standards, they would have likely discovered that the fees advanced to the General Partner had been used for the business operations of affiliated Burrill entities, such as Burrill Securities LLC, and to pay for Burrill's own personal expenses. Further, Beamish did not take adequate steps to determine whether Burrill and the affiliated entities were authorized to receive such payments, as well as whether they had the ability to repay the amounts.

22. Generally Accepted Auditing Standards require auditors to exercise "due professional care" throughout an audit. AU § 230. Due professional care requires an auditor to exercise professional skepticism, "an attitude that includes a questioning mind and a critical assessment of audit evidence." AU § 230.07. "Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process." AU § 230.08. The auditor "should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09; *see also* AU § 316.13. This is particularly true with respect to related party transactions. Audit procedures for related party transactions "should extend beyond inquiry of management," and an auditor should apply the procedures he or she considers necessary to obtain an "understanding of the business purpose of the transaction." AU § 334.09.

23. Beamish failed to exercise the professional care required by GAAS in the audits of the Fund's 2009, 2010, and 2011 financial statements. Beamish took insufficient steps to obtain audit evidence that the payments were properly approved and authorized, even as the balance continued to grow year to year. During the audit of the Fund's year-end 2011 financial statements, Beamish's audit team calculated the total future management fees due to the General Partner for the remaining life of Fund III. The audit team estimated there was approximately $10.2 million left in future management fees to be earned by the General Partner over the remainder of the contractual life of Fund III, beyond the nearly $13.4 million that had already been advanced. The audit team concluded that the General Partner could "earn down" the

---

[4] "AU" and "AU-C" refer to Statements on Auditing Standards issued by the American Institute of Certified Public Accountants.

6

balance, through the provision of management services by the scheduled termination of the Fund in 2016.

24. The auditors' calculation of the amount of future fees available to the General Partner during the 2011 audit, however, was incorrect by a significant margin. If Beamish's audit team had correctly calculated the future management fees to be earned, using a conservative calculation, they would have realized there was, at most, $3.2 million in future fees to be earned—not the $10.2 million that they had calculated. After the approximately $3.2 million was paid, Fund III would have no contractual obligation to pay additional management fees to the General Partner or its designee for the remaining contractual term of the Fund. While Beamish was not aware of this calculation error at the time, had he exercised the appropriate professional skepticism required of him as an auditor, especially in light of the ever increasing advanced management fee balance, he should have questioned and sought evidence for the premise that the advanced management fee balance would likely be recovered simply through the provision of future management services by the General Partner.

25. From his audit, moreover, Beamish learned that the Fund described the advanced management fee balance as a "receivable," which in this instance represented an undocumented loan, to the General Partner in the year-end 2009, 2010, and 2011 financial statements. Generally Accepted Auditing Standards require special scrutiny of interest-free loans between related parties and loans with "no scheduled terms for when or how the funds will be repaid." AU § 334.03. When confronted with such an undocumented loan, an auditor should apply the procedures he or she considers necessary to "[d]etermine whether the transaction has been approved by those charged with governance." AU § 334.09. Nonetheless, Beamish, and the PwC auditors working at his direction, took no steps to determine whether such a loan to the General Partner was permitted by the LPA. Nor did Beamish inquire whether the General Partner's governing documents permitted Burrill to take the advanced fees without the consent of the General Partner.

**G.   The Fund's Year-End 2009, 2010, and 2011 Financial Statements Failed to Disclose Fees Accurately**

26. Generally Accepted Auditing Standards concerning related party transactions require that an "auditor should view related party transactions within the framework of existing [accounting] pronouncements, *placing primary emphasis on the adequacy of disclosure*." AU § 334.02 (emphasis added). Furthermore, an auditor should apply procedures to obtain satisfaction about the related party transactions and the effect on financial statements. AU § 334.09. For each "material related party transaction . . . common ownership or management control relationship . . . the auditor should consider whether he has obtained sufficient appropriate audit evidence to understand the relationship of the parties and . . . the effects of the transaction on the financial statements." AU § 334.11. Disclosures of related party transactions must include (1) the nature of the relationships involved; (2) a description of the transactions and

7

other such information deemed necessary to an understanding of the effects of the transactions on the financial statements; and (3) the terms and manner of settlement. ASC 850-10-50-1.[5]

