**HUESTON HENNIGAN LLP**
John C. Hueston, State Bar No. 164921
*jhueston@hueston.com*
Joseph A. Reiter, State Bar No. 294976
*jreiter@hueston.com*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

Attorneys for Defendant
PricewaterhouseCoopers LLP

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURO BOTTA,<br><br>          Plaintiff,<br><br>     vs.<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>          Defendant. | Case No. 3:18-cv-2615-RS<br><br>**DECLARATION OF JOSEPH A. REITER IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   March 7, 2019<br>Time:   1:30 p.m.<br>Judge: Hon. Richard Seeborg |

## DECLARATION OF JOSEPH A. REITER

I, Joseph A. Reiter, declare as follows:

1.      I am an attorney at law duly licensed to practice before all of the courts in the State of California.  I am a member of the law firm of Hueston Hennigan LLP, counsel of record for Defendant PricewaterhouseCoopers LLP ("PwC") in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the deposition transcript of Mauro Botta, dated September 25, 2018.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the deposition transcript of Shawna Hewitt, dated December 19, 2018.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts of Plaintiff's verified Responses to PwC's First Set of Interrogatories, dated January 4, 2019.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of Plaintiff's Responses to PwC's First Set of Requests for Admission, dated January 18, 2019.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of PwC's Audit Guidance 2023, introduced as Exhibit 1 during the deposition of Mauro Botta on September 25, 2018.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of an email chain between Tina MacGregor and Mauro Botta, BATES stamped PLAINTIFF 001955.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the Employment Agreement between PwC and Mauro Botta, dated July 1, 2010.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of the Employment Offer and Proprietary Information and Inventions Agreement between Armanino LLP and Mauro Botta, executed on August 4, 2017.

10.      Attached hereto as **Exhibit 9** is a letter from the Securities and Exchange Commission ("SEC") regarding a non-public, fact-finding inquiry.  As stated in the

letter, the SEC's inquiry concerned PwC's audits of the third-party referenced in paragraphs 2–6 of the Declaration of Walter F. Brown ("Brown Declaration") and Exhibit 1 to the Brown Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of January, 2019, in Los Angeles, California.

Joseph A. Reiter

DECLARATION OF JOSEPH A. REITER ISO PWC'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:18-cv-2615-RS

5471371

# EXHIBIT 1

Confidential
MAURO BOTTA - 09/25/2018

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAURO BOTTA

      Plaintiff,

 vs.               Case No.  3:18-CV-02615-RS

PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

      Defendants.
--------------------------------/

---oOo---

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF MAURO BOTTA

Tuesday, September 25, 2018

---oOo---

Reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523

Job No. NY-191159

Confidential

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MAURO BOTTA

          Plaintiff,

 vs.                          Case No.  3:18-CV-02615-RS


PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

          Defendants.
--------------------------------/




          VIDEOTAPED DEPOSITION OF MAURO BOTTA,

taken at WINSTON & STRAWN LLP, 101 California

Street, 38th Floor, San Francisco, California,

on Tuesday, September 25, 2018, at 9:05 a.m., before

Lorrie L. Marchant, California Certified Shorthand

Reporter, RMR, CRR, CCRR, CRC.

```
 1                  A P P E A R A N C E S

 2

 3    Appearing as counsel on behalf of Plaintiff:

 4              INGRID M. EVANS, Esquire
                EVANS LAW FIRM, INC.
 5              3053 Fillmore Street, #236
                San Francisco, CA 94123
 6              (415) 441-8669
                ingrid@evanslaw.com
 7

 8    Appearing as counsel on behalf of Defendants:

 9              JOHN C. HUESTON, Esquire
                YEGOR FURSEVICH, Esquire
10              JOSEPH A. REITER, Esquire
                HUESTON HENNIGAN, LLP
11              523 West 6th Street, Suite 400
                Newport Beach, CA 92660
12              (213) 788-4340
                jhueston@hueston.com
13              yfursevich@hueston.com
                jreiter@hueston.com
14

15    Also present:

16              Ralna Ramse, Videographer

17                      ---oOo---

18

19

20

21

22

23

24

25
```

Confidential
MAURO BOTTA - 09/25/2018                         Page 9

1              SAN FRANCISCO, CALIFORNIA

2              Tuesday, September 25, 2018

3                      9:05 a.m.

4                      ---oOo---

5              THE VIDEOGRAPHER:  Here begins videotape      09:05:22

6    No. 1 in the deposition of Mauro Botta, in the

7    matter of Mauro Botta versus PricewaterhouseCoopers,

8    LLP, et al., in the United States District Court,

9    Northern District of California.  Case No.

10   3:18-CV-02165-RS [sic].                                09:05:38

11             Today's date is September 25th, 2018.  The

12   time on the video monitor is 9:05 a.m.  The video

13   operator today is Ralna Ramse.

14             This video deposition is taking place at

15   101 California Street, 35th Floor, in San Francisco,   09:05:59

16   California.

17             Counsel, please voice-identify yourselves

18   and state whom you represent.

19             MS. EVANS:  Ingrid Evans for the plaintiff.

20             MR. HUESTON:  Good morning.  John Hueston     09:06:12

21   of Hueston Hennigan on behalf of PwC.

22             MR. REITER:  Joe Reiter on behalf of PwC.

23             MR. FURESVICH:  Yegor Furesvich on behalf

24   of PwC.

25             THE VIDEOGRAPHER:  The court reporter today   09:06:26

```
 1   is Lorrie Marchant of Epiq Global.              09:06:27

 2          Would the court reporter please swear in

 3   the witness.

 4                    MAURO BOTTA,

 5    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:   09:06:33

 6              EXAMINATION BY MR. HUESTON

 7          BY MR. HUESTON:

 8      Q.   Good morning, Mr. Botta.

 9          Could you please state your name and

10   address.                                        09:06:51

11      A.   Mauro Botta.  88 East San Fernando Street,

12   Unit 1308, San Jose, California 95113.

13      Q.   Okay.  Have you ever been deposed before?

14      A.   No.

15      Q.   And you understand you are testifying under  09:07:09

16   oath?

17      A.   Yes.

18      Q.   Under penalty of perjury?

19      A.   Yes.

20      Q.   The same as if you were testifying in a    09:07:18

21   court of law; yes?

22      A.   Yes.

23      Q.   So one of the things we have to make clear

24   is we need -- a nod of the head, I understood you

25   meant "yes" by that, but we have to make every    09:07:30
```

1      Q.   Did you review documents to prepare for          09:19:33

2   this deposition?

3      A.   Yes.

4      Q.   And what kind of documents did you review?

5      A.   I reviewed my complaint that was filed.         09:19:42

6      Q.   What else?

7      A.   Supporting documents that I filed with the

8   PCOB and the CBA and the SEC.

9      Q.   Anything else?

10     A.   No.                                               09:20:03

11     Q.   Did you bring those documents that you

12   reviewed with you here today?

13     A.   No.

14     Q.   Did you take any notes from your review of

15   the documents?                                           09:20:20

16     A.   No.

17     Q.   Other than your attorneys, did you speak to

18   anyone else to prepare for this deposition today?

19     A.   No.

20     Q.   You understand that PwC serves as an             09:20:43

21   independent external auditor to companies covered

22   under the Sarbanes-Oxley Act, correct?

23          MS. EVANS:  Can you repeat that question?

24   It calls for a legal conclusion.  Overbroad.

25          MR. HUESTON:  Yeah.  Do you need me to           09:21:00

```
 1  repeat the question?                              09:21:01

 2          MS. EVANS:  Yes, I do.

 3          THE WITNESS:  Yes.

 4          BY MR. HUESTON:

 5      Q.  Okay.  You understand that PwC serves as an  09:21:04

 6  independent external auditor to companies covered

 7  under the Sarbanes-Oxley Act; correct?

 8          MS. EVANS:  Overbroad.  Vague and

 9  ambiguous.  Calls for a legal conclusion.

10          BY MR. HUESTON:                           09:21:15

11      Q.  You can answer.

12      A.  It is one of the function.

13      Q.  Okay.  And what are the responsibilities of

14  an independent external auditor?

15          MS. EVANS:  Overbroad.  Calls for a legal  09:21:25

16  conclusion.

17          BY MR. HUESTON:

18      Q.  You can answer.

19      A.  Can you repeat one more time, please?

20      Q.  Sure.                                     09:21:32

21          What are the responsibilities of an

22  independent external auditor?

23          MS. EVANS:  Overbroad.  Calls for a legal

24  conclusion.

25          THE WITNESS:  To express an opinion on the  09:21:38
```

1    fair representation of the financial statements and        09:21:42

2    related footnote and to express an opinion on the

3    public companies for internal controls.

4              BY MR. HUESTON:

5        Q.   Okay.  And you mentioned "internal             09:21:57

6    controls."  What do you mean when you say "internal

7    controls"?  What are internal controls?

8              MS. EVANS:  Overbroad.

9              THE WITNESS:  They are controls that

10   management of the company should have in place to       09:22:08

11   prevent and detect material misstatement to its

12   financial statements.

13             (Reporter clarification.)

14             THE WITNESS:  Material misstatements to the

15   financial statements.                                   09:22:28

16             BY MR. HUESTON:

17       Q.   And how does an external auditor evaluate

18   the effectiveness of internal controls?

19             MS. EVANS:  Overbroad.  Calls for a legal

20   conclusion.  Speculation.                               09:22:39

21             THE WITNESS:  It is a judgmental process.

22   There is a framework in place that you go through to

23   evaluate.  It's part of the whole of the process.

24   That is why the audit is defined as integrated audit

25   for public companies.                                   09:22:58

| | | |
|---|---|---|
| 1 | (Reporter clarification.) | 09:23:05 |
| 2 | THE WITNESS:  Is defined as integrated | |
| 3 | audit for public companies. | |
| 4 | BY MR. HUESTON: | |
| 5 | Q.  And I just want to make sure I got your | 09:23:15 |
| 6 | testimony right. | |
| 7 | You said it's a judgmental process or a | |
| 8 | judgment process? | |
| 9 | A.  The evaluation of the controls and their | |
| 10 | deficiencies is a judgmental process.  It requires | 09:23:27 |
| 11 | professional judgment. | |
| 12 | Q.  Thank you. | |
| 13 | And are there -- well, and in evaluating a | |
| 14 | company's internal controls, at times as an external | |
| 15 | auditor, you would find deficiencies in those | 09:23:43 |
| 16 | controls; right? | |
| 17 | A.  Yes. | |
| 18 | Q.  And are there varying levels of | |
| 19 | deficiencies? | |
| 20 | A.  Yes. | 09:23:56 |
| 21 | Q.  And what are they? | |
| 22 | MS. EVANS:  Overbroad. | |
| 23 | BY MR. HUESTON: | |
| 24 | Q.  You can answer. | |
| 25 | A.  Control deficiency is the lowest level of | 09:24:00 |

1          MS. EVANS:  Calls for speculation.  Vague          09:28:24

2   and ambiguous.  Overbroad.

3          BY MR. HUESTON:

4     Q.   You can answer.

5     A.   That is possible.                                   09:28:28

6     Q.   And if two auditors disagree as to whether

7   there is a material weakness, it doesn't necessarily

8   mean that one of them is violating their legal or

9   professional duties; right?

10         MS. EVANS:  Calls for speculation.                 09:28:39

11  Overbroad.  Vague and ambiguous as to the specific

12  issue.

13         BY MR. HUESTON:

14    Q.   You can answer.

15    A.   Can you repeat the question, please?               09:28:45

16    Q.   Sure.

17         If two auditors disagree as to whether

18  there is a material weakness, it doesn't necessarily

19  mean that one of them is violating their legal or

20  professional duties; correct?                             09:28:55

21         MS. EVANS:  Speculation.  Overbroad.  Vague

22  and ambiguous as to the issue.

23         THE WITNESS:  It is possible.

24         BY MR. HUESTON:

25    Q.   Right.  Because sometimes there's just a           09:29:06

1  difference of opinion; right?                           09:29:08

2     A.   It is possible.

3     Q.   Okay.  Now, from 2010 until your

4  termination, you served as a senior manager at PwC;

5  is that right?                                           09:29:23

6     A.   I honestly do not recall the exact year of

7  promotion to senior manager, but --

8     Q.   Approximately.  I'm not asking for -- and

9  that's a fair question for -- from you.  I'm not

10 asking for ultimate precision on dates, but just an     09:29:37

11 approximate recollection of dates.

12          So from approximately 2010 until your

13 termination, you were a senior manager at PwC;

14 correct?

15    A.   Yes.                                             09:29:50

16    Q.   And in your role as senior manager, were

17 you then the number two person on most audits?

18    A.   Yes.

19    Q.   There would be an engagement leader above

20 you on the audits?                                       09:30:07

21    A.   I would say number three, because there was

22 a QRP, quality review partner, then there was the

23 engagement leader, which is the partner that signed

24 the opinion, and then on most audits, I was next.

25    Q.   As the senior manager?                           09:30:29

1     A.    Yes.                                          09:30:31

2     Q.    And during the audits, you reported

3  directly to the engagement leader on the particular

4  audit; right?

5     A.    Not all audits.   Most.                       09:30:42

6     Q.    Most.

7           Which audits would you not have reported

8  directly to the engagement leader?

9     A.    There were engagements that were very

10 large, multibillion companies, where the size of the  09:30:57

11 audit team called for multiple senior managers.   So

12 in those cases, you don't necessarily report

13 directly to the engagement leader.   You may report

14 to senior manager.

15    Q.    And can you -- how many of those            09:31:18

16 engagements do you recall working on as a senior

17 manager?

18    A.    Since what period of time are you asking?

19    Q.    Since 2010, through the time of termination

20 at PwC.                                                09:31:31

21    A.    You're asking how many engagements I worked

22 on since my senior manager that I did not report to

23 the engagement leader or --

24    Q.    Yes.   Right.   You basically -- just to get

25 the frame of reference, you said most of the time     09:31:42

1   that I believe included the standards that were          11:47:27

2   relevant to the issue I was raising.

3        Q.   The standards.  The auditing standards?

4        A.   PwC reference.  I did not have, to my

5   recollection, references to specific language of all     11:47:39

6   these standards.

7        Q.   And with respect to the office of

8   Dianne Feinstein, when did you blow the whistle to

9   that office?

10       A.   Well, I just want to make sure, when you       11:48:03

11  say "blow the whistle," went to Senator Feinstein's

12  office in January '17 to seek their assistance in

13  what I told the SEC.  We didn't go through documents

14  in detail.

15       Q.   Okay.  And what assistance were you            11:48:18

16  seeking?

17       A.   To make sure that the SEC would have looked

18  at it.

