Exhibit 1

1              discussion with Art Chadwick, CFO, and          02:22:02

2              Suzy Seandel, CAO, we obtained

3              confirmation that their review would

4              focus on fluctuations that would be

5              greater than $10 million within the tax         02:22:12

6              footnote, and if such event would occur,

7              they would gather supporting evidence

8              from the controller to corroborate the

9              reasons for such fluctuations.  During FY

10             2014, no fluctuations occurred within the       02:22:24

11             tax footnote in the Form 10-K that would

12             be above such threshold."

13        My first question to you is that's language

14    that you added to this document; right?

15        A.   Yes.  After obtaining assurance from            02:22:36

16    Mr. Thorson that the company would have done it.

17        Q.   Okay.  But as of the moment you added that

18    language, you had not, in fact, conducted a

19    walk-through and discussion with Art Chadwick, CFO,

20    and Suzy Seandel, CAO, during which you obtained        02:22:51

21    confirmation that their review would focus on

22    fluctuations that would be greater than $10 million

23    within the tax footnote; correct?

24        A.   I would not have audited had Mr. Thorson

25    gave me assurances that he would have done -- made     02:23:06

1   sure that the company was doing it.                      02:23:08

2       Q.   That's not what I asked.  I just want a

3   simple answer to my question.

4           As of the moment that you wrote those

5   words, "based on our walk-through and discussion         02:23:20

6   with Art Chad, CFO and Suzy Seandel, CAO, we

7   obtained confirmation that their review would focus

8   on fluctuations that would be greater than

9   $10 million," you, in fact, had not obtained

10  confirmation; correct?                                   02:23:33

11      A.   I believe I answered the question already.

12      Q.   I require an answer to that question.

13          You had not obtained confirmation at the

14  time that you wrote that; correct?

15      A.   No.                                             02:23:47

16      Q.   Okay.  And at the time that you wrote that

17  language, you had not had a discussion with

18  Art Chadwick, the CFO, about this proposed issue to

19  address fluctuations greater than $10 million;

20  right?                                                   02:24:19

21      A.   The proposal was a resolution, and I wrote

22  it, based it on the reassurance from Mr. Thorson.

23      Q.   And as of the time you wrote this, you had

24  not had the discussion you referenced here with

25  Mr. Chadwick; right?                                     02:24:32

1    A.  Which paragraph are you pointing to?                    11:45:27

2    Q.  Well, I'm just asking if you recollect it.

3    A.  Yes.

4    Q.  Okay.  And to whom did you blow the whistle

5  while you were still working at PwC?                          11:45:47

6    A.  The FBI, the SEC, Senator Dianne Feinstein

7  office, state director, Department of Labor, the

8  FEH.  That's Department of Labor.  That's all I can

9  recall.

10   Q.  Okay.  And when did you report or blow the              11:46:21

11  whistle to the FBI?

12   A.  I believe it was in October of '16.

13   Q.  Okay.  And what laws did you claim were

14  being violated when you reported to the FBI?

15   A.  I did not articulate articles of law.  I                11:46:49

16  just went to their office and told them what my

17  concerns were.

18   Q.  Okay.  When did you blow the whistle to the

19  SEC?

20   A.  I believe that was in the beginning of                 11:47:07

21  November '16 or end of October '16, in that time

22  frame.

23   Q.  And did you attempt to describe to the SEC

24  violations of law by PwC?

25   A.  I attached the documents to my complaint              11:47:23

1  that I believe included the standards that were        11:47:27

2  relevant to the issue I was raising.

3     Q.  The standards.  The auditing standards?

4     A.  PwC reference.  I did not have, to my

5  recollection, references to specific language of all    11:47:39

6  these standards.

7     Q.  And with respect to the office of

8  Dianne Feinstein, when did you blow the whistle to

9  that office?

10    A.  Well, I just want to make sure, when you        11:48:03

11 say "blow the whistle," went to Senator Feinstein's

12 office in January '17 to seek their assistance in

13 what I told the SEC.  We didn't go through documents

14 in detail.

