Exhibit 2

CONFIDENTIAL

Page 20

1    accounting firm can issue, but the opinions that I

2    normally issue are the result of an audit that we

3    perform in accordance with some set of standards.

4    Depends on the type of standards we're following.

5            And then, at the end of that audit, we issue

6    an opinion normally on the financial statements.

7            There are other kinds of opinions that can be

8    issued but...

9        Q.  You said -- withdrawn.

10           You just described for me the opinions you

11   typically issue; is that correct?

12       A.  That's correct.

13       Q.  And you say there were, quote, some

14   standards?

15       A.  Yeah.

16       Q.  What standards are you referring to?

17       A.  There's different auditing standards out

18   there.  So it's auditing standards that I'm talking

19   about.

20       Q.  Are those standards modified by law?  Are

21   they internal standards?  Where do these standards

22   come from?

23       A.  These are third party standards established

24   by either governmental bodies like the PCAOB or

25   auditing standards by the AICPA, independent bodies.

CONFIDENTIAL

Page 21

1    Q.   Can you -- what does the PCAOB stand for?

2    A.   Public Company Accountability and Oversight

3 Board.

4    Q.   Mr. Thorson, I believe you used one more

5 acronym.

6         Can you say what that acronym stands for as

7 well?

8    A.   AICPA, which is the American Institute of

9 Certified Public Accountants.

10   Q.   Going back to your time with Pw or PwC was

11 there any time after you received your senior manager

12 position that you were promoted to a new position?

13   A.   Yes.

14   Q.   And when was that?

15   A.   I was promoted to partner in 2002 in San

16 Jose, California.

17   Q.   During your time as a senior manager, were

18 you still in Washington?

19   A.   Yes, I was in Washington as a senior manager.

20   Q.   So is it accurate to say you took this

21 partner position in 2002 and moved to San Jose?

22   A.   No, that would not be accurate to say.

23   Q.   Okay.  Did you work as a senior manager in

24 San Jose?

25   A.   Yes, I did.

CONFIDENTIAL

Page 22

1      Q.  What current position do you hold with PwC?

2      A.  I'm a partner in the assurance practice.

3      Q.  So have you held the same title since 2002

4   with PwC?

5      A.  Yes.

6      Q.  Have you been in the same practice since 2002

7   with PwC?

8      A.  Yes.

9      Q.  Can you provide some of your job

10   responsibilities as a partner?

11      A.  Yes, I can.  I am responsible for the overall

12   audit, the planning of the audit, the execution of it,

13   as well as the completion.  I'm responsible for

14   overall the client relationships with PwC.  I'm

15   responsible for financial performance on our clients.

16   I'm responsible for the quality of the audits.  I'm

17   responsible for supervision of the team.

18          And I'm responsible for reporting to our

19   client the results of our audits and issuing an

20   opinion on our audits.

21      Q.  Just clarifying that's it.  I don't want to

22   interrupt you.

23      A.  There could be more, but those are the

24   general responsibilities of an audit partner and the

25   general responsibilities that I have on my auditing

Page 39

1  BY MR. CABECEIRAS:

2     Q.   Mr. Thorson, when did you begin working --

3  withdrawn.

4        Mr. Thorson, when did Cavium become a client

5  of PwC's?

6     A.   I'm not sure of the exact year.

7     Q.   At the time you became a partner in 2002, was

8  Cavium a client of PwC?

9     A.   I'm not sure.

10    Q.   When did you begin working on any project

11  relating to Cavium?

12    A.   2011.

13    Q.   In 2011, what did you do at PwC with respect

14  to Cavium?

15        MR. HUESTON:   Objection.   Vague as to do.

16        THE WITNESS:   I was the engagement partner on

17  Cavium for the 2011 year end audit.

18  BY MR. CABECEIRAS:

19    Q.   And you said year end audit.   Are there more

20  than one audits in a year?

21    A.   No.

22    Q.   Are you currently the engagement partner on

23  the Cavium project?

24    A.   No.

25    Q.   Is Cavium still a client of PwC?

CONFIDENTIAL

Page 40

1     A.  I believe they are.  Or I believe it is.

2     Q.  Mr. Thorson, are you still based out of the

3  San Jose office?

4     A.  Yes.

5     Q.  Mr. Thorson, you stated you were assigned to

6  work on the Cavium audit in 2011; is that correct?

7     A.  That is correct.

8     Q.  Okay.  When did you stop working on Cavium in

9  any kind of capacity?

10    A.  The 2015 audit was the last audit that I

11 participated in on the Cavium account and that would

12 have finished up in early 2016.

13    Q.  In early 2016 you said?

14    A.  Yes, is the last time I would have worked on

15 that account.

16    Q.  Okay.  So how many audits in total did you

17 work on in relation to Cavium?

