Exhibit 3

Confidential

Page 16

1  certification; is that accurate?
2      A.  Correct.  Yes, that's accurate.
3      Q.  Can you recall if you've attended seminars on
4  how to deal with retaliation in the workplace?
5      A.  I can't recall specifically if I've attended an
6  external training on that topic.
7      Q.  Ms. Hewitt, who is Mauro Botta?
8          MR. REITER:  Object as vague.
9          You can answer, if you understand.
10     A.  No, I would need -- I need more specifics.
11 BY MR. CABECEIRAS:
12     Q.  Do you know who Mauro Botta is?
13     A.  Yes.
14     Q.  Did Mauro Botta work at PwC?
15     A.  Yes, he did.
16     Q.  And do you recall what position Mauro Botta had
17 at PwC?
18     A.  I do.
19     Q.  What position was that?
20     A.  He was a senior manager.
21     Q.  Were you ever made aware that Mr. Botta
22 reported PwC to the SEC?
23         MR. REITER:  Vague as to time, and also I'll
24 object to the extent the question calls for
25 attorney-client communications.

1   on the individual situation for me to be able to
2   describe to you what my role is.  It varies.  But
3   help -- you know, facilitating terminations is a part of
4   the role.
5   BY MR. CABECEIRAS:
6       Q.  You said you help facilitate the termination
7   process.  Can you describe what the termination process
8   is?
9           MR. REITER:  Objection.  Vague as to time
10  and circumstances.
11          Counsel, I think you're going to need to be
12  more specific.  She can't answer broad questions like
13  this about her role.  As she testified, it depends.
14  BY MR. CABECEIRAS:
15      Q.  She testified it depends, and then she
16  testified she helps facilitate the termination process
17  in her specific role as an assurance people leader.  I'm
18  asking what that process is.
19      A.  Are you asking what our termination process is
20  at PwC generally?
21      Q.  Yes.  Answer me that, please.
22      A.  It's the process of exiting or separating
23  employees from the firm.
24      Q.  And did you help facilitate Mr. Botta's
25  termination process?

1    A.  Yes, I did.

2    Q.  Ms. Hewitt, did you make the decision to
3 terminate Mr. Botta?

4    A.  No, I didn't.

5    Q.  Can you identify who did?

6        MR. REITER:  The question calls for
7 attorney-client communications.  As the witness already
8 testified, she cannot answer that question.

9 BY MR. CABECEIRAS:

10   Q.  Ms. Hewitt, in the termination process of
11 Mr. Botta, what non-attorneys played a role in the
12 termination process?

13       MR. REITER:  So same objection.

14       To the extent you can identify individuals
15 without disclosing attorney-client communications, you
16 may do so.

17   A.  I'm unable to do that.  Any -- I'm unable to
18 identify any individuals.  I am able to say that the
19 decision was made outside of the Bay Area Northwest
20 Market, and I was not involved in the decision.

21 BY MR. CABECEIRAS:

22   Q.  Why Mr. Botta was terminated?

23   A.  I'm sorry; could you repeat that again?  I
24 think it cut off at the beginning.

25   Q.  Yes.  Do you know why Mr. Botta was terminated

1  documents, we are asked on -- you know, employees are
2  asked when they exit, do they have a preservation order,
3  meaning, you know, is there anything we need to save the
4  computer for or save the files for.
5      Q.  And in this case, the preservation order was
6  for the Cavium engagement; is that correct?
7      A.  That's how I would read this.
8      Q.  Now, you stated before, that Mr. Baldwin gave
9  Mr. Botta a reason in August 2017 for terminating
10 Mr. Botta.
11     A.  Yes.
12     Q.  Do you know if any other employees -- if any
13 other employees got disciplined for the same infraction,
14 for the same falsifying a document at PwC?  Meaning --
15 and I'm sorry.  I can rephrase it.
16     A.  Uh-huh, uh-huh.
17     Q.  Meaning the particular document that Mr. Botta
18 allegedly had falsified, did anybody else on Mr. Botta's
19 team get in trouble for that alleged falsification?
20     A.  I'm only aware of this as it relates to
21 Mr. Botta.
22     Q.  Mr. Botta was a senior manager.  Who do senior
23 managers normally report to?
24     A.  That's a really -- that's a very broad
25 question.  Is there something more specific?

