Exhibit 5

Page 14

1    that's when I probably would have had some early contact
2    with Mauro.
3        Q.   And in 2015, were you aware that Mr. Botta was
4    a senior manager on the Cavium engagement?
5        A.   Yes, I would have been aware of that.
6        Q.   At any time did Mr. Botta complain to you about
7    things he was seeing of the Cavium engagement?
8             MR. REITER:  Object to form.  Vague.
9             THE WITNESS:  I mean, it's -- going back that
10   early is really hard for me to recollect any specifics.
11   I would -- you know, did we have a conversation about
12   Cavium in general?  Yes.  I just can't recall details.
13            BY MR. CABECEIRAS:
14       Q.   Okay.  You can't recall specifically what he
15   brought up to you?
16       A.   No.  I mean, it will be really hard for me to
17   accurately describe anything.
18       Q.   Okay.  At that time around February of 2015,
19   did you know an individual named Tye Thorson who worked
20   for PwC?
21       A.   Yes.
22       Q.   At that time did you understand that
23   Mr. Thorson was also working on the Cavium engagement
24   with Mr. Botta?
25       A.   Yes.  That's -- yes, that's correct.

CONFIDENTIAL

Page 15

1  Q.  And at that time do you recall having any
2  conversations with Mr. Thorson regarding Mr. Botta's
3  conduct with respect to the Cavium engagement?
4          MR. REITER:  Objection.  Vague.
5          THE WITNESS:  Yeah.  I don't -- I don't recall
6  any specifics, and I wasn't that closely involved, I
7  mean, in anything related to that account being in an HR
8  role.
9          BY MR. CABECEIRAS:
10     Q.  Around that time, February 2015, did you ever
11  become aware that Mr. Botta had escalated a complaint to
12  PwC's national office regarding the Cavium audits?
13     A.  That -- it sounds familiar.  I wasn't involved
14  in any of the specifics in terms of the details, but
15  I -- you know, what you're describing sounds familiar.
16     Q.  In your past experience as assurance HR leader,
17  if a senior -- or not if.  When a senior manager reports
18  an issue to the national office, have you been made
19  aware of that?
20          MR. REITER:  Object to form.
21          THE WITNESS:  Yeah.  I mean, it would --
22  there's a lot of different circumstances and, you know,
23  reasons for things to get escalated.  I would be aware
24  of -- I can't say 100 percent I'd be aware of all of
25  them because we've got such a defined process and

CONFIDENTIAL

Page 19

1       You've mentioned this was new work.  Who
2  brought in this new work?
3       MR. REITER:  Calls for speculation.
4       THE WITNESS:  I don't know exactly everybody
5  who was involved in the proposal and the process.  I am
6  aware that Mauro was involved in some aspect of it, but
7  I couldn't give you the names of everybody.
8       BY MR. CABECEIRAS:
9    Q.  Okay.  And you said you knew Mauro was involved
10 in some aspect of it, though.
11      Can you elaborate as to exactly what you know
12 he was involved in or not involved in?
13   A.  Thinking back, I recall -- I believe he was
14 part of the proposal process, but I -- I mean, I don't
15 have direct involvement in that, so I can't give you --
16 it would be hard to give you specifics.  I just don't
17 know enough.
18   Q.  Okay.  What is a proposal process?
19      MR. REITER:  Object to form.
20      THE WITNESS:  Again, it's not an area I'm
21 involved in.  Very roughly it would be obviously going
22 out to the client with a proposal on the work and, you
23 know, but I -- there's pieces -- many parts to that that
24 I'm not privy to.
25      ///

1   market assurance leader at the time, just to make him
2   aware of it and the fact that we had this new work, but
3   I -- and that Mauro was -- I just can't state
4   100 percent accurately that I did.
5       Q.   Okay.  That's fine.
6            During this conversation with Mr. Botta, did he
7   make it clear to you that he was disappointed he was not
8   on the Pacific Bioscience engagement?
9       A.   Yeah.  I believe at the time there was a level
10  of frustration and just, I think -- I think he was
11  trying to understand or was confused about why he wasn't
12  going to be on the work.
13      Q.   Do you have any knowledge if he ever brought a
14  similar issue up to anybody at PwC besides yourself?
15           MR. REITER:  Calls for speculation.
16           THE WITNESS:  Yeah.  Are you -- I guess I'm
17  unclear on whether or not you're asking if he voiced the
18  same to another person besides myself in terms of not
19  being on this work or --
20           BY MR. CABECEIRAS:
21      Q.   Yep.  That's exactly what I'm asking.
22           So for example, if Tim Carey told you, "Hey,
23  Mauro came to me, and he was complaining about not being
24  put on the Pacific Bioscience"; right?  If you have any
25  knowledge as to any conversations that Mauro had with

