# EXHIBIT 2

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                 SAN FRANCISCO DIVISION
4    MAURO BOTTA,                      )
                                       )
5              Plaintiff,              )
                                       )
6         vs.                          ) Civil Case No.:
                                       ) 3:18-cv-2615
7    PRICEWATERHOUSECOOPERS LLP,       )
     LAURA BUSTAMANTE, TYE THORSON,    )
8    ROBERT HEATLEY, STIG              )
     HAAVARDTUN, ERGUN GENC, TIMOTHY   )
9    CAREY and STEVE MCMANN,           )
                                       )
10             Defendants.             )
     _____

11

         TELEPHONIC DEPOSITION UPON ORAL EXAMINATION
12
                           OF
13
                     SHAWNA HEWITT
14   _____
15        Taken at 1420 Fifth Avenue, Suite 2800
16
                  Seattle, Washington
17
18
19
20        * * * * CONFIDENTIAL * * * *
21
22
23   Job No: 153103
24   DATE TAKEN:   DECEMBER 19, 2018
25   REPORTED BY:  CINDY M. KOCH, RPR, CRR, CCR #2357

Confidential

```
1                      A P P E A R A N C E S
2    FOR PLAINTIFF (via telephone):
3                    ALEXANDER CABECEIRAS, ESQ.
                     Derek Smith Law Group
4                    One Penn Plaza
5                    New York, NY 10119
6

7

     FOR DEFENDANTS:
8

                     JOE REITER, ESQ.
9                    HUESTON HENNIGAN
                     523 West 6th Street
10                   Los Angeles, CA 90014
11

12

13   ALSO PRESENT:
14                   GEOFFREY EZGAR
                     Office of General Counsel
15                   PricewaterhouseCoopers
16

17                       *   *   *   *   *
18

19

20

21

22

23

24

25
```

Confidential

```
 1              DEPOSITION OF SHAWNA HEWITT
 2                   EXAMINATION INDEX
 3    EXAMINATION BY:                           PAGE
 4    Mr. Cabeceiras                             5
 5
 6                    EXHIBIT INDEX
 7    EXHIBITS FOR IDENTIFICATION               PAGE
```

```
 8    Exhibit 23  Email chain re: (For When you are back) -   25
            Sr Mananger [sic] Exits, most recently
 9          dated 4/18/17; PwC_B00011075.
            *CONFIDENTIAL*
10
      Exhibit 24  6/21/17 (M.B.) Meeting outline;          37
11          PwC_B00001941.  *CONFIDENTIAL*
12    Exhibit 25  Google Calendar document;               42
            PwC_B00001916-917.  *CONFIDENTIAL*
13
      Exhibit 26  Google Calendar email; PwC_B00001915.   42
14          *CONFIDENTIAL*
15    Exhibit 27  Email chain re Fwd: Confidential: Follow  46
            up (M.B.); PwC_B00001858-859, 861-863.
16          *CONFIDENTIAL*
17    Exhibit 28  Email chain re Fwd: SD13325746 Mauro      49
            Botta 00300178571; PwC_B00001832-842.
18          *CONFIDENTIAL*
19    Exhibit 29  Email chain re Plan for tomorrow;         65
            PwC_B00001813.  *CONFIDENTIAL*
20
      Exhibit 30  Copy of photograph; PLAINTIFF 001293     67
21
      Exhibit 31  Email chain re (Draft) Notice of          71
22          Separation; PwC_B00001849-850.
            *CONFIDENTIAL*
23
      Exhibit 32  Google Calendar email; PwC_B00001852.    74
24          *CONFIDENTIAL*
25
```

1                        EXHIBIT INDEX (Continuing)

2    EXHIBITS FOR IDENTIFICATION                          PAGE

3       Exhibit 33   Email chain re Responding to your          77

            question, most recently dated 10/6/17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

1     SEATTLE, WASHINGTON; DECEMBER 19, 2018

2                    10:01 a.m.

3                     -o0o-

4

5   SHAWNA HEWITT,            witness herein, having been

6                            first duly sworn on oath,

7                            was examined and testified

8                            as follows:

9

10            E X A M I N A T I O N

11  BY MR. CABECEIRAS:

12      Q.  Good morning, Ms. Hewitt.  My name is

13  Alexander Cabeceiras.  I represent Mr. Mauro Botta in

14  his claim against PwC.

15          First of all, thank you for coming today.

16          Second of all, as the court reporter has

17  stated off the record, we are on a telephone

18  deposition, meaning, when I ask you questions, it is

19  extremely important for you to pause and make sure my

20  question is complete.

21          This will allow the court reporter to

22  accurately capture the question and allow your

23  attorney to make any objections if he has any.

24          You understand?

25      A.  Yes, I do.  Thank you.

Confidential

1    Q.  Ms. Hewitt, could you state your full name for

2  the record.

3    A.  Yes.  Shawna Scott Hewitt.

4    Q.  And, Ms. Hewitt, where do you currently reside?

5    A.  I live in Seattle, Washington.

6    Q.  Ms. Hewitt, have you ever been deposed before?

7    A.  I have not.

8    Q.  Have you ever given testimony in a court

9  proceeding before?

10    A.  No, I have not.

11    Q.  Have you ever given testimony in any kind of

12  administrative proceeding?

13    A.  No, I haven't.

14    Q.  Ms. Hewitt, is there any reason you can think

15  of why you will be unable to testify truthfully today?

16    A.  No.

17    Q.  Are you under the influence of any drugs that

18  may impair your memory today?

19    A.  No.

20    Q.  Have you drank any alcohol in the last 24

21  hours?

22    A.  No.

23    Q.  Ms. Hewitt, where did you graduate from high

24  school?

25    A.  I graduated from high school in Delaware, Ohio.

Confidential

Page 7

1      Q.  And after high school, did you attend any

2   college or university?

3      A.  I did.

4      Q.  And where did you attend?

5      A.  I attended Ohio Westland University, also in

6   Delaware, Ohio.

7      Q.  And what years -- thank you.

8          And what years did you attend Ohio Westland?

9      A.  I attended from 1995 to 1998, I believe.

10  Actually, no.  Started in '94.  Sorry.

11     Q.  And did you ultimately receive a degree from

12  Ohio Westland?

13     A.  Yes.

14     Q.  What degree was that?

15     A.  It was a bachelor of arts in English and music.

16     Q.  And after Ohio Westland, did you attend any

17  other colleges or universities?

18     A.  Yes.

19     Q.  Where else did you attend?

20     A.  I attended Seattle University in the mid-2000s

21  and did some master's work in counseling.  I never

22  completed a degree there.

23     Q.  Do you recall, how long did you attend Seattle

24  University for?

25     A.  About three years.

Confidential

1    Q.  And what degree were you seeking at that time?

2    A.  A master's of education in counseling, I

3  believe.

4    Q.  And after Seattle University, did you attend

5  any other colleges or universities?

6    A.  No, I didn't.

7    Q.  So at this point do you hold any other degrees

8  besides the degree you received from Ohio Westland?

9    A.  I do not.

10    Q.  Do you hold any professional certifications?

11    A.  I do.

12    Q.  What certifications?

13    A.  I am a certified professional coach, and I'm

14  also a certified professional in human resources.

15    Q.  Anything else?

16    A.  No.

17    Q.  When did you get your certification in human

18  resources?

19    A.  I can't recall specifically, but it would have

20  been at least probably eight to ten years ago.

21    Q.  And where did you receive your certification?

22    A.  In Washington State.

23    Q.  What organization certified you?

24    A.  I'm pausing because it recently changed.  So

25  it's the Society of Human Resource Professionals, and

Confidential

1   there's another one called HRCI, and I think it was

2   through HRCI originally.

3        Q.  And what did you have to do to receive this

4   certification?

5        A.  I had to take an exam.

6        Q.  Is that it?

7        A.  Yes.

8        Q.  And is that certification -- do you have to

9   renew that certification at any time?

10       A.  I do.  Every three years.

11       Q.  What do you have to do in order to renew that

12   certification?

13       A.  I have to complete a certain number of

14   continuing education credits.  Can't remember right now

15   how many it is per three years.  But I've renewed it

16   multiple times.

17       Q.  And how do you receive continuing education

18   credits?

19       A.  Primarily through the work I do at the firm,

20   courses I instruct, sometimes external seminars that I

21   attend.

22       Q.  And as of today, your certification is up to

23   date with your continuing education requirements?

24       A.  Yes, it is.

25       Q.  Circling back a bit to after your time at

Confidential

Page 10

1   Seattle University, when you finished school, what did

2   you do for work, if anything?

3       A.   So for the Seattle University time, I did that

4   simultaneously while working at the firm, at PwC.

5       Q.   Ms. Hewitt, when were you initially hired at

6   PwC?

7       A.   In 2000.

8       Q.   And what position were you hired for?

9       A.   I was hired as a marketing assistant.

10      Q.   What office did you work out of as a marketing

11  assistant?

12      A.   The Seattle office.

13      Q.   At any time did you change positions at PwC?

14      A.   Many times.

15      Q.   When you initially changed -- well, withdrawn.

16           What position did you hold after a marketing

17  assistant?

18      A.   I was an executive assistant.

19      Q.   And when did you hold the position of executive

20  assistant?

21      A.   My best recollection is that it was in 2001 --

22  approximately 2001 to 2002.

23      Q.   What position did you hold after you were an

24  executive assistant?

25      A.   I was a human resources coordinator, I believe.

Confidential

Page 11

1    Q.  Did you have to apply for this position?

2    A.  Yes.

3    Q.  How long did you hold this position?

4    A.  Approximately maybe three or four years.  I

5  moved through a number of different human resources

6  roles.  So I would -- I can't remember off the top of my

7  head exactly how long in the coordinator level.

8    Q.  Can you take me through those human resources

9  roles you went through?

10   A.  Yeah.  So I was a human resources coordinator

11  starting around 2002.

12       Was promoted directly into a human resources

13  senior associate role probably around 2005, is my best

14  guess.

15       And then in 2007 I was promoted to a human

16  resources manager role, and I was then simultaneously

17  also the assurance HR leader for the Pacific Northwest.

18       Then probably around 2014 -- 2014 or 2015, I

19  became the market HR leader for Seattle and Portland.

20       And then in April of 2017, I became the

21  assurance people leader for the Bay Area Northwest

22  Market.

23   Q.  And is the assurance leader position the

24  position you currently hold?

25   A.  Yes.  I am the assurance people leader.

Confidential

1    Q.  And during this time in your various positions

2  within human resources, have you always worked out of

3  the Seattle office?

4    A.  Yes, I have.

5    Q.  And if you can describe for me your role as

6  assurance HR leader for the Pacific Northwest.  What do

7  you do in that capacity, or did you do?  Excuse me.

