# EXHIBIT 3

CONFIDENTIAL

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
 5   MAURO BOTTA,                        )
                                         )
 6        Plaintiff,                     )
                                         )
 7        vs.                            ) No. 3:18-cv-2615
                                         )
 8   PRICEWATERHOUSECOOPERS LLP, LAURA   )
     BUSTAMANTE, TYE THORSON, ROBERT     )
 9   HEATLEY, STIG HAAVARDTUN, ERGUN     )
     GENC, TIMOTHY CAREY and STEVE       )
10   MCCANN,                             )
                                         )
11        Defendants.                    )
     _____    )
12
13
14
15         CONFIDENTIAL DEPOSITION OF TRACI E. NELSON
16                     San Jose, CA
17                   January 16, 2019
18                      9:05 a.m.
19
20
21   Reported by:
     SUSAN F. MAGEE, RPR, CCRR, CLR
22   CSR No. 11661
23
24
25
```

CONFIDENTIAL

Page 2

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    MAURO BOTTA,                        )
                                         )
6         Plaintiff,                     )
                                         )
7           vs.                          ) No. 3:18-cv-2615
                                         )
8    PRICEWATERHOUSECOOPERS LLP, LAURA   )
     BUSTAMANTE, TYE THORSON, ROBERT     )
9    HEATLEY, STIG HAAVARDTUN, ERGUN     )
     GENC, TIMOTHY CAREY and STEVE       )
10   MCCANN,                             )
                                         )
11        Defendants.                    )
     _____ )
12   _____

13

14

15          CONFIDENTIAL DEPOSITION OF TRACI E. NELSON,

16   Volume I, taken on behalf of Plaintiff at

17   488 South Almaden Boulevard, Suite 1800, San Jose, CA

18   95110, beginning at 9:05 a.m. and ending at 11:53 a.m.

19   on Wednesday, January 16, 2019, before Susan F. Magee,

20   RPR, CCRR, CLR, Certified Shorthand Reporter No. 11661.

21

22

23

24

25

CONFIDENTIAL

Page 3

```
1   APPEARANCES:

2       For the Plaintiff:

3           DEREK SMITH LAW GROUP, PLLC

4           One Penn Plaza

5           Suite 4905

6           New York, NY 10119

7           (212) 587-0760

8           BY:  ALEXANDER G. CABECEIRAS, ESQ.

9               (Appearing telephonically)

10              alexc@dereksmithlaw.com

11

12      For the Defendants:

13          HUESTON HENNIGAN, LLP

14          523 West Sixth Street

15          Suite 400

16          Los Angeles, CA 90014

17          (213) 788-4536

18          BY:  JOSEPH A. REITER, ESQ.

19              jreiter@hueston.com

20

21      Also Present:

22          GEOFF EZGAR, In-house Counsel

23          MAURO BOTTA (Appearing telephonically)

24                      --o0o--

25
```

CONFIDENTIAL

Page 4

1                         I N D E X

2    CONFIDENTIAL DEPOSITION OF TRACI E. NELSON

3    Volume I

4    EXAMINATION BY                                    PAGE

5    BY MR. CABECEIRAS                                    7

6                       --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

1                         E X H I B I T S

2      NUMBER          DESCRIPTION                              PAGE

3      Exhibit 50   E-mail String Containing 10/13/16          16

4                   E-mail from Patty Lin to Traci

5                   Nelson, PwC_B800001774-PwC_B00001775

6      Exhibit 51   2/9/17 Conversation Entry,                 28

7                   PwC_B00005965

8      Exhibit 52   3/7/17 Conversation Entry,                 33

9                   PwC_B00005966

10     Exhibit 53   E-mail String Containing 4/10/17           39

11                  E-mail from Traci Nelson to Ergun

12                  Genc, Pwc_B00001621

13     Exhibit 54   E-mail String Containing 4/27/17           46

14                  E-mail from Traci Nelson to Mauro

15                  Botta, PwC_B00000281

16     Exhibit 55   4/27/16 Initial Report,                    47

17                  PwC_B00005920-PwC_B00005922

18     Exhibit 56   6/12/17 Conversation Entry,                55

19                  PwC_B00005983

20     Exhibit 57   E-mail String Containing 6/16/17           57

21                  E-mail from Traci Nelson to Ergun

22                  Genc, PwC_B00001609-PwC_B00001610

23     Exhibit 58   E-mail String Containing 6/17/17           60

24                  E-mail from Ergun Genc to Traci

25                  Nelson, PwC_B00001595-PwC_B00001596

CONFIDENTIAL

Page 6

1              E X H I B I T S (continued)

2      NUMBER        DESCRIPTION                          PAGE

3      Exhibit 59  6/21/17 E-mail from Mauro Botta to        65

4                  Traci Nelson, PwC_B00000206

5      Exhibit 60  Conversation Entry, PwC_B00006002         69

6      Exhibit 61  8/17/17 E-mail from Traci Nelson to       75

7                  Partners, PwC_B00000001

8                       --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1          San Jose, CA, Wednesday January 16, 2019

2                          9:05 a.m.

3

4                      TRACI E. NELSON,

5     having been administered an oath, was examined and

6     testified as follows:

7

8                  EXAMINATION BY MR. CABECEIRAS

9

10        Q.   Okay.  Good morning, Ms. Nelson.  How are you

11    doing?

12        A.   Good morning.  I'm doing well.  Thank you.

13        Q.   My name is Alex Cabeceiras.  I represent

14    Mr. Botta in his claims against PwC.  Can you state your

15    full name for the record.

16        A.   Traci Ellen Nelson.

17        Q.   Okay.  And Ms. Nelson, are you currently a

18    resident in California?

19        A.   I am.

20        Q.   Okay.  Have you ever been deposed before?

21        A.   I have.

22        Q.   Okay.  When is the last time you were deposed?

23        A.   I believe it was about a year ago.

24        Q.   About a year.

25             Other than that time, about a year ago, have

Page 8

1   you ever been deposed?

2       A.   No.

3       Q.   Okay.  And what was the matter regarding about

4   a year ago?

5       A.   It was not a matter I had any direct

6   involvement in.  I was just representing the firm

7   related to an employee matter.

8       Q.   Okay.  Was it a matter that was filed in

9   federal court?

10      A.   No.

11      Q.   Was it a matter that was filed in state court?

12          MR. REITER:  Do you know?

13          THE WITNESS:  I don't know for sure.

14          BY MR. CABECEIRAS:

15      Q.   Okay.

16      A.   Very minor case.

17      Q.   Okay.  Did the case involve any claims of

18  retaliatory discharge?

19      A.   No.

20      Q.   Okay.  So generally just as a refresher for

21  you, I'm going to ask you a series of questions.  We are

22  conducting this deposition via telephone, so I ask that

23  you pause after I ask a question.  This will ensure that

24  I have completed my question and will allow your

25  attorney to object if he has any objections.

1           Do you understand?
2      A.   Yes.
3      Q.   Okay.  As a general rule, unless your attorney
4  instructs you not to answer, please answer any open
5  question, okay?
6      A.   Okay.
7      Q.   If you do not -- sorry?
8      A.   I'm just responding.
9      Q.   If you do not know -- if you do not know
10  something, please do not guess.  I do not want any guess
11  answers.  Unless we ask you to approximate maybe a date
12  or a time, please do not speculate or guess, okay?
13      A.   Okay.
14      Q.   Ms. Nelson, are you under the influence of any
15  drugs that would impair your ability to recollect facts
16  at this time?
17      A.   No, I am not.
18      Q.   Have you drunk any alcohol in the last 24
19  hours?
20      A.   I have not.
21      Q.   Is there any reason you can think of why you
22  will be unable to provide truthful, honest testimony
23  today?
24      A.   No reason.
25      Q.   Ms. Nelson, did you ever attend college or

Page 10

1    university?

2         A.  I did.

3         Q.  Okay.  Where did you attend?

4         A.  I attended Chico State University for undergrad

5    and UC San Francisco for graduate school.

6         Q.  Okay.  And for your undergrad, did you receive

7    a bachelor's degree?

8         A.  I did.  I received a bachelor's in child

9    psychology and child development.

10        Q.  Okay.  And I assume you received a master's

11   degree at some point?

12        A.  I did.  I received a master's in human

13   resources and organizational development.

14        Q.  Okay.  And what year did you receive your

15   master's degree?

16        A.  Oh, boy.  Trying to recall.  It was roughly

17   2002, 2003, I believe.

18        Q.  And do you currently work for PwC?

19        A.  I do.

20        Q.  Okay.  And when did you first start working for

21   PwC?

22        A.  I was hired with PwC -- I was originally hired

23   on with Coopers & Lybrand in 1996 and have been with the

24   firm with the exception of a six-month period where I

25   left the firm and then returned.

CONFIDENTIAL

1      Q.   Okay.  And in 1996 what role were you initially

2  hired for?

3      A.   It was a human resources assistant role.

4      Q.   Okay.  And how long did you hold the human

5  resources assistant role for?

6      A.   That's tough for me to answer.  I mean, I'd

7  have to approximate and it was probably a couple of

8  years.  Two years, I'd say.

9      Q.   After that role did you receive a promotion?

10      A.   Yes.  I believe I would have been promoted, and

11  I would have to guess of it in terms of whether or not

12  that was to an HR associate or senior associate role.

13      Q.   Okay.  And do you know about when that was, if

14  you can approximate for us?

15      A.   Probably '98, '99.  Probably '99.  1999.

16      Q.   And after that did you receive any kind of

17  promotion?

18      A.   I did.  I would have been promoted to HR

19  manager.

20      Q.   Okay.  And anything after that?

21      A.   I was promoted to an HR senior manager role.

22      Q.   Is that the role that you currently hold today?

23      A.   The titling of my role has changed over time,

24  but it is the level at which I'm at today.

25      Q.   Okay.  And when did you initially receive the

CONFIDENTIAL

Page 12

1    promotion for HR senior manager?

2        A.  I'm approximating again, but it would have been

3    2005, 2006.  Somewhere in that time frame.

4        Q.  Okay.  And you had mentioned you took six

5    months.  There was a gap of some kind.

6            Why did you take six months?  Why were you

7    working for those six months?

8        A.  I left the firm and was contracting for Cisco

9    Systems for a period of time, and then I returned back

10   to the firm.

11       Q.  Were you at any time terminated by PwC?

12       A.  No, no.  I left voluntarily.

13       Q.  Okay.  And do you currently work in the

14   San Jose PwC office?

15       A.  Yes, I work in San Jose.

16       Q.  How long have you worked out of the San Jose

17   office?

18       A.  I have worked out of the San Jose office since

19   I joined the firm back in '96.  I worked in our Denver

20   office for about 18 months in the 1999 and 2000 time

21   frame.

22       Q.  Okay.  And do you have a current immediate

23   supervisor you report to?

24       A.  Yes, I do.  I report in to Shawna Hewitt.

25       Q.  And how long has Ms. Hewitt been your immediate

1  supervisor?

2      A.  Pretty close to two years.  Just shy of two

3  years.

4      Q.  Okay.  Prior to Ms. Hewitt, who was your

5  immediate supervisor?

6      A.  Patty Shaw.

7      Q.  Patty Shaw.  And was Patty Shaw based in

8  San Jose as well?

9      A.  She was based in San Jose, was a human

10  resources market leader, office leader.

11      Q.  And how long was Patty Shaw your immediate

12  supervisor for?

13      A.  Approximating.  I mean, it's -- it was probably

14  four, five years maybe.

15      Q.  Okay, great.  In February of 2015, were you

16  working for PwC out of their San Jose office?

17      A.  Yes.

18      Q.  At that time did you know an employee, the

19  plaintiff in this matter, named Mauro Botta?

20      A.  Yes, I did.

21      Q.  Okay.  About when was the first time?  And I'll

22  ask you to approximate.  About when was the first time

23  you met Mr. Botta?

24      A.  I -- when I transferred into the assurance HR

25  leader role in San Jose, which was sometime 2013-2014,

CONFIDENTIAL

Page 14

1    that's when I probably would have had some early contact

2    with Mauro.

3         Q.   And in 2015, were you aware that Mr. Botta was

4    a senior manager on the Cavium engagement?

5         A.   Yes, I would have been aware of that.

6         Q.   At any time did Mr. Botta complain to you about

7    things he was seeing of the Cavium engagement?

8              MR. REITER:   Object to form.   Vague.

9              THE WITNESS:   I mean, it's -- going back that

10   early is really hard for me to recollect any specifics.

11   I would -- you know, did we have a conversation about

12   Cavium in general?   Yes.   I just can't recall details.

13             BY MR. CABECEIRAS:

14        Q.   Okay.   You can't recall specifically what he

15   brought up to you?

16        A.   No.   I mean, it will be really hard for me to

17   accurately describe anything.

18        Q.   Okay.   At that time around February of 2015,

19   did you know an individual named Tye Thorson who worked

20   for PwC?

21        A.   Yes.

22        Q.   At that time did you understand that

23   Mr. Thorson was also working on the Cavium engagement

24   with Mr. Botta?

25        A.   Yes.   That's -- yes, that's correct.

Page 15

1       Q.  And at that time do you recall having any

2   conversations with Mr. Thorson regarding Mr. Botta's

3   conduct with respect to the Cavium engagement?

4            MR. REITER:  Objection.  Vague.

5            THE WITNESS:  Yeah.  I don't -- I don't recall

6   any specifics, and I wasn't that closely involved, I

7   mean, in anything related to that account being in an HR

8   role.

9            BY MR. CABECEIRAS:

10       Q.  Around that time, February 2015, did you ever

11   become aware that Mr. Botta had escalated a complaint to

12   PwC's national office regarding the Cavium audits?

13       A.  That -- it sounds familiar.  I wasn't involved

14   in any of the specifics in terms of the details, but

15   I -- you know, what you're describing sounds familiar.

16       Q.  In your past experience as assurance HR leader,

17   if a senior -- or not if.  When a senior manager reports

18   an issue to the national office, have you been made

19   aware of that?

20            MR. REITER:  Object to form.

21            THE WITNESS:  Yeah.  I mean, it would --

22   there's a lot of different circumstances and, you know,

23   reasons for things to get escalated.  I would be aware

24   of -- I can't say 100 percent I'd be aware of all of

25   them because we've got such a defined process and

CONFIDENTIAL

Page 16

1    avenues where these things get escalated and reviewed.

2              BY MR. CABECEIRAS:

3        Q.  Okay.  In general, though, that's something as

4    the HR assurance leader you are made aware of from time

5    to time?

6              MR. REITER:  Asked and answered.  Object to

7    form.

8              THE WITNESS:  I mean, yeah.  As I described, in

9    many cases I would be made aware of it or would have

10   heard of it.

11             MR. CABECEIRAS:  Counsel, if you can hand the

12   witness what's been marked for us as Attachment A.

13             (Exhibit 50, E-mail String Containing 10/13/16

14   E-mail from Patty Lin to Traci Nelson,

15   PwC_B800001774-PwC_B00001775, marked for

16   identification.)

17             MR. CABECEIRAS:  And court reporter, can we go

18   off the record for one second.

19             THE REPORTER:  Sure.

20             (Discussion off the record.)

21             BY MR. CABECEIRAS:

22       Q.  Great, if you can just review it and let me

23   know when you're done.

24       A.  Okay.

25       Q.  First off, do you remember writing or having

CONFIDENTIAL

```
                                        Page 17
```

1    this e-mail exchange between you and Patty Lin?

2         A.   Now that I have it in front of me, I do recall

3    writing it.

4         Q.   Who is Patty Lin?

5         A.   She is part of our office of ethics.

6         Q.   Okay.  And you write on October 12, 2016, at

7    5:53 p.m. -- or excuse me.  Yeah.  I believe that's it.

8    "The client is PAC Bio (revenue recognition project),

9    the partner is Lindsey Pizali, and the new senior

10   manager is Tania Devilliers."

11        A.   Right.

12        Q.   Who was the prior partner, if anybody?  I

13   believe you're referring to Pacific Bioscience?

14             MR. REITER:  Object to form.  Lacks foundation.

15             THE WITNESS:  I -- I don't have an answer to

16   that.

17             BY MR. CABECEIRAS:

18        Q.   You further -- again, the new senior manager --

19   who was the old senior manager on Pacific Bioscience?

20             MR. REITER:  Calls for speculation.

21             THE WITNESS:  My recollection on this is that

22   it was new work that was coming in to the firm, and

23   Tania Devilliers was the senior manager who was going to

24   perform and be assigned to that account.

25             ///

CONFIDENTIAL

1    BY MR. CABECEIRAS:

2  Q.  Do you know who assigns her that account?

3    MR. REITER:  Calls for speculation.

4    THE WITNESS:  I know I was not personally

5 involved in that decision.  I can't tell you for sure

6 how that decision was made.

7    BY MR. CABECEIRAS:

8  Q.  Okay.  Is there a process at PwC for assigning

9 senior managers to certain engagements?  And we can

10 limit that to the assurance department.

11  A.  I would say there's not a set process that is

12 always followed.  There's different -- you know,

13 different situations and different scenarios in terms of

14 who is involved in those discussions and how those

15 determinations are made.  There's some flexibility in

16 it.

17  Q.  Okay.  Regarding Pacific Bioscience, what

18 process, if any, was used by PwC to determine who would

19 be the senior manager?

20    MR. REITER:  Calls for speculation.

21    THE WITNESS:  Hard for me to answer because I

22 wasn't involved in those discussions.  I would be

23 guessing a bit, you know, to give you an answer to that.

24    BY MR. CABECEIRAS:

25  Q.  Don't want you to guess.

CONFIDENTIAL

Page 19

1       You've mentioned this was new work.  Who

2   brought in this new work?

3           MR. REITER:  Calls for speculation.

4           THE WITNESS:  I don't know exactly everybody

5   who was involved in the proposal and the process.  I am

6   aware that Mauro was involved in some aspect of it, but

7   I couldn't give you the names of everybody.

8           BY MR. CABECEIRAS:

9       Q.  Okay.  And you said you knew Mauro was involved

10  in some aspect of it, though.

11          Can you elaborate as to exactly what you know

12  he was involved in or not involved in?

13      A.  Thinking back, I recall -- I believe he was

14  part of the proposal process, but I -- I mean, I don't

15  have direct involvement in that, so I can't give you --

16  it would be hard to give you specifics.  I just don't

17  know enough.

18      Q.  Okay.  What is a proposal process?

19          MR. REITER:  Object to form.

20          THE WITNESS:  Again, it's not an area I'm

21  involved in.  Very roughly it would be obviously going

22  out to the client with a proposal on the work and, you

23  know, but I -- there's pieces -- many parts to that that

24  I'm not privy to.

25          ///

CONFIDENTIAL

Page 20