27. The Fund III year-end 2009, 2010, and 2011 financial statements inconsistently and inaccurately disclosed the nature of the advanced management fees. In none of the three year-end financial statements did the Fund adequately disclose that management fees were being advanced:

- The balance sheet in the Fund's year-end 2009 audited financial statements included the amount of advanced management fees as an undefined part of a larger "prepaid expense" paid by the Fund. The balance sheets in the 2010 and 2011 financial statements similarly included the amount of advanced management fees as an undefined part of a larger amount of "prepaid expenses and other receivables," but did not separately show a related party receivable on the balance sheet as required by GAAP (and in particular, ASC 850-10-50-2). The balance sheets did not further describe the nature of the "prepaid expenses" or "receivables," and made no explicit reference to the payment of advanced management fees.

- The Related Party footnotes to the year-end 2009, 2010, and 2011 audited financial statements described the amount of the advanced management fees only as a "receivable from the General Partner." The footnotes did not further describe the transaction nor the terms and manner of settlement of the so-called "receivable," as required by GAAP. ASC 850-10-50-1.

- The Management Fee footnotes to the year-end 2009, 2010, and 2011 audited financial statements merely described the amount the General Partner was legally entitled to receive over the course of the calendar year in accordance with the LPA. The footnotes did not disclose that the Fund had actually paid advanced management fees, and contained no references to the amounts described as "prepaid expenses" and "receivables" on the balance sheets or a cross-reference to the Related Party footnotes. As a result, the footnotes further created a misleading picture of the Fund's financial statements for each period.

28. The Fund's audited financial statements materially misstated the nature of the related party payments. Beamish failed to obtain sufficient appropriate audit evidence to determine whether GAAP compliant disclosure of the payments made was adequate, as required by GAAS, when he authorized PricewaterhouseCoopers to issue audit reports with unqualified opinions on the Fund's year-end 2009, 2010, and 2011 financial statements.

**H.  Beamish Issued a Clean Opinion on the Fund's Year-End 2012 Financial Statements**

29. By the first quarter of 2012, the General Partner was paid more in management fees from Fund III than the General Partner was contractually entitled to earn over the entire 10-

---

[5] "ASC" refers to the Accounting Standards Codification issued by the Financial Accounting Standards Board.

year life of the Fund. At the end of 2012, the balance of the advanced management fees totaled $17,922,059. Beamish was aware of the balance of advanced management fees in connection with the audit of the Fund's 2012 financial statements. Under Beamish's supervision, the PwC audit team calculated that the fund overpaid in excess of approximately $7 million in management fees.

30.     Aware that millions of dollars in excess management fees had been taken from the Fund, the audit team proposed to BCM management that the Fund provide the following additional disclosure in its year-end 2012 financial statements: "Prepaid expenses and other receivables at December 31, 2012 include $17.9 million due from the General Partner. *This amount exceeds the expected future management fee expenses for the remaining contractual life of the fund*." (Emphasis added.) BCM management rejected the second sentence of Beamish's proposal regarding the excessive amount and suggested alternative language regarding its repayment. In response, Beamish agreed that the additional disclosure contained in his proposed second sentence need not be included in the Fund's financial statements.

31.     Shortly thereafter, BCM management told Beamish that Burrill had executed an unsecured promissory note for the full amount of the advanced management fee balance. The BCM controller provided PwC with the promissory note, which was dated December 31, 2012. After receiving the note, Beamish's audit team suggested a revision to the proposed Related Party footnote for the Fund's year-end 2012 financial statements to describe the terms of the note, the manner of settlement, and the interest rate. The auditors provided the suggestion to BCM management. Three days later, the BCM controller told Beamish that Burrill "strongly feels he does not want the footnote as currently worded to be included in the financials" and that the note had been "withdrawn." The reference to the promissory note was removed from the year-end 2012 audited financial statements.

32.     In April 2013, the Fund issued its year-end 2012 financial statements with an audit report with an unqualified audit opinion from PricewaterhouseCoopers. The audited financial statements materially misstated the nature of the related party payments. Beamish failed to obtain sufficient appropriate audit evidence to determine whether GAAP compliant disclosure of the payments was made, as required by GAAS, when he authorized PwC to issue its audit report with an unqualified opinion. The balance sheet identified the advanced management fees as part of a larger amount of "prepaid expenses and other receivables from related party" owed to the Fund, but did not separately show a related party receivable on the balance sheet as required by GAAP (and in particular, ASC 850-10-50-2).