19       Q.   Okay.  And that's because the SEC had done

20  nothing up to that point in time after your             11:48:32

21  complaint; right?

22       A.   That would be speculation.  I did not

23  receive any communication from the SEC after I

24  submitted my complaint.

25       Q.   Have you received any communication from      11:48:45

1    the SEC since you've submitted your complaint?          11:48:47

2         A.    In what time period?

3         Q.    Any time period.

4         A.    Yes.

5         Q.    In fact, you've been notified that it's a    11:48:57

6    closed investigation; right?

7         A.    Yes.

8         Q.    And when did you blow the whistle to the

9    Department of Labor?

10        A.    That was in August 2017, early August.       11:49:16

11        Q.    And what violations of law, if any, did you

12   identify to the Department of Labor?

13             MS. EVANS:  Speculation.  Calls for a legal

14   conclusion.  Overbroad.

15             THE WITNESS:  I believe my complaint          11:49:33

16   articulated the concerns that I had.  I would have

17   to read that to give you the exact quote.

18             BY MR. HUESTON:

19        Q.    What do you remember, generally?

20        A.    Concerns on retaliation, discrimination      11:49:50

21   referring to national origin.

22        Q.    Okay.  Let's go back to the blowing of the

23   whistle to the SEC.

24             You actually filed a complaint with the

25   SEC; correct?                                           11:50:14

1    Q.   And, in fact, you mentioned your love of          04:14:24
2  your work at PwC at that time; right?
3    A.   I would need to review the e-mail, but I do
4  not have any problem making that statement.  I loved
5  the firm and the work I was doing at the firm.          04:14:40
6         MR. HUESTON:  Okay.  Mark this as 39.
7         (Marked for identification purposes,
8          Exhibit 39.)
9         BY MR. HUESTON:
10    Q.   And Exhibit 39 attaches your communication       04:15:24
11  to Tim Ryan as the CEO of PwC; right?
12    A.   Yes.  Printout of the e-mail.
13    Q.   All right.  And this is what you were just
14  describing to me; right?
15    A.   That is what I was recalling, yes, based on      04:15:42
16  this e-mail.
17    Q.   Okay.  You can put that aside.
18         Now, do you recall that your layoff was
19  ultimately accelerated, your end date?
20    A.   That is not what they told me.                    04:16:16
21    Q.   All right.  Why don't you -- well, let me
22  ask it this way.
23         Do you recall being called into a meeting
24  with Shauna Hewitt and Kevin Baldwin?
25    A.   I recall to be called in the meeting with        04:16:31

```
 1   Shauna Hewitt and Kevin Baldwin.  I was not told      04:16:34
 2   about that meeting or who was there.  I was told by
 3   Shauna Hewitt that the meeting was with a different
 4   person for a different topic.  So that was --
 5        Q.   Okay.  I didn't ask you that.  I just --    04:16:49
 6   all I asked you was do you recall a meeting with
 7   those two, and I guess the answer is "yes."  So we
 8   can just kind of move along?
 9        A.   I don't recall.
10        Q.   Okay.  And at that -- when was that         04:16:57
11   meeting, by the way?
12        A.   August 17, 2017.
13        Q.   Okay.  And what did they tell you at that
14   meeting?
15        A.   Mr. Baldwin told me that I was -- today,    04:17:09
16   that day, was my last day at PwC because of
17   misconduct that they noted in connection of the
18   Cavium engagement.
19             And I -- somebody else would have gone to
20   the room where I was in the office to collect my      04:17:27
21   belongings.  And then they would have escorted me
22   out of the premises.
23        Q.   Okay.  And did either of them describe what
24   this misconduct was?
25        A.   I believe Mr. Baldwin did mention the tax   04:17:45
```

1  control, but I do not recall the specifics.                    04:17:47

2       Q.   Did you ask him for specifics?

3       A.   No.  At the time I was kind of numb, so ...

4       Q.   Well, do you recall him mentioning that the

5  Cavium engagement misconduct had to do with a false       04:18:10

6  control entry that you made?

7       A.   I do not recall he specified in those

8  terms.

9       Q.   Well, you understand he was referencing the

10  control language that you inserted that facially        04:18:26

11  made it appear that you had consulted with Cavium

12  employees at that time when you had not; right?

13      A.   I do not believe that's an accurate

14  characterization.

15      Q.   No.  That didn't creep into the back of       04:18:38

16  your mind as he talked about misconduct with the

17  Cavium engagement?

18      A.   What crept in my mind?

19      Q.   The fact that you put down something and

20  signed it that was not truthful at the time that you    04:18:49

21  signed off on the engagement.

22      A.   It did not creep because, as I said, I have

23  done that after Mr. Thorson assured me that the

24  company would have done it.

25      Q.   Sir, after you were terminated -- after you    04:19:05

1  were terminated, you actually prepared a draft          04:19:17

2  SEC -- scratch that question.

3           While you were at -- still at PwC, you put

4  together a draft SEC complaint; correct?

5       A.   I submitted to the SEC a complaint, as I       04:19:44

6  stated before.

7       Q.   Okay.  Do you remember, before submitting

8  that complaint, you put together something that you

9  called a "History of Events - SEC matter"?

10      A.   I do not recall when I put that together.      04:20:07

11      Q.   Okay.  You remember it, though?  Something

12  you called "History of Events - SEC"; right?

13      A.   I do recall a file with that name.

14      Q.   Yeah.  And you created it while you were

15  still an employee of PwC; right?                        04:20:18

16      A.   As I said, I do not recall, that specific

17  file name, when was created.

18      Q.   Well, I'm going to refresh your

19  recollection at the moment, but you do recall it was

20  created while you were an employee of PwC; right?       04:20:29

21      A.   I would have to see the content of that

22  file.  I do know that I submitted a complaint to the

23  SEC while I was still employed at PwC.

24      Q.   Okay.  Let's go to this document.

25           Before you submitted the complaint to the      04:20:42

```
 1   SEC, you actually prepared a document entitled        04:20:44

 2   "History of Events - SEC"; right?

 3        A.   As I said before I do not recall.

 4             (Marked for identification purposes,

 5              Exhibit 40.)                                04:20:56

 6             BY MR. HUESTON:

 7        Q.   I'm putting before you, as Exhibit 40, an

 8   e-mail from you at PwC on November 26th, 2016, sent

 9   to apparently a personal e-mail address of yours,

10   mauro_botta@libero.it; is that right?                 04:21:25

11        A.   Yes.

12        Q.   And you were sending to yourself a number

13   of documents and attachments; right?

14        A.   Yes.

15        Q.   And one of those documents and attachments,  04:21:39

16   if you go down -- one, two, three, four, five -- six

17   rows down, three over, there's a Word document that

18   says "History of Events."

19             Do you see that?

20        A.   Yes.                                         04:21:53

21        Q.   Okay.  And then that's attached.  It says

22   "History of Events - SEC matter."

23             Do you see that?

24        A.   Yes.

25        Q.   And this is something that you wrote?        04:22:03
```

```
 1       A.   It is possible.  I don't recall with      04:22:15

 2   certainty, but it's possible.

 3       Q.   Okay.  Well, let's read the first sentence

 4   so we can move from the possible to the probable.

 5            "In 2014 I started noticing signs of      04:22:29

 6            a concerning trend involving partners at

 7            this firm in my public engagement A."

 8            Do you see that?

 9       A.   Yes.

10       Q.   Okay.  Does this refresh your recollection? 04:22:38

11   You wrote this.  This is you.  That's fair; right?

12       A.   I do not recall if I wrote it or when I

13   wrote it.  I just said it's possible.

14       Q.   Well, I'm going to represent that this

15   document, "History of Events - SEC," where you talk  04:22:56

16   about noticing signs of a concerning trend, was

17   attached as a history of events document to an

18   e-mail address that was yours at PwC in November of

19   2016; right?  Mauro.x.botta@us.pwc.com; right?

20       A.   Yes.                                       04:23:16

21       Q.   That's your e-mail address; correct?

22       A.   Yes.

23       Q.   And who are you sending it to?  Is that

24   your personal e-mail address?

25       A.   Yes.                                       04:23:24
```

1    Q.   Okay.  So by what's represented facially in   04:23:24

2    this document, it appears the history of event

3    documents is the one that's attached; right?

4    A.   Yes.

5    Q.   And if you take a moment to look at it, it,   04:23:34

6    in fact, discusses the issues that you have been

7    setting forth in your complaint; right?

8    A.   I would have to compare, but -- I would

9    have to read it.  It does bring topics that are in

10   the SEC complaint.                                 04:23:53

11   Q.   Okay.  And in the last sentence starting

12   three lines from the bottom of the first paragraph,

13   you write:

14          "Also, I challenge the opinion on

15          internal controls which was able to be     04:24:08

16          issued thanks to me creating a control

17          the day before the filing of the Form

18          10-K which was never documented nor

19          discussed with the company."

20          Those are your words; right?               04:24:23

21   A.   As I said, I do not recall if those are my

22   exact words.  It's possible.

23   Q.   All right.  And if we can show forensically

24   that this is your document attached to this e-mail,

25   you would be satisfied you, in fact, wrote these   04:24:37

```
 1  words; right?                                    04:24:40

 2      A.   I'm not sure how would the forensic look

 3  like, but if I had a chance to review the original

 4  file, I could confirm it, yes.

 5      Q.   And going back to Exhibit 23, that's your   04:25:02

 6  SEC complaint.

 7           Do you have that before you?

 8      A.   Yes.

 9      Q.   Okay.  And beginning at Plaintiff's Bates

10  stamp 32, it starts with "Whistleblower              04:25:30

11  Declarations," right, at the bottom of the page?

12           Do you see that?

13      A.   Yes.

14      Q.   Okay.  And going on to the next page, No. 6

15  says:                                               04:25:52

16           "If the answer to any of the

17           Questions 1 through 5 above is 'yes,'

18           please provide details."

19           And you wrote:

20           "See 'outline' document uploaded."        04:25:57

21           Right?

22      A.   Yes.

23      Q.   And that's attached beginning at

24  Plaintiff's 165; right?

25           MS. EVANS:  Vague and ambiguous.           04:26:09
```

```
 1              BY MR. HUESTON:                          04:26:17

 2     Q.   That's your attachment to it; right?

 3     A.   Again, I would have to compare with what I

 4  submitted, but it appears.

 5     Q.   Okay.  That's all I'm asking, whether it    04:26:21

 6  appears.  I realize you can't identify necessarily

 7  if it's the exact document.

 8          And back on Plaintiff's 34, that's your

 9  declaration under penalty of perjury that the

10  information contained in this submission is true,   04:26:35

11  correct, and complete to the best of your knowledge,

12  information, and belief; right?

13     A.   Yes.

14     Q.   All right.  So moving to the attachment,

15  let's go to Plaintiff's page 168.                   04:26:50

16     A.   Still Exhibit 23?

17     Q.   Yep.  It's the attachment that you created

18  with the submission.

19          Are you on the page?

20     A.   Yes.                                         04:27:03

21     Q.   All right.  Going to the first full

22  paragraph that starts "As a result of this

23  document."

24          Do you see this?

25     A.   Yes.                                         04:27:11
```

```
 1       Q.   All right.  So going to the next sentence,      04:27:12

 2   it states -- you state:

 3            "During that consultation, the

 4            conclusion was to consider the outcome

 5            only as significant deficiency            04:27:24

 6            aggregated.  Such conclusion was achieved

 7            after a control over the tax footnote was

 8            documented.  However, such control was

 9            not noted during the walk-through and

10            constituted a documentation exercise      04:27:35

11            thanks to which the significant

12            deficiency conclusion was agreed upon by

13            national; evidence of that is that this

14            control was created the night before the

15            filing of the 10-K."                      04:27:49

16            You wrote that; right?

17       A.   Yes.

18       Q.   And under penalty of perjury?

19       A.   Yes.

20       Q.   Do you know who made the decision to      04:28:05

21   accelerate your termination?

22       A.   I do not.

23       Q.   All right.  Do you know who Mark Simon is?

24       A.   Who?  Sorry?

25       Q.   Do you know who Mark Simon is?            04:28:16
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 256

1      A.   Some leader in PwC.  I don't recall the        04:28:19
2  title.  But I've heard the name.
3      Q.   Okay.  Did you ever speak to him about your
4  whistleblowing?
5      A.   Not that I recall.                             04:28:28
6      Q.   Okay.  Do you have any reason to believe
7  that any of the engagement leaders you worked with
8  spoke to Mr. Simon?
9      A.   About what?
10     Q.   About any of the alleged whistleblower         04:28:39
11 issues that you had brought to bear against PwC.
12     A.   I would be speculating.
13     Q.   Okay.  So you have no reason to believe
14 that anybody raised whistleblower issues with
15 Mr. Simon; correct?                                      04:28:54
16     A.   I would have no way of knowing.
17     Q.   Yeah.  So who at PwC have you spoken to
18 about the decision to accelerate your termination,
19 if anyone?
20     A.   Shauna Hewitt is the only person -- maybe      04:29:14
21 Traci Nelson -- that I recall we had contacts after
22 I was terminated.  But my claim of retaliation
23 whistleblower was communicated to PwC before, from
24 my attorneys to PwC attorneys.
25     Q.   Okay.  What did you tell Shauna Hewitt         04:29:38

1   about your termination?                                      04:29:41

2       A.   The communication that I had related to

3   that was if I could reapply, given that I saw that

4   there were open positions at PwC.

5       Q.   Okay.  Did you tell her -- well, when did      04:29:59

6   you have that conversation?

7       A.   I don't remember the date, the exact date.

8   Must have been the end of August or September, but

9   that's the best I can recall.

10      Q.   Okay.  You asked her if you could reapply?   04:30:16

11      A.   Yes.

12      Q.   And what did she say?

13      A.   That due to the fact I was terminated for

14  misconduct, I was prohibited from reapplying.

15      Q.   Okay.  And you said you also talked to        04:30:28

16  Traci Nelson after you were terminated for

17  misconduct; correct?

18      A.   I believe I did speak to Traci on this same

19  topic, and Traci, I think, alerted Shauna.

20      Q.   When you said you spoke to her about the     04:30:46

21  same topic, what did you ask her?

22      A.   To the best of my recollection, I asked her

23  this fact, if I could reapply.

24      Q.   Okay.  Did you attempt to explain to her

25  why you felt you had not committed misconduct?      04:30:59

Confidential
MAURO BOTTA - 09/25/2018                    Page 258

1       A.   I stated that to Ms. Hewitt in my e-mail        04:31:05

2   reply once she said that.

3       Q.   Okay.  Did you state that to Ms. Nelson?

4       A.   I don't recall.

5       Q.   Okay.  Now, in the time that you worked at     04:31:16

6   PwC, did you ever think about leaving the company?

7       A.   Yes.

8       Q.   In fact, you, on a number of occasions,

9   attempted to resign or submit your resignation;

10  right?                                                   04:31:41

11      A.   Yes.

12      Q.   How many times did you do so during the

13  course of your tenure?

14      A.   I believe there were 10.

15      Q.   Might there have been 12?                       04:31:50

16      A.   My recollection was 10, but I do not

17  guarantee the exact number.

18      Q.   And during the time you worked at PwC and

19  you tendered your resignation or offered to resign,

20  during that time period, did you ever get a job         04:32:11

21  offer to work elsewhere?

22      A.   Yes.

23      Q.   And where did you receive -- from which

24  firms did you receive job offers during the time

25  that you worked at PwC?                                  04:32:22