15    Q.  Okay.  And what assistance were you             11:48:18

16 seeking?

17    A.  To make sure that the SEC would have looked

18 at it.

19    Q.  Okay.  And that's because the SEC had done

20 nothing up to that point in time after your            11:48:32

21 complaint; right?

22    A.  That would be speculation.  I did not

23 receive any communication from the SEC after I

24 submitted my complaint.

25    Q.  Have you received any communication from        11:48:45

1       THE WITNESS:  I can think of some --            01:22:08

2       BY MR. HUESTON:

3    Q.  Okay.  Tell me.

4    A.  -- that are in the complaint.

5       The consolidations related to XPliant.  The    01:22:13

6  inventory write-down issue.  The sales of a group of

7  assets.  Build-to-suit lease.

8       (Reporter clarification.)

9       THE WITNESS:  Build-to-suit lease.

10       The convertible note.  There's other ones I    01:22:56

11  can't recall.

12       BY MR. HUESTON:

13    Q.  Okay.  So moving into 2014, you continue to

14  work on the Cavium engagement team; right?

15    A.  Yes.                                           01:23:22

16    Q.  And at the end of the 2014 Cavium audit,

17  you raised various concerns about Cavium to your

18  engagement leader, Tye Thorson; right?

19    A.  Yes.

20    Q.  And did, in fact, Mr. Thorson ask you to       01:23:34

21  write down your views in a memo?

22    A.  He asked me to document my points in bullet

23  points.

24    Q.  Okay.  And then you complied with his

25  request and created such a document; right?          01:23:47

1    A.  This is exhibit?                                          02:16:46

2    Q.  We're on Exhibit 30.

3    A.  30.  Okay.

4    Q.  This is your revision back now.  And we are

5  now going to -- going to the first page of the memo.           02:16:53

6         So going to the underscored portion at the

7  end, the language states:

8            "The company, as part of their review

9         of the tax precision, adopts a level of

10        precision equal to 100,000 and a level of            02:17:18

11        precision of 1 million for items not

12        affecting balance sheet or income

13        statement.  Based on discussion with

14        Art Chadwick, CFO, and Suzy Seandel, CAO,

15        in performing their review of the tax              02:17:34

16        footnote, they stated that they would

17        consider material fluctuations above

18        $10 million and investigate with support

19        to the company's controller (See Control

20        7.2.6).  In light of the considerations           02:17:47

21        in this memo, we do not believe such

22        level of precision to be unreasonable for

23        disclosures with low inherent risks such

24        as the tax footnote."

25        This was language that you added to this           02:17:59

1  draft; right?                                                    02:18:02

2      A.   There was a discussion that night before,

3  where Mr. Thorson called me, stating that we had an

4  issue, that national office could not move past.

5  The material weakness they believed that they had,    02:18:19

6  they could not contain the exposure for the deferred

7  tax asset disclosure items.  And he told me that we

8  needed to find the solution.

9          I asked him to send me the comments that

10  national was giving him so that I could have had a     02:18:37

11  chance to look at it and see if it was possible to

12  find the solution.

13          I took a look, and I told Mr. Thorson that

14  I believe I have a solution as long as he would have

15  told the company to do exactly what we were stating    02:18:53

16  in this memo.  And he replied to me over the same

17  time, "You got it."

18          And after sent it to him, the first draft,

19  he read it, and then he replied back to me, I

20  believe on the same time, all caps, he said, "Whoa,    02:19:08

21  you wouldn't think I would have read this.

22  Initially we discussed 7 million as procedure, and

23  you put 10."

24          And I told him that obviously if there was

25  a control that would compensate the errors that were   02:19:21

1  noted, the precision had to be above the level of          02:19:25

2  the error noted; otherwise, that control, too, would

3  have failed.

4       Then he told me do the national would agree

5  to that?  And I told him only one way find out.  And       02:19:36

6  that is the last I heard.