18    A.  Five.

19    Q.  And in each audit, you were a partner; is

20 that correct?

21    A.  That's correct.

22    Q.  What kind of organization is Cavium, if you

23 can recall?

24    A.  Cavium is a public company.  It's a fabless

25 semiconductor company.

CONFIDENTIAL

Page 41

1    Q.   Did Mr. Botta work on the same audits for

2  Cavium as you?

3    A.   He worked on some of them, yes.

4    Q.   Do you recall which one?

5    A.   I believe he worked -- I believe he started

6  in 2012 and worked on the 2012, '13, '14 and part of

7  the 2015 audit.

8    Q.   Mr. Thorson, you stated before, as a partner,

9  part of your job is client relationships; is that

10  correct?

11    A.   That is correct.

12    Q.   Great.  Did you have a primary point of

13  contact at Cavium to maintain these client

14  relationships with?

15    A.   I had a number of contacts at Cavium that I

16  maintain relationships with.

17    Q.   Who is Art Chadwick?

18    A.   He's the CFO at Cavium, or was at the time.

19    Q.   Just so we clarify, at the time he was the

20  CFO between 2011 and 2016?

21    A.   Yes.

22    Q.   And how often did you speak to Mr. Chadwick

23  in, say, a given week?

24    A.   I would not characterize my discussions on a

25  weekly basis with him.  I would say more along the

1   21st of February.

2       Q.  And when did this discussion take place?

3       A.  I don't recall.

4       Q.  Do you recall if it was at PwC's office in

5   San Jose?

6       A.  I don't.  I believe it was in person.  That's

7   about all I can remember, having a face-to-face

8   discussion with Mauro on this one.  But again,

9   that's...

10      Q.  And if you can remember, what did Mauro share

11  with you during that face-to-face discussion?

12      A.  Mauro shared with me that he believed there

13  was a material weakness at Cavium based on aggregation

14  of controlled deficiencies.  And I had told him I

15  wanted to understand his point of view better and

16  asked him to put it down in writing.

17      Q.  Did you agree at this time with Mauro that

18  there were material weaknesses?

19      A.  My initial evaluation was that there were not

20  material weaknesses or a material weakness at Cavium,

21  but I also wanted to hear Mauro's point of view and

22  understand why he thought there may be one.

23      Q.  Turning to the third page in the exhibit,

24  what's marked PwC_B00000392, can you turn there?

25      A.  Yes.

CONFIDENTIAL

Page 51

1    Q.  The second paragraph down says

2  "Issue/concerns:  Lack of transparency/competency,

3  (Path A) lack of sufficient resources to perform

4  effective controls on tax and treasury functions."

5        Mr. Thorson, are these the kind of material

6  weaknesses that Mr. Botta brought up in your

7  conversation?

8        MR. HUESTON:  Objection.  Foundation.

9        THE WITNESS:  I'm not sure that I would

10  characterize Mauro saying that these were material

11  weaknesses.  I think Mauro shared a view there was a

12  material weakness here relating to aggregating a

13  number of issues together.

14  BY MR. CABECEIRAS:

15    Q.  What were those issues?

16    A.  The issues are laid out in this memo that

17  Mauro has put together.

18    Q.  And just so we are clear on the timeline,

19  this e-mail was written in February of 2015 about the

20  Cavium's 2014 audit; is that correct?

21    A.  That's correct.

22    Q.  Now, for each Cavium audit that you worked

23  on, did you have to sign an opinion?

24    A.  Yes, for each Cavium audit, PwC signed an

25  audit opinion for all the years that I was the audit

CONFIDENTIAL

Page 52

1   partner.

2      Q.  Now, you said PwC signed.  Does that mean

3   somebody else signs or who actually signs the opinion?

4      A.  I signed the opinion using PwC's name.

5      Q.  Okay.  Now, is Mauro, through this e-mail,

6   bringing up issues with an opinion that had already

7   been signed?

8      A.  Yes, some of these issues that Mauro brought

9   up related to prior year's audits that had already

10  been signed.

11     Q.  Is there a way to correct -- withdrawn.

12         Is there a way to change opinions after

13  you've signed one?

14         MR. HUESTON:  Objection.  I'm going to

15  object.  This is vague and incomplete hypothetical and

16  otherwise, calling for an expert opinion.

17         THE WITNESS:  I can say I have never changed

18  an opinion after I have signed one or I have signed on

19  behalf of PricewaterhouseCoopers.

20  BY MR. CABECEIRAS:

21     Q.  Going back real quick to your conversation

22  with Mr. Chadwick, did you ever mention to Mr. Botta

23  that Mr. Chadwick wanted him removed from the audit?