Confidential

1  Q. Sure. So Mr. Botta was in the auditing group;
2  right?
3  A. Correct.
4  Q. And he was in the auditing group as a senior
5  manager; is that correct?
6  A. Yeah, he was an auditor with us.
7  Q. And when assigned to particular audits, did
8  Mr. Botta have superiors who he reported to?
9  A. Yes.
10  Q. Do those superiors typically oversee the work
11  of senior managers?
12        MR. REITER: Vague as to "oversee."
13        If you understand the question, you can
14  answer.
15  A. I don't -- I mean, what I could answer is, you
16  know, typically the level above a senior manager is
17  partner. Could be a managing director, but often is a
18  partner, if that answers the question.
19  BY MR. CABECEIRAS:
20  Q. Sure. So my question, just so we're clear, is,
21  you know, Kevin Baldwin said, Mauro, you falsified this
22  document. Were any partners aware of this
23  falsification?
24        MR. REITER: Objection. Mis- -- to the
25  extent it misstates prior testimony, and --

1          THE WITNESS:  Yeah.

2          MR. REITER:  -- calls for speculation.

3     A.   Yeah, I don't have any, you know, information,
4  other than what I've already shared.
5  BY MR. CABECEIRAS:
6     Q.   And you don't recall the engagement matter in
7  which it was alleged that Mr. Botta falsified or lied?
8     A.   I do recall.  I believe we said it -- that
9  Mr. Baldwin said it in the meeting, that it related to
10 Cavium.
11    Q.   Do you remember who the partner on the Cavium
12 engagements were?
13         MR. REITER:  Calls for speculation.
14    A.   No, I don't.
15 BY MR. CABECEIRAS:
16    Q.   Did you, as your role in HR, after you did --
17 when any PwC employees were there, work on the Cavium
18 matter besides Mr. Botta?
19    A.   I believe that's not really something that I --
20 I could answer because it would relate to someone
21 else -- another employee at the firm.  However, I've
22 already stated that I'm only aware -- I was only
23 involved in, you know, the -- sitting in on the
24 termination of Mr. Botta as it relates to this.
25    Q.   Okay.  So you never disciplined another

1  employee at PwC as it relates to the Cavium matter?
2      A.  That's correct.
3      Q.  On the day you actually terminated Mr. Botta,
4  where did you physically meet him?
5      A.  Mr. Baldwin and myself met him in the San Jose
6  office.
7      Q.  And was anybody else present?
8      A.  No, not in the meeting.  Just the three of us.
9      Q.  And you may have answered this, and I
10 apologize:  Did you actually say anything during that
11 meeting?
12     A.  To the best of my memory, I may have, you know,
13 asked if he had any questions about the exit process.  I
14 was there, you know, as an HR representative to
15 administer that process.  So I may have asked him if he
16 had questions.
17     Q.  Can you recall if he asked any questions?
18     A.  I recall that he said very little to us, and it
19 was a very short meeting.
20     Q.  And I understand, as you testified to the
21 reason Kevin gave to Mauro why he was being terminated.
22 Can you think of anything else that Kevin said to
23 Mr. Botta at that meeting?
24     A.  Nothing else that comes to mind.  It really
25 was, you know, focused on that reason for termination,

1       A.  No, I didn't learn anything more.
2  BY MR. CABECEIRAS:
3       Q.  And at that point, in September of 2017, were
4  any other PwC employees terminated for misconduct on the
5  Cavium audit?
6           MR. REITER:  Calls for speculation.
7       A.  Yeah, I believe I've already stated that I am
8  not aware of, nor was I involved in, you know,
9  terminating any other employees related to this.
10 BY MR. CABECEIRAS:
11      Q.  Now, Ms. Hewitt, does Robert Heatley still work
12 at PwC?
13      A.  He does not.
14      Q.  And why does he no longer work at PwC?
15          MR. REITER:  I'm going to object to the
16 extent it calls for speculation.  And as Ms. Hewitt has
17 already explained multiple times, the circumstances
18 surrounding particular employees and their employment
19 situation is private.
20      A.  I have no knowledge of that situation.
21 BY MR. CABECEIRAS:
22      Q.  Just to clarify, because this is the
23 information I'm seeking, was Robert Heatley terminated
24 for anything having to do with the Cavium audit --
25      A.  I have no --