Page 23

1  other PwC employees about the same issues he brought up
2  with you.
3       A.   Yeah.  I -- I can't recall 100 percent whether
4  or not that was shared at the time or not.  Or -- and I
5  don't recall being aware of him talking to others
6  directly about it.
7       Q.   Okay.  And turn your attention to Exhibit 50
8  again, the only paragraph you wrote, the last
9  sentence -- full sentence you say, "It did seem to 'set
10 him off' again though about not being fully
11 deployed/underutilized."
12          How did this set him off?
13      A.   Thinking back on it, I think he -- it was time
14 where he was -- he had some capacity to do more work,
15 and it was a frustrating -- he was not happy with the
16 fact that this was not going to be assigned to him.
17      Q.   What do you mean that he had capacity to do
18 more work?
19      A.   I can't recall exactly everything he had on
20 his -- you know, the clients and projects he was
21 assigned to at the time, but everything he shared when
22 he was speaking with me, he made it sound like he still
23 had time in his schedule to do some -- do more.
24      Q.   At that time when this e-mail was, you know,
25 taking place, October 12, 2016, when he had this

Page 24

1    conversation with Mauro, do you have any idea what
2    Mr. Botta's utilization rating was?
3         A.   Yeah.  I don't -- I don't recall exactly what
4    that would have been.
5         Q.   Okay.  And turning your attention, again, to
6    the last line, I read you say, "It did seem to 'set him
7    off' again."
8              What other times was Mr. Botta, quote, set off?
9              MR. REITER:  Object to form.  Overbroad.
10             THE WITNESS:  I mean, there were many, many
11   times that Mauro came to my office very emotional and
12   very negative, and it would be very difficult to recall
13   all of those instances.
14             BY MR. CABECEIRAS:
15        Q.   Okay.  So of these times Mr. Botta came to your
16   office, did he ever come to your office emotional or
17   saying negative things about the Cavium engagement?
18             MR. REITER:  Object to form.
19             THE WITNESS:  Yeah.  I mean, I -- I know early
20   on that was many -- I mean, the time frame on that is
21   challenging for me to recall the specifics.  You know, I
22   do recall some mention of Cavium, but I'm comfortable
23   that those matters get escalated and go through a
24   different process, but I'm sure he mentioned Cavium in a
25   conversation and frustration with it.

Page 25

1        BY MR. CABECEIRAS:
2     Q.  With respect to Mr. Botta coming in to your
3  office, being frustrated with the Cavium issue, did you
4  ever raise any of those specific issues up the ladder or
5  up the chain to somebody else at PwC?
6        MR. REITER:  Object to form.
7        THE WITNESS:  I don't recall being -- being
8  that involved in that issue or what -- how that
9  transpired in terms of anything that was looked into.  I
10 was on the periphery of, you know, just being kind of
11 aware that there were issues and some mention of it, but
12 I was not involved in the matter.
13       BY MR. CABECEIRAS:
14    Q.  I see.  Okay.
15       You know, going back to these times Mauro would
16 come to your office, as you said, emotional.  He
17 would -- you know, negative feedback.
18       Did he ever come into your office in relation
19 to any issues he was having on the Harmonic engagement?
20       MR. REITER:  So objection.  Vague as to
21 "issues."
22       THE WITNESS:  Yeah.  I do recall having
23 conversations about Harmonic with Mauro directly.
24       BY MR. CABECEIRAS:
25    Q.  And based off those conversations -- well, I'll

Page 26

1  withdraw.
2           Do you remember when these conversations took
3  place?
4      A.  Approximately -- I believe that was in 2016.  I
5  just don't recall exact timing.
6      Q.  And as a result of having conversations about
7  Harmonic with Mr. Botta, did you ever escalate the
8  matter to anybody at PwC?
9           MR. REITER:  Object to form.
10          THE WITNESS:  On that particular matter, that
11 would have -- that was escalated through our office of
12 ethics.
13          BY MR. CABECEIRAS:
14     Q.  Okay.  Did you contact the office of ethics on
15 behalf of Mr. Botta?
16     A.  I'm trying to recall whether or not -- it's a
17 little vague in my memory in terms of whether or not
18 I -- I reached out and escalated that or Mauro did on
19 his own.
20     Q.  Sorry, Ms. Nelson.  Are you still trying to
21 think or was that your answer?
22     A.  That was my answer.
23     Q.  Oh, okay.
24     A.  I can't recall exactly whether or not I did or
25 Mauro did on his own.

Page 27

1      Q.   The complaint that was brought up to the office
2   of ethics, whoever brought it up, do you recall what
3   that complaint was about?
4      A.   My recollection of Harmonic was that he was
5   frustrated and didn't agree with the ultimate
6   recommendation to remove him from the account, and he
7   did not agree with the feedback that was provided to
8   him.
9      Q.   Was he upset or did his complaint contain
10  anything else?
11          MR. REITER:  Object to form.
12          THE WITNESS:  I mean --
13          MR. REITER:  I think the document speaks for
14  itself.
15          THE WITNESS:  Yeah.  Those are the two pieces
16  of it that I recall.
17             MR. CABECEIRAS:  Joe, which document are
18  you referring to?  I'm sorry.
19          MR. REITER:  Well, I'm going to object.  It
20  lacks foundation that there was a complaint.  And I'm
21  referring to an ethics file would speak for itself.
22          BY MR. CABECEIRAS:
23      Q.   Ms. Nelson, I'm going to turn your attention
24  back to Exhibit 50.  It says in your first sentence the
25  new senior manager was Tania.