8    A.  Did I do in that previous role?

9    Q.  Correct.

10    A.  I just want to clarify.

11      Okay.  I was the -- essentially the HR point of

12  contact for the market, so far -- we were the Pacific

13  Northwest market, and so I was the person who worked

14  directly with the national office to then lead HR for

15  the assurance line of service for Seattle and Portland.

16    Q.  Okay.  And then eventually you became the

17  market human resources leader?

18    A.  Correct.

19    Q.  Can you discuss what you did as the market HR

20  leader?

21    A.  Yes.  I oversaw all of HR for the Pacific

22  Northwest market, and that involved all of our lines of

23  service.  We have four different lines of service, and I

24  was in charge of the HR team and the recruiting team for

25  the Pacific Northwest.

Confidential

1    Q.  Can you share with me what a line of service

2  is?

3    A.  Yes.  It's one of our -- we call our different

4  businesses, within our professional services firm, a

5  line of service.  So assurance is a line of service, tax

6  is a line of service, etc.

7    Q.  You mentioned there were four?

8    A.  Yes.  Assurance --

9    Q.  What are the other two?

10   A.  Yeah.  The other two are advisory and internal

11  firm services.

12   Q.  And ultimately you became the assurance people

13  leader.  Can you describe your role as the assurance

14  people leader for me?

15   A.  Yes.  I am the leader of our human resources

16  team for the Bay Area Northwest Market, which includes

17  five offices.  It includes San Jose, San Francisco,

18  Sacramento, Portland, and Seattle.

19   Q.  And do you have anybody report to you directly?

20   A.  Yes, I do.

21   Q.  How many people report to you directly?

22   A.  Directly, I have -- I have seven, I would say,

23  direct reports, and a team of about -- including those

24  direct reports, a team of about 20 people reporting to

25  me.

Confidential

Page 14

1      Q.  Are all these people in some kind of human

2   resources role?

3      A.  Yes, they are.

4      Q.  And I forgot to mention in the beginning.  I'm

5   sorry.  If you don't understand a question or something

6   I say, please just ask me to rephrase, and I'm happy to

7   do so.  Okay?

8      A.  Thank you.

9      Q.  Ms. Hewitt, you said that you had conducted

10  trainings in order to get CLEs, or continuing education

11  credits; is that correct?

12     A.  Correct.  I facilitate training sometimes.

13     Q.  Have you ever facilitated a training regarding

14  SEC whistle-blowers?

15     A.  No.

16     Q.  Have you ever received any training regarding

17  SEC whistle-blowers?

18          MR. REITER:  I'm going to object as vague

19  and ambiguous.

20          You can answer, if you understand the

21  question.

22     A.  I would need more clarification on the

23  question.

24  BY MR. CABECEIRAS:

25     Q.  That's fine.  I can withdraw that one.

Confidential

Page 15

1        So, Ms. Hewitt, does PwC have any sort of

2   anti-retaliation policy in place?

3        A.   Yes.

4        Q.   And what's your understanding of that policy?

5        A.   My understanding of the policy is that we do

6   not retaliate.

7        Q.   Does this policy apply to SEC whistle-blowers?

8        A.   It applies to all of our employees.

9        Q.   And have you received any training on this

10  policy from PwC?

11       A.   I believe it's included in our annual ethics

12  and compliance training, and then certainly it's in all

13  of our, you know, manuals that have our policies.

14       Q.   So when you said ethics and compliance

15  training, how often does that occur?

16       A.   Annually.

17       Q.   So every year?

18       A.   Correct.  Every year.

19       Q.   And if you can recall, when was the last time

20  you attended an ethics and compliance training?

21       A.   It's done virtually.  It's an e-learn, and my

22  best guess was within the last six months.

23       Q.   Ms. Hewitt, you had stated that you had to

24  complete -- or you could complete, I should say,

25  external seminars to get credits toward your

Confidential

Page 16

1    certification; is that accurate?

2        A.   Correct.   Yes, that's accurate.

3        Q.   Can you recall if you've attended seminars on

4    how to deal with retaliation in the workplace?

5        A.   I can't recall specifically if I've attended an

6    external training on that topic.

7        Q.   Ms. Hewitt, who is Mauro Botta?

8            MR. REITER:   Object as vague.

9            You can answer, if you understand.

10       A.   No, I would need -- I need more specifics.

11   BY MR. CABECEIRAS:

12       Q.   Do you know who Mauro Botta is?

13       A.   Yes.

14       Q.   Did Mauro Botta work at PwC?

15       A.   Yes, he did.

16       Q.   And do you recall what position Mauro Botta had

17   at PwC?

18       A.   I do.

19       Q.   What position was that?

20       A.   He was a senior manager.

21       Q.   Were you ever made aware that Mr. Botta

22   reported PwC to the SEC?

23            MR. REITER:   Vague as to time, and also I'll

24   object to the extent the question calls for

25   attorney-client communications.

Confidential

Page 17

1     If you can answer the question without doing

2  that, please do so.

3          THE WITNESS:  I can't.  It would be -- it

4  would require privilege, I think.  Unless there's more

5  specifics around the timeline.

6          MR. REITER:  Counsel, are you referring to

7  before or after --

8          MR. CABECEIRAS:  Yeah.

9          MR. REITER:  -- Mr. Botta filed his

10  complaint?

11          MR. CABECEIRAS:  Before Mr. Botta filed his

12  complaint.

13          THE WITNESS:  And when was the complaint

14  filed?

15          MR. REITER:  His initial employment

16  complaint was --

17          MR. CABECEIRAS:  -- in April 2018.

18          THE WITNESS:  I think to reveal that, it

19  would be privileged.

20  BY MR. CABECEIRAS:

21     Q.  I'm not asking you to reveal any conversations

22  you've had with your attorney.  I don't want to know

23  anything in-house counsel attorney or external attorney

24  talked to you about at all.

25          I want to know generally when you became aware,

Confidential

Page 18

1  if you even did, that Mr. Botta reported PwC to the SEC.

2          MR. REITER:  Counsel, why don't you give us

3  a minute off the record.

4          MR. CABECEIRAS:  There's an open question.

5          MR. REITER:  Your question, as she already

6  testified, calls -- it may call for privileged

7  communication, so I'd like to discuss it with her before

8  she answers.

9          MR. CABECEIRAS:  That's fine.  We'll go off

10  the record.

11          (Discussion off the record.)

12          MR. REITER:  Alex, we're back, and we can go

13  back on the record.

14          And, Ms. Court Reporter, would you please

15  read back the question to the witness?

16          (Question was read back.)

17          MR. REITER:  And I'll object on the grounds

18  that the question calls for attorney-client

19  communications.

20          If you can answer without disclosing

21  attorney-client communications, you can do so.

22      A.  Yeah, I think the only thing I can say that

23  doesn't disclose that is that I was not aware of an SEC

24  investigation at the time of -- that we terminated

25  Mauro.

Confidential

Page 19

1   BY MR. CABECEIRAS:

2       Q.  Ms. Hewitt, who made the decision to terminate

3   Mr. Botta?

4               MR. REITER:  Object to the extent the

5   question calls for disclosure of attorney-client

6   communications.

7               If you can answer without doing that, you

8   may.  If not, I'm instructing you not to answer.

9       A.  I can't answer the question.

10  BY MR. CABECEIRAS:

11      Q.  Ms. Hewitt, have you terminated any employee of

12  PwC before?

13              MR. REITER:  I'm going to caution the

14  witness not to disclose names or the circumstances

15  surrounding a particular employee, as that question

16  would infringe on their privacy rights, but --

17              THE WITNESS:  Sure.

18      A.  Yeah, just -- so generally, yes, being involved

19  in terminations is a part of my responsibilities.

20  BY MR. CABECEIRAS:

21      Q.  And what role do you play in terminating PwC

22  employees?

23              MR. REITER:  Vague as to time and

24  circumstances.

25              If you're able to understand the question,

Confidential

Page 20

1    you can answer.

2        A.   Yeah, could -- could you rephrase that so I can

3    understand it?

4    BY MR. CABECEIRAS:

5        Q.   Sure.  Ms. Hewitt, you testified you're an

6    insurance people leader; correct?

7        A.   No.  I'm the assurance people leader.

8        Q.   Assurance people leader.

9        A.   Uh-huh.

10       Q.   As an assurance people leader, as part of your

11   job, you participate in the termination of PwC

12   employees?

13       A.   Yes.  That's one of many responsibilities.

14       Q.   Okay.  And what do you do in this capacity?

15           MR. REITER:  Same objection.  Vague as to

16   time and circumstances.

17       A.   Is there a specific --

18   BY MR. CABECEIRAS:

19       Q.   Can you answer?

20       A.   Well, is there -- so it really is dependent on

21   the situation.

22       Q.   Okay.  How so?

23           MR. REITER:  Object to form.

24       A.   I guess one thing I could say is that I help

25   facilitate the termination process.  So it would depend

Confidential

Page 21

1  on the individual situation for me to be able to

2  describe to you what my role is.  It varies.  But

3  help -- you know, facilitating terminations is a part of

4  the role.

5  BY MR. CABECEIRAS:

6      Q.  You said you help facilitate the termination

7  process.  Can you describe what the termination process

8  is?

9          MR. REITER:  Objection.  Vague as to time

10  and circumstances.

11          Counsel, I think you're going to need to be

12  more specific.  She can't answer broad questions like

13  this about her role.  As she testified, it depends.

14  BY MR. CABECEIRAS:

15      Q.  She testified it depends, and then she

16  testified she helps facilitate the termination process

17  in her specific role as an assurance people leader.  I'm

18  asking what that process is.

19      A.  Are you asking what our termination process is

20  at PwC generally?

21      Q.  Yes.  Answer me that, please.

22      A.  It's the process of exiting or separating

23  employees from the firm.

24      Q.  And did you help facilitate Mr. Botta's

25  termination process?

Confidential

Page 22

1    A.  Yes, I did.

2    Q.  Ms. Hewitt, did you make the decision to

3  terminate Mr. Botta?

4    A.  No, I didn't.

5    Q.  Can you identify who did?

6        MR. REITER:  The question calls for

7  attorney-client communications.  As the witness already

8  testified, she cannot answer that question.

9  BY MR. CABECEIRAS:

10    Q.  Ms. Hewitt, in the termination process of

11  Mr. Botta, what non-attorneys played a role in the

12  termination process?

13        MR. REITER:  So same objection.

14        To the extent you can identify individuals

15  without disclosing attorney-client communications, you

16  may do so.

17    A.  I'm unable to do that.  Any -- I'm unable to

18  identify any individuals.  I am able to say that the

19  decision was made outside of the Bay Area Northwest

20  Market, and I was not involved in the decision.

21  BY MR. CABECEIRAS:

22    Q.  Why Mr. Botta was terminated?

23    A.  I'm sorry; could you repeat that again?  I

24  think it cut off at the beginning.