```
 1              BY MR. CABECEIRAS:
 2         Q.  Okay.  And you go on in e-mail to describe a
 3    conversation or at least something Mr. Botta stated to
 4    you about this matter.
 5              Do you recall when that conversation took
 6    place?
 7         A.  I mean --
 8              MR. REITER:  I'm going to object to form.  So
 9    do you want to specify which sentence you're referring
10    to in the e-mail?  I think there's multiple
11    conversations mentioned.
12              MR. CABECEIRAS:  Sure, yep.
13              BY MR. CABECEIRAS:
14         Q.  Ms. Nelson, if I can direct your attention to
15    the -- what appears to be the only text you wrote in the
16    e-mail.  The third line down about in the middle, "Mauro
17    even stated to me that he is not overly worked up about
18    it," and then it goes on.
19              So my question is, when did Mauro make that
20    statement to you?
21         A.  I mean, based on the time frame of the e-mail,
22    it would have been sometime in that October 2016 time
23    frame before October 12th.  I cannot give you an exact
24    day we had that conversation.
25         Q.  Okay.  Do you recall where this conversation
```

CONFIDENTIAL

Page 21

1    took place?

2        A.  I -- it was either over the phone or in my

3    office.  I cannot remember exactly.

4        Q.  And did Mr. Botta reach out to you, or did you

5    reach out to him?

6        A.  He -- Mauro would have reached out to me on

7    this particular matter.

8        Q.  And besides what you wrote in the e-mail in

9    front of you that's been marked as Exhibit 50, can you

10   recall anything else Mauro said to you during this

11   conversation?

12       A.  Yeah.  I can't recall if it was part of a

13   larger conversation, but I -- I recall, I mean, what I

14   wrote in the e-mail in terms of him explaining to me

15   that he was part of this proposal process, there was

16   some frustration around not actually being assigned to

17   perform the work.  And then I obviously followed up on

18   that just to understand more because I had no

19   involvement at the time on it.

20       Q.  Got it.  And besides following up with -- or

21   withdrawn.

22           Besides discussing this conversation you had

23   with Mr. Botta to Ms. Lin, did you talk about this

24   conversation to anybody else at PwC?

25       A.  Not -- I may have talked to Tim Carey, the

CONFIDENTIAL

Page 22

1   market assurance leader at the time, just to make him

2   aware of it and the fact that we had this new work, but

3   I -- and that Mauro was -- I just can't state

4   100 percent accurately that I did.

5        Q.   Okay.   That's fine.

6             During this conversation with Mr. Botta, did he

7   make it clear to you that he was disappointed he was not

8   on the Pacific Bioscience engagement?

9        A.   Yeah.   I believe at the time there was a level

10  of frustration and just, I think -- I think he was

11  trying to understand or was confused about why he wasn't

12  going to be on the work.

13       Q.   Do you have any knowledge if he ever brought a

14  similar issue up to anybody at PwC besides yourself?

15            MR. REITER:   Calls for speculation.

16            THE WITNESS:   Yeah.   Are you -- I guess I'm

17  unclear on whether or not you're asking if he voiced the

18  same to another person besides myself in terms of not

19  being on this work or --

20            BY MR. CABECEIRAS:

21       Q.   Yep.   That's exactly what I'm asking.

22            So for example, if Tim Carey told you, "Hey,

23  Mauro came to me, and he was complaining about not being

24  put on the Pacific Bioscience"; right?   If you have any

25  knowledge as to any conversations that Mauro had with

1   other PwC employees about the same issues he brought up

2   with you.

3       A.  Yeah.  I -- I can't recall 100 percent whether

4   or not that was shared at the time or not.  Or -- and I

5   don't recall being aware of him talking to others

6   directly about it.

7       Q.  Okay.  And turn your attention to Exhibit 50

8   again, the only paragraph you wrote, the last

9   sentence -- full sentence you say, "It did seem to 'set

10  him off' again though about not being fully

11  deployed/underutilized."

12          How did this set him off?

13      A.  Thinking back on it, I think he -- it was time

14  where he was -- he had some capacity to do more work,

15  and it was a frustrating -- he was not happy with the

16  fact that this was not going to be assigned to him.

17      Q.  What do you mean that he had capacity to do

18  more work?

19      A.  I can't recall exactly everything he had on

20  his -- you know, the clients and projects he was

21  assigned to at the time, but everything he shared when

22  he was speaking with me, he made it sound like he still

23  had time in his schedule to do some -- do more.

24      Q.  At that time when this e-mail was, you know,

25  taking place, October 12, 2016, when he had this

CONFIDENTIAL

Page 24

1    conversation with Mauro, do you have any idea what

2    Mr. Botta's utilization rating was?

3         A.   Yeah.  I don't -- I don't recall exactly what

4    that would have been.

5         Q.   Okay.  And turning your attention, again, to

6    the last line, I read you say, "It did seem to 'set him

7    off' again."

8              What other times was Mr. Botta, quote, set off?

9              MR. REITER:  Object to form.  Overbroad.

10             THE WITNESS:  I mean, there were many, many

11   times that Mauro came to my office very emotional and

12   very negative, and it would be very difficult to recall

13   all of those instances.

14             BY MR. CABECEIRAS:

15        Q.   Okay.  So of these times Mr. Botta came to your

16   office, did he ever come to your office emotional or

17   saying negative things about the Cavium engagement?

18             MR. REITER:  Object to form.

19             THE WITNESS:  Yeah.  I mean, I -- I know early

20   on that was many -- I mean, the time frame on that is

21   challenging for me to recall the specifics.  You know, I

22   do recall some mention of Cavium, but I'm comfortable

23   that those matters get escalated and go through a

24   different process, but I'm sure he mentioned Cavium in a

25   conversation and frustration with it.

1        BY MR. CABECEIRAS:

2    Q.  With respect to Mr. Botta coming in to your

3  office, being frustrated with the Cavium issue, did you

4  ever raise any of those specific issues up the ladder or

5  up the chain to somebody else at PwC?

6        MR. REITER:  Object to form.

7        THE WITNESS:  I don't recall being -- being

8  that involved in that issue or what -- how that

9  transpired in terms of anything that was looked into.  I

10  was on the periphery of, you know, just being kind of

11  aware that there were issues and some mention of it, but

12  I was not involved in the matter.

13        BY MR. CABECEIRAS:

14    Q.  I see.  Okay.

15        You know, going back to these times Mauro would

16  come to your office, as you said, emotional.  He

17  would -- you know, negative feedback.

18        Did he ever come into your office in relation

19  to any issues he was having on the Harmonic engagement?

20        MR. REITER:  So objection.  Vague as to

21  "issues."

22        THE WITNESS:  Yeah.  I do recall having

23  conversations about Harmonic with Mauro directly.

24        BY MR. CABECEIRAS:

25    Q.  And based off those conversations -- well, I'll

CONFIDENTIAL

Page 26

1    withdraw.

2           Do you remember when these conversations took

3    place?

4       A.  Approximately -- I believe that was in 2016.  I

5    just don't recall exact timing.

6       Q.  And as a result of having conversations about

7    Harmonic with Mr. Botta, did you ever escalate the

8    matter to anybody at PwC?

9           MR. REITER:  Object to form.

10          THE WITNESS:  On that particular matter, that

11   would have -- that was escalated through our office of

12   ethics.

13          BY MR. CABECEIRAS:

14      Q.  Okay.  Did you contact the office of ethics on

15   behalf of Mr. Botta?

16      A.  I'm trying to recall whether or not -- it's a

17   little vague in my memory in terms of whether or not

18   I -- I reached out and escalated that or Mauro did on

19   his own.

20      Q.  Sorry, Ms. Nelson.  Are you still trying to

21   think or was that your answer?

22      A.  That was my answer.

23      Q.  Oh, okay.

24      A.  I can't recall exactly whether or not I did or

25   Mauro did on his own.

CONFIDENTIAL

1      Q.  The complaint that was brought up to the office

2   of ethics, whoever brought it up, do you recall what

3   that complaint was about?

4      A.  My recollection of Harmonic was that he was

5   frustrated and didn't agree with the ultimate

6   recommendation to remove him from the account, and he

7   did not agree with the feedback that was provided to

8   him.

9      Q.  Was he upset or did his complaint contain

10  anything else?

11          MR. REITER:  Object to form.

12          THE WITNESS:  I mean --

13          MR. REITER:  I think the document speaks for

14  itself.

15          THE WITNESS:  Yeah.  Those are the two pieces

16  of it that I recall.

17              MR. CABECEIRAS:  Joe, which document are

18  you referring to?  I'm sorry.

19          MR. REITER:  Well, I'm going to object.  It

20  lacks foundation that there was a complaint.  And I'm

21  referring to an ethics file would speak for itself.

22          BY MR. CABECEIRAS:

23      Q.  Ms. Nelson, I'm going to turn your attention

24  back to Exhibit 50.  It says in your first sentence the

25  new senior manager was Tania.

CONFIDENTIAL

Page 28

1           At that point in October of 2016, did Tania

2    have any background in pharmaceuticals?

3        A.  I cannot remember exactly which clients she

4    worked on, but I understand she was part of that

5    industry group and that team and credentialed in pharma.

6        Q.  And when you say "industry group," does PwC

7    have a specifically defined industry group for folks who

8    have experience in pharmaceuticals?

9        A.  Yes.  For the most part, our practice is made

10   up of employees that work on technology clients, but

11   we've got a defined group of individuals who work on

12   pharmaceuticals and biotech.

13           MR. CABECEIRAS:  Okay.  Counsel, if you can

14   hand Ms. Nelson what's been marked for us as

15   Attachment B.  We can mark it 51.

16           (Exhibit 51, 2/9/17 Conversation Entry,

17   PwC_B00005965, marked for identification.)

18           BY MR. CABECEIRAS:

19       Q.  Ms. Nelson, if you can review the document, let

20   me know when you're done.

21       A.  Okay.  I've reviewed it.

22       Q.  Great.  First, who is Justin Wallace?

23       A.  Justin Wallace is one of the office of ethics

24   and compliance representatives.

25       Q.  Okay.  And is Mr. Wallace based in San Jose?

CONFIDENTIAL

Page 29

1    A.  No, he is not.

2    Q.  Do you know where Mr. Wallace is based out of?

3    A.  I -- I don't know for certain.

4    Q.  Does the office of ethics work out of a

5    particular PwC office?

6    A.  I don't believe so.  I think they're in various

7    locations.

8    Q.  Okay.  Do you remember in February of 2017

9    having a meeting with Mr. Wallace and Mr. Botta?

10   A.  Yes.  I recall that meeting Justin, I believe,

11   was on the phone and Mauro was in my office.

12   Q.  Prior to having Mr. Botta in your office and

13   Mr. Wallace on the phone, did you speak to Mr. Wallace

14   about the upcoming meeting?

15   A.  I don't recall any specifics.  I mean, I -- it

16   may have been a conversation just to make sure we had a

17   meeting set up, but I don't remember going into any

18   details.

19   Q.  Okay.  Do you recall what the purpose of this

20   meeting was?

21   A.  I believe the purpose of this meeting was to go

22   through -- it was either to go through the findings of

23   this matter, this investigation, and to -- that's my

24   recollection was to go through and review what Justin

25   had looked into and hear from Mauro.

                                                        Page 30

1        Q.  And on the call on that day, did Justin share

2   exactly what he looked into?

3        A.  That would be the standard process in terms of

4   the call to go through steps and explain to him how an

5   investigation is conducted and help him understand the

6   process and outcomes.

7        Q.  So as a result of Mr. Botta's complaint, was

8   there an investigation opened with respect to February

9   of 2017?

10          MR. REITER:  I'm going to object to form.

11   Vague.

12          THE WITNESS:  I -- there was an investigation

13   as it relates to his -- his -- what he asked to have

14   looked into related to Harmonic.  I mean, I believe -- I

15   can't remember the specifics on the time frame of when

16   that was opened and closed.

17          BY MR. CABECEIRAS:

18        Q.  So just so we're clear for the record, you

19   know, we talked about earlier you didn't know if you

20   prompted the investigation -- or the complaint up to

21   ethics or if Mr. Botta did.

22          Regardless of who, you know, got ethics

23   involved, is this investigation a result of that

24   complaint?

25        A.  Yes.

CONFIDENTIAL

Page 31

1      Q.   Okay.

2      A.   Yep.

3      Q.   Thank you.  To your knowledge, was anybody else

4   removed from the Harmonic engagement besides Mr. Botta?

5           MR. REITER:  Calls for speculation.

6           THE WITNESS:  Yeah.  I don't recall.  I mean, I

7   know there were -- there was some turnover on the

8   account, but I don't recall anyone else being removed.

9           BY MR. CABECEIRAS:

10     Q.   Okay.  As far as this actual document in front

11  of you, it's titled Entries, did you type the words that

12  are in front of you right now?

13     A.   No.  Those would not have been any -- that

14  wasn't anything I typed.  I mean, that would have been

15  typed by the office of the ethics based on the

16  conversation.

17          MR. REITER:  And again, the document speaks for

18  itself.

19          MR. CABECEIRAS:  Right, okay.

20          BY MR. CABECEIRAS:

21     Q.   The seventh complete paragraph of this

22  paragraph says, "On Harmonic, I ID'd 25 issues, and I

23  was removed from the engagement even after CAO was

24  fired."

25          Ms. Nelson, do you have any idea what CAO is an

1  acronym for?

2      A.  I believe it would be chief accounting officer.

3      Q.  And was Harmonic's CAO fired?

4          MR. REITER:  Lacks foundation.  Calls for

5  speculation.

6          THE WITNESS:  Yeah.  I -- I don't recall

7  exact -- I mean, that's why we have the office of ethics

8  to investigate these matters.  I didn't get that deeply

9  involved in all the pieces and don't recall all the

10  specifics.

11          BY MR. CABECEIRAS:

12      Q.  Okay.  What about the 25 issues?  You know, the

13  writer of this which appears to be Justin Wallace, "On

14  Harmonic, I ID'd 25 issues," assuming that it was

15  Mr. Mauro who brought up these issues, do you have any

16  idea what these issues are?

17          MR. REITER:  Compound.  Lacks foundation.  I'd

18  like to point out that these are -- what appear to be

19  comments made by Mr. Botta that were put into writing,

20  not comments that Ms. Nelson or Mr. Wallace made.

21          THE WITNESS:  Yeah.  I'll just add that I don't

22  have an audit background, and I -- you know, they're

23  probably very technical in nature, so I -- I wouldn't

24  have the specifics on all that.

25          MR. CABECEIRAS:  Okay.  Counsel, if you can

CONFIDENTIAL

Page 33

1   hand the witness what's been marked for us as

2   Attachment C as in cat.

3             And we can mark it 52.

4             (Exhibit 52, 3/7/17 Conversation Entry,

5   PwC_B00005966, marked for identification.)

6             THE WITNESS:  Okay.  I've read it over.

7             BY MR. CABECEIRAS:

8        Q.  Great.  Do you remember calling Mr. Wallace on

9   March 7, 2017, to update him with respect to Mr. Botta?

10       A.  Looking at the document and the time frame, I

11  mean, it looks familiar.  I don't -- yes, I recall it.

12       Q.  Okay.  And the second paragraph you say,

13  Gigamon is -- or at least what was transcribed what you

14  said -- well, I'll withdraw.

15            Do you remember telling Mr. Wallace in that

16  call that Gigamon asked Mr. Botta to be rolled off?

17       A.  Yes, I do recall that.

18       Q.  Okay.  How did you learn that Gigamon wanted

19  Mr. Botta to be rolled off?

20       A.  Thinking back on it, I would have likely

21  learned that from the partner on Gigamon, Ergun Genc.

22       Q.  Okay.  You didn't have any direct communication

23  with anybody at Gigamon; right?

24       A.  No.  No contact with the client.

25       Q.  When did Ergun share this information with you,

CONFIDENTIAL

Page 34

1   if you can recall?

2       A.  I'd be relying on the entry date of this

3   document.  I don't recall, but it was in that March of

4   '17, probably, time frame.

5       Q.  And did Ergun call you with this information?

6       A.  I don't recall if he called me or stopped by my

7   office and had a conversation about it directly.

8       Q.  Do you remember generally when Ergun shared

9   with you?

10      A.  Generally I recall that the client was

11  frustrated with how they felt they were being treated

12  and Mauro's communication style and were looking for --

13  looking to have him rolled off and have another senior

14  manager put on the account.

15      Q.  Did Ergun at that point share with you how

16  Mr. Botta was pressing Gigamon?

17      A.  We would have -- yeah.  Thinking back on it, I

18  mean, we will have -- there would have been some -- some

19  detail in terms of what Ergun had understood from the

20  client and some details related to his performance on

21  that account.

22      Q.  The document that's been marked Exhibit 52, you

23  know it says, Similar to Harmonic - not teaming with the

24  client; over-scrutinizing of work; and audit steps,

25  pressing the client for irrelevant information.

1              Did Ergun give you any examples of how
2      Mr. Botta was scrutinizing Gigamon?
3          A.  I mean, that would be a generalization from me
4      because I -- because I don't have the audit background
5      and don't get into the technical nature of matters.  I
6      don't recall the absolute specifics, more the behavioral
7      portion of it in terms of them just being very
8      frustrated, them feeling like they were always on the
9      defensive, not comfortable in terms of how that
10     relationship was working.
11         Q.  And the third paragraph of this document, "OGC
12     is involved - Lauren Kim and Lori Lynn Phillips."
13             Did you reach out to OGC at that time?
14             MR. REITER:  And I'm going to counsel the
15     witness not to disclose any communications she had with
16     OGC as those are privileged.
17             MR. CABECEIRAS:  Counsel, I'm sorry.  Are you
18     instructing her not to answer?
19             MR. REITER:  I'm going to instruct her not to
20     disclose the substance of any communication she had with
21     OGC.
22             BY MR. CABECEIRAS:
23         Q.  Okay.  And Ms. Nelson, just to clarify, I don't
24     know any conversations you had with OGC at all.  Please
25     don't tell me any conversations you had with in-house

CONFIDENTIAL

Page 36

1   counsel, outside counsel, any attorney.  I don't want to

2   know about it.  I just want to know if you at that time

3   reached out to them.

4        A.  I believe -- I -- my best recollection of that

5   is that I -- I may have gotten in touch with them over

6   this, you know, what I was understanding related to

7   Gigamon.

8        Q.  Okay.  And why did you feel at that time it was

9   necessary to contact an attorney?

10            MR. REITER:  That calls for privileged

11   information.  She's not going to answer that question.

12            BY MR. CABECEIRAS:

13        Q.  All right.  Ms. Nelson, paragraph 4 goes on to

14   say, "Traci also mentioned that there is a Project Zone

15   with Kevin Healy."

16            Can you describe for me what, if you know, a

17   Project Zone is?

18        A.  So it was an engagement -- I believe new -- a

19   new engagement or new work we had brought in to the

20   firm, and Kevin Healy was the partner on that account.

21        Q.  So Zone was the name of the client; is that

22   correct?

23        A.  Yeah.  I think it goes -- there's actually

24   another name it goes by, but I was -- I think that was

25   kind of shorthand for that client name and what I

1    referred to it as.

2         Q.  Okay.  Going back real quick to Gigamon, was

3    Mr. Botta ever actually rolled off of that project?

4         A.  Thinking back on it, I don't know.  Thinking --

5    I don't know that he came off of the account before

6    leaving the firm.

7         Q.  Okay.  Just to clarify, you don't know if he

8    did, or he wasn't rolled off?  I just want to make sure

9    we're clear.

10        A.  I mean, my -- yeah.  Again, things blend

11   together.  I'm just trying to recall.  I -- I -- I'm

12   fairly certain that he did not -- he was -- he continued

13   to be involved in the account up until the time that he

14   left the firm in some capacity.  I mean, his -- the role

15   may have evolved or changed, but I think he had some

16   level of involvement up until that time.

17        Q.  Okay.  Thank you.

18             Does PwC -- withdrawn.

19             Going back to the Zone matter in paragraph 4 of

20   what's been marked Exhibit 52, third line -- or second

21   line, the fourth paragraph, "The project that he's on is

22   a disaster."

23             At that time was the Zone project a disaster?

24             MR. REITER:  So calls -- calls for speculation

25   and vague.

CONFIDENTIAL

Page 38

1          THE WITNESS:  I mean, that would have been how

2     Mauro likely described it to me.  I can't spend any

3     time -- you know, I wasn't working and involved.  It was

4     just what I was understanding through Mauro.

5          BY MR. CABECEIRAS:

6     Q.  Okay.  So at one point did Mr. Botta tell you

7     that the Zone project was a disaster?

8     A.  He likely used that word with a lot of, you

9     know, description in terms of some of the challenges he

10    was having out there.

11    Q.  Okay.  Do you recall what challenges exactly he

12    brought up to you?

13    A.  What would have been brought up to me was more

14    focused on -- I know there was staffing challenges in

15    terms of a lower-performing manager I believe he was

16    working with and what he described as a challenging

17    dynamic with a -- you know, another more experienced

18    manager.  There was definitely some changes with the

19    staffing and it being a new client.  I don't remember

20    the technical specifics in terms of what he was working

21    on and the challenges related to that, but I know that

22    he was definitely spending some time out there.

23    Q.  Was Mr. Botta ever rolled off of the Zone

24    project?

25    A.  No.

CONFIDENTIAL

Page 39

1       Q.  The fifth paragraph in what's been marked

2   Exhibit 52, "Traci, Lauren, Carey and Healy are

3   discussing."

4           In this case is Lauren Lauren Kim?  Do you have

5   any knowledge of that?  Or is that somebody else?

6       A.  That would have been Lauren Kim.

7       Q.  Okay.  Is Carey in the document Tim Carey, I'm

8   assuming?

9       A.  Yes, that's correct.

10          MR. CABECEIRAS:  Counsel, can we just take two

11  minutes here?

12          MR. REITER:  Yeah.  We've been going about an

13  hour, so why don't we take five minutes.

14          MR. CABECEIRAS:  Take five?  Okay.

15          MR. REITER:  Thank you.

16          (Recess taken from 10:06 a.m. to 10:17 a.m.)

17          MR. CABECEIRAS:  Counsel, if you can hand the

18  witness what's been marked for us as Attachment D as in

19  David.  Mark it as 53.

20          (Exhibit 53, E-mail String Containing 4/10/17

21  E-mail from Traci Nelson to Ergun Genc, PwC_B00001621,

22  marked for identification.)

23          BY MR. CABECEIRAS:

24      Q.  Ms. Nelson, if you can just review it, let me

25  know when you're done.

CONFIDENTIAL

Page 40

1          A.   Okay.   I'm reviewing it.

2               Okay.   I've reviewed it.

3          Q.   Great.   Do you recall having this e-mail

4     exchange between you and Ergun in or around April 10th

5     of 2017?

6          A.   Looking at the document I recall having this

7     exchange, yes.

8          Q.   Okay.   And it appears from the document that

9     you two wanted to set up a time to speak by phone.

10              Did you ever set up a time to speak by phone

11    with respect to this conversation?

12         A.   I don't recall specifically, but I vaguely

13    remember having a -- I mean, there were -- I mean, I

14    talked to Ergun pretty frequently, so we would have had

15    some kind of conversation.

16         Q.   And we discussed earlier that you learned from

17    Ergun of Mr. Botta's potential roll-off of Gigamon; is

18    that accurate?

19         A.   Sorry.   Can you say that one more time.

20         Q.   Sure.   Earlier you testified that you had

21    learned about Mr. Botta's potential to be rolled off of

22    the Gigamon engagement from Ergun; is that accurate?

23         A.   Yes, that's correct.

24         Q.   Okay.   I'll point your attention to where Ergun

25    says to you, "Traci, ignore the last sentence in my

CONFIDENTIAL

                                                        Page 41

1    e-mail.  I would like to update it as follows.  Any

2    suggestion is welcome."  And then he writes a statement

3    about Mauro getting rolled off of Gigamon Quarter 1

4    2017.

5              To your knowledge, did Ergun ever publish this

6    information to anybody at PwC?

7              MR. REITER:  Object to form.  Vague.

8              THE WITNESS:  Yeah.  I don't know that I

9    understand exactly the question.

10             BY MR. CABECEIRAS:

11        Q.   Sure.  Well, it appears on Sunday,

12   April 9th, 2017, Ergun saw your input, or suggestions as

13   he says, on a sentence in which it appears that Mauro

14   will be rolled off of Gigamon engagement Quarter '17.

15             Do you have any understanding of what Ergun was

16   going to do with this sentence that he wanted your

17   suggestions on?

18             MR. REITER:  Calls for speculation.

19             THE WITNESS:  My recollection is this was an

20   exchange in terms of Ergun preparing feedback and having

21   a conversation with Mauro about his performance on

22   Gigamon.  And it's pretty typical that partners will

23   reach out to me to just have me review and be aware of

24   feedback, especially critical feedback, that's going to

25   our people and seek advice on that.

 1          BY MR. CABECEIRAS:

 2      Q.  Okay.  And did you give Ergun any advice with

 3  respect to Mr. Botta being rolled off of Gigamon?

 4      A.  I can't recall the specific advice I would have

 5  given him.  I mean, and that would have only been advice

 6  on the -- the actual performance evaluation he was

 7  completing which we called the snapshot.

 8      Q.  Okay.  Referring again to the sentences that

 9  Ergun writes where he asks for suggestions or welcomes

10  suggestions, do you have any idea if he shared that

11  sentence with anybody else at PwC?

12          MR. REITER:  Calls for speculation.

13          THE WITNESS:  Yeah.  Not that I'm aware of.

14  This would have been, you know, directly between Ergun

15  and I in terms of him preparing evaluation and feedback

16  for Mauro which would have only been shared with Mauro.

17          BY MR. CABECEIRAS:

18      Q.  In this -- at this time in April 2017, what was

19  Ergun's job title?

20      A.  Assurance partner.

21      Q.  Prior to April 2017, had an assurance partner

22  ever come to you and sought your advice with respect to

23  rolling off a senior manager from a project?

24          MR. REITER:  So misstates testimony.  Misstates

25  the document.  Lacks foundation.  Vague and overbroad.

Page 43

1           THE WITNESS:  Yeah.  I would -- I guess what I

2    would share there is this -- I had had a similar

3    conversation with Stig related to Harmonic where he --

4    where I focus is on, you know, ensuring that there's

5    documentation and feedback back to our people, and they

6    oftentimes will reach out to have those discussions and

7    get me involved in that aspect.  So I mean, I'm losing

8    track of the question, but --

9        Q.  Well, I'd like to know your --

10          MR. REITER:  Take your time.  Were you done?

11   BY MR. CABECEIRAS:

12       Q.  -- general involvement when a partner has to,

13   for whatever reason, roll off a senior manager, so why

14   don't we start with that.

15          How often have you seen or how many times have

16   you seen a partner seek a senior manager be rolled off

17   of the engagement?

18       A.  I wouldn't be able to quantify that for you,

19   but it is -- I mean, it does happen and it happens for

20   various -- you know, circumstances and reasons.  It's

21   not unheard of.

22       Q.  Can you give me an approximation of how many

23   times you think you've seen it?

24          MR. REITER:  Asked and answered.

25          THE WITNESS:  Yeah.  I don't know that I have

CONFIDENTIAL

Page 44

1    anything more specific to give you to answer that

2    question.

3              BY MR. CABECEIRAS:

4        Q.  Okay.  Of those times were any senior managers

5    rolled off of projects because they did not demonstrate

6    sufficient levels of empathy towards a client?

7              MR. REITER:  Object to form.  Calls for

8    speculation.

9              And I don't want you to disclose details about

10   specific employees as they have privacy rights.  If you

11   can answer without doing that, go ahead.

12             THE WITNESS:  I don't -- without going into --

13   I mean, there are -- there are different reasons why

14   I -- individuals are rolled off and senior managers are

15   rolled off of accounts, and, you know, that may be a

16   part of it, but I mean, it's -- that's a very hard

17   question for me to answer in terms of specific reasons

18   and if that was part of a . . .

19             BY MR. CABECEIRAS:

20       Q.  Right.  So, you know, in here Ergun says he's

21   going to be -- Mauro's going to be rolled off "primarily

22   as a result of working practice difference where the

23   client's staff felt that Mauro did not demonstrate

24   sufficient level of empathy towards them."

25             Again, have you ever seen -- and I don't need

1   to know specific names.  Have you ever seen a senior

2   manager rolled off an engagement for a similar reason?

3        A.  Yeah.  I mean -- yeah.  I mean, I'm trying to

4   think back.  I mean, I don't know that -- I think there

5   were -- when I think back on, you know, how I understood

6   this particular situation, I mean, empathy was part of

7   it.  It was a real challenge in terms of Mauro's style

8   and communication with the client and how he conducted

9   himself, and, you know, I think empathy is part of that.

10  But it -- you know, I think there are other words that

11  can be attached to how you would describe Mauro's style

12  and performance with the client in that engagement.

13       Q.  Right.  And I appreciate that.

14           But with respect to past senior managers -- and

15  we can use apathetic, we can use lack of empathy, the

16  same traits that Ergun is describing in what's been

17  marked Exhibit 53, have you seen those traits be used as

18  a reason to roll off a senior manager from an

19  engagement?

20       A.  Yeah.  I don't know that that exact word -- I

21  mean, it just -- I'm not privy to all the historical

22  changes we've had on accounts and senior managers that

23  have rolled off, so it's really -- I can't answer that

24  with 100 percent accuracy.

25       Q.  Let's narrow it back to just the matters you

CONFIDENTIAL

Page 46

1    are aware of and the matters you have been privy to.

2         A.  I'm thinking back.  I mean, I can't say

3    100 percent Mauro -- I mean, speaking about Mauro in

4    particular, he had a style that was very different and

5    very unconventional.  That stands out in my mind.  I

6    can't recall that empathy was, as a standalone

7    adjective, a reason why we would have rolled others off,

8    but it's . . .

9         Q.  Okay.  Is that your complete answer?  I'm

10   sorry.

11        A.  That's my complete answer.

12             MR. CABECEIRAS:  Okay.  Counsel, we can pass

13   the witness what's been marked the witness Exhibit F as

14   in Frank.  We're just going to skip over E.  And we can

15   mark this as Exhibit 54.

16             (Exhibit 54, E-mail String Containing 4/27/17

17   E-mail from Traci Nelson to Mauro Botta PwC_B00000281,

18   marked for identification.)

19             BY MR. CABECEIRAS:

20        Q.  Ms. Nelson, please review, and let me know when

21   you're done.

22        A.  Okay.  I've reviewed.

23        Q.  Great.  Do you remember receiving this e-mail

24   from Mr. Botta in which the subject line is, "Hi, I'd

25   need to connect with you.  Please let me know when you

CONFIDENTIAL

Page 47

1   have a few minutes.  Thanks."

2       A.  I don't recall the specifics.  I mean, looking

3   at the e-mail it's familiar.

4       Q.  Do you remember having a call on your cell

5   phone with Mr. Botta that day?

6       A.  I -- yeah.  I -- I mean, I believe -- I don't

7   know for sure if we ended up connecting by phone that

8   day or what the interaction was.

9       Q.  Okay.  You don't remember having a telephone

10  call with Mr. Botta around April 27th of 2016?

11      A.  Yeah.  I mean, my job and my life are so busy

12  that I -- it's -- you know, I'm really relying on this

13  e-mail to even bring back a vague recollection.  There

14  were a lot of different contacts with Mauro over the

15  years, so I don't recall the specifics.

16          MR. CABECEIRAS:  Okay.  Okay.  We'll move on

17  to -- Counsel, if you can hand the witness what's been

18  marked as Exhibit G as in Gary.  And for our purposes we

19  can mark it as Exhibit 55.

20          (Exhibit 55, 4/27/16 Initial Report,

21  PwC_B00005920-PwC_B00005922, marked for identification.)

22          BY MR. CABECEIRAS:

23      Q.  And Ms. Nelson, please review the document.

24  Let me know when you're done.

25      A.  Okay.  I'm reviewing.

CONFIDENTIAL

1     Q.  And Ms. Nelson, just so you know -- I don't

2   want to interrupt you, but I'm going to be primarily

3   asking you questions about the first page.

4     A.  Okay.  That's helpful.

5         Okay.  I've reviewed.

6     Q.  Great.  Thank you.  First off, who is

7   Patricia Lin?

8     A.  That's --

9         MR. REITER:  That's asked and answered.

10        THE WITNESS:  -- the same Patty Lin that we

11  spoke of earlier that's with the office of ethics and

12  compliance.

13        BY MR. CABECEIRAS:

14    Q.  I'm sorry.  I didn't realize Patty and

15  Patricia, same name.  Got it.

16        Do you remember talking to Ms. Lin on

17  April 27, 2016?

18    A.  I recollect talking to her.  I've got the

19  document and the time frame on here that I'm relying on,

20  but it's -- yes, I do recall.

21    Q.  Okay.  And did you call Ms. Lin, or did she

22  call you?

23    A.  That I don't recall.

24    Q.  And prior to this conversation, can you recall

25  when was the last time you spoke to Ms. Lin, if at all,

CONFIDENTIAL

Page 49

1    about Mr. Botta?

2        A.  I -- I don't recall all the contacts I had with

3    Patty.  They were the ones handling any open

4    investigation that was going on at the time and may have

5    reached out to me.

6        Q.  And in April 2016, was there an open

7    investigation occurring with respect to any complaints

8    made by Mr. Botta?

9            MR. REITER:  Object to form.  Calls for

10   speculation.

11           THE WITNESS:  Yeah.  I mean, relying on this

12   document and what I'm reading and my recollection,

13   there -- I mean, there were -- there likely was an

14   open -- you know, how you define an open investigation

15   at the time.

16           BY MR. CABECEIRAS:

17       Q.  I'm sorry.  Can you repeat that?  I just didn't

18   really hear you.

19       A.  Yeah.  Can you repeat the question one more

20   time?  I'm just trying to make sure I understand the

21   question.

22           MR. CABECEIRAS:  Ms. Court Reporter, can you

23   please read the question back.

24           (Record read.)

25           MR. REITER:  Same objections.

CONFIDENTIAL

Page 50

1          THE WITNESS:  Yeah.  I -- my understanding is

2     that there was.  I don't know -- I can't recall without

3     looking at this document the time frames that

4     investigations were opened and closed and investigated.

5          BY MR. CABECEIRAS:

6          Q.  Were there multiple investigations open over

7     the course of Mr. Botta's career at PwC?

8          A.  Yes.  There were -- there were multiple.

9          Q.  Not relying on the document in front of you,

10    can you recall all of the investigations?

11          MR. REITER:  Object to form.

12          THE WITNESS:  Yeah.  I -- where I was involved

13    and what I recall is he was -- I mean, he spoke to me

14    about -- we talked about Harmonic and the fact that he

15    didn't agree with the feedback.  And I believe he -- I

16    either escalated or gave him the opportunity, if he

17    needed to have it investigated and talk further, that he

18    take it to ethics.

19          I believe the Gigamon investigation was a

20    result of him not agreeing with the feedback and, you

21    know, I believe he -- Mauro opened an investigation

22    related to Gigamon.

23          But there were -- Mauro was -- Mauro had

24    contact, you know -- I -- I'm trying to recount this.  I

25    mean, there were -- yeah.  I think that's the best of my