33.     In the Related Party footnote to the year-end 2012 financial statements, the Fund described the advanced management fees only as a "receivable" owed by the Management Company, Burrill Capital, LLC—not the General Partner, as had been disclosed in the year-end 2009, 2010, and 2011 financial statements. The footnote did not further describe the transaction nor the terms of the "receivable," as required by GAAP (and in particular, ASC 850-10-50-1).

34.     The footnote further stated that the Management Company "intends to pay" the receivable "from future distributions to the General Partner" and from "Management Company funds." Beamish and his audit team, however, failed to obtain sufficient audit evidence of the receivable's collectability, as required by GAAS. An auditor "should design and perform audit

procedures that are appropriate in the circumstances for the purpose of obtaining sufficient appropriate audit evidence." AU-C § 500.06. Furthermore, an auditor should "obtain sufficient appropriate audit evidence about whether related party relationships and transitions have been appropriately identified, accounted for, and disclosed in the financial statements." AU-C § 550.09.

35. With respect to the collectability of the receivable "from future distributions to the General Partner," Beamish looked only to the Fund's capital account for the General Partner, which was valued at $15.3 million as of December 31, 2012. As set forth in the LPA, the General Partner's right to use the capital account was conditioned on the performance of its management duties (including, among other things, not breaching its fiduciary duties nor engaging in willful or reckless misconduct or fraud). Significantly, the LPA provided that if the General Partner failed to make its required capital contributions to the Fund, its right to the capital account could be substantially impaired. As Beamish and the PwC audit team were aware, the General Partner had not made its required capital contributions from 2009 through 2012 and was instead adding the amount of the contributions to the advanced management fee balance each year. By relying only on the value of the General Partner's capital account, and failing to consider that the General Partner did not make its required capital contributions, Beamish failed to obtain sufficient appropriate audit evidence about the collectability of the receivable.

36. Furthermore, Beamish relied on Burrill's and management's written representations about the General Partner's intent to pay the receivable through its future distributions without determining whether they had authority to bind the entity. Beamish did not inquire whether the General Partner's governing documents permitted Burrill to commit the future distributions of the General Partner. Nor did Beamish obtain evidence of the financial condition of the General Partner to determine whether the General Partner was encumbered by other financial obligations. Thus, Beamish's failure to scrutinize the representations made by Burrill regarding the intent to pay the receivable "from future distributions to the General Partner" demonstrated a significant lack of professional skepticism by Beamish under the circumstances. Additionally, when faced with inconsistent audit evidence, "the auditor should determine what modifications or additions to audit procedures are necessary to resolve the matter…" AU-C § 500.10. In this situation, Beamish failed to identify the contradictory audit evidence and thus did not consider additional audit procedures to test the collectability of the receivable.

37. Nor did Beamish take sufficient steps to verify whether the Management Company had the funds to repay the receivable. While Beamish did not audit the Management Company, had he requested the Management Company's balance sheet, he would have discovered that the Management Company had less than $1,600 in cash on hand as of December 31, 2012, and that its remaining assets were illiquid and arose out of related party transactions with other Burrill entities. Generally Accepted Auditing Standards state that written representations "complement other auditing procedures and do not provide sufficient appropriate audit evidence on their own about any of the matters with which they deal." AU-C 580.04. Additionally, "if written representations are inconsistent with other audit evidence, the auditor should perform audit procedures to attempt to resolve the matter." AU-C 580.23. Instead, in violation of the professional standards required by GAAS, Beamish relied on management's written representations about the sources and means of repayment.

10

38. As in the year-end 2009-2011 audited financial statements, the Management Fee footnote to the Fund's year-end 2012 financial statements merely described the amount the General Partner was legally entitled to receive over the course of the calendar year in accordance with the LPA. The footnote did not disclose that the Fund had actually paid advanced management fees, and contained no references to the amounts described as "prepaid expenses" and "receivables" on the balance sheet and in the Related Party footnote.