```
 1      A.    There were several.  I can try to recall      04:32:29
 2  them.
 3            So the very first was on a company called
 4  Micrus Endovascular.  Then there was an offer
 5  from -- I'm not talking chronologically.  I'm         04:32:48
 6  talking as I can recall them -- Moss Adams.
 7      Q.    Moss Adams.  Okay.
 8      A.    KPMG.  Deloitte.  BBO.  Logitech.  Did I
 9  say already Logitech?
10      Q.    No.                                            04:33:19
11      A.    Okay.  Logitech.
12      Q.    Ernst & Young?
13      A.    No, I wouldn't have gotten an offer from
14  them because I found out that PwC talked behind my
15  back to them.                                            04:33:39
16            Connor Group, but then they retracted it.
17            That's everyone I can recall.
18      Q.    Okay.  And of those that you can recall,
19  which ones -- which of those offers, if any, did you
20  accept?                                                  04:34:14
21      A.    I believe I accepted all of them and then
22  retracted the acceptance.
23      Q.    Okay.  And each time you decided to retract
24  the acceptance, it was because PwC was convincing
25  you to stay; is that fair?                               04:34:31
```

| | | |
|---|---|---|
| 1 | A.    Yes. | 04:34:33 |
| 2 | Q.    All right.  So let's -- and did you get any | |
| 3 | job offers after your layoff notice from PwC but | |
| 4 | before you were finally terminated? | |
| 5 | A.    Yes. | 04:35:27 |
| 6 | Q.    And who did you receive job offers from | |
| 7 | during that period of time? | |
| 8 | A.    Armanino, LLP. | |
| 9 | Q.    Anyone else? | |
| 10 | A.    No. | 04:35:40 |
| 11 | Q.    And did you accept the offer from Armanino, | |
| 12 | LLP, before your actual termination? | |
| 13 | A.    Yes. | |
| 14 | Q.    When did you accept it? | |
| 15 | A.    I don't remember the exact date. | 04:35:57 |
| 16 | Q.    Well, weeks before you were terminated? | |
| 17 | A.    I don't recall it was that long. | |
| 18 | Q.    Okay.  You have an -- is that in writing, | |
| 19 | the acceptance? | |
| 20 | A.    Yes. | 04:36:13 |
| 21 | Q.    In an e-mail, or did you sign a document? | |
| 22 | A.    I don't remember if it was an e-mail.  I | |
| 23 | did sign the document.  I do not recall if it was | |
| 24 | through e-mail or hard copy. | |
| 25 | (Reporter clarification.) | 04:36:28 |

```
 1              THE WITNESS:  Was through e-mail or hard      04:36:28
 2    copy.
 3              BY MR. HUESTON:
 4         Q.   All right.  And when did you begin work at
 5    Armanino?                                              04:36:43
 6         A.   September 11, 2017.
 7         Q.   And Armanino is another public accounting
 8    firm; correct?
 9         A.   Yes.
10         Q.   And when you began work in September, what   04:37:00
11    title did you have when you began?
12         A.   Actually, public accounting is an audit
13    firm.  I don't know if that's meet the definition of
14    public accountant.  Probably they do.
15              Sorry.  Can you continue.                    04:37:11
16         Q.   Sure.
17              What title did you have when you began work
18    there?
19         A.   Senior manager.
20         Q.   And who did you report to at Armanino?       04:37:19
21         A.   There were several partners, just given the
22    structure of the firm.
23              (Marked for identification purposes,
24               Exhibit 41.)
25    ///
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 04:37:55 |
| 2 | Q.   Putting Exhibit 41 before you. | |
| 3 | Do you recall this as your employment offer | |
| 4 | from Armanino, dated July 28th, 2017? | |
| 5 | A.   This is a printout.  I recall that I | 04:38:18 |
| 6 | received an employment offer.  I do not recall the | |
| 7 | exact date. | |
| 8 | Q.   Okay.  Do you see down in the bottom right, | |
| 9 | this is -- says Plaintiff's 99.  This is actually | |
| 10 | produced from you. | 04:38:28 |
| 11 | So do you have any reason to doubt that | |
| 12 | this is dated July 28th, 2017? | |
| 13 | A.   I have no reason to doubt it.  I just | |
| 14 | didn't recall the date. | |
| 15 | Q.   Okay.  And this is signed by | 04:38:39 |
| 16 | Scott Copeland, partner? | |
| 17 | A.   Yes. | |
| 18 | Q.   And what was your salary at Armanino when | |
| 19 | you started? | |
| 20 | A.   190,000 per annum. | 04:38:54 |
| 21 | Q.   Okay.  Did you have the possibility of | |
| 22 | earning a bonus? | |
| 23 | A.   Yes. | |
| 24 | Q.   And what were the terms of potential bonus | |
| 25 | that you could earn? | 04:39:07 |

1      A.    Actually, I do not recall the specific        04:39:10

2  terms.  There was a separate document called "bonus

3  plan," and I really don't remember the terms.

4      Q.    Okay.  And was the bonus terms document

5  part of the employment offer?                           04:39:24

6      A.    I recall I received it as a package.  I

7  don't know if it was sent with this, but it was sent

8  to me.

9      Q.    And roughly what do you recall you could

10  earn as a bonus at Armanino?  If you were being paid   04:39:37

11  about 190,000 a year, what do you recall the bonus

12  policy to be, just at a very high level?

13          MS. EVANS:  Speculation.

14          If you recall.

15          THE WITNESS:  Well, at a higher level, I do    04:39:51

16  not recall the amount.  I recall, after I read this

17  paragraph, that it was based on the timing of

18  issuance of financial statements.  So if you were to

19  issue audited financials within 30 days from the

20  start of the field work, you would have been          04:40:09

21  eligible for -- for the bonus.

22          BY MR. HUESTON:

23      Q.    So do you recall the bonus proposal is

24  captured at No. 2 of the employment offer; namely:

25              "As senior manager, you will be            04:40:25

```
1              eligible for an annual bonus of up to        04:40:28
2              $13,000 per the 30-day issuance financial
3              statement bonus plan, in addition to the
4              manager bonus plan, both paid on a
5              quarterly basis."                             04:40:42
6         A.   I recall the first one.  The second one, I
7    do not recall the terms right now.
8         Q.   Okay.  The second one being the manager
9    bonus plan; right?
10        A.   Yes.                                          04:40:53
11        Q.   All right.  And what were your benefits?
12   Is it as stated in No. 3 of your employment offer?
13        A.   Yes.
14        Q.   All right.  When did your employment at
15   Armanino end?                                           04:41:21
16        A.   End of January 2018.
17        Q.   And what was the reason for the termination
18   or ending of your employment at Armanino?
19        A.   I left.
20        Q.   Did you obtain employment elsewhere?          04:41:42
21        A.   Yes.
22        Q.   And was that at SOAProjects?
23        A.   It's S-O-A Projects.
24        Q.   SOAProjects.  Okay.
25        A.   Many do call it SOAP.                         04:41:52
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 304

```
 1                    REPORTER CERTIFICATE

 2              I, LORRIE L. MARCHANT, Certified Shorthand

 3    Reporter, Certificate No. 10523, for the State of

 4    California, hereby certify that MAURO BOTTA was by

 5    me duly sworn/affirmed to testify to the truth, the

 6    whole truth and nothing but the truth in the

 7    within-entitled cause; that said deposition was

 8    taken at the time and place herein named; that the

 9    deposition is a true record of the witness's

10    testimony as reported to the best of my ability by

11    me, a duly certified shorthand reporter and a

12    disinterested person, and was thereafter transcribed

13    under my direction into typewriting by computer;

14    that request [  ] was [ X ] was not made to read and

15    correct said deposition.

16              I further certify that I am not interested

17    in the outcome of said action, nor connected with,

18    nor related to any of the parties in said action,

19    nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunto set my

21    hand this 19th day of October, 2018.

22

23    _____

24         LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
             Certified Shorthand Reporter #10523

25
```

# EXHIBIT 2

Confidential

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
4  MAURO BOTTA,                     )
                                    )
5               Plaintiff,          )
                                    )
6       vs.                         ) Civil Case No.:
                                    ) 3:18-cv-2615
7  PRICEWATERHOUSECOOPERS LLP,      )
   LAURA BUSTAMANTE, TYE THORSON,   )
8  ROBERT HEATLEY, STIG             )
   HAAVARDTUN, ERGUN GENC, TIMOTHY  )
9  CAREY and STEVE MCMANN,          )
                                    )
10               Defendants.        )
   _____

11

           TELEPHONIC DEPOSITION UPON ORAL EXAMINATION
12
                             OF
13
                        SHAWNA HEWITT
14 _____
15       Taken at 1420 Fifth Avenue, Suite 2800
16
                    Seattle, Washington
17
18
19
20         * * * * CONFIDENTIAL * * * *
21
22
23 Job No: 153103
24 DATE TAKEN:  DECEMBER 19, 2018
25 REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Confidential