7    Q.  Okay.  Thank you for that.  But I asked you

8  a very simple question.

9       Just so the record is clear, the language

10  that I read, it's underscored here in your attached        02:19:48

11  draft.  That's language that you added to this

12  document?

13    A.  Yes.

14    Q.  Okay.  And this language, you would agree,

15  read facially, describes an existing control with          02:19:58

16  different levels of precision; right?

17    A.  That is why I added the context.

18    Q.  Well, I'm just asking you -- you've added

19  context not in this document; right, sir?

20    A.  It was in conversation with Mr. Thorson.             02:20:16

21  Obviously he wouldn't have it in that document.

22    Q.  Well, I know.  I'm just asking you what's

23  in this document.

24       This document simply suggests an existing

25  control, right, with different levels of precision?        02:20:27

1  That's what the document states facially right, sir?          02:20:31

2     A.  It does refer to inquiry with Mr. Chadwick

3  and Mr. Seandel [sic].

4     Q.  Right.  And by the way, what was the

5  magnitude of the error that led to the 2014                    02:20:54

6  deficiency?  Do you recall?

7     A.  I believe it was 7 or 8 million gross.

8     Q.  Do you remember 3.3 million?

9     A.  No.  I think the gross impact on the

10  footnote was higher than that.                                02:21:09

11        (Reporter clarification.)

12        THE WITNESS:  The gross error was higher

13  than that.

14        BY MR. HUESTON:

15     Q.  Let's go -- turn to two pages later.                   02:21:31

16  There's a section called "Compensating Control,

17  7.0206."

18        Do you see that?

19     A.  That one 6242?

20     Q.  You see the topic that says "Compensating           02:21:46

21  Control, Section 7.0206"?

22     A.  Yes.

23     Q.  Okay.  And go down four lines.  There is

24  language that you inserted here that starts with:

25        "Based on our walk-through and                          02:22:00

1    A.  Yeah.  What I recall.                                02:56:59

2    Q.  Okay.  And what was illegal about that?

3    A.  The fact that PwC policies, each

4  performance year should be evaluated as standalone.

5  And at that time I was not out for partner yet, so       02:57:11

6  how could they decide so early that I would have

7  never made it?

8    Q.  When you say "so earlier," when was that?

9    A.  2014.

10   Q.  How long had you been at PwC by that point        02:57:23

11  in time?

12   A.  How long have I been what?

13   Q.  How long -- by 2014, how long had you been

14  employed by PwC?

15   A.  In the U.S., ten years.                            02:57:31

16   Q.  And including your time in Italy at PwC,

17  what was the total amount of time?

18   A.  15.

19   Q.  All right.  Now, you claim that PwC

20  retaliated against you by underutilizing you; right?    02:57:45

21   A.  Yes.

22   Q.  And when did your utilization rate begin to

23  drop?

24   A.  After I was removed from Harmonic.

25   Q.  That's when?                                       02:57:56

1    A.   Sometime March, April 20 -- 2016.                    02:58:02

2    Q.   Okay.  And in your view, how many

3   engagements would you have to be staffed on at a

4   time to achieve full utilization?

5    A.   That does depend on the engagement.                  02:58:23

6    Q.   All right.  How many -- how many

7   engagements do you recall being staffed on in 2015?

8    A.   '15.  Calendar year or like --

9    Q.   Yeah, calendar year.

10    A.   2015.  Maybe three, I recall.                        02:58:52

11    Q.   How about in 2016?  How many engagements

12   were you staffed on in 2016?

13    A.   Two, I believe.

14    Q.   All right.  And what about 2017?

15    A.   Two.                                                 02:59:21

16    Q.   And in 2015, what percentage of your work

17   time was utilized?