24     A.  I'm sorry, can you repeat the question?

25     Q.  Absolutely.  Going back to your conversation

CONFIDENTIAL

Page 53

1   with Mr. Chadwick, which you described Mr. Chadwick

2   asked that Mauro be removed from the future Cavium

3   audit, did you ever share this information with

4   Mr. Botta?

5       A.   I don't recall sharing it with him.

6       Q.   I apologize if I asked this, but do you

7   remember when that conversation took place with

8   Mr. Chadwick?

9       A.   After the 2012 audit, probably as we were

10  getting started for the 2013 audit, I -- you know, I

11  don't specifically remember a month, but it was

12  probably in March or April of 2013.

13      Q.   Bringing your attention back to what's been

14  marked as Plaintiff's 6, if you could turn to the

15  second to the last page, last three digits, bottom

16  right-hand corner, 397?

17      A.   Okay.

18      Q.   Under the header "Conclusion"?

19      A.   Okay.

20      Q.   The first paragraph Mr. Botta writes "In my

21  professional opinion, the recurring episodes of lack

22  of communication and, in the case of the Q filing,

23  false representation on the timing as to when they

24  became aware raises significant concern about the tone

25  at the top and the ethic of the top level management

CONFIDENTIAL

Page 54

1   as highlighted by the VIE the tire transfer, the

2   inventory write-off facts noted above."

3          So a few questions on this.  Do you know what

4   he was referring to when he mentioned the Q filing?

5      A.   I believe that that related to the filing of

6   the company's 10-Q in 2014 around the timing of the

7   wire transfer phishing issue.

8      Q.   Okay.  And for the record, what's a 10-Q?

9      A.   It's a quarterly -- it's a quarterly

10  financial statement that's filed by public companies,

11  generally within 40 days of the particular quarter's

12  end.

13     Q.   Okay.  And where do these 10-Q's get filed?

14     A.   With the Securities and Exchange Commission

15  referred to normally as the SEC.

16     Q.   And I may have misheard you.  Did you say

17  phishing issue?

18     A.   Phishing with a P-H, yes.

19     Q.   Okay.  And what was the phishing issue?

20     A.   The phishing issue was that the company had

21  wired funds out of the company to a third party based

22  on fraudulent e-mails requesting a transfer of those

23  funds.

24     Q.   Going down to where Mr. Botta writes "as

25  highlighted by the VIE," do you have any knowledge as

Page 55

1  to what VIE stands for?

2      A.  Yeah, that stands for variable interest

3  entity, in this case.

4      Q.  So did Cavium have to file -- withdrawn.

5          In 2014, did Cavium have to file a 10-Q with

6  the SEC?

7      A.  Yes.

8      Q.  To your knowledge, did Cavium rely on PwC's

9  2014 audit?

10         MR. HUESTON:  Objection.  Vague.  Lacks

11  foundation.

12         THE WITNESS:  I'm not sure what is meant by

13  that question.

14  BY MR. CABECEIRAS:

15     Q.  That's fair.  What kind of information did

16  you provide to Cavium in the 2014 audit?

17     A.  I'm sorry, can you repeat that, please?

18     Q.  Yes.  What kind of information did PwC

19  provide to Cavium in the Cavium 2014 audit?

20     A.  That question is so broad, it's hard for me

21  to answer.  If you could be a little more specific,

22  that would be helpful.

23     Q.  I can be.  I can be.  I can withdraw that.

24  Build a foundation here.

25         Turning back to all the information in the

Page 56

1   first paragraph under "Conclusion," was any of this

2   information raised to Cavium in the 2014 audit?

3       A.   The issues themselves in terms of the

4   accounting issues or those issues were certainly known

5   by Cavium in the various years where the audits

6   occurred.

7           So, for example, when you refer to the VIE,

8   the company knew they had a VIE in 2012.  We spent a

9   lot of time talking to them about the VIE.  So they

10  knew about it.  So they knew about these issues in

11  terms of the general issues themselves.

12          But as far as the ethics and tone at the top,

13  we never had any discussions about that with them that

14  I can recall.

15      Q.   In the 2014 audit, was it -- was it PwC's

16  responsibility to mention any internal controls that

17  they found?

18          MR. HUESTON:   Objection.   Vague.

19          THE WITNESS:   In any audit where we find

20  internal control deficiencies, management is made

21  aware of them and, depending on the level, it gets

22  reported up to the Audit Committee.

23  BY MR. CABECEIRAS:

24      Q.   Was that information also reflected in the

25  actual final audit of the company?

CONFIDENTIAL

Page 57

1        MR. HUESTON:  Objection.  Vague as to audit.

2   Incomplete hypothetical.

3        THE WITNESS:  Yeah, if you could maybe

4   rephrase that one, it would be helpful for me.

5   BY MR. CABECEIRAS:

6     Q.  Sure.  You said you worked on the 2014 audit

7   for Cavium; is that correct?