25    Q.  Yes.  Do you know why Mr. Botta was terminated

Confidential

Page 23

1   from PwC?

2       A.  I can -- I can share with you exactly the

3   reason that we communicated to Mr. Botta when we

4   terminated him on August 17, 2017.

5       Q.  Okay.

6       A.  That reason -- and I'm going to paraphrase a

7   bit because, you know, it was more than a year ago, but

8   Mr. Botta had represented to us that he had falsified a

9   control and audit documentation.  And as it was directly

10  communicated to him in our termination conversation, he

11  was being terminated either because he had done that or

12  because he had lied about it.

13      Q.  When you say falsified a control, can you

14  describe what control he falsified?

15      A.  No.  I'm unable to do that.  I don't have any

16  more information than just what I shared with you.

17      Q.  Do you recall in what document Mr. Botta

18  allegedly falsified a control?

19      A.  I have no knowledge of that.

20      Q.  How did you first learn that Mr. Botta

21  allegedly falsified a control?

22          MR. REITER:  Objection.  Calls for

23  attorney-client communications.  I'm going to instruct

24  the witness not to answer.

25          MR. CABECEIRAS:  Counsel, I'd like to know

Confidential

Page 24

1    if she found out through anybody other than an attorney.

2    BY MR. CABECEIRAS:

3        Q.  So, Ms. Hewitt, did you find out from anybody

4    other than an attorney that Mr. Botta allegedly

5    falsified this control?

6        A.  Before I answer that, I'd like to --

7            MR. REITER:  Yeah.  Give us a second,

8    Counsel.

9        A.  -- speak with my attorney.

10           MR. REITER:  We're going to go off the

11   record for a minute.

12           (Pause in proceedings.)

13           MR. REITER:  Okay.  Alex, we're back.

14           MR. CABECEIRAS:  Could you please read back

15   my last question?

16           (Question was read back.)

17       A.  No.

18   BY MR. CABECEIRAS:

19       Q.  Okay.

20       A.  Again, I think this -- you know, part of this

21   is privileged, so I don't . . .

22           MR. REITER:  Yeah.  She answered the

23   question.  There's no question pending.

24   BY MR. CABECEIRAS:

25       Q.  Were there any other reasons why Mr. Botta was

Confidential

Page 25

1  terminated besides the reasons you just gave us that you

2  gave him in August 2017?

3      A.  I gave you -- so I was merely in the room to be

4  an HR presence as the message was delivered to him, and

5  what I stated to you was exactly the reason that I

6  heard, and that is the only thing I'm aware of.

7      Q.  Okay.  And who else was in the room at that

8  time?

9      A.  Kevin Baldwin and Mauro.

10     Q.  And what is Kevin Baldwin's role?

11     A.  I believe that Kevin's role is vice chairman of

12 the West region.

13     Q.  Ms. Hewitt, who is Traci Nelson?

14     A.  Traci Nelson is the assurance people manager

15 for the Bay Area Northwest Market.

16     Q.  And does she report directly to you?

17     A.  Yes, she does.

18         MR. CABECEIRAS:  Counsel, if you could hand

19 the witness -- we're going to go a little out of order

20 here -- what was marked as Exhibit N, as in Nancy.

21         (Pause in proceedings.)

22         (Exhibit No. 23 marked.)

23 BY MR. CABECEIRAS:

24     Q.  Ms. Hewitt, please review this and let me know

25 when you're done.

Confidential

Page 26

1        A.   Okay.   Thanks.   I'll look at it now.

2             (Witness peruses document.)

3             Okay.   I've read it.

4        Q.   First off, can you describe exactly what this

5   document appears to be?

6        A.   Yes.   It appears -- it's an email exchange

7   between myself and Traci Nelson.

8        Q.   Ms. Hewitt, who is Lisa Burnison?

9        A.   Lisa Burnison is the person to whom I report

10  nationally.   She's our assurance strategy -- people

11  strategy leader, I believe.   I'm not exactly sure on

12  that title.   But she's my -- the person I report to.

13       Q.   And in this email, the second paragraph, you

14  write, "We can set up a time with whomever makes most

15  sense on the national team."

16            Is that an accurate reflection?

17       A.   Yes, that's the second paragraph that I wrote

18  to Tracy.

19       Q.   Did you at one point set up a time to speak

20  with somebody on the national team regarding Mr. Botta?

21       A.   My recollection is that what I was going to be

22  asking them was, you know, not specific to just Mauro,

23  but the exit process and timeline to better understand

24  for Mauro and for others whom we were putting in our

25  Friend of the Firm program, what that process was going

Confidential

Page 27

1    to be, as we had not received national instruction yet.

2          So I do -- I did connect with -- it probably

3    wasn't Lisa.  It probably was someone named Kelly

4    Schroeder, about -- to gain more understanding of the

5    way the program was going to work.

6          Q.  And what is the Friend of the Firm program,

7    exactly?

8          A.  So I'll -- I'll do my best to summarize it.  It

9    was a process by which we were looking to identify

10   individuals at the senior manager and director level who

11   were quite tenured with the firm and were not going to

12   be make- -- who were not on the partner pipeline, to

13   help them find a position outside of the firm, as we did

14   not have the continued space for those individuals

15   within our organization.

16         Q.  Okay.  And when did you first hear of this

17   program?

18         A.  I believe I first heard of it sometime in

19   probably late March or early April.  Sorry, of 2017.

20         Q.  Thank you.  And who first told you about this

21   program?

22         A.  Honestly, I can't remember who first told me.

23         Q.  Prior to this email that's been marked as

24   Hewitt 23, had you had conversation with Traci Nelson

25   regarding Mr. Botta's employment at PwC?

Confidential

Page 28

1     A.  Could you clarify that question a bit?

2     Q.  Sure.  This email seems to suggest, as

3  Ms. Nelson writes to you, she wants to update you of

4  "where we are potentially going with Mauro"; is that

5  correct?  It's in the second paragraph of her initial

6  email -- or first paragraph?

7     A.  That's correct.  Yes, she says that.

8     Q.  So did you have a discussion prior to this

9  email about where you were potentially going with

10  Mr. Botta?

11     A.  I believe so.  We were discussing all of the

12  senior managers who fit that category that I just

13  mentioned to you.

14     Q.  Do you remember when that conversation was had?

15     A.  I don't remember the specific timeline of -- or

16  the exact day when we began the conversations around

17  this.  It was a fluid process.  It was multiple weeks

18  that we were talking about it.

19     Q.  And how many senior managers fit that category?

20     A.  You know, without the document in front of me,

21  I couldn't say for sure how many were on the list from

22  our market.  I do recall that for the West region,

23  because this was done on a regional basis, we were -- we

24  had around 30 to 35.

25     Q.  And you identified that the Friend of the Firm

Confidential

Page  29

1   program would help senior managers and directors find

2   new positions?  Is that accurate?

3       A.  That's -- that is one piece of the program.

4       Q.  Were these new positions within PwC?

5       A.  We were looking to help our senior managers

6   find roles outside of PwC.

7              MR. REITER:  Alex, we've been going for

8   about an hour.  Can we take a quick break?

9              MR. CABECEIRAS:  Sure.  Let's take five.

10  Off the record, please.

11              (Recess from 10:56 a.m. to 11:02 a.m.)

12              E X A M I N A T I O N (Continuing)

13  BY MR. CABECEIRAS:

14      Q.  Ms. Hewitt, before we took our break, we had a

15  conversation about the Friend of the Firm program.

16      A.  Uh-huh.

17      Q.  To your knowledge, who at PwC created or

18  implemented this program?

19      A.  I don't have specific knowledge around who

20  created it, but it was a national approach we took

21  within the assurance practice.  I'm not sure which

22  individual specifically.

23      Q.  And you had mentioned, you know, one component

24  was to help managers and directors find new positions.

25  Is there any other components of this Friend of the Firm

Confidential

Page 30

1  program?

2      A.  I should clarify that it was not to help

3  managers and directors.  It was for senior managers and

4  directors.  And it was -- you know, when we say help

5  them find other positions, one aspect of it was, they

6  could get support for outplacement services.

7          But the primary -- the primary sort of emphasis

8  of the program was that we were telling tenured senior

9  managers who were not on the partner path that that was

10  the case for them, that they did not have a future

11  promotion potential at our firm, and thus asking them to

12  find external employment.

13      Q.  If they did not find external employment, would

14  they be terminated?

15      A.  So generally, the program operated under -- you

16  know, having conversations that they would look for

17  something within a three-month window, but there was

18  definitely flexibility to that.

19      Q.  Were all senior managers at PwC chosen to be

20  part of the Friend of the Firm program?

21      A.  I wouldn't have that information.  You know,

22  I'm only in a market role.  I don't have any information

23  for the whole firm.

24      Q.  When you say you're only in a market role, can

25  you describe what that means?

Confidential

Page 31

1    A.  Yes.  I'm the HR leader for the Bay Area

2  Northwest Market, which is five offices.  We have nine

3  markets, plus Mexico, within the U.S., and so I only

4  have responsibility for those cities that I mentioned.

5    Q.  I see.  I'm sorry.  So the market is more of a

6  regional thing; right?  I'll withdraw that question.  I

7  just wanted to clarify that.

8         To your knowledge, the senior managers part of

9  this program within your market, were they all

10 ultimately terminated by PwC?

11   A.  Sorry.  I'm pausing.  I'm thinking about it.

12   Q.  Take your time.

13   A.  I'm thinking through the individuals within the

14 market who were identified.  It was an evolving list,

15 meaning, you know, there was that flexibility I

16 mentioned to you, that not every senior manager who was

17 told that they wouldn't make partner and needed to find

18 something else left within that timeline.

19   Q.  You said this was an evolving list.

20   A.  Uh-huh.

21   Q.  Were there names removed from the list?

22   A.  So I'm uncomfortable talking about, you know,

23 the employment situation and, you know, performance for

24 other individuals.  You know, we're very confidential

25 with how we handle that at the firm.  So I guess maybe

Confidential

Page 32

1  if you have another -- another question.  I just can't

2  reveal anything about other employees.

3      Q.  Ms. Hewitt, I'm not asking you to reveal names

4  or reasons why.  I'm just asking if there were names

5  that were removed from the list.

6      A.  I don't know whether anyone was removed from

7  the list, but we do have individuals who, you know,

8  worked longer than that period, and at least -- you

9  know, at least one individual who is still employed with

10  us.

11     Q.  Who actually kept the list?

12         MR. REITER:  Calls for speculation.

13     A.  I was -- I can speak to my responsibility in

14  this.  I was helping to facilitate the process, so I

15  made the updates for our market to our list.

16  BY MR. CABECEIRAS:

17     Q.  So, Ms. Hewitt, just so we're clear, you would

18  specifically put names into the list?