```
                                                    Page 51
```

1    recollection on those two.

2              BY MR. CABECEIRAS:

3         Q.   Okay.  And on or around April 2016, did you

4    have any communication with Justin Wallace about

5    Mr. Botta?

6         A.   Yeah.  I know I talked to Justin and we see it

7    in the documentation.  I didn't recall the specific

8    date, but yes, I would have talked to Justin.

9         Q.   Turning your attention to the document in front

10   of you.  The fourth complete paragraph says that, "Mauro

11   raised retaliation."

12             Do you remember telling Ms. Lin that Mauro

13   raised retaliation?

14        A.   I mean, it's vaguely familiar.  I guess there

15   were -- he used that term so, kind of loosely, to get

16   attention on areas where he was really frustrated and

17   emotional.  And, you know, I'm -- in my profession when

18   words like that are used, that's why we have the avenues

19   like office of ethics to escalate them to.  So, you

20   know, that definitely would have been a reason to get

21   them involved and probably -- yeah.  I'll stop with

22   that.

23        Q.   Right.  So do you recall saying that to

24   Ms. Lin?

25        A.   I -- yeah.  I mean, it sounds familiar.  I'm --

1    you know, these aren't my words in the document, so, you

2    know, whether I used that or it was described as that,

3    but that's likely -- that is my recollection that

4    that -- that word was used.

5         Q.   Okay.  And you mentioned he would use the word

6    "retaliation" in areas he was frustrated with; is that

7    accurate?

8         A.   Yes.  I mean, I just remember Mauro using what

9    I use -- refer to as kind of trigger words to get

10   attention on things and was very emotional and -- yeah.

11   I mean, I'm sure that word was used, or I believe that

12   word was used.

13        Q.   If you can recall, what things was Mauro trying

14   to get, as you described, attention to or on?

15        A.   I mean --

16             MR. REITER:  Calls for speculation.

17             THE WITNESS:  Yeah.  I mean, where I focus as

18   an HR person is really on, you know, performance

19   feedback and -- I mean, that aspect of it.  I mean,

20   whether or not there were other things shared, I -- I

21   don't know whether or not -- I believe he -- in a couple

22   of these situations he definitely disagreed with the

23   feedback he was getting and didn't agree with reasons as

24   to why he was being rolled off of accounts.  So yeah, I

25   definitely remember because of my involvement from an HR

CONFIDENTIAL

Page 53

1    standpoint the feedback and not agreeing with the

2    feedback he was getting.

3              BY MR. CABECEIRAS:

4         Q.   Okay.  Do you remember discussing with Ms. Lin

5    Mauro's work or complaints on the Cavium matter?

6         A.   Yeah.  I mean, it's -- I didn't recall it but

7    I -- you know, looking at the document.  Yeah.  I mean,

8    that was --

9         Q.   But you didn't -- I'm sorry.

10        A.   No.  Go ahead.

11        Q.   So in April 2016, were you aware that Mauro

12   uncovered issues that he felt that the partners and

13   teams in the past in the Cavium audit should have

14   spotted?

15             MR. REITER:  Lacks foundation.

16             THE WITNESS:  I mean, over the years Mauro

17   complained to me, was frustrated over a number of

18   things.  There may have been some technical pieces

19   involved in that.  I mean, I -- I don't remember any of

20   the -- you know, the exact specifics around what the

21   frustrations were.

22             BY MR. CABECEIRAS:

23        Q.   Okay.  But at that time in April of 2016, you

24   understood that Mauro held some frustrations about the

25   Cavium audit?

CONFIDENTIAL

Page 54

1      A.   Yeah.   I mean, I just -- I can't recall the

2   specifics.

3      Q.   Who is Matt Steele?

4      A.   Matt Steele is an HR manager, so he was Mauro's

5   assigned HR manager.   Matt reported at that time in to

6   me.

7      Q.   Okay.   And how long did Matt Steele report in

8   to you?

9      A.   It was probably, I'm estimating, three or four

10  years until Shawna Hewitt took the market lead role, and

11  so the lines of reporting changed a little bit.

12     Q.   Okay.   Did Matt Steele ever share with you

13  conversations he had had with Mr. Botta with respect to

14  Mr. Botta's complaints in the Cavium engagement?

15          MR. REITER:   Lacks foundation.   Vague.

16  Overbroad.

17          THE WITNESS:   Yeah.   Nothing that I can

18  specifically recall.

19          BY MR. CABECEIRAS:

20     Q.   And going down to paragraph 10, it begins the

21  third from the bottom on the first page.   "He was

22  tier 1.   Mauro, he is being withheld opportunities.

23  Reputation he has for being aggressive and demanding.

24  Soft skills needs to work on."

25          Do you remember telling Ms. Lin that Mauro was

CONFIDENTIAL

Page 55

1    being withheld opportunities?

2        A.  Those are not -- those are not my words.

3    Those -- you know, not how I would describe it, so yeah.

4        Q.  Do you remember telling Ms. Lin that Mauro

5    feels like he's being withheld opportunities?

6        A.  Yeah.  I don't specifically recall, but I'd be

7    relying on this document to describe that.

8        Q.  Turning away from the document in front of you,

9    do you remember anything else from the conversation you

10   had with Ms. Lin towards the end of April 2016 regarding

11   Mr. Botta?

12           MR. REITER:  Object to form.

13           THE WITNESS:  Yeah.  Nothing specifically.

14           MR. CABECEIRAS:  Counsel, can you hand the

15   witness what's been marked for our purposes as

16   Attachment H as in Harry.  We can mark it as 56.

17           (Exhibit 56, 6/12/17 Conversation Entry,

18   PwC_B00005983, marked for identification.)

19           BY MR. CABECEIRAS:

20       Q.  Ms. Nelson, please review it.  Let me know when

21   you're done.

22       A.  Okay.  I've reviewed it.

23       Q.  Great.  This appears to be an entry note from

24   Mr. Wallace.

25           Do you recall having a meeting with Mr. Wallace

1    and Mr. Botta around June 12, 2017?

2         A.   I vaguely recall, yeah.

3         Q.   Do you recall Mr. Wallace ever in your presence

4    advising Mr. Botta of findings in relation to the Zone

5    project?

6         A.   Yeah.  I mean, this, again, would have been,

7    you know, Justin on the phone likely with Mauro and I

8    talking about, you know, the investigation that was open

9    at the time.

10        Q.   Right.  Do you remember that conversation

11   taking place?

12        A.   I don't recall the specifics.  I mean, we've

13   talked about many different conversations, and . . .

14        Q.   Okay.  Do you recall a conversation in which

15   Mr. Wallace relayed to Mr. Botta any of the findings

16   with respect to the Zone project?

17        A.   Yeah.  I don't recall the specifics.  I -- I

18   mean, I only recall all of the open investigations being

19   unsubstantiated and that's what's in my mind.  I don't

20   remember the details.

21        Q.   Okay.  At any time did you gain an

22   understanding of what the findings with the Zone project

23   were?

24        A.   I do not remember the specifics of the Zone,

25   what was the -- what his -- what -- you know, what he

Page 57

1    was working with at the office of ethics to look into as

2    it relates to that.

3        Q.  Okay.  Do you recall a conversation in which

4    Mr. Wallace advised Mr. Botta on a matter in relation to

5    the 2014 Harmonic audit?

6        A.  My best recollection of that was that Mauro had

7    asked to have something -- I don't know the technical

8    nature of it -- related to 2014 looked into, and they

9    were handling that with him.  The office of ethics was

10   working with him on that.

11       Q.  Besides the office of ethics, was anybody else

12   at PwC working with him on that matter?

13           MR. REITER:  Calls for speculation.

14           THE WITNESS:  Yeah.  That all would have gone

15   through the office of ethics.  And whether or not they

16   would have engaged, I'm just not -- that's something

17   they handle independently.

18           MR. CABECEIRAS:  Okay.  Counsel, could you

19   please hand the witness what's been marked for us as

20   Attachment J and we can mark it as 57.

21           (Exhibit 57, E-mail String Containing 6/16/17

22   E-mail from Traci Nelson to Ergun Genc,

23   PwC_B00001609-PwC_B00001610, marked for identification.)

24   BY MR. CABECEIRAS:

25       Q.  Ms. Nelson, if you can please review it and let

CONFIDENTIAL

Page 58