39. With respect to the year-end 2012 audit specifically, Beamish was responsible for obtaining audit evidence that "significant related party transactions outside the entity's normal course of business . . . have been appropriately authorized and approved." AU-C § 550.24. This he did not do. While Beamish and his audit team obtained management's representations that the Fund had complied with all contractual agreements and that management intended to repay the receivable (i.e., the undocumented loan), they took no steps to determine whether the LPA permitted the payment of management fees in excess of what the General Partner would be entitled to earn, or loans to related parties without approval of an advisory committee of limited partners.

40. Beamish failed to maintain professional skepticism with respect to the audit of the Fund's year-end 2012 financial statements, as required by GAAS (and in particular, AU-C § 200.08). Beamish did not take adequate steps to understand the business rationale for taking advanced management fees, even after BCM management resisted his proposed additional disclosure and "withdrew" the promissory note, contrary to GAAS (and in particular, AU-C § 240.32 and AU-C §§ 315.28-29). By failing to make adequate inquiry into these matters, and instead relying on the representations of BCM management, Beamish fell short of the professional standards required by GAAS.

**I.      PricewaterhouseCoopers Resigned as Auditor of the Fund**

41. From the beginning of 2013 through the issuance of the Fund's year-end 2012 audited financial statements on April 4, 2013, Burrill, alone directing the General Partner, took an additional $3.2 million in advanced management fees. After the audit opinion was issued, Burrill took another $1.15 million in advanced management fees through July 2013.

42. In late August 2013, the Fund's investment committee became aware that virtually all the committed capital in Fund III had been spent. Emergency meetings of the investment committee were convened. Over the following weeks, the other members of the General Partner were informed that the Fund paid approximately $18 million in advanced management fees. The amounts taken exceeded the amount to which the General Partner was entitled to receive over the contractual life of the Fund by millions of dollars.

43. In late October 2013, three members of the General Partner sent a letter to the advisory committee of the limited partners informing them of Burrill's misappropriation. In response, the advisory committee of the limited partners removed the General Partner, including Burrill, from managing the Fund.

44. On November 6, 2013, BCM management provided Beamish with several letters between BCM management and various limited partners regarding the misappropriation.

45.     Prior to learning of the limited partners' allegations of misappropriation, PwC was contemplating resigning as auditor of the Fund for economic reasons. On or about November 11, 2013, PricewaterhouseCoopers resigned as the auditor of the Fund.

46.     In 2014, the limited partners agreed to recycle distribution payments back into Fund III, in lieu of receiving individual distribution pay-outs. They used the recycled money to meet the Fund's financial commitments to its portfolio companies and to stabilize the Fund.

**J.    Violations**

47.     As a result of the conduct described above, Respondent engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

48.     Section 4C of the Exchange Act and Rule 102(e)(1)(ii) provide, in part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in "improper professional conduct." In relevant part, Section 4C(b)(2) and Rule 102(e)(1)(iv)(B) define "improper professional conduct" as one of two types of negligent conduct: (1) a single instance of highly unreasonable conduct in circumstances for which heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct that indicate a lack of competence.

49.     As discussed above, Respondent's failures to conform to applicable professional standards found in GAAS, in connection with the audits of the year-end 2009, 2010, 2011, and 2012 Fund III financial statements, constitute repeated instances of unreasonable conduct. In addition, Respondent's failures to conform to the applicable professional standards found in GAAS, in connection with the Fund's year-end 2012 financial statements, constitutes an instance of highly unreasonable conduct under circumstances that warranted heightened scrutiny, which is required under Rule 102(e)(1)(ii) in instances where significant and unusual transactions take place, such as taking millions of dollars in advanced fees beyond the life of Fund.

**K.    Findings**

50.     Based on the foregoing, the Commission finds that Respondent engaged in improper professional conduct pursuant to Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.     Respondent Beamish is denied the privilege of appearing or practicing before the Commission as an accountant.

12

B. After one year from the date of this order, Respondent Beamish may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Respondent Beamish's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2. a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3. an independent accountant.

Such an application must satisfy the Commission that:

(a) Respondent Beamish, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b) Respondent Beamish, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in Respondent Beamish's or the firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

(c) Respondent Beamish has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d) Respondent Beamish acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

C. The Commission will consider an application by Respondent Beamish to resume appearing or practicing before the Commission provided that his state CPA license is current and

he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Respondent Beamish's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

    By the Commission.

                                              Brent J. Fields
                                              Secretary