```
 1                    A P P E A R A N C E S
 2   FOR PLAINTIFF (via telephone):
 3                   ALEXANDER CABECEIRAS, ESQ.
                     Derek Smith Law Group
 4                   One Penn Plaza
 5                   New York, NY 10119
 6
 7
     FOR DEFENDANTS:
 8
                     JOE REITER, ESQ.
 9                   HUESTON HENNIGAN
                     523 West 6th Street
10                   Los Angeles, CA 90014
11
12
13   ALSO PRESENT:
14                   GEOFFREY EZGAR
                     Office of General Counsel
15                   PricewaterhouseCoopers
16
17                    *   *   *   *   *
18
19
20
21
22
23
24
25
```

Confidential

Page 5

1        SEATTLE, WASHINGTON; DECEMBER 19, 2018

2                        10:01 a.m.

3                          -o0o-

4

5   SHAWNA HEWITT,              witness herein, having been

6                              first duly sworn on oath,

7                              was examined and testified

8                              as follows:

9

10              E X A M I N A T I O N

11  BY MR. CABECEIRAS:

12      Q.  Good morning, Ms. Hewitt.  My name is

13  Alexander Cabeceiras.  I represent Mr. Mauro Botta in

14  his claim against PwC.

15          First of all, thank you for coming today.

16          Second of all, as the court reporter has

17  stated off the record, we are on a telephone

18  deposition, meaning, when I ask you questions, it is

19  extremely important for you to pause and make sure my

20  question is complete.

21          This will allow the court reporter to

22  accurately capture the question and allow your

23  attorney to make any objections if he has any.

24          You understand?

25      A.  Yes, I do.  Thank you.

Confidential

Page 21

1   on the individual situation for me to be able to

2   describe to you what my role is.  It varies.  But

3   help -- you know, facilitating terminations is a part of

4   the role.

5   BY MR. CABECEIRAS:

6       Q.  You said you help facilitate the termination

7   process.  Can you describe what the termination process

8   is?

9            MR. REITER:  Objection.  Vague as to time

10  and circumstances.

11           Counsel, I think you're going to need to be

12  more specific.  She can't answer broad questions like

13  this about her role.  As she testified, it depends.

14  BY MR. CABECEIRAS:

15      Q.  She testified it depends, and then she

16  testified she helps facilitate the termination process

17  in her specific role as an assurance people leader.  I'm

18  asking what that process is.

19      A.  Are you asking what our termination process is

20  at PwC generally?

21      Q.  Yes.  Answer me that, please.

22      A.  It's the process of exiting or separating

23  employees from the firm.

24      Q.  And did you help facilitate Mr. Botta's

25  termination process?

Confidential

Page 22

1    A.  Yes, I did.

2    Q.  Ms. Hewitt, did you make the decision to

3  terminate Mr. Botta?

4    A.  No, I didn't.

5    Q.  Can you identify who did?

6        MR. REITER:  The question calls for

7  attorney-client communications.  As the witness already

8  testified, she cannot answer that question.

9  BY MR. CABECEIRAS:

10   Q.  Ms. Hewitt, in the termination process of

11  Mr. Botta, what non-attorneys played a role in the

12  termination process?

13        MR. REITER:  So same objection.

14        To the extent you can identify individuals

15  without disclosing attorney-client communications, you

16  may do so.

17   A.  I'm unable to do that.  Any -- I'm unable to

18  identify any individuals.  I am able to say that the

19  decision was made outside of the Bay Area Northwest

20  Market, and I was not involved in the decision.

21  BY MR. CABECEIRAS:

22   Q.  Why Mr. Botta was terminated?

23   A.  I'm sorry; could you repeat that again?  I

24  think it cut off at the beginning.

25   Q.  Yes.  Do you know why Mr. Botta was terminated

Confidential

Page 23

1    from PwC?

2        A.  I can -- I can share with you exactly the

3    reason that we communicated to Mr. Botta when we

4    terminated him on August 17, 2017.

5        Q.  Okay.

6        A.  That reason -- and I'm going to paraphrase a

7    bit because, you know, it was more than a year ago, but

8    Mr. Botta had represented to us that he had falsified a

9    control and audit documentation.  And as it was directly

10   communicated to him in our termination conversation, he

11   was being terminated either because he had done that or

12   because he had lied about it.

13       Q.  When you say falsified a control, can you

14   describe what control he falsified?

15       A.  No.  I'm unable to do that.  I don't have any

16   more information than just what I shared with you.

17       Q.  Do you recall in what document Mr. Botta

18   allegedly falsified a control?

19       A.  I have no knowledge of that.

20       Q.  How did you first learn that Mr. Botta

21   allegedly falsified a control?

22           MR. REITER:  Objection.  Calls for

23   attorney-client communications.  I'm going to instruct

24   the witness not to answer.

25           MR. CABECEIRAS:  Counsel, I'd like to know

Confidential

Page 53

1          (Pause in proceedings.)

2          MR. REITER:  So why don't you repeat your

3    question.

4    BY MR. CABECEIRAS:

5          Q.  Okay.  Is Ms. Nelson an attorney?

6          A.  No, she's not.

7          Q.  Did you discuss with Ms. Nelson plans to

8    terminate Mr. Botta?

9          A.  My conversations with Ms. Nelson were in the

10   presence of our attorneys, with our in-house counsel.

11         Q.  Days before you actually terminated Mr. Botta,

12   did you discuss his termination with Tim Ryan -- or

13   excuse me, Timothy Carey?

14         A.  Can you repeat that?  I'm sorry.  I think it

15   cut out at the beginning.

16         Q.  Yeah.  So a few days prior to actually

17   terminating Mr. Botta, did you discuss Mr. Botta's

18   termination with Tim Carey?

19         A.  No, I did not.

20         Q.  What about Mr. Ward?

21         A.  No, I did not.

22         Q.  You stated previously that the reason given to

23   Mr. Botta was allegedly falsifying a control, the reason

24   for termination; is that accurate?

25         MR. REITER:  That misstates testimony.

Confidential

Page 54

1   Asked and answered.

2        A.   I stated that he --

3             THE WITNESS:   Should I say it again?

4             MR. REITER:   Sure.

5             THE WITNESS:   Okay.

6        A.   I stated that we shared with Mr. Botta in that

7   conversation -- Kevin Baldwin actually said to him in

8   that conversation that Mr. Botta had represented to us

9   that he had falsified a control and audit papers, and so

10  he was being terminated either for doing that or for

11  lying about it.

12  BY MR. CABECEIRAS:

13       Q.   And do you know when Mr. Botta actually shared

14  with you this alleged falsification?

15       A.   I don't know anything other than what I just

16  shared, and it was what I heard said in the meeting.

17       Q.   And when you say the meeting, are you referring

18  to the meeting with your attorneys that we won't get

19  into?

20       A.   No, I'm referring to the -- no, I'm referring

21  to the termination conversation.

22            MR. REITER:   To be clear, she's referring to

23  the meeting with your client, Mr. Botta.

24  BY MR. CABECEIRAS:

25       Q.   Prior to having that termination meeting, did

Confidential

Page 55

1   you have any idea why Mr. Botta was going to be

2   terminated?

3               MR. REITER:  Objection.  Calls for

4   attorney-client communications.

5               If you can answer without disclosing those

6   communications or information provided by counsel, you

7   can.

8       A.   I can't answer it without doing that.

9               MR. CABECEIRAS:  Go off the record for a

10  second?

11              MR. REITER:  Sure.

12              MR. CABECEIRAS:  Guys, you want to take a

13  quick five minutes?

14              MR. REITER:  Yes, that's fine.

15              (Recess from 12:02 p.m. to 12:09 p.m.)

16              (Discussion off the record.)

17              (Recess from 12:10 p.m. to 1:00 p.m.)

18               E X A M I N A T I O N (Continuing)

19  BY MR. CABECEIRAS:

20      Q.   Turning your attention to what's been marked as

21  Hewitt 28, can you turn to the second to last page for

22  me.

23      A.   Yes.

24      Q.   I know we just took a break, so if you'd like

25  to review that page for a minute, and let me know when

Confidential

Page 60

1    employee at PwC as it relates to the Cavium matter?

2         A.   That's correct.

3         Q.   On the day you actually terminated Mr. Botta,

4    where did you physically meet him?

5         A.   Mr. Baldwin and myself met him in the San Jose

6    office.

7         Q.   And was anybody else present?

8         A.   No, not in the meeting.  Just the three of us.

9         Q.   And you may have answered this, and I

10   apologize:  Did you actually say anything during that

11   meeting?

12        A.   To the best of my memory, I may have, you know,

13   asked if he had any questions about the exit process.  I

14   was there, you know, as an HR representative to

15   administer that process.  So I may have asked him if he

16   had questions.

17        Q.   Can you recall if he asked any questions?

18        A.   I recall that he said very little to us, and it

19   was a very short meeting.

20        Q.   And I understand, as you testified to the

21   reason Kevin gave to Mauro why he was being terminated.

22   Can you think of anything else that Kevin said to

23   Mr. Botta at that meeting?

24        A.   Nothing else that comes to mind.  It really

25   was, you know, focused on that reason for termination,

Confidential

Page 61

1    and that he was being terminated.

2         Q.  Did Mr. Botta attempt to defend himself at all

3    at that point?

4         A.  Not that I can recall.

5         Q.  Was the Friend of the Firm program discussed at

6    that point?

7         A.  Not that I can recall.

8         Q.  And after this meeting occurred, when was the

9    next time you spoke to Mr. Botta, if at all?

10        A.  I believe the next time I spoke to him was in

11   regards to -- it may have been later that day or the

12   next day.  I think it was later that day, when he asked

13   for some personal documents and files from his computer.

14        Q.  And after that meeting where Mauro was

15   terminated, focusing your attention on that day, right

16   after the meeting, what did you do?  Where did you go

17   to?

18        A.  Can you be more specific?  I just want to make

19   sure I answered that right.

20        Q.  Yeah.  After you had the conversation -- no,

21   absolutely, and I'm happy to clarify.  You have the

22   conversation with Mr. Botta.  I just want to get your

23   description of what happened next.

24             So for example, did he just get up and leave

25   the building?  Did you escort him out?  What did you do

Confidential

Page 81

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Shawna

9    Hewitt, having been duly sworn, on December 19, 2018, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 3rd day of January, 2019.

14

15

16   _____

17        CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2019

21

22

23

24

25

# EXHIBIT 3

ALEXANDER G. CABECEIRAS, ESQ.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760
Fax: (212) 587-4169
alexc@dereksmithlaw.com
*APPEARANCE PRO HACE VICE*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

--------------------------------------------------------X

MAURO BOTTA,

                Plaintiff,

    -against-

Civil Case No: 3:18-cv-2615

PRICEWATERHOUSECOOPERS LLP,

                Defendants.

--------------------------------------------------------X

### PLAINTIFF'S RESPONSES TO FIRST REQUEST FOR INTERROGATORIES

### PRELIMINARY STATEMENT

These responses and objections ("Responses") reflect on the current state of Plaintiff's knowledge, understanding, and belief with regard to matters about which inquiry has been made. Discovery in this case is not complete, and, consequently, Plaintiff continues to investigate the facts relating to the above-captioned action. These Responses are therefore based upon information that is presently available to Plaintiff and his attorney. Further, these Responses are given without prejudice to Plaintiff's right to produce, use or rely on at any time, including at trial, evidence, facts, documents, things or information that is subsequently discovered, the

relevance of which has not yet been determined, or which was omitted from these objections by inadvertence, mistake, or otherwise. Plaintiff reserves the right to modify these Responses as additional facts are ascertained, analyses are made, legal research is completed, and contentions are asserted. Plaintiff also reserves the right to modify these Responses in the event that it determines that any information was omitted from them inadvertently.

Each response is subject to all objections as to relevance, materiality, and admissibility, and to any and all objections on any grounds that would require exclusion of any Responses herein if it were introduced in court. All objections and grounds are therefore expressly reserved and may be interposed at the time of trial. This Preliminary Statement shall apply to each and every Response given herein, and shall be incorporated by referenced as though set forth fully in each Response below.

**INTERROGATORY NO. 1:** IDENTIFY each and every individual who YOU claim knew at the time of YOUR termination from PWC that YOU were "a *bona fide* whistleblower," as alleged in Paragraphs 93 and 98 of the COMPLAINT.

**RESPONSE: OBJECT. Plaintiff objects as to use of the term "*bona fide* whistleblower" is vague and may call for a legal conclusion. To the extent Plaintiff made both internal and external complaints about perceived unlawful activity, and is therefore, a "*bona fide* whistleblower," for purposes of responding to this interrogatory and without waiver of the aforementioned objection, Plaintiff responds as follows:**
**Timothy Carey, Ergun Genc, Stig Haavardtun, Traci Nelson, Shawna Hewitt, Shannon Odam, Robert Heatley, Kevin Healy, Rishi Jobanputra, Sameer Shirsekar, Denis Kozhevnikov, Mike Brandstetter, Brian Dalton, James Sergi, Umit Ozdemir, Mert Turkoglu, Jooree Na, Jungrye Lee, Joseph Brashear, Vykintas Striuzas, Robyn Diamond, Ai-Li Shao, Timothy Scott, Gil Simonetti III, Marc Panucci, Keith Steel, Craig Tynes, Thang Pham, Mayank Gupta, Alan Woolery, Christopher J Smith, Paul Sawyer, Michael Bayer, Trudy Doucet, Kevin Hasegawa, Anne-Marie Vitale, Maurizio Baratta, Luca Baratta, Francesco Ferrara, Marco Botta, Martino Botta, Maria Rosa Rigamonti, Leonardo Cadeddu, Carlo Croce, Andrea Martinelli, Adriano Antonini, Paolo Caccini, Giorgio Greco, Andrea Brivio, Gabriele Scuratti, Alessandro Martini, Andrea Gallino, Alisher Zokhidov, Deepak Bhandarkar, Eric Chan, Eric Schaefer, Hazem Elnahas, Henrik Gerdes, Johan Heyns, John Shippy, Johnny Choi, Ofir Fatal, Rajindra Gunasekera, Kenneth Kong, Michael Fitzsimons, Harsh Rungta, Scott Almassy, Mariaan Badenhorst, Liran Sender, Patrick McNamara, Nipun Malhotra, Raffaele Perrone, Rob Ward, Tarun Arora, Tye Thorson, Johan Furstenberg, and Mari Mazour.**

**INTERROGATORY NO. 2:** For each individual identified in response to Interrogatory No. 1, IDENTIFY all facts, including, but not limited to, all DOCUMENTS and witnesses, supporting your contention that the individual knew at the time of YOUR termination from PWC that YOU were a "*bona fide* whistleblower."

**RESPONSE: OBJECTION. Plaintiff objects to this request and overly broad, unduly burdensome, and further objects as it seeks information already in Defendants' possession. To the extent Plaintiff can respond and without waiver of the aforementioned objection, Plaintiff responds as follows: Please refers Defendants to documents previously provided Bate Stamped No. PLAINTIFF 165 – 178, 214 – 227, 233 – 235, 544 – 564, 575 – 588, 601 – 603, 751 – 757, 789 – 805, 1237 – 1248, 1340 – 1344, 1484 – 1490. Plaintiff is unable to identify precise dates and circumstances surrounding each individual listed in Response No. 1. Additionally, Plaintiff refers Defendants to any "Same Time" conversations that may be already in Defendants' possession.**

**INTERROGATORY NO. 3:** IDENTIFY each and every individual who YOU claim "engaged in unlawful retaliatory employment practices" against YOU, as alleged in Paragraphs 93 and 98 of the COMPLAINT.

**RESPONSE: OBJECTION. Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and seeks information already in Defendants' position. To the extent Plaintiff can answer and without waiver of the aforementioned objection, Plaintiff responds as follows: Plaintiff cannot possibly know the extent of the retaliatory acts that Defendants have subjected him to. To the extent Plaintiff can respond, Plaintiff believes Steve McCann, Tim Carey, Kevin Baldwin, Shawna Hewitt, Ergun Genc, Laura Bustamante, Deepak Bhandarkar, Stig Haavardtun, Traci Nelson, and Tye Thorson. Plaintiff reserves the right to supplement this response once fact discovery is completed.**

**INTERROGATORY NO. 4:** IDENTIFY the date of each act of retaliation that YOU CLAIM the individuals identified in Interrogatory No. 2 engaged in.

**RESPONSE: OBJECTION. OBJECTION. Plaintiff objects to this interrogatory as overly broad, unduly burdensome, and seeks information already in Defendants' position. To the extent Plaintiff can answer and without waiver of the aforementioned objection, Plaintiff responds as follows: Defendant PwC and Defendant's representatives retaliated against Plaintiff in a myriad of ways for objecting to perceived and/or actual unlawful activity, including by telling Plaintiff via a performance review that Plaintiff was "an emotional Italian guy," that Plaintiff "throws partners under the bus," and that Plaintiff has to "suck it up"; by giving Plaintiff negative performance reviews; by terminating Plaintiff; by reprimanding Plaintiff for reporting perceived and/or actual unlawful activities; by discouraging Plaintiff from reporting perceived and/or actual unlawful activities both internally and externally; by removing Plaintiff from engagements; by rating Plaintiff as "insufficient" and "not operating at a Senior Manager Level,"; by not giving Plaintiff new**

**CERTIFICATION**

I hereby certify that the foregoing Responses are true. I further certify that if any of the foregoing Responses are willfully false, I am subject to punishment.


By: _____

    Mauro Botta

Date: 01/03/19

# EXHIBIT 4

ALEXANDER G. CABECEIRAS, ESQ.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760
Fax: (212) 587-4169
alexc@dereksmithlaw.com
*APPEARANCE PRO HACE VICE*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

-----------------------------------------------------------X

MAURO BOTTA,

                    Plaintiff,

                                       Civil Case No: 3:18-cv-2615

   -against-

PRICEWATERHOUSECOOPERS LLP,

                    Defendants.

-----------------------------------------------------------X

**<u>PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST REQUEST TO ADMIT</u>**

**REQUEST FOR ADMISSION NO. 1**:
Admit that on or around July 17, 2017, YOU were interviewed by Walter
Brown and Paul Rugani of Orrick, Herrington & Sutcliffe LLP (the "Interview") in
PwC's San Jose office.

**DENY. I do not recall the date of the meeting with the PwC attorneys and I do not recall
who was present in such occasions. I do admit a meeting took place in the PwC San Jose
office with attorneys. I do recall there were representatives from Orrick and PwC's Office
of General Counsel. I do remember Anna-Maria Vitale from PwC's OGC. I remember**