18    A.   I do not recall.

19    Q.   All right.  Well, close to full-time?

20    A.   How do you define "full-time"?                       02:59:37

21    Q.   I don't know.  Full utilized.

22       Were you fully utilized in 2015?

23    A.   How do you define "fully utilized"?

24    Q.   Well, we've just been talking, and you've

25   been answering questions about full utilization.          02:59:52

1  keep you; is that right?                              03:21:52

2    A.  So he says.

3    Q.  So he says.

4        Do you have a reason to believe that that's

5  not true?                                             03:21:58

6    A.  I wouldn't speculate because I do not know

7  what he did or didn't.

8    Q.  Okay.  Do you recall telling Mr. Wallace

9  that Ergun told you that he tried to convince

10  Gigamon to keep you on the engagement?               03:22:16

11    A.  I do not recall to tell him that.  It is

12  possible.

13    Q.  All right.  Now, you mentioned that -- in

14  your list of retaliatory actions that PwC did not

15  staff you on a client that you brought in; right?    03:22:36

16    A.  Yes.

17    Q.  And that was Pacific Biosciences?

18    A.  Yes.

19    Q.  And Pacific Biosciences is a pharmaceutical

20  company; right?                                       03:22:47

21    A.  Not exactly.

22    Q.  Well, it manufactures systems for gene

23  sequencing; right?

24    A.  Right.

25    Q.  All right.  Do you recall having a             03:22:56

1    A.  I believe that was before.                          03:40:09

2    Q.  Okay.  And did you have this -- I assume a

3  conversation by phone with Mr. Dubois --

4    A.  Yes.

5    Q.  -- or in person?  A phone call.                     03:40:18

6        And was there more than one call, or was it

7  just one call?

8    A.  I believe it was one.

9    Q.  Okay.  What do you recall saying to

10  Mr. Dubois about the decision to lay you off?            03:40:26

11    A.  I told him what occurred, that it came as a

12  complete shock.  And I do not believe it was in

13  accordance with PwC policies, what just happened, as

14  far as the communication.

15        And I wanted to know a little more about          03:40:49

16  the process and the -- how it came to be.

17    Q.  And what did he say in response?

18    A.  He apologized for the communication that

19  Mr. Carey gave me.  He said that that should not

20  have happened that way.  And he did say that the        03:41:05

21  restructuring was something that national did speak

22  to local offices as far as the need to do it, but

23  they did not give names or quota for each office to

24  fill.  The decision was independently done from each

25  office as to who and how many.                          03:41:26

1    Q.   And did he indicate that the restructuring          03:41:30

2  guidelines were for all senior managers in their

3  fifth year who were not in the pipeline to

4  partnership?

5    A.  I do not recall we discussed that aspect.            03:41:40

6    Q.   Okay.  Did he say anything to you that was

7  inconsistent with that guidance?

8    A.  No.

9    Q.   Okay.  And then you said he apologized for

10  Mr. Carey's communication.                                03:41:55

11       What communication are you referring to?

12    A.   That meeting in June with Traci Nelson and

13  Robert Ward.

14    Q.   What is it that he was apologizing for, the

15  fact that there was a meeting?  I'm just confused.         03:42:06

16  What about the communication was he apologizing

17  about?

18    A.   That it should have -- not have come as a

19  surprise and blindsiding people as it did.

20    Q.   I see.  So the criticism was that it               03:42:19

21  shouldn't have been a surprise.  The criticism was

22  not about the substance of Mr. Carey's

23  communication; right?

24    A.   Correct.

25    Q.   All right.                                         03:42:30

1  a reduction in force; right?                                    04:05:38

2     A.  I was referring to the fact that I was part

3  of the invite of the webcast "Path to Partnership,"

4  and this was very few days later, after I was told

5  that I needed to look for another job.                          04:05:51

6     Q.  Right.  And you did not write to her at

7  this time that you believe that your layoff decision

8  was actually because of retaliation; right?

9     A.  Nope.

10    Q.  Okay.  You can put that aside.                           04:06:05

11       MR. HUESTON:  Go to the next one, which is

12  36.

13       (Marked for identification purposes,

14        Exhibit 36.)

15       BY MR. HUESTON:                                           04:06:12

16    Q.  And 36 is an e-mail from you to Keith Steel

17  on June 28th, 2017.