8     A.  Yes.

9     Q.  At any time, was there a final product

10  presented to Cavium recapping the audit of 2014?

11    A.  There was a final opinion issued as part of

12  that audit and there were communications with the

13  Audit Committee as part of that audit.

14    Q.  And did you sign that audit opinion in 2014?

15    A.  I did.

16    Q.  And to your knowledge, did Cavium rely on

17  that audit opinion in their 10-Q filing?

18        MR. HUESTON:  Objection.  Vague.  Lacks

19  foundation and calls for a legal conclusion.

20        THE WITNESS:  The company included our

21  opinion in their 10-K filing that was filed with the

22  SEC.

23  BY MR. CABECEIRAS:

24    Q.  And in that audit -- sorry.

25    A.  Go ahead.

CONFIDENTIAL

Page 58

1    Q.  And in that audit opinion, to your

2  recollection, were any material weaknesses flagged or

3  mentioned?

4    A.  No, there were no material weaknesses flagged

5  in that audit opinion.

6    Q.  Did the audit opinion mention any weaknesses

7  back to internal controls at Cavium?

8    A.  No, it did not.

9    Q.  If you recall, how much money did they lose

10 on this phishing issue?

11   A.  My recollection was it was around 450,000,

12 give or take ten or 20,000.  It was in that ballpark.

13   Q.  Going back to the document marked Plaintiff's

14 6, the third to the last paragraph, under the

15 conclusion header, Mr. Botta writes "The 2014 audit

16 has also 3 deficiencies in the 2 areas the controller

17 is responsible for."

18        Mr. Thorson, do you know what he means when

19 he said -- withdrawn.

20        Do you have any knowledge as to what 3

21 deficiencies Mr. Botta was referring to?

22        MR. HUESTON:  You mean sitting here today or

23 at the time?

24        MR. CABECEIRAS:  At the time.

25        THE WITNESS:  Certainly, at the time, I would

Page 59

1    have known what those deficiencies were.  I can't tell

2    you what they are right now.

3    BY MR. CABECEIRAS:

4        Q.  You cannot?

5        A.  I cannot tell you what they are right now.

6        Q.  Okay.  Give me one minute here.

7            MR. CABECEIRAS:  Counsel, if you could hand

8    the witness what I've had marked for you as Exhibit 10

9    and we can mark as Exhibit 7.

10           (Whereupon, Exhibit 7 was marked for

11   identification.)

12   BY MR. CABECEIRAS:

13       Q.  Mr. Thorson, please review the document and

14   let me know when you're finished.

15       A.  Okay.  Appears to be an e-mail of the

16   previous document that I forwarded along to Robert

17   Heatley.

18       Q.  Mr. Thorson, who is Robert Heatley?

19       A.  He is the quality review partner on the

20   engagement.

21       Q.  What is your understanding of his job as a

22   quality review partner?

23       A.  His responsibilities are to work with the

24   engagement team on complex matters.  He's responsible

25   for reviewing the audit plan, working and also

Page 60

1   responsible for kind of understanding the final

2   conclusions reached on key audit or accounting

3   matters.  He's generally involved in -- on a quarterly

4   basis and annual basis for the annual opinion.

5       Q.  And why did you forward this document to

6   Mr. Heatley?

7       A.  There were items in here that were concerning

8   to me and I wanted to initiate a discussion with Bob

9   on the matters in this document.

10      Q.  And what items were concerning to you?

11      A.  I don't remember the specific items in here.

12  I think there was a general concern of mine that there

13  were references made to the client not being

14  trustworthy and sharing information with the auditors

15  and I wanted to talk to Bob about those kinds of

16  matters.

17      Q.  And if you can recall, what kind of

18  information being shared with auditors?

19      A.  I'm sorry, can you be a little more specific

20  on that?

21      Q.  Sure.  You just stated my concern was that

22  the document said information was being shared with

23  auditors.

24          I want to know specifically if your concern

25  was over the information, right?  So what information

CONFIDENTIAL

Page 61

1   was being shared between the auditors or with the

2   auditors, excuse me?

3       A.   It was the lack of forthrightness with the

4   auditors that Mauro brought up with this complaint

5   that was a concern of mine.   Mauro referred to it as

6   the lack of communication in his conclusion at the end

7   of this document.   That was concerning.   Tone at the

8   top and ethics of top level management, when I hear

9   that, I get concerned.   And I wanted to -- I talked to

10  Bob about it.

11      Q.   During the 2014 audit, did Cavium disclose to

12  you that -- I'll call it the phishing incident?

13      A.   Yes.

14      Q.   So this wasn't something that Mr. Botta

15  learned after the fact?

16      A.   No, this was not.

17      Q.   Have you seen -- as a partner, have you seen

18  a manager, senior manager, raise these kinds of issues

19  before?