19     A.  Correct.  I would update the status of, you

20  know, individuals so that, you know, as we put people --

21  we identified people to join the Friends of the Firm

22  program, I made that edit in the actual spreadsheet.

23     Q.  And you had mentioned there was some

24  flexibility.

25     A.  Yeah, we --

Confidential

Page 33

1       Q.   I want to ask you a little more --

2       A.   Sure.  Yeah, sorry.

3       Q.   Yeah, it's okay.  I want to ask you a little

4   more about that.  I guess my question is, if you know,

5   who had the authority to determine, you know, how long

6   people could stay on this list, that kind of a thing.

7       A.   Well, I can speak to within our market, you

8   know, the business made the decisions on who was a part

9   of this -- of this process.  And, you know, I would say

10  our -- you know, our partners had the ability to make a

11  decision around, you know, how long someone that we had

12  identified as a Friend of the Firm, how long they stayed

13  with us.

14      Q.   And you identified that at least one person was

15  taken off the list?  Was that person a Hugh Lester?

16           MR. REITER:  Objection.  I think that

17  misstates testimony.

18           MR. CABECEIRAS:  Okay.  I can withdraw it.

19  BY MR. CABECEIRAS:

20      Q.   Ms. Hewitt, do you know an individual named

21  Hugh Lester?

22      A.   I do know an individual named Hugh Lester.

23      Q.   Was or is Hugh Lester a PwC employee?

24      A.   Yes, Hugh is a PwC employee.

25      Q.   Is he a senior manager?

Confidential

Page  34

1       A.   Yes.

2       Q.   Was Mr. Lester placed on the list we've been

3    talking about?

4       A.   I can't speak to other individuals who are or

5    are not on the list from a confidentiality perspective.

6            MR. REITER:   And so I'll object on the

7    grounds that the question calls for private information

8    concerning third parties.

9            MR. CABECEIRAS:   Counsel, this is direct

10   comparative evidence.   We have a senior manager, same

11   position as my client, was placed on the list, the same

12   list my client was placed on.   We have a right to know

13   why he was removed, if he was removed, and for what.

14           MR. REITER:   Counsel, as the witness has

15   already testified, there was flexibility with respect to

16   the Friends of the Firm program and how long individuals

17   could stay at the firm.

18           The situation, the circumstances surrounding

19   one particular individual on the list is not relevant to

20   this case, certainly -- among other reasons, because, as

21   the witness has already testified, Mr. Botta was told he

22   was being terminated because of misconduct.

23           MR. CABECEIRAS:   Can we go off the record

24   for a minute?

25           MR. REITER:   Sure.

Confidential

Page 35

1           (Discussion off the record.)

2   BY MR. CABECEIRAS:

3       Q.  Ms. Hewitt, prior to -- well, withdrawn.

4           You testified you met with Mr. Botta in August

5   2017.  Prior to that time, had you met with Mr. Botta

6   before at all?

7       A.  I'm trying to recall.  I don't believe that we

8   had met more than just in passing in person.  We had had

9   at least one phone conversation, and maybe a couple, but

10  I'd had very limited interactions with him.

11      Q.  Okay.  You mentioned a -- perhaps a phone

12  conversation?

13      A.  Uh-huh.

14      Q.  Can you recall when that phone conversation may

15  have taken place?

16      A.  I can't remember the exact timing, but I would

17  have said maybe in July of 2017.

18      Q.  Can you recall what was discussed on this

19  telephone conversation?

20      A.  I can't recall all of the specifics, but Traci

21  Nelson and I had a call with Mr. Botta because he was

22  expressing -- he had some questions about the message he

23  had been given in June around the Friend of the Firm

24  program.  He had some questions for us.

25           And so -- I believe one of the questions was

Confidential

Page 36

1  whether he could be re-leveled to be a manager.  I don't

2  recall if it was in the same conversation.  He also was

3  asking about whether there were other roles within the

4  firm for him outside of client service.  And those are

5  the two main things I recall.  There could have been a

6  few other questions that he had.

7      Q.  Okay.  And at that time, when you spoke to

8  Mr. Botta by phone, could he be considered to be a

9  manager, or considered for a manager position?

10      A.  At the time we spoke, I told him that I did not

11  believe that it would be possible to be demoted to a

12  manager level position, but that I would consult around

13  it because I wanted to be 100 percent sure that it

14  wasn't something that we ever did.

15      Q.  And did you receive any consultation on that

16  issue?

17          MR. REITER:  So I'm going to object to the

18  extent it calls for attorney-client communications.

19          If you can answer without disclosing those

20  communications or information provided by counsel, you

21  may do so.

22      A.  I can't.  It would be -- it would be

23  privileged.

24  BY MR. CABECEIRAS:

25      Q.  And when he asked you about other roles within

Confidential

1  the firm generally, did you know at that point?

2          MR. REITER:  Object as vague.

3          Do you understand the question?

4          THE WITNESS:  No.  I would like it

5  clarified.

6  BY MR. CABECEIRAS:

7     Q.  Sure.  You said that Mauro came with two

8  questions, one of which was if there were other roles in

9  the firm for him.

10    A.  Uh-huh.

11    Q.  Did you know at that point if there were any

12  other roles available for him, or if he would be allowed

13  to be hired in another role?

14    A.  Yeah, I did not know at that point the answer

15  to that.

16    Q.  And the same thing.  Did you consult with --

17  get some consultation on that, is that the same --

18    A.  It would be the same.  It would -- yeah, it

19  would require privilege or --

20          MR. CABECEIRAS:  Okay.  Joe, if you could

21  hand Ms. Hewitt what's been marked as Exhibit A.

22          Ms. Koch, we can mark this as Hewitt 24,

23  please.

24          (Exhibit No. 24 marked.)

25  ////

Confidential

Page 38

1    BY MR. CABECEIRAS:

2         Q.  Ms. Hewitt, please review the document.  Let me

3    know when you're done.

4         A.  Okay.

5              (Witness peruses document.)

6              Okay.  I've reviewed it.

7         Q.  Ms. Hewitt, do you recognize this document at

8    all?

9         A.  I do not.

10        Q.  Have you ever seen this document before?

11        A.  No, I haven't.  Not that I can recall.

12        Q.  In June of 2017, do you know who Mr. Botta's

13   coach was at PwC?

14        A.  I believe -- and I don't know if it was coach

15   or relationship partner, and it may have been both

16   roles -- two separate roles -- I believe it was Rob

17   Ward.

18        Q.  Rob Ward.  And do you know, what was Rob Ward's

19   position at PwC?

20        A.  I don't know him personally.  He's a partner.

21        Q.  But you don't know his title?

22        A.  Partner.

23        Q.  Just partner.  Okay.

24        A.  I don't know if he has other roles within the

25   firm.

Confidential

Page 39

1      Q.  Did you ever meet with Rob Ward to discuss

2  Mr. Botta's employment?

3      A.  Not that I can recall.

4      Q.  Did you ever meet with Tim Carey to discuss

5  Mr. Botta's employment?

6      A.  I met with Tim Carey to discuss Mr. Botta being

7  included in the Friend of the Firm program.

8      Q.  And when did you meet with Tim?

9      A.  It would have been in the, you know -- starting

10  as early as March, sometime March, April.  But as we

11  were working through the list, Mauro was someone that we

12  were talking about.

13      Q.  Do you remember where you met with Mr. Carey?

14      A.  I remember at least once meeting in his office,

15  and we also would have telephone conversations because I

16  live in Seattle.  But at least once in the San Jose

17  office.

18      Q.  Just to clarify, Mr. Carey's office is in San

19  Jose?

20      A.  Yes, that's right.

21      Q.  And what do you remember discussing with

22  Mr. Carey in person at the San Jose office?

23      A.  Could you be more specific?

24      Q.  Yes.  Specifically what was said?  What did

25  Mr. Carey say to you?  What did you say to him?

Confidential

Page 40

1          MR. REITER:  With respect to Mauro?

2          MR. CABECEIRAS:  Correct.

3     A.  As we worked through the list of individuals

4  who it had been known that they weren't on our partner

5  pipeline, Mauro's name came up as one of these

6  individuals.

7          So, you know, that conversation had happened

8  prior to my coming into this role, but it was known at

9  that point that he would not be someone who was in our

10  partner pipeline.

11  BY MR. CABECEIRAS:

12     Q.  Did you ask Mr. Carey for feedback on

13  Mr. Botta's work product?

14     A.  I did not.  Because at that point, you know, we

15  were -- in my role, I was essentially facilitating a

16  process of, you know, putting people into the Friend of

17  the Firm program for whom it had been previously decided

18  whether they had part- -- you know, would be moving

19  towards partnership at the firm, and that was -- so that

20  piece of the decision had already been made prior to me

21  coming into this role.

22     Q.  Okay.  And do you know who made that decision?

23     A.  I don't.

24     Q.  Do you remember any questions Mr. Carey asked

25  you about the Friend of the Firm program during your

Confidential

Page 41

1  in-person meeting?

2      A.  I don't remember whether it was in person, but,

3  you know, I did consult to understand for the

4  individuals who were being put on the list, you know,

5  how long of a time frame they would have, what would be

6  their -- you know, the package they would receive with

7  us.  So I know at some point I told Tim about what --

8  you know, more details around the program.

9      Q.  You had mentioned you and Tim had some phone

10  calls as well.  How many phone calls, if you can

11  approximate, between you and Tim regarding Mr. Botta's

12  employment?

13      A.  It's hard for me to say because it was a part

14  of the same conversation as with the other senior

15  managers who were being put on the list.  So it was this

16  ongoing dialogue that we had for a couple of months.  So

17  I couldn't say for sure.

18      Q.  Did Mr. Carey, in any of these conversations,

19  ever ask you to take Mauro off of the list?

20      A.  At the point at -- we added -- at the point at

21  which I put him on the list, Tim never asked me to take

22  him off again.  So no.

23          MR. CABECEIRAS:  Joe, can you please hand

24  Ms. Hewitt -- or the court reporter, excuse me, what's

25  been marked as Exhibit B, and we can mark it as

Confidential

Page 42

1    Hewitt 25.

2              (Exhibit No. 25 marked.)

3    BY MR. CABECEIRAS:

4         Q.  Ms. Hewitt, please review the documents once

5    you've received them, and let me know when you're done.

6         A.  (Witness peruses document.)

7              Yes, I've reviewed it.

8         Q.  This appears to be a Google Calendar invite for

9    a meeting between you, Ms. Nelson, and Mr. Botta.

10             Is that an accurate reflection?

11        A.  Yes, correct, for a phone meeting.

12        Q.  Do you remember having this phone meeting?

13        A.  I do remember it.  And I believe this was the

14   meeting that I was referring to earlier, when I thought

15   it was in July, but it looks like it was late June.

16        Q.  And can you recall anything else that was

17   discussed during this meeting?