```
 1    me know when you're done.
 2        A.  Okay.  I've reviewed it.
 3            I don't know if you heard me, but I finished
 4    reviewing it.
 5        Q.  Oh.  Sorry about that.
 6            This appears to be an e-mail thread between you
 7    and Ergun.  In Ergun's initial e-mail to you he says,
 8    Unfortunately, I do not have a control over what a
 9    former employee texts to our team.
10            Do you have any knowledge as to what former
11    employees he's referring to?
12        A.  No.  I mean, it might.  My vague recollection
13    is that I believe it was a former employee of Gigamon,
14    but I can't remember exactly who was involved in the
15    exchange.
16        Q.  Okay.  You respond, "I wouldn't e-mail him
17    directly about it.  Obviously a result of news of the
18    previous controller's request to have him rolled off."
19            What previous controller are you referring to?
20        A.  My recollection is there was some movement on
21    the client in terms of some changes.  I -- I mean, the
22    focus of my response was really driven by this was an
23    emotional topic for Mauro and, you know, it's better to
24    have a live conversation about it and not get caught up
25    in an emotional e-mail exchange.
```

1      Q.  Right.  But do you know what previously --

2   previous controller you were referring to?

3      A.  I mean, I -- I can't recall the specifics in

4   terms of names of individuals or the movement on the

5   account.  I was really focused on helping Ergun deliver

6   feedback to Mauro during that time.

7      Q.  Okay.  When you say movement from the account,

8   just so we're clear, what do you mean by that?

9      A.  Well, were those -- I don't think those were --

10  let's see.  I mean, the only -- the reference, if I'm

11  reading or responding to your question, is acknowledging

12  that he had -- you know, the client had requested to

13  have him taken off the account.  It was Ergun's

14  reference in terms of -- yeah.  I don't know that I'm

15  following your question.

16     Q.  Right.  So I just generally want to know

17  because you referred to a previous controller's request:

18  one, who was the previous controller; and two, what did

19  they request?

20             MR. REITER:  So --

21             THE WITNESS:  Yeah.  My recollection is the

22  controller asked to have him taken off.  I can't recall,

23  you know, the movement on the client because I wasn't

24  involved in managing that aspect of it.

25             MR. CABECEIRAS:  Counsel, can we take another

                                                    Page 60

1    five minutes?

2              MR. REITER:  Yes.

3              MR. CABECEIRAS:  Off record.

4              MR. REITER:  Yeah.

5              (Recess taken from 11:02 a.m. to 11:10 a.m.)

6              THE REPORTER:  Do you want to order a copy of

7    the transcript?

8              MR. REITER:  We're good to need a rush.

9              THE REPORTER:  When do you need it?

10             MR. REITER:  As soon as possible.  By the end

11   of this week if that's possible.

12             THE REPORTER:  Sure.

13             MR. CABECEIRAS:  Counsel, if you could hand the

14   witness what's been marked for our purposes as

15   Attachment L.  And we can mark it as 58.

16             (Exhibit 58, E-mail String Containing 6/17/17

17   E-mail from Ergun Genc to Traci Nelson,

18   PwC_B00001595-PwC_B00001596, marked for identification.)

19             THE WITNESS:  Okay.  I've reviewed it.

20             BY MR. CABECEIRAS:

21        Q.  Great.  Just generally after reviewing this, do

22   you recall having this e-mail exchange with Ergun?

23        A.  Yes.  This looks familiar.

24        Q.  Okay.  Ergun writes you, says "I am assuming

25   he" -- meaning Mr. Botta -- "is meeting his coach this

CONFIDENTIAL

Page 61

1   coming week."

2          You respond, "Yes.  Tim and Rob are meeting

3   with him on Wednesday morning."

4          For the record, who were you referring to when

5   you were referring to Tim and Rob?

6      A.  That would have been Tim Carey and Rob Ward who

7   was his coach at the time.

8      Q.  Okay.  You go on to say he is very anxious

9   right now about this and the fact that Tim will be part

10  of the conversation.

11         "He," I'm assuming you're referring to

12  Mr. Botta; is that correct?

13     A.  That's correct.

14     Q.  Did Mr. Botta share with you that he was

15  anxious about this meeting?

16     A.  I don't know that he used those exact words.  I

17  know that he was definitely looking to get more

18  information.  I believe this related to his year-end

19  performance evaluation.

20     Q.  Okay.  What did Mr. Botta share with you?  I

21  mean, he wrote he's very anxious right now.  What did he

22  share with you to make you think that he was very

23  anxious at that moment?

24         MR. REITER:  Lacks foundation.  Vague.

25         THE WITNESS:  The only thing I can recall is

CONFIDENTIAL

1  that he -- he was typically very -- very focused on

2  getting his year-end evaluation and feedback for the

3  year which is part of our typical process, and I think

4  he definitely wanted to have that conversation.

5        BY MR. CABECEIRAS:

6    Q.  Okay.  Did Mr. Botta share with you his

7  concerns of being rolled off the Gigamon engagement?

8    A.  Our conversations were very -- I recall him

9  being very focused on disagreeing with the feedback he

10  was getting from Ergun.

11   Q.  Okay.  And specifically what about the

12  feedback?

13   A.  Just, I mean, thinking back on that, I mean,

14  Mauro on, you know, more than one occasion was getting

15  feedback about his style and his communication style and

16  negativity and, you know, that was definitely something

17  that we continued to coach him on, and he -- just -- he

18  did not agree with that feedback.

19   Q.  At the bottom of the e-mail that's in front of

20  you is a conversation thread between Mr. Botta and

21  Ergun.  The second paragraph reads, On the below I'm

22  okay if you connect live, but I was frankly expecting

23  reassurance that I was on the engagement.

24        Do you have any knowledge as to what engagement

25  Mr. Botta was referring to?

CONFIDENTIAL

Page 63

1      A.   Yeah.   Looking at the thread and the time

2  frame, that would have been Gigamon.

3      Q.   Turning your attention back to what appears to

4  be the only thing you wrote in this e-mail, "He is very

5  anxious right now about this and the fact that Tim will

6  be part of the conversation."

7           Did Mr. Botta ever bring up to you concerns

8  about speaking to Tim Carey?

9      A.   I think at the time -- I mean, Rob Ward was his

10  coach, so typically it would have been a conversation

11  between him and Rob.   But just given the nature of the

12  performance concerns at the time and the conversation we

13  were having, Tim Carey was a part of that conversation

14  and I think he was just speculating on that.

15      Q.   I'm sorry.   He was speculating on that?

16      A.   I think he was unclear on -- I mean, I used the

17  word action about why Tim was going to be a part of that

18  conversation.

19      Q.   And just to clarify, why was Tim a part of that

20  conversation?

21      A.   So my recollection on this is Tim -- it was a

22  broader conversation and Tim Carey needed to be part of

23  that conversation.   That would include what his year-end

24  rating was and the feedback, and I think that was the --

25  yeah.

1        Q.   Okay.  Did you ever receive confirmation from

2    either Tim or Rob that this meeting took place between

3    Tim, Rob and Mr. Botta?

4        A.   Yeah.  That -- that meeting -- yeah.  That

5    meeting took place, and I believe I was even part of

6    that meeting.

7        Q.   And do you know where this meeting took place?

8        A.   In the office.

9        Q.   Besides you and Mr. Botta and Tim and Rob, were

10   there any other individuals present at that meeting?

11       A.   No.

12       Q.   Okay.  And at that meeting, did anybody tell

13   Mr. Botta that he would remain on the Gigamon project?

14       A.   Trying to recall.  In that meeting there was

15   some flexibility at the time and that he would remain

16   involved in some capacity.  I don't distinctly, you

17   know, recall the words that were used or how that was

18   described.

19       Q.   Okay.  At that meeting did anybody discuss any

20   of the open investigations that were occurring within

21   the ethics office as a result of Mr. Botta's complaints?

22            MR. REITER:  Lacks foundation that there were

23   open investigations.

24            THE WITNESS:  I mean, that wasn't the nature of

25   the conversation.

Page 65

1           MR. CABECEIRAS:  Counsel, if you could pass the

2     witness what's been marked as Attachment N as in Nancy.

3     And we can mark it 59.

4           (Exhibit 59, 6/21/17 E-mail from Mauro Botta to

5     Traci Nelson, PwC_B00000206, marked for identification.)

6                 THE WITNESS:  Okay.  I've reviewed.

7     BY MR. CABECEIRAS:

8        Q.  Great.  And within the e-mail it appears that

9     Mr. Botta is following up on four specific inquiries.

10    In the first one he says, "To recap what I'd need your

11    help with, 1) Provide OGC contact to file a retaliation

12    claim towards CRT and its components."

13          Did you provide a contact for Mr. Botta at the

14    OGC from the OGC at that time?

15       A.  Yes.  I mean, as a response I would have

16    escalated it and given him a contact.

17       Q.  Okay.  And when you said you would have

18    escalated, does that mean you did escalate?

19       A.  Yes.  It was escalated.

20       Q.  To the OGC or to ethics?

21       A.  Definitely to -- yeah.  To OGC.

22       Q.  Do you have any idea what Mr. Botta was

23    referring to when he used the acronym CRT?

24       A.  So that would be his year-end -- referred to as

25    his tier, so his overall rating for the year, and just

1    the -- yeah, the evaluation process.

2        Q.  So based off of what Mauro shared with you

3    around June of 2017, did you understand Mauro felt

4    retaliated based off his rating?

5        A.  I know that he didn't, like in many instances,

6    agree with the feedback he was getting and the result in

7    terms of what he understood to be his tier for the year.

8        Q.  Okay.  And to the second request, Mauro appears

9    to ask you to "Remove Rob Ward as a coach.  Assign

10   none."

11          Was Rob removed as Mr. Botta's coach?

12       A.  Yes.  We communicated that to Rob, and I -- I

13   vaguely recall we were having challenges in our system

14   to -- because it wouldn't be typical to not have anyone

15   assigned with a coach to make that systematic change,

16   but we understood his request.

17       Q.  Okay.  All right.  Did he share with you why he

18   did not want Rob Ward as his coach?

19       A.  In -- generally he didn't -- you know, he

20   didn't agree with the feedback he was getting from Rob.

21   We had made, I mean, coaching changes before for Mauro,

22   and that usually was a result of him disagreeing with

23   what he was hearing in terms of the performance feedback

24   and areas that we really needed him to focus on to be

25   successful.

CONFIDENTIAL

1      Q.  And in the third request he seems to ask to

2   de-map him from Team C and please reassign him to

3   another team.

4          Do you have any knowledge in your profession

5   what de-mapping means?

6      A.  Yeah.  All of our employees are assigned to a

7   market team.  At the time he was assigned to Team C, and

8   he was asking to be changed to a different team.

9      Q.  And I know this is a bit vague, but I just want

10  to understand how the teams are structured.

11         So how many teams are there in the assurance

12  practice?

13     A.  So there's four teams in the San Jose assurance

14  practice.  It's just how we -- it's how we organize our

15  people, Teams A, B, C and D.

16     Q.  Okay.  So is there one team that's paid more

17  than the other team?

18     A.  No.  All the teams and the people -- I mean,

19  it's all -- it's all the same.  It's merely -- it's just

20  a way to organize a large group of people, and then they

21  are -- there's a market team leader assigned to each one

22  of those teams.

23     Q.  Got it.  Thank you.  And in June of 2017 who

24  was the market team leader assigned to Team C?

25     A.  I believe at the time that was -- I think that

CONFIDENTIAL

Page 68

1   was Ergun Genc.

2         Q.   And then finally number 4, he asked you to

3   "provide insight as to what happens if I won't look for

4   a job.  Will you guys fire me?"

5              At that point in June of 2017, had you at any

6   time threatened to terminate Mr. Botta?

7         A.   So part of the conversation in that meeting was

8   the fact that we would start helping him look for

9   another job as part of the friend of firm, I guess,

10  process we were working -- the firm was working through

11  at the time.

12        Q.   Okay.

13        A.   That was --

14             MR. REITER:  Do you have more?

15             THE WITNESS:  Yeah.  I mean, that was -- I

16  mean, the nature of the conversation was, I mean, it

17  wasn't given any hard time line to that.  It was

18  flexible.  You know, we wanted to make sure that he was,

19  you know, finding the best opportunity for himself and

20  setting himself up for success outside of the firm.

21             BY MR. CABECEIRAS:

22        Q.   And how many other senior managers in the

23  San Jose office were put on the friend of the firm --

24  I'll refer to it as a list.

25        A.   I mean, I was not closely tied into that

1    process.  I mean, there were others, other senior

2    managers in San Jose and in other parts of our market

3    just as there were across the entire firm that were part

4    of that process.

5           MR. CABECEIRAS:  Okay.  Counsel, can we hand

6    the witness what's been marked as Attachment P as in

7    Peter.  For our purposes we can mark it as 60.

8           (Exhibit 60, Conversation Entry, PwC_B00006002,

9    marked for identification.)

10          BY MR. CABECEIRAS:

11     Q.  Ms. Nelson, please review, and let me know when

12   you're done.

13     A.  Okay.  I've reviewed it.

14     Q.  Great.  And I apologize if this has been asked

15   and answered, but who is Steve Kessler?

16     A.  Steve Kessler is also part of the office of

17   ethics, and I think even may be the -- he's one of the

18   higher-level officers in that organization.

19     Q.  And do you remember around July 6, 2017,

20   speaking with Mr. Kessler about Mr. Botta?

21     A.  Yeah.  I'm familiar with it.  Vaguely recall,

22   yep.

23     Q.  Why were you speaking to Mr. Kessler about

24   Mr. Botta in or around July of 2017?

25     A.  My recollection is that Mauro wanted -- had --

1    was still asking to have his ethics inquiries, like,

2    further investigated and reviewed by someone else in the

3    ethics organization, and Steve was involved in that

4    process.

5         Q.   Okay.  To your knowledge, with this particular

6    investigation, was there any one person assigned to lead

7    the investigation?

8              MR. REITER:  Calls for speculation.

9              THE WITNESS:  Yeah.  I'm not -- I mean, I don't

10   get involved in those details.  I mean, that will have

11   been organized by the office of ethics in terms of how

12   they handle those investigations.

13             BY MR. CABECEIRAS:

14        Q.   And for this particular conversation, did Steve

15   reach out to you, or did you reach out to him?

16        A.   I recall Steve reaching out to me.

17        Q.   In this document in the sixth line down it

18   says, "He also came to Traci with issues."

19             If you can recall, at that time what other

20   issues did Mr. Botta come to you with?

21             MR. REITER:  Object to form.

22             THE WITNESS:  Yeah.  Those -- I mean, there

23   were, you know, definitely times where Mauro was just

24   very emotional and would -- you know, I almost describe

25   as an emotional rant about all kinds of things that he,

CONFIDENTIAL

Page 71

1   you know -- I mean, it could have been as specific as an

2   e-mail he got that he didn't agree with on a policy the

3   firm was rolling out.

4            BY MR. CABECEIRAS:

5        Q.  And looking further down in the document it

6   states that "4 senior managers in San Jose were told

7   that their roles were eliminated.  This is out of 49

8   senior managers.  The 4 were not going to become

9   partner."

10           Do you remember saying that to Mr. Kessler?

11       A.  Yeah.  I mean, looking on the document I --

12   yeah.  I would have shared that.

13       Q.  Was Mauro one of those four senior managers

14   whose role was going to be eliminated?

15       A.  Yeah.  I don't -- I did not use or don't recall

16   using the word "eliminated."  It was part of the friends

17   of firm exercise we were going through as a firm in

18   terms of, I mean, having conversations with senior

19   managers that were not on the partner pipeline, and

20   Mauro was aware of that given the conversation we had

21   had with him in the past, and we were doing our best to

22   make sure he understood and was clear with that feedback

23   and we were helping him look for an opportunity outside

24   of the firm.

25       Q.  Okay.  Was Mauro one of four individuals on the

CONFIDENTIAL

Page 72

1    friend of the firm program in the San Jose office as it

2    was applied to senior managers?

3         A.  Yes, that's correct.

4         Q.  Of those four senior managers on the friend of

5    the firm -- I'll refer to it again as a list.  Were all

6    four of those senior managers ultimately let go by PwC?

7         A.  I believe because of the nature of how this

8    worked and the flexibility that there is -- I know of

9    one instance where there's a senior manager who is on a

10   very specific account and that's still contributing that

11   with the understanding that, you know, this is not -- I

12   guess the words I want to use, I mean, there was no

13   guarantee in that.  There was many different kind of

14   circumstances and situations with this program.

15        Q.  Okay.  So as of today out of the senior

16   managers on the friend of the firm list, there's only

17   one still working for the PwC San Jose office?

18        A.  Yeah.  That's what I -- that's what I believe.

19   This was something that I wasn't -- this was not part of

20   my focus area and what I was intimately involved in.  So

21   that is what I believe to be true.

22        Q.  The sentence under that says "Tim Carey" -- and

23   I believe that's spelled incorrectly -- "as market

24   assurance leader as to which senior managers would not

25   become partner."

1       Did you ever speak to Mr. Carey about Mr. Botta

2   not becoming a partner at PwC?

3       A.  Yeah.  There would have been, I mean,

4   conversations with Tim and other partners just as part

5   of the process in terms of reviewing our senior manager

6   group given there are very limited spots to become

7   partner.  So we would have had some conversation about

8   it over the years.

9       Q.  And do you recall any specific feedback

10  Mr. Carey gave you with respect to Mr. Botta becoming a

11  partner?

12      A.  I mean, the feedback would have been similar

13  to, you know, the feedback that he was given over the

14  years in terms of, you know, the challenges and the

15  concerns we had related to his ability to build/sustain

16  trusting relationships with clients and our people and

17  leadership, leadership style.  I mean, all the areas

18  that are really important and that we value in terms of

19  making partners in the firm.

20      Q.  We're all set with Exhibit 60.  There's

21  nothing -- you testified before that Mr. Botta would

22  come in to your office, and I think you used the term

23  become emotional and essentially air his grievances.

24          Is that a somewhat accurate reflection of what

25  we talked about earlier?