**Marie Mazur from OGC. I remember Mari Mazour from PwC's OGC. I do recall Paul Rugami from Orrick. I do recall two meetings taking place, one in July of 2017 and one in June of 2017. I believe, but am not certain, that the above mentioned attorneys were in both the July and June meetings. I also recall my SEC Attorney, Jason Brown, being in attendance. I do not recall if he was at the July or June meeting.**

**REQUEST FOR ADMISSION NO. 2**:
Admit YOU stated during the Interview that you had created the CONTROL THRESHOLD in 2015 during the audit of CAVIUM's 2014 year-end.

**DENY. I do not recall the exact language used during the interview or the exact questions that I was asked. Therefore, I cannot admit or deny.**

**REQUEST FOR ADMISSION NO. 3**:
Admit YOU stated during the Interview that—at the time YOU created the CONTROL THRESHOLD—YOU had no evidence that the CONTROL THRESHOLD was documented or existed.

**DENY. I do not recall the exact language used during the interview or the exact questions that I was asked. Therefore, I cannot admit or deny.**

**REQUEST FOR ADMISSION NO. 4**:
Admit YOU stated during the Interview that YOU had documented the CONTROL THRESHOLD for the first time in the MEMORANDUM.

**DENY. I do not recall the exact language used during the interview or the exact questions that I was asked. Therefore, I cannot admit or deny. Lastly I cannot represent the document attached is the original DRAFT of the memorandum that Mr. Thorson and I discussed that night. Had PwC given me the opportunity to review such questions or clarify their misunderstanding of the facts, or had PwC retained, as they should have, the transcripts of the Sametime chats with Mr. Thorson that Sunday night before Cavium 10-K filing, this question could have been answered. I explained the facts as they occurred during my deposition. I deny that there was any professional misconduct on my part, or any lies as Defendant indicated and the reason for my termination is completely false.**

Date:   January 18, 2019
        New York, New York

                         Respectfully Submitted,
                         **DEREK SMITH LAW GROUP, PLLC**

                         _**/s/ Alexander G. Cabeceiras**_
                         Alexander G. Cabeceiras, Esq.
                         One Penn Plaza, Suite 4905
                         New York, New York 10119

# EXHIBIT 5

Lorrie L. Marchant CSR# 10523. RMR, CRR, CCRR, CRC

**EXHIBIT    1**

WITNESS: Mauro Botta
CASE   Botta v PricewaterhouseCoopers
CASE No.: 3:18-CV-02615-RS
DATE   Tuesday September 25 2018

◄ **Previous Section**    **Next Section** ►

## 2023 Manager

The engagement leader is responsible for the engagement and its performance. The engagement leader may seek assistance from appropriate engagement team members in fulfilling his or her planning and supervisory responsibilities. Engagement team members, including managers and senior associates, who assist the engagement leader with planning and supervision of the work of other engagement team members should comply with the requirements of relevant professional standards with respect to the planning and supervisory responsibilities assigned to them. (AS 9 3 and 10.4)

### Definition of Role

The manager is the member of the engagement team who, with the appropriate oversight and coaching by the engagement leader, assists in the design of the audit strategy and plan and supervises its execution by the engagement team. The manager:

- Consults with the engagement leader to determine the resources needed to perform the engagement;
- Helps build, brief and coach the team;
- Oversees that the audit strategy and audit plan as agreed to with the engagement leader during planning have been translated into a tailored audit program and appropriately executed;
- Assists in overseeing the nature and extent of supervision and review of the quality of fieldwork and its documentation. This may include visits to components on multilocation engagements;
- Is responsible, subject to the engagement leader's oversight, for determining that the audit documentation, including work performed by specialists, has been prepared, reviewed and archived in accordance with professional and Firm standards;
- Is responsible for bringing to the attention of the engagement leader issues which require his/her involvement throughout the course of the audit; and
- Takes the primary responsibility for interaction with client management.

### The Manager's Role

A manager should be present on every engagement. A manager or an experienced person below manager grade may fill the manager role with the approval of the engagement leader. For example, on smaller clients, the manager and senior associate roles may be filled by one person (e.g., an experienced senior associate) who reports directly to the engagement leader.

On larger engagements, more than one person on the engagement team may perform the role of manager. In such cases, each manager may report directly to the engagement leader or a less experienced manager may report to a more experienced manager. Additionally, in some cases a manager may be designated as the "lead engagement manager". Whatever the circumstances, the roles and responsibilities of those in manager roles, the reporting lines and the responsibilities for briefing, coaching and reviewing the work of the team need to be clear

The manager should:

- Have an understanding of and practical experience with engagements of a similar nature and complexity through appropriate training and participation;
- Have an understanding of professional, regulatory and legal requirements relevant to the client and the engagement;
- Have appropriate and sufficient industry and technical knowledge, including knowledge of relevant information technology;
- Be able to apply the appropriate degree of professional judgment relevant to the tasks allocated to him/her and having regard to the circumstances of the particular engagement; and
- Have an understanding of the Firm's risk management and quality control policies and procedures.

The manager should follow the rotation requirements in **PwC Audit 3230**.

### Responsibilities of the Manager

Confidential

**Audit Quality**

The manager, supporting the engagement leader in his/her responsibility for audit quality, should:

- Set an example in terms of professional behavior and pride in the audit, striving for continuous improvement, applying the Firm's values and rigor to the audit process;
- In discussion with the engagement leader, identify the experience and competencies required to carry out the audit work, including integrating specialists into the team, where necessary;
- Coordinate work of specialists assigned to the engagement, including work performed by Process Assurance or Tax;
- Maintain an awareness of professional developments (e.g., new accounting or auditing standards) that may impact work on the engagement;
- Share information with other team members which might impact their work or conclusions;
- Oversee the work performed related to the risk of fraud, including brainstorming sessions regarding fraud risks;
- Supervise and be available to the team for discussion of issues and challenge and coach team members; and
- Determine that the audit documentation has been prepared, reviewed and archived in accordance with professional and Firm standards and that audit work has been appropriately documented on a timely basis.

The manager should be proactive in communicating with the engagement leader throughout the audit process. In particular, where significant issues are identified by the team which should be raised as significant matters, the issues should be communicated to the engagement leader to assist him/her in meeting the engagement leader's responsibilities (see also under **Execution**). However, the engagement leader remains responsible for the overall quality of the work done and documented and is, therefore, expected to be sufficiently involved in identifying the risks and being satisfied that they are responded to appropriately.

**Acceptance and Continuance**

The manager should:

- Complete the Acceptance & Continuance assessment, in consultation with the engagement leader, and prepare any analysis relevant to the decision, including details of threats to independence and the related safeguards in place; and
- Prepare/update the engagement letter and be proactive in achieving timely signature of the engagement letter by the engagement leader and client.

**Engagement Team**

The manager, in consultation with the engagement leader, should:

- Identify the experience and competencies needed to develop and implement the proposed audit approach, including the need for Process Assurance, Tax and other specialists and obtain adequate and appropriate resource allocation to successfully perform the engagement;
- Build the team and assign the right people to the right tasks at the right time, planning for appropriate levels of supervision and review and for clear communication of tasks to be performed and reporting lines; and
- Assess, through regular contact with team members, team capabilities and performance throughout the audit and discuss with the engagement leader situations where additional resources or expertise are needed.

**Independence**

The engagement leader should work with and coach the manager to evaluate independence and compliance with reference to the PwC U.S. Independence policy, and any additional ethical requirements that apply to the client entity (as included in the relevant territory independence policy), and the manager should obtain the final approval by the engagement leader.

In order to fulfill the independence evaluation at the acceptance/continuance decision and during planning, the manager should:

Confidential                                                                    PwC_B00002626

- Assist, at the time of acceptance/continuance and again before the commencement of significant audit work, in assessing threats to independence and the related safeguards in place, and evaluating compliance with independence policy. The manager should prepare the summary of independence considerations.
- In the case of a multilocation audit, issue instructions regarding independence to other PwC and non-PwC firms, as appropriate, such instructions should address the required use of AFS for authorization of services.
- If the entity is a related party of a group audit in another country, check that such instructions have been received.
- Determine that data has been input into Central Entity Service (CES) and has been updated on a timely basis to reflect changes in group structure of which the engagement leader and manager are aware.

In order to fulfill independence requirements in relation to completion steps, the manager should:

- Remain alert throughout the audit to assist in identifying changes in circumstances that may create threats to independence, and communicate any such matters identified to the engagement leader on a timely basis.
- Determine whether audit and non-audit services have been pre-approved by the Audit Committee or equivalent body of governance, where required by regulation or client requirements.
- Update the summary of independence considerations on any new matters arising that may create threats to independence and obtain approval by the engagement leader.
- Determine whether the client's fee analysis reflects the engagement leader's and team's knowledge of the professional services that have been provided, and check the completeness and accuracy of the analysis.
- Keep the engagement leader informed of independence issues as they arise.

In addition, the manager on a group engagement should determine, using the AFS system, whether the engagement leader has authorized requests received regarding the provision of audit, audit-related and non-audit services to the client entity and its related entities.

**Planning**

It is important that all members of the engagement team understand the objectives of the work they are to perform. Appropriate teamwork and on-the-job training are necessary to assist less experienced team members of the engagement team to clearly understand the objectives of the assigned work as further discussed in **PwC Audit 2510**.

The manager is responsible for:

- Organizing the team planning meeting and other meetings and, together with the engagement leader, sharing with engagement team members his/her knowledge and understanding of the client and its business, including information about components in a multilocation engagement;
- In the scoping phase of the audit engagement, together with the engagement leader, checking that critical Engagement Management Website (EMW) information is completely and accurately entered, and that the dates represent their best estimates. It is also engagement leader's and manager's responsibility to confirm that the dates are updated throughout the course of the engagement for changes due to any circumstances;
- Briefing engagement team members on their responsibilities, including responsibilities for maintaining an objective state of mind and an appropriate level of professional skepticism, and performing work assigned to them in accordance with the ethical principle of due care;
- Assigning roles appropriate to the experience of individual team members, and briefing team members, including specialists, on risk-related issues, problems that may arise and the detailed approach to the audit, encouraging them to raise questions with more experienced team members;
- The incorporation of identified significant risks into the Client File and, together with the engagement leader, developing the audit strategy and audit plan;
- Providing members of the engagement team, including specialists, with information from or references to the relevant EGAs, Audit Committee reports and other materials, where applicable, to assist team members in obtaining an understanding of our audit strategy and plan;
- The preparation and dissemination of group audit instructions in the case of multilocation audits;

Confidential                                                                                        PwC_B00002627

- Arranging for early involvement of the QRP, proactively arranging meetings/conference calls between the QRP and engagement leader to discuss key judgments/significant matters relevant to the planning phase, and providing the QRP with access to the relevant Client File;
- Development of the communication plan and obtaining the engagement leader's approval for such plan, and, together with the engagement leader, preparing audit planning communications to the client on a timely basis;
- Planning for active and ongoing supervision and review of audit work and related documentation at the appropriate level throughout the audit engagement, and assessment of engagement team capabilities to perform the audit engagement, and for corrective action to be taken where issues are identified; and
- Ensuring the engagement leader is appropriately included in the Aura workflow as directed by the engagement leader.

**Execution**

The manager overseeing the execution of the audit strategy and audit plan should:

- Obtain updates from the senior associate on the progress of the work and consider whether team members have received sufficient briefing on tasks before they perform them, understand their instructions and have sufficient time to carry out their work, and are being coached throughout the performance of tasks;
- Manage the development of the audit plan;
- Coordinate the planned work to be performed by specialists (e.g., Process Assurance, Tax, etc.) on the engagement;
- Consider whether issues arising during the audit may require a modification of the audit strategy or the audit plan and should obtain the engagement leader's approval for any significant changes;
- Consider whether there are any significant judgmental issues which he/she is aware of which should be raised as significant matters, and is responsible for bringing such matters to the attention of the engagement leader on a timely basis throughout the course of the audit; and
- Assist in the resolution of significant matters, including determining that appropriate consultations have taken place, where needed, and have been documented and agreed with the person consulted.

**Completion**

The manager should:

- Obtain an overall understanding of the engagement (i.e., of risks, approach, work done, issues raised);
- Consider whether all work is appropriately and completely performed and reviewed in accordance with the planned audit approach;
- Determine that all required EGAs have been addressed in order to comply with professional and Firm standards;
- Determine that all significant changes to the audit approach (audit strategy and audit plan) have been documented;
- Arrange for the QRP final sign-off meeting or conference call between the QRP and engagement leader and ascertain that all relevant information is provided to the QRP on a timely basis throughout the audit process and prior to sign-off;
- Determine that the audit documentation, including work performed by specialists, has been prepared and reviewed in accordance with professional and Firm standards (see also **PwC Audit 2500**);
- Determine that required documentation has been obtained from component auditors and has been reviewed by the group engagement team;
- Complete or review all significant matters;
- Determine that the work performed, and the evidence obtained, supports the conclusions reached and the opinion given,
- Consider whether client communications are appropriate and include all required communications;
- Determine that the actual critical dates are completely and accurately entered into the EMW system if they differ from the estimated dates; and

Confidential

PwC_B00002628

- Ensure that the electronic and related hardcopy workpapers are archived on a timely basis, as further discussed in **PwC Audit 6900**.

**Consultations**

Supporting the engagement leader in the engagement leader's responsibility for the team undertaking appropriate consultation on difficult or contentious matters, the manager should direct engagement team members to bring significant accounting and auditing issues arising during the audit to his or her attention and assist in their evaluation and resolution, including determining that appropriate consultations have taken place, where needed. (AS 10.5(b)) Consulting with the engagement leader, and where applicable, the QRP, the manager should be satisfied that conclusions resulting from consultations are appropriately documented and implemented.

Consultations that involve difficult or contentious matters or matters significant to the audit should be documented as significant matters and agreed by both the individual seeking consultation and the individual consulted (See further guidance in **PwC Audit 2300** for identifying and resolving significant matters).

**Differences of Opinion**

In applying due professional care, each engagement team member has a responsibility to bring to the attention of appropriate persons, disagreements or concerns the engagement team member might have with respect to accounting and auditing issues that he or she believes are of significance to the financial statements or our report regardless of how those disagreements or concerns may have arisen. (AS 10.5(b))

If there is an unresolved difference of opinion regarding important matters between audit team members, or between the manager/team members and the engagement leader, the Firm's policy on resolving differences in professional opinion should be followed (see further guidance in **PwC Audit 2710**).

Where the unresolved difference relates to a concern that there is failure to comply with appropriate professional, regulatory and legal requirements or PwC's own systems of quality control, and which a team member considers he/she cannot discuss with the engagement leader, the team member may follow the Firm's whistle blowing processes. The audit report should not be issued until the matter is resolved.

**Documentation and Sign-off**

The Client File should reflect the nature, timing and extent of the manager's execution and review of audit work. Refer to **PwC Audit 2570** with respect to the extent of the sign-offs required by the manager and **PwC Audit 2460** regarding timing of the completion of audit documentation and sign-offs.

**Issue Date: November 2014**

Confidential