18       Who the Keith Steel?

19    A.  He was assistant controller at one of the

20  engagements that I audited a few years back called             04:06:39

21  Exar.  And then we remained --

22       (Reporter clarification.)

23       THE WITNESS:  Sorry.  Exar, E-X-A-R.  It

24  was a public company.  And we remained in touch.

25  And at the time of this e-mail, he was at the                  04:06:54

1  company named Kateeva.                                      04:06:59

2       BY MR. HUESTON:

3    Q.  Right.  And you told him in the e-mail on

4  the top there, "Apparently I've been RIF'd"; right?

5    A.  Yes.                                                  04:07:08

6    Q.  And you did not write you believed you were

7  retaliated against; right?

8    A.  I did not state that in this e-mail.

9       MR. HUESTON:  All right.  Put that aside.

10      Marking the next one -- sorry -- as              04:07:43

11  Exhibit 37.

12      (Marked for identification purposes,

13       Exhibit 37.)

14      BY MR. HUESTON:

15   Q.  And what I've placed before you is an           04:08:06

16  e-mail chain between you and Francesco Ferrara and

17  others at PwC in Italy, with a certified English

18  translation.

19      And you wrote on June 30th, 2017 --

20  actually on June 29th, you informed them:            04:08:32

21       "Well, the time has come.  The U.S.A.

22       has downsized by kicking out any SM of

23       fifth year or more who does not become a

24       partner within the next three years,

25       which includes me too."                         04:08:52

1    Q.   And, in fact, you mentioned your love of          04:14:24

2   your work at PwC at that time; right?

3    A.   I would need to review the e-mail, but I do

4   not have any problem making that statement.  I loved

5   the firm and the work I was doing at the firm.          04:14:40

6        MR. HUESTON:  Okay.  Mark this as 39.

7        (Marked for identification purposes,

8         Exhibit 39.)

9        BY MR. HUESTON:

10   Q.   And Exhibit 39 attaches your communication         04:15:24

11  to Tim Ryan as the CEO of PwC; right?

12   A.   Yes.  Printout of the e-mail.

13   Q.   All right.  And this is what you were just

14  describing to me; right?

15   A.   That is what I was recalling, yes, based on        04:15:42

16  this e-mail.

17   Q.   Okay.  You can put that aside.

18       Now, do you recall that your layoff was

19  ultimately accelerated, your end date?

20   A.   That is not what they told me.                     04:16:16

21   Q.   All right.  Why don't you -- well, let me

22  ask it this way.

23       Do you recall being called into a meeting

24  with Shauna Hewitt and Kevin Baldwin?

25   A.   I recall to be called in the meeting with          04:16:31

1   Shauna Hewitt and Kevin Baldwin.  I was not told          04:16:34

2   about that meeting or who was there.  I was told by

3   Shauna Hewitt that the meeting was with a different

4   person for a different topic.  So that was --

5       Q.   Okay.  I didn't ask you that.  I just --         04:16:49

6   all I asked you was do you recall a meeting with

7   those two, and I guess the answer is "yes."  So we

8   can just kind of move along?

9       A.   I don't recall.

10      Q.   Okay.  And at that -- when was that              04:16:57

11  meeting, by the way?

12      A.   August 17, 2017.

13      Q.   Okay.  And what did they tell you at that

14  meeting?

15      A.   Mr. Baldwin told me that I was -- today,         04:17:09

16  that day, was my last day at PwC because of

17  misconduct that they noted in connection of the

18  Cavium engagement.

19          And I -- somebody else would have gone to

20  the room where I was in the office to collect my        04:17:27

21  belongings.  And then they would have escorted me

22  out of the premises.

23      Q.   Okay.  And did either of them describe what

24  this misconduct was?

25      A.   I believe Mr. Baldwin did mention the tax        04:17:45

1    A.  I stated that to Ms. Hewitt in my e-mail                    04:31:05

2  reply once she said that.