20           MR. HUESTON:   Objection.   Vague.

21           THE WITNESS:   Yeah, I've -- I've certainly

22  seen these kind of issues raised on engagements and

23  whether it was by a staff or senior manager or senior

24  manager, I don't recall, but certainly, I've seen

25  issues like this raised before.

CONFIDENTIAL

Page 62

1    BY MR. CABECEIRAS:

2         Q.  Have you seen, before Mauro, a manager or

3    senior manager, questioning -- questioning the

4    trustworthiness of a client?

5         A.  I don't recall.

6         Q.  Do you recall if a manager or senior manager

7    has raised an issue of trustworthiness with the client

8    in a written document such as the one Mauro sent to

9    you?

10             MR. HUESTON:  Objection.  Vague.

11             THE WITNESS:  Yeah, it's -- I don't recall.

12   It certainly could have happened, but I don't recall.

13   BY MR. CABECEIRAS:

14        Q.  Were you upset that Mauro added into this

15   document some items that, as you said, were concerning

16   to you?

17        A.  No.  I wasn't concerned that he put them in

18   the document.  I was concerned at the nature of the

19   items themselves.

20        Q.  What was wrong -- why were you concerned with

21   the nature of the items?  I'm not sure what that

22   means.

23        A.  Well, in our profession, it's important that

24   the people we work with have integrity, that our

25   clients have integrity, that we have integrity and

CONFIDENTIAL

Page 65

1    or senior manager raise similar issues?

2            MR. HUESTON:  Objection.  Vague.

3            And also I'm going to object because this may

4    call for the disclosure of confidential information.

5            MR. CABECEIRAS:  I can instruct the witness

6    not to disclose any confidential information to me.

7    That is not what I'm seeking.

8            MR. HUESTON:  Subject to that, are you able

9    to answer the question?

10           THE WITNESS:  I don't recall one way or the

11   other whether or not this has come to my attention on

12   another account.

13   BY MR. CABECEIRAS:

14      Q.  When Mr. Botta did send this document to you,

15   were you surprised?

16      A.  Yes.

17      Q.  What was surprising about the document to

18   you?

19      A.  I had asked him to send his aggregation

20   summary to me about why he was concerned about

21   aggregation and normally that means aggregating issues

22   in the current year, that could possibly, when

23   combined, result in a material weakness or in the case

24   of just control deficiencies, it could get elevated to

25   a significant deficiency.

Page 70

1   A.  I don't recall if I spoke to him Sunday

2   night.  I may have briefly in order to set up the

3   meeting on Monday, but I don't have a specific

4   recollection of that.

5   Q.  Do you recall if Mr. Scott replied to your

6   e-mail?

7   A.  I don't recall.

8   Q.  Just to clarify, you don't recall speaking to

9   Robert Heatley by phone that day?

10   A.  I don't recall speaking to Heatley.  I

11   believe I spoke to Tim, either e-mail or phone, I

12   don't remember how, briefly on the matter.  We didn't

13   get into the details.  It was more just let's set up a

14   meeting and probably one or two should be involved.

15   That's a little speculation on my part.

16       MR. HUESTON:  Please don't speculate.

17   BY MR. CABECEIRAS:

18   Q.  No speculating or guessing, please.

19   A.  All right.

20   Q.  In February of 2015, did you have the

21   cellphone number 408-460-5977?

22   A.  I did.

23   Q.  And do you remember what kind of phone you

24   were using in February of 2015?

25   A.  It was an iPhone.

CONFIDENTIAL

Page 71

1    Q.  February of 2015, did you have an iCloud

2  account backing up any text messages?

3    A.  Most likely, yes.

4    Q.  Do you remember texting Robert Heatley that

5  day?

6    A.  No.

7    Q.  Do you remember texting Timothy Scott that

8  day?

9    A.  No.

10    Q.  Do you remember texting Mr. Botta that day?

11    A.  No.

12    Q.  Do you remember calling Mr. Botta that day

13  after you received the document we've been talking

14  about?

15    A.  No, I don't.  I'm sure I would have talked to

16  him either that day or the next day for sure, but I'm

17  not sure when I talked to him.

18    Q.  You mentioned before that one of your

19  concerns was that Mauro brought up potential

20  wrongdoing on the part of the client; is that

21  accurate?

22    A.  Yes.

23    Q.  Did you have any concerns at that time

24  regarding potential wrongdoing by PwC?

25    A.  No.

CONFIDENTIAL

Page 72

1    Q.  So at that time, you didn't have any

2  outstanding concerns with the 2014 Cavium audit?

3          MR. HUESTON:  Objection.  Vague.

4          THE WITNESS:  We were in the process of

5  completing the audit, so I don't remember if I had any

6  concerns about completing the audit at that point in

7  time.