18        A.  I can't recall off the top of my head anything

19   else that was discussed.

20             MR. CABECEIRAS:  Joe, I'd ask that you hand

21   the court reporter what's been marked as Exhibit C.  We

22   can mark it as Hewitt 26.

23             (Exhibit No. 26 marked.)

24   BY MR. CABECEIRAS:

25        Q.  Ms. Hewitt, please review, and let me know when

Confidential

Page 43

1   you're done.

2        A.  (Witness peruses document.)

3            Yes, I've reviewed it.

4        Q.  Ms. Hewitt, do you know who Steven Kessler is?

5        A.  I do.

6        Q.  Who is that?

7        A.  He is in our ethics and compliance office.

8        Q.  Okay.  Is he inside counsel to PwC?

9        A.  All -- I'm not sure of what the role is, but he

10  works in our ethics and compliance office.  I'm not sure

11  any more about his role.

12       Q.  Did you ever instruct Ms. Nelson to reach out

13  to the ethics and compliance department to discuss

14  Mr. Botta?

15       A.  I don't know if I instructed her specifically

16  to do this, but as I'm looking at this now, I recall

17  that -- and that -- that something else that I believe

18  Mr. Botta brought up on our call, Traci's and Mauro's

19  and my call, was some concerns he had over the outcome

20  of the CRT process.  This jogged my memory around it.

21          And I believe that Traci was -- you know, was

22  reaching out to ethics and compliance to let them know

23  of these concerns -- escalating these concerns that

24  Mauro had brought up to both of us.

25       Q.  I see.  And Mr. Botta, from your memory,

Confidential

Page 44

1   brought these concerns up at the meeting you had that's

2   reflected in what's been marked Hewitt 25; is that

3   correct?

4       A.  I believe so.  I'm not exactly sure whether it

5   was in that meeting or in an email exchange before or

6   after that, but he had escalated concerns to us that we

7   felt we needed to -- to bring up to ethics and

8   compliance.

9       Q.  Ms. Hewitt, what is CRT -- what's the CRT

10  process stand for?

11      A.  CRT stands for career roundtable.

12      Q.  And what is that?

13      A.  The career roundtable is our annual review

14  process.  It's our, you know, annual performance

15  evaluation process.

16      Q.  Do you remember what concerns Mr. Botta brought

17  up to you?

18      A.  He did not go into a lot of detail with us

19  around what he was particularly concerned about because

20  we escalated it to ethics to -- you know, to look into

21  with him.  But I believe he was un- -- did not agree

22  with the results of the CRT process.

23      Q.  And what were the results of the CRT process?

24      A.  Related to Mr. Botta specifically?

25      Q.  Correct.

Confidential

Page 45

1        A.   Without the information in my hand and looking

2   in the system to verify, I just believe he was unhappy

3   with the tier he had received, which I believe was

4   Tier 3, but again, I would have to double check that.

5   We have many employees.

6        Q.   I asked you if he was upset with something

7   related to him.  Was he upset with anything else about

8   the CRT process?

9        A.   That's what I recall.

10       Q.   Did you ever speak to anybody in ethics about

11  Mr. Botta's concerns?

12       A.   I don't believe that I did.  I believe that

13  Traci Nelson was the one who escalated that.

14       Q.   And did Traci ever share with you any

15  conversations she may have had with ethics and

16  Mr. Botta's concerns?

17       A.   Not that I can recall.

18       Q.   Did you ever follow up with Ms. Nelson about

19  speaking to ethics on Mr. Botta's concerns?

20       A.   I followed up with her just to make sure that

21  we had escalated those concerns, but the way our process

22  works is that, you know, once we turn a situation like

23  this over to the ethics and compliance office, they're

24  the ones who manage the conversation and have the

25  responsibility for doing that.  So I only made sure with

Confidential

Page 46

1   her that it had been elevated.

2        Q.  Do you have any knowledge as to whether the

3   ethics department took any action relating to

4   Mr. Botta's concerns?

5        A.  I don't have any specific knowledge related to

6   it.

7               MR. CABECEIRAS:  Joe, if you could hand the

8   court reporter Exhibit E, we can mark this as 27.

9               (Exhibit No. 27 marked.)

10  BY MR. CABECEIRAS:

11       Q.  Ms. Hewitt, once you've received it, please

12  review it, and let me know when you're done.

13       A.  (Witness peruses document.)

14            Okay.  I've reviewed it.

15       Q.  Okay.  Great.

16            First of all, who is Timothy Redding?

17       A.  Tim -- Timothy Redding is in our U.S. security

18  team.

19       Q.  And is Tim based in San Jose?

20       A.  No.  Tim is in -- he's based in the West

21  region.  He lives part of the time -- he's based in LA

22  and in Seattle, but he has a national role.  So he has a

23  responsibility for, you know, the entire country for the

24  firm.

25       Q.  And what is your understanding of Tim Redding's

Confidential

Page 47

1  responsibilities at PwC?

2      A.  I really wouldn't be able to say.  I think, you

3  know, that's something that would have to be asked Tim

4  specifically, but we go to him for anything that we need

5  consultation around from a security perspective.

6      Q.  And when you say from a security perspective,

7  are you talking about physical security?  Cyber

8  security?  I mean, what kind of security are you

9  referring to?

10      A.  All of the above.  Physical security, cyber

11  security, nation- -- natural disasters.  Anything that

12  might impact the safety of our people.

13      Q.  And in this email that you are CC'd on, it

14  appears to have an attachment, a conversation of

15  Mr. Botta and Traci Nelson.

16          Is that an accurate reflection?

17      A.  Yes, that's what I see here.

18      Q.  Turning your attention to the last page of

19  what's been previously marked as PwC 1863, the very last

20  line says, "She" -- referring to you -- "will be

21  reaching out in the next day or so addressing your

22  questions."

23          So I'd like to ask you, did you speak to

24  Ms. Nelson about Mr. Botta's conversation with her?

25              MR. REITER:  Objection.  Vague.  I'm not

Confidential

Page 48

1    sure what conversation you're referring to.

2              If the witness understands, she can answer.

3    BY MR. CABECEIRAS:

4         Q.  That's fair enough.

5              Ms. Hewitt, I'm referring to the conversation

6    that was attached to this email that you have in front

7    of you.

8         A.  Yes.  I was aware of this, you know, email --

9    or this chat, Google chat exchange.

10        Q.  And how were you made aware of this Google chat

11   exchange?

12        A.  I believe that Traci told me about it, and then

13   I was copied on the email that was sent to Tim Redding.

14        Q.  And when did Ms. Nelson tell you about it?

15        A.  If I have the timing right in my head, she told

16   me about it, you know, soon after it happened, and that

17   was what partially prompted us to have a call with Mauro

18   about -- you know, the call that we had on the 30th of

19   June.

20        Q.  On the 30th of June?

21        A.  The -- oh, sorry.  Sorry.  The -- it was sent

22   on the 30th of June, but the -- it was the call -- no.

23   Sorry.  Let me look back here.  On the -- I'm looking at

24   the Google calendar invitations.  Yeah, the call on the

25   30th of June between Traci, Mr. Botta, and myself.

Confidential

Page 49

1    Q.  Okay.  So turning your attention again to the

2  last page.

3    A.  Yes.

4    Q.  You called Mr. Botta, and we've already

5  discussed that conversation; is that correct?

6    A.  Correct.

7    Q.  Okay.  All right.  Thank you for clarifying.

8    A.  Yeah.  Thank you.

9         MR. CABECEIRAS:  Joe, if you can hand the

10  witness Exhibit F, we'll mark it as 28.

11         (Exhibit No. 28 marked.)

12  BY MR. CABECEIRAS:

13    Q.  Ms. Hewitt, please review it, and let me know

14  when you're done.

15    A.  Yes, I will.

16         (Witness peruses document.)

17         Okay.  I've reviewed it.

18    Q.  Okay.  And can you describe the document?

19    A.  Yes.  It is Mr. Botta's employment agreement,

20  as well as a departure summary that we do as a typical

21  off-boarding procedure.

22    Q.  Now, it appears that you reached out to

23  somebody named Carlos who provided something referred to

24  as an EA?  Is that accurate?

25    A.  That's correct.  The employment agreement.

Confidential

Page 50

1    Q.   Okay.   That was going to be my next question.

2    A.   Yes.

3    Q.   EA stands for employment agreement?

4    A.   Yes, it does.

5    Q.   And why, in August of 2017, August 15th, at

6  that time, why were you seeking Mr. Botta's employment

7  agreement?

8    A.   Yeah.   I was preparing for the termination

9  conversation that would occur the next day, where we

10  standardly provide employment agreements to employees.

11    Q.   What else did you do to prepare for the

12  termination?

13    A.   Made -- I made sure that we had the correct

14  paperwork ready, that we had a room reserved, and

15  ultimately I, you know, sent an invitation to Mr. Botta

16  for a meeting.   Those were some of the things we did.

17    Q.   Okay.   And what paperwork had you gathered?

18    A.   We have -- we have standard off-boarding

19  paperwork that we share with employees if there is time

20  and opportunity to do that.

21    Q.   So for this specific termination, did you

22  gather off-boarding paperwork?

23    A.   Yes, we would have.

24    Q.   And what exactly is included in the

25  off-boarding paperwork?

Confidential

Page 51

1      A.  A copy of the employment agreement, a list of

2  items to turn in, the confirmation of the date of

3  termination, that type of information.

4      Q.  And you'd mentioned you sent an invitation to

5  Mr. Botta?

6      A.  Correct.  I recall that I set up a meeting with

7  him.

8      Q.  Did you set this up via Google Calendar?

9      A.  Yes, I would have done that.

10      Q.  Did you speak to anybody as you were preparing

11  for the termination of Mr. Botta that day, on

12  August 15th?

13          MR. REITER:  I'll object to the extent the

14  question calls for attorney-client communications.

15          THE WITNESS:  Do I need to --

16      A.  So aside -- I can -- I can speak to the only

17  people that I spoke to about it aside from what you just

18  shared around the attorney-client communications, or

19  is --

20          MR. REITER:  Why don't -- Counsel, sorry.

21  Why don't you give us a quick second off the record.  It

22  won't be long.

23          MR. CABECEIRAS:  Okay.

24          (Pause in proceedings.)

25          MR. REITER:  Okay.  Counsel, we're back.

Confidential

Page 52

1   Should we have the court reporter read back the

2   question, or how do you want to do this?

3              MR. CABECEIRAS:  Yes.  Ms. Koch, if you

4   could, just read back my last question.

5              (Question was read back.)

6              MR. REITER:  And same objections.

7       A.  So I would say I don't know if it was the 15th

8   or the 16th, but the only person I would have spoken

9   with that I can share is let Tim -- consulted with Tim

10  Redding in security.

11  BY MR. CABECEIRAS:

12      Q.  Did you consult with Traci Nelson?

13      A.  That would apply to what my attorney shared

14  around attorney-client privilege.