```
 1              MR. REITER:  Asked and answered.  And I'll just
 2       object to the extent that it does misstate prior
 3       testimony.
 4              THE WITNESS:  Yeah, you could -- yeah.
 5       That's -- sounds accurate.
 6              BY MR. CABECEIRAS:
 7         Q.  During any of these conversations where Mauro
 8       either went into your office or called you, did Mauro
 9       ever share with you that he was going to report PwC or a
10       PwC employee to some kind of external agency?
11         A.  Yeah.  I don't -- I don't recall any specifics
12       on that.
13         Q.  Okay.  Do you recall Mr. Botta telling you he's
14       going to, quote, go external?
15              MR. REITER:  Lacks foundation.
16              THE WITNESS:  Yeah.  I mean, there were so many
17       times where Mauro threatened to quit, threaten to get an
18       attorney involved just in an emotional state that I -- I
19       mean, what I -- and many times I understood that as
20       trying to get just attention on himself and -- he's very
21       stylistic.
22              BY MR. CABECEIRAS:
23         Q.  I understand that and I appreciate that answer,
24       but I'm asking very specifically, do you remember him
25       saying I'm going to go external?
```

CONFIDENTIAL

Page 75

 1          MR. REITER:  Lacks foundation.

 2          THE WITNESS:  Yeah.  I don't remember those

 3     words specifically.  It may have been stated that way.

 4          BY MR. CABECEIRAS:

 5       Q.  Do you remember Mr. Botta ever bringing up to

 6     you in any regard the Securities and Exchange

 7     Commission?

 8       A.  No, I don't recall anything on that.

 9       Q.  Okay.  Do you recall Mr. Botta threatening to

10     report PwC to the SEC?

11       A.  I don't recall that.

12          MR. CABECEIRAS:  Counsel, if you can pass the

13     witness what's been marked for our purposes as

14     Attachment S as in Sam.  We can mark it as 61.

15          (Exhibit 61, 8/17/17 E-mail from Traci Nelson

16     to Partners, PwC_B00000001, marked for identification.)

17          BY MR. CABECEIRAS:

18       Q.  Ms. Nelson, please review the document and let

19     me know when you're done.

20       A.  Okay.  I've reviewed it.

21       Q.  Great.  Do you remember sending this e-mail out

22     to the U.S. assurance partners?

23       A.  Yes, I do.

24       Q.  Okay.  Ms. Nelson, why was Mr. Botta terminated

25     from PwC?

CONFIDENTIAL

Page 76

```
1              MR. REITER:  Calls for speculation.
2              THE WITNESS:  Yeah.  I was not involved in his
3       ultimate separation from the firm, so I wouldn't be able
4       to respond to that.
5              BY MR. CABECEIRAS:
6          Q.  So when did you learn that PwC was going to
7       terminate Mr. Botta?
8          A.  I -- it was in very close proximity to when he
9       was actually separated from firm.  It may have been just
10      earlier that day.
11         Q.  Okay.  And this may touch on attorney-client
12      privilege, Ms. Nelson.  I'm not asking you to divulge
13      any of that information or communication.  But to the
14      extent any of these conversations did not involve
15      attorneys, who told you initially that PwC was going to
16      terminate Mr. Botta?
17             MR. REITER:  So if an attorney from PwC told
18      you that information, I'm going to instruct you not to
19      answer.
20             If a nonattorney told you --
21             THE WITNESS:  Yeah.  I believe it was
22      Shawna Hewitt.  And that would have only --
23             BY MR. CABECEIRAS:
24         Q.  Sorry.  Please finish.
25         A.  I was going to say she would have just given me
```

CONFIDENTIAL

Page 77

```
 1    a heads-up earlier that day just to help with pulling

 2    together some paperwork.

 3        Q.  Okay.  And did you retrieve any kind of

 4    paperwork from Ms. Hewitt?

 5        A.  I believe I would have just -- I believe I've

 6    printed out just some standard documents that we use

 7    with all of our -- with our standard separations.

 8        Q.  Okay.  And when Ms. Hewitt reached out to you,

 9    did she give a reason why Mr. Botta was being

10    terminated?

11        A.  No.  I wasn't given any information.

12        Q.  And did you actually -- I'll withdraw.

13            Were you ever made aware that a photo of

14    Mr. Botta was placed behind the front desk in the

15    entryway to the PwC San Jose office?

16        A.  Yes.  I was made aware of that.  It's --

17        Q.  And who made you aware of that?

18        A.  I don't recall who made me aware of it.  I

19    mean, it's standard practice that we do place photos

20    with separated staff, but I -- yeah.  I recall someone

21    reaching out.