# EXHIBIT 6

2) I pointed out actual violation (not potential) in several filings adding specifics by period and month, so I am frankly surprised how can you label those as "vague", and furthermore the auditee did not address such issues, given the internal control opinion and the audit documentation did not reflect those as audit adjustments, so I am not sure what you're referring to when You say the issues were addressed. Thirdly, in matter of the independence violations, clearly the issues was not addressed nor remediated.

3) As You know it'd be illegal for me to withhold copies of workpapers after my departure however the details and specifics indicated, along with corroborating witnesses do provide specifics to investigate. If any terminated whistleblower needs to commit an illegal act to copy workpapers still available to validate the claim, despite he added dates, people and names, I am not sure how could any investigation be opened in such cases.

The testimony and deposition currently ongoing on my case I do not believe can be used, certainly not by me, however it'd be possible for the CBA to obtain access to those.

For the reasons I highlighted above, I do believe your statements and conclusion not to accurately reflect the body of evidence that I presented and I'd seek You to reconsider in light of what I stated above, your position. I was referred to You by the DOJ that did state the issues were merit of investigation, however if I am asked to commit illegal act to support claims already with ample level of detail and specificity, it is very surprising.

Thanks

Mauro

On Mon, Nov 26, 2018 at 1:03 PM MacGregor, Tina@CBA <Tina.MacGregor@cba.ca.gov> wrote:

Mr. Botta,

I have completed my review of the materials that I have obtained to date. I spoke with my supervisor about the issues presented in your complaint and we have determined that the California Board of Accountancy (CBA) does not have sufficient information of a potential violation of the Accountancy Act or CBA Regulations. The issues in your complaint are primarily employer/employee matters, which are not within the CBA's jurisdiction. You have described potential audit departures. However, the information was relatively vague or the auditee addressed the issues before the firm issued the audit report. As such, there is insufficient information for the CBA to make inquiries of the licensee.

Therefore, unless you have specific working papers that would support your allegations of audit deficiencies of a material matter, there is insufficient information to begin an investigation of the firm. If you have additional information and documentation, or if testimony or documentation comes from your civil and/or labor department actions to support your allegations, please resubmit your complaint for the CBA's review.

Consequently, we have closed our case.

Sincerely,

Tina MacGregor

Investigative CPA

California Board of Accountancy

2450 Venture Oaks Way, Suite 300

Sacramento, CA 95833

PLAINTIFF 001955

# EXHIBIT 7

New Window | Help | Customize Page | 📰

| Contract Status/Content | **Approval** | Print |
|---|---|---|

| Botta,Mauro | | Employee | | **EmplID:** 00300178571 |
|---|---|---|---|---|

**Contract Number:** AGREEMENT02     **Creation Date:** 07/01/2010     **Contract Status:** Active

Contract Data

# PricewaterhouseCoopers LLP Employment Agreement

In consideration of your promotion to the position of Sr Manager at PricewaterhouseCoopers LLP (the "Firm"), and for other good and valuable consideration, the adequacy, sufficiency and receipt of which are hereby acknowledged, you, Mauro Botta, hereby acknowledge and agree that:

1. **Compensation**.

   a. **Salary**. As a Sr Manager in the Firm's San Jose, CA office, you will be compensated at a rate of $9,583.33 per month, payable semi-monthly, which represents $115,000.00 when computed on an annual basis. Your compensation generally will be reviewed once each fiscal year for the purpose of determining whether any adjustment is appropriate; however, the Firm may make changes to or adjust compensation, up or down, at any time during the year for business or other reasons. Merit increases, if any, based on performance generally are made effective July 1.

   b. **Bonus**. You may be eligible to participate in bonus programs applicable to your position, as in effect from time to time. The amount and timing of any bonus are at the sole discretion of the Firm. To be eligible to receive a bonus, you must be actively employed by the Firm on the date such bonus is to be paid.

2. **Benefits**.

   You will remain eligible to participate in the comprehensive benefits program currently offered by the Firm to its employees, subject to the terms and conditions of the respective plans. The benefits currently offered by the Firm are outlined in the Staff Benefits Summary. The Firm reserves the right to change or eliminate these benefits in its sole discretion at any time. Also, the Firm will continue to reimburse you for appropriately documented, reasonable expenses you incur while working on Firm business, in accordance with its business expense reimbursement policies.

3. **Duties and Responsibilities**.

   You agree that you will continue to devote substantially all of your working time and attention to the performance of your assigned duties as required, and will not, without the written consent of the Firm, engage, directly or indirectly, in any other employment, business or professional activity for compensation, profit or financial gain. You also agree that you will not assume any paid or unpaid directorships; however, this restriction does not apply to directorships in non-client charitable, civic, educational, social or other similar nonprofit organizations, provided that such activities do not

Confidential

PwC_B00001945

conflict with Firm interests, including its independence policy.

4. **Employment-at-Will**.

      This Employment Agreement does not constitute, and may not be construed as, a commitment to employment for any specific duration. The duration and terms and conditions of your employment relationship with the Firm will continue to be at-will, which means that the Firm may change the terms and conditions of the employment relationship, and that you may leave the Firm, or the Firm may require you to leave its employ, for any reason or no reason, at any time.

5. **Termination of Employment**.

      a. **Termination by the Firm**. If your employment is terminated by the Firm for reasons other than professional, legal, ethical or Firm policy violations, subject to the Firm's Notice/Severance Policy for Certain Employees (the "Severance Plan"), you will be provided with: (i) one month's notice, if you have been employed for more than six months but less than two years; (ii) two months' notice, if you have been employed for two years but less than five years; or (iii) three months' notice, if you have been employed for five or more years. The Firm reserves the right under the Severance Plan to pay your base salary in lieu of continued employment for any or all of the applicable notice period.

      b. **Termination by You**. If you resign, you agree to provide the Firm with at least two weeks' notice to allow an orderly transition of your responsibilities. If the Firm chooses not to continue your employment for the two-week minimum notice period, you will be paid your base salary for the remaining portion of such two-week period. If you do not provide at least two weeks' notice, the Firm may choose to terminate your employment earlier than the date specified in your notice and, in any event, you will be paid only through your last day of employment. You agree that, prior to your departure, you will provide the Firm with the name of your subsequent employer or other professional affiliation and the position you intend to assume.

6. **Independence**.

      Independence is a professional principle and obligation that must be observed by employees of a firm which provides public accounting services. Independence obligations prohibit, among other things, you, your spouse/cohabitant and your dependents from holding certain positions with or investing in certain audit/attest clients of the Firm and such clients' affiliates. Similarly, a non-dependent close relative's position with or material investment in an audit/attest client of the Firm may impair your compliance with the Firm's independence rules. Your position, job description, office location and client associations determine the applicability of specific provisions of the Firm's independence policy to you. You acknowledge that you are already familiar with the Firm's independence rules and understand that it is important that you continue to comply with those rules. Periodically you will be required to confirm your compliance with the Firm's independence policy.

      In connection with your independence obligations, the Firm and/or the Securities and Exchange Commission may request, and you agree to provide, relevant

Confidential                                                                 PwC_B00001946

financial and tax information and up-to-date records of your investment portfolio. You also may be required to maintain a current record of your financial holdings (but not their value) in a Firm database. If an impairment of the Firm's independence or a conflict of interest exists or is likely to occur, you may be required to dispose of securities or resolve other independence issues on short notice and on terms that are disadvantageous to you. The Firm also may require that you relocate to another Firm office or even separate from its employ.

You also have an ongoing obligation to cooperate and comply with the Public Company Accounting Oversight Board (PCAOB). You agree to comply with the requirements of the PCAOB and to provide information to the Firm in support of its PCAOB registration requirements. Your obligations include, but are not limited to, cooperating and complying with any request for testimony or the production of documents made by the PCAOB in furtherance of its authority and responsibilities under the Sarbanes-Oxley Act of 2002.

## 7. **Confidential and Proprietary Information**.

Information and materials relating to the Firm or its clients, licensors or suppliers that are not publicly available must be treated as confidential and proprietary ("Confidential Information") and may only be used or disclosed for business purposes related to your employment duties with the Firm. You have an obligation to safeguard Confidential Information from unauthorized use and disclosure. Confidential Information shall include, without limitation, the Firm's trade secrets; inventions (whether or not patentable); professional, technical and administrative manuals; associated forms, processes, and computer systems (including hardware, software, databases and information technology systems); other methodologies and systems; sales and other forecasts; marketing and business development plans and strategies; client and prospect files, lists and materials; research materials; investigative materials; and project notes and plans. Information shall not be deemed Confidential Information if it is or becomes generally available to the public other than as a result of an unauthorized disclosure or action by you or at your direction or by any other person who directly or indirectly receives such information from you. Because Confidential Information is extremely valuable, the Firm takes measures to maintain its confidentiality and guard its secrecy. Confidential Information may be copied, disclosed or used by you during your employment with the Firm only as necessary to carry out Firm business and, where applicable, only as required or authorized under the terms of any agreements between the Firm and its clients, licensors and suppliers. You agree not to take or keep any Confidential Information when you leave the Firm, and to return all Confidential Information to the Firm before your departure. If you are ever asked to disclose any information or materials that are subject to these confidentiality restrictions, pursuant to legal process or otherwise, you must contact the leader of your practice unit or the Firm's Office of the General Counsel to seek the Firm's consent prior to any disclosure. These confidentiality restrictions are permanent and do not lapse or cease upon your departure from the Firm.

## 8. **Insider Information**.

You are prohibited from using or sharing information not publicly disclosed, which you obtain during the course of your work for the Firm, for your personal gain or

Confidential                                                                                          PwC_B00001947

advantage in securities transactions, or for the personal gain or advantage of anyone with whom you improperly share this information. This restriction applies to such information related to any company, not just the Firm's clients and their affiliates. The foregoing obligation is in addition to any obligation that you have not to purchase or hold securities of entities with respect to which the Firm must maintain independence.

9. **Intellectual Property**.

You agree to disclose promptly to the Firm all inventions, discoveries, techniques, technologies, methodologies, writings, software, improvements, and any other works developed, conceived or created by you, either alone or in conjunction with others, at any time during your employment and related to the actual or expected business or activities of the Firm ("Works"), including, without limitation, Works created in connection with services provided to clients. You hereby assign all of your rights, titles and interests (including, without limitation, all copyrights, trademarks, patent rights and other intellectual property rights) therein to the Firm. Whenever requested to do so by the Firm, you agree to cooperate and do all things necessary, including executing all applications, assignments or other instruments that the Firm shall deem necessary to apply for and obtain letters patent or copyrights of the United States or any foreign country, or otherwise protect the Firm's interests therein. If you do not execute such instruments within five days of their being presented to you, you hereby appoint the Firm with limited power of attorney to execute all such instruments. This power of attorney is a right coupled with an interest and is irrevocable. These obligations shall continue beyond the conclusion of your employment, and shall be binding upon your assigns, executors, administrators and other legal representatives. All Works shall be considered Confidential Information.

Notwithstanding the foregoing, pursuant to California Labor Code Section 2870, you shall not be required to assign, nor shall you be deemed to have assigned, any of your rights in any invention or work of authorship that you develop entirely on your own time without using or referring to the Firm's resources, equipment, supplies, facilities, Confidential Information or trade secret information, except for those inventions or works of authorship that either (1) at the time of creation, conception or reduction to practice of the work or invention relate to the Firm's business, or to actual or demonstrably anticipated research or development of the Firm; or (2) result from any work performed by you for the Firm. You acknowledge that you bear the burden of proving that an invention or work of authorship is so exempt from the assignment provisions of this Employment Agreement. You agree to disclose to the Firm, in confidence, all inventions or works of authorship made solely by you or jointly with others at any time during the term of your employment with the Firm, for a review process under which the Firm may determine such issues as may arise, including the Firm's rights and your rights in such inventions or works of authorship.

10. **Continuing Obligations**.

You represent that you have not taken, and agree that you will not take, in connection with your employment with the Firm, any action that would violate any contractual or other restriction or obligation that is binding on you or any continuing duty you may owe to others.

Confidential

PwC_B00001948

If you are a former federal government or military employee and are subject to an opinion letter issued by a federal government agency ethics officer, you represent that you have provided a copy of such opinion letter to the Firm. You also represent that you have fully complied, and agree that you will continue to fully comply, with the guidance set forth in such letter, and that you have not, and will not, engage in any activity that reasonably could be perceived as a personal conflict of interest under such letter. You agree to inform the Firm's Ethics and Compliance Office or lawyer in the Office of the General Counsel responsible for the Firm's Washington Federal Practice immediately if a Firm partner, principal or employee requests that you take any action that would cause you to violate the guidance set forth in such opinion letter.

11. **Solicitation of Clients**.

a. **Prohibition on Solicitation**. You acknowledge that, because of the nature of your work for the Firm, you will develop, learn of, have access to, or be provided with trade secret information belonging to the Firm. Trade secret information includes formulas, patterns, compilations, programs, devices, methods, techniques, or processes that derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use, and which are the subject of reasonable efforts to maintain their secrecy. You further acknowledge that the unauthorized use or disclosure of the Firm's trade secret information could impair the protectible relationships and goodwill of the Firm with its clients and prospective clients. Accordingly, you agree that you will not use or disclose, or assist others in using or disclosing, the Firm's trade secret information for any reason, including without limitation, for the purposes of directly or indirectly soliciting, accepting as a client, or performing services of any type that the Firm can render ("Services") for, any person or entity. It shall not be relevant that a person or entity desires or prefers that someone other than the Firm render Services or that the person or entity is already served by you or any third party with which you become associated.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm resulting from any breach by you of section 11(a) is uncertain and will be difficult to ascertain or calculate with precision. If you breach section 11(a), in addition to any other legal and equitable remedies the Firm may have, you agree to pay to the Firm liquidated damages in an amount equal to 25% of the gross fees paid for Services rendered in, or as a result of a, violation of section 11(a). Such percentage shall be paid with respect to all such Services rendered by you or a third party at any time during a period of three years from the first date of such violation. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm will incur as a result of your breach of section 11(a). You must make the payment to the Firm within 30 days after each such payment of fees has been made by the client.

12. **Solicitation of Partners, Principals and Employees**.

a. **Prohibition on Solicitation**. You agree that, during your employment and for two years following your departure from the Firm for any reason, you will not directly or indirectly solicit or induce, or assist others in soliciting or inducing, Firm partners, principals or employees to become associated with, or perform Services on behalf of, you or any employer or third party, or to otherwise disrupt, impair, damage or interfere

with the Firm's relationship with its partners, principals or employees.