3    Q.  Okay.  Did you state that to Ms. Nelson?

4    A.  I don't recall.

5    Q.  Okay.  Now, in the time that you worked at                 04:31:16

6  PwC, did you ever think about leaving the company?

7    A.  Yes.

8    Q.  In fact, you, on a number of occasions,

9  attempted to resign or submit your resignation;

10  right?                                                            04:31:41

11    A.  Yes.

12    Q.  How many times did you do so during the

13  course of your tenure?

14    A.  I believe there were 10.

15    Q.  Might there have been 12?                                   04:31:50

16    A.  My recollection was 10, but I do not

17  guarantee the exact number.

18    Q.  And during the time you worked at PwC and

19  you tendered your resignation or offered to resign,

20  during that time period, did you ever get a job                  04:32:11

21  offer to work elsewhere?

22    A.  Yes.

23    Q.  And where did you receive -- from which

24  firms did you receive job offers during the time

25  that you worked at PwC?                                          04:32:22

1     A.  It is possible.  I don't recall with                    04:22:15

2  certainty, but it's possible.

3     Q.  Okay.  Well, let's read the first sentence

4  so we can move from the possible to the probable.

5          "In 2014 I started noticing signs of              04:22:29

6          a concerning trend involving partners at

7          this firm in my public engagement A."

8          Do you see that?

9     A.  Yes.

10    Q.  Okay.  Does this refresh your recollection?         04:22:38

11  You wrote this.  This is you.  That's fair; right?

12    A.  I do not recall if I wrote it or when I

13  wrote it.  I just said it's possible.

14    Q.  Well, I'm going to represent that this

15  document, "History of Events - SEC," where you talk      04:22:56

16  about noticing signs of a concerning trend, was

17  attached as a history of events document to an

18  e-mail address that was yours at PwC in November of

19  2016; right?  Mauro.x.botta@us.pwc.com; right?

20    A.  Yes.                                                04:23:16

21    Q.  That's your e-mail address; correct?

22    A.  Yes.

23    Q.  And who are you sending it to?  Is that

24  your personal e-mail address?

25    A.  Yes.                                                04:23:24

1    Q.   Okay.  So by what's represented facially in          04:23:24

2   this document, it appears the history of event

3   documents is the one that's attached; right?

4    A.   Yes.

5    Q.   And if you take a moment to look at it, it,          04:23:34

6   in fact, discusses the issues that you have been

7   setting forth in your complaint; right?

8    A.   I would have to compare, but -- I would

9   have to read it.  It does bring topics that are in

10   the SEC complaint.                                          04:23:53

11    Q.   Okay.  And in the last sentence starting

12   three lines from the bottom of the first paragraph,

13   you write:

14        "Also, I challenge the opinion on

15        internal controls which was able to be            04:24:08

16        issued thanks to me creating a control

17        the day before the filing of the Form

18        10-K which was never documented nor

19        discussed with the company."

20        Those are your words; right?                       04:24:23

21    A.   As I said, I do not recall if those are my

22   exact words.  It's possible.

23    Q.   All right.  And if we can show forensically

24   that this is your document attached to this e-mail,

25   you would be satisfied you, in fact, wrote these          04:24:37

1  about your termination?                                      04:29:41

2     A.  The communication that I had related to

3  that was if I could reapply, given that I saw that

4  there were open positions at PwC.

5     Q.  Okay.  Did you tell her -- well, when did         04:29:59

6  you have that conversation?

7     A.  I don't remember the date, the exact date.

8  Must have been the end of August or September, but

9  that's the best I can recall.

10    Q.  Okay.  You asked her if you could reapply?       04:30:16

11    A.  Yes.

12    Q.  And what did she say?

13    A.  That due to the fact I was terminated for

14  misconduct, I was prohibited from reapplying.

15    Q.  Okay.  And you said you also talked to           04:30:28

16  Traci Nelson after you were terminated for

17  misconduct; correct?