8  BY MR. CABECEIRAS:

9    Q.  Okay.  And I am referring to the 2014 -- did

10  I say 2015?

11    A.  I think you said 2014, but I don't...

12    Q.  Okay, well, I apologize.  I was referring to

13  the 2014, which I believe you stated, and correct me

14  if I'm wrong, that the audit opinion had already been

15  signed; is that correct?

16    A.  So at the timing of this memo that Mauro sent

17  to me, the audit opinion had not been signed for 2014.

18  It had been signed for 2013 and 2012.

19    Q.  I'm going to refer to the document that Mauro

20  sent you as the memo, okay?

21    A.  Okay.

22    Q.  Did you -- well, withdrawn.

23          Do you know a person named Mayank Gupta?

24    A.  Yes.

25    Q.  And who is Gupta?

CONFIDENTIAL

Page 73

1    A.   He's -- he was a manager on the Cavium

2 account.

3    Q.   Did you ever instruct Gupta to print out the

4 memo that plaintiff wrote and leave it at Cavium?

5    A.   Not -- not -- no, I never instructed Mayank

6 to print out the memo which is, again, as we defined

7 it, Mauro's Exhibit 7, I never instructed Mayank that

8 I can recall to print that out.  I don't think he was

9 made aware of the memo -- of the memo, at least by me.

10    Q.   Okay.  Going back to what's been marked

11 Plaintiff's 8, did you at one point in time speak to

12 Timothy Scott and Robert Heatley about what Mauro had

13 sent to you?

14    A.   Yes, I -- yes, we had -- we did have a

15 discussion about the memo or about the document.

16    Q.   Just to be clear, the document that Mauro

17 forwarded to your e-mail on February 22nd, 2015?

18    A.   That's correct.

19    Q.   And when did this meeting take place?

20    A.   I don't recall.  Based on this information

21 you've sent me, it looks like it probably occurred the

22 next morning and, given the time frame, it was most

23 likely the next morning.

24    Q.   And if you can recall, do you remember where

25 the meeting took place?

CONFIDENTIAL

Page 77

1    Q.   What was the restaurant called?

2    A.   I don't recall.

3    Q.   Was the restaurant located at the Marriott

4    Hotel?

5    A.   I believe it was.

6    Q.   What was discussed at the restaurant?

7    A.   Well, certainly, the topic of discussion was

8    for me to understand Mauro's concerns about the memo

9    that I had received over the weekend.  I wanted to

10   understand from him better his thoughts, why he

11   thought what he thought and we discussed the memo,

12   among other things, I'm sure, but I can't remember the

13   details over the course of this dinner.

14   Q.   Excuse me, you said it was dinner?

15   A.   Yeah, we had dinner, I believe.

16   Q.   Mr. Thorson, after dinner did you tell Mauro

17   what he did was rare, in reference to sending you the

18   document that was labeled PB?

19   A.   Yes, I think I told him it was rare.

20   Q.   Did you tell Mauro this will cause the

21   company issues or have to delay the SEC filing because

22   of this?

23   A.   No, I did not say it that way.

24   Q.   You said you didn't say it that way.  Which

25   way did you say it?

CONFIDENTIAL

Page 78

1      A.   I said this had the potential of causing some

2   issues with the company and the timing of their

3   filing.

4      Q.   Is it your opinion that what Mauro did by

5   sending you this document was rare at PwC?

6      A.   I wouldn't characterize sending me the

7   document as rare.  I mean having a disagreement is the

8   way Mauro phrased this the day before, two days before

9   I asked him to put the memo together was rare.

10     Q.   You stated that you said to Mauro potentially

11  this could cause filing issues; is that correct?

12     A.   I -- I don't remember specifically what I

13  said, but it was something to that effect, that this

14  could cause an issue with the company's ability to

15  file by the required filing time frame.

16     Q.   And what was your concern about how this

17  would impact their ability to file?

18     A.   My concern was addressing the issues dealing

19  with any potential national office consultations that

20  may arise.  Clearly, what Mauro was doing was within

21  policy.  I supported Mauro's -- I supported following

22  our policy, frankly, and we needed to get to the

23  bottom of it.

24          So we just have work to do and I wanted to

25  make sure that it was clear that we were -- it was

CONFIDENTIAL

Page 88

1  generally up to the engagement leader to send one.

2  BY MR. CABECEIRAS:

3      Q.   So it's a discretionary matter?

4      A.   Generally, yes.   There may be some firm

5  requirements on sending a SAD to national.   I'm just

6  not aware of what those are off the top of my head.

7      Q.   If you can recall, was there a time that you

8  became aware that Mr. Botta escalated this matter to

9  the national office?