15             MR. REITER:  Calls for attorney-client

16  communications.

17  BY MR. CABECEIRAS:

18      Q.  So Ms. Nelson is an attorney; correct?

19             MR. REITER:  Alex, why don't we take a break

20  off the record for a second.  You and I can discuss.

21             MR. CABECEIRAS:  Okay.  I'll give you a call

22  again.

23             MR. REITER:  Just give us one moment off the

24  record.

25             MR. CABECEIRAS:  Okay.

Confidential

Page 53

1          (Pause in proceedings.)

2          MR. REITER:  So why don't you repeat your

3    question.

4    BY MR. CABECEIRAS:

5          Q.  Okay.  Is Ms. Nelson an attorney?

6          A.  No, she's not.

7          Q.  Did you discuss with Ms. Nelson plans to

8    terminate Mr. Botta?

9          A.  My conversations with Ms. Nelson were in the

10   presence of our attorneys, with our in-house counsel.

11         Q.  Days before you actually terminated Mr. Botta,

12   did you discuss his termination with Tim Ryan -- or

13   excuse me, Timothy Carey?

14         A.  Can you repeat that?  I'm sorry.  I think it

15   cut out at the beginning.

16         Q.  Yeah.  So a few days prior to actually

17   terminating Mr. Botta, did you discuss Mr. Botta's

18   termination with Tim Carey?

19         A.  No, I did not.

20         Q.  What about Mr. Ward?

21         A.  No, I did not.

22         Q.  You stated previously that the reason given to

23   Mr. Botta was allegedly falsifying a control, the reason

24   for termination; is that accurate?

25         MR. REITER:  That misstates testimony.

Confidential

Page 54

1    Asked and answered.

2         A.   I stated that he --

3              THE WITNESS:   Should I say it again?

4              MR. REITER:   Sure.

5              THE WITNESS:   Okay.

6         A.   I stated that we shared with Mr. Botta in that

7    conversation -- Kevin Baldwin actually said to him in

8    that conversation that Mr. Botta had represented to us

9    that he had falsified a control and audit papers, and so

10   he was being terminated either for doing that or for

11   lying about it.

12   BY MR. CABECEIRAS:

13        Q.   And do you know when Mr. Botta actually shared

14   with you this alleged falsification?

15        A.   I don't know anything other than what I just

16   shared, and it was what I heard said in the meeting.

17        Q.   And when you say the meeting, are you referring

18   to the meeting with your attorneys that we won't get

19   into?

20        A.   No, I'm referring to the -- no, I'm referring

21   to the termination conversation.

22             MR. REITER:   To be clear, she's referring to

23   the meeting with your client, Mr. Botta.

24   BY MR. CABECEIRAS:

25        Q.   Prior to having that termination meeting, did

Confidential

Page 55

1  you have any idea why Mr. Botta was going to be

2  terminated?

3           MR. REITER:  Objection.  Calls for

4  attorney-client communications.

5           If you can answer without disclosing those

6  communications or information provided by counsel, you

7  can.

8      A.  I can't answer it without doing that.

9           MR. CABECEIRAS:  Go off the record for a

10 second?

11          MR. REITER:  Sure.

12          MR. CABECEIRAS:  Guys, you want to take a

13 quick five minutes?

14          MR. REITER:  Yes, that's fine.

15          (Recess from 12:02 p.m. to 12:09 p.m.)

16          (Discussion off the record.)

17          (Recess from 12:10 p.m. to 1:00 p.m.)

18            E X A M I N A T I O N (Continuing)

19 BY MR. CABECEIRAS:

20     Q.  Turning your attention to what's been marked as

21 Hewitt 28, can you turn to the second to last page for

22 me.

23     A.  Yes.

24     Q.  I know we just took a break, so if you'd like

25 to review that page for a minute, and let me know when

Confidential

Page 56

1    you're done reviewing.

2         A.   (Witness peruses document.)

3              Okay.  I'm done reviewing.

4         Q.   Up at the top there, it says, "HR SSC

5    Compliance."

6              Can you tell me what SSC stands for?

7         A.   Yes.  Shared Services Center.

8         Q.   And what is the Shared Services Center?

9         A.   They are our group in Tampa who, from an HR

10   perspective, help with a lot of our HR function.

11        Q.   If you could look down a little further on the

12   page, it says, "Did staff have a Preservation Order,"

13   box marked "Yes" --

14        A.   Uh-huh.

15        Q.   -- "as it relates to Cavium engagement."

16             Do you see that?

17        A.   Yes.

18        Q.   Do you have any understanding of what that

19   means?

20        A.   I do understand what the preservation orders

21   are.

22        Q.   Okay.  And what are they generally to you?

23        A.   Yeah, generally, we receive -- if there is some

24   type of, you know, pending issue or litigation or, you

25   know, various circumstances that require us to preserve

Confidential

Page 57

1    documents, we are asked on -- you know, employees are

2    asked when they exit, do they have a preservation order,

3    meaning, you know, is there anything we need to save the

4    computer for or save the files for.

5         Q.  And in this case, the preservation order was

6    for the Cavium engagement; is that correct?

7         A.  That's how I would read this.

8         Q.  Now, you stated before, that Mr. Baldwin gave

9    Mr. Botta a reason in August 2017 for terminating

10   Mr. Botta.

11        A.  Yes.

12        Q.  Do you know if any other employees -- if any

13   other employees got disciplined for the same infraction,

14   for the same falsifying a document at PwC?  Meaning --

15   and I'm sorry.  I can rephrase it.

16        A.  Uh-huh, uh-huh.

17        Q.  Meaning the particular document that Mr. Botta

18   allegedly had falsified, did anybody else on Mr. Botta's

19   team get in trouble for that alleged falsification?

20        A.  I'm only aware of this as it relates to

21   Mr. Botta.

22        Q.  Mr. Botta was a senior manager.  Who do senior

23   managers normally report to?

24        A.  That's a really -- that's a very broad

25   question.  Is there something more specific?

Confidential

Page 58

1    Q.   Sure.  So Mr. Botta was in the auditing group;

2    right?

3    A.   Correct.

4    Q.   And he was in the auditing group as a senior

5    manager; is that correct?

6    A.   Yeah, he was an auditor with us.

7    Q.   And when assigned to particular audits, did

8    Mr. Botta have superiors who he reported to?

9    A.   Yes.

10   Q.   Do those superiors typically oversee the work

11   of senior managers?

12             MR. REITER:  Vague as to "oversee."

13             If you understand the question, you can

14   answer.

15   A.   I don't -- I mean, what I could answer is, you

16   know, typically the level above a senior manager is

17   partner.  Could be a managing director, but often is a

18   partner, if that answers the question.

19   BY MR. CABECEIRAS:

20   Q.   Sure.  So my question, just so we're clear, is,

21   you know, Kevin Baldwin said, Mauro, you falsified this

22   document.  Were any partners aware of this

23   falsification?

24             MR. REITER:  Objection.  Mis- -- to the

25   extent it misstates prior testimony, and --

Confidential

1          THE WITNESS:  Yeah.

2          MR. REITER:  -- calls for speculation.

3      A.  Yeah, I don't have any, you know, information,

4  other than what I've already shared.

5  BY MR. CABECEIRAS:

6      Q.  And you don't recall the engagement matter in

7  which it was alleged that Mr. Botta falsified or lied?

8      A.  I do recall.  I believe we said it -- that

9  Mr. Baldwin said it in the meeting, that it related to

10  Cavium.

11      Q.  Do you remember who the partner on the Cavium

12  engagements were?

13          MR. REITER:  Calls for speculation.

14      A.  No, I don't.

15  BY MR. CABECEIRAS:

16      Q.  Did you, as your role in HR, after you did --

17  when any PwC employees were there, work on the Cavium

18  matter besides Mr. Botta?

19      A.  I believe that's not really something that I --

20  I could answer because it would relate to someone

21  else -- another employee at the firm.  However, I've

22  already stated that I'm only aware -- I was only

23  involved in, you know, the -- sitting in on the

24  termination of Mr. Botta as it relates to this.

25      Q.  Okay.  So you never disciplined another

Confidential

Page 60

1   employee at PwC as it relates to the Cavium matter?

2       A.   That's correct.

3       Q.   On the day you actually terminated Mr. Botta,

4   where did you physically meet him?

5       A.   Mr. Baldwin and myself met him in the San Jose

6   office.

7       Q.   And was anybody else present?

8       A.   No, not in the meeting.   Just the three of us.

9       Q.   And you may have answered this, and I

10  apologize:   Did you actually say anything during that

11  meeting?

12      A.   To the best of my memory, I may have, you know,

13  asked if he had any questions about the exit process.   I

14  was there, you know, as an HR representative to

15  administer that process.   So I may have asked him if he

16  had questions.

17      Q.   Can you recall if he asked any questions?

18      A.   I recall that he said very little to us, and it

19  was a very short meeting.

20      Q.   And I understand, as you testified to the

21  reason Kevin gave to Mauro why he was being terminated.

22  Can you think of anything else that Kevin said to

23  Mr. Botta at that meeting?

24      A.   Nothing else that comes to mind.   It really

25  was, you know, focused on that reason for termination,

Confidential

Page 61

1   and that he was being terminated.

2        Q.  Did Mr. Botta attempt to defend himself at all

3   at that point?

4        A.  Not that I can recall.

5        Q.  Was the Friend of the Firm program discussed at

6   that point?

7        A.  Not that I can recall.

8        Q.  And after this meeting occurred, when was the

9   next time you spoke to Mr. Botta, if at all?

10       A.  I believe the next time I spoke to him was in

11  regards to -- it may have been later that day or the

12  next day.  I think it was later that day, when he asked

13  for some personal documents and files from his computer.

14       Q.  And after that meeting where Mauro was

15  terminated, focusing your attention on that day, right

16  after the meeting, what did you do?  Where did you go

17  to?

18       A.  Can you be more specific?  I just want to make

19  sure I answered that right.

20       Q.  Yeah.  After you had the conversation -- no,

21  absolutely, and I'm happy to clarify.  You have the

22  conversation with Mr. Botta.  I just want to get your

23  description of what happened next.

24            So for example, did he just get up and leave

25  the building?  Did you escort him out?  What did you do

Page 62

1    next, after you terminated Mr. Botta?

2         A.   Yes.  I believe I escorted him out.

3         Q.   Did you escort him to the front door?

4         A.   I can't recall whether I escorted him just to

5    our -- the lobby of our floor and to the elevator, or

6    actually down to the main level.  I can't recall.  It

7    was -- would have been one of those two things.

8         Q.   And did anybody walk with you when you were

9    escorting Mauro out of the building?