22        Q.  Do you recall who that someone was?

23            MR. REITER:  Asked and answered.

24            THE WITNESS:  Yeah.  I just -- I don't recall

25    who specifically reached out about it.
```

CONFIDENTIAL

Page 78

1        BY MR. CABECEIRAS:

2        Q.  Okay.  Did you physically print the photo out?

3        A.  No.  I was not part of that process of printing

4    or displaying the photo.

5        Q.  Do you know when approximate the photo actually

6    went up?

7        A.  I don't know exactly the timing of when that

8    went up.

9        Q.  Okay.  Do you know if the photo is still in the

10   PwC San Jose office?

11       A.  In the -- I mean, the photo --

12           MR. REITER:  So I'll --

13           THE WITNESS:  Yeah.

14           MR. REITER:  -- object as vague.  What do you

15   mean in the office?

16           MR. CABECEIRAS:  I can rephrase.

17           BY MR. CABECEIRAS:

18       Q.  Is the photo of Mr. Botta still behind the

19   front desk, the entryway, to PwC San Jose office?

20       A.  Yeah.  I don't believe so.

21       Q.  Did there ever come a time where you learned

22   that Mr. Botta had reported PwC to the SEC?

23       A.  Yeah.  That would have only been after he had

24   been separated and left the firm, but I became

25   vaguely -- I mean, just -- it was mentioned.

1      Q.   Okay.  And again, not looking to have you

2   disclose any attorney-client privilege, who mentioned

3   that fact to you?

4           MR. REITER:  So to the extent that calls for

5   disclosure of attorney-client communications, I'm going

6   to instruct the witness not to answer.

7           She's indicating she can't answer that

8   question.

9           THE WITNESS:  Yeah.

10          BY MR. CABECEIRAS:

11     Q.   Okay.  Going back to the photograph we were

12   discussing, Ms. Nelson, do you know -- well, withdrawn.

13          Joe, we'll take a quick five minutes off the

14   record.  Come back and finish up, okay?

15          MR. REITER:  Okay.  Sounds good.  Thanks.

16          (Recess taken from 11:48 a.m. to 11:52 a.m.)

17          MR. CABECEIRAS:  Back on the record.

18   BY MR. CABECEIRAS:

19     Q.   Ms. Nelson, I just want to clarify one thing

20   about the photo of Mr. Botta in the front desk at the

21   San Jose PwC.

22          Do you recall a specific date the photo was

23   removed from that desk?

24     A.   Yeah, I don't.  I mean, that wasn't -- that's

25   not my responsibility, so I don't have a date.

CONFIDENTIAL

Page 80

1    Q.   Okay.   Generally whose responsibility was it?

2    A.   At the time I was in touch with our office

3  services person who is involved in working with the

4  office on that type of request.

5         MR. CABECEIRAS:  Okay.  I have no further

6  questions.

7         MR. REITER:  Great.  I don't have any

8  questions, but I wanted to note for the record that

9  pursuant to the party's protective order, the entire

10  deposition transcript will be deemed confidential for a

11  certain period of time during which the parties will

12  have an opportunity to designate specific portions or

13  the entire transcript confidential.

14         THE REPORTER:  Thank you.

15         Alex, do you want to expedite your transcript?

16         MR. CABECEIRAS:  I'm sorry.  I didn't hear the

17  reporter.

18         MR. REITER:  She wants to know what sort of

19  processing time you would like on your transcript.

20         MR. CABECEIRAS:  We don't need it expedited.

21  Just the normal turnaround time is fine.

22         THE REPORTER:  Great.  Thank you.

23

24         (TIME NOTED:  11:53 a.m.)

25                     --o0o--

CONFIDENTIAL

**Page 81**

1

2  STATE OF _____ )

3                            )  :ss

4  COUNTY OF _____)

5

6

7          I, TRACI E. NELSON, the witness

8  herein, having read the foregoing

9  testimony of the pages of this deposition,

10  do hereby certify it to be a true and

11  correct transcript, subject to the

12  corrections, if any, shown on the attached

13  page.

14

15                    _____

16                    TRACI E. NELSON

17

18

19

20  Sworn and subscribed to before me,

21  this _____ day of _____, 2019.

22

23  _____

24          Notary Public

25

CONFIDENTIAL

Page 82

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3     That the foregoing proceedings were taken before me at

4     the time and place herein set forth; that any witnesses

5     in the foregoing proceedings, prior to testifying, were

6     administered an oath; that a record of the proceedings

7     was made by me using machine shorthand which was

8     thereafter transcribed under my direction; that the

9     foregoing transcript is a true record of the testimony

10    given.

11          Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript [ ] was [X] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or any party to this action.

18          IN WITNESS WHEREOF, I have this date subscribed

19    my name.

20    Dated: January 17, 2019

21

22

23

24          Susan F. Magee, RPR, CCRR, CLR

       CSR No. 11661

25

CONFIDENTIAL

Page 83

1              INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over carefully

4     and make any necessary corrections. You should state

5     the reason in the appropriate space on the errata

6     sheet for any corrections that are made.

7           After doing so, please sign the errata sheet

8     and date it.

9           You are signing same subject to the changes

10    you have noted on the errata sheet, which will be

11    attached to your deposition.

12          It is imperative that you return the original

13    errata sheet to the deposing attorney within thirty

14    (30) days of receipt of the deposition transcript by

15    you. If you fail to do so, the deposition transcript

16    may be deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

**Page 84**

1              E R R A T A

2

3

4

5        I wish to make the following changes,

6     for the following reasons:

7

8     PAGE LINE

9     ____  ____  CHANGE:_____

10    REASON:_____

11    ____  ____  CHANGE:_____

12    REASON:_____

13    ____ ____  CHANGE:_____

14    REASON:_____

15    ____ ____  CHANGE: _____

16    REASON:_____

17    ____ ____  CHANGE: _____

18    REASON:_____

19

20    _____     _____

           TRACI E. NELSON                    DATE

21

22    SUBSCRIBED AND SWORN TO BEFORE

23    ME THIS ____DAY OF_____, 201 .

24

      _____         _____

25    NOTARY PUBLIC                COMMISSION EXPIRES

CONFIDENTIAL

**[& - adjective]**                                                                          Page 1

| **&** |
| --- |
| **&**   10:23 |

| **1** |
| --- |
| **1**   41:3 54:22 65:11 |
| **10**   54:20 |
| **10/13/16**   5:3 16:13 |
| **100**   15:24 22:4 23:3 45:24 46:3 |
| **10119**   3:6 |
| **10:06**   39:16 |
| **10:17**   39:16 |
| **10th**   40:4 |
| **11661**   1:22 2:20 82:24 |
| **11:02**   60:5 |
| **11:10**   60:5 |
| **11:48**   79:16 |
| **11:52**   79:16 |
| **11:53**   2:18 80:24 |
| **12**   17:6 23:25 56:1 |
| **12th**   20:23 |
| **16**   1:17 2:19 5:3 7:1 |
| **17**   34:4 41:14 82:20 |
| **18**   12:20 |
| **1800**   2:17 |
| **1996**   10:23 11:1 |
| **1999**   11:15 12:20 |

| **2** |
| --- |
| **2/9/17**   5:6 28:16 |
| **2000**   12:20 |
| **2002**   10:17 |
| **2003**   10:17 |
| **2005**   12:3 |
| **2006**   12:3 |
| **201**   84:23 |
| **2013-2014**   13:25 |
| **2014**   57:5,8 |

| **2015**   13:15 14:3,18 15:10 |
| --- |
| **2016**   17:6 20:22 23:25 26:4 28:1 47:10 48:17 49:6 51:3 53:11,23 55:10 |
| **2017**   29:8 30:9 33:9 40:5 41:4,12 42:18,21 56:1 66:3 67:23 68:5 69:19,24 |
| **2019**   1:17 2:19 7:1 81:21 82:20 |
| **212**   3:7 |
| **213**   3:17 |
| **24**   9:18 |
| **25**   31:22 32:12,14 |
| **2615**   1:7 2:7 |
| **27**   48:17 |
| **27th**   47:10 |
| **28**   5:6 |

| **3** |
| --- |
| **3/7/17**   5:8 33:4 |
| **30**   83:14 |
| **33**   5:8 |
| **39**   5:10 |
| **3:18**   1:7 2:7 |

| **4** |
| --- |
| **4**   36:13 37:19 68:2 71:6,8 |
| **4/10/17**   5:10 39:20 |
| **4/27/16**   5:16 47:20 |
| **4/27/17**   5:13 46:16 |
| **400**   3:15 |
| **46**   5:13 |
| **47**   5:16 |
| **488**   2:17 |
| **49**   71:7 |

| **4905**   3:5 |
| --- |

| **5** |
| --- |
| **50**   5:3 16:13 21:9 23:7 27:24 |
| **51**   5:6 28:15,16 |
| **52**   5:8 33:3,4 34:22 37:20 39:2 |
| **523**   3:14 |
| **53**   5:10 39:19,20 45:17 |
| **54**   5:13 46:15,16 |
| **55**   5:16,18 47:19 47:20 |
| **56**   5:18 55:16,17 |
| **57**   5:20,20 57:20 57:21 |
| **58**   5:23 60:15,16 |
| **587-0760**   3:7 |
| **59**   6:3 65:3,4 |
| **5:53**   17:7 |

| **6** |
| --- |
| **6**   69:19 |
| **6/12/17**   5:18 55:17 |
| **6/16/17**   5:20 57:21 |
| **6/17/17**   5:23 60:16 |
| **6/21/17**   6:3 65:4 |
| **60**   5:23 6:5 69:7,8 73:20 |
| **61**   6:6 75:14,15 |
| **6444**   82:23 |
| **65**   6:3 |
| **69**   6:5 |

| **7** |
| --- |
| **7**   4:5 33:9 |
| **75**   6:6 |
| **788-4536**   3:17 |

| **8** |
| --- |
| **8/17/17**   6:6 75:15 |

| **9** |
| --- |
| **90014**   3:16 |
| **95110**   2:18 |
| **96**   12:19 |
| **98**   11:15 |
| **99**   11:15,15 |
| **9:05**   1:18 2:18 7:2 |
| **9th**   41:12 |

| **a** |
| --- |
| **a.m.**   1:18 2:18,18 7:2 39:16,16 60:5 60:5 79:16,16 80:24 |
| **ability**   9:15 73:15 |
| **able**   43:18 76:3 |
| **absolute**   35:6 |
| **account**   15:7 17:24 18:2 27:6 31:8 34:14,21 36:20 37:5,13 59:5,7,13 72:10 |
| **accounting**   32:2 |
| **accounts**   44:15 45:22 52:24 |
| **accuracy**   45:24 |
| **accurate**   40:18,22 52:7 73:24 74:5 83:16 |
| **accurately**   14:17 22:4 |
| **acknowledging**   59:11 |
| **acronym**   32:1 65:23 |
| **action**   63:17 82:16 82:17 |
| **actual**   31:10 42:6 |
| **add**   32:21 |
| **adjective**   46:7 |

**administered** 7:5
82:6

**advice** 41:25 42:2
42:4,5,22

**advised** 57:4

**advising** 56:4

**agency** 74:10

**aggressive** 54:23

**ago** 7:23,25 8:4

**agree** 27:5,7 50:15
52:23 62:18 66:6
66:20 71:2

**agreeing** 50:20
53:1

**ahead** 44:11 53:10

**air** 73:23

**alcohol** 9:18

**alex** 7:13 80:15

**alexander** 3:8

**alexc** 3:10

**allow** 8:24

**almaden** 2:17

**angeles** 3:16

**answer** 9:4,4 11:6
17:15 18:21,23
26:21,22 35:18
36:11 44:1,11,17
45:23 46:9,11
74:23 76:19 79:6
79:7

**answered** 16:6
43:24 48:9 69:15
74:1 77:23

**answers** 9:11

**anxious** 61:8,15
61:21,23 63:5

**anybody** 17:12
21:24 22:14 26:8
31:3 33:23 41:6
42:11 57:11 64:12
64:19

**apathetic** 45:15

**apologize** 69:14

**appear** 32:18

**appearances** 3:1

**appearing** 3:9,23

**appears** 20:15
32:13 40:8 41:11
41:13 55:23 58:6
63:3 65:8 66:8

**applied** 72:2

**appreciate** 45:13
74:23

**appropriate** 83:5

**approximate** 9:11
11:7,14 13:22
78:5

**approximately**
26:4

**approximating**
12:2 13:13

**approximation**
43:22

**april** 40:4 41:12
42:18,21 47:10
48:17 49:6 51:3
53:11,23 55:10

**area** 19:20 72:20

**areas** 51:16 52:6
66:24 73:17

**asked** 16:6 30:13
33:16 43:24 48:9
57:7 59:22 68:2
69:14 74:1 77:23

**asking** 22:17,21
48:3 67:8 70:1
74:24 76:12

**asks** 42:9

**aspect** 19:6,10
43:7 52:19 59:24

**assign** 66:9

**assigned** 17:24
21:16 23:16,21
54:5 66:15 67:6,7
67:21,24 70:6

**assigning** 18:8

**assigns** 18:2

**assistant** 11:3,5

**associate** 11:12,12

**assume** 10:10

**assuming** 32:14
39:8 60:24 61:11

**assurance** 13:24
15:16 16:4 18:10
22:1 42:20,21
67:11,13 72:24
75:22

**attached** 45:11
81:12 83:11

**attachment** 16:12
28:15 33:2 39:18
55:16 57:20 60:15
65:2 69:6 75:14

**attend** 9:25 10:3

**attended** 10:4

**attention** 20:14
23:7 24:5 27:23
40:24 51:9,16
52:10,14 63:3
74:20

**attorney** 8:25 9:3
36:1,9 74:18
76:11,17 79:2,5
82:17 83:13

**attorneys** 76:15

**audit** 32:22 34:24
35:4 53:13,25
57:5

**audits** 15:12

**avenues** 16:1
51:18

**aware** 14:3,5
15:11,19,23,24
16:4,9 19:6 22:2
23:5 25:11 41:23
42:13 46:1 53:11
71:20 77:13,16,17
77:18

**b**

**b** 5:1 6:1 28:15
67:15

**b00000001** 6:7
75:16

**b00000206** 6:4
65:5

**b00000281** 5:15
46:17

**b00001595** 5:25
60:18

**b00001596** 5:25
60:18

**b00001609** 5:22
57:23

**b00001610** 5:22
57:23

**b00001621** 5:12
39:21

**b00001775** 5:5
16:15

**b00005920** 5:17
47:21

**b00005922** 5:17
47:21

**b00005965** 5:7
28:17

**b00005966** 5:9
33:5

**b00005983** 5:19
55:18

**b00006002** 6:5
69:8

**b800001774** 5:5 16:15

**bachelor's** 10:7,8

**back** 12:9,19 14:9 19:13 23:13 25:15 27:24 33:20 34:17 37:2,4,19 43:5 45:4,5,25 46:2 47:13 49:23 62:13 63:3 79:11,14,17

**background** 28:2 32:22 35:4

**based** 13:7,9 20:21 25:25 28:25 29:2 31:15 66:2,4

**becoming** 73:2,10

**beginning** 2:18

**begins** 54:20

**behalf** 2:16 26:15

**behavioral** 35:6

**believe** 7:23 10:17 11:10 17:7,13 19:13 22:9 26:4 29:6,10,21 30:14 32:2 36:4,18 38:15 47:6 50:15 50:19,21 52:11,21 58:13 61:18 64:5 67:25 72:7,18,21 72:23 76:21 77:5 77:5 78:20

**best** 36:4 50:25 57:6 68:19 71:21

**better** 58:23

**bio** 17:8

**bioscience** 17:13 17:19 18:17 22:8 22:24

**biotech** 28:12

**bit** 18:23 54:11 67:9

**blend** 37:10

**botta** 1:5 2:5 3:23 5:15 6:3 7:14 13:19,23 14:3,6,24 15:11 20:3 21:4 21:23 22:6 24:8 24:15 25:2 26:7 26:15 29:9,12 30:21 31:4 32:19 33:9,16,19 34:16 35:2 37:3 38:6,23 42:3 46:17,24 47:5,10 49:1,8 51:5 54:13 55:11 56:1,4,15 57:4 60:25 61:12,14,20 62:6,20,25 63:7 64:3,9,13 65:4,9 65:13,22 68:6 69:20,24 70:20 73:1,10,21 74:13 75:5,9,24 76:7,16 77:9,14 78:18,22 79:20

**botta's** 15:2 24:2 30:7 40:17,21 50:7 54:14 64:21 66:11

**bottom** 54:21 62:19

**boulevard** 2:17

**boy** 10:16

**bring** 47:13 63:7

**bringing** 75:5

**broader** 63:22

**brought** 14:15 19:2 22:13 23:1 27:1,2 32:15 36:19 38:12,13

**build** 73:15

**bustamante** 1:8 2:8

**busy** 47:11

**c**

**c** 33:2 67:2,7,15,24

**ca** 1:16 2:17 3:16 7:1

**cabeceiras** 3:8 4:5 7:8,13 8:14 14:13 15:9 16:2,11,17,21 17:17 18:1,7,24 19:8 20:1,12,13 22:20 24:14 25:1 25:13,24 26:13 27:17,22 28:13,18 30:17 31:9,19,20 32:11,25 33:7 35:17,22 36:12 38:5 39:10,14,17 39:23 41:10 42:1 42:17 43:11 44:3 44:19 46:12,19 47:16,22 48:13 49:16,22 50:5 51:2 53:3,22 54:19 55:14,19 57:18,24 59:25 60:3,13,20 62:5 65:1,7 68:21 69:5 69:10 70:13 71:4 74:6,22 75:4,12,17 76:5,23 78:1,16,17 79:10,17,18 80:5 80:16,20

**california** 1:2 2:2 7:18 82:2

**call** 30:1,4 33:16 34:5 47:4,10 48:21,22

**called** 34:6 42:7 74:8

**calling** 33:8

**calls** 17:20 18:3,20 19:3 22:15 31:5 32:4 36:10 37:24 37:24 41:18 42:12 44:7 49:9 52:16 57:13 70:8 76:1 79:4

**cao** 31:23,25 32:3

**capacity** 23:14,17 37:14 64:16

**career** 50:7

**carefully** 83:3

**carey** 1:9 2:9 21:25 22:22 39:2 39:7,7 61:6 63:8 63:13,22 72:22 73:1,10

**case** 8:16,17 39:4 82:12

**cases** 16:9

**cat** 33:2

**caught** 58:24

**cavium** 14:4,7,12 14:23 15:3,12 24:17,22,24 25:3 53:5,13,25 54:14

**ccrr** 1:21 2:20 82:24

**cell** 47:4

**certain** 18:9 29:3 37:12 80:11

**certified** 2:20 82:1

**certify** 81:10 82:2 82:15

**chain** 25:5

**challenge** 45:7

**challenges** 38:9,11 38:14,21 66:13 73:14

CONFIDENTIAL

**challenging**  24:21 38:16

**change**  66:15 84:9 84:11,13,15,17

**changed**  11:23 37:15 54:11 67:8

**changes**  38:18 45:22 58:21 66:21 83:9 84:5

**chico**  10:4

**chief**  32:2

**child**  10:8,9

**circumstances** 15:22 43:20 72:14

**cisco**  12:8

**claim**  65:12

**claims**  7:14 8:17

**clarify**  35:23 37:7 63:19 79:19

**clear**  22:7 30:18 37:9 59:8 71:22

**client**  17:8 19:22 33:24 34:10,20,24 34:25 36:21,25 38:19 44:6 45:8 45:12 58:21 59:12 59:23 76:11 79:2 79:5

**client's**  44:23

**clients**  23:20 28:3 28:10 73:16

**close**  13:2 76:8

**closed**  30:16 50:4

**closely**  15:6 68:25

**clr**  1:21 2:20 82:24

**coach**  60:25 61:7 62:17 63:10 66:9 66:11,15,18

**coaching**  66:21

**college**  9:25

**come**  24:16 25:16 25:18 42:22 70:20 73:22 78:21 79:14

**comfortable**  24:22 35:9

**coming**  17:22 25:2 61:1

**comments**  32:19 32:20

**commission**  75:7 84:25

**communicated** 66:12

**communication** 33:22 34:12 35:20 45:8 51:4 62:15 76:13

**communications** 35:15 79:5

**complain**  14:6

**complained**  53:17

**complaining**  22:23

**complaint**  15:11 27:1,3,9,20 30:7 30:20,24

**complaints**  49:7 53:5 54:14 64:21

**complete**  31:21 46:9,11 51:10

**completed**  8:24

**completing**  42:7

**completion**  82:13

**compliance**  28:24 48:12

**components**  65:12

**compound**  32:17

**concerns**  62:7 63:7,12 73:15

**conduct**  15:3

**conducted**  30:5 45:8

**conducting**  8:22

**confidential**  1:15 2:15 4:2 80:10,13

**confirmation**  64:1

**confused**  22:11

**connect**  46:25 62:22

**connecting**  47:7

**contact**  14:1 26:14 33:24 36:9 50:24 65:11,13,16

**contacts**  47:14 49:2

**contain**  27:9

**containing**  5:3,10 5:13,20,23 16:13 39:20 46:16 57:21 60:16

**continued**  6:1 37:12 62:17

**contracting**  12:8

**contributing** 72:10

**control**  58:8

**controller**  58:19 59:2,18,22

**controller's**  58:18 59:17

**conversation**  5:6,8 5:18 6:5 14:11 20:3,5,24,25 21:11 21:13,22,24 22:6 24:1,25 28:16 29:16 31:16 33:4 34:7 40:11,15 41:21 43:3 48:24 55:9,17 56:10,14 57:3 58:24 61:10 62:4,20 63:6,10,12 63:13,18,20,22,23 64:25 68:7,16

**conducting**  8:22

**69**:8 70:14 71:20 73:7

**conversations** 15:2 20:11 22:25 25:23,25 26:2,6 35:24,25 54:13 56:13 62:8 71:18 73:4 74:7 76:14

**coopers**  10:23

**copy**  60:6

**correct**  14:25 36:22 39:9 40:23 61:12,13 72:3 81:11

**corrections**  81:12 83:4,6

**counsel**  3:22 16:11 28:13 32:25 35:14 35:17 36:1,1 39:10,17 46:12 47:17 55:14 57:18 59:25 60:13 65:1 69:5 75:12

**county**  81:4

**couple**  11:7 52:21

**course**  50:7

**court**  1:1 2:1 8:9 8:11 16:17 49:22 83:16

**credentialed**  28:5

**critical**  41:24

**crt**  65:12,23

**csr**  1:22 82:24

**current**  12:22

**currently**  7:17 10:18 11:22 12:13

**cv**  1:7 2:7

**d**

**d**  4:1 39:18 67:15

**date**  9:11 34:2 51:8 79:22,25

82:18 83:8 84:20