b. **Remedies**. You acknowledge and agree that the amount of damages to the Firm resulting from any breach by you of section 12(a) is uncertain and will be difficult to ascertain or calculate with precision. If you breach section 12(a), in addition to any other legal and equitable remedies the Firm may have, you agree to pay to the Firm liquidated damages in an amount equal to 30% of the individual's annual compensation (including, without limitation, base salary, commission, bonus and the like) at the time of departure to cover replacement costs, and an additional 10% of such annual compensation to cover costs associated with training his or her replacement. You agree that such damages are a reasonable and fair estimate and calculation of the amount of damages that the Firm will incur as a result of your breach of section 12(a). You must make the payment to the Firm within 30 days from the mailing of a written notice to you advising you of the amount due.

13. **Injunctive Relief**.

In the event of a breach or threatened breach by you of any provision of sections 7, 9, 11 or 12 of this Employment Agreement, you agree that the Firm, in addition to any other legal and equitable remedies available to it, shall be entitled to provisional and injunctive relief. You further agree that no bond shall be required to be posted by the Firm in connection with any such action for provisional or injunctive relief. The Firm may pursue any remedy available to it (including, without limitation, those remedies set forth in sections 11(b) and 12(b) above), concurrently or consecutively in any order, and the pursuit of one such remedy will not be deemed to be an election of remedies or waiver of the right to pursue any other remedy.

14. **Assignability**.

You may not assign any of your rights or obligations under this Employment Agreement. This Employment Agreement shall be binding upon and inure to the benefit of the Firm's successors and assigns. Without limiting the foregoing, the Firm may assign its rights and delegate its duties hereunder in whole or in part to any affiliate of the Firm or to any transferee of all or a portion of the assets or business to which this Employment Agreement relates.

15. **Severability**.

If any term or condition set forth in this Employment Agreement is found by a court or other tribunal to be unenforceable, then the remaining terms and conditions will remain in full force and effect. Terms and conditions, if any, found to be unenforceable, will be modified by the court or tribunal to conform to a provision that most closely expresses the intent of the unenforceable term or condition.

16. **Applicable Law**.

PricewaterhouseCoopers LLP is a nationwide firm with executive offices in the City of New York; accordingly, this Employment Agreement is governed by the laws of the State of New York regardless of your practice location and irrespective of the

Confidential
PwC_B00001950

principles of conflicts of law.

17. **Representations**.

You acknowledge that you have not relied on any representations or statements, whether oral or written, regarding your employment with the Firm, other than as contained in this Employment Agreement.

18. **Modifications**.

You acknowledge that this Employment Agreement supersedes all prior oral or written agreements or understandings with the Firm, except for any existing or outstanding agreements with the Firm regarding repayment obligations. This Employment Agreement may be modified only by a writing signed by the leader of your practice unit, or his or her designee; provided, however, that any modification of section 4 of this Employment Agreement must be signed by the Firm's U.S. Human Resources Leader.

19. **Headings**.

Section headings are used herein for convenience of reference and shall not affect the meaning of any provision of this Employment Agreement.

**ACCEPTED AND AGREED**

Name: _____

Signature: _____

Date: _____

| PwC GUID: | mbotta002 | Contract Signature Date Time: | 07/01/2010 11:27PM |
| --- | --- | --- | --- |

Confidential                                                                                                    PwC_B00001951

Save | Return to Search | Previous in List | Next in List | Notify | Previous tab | Next tab

Contract Status/Content | Approval | Print

Confidential

PwC_B00001952

# EXHIBIT 8

## PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

As an employee of **Armanino LLP** ("Company"), and in consideration of my offer of employment and compensation previously and hereafter paid to me, I agree to the following:

### 1.      MAINTAIN CONFIDENTIAL INFORMATION

(a)      <u>Company Information</u>.  During my employment, I will have access to, will acquaint and become acquainted with various trade secrets, confidential and proprietary information relating to the Company's business, and business of its subsidiaries, parent company, affiliates, successors or assigns (together "Affiliated Entities"), including but not limited to: customer, supplier, and distributor lists, contacts, addresses, training manuals and procedures, recruitment method and procedures, recruitment and distribution techniques, business plans and projections, employee handbooks, information about customers and suppliers, price lists, marketing, costs and expenses, documents, budgets, proposals, financial information, inventions, patterns, processes, formulas, data bases, know how, ideas, developments, experiments, improvements, computer programs, software, technology, manufacturing, engineering processes, designs, drawings, blue prints, specifications, tapes, and compilations of information, all of which are owned by the Company or its Affiliated Entities, other parties with which the Company or its Affiliated Entities do business ("Third Parties") or customers of the Company or its Affiliated Entities, and which are used in the operation of the Company's, Affiliated Entities', Third Parties' and/or a customer's business.  I agree at all times during the term of my employment and thereafter to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose directly or indirectly to any person, firm or corporation without written authorization of the Managing Partner of the Company, any trade secrets or confidential information.  In addition, I understand "trade secret" or "confidential information" to mean all information concerning the Company, Affiliated Entities, Third Parties and/or customers (including but not limited to information regarding the particularities, preferences and manner of doing business) that is (i) not generally known to the public and (ii) cannot be discovered or replicated by a third party without substantial expense and effort.  I understand that in the course of my employment, I will have access to confidential customer information that constitutes a trade secret as defined by law.  I further understand that I can only use such confidential customer information for the benefit of the Company, and not for any other purpose, and if I misappropriate such confidential customer information, the Company may pursue legal action against me under any applicable laws.

(b)      <u>Former Employer Information</u>.  I agree that I will not and have not, during my employment with the Company, use or disclose any proprietary information or trade secrets of my former or concurrent employers or companies, if any, and that I will not bring onto the premises of the Company any unpublished documents or any property belonging to my former or concurrent employers or companies, if any, unless consented to in writing by such employers or companies.

(c)      <u>Third Party Information</u>.  I recognize that the Company and its Affiliated Entities have received and in the future will receive from Third Parties and customers their confidential or proprietary information subject to a duty on the Company and Affiliated Entities' part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree that I owe the Company, Affiliated Entities, and such Third Parties and customers, during the term of my employment and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation (except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party) or to use it for the benefit of anyone other than for the Company, Affiliated Entity, or such Third Party or customer (consistent with the Company's agreement with such Third Party or customer) without the express written authorization of the [**President**] of the Company.

2.      **ASSIGNING INVENTIONS AND ORIGINAL WORKS**

(a)      Inventions And Original Works Retained and Licensed to The Company.  I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, and trade secrets which were conceived in whole or in part by me prior to my employment with the Company to which I have any right, title or interest, and which relate to the Company's proposed business, products, or research and development ("Excluded Inventions"); or, if no such list is attached, I represent and warrant that there are no such Excluded Inventions.  Furthermore, I represent and warrant that the inclusion of any Excluded Inventions on Exhibit A of this Agreement will not materially affect my ability to perform all obligations under this Agreement.  If, in the course of my employment with the Company, I incorporate into or use in connection with any product, process, service, technology or other work by or on behalf of Company and Excluded Invention, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale, and sell such Excluded Invention as part of or in connection with such product, process, service, technology or other work and to practice any method related thereto.

(b)      Inventions And Original Works Assigned To The Company.  I agree that I will promptly make full written disclosure to the Company, I will hold in trust for the sole right and benefit of the Company, and I hereby assign and transfer to the Company, or its designee, all my worldwide right, title, and interest in and to (1) any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, know-how, ideas, software, compositions of matter and trade secrets, whether or not patentable or registrable under patent, copyright or similar laws, which I may solely or jointly conceive, create, develop, reduce to practice or otherwise make (or cause to be conceived, created, developed, reduced to practice or made), during the entire period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company confidential information (collectively referred to as "Inventions"); (2) any and all trade secrets, patent rights, copyrights, moral rights, and other intellectual property rights anywhere in the world (collectively referred to as "Intellectual Property Rights") embodied in or related to such Inventions, except only the Excluded Inventions pursuant to Section 2(f) below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act, and the Company will be considered the author and owner of such works.  I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.  Notwithstanding the above, I recognize that Section 2870 of the California Labor Code, as set forth in Exhibit B hereto, exempts from this provision any invention as to which I can prove the following:

(i)      It was developed entirely on my own time; and

(ii)      No equipment, supplies, facility or trade secret of the Company or Affiliated Entities was used in its development; and

(iii)      It neither:

(1)      relates at the time of its conception or reduction to practice to the business of the Company or to the Company's actual or demonstrably anticipated research and development; nor

Armanino000038

(2)      results from any work performed by me for the Company.

(c)      Moral Rights.  I assign to the Company all "moral rights" I may have in any Inventions, except as provided in 3(f) below.  If and to the extent an assignment or transfer of any Moral Rights is not valid or enforceable under any applicable law, I grant the Company a worldwide, unlimited, royalty-free right and license in and to, and I hereby forever waive and agree never to assert, any and all Moral Rights I may have in or with respect to any Inventions even after termination of my employment or work on behalf of the Company, to the extent permitted under applicable law.  "**Moral Rights**" mean any rights to attribution or claim authorship of a work of authorship, to object to or prevent the modification of any work of authorship, or to withdraw from circulation or control the publication or distribution of any work, and any similar right, existing under judicial or statutory law of any country or jurisdiction in the work, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

(d)      Maintenance of Records.  I agree to keep and maintain adequate, accurate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, electronic files, reports and any other format that may be specified by the Company.  Such records are and will be available to and remain the sole property of the Company at all times.

(e)      Patent And Copyright Registrations.  I agree to assist the Company, or its designee, and the Company's expense, in every proper way to secure the Company's rights in the Inventions and any rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions and any rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of my employment.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature with respect to any Inventions including, without limitation, to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any papers, oaths and to do all other lawfully permitted acts with respect to such Inventions with the same legal force and effect as if executed by me.

(f)      Exception to Assignments.  I understand that the provisions of this Agreement requiring assignment to the Company do not apply to any invention which qualifies fully under the provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as Exhibit B.  I will advise the Company promptly in writing of any inventions, original works of authorship, developments, improvements or trade secrets that I believe meet the criteria in Subparagraphs 2(b)(i), (ii), and (iii) above; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. I understand that the Company will keep in confidence and will not disclose to third parties without my consent any confidential information disclosed in writing to the Company relating to inventions that qualify fully under the provisions of Section 2870 of the California Labor Code.

(g)      Immunity From Liability For Confidential Disclosure Of Trade Secret(s).  Pursuant to the Defend Trade Secrets Act of 2016 (18 U.S.C. 1833(b)), I shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence either directly or indirectly to a Federal, State, or local government official, or to an attorney, solely for the purpose

Confidential

Federal or State trade secret law for the disclosure of a trade secret made in a complaint, or other document filed in a lawsuit or other proceeding, if such filing is made under seal. If I file a lawsuit alleging retaliation by the company for reporting a suspected violation of the law, I may disclose the trade secret to my attorney and use the trade secret in the court proceeding, so long as any document containing the trade secret is filed under seal and does not disclose the trade secret, except pursuant to court order. This paragraph will govern to the extent it may conflict with any other provision of this Agreement.

### 3.   CONFLICTING EMPLOYMENT

I agree that, during my employment with the Company, I will devote full time to the business of the Company and will not directly or indirectly, engage, individually or as an officer, director, employee, consultant, advisor, partner or co-venturer, or as a stockholder or other proprietor owning more than a five percent (5%) interest in any firm, corporation, partnership or other organization (in case of any such ownership or participation) in the business of manufacturing, selling or distributing products in competition with the products and/or services of the Company or Affiliated Entities. I shall furnish to the Company a detailed statement of any outside employment or consulting services in which I seek to engage or invest, and, as from time to time requested by said Board, resubmit for approval a detailed statement thereof. In the event the Company determines in good faith that such violation or conflict exists, I shall refrain from such employment, consulting services or investment. It is intended and agreed that during the term of my employment, I will knowingly perform no act which may confer any competitive benefit or advantage upon any enterprise competing with the Company or Affiliated Entities.

### 4.   EMPLOYEE, AGENT, CONSULTANT OR CLIENT NONSOLICITATION

I agree that during my employment and for a period of one (1) year after the termination of my employment for any reason, and where the Company has offices, I shall not induce or attempt to induce any employee, agent or consultant of the Company or Affiliated Entities to terminate his or her association with the Company or Affiliated Entities; and (ii) except as necessary to carry out my job duties while employed by the Company, I shall not directly call upon or solicit any of the clients of the Company or any Affiliated Entities that were or became clients or potential clients, and with whom I know of or developed a relationship during my employment with the Company (as used herein, "customer" shall mean any person or company as listed as such on the books of the Company or Affiliated Entities). The Company and I agree that the provisions of this Section 4 contain restrictions that are not greater than necessary to protect the interests of the Company. In the event of the breach or threatened breach by me of this Section 4, the parties, in addition to all other remedies available to it at law or in equity, will be entitled to seek injunctive relief and/or specific performance to enforce this Section 4.

### 5.   NO BREACH OF DUTY

I represent that my performance of all the terms of this Agreement and as an employee of the Company does not, and to the best of my present knowledge and belief, will not breach any agreement or duty to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith. I am not at the present time restricted from being employed by the Company or entering into this Agreement. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices and documents), I have returned all property and confidential information belonging to all prior employers.

Armanino000040

6.    **RETURNING COMPANY DOCUMENTS**

I agree that, at the time of leaving the employ of the Company or on demand by the Company during employment, I will deliver to the Company (and will not keep in my possession or deliver to anyone else) any and all originals and copies of confidential information, devices, records, software, data, notes, reports, proposals, lists, and sources of customers, lists of employees, proposals to customers, drafts of proposals, business plans and projections, reports, job notes, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, or any other documents or property obtained by me in the course of my employment with the Company, including materials from Affiliated Entities, Third Parties, or any customer of the Company or Affiliated Entities.  In the event of the termination of my employment, I agree to an exit interview to confirm my compliance with this Agreement, and to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

7.    **NOTIFICATION OF NEW EMPLOYER**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.  I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me or my new employers regarding my continuing obligations provided by the Agreement.

8.    **NO EMPLOYMENT AGREEMENT**

Nothing in this Agreement changes my status as an express at-will employee.  I agree that unless specifically provided in another writing signed by me and the Managing Partner of the Company, my employment by the Company is not for a definite period of time.  Rather, my employment relationship with the Company is one of employment at will and may be terminated by either myself or the Company at any time, with or without cause or prior notice.  In addition, the Company has the right to change my compensation, duties, assignments, responsibilities, location of my position and any other terms and conditions of my employment at any time, with or without cause or notice.

9.    **GENERAL PROVISIONS**

        (a)    <u>California Law</u>.  This Agreement will be governed by the laws of the State of California without reference to its choice of law rules.