18    A.  I believe I did speak to Traci on this same

19  topic, and Traci, I think, alerted Shauna.

20    Q.  When you said you spoke to her about the         04:30:46

21  same topic, what did you ask her?

22    A.  To the best of my recollection, I asked her

23  this fact, if I could reapply.

24    Q.  Okay.  Did you attempt to explain to her

25  why you felt you had not committed misconduct?        04:30:59

```
1       A.    Yeah.   What I recall.                        02:56:59

2       Q.    Okay.   And what was illegal about that?

3       A.    The fact that PwC policies, each

4  performance year should be evaluated as standalone.

5  And at that time I was not out for partner yet, so     02:57:11

6  how could they decide so early that I would have

7  never made it?

8       Q.    When you say "so earlier," when was that?

9       A.    2014.

10      Q.    How long had you been at PwC by that point    02:57:23

11 in time?

12      A.    How long have I been what?

13      Q.    How long -- by 2014, how long had you been

14 employed by PwC?

15      A.    In the U.S., ten years.                        02:57:31

16      Q.    And including your time in Italy at PwC,

17 what was the total amount of time?

18      A.    15.

19      Q.    All right.   Now, you claim that PwC

20 retaliated against you by underutilizing you; right?    02:57:45

21      A.    Yes.

22      Q.    And when did your utilization rate begin to

23 drop?

24      A.    After I was removed from Harmonic.

25      Q.    That's when?                                   02:57:56
```

1      A.    Sometime March, April 20 -- 2016.              02:58:02

2      Q.    Okay.  And in your view, how many

3    engagements would you have to be staffed on at a

4    time to achieve full utilization?

5      A.    That does depend on the engagement.            02:58:23

6      Q.    All right.  How many -- how many

7    engagements do you recall being staffed on in 2015?

8      A.    '15.  Calendar year or like --

9      Q.    Yeah, calendar year.

10     A.    2015.  Maybe three, I recall.                  02:58:52

11     Q.    How about in 2016?  How many engagements

12   were you staffed on in 2016?

13     A.    Two, I believe.

14     Q.    All right.  And what about 2017?

15     A.    Two.                                           02:59:21

16     Q.    And in 2015, what percentage of your work

17   time was utilized?

18     A.    I do not recall.

19     Q.    All right.  Well, close to full-time?

20     A.    How do you define "full-time"?                 02:59:37

21     Q.    I don't know.  Full utilized.

22           Were you fully utilized in 2015?

23     A.    How do you define "fully utilized"?

24     Q.    Well, we've just been talking, and you've

25   been answering questions about full utilization.      02:59:52

1      A.    This is exhibit?                                    02:16:46

2      Q.    We're on Exhibit 30.

3      A.    30.  Okay.

4      Q.    This is your revision back now.  And we are

5    now going to -- going to the first page of the memo.        02:16:53

6            So going to the underscored portion at the

7    end, the language states:

8                 "The company, as part of their review

9            of the tax precision, adopts a level of

10           precision equal to 100,000 and a level of         02:17:18

11           precision of 1 million for items not

12           affecting balance sheet or income

13           statement.  Based on discussion with

14           Art Chadwick, CFO, and Suzy Seandel, CAO,

15           in performing their review of the tax           02:17:34

16           footnote, they stated that they would

17           consider material fluctuations above

18           $10 million and investigate with support

19           to the company's controller (See Control

20           7.2.6).  In light of the considerations         02:17:47

21           in this memo, we do not believe such

22           level of precision to be unreasonable for

23           disclosures with low inherent risks such

24           as the tax footnote."

25           This was language that you added to this         02:17:59

1    draft; right?                                          02:18:02

2        A.    There was a discussion that night before,

3    where Mr. Thorson called me, stating that we had an

4    issue, that national office could not move past.

5    The material weakness they believed that they had,     02:18:19

6    they could not contain the exposure for the deferred

7    tax asset disclosure items.  And he told me that we

8    needed to find the solution.