10     A.   I don't believe Mr. Botta escalated this

11 matter to the national office.   I believe that was a

12 decision by myself and Bob Heatley and Tim Scott and

13 maybe one or two other partners.

14     Q.   Okay.   And by the decision to escalate, I'm

15 referring to what's been marked as Plaintiff's 7, the

16 e-mail that Mauro wrote you with the attachment PB.

17         Do you understand?

18     A.   Yeah.

19         MR. HUESTON:   I'm not sure I understand.

20 You're saying the document is the decision?

21         MR. CABECEIRAS:   I'm sorry, go ahead.

22         MR. HUESTON:   No, I just -- no, go ahead.

23         MR. CABECEIRAS:   Okay.   The issues raised in

24 the document, the Mauro titled PB.

25 BY MR. CABECEIRAS:

CONFIDENTIAL

Page 89

1    Q.  Do you know what I'm saying?  Escalated

2  issues to the national office.  I'm talking about the

3  issues in that document.  I just want to make sure

4  we're on the same page.

5    A.  What was said to the national office as far

6  as the consultation goes was the SAD itself.  The PB

7  document itself was not part of the consultation.

8    Q.  So Mr. Thorson, you testified you and

9  Mr. Scott and Mr. Heatley made the decision to

10  escalate the issues to the national office; is that

11  correct?

12    A.  That's correct.

13    Q.  And the only -- withdrawn.

14    Besides the SAD document, did you submit any

15  other documents to the national office relating to

16  this issue?

17    A.  There were a number of other documents that

18  were submitted to the national office as part of this

19  issue.

20    Q.  Do you know what those were?

21    A.  There was a separate tax memo that further

22  explained kind of what was in the SAD.  There was -- I

23  believe there was a separate wire transfer memo that

24  was part of the understanding of a SAD, kind of helped

25  explain details of what was in this SAD which is

Page 90

1   really a spreadsheet, and there may -- there may be

2   some other documents that I just can't remember.

3            MR. CABECEIRAS:  Counsel, if you could hand

4   the witness what I've had marked as Exhibit 7.  If we

5   could mark it as Plaintiff's 11.

6            (Whereupon, Exhibit 11 was marked for

7   identification.)

8   BY MR. CABECEIRAS:

9       Q.  Mr. Thorson, please review.  Let me know when

10  you've finished?

11      A.  Okay.  I've looked at the document.

12      Q.  Mr. Thorson, who is Gilbert Simonetti III?

13      A.  He's a partner at PwC.

14      Q.  Where is he based out of?

15      A.  I believe he's based out of San Jose, but

16  spends a lot of time on the East Coast, probably in

17  Florham Park where a lot of people from our national

18  office reside.

19      Q.  This appears to be an e-mail that you wrote

20  to various people speaking about Mauro in relation to

21  Cavium; is that an accurate depiction?

22      A.  That's an accurate depiction.

23      Q.  Prior to sending this e-mail, did you talk to

24  Mr. Simonetti either by phone or in person regarding

25  Mauro and Cavium?

CONFIDENTIAL

Page 96

1    And depending if Mauro said I still disagree,

2    then I put that piece of paper in the file and we'd be

3    done.  If Mauro said, I'm fine with it, then I don't

4    put the piece of paper in the file and we're done.

5         So that was kind of the general gist of what

6    we were doing.  And because Mauro wasn't involved in

7    all aspects of it, I wanted to let him know what we

8    did, kind of in fairness to him, and the process and

9    to let him know that we -- we're serious about

10   listening to his concerns and we took it seriously,

11   did a national office consultation around the matters,

12   informed all the partners who were the key decision

13   makers at national as to what Mauro's concerns were.

14        I told Mauro that seven partners -- I think

15   it was seven, it might have been six or seven -- had

16   reviewed his memo.  Mauro seemed a little surprised.

17   I think Mauro's initial view when he sent the memo was

18   I had to keep it secret, but it's not the kind of

19   document that you can.

20        I shared it with the seven partners, he

21   seemed to be surprised.  Mauro asked to have a call

22   after he read this memo.  And before he agreed or

23   decided, he had a call with I believe was Gil.  It

24   might have been Tim Scott.  I think it was Gil, and

25   came back and said, I agree with the conclusion.

CONFIDENTIAL

Page 101

1    A.   A form 10-K is a required filing for public

2    companies.  It includes their annual reports and

3    annual financial statements.

4    Q.   And to support in this case Cavium's filing

5    of a form 10-K, do you, PwC, produce what's attached

6    here as report of independent registered public

7    accounting firm?

8          (Reporter clarification.)

9          MR. CABECEIRAS:  That was a tough one.  I can

10   try to say it again.

11   BY MR. CABECEIRAS:

12   Q.   To support Cavium's filing of a form 10-K,

13   does PwC submit to them what's in this exhibit as

14   titled "Report of independent registered public

15   accounting firm"?