10        A.   I can't recall anyone walking directly with

11   Mauro and myself to the elevator.

12        Q.   And did you fly in to San Jose just to

13   terminate Mr. Botta or were you there for other business

14   matters?

15        A.   I -- because I have a role in the market, I

16   conducted other business while I was there, but

17   certainly being -- you know, being involved to help with

18   this termination was part of the reason I was there.

19        Q.   How long were you actually in San Jose at that

20   time?

21        A.   To the best of my memory, I was there just that

22   day or maybe two days, but I can't say for sure.  I take

23   a lot of trips to San Jose.

24        Q.   And in that time period, the day or maybe two

25   days, did you terminate anybody else?  And I don't need

Confidential

Page 63

1    to know the names or anything.  I'm just wondering if

2    you conducted any other termination.

3         A.  Not that I can recall.

4         Q.  Out of all of the employees who were terminated

5    pursuant to the Friend of the Firm program, how many of

6    those terminations did you actually sit in on

7    physically, if any?

8         A.  Well, I -- so I want to be clear that the

9    reason I stated for Mauro being terminated was because

10   of misconduct.  So it's unrelated to the -- you know, to

11   the question you're asking.

12        Q.  Okay.  Yep.  Separate question then.  If you

13   could just answer the original question.

14        A.  And sorry; can you ask it again?

15        Q.  Sure.  How many terminations did you actually

16   sit in on of employees who were on this Friend of the

17   Firm list?

18        A.  It seems to me that, you know, first of all,

19   that would be perhaps confidential.

20             THE WITNESS:  I don't know, Joe, if I should

21   answer that.  Go ahead, answer?

22   BY MR. CABECEIRAS:

23        Q.  Please don't ask your attorney --

24        A.  Sorry.

25        Q.  -- when there's an outstanding question on the

Confidential

Page 64

1   record.

2        A.  Yeah.  Sorry about that.

3             I did not sit in on any of those conversations

4   as they were -- you know, the reason why I was -- I was

5   a part of Mr. Botta's conversation was because he was

6   being terminated for misconduct.

7        Q.  Do you always sit in when an employee is being

8   terminated for misconduct?

9        A.  There aren't absolutes in terms of me always

10  being a part of something or not.  But in this case it

11  was determined I was the right person to be a part of

12  that discussion.  I have an entire team of people who

13  are -- you know, often handle HR, you know, terminations

14  as well.

15       Q.  Okay.  I can imagine what your attorney's

16  objection will be, but who made the determination to

17  have you sit in on this particular termination?

18            MR. REITER:  Yeah, I'm going to object on

19  the grounds that that calls for attorney-client

20  communications, and instruct the witness not to answer.

21       A.  I can't answer that.

22  BY MR. CABECEIRAS:

23       Q.  Did anybody other than an attorney, whether

24  in-house counsel or external counsel, tell you to be in

25  the room when Mr. Botta was terminated?

Confidential

Page 65

1          MR. REITER:  I think that's asked and
2    answered.  Same objections.
3          A.  Yeah, I'm unable to answer that.
4          MR. CABECEIRAS:  Counsel, I don't want to
5    know any conversations with attorneys.  I'm asking for
6    non-attorney communication relating to my client's
7    termination.  I think I have a right to an answer.
8          MR. REITER:  She answered the question.
9          MR. CABECEIRAS:  If the answer's no -- she
10   just said, "I can't answer that."
11         A.  No one else instructed me.
12   BY MR. CABECEIRAS:
13         Q.  Thank you.
14         MR. CABECEIRAS:  Counsel, could you hand the
15   witness what's been marked as Exhibit G, and we can mark
16   it as Exhibit 29.
17              (Exhibit No. 29 marked.)
18         THE WITNESS:  Okay.  I've reviewed it.
19   BY MR. CABECEIRAS:
20         Q.  Ms. Hewitt, this appears to be an email from
21   you to Mr. Redding.  Is that accurate?
22         A.  That's correct.
23         Q.  Why were you emailing Mr. Redding about Mauro's
24   access?
25         A.  Yeah.  So as we -- as I stated earlier,

Confidential

Page 66

1   Mr. Redding is in our security department, and so it's

2   standard in cases like this, where we are terminating

3   someone for misconduct, that we would immediately cancel

4   their building access, so their access to our building.

5   And so I was asking him to do that.

6       Q.   And did you speak to Mr. Redding by phone at

7   any time relating to Mr. Botta's termination?

8       A.   Yeah, I'm guessing that I did.

9           MR. REITER:  Well, don't guess.

10          THE WITNESS:  Oh, sorry, sorry.

11      A.   Yes, I believe I did.

12  BY MR. CABECEIRAS:

13      Q.   Do you recall if it was before or after this

14  particular email that's in front of you now?

15      A.   It was before.

16      Q.   Did you talk to Mr. Redding by telephone?

17      A.   Yes.

18      Q.   And what was discussed?

19      A.   It was -- I just let him know that, you know,

20  there would be a termination occurring, and that we

21  would need there to be -- you know, that we need --

22  would need to cancel the access.

23          And we also asked for a security guard to be

24  on-site, which is something that is very standard for us

25  to do, again, in a termination situation where there's

Confidential

Page 67

1    been misconduct.

2        Q.  And the day you terminated Mr. Botta, was there

3    a security guard on-site?

4        A.  There was.

5        Q.  Did you speak to Mr. Redding about anything

6    else related to Mr. Botta's termination on the phone

7    call you just described?

8        A.  No.  I only spoke to him on the -- you know,

9    the security implications of this situation to make sure

10   he and I were aligned on that, but that was it.

11           MR. CABECEIRAS:  Counsel, if you could hand

12   the witness Exhibit L, we can mark it as Exhibit 30.

13           (Exhibit No. 30 marked.)

14   BY MR. CABECEIRAS:

15       Q.  Ms. Hewitt, please review the document.  Let me

16   know when you're done.

17       A.  (Witness peruses document.)

18           Okay.  I've reviewed it.

19       Q.  Ms. Hewitt, have you seen this photo before?

20       A.  No.

21       Q.  Do you recognize what this is a photo of?

22       A.  I think it's -- it looks like a desk, likely --

23   yeah, it's actually pretty hard for me to make out

24   what's in the photo.

25       Q.  Do you notice there's a hand on a mouse pad,

Confidential

Page 68

1   and above that, there's a photo?

2        A.  Yes, I can see a photo above it, yeah.  I just

3   can't make out what's in the photo.

4        Q.  Were you ever aware that a photo of Mr. Botta

5   was placed in the lobby of PwC San Jose's office?

6        A.  Yeah, I was aware after the fact of that.

7        Q.  When did you become aware?

8        A.  It came to our attention that it was there, and

9   I don't remember how, and just asked whether, you know,

10  it should be -- should be taken down.  So the question

11  was asked of me.

12       Q.  And you say "our attention."  Who are you

13  referring to?

14       A.  I believe it came to the attention of our

15  office -- of our market admin leader, who oversees the

16  office services team, and sometimes these kind of

17  questions are raised too.

18       Q.  And who is the market admin leader?

19       A.  Her name is Laurie Tempest.

20       Q.  Tempest with a T?

21       A.  Yeah, T-e-m-p-e-s-t.

22       Q.  Just so we're clear, somebody asked Laurie

23  directly about the photo or somebody asked you?

24       A.  I -- my recollection -- my best recollection is

25  that the question -- somebody asked Laurie about it or

Page 69

1   it came to her attention, and she asked me.

2       Q.  And you testified that she had asked if it

3   should be taken down?  Is that accurate?

4       A.  I'm struggling with my memory around these

5   details of who asked about it, but I -- what I know is

6   that I became aware there was a photo there, and I was

7   involved in a question around should it be taken down.

8   So that's how I knew it was there.  And I'm sorry; I

9   don't have more memory than that.

10      Q.  Okay.  And did you have an answer to if it

11  should be taken down?

12      A.  I believe it was a couple weeks after the

13  termination had occurred, so I believe we took it down.

14  It could have been a longer period than that.

15      Q.  Do you know who put the photo --

16      A.  Sorry.

17      Q.  Do you know who put -- it's okay.

18          Do you know who put the photo up?

19      A.  I don't know specifically who did.

20      Q.  Do you know who requested the photo be put up,

21  if anybody?

22      A.  I don't know who requested the photo be put up.

23  It would be a standard part of our security procedures,

24  when there's a termination for misconduct, to notify the

25  building security, particularly in this case.  So my

Confidential

Page 70

1   guess is that Tim -- sorry.  So typically our security

2   group would be involved in doing that.  But in this case

3   I don't know the exact person.

4        Q.  You said particularly in this case.  Why

5   particularly in this case?

6        A.  Sorry.  I don't recall exactly what I said,

7   what that related to.  Sorry.

8             MR. CABECEIRAS:  Could you read back her

9   answer to the last question, please?

10             (Answer was read back.)

11        A.  I can answer that.  So I meant particularly in

12   this case because we had a security guard present, and

13   so we had asked for security.  So it would have been

14   involved -- you know, the photo would have been a part

15   of that.

16   BY MR. CABECEIRAS:

17        Q.  And is it discretionary whether to ask for a

18   security guard to be present or not, or is it mandatory?

19        A.  I would say we use -- we use discretion around

20   that, and it's up to the expertise of our security team.

21        Q.  But in Mr. Botta's case, PwC requested that a

22   security guard be on-site; is that accurate?

23        A.  Yes, that's correct.

24        Q.  Ultimately, do you know if the photo was taken

25   down?

Confidential

Page 71

1          MR. REITER:  Asked and answered.

2     A.  Yes, it was ultimately taken down.

3  BY MR. CABECEIRAS:

4     Q.  Oh, I'm sorry.  Okay.

5          Turning your attention to -- or withdrawn.

6          MR. CABECEIRAS:  Joe, if you could hand the

7  witness Exhibit H, and we can mark it -- what are we up

8  to?  31?

9          THE COURT REPORTER:  Yes.

10          (Exhibit No. 31 marked.)

11  BY MR. CABECEIRAS:

12     Q.  Ms. Hewitt, please review it, and let me know

13  when you're done.

14     A.  (Witness peruses document.)

15          Okay.  I've reviewed it.

16     Q.  Ms. Hewitt, this appears to be an email

17  conversation between you and Ms. Nelson, speaking -- and

18  I'm going to put this very generally -- about an email

19  going out, notifying people that Mauro had been

20  terminated.

21          Is that an accurate general reflection?

22     A.  Yes.  It's specifically a notification to the

23  partners.

24     Q.  Ms. Hewitt, have you had to fire other senior

25  managers before in your capacity as an HR representative

Confidential

Page 72

1   at PwC?

2        A.   I can't speak to any specifics around that, but

3   yes, being involved in terminations of employees at all

4   levels is -- has been a part of my responsibilities.

5        Q.   And when a senior manager is terminated, are

6   emails like this typically sent out to partners?