**dated** 82:20
**david** 39:19
**day** 20:24 30:1
47:5,8 76:10 77:1
81:21 84:23
**days** 83:14
**de** 67:2,5
**decision** 18:5,6
**deemed** 80:10
83:16
**deeply** 32:8
**defendants** 1:11
2:11 3:12
**defensive** 35:9
**define** 49:14
**defined** 15:25 28:7
28:11
**definitely** 38:18,22
51:20 52:22,25
61:17 62:4,16
65:21 70:23
**degree** 10:7,11,15
**deliver** 59:5
**demanding** 54:23
**demonstrate** 44:5
44:23
**denver** 12:19
**department** 18:10
**deployed** 23:11
**deposed** 7:20,22
8:1
**deposing** 83:13
**deposition** 1:15
2:15 4:2 8:22
80:10 81:9 82:12
83:3,11,14,15
**derek** 3:3
**dereksmithlaw.c...**
3:10

**describe** 14:17
20:2 36:16 45:11
55:3,7 70:24
**described** 16:8
38:2,16 52:2,14
64:18
**describing** 15:15
45:16
**description** 5:2
6:2 38:9
**designate** 80:12
**desk** 77:14 78:19
79:20,23
**detail** 34:19
**details** 14:12
15:14 29:18 34:20
44:9 56:20 70:10
**determinations**
18:15
**determine** 18:18
**development** 10:9
10:13
**devilliers** 17:10,23
**difference** 44:22
**different** 15:22
18:12,13,13 24:24
44:13 46:4 47:14
56:13 67:8 72:13
**difficult** 24:12
**direct** 8:5 19:15
20:14 33:22
**direction** 82:8
**directly** 23:6
25:23 34:7 42:14
58:17
**disagreed** 52:22
**disagreeing** 62:9
66:22
**disappointed** 22:7
**disaster** 37:22,23
38:7

**discharge** 8:18
**disclose** 35:15,20
44:9 79:2
**disclosure** 79:5
**discuss** 64:19
**discussed** 40:16
**discussing** 21:22
39:3 53:4 79:12
**discussion** 16:20
**discussions** 18:14
18:22 43:6
**displaying** 78:4
**distinctly** 64:16
**district** 1:1,2 2:1,2
**division** 1:3
**divulge** 76:12
**document** 27:13
27:17 28:19 31:10
31:17 33:10 34:3
34:22 35:11 39:7
40:6,8 42:25
47:23 48:19 49:12
50:3,9 51:9 52:1
53:7 55:7,8 70:17
71:5,11 75:18
**documentation**
43:5 51:7
**documents** 77:6
**doing** 7:11,12
44:11 71:21 83:7
**driven** 58:22
**drugs** 9:15
**drunk** 9:18
**dynamic** 38:17

**e**

**e** 1:15 2:15 4:1,2
5:1,3,4,10,11,13
5:14,20,21,23,24
6:1,3,6 7:4 16:13
16:14 17:1 20:2
20:10,16,21 21:8

21:14 23:24 39:20
39:21 40:3 41:1
46:14,16,17,23
47:3,13 57:21,22
58:6,7,16,25 60:16
60:17,22 62:19
63:4 65:4,8 71:2
75:15,21 81:7,16
84:1,20
**earlier** 30:19
40:16,20 48:11
73:25 76:10 77:1
**early** 14:1,10
24:19
**either** 21:2 29:22
50:16 64:2 74:8
**elaborate** 19:11
**eliminated** 71:7,14
71:16
**ellen** 7:16
**emotional** 24:11
24:16 25:16 51:17
52:10 58:23,25
70:24,25 73:23
74:18
**empathy** 44:6,24
45:6,9,15 46:6
**employee** 8:7
13:18 58:9,13
74:10 82:16
**employees** 23:1
28:10 44:10 58:11
67:6
**ended** 47:7
**engaged** 57:16
**engagement** 14:4
14:7,23 15:3 22:8
24:17 25:19 31:4
31:23 36:18,19
40:22 41:14 43:17
45:2,12,19 54:14

CONFIDENTIAL

62:7,23,24
**engagements** 18:9
**ensure** 8:23
**ensuring** 43:4
**entire** 69:3 80:9,13
**entries** 31:11
**entry** 5:6,8,18 6:5
28:16 33:4 34:2
55:17,23 69:8
**entryway** 77:15
78:19
**ergun** 1:9 2:9 5:11
5:21,24 33:21,25
34:5,8,15,19 35:1
39:21 40:4,14,17
40:22,24 41:5,12
41:15,20 42:2,9,14
44:20 45:16 57:22
58:7 59:5 60:17
60:22,24 62:10,21
68:1
**ergun's** 42:19 58:7
59:13
**errata** 83:5,7,10
83:13
**escalate** 26:7
51:19 65:18
**escalated** 15:11,23
16:1 24:23 26:11
26:18 50:16 65:16
65:18,19
**especially** 41:24
**esq** 3:8,18
**essentially** 73:23
**estimating** 54:9
**ethics** 17:5 26:12
26:14 27:2,21
28:23 29:4 30:21
30:22 31:15 32:7
48:11 50:18 51:19
57:1,9,11,15 64:21

65:20 69:17 70:1
70:3,11
**evaluation** 42:6,15
61:19 62:2 66:1
**everybody** 19:4,7
**evolved** 37:15
**exact** 20:23 26:5
32:7 45:20 53:20
61:16
**exactly** 19:4,11
21:3 22:21 23:19
24:3 26:24 28:3
30:2 38:11 41:9
58:14 78:7
**examination** 4:4
7:8
**examined** 7:5
**example** 22:22
**examples** 35:1
**exception** 10:24
**exchange** 17:1
40:4,7 41:20
58:15,25 60:22
75:6
**excuse** 17:7
**exercise** 71:17
**exhibit** 5:3,6,8,10
5:13,16,18,20,23
6:3,5,6 16:13 21:9
23:7 27:24 28:16
33:4 34:22 37:20
39:2,20 45:17
46:13,15,16 47:18
47:19,20 55:17
57:21 60:16 65:4
69:8 73:20 75:15
**expecting** 62:22
**expedite** 80:15
**expedited** 80:20
**experience** 15:16
28:8

**experienced** 38:17
**expires** 84:25
**explain** 30:4
**explaining** 21:14
**extent** 74:2 76:14
79:4
**external** 74:10,14
74:25
**ezgar** 3:22

**f**

**f** 1:21 2:19 46:13
82:24
**fact** 22:2 23:16
50:14 61:9 63:5
68:8 79:3
**facts** 9:15
**fail** 83:15
**fairly** 37:12
**familiar** 15:13,15
33:11 47:3 51:14
51:25 60:23 69:21
**far** 31:10
**february** 13:15
14:18 15:10 29:8
30:8
**federal** 8:9 82:12
**feedback** 25:17
27:7 41:20,24,24
42:15 43:5 50:15
50:20 52:19,23
53:1,2 59:6 62:2,9
62:12,15,18 63:24
66:6,20,23 71:22
73:9,12,13
**feel** 36:8
**feeling** 35:8
**feels** 55:5
**felt** 34:11 44:23
53:12 66:3
**fifth** 39:1

**file** 27:21 65:11
**filed** 8:8,11
**finally** 68:2
**financially** 82:15
**finding** 68:19
**findings** 29:22
56:4,15,22
**fine** 22:5 80:21
**finish** 76:24 79:14
**finished** 58:3
**fire** 68:4
**fired** 31:24 32:3
**firm** 8:6 10:24,25
12:8,10,19 17:22
36:20 37:6,14
68:9,10,20,23 69:3
71:3,17,17,24 72:1
72:5,16 73:19
76:3,9 78:24
**first** 10:20 13:21
13:22 16:25 27:24
28:22 48:3,6
54:21 65:10
**five** 13:14 39:13
39:14 60:1 79:13
**flexibility** 18:15
64:15 72:8
**flexible** 68:18
**focus** 43:4 52:17
58:22 66:24 72:20
**focused** 38:14 59:5
62:1,9
**folks** 28:7
**followed** 18:12
21:17
**following** 21:20
59:15 65:9 84:5,6
**follows** 7:6 41:1
**foregoing** 81:8
82:3,5,9,11

CONFIDENTIAL

**[form - helping]**

Page 7

**form** 14:8 15:20
16:7 17:14 19:19
20:8 24:9,18 25:6
26:9 27:11 30:10
41:7 44:7 49:9
50:11 55:12 70:21
**former** 58:9,10,13
**forth** 82:4
**foundation** 17:14
27:20 32:4,17
42:25 53:15 54:15
61:24 64:22 74:15
75:1
**four** 13:14 54:9
65:9 67:13 71:13
71:25 72:4,6
**fourth** 37:21 51:10
**frame** 12:3,21
20:21,23 24:20
30:15 33:10 34:4
48:19 63:2
**frames** 50:3
**francisco** 1:3 10:5
**frank** 46:14
**frankly** 62:22
**frequently** 40:14
**friend** 68:9,23
72:1,4,16
**friends** 71:16
**front** 17:2 21:9
31:10,12 50:9
51:9 55:8 62:19
77:14 78:19 79:20
**frustrated** 25:3
27:5 34:11 35:8
51:16 52:6 53:17
**frustrating** 23:15
**frustration** 21:16
22:10 24:25
**frustrations** 53:21
53:24

**full** 7:15 23:9
**fully** 23:10
**further** 17:18
50:17 70:2 71:5
80:5 82:11,15

**g**

**g** 3:8 47:18
**gain** 56:21
**gap** 12:5
**gary** 47:18
**genc** 1:9 2:9 5:12
5:22,24 33:21
39:21 57:22 60:17
68:1
**general** 9:3 14:12
16:3 43:12
**generalization**
35:3
**generally** 8:20
34:8,10 59:16
60:21 66:19 80:1
**geoff** 3:22
**getting** 41:3 52:23
53:2 62:2,10,14
66:6,20
**gigamon** 33:13,16
33:18,21,23 34:16
35:2 36:7 37:2
40:17,22 41:3,14
41:22 42:3 50:19
50:22 58:13 62:7
63:2 64:13
**give** 18:23 19:7,15
19:16 20:23 35:1
42:2 43:22 44:1
77:9
**given** 42:5 63:11
65:16 68:17 71:20
73:6,13 76:25
77:11 82:10

**go** 16:17 20:2
24:23 29:21,22,24
30:4 44:11 53:10
61:8 72:6 74:14
74:25
**goes** 20:18 36:13
36:23,24
**going** 8:21 14:9
17:23 19:21 20:8
22:12 23:16 25:15
27:19,23 29:17
30:10 35:14,19
36:11 37:2,19
39:12 41:16,24
44:12,21,21 46:14
48:2 49:4 54:20
63:17 71:8,14,17
74:9,14,25 76:6,15
76:18,25 79:5,11
**good** 7:10,12 60:8
79:15
**gotten** 36:5
**graduate** 10:5
**great** 13:15 16:22
28:22 33:8 40:3
46:23 48:6 55:23
60:21 65:8 69:14
75:21 80:7,22
**grievances** 73:23
**group** 3:3 28:5,6,7
28:11 67:20 73:6
**guarantee** 72:13
**guess** 9:10,10,12
11:11 18:25 22:16
43:1 51:14 68:9
72:12
**guessing** 18:23
**guys** 68:4

**h**

**h** 5:1 6:1 55:16
**haavardtun** 1:9
2:9
**hand** 16:11 28:14
33:1 39:17 47:17
55:14 57:19 60:13
69:5
**handle** 57:17
70:12
**handling** 49:3
57:9
**happen** 43:19
**happens** 43:19
68:3
**happy** 23:15
**hard** 14:10,16
18:21 19:16 44:16
68:17
**harmonic** 25:19
25:23 26:7 27:4
30:14 31:4,22
32:14 34:23 43:3
50:14 57:5
**harmonic's** 32:3
**harry** 55:16
**heads** 77:1
**healy** 36:15,20
39:2
**hear** 29:25 49:18
80:16
**heard** 16:10 58:3
**hearing** 66:23
**heatley** 1:9 2:9
**held** 53:24
**help** 30:5 65:11
77:1
**helpful** 48:4
**helping** 59:5 68:8
71:23

CONFIDENTIAL

hennigan  3:13
hewitt  12:24,25
    13:4 54:10 76:22
    77:4,8
hey  22:22
hi  46:24
higher  69:18
hired  10:22,22
    11:2
historical  45:21
hold  11:4,22
honest  9:22
hour  39:13
hours  9:19
house  3:22 35:25
hr  11:12,18,21
    12:1 13:24 15:7
    15:16 16:4 52:18
    52:25 54:4,5
hueston  3:13
hueston.com  3:19
human  10:12 11:3
    11:4 13:9

**i**

id'd  31:22 32:14
idea  24:1 31:25
    32:16 42:10 65:22
identification
    16:16 28:17 33:5
    39:22 46:18 47:21
    55:18 57:23 60:18
    65:5 69:7 75:16
ignore  40:25
immediate  12:22
    12:25 13:5,11
impair  9:15
imperative  83:12
important  73:18
include  63:23
incorrectly  72:23

independently
    57:17
indicating  79:7
individual  14:19
individuals  28:11
    44:14 59:4 64:10
    71:25
industry  28:5,6,7
influence  9:14
information  33:25
    34:5,25 36:11
    41:6 61:18 76:13
    76:18 77:11
initial  5:16 47:20
    58:7
initially  11:1,25
    76:15
input  41:12
inquiries  65:9
    70:1
insight  68:3
instance  72:9
instances  24:13
    66:5
instruct  35:19
    76:18 79:6
instructing  35:18
instructions  83:1
instructs  9:4
interaction  47:8
interested  82:16
interrupt  48:2
intimately  72:20
investigate  32:8
investigated  50:4
    50:17 70:2
investigation
    29:23 30:5,8,12,20
    30:23 49:4,7,14
    50:19,21 56:8
    70:6,7

investigations
    50:4,6,10 56:18
    64:20,23 70:12
involve  8:17 76:14
involved  15:6,13
    18:5,14,22 19:5,6
    19:9,12,12,21 25:8
    25:12 30:23 32:9
    35:12 37:13 38:3
    43:7 50:12 51:21
    53:19 58:14 59:24
    64:16 70:3,10
    72:20 74:18 76:2
    80:3
involvement  8:6
    19:15 21:19 37:16
    43:12 52:25
irrelevant  34:25
issue  15:18 22:14
    25:3,8
issues  23:1 25:4,11
    25:19,21 31:22
    32:12,14,15,16
    53:12 70:18,20

**j**

j  57:20
january  1:17 2:19
    7:1 82:20
job  42:19 47:11
    68:4,9
joe  27:17 79:13
joined  12:19
jose  1:16 2:17 7:1
    12:14,15,16,18
    13:8,9,16,25 28:25
    67:13 68:23 69:2
    71:6 72:1,17
    77:15 78:10,19
    79:21
joseph  3:18

jreiter  3:19
july  69:19,24
june  56:1 66:3
    67:23 68:5
justin  28:22,23
    29:10,24 30:1
    32:13 51:4,6,8
    56:7

**k**

kessler  69:15,16
    69:20,23 71:10
kevin  36:15,20
kim  35:12 39:4,6
kind  11:16 12:5
    25:10 36:25 40:15
    51:15 52:9 72:13
    74:10 77:3
kinds  70:25
knew  19:9
know  8:12,13 9:9
    9:9 11:13 13:18
    14:11,19 15:15,22
    16:23 18:2,4,12,23
    19:4,11,17,23
    23:20,24 24:19,21
    25:10,15,17 28:20
    29:2,3 30:19,19,22
    31:7 32:12,22
    34:23 35:24 36:2
    36:2,6,16 37:4,5,7
    38:3,9,14,17,21
    39:25 41:8 42:14
    43:4,9,20,25 44:15
    44:20 45:1,4,5,9
    45:10,20 46:20,25
    47:7,12,24 48:1
    49:14 50:2,21,24
    51:6,17,20 52:1,2
    52:18,21 53:7,20
    55:3,20 56:7,8,25
    57:7 58:1,3,23

CONFIDENTIAL

**[know - mauro's]**

59:1,12,14,16,23
61:16,17 62:14,16
64:7,17 66:5,19
67:9 68:18,19
69:11 70:23,24
71:1 72:8,11
73:13,14 75:19
78:5,7,9 79:12
80:18
**knowledge** 22:13
22:25 31:3 39:5
41:5 58:10 62:24
67:4 70:5

**l**

**l** 60:15
**lack** 45:15
**lacks** 17:14 27:20
32:4,17 42:25
53:15 54:15 61:24
64:22 74:15 75:1
**ladder** 25:4
**large** 67:20
**larger** 21:13
**laura** 1:8 2:8
**lauren** 35:12 39:2
39:4,4,6
**law** 3:3
**lead** 54:10 70:6
**leader** 13:10,10,25
15:16 16:4 22:1
67:21,24 72:24
**leadership** 73:17
73:17
**learn** 33:18 76:6
**learned** 33:21
40:16,21 78:21
**leaving** 37:6
**left** 10:25 12:8,12
37:14 78:24
**level** 11:24 22:9
37:16 44:24 69:18

**levels** 44:6
**life** 47:11
**limit** 18:10
**limited** 73:6
**lin** 5:4 16:14 17:1
17:4 21:23 48:7
48:10,16,21,25
51:12,24 53:4
54:25 55:4,10
**lindsey** 17:9
**line** 20:16 24:6
37:20,21 46:24
68:17 70:17 84:8
**lines** 54:11
**list** 68:24 72:5,16
**little** 26:17 54:11
**live** 58:24 62:22
**llp** 1:8 2:8 3:13
**locations** 29:7
**long** 11:4 12:16,25
13:11 54:7
**look** 57:1 68:3,8
71:23
**looked** 25:9 29:25
30:2,14 57:8
**looking** 33:10
34:12,13 40:6
47:2 50:3 53:7
61:17 63:1 71:5
71:11 79:1
**looks** 33:11 60:23
**loosely** 51:15
**lori** 35:12
**los** 3:16
**losing** 43:7
**lot** 15:22 38:8
47:14
**lower** 38:15
**lybrand** 10:23
**lynn** 35:12

**m**

**machine** 82:7
**magee** 1:21 2:19
82:24
**mail** 5:3,4,10,11
5:13,14,20,21,23
5:24 6:3,6 16:13
16:14 17:1 20:2
20:10,16,21 21:8
21:14 23:24 39:20
39:21 40:3 41:1
46:16,17,23 47:3
47:13 57:21,22
58:6,7,16,25 60:16
60:17,22 62:19
63:4 65:4,8 71:2
75:15,21
**making** 73:19
**manager** 11:19,21
12:1 14:4 15:17
17:10,18,19,23
18:19 27:25 34:14
38:15,18 42:23
43:13,16 45:2,18
54:4,5 72:9 73:5
**managers** 18:9
44:4,14 45:14,22
68:22 69:2 71:6,8
71:13,19 72:2,4,6
72:16,24
**managing** 59:24
**map** 67:2
**mapping** 67:5
**march** 33:9 34:3
**mark** 28:15 33:3
39:19 46:15 47:19
55:16 57:20 60:15
65:3 69:7 75:14
**marked** 16:12,15
21:9 28:14,17
33:1,5 34:22

37:20 39:1,18,22
45:17 46:13,18
47:18,21 55:15,18
57:19,23 60:14,18
65:2,5 69:6,9
75:13,16
**market** 13:10 22:1
54:10 67:7,21,24
69:2 72:23
**master's** 10:10,12
10:15
**matt** 54:3,4,5,7,12
**matter** 8:3,5,7,8
8:11 13:19 20:4
21:7 25:12 26:8
26:10 29:23 37:19
53:5 57:4,12
**matters** 24:23
32:8 35:5 45:25
46:1
**mauro** 1:5 2:5
3:23 5:14 6:3
13:19 14:2 19:6,9
20:16,19 21:6,10
22:3,23,25 24:1,11
25:15,23 26:18,25
29:11,25 32:15
38:2,4 41:3,13,21
42:16,16 44:23
46:3,3,17 47:14
50:21,23,23 51:10
51:12 52:8,13
53:11,16,24 54:22
54:25 55:4 56:7
57:6 58:23 59:6
62:14 65:4 66:2,3
66:8,21 69:25
70:23 71:13,20,25
74:7,8,17
**mauro's** 34:12
44:21 45:7,11

| | | | |
|---|---|---|---|
| 53:5 54:4 | **mention** 24:22 | **necessary** 36:9 | **o** |
| **mccann** 1:10 2:10 | 25:11 | 83:4 | **o0o** 3:24 4:6 6:8 |
| **mean** 11:6 13:13 | **mentioned** 12:4 | **need** 44:25 46:25 | 80:25 |
| 14:9,16 15:7,21 | 19:1 20:11 24:24 | 60:8,9 65:10 | **oath** 7:5 82:6 |
| 16:8 19:14 20:7 | 36:14 52:5 78:25 | 80:20 | **object** 8:25 14:8 |
| 20:21 21:13 23:17 | 79:2 | **needed** 50:17 | 15:20 16:6 17:14 |
| 24:10,19,20 27:12 | **merely** 67:19 | 63:22 66:24 | 19:19 20:8 24:9 |
| 29:15 30:14 31:6 | **met** 13:23 | **needs** 54:24 | 24:18 25:6 26:9 |
| 31:14 32:7 33:11 | **middle** 20:16 | **negative** 24:12,17 | 27:11,19 30:10 |
| 34:18 35:3 37:10 | **mind** 46:5 56:19 | 25:17 | 41:7 44:7 49:9 |
| 37:14 38:1 40:13 | **minor** 8:16 | **negativity** 62:16 | 50:11 55:12 70:21 |
| 40:13 42:5 43:7 | **minutes** 39:11,13 | **neither** 82:15 | 74:2 78:14 |
| 43:19 44:13,16 | 47:1 60:1 79:13 | **nelson** 1:15 2:15 | **objection** 15:4 |
| 45:3,3,4,6,21 46:2 | **misstate** 74:2 | 4:2 5:5,11,14,21 | 25:20 |
| 46:3 47:2,6,11 | **misstates** 42:24,24 | 5:25 6:4,6 7:4,10 | **objections** 8:25 |
| 49:11,13 50:13,25 | **moment** 61:23 | 7:16,17 9:14,25 | 49:25 |
| 51:14,25 52:8,11 | **month** 10:24 | 16:14 20:14 26:20 | **obviously** 19:21 |
| 52:15,17,19,19 | **months** 12:5,6,7 | 27:23 28:14,19 | 21:17 58:17 |
| 53:6,7,16,19 54:1 | 12:20 | 31:25 32:20 35:23 | **occasion** 62:14 |
| 56:6,12,18 58:12 | **morning** 7:10,12 | 36:13 39:21,24 | **occurring** 49:7 |
| 58:21 59:3,8,10 | 61:3 | 46:17,20 47:23 | 64:20 |
| 61:21 62:13,13 | **move** 47:16 | 48:1 55:20 57:22 | **october** 17:6 20:22 |
| 63:9,16 64:24 | **movement** 58:20 | 57:25 60:17 65:5 | 20:23 23:25 28:1 |
| 65:15,18 66:21 | 59:4,7,23 | 69:11 75:15,18,24 | **office** 12:14,17,18 |
| 67:18 68:15,16,16 | **multiple** 20:10 | 76:12 79:12,19 | 12:20 13:10,16 |
| 68:25 69:1 70:9 | 50:6,8 | 81:7,16 84:20 | 15:12,18 17:5 |
| 70:10,22 71:1,11 | | **new** 3:6 17:9,18,22 | 21:3 24:11,16,16 |
| 71:18 72:12 73:3 | **n** | 19:1,2 22:2 27:25 | 25:3,16,18 26:11 |
| 73:12,17 74:16,19 | **n** 4:1 65:2 | 36:18,19,19 38:19 | 26:14 27:1 28:23 |
| 77:19 78:11,15,25 | **name** 7:13,15 | **news** 58:17 | 29:4,5,11,12 31:15 |
| 79:24 | 36:21,24,25 48:15 | **nonattorney** 76:20 | 32:7 34:7 48:11 |
| **meaning** 60:25 | 82:19 | **normal** 80:21 | 51:19 57:1,9,11,15 |
| **means** 67:5 | **named** 13:19 | **northern** 1:2 2:2 | 64:8,21 68:23 |
| **meeting** 29:9,10 | 14:19 | **notary** 81:24 | 69:16 70:11 72:1 |
| 29:14,17,20,21 | **names** 19:7 45:1 | 84:25 | 72:17 73:22 74:8 |
| 55:25 60:25 61:2 | 59:4 | **note** 55:23 80:8 | 77:15 78:10,15,19 |
| 61:15 64:2,4,5,6,7 | **nancy** 65:2 | **noted** 80:24 83:10 | 80:2,4 |
| 64:10,12,14,19 | **narrow** 45:25 | **number** 5:2 6:2 | **officer** 32:2 |
| 68:7 | **national** 15:12,18 | 53:17 68:2 | **officers** 69:18 |
| **memory** 26:17 | **nature** 32:23 35:5 | **ny** 3:6 | **oftentimes** 43:6 |
| | 57:8 63:11 64:24 | | |
| | 68:16 72:7 | | |

CONFIDENTIAL

**ogc** 35:11,13,16,21
35:24 65:11,14,14
65:20,21
**oh** 10:16 26:23
58:5
**okay** 7:10,17,20
7:22 8:3,8,15,17
8:20 9:3,5,6,12,13
10:3,6,10,14,20
11:1,4,13,20,25
12:4,13,22 13:4,15
13:21 14:14,18
16:3,24 17:6 18:8
18:17 19:9,18
20:2,25 22:5 23:7
24:5,15 25:14
26:14,23 28:13,21
28:25 29:8,19
31:1,10,19 32:12
32:25 33:6,12,18
33:22 35:23 36:8
37:2,7,17 38:6,11
39:7,14 40:1,2,8
40:24 42:2,8 44:4
46:9,12,22 47:9,16
47:16,25 48:4,5,21
51:3 52:5 53:4,23
54:7,12 55:22
56:14,21 57:3,18
58:2,16 59:7
60:19,24 61:8,20
62:6,11,22 64:1,12
64:19 65:6,17
66:8,17 67:16
68:12 69:5,13
70:5 71:25 72:15
74:13 75:9,20,24
76:11 77:3,8 78:2
78:9 79:1,11,14,15
80:1,5

**old** 17:19
**ones** 49:3
**open** 9:4 49:3,6,14
49:14 50:6 56:8
56:18 64:20,23
**opened** 30:8,16
50:4,21
**opportunities**
54:22 55:1,5
**opportunity** 50:16
68:19 71:23 80:12
**order** 60:6 80:9
**organization**
69:18 70:3
**organizational**
10:13
**organize** 67:14,20
**organized** 70:11
**original** 82:12
83:12
**originally** 10:22
**outcomes** 30:6
**outside** 36:1 68:20
71:23
**overall** 65:25
**overbroad** 24:9
42:25 54:16
**overly** 20:17

**p**

**p** 69:6
**p.m.** 17:7
**pac** 17:8
**pacific** 17:13,19
18:17 22:8,24
**page** 4:4 5:2 6:2
48:3 54:21 81:13
84:8
**pages** 81:9
**paid** 67:16
**paperwork** 77:2,4

**paragraph** 23:8
31:21,22 33:12
35:11 36:13 37:19
37:21 39:1 51:10
54:20 62:21
**part** 17:5 19:14
21:12,15 28:4,9
44:16,18 45:6,9
61:9 62:3 63:6,13
63:17,19,22 64:5
68:7,9 69:3,16
71:16 72:19 73:4
78:3
**particular** 21:7
26:10 29:5 45:6