        (b)    <u>Entire Agreement</u>.  This Agreement, together with my Offer Letter, sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions between us, written or oral.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by both an officer of the Company and myself.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

        (c)    <u>Severability</u>.  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

        (d)    <u>Successors And Assigns</u>.  This Agreement and my obligations hereunder will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

ARMANINO LLP
PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

    (e)    <u>Remedies</u>.  By virtue of the duties and responsibilities attendant with my engagement by the Company, I understand that great loss and irreparable damage would be suffered by the Company if I should breach any of the terms of this Agreement.  I acknowledge that each such term is reasonably necessary to protect and preserve the interests of the Company.  Therefore, in addition to all other remedies available to the Company at law or in equity, the Company shall be entitled to, without posting a bond, specific performance, a temporary restraining order and a permanent injunction to prevent a breach or the continuation of a breach of any of the terms of this Agreement.

    (f)    <u>Waiver</u>.  Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

    (g)    <u>Survivorship</u>.  My obligations under this Agreement, and the rights of the Company hereunder, will survive termination of my employment with the Company.

    (h)    <u>Agreement Read, Understood and Fair</u>.  I have carefully read and considered the provisions of this Agreement and agree that all of the restrictions set forth are fair and reasonable and are reasonably required for the protection of the interests of the Company.  The Company acknowledges that the goodwill and value of the Company is enhanced by these provisions and that said enhancement is desired by me.

    (i)    <u>Effective Date</u>.  The Agreement shall be deemed effective the first day of my employment by the Company.

Date: 08/04/2017

MAURO BOTTA
Mauro Botta
Signature

ACCEPTED AND AGREED TO:

Date:_____

Armanino LLP

By:_____

Title:_____

**EXHIBIT A**

LIST OF EXCLUDED INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|---|---|---|

**EXHIBIT B**

**CALIFORNIA LABOR CODE SECTION 2870**

**EMPLOYMENT AGREEMENTS, ASSIGNMENT OF RIGHTS**

California Labor Code § 2870.  Invention on Own Time - Exemption from Agreement.

    (a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        (1)    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

        (2)    Result from any work performed by the employee for the employer.

    (b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

Armanino000044

**EXHIBIT C**

**ARMANINO**

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, software, data, notes, reports, proposals, lists, and sources of customers, lists of employees, proposals to customers, drafts of proposals, business plans and projections, reports, job notes, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Armanino, its parent, subsidiaries, affiliates, successors or assigns (together "Affiliated Entities").

I further certify that I have complied with all terms of the Company's Proprietary Information and Inventions Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others) covered by that Agreement.

I further agree that, in compliance with the Proprietary Information and Inventions Agreement, I will preserve as confidential all Company Information as defined in that Agreement, including but not limited to trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company and Affiliated Entities, and their customers, consultants or licensees.

Date: _____          _____

                                                         **Mauro Botta**

                                                         _____

                                                         Signature

Armanino000045

50 West San Fernando Street
Suite 500
San Jose, CA 95113-2438
408 494 1255   main
408 494 1219   fax
armaninoLLP.com

**armanino**

July 28, 2017

Mauro Botta
Via E-Mail (*mauro_botta@libero.it*)

**EMPLOYMENT OFFER**

Dear Mauro,

I am delighted to extend you an offer to join Armanino LLP as a Senior Manager within our Audit Department. You will be based in Armanino's San Jose office located at 50 West San Fernando Street, Suite 500. This offer of employment with Armanino is conditioned upon your acceptance, in writing, of the terms and conditions as enumerated below.

1. **Compensation:** Commencing on your Start Date, your salary will be $7,916.66 semi-monthly ($190,000 per annum), less deductions required or permitted by law. The compensation will be paid in accordance with Armanino's standard payroll policies (subject to applicable withholding taxes as required by law).

2. **Bonus:** As a Senior Manager, you will be eligible for an annual bonus of up to $13,000 per the 30-Day Issuance Financial Statement Bonus Plan, in addition to the Manager Bonus Plan, both paid on a quarterly basis.

3. **Benefits:** You will be eligible to participate in the Armanino benefit programs: Medical, Dental, Vision, Life/AD&D, STD, LTD and LTC in accordance with their terms, subject to the usual eligibility restrictions. The Firm offers a Profit Sharing Plan to which the firm may make a discretionary contribution. You will begin accruing five (5) weeks of Personal Time Off (PTO) per year (16.6 hours per month) upon date of hire. You will be eligible to participate in our 401k plan immediately following your first pay period.

4. **General Duties:** During the term of your employment, you agree that at all times and to the best of your ability you will loyally and conscientiously perform all of the duties and obligations required of you in your job and by Armanino. You further agree that you will not, without the prior written consent of Armanino, directly or indirectly engage in or participate in any business that is competitive in any manner with the business of Armanino during the time of your employment with Armanino. You also agree to comply with any and all policies of Armanino as in effect from time to time.

5. **Start Date:** If you accept our offer, we would like for you to start on Monday, Monday, August 7, 2017 or Monday, September 25, 2017. This offer is contingent upon adequate reference and background check results and will expire on August 2, 2017. The date you actually start working at Armanino is referred to as your "Start Date".

6. **Proof of Work:** In compliance with the Immigration Reform and Control Act of 1986, you will be required to provide to Armanino documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided within three (3) business days of your date of hire. Your failure to meet this condition could result in termination of your employment with Armanino.

7. **Proprietary Information and Invention Agreement:** Your acceptance of this offer and commencement of your employment with Armanino is contingent upon your execution of Armanino's Proprietary Information and Invention Agreement (the "PIIA", a copy of which is enclosed for your review. An executed copy of the PIIA must be delivered to Armanino's Human Resources Department on or before your Start Date. The

Armanino000046

8. **Dispute Resolution and Agreement to Arbitration of Disputes (in lieu of litigation).** Both parties agree that for any and all legal disputes or claims, including all contract, tort, discrimination, common law or statutory disputes or claims between you and Armanino and/or its agents, arising under or relating to your employment or termination of employment with Armanino, the parties will try in good faith to resolve any dispute or claim by negotiation and consultation between themselves. If the parties cannot resolve the dispute or claim for any reason, either party may commence binding arbitration in accordance with the provisions of this Agreement to Arbitration of Disputes.

This Agreement to Arbitrate Disputes shall be governed by and construed and enforced in accordance with the laws of the State of California. You and Armanino agree that any and all disputes or claims, including all contract, tort, discrimination, common law or statutory disputes or claims between you and Armanino and/or any of its related entities, holding companies, parents, subsidiaries, divisions, officers, shareholders, directors, teammates, employees, agents, insurers, predecessors, successors, and assigns, arising under or relating to your employment or termination of your employment with Armanino ("Arbitrable Claims") shall be resolved exclusively by final and binding arbitration. The sole exceptions are claims under applicable workers' compensation law, disputes solely before government agencies (including but not limited to the Equal Employment Opportunity Commission, the U.S. Department of Labor, or the National Labor Relations Board), state disability insurance, unemployment insurance claims or employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act, actions seeking provisional remedies pursuant to Code of California Civil Procedure section 1281.8, and other claims expressly prohibited by law from being subject to binding arbitration. Further, nothing in this Agreement excuses either party from bringing an administrative claim before a state or federal agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

For all Arbitrable Claims, you and Armanino mutually agree that arbitration shall be exclusive, final and binding remedy. You, Armanino and its agents hereby waive any rights each may have to a jury trial in regard to the Arbitrable Claims. You also agree that any Arbitrable Claims shall by resolved on an individual basis, and you agree to waive your right, to the extent allowed by applicable law, to consolidate any Arbitrable Claims with the claims of any other person in a class, representative, or collective action. The arbitration will be conducted by a single neutral arbitrator and administered by JAMS, Inc. ("JAMS"), in Contra Costa County, California (or other mutually agreed upon city), pursuant to its Employment Arbitration Rules & Procedures effective July 1, 2014. These rules can be found at http://www.jamsadr.com/rules-employment-arbitration/. If you are unable to access or print the JAMS rules, you may obtain a printout of the rules from the office by asking Human Resources. In arbitration, the parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses. Any disputes in this regard shall be resolved by the Arbitrator, provided, however, that to the extent discovery and presentation of witnesses and evidence would be limited or unavailable under applicable law if the dispute were brought in court, such limitations shall also apply in arbitration. Armanino shall be responsible for all costs of JAMS to administer the arbitration and the costs for the arbitrator less those amounts you would otherwise be required to pay were the claims litigated in a court of law. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, including an award of attorneys' fees, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator. No remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Agreement. Notwithstanding the foregoing, in no event shall an arbitration proceed on a class, collective, or joint or multiple plaintiff/claimant basis. After the arbitration, the Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law, to allow for judicial review. The promises by the Armanino and by you to arbitrate differences, rather than litigate them before courts or other bodies, provide consideration for each other.

If any provision of this Agreement to Arbitrate Disputes is adjudged to be void or otherwise unenforceable, in whole or in part, it shall be severed. Severing of any provision of the Agreement shall not affect the validity of the remainder of the Agreement. All other provisions shall remain in full force and effect based on the parties' mutual intent to create a binding agreement to arbitrate their disputes. Notwithstanding the foregoing, in no event shall an arbitration proceed on a class, collective, representative or joint or multiple plaintiff/claimant basis. If you have any questions regarding the foregoing provision or any provision of this letter, please contact the undersigned.

You may opt-out of this Agreement to Arbitrate Disputes by signing the Arbitration Opt-Out form enclosed with this offer letter within 30 days of the date of this offer letter and returning it to HRTeam@armaninollp.com. Your decision to opt out or not opt out will not be used as a basis for Armanino to take any adverse employment action against you.

9.    **Non-Engagement in Conflicting Employment.** This position is a full time job with the understanding that during your employment you will not engage in outside consulting activities, whether compensated or not, which materially interfere with the performance of your job duties with Armanino or create a conflict of interest, nor will you establish a competing business during your employment with Armanino.

10.   **Pre-Existing Agreements and Trade Secrets.** You confirm that you are not bound by any other agreement with any prior or current employer, person or entity that would prevent you from fully performing your duties with Armanino, and that you will not during your employment with Armanino, or have not during the pre-hire process, use or disclose any proprietary or confidential information, or trade secrets, of your former or concurrent employers or companies.

11.   **At-Will Employment.** This offer of employment is not for any specific period of time; instead your employment is at all times "at will." This means that you may terminate your employment with or without cause or prior notice, and Armanino has the same right.  In addition, Armanino may change your compensation, benefits, duties, assignments, and responsibilities, location of your position, or any other terms and conditions of your employment, at any time to adjust to the changing needs of our dynamic company.  These provisions expressly supersede any previous representations, oral or written.  Your at-will employment status cannot be modified unless it is written and signed by both you and the President of Armanino.

12. **Severability.** This Agreement will be enforced to the fullest extent permitted by applicable law.  If any provision of this Agreement is held to be invalid or unenforceable to any extent, then the remainder of this Agreement will have full force and effect and such provision will be interpreted, construed or reformed to the extent reasonably required to render the same valid, enforceable and consistent with the original intent underlying such provision.

Mauro, we are excited at the prospect of having you join our team and look forward to this being a rewarding relationship.

Thank you again and we look forward to your reply.

Best regards,

Scott Copeland, Partner
ARMANINO LLP

**ACKNOWLEDGMENTS & ACCEPTANCE**

I accept this employment offer with the understanding that it is not a contract for a fixed term or specified period of time. I understand that my employment is voluntary, ("At Will"), and can be terminated either by me or by Armanino at any time, with or without notice and with or without cause. The provisions stated above supersede all prior representations or agreements, whether written or oral. This offer letter may be amended or modified only in writing, signed by Armanino and me.

The terms and conditions above are hereby agreed and accepted:

Signed: _____     Date: 08 / 04 / 2017
Mauro Botta

**ARBITRATION OPT-OUT FORM**


**[SIGN ONLY IF YOU ELECT TO OPT OUT OF THE AGREEMENT TO ARBITRATION OF DISPUTES]**


I am exercising my right to opt out of the Agreement to Arbitration of Disputes contained in Section 8 of my offer letter. By opting out within 30 days of receipt of this offer letter, I agree that I am no longer entitled to participate, or utilize the procedures outlined in the Agreement to Arbitrate Disputes.


Signed:_____          Date:_____
       Mauro Botta

Armanino000049

# EXHIBIT 9



**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION**
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104

DIVISION OF ENFORCEMENT

John Roscigno
415-705-8135

April 28, 2017

**Via UPS & EMAIL (ted.senger@us.pwc.com)**

PricewaterhouseCoopers LLP
c/o Theodore Senger
Three Embarcadero Center
San Francisco, CA 94111-4004

   Re: <u>In the Matter of Certain PricewaterhouseCoopers Audits (MSF-4149)</u>

Dear Mr. Senger:

  The staff of the United States Securities and Exchange Commission is conducting an investigation relating to the above-referenced matter to determine if violations of the federal securities laws have occurred. In connection with this investigation, the staff requests that PricewaterhouseCoopers LLP ("PwC") immediately preserve, and voluntarily provide us with, the information and documents set forth in Attachment A by 5:00 p.m., May 12, 2017.

  Please send the materials to:

     ENF-CPU
     U.S. Securities and Exchange Commission
     100 F St., N.E., Mailstop 5973
     Washington, DC 20549-5973

  Please carefully read this letter, the enclosed Form 1662, and Attachment A. Attachment A contains, among other things, important instructions related to the manner of producing documents. In particular, if PwC prefers to send us copies of original documents, **the staff requests that PwC scan and produce hard copy documents, as well as electronic documents, in an electronic format consistent with the SEC Data Delivery Standards attached hereto. All electronic documents responsive to the document request, including all metadata, should also be produced in their native software format.** If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible and in any event before producing documents.

  Please also email a copy of the cover letter accompanying the production to John Roscigno.

Confidential

PricewaterhouseCoopers LLP
April 28, 2017
Page 2

In your cover letter(s) accompanying the production of responsive documents, please enclose a list briefly describing each item you send. The list should state to which paragraph(s) in the attachment each item responds. Please also state in the cover letter(s) whether PwC has met its obligations under the document request by searching carefully and thoroughly for everything called for by the request, and sending it all to us.

Please also provide a narrative description describing what was done to identify and collect documents responsive to the request. At a minimum, the narrative should describe:

- who searched for documents;
- who reviewed documents found to determine whether they were responsive;
- which custodians were searched;
- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, storage facilities, home offices, work offices, voice mails, home email, webmail, work email, backup tapes or other media);
- what search terms, if any, were employed to identify responsive documents;
- what firms and/or persons, if any, assisted in analyzing the data collected;
- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and
- where the original electronic and hardcopy documents are maintained and by whom.

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

This investigation is a non-public, fact-finding inquiry. The investigation does not mean that we have concluded that you or anyone else has violated the law. Also, the investigation does not mean that we have a negative opinion of any person, entity, or security. Enclosed is a copy of the Commission's Form 1662 entitled "Supplemental Information for Persons Requested to Supply Information Voluntarily or Directed to Supply Information Pursuant to a Commission Subpoena." Form 1662 explains how we may use the information you provide to the Commission and has other important information for you.

Confidential

PricewaterhouseCoopers LLP
April 28, 2017
Page 3

    Thank you in advance for your anticipated cooperation.  If you have any questions or would like to discuss this matter, you may call me at 415-705-8135.

Sincerely,

John Roscigno
Senior Accountant
Division of Enforcement

Enclosures:    Attachment A
                SEC Data Delivery Standards
                SEC Form 1662

Confidential