9            I asked him to send me the comments that

10   national was giving him so that I could have had a      02:18:37

11   chance to look at it and see if it was possible to

12   find the solution.

13           I took a look, and I told Mr. Thorson that

14   I believe I have a solution as long as he would have

15   told the company to do exactly what we were stating     02:18:53

16   in this memo.  And he replied to me over the same

17   time, "You got it."

18           And after sent it to him, the first draft,

19   he read it, and then he replied back to me, I

20   believe on the same time, all caps, he said, "Whoa,     02:19:08

21   you wouldn't think I would have read this.

22   Initially we discussed 7 million as procedure, and

23   you put 10."

24           And I told him that obviously if there was

25   a control that would compensate the errors that were    02:19:21

```
 1  noted, the precision had to be above the level of      02:19:25
 2  the error noted; otherwise, that control, too, would
 3  have failed.
 4        Then he told me do the national would agree
 5  to that?  And I told him only one way find out.  And   02:19:36
 6  that is the last I heard.
 7     Q.   Okay.  Thank you for that.  But I asked you
 8  a very simple question.
 9        Just so the record is clear, the language
10  that I read, it's underscored here in your attached    02:19:48
11  draft.  That's language that you added to this
12  document?
13     A.   Yes.
14     Q.   Okay.  And this language, you would agree,
15  read facially, describes an existing control with      02:19:58
16  different levels of precision; right?
17     A.   That is why I added the context.
18     Q.   Well, I'm just asking you -- you've added
19  context not in this document; right, sir?
20     A.   It was in conversation with Mr. Thorson.      02:20:16
21  Obviously he wouldn't have it in that document.
22     Q.   Well, I know.  I'm just asking you what's
23  in this document.
24        This document simply suggests an existing
25  control, right, with different levels of precision?    02:20:27
```

1  That's what the document states facially right, sir?    02:20:31

2      A.   It does refer to inquiry with Mr. Chadwick

3  and Mr. Seandel [sic].

4      Q.   Right.  And by the way, what was the

5  magnitude of the error that led to the 2014              02:20:54

6  deficiency?  Do you recall?

7      A.   I believe it was 7 or 8 million gross.

8      Q.   Do you remember 3.3 million?

9      A.   No.  I think the gross impact on the

10 footnote was higher than that.                           02:21:09

11          (Reporter clarification.)

12          THE WITNESS:  The gross error was higher

13 than that.

14          BY MR. HUESTON:

15     Q.   Let's go -- turn to two pages later.            02:21:31

16 There's a section called "Compensating Control,

17 7.0206."

18          Do you see that?

19     A.   That one 6242?

20     Q.   You see the topic that says "Compensating      02:21:46

21 Control, Section 7.0206"?

22     A.   Yes.

23     Q.   Okay.  And go down four lines.  There is

24 language that you inserted here that starts with:

25          "Based on our walk-through and                  02:22:00

1    control, but I do not recall the specifics.                    04:17:47

2        Q.   Did you ask him for specifics?

3        A.   No.  At the time I was kind of numb, so ...

4        Q.   Well, do you recall him mentioning that the

5    Cavium engagement misconduct had to do with a false    04:18:10

6    control entry that you made?

7        A.   I do not recall he specified in those

8    terms.

9        Q.   Well, you understand he was referencing the

10   control language that you inserted that facially        04:18:26

11   made it appear that you had consulted with Cavium

12   employees at that time when you had not; right?

13       A.   I do not believe that's an accurate

14   characterization.

15       Q.   No.  That didn't creep into the back of        04:18:38

16   your mind as he talked about misconduct with the

17   Cavium engagement?

18       A.   What crept in my mind?

19       Q.   The fact that you put down something and

20   signed it that was not truthful at the time that you    04:18:49

21   signed off on the engagement.

22       A.   It did not creep because, as I said, I have

23   done that after Mr. Thorson assured me that the

24   company would have done it.

25       Q.   Sir, after you were terminated -- after you    04:19:05