16          MR. HUESTON:  I'm going to object to the term

17   "support" as vague and ambiguous.

18          (Reporter clarification.)

19          THE WITNESS:  As part of the --

20   BY MR. CABECEIRAS:

21   Q.   And Mr. -- go on.

22   A.   As part of the company's 10-K filing, they're

23   required to file an audit opinion and this is our

24   audit opinion that we have furnished to the company.

25   Q.   And turning your attention to the last page

CONFIDENTIAL

Page 107

1    guys off the top of my head.

2        Q.  Do you remember about how many staff auditors

3    there were between 2012 and 2015 on the Cavium matter?

4        A.  On the audit side there were generally two to

5    three staff working on the engagement and would turn

6    over two to three per year.  That's really all I can

7    remember, the way we staffed the job.

8        Q.  Did Bob Heatley ever make any complaints to

9    you about Cavium's internal controls?

10       A.  I don't recall any complaints by Bob on the

11   internal controls at Cavium.

12       Q.  Did Bob ever raise any issues about the

13   findings of an audit to you?

14       A.  Not that I can recall.  The primary dialogue

15   on the audits with Cavium was with Mauro and Bob.

16           I would have a dialogue on particular issues,

17   but I let Mauro handle the communication with Bob for

18   the most part over the years.

19       Q.  Did Mr. Gupta ever raise any issues with you

20   about the Cavium internal controls?

21       A.  I don't have a specific recollection of that.

22       Q.  Do you remember the tax director raising any

23   similar issues?

24       A.  I don't have -- the PwC tax director?

25       Q.  Correct.

CONFIDENTIAL

Page 108

1    A.  I don't have a specific recollection of that.

2    Q.  Do you remember any other staff auditors,

3  directors, administrator, whatever they may be, who

4  worked on the Cavium audit between 2011, 2015 raising

5  any issues relating to Cavium's internal controls with

6  you?

7        MR. HUESTON:  Objection.  That is vague and

8  overbroad.

9        THE WITNESS:  I don't have a recollection of

10  that.  It's more than likely that I did have

11  discussions with various people on the team about

12  internal controls, but I don't remember specifically

13  any of those discussions.

14  BY MR. CABECEIRAS:

15    Q.  Did any of these discussions lead to a PwC

16  employee writing a memo about the internal controls

17  being discussed?

18    A.  The only one I can recall is Mauro's --

19  Mauro's memo.  That was -- that was initially supposed

20  to be along the lines of how aggregation impacted his

21  conclusion on the SAD.

22    Q.  Did any of these other conversations speaking

23  on Cavium's internal controls lead to consulting the

24  national office?

25    A.  Not that I can recall, yeah.

CONFIDENTIAL

Page 112

1    A.  I don't remember that.

2    Q.  Do you remember saying Mauro throws partners

3  under the bus?

4    A.  I don't remember that.

5    Q.  Do you remember writing what we deal with is

6  not perfect, you just have to suck it up?

7    A.  I don't remember that.

8    Q.  Was Mr. Botta ultimately removed from working

9  on the Cavium engagements?

10    A.  Yes.

11    Q.  When was that?

12    A.  Sometime in the middle of 2015.  I don't

13  remember the specific date or month even.

14    Q.  Do you recall why he was removed?

15    A.  I don't know all the specifics.  I don't

16  believe that I actually removed him, but -- I don't

17  remember why.

18        I know that the CFO had given some feedback

19  to the SRP as part of the SRP's annual review process

20  and that was in part a driver of it, but besides that,

21  there may have been other discussions that I wasn't

22  party to.

23    Q.  What's SRP an acronym for?

24    A.  Senior relationship partner.

25    Q.  And at that time, who was the senior

CONFIDENTIAL

Page 139

1    Q.  Did anybody at PwC ever consult you on

2  Mr. Botta's termination?

3    A.  No.

4    Q.  Never asked for your opinion on Mr. Botta

5  before terminating him?

6    A.  No.

7    Q.  Did Timothy Carey ever talk to you about

8  terminating Mr. Botta?

9        MR. HUESTON:  I'm sorry, can you give me the

10  whole question?

11       MR. CABECEIRAS:  Sure.  I can withdraw that.

12  Lay a better foundation here.

13  BY MR. CABECEIRAS:

14    Q.  Mr. Thorson, do you know an individual named

15  Timothy Carey?

16    A.  Yes, I do.

17    Q.  And who's Timothy Carey?

18    A.  A partner at PwC.

19    Q.  Is he based in San Jose?

20    A.  Yes.

21    Q.  Did Mr. Carey ever discuss with you at any

22  time Mr. Botta's work performance?

23    A.  Yes.

24    Q.  Okay.  Do you remember what?

25    A.  No.