7        A.   It would -- you know, it would really depend on

8   the situation, but it would not be uncommon when someone

9   is terminated in the same day, who has client

10  responsibilities, for us to need to notify the client --

11  or the partners, rather, that it has occurred, and

12  instruct them on, you know, some of the details in this

13  note.  Because, you know, they would need to know

14  what -- how to handle inquiries from clients, etc.

15       Q.   And at the time Mauro was terminated, did he

16  have client responsibilities?

17       A.   I actually can't answer that because I don't

18  have that specific knowledge.  I'm not involved directly

19  in the staffing to know for sure.

20       Q.   Do you have any knowledge as to Mr. Botta's

21  utilization rate at the time he was terminated?

22       A.   I would have had access to that, but I don't

23  have knowledge of that, that I could -- you know, I

24  don't have anything that I know right now, yeah.

25       Q.   Okay.  That's okay.

Confidential

Page 73

1          Now, there's a sentence it looks like you

2    suggested be added to this email.  "If he reaches out to

3    you, please contact me" -- or no, excuse me.  Another

4    sentence that Traci thought should be added to the

5    email, which is, "If he reaches out to you, please

6    contact me, Shawna Hewitt, before responding."

7          Do you see that section?

8     A.   Uh-huh.

9     Q.   Now, in this final email to partners, do you

10   recall if a sentence like that, or that very sentence,

11   was added to the email?

12    A.   Yes, I believe it was added.

13    Q.   And after Mauro was terminated, did any

14   partners reach out to you, saying that Mauro had reached

15   out to them?

16    A.   I do not recall any partners reaching out to me

17   directly.

18    Q.   Did Ms. Nelson ever share with you that

19   partners had reached out to her, saying that Mauro had

20   been reaching out to them?

21    A.   Yes.  She let me know that -- that some

22   partners -- or at least one partner had reached out to

23   her, but I don't know any of the de- -- I don't remember

24   any of the details of that.  You would have to ask her.

25    Q.   You don't remember the partner's name?

Confidential

Page 74

1      A.   I don't remember which partners.

2      Q.   Do you recall, you know, the general date,

3  maybe the month, if you can't recall the approximate

4  date?

5      A.   I'm sorry; I don't have a lot of memory of that

6  because it wasn't a direct reach out to me.

7      Q.   Okay.  That's fine.

8          MR. CABECEIRAS:  Counsel, if you could hand

9  the witness Exhibit I, we can mark it as 32.

10         (Exhibit No. 32 marked.)

11  BY MR. CABECEIRAS:

12     Q.   Ms. Hewitt, please review, and let us know when

13  you're done.

14     A.   (Witness peruses document.)

15         Okay.  I've reviewed it.

16     Q.   And what is this document?

17     A.   This document is the Google Calendar invitation

18  that I sent to Mauro for the meeting on August 17th, the

19  termination meeting.

20     Q.   And it appears that you only sent this to

21  Mr. Botta; is that correct?

22     A.   Yes, that's correct.

23     Q.   But you testified there was somebody else

24  actually there to terminate Mr. Botta; right?

25     A.   Yes, correct.

Confidential

1    Q.  Did you invite him over the phone?

2    A.  I told him, it is my guess, over the -- sorry.

3  I told him over the phone of the time of the meeting,

4  Kevin Baldwin.

5    Q.  Kevin Baldwin.  Thank you.

6    A.  Uh-huh.

7    Q.  And during that conversation, did you discuss

8  anything else about Mr. Botta's termination?

9    A.  I did not discuss anything -- the only thing I

10  discussed with Kevin was the time of the meeting and

11  what we would each -- each of our roles in that meeting.

12    Q.  Okay.  And what was your role going to be in

13  that meeting, as you explained it to Kevin?

14    A.  Yeah, and as I explained earlier, my role was

15  to be the HR person on-site and to facilitate the

16  termination, to be there to answer, you know, questions

17  that Mauro might have around the exit process, and to be

18  a representative of the firm from that perspective.

19    Q.  And during that telephone conversation, what

20  did you explain to Mr. Baldwin that his role in the

21  termination meeting would be?

22    A.  At the time Kevin and I spoke, he already knew

23  what his role would be.

24    Q.  On the phone call, did Mr. Baldwin elaborate on

25  the reason he was going to terminate Mr. Botta?

Confidential

Page 76

1      A.  I don't remember exactly when I knew -- or when

2  I -- Kevin and I talked about the reason.  I --

3  obviously I heard it in the termination conversation,

4  and I don't recall if we talked about it.

5      Q.  Do you know if Kevin Baldwin worked on any of

6  the Cavium audits?

7      A.  I don't have any knowledge of that.

8      Q.  In terminating Mr. Botta, did you have to talk

9  to any individuals who work on the Cavium matter?

10      A.  No.

11      Q.  You did not conduct any kind of investigation

12  into the Cavium matter?

13          MR. REITER:  You cut out.  Could you repeat

14  the question?

15  BY MR. CABECEIRAS:

16      Q.  Oh, yeah.  Did you conduct any type of

17  investigation into the auditors' behavior on the Cavium

18  matter?

19      A.  I did not play any role in determining that

20  Mauro should be terminated.  I was simply the person who

21  was asked to sit in on the termination meeting.

22      Q.  At any time did Mr. Baldwin share with you --

23  I'll withdraw it.

24          MR. CABECEIRAS:  Could we go off the record

25  for a quick five, and then come back and wrap up?

Confidential

Page 77

1        MR. REITER:  Yes.

2        (Recess from 1:41 p.m. to 1:49 p.m.)

3        MR. CABECEIRAS:  Counsel, if you could hand

4   the witness Exhibit J, we can mark it as 33.

5        (Exhibit No. 33 marked.)

6   BY MR. CABECEIRAS:

7        Q.  Ms. Hewitt, review the document, and let me

8   know when you're finished.

9        A.  (Witness peruses document.)

10       Okay.  I've reviewed it.

11       Q.  Do you remember receiving -- or excuse me --

12   sending an email to Mr. Botta September 14, 2017?

13       A.  Yes.  And I have it in front of me.

14       Q.  And it appears to be in a response to a text

15   that Mr. Botta sent to Traci Nelson.  Is that accurate?

16       A.  Yes.

17       Q.  How were you alerted of this text message?

18       A.  I don't remember whether -- I'm guessing she

19   called me to tell me about it, but I don't remember for

20   sure.

21       Q.  Well, please don't guess.

22       A.  Okay.

23       Q.  Can you recall a phone call in which Traci

24   talked to you about this text message?

25       A.  All I know is that she told me about the

Confidential

Page 78

1    text -- the text message.  I don't remember how it was

2    done.

3         Q.  Okay.  And can you remember what she said?

4         A.  Yes.  She said that Mauro had reached out to

5    her to ask if he would be eligible for rehire, and, you

6    know, I had asked him to use me as his main point of

7    contact with the firm, and so that was why then I got in

8    touch with him.

9              MR. REITER:  Did we just have somebody drop

10   off or join?  We heard some noise.

11             MR. CABECEIRAS:  Yeah, I did as well.  Let's

12   go off the record for a second.

13             (Discussion off the record.)

14   BY MR. CABECEIRAS:

15        Q.  Ms. Hewitt, in September, when you wrote this

16   email, did you have any kind of chance to learn more

17   about the particular misconduct Mr. Botta was being

18   accused of?

19             MR. REITER:  I'll object to the extent the

20   question asks for attorney-client communications.

21             It sound like somebody just joined.  Go off

22   the record for a second.

23             MR. CABECEIRAS:  Off the record.

24             (Discussion off the record.)

25             (Question and objection were read back.)

Confidential

Page 79

1      A.   No, I didn't learn anything more.

2  BY MR. CABECEIRAS:

3      Q.   And at that point, in September of 2017, were

4  any other PwC employees terminated for misconduct on the

5  Cavium audit?

6           MR. REITER:   Calls for speculation.

7      A.   Yeah, I believe I've already stated that I am

8  not aware of, nor was I involved in, you know,

9  terminating any other employees related to this.

10 BY MR. CABECEIRAS:

11     Q.   Now, Ms. Hewitt, does Robert Heatley still work

12 at PwC?

13     A.   He does not.

14     Q.   And why does he no longer work at PwC?

15          MR. REITER:   I'm going to object to the

16 extent it calls for speculation.  And as Ms. Hewitt has

17 already explained multiple times, the circumstances

18 surrounding particular employees and their employment

19 situation is private.

20     A.   I have no knowledge of that situation.

21 BY MR. CABECEIRAS:

22     Q.   Just to clarify, because this is the

23 information I'm seeking, was Robert Heatley terminated

24 for anything having to do with the Cavium audit --

25     A.   I have no --

Page 80

1      Q.   -- to the extent you know --

2      A.   Yeah, I have no knowledge related to that.

3      Q.   Are you aware if Tye Thorson is still an

4  employee of PwC?

5      A.   I believe Tye is a partner at PwC.

6      Q.   Other than what's been discussed today, do you

7  have anything you'd like to add to the record?

8           MR. REITER:   I'm going to object to form.

9      A.   No, I don't.

10          MR. CABECEIRAS:   I think we can end the

11  deposition.

12          MR. REITER:   Great.   And I don't have any

13  questions.   But I will note for the record that,

14  pursuant to the parties' protective order, the entire

15  deposition transcript will be marked confidential for a

16  certain period of time during which the parties will

17  have an opportunity to designate specific portions

18  confidential.

19          MR. CABECEIRAS:   Noted.   Thank you.

20          (Signature reserved.)

21          (Deposition concluded at 1:57 p.m.)

22

23                    -o0o-

24

25

Confidential

Page 81

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Cindy M. Koch, a Certified Court Reporter in

7    and for the State of Washington, do hereby certify that

8    the foregoing transcript of the deposition of Shawna

9    Hewitt, having been duly sworn, on December 19, 2018, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 3rd day of January, 2019.

14

15

16   _____

17        CINDY M. KOCH, CCR, RPR, CRR #2357

18

19   My commission expires:

20   JUNE 9, 2019

21

22

23

24

25

Confidential

Page 82

```
1                    ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads       Should Read   Reason
6   ____ ____ _____   _____  _____
7   ____ ____ _____   _____  _____
8   ____ ____ _____   _____  _____
9   ____ ____ _____   _____  _____
10  ____ ____ _____   _____  _____
11  ____ ____ _____   _____  _____
12  ____ ____ _____   _____  _____
13  ____ ____ _____   _____  _____
14  ____ ____ _____   _____  _____
15  ____ ____ _____   _____  _____
16  ____ ____ _____   _____  _____
17  ____ ____ _____   _____  _____
18  ____ ____ _____   _____  _____
19  ____ ____ _____   _____  _____
20
                                 _____
21
                                 Signature of Deponent
22
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2018.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____
```