46:4 70:5,14
**parties** 80:11
**partner** 17:9,12
33:21 36:20 42:20
42:21 43:12,16
71:9,19 72:25
73:2,7,11
**partners** 6:7 41:22
53:12 73:4,19
75:16,22
**parts** 19:23 69:2
**party** 82:17
**party's** 80:9
**pass** 46:12 65:1
75:12
**patricia** 48:7,15
**patty** 5:4 13:6,7,7
13:11 16:14 17:1
17:4 48:10,14
49:3
**pause** 8:23
**penn** 3:4
**people** 41:25 43:5
67:15,18,20 73:16
**percent** 15:24 22:4
23:3 45:24 46:3

**perform** 17:24
21:17
**performance**
34:20 41:21 42:6
45:12 52:18 61:19
63:12 66:23
**performing** 38:15
**period** 10:24 12:9
80:11
**periphery** 25:10
**person** 22:18
52:18 70:6 80:3
**personally** 18:4
**pertains** 82:11
**peter** 69:7
**pharma** 28:5
**pharmaceuticals**
28:2,8,12
**phillips** 35:12
**phone** 21:2 29:11
29:13 40:9,10
47:5,7 56:7
**photo** 77:13 78:2,4
78:5,9,11,18 79:20
79:22
**photograph** 79:11
**photos** 77:19
**physically** 78:2
**pieces** 19:23 27:15
32:9 53:18
**pipeline** 71:19
**pizali** 17:9
**place** 20:6 21:1
23:25 26:3 56:11
64:2,5,7 77:19
82:4
**placed** 77:14
**plaintiff** 1:6 2:6,16
3:2 13:19
**plaza** 3:4

**please**  9:4,10,12
  35:24 46:20,25
  47:23 49:23 55:20
  57:19,25 67:2
  69:11 75:18 76:24
  83:3,7
**pllc**  3:3
**point**  10:11 28:1
  32:18 34:15 38:6
  40:24 68:5
**policy**  71:2
**portion**  35:7
**portions**  80:12
**possible**  60:10,11
**potential**  40:17,21
**practice**  28:9
  44:22 67:12,14
  77:19
**preparing**  41:20
  42:15
**presence**  56:3
**present**  3:21 64:10
**pressing**  34:16,25
**pretty**  13:2 40:14
  41:22
**previous**  58:18,19
  59:2,17,18
**previously**  59:1
**pricewaterhouse...**
  1:8 2:8
**primarily**  44:21
  48:2
**print**  78:2
**printed**  77:6
**printing**  78:3
**prior**  13:4 17:12
  29:12 42:21 48:24
  74:2 82:5
**privacy**  44:10
**privilege**  76:12
  79:2

**privileged**  35:16
  36:10
**privy**  19:24 45:21
  46:1
**probably**  11:7,15
  11:15 13:13 14:1
  32:23 34:4 51:21
  54:9
**proceedings**  82:3
  82:5,6,13
**process**  15:25 18:8
  18:11,18 19:5,14
  19:18 21:15 24:24
  30:3,6 62:3 66:1
  68:10 69:1,4 70:4
  73:5 78:3
**processing**  80:19
**profession**  51:17
  67:4
**program**  72:1,14
**project**  17:8 36:14
  36:17 37:3,21,23
  38:7,24 42:23
  56:5,16,22 64:13
**projects**  23:20
  44:5
**promoted**  11:10
  11:18,21
**promotion**  11:9,17
  12:1
**prompted**  30:20
**proposal**  19:5,14
  19:18,22 21:15
**protective**  80:9
**provide**  9:22
  65:11,13 68:3
**provided**  27:7
**proximity**  76:8
**psychology**  10:9
**public**  81:24 84:25

**publish**  41:5
**pulling**  77:1
**purpose**  29:19,21
**purposes**  47:18
  55:15 60:14 69:7
  75:13
**pursuant**  80:9
**put**  22:24 32:19
  34:14 68:23
**pwc**  5:5,5,7,9,12
  5:15,17,17,19,22
  5:22,25,25 6:4,5,7
  7:14 10:18,21,22
  12:11,14 13:16
  14:20 16:15,15
  18:8,18 21:24
  22:14 23:1 25:5
  26:8 28:6,17 29:5
  33:5 37:18 39:21
  41:6 42:11 46:17
  47:21,21 50:7
  55:18 57:12,23,23
  60:18,18 65:5
  69:8 72:6,17 73:2
  74:9,10 75:10,16
  75:25 76:6,15,17
  77:15 78:10,19,22
  79:21
**pwc's**  15:12

**q**

**quantify**  43:18
**quarter**  41:3,14
**question**  8:23,24
  9:5 20:19 36:11
  41:9 43:8 44:2,17
  49:19,21,23 59:11
  59:15 79:8
**questions**  8:21
  48:3 80:6,8
**quick**  37:2 79:13

**quit**  74:17
**quote**  24:8 74:14

**r**

**r**  84:1,1
**raise**  25:4
**raised**  51:11,13
**rant**  70:25
**rating**  24:2 63:24
  65:25 66:4
**reach**  21:4,5 35:13
  41:23 43:6 70:15
  70:15
**reached**  21:6
  26:18 36:3 49:5
  77:8,25
**reaching**  70:16
  77:21
**read**  24:6 33:6
  49:23,24 81:8
  83:3
**reading**  49:12
  59:11
**reads**  62:21
**real**  37:2 45:7
**realize**  48:14
**really**  14:10,16
  45:23 47:12 49:18
  51:16 52:18 58:22
  59:5 66:24 73:18
**reason**  9:21,24
  43:13 45:2,18
  46:7 51:20 77:9
  83:5 84:10,12,14
  84:16,18
**reasons**  15:23
  43:20 44:13,17
  52:23 84:6
**reassign**  67:2
**reassurance**  62:23
**recall**  10:16 14:12
  14:14 15:1,5 17:2

19:13 20:5,25
21:10,12,13 23:3,5
23:19 24:3,12,21
24:22 25:7,22
26:5,16,24 27:2,16
29:10,15,19 31:6,8
32:6,9 33:11,17
34:1,3,6,10 35:6
37:11 38:11 40:3
40:6,12 42:4 46:6
47:2,15 48:20,23
48:24 49:2 50:2
50:10,13 51:7,23
52:13 53:6 54:1
54:18 55:6,25
56:2,3,12,14,17,18
57:3 59:3,22
60:22 61:25 62:8
64:14,17 66:13
69:21 70:16,19
71:15 73:9 74:11
74:13 75:8,9,11
77:18,20,22,24
79:22
**recap** 65:10
**receipt** 83:14
**receive** 10:6,14
11:9,16,25 64:1
**received** 10:8,10
10:12
**receiving** 46:23
**recess** 39:16 60:5
79:16
**recognition** 17:8
**recollect** 9:15
14:10 48:18
**recollection** 17:21
27:4 29:24 36:4
41:19 47:13 49:12
51:1 52:3 57:6
58:12,20 59:21

63:21 69:25
**recommendation**
27:6
**record** 7:15 16:18
16:20 30:18 49:24
60:3 61:4 79:14
79:17 80:8 82:6,9
**recount** 50:24
**refer** 52:9 68:24
72:5
**reference** 59:10,14
**referred** 37:1
59:17 65:24
**referring** 17:13
20:9 27:18,21
42:8 58:11,19
59:2 61:4,5,11
62:25 65:23
**reflection** 73:24
**refresher** 8:20
**regard** 75:6
**regarding** 8:3 15:2
15:12 18:17 55:10
**regardless** 30:22
**reiter** 3:18 8:12
14:8 15:4,20 16:6
17:14,20 18:3,20
19:3,19 20:8
22:15 24:9,18
25:6,20 26:9
27:11,13,19 30:10
31:5,17 32:4,17
35:14,19 36:10
37:24 39:12,15
41:7,18 42:12,24
43:10,24 44:7
48:9 49:9,25
50:11 52:16 53:15
54:15 55:12 57:13
59:20 60:2,4,8,10
61:24 64:22 68:14

70:8,21 74:1,15
75:1 76:1,17
77:23 78:12,14
79:4,15 80:7,18
**related** 8:7 15:7
30:14 34:20 36:6
38:21 43:3 50:22
57:8 61:18 73:15
**relates** 30:13 57:2
**relation** 25:18
56:4 57:4
**relationship** 35:10
**relationships**
73:16
**relative** 82:16
**relayed** 56:15
**relying** 34:2 47:12
48:19 49:11 50:9
55:7
**remain** 64:13,15
**remember** 16:25
21:3 26:2 28:3
29:8,17 30:15
33:8,15 34:8
38:19 40:13 46:23
47:4,9 48:16
51:12 52:8,25
53:4,19 54:25
55:4,9 56:10,20,24
58:14 69:19 71:10
74:24 75:2,5,21
**remove** 27:6 66:9
**removed** 31:4,8,23
66:11 79:23
**repeat** 49:17,19
**rephrase** 78:16
**report** 5:16 12:23
12:24 47:20 54:7
74:9 75:10
**reported** 1:21 54:5
78:22

**reporter** 2:20
16:17,19 49:22
60:6,9,12 80:14,17
80:22 82:2
**reporting** 54:11
**reports** 15:17
**represent** 7:13
**representatives**
28:24
**representing** 8:6
**reputation** 54:23
**request** 58:18
59:17,19 66:8,16
67:1 80:4
**requested** 59:12
82:14
**resident** 7:18
**resources** 10:13
11:3,5 13:10
**respect** 15:3 25:2
30:8 33:9 40:11
42:3,22 45:14
49:7 54:13 56:16
73:10
**respond** 58:16
61:2 76:4
**responding** 9:8
59:11
**response** 58:22
65:15
**responsibility**
79:25 80:1
**result** 26:6 30:7,23
44:22 50:20 58:17
64:21 66:6,22
**retaliated** 66:4
**retaliation** 51:11
51:13 52:6 65:11
**retaliatory** 8:18
**retrieve** 77:3

CONFIDENTIAL

**[return - speaking]**                                                                                  Page 14

**return**  83:12
**returned**  10:25
    12:9
**revenue**  17:8
**review**  16:22
    28:19 29:24 39:24
    41:23 46:20 47:23
    55:20 57:25 69:11
    75:18 82:13
**reviewed**  16:1
    28:21 40:2 46:22
    48:5 55:22 58:2
    60:19 65:6 69:13
    70:2 75:20
**reviewing**  40:1
    47:25 58:4 60:21
    73:5
**right**  17:11 22:24
    31:12,19 33:23
    36:13 44:20 45:13
    51:23 56:10 59:1
    59:16 61:9,21
    63:5 66:17
**rights**  44:10
**rob**  61:2,5,6 63:9
    63:11 64:2,3,9
    66:9,11,12,18,20
**robert**  1:8 2:8
**role**  11:1,3,5,9,12
    11:21,22,23 13:25
    15:8 37:14 54:10
    71:14
**roles**  71:7
**roll**  40:17 43:13
    45:18
**rolled**  33:16,19
    34:13 37:3,8
    38:23 40:21 41:3
    41:14 42:3 43:16
    44:5,14,15,21 45:2
    45:23 46:7 52:24

58:18 62:7
**rolling**  42:23 71:3
**roughly**  10:16
    19:21
**rpr**  1:21 2:20
    82:24
**rule**  9:3
**rush**  60:8

**s**

**s**  5:1 6:1 75:14
**sam**  75:14
**san**  1:3,16 2:17 7:1
    10:5 12:14,15,16
    12:18 13:8,9,16,25
    28:25 67:13 68:23
    69:2 71:6 72:1,17
    77:15 78:10,19
    79:21
**saw**  41:12
**saying**  24:17 51:23
    71:10 74:25
**says**  27:24 31:22
    34:23 40:25 41:13
    44:20 51:10 58:7
    60:24 65:10 70:18
    72:22
**scenarios**  18:13
**schedule**  23:23
**school**  10:5
**scrutinizing**  34:24
    35:2
**sec**  75:10 78:22
**second**  16:18
    33:12 37:20 62:21
    66:8
**securities**  75:6
**see**  25:14 51:6
    59:10
**seeing**  14:7
**seek**  41:25 43:16

**seen**  43:15,16,23
    44:25 45:1,17
**sending**  75:21
**senior**  11:12,21
    12:1 14:4 15:17
    15:17 17:9,18,19
    17:23 18:9,19
    27:25 34:13 42:23
    43:13,16 44:4,14
    45:1,14,18,22
    68:22 69:1 71:6,8
    71:13,18 72:2,4,6
    72:9,15,24 73:5
**sentence**  20:9 23:9
    23:9 27:24 40:25
    41:13,16 42:11
    72:22
**sentences**  42:8
**separated**  76:9
    77:20 78:24
**separation**  76:3
**separations**  77:7
**series**  8:21
**services**  80:3
**set**  18:11 23:9,12
    24:6,8 29:17 40:9
    40:10 73:20 82:4
**setting**  68:20
**seventh**  31:21
**share**  30:1 33:25
    34:15 43:2 54:12
    61:14,20,22 62:6
    66:17 74:9
**shared**  23:4,21
    34:8 42:10,16
    52:20 66:2 71:12
**shaw**  13:6,7,7,11
**shawna**  12:24
    54:10 76:22
**sheet**  83:6,7,10,13

**shorthand**  2:20
    36:25 82:1,7
**shown**  81:12
**shy**  13:2
**sign**  83:7
**signature**  82:23
**signing**  83:9
**similar**  22:14
    34:23 43:2 45:2
    73:12
**situation**  45:6
**situations**  18:13
    52:22 72:14
**six**  10:24 12:4,6,7
**sixth**  3:14 70:17
**skills**  54:24
**skip**  46:14
**smith**  3:3
**snapshot**  42:7
**soft**  54:24
**somebody**  25:5
    39:5
**somewhat**  73:24
**soon**  60:10
**sorry**  9:7 26:20
    27:18 35:17 40:19
    46:10 48:14 49:17
    53:9 58:5 63:15
    76:24 80:16
**sort**  80:18
**sought**  42:22
**sound**  23:22
**sounds**  15:13,15
    51:25 74:5 79:15
**south**  2:17
**space**  83:5
**speak**  27:21 29:13
    40:9,10 73:1
**speaking**  23:22
    46:3 63:8 69:20
    69:23

CONFIDENTIAL

**[speaks - things]**                                                     Page 15

speaks   27:13
  31:17
specific   25:4 42:4
  44:1,10,17 45:1
  51:7 65:9 71:1
  72:10 73:9 79:22
  80:12
specifically   14:14
  28:7 40:12 54:18
  55:6,13 62:11
  74:24 75:3 77:25
specifics   14:10
  15:6,14 19:16
  24:21 29:15 30:15
  32:10,24 35:6
  38:20 47:2,15
  53:20 54:2 56:12
  56:17,24 59:3
  74:11
specify   20:9
speculate   9:12
speculating   63:14
  63:15
speculation   17:20
  18:3,20 19:3
  22:15 31:5 32:5
  37:24 41:18 42:12
  44:8 49:10 52:16
  57:13 70:8 76:1
spelled   72:23
spend   38:2
spending   38:22
spoke   48:11,25
  50:13
spots   73:6
spotted   53:14
ss   81:3
staff   44:23 77:20
staffing   38:14,19
standalone   46:6

standard   30:3
  77:6,7,19
standpoint   53:1
stands   46:5
start   10:20 43:14
  68:8
state   7:14 8:11
  10:4 22:3 74:18
  81:2 82:2 83:4
stated   20:3,17
  75:3
statement   20:20
  41:2
states   1:1 2:1 71:6
steele   54:3,4,7,12
steps   30:4 34:24
steve   1:9 2:9 69:15
  69:16 70:3,14,16
stig   1:9 2:9 43:3
stop   51:21
stopped   34:6
street   3:14
string   5:3,10,13,20
  5:23 16:13 39:20
  46:16 57:21 60:16
structured   67:10
style   34:12 45:7,11
  46:4 62:15,15
  73:17
stylistic   74:21
subject   46:24
  81:11 83:9
subscribed   81:20
  82:18 84:22
substance   35:20
success   68:20
successful   66:25
sufficient   44:6,24
suggestion   41:2
suggestions   41:12
  41:17 42:9,10

suite   2:17 3:5,15
sunday   41:11
supervisor   12:23
  13:1,5,12
sure   8:13 16:19
  18:5 20:12 24:24
  29:16 37:8 40:20
  41:11 47:7 49:20
  52:11 60:12 68:18
  71:22
susan   1:21 2:19
  82:24
sustain   73:15
sworn   81:20 84:22
system   66:13
systematic   66:15
systems   12:9

**t**

t   5:1 6:1 84:1
take   12:6 39:10,13
  39:14 43:10 50:18
  59:25 79:13
taken   2:16 39:16
  59:13,22 60:5
  79:16 82:3
talk   21:23 50:17
talked   21:25 30:19
  40:14 50:14 51:6
  51:8 56:13 73:25
talking   23:5 48:16
  48:18 56:8
tania   17:10,23
  27:25 28:1
team   28:5 58:9
  67:2,3,7,7,8,16,17
  67:21,24,24
teaming   34:23
teams   53:13 67:10
  67:11,13,15,18,22
technical   32:23
  35:5 38:20 53:18

57:7
technology   28:10
telephone   8:22
  47:9
telephonically   3:9
  3:23
tell   18:5 35:25
  38:6 64:12
telling   33:15 51:12
  54:25 55:4 74:13
term   51:15 73:22
terminate   68:6
  76:7,16
terminated   12:11
  75:24 77:10
terms   11:11 15:14
  18:13 21:14 22:18
  25:9 26:17 30:3
  34:19 35:7,9 38:9
  38:15,20 41:20
  42:15 44:17 45:7
  58:21 59:4,14
  66:7,23 70:11
  71:18 73:5,14,18
testified   7:6 40:20
  73:21
testifying   82:5
testimony   9:22
  42:24 74:3 81:9
  82:9
text   20:15
texts   58:9
thank   7:12 31:3
  37:17 39:15 48:6
  67:23 80:14,22
thanks   47:1 79:15
thing   61:25 63:4
  79:19
things   14:7 15:23
  16:1 24:17 37:10
  52:10,13,20 53:18

**[things - vaguely]**                                                                 Page 16

70:25
**think**  9:21 20:10
  22:10,10 23:13
  26:21 27:13 29:6
  36:23,24 37:15
  43:23 45:4,4,5,9
  45:10 50:25 59:9
  61:22 62:3 63:9
  63:14,16,24 67:25
  69:17 73:22
**thinking**  19:13
  23:13 33:20 34:17
  37:4,4 46:2 62:13
**third**  20:16 35:11
  37:20 54:21 67:1
**thirty**  83:13
**thorson**  1:8 2:8
  14:19,23 15:2
**thread**  58:6 62:20
  63:1
**threaten**  74:17
**threatened**  68:6
  74:17
**threatening**  75:9
**three**  54:9
**tied**  68:25
**tier**  54:22 65:25
  66:7
**tim**  21:25 22:22
  39:7 61:2,5,6,9
  63:5,8,13,17,19,21
  63:22 64:2,3,9
  72:22 73:4
**time**  7:22,25 9:12
  9:16 11:23 12:3,9
  12:11,20 13:18,21
  13:22 14:6,18,22
  15:1,10 16:4,5
  20:21,22 21:19
  22:1,9 23:4,13,21
  23:23,24 24:20

30:15 33:10 34:4
  35:13 36:2,8
  37:13,16,23 38:3
  38:22 40:9,10,19
  42:18 43:10 48:19
  48:25 49:4,15,20
  50:3 53:23 54:5
  56:9,21 59:6 61:7
  63:1,9,12 64:15
  65:14 67:7,25
  68:6,11,17 70:19
  78:21 80:2,11,19
  80:21,24 82:4
**times**  24:8,11,15
  25:15 43:15,23
  44:4 70:23 74:17
  74:19
**timing**  26:5 78:7
**timothy**  1:9 2:9
**title**  42:19
**titled**  31:11
**titling**  11:23
**today**  9:23 11:22
  11:24 72:15
**told**  22:22 71:6
  76:15,17,20
**topic**  58:23
**touch**  36:5 76:11
  80:2
**tough**  11:6
**traci**  1:15 2:15 4:2
  5:4,11,14,21,24
  6:4,6 7:4,16 16:14
  36:14 39:2,21
  40:25 46:17 57:22
  60:17 65:5 70:18
  75:15 81:7,16
  84:20
**track**  43:8
**traits**  45:16,17

**transcribed**  33:13
  82:8
**transcript**  60:7
  80:10,13,15,19
  81:11 82:9,12,14
  83:14,15
**transferred**  13:24
**transpired**  25:9
**treated**  34:11
**trigger**  52:9
**true**  72:21 81:10
  82:9
**trusting**  73:16
**truthful**  9:22
**trying**  10:16 22:11
  26:16,20 37:11
  45:3 49:20 50:24
  52:13 64:14 74:20
**turn**  23:7 27:23
**turnaround**  80:21
**turning**  24:5 51:9
  55:8 63:3
**turnover**  31:7
**two**  11:8 13:2,2
  27:15 39:10 40:9
  51:1 59:18
**tye**  1:8 2:8 14:19
**type**  31:11 80:4
**typed**  31:14,15
**typical**  41:22 62:3
  66:14
**typically**  62:1
  63:10

| u |
|---|
**u.s.**  75:22
**uc**  10:5
**ultimate**  27:5 76:3
**ultimately**  72:6
**unable**  9:22
**unclear**  22:17
  63:16

**unconventional**
  46:5
**uncovered**  53:12
**undergrad**  10:4,6
**undersigned**  82:1
**understand**  9:1
  14:22 21:18 22:11
  28:4 30:5 41:9
  49:20 66:3 67:10
  74:23
**understanding**
  36:6 38:4 41:15
  50:1 56:22 72:11
**understood**  34:19
  45:5 53:24 66:7
  66:16 71:22 74:19
**underutilized**
  23:11
**unfortunately**
  58:8
**unheard**  43:21
**united**  1:1 2:1
**university**  10:1,4
**unsubstantiated**
  56:19
**upcoming**  29:14
**update**  33:9 41:1
**upset**  27:9
**use**  45:15,15 52:5
  52:9 71:15 72:12
  77:6
**usually**  66:22
**utilization**  24:2

| v |
|---|
**vague**  14:8 15:4
  25:20 26:17 30:11
  37:25 41:7 42:25
  47:13 54:15 58:12
  61:24 67:9 78:14
**vaguely**  40:12
  51:14 56:2 66:13

CONFIDENTIAL

**[vaguely - zone]**                                    Page 17

69:21 78:25
**value**  73:18
**various**  29:6 43:20
**voiced**  22:17
**volume**  2:16 4:3
**voluntarily**  12:12
**vs**  1:7 2:7

**w**

**wallace**  28:22,23
28:25 29:2,9,13,13
32:13,20 33:8,15
51:4 55:24,25
56:3,15 57:4
**want**  9:10 18:25
20:9 36:1,2 37:8
44:9 48:2 59:16
60:6 66:18 67:9
72:12 79:19 80:15
**wanted**  33:18 40:9
41:16 62:4 68:18
69:25 80:8
**wants**  80:18
**ward**  61:6 63:9
66:9,18
**way**  67:20 75:3
**we've**  15:25 28:11
39:12 45:22 56:12
**wednesday**  2:19
7:1 61:3
**week**  60:11 61:1
**welcome**  41:2
**welcomes**  42:9
**went**  74:8 78:6,8
**west**  3:14
**whereof**  82:18
**wish**  84:5
**withdraw**  26:1
33:14 77:12
**withdrawn**  21:21
37:18 79:12

**withheld**  54:22
55:1,5
**witness**  8:13 14:9
15:5,21 16:8,12
17:15,21 18:4,21
19:4,20 22:16
24:10,19 25:7,22
26:10 27:12,15
30:12 31:6 32:6
32:21 33:1,6
35:15 38:1 39:18
41:8,19 42:13
43:1,25 44:12
46:13,13 47:17
48:10 49:11 50:1
50:12 52:17 53:16
54:17 55:13,15
57:14,19 59:21
60:14,19 61:25
64:24 65:2,6
68:15 69:6 70:9
70:22 74:4,16
75:2,13 76:2,21
77:24 78:13 79:6
79:9 81:7 82:18
83:1
**witnesses**  82:4
**word**  38:8 45:20
52:4,5,11,12 63:17
71:16
**words**  31:11 45:10
51:18 52:1,9 55:2
61:16 64:17 72:12
75:3
**work**  10:18 12:13
12:15 17:22 19:1
19:2,22 21:17
22:2,12,19 23:14
23:18 28:10,11
29:4 34:24 36:19
53:5 54:24

**worked**  12:16,18
12:19 14:19 20:17
28:4 72:8
**working**  10:20
12:7 13:16 14:23
35:10 38:3,16,20
44:22 57:1,10,12
68:10,10 72:17
80:3
**write**  17:6
**writer**  32:13
**writes**  41:2 42:9
60:24
**writing**  16:25 17:3
32:19
**wrote**  20:15 21:8
21:14 23:8 61:21
63:4

**x**

**x**  4:1 5:1 6:1 82:14

**y**

**yeah**  15:5,21 16:8
17:7 21:12 22:9
22:16 23:3 24:3
24:19 25:22 27:15
31:6 32:6,21
34:17 36:23 37:10
39:12 41:8 42:13
43:1,25 45:3,3,20
47:6,11 49:11,19
50:1,12,25 51:6,21
51:25 52:10,17,24
53:6,7 54:1,17
55:3,6,13 56:2,6
56:17 57:14 59:14
59:21 60:4 63:1
63:25 64:4,4
65:21 66:1 67:6
68:15 69:21 70:9
70:22 71:11,12,15

72:18 73:3 74:4,4
74:11,16 75:2
76:2,21 77:20,24
78:13,20,23 79:9
79:24
**year**  7:23,24,25
8:4 10:14 61:18
62:2,3 63:23
65:24,25 66:7
**years**  11:8,8 13:2
13:3,14 47:15
53:16 54:10 73:8
73:14
**yep**  20:12 22:21
31:2 69:22
**york**  3:6

**z**

**zone**  36:14,17,21
37:19,23 38:7,23
56:4,16,22,24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.