# DX1649

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MAURO BOTTA

      Plaintiff,

 vs.               Case No.  3:18-CV-02615-RS


PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

      Defendants.
--------------------------------/




---oOo---

** CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF MAURO BOTTA

Tuesday, September 25, 2018

---oOo---




Reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523

Job No. NY-191159

**DX1649-1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MAURO BOTTA

          Plaintiff,

 vs.                          Case No.  3:18-CV-02615-RS


PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

          Defendants.
--------------------------------/




          VIDEOTAPED DEPOSITION OF MAURO BOTTA,

taken at WINSTON & STRAWN LLP, 101 California

Street, 38th Floor, San Francisco, California,

on Tuesday, September 25, 2018, at 9:05 a.m., before

Lorrie L. Marchant, California Certified Shorthand

Reporter, RMR, CRR, CCRR, CRC.

**DX1649-2**

```
 1                    A P P E A R A N C E S

 2

 3     Appearing as counsel on behalf of Plaintiff:

 4              INGRID M. EVANS, Esquire
                EVANS LAW FIRM, INC.
 5              3053 Fillmore Street, #236
                San Francisco, CA 94123
 6              (415) 441-8669
                ingrid@evanslaw.com
 7

 8     Appearing as counsel on behalf of Defendants:

 9              JOHN C. HUESTON, Esquire
                YEGOR FURSEVICH, Esquire
10              JOSEPH A. REITER, Esquire
                HUESTON HENNIGAN, LLP
11              523 West 6th Street, Suite 400
                Newport Beach, CA 92660
12              (213) 788-4340
                jhueston@hueston.com
13              yfursevich@hueston.com
                jreiter@hueston.com
14

15     Also present:

16              Ralna Ramse, Videographer

17                       ---oOo---

18

19

20

21

22

23

24

25
```

**DX1649-3**

Confidential
MAURO BOTTA - 09/25/2018                                    Page 4

```
 1                    I N D E X

 2                 INDEX OF EXAMINATION

 3   EXAMINATION BY                                  PAGE

 4   MR. HUESTON                                       10

 5                    ---oOo---

 6     INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 7     EXHIBIT        DESCRIPTION                    PAGE

 8   [Exhibit 1]   Document entitled "2023            32
                   Manager," PwC_B00002625 -
 9                 PwC_B00002629

10   [Exhibit 2]   Document entitled "2710            39
                   Resolving Differences in
11                 Professional View Among
                   Personnel Assigned to an Audit
12                 Engagement," PwC_B00008300 -
                   PwC_B00008303
13
     [Exhibit 3]   PCAOB document entitled "AS        45
14                 1215:  Audit Documentation"

15   [Exhibit 4]   Document entitled "2570 Manager    51
                   Review Responsibilities,"
16                 PwC_B00008290

17   [Exhibit 5]   Document entitled "Engagement      55
                   Leader and Manager Checklist,
18                 PwC_B00006158 - PwC_B00006168

19   [Exhibit 6]   PwC document entitled "Covad       69
                   Communications Group, Inc.,
20                 Valuation Specialist Completion
                   Memorandum:  Valuation
21                 Procedures Performed Re:
                   Acquisition of MegaPath as of
22                 August 20, 2010 and Speakeasy as
                   of August 25, 2010 in Accordance
23                 with ASC 805, 'Business
                   Combinations,'" PwC_B00001536 -
24                 00001543

25
```

**DX1649-4**

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2      EXHIBIT          DESCRIPTION                    PAGE

 3    Exhibit 7      Memo to CCGI Holding Corporation    71
                     - 12/31/2011 Audit File from
 4                   Mauro Botta, dated 2/29/2012,
                     subject:  Deferred Revenue
 5                   Acquired in 2010 Analysis (Bates
                     stamps illegible)
 6
      Exhibit 8      e-mail correspondence, dated        74
 7                   3/23/2012, subject: Covad -
                     Deferred Revenue 2010,
 8                   PwC_B00001527

 9    Exhibit 9      e-mail correspondence, dated        76
                     7/24/2012, subject: Peer Review
10                   Notification - CCGI Holding
                     Corporation - Week of August 13
11                   - your input required,
                     PwC_B0000732 - PwC_B0000737
12
      Exhibit 10     e-mail correspondence, dated        78
13                   4/27/2013, subject: Performance
                     Note, PwC_B0000361 -
14                   PwC_B0000363 and PwC_B0000169

15    Exhibit 11     e-mail correspondence, dated        85
                     4/27/2013, subject: Performance
16                   Note, PwC_B0000336 -
                     PwC_B0000338
17
      Exhibit 12     Oversized blowup of spreadsheet     89
18                   entitled "Individual Control
                     Deficiencies - Summary," first
19                   page

20    Exhibit 13     Oversized blowup of spreadsheet     92
                     entitled "Individual Control
21                   Deficiencies - Summary," second
                     page
22
      Exhibit 14     Oversized blowup of spreadsheet     93
23                   entitled "Individual Control
                     Deficiencies - Summary," third
24                   page

25    Exhibit 15     Amended Complaint                   96
```

DX1649-5

Confidential
MAURO BOTTA - 09/25/2018                    Page 6

```
 1     INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2     EXHIBIT        DESCRIPTION                    PAGE

 3     Exhibit 16     e-mail correspondence, dated     99
                      3/21/2016, subject: Harmonic -
 4                    SLA Memo for review,
                      PwC_B0000635
 5
       Exhibit 17     PwC memo to Harmonic, Inc.,      99
 6                    dated 12/31/2015, PwC_B00000636
                      - PwC_B00000644
 7
       Exhibit 18     e-mail correspondence, dated    101
 8                    1/28/2016, subject: Sab 99 -
                      harmonic, PwC_B00000598
 9
       Exhibit 19     e-mail correspondence, dated    101
10                    1/24/16, subject: SAB 99
                      Analysis of Daily Convention
11                    Impact on 2014 and 2015 Income
                      Statements and Balance Sheets,
12                    PwC_B00000599 - PwC_B00000605

13     Exhibit 20     e-mail correspondence, dated    105
                      2/12/2016, subject: Harmonic -
14                    notes from this morning's
                      discussion - action required,
15                    PwC_B00000609

16     Exhibit 21     Harmonic document entitled      105
                      "Discussion - 2/11/16,"
17                    PwC_B00000607 - PwC_B00000608

18     Exhibit 22     Screenshot                      109

19     Exhibit 23     Complaint to the SEC, Reference 120
                      Number:  TCR1478218903573,
20                    PLAINTIFF 0030 - PLAINTIFF 00178

21     Exhibit 24     e-mail correspondence, dated    129
                      2/24/2014, subject: Cavium,
22                    PwC_B00000481 - PwC_B00000482

23     Exhibit 25     e-mail correspondence, dated    131
                      2/2/2014, subject: The memo,
24                    sorry for the delay :-),
                      PwC_B00007392 - PwC_B00008250
25
```

**DX1649-6**

Confidential
MAURO BOTTA - 09/25/2018                              Page 7

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2      EXHIBIT        DESCRIPTION                      PAGE

 3    Exhibit 26    e-mail correspondence, dated        134
                    2/21/2014, subject: Accounting
 4                  memo attached - DRAFT,
                    PwC_B00001570 - PwC_B00001577
 5
      Exhibit 27    e-mail correspondence, dated        143
 6                  2/22/2015, PwC_B00000390 -
                    PwC_B00000398
 7
      Exhibit 28    e-mail correspondence, dated        161
 8                  3/2/2015, subject: consultation
                    memo
 9
      Exhibit 29    e-mail correspondence, dated        169
10                  3/2/2015, subject: tax memo
                    gsiii comments.docx,
11                  PwC_B00006366 - PwC_B00006371

12    Exhibit 30    e-mail correspondence, dated        171
                    3/2/2015, subject: Revised TC
13                  and Clean, PwC_B00006239 -
                    PwC_B00006246
14
      Exhibit 31    e-mail correspondence, dated        191
15                  8/7/2016, subject: Capitolo 17!!

16    Exhibit 32    e-mail correspondence, dated        193
                    7/8/2011, subject: Capitolo
17                  12..., PwC_B00000562 -
                    PwC_B00000572
18
      Exhibit 33    Document entitled "Case Detail      208
19                  Report:  2016-0714,"
                    PwC_B00005915 - PwC_B00005940
20
      Exhibit 34    Document entitled "Case Detail      212
21                  Report:  2017-0323,"
                    PwC_B00005963 - PwC_B00005984
22
      Exhibit 35    e-mail correspondence, dated        239
23                  6/23/2017, subject: You're
                    Invited:  xLos 'Path to
24                  Partnership' informational
                    webcast, PwC_B00000080
25
```

**DX1649-7**

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2      EXHIBIT        DESCRIPTION                        PAGE

 3    Exhibit 36     e-mail correspondence, dated        240
                     6/28/2017, PwC_B00000209
 4
      Exhibit 37     e-mail correspondence, dated        241
 5                   6/30/2017, subject: Infiniti
                     Wars, PwC_B00008218 -
 6                   PwC_B000008220

 7    Exhibit 38     e-mail correspondence, dated        243
                     7/11/2017, subject: Invitation:
 8                   Mauro & Gary Catch-Up @ Tue Jul
                     11, 2017 8:30 - 9 am,
 9                   PwC_B00000056 - PwC_B00000057

10    Exhibit 39     e-mail correspondence, dated        246
                     7/27/2017, subject: Feedback
11                   need - please reply and help.
                     Thanks!, PwC_B000000245 -
12                   PwC_B00000247

13    Exhibit 40     e-mail correspondence, dated        250
                     11/26/2016, subject: mail,
14                   PwC_B000000748 - PwC_B00000797

15    Exhibit 41     Employment Offer Letter to Mauro    261
                     Botta from Armanino, dated
16                   7/28/2017, PLAINTIFF 0099 -
                     PLAINTIFF 00101
17
      Exhibit 42     Document entitled "Chat with        273
18                   brian.dalton@gmail.com,"
                     PLAINTIFF 00710 - PLAINTIFF
19                   00713

20    Exhibit 43     Document entitled "Gmail Hangout    277
                     with Mario Piergallini,"
21                   PLAINTIFF 00661 - PLAINTIFF
                     00664
22
      Exhibit 44     e-mail correspondence, dated        299
23                   2/12/2018, subject: Mauro

24                         ---oOo---

25
```

```
 1                 SAN FRANCISCO, CALIFORNIA

 2                 Tuesday, September 25, 2018

 3                         9:05 a.m.

 4                        ---oOo---

 5          THE VIDEOGRAPHER:  Here begins videotape       09:05:22

 6  No. 1 in the deposition of Mauro Botta, in the

 7  matter of Mauro Botta versus PricewaterhouseCoopers,

 8  LLP, et al., in the United States District Court,

 9  Northern District of California.  Case No.

10  3:18-CV-02165-RS [sic].                                09:05:38

11          Today's date is September 25th, 2018.  The

12  time on the video monitor is 9:05 a.m.  The video

13  operator today is Ralna Ramse.

14          This video deposition is taking place at

15  101 California Street, 35th Floor, in San Francisco,   09:05:59

16  California.

17          Counsel, please voice-identify yourselves

18  and state whom you represent.

19          MS. EVANS:  Ingrid Evans for the plaintiff.

20          MR. HUESTON:  Good morning.  John Hueston       09:06:12

21  of Hueston Hennigan on behalf of PwC.

22          MR. REITER:  Joe Reiter on behalf of PwC.

23          MR. FURESVICH:  Yegor Furesvich on behalf

24  of PwC.

25          THE VIDEOGRAPHER:  The court reporter today     09:06:26
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 10

```
 1   is Lorrie Marchant of Epiq Global.               09:06:27

 2           Would the court reporter please swear in

 3   the witness.

 4                   MAURO BOTTA,

 5    FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:  09:06:33

 6              EXAMINATION BY MR. HUESTON

 7           BY MR. HUESTON:

 8      Q.   Good morning, Mr. Botta.

 9           Could you please state your name and

10   address.                                          09:06:51

11      A.   Mauro Botta.  88 East San Fernando Street,

12   Unit 1308, San Jose, California 95113.

13      Q.   Okay.  Have you ever been deposed before?

14      A.   No.

15      Q.   And you understand you are testifying under 09:07:09

16   oath?

17      A.   Yes.

18      Q.   Under penalty of perjury?

19      A.   Yes.

20      Q.   The same as if you were testifying in a    09:07:18

21   court of law; yes?

22      A.   Yes.

23      Q.   So one of the things we have to make clear

24   is we need -- a nod of the head, I understood you

25   meant "yes" by that, but we have to make every     09:07:30
```

**DX1649-10**

```
 1   answer oral.                                          09:07:33

 2          So if I ask for a question and you intend

 3   to say "yes," please say "yes" or give an oral

 4   answer for the record.

 5          Do you understand that?                        09:07:39

 6      A.   Okay.

 7      Q.   The other thing that I'm sure your counsel

 8   will tell you is even though you may know exactly

 9   what I'm going to say, allow me to finish my

10   question for the record before you begin your        09:07:50

11   answer.  And likewise, I will try not to interrupt

12   you, and I will wait for you to give your answer

13   before I give my next question.

14          Do you understand that?

15      A.   Yes.                                          09:08:00

16      Q.   Okay.  Thank you.

17          Have you ever been convicted of a crime?

18          MS. EVANS:  Overbroad.

19          You can answer.

20          THE WITNESS:  No.                              09:08:11

21          BY MR. HUESTON:

22      Q.   Have you ever been sued before?

23      A.   No.

24      Q.   After you were terminated from PwC, did you

25   keep any e-mails that were sent or received by your  09:08:23
```

1    PwC e-mail address?                                    09:08:27

2         A.   Can you repeat the question?

3         Q.   Sure.

4              After you were terminated from PwC, did you

5    keep any e-mails that were sent or received by your    09:08:37

6    work PwC e-mail address?

7              MS. EVANS:  Vague and ambiguous.

8              THE WITNESS:  There were e-mails that were

9    filed to the Department of Labor that I did have

10   copy of.                                               09:09:03

11             BY MR. HUESTON:

12        Q.   And when you say "that were filed with the

13   Department of Labor," how many e-mails were they?

14        A.   I do not recall the number of e-mails.

15        Q.   Okay.  And when you say "filed with the      09:09:18

16   Department of Labor," what do you mean by that?

17        A.   As part of the complaint that I filed, I

18   attached as exhibits those e-mails.

19        Q.   Okay.  And then other than the e-mails that

20   you attached as exhibits to your Department of Labor   09:09:35

21   filing, have you kept any other PwC e-mails?

22             MS. EVANS:  Overbroad.  Vague and ambiguous

23   as to time.

24             THE WITNESS:  Not that I recall.

25   ///

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 09:09:52 |

1    BY MR. HUESTON:                                09:09:52

2    Q.   Okay.  I mean, sitting here today, do you

3    have other e-mails from your old PwC account, other

4    than what you just described, as attached as

5    exhibits to your Department of Labor filing?       09:10:01

6         MS. EVANS:  Overbroad.  Vague and ambiguous

7    as to time.

8         THE WITNESS:  Not that I recall.

9         BY MR. HUESTON:

10   Q.   Okay.  When you worked at PwC, did you use   09:10:13

11   Sametime to chat with others?

12   A.   Yes.

13   Q.   And did you retain possession of any of

14   your Sametime chats from the time that you were

15   employed at PwC?                                   09:10:32

16        MS. EVANS:  Overbroad.  Vague and

17   ambiguous.

18        BY MR. HUESTON:

19   Q.   You can answer.

20   A.   No.                                           09:10:38

21   Q.   Did you also use a smartphone device for

22   PwC business?

23   A.   Yes.

24   Q.   And what type of device did you use?

25   A.   BlackBerry.                                   09:10:58

```
 1      Q.   And are there any PwC materials stored on      09:11:02

 2   that BlackBerry?

 3           MS. EVANS:  Vague and ambiguous.

 4   Speculation.

 5           THE WITNESS:  No.                               09:11:10

 6           BY MR. HUESTON:

 7      Q.   Okay.  Do you have any personal e-mail

 8   accounts?

 9      A.   Yes.

10      Q.   What are your personal e-mail accounts?        09:11:19

11           MS. EVANS:  Vague and ambiguous.  Do you

12   want the e-mail address?

13           BY MR. HUESTON:

14      Q.   Yeah, you can give the e-mail address or

15   addresses.                                             09:11:29

16           MS. EVANS:  Privacy.

17           You can choose not to answer that if you

18   want, or you can go ahead and answer it.  It's your

19   choice.

20           THE WITNESS:  Personal e-mail address.  So     09:11:46

21   do you want all of them?

22           BY MR. HUESTON:

23      Q.   Well, how many -- let's start with this:

24   How many personal e-mail addresses do you currently

25   have?                                                  09:11:54
```

```
 1      A.   Two.                                          09:11:58

 2      Q.   Two.

 3           And let's just start with can you just --

 4   do you have a Gmail account?

 5      A.   Yes.                                          09:12:05

 6      Q.   Okay.  And what's the other one?

 7      A.   It's an Italian domain e-mail account.

 8      Q.   Okay.  And do you have any other personal

 9   e-mail accounts other than your Gmail account and

10   the one that is an Italian domain account?           09:12:20

11      A.   Not that I recall.

12      Q.   Okay.  Have you ever e-mailed PwC materials

13   to either of those two personal e-mail accounts?

14           MS. EVANS:  Vague and ambiguous.

15   Overbroad.                                            09:12:34

16           BY MR. HUESTON:

17      Q.   You can answer.

18      A.   Yes.

19      Q.   And what materials have you e-mailed to

20   those accounts?                                       09:12:39

21      A.   Those e-mails that I sent to the Department

22   of Labor.

23      Q.   Any other e-mails?

24      A.   Not that I recall.

25      Q.   Any other documents other than e-mails that  09:12:58
```

```
 1   you sent to your personal e-mail accounts from your      09:13:00
 2   time at PwC?
 3              MS. EVANS:  Overbroad.  Relevance.  Vague
 4   and ambiguous.
 5              THE WITNESS:  Not that I recall.              09:13:11
 6              BY MR. HUESTON:
 7       Q.   Other than attaching those PwC e-mails to
 8   your Department of Labor filing, what else have you
 9   done with those e-mails?  Do you still have those?
10       A.   I believe those are stored in those e-mail     09:13:34
11   accounts.
12       Q.   Have you shared the e-mails that you
13   attached as exhibits to your Department of Labor
14   filing with anyone else?
15              MS. EVANS:  Overbroad.                       09:13:48
16              BY MR. HUESTON:
17       Q.   Other than your attorney.  I'm not talking
18   about attorney communications.
19              MS. EVANS:  Overbroad.  Vague and
20   ambiguous.                                              09:13:53
21              BY MR. HUESTON:
22       Q.   You can answer.
23       A.   Yes.
24       Q.   Who have you shared them with?
25              MS. EVANS:  Other than your attorneys.       09:13:58
```

```
 1            THE WITNESS:  Redacted version were shown      09:14:03
 2    to POGO.
 3            BY MR. HUESTON:
 4       Q.   Okay.  A redacted version?  Is that what
 5    you just said?                                         09:14:15
 6       A.   Yes.
 7       Q.   Was shown to?  I didn't catch that.
 8       A.   POGO, P-O-G-O.
 9       Q.   Okay.  And when did you share this with
10    POGO?                                                  09:14:23
11       A.   I don't recall the exact date.  May this
12    year probably.  Yeah.
13            MS. EVANS:  I think we should mark the
14    deposition confidential, and we can talk about it on
15    the break.                                             09:14:52
16            MR. HUESTON:  Well, we can -- we can
17    address that on a break.
18            BY MR. HUESTON:
19       Q.   Did you share the e-mails that you attached
20    as exhibits to your Department of Labor filing with   09:15:01
21    anyone else other than with POGO and your attorneys?
22       A.   Yes.
23       Q.   Who else did you share them with?
24       A.   The Security and Exchange Commission, the
25    PCOB, and the California Board of Accountancy.         09:15:23
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 18

```
 1      Q.    Okay.  Anyone else or any other entity?     09:15:30
 2      A.    My brother.
 3      Q.    Who's your brother?  Would you name your
 4   brother, please.
 5      A.    Marco Botta.                                 09:15:48
 6      Q.    When did you share these with him?
 7      A.    I don't remember the exact date.
 8      Q.    Okay.  Anyone else?
 9      A.    Not that I recall.
10      Q.    Okay.  Who is your brother currently         09:16:03
11   employed by?
12      A.    He's self-employed.
13      Q.    Doing what?
14      A.    He is a -- I'm trying to find the
15   description.  He's like an environmental IT           09:16:23
16   engineer.
17      Q.    And to your knowledge, does your brother
18   still possess the PwC documents you sent him?
19      A.    No.
20      Q.    What did he do with them?                    09:16:45
21      A.    He stored them until I told him to destroy
22   them.
23      Q.    When did you tell him to destroy them?
24      A.    A couple of weeks ago or last week.  I
25   don't recall the exact date.                          09:17:00
```

**DX1649-18**

1       Q.   Okay.  Are you aware that you have a           09:17:03

2   contractual duty not to take any confidential PwC

3   materials or to disclose them to third parties?

4       A.   Yes.

5       Q.   And specifically, you understood from your    09:17:24

6   employment agreement, that you were not to take or

7   keep any confidential information when you leave the

8   firm; right?

9       A.   Yes.

10      Q.   And you understood that you were to return    09:17:36

11  all confidential information to the firm before your

12  departure; right?

13      A.   Yes.

14      Q.   I would like to talk about what you did to

15  prepare for this deposition.                           09:17:52

16           Did you meet with your attorneys?  And I'm

17  only asking if you met with them.  I'm not asking

18  what you might have said with them.

19           Did you meet with your attorneys?

20      A.   Yes.                                           09:18:04

21      Q.   And tell me with whom you met.  Which

22  attorneys did you meet with to prepare for your

23  deposition?

24      A.   I met with Ingrid here.  And then I have

25  phone call with my other attorney, Alex.               09:18:15

```
 1      Q.   All right.  And did you meet one time?  Did      09:18:22
 2  you have one in-person meeting?
 3      A.   Yes.
 4           MS. EVANS:  Misstates the testimony.
 5           BY MR. HUESTON:                                  09:18:38
 6      Q.   Okay.  And how long did you meet?
 7      A.   I did not time it.  Maybe over a couple of
 8  hours, two hour and a half, something like.
 9      Q.   Okay.  All right.
10           And other than your attorney, was someone       09:18:55
11  else present during your meeting with your attorney?
12  Other than you and your attorney --
13      A.   No.
14      Q.   -- was there anyone else present?
15      A.   No.                                              09:19:04
16      Q.   And in your call with the other attorney,
17  Alex, how long was that call?
18      A.   As I said, I did not time it.  I believe
19  the total time was about two hour, two hour and a
20  half.                                                     09:19:24
21      Q.   And was anyone else on the call besides
22  yourself and your attorney?
23      A.   Ingrid was also on the call.
24      Q.   Okay.  Anyone else?
25      A.   No.                                              09:19:32
```

```
 1        Q.   Did you review documents to prepare for        09:19:33
 2   this deposition?
 3        A.   Yes.
 4        Q.   And what kind of documents did you review?
 5        A.   I reviewed my complaint that was filed.        09:19:42
 6        Q.   What else?
 7        A.   Supporting documents that I filed with the
 8   PCOB and the CBA and the SEC.
 9        Q.   Anything else?
10        A.   No.                                            09:20:03
11        Q.   Did you bring those documents that you
12   reviewed with you here today?
13        A.   No.
14        Q.   Did you take any notes from your review of
15   the documents?                                           09:20:20
16        A.   No.
17        Q.   Other than your attorneys, did you speak to
18   anyone else to prepare for this deposition today?
19        A.   No.
20        Q.   You understand that PwC serves as an           09:20:43
21   independent external auditor to companies covered
22   under the Sarbanes-Oxley Act, correct?
23             MS. EVANS:  Can you repeat that question?
24   It calls for a legal conclusion.  Overbroad.
25             MR. HUESTON:  Yeah.  Do you need me to          09:21:00
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 22

```
 1   repeat the question?                                    09:21:01

 2            MS. EVANS:  Yes, I do.

 3            THE WITNESS:  Yes.

 4            BY MR. HUESTON:

 5       Q.   Okay.  You understand that PwC serves as an    09:21:04

 6   independent external auditor to companies covered

 7   under the Sarbanes-Oxley Act; correct?

 8            MS. EVANS:  Overbroad.  Vague and

 9   ambiguous.  Calls for a legal conclusion.

10            BY MR. HUESTON:                                09:21:15

11       Q.   You can answer.

12       A.   It is one of the function.

13       Q.   Okay.  And what are the responsibilities of

14   an independent external auditor?

15            MS. EVANS:  Overbroad.  Calls for a legal      09:21:25

16   conclusion.

17            BY MR. HUESTON:

18       Q.   You can answer.

19       A.   Can you repeat one more time, please?

20       Q.   Sure.                                          09:21:32

21            What are the responsibilities of an

22   independent external auditor?

23            MS. EVANS:  Overbroad.  Calls for a legal

24   conclusion.

25            THE WITNESS:  To express an opinion on the     09:21:38
```

**DX1649-22**

1   fair representation of the financial statements and        09:21:42

2   related footnote and to express an opinion on the

3   public companies for internal controls.

4          BY MR. HUESTON:

5     Q.   Okay.  And you mentioned "internal              09:21:57

6   controls."  What do you mean when you say "internal

7   controls"?  What are internal controls?

8          MS. EVANS:  Overbroad.

9          THE WITNESS:  They are controls that

10  management of the company should have in place to        09:22:08

11  prevent and detect material misstatement to its

12  financial statements.

13         (Reporter clarification.)

14         THE WITNESS:  Material misstatements to the

15  financial statements.                                    09:22:28

16         BY MR. HUESTON:

17    Q.   And how does an external auditor evaluate

18  the effectiveness of internal controls?

19         MS. EVANS:  Overbroad.  Calls for a legal

20  conclusion.  Speculation.                                09:22:39

21         THE WITNESS:  It is a judgmental process.

22  There is a framework in place that you go through to

23  evaluate.  It's part of the whole of the process.

24  That is why the audit is defined as integrated audit

25  for public companies.                                    09:22:58

Confidential
MAURO BOTTA - 09/25/2018                    Page 24

| | | |
|---|---|---|
| 1 | (Reporter clarification.) | 09:23:05 |
| 2 | THE WITNESS:  Is defined as integrated | |
| 3 | audit for public companies. | |
| 4 | BY MR. HUESTON: | |
| 5 | Q.   And I just want to make sure I got your | 09:23:15 |
| 6 | testimony right. | |
| 7 | You said it's a judgmental process or a | |
| 8 | judgment process? | |
| 9 | A.   The evaluation of the controls and their | |
| 10 | deficiencies is a judgmental process.  It requires | 09:23:27 |
| 11 | professional judgment. | |
| 12 | Q.   Thank you. | |
| 13 | And are there -- well, and in evaluating a | |
| 14 | company's internal controls, at times as an external | |
| 15 | auditor, you would find deficiencies in those | 09:23:43 |
| 16 | controls; right? | |
| 17 | A.   Yes. | |
| 18 | Q.   And are there varying levels of | |
| 19 | deficiencies? | |
| 20 | A.   Yes. | 09:23:56 |
| 21 | Q.   And what are they? | |
| 22 | MS. EVANS:  Overbroad. | |
| 23 | BY MR. HUESTON: | |
| 24 | Q.   You can answer. | |
| 25 | A.   Control deficiency is the lowest level of | 09:24:00 |

**DX1649-24**

```
 1   severity.  Then there is significant deficiency, and    09:24:06
 2   then there is material weakness.
 3       Q.   All right.  And what is a controlled
 4   deficiency?  How would you define that?
 5       A.   It's a control that did not operate as         09:24:19
 6   designed, but for which the impact is either
 7   mitigated or does not necessarily cause a --
 8   material misstatements to the financial statements.
 9       Q.   Okay.  And what is a significant
10   deficiency?                                             09:24:38
11            MS. EVANS:  Overbroad.  Calls for a legal
12   conclusion.
13            BY MR. HUESTON:
14       Q.   You can answer.
15       A.   That's the -- it's the middle category.        09:24:42
16   And it is something that is more severe than the
17   control deficiency, but does not rise to the level
18   of a material weakness.
19       Q.   And then what is a material weakness?
20            MS. EVANS:  Overbroad.  Calls for a legal      09:25:03
21   conclusion.
22            THE WITNESS:  Material weakness is a
23   deficiency in the control or set of controls that
24   could cause a material misstatement in the financial
25   statements.                                             09:25:17
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 09:25:19 |
| 2 | Q.   And how do external auditors determine what | |
| 3 | constitutes a control deficiency, significant | |
| 4 | deficiency, or a material weakness? | |
| 5 | A.   There is a framework that PwC had in place. | 09:25:34 |
| 6 | Other firms also. | |
| 7 | Q.   And what was that framework? | |
| 8 | A.   It is a framework.  I'm not sure what you | |
| 9 | mean by "what is the framework." | |
| 10 | Q.   Well, you said PwC had a framework.  What | 09:25:49 |
| 11 | do you -- explain.  What is the framework that | |
| 12 | you're referring to? | |
| 13 | A.   It's a flow chart, guided flow chart, with | |
| 14 | boxes that you go through as you evaluate the | |
| 15 | deficiency, that series of steps that you need to | 09:26:02 |
| 16 | address to evaluate those deficiencies. | |
| 17 | Q.   Okay.  And did the flow chart have a name? | |
| 18 | A.   I don't believe there was a name.  I think | |
| 19 | it was assessment framework for controlled | |
| 20 | deficiencies, but I do not recall the exact name. | 09:26:27 |
| 21 | Q.   And in using the flow -- I'm sorry. | |
| 22 | Scratch the question. | |
| 23 | In using the flow chart, you, as an | |
| 24 | external auditor, needed to bring your judgment to | |
| 25 | bear in determining whether something ultimately was | 09:26:43 |

```
 1   a control deficiency, a significant deficiency, or a      09:26:46

 2   material weakness; right?

 3        A.    Not individually.  There was a collective

 4   decision from the audit engagement team.

 5        Q.    Did you not -- well, let me -- hold on one       09:27:03

 6   second.

 7              Okay.  You said not individually.  There

 8   was a collective decision from the engagement team.

 9              And what I'm focusing on, in the collective

10   decision from the engagement team that you would be       09:27:37

11   involved with, there would be an exercise of

12   judgment.  This would be the judgmental issue that

13   you cited earlier; right?

14        A.    Yes.

15        Q.    And it requires professional judgment to        09:27:48

16   determine whether a particular deficiency amounts to

17   a material weakness; right?

18        A.    Yes.

19        Q.    And it also requires judgment to determine

20   whether several smaller deficiencies could aggregate     09:28:08

21   to a material weakness; right?

22        A.    Yes.

23        Q.    And you would agree that reasonable

24   auditors sometimes disagree as to whether there is a

25   material weakness in a company's controls; right?        09:28:20
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 28

1          MS. EVANS:  Calls for speculation.  Vague        09:28:24

2    and ambiguous.  Overbroad.

3          BY MR. HUESTON:

4      Q.   You can answer.

5      A.   That is possible.                               09:28:28

6      Q.   And if two auditors disagree as to whether

7    there is a material weakness, it doesn't necessarily

8    mean that one of them is violating their legal or

9    professional duties; right?

10         MS. EVANS:  Calls for speculation.               09:28:39

11   Overbroad.  Vague and ambiguous as to the specific

12   issue.

13         BY MR. HUESTON:

14     Q.   You can answer.

15     A.   Can you repeat the question, please?            09:28:45

16     Q.   Sure.

17         If two auditors disagree as to whether

18   there is a material weakness, it doesn't necessarily

19   mean that one of them is violating their legal or

20   professional duties; correct?                          09:28:55

21         MS. EVANS:  Speculation.  Overbroad.  Vague

22   and ambiguous as to the issue.

23         THE WITNESS:  It is possible.

24         BY MR. HUESTON:

25     Q.   Right.  Because sometimes there's just a        09:29:06

| | |
|---|---|
| 1 | difference of opinion; right? | 09:29:08 |
| 2 | A.    It is possible. | |
| 3 | Q.    Okay.  Now, from 2010 until your | |
| 4 | termination, you served as a senior manager at PwC; | |
| 5 | is that right? | 09:29:23 |
| 6 | A.    I honestly do not recall the exact year of | |
| 7 | promotion to senior manager, but -- | |
| 8 | Q.    Approximately.  I'm not asking for -- and | |
| 9 | that's a fair question for -- from you.  I'm not | |
| 10 | asking for ultimate precision on dates, but just an | 09:29:37 |
| 11 | approximate recollection of dates. | |
| 12 | So from approximately 2010 until your | |
| 13 | termination, you were a senior manager at PwC; | |
| 14 | correct? | |
| 15 | A.    Yes. | 09:29:50 |
| 16 | Q.    And in your role as senior manager, were | |
| 17 | you then the number two person on most audits? | |
| 18 | A.    Yes. | |
| 19 | Q.    There would be an engagement leader above | |
| 20 | you on the audits? | 09:30:07 |
| 21 | A.    I would say number three, because there was | |
| 22 | a QRP, quality review partner, then there was the | |
| 23 | engagement leader, which is the partner that signed | |
| 24 | the opinion, and then on most audits, I was next. | |
| 25 | Q.    As the senior manager? | 09:30:29 |

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:30:31 |

1    A.   Yes.                                          09:30:31

2    Q.   And during the audits, you reported

3    directly to the engagement leader on the particular

4    audit; right?

5    A.   Not all audits.  Most.                        09:30:42

6    Q.   Most.

7         Which audits would you not have reported

8    directly to the engagement leader?

9    A.   There were engagements that were very

10   large, multibillion companies, where the size of the   09:30:57

11   audit team called for multiple senior managers.  So

12   in those cases, you don't necessarily report

13   directly to the engagement leader.  You may report

14   to senior manager.

15   Q.   And can you -- how many of those             09:31:18

16   engagements do you recall working on as a senior

17   manager?

18   A.   Since what period of time are you asking?

19   Q.   Since 2010, through the time of termination

20   at PwC.                                            09:31:31

21   A.   You're asking how many engagements I worked

22   on since my senior manager that I did not report to

23   the engagement leader or --

24   Q.   Yes.  Right.  You basically -- just to get

25   the frame of reference, you said most of the time   09:31:42

```
 1   you report to an engagement leader, but sometimes,      09:31:45

 2   if there were very large multibillion-dollar

 3   matters, there might be multiple senior managers;

 4   correct?

 5       A.  Yes.                                             09:31:55

 6       Q.  Okay.  And just roughly, how many times do

 7   you recall reporting to multiple senior managers on

 8   these multibillion-dollar engagements during that

 9   time period, 2010 through termination?

10       A.  It depends how you count times.  Count as        09:32:12

11   standalone audit engagements?

12       Q.  Standalone audit engagements.

13       A.  I would have to give you my best guess.

14       Q.  Just your best estimate.

15           More than five times?                            09:32:28

16           MS. EVANS:  Don't guess.  No speculating.

17   But you can give an estimate.

18           THE WITNESS:  If you can give me a moment

19   to just recall.

20           BY MR. HUESTON:                                  09:32:39

21       Q.  Sure.

22       A.  Probably around five.  Yeah.

23       Q.  Okay.

24       A.  Again, my best guess.

25       Q.  That's fine.                                     09:32:54
```

```
 1          And can you tell me, to the best of your        09:32:55
 2   recollection, which engagements you recall?  If
 3   they're around five, what -- could you name them to
 4   the best of your ability?
 5      A.   It was the same engagement, just multiple      09:33:09
 6   years, and different projects on that engagement.
 7   The engagement was Micron Technology, Inc., and then
 8   there were projects within that engagement, like
 9   subsidiaries or joint ventures or special project as
10   part of that audit, over the years.                    09:33:33
11      Q.   All right.  That's fair.  Thank you for
12   that.
13          So other than Micron Technology and related
14   projects for Micron Technology and its subsidiaries,
15   to the best of your recollection, the rest of your    09:33:48
16   engagements as senior manager you reported directly
17   to an engagement leader?
18      A.   Yes.
19          MR. HUESTON:  All right.  Let's turn to
20   what we're going to mark as Exhibit 1 to the          09:33:59
21   deposition.
22          (Marked for identification purposes,
23          Exhibit 1.)
24          BY MR. HUESTON:
25      Q.   So just -- again, in terms of the             09:34:24
```

| | | |
|---|---|---|
| 1 | deposition, generally the court reporter will hand | 09:34:25 |
| 2 | you the official exhibit, and then I will hand a | |
| 3 | separate copy to your attorney. | |
| 4 | A.   Thank you. | |
| 5 | Q.   So directing your attention to what has now | 09:34:34 |
| 6 | been marked as Exhibit 1, you recognize this as -- | |
| 7 | well, let me ask you. | |
| 8 | Do you recognize this document? | |
| 9 | A.   It does appear to be an extract from our | |
| 10 | audit guide. | 09:34:48 |
| 11 | Q.   And this is, in fact, PwC audit standard | |
| 12 | 2023, which outlines the responsibilities of the | |
| 13 | manager? | |
| 14 | A.   I wouldn't characterize that PwC about the | |
| 15 | standards, that PwC only can issue audit standards. | 09:35:03 |
| 16 | This is PwC audit guide. | |
| 17 | Q.   Okay.  And are you familiar with this | |
| 18 | document and this standard as it's set forth in | |
| 19 | Exhibit 1? | |
| 20 | A.   What is your definition of "familiar"? | 09:35:27 |
| 21 | Q.   Well -- well, let me ask you, are you | |
| 22 | familiar with what's set forth here under "2023 | |
| 23 | Manager"?  Have you read this document before? | |
| 24 | A.   I may have a long time ago.  So that is why | |
| 25 | I asked you what's the definition of "familiar." | 09:35:53 |

```
 1      Q.   Okay.  Sitting here today, do you recall    09:35:56
 2   having reviewed it before?
 3      A.   Yes.
 4      Q.   Okay.  Let's go under the first heading
 5   called "Definition of Role."  And under "Definition  09:36:09
 6   of Role," the document states that "the manager" --
 7   if you look at the last bullet -- "takes the primary
 8   responsibility for interaction with client
 9   management."
10           Do you see that?                             09:36:28
11      A.   Yes.
12      Q.   And so when you were a senior manager,
13   consistent with this guidance, you took primary
14   responsibility for interacting with client
15   management; correct?                                 09:36:40
16      A.   For the job that I was the main contact, I
17   believe that is accurate.  As far as Micron, for
18   example, I would not think that that was my primary
19   responsibility within an engagement team.
20      Q.   Right.  I'm not going to be -- okay.  So     09:37:00
21   just for clarity, I wouldn't be talking about
22   Micron.  So let's put Micron to the side.  It will
23   be for the engagements other than Micron.
24           So the engagements other than Micron, under
25   "Definition of Role," where it starts "the manager," 09:37:13
```

```
 1   this defined in those bullets the guidance for you      09:37:17
 2   as the engagement manager; correct?
 3            MS. EVANS:  Overbroad.  Vague and
 4   ambiguous.  Unintelligible.
 5            BY MR. HUESTON:                                 09:37:26
 6       Q.   You can answer.
 7       A.   I do not recall, honestly, if there was a
 8   section for senior managers.  So if there was, then
 9   I would apply under the senior manager roles.
10   Because, again, depending on the structure of an        09:37:46
11   engagement, you can have the manager that is primary
12   responsibility as much as the senior manager if you
13   have both.
14       Q.   All right.  Well, let's just go back to
15   that last bullet, under "Definition of Role."           09:37:56
16            As senior manager, you would agree that you
17   would take the primary responsibility for
18   interaction with client management, other than the
19   Micron Technology work that you did; correct?
20            MS. EVANS:  Overbroad.  Vague and              09:38:10
21   ambiguous.
22            THE WITNESS:  Again, this is subjective.
23   "Primarily responsibility" can be read in many ways.
24   I would say that it was part of my responsibility to
25   interact with management.                               09:38:23
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 36

```
 1            BY MR. HUESTON:                          09:38:30

 2       Q.   Okay.  Let's go to the fifth page of this

 3    document, and there's a section entitled

 4    "Differences of Opinion."

 5            Do you see that?                          09:38:38

 6       A.   Yes.

 7       Q.   And it states, in the first paragraph:

 8                "In applying due professional care,

 9            each engagement team member has a

10            responsibility to bring to the attention  09:38:51

11            of appropriate persons disagreements or

12            concerns the engagement team member might

13            have with respect to accounting and

14            auditing issues that he or she believes

15            are of significance to the financial      09:39:05

16            statements or our report regardless of

17            how those disagreements or concerns may

18            have arisen."

19            Do you see that?

20       A.   Yes.                                      09:39:14

21       Q.   And you understood that while you were at

22    PwC; correct?

23            MS. EVANS:  Vague and ambiguous.

24            THE WITNESS:  Yes.

25    ///
```

```
 1          BY MR. HUESTON:                              09:39:26

 2     Q.   And so it was your duty and responsibility

 3   as a senior manager to bring up any significant

 4   disagreements or concerns you might have had with

 5   other team members; right?                         09:39:35

 6          MS. EVANS:  Overbroad.  Vague and

 7   ambiguous.

 8          BY MR. HUESTON:

 9     Q.   You can answer.

10     A.   Anybody at all levels, if there was a       09:39:41

11   disagreement, needed to bring that up, not just the

12   senior manager.

13     Q.   Yeah.  Well, that's fair.  But I'm just

14   asking about the senior manager.

15          So you would have an obligation as senior   09:39:53

16   manager; right?

17     A.   Yes.

18     Q.   And that would include disagreements with

19   the engagement leader; correct?

20     A.   Yes.                                         09:40:03

21     Q.   So let's review the next paragraph.

22          "If there is an unresolved difference

23          of opinion regarding important matters

24          between audit team members or between the

25          management/team members and the            09:40:15
```

```
 1            engagement leader, the firm's policy on        09:40:17

 2            resolving differences in professional

 3            opinion should be followed."

 4            Do you see that?

 5       A.   Yes.                                            09:40:24

 6       Q.   And then there's a reference to PwC Audit

 7   2710.

 8            Do you see that?

 9       A.   Yes.

10       Q.   And were you familiar with PwC Audit 2710?     09:40:32

11       A.   At what time?

12       Q.   While you were at PwC.

13            MS. EVANS:  Vague and ambiguous.

14   Overbroad.

15            THE WITNESS:  I became familiar during the     09:40:48

16   Cavium audit.

17            (Reporter clarification.)

18            BY MR. HUESTON:

19       Q.   Okay.  And that's C-A-V-I-U-M; correct?

20       A.   Yes.                                            09:41:04

21       Q.   And what time period did you become

22   familiar with that section?

23       A.   During the 2014 audit.

24            MR. HUESTON:  Okay.  Okay.  Let's go to

25   that document and mark it as Exhibit 2.                  09:41:28
```

```
 1              (Discussion off the record.)              09:41:30

 2              (Marked for identification purposes,

 3          Exhibit 2.)

 4          BY MR. HUESTON:

 5     Q.    So directing your attention to Exhibit 2,    09:41:51

 6  this is PwC Audit Standard 2710.

 7          Do you see that?

 8     A.    Again, I would not define them as audit

 9  standard.  This is PwC audit guide.

10     Q.    Okay.  I'll just call it "PwC              09:42:02

11  Section 2710."  You'll understand what I'm referring

12  to; right?

13     A.    To the PwC audit guide.

14     Q.    Okay.  And you're familiar with PwC

15  Section 2710?                                         09:42:22

16     A.    Yes.

17     Q.    I want to draw your attention to the third

18  full paragraph, last sentence.  It starts with "each

19  professional of the firm."

20          Do you see it?                                09:42:42

21     A.    No.  Which page?

22     Q.    Okay.  It's on the first page.  Under

23  "2710," the third paragraph starts with "the firm

24  encourages."

25          Do you see that?                              09:42:57
```

```
 1      A.    Yes.                                      09:42:57

 2      Q.    Okay.  Go to the last sentence that starts

 3   with "each professional."  Do you see it?  Of that

 4   same paragraph.

 5      A.    Yes.                                      09:43:05

 6      Q.    This states:

 7             "Each professional of the firm has

 8             the right and obligation to form his or

 9             her own conclusion and is responsible for

10             ensuring that his or her views receive    09:43:14

11             adequate consideration."

12             Right?

13      A.    Yes.

14      Q.    So you would agree, then, as senior

15   manager, you had the obligation to form your own    09:43:22

16   conclusions, and you were responsible for ensuring

17   that your reviews received adequate consideration;

18   right?

19             MS. EVANS:  Overbroad.

20             THE WITNESS:  Yes.                        09:43:34

21             BY MR. HUESTON:

22      Q.    Okay.  Let's turn down to the next section.

23   On the bottom of the first page, you see "2711 The

24   Resolution Process"?

25             Do you see that heading at the bottom of  09:44:00
```

```
 1   the page?                                                09:44:01

 2      A.   Yes.

 3      Q.   Were you also familiar with Section 2711

 4   The Resolution Process, while you were at PwC?

 5      A.   I became familiar, as I said, during the        09:44:12

 6   Cavium audit.

 7      Q.   Okay.  Let's go to the next page.  The

 8   second paragraph that starts with "the firm does not

 9   expect."

10          Do you see that?                                 09:44:24

11      A.   Yes.

12      Q.   And specifically it states:

13            "The firm does not expect

14            professionals to accept a position that

15            they cannot agree with."                       09:44:34

16          And you understood that was the position of

17   PwC; right?

18          MS. EVANS:  Overbroad.  Vague and

19   ambiguous.

20          THE WITNESS:  I understood what was written      09:44:48

21   in the audit guide.

22          BY MR. HUESTON:

23      Q.   All right.  And it says -- it continues.

24            "In all cases, when a difference of

25            professional views occurs, the goal of        09:44:55
```

```
 1            the resolution process is to resolve the     09:44:57

 2            difference.  If this cannot be achieved,

 3            the dissenting party should consider the

 4            guidance in the documentation

 5            requirements section below, including the    09:45:07

 6            requirement as set forth therein to

 7            discuss the documentation of the

 8            difference with the office of general

 9            counsel and consider whether such

10            difference of views is so significant        09:45:19

11            that the professional considers it

12            necessary to remove himself or herself

13            from the engagement."

14            You were familiar with the provision that I

15   just read; correct?                                   09:45:30

16      A.   Yes.

17      Q.   And as senior manager, then, you understood

18   that you were not required to accept a position that

19   you disagreed with; right?

20            MS. EVANS:  Overbroad.  Vague and            09:45:42

21   ambiguous.

22            THE WITNESS:  Yes.

23            BY MR. HUESTON:

24      Q.   And you also understood that if you could

25   not accept a position, you could remove yourself      09:45:53
```

```
 1   from the engagement; right?                        09:45:55

 2      A.   Yes.

 3      Q.   Now, let's look further.  You see No. 2,

 4   "Differences Between Manager and Engagement Leader,"

 5   further on the page.                               09:46:09

 6           Do you see that?

 7      A.   Yes.

 8      Q.   And this section describes the procedure

 9   for resolving differences between a manager and an

10   engagement leader; correct?                        09:46:18

11      A.   Yes.

12      Q.   And you were familiar with this procedure;

13   correct?

14      A.   Yes.

15      Q.   Okay.  Let's go now to 2713 which is on     09:46:27

16   the -- starts at the bottom of the next page.

17   "Documentation Requirements."

18           Do you see that?

19      A.   Yes.

20      Q.   And then turning to the next page under     09:46:41

21   that same section, it states:

22              "Differences of professional view

23           that still exist after completing the

24           resolution process set forth in PwC Audit

25           2711 should be documented and included     09:46:58
```

```
 1              in, or cross-referenced to, the            09:47:01

 2              documentation of significant matters.

 3              However, prior to concluding that a

 4              difference of professional views still

 5              exists, consultation is required among     09:47:12

 6              the office of general counsel, the

 7              dissenting party, or parties, and the

 8              engagement leader regarding the matter

 9              and the documentation of the difference."

10         Do you see that?                                09:47:25

11    A.   Yes.

12    Q.   And as senior manager, then, you understood

13  that if you continued to disagree with an engagement

14  leader, even after the resolution process that was

15  described in Section 2711, you had the obligation to   09:47:35

16  document the disagreement after a consultation with

17  the office of general counsel; correct?

18    A.   Yes.

19    Q.   And you also had a duty to document any

20  disagreements with the engagement leader; right?       09:48:01

21         MS. EVANS:  Overbroad.  Vague and

22  ambiguous.

23         BY MR. HUESTON:

24    Q.   You can answer.

25    A.   If those were not resolved, yes.                09:48:16
```

**DX1649-44**

```
 1        Q.   Okay.  And so you understood that        09:48:22
 2   disagreements among members of the engagement team
 3   or with others consulted on the engagement about
 4   final conclusions reached on significant accounting
 5   or auditing matters, including the basis for the    09:48:34
 6   final resolution of those disagreements, if an
 7   engagement team member disagrees with the final
 8   conclusions reached, he or she should document that
 9   disagreement.
10        You understood that; correct?                 09:48:49
11        A.   Yes.
12        Q.   That was, in fact, a PCAOB audit
13   documentation requirement; right?
14        MS. EVANS:  Calls for speculation.
15   Overbroad.  Vague and ambiguous.                    09:49:03
16        If you know.
17        BY MR. HUESTON:
18        Q.   You can answer.
19        A.   I would not recall the source, but what you
20   stated is -- appears correct.                       09:49:11
21        MR. HUESTON:  All right.  Introduce the
22   document as Exhibit 3 to the deposition.
23        (Marked for identification purposes,
24         Exhibit 3.)
25   ///
```

```
 1            BY MR. HUESTON:                          09:49:27
 2       Q.   I've handed you, as Exhibit 3 PCAOB
 3   AS 1215: Audit Documentation, with subsections.
 4            Do you see that?
 5       A.   Yes.                                     09:49:49
 6       Q.   Are you familiar with AS 1215, the audit
 7   documentation section?
 8       A.   I may have read it, but I can't say that I
 9   am.
10       Q.   I think I handed you the wrong copy.  I   09:50:09
11   annotated that.  Let me give you this copy back.
12            MS. EVANS:  Doesn't look like it, but you
13   can check it out.
14            MR. HUESTON:  No?  All right.
15            MS. EVANS:  I just wrote on it.           09:50:18
16            MR. HUESTON:  Oh, you did.  Well, then
17   we'll --
18            MS. EVANS:  I just wrote the Exhibit 3.
19   It's not a big deal.
20            MR. HUESTON:  It's okay.  It's all right.  09:50:24
21   We'll move on.
22            MS. EVANS:  Yeah, I don't see any of your
23   writing on here.
24            MR. HUESTON:  All right.
25            MS. EVANS:  Do you want to make sure that  09:50:31
```

```
 1   this one -- this one doesn't --                        09:50:32

 2            MR. HUESTON:  No, no.  It's fine.  We're

 3   all set.  Okay.

 4            BY MR. HUESTON:

 5       Q.   So let's -- turning your attention now to     09:50:36

 6   Exhibit 3, you recognize this as AS 1215: Audit

 7   Documentation from the PCAOB; correct?

 8       A.   It seems to be printed from the right

 9   website.

10       Q.   And turning your attention to the fourth      09:51:03

11   page, four of seven, do you see Section .12d, that

12   starts with "disagreements"?

13       A.   Yes.

14       Q.   Okay.  And that states there:

15            "Disagreements among members of the           09:51:23

16            engagement team or with others consulted

17            on the engagement about final conclusions

18            reached on significant accounting or

19            auditing matters, including the basis for

20            the final resolution of those               09:51:34

21            disagreements.  If an engagement team

22            member disagrees with the final

23            conclusions reached, he or she should

24            document that disagreement."

25            Do you see that?                              09:51:45
```

| | |
|---|---|
| 1      A.   Yes. | 09:51:45 |
| 2      Q.   And you understand that was a requirement | |
| 3  of the PCAOB; right? | |
| 4      A.   As I stated, I can't say that I was | |
| 5  familiar with this particular document.  As it is | 09:51:54 |
| 6  and I'm reading now, I understand it. | |
| 7      Q.   Okay.  So you recognize this, then, as a | |
| 8  requirement by the PCAOB; right? | |
| 9          MS. EVANS:  Misstates his testimony. | |
| 10          Listen to his question. | 09:52:10 |
| 11          BY MR. HUESTON: | |
| 12      Q.   You can answer. | |
| 13          Now that you have the document before you, | |
| 14  this refreshes your recollection that this is, in | |
| 15  fact, a requirement of the PCAOB; right? | 09:52:17 |
| 16          MS. EVANS:  Misstates his testimony. | |
| 17          THE WITNESS:  I'm reading this now, that | |
| 18  this is from the PCAOB, and I believe it to be | |
| 19  consistent with what PwC guide said that I was | |
| 20  familiar with. | 09:52:40 |
| 21          BY MR. HUESTON: | |
| 22      Q.   All right.  You can put that aside. | |
| 23          Let's go back to Exhibit 1 in your pile. | |
| 24  And this is "Section 2023 Manager." | |
| 25          Do you have that before you? | 09:53:08 |

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:53:09 |
| 2 | Q.   Let's go to page 5 of that document.  There | |
| 3 | is, in fact, a section that starts with the bolded | |
| 4 | words "differences of opinion"; right? | |
| 5 | A.   Yes. | 09:53:34 |
| 6 | Q.   And in the third paragraph down, it starts: | |
| 7 | "Where the unresolved difference | |
| 8 | relates to a concern that there is | |
| 9 | failure to comply with appropriate | |
| 10 | professional, regulatory and legal | 09:53:46 |
| 11 | requirements or PwC's own systems of | |
| 12 | quality control, and which a team member | |
| 13 | considers he/she cannot discuss with the | |
| 14 | engagement leader, the team member may | |
| 15 | follow the firm's whistleblowing | 09:53:59 |
| 16 | processes.  The audit report should not | |
| 17 | be issued until the matter is resolved." | |
| 18 | Do you see that? | |
| 19 | A.   Yes. | |
| 20 | Q.   And as senior manager, you knew about this | 09:54:08 |
| 21 | procedure; correct? | |
| 22 | A.   Yes. | |
| 23 | Q.   So as a senior manager, if you thought that | |
| 24 | there was a failure to comply with professional, | |
| 25 | regulatory, or legal requirements, you would follow | 09:54:18 |

```
 1   the firm's whistleblowing processes; correct?          09:54:21

 2        A.   Yes.

 3             MS. EVANS:  Overbroad.

 4             BY MR. HUESTON:

 5        Q.   And you understood those processes would      09:54:31

 6   involve making a complaint to PwC's hotline; right?

 7             MS. EVANS:  Overbroad.  Vague and ambiguous

 8   as to time.

 9             BY MR. HUESTON:

10        Q.   You can answer.                               09:54:48

11        A.   Hotline ethics office.

12        Q.   Okay.  So if you, in fact, thought somebody

13   was actually violating the law, you would follow

14   PwC's whistleblowing policies; correct?

15             MS. EVANS:  Overbroad.  Vague and ambiguous   09:55:09

16   as to time and --

17             BY MR. HUESTON:

18        Q.   While at PwC.

19             MS. EVANS:  Same objections.

20             BY MR. HUESTON:                               09:55:15

21        Q.   You can answer.

22        A.   Yes.

23             MR. HUESTON:  Let's go to what we will mark

24   as Exhibit 4.

25   ///
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 51

```
 1              (Marked for identification purposes,      09:55:36
 2         Exhibit 4.)
 3         BY MR. HUESTON:
 4    Q.   I've placed before you PwC Section 2570
 5  Manager Review Responsibilities.                      09:56:07
 6         Do you recognize Section 2570 entitled
 7  "Manager Review Responsibilities"?
 8    A.   Yes.
 9    Q.   The first sentence of the first paragraph
10  reads:                                                09:56:25
11              "The manager, with appropriate
12              involvement and oversight by the
13              engagement leader, is responsible for
14              determining that the audit documentation
15              included in the final record of work      09:56:34
16              performed, including the work of
17              specialists, has been performed and
18              reviewed in accordance with professional
19              and firm standards."
20         Do you see that?                               09:56:45
21    A.   Yes.
22    Q.   So as senior manager, you were responsible
23  for reviewing the documentation showing what work
24  was performed; correct?
25              MS. EVANS:  Overbroad.  Vague and         09:56:58
```

**DX1649-51**

```
 1   ambiguous.                                              09:56:59

 2            THE WITNESS:  I was one of the resources

 3   that was performing this activity, yes.

 4            BY MR. HUESTON:

 5       Q.   Right.  You were -- when it refers to "the    09:57:08

 6   manager," you were the senior manager; right?

 7       A.   Yes.

 8       Q.   Okay.  So you wouldn't argue, then, when it

 9   says the responsibilities of the manager, what's

10   described there and that I read to you, in fact,       09:57:22

11   described your responsibilities, in part; right?

12       A.   Yes.

13       Q.   Okay.  Toward the bottom of the page, you

14   see it starts, before there are three bullets:

15            "The manager is required to                    09:57:36

16            electronically sign-off"?

17            Do you see that language?

18       A.   Yes.

19       Q.   It states:

20            "The manager is required to                    09:57:44

21            electronically sign-off the following

22            EGAs."

23            And "EGA" is evidence-gathering activity;

24   is that right?

25       A.   I actually don't recall the exact acronym.    09:57:57
```

| | | |
|---|---|---|
| 1 | We always called them "EGAs." | 09:57:59 |
| 2 |    Q.   All right.  But it describes the three | |
| 3 | things below; right?  Is that right:  The three | |
| 4 | bulleted items -- | |
| 5 |    A.   Yes. | 09:58:10 |
| 6 |    Q.   -- beneath it? | |
| 7 |    A.   Yes. | |
| 8 |    Q.   The first one is: | |
| 9 |        "Engagement leader and manager audit | |
| 10 |        planning affirmation." | 09:58:16 |
| 11 |        Right? | |
| 12 |    A.   Yes. | |
| 13 |    Q.   And explain, what was your understanding of | |
| 14 | "the engagement leader and manager audit planning | |
| 15 | affirmation"?  What is that? | 09:58:27 |
| 16 |    A.   It is an EGA where the engagement team | |
| 17 | summarizes the planning activities being performed | |
| 18 | and the -- the attestation from both the department | |
| 19 | and the leading manager that planning was done. | |
| 20 |    Q.   The planning for the audit? | 09:58:53 |
| 21 |    A.   Yes. | |
| 22 |    Q.   Okay.  And that occurs before the actual | |
| 23 | audit commences; right? | |
| 24 |    A.   It should.  Not always. | |
| 25 |    Q.   And what steps would you typically take | 09:59:05 |

```
 1   before signing off on this EGA?                    09:59:09

 2       A.   Review the planning EGAs.

 3       Q.   And what other documents besides the

 4   planning EGAs would you review in order to sign off

 5   on that EGA?                                       09:59:25

 6       A.   That is a bit broad, because the structure

 7   of the core papers has evolved over the years,

 8   including this EGA.  I do not recall when they put

 9   it in.  But generally, yes, planning EGAs are the

10   one that are the subject of this affirmation.      09:59:46

11       Q.   That you would review before signing off on

12   the planning affirmation; right?

13       A.   Yes.

14       Q.   Okay.  And then going to the second one, it

15   saws:                                              10:00:00

16            "Engagement leader and manager

17            checklist."

18            Do you see that?

19       A.   Yes.

20       Q.   And please describe your understanding of  10:00:04

21   the engagement leader and manager checklist.

22       A.   As I said before, throughout the years,

23   this has evolved.  There were several checklists.

24   This one, I would be guessing what they refer to is

25   the completion checklist.                          10:00:26
```

```
 1      Q.   When you refer to a "completion checklist,"      10:00:35
 2   what do you mean by that?
 3      A.   It is a checklist in the completion section
 4   of the database that engagement leader and manager
 5   would sign off.                                          10:00:48
 6      Q.   And what time period during your tenure as
 7   senior manager do you recall signing off on what
 8   you've described as a completion checklist?
 9      A.   I can't give you the time period because it
10   is possible that I was leading manager even prior to     10:01:08
11   2010.  So I can't give you the exact years.
12      Q.   Well, from 2010 to the time of your
13   termination, in following the EGAs, you would sign
14   off, for an engagement leader and manager checklist,
15   on something you call a completion checklist; right?     10:01:26
16   Is that fair?
17      A.   Yes.
18           MR. HUESTON:  Okay.
19           Okay.  So let's go to what we're going to
20   mark as Exhibit 5.  Right?  Next exhibit, Exhibit 5.     10:01:44
21           (Marked for identification purposes,
22           Exhibit 5.)
23           BY MR. HUESTON:
24      Q.   I've handed you, as Exhibit 5, a document
25   that's entitled "Engagement Leader and Manager           10:02:08
```

| | | |
|---|---|---|
| 1 | Checklist," and it has a date of June 2013. | 10:02:11 |
| 2 |      Do you see that? | |
| 3 | A.   Yes. | |
| 4 | Q.   And were you, while you were at PwC, | |
| 5 | familiar with this engagement letter and manager | 10:02:20 |
| 6 | checklist? | |
| 7 | A.   Yes. | |
| 8 | Q.   And, in fact, going to page 11 of this | |
| 9 | document, this particular one you signed as the | |
| 10 | engagement manager; correct? | 10:02:39 |
| 11 | A.   I can see this printout.  I signed it. | |
| 12 | Q.   All right.  And then going back to page 1, | |
| 13 | and continuing on to page 2, there is an explanation | |
| 14 | of the checklist and a description of areas | |
| 15 | requiring a detailed review. | 10:03:08 |
| 16 |      Do you see that? | |
| 17 | A.   Can you point to the sections you're | |
| 18 | referring? | |
| 19 | Q.   Sure.  At the top of the page, it says: | |
| 20 |      "This checklist is organized into the | 10:03:21 |
| 21 |      following sections." | |
| 22 |      Do you see that? | |
| 23 | A.   Which page are you on?  Sorry. | |
| 24 | Q.   First page.  Top of the page. | |
| 25 | A.   Oh, first.  Yes. | 10:03:29 |

```
 1       Q.   Okay.  And you understood on this page, and     10:03:32

 2   on the next page, page 2, there was a description of

 3   checklist items which the engagement leader and

 4   manager would sign off on; right?

 5       A.   Yes.                                             10:03:46

 6       Q.   And we're not going to go through every

 7   item on this checklist, but let's just take a couple

 8   of examples.

 9            If we go to the section on page 8 -- let's

10   turn to page 8 of the document.  There's a            10:04:01

11   Section 12 called "Evaluating Control Deficiencies."

12            Do you see that?

13       A.   Yes.

14       Q.   Before signing off on this EGA, you would

15   ensure that any control deficiencies have been        10:04:14

16   identified and evaluated on a document called

17   "Summary of Aggregate Deficiencies" or "SAD"; right?

18       A.   Yes.

19       Q.   Okay.  And you would ensure that

20   compensating controls have been sufficiently          10:04:29

21   documented, considered, and tested when relying on

22   such controls; right?

23            MS. EVANS:  Overbroad.  Vague and

24   ambiguous.

25            THE WITNESS:  Yes.                            10:04:42
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 10:04:44 |
| 2 | Q.   Now let's go to page 10, and look at the | |
| 3 | Section 16, entitled "Significant Matters." | |
| 4 | Do you see that? | |
| 5 | A.   Yes. | 10:04:54 |
| 6 | Q.   And before signing off on the EGA, you and | |
| 7 | the engagement leader would confirm that all | |
| 8 | significant matters, such as control deficiencies, | |
| 9 | have been documented; right? | |
| 10 | A.   Yes. | 10:05:11 |
| 11 | Q.   And then moving to page 11, Section 19, is | |
| 12 | entitled "Conclude on Sufficiency of Audit Evidence | |
| 13 | Obtained and Documented." | |
| 14 | Do you see that? | |
| 15 | A.   I don't see 19. | 10:05:26 |
| 16 | Q.   Sorry. | |
| 17 | A.   Oh, beginning of the page? | |
| 18 | Q.   Yeah.  Top of the page 11, there's No. 19, | |
| 19 | titled "Conclude on Sufficiency of Audit Evidence | |
| 20 | Obtained and Documented." | 10:05:36 |
| 21 | Are you with me? | |
| 22 | MS. EVANS:  No.  You mean the bottom of | |
| 23 | page 10; correct? | |
| 24 | MR. HUESTON:  Well, it's on page 11 of | |
| 25 | mine.  It might be on the bottom of your page.  It | 10:05:45 |

| | | |
|---|---|---|
| 1 | looks like on the bottom of your page.  So my | 10:05:45 |
| 2 | mistake. | |
| 3 | BY MR. HUESTON: | |
| 4 | Q.   So at the bottom of page 10, do you see the | |
| 5 | Section 19, "Conclude on Sufficiency of Audit | 10:05:50 |
| 6 | Evidence Obtained and Documented"? | |
| 7 | A.   Yes. | |
| 8 | Q.   All right.  And before signing off on this | |
| 9 | EGA, you would confirm that all audit work has been | |
| 10 | performed and audit documentation has been completed | 10:06:02 |
| 11 | in accordance with PwC's documentation standards; | |
| 12 | correct? | |
| 13 | A.   Yes. | |
| 14 | Q.   And you would confirm that appropriate | |
| 15 | evidence has been obtained to support the | 10:06:14 |
| 16 | conclusions of the audit; right? | |
| 17 | MS. EVANS:  Overbroad.  Vague and | |
| 18 | ambiguous. | |
| 19 | THE WITNESS:  Yes. | |
| 20 | BY MR. HUESTON: | 10:06:22 |
| 21 | Q.   What is the significant matters EGA? | |
| 22 | MS. EVANS:  Vague and ambiguous. | |
| 23 | Overbroad. | |
| 24 | THE WITNESS:  It is a matter that -- it is | |
| 25 | judgmental.  I can't give you, like, exact case by | 10:06:45 |

1  case.  It is a matter that the audit team does          10:06:52

2  create when there is a matter of particular

3  significance.

4         BY MR. HUESTON:

5     Q.   Okay.  Would your assessment of significant       10:06:58

6  matters include reviewing and signing off on an SAD?

7         MS. EVANS:  Overbroad.

8         THE WITNESS:  I recall that also evolved.

9  I do not remember at the moment if the SAD was a

10  significant matter or there was an EGA called SAD      10:07:28

11  that says you should create a significant matter

12  called SAD.  So ...

13         BY MR. HUESTON:

14     Q.   Fair enough.  Let's look at Exhibit 5.

15         And just -- this Exhibit 5, entitled           10:07:38

16  "Engagement Leader and Manager Checklist" dated

17  June 2013, if we turn to page 20, Section 16,

18  "Significant Matters."

19         Do you see that?

20     A.   Slow down.  Which one?                          10:07:51

21     Q.   Sure.  You're on Exhibit 5.

22     A.   Yeah.

23     Q.   Turn to, I believe, page 10, No. 16.

24     A.   Yes.

25     Q.   It says "Significant Matters"; right?          10:08:00

| | | |
|---|---|---|
| 1 | A.   Yes. | 10:08:02 |
| 2 | Q.   And significant matters include -- look at | |
| 3 | the second bullet point -- the SAD; correct? | |
| 4 | A.   Yes. | |
| 5 | Q.   All right.  Let's talk about the SAD. | 10:08:13 |
| 6 | What steps would you take typically before | |
| 7 | signing off on an SAD? | |
| 8 | A.   To review the content of the SAD and make | |
| 9 | sure I was comfortable with before signing off. | |
| 10 | Q.   All right.  Now, let's go to the end of | 10:08:34 |
| 11 | page 11.  That's where you signed off there as the | |
| 12 | engagement manager; right? | |
| 13 | A.   I see this printout, and I see my name on | |
| 14 | it.  I know I signed off Cavium database.  I cannot | |
| 15 | say that this is an exact copy of what we were | 10:08:59 |
| 16 | using, the Cavium electronic web papers. | |
| 17 | Q.   All right.  But looking at this, you have | |
| 18 | no reason to doubt that, in fact, that indicates | |
| 19 | your sign-off; right? | |
| 20 | MS. EVANS:  Calls for speculation.  Vague | 10:09:10 |
| 21 | and ambiguous.  Overbroad. | |
| 22 | THE WITNESS:  I would repeat my previous | |
| 23 | answer. | |
| 24 | BY MR. HUESTON: | |
| 25 | Q.   Okay.  Can you recall not signing off on | 10:09:22 |

```
 1   any particular engagement while at PwC?              10:09:23
 2           MS. EVANS:  Vague and ambiguous.
 3           THE WITNESS:  Not signing off what?
 4           BY MR. HUESTON:
 5       Q.   All right.  I'm going to just -- I'll       10:09:36
 6   scratch that question.
 7           When you --
 8           MS. EVANS:  Can we stop for a minute?  Can
 9   we take a restroom break?
10           MR. HUESTON:  Can I finish a couple of       10:09:43
11   questions, and then we can do?  I'm in the middle of
12   a couple of questions.
13           MS. EVANS:  I would prefer to do it now.
14           MR. HUESTON:  You're going to interrupt
15   my -- my questioning?                                10:09:50
16           MS. EVANS:  There's not a question pending.
17           MR. HUESTON:  Well, generally one is
18   enabled and allowed to finish the questions in a
19   line.  I have two or three questions.  If you
20   insist --                                            10:10:00
21           MS. EVANS:  Sorry.  I really have to go to
22   the restroom.
23           MR. HUESTON:  All right.  We'll take a
24   break.
25           THE VIDEOGRAPHER:  We're going off the       10:10:07
```

**DX1649-62**

Confidential
MAURO BOTTA - 09/25/2018                    Page 63

```
 1   record.  The time is 10:10 a.m.                    10:10:08

 2              (Recess taken, from 10:10 to 10:19.)

 3              THE VIDEOGRAPHER:  We're back on the record

 4   at 10:19 a.m.

 5              BY MR. HUESTON:                          10:18:59

 6      Q.   Let's have you turn back to Section 2570,

 7   which is in your pile of exhibits there.

 8              Do you see it?  Should be Exhibit 5.

 9              (Discussion off the record.)

10              BY MR. HUESTON:                          10:20:04

11      Q.   So turning your attention back to

12   Exhibit 4.  This is the "Manager Review

13   Responsibilities" section; correct?

14      A.   Yes.

15      Q.   Okay.  And then turning your attention back  10:20:12

16   to those three bullet points we reviewed earlier, do

17   you see those?  Down at the bottom:

18              "The manager is required to

19              electronically sign off on the following

20              EGAs."                                   10:20:26

21              Do you see that?

22      A.   Yes.

23      Q.   When you signed off on those EGAs, your

24   signature represented your approval and agreement

25   with, in the first one, the auditing client; right?  10:20:33
```

| | | |
|---|---|---|
| 1 | MS. EVANS:  Overbroad.  Vague and | 10:20:38 |
| 2 | ambiguous.  Calls for speculation. | |
| 3 | BY MR. HUESTON: | |
| 4 | Q.   You can answer. | |
| 5 | A.   Yes. | 10:20:42 |
| 6 | Q.   And so if you signed off on the engagement | |
| 7 | leader and manager checklist, No. 2, your signature | |
| 8 | would represent that you addressed and complied with | |
| 9 | each item on the checklist; right? | |
| 10 | MS. EVANS:  Vague and ambiguous. | 10:20:56 |
| 11 | Overbroad. | |
| 12 | THE WITNESS:  I felt pressure to sign it. | |
| 13 | BY MR. HUESTON: | |
| 14 | Q.   Well, if you signed off, your signature | |
| 15 | would represent you addressed and complied with each | 10:21:08 |
| 16 | item on the checklist; right? | |
| 17 | MS. EVANS:  Misstates his testimony that he | |
| 18 | just gave. | |
| 19 | THE WITNESS:  I felt pressured to sign off. | |
| 20 | BY MR. HUESTON: | 10:21:23 |
| 21 | Q.   Putting aside -- and we'll get to | |
| 22 | particular audits where you're alleging you felt | |
| 23 | pressure. | |
| 24 | Putting aside your recollection of those | |
| 25 | occurrences, when you signed off on a checklist, | 10:21:38 |

```
 1   your signature represented in the document that you      10:21:42

 2   addressed and complied with each item on that

 3   checklist; right?

 4            MS. EVANS:  Overbroad.  Vague and

 5   ambiguous.  I don't think he can give a blanket           10:21:50

 6   answer like that.  He just answered it.

 7            MR. HUESTON:  Well, that's -- first of all,

 8   that's a totally improper speaking objection, and I

 9   ask that you stop and cease.

10            BY MR. HUESTON:                                   10:22:01

11       Q.   You may answer.

12            MS. EVANS:  Repeat the question, please.

13            BY MR. HUESTON:

14       Q.   Do you need the question repeated?

15       A.   Yes.                                              10:22:05

16            MS. EVANS:  I do.

17            MR. HUESTON:  Well, you're not the one

18   who's getting her deposition taken.  And you are

19   also giving very improper speaking objections, and

20   I'm going to ask you to stop.                              10:22:12

21            MS. EVANS:  I've never given an improper

22   speaking objection.

23            MR. HUESTON:  Okay.  Well, we'll let the

24   court determine that.

25            MS. EVANS:  We will.                              10:22:20
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 66

```
 1              MR. HUESTON:  Could you reread my question,     10:22:20
 2     please.
 3              (Record read as follows:
 4              "Q   Putting aside -- and we'll get to
 5         particular audits where you're alleging you      10:21:29
 6         felt pressure.
 7                  "Putting aside your recollection of
 8         those occurrences, when you signed off on a
 9         checklist, your signature represented in
10         the document that you addressed and           10:21:43
11         complied with each item on that checklist;
12         right?")
13              MS. EVANS:  Overbroad.  Vague and
14     ambiguous.  Calls for speculation.
15              BY MR. HUESTON:                           10:22:54
16     Q.   You can answer.
17     A.   Yes.
18     Q.   And if you signed off on the significant
19     matters EGA, the third one, your signature would
20     represent that you approved and agreed with your   10:23:04
21     team's evaluation of the control deficiencies;
22     correct?
23              MS. EVANS:  Overbroad.  Vague and
24     ambiguous.
25     ///
```

DX1649-66

```
 1              BY MR. HUESTON:                          10:23:12

 2        Q.   You can answer.

 3        A.   Except the times where I felt pressured.

 4        Q.   All right.  But otherwise, that's what it

 5   would indicate; correct?                           10:23:20

 6        A.   Yes.

 7        Q.   And if there was an SAD prepared, your

 8   signature on that SAD would indicate you agreed with

 9   the conclusions in the SAD; right?

10              MS. EVANS:  Overbroad.  Vague and        10:23:33

11   ambiguous.

12              THE WITNESS:  Except the time I felt

13   pressured.

14              BY MR. HUESTON:

15        Q.   You will recall that in 2011 and 2012, you 10:23:55

16   were staffed on the engagement team for Covad;

17   correct?  Do you recall roughly that time period?

18        A.   I do not recall I was staffed on Covad.

19        Q.   Okay.  Well, you were the engagement

20   manager for Covad during that time period; right?    10:24:12

21        A.   I do not believe I was.

22        Q.   Okay.  Well, you would call yourself the

23   lead manager for the whole audit at Covad; right?

24              MS. EVANS:  Misstates the testimony.

25   ///
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 10:24:30 |
| 2 | Q.   You can answer. | |
| 3 | A.   During which years? | |
| 4 | Q.   Well, let me ask you. | |
| 5 | Do you believe that you were the lead | 10:24:34 |
| 6 | manager for the whole audit at Covad at any point in | |
| 7 | time? | |
| 8 | A.   Yes. | |
| 9 | Q.   What years? | |
| 10 | A.   I do not recall exactly what was the last | 10:24:45 |
| 11 | year.  My best guess would be 2009, maybe '8. | |
| 12 | Q.   What would be the beginning time that you | |
| 13 | recall being lead manager for the whole audit at | |
| 14 | Covad? | |
| 15 | A.   That I do not recall, the exact year when | 10:25:10 |
| 16 | it started. | |
| 17 | Q.   And do you roughly recall when it ended | |
| 18 | when you were lead manager? | |
| 19 | A.   As I said, I believe 2009, 2008. | |
| 20 | MR. HUESTON:  Okay.  Marking the next | 10:26:10 |
| 21 | document as Exhibit 10 -- | |
| 22 | THE REPORTER:  6. | |
| 23 | MR. HUESTON:  Whoops.  We're on 6?  All | |
| 24 | right. | |
| 25 | (Discussion off the record.) | 10:26:21 |

Confidential
MAURO BOTTA - 09/25/2018                          Page 69

1            (Marked for identification purposes,          10:26:21

2            Exhibit 6.)

3       BY MR. HUESTON:

4       Q.   Do you recognize what's been placed before

5   you as Exhibit 6?                                      10:26:38

6       A.   I do recall the topic.  I cannot represent

7   if this is the electronic work paper that is

8   archived.

9       Q.   Okay.  Let's go to page 8 of 8.  On the

10  last page, it lists the engagement manager and has     10:28:09

11  your name, with a date, May 26, 2011; right?

12      A.   Yes.

13      Q.   And so the document indicates that as of

14  that date, May 26, 2011, you signed off as an

15  engagement manager on the conclusions expressed in     10:28:24

16  this memo; right?

17          MS. EVANS:  Overbroad.  Calls for

18  speculation.

19          THE WITNESS:  Similar to before, I would

20  have to see the original work papers.  I can see the   10:28:39

21  printout that has my name on it, but unless I see

22  the original electronic copy, I can't tell you.

23          BY MR. HUESTON:

24      Q.   Well, other than not seeing the work

25  papers, you have no reason to believe that this is     10:28:50

```
 1   not a true and correct document; right?                    10:28:52

 2          MS. EVANS:  Calls for speculation.

 3          BY MR. HUESTON:

 4     Q.   You can answer.

 5     A.   I wouldn't want to speculate.                        10:28:58

 6     Q.   Well, what is it about this document that

 7   you believe -- causes you to believe this is not, in

 8   fact, a true and correct document from PwC?

 9     A.   Any printout can be edited.  So that is

10   why, unless I see the archived copy, I cannot tell          10:29:20

11   you with certainty that this is what it is in the

12   work papers.

13     Q.   All right.  So I'm going to represent this

14   is from the work papers, but what I'll do is we'll

15   just reference the document on this page 8 of 8.            10:29:32

16          That's your name listed and the date,

17   May 26, 2011; right?

18     A.   Yes.

19     Q.   And you recall that this memo included

20   conclusions on deferred revenue; right?                     10:29:45

21     A.   I do not recall.

22     Q.   Okay.  Let's go to the bottom of page 6.

23   There is a section entitled "Deferred Revenues."

24          Do you see that?

25          MS. EVANS:  When you refer to page 6 --             10:30:03
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 71

```
 1            MR. HUESTON:  Page 6 of 8 of the document.    10:30:06

 2            MS. EVANS:  Thank you.

 3            THE WITNESS:  Yes.

 4            BY MR. HUESTON:

 5       Q.   And please, to yourself, review that         10:30:15

 6   paragraph under "Deferred Revenues" and tell me when

 7   you have completed your review.

 8       A.   I've read it.

 9       Q.   Okay.  Does that refresh your recollection

10   that you reviewed a memo in connection with Covad      10:31:00

11   that described deferred revenues issues?

12       A.   I do not recall documents that I reviewed,

13   so I can't give you a better answer.

14       Q.   Well, does this refresh your recollection

15   that this was an issue that came up during the Covad   10:31:25

16   audit --

17       A.   Yes.

18       Q.   -- in or around May of 2011?  Yes?

19       A.   Yes.

20            MR. HUESTON:  Okay.  And so let's go to       10:31:35

21   another -- Exhibit 7.  Mark that as Exhibit 7.

22            (Marked for identification purposes,

23            Exhibit 7.)

24            BY MR. HUESTON:

25       Q.   You recognize Exhibit 7 as a memo from you    10:32:14
```

**DX1649-71**

```
 1   to CCGI Holding Company, "Subject: Deferred Revenue    10:32:18

 2   Acquired in 2010 Analysis"?  That's your document;

 3   right?

 4       A.   Same as before.  I'm seeing a printout.

 5   Unless I see the original work papers, I can't tell     10:32:31

 6   you that this was my memo as well.

 7       Q.   Okay.  Well, that's your name on the top of

 8   the memo; right?  And looking at the memo, what I'm

 9   going to ask you, is there anything about this memo

10   that makes you believe that it's not, in fact, the     10:32:47

11   memo you wrote?

12       A.   I cannot give you such statement on

13   something that is that dated.  So I cannot tell you

14   if there was words changed for what is in the

15   original work papers.                                  10:33:01

16       Q.   Okay.  You recall writing a memo in 2012

17   about the topic of deferred revenue acquired with

18   respect to Covad; right?

19       A.   Actually, I do not recall writing a memo.

20   It is possible, but I do not recall.                   10:33:18

21       Q.   Okay.  Well, take a moment to review this,

22   and I'll ask you whether this refreshes your

23   recollection that you, in fact, wrote a memo about

24   deferred revenue.

25            MS. EVANS:  Go ahead and read the whole       10:33:30
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 73

```
 1   thing.                                          10:33:31

 2           BY MR. HUESTON:

 3       Q.   Have you reviewed memo?

 4       A.   Yes.

 5       Q.   Does it refresh your recollection that you   10:35:35

 6   wrote a memo on deferred revenue acquired?

 7       A.   It does not refresh it.  I mean, I would

 8   have the same answer as before.  It's possible that

 9   I did.

10       Q.   Okay.  Let's go to the last page of the     10:35:50

11   text of the memo, where it says "conclusion."

12           Do you see the conclusion in bold?

13       A.   Yes.

14       Q.   And in the second-to-last sentence, it

15   starts:                                              10:36:06

16               "Based on the company's model, we

17               reengaged our TS specialists to review

18               the methodology and the model prepared by

19               Brooke Mastin, VP of tax and FP&A, and

20               found the revised valuation to be         10:36:19

21               reasonable."

22           That's what the document says; correct?

23       A.   Yes.

24       Q.   And -- so let's go -- you can put that one

25   aside.                                               10:36:52
```

DX1649-73

Confidential
MAURO BOTTA - 09/25/2018                    Page 74

```
 1            MR. HUESTON:  I'm handing you what's marked    10:37:01
 2      as Exhibit 8.
 3            (Marked for identification purposes,
 4             Exhibit 8.)
 5            BY MR. HUESTON:                                 10:37:16
 6      Q.    And Exhibit 8 is an e-mail from you to
 7      Carol Lee, Deepak Bhandarkar, and Peter Geday at
 8      PwC.  "Subject: Covad - Deferred Revenue 2010."
 9            Do you see that?
10      A.    I see the printout.                             10:37:42
11      Q.    And down below, the single sentence says:
12            "Purpose of the call" -- and this is
13            dated March 23rd, 2012 -- "is to
14            brainstorm on how to document the revised
15            valuation of 2010 Deferred Revenue for MP       10:37:56
16            and SE."
17            Do you see that?
18      A.    Yes.
19      Q.    What is your recollection of what "MP"
20      means?                                                10:38:05
21      A.    My best recollection would be MP, MegaPath.
22      Q.    And what about SE?
23            (Reporter clarification.)
24            THE WITNESS:  MegaPath.
25      ///
```

Confidential
MAURO BOTTA - 09/25/2018                     Page 75

```
 1            BY MR. HUESTON:                        10:38:30

 2       Q.   And what is SE?

 3       A.   Speakeasy.

 4       Q.   And who is Carol Lee?

 5       A.   Now she is a partner --               10:38:39

 6       Q.   No.  Sorry.  Scratch the question.

 7            In March of 2012, who was Carol Lee?

 8       A.   She was a director in the transaction

 9   services group.

10       Q.   Same question for Deepak Bhandarkar.  Who  10:38:54

11   was he in March of 2012?

12       A.   Engagement leader on the Covad engagement.

13       Q.   And same question for Peter Geday.

14       A.   I believe at the time -- I don't recall his

15   rank.  Could have been senior or manager, but    10:39:13

16   transaction services group.

17       Q.   Okay.  And do you recall being involved in

18   the brainstorming call to document the revised

19   valuation of the 2010 deferred revenue issue?

20       A.   It is possible.                        10:39:39

21       Q.   Okay.  Do you recall that Covad was

22   selected for peer review?

23       A.   Yes.

24            MR. HUESTON:  Okay.  Marking the next,

25   Exhibit 9.                                       10:40:24
```

DX1649-75

Confidential
MAURO BOTTA - 09/25/2018                          Page 76

```
 1              (Marked for identification purposes,        10:40:30
 2         Exhibit 9.)
 3         BY MR. HUESTON:
 4    Q.    Exhibit 9 is an e-mail.  It starts with an
 5    e-mail at the top from a Meixuan Goh to a number of   10:40:46
 6    individuals, including yourself, dated July 24th,
 7    2012.
 8              Do you see that?
 9    A.    Yes.
10    Q.    And who is Meixuan Goh in 2012?               10:41:00
11    A.    She was the leading manager on the Covad
12    engagement.
13    Q.    Okay.  And then right before the table,
14    down below it says:
15              "Hi everyone.  In relation to             10:41:15
16         Deepak's previous e-mail on the peer
17         review for MegaPath's 2011 audit ..."
18              This refers to the peer review that you
19    recollected; right?
20    A.    I do recollect the peer review.              10:41:27
21    Q.    Okay.  Now, down below, in that list of
22    roles, this is dated July of 2012, there -- it
23    states "Lead Engagement Manager 1," and it has your
24    name next to it; right?
25    A.    This printout does, yes.                      10:41:48
```

DX1649-76

```
 1      Q.   And it says your staff level, as of         10:41:50
 2  July 24th, was senior manager; right?
 3      A.   Yes.
 4      Q.   And it states that as of July 24th, 2012,
 5  that you had worked a total of seven years on this    10:42:02
 6  client; right?
 7      A.   That's what it states.
 8      Q.   And it states that you had been in your
 9  current position on the client for one year; right?
10      A.   That's what it states.                       10:42:18
11      Q.   Okay.  And -- and do you have any reason to
12  believe that the information listed here about
13  yourself, your position, and years in the client,
14  was inaccurate at the time?
15          MS. EVANS:  Speculation.  Vague and           10:42:43
16  ambiguous.  Overbroad.
17          BY MR. HUESTON:
18      Q.   You can answer.
19      A.   I do believe, as it states, misleads my
20  position on the engagement on 2011 audit.            10:42:53
21      Q.   I'm sorry.  Could you repeat your answer.
22      A.   Can you reread it.
23          MS. EVANS:  Can you read it back.
24          (Record read as follows:
25          "A   I do believe, as it states,             10:43:09
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 78

```
 1        misleads my position on the engagement on        10:43:09
 2        2011 audit.")
 3             BY MR. HUESTON:
 4        Q.   And what do you mean by it misleads your
 5   position?                                              10:43:23
 6        A.   I was not the lead engagement manager.
 7        Q.   Okay.  Do you recall e-mailing back to
 8   Meixuan Goh, or anyone else, saying, Wait, this is a
 9   mistake.  I'm not the lead engagement manager?
10        A.   I do not recall.                             10:43:35
11        Q.   You don't recall doing that?
12        A.   No.
13             MR. HUESTON:  Marking the next, Exhibit 10.
14             (Marked for identification purposes,
15             Exhibit 10.)                                 10:44:12
16             BY MR. HUESTON:
17        Q.   Exhibit 10 is a two-page e-mail chain,
18   beginning at the top of page 1, from
19   Deepak Bhandarkar to yourself, April 27th, 2013,
20   regarding a performance note.                          10:44:38
21             Do you see that?
22        A.   Yes.
23        Q.   And at the bottom of the e-mail chain, that
24   goes on to page 2, it's actually from
25   Laura Bustamante to yourself regarding a performance   10:44:49
```

**DX1649-78**

Confidential
MAURO BOTTA - 09/25/2018                    Page 79

```
 1  note; right?                                          10:44:53

 2      A.   Yes.

 3      Q.   And it actually attaches the performance

 4  note as a memo from Laura Bustamante to yourself,

 5  dated April 26, with inspection findings; right?     10:45:08

 6      A.   Yes.

 7      Q.   And you recall that as your performance

 8  note; right?

 9      A.   I recall I received the performance note.

10  I can't tell you if this is the original.            10:45:21

11      Q.   Okay.  And if you look at the first

12  paragraph, it states:

13              "In connection with the 2011 audit of

14              Covad, which was rated as non-compliant

15              ('NC') as a result of an inspection in  10:45:36

16              2012, you were responsible for the

17              design, completion, and/or review of the

18              audit areas which resulted in the NC

19              rating.  You should focus on these areas

20              more closely in future audits."         10:45:49

21              Do you see that?

22      A.   Yes.

23      Q.   And do you dispute that finding?

24      A.   Yes.

25      Q.   And what specifically is untrue in what was  10:45:56
```

**DX1649-79**

1    stated in that paragraph?                              10:46:00

2        A.    That the area that resulted in the NC

3    rating, the aspect of that resulted, I was not the

4    responsible for the design or completion of the

5    review.  Mr. Bhandarkar was the one who made the      10:46:14

6    call.

7        Q.    You recall that the non-compliant reference

8    here relates to the deferred revenue issue in the

9    memo you wrote; right?

10       A.    My recollection is that the non-compliant    10:46:35

11   was related to the disclosure of the deferred

12   revenue.  I do not believe that was part of the

13   memo.

14       Q.    But it related to the issue of deferred

15   revenue addressed in your memo; right?                 10:46:47

16       A.    As I said, I do not believe the disclosure

17   was addressing that memo.

18       Q.    And going back to the first page of

19   Exhibit 10, at the top, the e-mail from

20   Mr. Bhandarkar, and he states, in the third            10:47:05

21   sentence:

22               "You were primarily responsible for

23               the former matter, which they did not

24               challenge.  And while you and I consulted

25               together on the latter matter and signed   10:47:26

```
1            off on the memo to treat it as a              10:47:28

2            measurement period adjustment, it was my

3            judgment call on this which the peer

4            review team disagreed with."

5            Do you see that?                               10:47:37

6      A.    Yes.

7      Q.    So you agree that you consulted with

8   Mr. Bhandarkar on how to treat the deferred revenue

9   from a disclosure perspective; right?

10     A.    We consulted on if this should have been       10:47:48

11  treated as measurement period adjustment.

12          (Reporter clarification.)

13          THE WITNESS:  I consulted with

14  Mr. Bhandarkar if this was a measurement period

15  adjustment.                                             10:48:07

16          BY MR. HUESTON:

17     Q.    Okay.  Let me go to the sentence before

18  that.  He states:

19              "As you know, there were two issues

20              raised in the peer review.  One was        10:48:15

21              whether the revised valuation of the

22              deferred revenue was correct."

23          That was one issue; right?

24     A.    I do not recall.

25     Q.    Okay.  And the second one he notes is:         10:48:26
```

```
 1                  "How to treat it from a disclosure      10:48:30

 2          perspective."

 3          You recall that; right?

 4     A.   I recall that was raised in the peer

 5  review, yes.                                            10:48:39

 6     Q.   Right.  And then he states:

 7                  "You were primarily responsible for

 8          the former matter."

 9          And that's whether the revised valuation of

10  the deferred revenue was correct; right?               10:48:48

11     A.   I believe "correct" is a bit of an improper

12  characterization.  Probably more like "reasonable"

13  would be a better word to describe it.

14     Q.   All right.  That's fine.

15          And then he states -- with respect to the       10:49:02

16  second one, how to treat it from a disclosure

17  perspective, he states:

18                  "While you and I consulted together

19          on the latter matter" --

20          And I just want to pause there.                 10:49:14

21          You recall consulting with him on how to

22  treat it from a disclosure perspective; correct?

23     A.   I recall we consulted if -- on the

24  measurement period adjustment.  I do not recall the

25  discussions on the disclosure of that adjustment.      10:49:31
```

```
 1       Q.   And then he further continues, after      10:49:43

 2   writing consulting together on the latter matter:

 3            "And signed off in the memo to treat

 4            it as a measurement period adjustment.

 5            It was my judgment call on this which the  10:49:52

 6            peer team" -- "peer review team disagreed

 7            with."

 8            Do you see that?

 9       A.   Yes.

10       Q.   And you agreed with that statement, right,  10:50:02

11   that it was his judgment call with which the peer

12   team disagreed?

13       A.   I would be speculating.  I know it was not

14   my judgment call.  I do not know if it was his in

15   consultation with QRP or others.  But that one I     10:50:18

16   would be speculating, so I can't tell you.

17       Q.   He then writes:

18            "This performance note is a standard

19            write-up issued to managers/senior

20            managers who were involved with matters     10:50:29

21            leading up to non-compliant inspections."

22            And you agreed with his characterization of

23   the performance note; right?

24            MS. EVANS:  Overbroad.

25            THE WITNESS:  I'm not sure -- I'm not sure   10:50:44
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 84

```
 1   what you mean with I agree with his              10:50:46

 2   characterization.

 3          BY MR. HUESTON:

 4     Q.   Well, do you -- well, do you disagree with

 5   anything he writes in that sentence?             10:50:52

 6              "This performance note is a standard

 7              write-up issued to managers/senior

 8              managers who were involved with matters

 9              leading to non-compliant inspections."

10          MS. EVANS:  Overbroad.  Vague and          10:51:02

11   ambiguous.

12          BY MR. HUESTON:

13     Q.   Did you agree with that statement at the

14   time?

15     A.   I was not in a position to agree or        10:51:07

16   disagree because I did not have prior experiences or

17   after that to assess if this was a true statement or

18   not.

19     Q.   Okay.  So at the time you had no reason to

20   believe that was untrue statement; right?         10:51:20

21          MS. EVANS:  Misstates his testimony and

22   overbroad.  Vague and ambiguous.

23          BY MR. HUESTON:

24     Q.   You can answer.

25     A.   I have no basis to say if it was true or   10:51:25
```

```
 1   untrue at the time.                                      10:51:30
 2           MR. HUESTON:  Mark this as Exhibit 11.
 3           (Marked for identification purposes,
 4            Exhibit 11.)
 5           BY MR. HUESTON:                                   10:51:47
 6       Q.  Exhibit 11 is an e-mail that begins from
 7   you, sent to a Sameer Ladiwala, dated April 27th,
 8   2013, and subject performance note.
 9           Do you see that?
10       A.  Yes.                                              10:52:18
11       Q.  And who do you recall Sameer Ladiwala was
12   in 2013?
13       A.  Again, the rank, not positive.  Manager or
14   senior manager in the San Jose office.
15       Q.  Okay.  And you wrote down below:                  10:52:31
16               "Obviously must be just me in foo foo
17               land, but I still think this performance
18               note is not warranted and should not go
19               in my file.  Won't matter anyway."
20           That's what you wrote; right?                     10:52:46
21       A.  That's what I see in the printout.  I can't
22   tell you if the original e-mail has that language.
23       Q.  Okay.  Well, you understood that by writing
24   that language "won't matter anyway," you understood
25   that the performance note wouldn't matter; right?        10:52:59
```

```
 1      A.   That will be speculation.  I wouldn't say      10:53:02

 2   that.

 3      Q.   Why did you write "won't matter anyway"?

 4      A.   I cannot tell you what -- why I wrote

 5   something five years ago.                              10:53:13

 6      Q.   You have no recollection of why you would

 7   write "won't matter"?

 8      A.   Nope.

 9      Q.   You wrote that because you understood that

10   the performance note would not have an impact on       10:53:25

11   you; isn't that right?

12      A.   Nope.

13      Q.   You did not suffer any consequences in your

14   employment due to this note; correct?

15           MS. EVANS:  Overbroad.  Speculation.  Vague    10:53:38

16   and ambiguous.

17           THE WITNESS:  I cannot say that.

18           BY MR. HUESTON:

19      Q.   What can you identify as a consequence of

20   this performance note?                                 10:53:48

21           MS. EVANS:  Overbroad.  Speculation.  Vague

22   and ambiguous.

23           THE WITNESS:  The consequence is that I was

24   pressured to upload something in my personal file

25   for something that I did not do.  That in itself is    10:54:00
```

```
 1   a consequence, that I fought against it.              10:54:03

 2           BY MR. HUESTON:

 3       Q.   And other than that, can you identify any

 4   other consequences?

 5           MS. EVANS:  Overbroad.  Speculation.  Vague   10:54:11

 6   and ambiguous.

 7           THE WITNESS:  I can't speculate.

 8           BY MR. HUESTON:

 9       Q.   I'm not asking you to speculate.

10           Other than what you described, can you        10:54:19

11   recall any other consequences of the performance

12   note going in your file?

13           MS. EVANS:  Overbroad.  Speculation.  Vague

14   and ambiguous.  He's answered.

15           BY MR. HUESTON:                                10:54:30

16       Q.   You can go ahead.

17       A.   I will repeat the same answer.

18       Q.   Well, you haven't answered the question.

19   I'm entitled to get an answer.  If you can't recall,

20   that's fine.  I don't want you to guess.  But you've  10:54:39

21   identified one consequence, and I'm asking if you

22   recall any others.  And I am entitled to have an

23   answer to that.

24           MS. EVANS:  Same objections.

25   ///
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 10:54:52 |
| 2 | Q.   You may answer. | |
| 3 | A.   I don't recall. | |
| 4 | Q.   Okay.  You, while at PwC, were staffed on | |
| 5 | engagement teams for Cavium; correct? | 10:55:14 |
| 6 | A.   Yes. | |
| 7 | Q.   And what kind of company is Cavium? | |
| 8 | A.   You mean the industry or -- what do you | |
| 9 | mean, what kind of company? | |
| 10 | Q.   I'm just asking you about Cavium. | 10:55:25 |
| 11 | Can you describe what kind of company it | |
| 12 | is? | |
| 13 | A.   It's a public company in the semiconductor | |
| 14 | business. | |
| 15 | Q.   And when did you first begin working on | 10:55:36 |
| 16 | Cavium engagements at PwC? | |
| 17 | A.   In quarterly review 2012.  I believe it was | |
| 18 | Q2. | |
| 19 | Q.   And starting in 2012, who do you recall was | |
| 20 | the engagement leader on the engagement team? | 10:55:55 |
| 21 | A.   Tye Thorson. | |
| 22 | Q.   And during that time, you served as the | |
| 23 | senior manager for the Cavium audits; right? | |
| 24 | A.   Yes. | |
| 25 | Q.   During your audit work on Cavium, did you | 10:56:20 |

```
 1   interact with Cavium's CFO, Art Chadwick?              10:56:23

 2       A.   Yes.

 3       Q.   And did you interact with Cavium's CAO,

 4   Suzy Seandel?

 5       A.   Yes.                                           10:56:34

 6       Q.   And, in general, how often did you interact

 7   with them?  A few times a week or a month?  Can you

 8   quantify?

 9       A.   I would say it depends.  When we were

10   on-site, several times during the week.                10:56:51

11       Q.   Okay.  I'm now going to place before you

12   what I'm going to represent -- because these are

13   large spreadsheets -- as the Cavium 2012 SAD.

14            MR. HUESTON:  And we're going to mark this

15   document as the next in order.                         10:57:33

16            (Marked for identification purposes,

17            Exhibit 12.)

18            MS. EVANS:  That's Exhibit 12?

19            MR. HUESTON:  Yes.

20            MS. EVANS:  Do we have an extra copy?         10:57:56

21            MR. FURESVICH:  Yeah.

22            MS. EVANS:  Thank you.  This was produced?

23            MR. FURESVICH:  Yes.

24            MS. EVANS:  Okay.  Do we have Bates numbers

25   on it?                                                 10:58:14
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 90

```
 1          MR. HUESTON:  Pardon me?                    10:58:15

 2          MS. EVANS:  The Bates numbers for the

 3   production?

 4          MR. FURESVICH:  These were produced native.

 5          MS. EVANS:  Okay.                           10:58:20

 6          BY MR. HUESTON:

 7     Q.   I'm going to ask you some questions in a

 8   moment, but do you have a general recollection of

 9   preparing or working on the SAD for Cavium?

10     A.   I just want to make sure, based on you said  10:58:39

11   before.  I was supposed to get the exhibits from

12   her, not him.

13          MR. HUESTON:  It's coming.  It's coming

14   through her.  We're helping the court reporter.

15          THE WITNESS:  Okay.  Just making sure.      10:58:50

16          MS. EVANS:  She's marked this, though;

17   right?

18          MR. HUESTON:  Yes.

19          THE WITNESS:  Sorry.  Can you repeat the

20   question?                                          10:58:56

21          BY MR. HUESTON:

22     Q.   Sure.

23          Before getting into the document, you do

24   recall working on and preparing an SAD for Cavium in

25   2012; right?                                       10:59:03
```

**DX1649-90**

```
 1      A.   I do not recall if I prepared it.  I recall    10:59:05

 2   working on it either as a reviewer or part preparer.

 3      Q.   Okay.  So I want to direct your attention

 4   to the section entitled "Individual Control

 5   Deficiencies."                                          10:59:19

 6           Do you see that?  There should be a third

 7   column, C, that lists all the control deficiencies.

 8      A.   The header of the column?  I'm sorry.

 9      Q.   Yeah.  Moving across, you see what I'm

10   calling Column C.                                       10:59:40

11           You can see a listing of control

12   deficiencies; correct?

13      A.   Column C has a bunch of "yeses."

14      Q.   Okay.  Can you identify in the document --

15   you see the listing of control deficiencies?           10:59:56

16      A.   I see the description of the control

17   deficiencies.  Deficiency, Column B.

18      Q.   All right.  Thank you.

19           And you see that there are 17 deficiencies

20   identified under Column B?                              11:00:07

21      A.   Yes.

22      Q.   It looks like there are -- of the 17, there

23   are 16 control deficiencies and one as a significant

24   deficiency; correct?

25      A.   There are rows that appear to be hidden, so     11:00:24
```

```
 1    I cannot tell you that, because it goes from 4 to      11:00:26

 2    12.

 3            MR. FURESVICH:  We have a continuation.

 4            MR. HUESTON:  We'll give you the other

 5    documents just so you feel comfortable.  So we'll      11:00:38

 6    have to -- so we're going to mark this next document

 7    as 11 just to make sure our record --

 8            MS. EVANS:  11?  We already have an 11.

 9            THE REPORTER:  13.

10            MR. HUESTON:  Sorry.  The next one in          11:01:03

11    order.

12            (Marked for identification purposes,

13             Exhibit 13.)

14            BY MR. HUESTON:

15       Q.   And Exhibit 12 is another page of the SAD;     11:01:26

16    correct?

17            MS. EVANS:   Exhibit 13.

18            THE WITNESS:  13 or 12?

19            MS. EVANS:  13; right?

20            Can we start over so we get this clear?        11:01:40

21            MR. HUESTON:  Yeah.

22            BY MR. HUESTON:

23       Q.   I've just handed you what I'm marking as

24    Exhibit 13.  So you recognize this as the additional

25    items that we were referring to that's listing the    11:01:49
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 93

1  individual control deficiencies; right?                11:01:53

2      A.   It's a printout.  I would have to see

3  original work paper, so ...

4      Q.   But what you can see in the printouts is a

5  total of 17 deficiencies, right, 16 as control         11:02:07

6  deficiencies and one as a significant deficiencies.

7      A.   Again, I think that there are rows hidden,

8  so I can't tell you.  Because this one has 18, 19,

9  on, but there is still something missing from -- I

10  mean, line 18 here doesn't match with Row 18 here.     11:02:24

11  So I do not know how this was edited.

12            MR. HUESTON:  All right.  14.

13            (Marked for identification purposes,

14             Exhibit 14.)

15            BY MR. HUESTON:                               11:02:41

16      Q.   Now, with what we've marked as Exhibit 14,

17  you should now have all the listing of control

18  deficiencies, a total of 17, with 16 noted as

19  control deficiencies and one as a significant

20  deficiency; correct?                                   11:03:12

21      A.   Do you want me to do the reconciliation to

22  count?  I can't tell you right off the bat.

23      Q.   Well, just take a brief review.  And this

24  is noted summarily in the columns.

25      A.   So I would repeat the same answer.  I do     11:03:38

 1  not know how this was edited, so I can't tell you,    11:03:39

 2  like, from 4 how it goes to 12 and the missing ones

 3  were pasted here or ...

 4      Q.   Yeah, I realize -- look, I realize that you

 5  are not here to say whether this is, in fact, an      11:03:50

 6  exact printout.  I'm going to represent that it is.

 7          And so with that representation, I would

 8  ask that you look at it and ask whether you agree

 9  that there appear to be 17 deficiencies identified,

10  16 as control deficiencies and one as a significant   11:04:07

11  deficiency.

12          MS. EVANS:  Overbroad.  Vague and

13  ambiguous.  Compound.

14          BY MR. HUESTON:

15      Q.   You can answer.                              11:04:18

16      A.   The columns are out of place, so maybe

17  there was a shift.  I mean, I sum the first -- if I

18  sum 12 plus 14, there is more than 17 I count.

19  So -- and, again, the column do not even match.  So

20  I can't tell you, yes, it's 17.                       11:04:59

21          MR. HUESTON:  Okay.  Let's take a break,

22  and we're going to work on the exhibits for a few

23  minutes.

24          THE VIDEOGRAPHER:  This marks the end of

25  Media Unit No. 1.  The time is 11:05 a.m., and we're  11:05:07

DX1649-94

```
 1   going off the record.                              11:05:11

 2           (Recess taken, from 11:05 to 11:15.)

 3           THE VIDEOGRAPHER:  This marks the beginning

 4   of Media 2.  The time is 11:15 a.m., and we're back

 5   on the record.                                     11:15:02

 6           BY MR. HUESTON:

 7      Q.   Okay.  I want to turn to the topic of

 8   Harmonic audit.

 9           Who was in charge of the Harmonic audit?

10      A.   Can you clarify "in charge"?  You mean the  11:15:16

11   partner?  Manager?  Who are you asking?

12      Q.   What was your role on the Harmonic audit in

13   2015?

14      A.   Lead senior manager.

15      Q.   And who reported to you in that audit?      11:15:27

16      A.   Several team members.

17      Q.   Okay.  Do you remember who they are?

18      A.   So there was senior associate Umit Ozdemir.

19   Senior associate Ai-Li Shao.  Experience associate

20   Robyn Diamond.  Manager Umit Usta.  Experience      11:15:56

21   associate Kyle Filter.  Either associate or

22   experience associate Erik Toral.  Those were the

23   core engagement team member, I believe.

24      Q.   Okay.  And who did you report to in that

25   audit in 2015?                                      11:16:38
```

```
 1      A.    The partner, Stig Haavardtun.              11:16:39

 2      Q.    Okay.  Now, in your first amended complaint

 3   in this action, you have alleged that you continued

 4   to point out material weaknesses during the year end

 5   valuation in this audit; correct?                   11:16:59

 6      A.    I have not memorized the complaint, so I

 7   would like to chance to reread it.

 8      Q.    Okay.  I'm happy to give that to you to

 9   refresh your recollection.

10           MR. HUESTON:  Mark that as next in order.   11:17:17

11           (Marked for identification purposes,

12           Exhibit 15.)

13           BY MR. HUESTON:

14      Q.    You recognize this as your first amended

15   complaint; correct?                                 11:17:36

16      A.    It's a -- yeah.  The printout, yeah.

17      Q.    Okay.  And then turning to page 9,

18   paragraph 54, it states:

19               "Throughout 2016 plaintiff" --

20               That's you; correct?                    11:17:54

21      A.    Yes.

22      Q.    -- "continued to point out

23           material weaknesses and unethical

24           behavior defendants were engaged in."

25           Right?                                      11:18:01
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 97

```
 1      A.   Yes.                                        11:18:03

 2      Q.   Okay.  And you believed that the material

 3  weaknesses with respect to the Harmonic audit

 4  related to the subledger accounting issue; right?

 5      A.   No.                                         11:18:18

 6      Q.   What did you believe the material weakness

 7  related to?

 8      A.   It was pervasive on competency of the

 9  finance department.

10      Q.   Okay.  And your engagement team did a      11:18:34

11  national consultation on that issue; right?

12      A.   Nope.

13      Q.   You consulted with national team members

14  with respect to the issue you identified; right?

15      A.   We consulted with national on one issue    11:18:48

16  that I identified.

17      Q.   And what issue was that?

18      A.   The accounting convention of deferred

19  revenue.

20      Q.   The accounting convention of deferred      11:18:57

21  revenue?

22      A.   Yes.

23      Q.   And is there another issue that you did not

24  consult with national on that you thought related to

25  a material weakness?                                11:19:20
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 98

```
 1            MS. EVANS:  Overbroad.                    11:19:23

 2            THE WITNESS:  We consulted on the deferred

 3    revenue matter, and that's the only consultation we

 4    did.

 5            BY MR. HUESTON:                           11:19:34

 6        Q.  Well, just so I understand it, at that time

 7    had you identified any material weakness, other than

 8    what you called the accounting convention of

 9    deferred revenue?

10        A.  I did not say that the accounting of the   11:19:46

11    deferred revenue was a material weakness.  I stated

12    I that I believe the material weakness was related

13    to the competence of the finance department.

14            (Reporter clarification.)

15            MS. EVANS:  You started with "I do not      11:20:02

16    believe," and go ahead.

17            THE WITNESS:  Okay.

18            MS. EVANS:  Think about your answer.

19            (Discussion off the record.)

20            THE WITNESS:  I stated that the material     11:20:07

21    weakness was related to the competency of the

22    finance department.

23            BY MR. HUESTON:

24        Q.  So did you, in fact, consult with national

25    about what you felt was the material weakness, the   11:20:50
```

```
 1    competency of the finance department?              11:20:55

 2         A.   No.

 3              MR. HUESTON:  Let's go -- we're going to

 4    put these two together as 16 and 17.  Mark the first

 5    document 16 and the attachment 17.                 11:21:34

 6              (Marked for identification purposes,

 7               Exhibits 16 and 17.)

 8              BY MR. HUESTON:

 9         Q.   You recognize Exhibit 16 as a cover e-mail

10    to you and others for what is marked as Exhibit 17, 11:22:06

11    the Harmonic SLA memo; right?

12         A.   The same as before.  These are printouts.

13         Q.   Okay.  And that's your name on the e-mail,

14    right, Mauro Botta?

15         A.   Yes.                                       11:22:24

16         Q.   Okay.  And turning your attention to the

17    memo itself, you're listed there as the manager,

18    with Susan Ledezma; right?

19         A.   Yes.

20         Q.   Do you recall reviewing this memo?         11:22:50

21         A.   I do not recall.  It's possible.

22         Q.   Okay.  But it would be your custom and

23    practice to review a memo with your -- that listed

24    your name on it, like here; right?

25         A.   The portion that I was responsible for,    11:23:13
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 100

```
 1  yes.                                                    11:23:15

 2      Q.   Let's turn to Box 7, about the fifth and

 3  sixth page in.

 4           Do you see, in bold, it says "Box 7"?

 5      A.   What page?  Sorry.                              11:23:36

 6      Q.   It's about the fifth or sixth page in.  You

 7  see Box 3, Box 4, 5.  And I'm turning your attention

 8  to Box 7.

 9      A.   Yes.

10      Q.   Okay.  And take a moment to review Box 7       11:23:48

11  beginning there and continuing on to the next page.

12      A.   Okay.

13      Q.   Okay.  So Box 7 asks:

14           "Are there multiple control

15           deficiencies and/or significant               11:24:53

16           deficiencies that should be considered in

17           the aggregate?"

18           Do you see that?

19      A.   Yes.

20      Q.   And it says:                                   11:24:59

21           "If, yes, then go back to Box 2 and

22           repeat the evaluation."

23           That's what it says; right?

24      A.   Yes.

25      Q.   And in the response, the memo states:          11:25:05
```

DX1649-100

```
 1                    "No, no other deficiencies related to      11:25:09

 2              the same FSLI (service revenues and

 3              deferred revenues).  Furthermore, there

 4              were no other design issues or control

 5              deficiencies related to the order to cash    11:25:19

 6              cycle identified this year or in the

 7              prior year."

 8              Right?

 9              MS. EVANS:  Overbroad.

10              THE WITNESS:  I can read.  That is what is    11:25:29

11   written on this printout.

12              MR. HUESTON:

13        Q.   Right.  And this memo, this one with your

14   name on it, as well as Susan Ledezma; right?

15        A.   Printout, yes.                                 11:25:40

16              MR. HUESTON:  This is the next document.

17   You can put that one aside.

18              Okay.  I'm going to hand you what I'm

19   marking as Exhibits 18 and 19.  18 is a cover e-mail

20   to Exhibit 19.                                           11:26:27

21              (Marked for identification purposes,

22               Exhibits 18 and 19.)

23              BY MR. HUESTON:

24        Q.   Turn your attention to Exhibit 18.  That's

25   your e-mail address, mauro.x.botta@us.pwc.com;           11:26:51
```

```
 1   right?                                              11:26:56

 2      A.   Yes.

 3      Q.   And it's sent January 28th, 2016; right?

 4      A.   Printout, yes.

 5      Q.   And the e-mail is to who?                    11:27:05

 6      A.   This printout says it's to Stig Haavardtun

 7   and Ergun Genc.

 8      Q.   And who are they?

 9      A.   Stig Haavardtun was the engagement leader,

10   and Ergun Genc was the QRP.                          11:27:17

11      Q.   Okay.  And you write:

12           "Dear all, please see below SAB 99

13           updated with my comments."

14           And let me ask you, what did you refer to

15   with "SAB 99"?                                       11:27:33

16      A.   Is the standard that talks about the -- how

17   to payroll adjustments.  Staff accounting bulletin.

18      Q.   Okay.  And you further write:

19           "Ergun, for your benefit, you may

20           finalize your comments leveraging mine's     11:27:47

21           and Stig's to make it more efficient."

22           What did you mean by that?

23      A.   That he could have seen our comments in the

24   memo to avoid to have the same exact comment.  If he

25   read our comment first, he could just top off on     11:28:05
```

```
 1   what our comments were, rather than having to repeat      11:28:08

 2   the same comment that me and/or Stig already had.

 3        Q.   Okay.  So let's turn to the attachment,

 4   which is the SAB 99 analysis memo with comments.

 5             Do you see that?                                 11:28:22

 6        A.   I see Exhibit 19, SAB analysis of daily

 7   convention --

 8        Q.   Right.  And you see comments on the right,

 9   including comments MB, with numbers next to them, as

10   well as comments with other initials; right?             11:28:38

11        A.   Yes.

12        Q.   And MB is you; right?

13        A.   Yes.

14        Q.   So -- turn to the page ending in Bates

15   stamp 605.  It should be the last page.                  11:29:07

16             Do you see that?

17        A.   Yes.

18        Q.   And in the second line, it starts "the

19   company."  Do you see it?  "The company does not

20   believe"?                                                11:29:27

21        A.   Yes.

22        Q.        "The company does not believe the

23             adjustments signify a material weakness

24             in internal controls or should result in

25             a restatement of prior period financial        11:29:35
```

1              statements."                                    11:29:39

2              Do you see that?

3      A.   Yes.

4      Q.   And in the comments right at the end of

5  that, you have Comment MB27.                                11:29:45

6              Do you see that?

7      A.   Yes.

8      Q.   And you write:

9              "There needs to be a discussion on

10             the could factor and how those controls        11:29:57

11             reduce the exposure to less than an MW."

12             And you meant "material weakness" with

13  "MW"; right?

14     A.   Yes.

15     Q.       "Especially on the error start           11:30:08

16             end" -- "start date end date which

17             was not even known at the time."

18             That was your comment; correct?

19     A.   That is what I read in the printout.

20     Q.   And so with that comment, you were agreeing    11:30:20

21  that the internal controls reduce the exposure from

22  the error to less than a material weakness; right?

23     A.   No.  I just said that, in the memo, there

24  needed to be a discussion.

25     Q.   In order to -- in order to determine how       11:30:37

```
 1   those controls reduce the exposure to a less than a      11:30:40

 2   material weakness.  That's what you wrote in your

 3   Comment 27; right?

 4        A.   Yes.

 5        Q.   Okay.  You can put that aside.               11:30:48

 6             And, in fact, you recall having that

 7   discussion with your Harmonic team?

 8        A.   I do not recall I was involved in the

 9   consultation for the control aspect of this issue.

10             MR. HUESTON:  Okay.  Next in order.  I      11:31:36

11   think we're on 20; right?

12             THE REPORTER:  Yes.

13             MR. HUESTON:  20 and 21.

14             (Discussion off the record.)

15             (Marked for identification purposes,        11:31:42

16              Exhibits 20 and 21.)

17             BY MR. HUESTON:

18        Q.   We're on Exhibit 20.  So focusing on

19   Exhibit 20.

20             MS. EVANS:  Wait.  I'm missing some          11:32:22

21   exhibits.  I just want to make sure I have

22   everything.

23             MR. HUESTON:  Well, we can do that on the

24   break.  I'm not talking about the other exhibits.

25   You have 20 and 21, which I'm now going to ask him     11:32:28
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 106

```
 1   about that.                                          11:32:30
 2           BY MR. HUESTON:
 3       Q.   So looking at Exhibit 20, this is from your
 4   e-mail account, from Mauro Botta, on February 12,
 5   2016, to Anna Watson; right?                         11:32:39
 6       A.   Printout, yeah.
 7       Q.   Well, let's just make clear, that is from
 8   what you recognize at the top as your Mauro Botta
 9   PwC e-mail address; right?
10       A.   I do not see my address typed on top.       11:32:54
11       Q.   Okay.  Is there anything about that header
12   that makes you believe that this is not, in fact, a
13   true and correct e-mail from your account?
14       A.   I'm not actually not familiar with this cn
15   equal ou, us -- I'm not familiar with that.          11:33:08
16       Q.   The e-mail at the top states it's from you
17   to Anna Watson.
18           Who is Anna Watson?
19       A.   She is a senior manager in the chief
20   auditor network.                                     11:33:29
21       Q.   Okay.  And the subject is:
22               "Harmonic - notes from this morning's
23               discussion - action required."
24           Right?
25       A.   Yes.                                        11:33:38
```

```
 1      Q.   And you write:                              11:33:39

 2           "Anna, I am okay with the note

 3           attached.  I am Mauro Botta and I approve

 4           this message."

 5           That's what you wrote; right?               11:33:47

 6      A.   Yes.

 7      Q.   And attached as the next exhibit, 21, are

 8  the notes, the Harmonic notes, reflecting a

 9  discussion on February 11th, 2016, with yourself and

10  three others listed in the discussion notes; right?  11:34:04

11      A.   Yes.

12      Q.   And these are notes of a meeting between

13  you, Mr. Haavardtun, and Mr. Simonetti of national;

14  right?

15      A.   I believe Anna Watson was there during one  11:34:22

16  meeting as well.

17      Q.   Okay.  And if you turn to the second page

18  of the notes, you see at the top -- can you read

19  that bullet point, the first bullet point at the

20  top?                                                 11:34:41

21      A.        "No implication of fraud,

22           manipulation or lack of

23           integrity.  Impacts consideration of

24           risk."

25      Q.   And that was one of the points discussed at 11:34:50
```

```
 1   that meeting, according to your notes that you       11:34:52
 2   approved; right?
 3       A.   I do not recall that I am the one that took
 4   those notes.
 5       Q.   Those are the notes that you reference in    11:35:00
 6   your e-mail that we just went over in Exhibit 20,
 7   where you stated:
 8               "I am Mauro Botta and I approve this
 9               message."
10               Right?                                    11:35:11
11       A.   It does not mean that those were my notes.
12       Q.   The line before, you said:
13               "I am okay with the notes attached."
14               You wrote that; right?
15       A.   Yes.                                         11:35:19
16       Q.   Okay.  And you recall that the final
17   Harmonic SAD did not document any material
18   weaknesses.  You recall that; right?
19       A.   Sorry.  Can you repeat the question?
20       Q.   Sure.                                        11:35:38
21           The final Harmonic SAD in 2015, you recall
22   that that SAD did not document any material
23   weaknesses; correct?
24           MS. EVANS:  Calls for speculation.
25   Overbroad.                                            11:35:48
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 109

```
 1           BY MR. HUESTON:                          11:35:50
 2      Q.   You can answer.
 3      A.   Yes.
 4           MR. HUESTON:  Mark this as the next in
 5   order.  It's 23, is it?                          11:36:28
 6           THE REPORTER:  22.
 7           (Marked for identification purposes,
 8           Exhibit 22.)
 9           BY MR. HUESTON:
10      Q.   So I've handed you a screenshot I'd ask you   11:36:48
11   to take a look at.
12           MS. EVANS:  You're not passing me copies of
13   documents anymore for some reason.  Thank you.
14           MR. HUESTON:  You can just ask, and we'll
15   hand you them if we forget to.                   11:37:05
16           BY MR. HUESTON:
17      Q.   Looking at Exhibit 22, do you recognize
18   this as a screenshot from the PwC Aura Online
19   workplace?
20      A.   I'm actually not familiar with Aura Online.   11:37:21
21   Our work papers at the time were not documented in
22   Aura Online.  It's regular Aura.
23      Q.   Okay.  You recall that you reviewed and
24   signed off on the SLA consultation; right?
25      A.   Yes.                                      11:37:38
```

1      Q.    Okay.  And with that sign-off, you agreed          11:37:40

2   with and approved the conclusion of that

3   consultation; correct?

4      A.    Pressured, but, yes.

5      Q.    Now, at the time of the sign-off on this           11:38:20

6   audit, you did not believe that Harmonic violated

7   any laws; correct?

8           MS. EVANS:  Calls for speculation.  Calls

9   for a legal conclusion.  Overbroad.  Vague and

10  ambiguous.                                                  11:38:32

11          BY MR. HUESTON:

12     Q.    You can answer.

13     A.    I'm sorry.  Can you repeat the question?

14     Q.    Sure.

15          At the time that you signed off on that             11:38:37

16  Harmonic audit, you did not think that Harmonic

17  violated any laws; correct?

18          MS. EVANS:  Calls for a legal conclusion.

19  Calls for speculation.  Overbroad.  Vague and

20  ambiguous.                                                  11:38:47

21          BY MR. HUESTON:

22     Q.    Well, let me back up.  Let's take the

23  question off.

24          You recall that you also signed off on the

25  Harmonic SAD; right?                                        11:39:01

```
 1     A.   Yes.                                          11:39:05

 2     Q.   Okay.  So -- and as part of that, you would

 3  also have signed off on the engagement leader and

 4  manager checklist for the Harmonic audit; right?

 5     A.   Yes.                                          11:39:21

 6     Q.   All right.  So with reference to those

 7  sign-offs, at the time that you did those sign-offs,

 8  you did not think that Harmonic violated any laws;

 9  right?

10          MS. EVANS:  Calls for speculation.  Calls     11:39:32

11  for a legal conclusion.  Overbroad.  Vague and

12  ambiguous.

13          BY MR. HUESTON:

14     Q.   You can answer.

15     A.   Violated any laws.  It depends how you        11:39:39

16  define "law."  But, again, I signed off under

17  pressure.

18     Q.   I'm just asking, did you think at the time

19  that Harmonic violated any laws?

20          MS. EVANS:  Calls for speculation.            11:39:58

21          THE WITNESS:  What's the definition of

22  "law"?  If you say audit standards, yes, I believe

23  that there were not -- they should have had a

24  material weakness.

25  ///
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 11:40:11 |
| 2 | Q.   I'm not -- when I say "laws," I'm not | |
| 3 | including audit standard. | |
| 4 | So other than audit standards, did you | |
| 5 | believe that Harmonic violated any law, a criminal | 11:40:23 |
| 6 | law, a civil law, any law at all? | |
| 7 | MS. EVANS:  Calls for speculation.  Calls | |
| 8 | for a legal conclusion.  Vague and ambiguous.  He | |
| 9 | doesn't know what laws are.  He answered it fine. | |
| 10 | MR. HUESTON:  Well, no.  You're doing a | 11:40:34 |
| 11 | speaking objection.  That's improper. | |
| 12 | MS. EVANS:  I'm not.  It's improper to ask | |
| 13 | him about laws -- | |
| 14 | MR. HUESTON:  It is not -- | |
| 15 | MS. EVANS:  -- when you're not asking about | 11:40:38 |
| 16 | specific laws. | |
| 17 | MR. HUESTON:  Well, no, I don't have to do | |
| 18 | that.  And -- | |
| 19 | MS. EVANS:  I will -- we'll take it up with | |
| 20 | the judge, then. | 11:40:45 |
| 21 | MR. HUESTON:  That's fine. | |
| 22 | BY MR. HUESTON: | |
| 23 | Q.   So the question to you, sir, at that | |
| 24 | time -- putting aside concerns about audit | |
| 25 | standards, did you believe at that time, in 2015, | 11:40:52 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 113

```
 1   that Harmonic had violated any laws?              11:40:55
 2          MS. EVANS:  Speculation.  Calls for a legal
 3   conclusion.  Vague.  Ambiguous.  Overbroad.
 4          BY MR. HUESTON:
 5      Q.   You can answer.                            11:41:05
 6      A.   I don't think I'm in a position to answer.
 7      Q.   Well, did you think at the time -- I'm
 8   asking for your best recollection of whether you
 9   thought at the time, one way or the other, whether
10   there was a violation of law by Harmonic.         11:41:15
11          MS. EVANS:  Calls for a legal conclusion.
12          BY MR. HUESTON:
13      Q.   Putting aside a concern about audit
14   standards.
15          MS. EVANS:  Calls for a legal conclusion.  11:41:25
16   Speculation.  Overbroad.  Vague and ambiguous.
17          THE WITNESS:  I would have to speculate.
18   No.
19          BY MR. HUESTON:
20      Q.   And what audit standards did you believe   11:41:36
21   Harmonic violated in 2015?
22      A.   As I said, I believe they had a material
23   weakness.
24      Q.   And with that material weakness, what audit
25   standard or standards did you believe they violated?  11:42:05
```

DX1649-113

Confidential
MAURO BOTTA - 09/25/2018                    Page 114

1      A.   I can't give you the exact numbering.          11:42:10

2      Q.   Can you give me a description of what that

3  audit standard was without the exact numbering?

4      A.   A standard that assesses the auditor

5  responsibility to issue an internal control opinion     11:42:24

6  and how to evaluate those deficiencies.

7      Q.   And in 2015, did you believe that PwC's

8  national team violated audit standards?

9           MS. EVANS:  Overbroad.

10          You can answer.                                 11:42:48

11          THE WITNESS:  Yes.

12          BY MR. HUESTON:

13     Q.   And I'm asking specifically with respect to

14  Harmonic.

15     A.   Yes.                                            11:42:55

16     Q.   And what is that?  What audit standards do

17  you believe they violated at that time with respect

18  to Harmonic?

19     A.   Independence, objectivity, and the others

20  that I mentioned in my previous response.               11:43:13

21     Q.   What are those others?

22     A.   Internal control evaluation and evaluation

23  of the deficiencies.

24     Q.   Okay.  And at that time, in 2015, was it

25  your position that PwC's national team, other than      11:43:40

DX1649-114

```
 1   violating audit standards, violated some other law?    11:43:43

 2          MS. EVANS:  Overbroad.  Calls for a legal

 3   conclusion.

 4          BY MR. HUESTON:

 5     Q.   You may answer.                                  11:43:52

 6     A.   I'm not going to speculate.

 7     Q.   Well, I'm not asking you to speculate.

 8          Did you have a view then that they violated

 9   a law other than what you described as the violation

10   of audit standards?                                     11:44:03

11          MS. EVANS:  Calls for a legal conclusion.

12   Speculation.

13          BY MR. HUESTON:

14     Q.   It's just a "yes" or a "no."

15          MS. EVANS:  Overbroad.                           11:44:08

16          THE WITNESS:  I cannot give you an answer

17   because I do not have the full breadth of knowledge

18   of all the laws.

19          BY MR. HUESTON:

20     Q.   So you didn't have a view as to whether          11:44:17

21   they violated a law, one way or the other, in 2015;

22   is that right?

23          MS. EVANS:  Misstates his testimony.

24          BY MR. HUESTON:

25     Q.   You can answer.                                  11:44:26
```

1      A.   I do not believe that is what I said.        11:44:26

2      Q.   In 2015, did you have a view, one way or

3  the other, as to whether the PwC national team

4  violated a law outside of any auditing standards?

5  That's a simple "yes" or "no" question.              11:44:42

6           MS. EVANS:  Calls for a legal conclusion.

7  Vague.  Ambiguous.  Overbroad.  Speculation.

8           BY MR. HUESTON:

9      Q.   You can answer.

10     A.   Same answer as before.  I can't give you an  11:44:50

11 answer.

12     Q.   You can't identify any law at the time that

13 you feel they violated; correct?

14           MS. EVANS:  Speculation.  Calls for a legal

15 conclusion.                                           11:45:02

16           BY MR. HUESTON:

17     Q.   You may answer.

18     A.   No.

19     Q.   Okay.  Now, in your first amended

20 complaint, you do allege that you are a              11:45:13

21 whistleblower; right?

22     A.   I'm sorry.  Can you repeat the question?

23     Q.   Sure.

24           In your first amended complaint, you allege

25 that you are, in fact, a whistleblower; right?        11:45:23

Confidential
MAURO BOTTA - 09/25/2018                    Page 117

```
 1      A.    Which paragraph are you pointing to?      11:45:27

 2      Q.    Well, I'm just asking if you recollect it.

 3      A.    Yes.

 4      Q.    Okay.  And to whom did you blow the whistle

 5   while you were still working at PwC?               11:45:47

 6      A.    The FBI, the SEC, Senator Dianne Feinstein

 7   office, state director, Department of Labor, the

 8   FEH.  That's Department of Labor.  That's all I can

 9   recall.

10      Q.    Okay.  And when did you report or blow the  11:46:21

11   whistle to the FBI?

12      A.    I believe it was in October of '16.

13      Q.    Okay.  And what laws did you claim were

14   being violated when you reported to the FBI?

15      A.    I did not articulate articles of law.  I    11:46:49

16   just went to their office and told them what my

17   concerns were.

18      Q.    Okay.  When did you blow the whistle to the

19   SEC?

20      A.    I believe that was in the beginning of      11:47:07

21   November '16 or end of October '16, in that time

22   frame.

23      Q.    And did you attempt to describe to the SEC

24   violations of law by PwC?

25      A.    I attached the documents to my complaint    11:47:23
```

1    that I believe included the standards that were          11:47:27

2    relevant to the issue I was raising.

3        Q.   The standards.  The auditing standards?

4        A.   PwC reference.  I did not have, to my

5    recollection, references to specific language of all     11:47:39

6    these standards.

7        Q.   And with respect to the office of

8    Dianne Feinstein, when did you blow the whistle to

9    that office?

10       A.   Well, I just want to make sure, when you        11:48:03

11   say "blow the whistle," went to Senator Feinstein's

12   office in January '17 to seek their assistance in

13   what I told the SEC.  We didn't go through documents

14   in detail.

15       Q.   Okay.  And what assistance were you             11:48:18

16   seeking?

17       A.   To make sure that the SEC would have looked

18   at it.

19       Q.   Okay.  And that's because the SEC had done

20   nothing up to that point in time after your             11:48:32

21   complaint; right?

22       A.   That would be speculation.  I did not

23   receive any communication from the SEC after I

24   submitted my complaint.

25       Q.   Have you received any communication from        11:48:45

Confidential
MAURO BOTTA - 09/25/2018                    Page 119

1   the SEC since you've submitted your complaint?          11:48:47

2       A.   In what time period?

3       Q.   Any time period.

4       A.   Yes.

5       Q.   In fact, you've been notified that it's a     11:48:57

6   closed investigation; right?

7       A.   Yes.

8       Q.   And when did you blow the whistle to the

9   Department of Labor?

10      A.   That was in August 2017, early August.        11:49:16

11      Q.   And what violations of law, if any, did you

12  identify to the Department of Labor?

13           MS. EVANS:  Speculation.  Calls for a legal

14  conclusion.  Overbroad.

15           THE WITNESS:  I believe my complaint          11:49:33

16  articulated the concerns that I had.  I would have

17  to read that to give you the exact quote.

18           BY MR. HUESTON:

19      Q.   What do you remember, generally?

20      A.   Concerns on retaliation, discrimination       11:49:50

21  referring to national origin.

22      Q.   Okay.  Let's go back to the blowing of the

23  whistle to the SEC.

24           You actually filed a complaint with the

25  SEC; correct?                                           11:50:14

**DX1649-119**

```
 1     A.   Yes.                                          11:50:16

 2          MR. HUESTON:  Okay.  Let me put that before

 3     you.

 4          (Marked for identification purposes,

 5          Exhibit 23.)                                  11:50:35

 6          BY MR. HUESTON:

 7     Q.   And you recognize Exhibit 23 as a copy of

 8     your complaint to the SEC; right?

 9     A.   Give me a second.

10          This is a printout and does resemble it.     11:51:09

11     Q.   Okay.  And if we turn to the Bates stamp

12     PLAINTIFF -- that's you by the way, this is your

13     copy -- No. 165, you'll see Section 1, "Directly

14     observed."

15          Do you see that?                              11:51:31

16     A.   Yes.

17     Q.   Okay.  So there's Section 1, and I'm just

18     going to ask you to keep that in mind.  And then

19     there's a second section that you find at

20     Plaintiff's No. 173 that's entitled "Indirect     11:51:45

21     Evidence and Tone" at the top; right?

22     A.   Yes.

23     Q.   So Section 1 is directly observed, and then

24     Section 2 is indirect evidence; right?

25     A.   And tone at the top.                          11:52:01
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 121

```
 1      Q.   Right.  So the direct evidence -- let's go    11:52:04
 2   back to the direct evidence section.
 3           That section consists of Covad, Cavium, and
 4   Harmonic audits; right?
 5      A.   I'm not sure where you see Covad.              11:52:20
 6      Q.   Well, there's Cavium is one.
 7           MS. EVANS:  What page are you on, please?
 8           BY MR. HUESTON:
 9      Q.   Starting at page 165, there's the Cavium
10   audit as directly observed; right?                    11:52:29
11      A.   Yeah.  But I don't see Covad.
12      Q.   You're right.  There's no Covad.  You're
13   correct.
14           So there's the Cavium audit and the
15   Harmonic audit; right?  The Harmonic audit begins at  11:52:40
16   Plaintiff's 169.
17           Do you see that?
18      A.   Yes.
19      Q.   And you were personally involved in those
20   two audits; correct?                                  11:52:59
21      A.   Yes.
22      Q.   And going to the indirect evidence section,
23   starting at 173, the first one is Micron Technology
24   2016.
25           Were you personally involved in that audit?   11:53:19
```

DX1649-121

```
 1      A.   No.                                            11:53:21

 2      Q.   Then the others listed -- Bluecoat,

 3  Spansion, Avago/Broadcom, and the other -- and

 4  Innovium -- you were not personally involved in

 5  those audits; correct?                                 11:53:34

 6      A.   Bluecoat, I did participate in the initial

 7  stages.

 8      Q.   In the initial stages.  But you did not

 9  participate in the full audit; correct?

10      A.   Correct.                                       11:53:46

11      Q.   And so for the assertions that you're

12  putting down with respect to indirect evidence, you

13  learned of these issues from other people at PwC; is

14  that right?

15      A.   Well, No. 1, I also witnessed that            11:54:10

16  all-hands meeting.  No. 2, I had --

17      Q.   Sorry.  Let me just make sure I'm following

18  you here.

19           When you say "No. 1," are you referring to

20  Micron Technology?                                      11:54:23

21      A.   Yes.

22      Q.   Okay.

23      A.   So I was at the all-hands meeting.

24           No. 2, Bluecoat --

25      Q.   Let's just pause for a moment.                 11:54:31
```

```
 1              So with respect to number one, you were      11:54:33

 2    present at an all-hands meeting that's referenced in

 3    the first line there; is that right?

 4        A.   Marketing meeting, yes.

 5        Q.   Okay.  Did you obtain information relevant      11:54:43

 6    to your entry here on number one from anyone else at

 7    PwC?

 8        A.   Yes.

 9        Q.   Who was that?

10        A.   Trudy Doucet.                                  11:54:56

11        Q.   Can you spell that?

12        A.   T, like Toronto, R-U-D, like Detroit, Y.

13    And the last name is D, like Detroit, O-U-C-E-T.

14        Q.   Who else did you speak to?

15        A.   Adam Power.                                    11:55:14

16        Q.   And who else, if anyone, with respect to

17    the allegations you place here in Section 1?

18        A.   Right.  I believe those two.

19        Q.   Okay.  And moving to No. 2, Bluecoat

20    independence, who did you speak to, if anyone, to      11:55:34

21    obtain information pertinent to your entry as number

22    two, Bluecoat?

23        A.   So on this particular one, the independence

24    consultation, I was aware because it was during the

25    time that I was involved.  And my conversations were   11:55:55
```

```
 1   then with the then-partner Tina Knauss, K-N-A-U-S-S,      11:56:01
 2   last name.  And then Trudy Doucet, we discussed the
 3   topic.
 4        Q.   Anyone else with respect to Bluecoat?
 5        A.   No.  Not that I recall.                         11:56:18
 6        Q.   Okay.  Moving to Spansion, No. 3, who were
 7   the people who told you about the issues that you
 8   described with Spansion?
 9        A.   Mario Piergallini.
10        Q.   And for the court reporter, please spell        11:56:35
11   the last name.
12        A.   P, like Philadelphia, I-E-R-G-A-L-L-I-N-I.
13        Q.   Anyone else?
14        A.   Not that I recall, no.
15        Q.   Okay.  And moving to Avago/Broadcom, No. 4,     11:56:53
16   who did you speak to about the issues itemized under
17   number four?
18        A.   Kevin Hasegawa.  Vykintas Striuzas.
19        Q.   Okay.  That one I think you're going to
20   have to spell.                                            11:57:09
21        A.   Which one?  Kevin Hasegawa?
22        Q.   No.  The second one.
23        A.   Okay.  V, like Victor, Y-K-I-N-T-A-S is the
24   first name.  And then the last name is
25   S-T-R-I-U-Z-A-S.                                          11:57:31
```

```
1      Q.   Anyone else?                                  11:57:40

2      A.   Let me just reread it.

3           MS. EVANS:  Overbroad.

4           THE WITNESS:  Mario Piergallini.

5           BY MR. HUESTON:                               11:58:01

6      Q.   Okay.  Anyone else pertinent to

7   Avago/Broadcom that you spoke to?

8      A.   Not that I remember.

9      Q.   Okay.  And same question with respect to

10  No. 5, Innovium.                                      11:58:16

11     A.   Vykintas Striuzas.

12     Q.   Anyone else?

13     A.   No, not that I recall.

14          MR. HUESTON:  Okay.  Why don't we take our

15  lunch break now.  It's just about noon.               11:58:32

16          THE VIDEOGRAPHER:  We're going off the

17  record.  The time is 11:58 a.m.

18          (Recess taken, from 11:58 to 12:59.)

19          THE VIDEOGRAPHER:  We're back on the record

20  at 12:59 p.m.                                          12:59:01

21          BY MR. HUESTON:

22     Q.   Mr. Botta, I'm going to try to shortcut

23  some of this.

24          Going back to the 2012 Cavium audit, if I

25  can direct your attention to that time period, you    12:59:11
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 126

```
 1    recall that there were no material weaknesses noted    12:59:16
 2    in the audit for the 2012 Cavium audit; correct?
 3        A.   Correct.
 4        Q.   And as you did in the other audits, you
 5    reviewed and signed off on the 2012 engagement         12:59:30
 6    leader and manager checklist for Cavium; right?
 7        A.   Yes.
 8        Q.   And you also reviewed and signed off on the
 9    2012 SAD for Cavium as well; right?
10        A.   Yes.                                           12:59:48
11        Q.   And, Mr. Botta, do you claim that you
12    reviewed and signed off on those because of pressure
13    for 2012?
14        A.   Not at the time, no.
15        Q.   Okay.  And, likewise.  Let me just ask you    01:00:08
16    briefly about the 2013 Cavium audit.
17             You were also involved in preparing the SAD
18    in 2013 for Cavium; correct?
19        A.   I do not recall if I was involved in
20    preparing it or just reviewing it.                      01:00:37
21        Q.   Okay.  You would have either helped prepare
22    or reviewed it?
23        A.   Either, yes.
24        Q.   Okay.  And likewise, in 2013, there was no
25    material weakness noted in the audit for Cavium in      01:00:50
```

```
 1   2013; correct?                                        01:00:54

 2          MS. EVANS:  Overbroad.

 3          THE WITNESS:  There was no material

 4   weakness as part of our control opinion for 2013

 5   audit.                                                01:01:04

 6          BY MR. HUESTON:

 7     Q.   Now, during the 2013 audit, do you recall

 8   noting a control deficiency with respect to an issue

 9   relating to XPliant?

10     A.   I remember both years, 2012 and 2013, we --   01:01:34

11   I had several discussions with Mr. Thorson on issues

12   related to XPliant.

13     Q.   Okay.  And specifically, do you recall

14   crafting a consultation memorandum for PwC's

15   national office to analyze an alleged control        01:01:58

16   deficiency with respect to Alliant -- I'm sorry,

17   XPliant?

18     A.   I recall we drafted a consultation with

19   national for a financial instrument for XPliant, not

20   for controls.                                         01:02:13

21     Q.   And do you recall that that related how to

22   treat convertible security notes of XPliant from

23   Cavium's perspective because XPliant and Cavium had

24   been consolidated for accounting purposes?

25     A.   But that was not the reason for the           01:02:32
```

 1  consultation, but we consulted on one of the notes,    01:02:33

 2  of how it should have been accounted.

 3      Q.   And what do you recall was the reason for

 4  the national consultation memo that you prepared?

 5      A.   It was technically a very complex            01:02:48

 6  instrument that, even per our national, they stated

 7  that they did not come across such an instrument

 8  before.

 9      Q.   Okay.  I understand.  I think you're

10  describing how it was technical, but what was the      01:03:06

11  reason that you recall for you preparing the

12  national consultation memo in that instance?

13      A.   In discussion with Mr. Thorson, I

14  identified that that was a complex instrument, and

15  it is common practice when there are issues of         01:03:24

16  particular significance of complexity, that you do

17  consult with national office for having experts to

18  validate what the audit engagement team is

19  asserting.

20      Q.   Okay.  And do you remember that, in fact, a   01:03:46

21  national consultation did occur on the issues you

22  raised in your memo?

23      A.   Yes.

24      Q.   And who was involved in that consultation

25  from national?                                         01:04:02

```
 1      A.   So to the best I recall, there was          01:04:09

 2   Steven Halterman.  H-A-L-T, like Toronto, E-R-M-A-N,

 3   like Nancy.  And I think John Horan III.  So John is

 4   John.  Then Horan is H-O-R-A-N, like Nancy.  And

 5   then there was like the Roman Numeral III after.      01:04:41

 6      Q.   What about John Althoff?  Does that name

 7   ring a bell?

 8      A.   It rings a bell as far as him being a

 9   national office partner.  I do not recall if we

10   consulted with him as well.  It's possible, but I     01:04:57

11   don't recall.

12      Q.   Okay.  Let me see if I can show you a

13   document that might refresh your recollection.

14           MR. HUESTON:  Mark that next in order,

15   please.                                               01:05:21

16           (Marked for identification purposes,

17           Exhibit 24.)

18           BY MR. HUESTON:

19      Q.   And Tab 24 is a two-page e-mail chain that

20   starts from you at the top, from Mauro Botta, to      01:05:40

21   John Horan, February 24th, 2014, Re: Forward Cavium.

22           Do you see that?

23      A.   Yes.

24      Q.   Okay.  And then below, if you look further

25   down in the e-mail chain, you can see an e-mail       01:05:59
```

1    correspondence at the bottom of the first page, from      01:06:01

2    John Althoff to John Horan, Re: Cavium, and

3    continuing onto the following page.

4           Do you see that?

5       A.   Yes.                                               01:06:15

6       Q.   And do you recognize this e-mail chain as a

7    review of members of the national consultation of

8    your memo with some suggested changes?

9       A.   I do not recall the exact e-mail, but

10   assuming that this one is correct, it is part of the      01:06:30

11   consultation.

12      Q.   All right.  And part of the consultation it

13   reflects is that they're actually reviewing,

14   commenting, and making some suggested changes;

15   right?                                                    01:06:43

16      A.   Yes.

17      Q.   Okay.  And this is dated February 24th,

18   2014.

19          Do you recall finalizing the memo on that

20   date?                                                     01:06:53

21      A.   I do not recall.

22          MR. HUESTON:  Okay.  Let's see if we can

23   help with the timeline.

24          (Discussion off the record.)

25   ///

```
 1              (Marked for identification purposes,      01:07:14
 2         Exhibit 25.)
 3         BY MR. HUESTON:
 4    Q.    Okay.  And so Exhibit 25 is an e-mail from
 5    yourself, dated February 26th, 2014, to David Hicks   01:07:50
 6    and Mrinal Bedi.  And the subject says:
 7              "The memo, sorry for the delay."
 8              And attached is the memo, which states it's
 9    from the Cavium engagement team, with a date on the
10    memo of February 21st, 2014.                          01:08:14
11              Do you see that?
12    A.    Yes.
13    Q.    And who is David Hicks?
14    A.    Again, I don't recall the rank.  I believe
15    was a manager, but possibly could have been a         01:08:26
16    senior, in the CMAAS group.
17    Q.    And what about is this -- this Mrinal Bedi?
18    A.    He was working underneath David Hicks, in
19    the CMAAS group.
20    Q.    Okay.  And does this refresh your             01:08:44
21    recollection that this would have been the
22    attachment that would be the final version of your
23    memo that you were then forwarding to them?
24    A.    I cannot state if this is the final
25    version.  There was a database where we stored the    01:08:59
```

```
1   final version and has the dates of the sign-off.        01:09:03

2       Q.   Okay.  But the memo "sorry for the delay,"

3   you would agree that this e-mail is indicating that

4   you're now submitting the memo for consideration to

5   David Hicks and Mrinal Bedi; right?                      01:09:18

6       A.   I do not recall the circumstances that

7   prompted to send this memo to them.

8       Q.   And do you recall making any changes to

9   that memo after this time?

10      A.   I do not recall if changes were made.          01:09:37

11      Q.   Okay.  You recall, from your first amended

12  complaint, that you have alleged that Mr. Thorson

13  instructed another manager, someone named Gupta, to

14  print out your memorandum and leave it on a cube at

15  Cavium.  That's what you've alleged; right?             01:10:05

16      A.   Yes.  That's what happened.

17      Q.   And you allege that Mr. Thorson stated that

18  Cavium can find the memo and make it their own; is

19  that right?

20      A.   That is what Mr. Gupta reported to me.         01:10:15

21      Q.   Okay.  And the memo that you're referring

22  to in the first amended complaint, that's the memo

23  attached here to this e-mail; right?

24      A.   I do not recall which draft, if a draft,

25  when Mr. Thorson had that conversation with           01:10:29
```

Confidential
MAURO BOTTA - 09/25/2018          Page 133

```
 1   Mr. Gupta.  I do not know if it was referring to      01:10:31
 2   which memo or which version of the memo.
 3       Q.   And let me ask, what is the source of your
 4   information that Mr. Thorson asked Mr. Gupta to
 5   leave the memo at Cavium?                              01:10:50
 6       A.   Mr. Gupta.
 7       Q.   What exactly did Mr. Gupta tell you?
 8       A.   What I stated in the complaint.
 9       Q.   Anything else?
10       A.   Not that I recall.                            01:11:03
11       Q.   Okay.  And when did Mr. Thorson, according
12   you to, ask Mr. Gupta to leave the memo on a cube at
13   Cavium?
14       A.   I do not recall the exact date.
15       Q.   Well, what approximate date do you recall?    01:11:16
16       A.   I do not recall the date.
17       Q.   Okay.  And are you aware of whether or not
18   Mr. Gupta actually left the memo on a cube at
19   Cavium?
20       A.   I have no way of knowing.                     01:11:38
21       Q.   Well, did Mr. Gupta say, "And I actually
22   did it.  I actually left the memo on the cube at
23   Cavium"?
24       A.   I do not recall.
25       Q.   You don't remember him saying that he         01:11:48
```

DX1649-133

Confidential
MAURO BOTTA - 09/25/2018                    Page 134

```
 1   actually did what he alleged he was instructed to do    01:11:50
 2   by Mr. Thorson; right?
 3       A.   I do not recall.
 4            (Marked for identification purposes,
 5            Exhibit 26.)                                     01:12:17
 6            BY MR. HUESTON:
 7       Q.   Exhibit 26 is a cover e-mail from a
 8   Anupama Donthi to yourself and others, dated
 9   February 21st, 2014.  Subject: Accounting memo
10   attached.                                                01:12:45
11            Do you see that?
12       A.   Yes.
13       Q.   And this is an e-mail -- first of all, who
14   is Anupama Donthi?
15       A.   I believe her role was revenue manager at      01:12:59
16   Cavium.
17       Q.   Okay.  And you recall reviewing the
18   attached Cavium internal memo that starts at Bates
19   stamp 1575?
20       A.   I recall reviewing the memo.                    01:13:19
21       Q.   Okay.  And this memo is dated
22   February 21st, 2014; right?
23       A.   That's what the printout says.
24       Q.   Okay.  You -- this memo agreed with your
25   memo's conclusion; is that right?  Do you recall        01:13:37
```

```
 1   that?                                              01:13:43

 2       A.   I do recall at the time that there were no

 3   disagreement with management on the accounting

 4   treatment of that instrument.

 5       Q.   Okay.  Do you recall, though, that the    01:13:51

 6   analysis and structure of the Cavium memo is

 7   different from the analysis and structure of your

 8   memo?

 9       A.   I do not recall I compare side by side, so

10   I cannot answer that question.                     01:14:06

11       Q.   Okay.  So even sitting here through today,

12   you've never compared this internal Cavium memo

13   dated February 21st with your own?

14       A.   No.

15       Q.   Okay.  In fact, Cavium didn't need your   01:14:18

16   memo because it had already prepared its own memo on

17   the same topic and reached the same conclusion as

18   you; correct?

19       A.   No.

20       Q.   What's "no"?                              01:14:29

21       A.   It's your speculation.

22       Q.   Well, let's explore speculation.

23            What in this memo from Cavium dated

24   February 21st leads you to believe that they copied

25   your memo?                                         01:14:48
```

Confidential
MAURO BOTTA - 09/25/2018          Page 136

| | | |
|---|---|---|
| 1 | A.   I have no way of saying, because I do not | 01:14:55 |
| 2 | know if Mr. Gupta ended up doing what Mr. Thorson | |
| 3 | said and what Mr. Thorson wrote also in the | |
| 4 | performance survey. | |
| 5 | Q.   Okay.  And, in fact, you do remember, both | 01:15:06 |
| 6 | then and now, that Cavium had independently prepared | |
| 7 | its own memo on or about the same date, | |
| 8 | February 21st; right? | |
| 9 | A.   No. | |
| 10 | Q.   Well, that's what the date of the memo is, | 01:15:20 |
| 11 | February 21st; correct? | |
| 12 | A.   I cannot conclude it was independently | |
| 13 | prepared. | |
| 14 | Q.   Well, looking at Bates stamp 1575, that's | |
| 15 | February 21st, 2014; right? | 01:15:31 |
| 16 | A.   Yes. | |
| 17 | Q.   Okay.  And going back to Exhibit 24, can we | |
| 18 | turn back there, please.  Let's look at the date | |
| 19 | here.  That e-mail at the top begins February 24th, | |
| 20 | 2014, doesn't it? | 01:15:58 |
| 21 | A.   Yes. | |
| 22 | Q.   And these were changes that you acknowledge | |
| 23 | processing to your memo with input by national; | |
| 24 | right? | |
| 25 | A.   Yes. | 01:16:09 |

```
 1      Q.   And February 24th, if that date is a true     01:16:10

 2  and correct date from the e-mail, is 13 days later

 3  than the date of the Cavium memo that I just showed

 4  you at Bates stamp 1575.

 5      A.    February 21st versus February 24th is three   01:16:28

 6  days in my mind.

 7      Q.    Three days.  You've corrected me.  It's

 8  three days earlier than the revised version that you

 9  were preparing on February 24th; right, sir?

10      A.    Yes.                                          01:16:39

11      Q.    Okay.  And in 2013, with respect to the

12  Cavium audit, once again, you signed off on the 2013

13  Cavium EGAs, right, meaning the engagement leader

14  and management checklist; correct?

15      A.    Yes.                                          01:17:08

16      Q.    And you reviewed and signed off on the

17  Cavium 2013 SAD; correct?

18      A.    Yes.

19      Q.    And is it your testimony, sir, that you

20  were -- you disagreed with what you signed off on    01:17:22

21  with respect to the 2013 Cavium audit?

22      A.    What's the question?

23      Q.    Is it your testimony, sir, that you

24  disagreed with what you signed off on with respect

25  to the 2013 Cavium audit?                             01:17:43
```

1        A.    I disagreed in 2014 on the prior two years        01:17:46

2    and in 2014.

3        Q.    Okay.  But in 2013, when it was time for

4    you to sign off, you had no disagreement to note and

5    you, in fact, signed off; right?                            01:17:58

6        A.    We had several discussions with

7    Mr. Thorson.  There was no formal disagreement.

8        Q.    There was no formal disagreement.

9              Are you alleging there was an informal

10   disagreement?                                               01:18:15

11       A.    We had several discussions where we saw

12   things differently.

13       Q.    Okay.  But at the end, when it was time to

14   sign off on the SAD and the engagement leader and

15   management checklist, you did so for 2013; right?           01:18:26

16       A.    Yes.

17       Q.    All right.  And at that time you did not

18   note in any documentation in the audit that you had

19   any disagreements with Mr. Thorson or anyone else;

20   right?                                                      01:18:40

21       A.    Correct.

22       Q.    And at the time that you signed off on the

23   2013 Cavium audit papers, meaning the SAD and the

24   engagement leader and management checklist, you did

25   not believe at that time that Cavium violated any           01:18:58

```
 1   audit professional rules or laws; right?              01:19:03
 2          MS. EVANS:  Overbroad.  Calls for a legal
 3   conclusion.  Vague and ambiguous.
 4          THE WITNESS:  There was a difference of
 5   opinion between me and Mr. Thorson, but there was no  01:19:26
 6   formal disagreement as far as the opinion on the
 7   internal controls.
 8          BY MR. HUESTON:
 9     Q.   And other than that informal disagreement,
10   there was no other violation of audit rules or any    01:19:44
11   laws that you were aware of at that time; right?
12          MS. EVANS:  Calls for a legal conclusion.
13   Overbroad.  Speculation.
14          BY MR. HUESTON:
15     Q.   You can answer.                                01:19:57
16     A.   As I stated before, I'm not -- I'm not an
17   attorney, so I can't express comments on laws.  And
18   I believe I articulated all the issues that I
19   believe existed in my complaint to the regulatory
20   authorities.                                          01:20:13
21     Q.   Okay.  But turning back to this, other than
22   the informal disagreement which you have described
23   with Mr. Thorson, there was no other disagreement,
24   even, that you had at the time of your sign-off on
25   the 2013 Cavium audit papers; right?                  01:20:28
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 140

```
 1            MS. EVANS:  Overbroad.  Calls for a legal      01:20:31
 2    conclusion.  Vague and ambiguous.
 3            THE WITNESS:  There were discussions and
 4    disagreements on issues noted during those two
 5    years.                                                 01:20:44
 6            BY MR. HUESTON:
 7       Q.   And what were those issues?  In 2013, at
 8    the time that you were signing off on the 2013
 9    Cavium audit papers, what were those issues?
10            MS. EVANS:  Overbroad.                         01:21:01
11            You can answer.
12            THE WITNESS:  The ones that I recall are
13    the ones that are stated in the complaint to the
14    regulatory authorities.
15            BY MR. HUESTON:                                01:21:09
16       Q.   And what are those?
17       A.   I can read whatever I submitted to them.
18       Q.   Actually, I have the right to ask your
19    recollection.
20            So sitting here today, without paging          01:21:17
21    through a complaint, what do you recall disagreeing
22    about at the time you signed off on the Cavium 2013
23    audit?
24            MS. EVANS:  You can look at the exhibits if
25    you need to.                                           01:21:29
```

DX1649-140

Confidential
MAURO BOTTA - 09/25/2018                    Page 141

| | |
|---|---|
| 1      BY MR. HUESTON: | 01:21:30 |
| 2      Q.   No.  I'm just asking for your recollection. | |
| 3           Can you give me that answer, please? | |
| 4           MS. EVANS:  There's three pages of | |
| 5      information. | 01:21:37 |
| 6           MR. HUESTON:  Well, you're speaking and | |
| 7      directing the witness. | |
| 8           MS. EVANS:  No, no, no. | |
| 9           BY MR. HUESTON: | |
| 10     Q.   If you can't recall, sir -- | 01:21:41 |
| 11          MR. HUESTON:  No.  You cannot -- I'm not | |
| 12     going to allow you to do long speaking objections. | |
| 13          MS. EVANS:  I have not done that. | |
| 14          BY MR. HUESTON: | |
| 15     Q.   It's a simple question about whether you | 01:21:47 |
| 16     recollect what those disagreements were at the time | |
| 17     that you signed off on the Cavium audit. | |
| 18          MS. EVANS:  You can refer to the complaint | |
| 19     if you need to review. | |
| 20          THE WITNESS:  I will refer to the | 01:21:57 |
| 21     complaint. | |
| 22          BY MR. HUESTON: | |
| 23     Q.   Okay.  Without referring to the complaint, | |
| 24     can you think of anything? | |
| 25          MS. EVANS:  Overbroad. | 01:22:02 |

DX1649-141

Confidential
MAURO BOTTA - 09/25/2018                    Page 142

| | |
|---|---|
| 1 | THE WITNESS:  I can think of some -- | 01:22:08 |
| 2 | BY MR. HUESTON: |
| 3 | Q.  Okay.  Tell me. |
| 4 | A.  -- that are in the complaint. |
| 5 | The consolidations related to XPliant.  The | 01:22:13 |
| 6 | inventory write-down issue.  The sales of a group of |
| 7 | assets.  Build-to-suit lease. |
| 8 | (Reporter clarification.) |
| 9 | THE WITNESS:  Build-to-suit lease. |
| 10 | The convertible note.  There's other ones I | 01:22:56 |
| 11 | can't recall. |
| 12 | BY MR. HUESTON: |
| 13 | Q.  Okay.  So moving into 2014, you continue to |
| 14 | work on the Cavium engagement team; right? |
| 15 | A.  Yes. | 01:23:22 |
| 16 | Q.  And at the end of the 2014 Cavium audit, |
| 17 | you raised various concerns about Cavium to your |
| 18 | engagement leader, Tye Thorson; right? |
| 19 | A.  Yes. |
| 20 | Q.  And did, in fact, Mr. Thorson ask you to | 01:23:34 |
| 21 | write down your views in a memo? |
| 22 | A.  He asked me to document my points in bullet |
| 23 | points. |
| 24 | Q.  Okay.  And then you complied with his |
| 25 | request and created such a document; right? | 01:23:47 |

```
 1      A.    Yes.                                          01:23:51

 2            MR. HUESTON:  And let's take a look at

 3      that.

 4            (Marked for identification purposes,

 5            Exhibit 27.)                                  01:23:56

 6            BY MR. HUESTON:

 7      Q.    So taking a look at Exhibit 27, this is an

 8      e-mail attachment from you to Mr. Thorson, "Tye,

 9      please see below," dated February 22nd, 2015, with

10      an attached memo.                                   01:24:33

11            Do you have that before you?

12      A.    Yes.

13      Q.    And this is the memo that you prepared in

14      response to his request for you to write down your

15      views; correct?                                     01:24:44

16      A.    This is a printout.  I can't tell you if it

17      was the original memo or not.

18      Q.    Well, it is a copy of your memo; correct?

19      A.    Unless I compare with my memo, I can't tell

20      you for certain.                                    01:24:57

21      Q.    All right.  Well, I represent it is a copy

22      of your memo.  If at some time in our review you

23      note something that doesn't appear to be authentic,

24      please let me know.

25            MS. EVANS:  He will only respond to          01:25:10
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 144

| | | |
|---|---|---|
| 1 | questions.  Overbroad. | 01:25:11 |
| 2 | MR. HUESTON:  Well, I'm going to leave that | |
| 3 | out there as a continuing question for you. | |
| 4 | MS. EVANS:  And we will disagree with that. | |
| 5 | BY MR. HUESTON: | 01:25:20 |
| 6 | Q.  So you, in fact, e-mailed your memo on or | |
| 7 | about February 22nd, 2015; right? | |
| 8 | A.  Yes. | |
| 9 | Q.  And as of that date, the concerns that you | |
| 10 | expressed in your memo were known to you for weeks, | 01:25:32 |
| 11 | if not months, beforehand; right? | |
| 12 | A.  But also known to Mr. Thorson. | |
| 13 | Q.  I'm just asking if they were known to you | |
| 14 | for weeks, if not months, beforehand. | |
| 15 | A.  Yes. | 01:25:45 |
| 16 | Q.  Okay.  And you remember that Cavium | |
| 17 | originally planned to file its 2014 10-K on | |
| 18 | February 25th; right? | |
| 19 | A.  Yes. | |
| 20 | Q.  And do you recall the drop-dead deadline | 01:25:58 |
| 21 | for file Cavium's 2014 10-K? | |
| 22 | A.  I believe it was the Monday after that | |
| 23 | original Cavium planned filing. | |
| 24 | Q.  So March 2nd sound about right? | |
| 25 | A.  I haven't done the math. | 01:26:13 |

```
 1        Q.   And you were aware of those deadlines when      01:26:17

 2   you raised your concerns to Mr. Thorson; right?

 3        A.   Yes.

 4        Q.   Let's go over some of the concerns you

 5   raised in the memo.  Let's go to the second page of      01:26:40

 6   the memo.  And there is a section that starts in

 7   bold "Summary Facts, 2012, Q2."

 8             Do you see that?

 9        A.   Yes.

10        Q.   And under Q2, you describe a variable         01:26:57

11   interest entity, VIE, that was not disclosed to the

12   auditors and that you later discovered an agreement

13   under which Cavium was directing R&D efforts of the

14   VIE; is that right?

15        A.   Yes.                                           01:27:17

16        Q.   Okay.  And the VIE entity you're referring

17   to here is XPliant; right?

18        A.   Yes.

19        Q.   And what is the precise issue with XPliant

20   that you were trying to describe?                        01:27:36

21        A.   In which --

22        Q.   In this entry.

23        A.   The issue that I was raising was management

24   lack of transparency and competency.

25        Q.   You were raising, in part, Cavium's failure   01:28:01
```

```
1   to communicate the existence of the contract between   01:28:03
2   Cavium and XPliant to its financial department;
3   right?
4        A.   We did find at the time that Cavium finance
5   did not seem aware that that agreement was being         01:28:18
6   signed.
7        Q.   And that was one of your competency issues;
8   correct?
9             MS. EVANS:  Calls for speculation.
10            BY MR. HUESTON:                                01:28:29
11       Q.   Well, was it?
12       A.   I wouldn't characterize that that was
13  competency, the fact that they did not know an
14  agreement was signed.  The competency was that there
15  was no analysis prepared, no consideration being        01:28:42
16  done from a VIE perspective.
17            The fact that they did not know that
18  somebody else signed the contract, that was
19  indication of poor controls within the company.
20       Q.   Looking at the next paragraph, Q3, there      01:29:00
21  you're stating that Cavium sold some assets to a
22  private company named Open Silicon for $3.2 million
23  and accounted for the full $3.2 million as a
24  receivable without producing evidence of
25  collectability; right?                                  01:29:18
```

```
 1      A.   Yes.                                          01:29:19

 2      Q.   And just so I'm clear, you did not document

 3   this issue as a deficiency in the 2012 SAD; right?

 4      A.   After discussing with Mr. Thorson, it was

 5   not deemed to be, by him, audit adjustment.           01:29:36

 6      Q.   It was not deemed by him to be -- I'm

 7   sorry?

 8      A.   An audit adjustment.

 9      Q.   And did you disagree at the time, in 2012,

10   with Mr. Thorson's judgment?                          01:29:49

11      A.   Informally, yes.

12      Q.   Okay.  Did you note your informal

13   disagreement in the audit work papers of 2012 Cavium

14   audit?

15      A.   PwC policy does not state that you should    01:30:02

16   document informal agreements in a work paper.  Only

17   formal.

18      Q.   Did you document your -- what you're

19   calling "informal disagreement" in any either audit

20   work papers or to national?                           01:30:14

21      A.   Not to my recollection.

22      Q.   And on the next page -- okay.

23           The next page of the memo, you list

24   deficiencies documented in the 2012 SAD; right?

25      A.   Yes.                                          01:30:51
```

1      Q.   Okay.  And let's now move past those to the          01:30:51

2  issues you noted for 2013 on the next page.

3           So under Q1, you noted that Cavium entered

4  into a new building lease in Massachusetts but did

5  not perform a thorough accounting analysis, an          01:31:11

6  implication of a potential build-to-suit lease;

7  right?

8      A.   Yes.

9      Q.   That deficiency was not included in the

10  2012 SAD; right?          01:31:23

11     A.   It's 2013, so I do not believe it was.

12     Q.   That deficiency was not included on the

13  2013 SAD; right?

14     A.   I do not recall if it was or not.

15     Q.   And the next entry, you write, under Q2 of          01:31:42

16  2013, Cavium sold products to Amazon but failed to

17  note that purchasing agreement allowed Amazon to

18  return up to 5,000 units of products.  Cavium signed

19  a revised agreement without this provision in

20  May 2013.          01:32:02

21          Is that right?

22     A.   Yes.

23     Q.   And you did not document a control

24  deficiency related to this issue in the 2013 Cavium

25  SAD; correct?          01:32:15

| | |
|---|---|
| 1    A.   I do not recall. | 01:32:16 |
| 2    Q.   And right underneath that, under Q4, you | |
| 3  note that Cavium did not notify your team that it | |
| 4  was not certain it could sell $3.9 million in | |
| 5  inventory.  Only after you inquired into this issue | 01:32:37 |
| 6  did the CFO agree to write off the whole inventory | |
| 7  amount; right? | |
| 8    A.   We inquired the company, and then | |
| 9  Mr. Thorson had a meeting with the CFO. | |
| 10   Q.   Okay.  And this issue you've described | 01:32:50 |
| 11 under Q4, you did not document a control deficiency | |
| 12 related to that in the 2013 Cavium SAD; right? | |
| 13   A.   I do not recall. | |
| 14   Q.   Okay.  You would agree that if you had | |
| 15 identified a control deficiency in 2013 related to | 01:33:09 |
| 16 Cavium, you would have included it and identified it | |
| 17 as such in the 2013 Cavium SAD; right? | |
| 18   A.   Provided the partner was okay with that. | |
| 19   Q.   Do you recall raising, for instance, this | |
| 20 issue with respect -- what you described under Q4 | 01:33:32 |
| 21 with the partner and the partner telling you you | |
| 22 were not allowed to list it as a control deficiency? | |
| 23   A.   I did not say I was not allowed to list it | |
| 24 as a control deficiency, but it was the theme of | |
| 25 these engagement that every time I believe that we | 01:33:48 |

```
 1   had an audit finding, Mr. Thorson was saying that it     01:33:52

 2   was not.

 3        Q.   So that meant you had a disagreement;

 4   correct?

 5        A.   Yes.                                            01:34:04

 6        Q.   And you did not note that disagreement in

 7   the audit records in 2013, did you?

 8        A.   I did not.

 9        Q.   Okay.  Let's go to the last paragraph of

10   the memo, at the very end.  You write, in the            01:34:23

11   conclusion section, you --

12              "For this reason I propose to issue a

13              material weakness on the skill and

14              competence of the finance department

15              related to areas of income taxes,            01:34:43

16              treasury, and technical accounting."

17              Correct?

18        A.   Yes.

19        Q.   And so in your view, a material weakness

20   based on the incompetence of the finance department     01:34:51

21   should have been documented in the 2013 audit work

22   papers; right?

23        A.   As well as '12 and '13.

24        Q.   Okay.  And that was your position at that

25   time; right?                                             01:35:05
```

```
 1      A.   Yes.                                          01:35:05

 2      Q.   Now, after you sent this memo to

 3   Mr. Thorson, what happened?

 4      A.   In what day are you referring to?

 5      Q.   Well, you sent the memo to Mr. Thorson, it    01:35:21

 6   appears, on the date of the cover e-mail, on

 7   February 22nd.  And what do you recall happening

 8   next with respect to a response from anyone at PwC?

 9      A.   I recall the Monday after I got the call

10   from the QRP, Bob Heatley.                            01:35:44

11           (Reporter clarification.)

12           THE WITNESS:  QRP.  Bob -- Robert Heatley,

13   H-E-A-T-L-E-A-Y [sic].

14           BY MR. HUESTON:

15      Q.   And when you say "QRP," that's the quality    01:36:02

16   review partner; correct?

17      A.   Yes.

18      Q.   Okay.  And what do you recall him stating

19   to you?

20      A.   I wrote it in the complaint.  As of right     01:36:12

21   now, I recall that he stated that I would have

22   gotten a call later in the day from Mr. Thorson, and

23   what I wrote was putting the firm at risk, and this

24   was unprecedented.

25      Q.   Okay.  And do you recall going to a dinner    01:36:35
```

```
 1   the following night with a Mr. Thorson?            01:36:40

 2       A.   I believe the dinner was the same night.

 3       Q.   Okay.

 4       A.   That Monday.

 5       Q.   Do you remember going to dinner with      01:36:48

 6   Mr. Thorson that night, then, February 23rd?

 7       A.   Yes.

 8       Q.   Okay.  And you recall him expressing to you

 9   that you had a decision; you could either retract

10   the memo or escalate it to national for            01:37:01

11   consultation; right?

12       A.   That was one of the things that he told me.

13       Q.   Okay.  And Mr. Thorson never told you that

14   you would not make partner if you decided to

15   escalate the issues you raised in the memo, did he? 01:37:20

16       A.   At that dinner or ...

17       Q.   Well, let's start with at the dinner.

18       A.   At the dinner, I made the statement and he

19   did not disagree.

20       Q.   Well, he didn't say you're not going to    01:37:38

21   make partner if you decide to escalate the issues;

22   he didn't say that, did he?

23       A.   I believe I just answered that question.

24       Q.   Well, did he state words to the effect of

25   if you escalate this, you will not make partner?    01:37:52
```

| | |
|---|---|
| 1 | A.   He did not say those words. | 01:37:57 |
| 2 | Q.   Okay.  And then what happened the next day, |
| 3 | on February 24th? |
| 4 | A.   On what regard? |
| 5 | Q.   Well, did you have a conversation with the | 01:38:07 |
| 6 | semiconductor HR leader, Matt Steele? |
| 7 | A.   I don't believe he was the leader at the |
| 8 | time, but, yes, I did have a conversation with him. |
| 9 | Q.   And you discussed what to do with your |
| 10 | coach, who was Christopher Smith; right? | 01:38:22 |
| 11 | A.   Yes. |
| 12 | Q.   And your coach told you that he didn't |
| 13 | believe the firm would have retaliated, so that if |
| 14 | that was your only concern, there was really no |
| 15 | choice that you had to make; right? | 01:38:34 |
| 16 | A.   Yes. |
| 17 | Q.   Okay.  And then what happened after you had |
| 18 | that discussion? |
| 19 | A.   I spoke to Kevin Healy, H-E-A-L-Y, which -- |
| 20 | at the time I believe his title was market assurance | 01:38:50 |
| 21 | leader for the San Jose office. |
| 22 | Q.   And what did you tell him? |
| 23 | A.   Well, I went to his office, and he opened |
| 24 | the conversation stating that Tye called him several |
| 25 | times, and he was familiar with what was going on. | 01:39:11 |

```
 1   And I expressed to him the concern that at that          01:39:16
 2   dinner Tye gave me an ultimatum, and I was feeling
 3   the pressure that all of a sudden all the decision
 4   authority was on my shoulders as I was not a
 5   partner.                                                  01:39:31
 6        Q.   And what did Mr. Healy say in response?
 7        A.   He said that he wouldn't characterize what
 8   Mr. Thorson told me as an ultimatum; however, he
 9   said that from his view, I had three options, to
10   which I responded that that was already one more         01:39:49
11   option than Mr. Thorson gave me the night before.
12           And then Mr. Healy stated that the three
13   options were retracting the document, disagreeing
14   with Mr. Thorson and going through the consultation,
15   or going through the consultation, and at the end,       01:40:20
16   the results would have been that I would have
17   agreed.
18        Q.   Well, you also had the option at the end
19   to -- maybe this is what you mean by "retraction" --
20   to remove yourself from the engagement.  That was an     01:40:35
21   option that you understood you had; correct?
22        A.   I did not recall at the time that was an
23   option that I thought about.  "Retraction" meant the
24   retraction of the memorandum that I sent to
25   Mr. Thorson.  That is what Mr. Healy was referring       01:40:51
```

```
 1   to.                                                     01:40:54
 2       Q.   Okay.  Let's go back to Exhibit 2 in your
 3   stack.
 4       A.   2?
 5       Q.   Yes.  All the way back to Exhibit 2.          01:40:59
 6            And this is the PwC standards,
 7   Section 2710, "Resolving Differences," and
 8   Section 2711, "The Resolution Process"; right?  Do
 9   you see that?
10       A.   Yes.                                           01:41:19
11       Q.   And going to the second page, the second
12   full paragraph states:
13            "The firm does not expect
14            professionals to accept a position that
15            they cannot agree with.  In all cases,        01:41:31
16            when a difference of professional views
17            occurs, the goal of the resolution
18            process is to resolve the difference.  If
19            this cannot be achieved, the dissenting
20            party should consider the guidance in the     01:41:43
21            documentation requirements section
22            below" --
23            And there's a paren referring to that:
24            -- "and consider whether such
25            difference of views is so significant         01:41:54
```

| | | |
|---|---|---|
| 1 | that the professional considers it | 01:41:55 |
| 2 | necessary to remove himself or herself | |
| 3 | from the engagement." | |
| 4 | Do you see that? | |
| 5 | A.   Yes. | 01:42:01 |
| 6 | Q.   So you knew from PwC guidance that if you | |
| 7 | concluded that you had a difference of views so | |
| 8 | significant, after the consultation steps, you could | |
| 9 | decide to remove yourself from the engagement; | |
| 10 | right? | 01:42:16 |
| 11 | A.   The fact that I was familiar with the | |
| 12 | paragraph does not mean that I memorized every | |
| 13 | paragraph. | |
| 14 | Q.   Okay.  But that was an option that PwC | |
| 15 | provided in writing for people who felt that they | 01:42:25 |
| 16 | had a difference of views that was so significant, | |
| 17 | they were unable to resolve it; correct? | |
| 18 | A.   Yes. | |
| 19 | Q.   Okay.  Now, when you spoke with your career | |
| 20 | coach, Christopher Smith, he expressed to you that | 01:42:46 |
| 21 | you should not worry about fears of PwC retaliation | |
| 22 | when raising your concerns; right? | |
| 23 | A.   Yes. | |
| 24 | Q.   And when you raised the issue afterwards | |
| 25 | with Kevin Healy, he also reassured you that you, in | 01:43:00 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 157

1   fact, had three choices; right?                    01:43:05

2       A.   He did tell me I had three options.

3       Q.   Okay.  And Mr. Healy did not pressure you

4   to make a specific choice, did he?

5       A.   He pressured me to make a choice.         01:43:17

6       Q.   Which choice do you believe he pressured

7   you to make?

8       A.   I did not say that he pressured me to make

9   a specific choice.  I just said that he pressured me

10  to make a choice.                                  01:43:28

11      Q.   I see.  Make a choice amongst those three

12  options, that you had to do something; is that

13  right?

14      A.   Yes.

15      Q.   Okay.  Do you need a break?               01:43:35

16      A.   No, no.  Just top off water.

17           MS. EVANS:  I'll get some more.

18           BY MR. HUESTON:

19      Q.   And then you did, in fact, choose to move

20  forward with the escalation; right?                01:43:47

21      A.   Yes.

22      Q.   And do you recall requesting anyone

23  specifically from national to participate in the

24  consultation?

25      A.   Yes.                                      01:43:56

Confidential
MAURO BOTTA - 09/25/2018                    Page 158

```
1      Q.   And who was that?                          01:43:57

2      A.   Gil Simonetti III.  S-I-M, like Milan, O-N,

3   like Nancy, E-T-T-I, and then the Roman Numeral III.

4      Q.   And why did you request Mr. Simonetti?

5      A.   Because Mr. Healy initially indicated       01:44:18

6   Tim Scott -- that's Tim Scott -- as a liaison to

7   deal with this matter.  And I expressed to Mr. Healy

8   my concerns on having Mr. Scott assigned to that.

9      Q.   Okay.  So they agreed that Mr. Simonetti

10  would be assigned at your request; right?            01:44:37

11     A.   Yes.

12     Q.   And you viewed Mr. Simonetti as a

13  straight-shooter; right?

14     A.   Yes.

15     Q.   Okay.  So you trusted Mr. Simonetti to get   01:44:46

16  to the fair conclusion, right, as a

17  straight-shooter?

18     A.   At the time, yes.

19     Q.   Okay.  And Mr. Healy agreed to your request

20  to staff Mr. Simonetti on that consultation;         01:44:57

21  correct?

22     A.   Yes.

23     Q.   And later that the day Mr. Simonetti held a

24  meeting with you, Mr. Healy, and Mr. Thorson;

25  correct?                                              01:45:06
```

Confidential
MAURO BOTTA - 09/25/2018          Page 159

1       A.    There were other party.  Was a -- was a      01:45:09

2    meeting/conference call.  Mr. Simonetti was on the

3    phone with someone, that I don't recall the name,

4    but was also either national or OGC.  Those were on

5    the phone.  And then in the room there was myself,    01:45:22

6    Mr. Healy, and Mr. Thorson.

7       Q.    Okay.  Thank you.

8             And what did you understand the purpose of

9    that meeting and call to be?

10      A.    To discuss what was going on.                01:45:34

11      Q.    In fact, for you to tell your side of the

12   story; right?

13      A.    I did not know that was the purpose of the

14   meeting.  But part of the meeting, yes, was to hear

15   my side.                                              01:45:46

16      Q.    Okay.  And so you did get an opportunity to

17   explain all the reasons why you thought Cavium

18   deserved a material weakness; correct?

19      A.    Yes.

20      Q.    Okay.  And did you speak about all the       01:45:55

21   issues you discussed in the memorandum you wrote to

22   Mr. Thorson?

23      A.    I do not recall if we read every single

24   words, but I do remember reading extensively from

25   it.                                                   01:46:09

DX1649-159

| | | |
|---|---|---|
| 1 | Q.   Okay.  And you recall that Mr. Simonetti | 01:46:10 |
| 2 | asked questions of you about those issues; right? | |
| 3 | A.   Yes. | |
| 4 | Q.   And at the meeting, you and the other | |
| 5 | people who were participating at the meeting decided | 01:46:19 |
| 6 | to perform a formal consultation on the 2014 SAD; | |
| 7 | right? | |
| 8 | A.   That was one of the decisions that came out | |
| 9 | of that. | |
| 10 | Q.   All right.  And did you, in fact, work on | 01:46:34 |
| 11 | preparing the 2014 SAD for the next several days? | |
| 12 | A.   Not in isolation, but, yes. | |
| 13 | Q.   Yeah.  You helped prepare it; right? | |
| 14 | A.   Yes. | |
| 15 | Q.   And who did you work with in putting that | 01:46:46 |
| 16 | SAD together? | |
| 17 | A.   With Mr. Thorson and Mr. Gupta. | |
| 18 | Q.   Okay.  And while you were preparing that | |
| 19 | document, did you continue to communicate with the | |
| 20 | national office? | 01:47:01 |
| 21 | A.   Only when Mr. Thorson was inviting me. | |
| 22 | Q.   Inviting you to what? | |
| 23 | A.   To speak to national with him present. | |
| 24 | Q.   Okay.  Did you ever seek to speak to | |
| 25 | national without him being present? | 01:47:18 |

```
 1      A.   Not at that time.                          01:47:20

 2      Q.   All right.  And did the national team

 3  review and comment on the drafts that were being

 4  prepared now on this 2014 SAD?

 5      A.   Yes.                                        01:47:32

 6           MR. HUESTON:  Okay.  Let's go off the

 7  record.

 8           THE VIDEOGRAPHER:  We're going off the

 9  record.  The time is 1:48 p.m.

10           (Recess taken, from 1:48 to 2:01.)         01:48:33

11           (Marked for identification purposes,

12           Exhibit 28.)

13           THE VIDEOGRAPHER:  This is the beginning of

14  Media 3.  The time is 2:01, and we're back on the

15  record.                                             02:01:09

16           MS. EVANS:  We've had a lot of breaks, it

17  seems, because the exhibits have been unorganized.

18  So I'd appreciate we'd be a little more efficient

19  with the exhibits and breaks.

20           MR. HUESTON:  The exhibits have been taken  02:01:19

21  care of during normal break times, and we've lost no

22  time in the normal sequence of the deposition.

23           BY MR. HUESTON:

24      Q.   Mr. Botta, before you now is Exhibit 28,

25  and that is an e-mail with the national consultation 02:01:28
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 162

```
 1   memo.                                                    02:01:35

 2           MS. EVANS:  Can I have Exhibit 28, please.

 3           MR. REITER:  Yes.

 4           MR. HUESTON:  It's in front of you.

 5           BY MR. HUESTON:                                  02:01:45

 6       Q.   And this is, in fact, the national --

 7   you'll recognize this as a copy of the national

 8   consultation memo; right, sir?

 9       A.   It's a printout.  Same as before.  I can't

10   tell you if this is the memo of the work papers,        02:01:57

11   but --

12       Q.   But it appears to be?

13       A.   It appears to be.

14       Q.   Okay.  And you recall that the national

15   consultation memo concludes that the deficiencies       02:02:07

16   identified in the 2014 audit aggregate to a

17   significant deficiency, but not a material weakness;

18   correct?

19       A.   Yes.

20       Q.   And you reviewed this consultation memo on      02:02:19

21   the day of the filing; right?

22       A.   I was given 15 minutes to review it.

23       Q.   Okay.  Well, you spoke to Mr. Simonetti

24   about the conclusions the national team reached in

25   this memo, didn't you?                                  02:02:34
```

1      A.   I have one phone call with Mr. Simonetti         02:02:35

2   where I just asked him if that is what he truly

3   believed, and he said, yes.

4      Q.   All right.  And is that all Mr. Simonetti

5   said?                                                    02:02:52

6      A.   Yes.  I believe, yeah.  I recall that was

7   the only thing he said.

8      Q.   And you called Mr. Simonetti because you

9   thought he was a straight-shooter; right?

10     A.   No.  I called Mr. Simonetti because I           02:03:07

11  expressed concern with Mr. Thorson, that throughout

12  the process of the consultation, I was not being in

13  the loop on several of the conversations that he was

14  having.

15          As a matter of fact, more than a few times,     02:03:27

16  I was not allowed in his office, and I did not know

17  what was going on.  So I told him that I was

18  concerned about that part of the process.

19          So I wanted at least one call with

20  Mr. Simonetti by myself.  Mr. Thorson offered first     02:03:40

21  to call Mr. Scott, and he didn't pick up the phone

22  because he also got involved, not to my approval,

23  but he got involved in nonetheless.  And then -- so

24  I called Mr. Simonetti.

25     Q.   I'm sorry.  You said you first tried to          02:03:59

```
1   call Mr. Scott?                                        02:04:01
2        A.   Mr. Thorson tried to call Mr. Scott because
3   he got involved in the process again.
4        Q.   Okay.  You didn't want -- you were not
5   interested in speaking to Mr. Scott at that point;     02:04:11
6   right?
7        A.   I was not.
8        Q.   Okay.  And so you didn't speak to him.  And
9   it was your suggestion to speak to Mr. Simonetti;
10  right?                                                 02:04:20
11       A.   Yes.
12       Q.   And you did speak to Mr. Simonetti?
13       A.   Yes.
14       Q.   And you chose the question to ask?
15       A.   Yes.                                         02:04:26
16       Q.   And you asked him, someone you had
17  previously described as a straight-shooter, whether
18  he truly believed in what was set forth in the memo;
19  right?
20       A.   Yes.                                         02:04:35
21       Q.   Okay.  And he said, yes, he did?
22       A.   He said that when he was talking to me, he
23  was not speaking personally, but he was expressing
24  the collective view of the national office.
25       Q.   All right.  And in that call Mr. Simonetti   02:04:50
```

```
 1  didn't pressure you to sign off on the memo;      02:04:53
 2  correct?
 3      A.   No.  Mr. Thorson did.
 4      Q.   Well, Mr. Simonetti, you were addressing
 5  him, and he was speaking, as you just said,       02:05:02
 6  collectively on behalf of the national office;
 7  right?
 8      A.   Yes.
 9      Q.   And he didn't pressure you to sign off on
10  the memo; right?                                  02:05:09
11      A.   No.
12      Q.   And you didn't tell Mr. Simonetti at that
13  time, "Mr. Simonetti, can you please help me.
14  Mr. Thorson is pressuring me to sign off, and I
15  don't want to"?                                   02:05:21
16      A.   No.
17      Q.   And, in fact, you did review and sign off
18  on the 2014 Cavium engagement leader and
19  management -- manager checklist; right?
20      A.   Again, I was pressured to do so, especially 02:05:44
21  after I got that survey.
22      Q.   Okay.  And you also signed off -- reviewed
23  and signed off on the 2014 Cavium SAD; right?
24      A.   Pressure to do so, yes.
25      Q.   Okay.  And you did not note in writing     02:06:02
```

1  anywhere in the audit papers that you were either          02:06:07

2  pressured to do so or otherwise disagreed with the

3  findings of the audit; right?

4      A.   I did ask Mr. Thorson if my memo was going

5  to be attached in the audit work papers.                   02:06:20

6      Q.   Other than that question, did you, in fact,

7  attempt to note any sort of disagreement to the

8  findings that you otherwise signed off on in the SAD

9  or the engagement leader and management checklist?

10     A.   Given the pressure I was under, I believe I       02:06:40

11 exhausted all the things that I felt I could do.

12     Q.   Well, one thing you could have done was to

13 note a disagreement; right?  That was possible;

14 correct?

15     A.   As I stated, given the pressure I was put         02:06:53

16 on, I believed I exhausted all the possibilities

17 that I could pursue.

18     Q.   Okay.  So you chose not to note any

19 disagreement and simply signed it, right, the

20 engagement leader and management checklist?               02:07:05

21     A.   I wouldn't characterize it as "simply

22 signed it."

23     Q.   Well, you didn't do -- other than signing

24 it, you didn't otherwise write or note any

25 disagreement in the audit work papers; correct?          02:07:16

| | |
|---|---|
| 1    A.   Correct. | 02:07:20 |
| 2    Q.   Okay.  And let me just make sure I also | |
| 3  understand.  You also chose not to remove yourself | |
| 4  from the engagement -- from the audit instead of | |
| 5  signing off on the audit; right? | 02:07:45 |
| 6    A.   I requested to stay on the engagement. | |
| 7    Q.   Right.  But you know, through PwC guidance, | |
| 8  that if you have a difference of opinion that can't | |
| 9  be resolved, you have a choice to remove yourself | |
| 10  from the audit; right? | 02:08:01 |
| 11    A.   Yes. | |
| 12    Q.   And you chose not to exercise that right; | |
| 13  correct? | |
| 14    A.   Yes. | |
| 15    Q.   And for the 2014 Cavium audit, what audit | 02:08:19 |
| 16  rules do you believe Cavium violated? | |
| 17        MS. EVANS:  Overbroad.  Calls for a legal | |
| 18  conclusion.  Vague and ambiguous. | |
| 19        You can answer. | |
| 20        THE WITNESS:  As I stated before, I believe | 02:08:34 |
| 21  they violated in terms of integrity, transparency, | |
| 22  competency. | |
| 23        BY MR. HUESTON: | |
| 24    Q.   Anything else? | |
| 25        MS. EVANS:  Overbroad.  Calls for | 02:08:50 |

```
 1   speculation.  Legal conclusion.                    02:08:50

 2           THE WITNESS:  I believe everything else

 3   that I wrote in the complaint.

 4           BY MR. HUESTON:

 5       Q.  Well, you said violate integrity,          02:09:05

 6   transparency, competency.  And with respect to that

 7   2014 audit, what audit professional rules did you

 8   believe Cavium violated other than what you've just

 9   described?

10           MS. EVANS:  Overbroad.  Calls for a legal   02:09:20

11   conclusion.  Vague and ambiguous.

12           THE WITNESS:  As I stated, I believe PwC

13   did violate standards.  Cavium was more the -- our

14   opinion on their controls.  So Cavium is not an

15   auditing firm, so I do not believe they can violate 02:09:41

16   auditing standards.

17           BY MR. HUESTON:

18       Q.  Okay.  So your view is in 2014, PwC

19   violated audit professional rules; is that right?

20       A.  '12 and '13 as well.                        02:09:50

21       Q.  Okay.  And in '12, '13, or 2014, did you

22   call the PwC ethics hotline to report violations of

23   the audit professional rules?

24       A.  No.  After receiving the survey, I did not.

25       Q.  Okay.  And what audit professional rules as 02:10:10
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 169

```
1    of 2014 did you believe PwC had violated?              02:10:19

2            MS. EVANS:  Overbroad.  Calls for a legal

3    conclusion.  Vague and ambiguous.

4            You can answer.

5            THE WITNESS:  Standards of independence, in    02:10:28

6    fact, and in appearance.

7            BY MR. HUESTON:

8        Q.  Anything else?

9            MS. EVANS:  Overbroad.

10           THE WITNESS:  That was the main issue.          02:10:42

11           MR. HUESTON:  Okay.

12           (Marked for identification purposes,

13            Exhibit 29.)

14           BY MR. HUESTON:

15       Q.  Okay.  I've placed before you, as              02:11:40

16   Exhibit 29, an e-mail from Tye Thorson to yourself,

17   March 2nd, 2015.  Subject: Forward tax memo, with an

18   attached memo with comments.

19           And you recognize Exhibit 29 to be a e-mail

20   that Mr. Thorson sent to you with the attached draft   02:12:03

21   of a tax memo before Cavium's 10-K deadline; right?

22       A.  This is a printout.  I would have to see

23   the original.  This is a printout that has the

24   attachment.

25       Q.  And I'm representing this is a printout of     02:12:21
```

Epiq Court Reporting Solutions - New York
1-800-325-3376                         www.deposition.com

```
 1   the original.  And when you see the comments with      02:12:25

 2   "GSI," "KP," who do you understand those comments

 3   are coming from?

 4        A.   GSI would be Gil Simonetti.

 5        Q.   And what about KP?                            02:12:43

 6        A.   KP is Karen Plunkett, P-L-U-N-K-E-T-T.

 7        Q.   So this draft contains comments from both

 8   Ms. Plunkett and Mr. Simonetti; right?

 9        A.   Yes.

10        Q.   And Mr. Simonetti, in his comments in the    02:12:59

11   last paragraph of the first page, and also moving to

12   the third page, at the bottom, he's addressing

13   concerns about the effectiveness of tax controls as

14   they're described in the memo; right?

15        A.   Which comments?  Sorry.                       02:13:31

16        Q.   Well, we can start at comment on the first

17   page of the memo, Comment GSI4; right?  And above

18   that, there's GSI2, where he's saying "I'm not sure

19   I understand," and he's talking about review of

20   deferred taxes; right?                                  02:13:57

21             And then on to the third page of this memo,

22   which is Bates stamped 6369, there's comment GSI10,

23   which is addressing an issue in the compensating

24   control, 7.02.06; right?

25        A.   Yes.                                          02:14:21
```

1      Q.   And this is addressing the effectiveness of      02:14:22

2   Cavium tax controls; right?

3      A.   I believe this is to evaluate the control

4   implications on the issues that were noted in the

5   tax cycle.                                                02:14:39

6           MR. HUESTON:  Okay.  Put that aside.

7           Mark the next as Exhibit 30.

8           (Marked for identification purposes,

9           Exhibit 30.)

10          BY MR. HUESTON:                                   02:15:01

11     Q.   And Exhibit 30 is a cover e-mail from

12   yourself, dated March 2nd, 2015, to Tye Thorson,

13   Subject: Revised TC and Clean.

14          And this is a response e-mail from you to

15   Mr. Thorson with a revised tax memo; correct?           02:15:47

16     A.   It's a printout where I send the -- these

17   two attachments.

18     Q.   And looking back at Exhibit 29, this is

19   being sent back from you a few hours after

20   Mr. Thorson sent the earlier tax memo draft to you,     02:16:15

21   looking at the date and time of the e-mails between

22   Exhibits 29 and 30; correct?

23     A.   It's about six hours.

24     Q.   Okay.  Then going to the revised tax memo,

25   at the last paragraph on the first page --              02:16:42

Confidential
MAURO BOTTA - 09/25/2018                    Page 172

```
 1      A.   This is exhibit?                           02:16:46

 2      Q.   We're on Exhibit 30.

 3      A.   30.  Okay.

 4      Q.   This is your revision back now.  And we are

 5   now going to -- going to the first page of the memo.  02:16:53

 6           So going to the underscored portion at the

 7   end, the language states:

 8                "The company, as part of their review

 9                of the tax precision, adopts a level of

10                precision equal to 100,000 and a level of  02:17:18

11                precision of 1 million for items not

12                affecting balance sheet or income

13                statement.  Based on discussion with

14                Art Chadwick, CFO, and Suzy Seandel, CAO,

15                in performing their review of the tax    02:17:34

16                footnote, they stated that they would

17                consider material fluctuations above

18                $10 million and investigate with support

19                to the company's controller (See Control

20                7.2.6).  In light of the considerations  02:17:47

21                in this memo, we do not believe such

22                level of precision to be unreasonable for

23                disclosures with low inherent risks such

24                as the tax footnote."

25           This was language that you added to this     02:17:59
```

DX1649-172

| | |
|---|---|
| 1 draft; right? | 02:18:02 |
| 2    A.    There was a discussion that night before, | |
| 3 where Mr. Thorson called me, stating that we had an | |
| 4 issue, that national office could not move past. | |
| 5 The material weakness they believed that they had, | 02:18:19 |
| 6 they could not contain the exposure for the deferred | |
| 7 tax asset disclosure items.  And he told me that we | |
| 8 needed to find the solution. | |
| 9        I asked him to send me the comments that | |
| 10 national was giving him so that I could have had a | 02:18:37 |
| 11 chance to look at it and see if it was possible to | |
| 12 find the solution. | |
| 13        I took a look, and I told Mr. Thorson that | |
| 14 I believe I have a solution as long as he would have | |
| 15 told the company to do exactly what we were stating | 02:18:53 |
| 16 in this memo.  And he replied to me over the same | |
| 17 time, "You got it." | |
| 18        And after sent it to him, the first draft, | |
| 19 he read it, and then he replied back to me, I | |
| 20 believe on the same time, all caps, he said, "Whoa, | 02:19:08 |
| 21 you wouldn't think I would have read this. | |
| 22 Initially we discussed 7 million as procedure, and | |
| 23 you put 10." | |
| 24        And I told him that obviously if there was | |
| 25 a control that would compensate the errors that were | 02:19:21 |

1  noted, the precision had to be above the level of            02:19:25

2  the error noted; otherwise, that control, too, would

3  have failed.

4         Then he told me do the national would agree

5  to that?  And I told him only one way find out.  And      02:19:36

6  that is the last I heard.

7     Q.   Okay.  Thank you for that.  But I asked you

8  a very simple question.

9         Just so the record is clear, the language

10  that I read, it's underscored here in your attached      02:19:48

11  draft.  That's language that you added to this

12  document?

13     A.   Yes.

14     Q.   Okay.  And this language, you would agree,

15  read facially, describes an existing control with        02:19:58

16  different levels of precision; right?

17     A.   That is why I added the context.

18     Q.   Well, I'm just asking you -- you've added

19  context not in this document; right, sir?

20     A.   It was in conversation with Mr. Thorson.         02:20:16

21  Obviously he wouldn't have it in that document.

22     Q.   Well, I know.  I'm just asking you what's

23  in this document.

24         This document simply suggests an existing

25  control, right, with different levels of precision?      02:20:27

```
 1   That's what the document states facially right, sir?    02:20:31

 2       A.   It does refer to inquiry with Mr. Chadwick

 3   and Mr. Seandel [sic].

 4       Q.   Right.  And by the way, what was the

 5   magnitude of the error that led to the 2014             02:20:54

 6   deficiency?  Do you recall?

 7       A.   I believe it was 7 or 8 million gross.

 8       Q.   Do you remember 3.3 million?

 9       A.   No.  I think the gross impact on the

10   footnote was higher than that.                          02:21:09

11           (Reporter clarification.)

12           THE WITNESS:  The gross error was higher

13   than that.

14           BY MR. HUESTON:

15       Q.   Let's go -- turn to two pages later.           02:21:31

16   There's a section called "Compensating Control,

17   7.0206."

18           Do you see that?

19       A.   That one 6242?

20       Q.   You see the topic that says "Compensating      02:21:46

21   Control, Section 7.0206"?

22       A.   Yes.

23       Q.   Okay.  And go down four lines.  There is

24   language that you inserted here that starts with:

25              "Based on our walk-through and               02:22:00
```

Confidential
MAURO BOTTA - 09/25/2018          Page 176

```
 1              discussion with Art Chadwick, CFO, and      02:22:02
 2              Suzy Seandel, CAO, we obtained
 3              confirmation that their review would
 4              focus on fluctuations that would be
 5              greater than $10 million within the tax     02:22:12
 6              footnote, and if such event would occur,
 7              they would gather supporting evidence
 8              from the controller to corroborate the
 9              reasons for such fluctuations.  During FY
10              2014, no fluctuations occurred within the   02:22:24
11              tax footnote in the Form 10-K that would
12              be above such threshold."
13         My first question to you is that's language
14    that you added to this document; right?
15         A.   Yes.  After obtaining assurance from        02:22:36
16    Mr. Thorson that the company would have done it.
17         Q.   Okay.  But as of the moment you added that
18    language, you had not, in fact, conducted a
19    walk-through and discussion with Art Chadwick, CFO,
20    and Suzy Seandel, CAO, during which you obtained      02:22:51
21    confirmation that their review would focus on
22    fluctuations that would be greater than $10 million
23    within the tax footnote; correct?
24         A.   I would not have audited had Mr. Thorson
25    gave me assurances that he would have done -- made    02:23:06
```

1   sure that the company was doing it.                    02:23:08

2       Q.   That's not what I asked.  I just want a

3   simple answer to my question.

4            As of the moment that you wrote those

5   words, "based on our walk-through and discussion       02:23:20

6   with Art Chad, CFO and Suzy Seandel, CAO, we

7   obtained confirmation that their review would focus

8   on fluctuations that would be greater than

9   $10 million," you, in fact, had not obtained

10  confirmation; correct?                                 02:23:33

11      A.   I believe I answered the question already.

12      Q.   I require an answer to that question.

13           You had not obtained confirmation at the

14  time that you wrote that; correct?

15      A.   No.                                           02:23:47

16      Q.   Okay.  And at the time that you wrote that

17  language, you had not had a discussion with

18  Art Chadwick, the CFO, about this proposed issue to

19  address fluctuations greater than $10 million;

20  right?                                                 02:24:19

21      A.   The proposal was a resolution, and I wrote

22  it, based it on the reassurance from Mr. Thorson.

23      Q.   And as of the time you wrote this, you had

24  not had the discussion you referenced here with

25  Mr. Chadwick; right?                                   02:24:32

| 1  | A.   Right.                                              | 02:24:35 |
| 2  | Q.   That's a "yes" or "no."                             |          |
| 3  | A.   Yes.                                                |          |
| 4  | Q.   You had not had the discussion; right --            |          |
| 5  | A.   Yes.                                                | 02:24:44 |
| 6  | Q.   -- with Mr. Chadwick?                               |          |
| 7  | A.   I did not have that discussion.                     |          |
| 8  | Q.   And, likewise, you did not have the                 |          |

9  discussion at that time with Suzy Seandel; correct?

| 10 | A.   I did not have the discussion.                      | 02:24:51 |
| 11 | Q.   All right.  Let's go back now to                    |          |

12 Exhibit 28.  And this is the final -- this is

13 your -- the e-mail attaching the national

14 consultation memo.  And let's go to the eighth page

15 of that.                                                     02:25:20

16          (Discussion off the record.)

17          MR. HUESTON:  We can put that aside.  I'm

18 going to move on to another document.

19          BY MR. HUESTON:

20     Q.   All right.  Mr. Botta, do you know whether         02:25:52

21 or not the control that was documented in your tax

22 memo was, in fact, ever discussed with the CFO or

23 CAO of Cavium?

24     A.   I have no evidence to suggest that it

25 wasn't given that it's part of the representation        02:27:07

1    letter, that management attached their version of        02:27:09

2    the SAD.  There was no disagreement expressed from

3    them.

4        Q.   Well, sitting here today, do you have any

5    basis to assert that the discussion referenced in       02:27:23

6    your tax memo ever happened with the CFO or CAO of

7    Cavium?

8        A.   I do not.  I would have hadn't PwC

9    conveniently removed me from the job before we did

10   the walk-through for the year after, despite I          02:27:42

11   requested to stay on the job.

12            (Reporter clarification.)

13            (Discussion off the record.)

14            THE WITNESS:  Despite I requested to stay

15   on the job, they removed me, conveniently, before       02:28:10

16   we --

17            MS. EVANS:  No.  You've got to just answer

18   what she said.  Despite -- is it "they" or "I

19   requested to stay on the job"?

20            THE WITNESS:  I requested to stay on the        02:28:20

21   job.

22            (Discussion off the record.)

23            BY MR. HUESTON:

24       Q.   So this control, just so I'm clear, that

25   was described in the tax memo we just reviewed was       02:29:37

1   created the night before the filing of the Cavium          02:29:40

2   10-K; right?

3       A.   No.

4       Q.   You did not create it the night before; is

5   that your testimony?                                        02:29:53

6       A.   I did not create that control.

7       Q.   Who did create the control?

8       A.   The control was already existing.

9       Q.   What do you mean, it was already existing?

10      A.   7.2.6 was an existing control.  What we did    02:30:03

11  that night was to document better the level of

12  precision of that control.

13      Q.   Okay.  What you documented in terms of

14  precision for that control had not, in fact,

15  happened.  You mean the walk-through and discussions    02:30:17

16  with the referenced CFO and CAO?

17      A.   That particular aspect, yes, was not done.

18      Q.   Right.  And you added that language the

19  night before the filing of the Cavium 10-K; right?

20      A.   After getting reassurances from               02:30:34

21  Mr. Thorson, yes.

22      Q.   Okay.  And, in fact, that control, as set

23  forth, was never documented with Cavium; right?

24      A.   I cannot state that.

25      Q.   Well, you stated that in your SEC             02:30:51

```
 1   complaint, didn't you?                          02:30:53

 2       A.   I do not recall I stated that.

 3       Q.   You recall stating:

 4            "I challenged the opinion on internal

 5            controls which was able to be issued   02:31:05

 6            thanks to me creating a control the day

 7            before the filing of the Form 10-K, which

 8            was never documented nor discussed with

 9            the company."

10            That's what you said to the SEC; right,  02:31:17

11   sir?

12       A.   I would have a chance to read what I

13   submitted.

14       Q.   Sure.  Would you like to review that to

15   refresh your recollection?  You don't remember that  02:31:25

16   at all?

17       A.   I do not remember the exact words.

18       Q.   Okay.  Well, putting aside the exact words,

19   does that capture the truth, sir?  You challenged

20   the opinion on internal controls which was able to  02:31:35

21   be issued thanks to me creating a control the day

22   before the filing of the Form 10-K which was never

23   documented nor discussed with the company.

24            Is that a true statement?

25       A.   I do not believe it's completely accurate.  02:31:49
```

1      Q.   Okay.  What's inaccurate about it?                02:31:51

2      A.   It was not the creation of a control.  And

3  it did not go through the detail of my discussion

4  with Mr. Thorson.

5      Q.   Let me ask you if this is an accurate           02:33:02

6  statement:

7              "During the consultation, the

8              conclusion was to consider the outcome

9              only as significant deficiency

10             aggregated.  Such conclusion was achieved    02:33:10

11             after a control over the tax footnote was

12             documented.  However, such control was

13             not noted during the walk-through and

14             constituted a documentation exercise

15             thanks to which the significant             02:33:23

16             deficiency conclusion was agreed upon by

17             national.  Evidence of that is that this

18             control was created the night before the

19             filing of the 10-K."

20             Is that an accurate statement?              02:33:34

21     A.   I believe it's not completely accurate.

22     Q.   Okay.  What's inaccurate about it?

23     A.   As I stated before, the control was not

24  created with the level of precisions that was

25  documented, and that happened only after Mr. Thorson   02:33:48

1   assured me that the company would have done it.        02:33:52

2       Q.   And you recall filing your SEC complaint

3   under penalty of perjury; correct?

4       A.   Yes.

5       Q.   You carefully reviewed everything in that     02:34:09

6   SEC complaint for truthfulness and completeness;

7   right, sir?

8       A.   To the best of my abilities.

9       Q.   I'm going to turn to the Harmonic audit,

10  and I had a couple of questions there.  We already     02:34:37

11  talked about it quite a bit.

12           You did state, I think, that you felt

13  pressured to sign off on the Harmonic SAD, is that

14  your testimony?

15      A.   Yes.                                           02:34:52

16      Q.   And did you allege to the SEC that you were

17  pressured to sign off on the Harmonic SAD?

18      A.   I do not recall if it came up in one of the

19  meetings I had with them.  We did have meetings,

20  myself and the SEC, where they asked me about          02:35:07

21  Cavium.

22      Q.   And did you document any disagreement you

23  had on the Harmonic audit in the audit work

24  papers --

25           MS. EVANS:  Overbroad.                         02:35:23

Confidential
MAURO BOTTA - 09/25/2018                Page 184

```
 1          BY MR. HUESTON:                              02:35:23
 2      Q.   -- for 2015?
 3          MS. EVANS:  Overbroad.  Vague and
 4   ambiguous.
 5          You can answer.                              02:35:26
 6          THE WITNESS:  I did not document
 7   disagreements in Harmonic given what was occurring.
 8          BY MR. HUESTON:
 9      Q.   So you didn't document any disagreements in
10   the audit work papers for 2015 for Harmonic;        02:35:39
11   correct?
12      A.   Given what was happening, no.
13      Q.   Okay.  And you also, given what was
14   happening, decided to sign off on the work papers
15   rather than remove yourself from the audit; right?  02:35:54
16      A.   I did sign off, again, under pressure.
17      Q.   Okay.  You had an option to remove
18   yourself, and you chose not to go that option;
19   right?
20      A.   They removed me shortly after.  So the     02:36:10
21   decision was --
22      Q.   That's not what I asked, sir.
23          At the time you were considering signing
24   off on the 2015 Harmonic audit work papers, you had
25   an option to remove yourself, and you chose not to; 02:36:25
```

1   right?                                              02:36:28

2       A.   I did not believe it was the ethical action

3   to taken [sic].

4            (Reporter clarification.)

5            THE WITNESS:  I did not believe it was the    02:36:33

6   ethical action to take.

7            BY MR. HUESTON:

8       Q.   I see.  So your testimony is it was not

9   ethical for you to remove yourself from the audit;

10  right?                                              02:36:44

11      A.   Given what was happening.

12      Q.   Okay.  So you thought it was ethical for

13  you to sign off on the audit work papers without

14  writing a note of disagreement in the audit work

15  papers; is that your testimony?                     02:36:55

16      A.   No.  I said that was the ethical thing, not

17  to have myself removed from the engagement.

18      Q.   Well, you had a choice, right, under the

19  rules.  If you have a difference in an opinion, you

20  either -- according to the rules, you note the      02:37:10

21  disagreement or you elect to remove yourself if you

22  can't resolve those disagreements; right?

23      A.   Formal disagreement.

24      Q.   Okay.  And so in this instance, you had no

25  formal disagreement, is that your testimony, with   02:37:27

Confidential
MAURO BOTTA - 09/25/2018                    Page 186

1    the Harmonic 2015 audit?                             02:37:29

2        A.   There was no formal disagreement.

3        Q.   Okay.  So I guess you're calling it an

4    informal disagreement; right?

5        A.   Yes.                                         02:37:37

6        Q.   Okay.  And in your view, is an informal

7    disagreement less significant than a formal

8    disagreement?

9            MS. EVANS:  Vague and ambiguous.

10           THE WITNESS:  Under those conditions, to me   02:37:51

11   was not a relevant distinction.

12           BY MR. HUESTON:

13       Q.   Okay.  Yeah, what's the difference between

14   a formal disagreement and an informal disagreement?

15   I'm not following you.                                02:38:02

16           MS. EVANS:  Vague and ambiguous.

17           BY MR. HUESTON:

18       Q.   I agree.  So we're going to get some

19   clarification, I guess.

20       A.   Formal is when you put it in writing, such   02:38:09

21   as the Cavium case originally.  Informal is where I

22   don't put it in writing.

23       Q.   Okay.  So informal is where you just choose

24   not to put it in writing; right?

25       A.   Not a choice.  Just at the time, given the   02:38:26

Epiq Court Reporting Solutions - New York
1-800-325-3376                        www.deposition.com

Confidential
MAURO BOTTA - 09/25/2018                    Page 187

| | | |
|---|---|---|
| 1 | circumstances, that's what happened. | 02:38:28 |
| 2 | Q.   That's what happened. | |
| 3 |      But the PCAOB rules that we reviewed, 1215, | |
| 4 | state that if an engagement team member disagrees | |
| 5 | with the final conclusions reached, he or she should | 02:38:45 |
| 6 | document that disagreement. | |
| 7 |      You don't disagree with that; right? | |
| 8 | That's what it states? | |
| 9 | A.   I do not disagree. | |
| 10 | Q.   Okay.  I want to turn your attention now to | 02:38:55 |
| 11 | your time of employment at PwC, and I would ask you | |
| 12 | to describe what you felt were your strengths as a | |
| 13 | PwC employee. | |
| 14 | A.   Technically competent, ethical, man of | |
| 15 | integrity, excellent auditor, very considerate of | 02:39:40 |
| 16 | his team member, and straight-shooter. | |
| 17 | Q.   Okay.  And what were your weaknesses as a | |
| 18 | PwC employee? | |
| 19 |      MS. EVANS:  Overbroad.  Vague and | |
| 20 | ambiguous. | 02:40:05 |
| 21 |      MR. HUESTON:  I don't see how weaknesses | |
| 22 | is. | |
| 23 |      BY MR. HUESTON: | |
| 24 | Q.   But you may answer. | |
| 25 |      MS. EVANS:  You cut off my objections. | 02:40:12 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 188

```
 1          Overbroad.  Vague and ambiguous.          02:40:14
 2   Speculation.
 3          MR. HUESTON:  I think you got it all in.
 4          BY MR. HUESTON:
 5      Q.  You can answer.                            02:40:19
 6      A.  I could have spoke up more.
 7      Q.  Anything else?
 8      A.  No.
 9      Q.  Okay.  Do you recall your supervisors
10   pointing out any areas for improvement to you over 02:40:45
11   the course of your employment at PwC?
12      A.  Yes.
13      Q.  And what do you recall them calling out as
14   areas of improvement for you over the course of your
15   employment at PwC?                                02:40:58
16      A.  Being black and white.  And they called
17   out, especially in that survey, that I should have
18   kept my client out of trouble.  I should have made
19   sure that these guys like me.  That I was throwing
20   partners under the bus.  That they said the notion  02:41:34
21   of headless chicken act.  That I should have picked
22   my battles.  Those are the ones that come to mind
23   the most.
24      Q.  And what did you mean by "black and white"?
25      A.  You should ask them.                       02:41:55
```

DX1649-188

Confidential
MAURO BOTTA - 09/25/2018                    Page 189

1      Q.   Well, did you not know when they said          02:41:55
2   you're back and white?
3      A.   I can speculate what they meant.
4      Q.   Did you bother asking any questions when
5   they told you that criticism, that you were called    02:42:04
6   very crisply as black and white?
7           MS. EVANS:  Argumentative.
8           BY MR. HUESTON:
9      Q.   You can answer.
10     A.   There were discussion over the years on        02:42:11
11  themes.  And they stated, I recall, that auditing is
12  a gray area.
13     Q.   And is it your view that auditing is simply
14  black and white?
15     A.   I never said that auditing was black and       02:42:36
16  white.  And I reiterated to them multiple times that
17  the issue that they were having is that they were
18  seeing areas that are gray when, instead, they are
19  not gray.  There is absolutely judgment and
20  professional judgment, in the auditing profession,    02:42:52
21  but not in the areas that they tried to push that.
22     Q.   Is it your position that each time you had
23  a disagreement with another engagement team member
24  at PwC, it was always a black-and-white issue, as
25  opposed to a gray area, whether it could              02:43:15

Epiq Court Reporting Solutions - New York
1-800-325-3376                        www.deposition.com

1    legitimately be a difference of opinion?          02:43:18

2         A.   I can state that what I complained to the

3    regulatory authorities about what happened was part

4    of that pattern.  I cannot speak of every

5    disagreement that I had with every employee at PwC.  02:43:30

6         Q.   Right.  Because, of course, there were

7    times where you had a disagreement with another

8    engagement team member when, in fact, it was two

9    different opinions about an arguable gray area;

10   right?  That happened from time to time?           02:43:53

11        A.   Yes.

12        Q.   Okay.  Now, you've described yourself as

13   very impatient; right?

14        A.   I do not believe I have.

15        Q.   Never?                                    02:44:04

16        A.   I do not recall if I have.

17        Q.   Okay.  You actually began writing a book,

18   didn't you?

19        A.   Yes.

20        Q.   And you recall stating in this book,      02:44:16

21   quote -- you're an "Italian who is very impatient"?

22        A.   I do not recall that specific passage.  I

23   haven't memorized every single thing that I wrote.

24        Q.   Does that sound like it's got to be wildly

25   incorrect, or does that ring a bell?               02:44:34

```
 1      A.    I would have to review what I wrote to       02:44:38
 2  answer that.
 3      Q.    You have no recollection without reviewing
 4  it?
 5      A.    These exact words, no.                        02:44:45
 6      Q.    Or even just generally.  You don't recall
 7  yourself just generally describing yourself as --
 8  let's just go with impatient?
 9      A.    I wrote a book over the course of 14 years.
10  I honestly wouldn't sit here speculating.              02:44:56
11          MR. HUESTON:  Okay.  I'm going to introduce
12  this as the next document in order.
13          (Marked for identification purposes,
14           Exhibit 31.)
15          BY MR. HUESTON:                                 02:45:25
16      Q.    Here is -- and Exhibit 31, for the record,
17  is an e-mail from yourself to a number of others
18  with what appears to be "Chapter 17" in Italian.
19  And I'm going to turn you to the fifth -- the fifth
20  page of your chapter.                                  02:46:00
21          Fifth page of the Italian version -- there
22  is an English translation attached -- near the top
23  describes a trip where there's a stop in San Jose --
24  at San Jose and then Denver, Colorado, the airport.
25          Do you see that?                                02:46:52
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 192

```
 1      A.   I do see that.                              02:46:53

 2      Q.   Okay.  And a few lines down, you describe

 3  yourself finding yourself in front of a human wall,

 4  "and just like an Italian who is very impatient, I

 5  soon ask what the hell is going on," and then you    02:47:04

 6  continue; right?

 7      A.   No.

 8      Q.   Sir, read -- there's a certified

 9  translation in the back.  So when it says "umano e

10  da italiano che di pazienza," what is your           02:47:28

11  translation of those words into English?

12      A.   "Umano" is human, and as Italian, I do not

13  have a ton of patience.

14      Q.   Okay.  Thank you.  So --

15      A.   Sorry.  As Italian that does not have ton   02:47:55

16  of patience.

17      Q.   Okay.  And that's a fair description of

18  you, someone who doesn't have a ton of patience;

19  right, sir?

20      A.   No.                                         02:48:05

21      Q.   No, it's not?  All right.

22           And you never heard that criticism at PwC;

23  that you were somebody who seemed to be impatient?

24  Is that a criticism you heard at PwC?

25      A.   I honestly don't recall the word            02:48:22
```

DX1649-192

```
 1   "impatient."                                          02:48:23
 2       Q.   Okay.  And at another time you describe
 3   that your original nature is of a preacher and a
 4   revolutionary; right, sir?
 5       A.   Which passage are you referring to?          02:48:48
 6       Q.   Well, I'm not going to go to a passage.
 7   I'm just ask if you recollect describing yourself --
 8   let's just start with an easy concept -- as a
 9   revolutionary?
10       A.   I do not recall.                             02:48:58
11       Q.   Does that sound like something you'd never
12   call yourself?
13       A.   It's possible.
14       Q.   It's possible?  Okay.
15            So looking at the same exhibit -- it's not.  02:49:25
16   All right.  We're going to give you a new exhibit.
17            MR. HUESTON:  This will be 32.
18            (Marked for identification purposes,
19             Exhibit 32.)
20            BY MR. HUESTON:                               02:49:39
21       Q.   And Exhibit 32 is from you, dated July 8th,
22   2011, to a number of people.  This is a Chapter 12
23   of your book; right?
24       A.   This is a printout.  Unless I would see the
25   original, I can't say that is what I wrote.           02:50:06
```

1      Q.   Okay.  But it appears to be Chapter 12,        02:50:09

2  your Italian Chapter 12; right?

3      A.   It appears to be.

4      Q.   Okay.  And if we go to about six pages in,

5  Bates stamped 568 -- are you with me?                   02:50:23

6      A.   Yes.

7      Q.   Okay.  Go to the middle of the page.  And

8  there is sort of a middle paragraph that starts --

9  and I'm going to mispronounce it -- "purtroppo."

10         Do you see that?                                02:50:42

11     A.   Yes.

12     Q.   Okay.  So go -- one, two -- three lines

13  down.  It starts, in the middle of that line, "via a

14  favore della."

15         Do you see that?                                02:50:57

16     A.   Yes.

17     Q.   And it continues on to the next line,

18  through "rivoluzionario"; right?

19     A.   Yes.

20     Q.   And does this refresh your recollection       02:51:05

21  that you were describing yourself as a

22  revolutionary?

23     A.   This is what I wrote in the original, yes.

24     Q.   All right.  Now, you would also do

25  self-evaluations at PwC; right?                        02:51:23

| 1 | A. Yes. | 02:51:26 |

```
 1      A.   Yes.                                    02:51:26

 2      Q.   In fact, you would provide these

 3   self-evaluations to your career coach?

 4      A.   I honestly do not recall the routing.  I

 5   mean, we were filling it up in the system.  My coach   02:51:35

 6   had access, but I don't believe that there was,

 7   like, me sending it to him.  I think had he access

 8   to it, but I don't believes I was sending it to him.

 9      Q.   Okay.  Well, you prepared a self-evaluation

10   for review by your coach; right?                 02:51:48

11      A.   Yes.  Not only.  I believe others were

12   reviewing it as well.

13      Q.   All right.  For him and others to review?

14      A.   Yeah.

15      Q.   All right.  And do you recall that one of   02:51:57

16   the goals that you set forth for yourself at one

17   point was to improve on how to communicate more

18   effectively?  Do you remember that?

19      A.   I do not.

20      Q.   Does that sound like something you wouldn't   02:52:09

21   write?

22      A.   It is possible.

23      Q.   Okay.  Did you believe at any time that you

24   had some issues communicating with people at PwC?

25      A.   At the beginning, mostly because of    02:52:24
```

1   language and getting up to speed with the culture.          02:52:26

2       Q.   Okay.  Do you claim that you were

3   retaliated against for whistleblowing?

4       A.   Yes.

5       Q.   How were you retaliated against?          02:52:38

6       A.   I was fired as a last resort.  And

7   throughout those last three months, where

8   retaliation picked up even more.

9       Q.   I just want to make sure I understand how

10  you believe that you were retaliated against.          02:53:01

11          You feel that one way that you were

12  retaliated against was that you were fired; right?

13      A.   Yes.

14      Q.   Okay.  And then what else?

15      A.   Also because I was speaking up on those          02:53:13

16  issues on the engagements that I raised.

17      Q.   Yes.  How were you retaliated against?

18      A.   I was penalized in the evaluation ratings.

19  I was not allowed to work much, much less than my

20  peers.  I was not given access to even jobs that I          02:53:33

21  brought in the firm.  I was threatened.  I was asked

22  to work for a person that I had an ongoing

23  complaint, internal complaint, with.  And I was told

24  in writing that if I wanted to become partner, I had

25  to do behaviors that I believe were not legal.          02:53:58

1      Q.   And who told you that if you had wanted to      02:54:07

2    become partners -- partner, you would have to do

3    behaviors that you believe were illegal?

4      A.   That survey that I received in writing.

5      Q.   What survey?                                    02:54:24

6      A.   I believe it was May 2014 was the survey

7    that the executive coach Kay Sabotini (phonetic)

8    commissioned.

9      Q.   And what in that survey instructed you to

10   take actions that you believe were illegal?            02:54:44

11     A.   Not instructed.  That survey contained the

12   goal was to identify areas that I needed to improve

13   on to become partner.  And statements included in

14   that survey were suggesting that I had to do -- to

15   become partner, I had to do behaviors that I believe   02:55:01

16   were not legal.

17     Q.   And what were those behaviors that you felt

18   it was suggesting that you had to do that were not

19   legal?

20     A.   I would have to review the survey to give       02:55:10

21   you the complete list.

22     Q.   Well, give me what you can recall.

23          MS. EVANS:  Overbroad.  Vague and

24   ambiguous.

25          You can answer.                                 02:55:17

Confidential
MAURO BOTTA - 09/25/2018                    Page 198

```
 1              THE WITNESS:  I recall the fact that I        02:55:19
 2    should have given them the memo that I was working
 3    on on Cavium.  I recall that to become partner, I
 4    needed to have these guys to like me.  I recall that
 5    they said that my job was to keep my clients out of   02:55:37
 6    trouble.  I recall that they called me an emotional
 7    Italian guy.
 8              I recall that -- let me think -- that there
 9    were speculations that I wanted to prove that the
10    client was wrong, which was unfounded allegation.    02:56:00
11    There were personal attacks, such as that I throw
12    partners under the bus, as a development point.  And
13    there was even a statement that said that they
14    believed that I would never become partner, but I
15    trust that he would rise above it, or something like 02:56:24
16    that.
17              And then there were references to consider
18    clients as -- our role as trusted adviser.
19              BY MR. HUESTON:
20        Q.   Well, I just want to use one of these as an  02:56:46
21    example.
22              You said a statement that said that they
23    believed that I would never become partner, but
24    trusted that you would rise above it; right?  Is
25    that right?  I just read that back.                   02:56:56
```

| | | |
|---|---|---|
| 1 | A.    Yeah.  What I recall. | 02:56:59 |
| 2 | Q.    Okay.  And what was illegal about that? | |
| 3 | A.    The fact that PwC policies, each | |
| 4 | performance year should be evaluated as standalone. | |
| 5 | And at that time I was not out for partner yet, so | 02:57:11 |
| 6 | how could they decide so early that I would have | |
| 7 | never made it? | |
| 8 | Q.    When you say "so earlier," when was that? | |
| 9 | A.    2014. | |
| 10 | Q.    How long had you been at PwC by that point | 02:57:23 |
| 11 | in time? | |
| 12 | A.    How long have I been what? | |
| 13 | Q.    How long -- by 2014, how long had you been | |
| 14 | employed by PwC? | |
| 15 | A.    In the U.S., ten years. | 02:57:31 |
| 16 | Q.    And including your time in Italy at PwC, | |
| 17 | what was the total amount of time? | |
| 18 | A.    15. | |
| 19 | Q.    All right.  Now, you claim that PwC | |
| 20 | retaliated against you by underutilizing you; right? | 02:57:45 |
| 21 | A.    Yes. | |
| 22 | Q.    And when did your utilization rate begin to | |
| 23 | drop? | |
| 24 | A.    After I was removed from Harmonic. | |
| 25 | Q.    That's when? | 02:57:56 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 200

1      A.   Sometime March, April 20 -- 2016.          02:58:02

2      Q.   Okay.  And in your view, how many

3   engagements would you have to be staffed on at a

4   time to achieve full utilization?

5      A.   That does depend on the engagement.        02:58:23

6      Q.   All right.  How many -- how many

7   engagements do you recall being staffed on in 2015?

8      A.   '15.  Calendar year or like --

9      Q.   Yeah, calendar year.

10     A.   2015.  Maybe three, I recall.              02:58:52

11     Q.   How about in 2016?  How many engagements

12  were you staffed on in 2016?

13     A.   Two, I believe.

14     Q.   All right.  And what about 2017?

15     A.   Two.                                       02:59:21

16     Q.   And in 2015, what percentage of your work

17  time was utilized?

18     A.   I do not recall.

19     Q.   All right.  Well, close to full-time?

20     A.   How do you define "full-time"?            02:59:37

21     Q.   I don't know.  Full utilized.

22          Were you fully utilized in 2015?

23     A.   How do you define "fully utilized"?

24     Q.   Well, we've just been talking, and you've

25  been answering questions about full utilization.   02:59:52

Confidential
MAURO BOTTA - 09/25/2018                    Page 201

```
 1              Did you believe you were underutilized in     02:59:55
 2    2015?
 3       A.    2015, I do not recall I was underutilized.
 4       Q.    All right.  In 2016, do you recall whether
 5    you were underutilized?                                 03:00:10
 6       A.    Yes.
 7       Q.    And to what degree -- explain to me how you
 8    feel you were underutilized in 2016.
 9       A.    I believe, to the best I recall, my
10    utilization rate in 2016 was below 30 percent after     03:00:25
11    I was pulled off Harmonic.
12       Q.    Okay.  And how did you calculate a
13    30 percent utilization rate?
14       A.    It is a parameter that you can view on --
15    online.  It's not a calculation.  I mean, it's          03:00:36
16    possible that it is a calculation.  I don't know how
17    the system does it.  But it's a parameter, that you
18    can look it up.
19       Q.    Okay.  And what was your utilization rate
20    in 2017?                                                03:00:49
21       A.    I do not recall.
22       Q.    Well, was it higher than 30 percent?
23       A.    I believe so.
24       Q.    Okay.  Now, do you recall being removed
25    from any audits?                                        03:01:00
```

DX1649-201

| 1 | A. | Yes. | 03:01:01 |
| 2 | Q. | Which one or ones? | |
| 3 | A. | Cavium. | |
| 4 | Q. | When was that? | |
| 5 | A. | That was after Q1 of 2015. | 03:01:11 |
| 6 | Q. | Okay.  Any others? | |
| 7 | A. | Harmonic.  Right after year-end of 2015. | |
| 8 | Q. | Any others? | |
| 9 | A. | No. | |
| 10 | Q. | And I'm including your entire 15-year | 03:01:31 |

11   tenure with PwC.

12          Are these the only two?

13     A.   These are the two that I recall.

14     Q.   Okay.  Now let's talk about removal from

15   the Cavium engagement team.                          03:01:44

16          Who informed you that you were going to be

17   removed from the Cavium engagement team?

18     A.   I believe it was Kevin Healy.

19     Q.   And you understood that you were being

20   removed because the CFO of Cavium asked PwC to do    03:02:02

21   so; right?

22     A.   Yes.

23     Q.   You didn't like the CFO, did you?

24     A.   In what regard?

25     Q.   I don't know.  I'm just asking.              03:02:16

| 1 | Did you like him? | 03:02:17 |

1       Did you like him?       03:02:17

2    A.   In what regard?  It's a bit of a broad

3  question.

4    Q.   It's meant to be broad.  I'm just asking

5  broadly.       03:02:24

6    A.   Not particularly.

7    Q.   You thought he was incompetent; right?

8    A.   No.

9    Q.   You did not think the CFO of Cavium was

10  incompetent?       03:02:41

11    A.   Not really, no.

12    Q.   All right.  Do you recall how many

13  arguments you had with him a year, roughly, while

14  you were on the Cavium engagement?

15    A.   I do not recall we had any arguments, him  03:02:55

16  and I.

17    Q.   Okay.  You don't recall having any

18  arguments with the CFO of Cavium at any time?

19    A.   Not that I recall.

20    Q.   Okay.  Do you recall having any arguments  03:03:05

21  with any other Cavium employees while on the

22  engagement at any time?

23    A.   Arguments as in, like, disagreements or ...

24    Q.   Well, you seemed to understand what I meant

25  by "arguments" before.       03:03:23

| | | |
|---|---|---|
| 1 |     Do you remember having -- | 03:03:23 |
| 2 |    A.  I just want to make sure that I understand | |
| 3 | what you are asking, what arguments is like | |
| 4 | disagreements or -- | |
| 5 |    Q.  Let's -- | 03:03:32 |
| 6 |    A.  -- just discussions. | |
| 7 |    Q.  All right.  Let's talk about disagreements. | |
| 8 | And we'll go back to the CFO to make sure we have a | |
| 9 | clean record here. | |
| 10 |     Do you recall having any arguments, which | 03:03:41 |
| 11 | would include disagreements, with the CFO of Cavium | |
| 12 | at any time? | |
| 13 |    A.  I do not recall we had disagreement, him | |
| 14 | and I. | |
| 15 |    Q.  Okay.  And do you recall having any | 03:03:49 |
| 16 | arguments, which would include disagreements, with | |
| 17 | any other Cavium employees during your tenure on the | |
| 18 | Cavium audit? | |
| 19 |    A.  I do not recall if I had disagreements with | |
| 20 | Cavium employees. | 03:04:01 |
| 21 |    Q.  And is it your view that it was improper | |
| 22 | for PwC to agree to replace you with another PwC | |
| 23 | employee on the Cavium engagement? | |
| 24 |    A.  Yes. | |
| 25 |    Q.  And why do you think it was improper? | 03:04:14 |

1      A.    Given the risk that I stated existed on the    03:04:18

2    Cavium engagement, removing the person that found

3    the issues and protected the firm in that

4    circumstance was not a synonym of an independent

5    auditing actions.                                       03:04:34

6      Q.    PwC reviewed with you concerns that Cavium

7    had with your performance on the engagement team,

8    did they not?

9      A.    Not to my recollection.

10     Q.    Okay.  So sitting here today, it's your         03:04:52

11   testimony that you don't recall anyone at PwC ever

12   expressing concerns from anyone at Cavium about your

13   performance on the engagement team?

14     A.    Kevin Healy told me what the CFO told

15   Raman Chitkara.                                          03:05:10

16     Q.    And other than Kevin Healy, did you ever

17   hear any concerns expressed from Cavium at any other

18   time?

19     A.    Not that I recall.

20     Q.    And what did Kevin Healy say exactly?            03:05:23

21     A.    He said that the CFO had lunch with

22   Raman Chitkara, C-H-I-T-K-A-R-A, who was the senior

23   relationship partner on the account, and he asked

24   for my removal.

25     Q.    And did Mr. Healy give you any reasons why       03:05:51

1  he asked for your removal?                          03:05:54

2      A.   I do not recall the specific reasons.  The

3  reasons were told to me by Mr. Thorson.

4      Q.   Okay.  Let me make sure I understand.

5           You say "I don't recall the specific       03:06:08

6  reasons," but do you recall that Mr. Healy did

7  review some specific reasons; you just don't

8  remember them, sitting here today?

9      A.   I honestly do not remember if we went to

10  specifics or not with Mr. Healy.                     03:06:22

11     Q.   I suspect that -- well, let me just explore

12  this a bit.

13          If Mr. Healy was the one breaking the news

14  to you, that the CFO was looking to remove you, it's

15  fair to say you asked him why?                       03:06:37

16     A.   I do not recall.  As I said Mr. Thorson,

17  articulated right after the filing of the 10-K what

18  he told the company.  So --

19     Q.   I'm not asking about Mr. Thorson.  I'm

20  asking about the conversation with Mr. Healy.        03:06:55

21          Do you recall whether you asked him why?

22     A.   I do not recall.

23     Q.   Okay.  And subsequent to that discussion

24  with Mr. Healy, did you have a discussion with

25  anyone else asking, "Why?  Why is the CFO asking to  03:07:19

```
 1   remove me?"  Did you have a discussion with anyone        03:07:23

 2   else at PwC?

 3       A.   Not that I recall.

 4       Q.   Okay.  Now, let's talk about the removal

 5   from the Harmonic team.                                   03:07:32

 6            Who informed you of that removal?

 7       A.   I believe it was Mr. Haavardtun.

 8       Q.   Mr. Haavardtun.

 9       A.   Do you want the spelling?  He's the one

10   before the --                                             03:07:48

11       Q.   When do you recall him informing you that

12   you would be removed from the Harmonic audit?

13       A.   I do not recall the exact date.  I believe

14   it was probably in April.

15       Q.   April of?                                        03:08:00

16       A.   April of 2016.

17       Q.   All right.  And what reasons do you recall

18   Mr. Haavardtun providing you to as to why you were

19   being removed from the Harmonic audit or the

20   Harmonic team?                                            03:08:16

21       A.   He shared with me his evaluation of my

22   performance on the Harmonic engagement.

23       Q.   And what do you recall him sharing with you

24   in trying to describe why you were being removed

25   from that engagement team?                                03:08:31
```

```
 1      A.   I recall that that evaluation listed        03:08:35

 2   several points, among which I did not develop an

 3   effective relationship with particularly the chief

 4   accounting officer.  I -- according to him, I did

 5   not bring issues to closure.  Relationships and      03:08:55

 6   issue closures were the two main themes.

 7      Q.   Okay.  Did he describe to you that in his

 8   view, you weren't getting along with the employees

 9   at Harmonic?

10      A.   Other -- yeah.  I would say that is a fair   03:09:20

11   characterization.

12      Q.   And aside from this characterization, did

13   you have an independent understanding that you were

14   not, in general, getting along well with the

15   employees of Harmonic that you were dealing with?    03:09:38

16      A.   Yes.  I knew the reason why.

17           (Marked for identification purposes,

18            Exhibit 33.)

19           BY MR. HUESTON:

20      Q.   All right.  Placing before you as            03:10:28

21   Exhibit 23 --

22           MS. EVANS:  33.

23           MR. HUESTON:  Sorry.  33.

24           BY MR. HUESTON:

25      Q.   -- case detail report.                       03:10:35
```

| | | |
|---|---|---|
| 1 | All right.  And what I want to do is turn | 03:10:43 |
| 2 | you to Bates stamp page 5932.  And I'm going to draw | |
| 3 | your attention to the e-mail in the middle from a | |
| 4 | Gregg Lakritz at Harmonic to Stig Haavardtun. | |
| 5 | And you've mentioned Mr. Haavardtun.  What | 03:11:17 |
| 6 | was his role with respect to Harmonic? | |
| 7 | A.   He was the engagement partner, the | |
| 8 | engagement leader, signing partner. | |
| 9 | Q.   And who was Gregg Lakritz? | |
| 10 | A.   Chief accounting officer at Harmonic at the | 03:11:32 |
| 11 | time. | |
| 12 | Q.   All right.  And the subject is "Sally's | |
| 13 | feedback on PwC team." | |
| 14 | Who did you understand the reference to | |
| 15 | "Sally" to be? | 03:11:42 |
| 16 | A.   Actually, I'm not sure I've seen this | |
| 17 | e-mail before. | |
| 18 | Q.   I'm just asking you.  Who do you understand | |
| 19 | the reference to "Sally" to be at Harmonic? | |
| 20 | A.   My guess would be Sally Chu. | 03:11:55 |
| 21 | Q.   And who is she? | |
| 22 | A.   I don't remember her exact title.  She was | |
| 23 | kind of the head of inventory.  One of the inventory | |
| 24 | accountants.  The -- probably the inventory manager. | |
| 25 | I don't remember her exact title. | 03:12:10 |

```
 1      Q.   Okay.  And this states:                        03:12:12
 2               "Stig, Sally told me this morning
 3           that your team lacks sensitivity and
 4           reasonableness to properly match audit
 5           requests to the risk of error involved.        03:12:21
 6           She was asked to re-create manually the
 7           entire year of transactions even though
 8           no issues were uncovered or expected.
 9           Often major issues were presumed when
10           they did not, in fact, exist.  She            03:12:33
11           estimated that she would need
12           approximately four additional full-time
13           cost analysts to keep up with Umit and
14           Mauro's year-end requests, with as many
15           as 60 requests for the inventory area         03:12:44
16           that may have been unreasonable."
17           So I'm going to pause there and ask you,
18      were you aware of these concerns and issues in your
19      discussions with Mr. Haavardtun?
20      A.   During the audit, I was aware of Ms. Chu's    03:13:00
21      concerns and grievances on this year audit.
22      Q.   Okay.  And in the next paragraph, she says
23      it's --
24               "Sally mentioned your team indicates
25           her area has issues even when they do         03:13:15
```

| | |
|---|---|
| 1 | not.  Sally mentioned she feels like PwC | 03:13:18 |
| 2 | sometimes makes her feel like a criminal |
| 3 | in her interactions with them." |
| 4 | Do you see that language? |
| 5 | A.   Yes. | 03:13:27 |
| 6 | Q.   And were you -- did you understand, from |
| 7 | Mr. Haavardtun or anyone else, that this was another |
| 8 | criticism coming from Harmonic? |
| 9 | A.   No.  The criminal part, no.  That was not |
| 10 | my understanding.  I understand that she had | 03:13:42 |
| 11 | grievances on how the audit was impacting her, but |
| 12 | the criminal reference, no. |
| 13 | Q.   Okay.  This is the first time you're -- |
| 14 | you're understanding that; is that your testimony? |
| 15 | A.   To the best of my recollection. | 03:13:57 |
| 16 | Q.   Okay.  You understood that she believed |
| 17 | that the PwC audit team was indicating her area has |
| 18 | issues even when they do not?  That was a criticism |
| 19 | that she had; right? |
| 20 | A.   It appears so. | 03:14:15 |
| 21 | Q.   Okay.  And it was these complaints that led |
| 22 | to the request for your removal from the Harmonic |
| 23 | engagement; right? |
| 24 | A.   I do not know. |
| 25 | Q.   All right.  Now, while you were at PwC, you | 03:14:25 |

1   were also staffed on Gigamon audits?                    03:14:28

2        A.   Yes.

3             MR. HUESTON:  Mark this as 34.

4             (Marked for identification purposes,

5             Exhibit 34.)                                   03:14:53

6             BY MR. HUESTON:

7        Q.   Okay.  Exhibit 34 begins at the top with a

8   case detail report.  And this is an ethics file in

9   your complaint against Mr. Thorson and

10  Mr. Haavardtun for not staffing you on Cavium and        03:15:21

11  Harmonic; correct?

12       A.   I haven't reviewed this before, so I can't

13  tell you unless I read it.

14       Q.   All right.

15            MS. EVANS:  Take --                            03:15:32

16            BY MR. HUESTON:

17       Q.   Well, let me have you turn to page 966.

18            MS. EVANS:  Take the time to review it.

19            BY MR. HUESTON:

20       Q.   Well, I'm not going to ask you about almost    03:15:37

21  all the pages, so let's go to 966.  And if he needs

22  other document time to review, we can give it to

23  him.

24            But turning to page 966, here is an entry

25  that describes Traci Nelson's comments about your        03:15:49

Confidential
MAURO BOTTA - 09/25/2018                    Page 213

```
 1    engagement with Gigamon.                              03:15:53

 2              And my question to you is who is

 3    Traci Nelson?

 4       A.   At the time, I think she still was HR

 5    leader in San Jose.                                   03:16:08

 6              (Reporter clarification.)

 7              THE WITNESS:  HR.  At the time she was

 8    HR -- human resources leader in San Jose.

 9              BY MR. HUESTON:

10       Q.   And the date of this, March 7th, 2017, it    03:16:11

11    states:

12              "Traci called with an update to

13              Mauro Botta.  Gigamon, his main client,

14              is asking that Mauro be rolled off.

15              Similar to Harmonic, not teaming well       03:16:25

16              with the client.  Over scrutinization of

17              work and audit steps.  Pressing the

18              client for irrelevant information that

19              would be considered immaterial."

20              Were you aware that Gigamon was asking for  03:16:42

21    you to be rolled off the audit, sir, at the time?

22       A.   I was notified by Ergun Genc of their

23    request, but I was never rolled off.

24       Q.   All right.  Were you aware of these

25    concerns as they were captured in the language that   03:16:57
```

```
 1    I just quoted to you?                              03:17:01

 2        A.   This is not what I had the conversation

 3    with Mr. Genc.  One of the items was something

 4    similar.

 5        Q.   Well, I'm just -- let's make sure I have a  03:17:30

 6    clear record.

 7             I've asked you, with respect to the summary

 8    here, after it says "Gigamon, his main client, is

 9    asking that Mauro be rolled off, similar to

10    Harmonic, not teaming well with the client, over    03:17:43

11    scrutinization of work and audit steps, pressing the

12    client for irrelevant information that would be

13    considered immaterial," were you aware that Gigamon

14    had those concerns about your work on that

15    engagement?                                         03:17:57

16        A.   Mr. Genc told me that they had concerns.  I

17    disputed those concerns to him, and I was never

18    rolled off.

19        Q.   Okay.  So you were aware of these concerns

20    at the time?  You disputed them, but you were aware  03:18:09

21    of those concerns; right?

22        A.   I'm not aware that Gigamon said those

23    concerns.  That was what Mr. Genc told me.

24        Q.   All right.  But the concerns that you're

25    recalling from Mr. Dench --                          03:18:22
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 215

| 1  | A.   Genc.                                          | 03:18:23 |
| 2  | Q.   -- Genc are what I just quoted here from       |          |
| 3  | this document, right, in summary?                   |          |
| 4  | A.   Some.                                           |          |
| 5  | Q.   Oh.  What were the other concerns?             | 03:18:31 |
| 6  | A.   The handling of a particular control issue.    |          |
| 7  | Q.   Anything else?                                  |          |
| 8  | MS. EVANS:  Overbroad.                               |          |
| 9  | BY MR. HUESTON:                                      |          |
| 10 | Q.   You may answer.                                | 03:18:54 |
| 11 | A.   Not to my recollection.                         |          |
| 12 | Q.   Okay.  Do you remember having a               |          |
| 13 | conversation with a Mr. Wallace about this issue?   |          |
| 14 | A.   Yes.                                            |          |
| 15 | Q.   Who is Mr. Wallace?                            | 03:19:12 |
| 16 | A.   I do not recall his title, but he's a          |          |
| 17 | member of the ethics office at PwC.                  |          |
| 18 | Q.   Justin Wallace?                                 |          |
| 19 | A.   Yes.                                            |          |
| 20 | Q.   And do you recall telling him that the        | 03:19:27 |
| 21 | controller and inventory asked you to be off the    |          |
| 22 | engagement?                                          |          |
| 23 | A.   That is what Mr. Genc told me.  I do not       |          |
| 24 | recall if I told that to Mr. Wallace specifically.  |          |
| 25 | Q.   If we turn to Bates stamp 5971, the date is   | 03:19:46 |

**DX1649-215**

| | | |
|---|---|---|
| 1 | April 12, 2017.  Entry Type: Conversation.  Entered | 03:19:51 |
| 2 | By: Justin Wallace.  Entry Notes: Mauro Botta - | |
| 3 | complainant. | |
| 4 | Do you see that? | |
| 5 | A.   Yes. | 03:20:02 |
| 6 | Q.   Second paragraph: | |
| 7 | "Mauro said that he had just been | |
| 8 | rolled off Gigamund [sic]." | |
| 9 | Do you see that? | |
| 10 | A.   Yes. | 03:20:08 |
| 11 | Q.   And controller -- so were you rolled off or | |
| 12 | not, by the way? | |
| 13 | A.   I was not. | |
| 14 | Q.   Okay.  So that's a false statement? | |
| 15 | A.   I do not believe it's accurate. | 03:20:19 |
| 16 | Q.   All right.  And in the next paragraph: | |
| 17 | "Controller and inventory had asked | |
| 18 | me to be off the engagement and I was too | |
| 19 | tough and that it felt like I was waiting | |
| 20 | for them to make a mistake." | 03:20:30 |
| 21 | Are these the concerns that you conveyed to | |
| 22 | Mr. Wallace? | |
| 23 | A.   They're not accurately represented in this | |
| 24 | e-mail. | |
| 25 | Q.   Okay. | 03:20:45 |

1      A.   Our conversation.                          03:20:46

2      Q.   So what I just read to you is not a summary

3    of some of the concerns that you were raising with

4    Mr. Wallace?

5      A.   I would say it's not accurate.            03:20:53

6      Q.   What's inaccurate about it?

7      A.   My recollection is that the controller

8    had -- Mr. Genc told me that the controller claimed

9    that I was too tough, but the concern from the

10   inventory person was more on the time spent on the  03:21:10

11   particular item that he did not believe was

12   material.

13     Q.   All right.  The next line says:

14          "Ergun said that he tried to convince

15          them to keep me."                          03:21:24

16          Who is Ergun?

17     A.   Typo.  So the Ergun Genc, G-E-N, like

18   Nancy, C.  He's the engagement leader partner at

19   Gigamon engagement.

20     Q.   He's the engagement partner -- he's with   03:21:41

21   PwC; right?

22     A.   Yes.

23     Q.   And he was the engagement leader?

24     A.   Yes.

25     Q.   And he actually tried to convince them to  03:21:49

```
 1   keep you; is that right?                          03:21:52

 2       A.   So he says.

 3       Q.   So he says.

 4            Do you have a reason to believe that that's

 5   not true?                                          03:21:58

 6       A.   I wouldn't speculate because I do not know

 7   what he did or didn't.

 8       Q.   Okay.  Do you recall telling Mr. Wallace

 9   that Ergun told you that he tried to convince

10   Gigamon to keep you on the engagement?             03:22:16

11       A.   I do not recall to tell him that.  It is

12   possible.

13       Q.   All right.  Now, you mentioned that -- in

14   your list of retaliatory actions that PwC did not

15   staff you on a client that you brought in; right?  03:22:36

16       A.   Yes.

17       Q.   And that was Pacific Biosciences?

18       A.   Yes.

19       Q.   And Pacific Biosciences is a pharmaceutical

20   company; right?                                    03:22:47

21       A.   Not exactly.

22       Q.   Well, it manufactures systems for gene

23   sequencing; right?

24       A.   Right.

25       Q.   All right.  Do you recall having a         03:22:56
```

| | | |
|---|---|---|
| 1 | discussion about a concern with respect to Pacific | 03:23:09 |
| 2 | Biosciences about trying to align a senior manager | |
| 3 | or assign a senior manager to Pacific Biosciences | |
| 4 | who had a pharma background? | |
| 5 | A.   No. | 03:23:27 |
| 6 | Q.   You don't remember that at all? | |
| 7 | A.   No. | |
| 8 | Q.   Okay.  You recall talking to Traci Nelson | |
| 9 | about the fact that you were not assigned to Pacific | |
| 10 | Biosciences? | 03:23:45 |
| 11 | A.   I recall I talked to Mr. Carey.  It is | |
| 12 | possible I talked to Ms. Nelson as well.  The one | |
| 13 | that I recall is with Mr. Carey. | |
| 14 | Q.   Okay.  You recall stating that: | |
| 15 | "You were not overly worked up about | 03:24:02 |
| 16 | it, but disappointed we didn't have more | |
| 17 | communication upfront"? | |
| 18 | A.   I'm sorry.  Can you repeat the question? | |
| 19 | Q.   Sure. | |
| 20 | Do you recall stating words to the effect | 03:24:16 |
| 21 | that: | |
| 22 | "You were not overly worked up about | |
| 23 | it, but disappointed we didn't have more | |
| 24 | communication upfront"? | |
| 25 | A.   I do not recall those words.  As a matter | 03:24:26 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 220

1    of fact, I recall my conversation with Mr. Carey was      03:24:28
2    more heated.
3        Q.   So your view is that you were worked up
4    about it; is that your testimony today?
5        A.   I was very upset.                                03:24:39
6        Q.   Okay.  Do you remember -- who's Tim Carey?
7        A.   C-A-R-E-Y.  He is the -- now the -- I think
8    his title is market team leader for mega market.
9        Q.   Okay.  You recall at the time that
10   Tim Carey asked you if he'd like -- if you'd like        03:25:18
11   him to look into the issue of your not being
12   assigned to Pacific Biosciences?  Do you remember
13   that?
14       A.   Yes.
15       Q.   And do you recall telling him that you           03:25:31
16   would like him not to raise it or make a big deal
17   about it?
18       A.   I do recall that I told him that at this
19   point the firm would not have looked good had we
20   presented me to the engagement, given the engagement     03:25:49
21   was already started.  And I did not need him to look
22   into it because I believe that this was deliberate.
23       Q.   Okay.  Tim Carey was a PwC employee?
24       A.   Is a partner, not an employee.
25       Q.   Okay.  Even better.                              03:26:06

| | | |
|---|---|---|
| 1 | Tim Carey was a PwC partner; right? | 03:26:09 |
| 2 | A.   He is a PwC partner. | |
| 3 | Q.   And he is a PwC partner. | |
| 4 | And that's a level above senior manager, | |
| 5 | right? | 03:26:18 |
| 6 | A.   Yes. | |
| 7 | Q.   Okay.  And this partner of PwC offered, on | |
| 8 | your behalf, to look into the issue of your not | |
| 9 | being assigned to Pacific Biosciences; right? | |
| 10 | A.   Yes. | 03:26:31 |
| 11 | Q.   He volunteered to do so? | |
| 12 | A.   Yes. | |
| 13 | Q.   And you told him not to proceed; right? | |
| 14 | A.   Yes.  I did not think it was any point. | |
| 15 | Q.   He thought there was a point; right? | 03:26:44 |
| 16 | A.   I did not. | |
| 17 | Q.   Okay.  But he expressed the opinion as a | |
| 18 | partner that he could, in fact, make an inquiry, and | |
| 19 | you declined his offer; right? | |
| 20 | A.   He did ask me if he should have looked into | 03:26:57 |
| 21 | it. | |
| 22 | Q.   And what you told him is don't raise it and | |
| 23 | make a big deal; right? | |
| 24 | A.   I do not recall I used those words. | |
| 25 | Q.   All right.  And is it your recollection | 03:27:15 |

1   that you told him that it was -- it would be futile        03:27:19

2   or worthless to do so?

3       A.   To the best of my recollection is that

4   there was no point, and I felt that this was

5   deliberate.                                                03:27:35

6       Q.   Okay.  Sir, at the time that they were

7   staffing the audit team at Pacific Biosciences, you

8   did not have a background in pharma; correct?

9       A.   Pacific Biosciences was not an audit

10  project.                                                   03:27:55

11      Q.   That's not the question I asked.

12           At the time -- let's just put it

13  differently.

14           At the time Pacific Biosciences was coming

15  in as a client, you did not have a background in           03:28:04

16  pharma; correct?

17      A.   I was familiar with their revenue

18  recognition because I did a presentation with

19  Chris Smith a few months before.  So I knew the

20  finance department, and I was familiar with the            03:28:18

21  revenue recognition.

22      Q.   But you didn't have a pharma background;

23  right?

24      A.   Pacific Biosciences is a --

25      Q.   I'm just asking a simple question.                03:28:29

| | | |
|---|---|---|
| 1 | You didn't have a pharma background, did | 03:28:31 |
| 2 | you? | |
| 3 | A.   I did not. | |
| 4 | Q.   Okay.  Now, when you were working at PwC, | |
| 5 | you were assigned annual performance ratings? | 03:28:42 |
| 6 | A.   Yes. | |
| 7 | Q.   And those ratings were on a scale of 1 to | |
| 8 | 5; correct? | |
| 9 | A.   Up to a certain year.  After that they call | |
| 10 | them performance tiers. | 03:28:53 |
| 11 | Q.   Okay.  And those tiers went from 1 to 5; | |
| 12 | right? | |
| 13 | A.   Yes. | |
| 14 | Q.   And a 1 is the highest score and a 5 is the | |
| 15 | lowest? | 03:29:04 |
| 16 | A.   Yes. | |
| 17 | Q.   All right.  And were you aware that at PwC, | |
| 18 | senior managers were expected to have at least four | |
| 19 | years of consecutive 1 ratings, or tiers, in order | |
| 20 | to make partner? | 03:29:20 |
| 21 | A.   I was told three. | |
| 22 | Q.   Who told you three? | |
| 23 | A.   I do not recall who specifically.  It was | |
| 24 | conversations that did come up often with my coaches | |
| 25 | or partners that I was working with. | 03:29:32 |

1      Q.   Well, to the best of your recollection,        03:29:34

2   which of those coaches or partners told you that it

3   would only take three years of consecutive 1 ratings

4   to make partner?

5      A.   I would speculate.  I honestly don't recall    03:29:50

6   the exact person.

7      Q.   All right.  Did you ever hear anybody at

8   PwC inform you that, in fact, it would take four

9   years of consecutive 1 ratings or tiers to make

10  partner?                                               03:30:02

11     A.   No.

12     Q.   All right.  In any event, you received only

13  two years of consecutive 1 ratings or tiers; right?

14     A.   Yes.

15     Q.   And that was in 2014 and 2015?                 03:30:11

16     A.   Yes, I believe so.

17     Q.   In fact, in the ten years with PwC U.S.,

18  you received only two 1 -- number 1 ratings or

19  tiers; correct?

20     A.   I believe so.                                  03:30:40

21     Q.   Okay.  Now, you're aware that the firm did

22  go through a RIF, and there were a number of senior

23  managers asked to leave when you left; right?

24     A.   No.

25     Q.   You were not aware that others were also       03:30:58

```
 1   terminated at or around the time that you were        03:31:00
 2   terminated?
 3       A.   The RIF was announced to me as a surprise
 4   by Mr. Carey.  And at the time, given that it was a
 5   surprise, I had no idea that that was going on,        03:31:14
 6   especially because the CEO of the firm, Mr. Tim
 7   Ryan, the week before, answering a question to
 8   all-hands meetings, stated that there were no more
 9   cost-cut initiatives coming.
10       Q.   Well, let's -- why don't we get to the        03:31:27
11   specifications, then.
12            When were you told that you would be laid
13   off from PwC?
14       A.   In June '17.  I don't recall the exact
15   date.                                                  03:31:36
16       Q.   June of 2017; is that right?  Yes.
17       A.   Yes.
18       Q.   Okay.  And who was at that meeting that you
19   recall in June of 2017 when you were told you'd be
20   laid off from PwC?                                     03:31:48
21       A.   It was a meeting between myself, Mr. Carey,
22   and Traci Nelson.  They were in Mr. Carey's office.
23   And then Rob Ward, W-A-R-D, my coach, was on the
24   phone, because he was a member.
25       Q.   Okay.  And what reasons were provided in      03:32:05
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 226

1    that meeting for your termination?                          03:32:08

2         A.    Mr. Carey told me that the firm was doing a

3    restructuring of all senior managers fifth year and

4    above of seniority that were not in the pipeline

5    over the next three years.                                  03:32:26

6         Q.    Not in the pipeline for partner; correct?

7         A.    Yes.

8         Q.    And to be in the pipeline for partner, you

9    understood that you needed to have at least three

10   years of consecutive 1 ratings or tiers; correct?          03:32:39

11        A.    Yes.

12        Q.    And so at that time, by what Mr. Carey had

13   outlined, you would not qualify for continue

14   retention under that standard; right?

15        A.    It was inconsistent with what Mr. Carey        03:32:54

16   told me before, but, yes, at that time, yes.

17        Q.    All right.  And were you informed that

18   other senior managers other than yourself were going

19   to be laid off at this time?

20        A.    Mr. Carey said that that was the criteria.      03:33:14

21   I did not know at the time how many or who or if.

22        Q.    In fact, you were told that this was going

23   to impact 49 senior managers, weren't you?

24        A.    No.

25        Q.    No?  This is the first you're learning of      03:33:30

DX1649-226

```
 1   this?                                              03:33:32

 2       A.   That number does not ring a bell.

 3       Q.   All right.  And were there any other

 4   reasons given during this meeting with you in June

 5   of 2017 with respect to your termination?          03:33:46

 6       A.   That was it.  They even told me that I had

 7   no end date scheduled, unlike others.

 8       Q.   That you had no end date?  What do you mean

 9   by that?

10       A.   That they told me that because at the time 03:34:05

11   I was utilized, I did not have three months' notice,

12   but I had no end date.

13       Q.   I'm sorry.  I still don't know -- I

14   understand what you mean by "no end date."

15       A.   There was no time by which -- fixed by when 03:34:20

16   I would have been laid off.

17       Q.   Okay.  Did they give you an understanding

18   as to when you would expect to be laid off, then?

19       A.   No.

20       Q.   It could happen at any time; is that what   03:34:33

21   they were conveying?

22       A.   I do not know what they were conveying.

23   I'm just telling you what they told me.

24       Q.   Okay.  But when they said there's no end

25   date, you didn't interpret that to mean get a box,   03:34:44
```

Confidential
MAURO BOTTA - 09/25/2018          Page 228

```
 1   fill it up, and walk out of the office that day?      03:34:47
 2        A.   No.
 3        Q.   Okay.  And, in fact, when did you leave
 4   PwC?  When was your end date?
 5        A.   I did not leave.  They fired me.           03:34:57
 6        Q.   Okay.  When did you depart the premises and
 7   no longer work there?
 8        A.   August 17.
 9        Q.   Two months later?
10        A.   Just about.  I do not recall the meeting in  03:35:10
11   June, but it sounds about, yeah, around two months.
12        Q.   In fact, when it was described to you that
13   there would be a firm-wide restructuring impacting
14   49 different managers, you actually asked for a
15   demotion so that you could stay; do you remember      03:35:29
16   that?
17        A.   I do not remember they mentioned 49, as I
18   said before.
19        Q.   Okay.  Do you remember saying, "I'll take a
20   demotion in order to stay"?                           03:35:38
21        A.   Yes.
22        Q.   All right.  Did you subsequently speak to
23   anyone else at PwC after that meeting to talk about
24   the decision to lay you off?
25        A.   Yes.                                        03:35:54
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 229

```
 1      Q.   Who did you talk to after that meeting at      03:35:55
 2   PwC about the decision to lay you off?
 3      A.   I talked to Kevin Healy, H-E-A-L-Y.
 4      Q.   I think she's got it now.
 5           For -- just for your edification, if you're    03:36:10
 6   bringing up names you've described, assume the court
 7   reporter has got it.
 8      A.   Okay.
 9      Q.   So go ahead.  Anyone else?
10      A.   Dick Dubois.                                    03:36:21
11      Q.   Anyone else?
12      A.   Hold on.  D-U-B-O-I-S.
13           There was someone else in national, but his
14   name escapes me at the moment.  These I talked to
15   throughout the -- those time, from June to August      03:36:53
16   '17.
17      Q.   Okay.  Those two.
18           Let me ask you, then, what do you recall
19   saying to Mr. Healy and when about the layoff
20   decision?  Did you talk to him right after this        03:37:10
21   meeting?
22      A.   No.  We met at the coffee nearby the
23   office, Voltaire Coffee.
24      Q.   Within a day or two?
25      A.   I don't recall when it was.                     03:37:24
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 230

```
1       Q.   Soon afterwards?                          03:37:27

2       A.   I honestly don't remember the date.

3       Q.   All right.  Within a week or so?

4       A.   I can't really tell you the date.  It could

5  have been a week.  I really don't remember the exact  03:37:38

6  date.

7       Q.   All right.  So sometime afterwards,

8  possibly a week -- within a week or two, you had a

9  coffee with Mr. Healy to discuss the termination; is

10 that right?                                          03:37:47

11      A.   And then I had, I believe -- I recall

12 several text messages with partners that I knew

13 about, to tell them what was -- what I just heard.

14      Q.   Okay.  We'll get to a text messages in a

15 moment.                                              03:38:04

16           So at the coffee with Mr. Healy, what do

17 you recall describing about the decision to lay you

18 off?

19      A.   I did tell him about the -- my proposal for

20 the re-leveling down.  And he said it was an         03:38:17

21 interesting proposal, and he offered to run that

22 proposal up the chain.

23           And then he also told me that he was the

24 one that told Mr. Carey that he needed me on the

25 Zhone engagement, and he told me that he told        03:38:36
```

| | |
|---|---|
| 1   Mr. Carey that, at the minimum, he needed me until | 03:38:43 |
| 2   April of 2018.  And he told me to keep my head down, | |
| 3   and stranger things could have happened, meaning he | |
| 4   saw the possibility that I could have remained in | |
| 5   the organization. | 03:39:02 |
| 6       Q.   Okay.  And just so I'm clear, when you said | |
| 7   "proposal for re-leveling down," meaning that you | |
| 8   would be willing to take some sort of demotion | |
| 9   possibly to stay on and avoid the reduction in force | |
| 10  of senior managers; right? | 03:39:18 |
| 11      A.   Yes.  I expressed the same to the COO of | |
| 12  the firm, Tim Ryan. | |
| 13      Q.   Okay.  And do you recall telling Mr. Healy | |
| 14  anything else about the decision to lay you off? | |
| 15      A.   No. | 03:39:37 |
| 16      Q.   All right.  And then let's go to Mr. Dick | |
| 17  Dubois. | |
| 18           Who is Mr. Dubois? | |
| 19      A.   He's somebody in national that I was | |
| 20  directed to, that I was told had something to tell | 03:39:49 |
| 21  me about this decision and why it happened and how | |
| 22  it happened. | |
| 23      Q.   Okay.  And do you recall speaking to | |
| 24  Mr. Dubois before or after that coffee meeting you | |
| 25  had with Mr. Healy? | 03:40:07 |

```
 1      A.   I believe that was before.                    03:40:09

 2      Q.   Okay.  And did you have this -- I assume a

 3  conversation by phone with Mr. Dubois --

 4      A.   Yes.

 5      Q.   -- or in person?  A phone call.              03:40:18

 6           And was there more than one call, or was it

 7  just one call?

 8      A.   I believe it was one.

 9      Q.   Okay.  What do you recall saying to

10  Mr. Dubois about the decision to lay you off?         03:40:26

11      A.   I told him what occurred, that it came as a

12  complete shock.  And I do not believe it was in

13  accordance with PwC policies, what just happened, as

14  far as the communication.

15           And I wanted to know a little more about      03:40:49

16  the process and the -- how it came to be.

17      Q.   And what did he say in response?

18      A.   He apologized for the communication that

19  Mr. Carey gave me.  He said that that should not

20  have happened that way.  And he did say that the       03:41:05

21  restructuring was something that national did speak

22  to local offices as far as the need to do it, but

23  they did not give names or quota for each office to

24  fill.  The decision was independently done from each

25  office as to who and how many.                         03:41:26
```

1      Q.   And did he indicate that the restructuring          03:41:30

2   guidelines were for all senior managers in their

3   fifth year who were not in the pipeline to

4   partnership?

5      A.   I do not recall we discussed that aspect.           03:41:40

6      Q.   Okay.  Did he say anything to you that was

7   inconsistent with that guidance?

8      A.   No.

9      Q.   Okay.  And then you said he apologized for

10  Mr. Carey's communication.                                  03:41:55

11         What communication are you referring to?

12     A.   That meeting in June with Traci Nelson and

13  Robert Ward.

14     Q.   What is it that he was apologizing for, the

15  fact that there was a meeting?  I'm just confused.          03:42:06

16  What about the communication was he apologizing

17  about?

18     A.   That it should have -- not have come as a

19  surprise and blindsiding people as it did.

20     Q.   I see.  So the criticism was that it                03:42:19

21  shouldn't have been a surprise.  The criticism was

22  not about the substance of Mr. Carey's

23  communication; right?

24     A.   Correct.

25     Q.   All right.                                          03:42:30

1    A.   But he apologized on the way he                   03:42:30

2    communicated, especially because of the impact that

3    it had on me.

4    Q.   Okay.  And when you said you had thought

5    that the communication was not in accordance with     03:42:44

6    PwC policies regarding communication, you were

7    referring to the surprise element; is that right?

8    A.   Yes.

9    Q.   Okay.  And can you describe to me -- I

10   guess what I'm struggling with, anybody telling you   03:42:59

11   this for the first time would be delivering a

12   surprise; right?

13        It's unclear to me, and maybe you can

14   explain, how is it that you conceived -- how should

15   the news have been delivered to you in a way that     03:43:15

16   you would have found acceptable?

17   A.   I believe that stating that the recent

18   initiatives a week after the CEO signed the opposite

19   was not proper.  I believe that -- I believe that

20   the fact that this restructuring -- hold on.          03:43:39

21        Can you repeat the question?  Sorry.

22   Q.   I'll just give you a different question.

23        You addressed with Mr. Dubois that the

24   communication from Mr. Carey was not in accordance

25   with PwC policies; right?                             03:44:15

| | | |
|---|---|---|
| 1 | A.   Yes. | 03:44:17 |
| 2 | Q.   Okay.  And you explained to me that you | |
| 3 | meant that the communication was delivered as a | |
| 4 | surprise; right? | |
| 5 | A.   Yes.  As I said, the timing, which is one | 03:44:32 |
| 6 | week after the CEO, and then topic of that meeting | |
| 7 | also included the communication of their performance | |
| 8 | rating, which was lowered even further, 3, with | |
| 9 | consequence on compensation and bonus, and that was | |
| 10 | also total surprise. | 03:44:47 |
| 11 | And that also, in my view, was not in | |
| 12 | accordance with PwC policies because the results of | |
| 13 | the annual evaluation meeting should not come as a | |
| 14 | surprise to the individual.  And the fact that I was | |
| 15 | performance Tier 3 was a complete surprise because | 03:45:03 |
| 16 | of it all, I believe.  The evaluation that I | |
| 17 | received in this year were looking even better than | |
| 18 | the year before. | |
| 19 | Q.   Okay.  Well, let me just make sure I have | |
| 20 | something clear. | 03:45:15 |
| 21 | Because what you're now saying is you were | |
| 22 | surprised that you were getting -- you were | |
| 23 | surprised that you had learned that you had been | |
| 24 | rated as performance Tier 3; is that right? | |
| 25 | A.   As well as the restructuring, yes. | 03:45:26 |

1        Q.    Okay.  And did you explain to Mr. Dubois          03:45:27

2    that you were surprised to learn that you were at

3    performance Tier 3?  Did that come up?

4        A.    No.

5        Q.    Okay.  And in the meeting with Mr. Healy,         03:45:39

6    did you say you were surprised at the fact that you

7    had been rated a performance Tier 3?

8        A.    I believe it did came up.

9        Q.    Okay.  And in the meeting with Mr. Carey

10   that you described earlier, did that discussion             03:45:56

11   include reference to a performance Tier 3 rating?

12       A.    Yes.

13       Q.    Okay.

14       A.    That was the actual point of the meeting.

15   So I walked in that meeting, they rescheduled it.           03:46:08

16   We were supposed to meet before I was going on

17   vacation.  They rescheduled it, and I had have to go

18   to the office while I was on vacation.  And the

19   topic of the meeting was to communicate me my

20   rating.  It was not to tell me about any                    03:46:20

21   restructuring.  That was not -- I was not given any

22   preview or heads-up.

23       Q.    Okay.  So -- but you knew in advance of the

24   meeting they were going to communicate your rating,

25   right?                                                      03:46:33

1      A.    Yes.   That was the purpose of the meeting.      03:46:33

2      Q.    All right.   And you knew when you came to

3    the meeting that your rating could be anywhere from

4    number 1 to number 5, right?

5      A.    No.                                              03:46:41

6      Q.    Well, those are the five tiers or ratings

7    that are issued at PwC; right?

8      A.    Those are the five.   However, it's not that

9    when you go to a meeting, you say, okay, it's like a

10   roulette, it can be anywhere from 1 to 5.               03:46:52

11         You have the evaluations that you received

12   throughout the year, so you do have an expectation,

13   and they're supposed to tell you, even midyear, in

14   December, when there's the first touch point, if you

15   are trailing off or not.                                03:47:06

16         There was no such communication, even in

17   midyear, that I was trailing off or my performance

18   was lowering.

19     Q.    Okay.   You don't assign your own

20   performance tier or rating; your superiors do;          03:47:20

21   right?

22     A.    Correct.

23     Q.    Okay.   So going into that meeting, you did

24   not know exactly what performance tier you were

25   going to fall in; right?                                03:47:27

| | |
|---|---|
| 1    A.   Correct. | 03:47:29 |
| 2    Q.   Okay.  And they told you that you were | |
| 3   performance Tier 3; right? | |
| 4    A.   Yes. | |
| 5    Q.   And was that the first time you had ever | 03:47:36 |
| 6   received a performance Tier 3? | |
| 7    A.   I may have been a 3 earlier in my starting | |
| 8   in San Jose, but I don't recall which year or how | |
| 9   many times. | |
| 10    Q.   Yeah.  You received a 3 in 2009; right? | 03:47:54 |
| 11   Does that sound right? | |
| 12    A.   I do not recall the year. | |
| 13    Q.   Okay.  But that sounds about right?  You | |
| 14   had at least one 3 earlier during PwC U.S., your | |
| 15   tenure there; right? | 03:48:09 |
| 16    A.   Yes. | |
| 17    Q.   Did that come as a shock at that time? | |
| 18    A.   I do not remember. | |
| 19      MR. HUESTON:  Okay.  All right.  Let's take | |
| 20   a break. | 03:48:17 |
| 21      THE VIDEOGRAPHER:  This is the end of Media | |
| 22   No. 3.  The time is 3:48, and we're going off the | |
| 23   record. | |
| 24      (Recess taken, from 3:48 to 4:04.) | |
| 25      THE VIDEOGRAPHER:  This marks the beginning | 04:03:53 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 239

```
 1   of Media Unit No. 4.  We're back on the record at      04:03:54
 2   4:04 p.m.
 3           MS. EVANS:  Mr. Botta would like to correct
 4   something he said earlier.  Can we go ahead and do
 5   that now?                                              04:04:13
 6           Go ahead.
 7           THE WITNESS:  Yes.  So the list of the
 8   entities that I've seen documents POGO, PCOB, CBA,
 9   the one that I mentioned earlier, I forgot the FD
10   Financial Times in London, they have seen the         04:04:26
11   redacted version of the performance survey.
12           MR. HUESTON:  Okay.  Let's do that as the
13   next exhibit in order.
14           (Marked for identification purposes,
15           Exhibit 35.)                                  04:04:42
16           BY MR. HUESTON:
17   Q.   I've placed before you Exhibit 35.  And
18   this an e-mail from you to Traci Nelson on
19   June 23rd, 2017.  And you write to her:
20           "And the excellent communication              04:05:24
21           keeps on coming.  I guess they forgot to
22           mention the RIF they're doing."
23           Do you see that?
24   A.   Yes.
25   Q.   And so you're characterizing your layoff as      04:05:32
```

```
 1   a reduction in force; right?                          04:05:38

 2       A.   I was referring to the fact that I was part

 3   of the invite of the webcast "Path to Partnership,"

 4   and this was very few days later, after I was told

 5   that I needed to look for another job.                04:05:51

 6       Q.   Right.  And you did not write to her at

 7   this time that you believe that your layoff decision

 8   was actually because of retaliation; right?

 9       A.   Nope.

10       Q.   Okay.  You can put that aside.               04:06:05

11            MR. HUESTON:  Go to the next one, which is

12   36.

13            (Marked for identification purposes,

14            Exhibit 36.)

15            BY MR. HUESTON:                               04:06:12

16       Q.   And 36 is an e-mail from you to Keith Steel

17   on June 28th, 2017.

18            Who the Keith Steel?

19       A.   He was assistant controller at one of the

20   engagements that I audited a few years back called    04:06:39

21   Exar.  And then we remained --

22            (Reporter clarification.)

23            THE WITNESS:  Sorry.  Exar, E-X-A-R.  It

24   was a public company.  And we remained in touch.

25   And at the time of this e-mail, he was at the         04:06:54
```

```
 1    company named Kateeva.                              04:06:59

 2            BY MR. HUESTON:

 3        Q.   Right.  And you told him in the e-mail on

 4    the top there, "Apparently I've been RIF'd"; right?

 5        A.   Yes.                                       04:07:08

 6        Q.   And you did not write you believed you were

 7    retaliated against; right?

 8        A.   I did not state that in this e-mail.

 9            MR. HUESTON:  All right.  Put that aside.

10            Marking the next one -- sorry -- as         04:07:43

11    Exhibit 37.

12            (Marked for identification purposes,

13             Exhibit 37.)

14            BY MR. HUESTON:

15        Q.   And what I've placed before you is an      04:08:06

16    e-mail chain between you and Francesco Ferrara and

17    others at PwC in Italy, with a certified English

18    translation.

19            And you wrote on June 30th, 2017 --

20    actually on June 29th, you informed them:           04:08:32

21                "Well, the time has come.  The U.S.A.

22                has downsized by kicking out any SM of

23                fifth year or more who does not become a

24                partner within the next three years,

25                which includes me too."                 04:08:52
```

```
 1      A.   Where are you reading?                         04:09:00

 2      Q.   I'm reading from -- it's your e-mail of

 3   June 29th.  It starts at the bottom of the second

 4   page of the e-mail chain, onto the third page.  The

 5   lines right there at the top of the page.             04:09:19

 6      A.   I do not see any certified translation of

 7   it.

 8      Q.   Well, you can go two more if you would like

 9   that.  I know you can read Italian, but we can go

10   two more pages.                                        04:09:32

11      A.   There is no more two more pages.

12      Q.   Okay.  Well, I'm going to go back, and I'll

13   just have you -- directing your attention to the top

14   of the third page --

15           MS. EVANS:  Just to correct the record,       04:09:45

16   though, there is no certified translation to this

17   attachment.

18           MR. HUESTON:  All right.

19           BY MR. HUESTON:

20      Q.   At the top of the third page, you             04:09:51

21   reference:

22              "The U.S.A. has downsized by kicking

23              out any SM of fifth year or more who does

24              not become a partner within the next

25              three years, which includes me too."       04:10:02
```

| | | |
|---|---|---|
| 1 | Right? | 04:10:04 |
| 2 | A.   Yes. | |
| 3 | Q.   Okay.  And to your Italian colleagues, you | |
| 4 | did not say that you were being kicked out or laid | |
| 5 | off because you were being retaliated against; | 04:10:15 |
| 6 | right? | |
| 7 | A.   Not in that communication. | |
| 8 | Q.   Okay.  And you talked earlier about your | |
| 9 | conversation with Mr. Dubois; right? | |
| 10 | A.   Yes. | 04:10:36 |
| 11 | Q.   And we reviewed what you told him. | |
| 12 | MR. HUESTON:  And let me turn to another | |
| 13 | exhibit.  Should be 38. | |
| 14 | (Marked for identification purposes, | |
| 15 | Exhibit 38.) | 04:10:56 |
| 16 | BY MR. HUESTON: | |
| 17 | Q.   And Exhibit 38 begins with an e-mail at the | |
| 18 | top from Gary Price to yourself, with an embedded | |
| 19 | e-mail from you. | |
| 20 | And who is Mr. Price? | 04:11:19 |
| 21 | A.   That was the national guy that I did not | |
| 22 | recall the name before.  And it says here -- | |
| 23 | (Reporter clarification.) | |
| 24 | THE WITNESS:  It says here U.S. chief | |
| 25 | administrative officer and partner affairs leader. | 04:11:37 |

```
 1          BY MR. HUESTON:                          04:11:42
 2     Q.   And in the embedded e-mail directly below,
 3   on July 11, 2017, at 3:07 p.m., you write:
 4              "Dick called me an hour or so ago.
 5              We connected on a few topics.  He     04:11:53
 6              articulated clearly and very well the
 7              business rationale behind the decisions,
 8              as you did as well, and then apologized
 9              for what communication was made and
10              handled and offered his help to connect  04:12:06
11              back to the local team."
12              That's what you wrote; right?
13     A.   I haven't seen the original e-mail.  This
14   printout.
15     Q.   That's --                                04:12:17
16     A.   Yes.
17     Q.   That's what this e-mail represents as you
18   stated; right?
19     A.   Yes.
20     Q.   Okay.  Let's put that aside.             04:12:22
21          And by the way, on that document -- I will
22   ask you another question about that.
23          You did not state to Mr. Price that you
24   felt that the business rationale that was described
25   was pretextual or that you were really being laid   04:12:52
```

| | |
|---|---|
| 1   off because of retaliation; right? | 04:12:55 |
| 2        A.    I'm sorry.  Can you repeat the question? | |
| 3   I'm distracted by that noise. | |
| 4        Q.    Sure. | |
| 5              So at the time you wrote this to Mr. Price, | 04:13:00 |
| 6   you described how Dick described and articulated | |
| 7   clearly and very well the business rationale, and | |
| 8   you did not state that your layoff was coming | |
| 9   because of any sort of retaliation; right? | |
| 10       A.    Not in this e-mail. | 04:13:19 |
| 11       Q.    Okay.  Who is Tim Ryan? | |
| 12       A.    The chief executive officer of PwC U.S. | |
| 13       Q.    Okay.  And do you recall e-mailing him? | |
| 14       A.    Yes. | |
| 15       Q.    And what do you recall telling him in your | 04:13:40 |
| 16   e-mail? | |
| 17       A.    I recall that I was asking how the decision | |
| 18   of the structuring fit the values that he was | |
| 19   advocating.  I was proposing the solution of | |
| 20   pre-leveling.  And I articulated to him my concerns | 04:14:00 |
| 21   that there was a double standard, one for partners | |
| 22   and one for staff.  That's what I recall. | |
| 23       Q.    Do you remember informing Mr. Ryan that you | |
| 24   believed you were being retaliated against? | |
| 25       A.    I did not inform Mr. Ryan of that. | 04:14:22 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 246

```
 1      Q.   And, in fact, you mentioned your love of      04:14:24
 2  your work at PwC at that time; right?
 3      A.   I would need to review the e-mail, but I do
 4  not have any problem making that statement.  I loved
 5  the firm and the work I was doing at the firm.         04:14:40
 6           MR. HUESTON:  Okay.  Mark this as 39.
 7           (Marked for identification purposes,
 8           Exhibit 39.)
 9           BY MR. HUESTON:
10      Q.   And Exhibit 39 attaches your communication    04:15:24
11  to Tim Ryan as the CEO of PwC; right?
12      A.   Yes.  Printout of the e-mail.
13      Q.   All right.  And this is what you were just
14  describing to me; right?
15      A.   That is what I was recalling, yes, based on   04:15:42
16  this e-mail.
17      Q.   Okay.  You can put that aside.
18           Now, do you recall that your layoff was
19  ultimately accelerated, your end date?
20      A.   That is not what they told me.                04:16:16
21      Q.   All right.  Why don't you -- well, let me
22  ask it this way.
23           Do you recall being called into a meeting
24  with Shauna Hewitt and Kevin Baldwin?
25      A.   I recall to be called in the meeting with    04:16:31
```

Epiq Court Reporting Solutions - New York
1-800-325-3376                        www.deposition.com

1   Shauna Hewitt and Kevin Baldwin.  I was not told          04:16:34

2   about that meeting or who was there.  I was told by

3   Shauna Hewitt that the meeting was with a different

4   person for a different topic.  So that was --

5        Q.   Okay.  I didn't ask you that.  I just --       04:16:49

6   all I asked you was do you recall a meeting with

7   those two, and I guess the answer is "yes."  So we

8   can just kind of move along?

9        A.   I don't recall.

10        Q.   Okay.  And at that -- when was that           04:16:57

11   meeting, by the way?

12        A.   August 17, 2017.

13        Q.   Okay.  And what did they tell you at that

14   meeting?

15        A.   Mr. Baldwin told me that I was -- today,      04:17:09

16   that day, was my last day at PwC because of

17   misconduct that they noted in connection of the

18   Cavium engagement.

19             And I -- somebody else would have gone to

20   the room where I was in the office to collect my        04:17:27

21   belongings.  And then they would have escorted me

22   out of the premises.

23        Q.   Okay.  And did either of them describe what

24   this misconduct was?

25        A.   I believe Mr. Baldwin did mention the tax     04:17:45

| | |
|---|---|
| 1   control, but I do not recall the specifics. | 04:17:47 |
| 2      Q.   Did you ask him for specifics? | |
| 3      A.   No.  At the time I was kind of numb, so ... | |
| 4      Q.   Well, do you recall him mentioning that the | |
| 5   Cavium engagement misconduct had to do with a false | 04:18:10 |
| 6   control entry that you made? | |
| 7      A.   I do not recall he specified in those | |
| 8   terms. | |
| 9      Q.   Well, you understand he was referencing the | |
| 10  control language that you inserted that facially | 04:18:26 |
| 11  made it appear that you had consulted with Cavium | |
| 12  employees at that time when you had not; right? | |
| 13     A.   I do not believe that's an accurate | |
| 14  characterization. | |
| 15     Q.   No.  That didn't creep into the back of | 04:18:38 |
| 16  your mind as he talked about misconduct with the | |
| 17  Cavium engagement? | |
| 18     A.   What crept in my mind? | |
| 19     Q.   The fact that you put down something and | |
| 20  signed it that was not truthful at the time that you | 04:18:49 |
| 21  signed off on the engagement. | |
| 22     A.   It did not creep because, as I said, I have | |
| 23  done that after Mr. Thorson assured me that the | |
| 24  company would have done it. | |
| 25     Q.   Sir, after you were terminated -- after you | 04:19:05 |

1    were terminated, you actually prepared a draft        04:19:17

2    SEC -- scratch that question.

3           While you were at -- still at PwC, you put

4    together a draft SEC complaint; correct?

5       A.   I submitted to the SEC a complaint, as I      04:19:44

6    stated before.

7       Q.   Okay.  Do you remember, before submitting

8    that complaint, you put together something that you

9    called a "History of Events - SEC matter"?

10      A.   I do not recall when I put that together.     04:20:07

11      Q.   Okay.  You remember it, though?  Something

12   you called "History of Events - SEC"; right?

13      A.   I do recall a file with that name.

14      Q.   Yeah.  And you created it while you were

15   still an employee of PwC; right?                       04:20:18

16      A.   As I said, I do not recall, that specific

17   file name, when was created.

18      Q.   Well, I'm going to refresh your

19   recollection at the moment, but you do recall it was

20   created while you were an employee of PwC; right?      04:20:29

21      A.   I would have to see the content of that

22   file.  I do know that I submitted a complaint to the

23   SEC while I was still employed at PwC.

24      Q.   Okay.  Let's go to this document.

25           Before you submitted the complaint to the      04:20:42

```
 1   SEC, you actually prepared a document entitled        04:20:44

 2   "History of Events - SEC"; right?

 3        A.   As I said before I do not recall.

 4             (Marked for identification purposes,

 5             Exhibit 40.)                                 04:20:56

 6             BY MR. HUESTON:

 7        Q.   I'm putting before you, as Exhibit 40, an

 8   e-mail from you at PwC on November 26th, 2016, sent

 9   to apparently a personal e-mail address of yours,

10   mauro_botta@libero.it; is that right?                  04:21:25

11        A.   Yes.

12        Q.   And you were sending to yourself a number

13   of documents and attachments; right?

14        A.   Yes.

15        Q.   And one of those documents and attachments,  04:21:39

16   if you go down -- one, two, three, four, five -- six

17   rows down, three over, there's a Word document that

18   says "History of Events."

19             Do you see that?

20        A.   Yes.                                         04:21:53

21        Q.   Okay.  And then that's attached.  It says

22   "History of Events - SEC matter."

23             Do you see that?

24        A.   Yes.

25        Q.   And this is something that you wrote?        04:22:03
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 251

1      A.   It is possible.  I don't recall with          04:22:15
2   certainty, but it's possible.

3      Q.   Okay.  Well, let's read the first sentence
4   so we can move from the possible to the probable.

5            "In 2014 I started noticing signs of         04:22:29
6            a concerning trend involving partners at
7            this firm in my public engagement A."
8            Do you see that?

9      A.   Yes.

10     Q.   Okay.  Does this refresh your recollection?   04:22:38
11  You wrote this.  This is you.  That's fair; right?

12     A.   I do not recall if I wrote it or when I
13  wrote it.  I just said it's possible.

14     Q.   Well, I'm going to represent that this
15  document, "History of Events - SEC," where you talk   04:22:56
16  about noticing signs of a concerning trend, was
17  attached as a history of events document to an
18  e-mail address that was yours at PwC in November of
19  2016; right?  Mauro.x.botta@us.pwc.com; right?

20     A.   Yes.                                           04:23:16

21     Q.   That's your e-mail address; correct?

22     A.   Yes.

23     Q.   And who are you sending it to?  Is that
24  your personal e-mail address?

25     A.   Yes.                                           04:23:24

1     Q.   Okay.  So by what's represented facially in    04:23:24

2   this document, it appears the history of event

3   documents is the one that's attached; right?

4     A.   Yes.

5     Q.   And if you take a moment to look at it, it,    04:23:34

6   in fact, discusses the issues that you have been

7   setting forth in your complaint; right?

8     A.   I would have to compare, but -- I would

9   have to read it.  It does bring topics that are in

10   the SEC complaint.                                     04:23:53

11     Q.   Okay.  And in the last sentence starting

12   three lines from the bottom of the first paragraph,

13   you write:

14          "Also, I challenge the opinion on

15          internal controls which was able to be        04:24:08

16          issued thanks to me creating a control

17          the day before the filing of the Form

18          10-K which was never documented nor

19          discussed with the company."

20          Those are your words; right?                  04:24:23

21     A.   As I said, I do not recall if those are my

22   exact words.  It's possible.

23     Q.   All right.  And if we can show forensically

24   that this is your document attached to this e-mail,

25   you would be satisfied you, in fact, wrote these      04:24:37

```
 1   words; right?                                          04:24:40

 2        A.   I'm not sure how would the forensic look

 3   like, but if I had a chance to review the original

 4   file, I could confirm it, yes.

 5        Q.   And going back to Exhibit 23, that's your    04:25:02

 6   SEC complaint.

 7             Do you have that before you?

 8        A.   Yes.

 9        Q.   Okay.  And beginning at Plaintiff's Bates

10   stamp 32, it starts with "Whistleblower               04:25:30

11   Declarations," right, at the bottom of the page?

12             Do you see that?

13        A.   Yes.

14        Q.   Okay.  And going on to the next page, No. 6

15   says:                                                  04:25:52

16             "If the answer to any of the

17             Questions 1 through 5 above is 'yes,'

18             please provide details."

19             And you wrote:

20             "See 'outline' document uploaded."          04:25:57

21             Right?

22        A.   Yes.

23        Q.   And that's attached beginning at

24   Plaintiff's 165; right?

25             MS. EVANS:  Vague and ambiguous.             04:26:09
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 254

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 04:26:17 |
| 2 | Q.   That's your attachment to it; right? | |
| 3 | A.   Again, I would have to compare with what I | |
| 4 | submitted, but it appears. | |
| 5 | Q.   Okay.  That's all I'm asking, whether it | 04:26:21 |
| 6 | appears.  I realize you can't identify necessarily | |
| 7 | if it's the exact document. | |
| 8 | And back on Plaintiff's 34, that's your | |
| 9 | declaration under penalty of perjury that the | |
| 10 | information contained in this submission is true, | 04:26:35 |
| 11 | correct, and complete to the best of your knowledge, | |
| 12 | information, and belief; right? | |
| 13 | A.   Yes. | |
| 14 | Q.   All right.  So moving to the attachment, | |
| 15 | let's go to Plaintiff's page 168. | 04:26:50 |
| 16 | A.   Still Exhibit 23? | |
| 17 | Q.   Yep.  It's the attachment that you created | |
| 18 | with the submission. | |
| 19 | Are you on the page? | |
| 20 | A.   Yes. | 04:27:03 |
| 21 | Q.   All right.  Going to the first full | |
| 22 | paragraph that starts "As a result of this | |
| 23 | document." | |
| 24 | Do you see this? | |
| 25 | A.   Yes. | 04:27:11 |

```
 1      Q.   All right.  So going to the next sentence,      04:27:12
 2   it states -- you state:
 3                "During that consultation, the
 4           conclusion was to consider the outcome
 5           only as significant deficiency             04:27:24
 6           aggregated.  Such conclusion was achieved
 7           after a control over the tax footnote was
 8           documented.  However, such control was
 9           not noted during the walk-through and
10           constituted a documentation exercise      04:27:35
11           thanks to which the significant
12           deficiency conclusion was agreed upon by
13           national; evidence of that is that this
14           control was created the night before the
15           filing of the 10-K."                      04:27:49
16           You wrote that; right?
17      A.   Yes.
18      Q.   And under penalty of perjury?
19      A.   Yes.
20      Q.   Do you know who made the decision to      04:28:05
21   accelerate your termination?
22      A.   I do not.
23      Q.   All right.  Do you know who Mark Simon is?
24      A.   Who?  Sorry?
25      Q.   Do you know who Mark Simon is?            04:28:16
```

| | | |
|---|---|---|
| 1 | A.   Some leader in PwC.  I don't recall the | 04:28:19 |
| 2 | title.  But I've heard the name. | |
| 3 | Q.   Okay.  Did you ever speak to him about your | |
| 4 | whistleblowing? | |
| 5 | A.   Not that I recall. | 04:28:28 |
| 6 | Q.   Okay.  Do you have any reason to believe | |
| 7 | that any of the engagement leaders you worked with | |
| 8 | spoke to Mr. Simon? | |
| 9 | A.   About what? | |
| 10 | Q.   About any of the alleged whistleblower | 04:28:39 |
| 11 | issues that you had brought to bear against PwC. | |
| 12 | A.   I would be speculating. | |
| 13 | Q.   Okay.  So you have no reason to believe | |
| 14 | that anybody raised whistleblower issues with | |
| 15 | Mr. Simon; correct? | 04:28:54 |
| 16 | A.   I would have no way of knowing. | |
| 17 | Q.   Yeah.  So who at PwC have you spoken to | |
| 18 | about the decision to accelerate your termination, | |
| 19 | if anyone? | |
| 20 | A.   Shauna Hewitt is the only person -- maybe | 04:29:14 |
| 21 | Traci Nelson -- that I recall we had contacts after | |
| 22 | I was terminated.  But my claim of retaliation | |
| 23 | whistleblower was communicated to PwC before, from | |
| 24 | my attorneys to PwC attorneys. | |
| 25 | Q.   Okay.  What did you tell Shauna Hewitt | 04:29:38 |

```
 1   about your termination?                              04:29:41

 2       A.   The communication that I had related to

 3   that was if I could reapply, given that I saw that

 4   there were open positions at PwC.

 5       Q.   Okay.  Did you tell her -- well, when did    04:29:59

 6   you have that conversation?

 7       A.   I don't remember the date, the exact date.

 8   Must have been the end of August or September, but

 9   that's the best I can recall.

10       Q.   Okay.  You asked her if you could reapply?   04:30:16

11       A.   Yes.

12       Q.   And what did she say?

13       A.   That due to the fact I was terminated for

14   misconduct, I was prohibited from reapplying.

15       Q.   Okay.  And you said you also talked to       04:30:28

16   Traci Nelson after you were terminated for

17   misconduct; correct?

18       A.   I believe I did speak to Traci on this same

19   topic, and Traci, I think, alerted Shauna.

20       Q.   When you said you spoke to her about the     04:30:46

21   same topic, what did you ask her?

22       A.   To the best of my recollection, I asked her

23   this fact, if I could reapply.

24       Q.   Okay.  Did you attempt to explain to her

25   why you felt you had not committed misconduct?        04:30:59
```

1       A.   I stated that to Ms. Hewitt in my e-mail          04:31:05

2   reply once she said that.

3       Q.   Okay.  Did you state that to Ms. Nelson?

4       A.   I don't recall.

5       Q.   Okay.  Now, in the time that you worked at       04:31:16

6   PwC, did you ever think about leaving the company?

7       A.   Yes.

8       Q.   In fact, you, on a number of occasions,

9   attempted to resign or submit your resignation;

10  right?                                                     04:31:41

11      A.   Yes.

12      Q.   How many times did you do so during the

13  course of your tenure?

14      A.   I believe there were 10.

15      Q.   Might there have been 12?                         04:31:50

16      A.   My recollection was 10, but I do not

17  guarantee the exact number.

18      Q.   And during the time you worked at PwC and

19  you tendered your resignation or offered to resign,

20  during that time period, did you ever get a job           04:32:11

21  offer to work elsewhere?

22      A.   Yes.

23      Q.   And where did you receive -- from which

24  firms did you receive job offers during the time

25  that you worked at PwC?                                    04:32:22

```
 1      A.   There were several.  I can try to recall     04:32:29
 2   them.
 3           So the very first was on a company called
 4   Micrus Endovascular.  Then there was an offer
 5   from -- I'm not talking chronologically.  I'm        04:32:48
 6   talking as I can recall them -- Moss Adams.
 7      Q.   Moss Adams.  Okay.
 8      A.   KPMG.  Deloitte.  BBO.  Logitech.  Did I
 9   say already Logitech?
10      Q.   No.                                          04:33:19
11      A.   Okay.  Logitech.
12      Q.   Ernst & Young?
13      A.   No, I wouldn't have gotten an offer from
14   them because I found out that PwC talked behind my
15   back to them.                                        04:33:39
16           Connor Group, but then they retracted it.
17           That's everyone I can recall.
18      Q.   Okay.  And of those that you can recall,
19   which ones -- which of those offers, if any, did you
20   accept?                                              04:34:14
21      A.   I believe I accepted all of them and then
22   retracted the acceptance.
23      Q.   Okay.  And each time you decided to retract
24   the acceptance, it was because PwC was convincing
25   you to stay; is that fair?                           04:34:31
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 260

```
 1      A.    Yes.                                      04:34:33

 2      Q.    All right.  So let's -- and did you get any

 3   job offers after your layoff notice from PwC but

 4   before you were finally terminated?

 5      A.    Yes.                                      04:35:27

 6      Q.    And who did you receive job offers from

 7   during that period of time?

 8      A.    Armanino, LLP.

 9      Q.    Anyone else?

10      A.    No.                                       04:35:40

11      Q.    And did you accept the offer from Armanino,

12   LLP, before your actual termination?

13      A.    Yes.

14      Q.    When did you accept it?

15      A.    I don't remember the exact date.          04:35:57

16      Q.    Well, weeks before you were terminated?

17      A.    I don't recall it was that long.

18      Q.    Okay.  You have an -- is that in writing,

19   the acceptance?

20      A.    Yes.                                      04:36:13

21      Q.    In an e-mail, or did you sign a document?

22      A.    I don't remember if it was an e-mail.  I

23   did sign the document.  I do not recall if it was

24   through e-mail or hard copy.

25            (Reporter clarification.)                 04:36:28
```

**DX1649-260**

Confidential
MAURO BOTTA - 09/25/2018          Page 261

```
 1           THE WITNESS:  Was through e-mail or hard      04:36:28
 2  copy.
 3           BY MR. HUESTON:
 4      Q.  All right.  And when did you begin work at
 5  Armanino?                                               04:36:43
 6      A.  September 11, 2017.
 7      Q.  And Armanino is another public accounting
 8  firm; correct?
 9      A.  Yes.
10      Q.  And when you began work in September, what     04:37:00
11  title did you have when you began?
12      A.  Actually, public accounting is an audit
13  firm.  I don't know if that's meet the definition of
14  public accountant.  Probably they do.
15           Sorry.  Can you continue.                     04:37:11
16      Q.  Sure.
17           What title did you have when you began work
18  there?
19      A.  Senior manager.
20      Q.  And who did you report to at Armanino?         04:37:19
21      A.  There were several partners, just given the
22  structure of the firm.
23           (Marked for identification purposes,
24           Exhibit 41.)
25  ///
```

```
 1              BY MR. HUESTON:                          04:37:55

 2       Q.   Putting Exhibit 41 before you.

 3            Do you recall this as your employment offer

 4    from Armanino, dated July 28th, 2017?

 5       A.   This is a printout.  I recall that I        04:38:18

 6    received an employment offer.  I do not recall the

 7    exact date.

 8       Q.   Okay.  Do you see down in the bottom right,

 9    this is -- says Plaintiff's 99.  This is actually

10    produced from you.                                  04:38:28

11            So do you have any reason to doubt that

12    this is dated July 28th, 2017?

13       A.   I have no reason to doubt it.  I just

14    didn't recall the date.

15       Q.   Okay.  And this is signed by               04:38:39

16    Scott Copeland, partner?

17       A.   Yes.

18       Q.   And what was your salary at Armanino when

19    you started?

20       A.   190,000 per annum.                          04:38:54

21       Q.   Okay.  Did you have the possibility of

22    earning a bonus?

23       A.   Yes.

24       Q.   And what were the terms of potential bonus

25    that you could earn?                                04:39:07
```

```
 1      A.   Actually, I do not recall the specific       04:39:10

 2   terms.  There was a separate document called "bonus

 3   plan," and I really don't remember the terms.

 4      Q.   Okay.  And was the bonus terms document

 5   part of the employment offer?                        04:39:24

 6      A.   I recall I received it as a package.  I

 7   don't know if it was sent with this, but it was sent

 8   to me.

 9      Q.   And roughly what do you recall you could

10   earn as a bonus at Armanino?  If you were being paid 04:39:37

11   about 190,000 a year, what do you recall the bonus

12   policy to be, just at a very high level?

13         MS. EVANS:  Speculation.

14         If you recall.

15         THE WITNESS:  Well, at a higher level, I do    04:39:51

16   not recall the amount.  I recall, after I read this

17   paragraph, that it was based on the timing of

18   issuance of financial statements.  So if you were to

19   issue audited financials within 30 days from the

20   start of the field work, you would have been         04:40:09

21   eligible for -- for the bonus.

22         BY MR. HUESTON:

23      Q.   So do you recall the bonus proposal is

24   captured at No. 2 of the employment offer; namely:

25              "As senior manager, you will be           04:40:25
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 264

```
 1              eligible for an annual bonus of up to       04:40:28
 2              $13,000 per the 30-day issuance financial
 3              statement bonus plan, in addition to the
 4              manager bonus plan, both paid on a
 5              quarterly basis."                            04:40:42
 6        A.    I recall the first one.  The second one, I
 7    do not recall the terms right now.
 8        Q.    Okay.  The second one being the manager
 9    bonus plan; right?
10        A.    Yes.                                         04:40:53
11        Q.    All right.  And what were your benefits?
12    Is it as stated in No. 3 of your employment offer?
13        A.    Yes.
14        Q.    All right.  When did your employment at
15    Armanino end?                                          04:41:21
16        A.    End of January 2018.
17        Q.    And what was the reason for the termination
18    or ending of your employment at Armanino?
19        A.    I left.
20        Q.    Did you obtain employment elsewhere?         04:41:42
21        A.    Yes.
22        Q.    And was that at SOAProjects?
23        A.    It's S-O-A Projects.
24        Q.    SOAProjects.  Okay.
25        A.    Many do call it SOAP.                        04:41:52
```

Epiq Court Reporting Solutions - New York

| | | |
|---|---|---|
| 1 | Q.   It does say capital S, capital O, capital | 04:41:54 |
| 2 | A, capital P, and then r-o-j-e-c-t-s in small caps, | |
| 3 | in my defense.  I just want to say that for the | |
| 4 | record. | |
| 5 | A.   Yes.  I do believe that there is a reason | 04:42:07 |
| 6 | for that, that they told me there was a name thing. | |
| 7 | But that's why people often called it SOAP.  But it | |
| 8 | is, yes, capital letters up to the SOAP. | |
| 9 | Q.   All right.  So SOAProjects. | |
| 10 | Is that another auditing firm? | 04:42:20 |
| 11 | A.   No. | |
| 12 | Q.   Okay.  What kind of firm is it? | |
| 13 | A.   It's -- the best I can describe is | |
| 14 | accounting advisory. | |
| 15 | Q.   Accounting advisory. | 04:42:32 |
| 16 | A.   And internal controls as well.  They do | |
| 17 | also some IT consulting.  It's all consulting. | |
| 18 | Q.   You're still employed there? | |
| 19 | A.   Yes. | |
| 20 | Q.   What is your title? | 04:42:44 |
| 21 | A.   Senior manager. | |
| 22 | Q.   And what are your duties and | |
| 23 | responsibilities as a senior manager? | |
| 24 | A.   There isn't really a predefined list | |
| 25 | because it depends on the -- really on the project. | 04:42:58 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 266

```
 1   I am assigned to the SOX group, Sarbanes-Oxley      04:43:01
 2   group.
 3        Q.   Are you assigned to any other groups?
 4        A.   No.  You're assigned to one group, mapped.
 5   You can also work on projects belonging to other     04:43:14
 6   groups if they believe that you have the skill sets
 7   for it.
 8        Q.   Have you worked in any group other than the
 9   SOX group while you've been at SOAProjects?
10        A.   Yes.                                        04:43:25
11        Q.   What groups?
12        A.   Technical accounting.
13        Q.   Any other groups?
14        A.   No.
15        Q.   All right.  Who do you report to at         04:43:32
16   SOAProjects?
17        A.   I report to -- every engagement, I report
18   to a director, which changes depending on the job.
19   And we have one partner in the SOX group, which is
20   Robert Strasser, S-T-R-A-S-S-E-R.                     04:43:48
21        Q.   Okay.  And what is your current salary?
22        A.   180- -- 190,000, I believe.
23        Q.   All right.  And what are the terms of your
24   bonus eligibility?
25        A.   The bonus at SOA is -- the best I can       04:44:12
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 267

```
 1   describe it is more like a commission.  So it is          04:44:18

 2   based on if you bring in a job, then you get a

 3   percentage of the gross margin that that engagement

 4   invoices to the company that you're consulting with

 5   minus the actual hours that you work on that              04:44:37

 6   project, if you work on that project.

 7        Q.   All right.  And what is the percentage that

 8   you're entitled to?

 9        A.   I do not remember the percentages.

10        Q.   Well, can you give me an estimate, a range?     04:44:48

11        A.   I believe 10 percent is part of the range.

12   I do not remember if it's the top end or the bottom

13   end.  I believe 10 percent is in there.

14        Q.   And when are the bonuses payable?

15        A.   They are paid the quarter after the company     04:45:08

16   pays the invoices that SOA bills them for.

17        Q.   So I realize you just started there in

18   January of 2018.

19        A.   February.

20        Q.   February.                                       04:45:28

21             So once -- have you received any bonus

22   payout yet?

23        A.   Yes.

24        Q.   How many times have you received bonus

25   payouts?                                                  04:45:37
```

1      A.   Once.  I'm waiting for another one.            04:45:39

2      Q.   All right.  And how much in bonus were you

3  paid out in that first time?

4      A.   400 bucks.

5      Q.   Okay.  And what do you anticipate the          04:45:49

6  second -- that's reflecting the beginning of your

7  work there.

8           What are you -- what are you anticipating

9  in your second bonus payout?

10      A.   So the project that I sold, I was not          04:45:58

11  working on it, so I do not know actually how many

12  invoices do the issue.  It's a technical accounting

13  project.  So I do not know the amount.  HR

14  communicates to me once the invoices have been paid,

15  and they just say, hey, this is the calculation.      04:46:14

16  These are the invoices.  This is the amount that

17  will be reflected in your physical check.

18      Q.   Okay.  And so sitting here today, do you

19  have an estimate of what you believe that next bonus

20  will be?                                               04:46:31

21      A.   I do not because there is -- it is not a

22  straight calculation, the second part, because I got

23  told that there were some disputes on the invoices

24  from the client side, and they reached settlement.

25  But I do not know how much did the client ended up    04:46:49

```
 1   paying, and I do not know the amount of the original        04:46:53
 2   invoice.
 3       Q.   All right.  Are you eligible for any other
 4   type of bonus at SOAProjects?
 5       A.   I think the way that they told me, there            04:47:04
 6   are spot bonus that are eligible to be given, but it
 7   is completely discretionary to the discretion of the
 8   owner.
 9       Q.   All right.  Any other discretionary
10   bonuses, such as end-of-year or holiday bonuses?            04:47:15
11       A.   Not to my knowledge, no.
12       Q.   All right.  And you receive, I assume,
13   employment benefits as well?
14       A.   Yes.
15       Q.   And are they similar to what was described        04:47:26
16   in the employment letter for Armanino?
17       A.   Similar.  There are some differences, such
18   as, you know, the PTO or the -- the 401(k), I
19   believe, is a little different, but the standard
20   ones, medical, vision, dental, yes.                        04:47:44
21       Q.   Okay.  Since your termination from PwC,
22   have you taken any sick days at either Armanino or
23   SOAProjects?
24       A.   Maybe one or two.
25       Q.   Okay.  And what were the reasons for those        04:47:58
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 270

| | | |
|---|---|---|
| 1 | sick days? | 04:48:01 |
| 2 | A.   That I was physically sick. | |
| 3 | Q.   Okay.  Did you miss any days due to | |
| 4 | distress? | |
| 5 | A.   Nope. | 04:48:12 |
| 6 | Q.   All right.  And since August of 2017, have | |
| 7 | you sought any medical attention? | |
| 8 | A.   Yes. | |
| 9 | Q.   What kind of medical attention have you | |
| 10 | sought? | 04:48:23 |
| 11 | A.   I'm seeing a therapist every week. | |
| 12 | Q.   Okay.  And what is the therapist's name? | |
| 13 | A.   Ed, last name Sarrett, S-A-R-R-E-T-T. | |
| 14 | Q.   When did you start seeing Mr. -- is it Dr. | |
| 15 | or Mr.? | 04:48:44 |
| 16 | A.   I believe -- | |
| 17 | MS. EVANS:  If you know.  Speculation. | |
| 18 | THE WITNESS:  Yeah, I will speculate.  I | |
| 19 | believe it's Mr., but I'm not 100 percent positive. | |
| 20 | BY MR. HUESTON: | 04:48:53 |
| 21 | Q.   All right.  When did you start seeing | |
| 22 | Mr. Sarrett? | |
| 23 | A.   I don't recall the exact date.  I do | |
| 24 | believe sometime in August 2017. | |
| 25 | Q.   Okay.  And what was the reason you started | 04:49:03 |

DX1649-270

1    seeing Mr. Sarrett?                                      04:49:04

2        A.   I communicated to my doctor the issues that

3    I was experiencing, and he recommended me to see

4    Mr. Sarrett for anxiety, depression, and emotional

5    distress.                                                04:49:24

6        Q.   Okay.  And has Mr. Sarrett prescribed any

7    medications?

8        A.   No.

9        Q.   All right.  And has Mr. Sarrett prescribed

10   any particular treatment?                                04:49:35

11       A.   We did discuss, during sessions, certain

12   tips and tools and practices that would have helped

13   me.

14       Q.   Anything else?

15            MS. EVANS:  Overbroad.                           04:49:50

16            THE WITNESS:  In what regard?

17            BY MR. HUESTON:

18       Q.   Well, I asked you did he prescribe any

19   particular treatment, and you said tips and tools

20   and practices.                                           04:50:01

21            Do you recall him prescribing any other

22   treatment other than that?

23       A.   Not that I recall.

24       Q.   Okay.  Are you seeking any damages in this

25   suit?                                                    04:50:12

Confidential
MAURO BOTTA - 09/25/2018                    Page 272

```
 1          MS. EVANS:  Calls for a legal conclusion.    04:50:15
 2   Vague and ambiguous.
 3          You can answer.
 4          THE WITNESS:  Yes.
 5          BY MR. HUESTON:                               04:50:21
 6      Q.   How much are you seeking?
 7          MS. EVANS:  Calls for a legal conclusion.
 8   Vague and ambiguous.
 9          MR. HUESTON:  Calls for a number if he has
10   one.  It's not a legal conclusion.                   04:50:28
11          BY MR. HUESTON:
12      Q.   You can answer.
13          MS. EVANS:  Speculation.
14          Go ahead.
15          THE WITNESS:  I'm not asking for a number.    04:50:33
16          BY MR. HUESTON:
17      Q.   Okay.  Do you believe that you have been
18   harmed in a way that's caused you monetary damage?
19      A.   I believe my claim is that PwC violated a
20   series of laws, and the jury will decide that that   04:50:54
21   did occur.  I am entitled to damages.
22      Q.   And on what basis are you entitled to
23   damages?
24          MS. EVANS:  Calls for a legal conclusion.
25   Calls for speculation.                               04:51:06
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 04:51:08 |
| 2 | Q.   You can answer. | |
| 3 | A.   Punitive damages. | |
| 4 | Q.   Anything else? | |
| 5 | A.   Not that I recall at the moment. | 04:51:15 |
| 6 | Q.   Okay.  Who is Brian Dalton? | |
| 7 | A.   He is ex-PwC employee.  Ex-coachee of mine. | |
| 8 | Coachee.  It's like coach.  Add a couple of Es.  And | |
| 9 | he's one my best friends. | |
| 10 | Q.   Okay.  Do you recall telling him as long | 04:51:52 |
| 11 | ago as 2013 that you loathe the industry? | |
| 12 | A.   I do not recall if I stated that in 2013 to | |
| 13 | him. | |
| 14 | MR. HUESTON:  Okay.  Well, let's see if we | |
| 15 | can refresh your recollection. | 04:52:11 |
| 16 | (Marked for identification purposes, | |
| 17 | Exhibit 42.) | |
| 18 | BY MR. HUESTON: | |
| 19 | Q.   I'm putting before you Exhibit 42.  Okay. | |
| 20 | I've put before you a chat that you produced with | 04:52:36 |
| 21 | brian.dalton@gmail.com, and it's dated May 1st, | |
| 22 | 2013. | |
| 23 | Do you see that? | |
| 24 | A.   Yes. | |
| 25 | Q.   And let's go to the second page.  And at | 04:52:49 |

```
 1   2:46 p.m., there's a line, and it says "2:46 p.m."     04:53:02

 2         Do you see it?

 3    A.   Yes.

 4    Q.   And it says "Me."

 5         That's you; right?                                04:53:09

 6    A.   Yes.

 7    Q.   And you write:

 8         "Anyway, at this point, this is how

 9         it is.  I can't trust anyone.  I'll just

10         keep here and see how long can the comedy         04:53:17

11         last."

12         Right?

13    A.   Yes.

14    Q.   And you were employed at PwC at the time;

15   right?                                                  04:53:25

16    A.   Yes.

17    Q.   And Brian writes back:

18         "Bad idea.  That's what they want."

19         And you wrote:

20         "I don't have a fucking choice."                  04:53:33

21         Right?

22    A.   Yes.

23    Q.   And by the way, this is during the time

24   period where you were obtaining and then rescinding

25   multiple offers from other audit firms, right?         04:53:42
```

```
 1      A.   I do not recall if during '13 I got offers    04:53:45

 2   from other audit firms.

 3      Q.   Okay.  Well, let's look down.

 4           Brian then says:  "Should escape."

 5           And you write:                               04:53:55

 6              "There is not other firms.  I got one

 7           left, KPMG."

 8           Right?

 9      A.   Yes.

10      Q.   And, in fact, you've described KPMG as one   04:54:01

11   of the firms that, in fact, gave you an offer and

12   you accepted it at some point; right?

13      A.   Yes.

14      Q.   And then you write, after Brian responds:

15              "In a way I am because I loathe           04:54:17

16           industry."

17           Right?  That's what you wrote?

18      A.   Yes.

19      Q.   And you're referring to the audit industry?

20      A.   No.                                          04:54:27

21      Q.   Which industry are you referring to?

22      A.   Positions in finance department at

23   companies.

24      Q.   Positions in finance departments of

25   companies.  Those were -- the people in positions in  04:54:44
```

```
 1   finance departments in companies are the ones you        04:54:48

 2   were typically in communication with in your audit

 3   responsibilities at PwC; correct?

 4       A.   Yes.

 5       Q.   Okay.  In fact, you felt that positions --       04:54:56

 6   people in positions in finance departments of

 7   companies were all incompetent and crooks; right?

 8       A.   No.

 9       Q.   Didn't you decide to go on a crusade

10   against the industry?  "Crusade," that's your word;       04:55:19

11   right?

12       A.   I'm not sure what you mean is my word.

13       Q.   Have you ever used the word -- well, have

14   you ever used that word, "crusade"?

15           MS. EVANS:  Overbroad.                            04:55:31

16           THE WITNESS:  At some point in time, I

17   can't tell you for certain.  Possible.

18           BY MR. HUESTON:

19       Q.   Yeah.  You used that word to describe your

20   efforts to criticize the audit firm community;           04:55:43

21   right?

22       A.   I do not recall that I used that word.

23       Q.   And who is Mario Piergallini?

24       A.   Ex-PwC employee, ex-coachee, and a friend.

25       Q.   Okay.  And do you recall describing            04:56:11
```

```
 1   yourself as "one man against an entire industry"?          04:56:16

 2        A.   I do not recall.

 3        Q.   That's not something you would say?

 4        A.   It is possible.

 5             MR. HUESTON:  Yeah.  Let's go to the next         04:56:31

 6   exhibit.

 7             (Marked for identification purposes,

 8             Exhibit 43.)

 9             BY MR. HUESTON:

10        Q.   Putting before you Exhibit 43.  This is a        04:56:54

11   document produced by you, the top of which is "Gmail

12   Hangout with Mario Piergallini."

13             Do you see that?

14        A.   Yes.

15        Q.   And you're in a communication -- a chat          04:57:05

16   communication with Mario Piergallini; correct?

17        A.   Yes.

18        Q.   And it's dated January 12th, 2018?

19        A.   Yes.

20        Q.   So let's go to the third page, and that's        04:57:16

21   Bates stamped Exhibit 663, at 12:41 p.m.  And you

22   describe yourself "as one man against an entire

23   system"; right?

24        A.   "As one man against the entire system as it

25   gets," yes.                                                04:57:36
```

```
 1       Q.   Okay.  Do you recall stating to          04:57:37

 2   Mr. Piergallini that you "blew up Armanino in less

 3   than two months"?

 4       A.   I'm sorry.  Can you repeat?

 5       Q.   Sure.  Do you remember telling            04:58:32

 6   Mr. Piergallini that you "blew up Armanino in less

 7   than two months"?

 8       A.   I do not recall exact words.  If you can

 9   show them to me.

10       Q.   Well, does it sounds familiar?           04:58:44

11       A.   I do not recall.

12       Q.   Do you use words frequently like that,

13   "blowing up companies"?

14       A.   I do not believe I do.

15       Q.   Okay.  Let's see if you remember this one. 04:58:55

16            Go back to the same exhibit, 43.  Do you

17   have it before you, Exhibit 43?

18       A.   Yes.

19       Q.   Go to the second page.  At 12:21 p.m., do

20   you see your entry there?                          04:59:15

21                "I blew up Armanino in less than two

22                months."

23       A.   Yes.

24       Q.   And you wrote that; right?

25       A.   Yes.                                      04:59:22
```

```
 1      Q.   Have you encountered any problems at          04:59:32

 2   SOAProjects?

 3      A.   Can you define "problems"?

 4      Q.   Well, I'm saying it broadly.

 5           Have you -- have you identified any issues    04:59:43

 6   during your employment at SOAProjects?

 7           MS. EVANS:  Calls for speculation.

 8   Privacy.  Confidential.

 9           BY MR. HUESTON:

10      Q.   You can answer.                               04:59:54

11           MS. EVANS:  Relevance.

12           THE WITNESS:  It's too broad of a question.

13           BY MR. HUESTON:

14      Q.   Well, it sounds like you have.

15           Have you identified problems or issues to     05:00:13

16   any of your superiors at SOAProjects since you began

17   work there?

18           MS. EVANS:  Privacy.  Confidential.

19   Relevance.

20           MR. HUESTON:  Those are not valid            05:00:26

21   objections.

22           BY MR. HUESTON:

23      Q.   And you can answer.

24           MS. EVANS:  They are valid objections, and

25   they're on the record.                               05:00:32
```

```
 1              BY MR. HUESTON:                        05:00:33

 2      Q.   You can answer.

 3              MS. EVANS:  Please -- I'm going to object

 4   again.  Privacy.  Relevance.  Confidential.

 5              BY MR. HUESTON:                        05:00:38

 6      Q.   You can answer.

 7      A.   I don't believe I can answer that.

 8      Q.   Why not?

 9      A.   I stated why not.

10      Q.   No, you haven't stated why not.  I don't    05:00:49

11   understand.

12      A.   It's too broad of a question.

13      Q.   What's too broad?

14              Here's my question:  Have you identified

15   problems or issues to any of your superiors at    05:00:58

16   SOAProjects since you began work there?

17              MS. EVANS:  Privacy.  Relevance.

18              BY MR. HUESTON:

19      Q.   You can answer.

20      A.   The definition of "problem" and "issue" can    05:01:06

21   mean anything.  I will not answer a question phrased

22   that way.

23      Q.   It can mean anything?  What's your

24   understanding of the word "problem"?  What does that

25   mean to you?                                      05:01:16
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 281

```
1            MS. EVANS:  Argumentative.                    05:01:17

2            MR. HUESTON:  Nope.

3            BY MR. HUESTON:

4       Q.   You can answer.

5       A.   Things that represent an issue or a          05:01:26

6   concern, but can mean other as well.  To give you

7   the exact definition, I would have to look in the

8   dictionary.

9       Q.   No, we don't do that.  And we can -- we'll

10  go the full seven hours on this.  I'm entitled to   05:01:41

11  get answers here.

12           And things that represent an issue or a

13  concern, we'll go with that definition.

14           Have you identified things that represent

15  an issue or concern to any of your superiors at     05:01:51

16  SOAProjects since you began work there?

17           MS. EVANS:  Overbroad.  Vague.  Ambiguous.

18  Privacy.  Relevance.

19           BY MR. HUESTON:

20      Q.   You can answer.                              05:02:01

21      A.   I would have to state what I just stated.

22      Q.   That you don't understand the definition

23  you just provided?

24           Things that represent an issue or a

25  concern.  What do you have -- what are you having a  05:02:10
```

DX1649-281

Confidential
MAURO BOTTA - 09/25/2018          Page 282

1   problem with in that definition that you just          05:02:13

2   provided?

3       A.   I just believe it's too broad of a

4   question.  That is what I stated.

5       Q.   Okay.  Do you recall, since starting in       05:02:25

6   January, writing an e-mail complaining about a

7   practice at SOAProjects that you disagreed with?

8            MS. EVANS:  Privacy.  Relevance.

9   Overbroad.

10           THE WITNESS:  I do not recall I started SOA    05:02:44

11  in January.

12           BY MR. HUESTON:

13      Q.   Well, since the time that you started.

14           MS. EVANS:  Same objections.

15           MR. HUESTON:  Well, I'm going to mark this      05:02:54

16  point in the record, Counsel.  We're going to be

17  back here again, because I'm going to go to court,

18  and I am going to get answers to this.  And it is

19  relevant because it is a course of conduct that he's

20  pursued over time.                                      05:03:05

21           And this is an effort by you and the

22  witness to refuse to answer the questions.

23           So we're going to take a break.  You're

24  going to confer with your -- you're going to confer

25  with your client, and then we're going back on the     05:03:14

Confidential
MAURO BOTTA - 09/25/2018          Page 283

```
 1   record, and I'm going to be asking these questions,    05:03:16
 2   and I'm going to expect answers.
 3            MS. EVANS:  Okay.  We're not going off the
 4   record right now.
 5            MR. HUESTON:  We are going off the record.    05:03:22
 6            MS. EVANS:  No, we're not, because I have
 7   to put something on the record.
 8            MR. HUESTON:  You can put something on the
 9   record.
10            MS. EVANS:  I have never instructed him to    05:03:26
11   answer once in this deposition [sic], so for you to
12   imply otherwise is improper.
13            MR. HUESTON:  You are absolutely coaching
14   him and suggesting that he not answer the questions,
15   so we're going to take a break.                        05:03:36
16            MS. EVANS:  Absolutely not.  Absolutely
17   not.  We're not going off the record.
18            MR. HUESTON:  We are taking a break.
19            MS. EVANS:  We're not.
20            MR. HUESTON:  I'm entitled to take a break,   05:03:43
21   and I will, and we're going to go off the record.
22            MS. EVANS:  You're trying to waste time.
23            MR. HUESTON:  I'm not wasting time.
24            MS. EVANS:  We're not going off the record.
25            MR. HUESTON:  Well --                         05:03:52
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 284

```
 1            MS. EVANS:  We're here, and we're prepared        05:03:52
 2   to go forward.
 3            MR. HUESTON:  You are not prepared to go
 4   forward.
 5            MS. EVANS:  We are.                                05:03:54
 6            MR. HUESTON:  And in any event, I need a
 7   break.  We've gone about an hour, and we're going to
 8   take that break, and then we're going to --
 9            MS. EVANS:  We're finishing this deposition
10   today, and we're not going to come back again.  It's      05:04:00
11   concluding today, and if you're going to continue to
12   take extra breaks --
13            MR. HUESTON:  We've been on the record for
14   over an hour, and we're taking a break.
15            MS. EVANS:  It's been exactly an hour.            05:04:11
16            MR. HUESTON:  And it's time for a break.
17            MS. EVANS:  Okay.  But I want to put on the
18   record that you've taken numerous breaks.  You've
19   been unorganized over exhibits.  It's ridiculous.
20   And you're just dragging this out.                        05:04:21
21            MR. HUESTON:  You have been obstructive and
22   you have --
23            MS. EVANS:  Not at all.
24            MR. HUESTON:  -- prolonged this, and we
25   will be back again if he's not going to answer the        05:04:27
```

**DX1649-284**

Confidential
MAURO BOTTA - 09/25/2018                    Page 285

```
 1  questions.                                           05:04:30

 2          MS. EVANS:  Not at all.

 3          THE VIDEOGRAPHER:  Okay.  We're going off

 4  the record at 5:04 p.m.

 5          (Recess taken, from 5:04 to 5:12.)          05:04:38

 6          THE VIDEOGRAPHER:  We're back on the record

 7  at 5:12 p.m.

 8          MS. EVANS:  I talked to my client at the

 9  break, and he will answer any of those questions you

10  asked previously before the break.  So please go     05:12:26

11  ahead and ask those.

12          BY MR. HUESTON:

13     Q.   Okay.  I'm going to ask you this,

14  Mr. Botta:  Have you received any performance

15  evaluations since you have started at SOAProjects?   05:12:36

16     A.   No.

17          MS. EVANS:  I meant answer.  Sorry.

18          BY MR. HUESTON:

19     Q.   During your time at SOAProjects, have you

20  criticized any of SOAProjects' clients' accounting   05:12:49

21  practices?

22     A.   Not that I recall.

23     Q.   Have you criticized any of the accounting

24  practices at SOAProjects?

25          MS. EVANS:  Privacy.  Relevance.            05:13:02
```

| | | |
|---|---|---|
| 1 | Go ahead and answer. | 05:13:03 |
| 2 | THE WITNESS:  Not that I recall. | |
| 3 | BY MR. HUESTON: | |
| 4 | Q.   Okay.  Since your time since you began work | |
| 5 | at SOAProjects, have you claimed that anyone at | 05:13:12 |
| 6 | SOAProjects is incompetent? | |
| 7 | MS. EVANS:  Privacy and relevance. | |
| 8 | Go ahead and answer. | |
| 9 | THE WITNESS:  Yes. | |
| 10 | BY MR. HUESTON: | 05:13:23 |
| 11 | Q.   Who have you claimed is incompetent at | |
| 12 | SOAProjects? | |
| 13 | A.   The technical accounting partner. | |
| 14 | Q.   Anyone else? | |
| 15 | A.   Not to my recollection. | 05:13:37 |
| 16 | Q.   Who is the technical accounting partner? | |
| 17 | A.   Her first name is Yuko, Y-U-K-O.  I do not | |
| 18 | recall the last name. | |
| 19 | Q.   And what was your basis for claiming that | |
| 20 | she was incompetent? | 05:13:53 |
| 21 | MS. EVANS:  Privacy.  Relevance. | |
| 22 | THE WITNESS:  What I observed during a | |
| 23 | project where we worked together. | |
| 24 | BY MR. HUESTON: | |
| 25 | Q.   And what did you observe that to you formed | 05:14:04 |

1   the basis of an evaluation of incompetence?                05:14:06

2       A.   She did not seem aware of concepts that

3   were fairly basic, and the contribution that I

4   observed during that project was not what I would

5   have expected from someone at that level.                  05:14:25

6       Q.   And what were the basic concepts that you

7   felt she wasn't aware of?

8            MS. EVANS:  Privacy.  Relevance.

9            THE WITNESS:  Technical concepts.

10           BY MR. HUESTON:                                   05:14:41

11      Q.   What kind of technical concepts?

12      A.   The example I recall would be EPS.

13      Q.   And what does "EPS" stand for?

14      A.   Earnings per share.

15      Q.   Okay.  And any other technical concepts?          05:14:56

16      A.   Not that I recall.

17      Q.   And is it your testimony she didn't

18   understand what earnings per share meant?

19      A.   No.

20      Q.   What is it that she didn't understand with        05:15:07

21   respect to EPS?

22      A.   I did not believe that she was able to

23   review my work.

24      Q.   I see.  And who did you discuss your

25   concerns about her incompetence with at SOAProjects?      05:15:25

Confidential
MAURO BOTTA - 09/25/2018                    Page 288

```
 1        A.   My peers in the -- and some superiors.        05:15:31
 2        Q.   Now, you just mentioned she's a technical
 3   accounting partner; is that right?
 4        A.   She's the technical accounting partner.
 5        Q.   There's only one technical accounting        05:15:44
 6   partner, and it's her; right?
 7        A.   To my knowledge.
 8        Q.   All right.  By the way, how many partners
 9   are there at SOAProjects?  Do you know?
10        A.   I do not.                                     05:15:55
11        Q.   More than 50?
12        A.   I do not believe so.
13        Q.   More than 20?
14        A.   I doubt.
15        Q.   It's a smaller firm.  So it may be, what,     05:16:05
16   15, 20 partners?  10 to 20 partners?
17        A.   I wouldn't know.
18             MS. EVANS:  Calls for speculation.
19             BY MR. HUESTON:
20        Q.   Okay.  Not more than 25 or so partners at     05:16:15
21   SOAProjects to your recollection; right?
22        A.   Yes.
23        Q.   Okay.  And did you -- well, who does the
24   technical partner report to?  Do you know?
25        A.   I believe the CEO.                            05:16:30
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 289

```
 1        Q.   Did you complain to the CEO about the      05:16:32

 2   technical partner?

 3        A.   No.

 4        Q.   Do you plan to complain to the CEO about

 5   the technical partner?                               05:16:39

 6        A.   I'm hesitant because I was told that she's

 7   a personal friend with the technical accounting

 8   partner.

 9        Q.   I see.  So you were planning to complain to

10   the CEO, but you feel pressured not to?              05:16:50

11        A.   Not pressured.  But if we would end up on

12   another project together, I do plan to tell the CEO

13   that I do not believe it is a good idea.

14        Q.   Have you committed -- have you written down

15   your concerns about her competence?                  05:17:12

16        A.   No.  I do not believe I have.

17        Q.   And is she currently working on projects

18   that you believe could be imperiled by your view of

19   her incompetence?

20        A.   I couldn't speculate.                       05:17:31

21             MS. EVANS:  Vague and ambiguous.

22   Speculation.  Privacy.  Relevance.

23             Please let me object before you answer.

24             BY MR. HUESTON:

25        Q.   Have you claimed that anyone else at       05:17:42
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 290

```
 1   SOAProjects, other than the technical accounting      05:17:43
 2   partner, is incompetent?
 3           MS. EVANS:  Privacy.  Relevance.
 4           THE WITNESS:  I do not recall.
 5           BY MR. HUESTON:                                05:17:51
 6      Q.   Have you criticized the performance of
 7   anyone else at SOAProjects since you've begun work
 8   there?
 9           MS. EVANS:  Privacy.  Relevance.
10   Overbroad.                                             05:18:02
11           THE WITNESS:  I do not recall.
12           BY MR. HUESTON:
13      Q.   Have you sent your résumé out to other
14   firms or companies --
15           MS. EVANS:  Privacy.  Relevance.               05:18:14
16           BY MR. HUESTON:
17      Q.   -- since the time you've begun work at
18   SOAProjects?
19           MS. EVANS:  Privacy.  Relevance.
20           THE WITNESS:  Yes.                             05:18:21
21           BY MR. HUESTON:
22      Q.   And to whom have you sent your résumé?
23      A.   The one I recall are Aerohive, Bloom
24   Energy, Ernst & Young, Deloitte, Truilio, Marcum,
25   BDO.  Those are the ones I recall.                     05:19:20
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 291

```
 1      Q.   Okay.  Have you received offers from any of      05:19:30
 2   those employers?
 3      A.   No.
 4      Q.   Have you received offers to interview with
 5   any of those employers?                                  05:19:39
 6      A.   I'm sorry.  Can you repeat?
 7      Q.   Have you received offers to interview or to
 8   submit an application to any of those employers?
 9      A.   Yes.
10      Q.   Which ones?                                      05:19:49
11           MS. EVANS:  Privacy.  Relevance.
12           THE WITNESS:  Marcum, Truilio, Deloitte.
13           Oh, another one I applied to was Acilon,
14   A-C-I-L-O-N.  That's what I recall.
15           BY MR. HUESTON:                                  05:20:31
16      Q.   Okay.  And are you still in the process of
17   interviewing with any of those that you just
18   identified?
19      A.   One.
20      Q.   Which one?                                       05:20:38
21      A.   Truilio.
22      Q.   All right.
23      A.   I would also like to correct my previous
24   statements on the question that you asked about the
25   damages that I'm seeking in the complaint, that I        05:20:47
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 292

```
 1   mentioned punitive.  I would like to --          05:20:53
 2       Q.   This is after talking to your attorney?
 3            MS. EVANS:  Go ahead.
 4            THE WITNESS:  So I would like to add the
 5   compensatory damages, lost wages, for the fact that  05:21:02
 6   I'm not a partner, reinstatement, and emotional
 7   distress.
 8            BY MR. HUESTON:
 9       Q.   And what do you believe you're entitled to
10   in compensatory damages?                          05:21:16
11            MS. EVANS:  Calls for speculation.  Calls
12   for expert opinion.
13            BY MR. HUESTON:
14       Q.   You can answer.
15       A.   Compensatory damages -- I can't tell you  05:21:25
16   with certainty.
17       Q.   Okay.  What are your lost wages?
18       A.   The one that -- the difference that would
19   be from what I currently make and what I would make
20   as partner.                                       05:22:03
21       Q.   And you have the opportunity to be a
22   partner at SOAProjects, do you not?
23       A.   There are a lot of ifs that need to occur,
24   but I suppose it's possible.
25       Q.   No one has told you that you cannot make  05:22:23
```

1  partner at SOAProjects; isn't that right?              05:22:27

2      A.   Correct.

3      Q.   And you would agree that at PwC, there were

4  a lot of ifs in that same way there; right?

5      A.   The partnership process has a lot of ifs.    05:22:45

6  I believe had they behaved properly, I would be

7  partner there.

8      Q.   You believe that if you behaved properly --

9  they behaved properly -- it's your testimony that if

10 they behaved properly, you would have had at least    05:23:02

11 three number 1 rankings in a row, if not four,

12 justifying your entry into the partnership; is that

13 your testimony?

14     A.   I believe I should have, yes.

15     Q.   Okay.  Now, while at SOAProjects, you        05:23:14

16 worked on the same -- on a project that you had also

17 worked on at PwC; right?

18     A.   No.

19     Q.   No?  Did you work for a client at

20 SOAProjects that you also worked on while you were    05:23:29

21 at PwC?

22     A.   No.

23     Q.   Let me ask it a different question.

24          So while you were at SOAProjects, were you

25 working on a project that PwC was also working on?    05:23:45

| | | |
|---|---|---|
| 1 | A.   Yes. | 05:23:51 |
| 2 | Q.   Okay.  And what was that engagement? | |
| 3 | A.   Fluidigm.  F-L-U-I-D like Detroit, I, G | |
| 4 | like gold, M like mister. | |
| 5 | Q.   And you were eventually removed from that | 05:24:07 |
| 6 | engagement; correct? | |
| 7 | A.   I was asked to pack up and leave. | |
| 8 | Q.   And what was the reason you were told to | |
| 9 | pack up and leave? | |
| 10 | A.   That the company controller got told by PwC | 05:24:19 |
| 11 | that there were some reason for which they could not | |
| 12 | rely on my work.  And had I stayed, they would have | |
| 13 | needed to bill them extra because they would have | |
| 14 | had to redo my work. | |
| 15 | Q.   And who at PwC supposedly made that | 05:24:42 |
| 16 | statement? | |
| 17 | A.   Based on what my attorney told me -- | |
| 18 | Q.   Well, I don't -- | |
| 19 | MS. EVANS:  No, no, no.  Nope. | |
| 20 | BY MR. HUESTON: | 05:24:59 |
| 21 | Q.   Okay. | |
| 22 | MS. EVANS:  Anything that's attorney-client | |
| 23 | privilege you don't go into absolutely.  So we don't | |
| 24 | go there. | |
| 25 | THE WITNESS:  Got it.  Okay. | 05:25:03 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 295

```
 1           BY MR. HUESTON:                                05:25:03

 2      Q.   Okay.  Yeah, I don't want -- just to be

 3   clear, and I thought I said this earlier.

 4           MS. EVANS:  I'll have that struck from the

 5   record, please.                                        05:25:09

 6           MR. HUESTON:  That's fine.  Yeah.

 7           BY MR. HUESTON:

 8      Q.   I'm not looking for anything that your

 9   attorneys have said, and I mentioned that earlier.

10           So excluding anything your attorneys may      05:25:16

11   have told you, did you learn from anybody, outside

12   of your attorneys, who at PwC allegedly made this

13   statement?

14      A.   No.

15      Q.   You understand that under the PCAOB,          05:25:40

16   auditors are actually required to assess the

17   competency of other auditors before relying on their

18   product; right?

19      A.   Well, I wouldn't characterize it

20   "competency of other auditors" because PwC is the     05:25:59

21   auditors.  I would say competency of other people

22   that PwC needs to -- or chooses to rely upon.

23      Q.   Okay.  That's -- that's right.

24           And you recognize that as PCAOB Standard

25   2201.18?                                               05:26:15
```

1      A.   I do not recall the number by heart, but it        05:26:20

2   is in the PCAOB standard.

3      Q.   All right.  And so if you were required to

4   assess the competency of someone, how would you go

5   about doing it?                                            05:26:29

6      A.   If I was still in audit?

7      Q.   Right.

8      A.   There would be a series of steps that we

9   normally did perform when I was at PwC, such as

10   résumé review -- résumé review.  And then just a          05:26:44

11   review of the work papers that they produced and the

12   firm that they work for.

13      Q.   When you say "and the firm they work for,"

14   what do you mean by that?  Would you talk to people

15   at that firm about the performance -- performance of      05:27:10

16   the individual?

17      A.   No.  What I meant is that, for example, if

18   somebody is advising the company that I would be

19   auditing that works for, like, EY, it's one of the

20   big four, what we will normally document is that EY       05:27:24

21   being a big four has an established record and

22   reputation of screening employees and code of

23   conduct and all that type of stuff.

24      Q.   All right.  So you would do a review of the

25   résumé; right?                                            05:27:40

```
 1      A.   Yes.                                        05:27:42

 2      Q.   And you would review work papers and

 3   documents that that individual prepared; right?

 4      A.   Yes.

 5      Q.   And you would agree it wouldn't be         05:27:51

 6   necessary for you to assess competency to actually

 7   have worked with that individual personally; right?

 8      A.   Yes.

 9           MS. EVANS:  Calls for speculation.

10           BY MR. HUESTON:                            05:28:14

11      Q.   Now, Mr. McCann was subject to the duty to

12   assess the competence of others that he was relying

13   on; right?

14      A.   I think that's privileged.

15      Q.   No, I'm not asking about attorney          05:28:38

16   communications.  I'm just asking -- just listen to

17   my question.

18           Mr. McCann, as you understood it, was

19   subject to the duty to assess the competence of

20   other persons he was relying on; right?            05:28:49

21           MS. EVANS:  Repeat the question, please.

22           BY MR. HUESTON:

23      Q.   The question is -- and I'm going to remind

24   you your complaint has identified Mr. McCann.  So

25   I'm not talking about anything your attorney may   05:29:03
```

```
 1  also have said.  It's in your complaint.  You name       05:29:05

 2  Mr. McCann.  All right.

 3         So the question is Mr. McCann, you would

 4  agree, was subject to the duty to assess the

 5  competence of people he was relying on for their          05:29:14

 6  work; right?

 7         MS. EVANS:  Can I ask what you're reading

 8  from?

 9         MR. HUESTON:  No.

10         BY MR. HUESTON:                                     05:29:24

11    Q.   You can answer the question.

12         MS. EVANS:  Calls for speculation.  Vague.

13  Ambiguous.  Overbroad.

14         Go ahead.

15         BY MR. HUESTON:                                     05:29:29

16    Q.   Go ahead.

17    A.   Yes, in principle, partners in other firms

18  would need to assess qualifications of people that

19  they rely upon.

20    Q.   Right.  And that duty in this instance             05:29:41

21  would include assessing your competency before

22  relying on your product at SOAProjects; right?

23         MS. EVANS:  Overbroad.  Speculation.

24         BY MR. HUESTON:

25    Q.   You can answer.                                     05:29:53
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 299

```
 1      A.    That would be part of his responsibilities,    05:29:56
 2   to review résumés of people that he would be relying
 3   upon.
 4      Q.    Résumés as well as work product; right?
 5      A.    Yes.                                            05:30:04
 6      Q.    And Mr. McCann could make that assessment
 7   by conducting an appropriate investigation into your
 8   competency; right?
 9      A.    I would not speculate what he would be
10   doing, but if he does the job as he's supposed to,     05:30:16
11   yes.
12           MR. HUESTON:  Okay.  Let's mark this as the
13   next exhibit.
14           (Marked for identification purposes,
15            Exhibit 44.)                                   05:30:57
16           BY MR. HUESTON:
17      Q.    Okay.  I've placed before you an e-mail
18   chain marked as Exhibit 44.  The subject Re: Mauro.
19   And there's an e-mail chain of attorneys.  And
20   embedded in this is an e-mail from your attorneys      05:31:32
21   with respect to you that I'm going to turn your
22   attention to on page 4.
23           And just for reference, at the bottom of
24   page 3, there is a Renee Phillips from Orrick
25   writing to Alex at Derek Smith Law.                    05:31:50
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 300

```
 1          That's one of the attorneys who represents     05:31:52
 2   you; right?
 3      A.   Yes.
 4      Q.   Okay.  And the Orrick attorney for PwC
 5   writes:                                               05:31:58
 6           "PwC does not want to say anything to
 7           this client or to any client about Mauro.
 8           That's why we were hoping he could just
 9           ask not to be placed on assignments where
10           PwC is the auditor to avoid any issue        05:32:10
11           like this now or in the future.  PwC has
12           absolutely no desire to threaten Mauro's
13           job security or reputation, which is why
14           I reached out to you on this in an effort
15           to find a better solution."                  05:32:23
16           Do you see that?
17      A.   Yes.
18      Q.   And so you understand, through that
19   language -- and this was in February of 2018 -- that
20   PwC was requesting that you not be staffed on any of  05:32:34
21   the same projects as PwC so that PwC could avoid
22   having to communicate with your current employer
23   about their views of your competency; right?
24           MS. EVANS:  Calls for speculation.
25           THE WITNESS:  I wouldn't want to speculate    05:33:01
```

| | | |
|---|---|---|
| 1 | on what PwC mind or state of mind or intent was when | 05:33:02 |
| 2 | they wrote this. | |
| 3 |      BY MR. HUESTON: | |
| 4 |   Q.  Well, the words express that there's no | |
| 5 | desire to threaten your job security and requested | 05:33:12 |
| 6 | to avoid having to pass on their views of your | |
| 7 | competence, that you simply not be assigned to the | |
| 8 | same project. | |
| 9 |      You can see that; right? | |
| 10 |      MS. EVANS:  Misstates the testimony. | 05:33:26 |
| 11 |      THE WITNESS:  I can read what is written. | |
| 12 |      BY MR. HUESTON: | |
| 13 |   Q.  Okay.  And what is written is they didn't | |
| 14 | want to say anything to this client or to any client | |
| 15 | about you; right?  That's the first line. | 05:33:44 |
| 16 |   A.  That is what they wrote. | |
| 17 |   Q.  Now, let me ask you about Mr. McCann's | |
| 18 | assessment, because you've alleged this in your | |
| 19 | complaint. | |
| 20 |      Did you -- is it your opinion that you | 05:34:06 |
| 21 | experienced negative repercussions at SOAProjects as | |
| 22 | a result of that alleged statement by Mr. McCann? | |
| 23 |   A.  Yes. | |
| 24 |   Q.  And what were those repercussions? | |
| 25 |   A.  My deployability is limited because I | 05:34:23 |

```
 1   cannot work on PwC accounts.                          05:34:26

 2       Q.   Other than not working on PwC accounts,

 3   have there been any other negative repercussions?

 4            MS. EVANS:  Overbroad.  Speculation.  Vague

 5   and ambiguous.                                        05:34:38

 6            You can answer.

 7            THE WITNESS:  Not to my knowledge.

 8            BY MR. HUESTON:

 9       Q.   Okay.  And, in fact, SOAProjects hasn't

10   fired you for being incompetent; right?               05:34:45

11       A.   Right.

12       Q.   And is it your view that you're not being

13   fully utilized at this time by SOAProjects?

14       A.   No.

15            MR. HUESTON:  Those are all the questions I   05:35:04

16   have at this time.  We can end the deposition.

17            MS. EVANS:  Is the deposition over?

18            MR. HUESTON:  It is.

19            MS. EVANS:  Okay.  This deposition is

20   concluded.  It's not being reopened.                  05:35:19

21            MR. HUESTON:  Well, that is not your

22   statement to make, but we are done for the day.

23   Thank you.

24            THE VIDEOGRAPHER:  Okay.  This marks the

25   end of Volume I, Media No. 4, in the deposition of     05:35:29
```

**DX1649-302**

```
 1   Mauro Botta.  Going off the record.  The time is      05:35:33
 2   5:35 p.m.
 3            THE REPORTER:  And, Counsel, if I can just
 4   please confirm what you need as far as your orders.
 5            Mr. Hueston, you had the two real-time        05:35:44
 6   feeds. Do you know if you want a rough and/or an
 7   expedite of the final?
 8            MR. FURESVICH:  If we can get a rough.  And
 9   regular turnaround on the final.
10            MS. EVANS:  Alex will make that              05:35:54
11   determination.  I'll have him e-mail you.
12            (Deposition concluded at 5:35 p.m.)
13                    ---oOo---
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 304

```
 1                    REPORTER CERTIFICATE

 2              I, LORRIE L. MARCHANT, Certified Shorthand

 3     Reporter, Certificate No. 10523, for the State of

 4     California, hereby certify that MAURO BOTTA was by

 5     me duly sworn/affirmed to testify to the truth, the

 6     whole truth and nothing but the truth in the

 7     within-entitled cause; that said deposition was

 8     taken at the time and place herein named; that the

 9     deposition is a true record of the witness's

10     testimony as reported to the best of my ability by

11     me, a duly certified shorthand reporter and a

12     disinterested person, and was thereafter transcribed

13     under my direction into typewriting by computer;

14     that request [  ] was [ X ] was not made to read and

15     correct said deposition.

16              I further certify that I am not interested

17     in the outcome of said action, nor connected with,

18     nor related to any of the parties in said action,

19     nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunto set my

21     hand this 19th day of October, 2018.

22

23     _____

24          LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
               Certified Shorthand Reporter #10523
25
```

DX1649-304

Confidential
MAURO BOTTA - 09/25/2018                          i1

## Exhibits

**Exhibit 1**
4:8 32:20,23 33:6,19
48:23

**Exhibit 2**
4:10 38:25 39:3,5
155:2,5

**Exhibit 3**
4:13 45:22,24 46:2,18
47:6

**Exhibit 4**
4:15 50:24 51:2 63:12

**Exhibit 5**
4:17 55:20,22,24 60:14,
15,21 63:8

**Exhibit 6**
4:19 69:2,5

**Exhibit 7**
5:3 71:21,23,25

**Exhibit 8**
5:6 74:2,4,6

**Exhibit 9**
5:9 75:25 76:2,4

**Exhibit 10**
5:12 68:21 78:13,15,17
80:19

**Exhibit 11**
5:15 85:2,4,6

**Exhibit 12**
5:17 89:17,18 92:15

**Exhibit 13**
5:20 92:13,17,24

**Exhibit 14**
5:22 93:14,16

**Exhibit 15**
5:25 96:12

**Exhibit 16**
6:3 99:9

**Exhibit 17**
6:5 99:10

**Exhibit 18**
6:7 101:24

**Exhibit 19**
6:9 101:20 103:6

**Exhibit 20**
6:13 105:18,19 106:3
108:6

**Exhibit 21**
6:16

**Exhibit 22**
6:18 109:8,17

**Exhibit 23**
6:19 120:5,7 208:21
253:5 254:16

**Exhibit 24**
6:21 129:17 136:17

**Exhibit 25**
6:23 131:2,4

**Exhibit 26**
7:3 134:5,7

**Exhibit 27**
7:5 143:5,7

**Exhibit 28**
7:7 161:12,24 162:2
178:12

**Exhibit 29**
7:9 169:13,16,19
171:18

**Exhibit 30**
7:12 171:7,9,11 172:2

**Exhibit 31**
7:14 191:14,16

**Exhibit 32**
7:16 193:19,21

**Exhibit 33**
7:18 208:18

**Exhibit 34**
7:20 212:5,7

**Exhibit 35**
7:22 239:15,17

**Exhibit 36**
8:3 240:14

**Exhibit 37**
8:4 241:11,13

**Exhibit 38**
8:7 243:15,17

**Exhibit 39**
8:10 246:8,10

**Exhibit 40**
8:13 250:5,7

**Exhibit 41**
8:15 261:24 262:2

**Exhibit 42**
8:17 273:17,19

**Exhibit 43**
8:20 277:8,10 278:17

**Exhibit 44**
8:22 299:15,18

## $

**$10**
172:18 176:5,22 177:9,
19

**$13,000**
264:2

**$3.2**
146:22,23

**$3.9**
149:4

## -

**---ooo---**
9:4 303:13

## 1

**1**
9:6 32:20,23 33:6,19
48:23 56:12 76:23
78:18 94:25 120:13,17,
23 122:15,19 123:17
172:11 223:7,11,14,19
224:3,9,13,18 226:10
237:4,10 253:17 293:11

**10**
58:2,23 59:4 60:23
68:21 78:13,15,17
80:19 173:23 258:14,16
267:11,13 288:16

**10-K**
144:17,21 169:21
176:11 180:2,19 181:7,
22 182:19 206:17
252:18 255:15

**100**
270:19

**100,000**
172:10

**101**
9:15

**10:10**
63:1,2

**10:19**
63:2,4

**11**
56:8 58:11,18,24 61:11
85:2,4,6 92:7,8 244:3
261:6

**11:05**
94:25 95:2

**11:15**
95:2,4

**11:58**
125:17,18

**11th**
107:9

**12**
57:11 89:17,18 92:2,15,
18 94:2,18 106:4
150:23 168:20,21
193:22 194:1,2 216:1
258:15

**1215**
46:3,6 47:6 187:3

**12:21**
278:19

**12:41**
277:21

**12:59**
125:18,20

**12d**
47:11

**12th**
277:18

**13**
92:9,13,17,18,19,24
137:2 150:23 168:20,21
275:1

**1308**
10:12

**DX1649-305**

Confidential
MAURO BOTTA - 09/25/2018                          i2

**14**
93:12,14,16 94:18
191:9

**15**
96:12 162:22 199:18
200:8 288:16

**15-year**
202:10

**1575**
134:19 136:14 137:4

**16**
58:3 60:17,23 91:23
93:5,18 94:10 99:4,5,7,
9 117:12,21

**165**
120:13 121:9 253:24

**168**
254:15

**169**
121:16

**17**
91:19,22 93:5,18 94:9,
18,20 99:4,5,7,10
118:12 191:18 225:14
228:8 229:16 247:12

**173**
120:20 121:23

**18**
93:8,10 101:19,22,24

**180-**
266:22

**19**
58:11,15,18 59:5 93:8
101:19,20,22 103:6

**190,000**
262:20 263:11 266:22

**1:48**
161:9,10

**1st**
273:21

**2**

**2**
38:25 39:3,5 43:3 56:13
57:2 64:7 78:24 95:4
100:21 120:24 122:16,

**24** 123:19 155:2,4,5
263:24

**20**
60:17 105:11,13,16,18,
19,25 106:3 108:6
200:1 288:13,16

**2008**
68:19

**2009**
68:11,19 238:10

**2010**
29:3,12 30:19 31:9
55:11,12 72:2 74:8,15
75:19

**2011**
67:15 69:11,14 70:17
71:18 76:17 77:20 78:2
79:13 193:22

**2012**
67:15 72:16 74:13 75:7,
11 76:7,10,22 77:4
79:16 88:17,19 89:13
90:25 125:24 126:2,5,9,
13 127:10 145:7 147:3,
9,13,24 148:10

**2013**
56:1 60:17 78:19 85:8,
12 126:16,18,24 127:1,
4,7,10 137:11,12,17,21,
25 138:3,15,23 139:25
140:7,8,22 148:2,11,13,
16,20,24 149:12,15,17
150:7,21 273:11,12,22

**2014**
38:23 129:21 130:18
131:5,10 134:9,22
136:15,20 138:1,2
142:13,16 144:17,21
160:6,11 161:4 162:16
165:18,23 167:15
168:7,18,21 169:1
175:5 176:10 197:6
199:9,13 224:15 251:5

**2015**
95:13,25 108:21 112:25
113:21 114:7,24 115:21
116:2 143:9 144:7
169:17 171:12 184:2,
10,24 186:1 200:7,10,
16,22 201:2,3 202:5,7
224:15

**2016**
96:19 102:3 106:5
107:9 121:24 200:1,11,
12 201:4,8,10 207:16
250:8 251:19

**2017**
119:10 200:14 201:20
213:10 216:1 225:16,19
227:5 239:19 240:17
241:19 244:3 247:12
261:6 262:4,12 270:6,
24

**2018**
9:2,11 231:2 264:16
267:18 277:18 300:19

**2023**
33:12,22 48:24

**21**
105:13,16,25 107:7

**21st**
131:10 134:9,22
135:13,24 136:8,11,15
137:5

**22**
109:6,8,17

**2201.18**
295:25

**22nd**
143:9 144:7 151:7

**23**
109:5 120:5,7 208:21
253:5 254:16

**23rd**
74:13 152:6 239:19

**24**
129:17,19 136:17

**24th**
76:6 77:2,4 129:21
130:17 136:19 137:1,5,
9 153:3

**25**
9:2 131:2,4 288:20

**2570**
51:4,6 63:6

**25th**
9:11 144:18

**26**
69:11,14 70:17 79:5
134:5,7

**26th**
131:5 250:8

**27**
105:3 143:5,7

**2710**
38:7,10 39:6,11,15,23
155:7

**2711**
40:23 41:3 43:25 44:15
155:8

**2713**
43:15

**27th**
78:19 85:7

**28**
161:12,24 162:2 178:12

**28th**
102:3 240:17 262:4,12

**29**
169:13,16,19 171:18,22

**29th**
241:20 242:3

**2:01**
161:10,14

**2:46**
274:1

**2nd**
144:24 169:17 171:12

**3**

**3**
45:22,24 46:2,18 47:6
100:7 124:6 161:14
235:8,15,24 236:3,7,11
238:3,6,7,10,14,22
264:12 299:24

**3.3**
175:8

**30**
171:7,9,11,22 172:2,3
201:10,13,22 263:19

**30-day**

**DX1649-306**

264:2

**30th**
241:19

**31**
191:14,16

**32**
193:17,19,21 253:10

**33**
208:18,22,23

**34**
212:3,5,7 254:8

**35**
239:15,17

**35th**
9:15

**36**
240:12,14,16

**37**
241:11,13

**38**
243:13,15,17

**39**
246:6,8,10

**3:07**
244:3

**3:18-CV-02165-RS**
9:10

**3:48**
238:22,24

**4**

**4**
50:24 51:2 63:12 92:1
94:2 100:7 124:15
239:1 299:22 302:25

**40**
250:5,7

**400**
268:4

**401(k)**
269:18

**41**
261:24 262:2

**42**
273:17,19

**43**
277:8,10 278:16,17

**44**
299:15,18

**49**
226:23 228:14,17

**4:04**
238:24 239:2

**5**

**5**
49:2 55:20,22,24 60:14,
15,21 63:8 100:7
125:10 223:8,11,14
237:4,10 253:17

**5,000**
148:18

**50**
288:11

**54**
96:18

**568**
194:5

**5932**
209:2

**5971**
215:25

**5:04**
285:4,5

**5:12**
285:5,7

**5:35**
303:2,12

**6**

**6**
68:22,23 69:2,5 70:22,
25 71:1 253:14

**60**
210:15

**605**
103:15

**6242**
175:19

**6369**
170:22

**663**
277:21

**7**

**7**
71:21,23,25 100:2,4,8,
10,13 173:22 175:7

**7.02.06**
170:24

**7.0206**
175:17,21

**7.2.6**
172:20 180:10

**7th**
213:10

**8**

**8**
57:9,10 68:11 69:9
70:15 71:1 74:2,4,6
175:7

**88**
10:11

**8th**
193:21

**9**

**9**
75:25 76:2,4 96:17

**95113**
10:12

**966**
212:17,21,24

**99**
102:12,15 103:4 262:9

**9:05**
9:3,12

**A**

**A-C-I-L-O-N**
291:14

**a.m.**
9:3,12 63:1,4 94:25
95:4 125:17

**abilities**
183:8

**ability**
32:4

**able**
181:5,20 252:15 287:22

**absolutely**
189:19 283:13,16
294:23 300:12

**accelerate**
255:21 256:18

**accelerated**
246:19

**accept**
41:14 42:18,25 155:14
259:20 260:11,14

**acceptable**
234:16

**acceptance**
259:22,24 260:19

**accepted**
259:21 275:12

**access**
195:6,7 196:20

**account**
13:3 15:4,7,9,10 106:4,
13 205:23

**Accountancy**
17:25

**accountant**
261:14

**accountants**
209:24

**accounted**
128:2 146:23

**accounting**
36:13 45:4 47:18 97:4,
18,20 98:8,10 102:17

127:24 134:9 135:3
148:5 150:16 208:4
209:10 261:7,12
265:14,15 266:12
268:12 285:20,23
286:13,16 288:3,4,5
289:7 290:1

**accounts**
14:8,10 15:9,13,20
16:1,11 302:1,2

**accurate**
34:17 181:25 182:5,20,
21 216:15 217:5 248:13

**accurately**
216:23

**achieve**
200:4

**achieved**
42:2 155:19 182:10
255:6

**Acilon**
291:13

**acknowledge**
136:22

**acquired**
72:2,17 73:6

**acronym**
52:25

**act**
21:22 22:7 188:21

**action**
96:3 106:23 185:2,6

**actions**
197:10 205:5 218:14

**activities**
53:17

**activity**
52:3,23

**actual**
53:22 236:14 260:12
267:5

**Adam**
123:15

**Adams**
259:6,7

**add**
273:8 292:4

**added**
172:25 174:11,17,18
176:14,17 180:18

**addition**
264:3

**additional**
92:24 210:12

**address**
10:10 12:1,6 14:12,14,
20 17:17 26:16 101:25
106:9,10 177:19 250:9
251:18,21,24

**addressed**
64:8,15 65:2 66:10
80:15 234:23

**addresses**
14:15,24

**addressing**
80:17 165:4 170:12,23
171:1

**adequate**
40:11,17

**adjustment**
81:2,11,15 82:24,25
83:4 147:5,8

**adjustments**
102:17 103:23

**administrative**
243:25

**adopts**
172:9

**advance**
236:23

**adviser**
198:18

**advising**
296:18

**advisory**
265:14,15

**advocating**
245:19

**Aerohive**
290:23

**affairs**
243:25

**affirmation**
53:10,15 54:10,12

**aggregate**
27:20 57:17 100:17
162:16

**aggregated**
182:10 255:6

**ago**
18:24 33:24 86:5 244:4
273:11

**agree**
27:23 35:16 40:14
41:15 81:7 84:1,13,15
94:8 132:3 149:6,14
155:15 174:4,14 186:18
204:22 293:3 297:5
298:4

**agreed**
66:20 67:8 83:10,22
110:1 134:24 154:17
158:9,19 182:16 255:12

**agreeing**
104:20

**agreement**
19:6 63:24 145:12
146:5,14 148:17,19

**agreements**
147:16

**ahead**
14:18 72:25 87:16
98:16 229:9 239:4,6
272:14 285:11 286:1,8
292:3 298:14,16

**Ai-li**
95:19

**airport**
191:24

**alerted**
257:19

**Alex**
19:25 20:17 299:25
303:10

**align**
219:2

**all-hands**
122:16,23 123:2 225:8

**allegation**
198:10

**allegations**
123:17

**allege**
116:20,24 132:17
183:16

**alleged**
96:3 127:15 132:12,15
134:1 256:10 301:18,22

**allegedly**
295:12

**alleging**
64:22 66:5 138:9

**Alliant**
127:16

**allow**
11:9 141:12

**allowed**
62:18 148:17 149:22,23
163:16 196:19

**Althoff**
129:6 130:2

**Amazon**
148:16,17

**ambiguous**
12:7,22 13:6,17 14:3,11
15:14 16:4,20 22:9
28:2,11,22 35:4,21
36:23 37:7 38:13 41:19
42:21 44:22 45:15 50:7,
15 52:1 57:24 59:18,22
61:21 62:2 64:2,10 65:5
66:14,24 67:11 77:16
84:11,22 86:16,22 87:6,
14 94:13 110:10,20
111:12 112:8 113:3,16
116:7 139:3 140:2
167:18 168:11 169:3
184:4 186:9,16 187:20
188:1 197:24 253:25
272:2,8 281:17 289:21
298:13 302:5

**amended**
96:2,14 116:19,24
132:11,22

Confidential
MAURO BOTTA - 09/25/2018                                    i5

**amount**
149:7 199:17 263:16
268:13,16 269:1

**amounts**
27:16

**analysis**
72:2 103:4,6 135:6,7
146:15 148:5

**analysts**
210:13

**analyze**
127:15

**and/or**
79:17 100:15 103:2
303:6

**Anna**
106:5,17,18 107:2,15

**annotated**
46:11

**announced**
225:3

**annual**
223:5 235:13 264:1

**annum**
262:20

**answer**
11:1,4,11,12,19 13:19
14:17,18 15:17 16:22
22:11,18 24:24 25:14
28:4,14 35:6 37:9 44:24
45:18 48:12 50:10,21
61:23 64:4 65:6,11
66:16 67:2 68:2 70:4
71:13 73:8 77:18,21
84:24 87:17,19,23 88:2
93:25 94:15 98:18
109:2 110:12 111:14
113:5,6 114:10 115:5,
16,25 116:9,10,11,17
135:10 139:15 140:11
141:3 167:19 169:4
177:3,12 179:17 184:5
187:24 188:5 189:9
191:2 197:25 215:10
247:7 253:16 272:3,12
273:2 279:10,23 280:2,
6,7,19,21 281:4,20
282:22 283:11,14
284:25 285:9,17 286:1,
8 289:23 292:14

298:11,25 302:6

**answered**
65:6 87:14,18 112:9
152:23 177:11

**answering**
200:25 225:7

**answers**
281:11 282:18 283:2

**anticipate**
268:5

**anticipating**
268:8

**Anupama**
134:8,14

**anxiety**
271:4

**anybody**
37:10 224:7 234:10
256:14 295:11

**anymore**
109:13

**anyway**
85:19,24 86:3 274:8

**apologized**
232:18 233:9 234:1
244:8

**apologizing**
233:14,16

**apparently**
241:4 250:9

**appear**
33:9 91:25 94:9 143:23
248:11

**appearance**
169:6

**appears**
45:20 151:6 162:12,13
191:18 194:1,3 211:20
252:2 254:4,6

**application**
291:8

**applied**
291:13

**apply**
35:9

**applying**
36:8

**appreciate**
161:18

**appropriate**
36:11 49:9 51:11 59:14
299:7

**approval**
63:24 163:22

**approve**
107:3 108:8

**approved**
66:20 108:2 110:2

**approximate**
29:11 133:15

**approximately**
29:8,12 210:12

**April**
78:19 79:5 85:7 200:1
207:14,15,16 216:1
231:2

**archived**
69:8 70:10

**area**
80:2 189:12,25 190:9
210:15,25 211:17

**areas**
56:14 79:18,19 150:15
188:10,14 189:18,21
197:12

**arguable**
190:9

**argue**
52:8

**Argumentative**
189:7 281:1

**arguments**
203:13,15,18,20,23,25
204:3,10,16

**arisen**
36:18

**Armanino**
260:8,11 261:5,7,20
262:4,18 263:10
264:15,18 269:16,22
278:2,6,21

**Art**
89:1 172:14 176:1,19
177:6,18

**articles**
117:15

**articulate**
117:15

**articulated**
119:16 139:18 206:17
244:6 245:6,20

**aside**
48:22 64:21,24 66:4,7
73:25 101:17 105:5
112:24 113:13 171:6
178:17 181:18 208:12
240:10 241:9 244:20
246:17

**asked**
33:25 133:4 142:22
160:2 163:2 164:16
173:9 174:7 177:2
183:20 184:22 196:21
202:20 205:23 206:1,
15,21 210:6 214:7
215:21 216:17 220:10
222:11 224:23 228:14
247:6 257:10,22 271:18
285:10 291:24 294:7

**asking**
19:17 29:8,10 30:18,21
37:14 87:9,21 88:10
95:11 111:18 112:15
113:8 114:13 115:7
117:2 141:2 144:13
174:18,22 189:4 202:25
203:4 204:3 206:19,20,
25 209:18 213:14,20
214:9 222:25 245:17
254:5 272:15 283:1
297:15,16

**asks**
100:13

**aspect**
80:3 105:9 180:17
233:5

**assert**
179:5

**asserting**
128:19

**DX1649-309**

**assertions**
122:11

**assess**
84:17 295:16 296:4
297:6,12,19 298:4,18

**assesses**
114:4

**assessing**
298:21

**assessment**
26:19 60:5 299:6
301:18

**asset**
173:7

**assets**
142:7 146:21

**assign**
219:3 237:19

**assigned**
158:8,10 219:9 220:12
221:9 223:5 266:1,3,4
301:7

**assignments**
300:9

**assistance**
118:12,15

**assistant**
240:19

**associate**
95:18,19,21,22

**assume**
229:6 232:2 269:12

**assuming**
130:10

**assurance**
153:20 176:15

**assurances**
176:25

**assured**
183:1 248:23

**attached**
12:18,20 13:4 16:13
17:19 107:3,7 108:13
117:25 131:8 132:23
134:10,18 143:10 166:5
169:18,20 174:10 179:1

191:22 250:21 251:17
252:3,24 253:23

**attaches**
79:3 246:10

**attaching**
16:7 178:13

**attachment**
99:5 103:3 131:22
143:8 169:24 242:17
254:2,14,17

**attachments**
171:17 250:13,15

**attacks**
198:11

**attempt**
117:23 166:7 257:24

**attempted**
258:9

**attention**
33:5 36:10 39:5,17
47:5,10 63:11,15 91:3
99:16 100:7 101:24
125:25 187:10 209:3
242:13 270:7,9 299:22

**attestation**
53:18

**attorney**
16:17,18 19:25 20:10,
11,12,16,22 33:3
139:17 292:2 294:17
297:15,25 300:4

**attorney-client**
294:22

**attorneys**
16:25 17:21 19:16,19,
22 21:17 256:24 295:9,
10,12 299:19,20 300:1

**audit**
23:24 24:3 27:4 30:4,11
31:11,12 32:10 33:10,
11,15,16 37:24 38:6,10,
16,23 39:6,8,9,13 41:6,
21 43:24 45:12 46:3,6
47:6 49:16 51:14 53:9,
14,20,23 58:12,19 59:5,
9,10,16 60:1 67:23
68:6,13 71:16 76:17
77:20 78:2 79:13,18
88:25 95:8,9,12,15,25

96:5 97:3 110:6,16
111:4,22 112:3,4,24
113:13,20,24 114:3,8,
16 115:1,10 121:10,14,
15,25 122:9 125:24
126:2,16,25 127:5,7
128:18 137:12,21,25
138:18,23 139:1,10,25
140:9,23 141:17 142:16
147:5,8,13,14,19 150:1,
7,21 162:16 166:1,3,5,
25 167:4,5,10,15 168:7,
19,23,25 183:9,23
184:10,15,24 185:9,13,
14 186:1 204:18
207:12,19 210:4,20,21
211:11,17 213:17,21
214:11 222:7,9 261:12
274:25 275:2,19 276:2,
20 296:6

**audited**
176:24 240:20 263:19

**auditing**
36:14 45:5 47:19 63:25
116:4 118:3 168:15,16
189:11,13,15,20 205:5
265:10 296:19

**auditor**
21:21 22:6,14,22 23:17
24:15 26:24 106:20
114:4 187:15 300:10

**auditors**
26:2 27:24 28:6,17
145:12 295:16,17,20,21

**audits**
29:17,20,24 30:2,5,7
64:22 66:5 79:20 88:23
121:4,20 122:5 126:4
201:25 212:1

**August**
119:10 228:8 229:15
247:12 257:8 270:6,24

**Aura**
109:18,20,22

**authentic**
143:23

**authorities**
139:20 140:14 190:3

**authority**
154:4

**Avago/broadcom**
122:3 124:15 125:7

**avoid**
102:24 231:9 300:10,21
301:6

**aware**
19:1 123:24 133:17
139:11 145:1 146:5
210:18,20 213:20,24
214:13,19,20,22 223:17
224:21,25 287:2,7

**B**

**back**
35:14 46:11 48:23
56:12 63:3,6,11,15
77:23 78:7 80:18 95:4
100:21 110:22 119:22
121:2 125:19,24
136:17,18 139:21
155:2,5 161:14 171:18,
19 172:4 173:19 178:11
189:2 192:9 198:25
204:8 239:1 240:20
242:12 244:11 248:15
253:5 254:8 259:15
274:17 278:16 282:17,
25 284:10,25 285:6

**background**
219:4 222:8,15,22
223:1

**Bad**
274:18

**balance**
172:12

**Baldwin**
246:24 247:1,15,25

**based**
73:16 90:10 150:20
172:13 175:25 177:5,22
246:15 263:17 267:2
294:17

**basic**
287:3,6

**basically**
30:24

**basis**
45:5 47:19 84:25 179:5

DX1649-310

264:5 272:22 286:19
287:1

**bat**
93:22

**Bates**
89:24 90:2 103:14
120:11 134:18 136:14
137:4 170:22 194:5
209:2 215:25 253:9
277:21

**battles**
188:22

**BBO**
259:8

**BDO**
290:25

**bear**
26:25 256:11

**Bedi**
131:6,17 132:5

**began**
190:17 261:10,11,17
279:16 280:16 281:16
286:4

**beginning**
58:17 68:12 78:18 95:3
100:11 117:20 161:13
195:25 238:25 253:9,23
268:6

**begins**
9:5 85:6 121:15 136:19
212:7 243:17

**begun**
290:7,17

**behalf**
9:21,22,23 165:6 221:8

**behaved**
293:6,8,9,10

**behavior**
96:24

**behaviors**
196:25 197:3,15,17

**belief**
254:12

**believe**
16:10 20:18 26:18

34:17 48:18 60:23
67:21 68:5,19 69:25
70:7 72:10 75:14 77:12,
19,25 80:12,16 82:11
84:20 88:17 95:23 97:6
98:12,16 103:20,22
106:12 107:15 110:6
111:22 112:5,25
113:20,22,25 114:7,17
116:1 117:12,20 118:1
119:15 123:18 131:14
134:15 135:24 138:25
139:18,19 144:22
148:11 149:25 152:2,23
153:7,13,20 157:6
163:6 166:10 167:16,20
168:2,8,12,15 169:1
171:3 172:21 173:14,20
175:7 177:11 181:25
182:21 185:2,5 190:14
195:6,11,23 196:10,25
197:3,6,10,15 200:13
201:1,9,23 202:18
207:7,13 216:15 217:11
218:4 220:22 224:16,20
230:11 232:1,8,12
234:17,19 235:16 236:8
240:7 247:25 248:13
256:6,13 257:18 258:14
259:21 265:5 266:6,22
267:11,13 268:19
269:19 270:16,19,24
272:17,19 278:14 280:7
282:3 287:22 288:12,25
289:13,16,18 292:9
293:6,8,14

**believed**
97:2 163:3 164:18
166:16 173:5 198:14,23
211:16 241:6 245:24

**believes**
36:14 195:8

**bell**
129:7,8 190:25 227:2

**belonging**
266:5

**belongings**
247:21

**beneath**
53:6

**benefit**
102:19

**benefits**
264:11 269:13

**best**
31:13,14,24 32:1,4,15
68:11 74:21 113:8
129:1 183:8 201:9
211:15 222:3 224:1
254:11 257:9,22 265:13
266:25 273:9

**better**
71:13 82:13 180:11
220:25 235:17 300:15

**Bhandarkar**
74:7 75:10 78:19 80:5,
20 81:8,14

**big**
46:19 220:16 221:23
296:20,21

**bill**
294:13

**bills**
267:16

**Biosciences**
218:17,19 219:2,3,10
220:12 221:9 222:7,9,
14,24

**bit**
54:6 82:11 183:11
203:2 206:12

**black**
188:16,24 189:6,14,15

**black-and-white**
189:24

**Blackberry**
13:25 14:2

**blanket**
65:5

**blew**
278:2,6,21

**blindsiding**
233:19

**Bloom**
290:23

**blow**
117:4,10,18 118:8,11
119:8

**blowing**
119:22 278:13

**Bluecoat**
122:2,6,24 123:19,22
124:4

**Board**
17:25

**Bob**
151:10,12

**bold**
73:12 100:4 145:7

**bolded**
49:3

**bonus**
235:9 262:22,24 263:2,
4,10,11,21,23 264:1,3,
4,9 266:24,25 267:21,
24 268:2,9,19 269:4,6

**bonuses**
267:14 269:10

**book**
190:17,20 191:9 193:23

**bother**
189:4

**Botta**
9:6,7 10:4,8,11 18:5
99:14 106:4,8 107:3
108:8 125:22 126:11
129:20 161:24 178:20
213:13 216:2 239:3
285:14 303:1

**bottom**
40:23,25 43:16 52:13
58:22,25 59:1,4 63:17
70:22 78:23 130:1
170:12 242:3 252:12
253:11 262:8 267:12
299:23

**box**
100:2,4,7,8,10,13,21
227:25

**boxes**
26:14

**brainstorm**
74:14

**brainstorming**
75:18

**breadth**
115:17

**break**
17:15,17 62:9,24 94:21
105:24 125:15 157:15
161:21 238:20 282:23
283:15,18,20 284:7,8,
14,16 285:9,10

**breaking**
206:13

**breaks**
161:16,19 284:12,18

**Brian**
273:6 274:17 275:4,14

**brian.dalton@gmail.
com**
273:21

**brief**
93:23

**briefly**
126:16

**bring**
21:11 26:24 36:10 37:3,
11 208:5 252:9 267:2

**bringing**
229:6

**broad**
54:6 203:2,4 279:12
280:12,13 282:3

**broadly**
203:5 279:4

**Brooke**
73:19

**brother**
18:2,3,4,10,17

**brought**
196:21 218:15 256:11

**bucks**
268:4

**build-to-suit**
142:7,9 148:6

**building**
148:4

**bullet**
34:7 35:15 61:3 63:16
107:19 142:22

**bulleted**
53:4

**bulletin**
102:17

**bullets**
35:1 52:14

**bunch**
91:13

**bus**
188:20 198:12

**business**
13:22 88:14 244:7,24
245:7

**Bustamante**
78:25 79:4

---

**C**

**C-A-R-E-Y**
220:7

**C-A-V-I-U-M**
38:19

**C-H-I-T-K-A-R-A**
205:22

**calculate**
201:12

**calculation**
201:15,16 268:15,22

**calendar**
200:8,9

**California**
9:1,9,15,16 10:12 17:25

**call**
19:25 20:16,17,21,23
39:10 55:15 67:22
74:12 75:18 80:6 81:3
83:5,11,14 151:9,22
159:2,9 163:1,19,21
164:1,2,25 168:22
193:12 223:9 232:5,6,7
264:25

**called**
30:11 34:5 53:1 57:11,
16 60:10,12 98:8
153:24 163:8,10,24
173:3 175:16 188:16
189:5 198:6 213:12

240:20 244:4 246:23,25
249:9,12 259:3 263:2
265:7

**calling**
91:10 147:19 186:3
188:13

**calls**
21:24 22:9,15,23 23:19
25:11,20 28:1,10 45:14
61:20 64:2 66:14 69:17
70:2 108:24 110:8,18,
19 111:10,20 112:7
113:2,11,15 115:2,11
116:6,14 119:13 139:2,
12 140:1 146:9 167:17,
25 168:10 169:2 272:1,
7,9,24,25 279:7 288:18
292:11 297:9 298:12
300:24

**can't**
46:8 48:4 55:9,11 59:25
69:22 71:13 72:5 79:10
83:16 85:21 87:7,19
93:8,22 94:1,20 114:1
116:10,12 139:17
141:10 142:11 143:16,
19 162:9 167:8 185:22
193:25 212:12 230:4
254:6 274:9 276:17
292:15

**CAO**
89:3 172:14 176:2,20
177:6 178:23 179:6
180:16

**capital**
265:1,2,8

**caps**
173:20 265:2

**capture**
181:19

**captured**
213:25 263:24

**care**
36:8 161:21

**career**
156:19 195:3

**carefully**
183:5

**Carey**

219:11,13 220:1,6,10,
23 221:1 225:4,21
226:2,12,15,20 230:24
231:1 232:19 234:24
236:9

**Carey's**
225:22 233:10,22

**Carol**
74:7 75:4,7

**case**
9:9 59:25 60:1 186:21
208:25 212:8

**cases**
30:12 41:24 155:15

**cash**
101:5

**catch**
17:7

**category**
25:15

**cause**
25:7,24

**caused**
272:18

**causes**
70:7

**Cavium**
38:16 41:6 61:14,16
88:5,7,10,16,23,25
89:13 90:9,24 121:3,6,
9,14 125:24 126:2,6,9,
16,18,25 127:23 129:21
130:2 131:9 132:15,18
133:5,13,19,23 134:16,
18 135:6,12,15,23
136:6 137:3,12,13,17,
21,25 138:23,25 139:25
140:9,22 141:17
142:14,16,17 144:16,23
145:13 146:2,4,21
147:13 148:3,16,18,24
149:3,12,16,17 159:17
165:18,23 167:15,16
168:8,13,14 171:2
178:23 179:7 180:1,19,
23 183:21 186:21 198:3
202:3,15,17,20 203:9,
14,18,21 204:11,17,18,
20,23 205:2,6,12,17
212:10 247:18 248:5,

DX1649-312

11,17

**Cavium's**
89:1,3 127:23 144:21
145:25 169:21

**CBA**
21:8 239:8

**CCGI**
72:1

**cease**
65:9

**CEO**
225:6 234:18 235:6
246:11 288:25 289:1,4,
10,12

**certain**
143:20 149:4 223:9
271:11 276:17

**certainty**
70:11 251:2 292:16

**certified**
192:8 241:17 242:6,16

**CFO**
89:1 149:6,9 172:14
176:1,19 177:6,18
178:22 179:6 180:16
202:20,23 203:9,18
204:8,11 205:14,21
206:14,25

**Chad**
177:6

**Chadwick**
89:1 172:14 175:2
176:1,19 177:18,25
178:6

**chain**
78:17,23 129:19,25
130:6 230:22 241:16
242:4 299:18,19

**challenge**
80:24 252:14

**challenged**
181:4,19

**chance**
96:7 173:11 181:12
253:3

**changed**
72:14

**changes**
130:8,14 132:8,10
136:22 266:18

**chapter**
191:18,20 193:22
194:1,2

**characterization**
82:12 83:22 84:2
208:11,12 248:14

**characterize**
33:14 146:12 154:7
166:21 295:19

**characterizing**
239:25

**charge**
95:9,10

**chart**
26:13,17,23

**chat**
13:11 273:20 277:15

**chats**
13:14

**che**
192:10

**check**
46:13 268:17

**checklist**
54:17,21,25 55:1,3,8,
14,15 56:1,6,14,20
57:3,7 60:16 64:7,9,16,
25 65:3 66:9,11 111:4
126:6 137:14 138:15,24
165:19 166:9,20

**checklists**
54:23

**chicken**
188:21

**chief**
106:19 208:3 209:10
243:24 245:12

**Chitkara**
205:15,22

**choice**
14:19 153:15 157:4,5,6,
9,10,11 167:9 185:18
186:25 274:20

**choices**
157:1

**choose**
14:17 157:19 186:23

**chooses**
295:22

**chose**
164:14 166:18 167:3,12
184:18,25

**Chris**
222:19

**Christopher**
153:10 156:20

**chronologically**
259:5

**Chu**
209:20

**Chu's**
210:20

**circumstance**
205:4

**circumstances**
132:6 187:1

**cited**
27:13

**civil**
112:6

**claim**
117:13 126:11 196:2
199:19 256:22 272:19

**claimed**
217:8 286:5,11 289:25

**claiming**
286:19

**clarification**
23:13 24:1 38:17 74:23
81:12 98:14 142:8
151:11 175:11 179:12
185:4 186:19 213:6
240:22 243:23 260:25

**clarify**
95:10

**clarity**
34:21

**clean**

171:13 204:9

**clear**
10:23 92:20 106:7
147:2 174:9 179:24
214:6 231:6 235:20
295:3

**clearly**
244:6 245:7

**client**
34:8,14 35:18 63:25
77:6,9,13 188:18
198:10 213:13,16,18
214:8,10,12 218:15
222:15 268:24,25
282:25 285:8 293:19
300:7 301:14

**clients**
198:5,18

**clients'**
285:20

**close**
200:19

**closed**
119:6

**closely**
79:20

**closure**
208:5

**closures**
208:6

**CMAAS**
131:16,19

**cn**
106:14

**coach**
153:10,12 156:20
195:3,5,10 197:7
225:23 273:8

**Coachee**
273:8

**coaches**
223:24 224:2

**coaching**
283:13

**code**
296:22

DX1649-313

coffee
229:22,23 230:9,16
231:24

colleagues
243:3

collect
247:20

collectability
146:25

collective
27:3,8,9 164:24

collectively
165:6

Colorado
191:24

column
91:7,8,10,13,17,20
94:19

columns
93:24 94:16

come
128:7 188:22 223:24
233:18 235:13 236:3
238:17 241:21 284:10

comedy
274:10

comfortable
61:9 92:5

coming
90:13 170:3 211:8
222:14 225:9 239:21
245:8

commences
53:23

comment
102:24,25 103:2 104:5,
18,20 105:3 161:3
170:16,17,22

commenting
130:14

comments
102:13,20,23 103:1,4,8,
9,10 104:4 139:17
169:18 170:1,2,7,10,15
173:9 212:25

commission

17:24 267:1

commissioned
197:8

committed
257:25 289:14

common
128:15

communicate
146:1 160:19 195:17
236:19,24 300:22

communicated
234:2 256:23 271:2

communicates
268:14

communicating
195:24

communication
118:23,25 219:17,24
232:14,18 233:10,11,
16,23 234:5,6,24 235:3,
7 237:16 239:20 243:7
244:9 246:10 257:2
276:2 277:15,16

communications
16:18 297:16

community
276:20

companies
21:21 22:6 23:3,25 24:3
30:10 275:23,25 276:1,
7 278:13 290:14

company
23:10 72:1 88:7,9,11,13
103:19,22 146:19,22
149:8 172:8 173:15
176:16 177:1 181:9,23
183:1 206:18 218:20
240:24 241:1 248:24
252:19 258:6 259:3
267:4,15 294:10 296:18

company's
24:14 27:25 73:16
172:19

compare
135:9 143:19 252:8
254:3

compared

135:12

compensate
173:25

compensating
57:20 170:23 175:16,20

compensation
235:9

compensatory
292:5,10,15

competence
98:13 150:14 289:15
297:12,19 298:5 301:7

competency
97:8 98:21 99:1 145:24
146:7,13,14 167:22
168:6 295:17,20,21
296:4 297:6 298:21
299:8 300:23

competent
187:14

complain
289:1,4,9

complainant
216:3

complained
190:2

complaining
282:6

complaint
12:17 21:5 50:6 96:2,6,
15 116:20,24 117:25
118:21,24 119:1,15,24
120:8 132:12,22 133:8
139:19 140:13,21
141:18,21,23 142:4
151:20 168:3 181:1
183:2,6 196:23 212:9
249:4,5,8,22,25 252:7,
10 253:6 291:25 297:24
298:1 301:19

complaints
211:21

complete
197:21 232:12 235:15
254:11

completed
59:10 71:7

completely
181:25 182:21 269:7

completeness
183:6

completing
43:23

completion
54:25 55:1,3,8,15 79:17
80:4

complex
128:5,14

complexity
128:16

complied
64:8,15 65:2 66:11
142:24

comply
49:9,24

Compound
94:13

conceived
234:14

concept
193:8

concepts
287:2,6,9,11,15

concern
49:8 113:13 153:14
154:1 163:11 217:9
219:1 281:6,13,15,25

concerned
163:18

concerning
251:6,16

concerns
36:12,17 37:4 112:24
117:17 119:16,20
142:17 144:9 145:2,4
156:22 158:8 170:13
205:6,12,17 210:18,21
213:25 214:14,16,17,
19,21,23,24 215:5
216:21 217:3 245:20
287:25 289:15

conclude
58:12,19 59:5 136:12

DX1649-314

Confidential
MAURO BOTTA - 09/25/2018

i11

concluded
156:7 302:20 303:12

concludes
162:15

concluding
44:3 284:11

conclusion
21:24 22:9,16,24 23:20
25:12,21 40:9 73:11,12
110:2,9,18 111:11
112:8 113:3,11,15
115:3,11 116:6,15
119:14 134:25 135:17
139:3,12 140:2 150:11
158:16 167:18 168:1,11
169:3 182:8,10,16
255:4,6,12 272:1,7,10,
24

conclusions
40:16 45:4,8 47:17,23
59:16 67:9 69:15 70:20
162:24 187:5

conditions
186:10

conduct
282:19 296:23

conducted
176:18

conducting
299:7

confer
282:24

confidential
17:14 19:2,7,11 279:8,
18 280:4

confirm
58:7 59:9,14 253:4
303:4

confirmation
176:3,21 177:7,10,13

confused
233:15

connect
244:10

connected
244:5

connection
71:10 79:13 247:17

Connor
259:16

consecutive
223:19 224:3,9,13
226:10

consequence
86:19,23 87:1,21 235:9

consequences
86:13 87:4,11

consider
42:3,9 155:20,24
172:17 182:8 198:17
255:4

considerate
187:15

consideration
40:11,17 107:23 132:4
146:15

considerations
172:20

considered
57:21 100:16 213:19
214:13

considering
184:23

considers
42:11 49:13 156:1

consistent
34:13 48:19

consists
121:3

consolidated
127:24

consolidations
142:5

constituted
182:14 255:10

constitutes
26:3

consult
97:24 98:24 128:17

consultation
44:5,16 83:15 97:11

98:3 105:9 109:24
110:3 123:24 127:14,18
128:1,4,12,21,24 130:7,
11,12 152:11 154:14,15
156:8 157:24 158:20
160:6 161:25 162:8,15,
20 163:12 178:14 182:7
255:3

consulted
45:3 47:16 80:24 81:7,
10,13 82:18,23 97:13,
15 98:2 128:1 129:10
248:11

consulting
82:21 83:2 265:17
267:4

contact
34:16

contacts
256:21

contain
173:6

contained
197:11 254:10

contains
170:7

content
61:8 249:21

context
174:17,19

continuation
92:3

continue
142:13 160:19 192:6
226:13 261:15 284:11

continued
44:13 96:3,22

continues
41:23 83:1 194:17

continuing
56:13 100:11 130:3
144:3

contract
146:1,18

contractual
19:2

contribution
287:3

control
24:25 25:5,17,23 26:3
27:1 49:12 57:11,15
58:8 66:21 91:4,7,11,
15,16,23 93:1,5,17,19
94:10 100:14 101:4
105:9 114:5,22 127:4,8,
15 148:23 149:11,15,
22,24 170:24 171:3
172:19 173:25 174:2,
15,25 175:16,21 178:21
179:24 180:6,7,8,10,12,
14,22 181:6,21 182:2,
11,12,18,23 215:6
248:1,6,10 252:16
255:7,8,14

controlled
25:3 26:19

controller
172:19 176:8 215:21
216:11,17 217:7,8
240:19 294:10

controls
23:3,6,7,9,18 24:9,14,
16 25:23 27:25 57:20,
22 103:24 104:10,21
105:1 127:20 139:7
146:19 168:14 170:13
171:2 181:5,20 252:15
265:16

conveniently
179:9,15

convention
97:18,20 98:8 103:7

conversation
132:25 153:5,8,24
174:20 206:20 214:2
215:13 216:1 217:1
220:1 232:3 243:9
257:6

conversations
123:25 163:13 223:24

convertible
127:22 142:10

conveyed
216:21

conveying
227:21,22

DX1649-315

convicted
11:17

convince
217:14,25 218:9

convincing
259:24

COO
231:11

Copeland
262:16

copied
135:24

copies
109:12

copy
12:10 33:3 46:10,11
61:15 69:22 70:10
89:20 120:7,13 143:18,
21 162:7 260:24 261:2

core
54:7 95:23

correct
21:22 22:7 28:20 29:14
31:4 34:15 35:2,19
36:22 37:19 38:19
42:15 43:10,13 44:17
45:10,20 47:7 49:21
50:1,14 51:24 56:10
58:23 59:12 61:3 63:13
66:22 67:5,17 70:1,8
73:22 81:22 82:10,11,
22 86:14 88:5 91:12,24
92:16 93:20 96:5,15,20
104:18 106:13 108:23
110:3,7,17 116:13
119:25 121:13,20
122:5,9,10 126:2,3,18
127:1 130:10 135:18
136:11 137:2,14,17
138:21 143:15,18 146:8
148:25 150:4,17 151:16
154:21 156:17 158:21,
25 159:18 162:18 165:2
166:14,25 167:1,13
171:15,22 176:23
177:10,14 178:9 183:3
184:11 212:11 222:8,16
223:8 224:19 226:6,10
233:24 237:22 238:1
239:3 242:15 249:4
251:21 254:11 256:15

257:17 261:8 276:3
277:16 291:23 293:2
294:6

corrected
137:7

correspondence
130:1

corroborate
176:8

cost
210:13

cost-cut
225:9

couldn't
289:20

counsel
9:17 11:7 42:9 44:6,17
282:16 303:3

count
31:10 93:22 94:18

couple
18:24 20:7 57:7 62:10,
12 183:10 273:8

course
188:11,14 190:6 191:9
258:13 282:19

court
9:8,25 10:2,21 33:1
65:24 90:14 124:10
229:6 282:17

Covad
67:16,18,20,23 68:6,14
71:10,15 72:18 74:8
75:12,21 76:11 79:14
121:3,5,11,12

cover
99:9 101:19 134:7
151:6 171:11

covered
21:21 22:6

crafting
127:14

create
60:2,11 180:4,6,7

created
142:25 180:1 182:18,24

249:14,17,20 254:17
255:14

creating
181:6,21 252:16

creation
182:2

creep
248:15,22

crept
248:18

crime
11:17

criminal
112:5 211:2,9,12

crisply
189:6

criteria
226:20

criticism
189:5 192:22,24 211:8,
18 233:20,21

criticize
276:20

criticized
285:20,23 290:6

crooks
276:7

cross-referenced
44:1

crusade
276:9,10,14

cube
132:14 133:12,18,22

culture
196:1

current
77:9 266:21 300:22

currently
14:24 18:10 289:17
292:19

custom
99:22

cut
187:25

cycle
101:6 171:5


D


D-U-B-O-I-S
229:12

da
192:10

daily
103:6

Dalton
273:6

damage
272:18

damages
271:24 272:21,23 273:3
291:25 292:5,10,15

database
55:4 61:14 131:25

date
9:11 17:11 18:7,25 56:1
69:11,14 70:16 104:16
130:20 131:9 133:14,
15,16 136:7,10,18
137:1,2,3 144:9 151:6
171:21 207:13 213:10
215:25 225:15 227:7,8,
12,14,25 228:4 230:2,4,
6 246:19 257:7 260:15
262:7,14 270:23

dated
60:16 72:13 74:13 76:6,
22 79:5 85:7 130:17
131:5 134:8,21 135:13,
23 143:9 171:12 193:21
262:4,12 273:21 277:18

dates
29:10,11 132:1

David
131:5,13,18 132:5

day
151:4,22 153:2 158:23
162:21 181:6,21 228:1
229:24 247:16 252:17
302:22

days
137:2,6,7,8 160:11

DX1649-316

240:4 263:19 269:22
270:1,3

**deadline**
144:20 169:21

**deadlines**
145:1

**deal**
46:19 158:7 220:16
221:23

**dealing**
208:15

**Dear**
102:12

**December**
237:14

**decide**
152:21 156:9 199:6
272:20 276:9

**decided**
152:14 160:5 184:14
259:23

**decision**
27:4,8,10 152:9 154:3
184:21 228:24 229:2,20
230:17 231:14,21
232:10,24 240:7 245:17
255:20 256:18

**decisions**
160:8 244:7

**declaration**
254:9

**Declarations**
253:11

**declined**
221:19

**deemed**
147:5,6

**Deepak**
74:7 75:10 78:19

**Deepak's**
76:16

**defendants**
96:24

**defense**
265:3

**deferred**
70:20,23 71:6,11 72:1,
17,24 73:6 74:8,15
75:19 80:8,11,14 81:8,
22 82:10 97:18,20 98:2,
9,11 101:3 170:20
173:6

**deficiencies**
24:10,15,19 26:16,20
27:20 57:11,15,17 58:8
66:21 91:5,7,12,15,17,
19,23 93:1,5,6,18,19
94:9,10 100:15,16
101:1,5 114:6,23
147:24 162:15

**deficiency**
24:25 25:1,4,10,17,23
26:3,4,15 27:1,16
91:17,24 93:20 94:11
127:8,16 147:3 148:9,
12,24 149:11,15,22,24
162:17 175:6 182:9,16
255:5,12

**define**
25:4 39:8 111:16
200:20,23 279:3

**defined**
23:24 24:2 35:1

**definition**
33:20,25 34:5,25 35:15
111:21 261:13 280:20
281:7,13,22 282:1

**degree**
201:7

**delay**
131:7 132:2

**deliberate**
220:22 222:5

**delivered**
234:15 235:3

**delivering**
234:11

**della**
194:14

**Deloitte**
259:8 290:24 291:12

**demotion**
228:15,20 231:8

**Dench**
214:25

**dental**
269:20

**Denver**
191:24

**depart**
228:6

**department**
12:9,13,16,20 13:5
15:21 16:8,13 17:20
53:18 97:9 98:13,22
99:1 117:7,8 119:9,12
146:2 150:14,20 222:20
275:22

**departments**
275:24 276:1,6

**departure**
19:12

**depend**
200:5

**depending**
35:10 266:18

**depends**
31:10 89:9 111:15
265:25

**deployability**
301:25

**deposed**
10:13

**deposition**
9:6,14 17:14 19:15,23
21:2,18 32:21 33:1
45:22 65:18 161:22
283:11 284:9 302:16,
17,19,25 303:12

**depression**
271:4

**Derek**
299:25

**describe**
54:20 82:13 88:11
117:23 145:10,20
187:12 192:2 193:2
207:24 208:7 234:9
247:23 265:13 267:1
276:19 277:22

**described**
13:4 44:15 52:10,11
55:8 71:11 87:10 115:9
124:8 139:22 149:10,20
164:17 168:9 170:14
179:25 190:12 228:12
229:6 236:10 244:24
245:6 269:15 275:10

**describes**
43:8 53:2 174:15
191:23 212:25

**describing**
128:10 191:7 193:7
194:21 230:17 246:14
276:25

**description**
18:15 56:14 57:2 91:16
114:2 192:17

**deserved**
159:18

**design**
79:17 80:4 101:4

**designed**
25:6

**desire**
300:12 301:5

**despite**
179:10,14,18

**destroy**
18:21,23

**detail**
118:14 182:3 208:25
212:8

**detailed**
56:15

**details**
253:18

**detect**
23:11

**determination**
303:11

**determine**
26:2 27:16,19 65:24
104:25

**determining**
26:25 51:14

**DX1649-317**

Confidential
MAURO BOTTA - 09/25/2018

i14

**Detroit**
123:12,13 294:3

**develop**
208:2

**development**
198:12

**device**
13:21,24

**di**
192:10

**Diamond**
95:20

**Dianne**
117:6 118:8

**Dick**
229:10 231:16 244:4
245:6

**dictionary**
281:8

**didn't**
17:7 115:20 118:13
135:15 152:20,22
153:12 162:25 163:21
164:4,8 165:1,9,12
166:23,24 181:1 184:9
190:18 202:23 218:7
219:16,23 222:22 223:1
227:25 247:5 248:15
262:14 276:9 287:17,20
301:13

**difference**
29:1 37:22 41:24 42:2,
8,10 44:4,9 49:7 139:4
155:16,18,25 156:7,16
167:8 185:19 186:13
190:1 292:18

**differences**
36:4 38:2 43:4,9,22
49:4 155:7 269:17

**different**
32:6 135:7 174:16,25
190:9 228:14 234:22
247:3,4 269:19 293:23

**differently**
138:12 222:13

**dinner**
151:25 152:2,5,16,17,
18 154:2

**direct**
91:3 121:1,2 125:25

**directed**
231:20

**directing**
33:5 39:5 141:7 145:13
242:13

**directly**
30:3,8,13 32:16 120:13,
23 121:10 244:2

**director**
75:8 117:7 266:18

**disagree**
27:24 28:6,17 44:13
84:4,16 144:4 147:9
152:19 187:7,9

**disagreed**
42:19 81:4 83:6,12
137:20,24 138:1 166:2
282:7

**disagreeing**
140:21 154:13

**disagreement**
37:11 44:16 45:9 47:24
135:3 138:4,7,8,10
139:6,9,22,23 147:13,
19 150:3,6 166:7,13,19,
25 179:2 183:22
185:14,21,23,25 186:2,
4,7,8,14 187:6 189:23
190:5,7 204:13

**disagreements**
36:11,17 37:4,18 44:20
45:2,6 47:12,15,21
138:19 140:4 141:16
184:7,9 185:22 203:23
204:4,7,11,16,19

**disagrees**
45:7 47:22 187:4

**disappointed**
219:16,23

**disclose**
19:3

**disclosed**
145:11

**disclosure**
80:11,16 81:9 82:1,16,
22,25 173:7

**disclosures**
172:23

**discovered**
145:12

**discretion**
269:7

**discretionary**
269:7,9

**discrimination**
119:20

**discuss**
42:7 49:13 159:10
230:9 271:11 287:24

**discussed**
107:25 124:2 153:9
159:21 173:22 178:22
181:8,23 233:5 252:19

**discusses**
252:6

**discussing**
147:4

**discussion**
39:1 63:9 68:25 98:19
104:9,24 105:7,14
106:23 107:9,10 128:13
130:24 153:18 172:13
173:2 176:1,19 177:5,
17,24 178:4,7,9,10,16
179:5,13,22 182:3
189:10 206:23,24 207:1
219:1 236:10

**discussions**
82:25 127:11 138:6,11
140:3 180:15 204:6
210:19

**dispute**
79:23

**disputed**
214:17,20

**disputes**
268:23

**dissenting**
42:3 44:7 155:19

**distinction**
186:11

**distracted**
245:3

**distress**
270:4 271:5 292:7

**District**
9:8,9

**doctor**
271:2

**document**
33:8,18,23 34:6 36:3
38:25 44:16,19 45:8,22
47:24 48:5,13 49:2
55:24 56:9 57:10,16
65:1 66:10 68:21 69:13
70:1,6,8,15 71:1 72:2
73:22 74:14 75:18
89:15 90:23 91:14 92:6
99:5 101:16 108:17,22
129:13 142:22,25
147:2,16,18 148:23
149:11 154:13 160:19
174:12,19,21,23,24
175:1 176:14 178:18
180:11 183:22 184:6,9
187:6 191:12 212:22
215:3 244:21 249:24
250:1,17 251:15,17
252:2,24 253:20 254:7,
23 260:21,23 263:2,4
277:11 296:20

**documentation**
42:4,7 43:17 44:2,9
45:13 46:3,7 47:7
51:14,23 59:10,11
138:18 155:21 182:14
255:10

**documented**
43:25 57:21 58:9,13,20
59:6 109:21 147:24
150:21 178:21 180:13,
23 181:8,23 182:12,25
252:18 255:8

**documents**
15:25 18:18 21:1,4,7,
11,15 54:3 71:12 92:5
109:13 117:25 118:13
239:8 250:13,15 252:3
297:3

**doesn't**
28:7,18 46:12 47:1
93:10 112:9 136:20
143:23 192:18

**doing**

DX1649-318

18:13 78:11 112:10
136:2 177:1 226:2
239:22 246:5 296:5
299:10

**domain**
15:7,10

**don't**
17:11 18:7,25 26:18
30:12 31:16 46:22
52:25 58:15 65:5 75:14
78:11 87:20 88:3
112:17 113:6 121:11
125:14 129:11 131:14
133:25 153:7 159:3
165:15 181:15 186:22
187:7,21 191:6 192:25
195:6,8 200:21 201:16
202:25 203:17 205:11
206:5,7 209:22,25
219:6 221:22 224:5
225:10,14 227:13
229:25 230:2,5 237:19
238:8 246:21 247:9
251:1 256:1 257:7
258:4 260:15,17,22
261:13 263:3,7 270:23
274:20 280:7,10 281:9,
22 294:18,23 295:2

**Donthi**
134:8,14

**double**
245:21

**doubt**
61:18 262:11,13 288:14

**Doucet**
123:10 124:2

**downsized**
241:22 242:22

**Dr**
270:14

**draft**
132:24 169:20 170:7
171:20 173:1,18 174:11
249:1,4

**drafted**
127:18

**drafts**
161:3

**dragging**

284:20

**draw**
39:17 209:2

**drop**
199:23

**drop-dead**
144:20

**Dubois**
229:10 231:17,18,24
232:3,10 234:23 236:1
243:9

**due**
36:8 86:14 257:13
270:3

**DULY**
10:5

**duties**
28:9,20 265:22

**duty**
19:2 37:2 44:19 297:11,
19 298:4,20

---

**E**

**e-mail**
12:1,6 14:7,10,12,14,
20,24 15:7,9,13 16:1,10
74:6 76:4,5,16 78:17,23
80:19 85:6,22 99:9,13
101:19,25 102:5 106:4,
9,13,16 108:6 129:19,
25 130:6,9 131:4 132:3,
23 134:7,13 136:19
137:2 143:8 151:6
161:25 169:16,19
171:11,14 178:13
191:17 209:3,17 216:24
239:18 240:16,25
241:3,8,16 242:2,4
243:17,19 244:2,13,17
245:10,16 246:3,12,16
250:8,9 251:18,21,24
252:24 258:1 260:21,
22,24 261:1 282:6
299:17,19,20 303:11

**e-mailed**
15:12,19 144:6

**e-mailing**
78:7 245:13

**e-mails**
11:25 12:5,8,13,14,18,
19,21 13:3 15:21,23,25
16:7,9,12 17:19 171:21

**E-R-M-A-N**
129:2

**E-T-T-I**
158:3

**E-X-A-R**
240:23

**earlier**
27:13 63:16 137:8
171:20 199:8 236:10
238:7,14 239:4,9 243:8
295:3,9

**early**
119:10 199:6

**earn**
262:25 263:10

**earning**
262:22

**earnings**
287:14,18

**East**
10:11

**easy**
193:8

**Ed**
270:13

**edification**
229:5

**edited**
70:9 93:11 94:1

**effect**
152:24 219:20

**effective**
208:3

**effectively**
195:18

**effectiveness**
23:18 170:13 171:1

**efficient**
102:21 161:18

**effort**
282:21 300:14

**efforts**
145:13 276:20

**EGA**
52:23 53:16 54:1,5,8
57:14 58:6 59:9,21
60:10 66:19

**EGAS**
52:22 53:1 54:2,4,9
55:13 63:20,23 137:13

**eighth**
178:14

**either**
15:13 25:6 91:2 95:21
126:21,23 147:19 152:9
159:4 166:1 185:20
247:23 269:22

**elect**
185:21

**electronic**
61:16 69:7,22

**electronically**
52:16,21 63:19

**element**
234:7

**eligibility**
266:24

**eligible**
263:21 264:1 269:3,6

**embedded**
243:18 244:2 299:20

**emotional**
198:6 271:4 292:6

**employed**
13:15 18:11 199:14
249:23 265:18 274:14

**employee**
187:13,18 190:5 204:23
220:23,24 249:15,20
273:7 276:24

**employees**
203:21 204:17,20
208:8,15 248:12 296:22

**employer**
300:22

**employers**
291:2,5,8

**employment**
19:6 86:14 187:11
188:11,15 262:3,6
263:5,24 264:12,14,18,
20 269:13,16 279:6

**enabled**
62:18

**encountered**
279:1

**encourages**
39:24

**end-of-year**
269:10

**ended**
68:17 136:2 268:25

**Endovascular**
259:4

**Energy**
290:24

**engaged**
96:24

**engagement**
27:4,8,10 29:19,23
30:3,8,13,23 31:1 32:5,
6,7,8,17 34:19 35:2,11
36:9,12 37:19 38:1
42:13 43:1,4,10 44:8,
13,20 45:2,3,7 47:16,
17,21 49:14 51:13 53:9,
14,16 54:16,21 55:4,14,
25 56:5,10 57:3 58:7
60:16 61:12 62:1 64:6
67:16,19 69:10,15
75:12 76:12,23 77:20
78:1,6,9 88:5,20 95:23
97:10 102:9 111:3
126:5 128:18 131:9
137:13 138:14,24
142:14,18 149:25
154:20 156:3,9 165:18
166:9,20 167:4,6
185:17 187:4 189:23
190:8 200:5 202:15,17
203:14,22 204:23
205:2,7,13 207:22,25
209:7,8 211:23 213:1
214:15 215:22 216:18
217:18,19,20,23 218:10
220:20 230:25 247:18
248:5,17,21 251:7
256:7 266:17 267:3

294:2,6

**engagements**
30:9,16,21 31:8,11,12
32:2,16 34:23,24 88:16
196:16 200:3,7,11
240:20

**engineer**
18:16

**English**
191:22 192:11 241:17

**ensure**
57:15,19

**ensuring**
40:10,16

**entered**
148:3 216:1

**entire**
202:10 210:7 277:1,22,
24

**entities**
239:8

**entitled**
36:3 51:6 55:25 58:3,12
60:15 70:23 87:19,22
91:4 120:20 250:1
267:8 272:21,22 281:10
283:20 292:9

**entity**
18:1 145:11,16

**entry**
123:6,21 145:22 148:15
212:24 216:1,2 248:6
278:20 293:12

**environmental**
18:15

**Epiq**
10:1

**EPS**
287:12,13,21

**equal**
106:15 172:10

**Ergun**
102:7,10,19 213:22
217:14,16,17 218:9

**Erik**
95:22

**Ernst**
259:12 290:24

**error**
104:15,22 174:2 175:5,
12 210:5

**errors**
173:25

**Es**
273:8

**escalate**
152:10,15,21,25

**escalation**
157:20

**escape**
275:4

**escapes**
229:14

**escorted**
247:21

**especially**
104:15 165:20 188:17
225:6 234:2

**established**
296:21

**estimate**
31:14,17 267:10 268:19

**estimated**
210:11

**et al**
9:8

**ethical**
185:2,6,9,12,16 187:14

**ethics**
50:11 168:22 212:8
215:17

**evaluate**
23:17,23 26:14,16
114:6 171:3

**evaluated**
57:16 199:4

**evaluating**
24:13 57:11

**evaluation**
24:9 66:21 100:22
114:22 196:18 207:21

208:1 235:13,16 287:1

**evaluations**
237:11 285:15

**Evans**
9:19 11:18 12:7,22
13:6,16 14:3,11,16
15:14 16:3,15,19,25
17:13 20:4 21:23 22:2,
8,15,23 23:8,19 24:22
25:11,20 28:1,10,21
31:16 35:3,20 36:23
37:6 38:13 40:19 41:18
42:20 44:21 45:14
46:12,15,18,22,25 48:9,
16 50:3,7,15,19 51:25
57:23 58:22 59:17,22
60:7 61:20 62:2,8,13,
16,21 64:1,10,17 65:4,
12,16,21,25 66:13,23
67:10,24 69:17 70:2,25
71:2 72:25 77:15,23
83:24 84:10,21 86:15,
21 87:5,13,24 89:18,20,
22,24 90:2,5,16 92:8,
17,19 94:12 98:1,15,18
101:9 105:20 108:24
109:12 110:8,18
111:10,20 112:7,12,15,
19 113:2,11,15 114:9
115:2,11,15,23 116:6,
14 119:13 121:7 125:3
127:2 139:2,12 140:1,
10,24 141:4,8,13,18,25
143:25 144:4 146:9
157:17 161:16 162:2
167:17,25 168:10
169:2,9 179:17 183:25
184:3 186:9,16 187:19,
25 189:7 197:23 208:22
212:15,18 215:8 239:3
242:15 253:25 263:13
270:17 271:15 272:1,7,
13,24 276:15 279:7,11,
18,24 280:3,17 281:1,
17 282:8,14 283:3,6,10,
16,19,22,24 284:1,5,9,
15,17,23 285:2,8,17,25
286:7,21 287:8 288:18
289:21 290:3,9,15,19
291:11 292:3,11
294:19,22 295:4 297:9,
21 298:7,12,23 300:24
301:10 302:4,17,19
303:10

**DX1649-320**

**event**
176:6 224:12 252:2
284:6

**events**
249:9,12 250:2,18,22
251:15,17

**eventually**
294:5

**evidence**
58:12,19 59:6,15
120:21,24 121:1,2,22
122:12 146:24 176:7
178:24 182:17 255:13

**evidence-gathering**
52:23

**evolved**
54:7,23 60:8

**ex-coachee**
273:7 276:24

**ex-pwc**
273:7 276:24

**exact**
17:11 18:7,25 26:20
29:6 52:25 55:11 59:25
61:15 68:15 94:6
102:24 114:1,3 119:17
130:9 133:14 181:17,18
191:5 207:13 209:22,25
224:6 225:14 230:5
252:22 254:7 257:7
258:17 260:15 262:7
270:23 278:8 281:7

**exactly**
11:8 68:10 133:7
173:15 205:20 218:21
237:24 284:15

**EXAMINATION**
10:6

**example**
34:18 198:21 287:12
296:17

**examples**
57:8

**Exar**
240:21,23

**excellent**
187:15 239:20

**Exchange**
17:24

**excluding**
295:10

**executive**
197:7 245:12

**exercise**
27:11 167:12 182:14
255:10

**exhausted**
166:11,16

**exhibit**
32:20,23 33:2,6,19
38:25 39:3,5 45:22,24
46:2,18 47:6 48:23
50:24 51:2 55:20,22,24
60:14,15,21 63:8,12
68:21 69:2,5 71:21,23,
25 74:2,4,6 75:25 76:2,
4 78:13,15,17 80:19
85:2,4,6 89:17,18
92:13,15,17,24 93:14,
16 96:12 99:9,10
101:20,24 103:6
105:18,19 106:3 107:7
108:6 109:8,17 120:5,7
129:17 131:2,4 134:5,7
136:17 143:5,7 155:2,5
161:12,24 162:2
169:13,16,19 171:7,9,
11,18 172:1,2 178:12
191:14,16 193:15,16,
19,21 208:18,21 212:5,
7 239:13,15,17 240:14
241:11,13 243:13,15,17
246:8,10 250:5,7 253:5
254:16 261:24 262:2
273:17,19 277:6,8,10,
21 278:16,17 299:13,
15,18

**exhibits**
12:18,20 13:5 16:13
17:20 63:7 90:11 94:22
99:7 101:19,22 105:16,
21,24 140:24 161:17,
19,20 171:22 284:19

**exist**
43:23 210:10

**existed**
139:19 205:1

**existence**
146:1

**existing**
174:15,24 180:8,9,10

**exists**
44:5

**expect**
41:9,13 155:13 227:18
283:2

**expectation**
237:12

**expected**
210:8 223:18 287:5

**expedite**
303:7

**experience**
95:19,20,22

**experienced**
301:21

**experiences**
84:16

**experiencing**
271:3

**expert**
292:12

**experts**
128:17

**explain**
26:11 53:13 159:17
201:7 234:14 236:1
257:24

**explained**
235:2

**explanation**
56:13

**explore**
135:22 206:11

**exposure**
104:11,21 105:1 173:6

**express**
22:25 23:2 139:17
301:4

**expressed**
69:15 144:10 154:1
156:20 158:7 163:11

179:2 205:17 221:17
231:11

**expressing**
152:8 164:23 205:12

**extensively**
159:24

**external**
21:21 22:6,14,22 23:17
24:14 26:2,24

**extra**
89:20 284:12 294:13

**extract**
33:9

**EY**
296:19,20

---

**F**

**F-L-U-I-D**
294:3

**facially**
174:15 175:1 248:10
252:1

**fact**
33:11 45:12 48:15 49:3
50:12 52:10 56:8 61:18
70:8 72:10,23 94:5
98:24 105:6 106:12
116:25 119:5 128:20
135:15 136:5 138:5
142:20 144:6 146:13,17
156:11 157:1,19 159:11
160:10 162:6 163:15
165:17 166:6 169:6
176:18 177:9 178:22
180:14,22 190:8 195:2
198:1 199:3 210:10
219:9 220:1 221:18
224:8,17 226:22 228:3,
12 233:15 234:20
235:14 236:6 240:2
246:1 248:19 252:6,25
257:13,23 258:8
275:10,11 276:5 292:5
302:9

**factor**
104:10

**Facts**
145:7

**failed**
148:16 174:3

**failure**
49:9,24 145:25

**fair**
23:1 29:9 32:11 37:13
55:16 60:14 158:16
192:17 206:15 208:10
251:11 259:25

**fairly**
287:3

**fall**
237:25

**false**
216:14 248:5

**familiar**
33:17,20,22,25 38:10,
15,22 39:14 41:3,5
42:14 43:12 46:6 48:5,
20 56:5 106:14,15
109:20 153:25 156:11
222:17,20 278:10

**far**
34:17 129:8 139:6
232:14,22 303:4

**favore**
194:14

**FBI**
117:6,11,14

**FD**
239:9

**fears**
156:21

**February**
106:4 107:9 129:21
130:17 131:5,10 134:9,
22 135:13,24 136:8,11,
15,19 137:1,5,9 143:9
144:7,18 151:7 152:6
153:3 267:19,20 300:19

**feedback**
209:13

**feeds**
303:6

**feel**
92:5 116:13 196:11
201:8 211:2 289:10

**feeling**
154:2

**feels**
211:1

**FEH**
117:8

**Feinstein**
117:6 118:8

**Feinstein's**
118:11

**felt**
64:12,19,22 66:6 67:3,
12 98:25 156:15 166:11
183:12 187:12 197:17
216:19 222:4 244:24
257:25 276:5 287:7

**Fernando**
10:11

**Ferrara**
241:16

**field**
263:20

**fifth**
36:2 100:2,6 191:19,21
226:3 233:3 241:23
242:23

**file**
85:19 86:24 87:12
144:17,21 212:8
249:13,17,22 253:4

**filed**
12:9,12,15,17 21:5,7
119:24

**filing**
12:21 13:5 16:8,14
17:20 144:23 162:21
180:1,19 181:7,22
182:19 183:2 206:17
252:17 255:15

**fill**
228:1 232:24

**filling**
195:5

**Filter**
95:21

**final**
45:4,6,7 47:17,20,22

51:15 108:16,21
131:22,24 132:1 178:12
187:5 303:7,9

**finalize**
102:20

**finalizing**
130:19

**finally**
260:4

**finance**
97:9 98:13,22 99:1
146:4 150:14,20 222:20
275:22,24 276:1,6

**financial**
23:1,12,15 25:8,24
36:15 103:25 127:19
146:2 239:10 263:18
264:2

**financials**
263:19

**find**
18:14 24:15 120:19
132:18 146:4 173:8,12
174:5 300:15

**finding**
79:23 150:1 192:3

**findings**
79:5 166:3,8

**fine**
31:25 47:2 82:14 87:20
112:9,21 295:6

**finish**
11:9 62:10,18

**finishing**
284:9

**fired**
196:6,12 228:5 302:10

**firm**
19:8,11 39:19,23 40:7
41:8,13 51:19 151:23
153:13 155:13 168:15
196:21 205:3 220:19
224:21 225:6 226:2
231:12 246:5 251:7
261:8,13,22 265:10,12
276:20 288:15 296:12,
13,15

**firm's**
38:1 49:15 50:1

**firm-wide**
228:13

**firms**
26:6 258:24 274:25
275:2,6,11 290:14
298:17

**first**
10:5 34:4 36:7 39:22
40:23 51:9 53:8 56:24,
25 63:25 65:7 79:11
80:18 88:15 94:17 96:2,
14 99:4 102:25 107:19
116:19,24 121:23 123:3
124:24 130:1 132:11,22
134:13 163:20,25
170:11,16 171:25 172:5
173:18 176:13 211:13
226:25 234:11 237:14
238:5 251:3 252:12
254:21 259:3 264:6
268:3 286:17 301:15

**fit**
245:18

**five**
31:15,22 32:3 86:5
237:6,8 250:16

**fixed**
227:15

**Floor**
9:15

**flow**
26:13,17,21,23

**fluctuations**
172:17 176:4,9,10,22
177:8,19

**Fluidigm**
294:3

**focus**
79:19 176:4,21 177:7

**focusing**
27:9 105:18

**follow**
49:15,25 50:13

**followed**
38:3

**following**
52:21 55:13 56:21
63:19 122:17 130:3
152:1 186:15

**follows**
10:5 66:3 77:24

**foo**
85:16

**footnote**
23:2 172:16,24 175:10
176:6,11,23 182:11
255:7

**force**
231:9 240:1

**forensic**
253:2

**forensically**
252:23

**forget**
109:15

**forgot**
239:9,21

**form**
40:8,15 176:11 181:7,
22 252:17

**formal**
138:7,8 139:6 147:17
160:6 185:23,25 186:2,
7,14,20

**formed**
286:25

**former**
80:23 82:8

**forth**
33:18,22 42:6 43:24
164:18 180:23 195:16
252:7

**forward**
129:21 157:20 169:17
284:2,4

**forwarding**
131:23

**fought**
87:1

**found**
73:20 205:2 234:16

259:14

**four**
47:11 124:17 175:23
210:12 223:18 224:8
250:16 293:11 296:20,
21

**fourth**
47:10

**FP&A**
73:19

**frame**
30:25 117:22

**framework**
23:22 26:5,7,8,9,10,11,
19

**Francesco**
241:16

**Francisco**
9:1,15

**fraud**
107:21

**frequently**
278:12

**friend**
276:24 289:7

**friends**
273:9

**front**
162:4 192:3

**FSLI**
101:2

**fucking**
274:20

**full**
39:18 115:17 122:9
146:23 155:12 200:4,
21,25 254:21 281:10

**full-time**
200:19,20 210:12

**fully**
200:22,23 302:13

**function**
22:12

**Furesvich**
9:23 89:21,23 90:4 92:3

303:8

**further**
43:3,5 83:1 102:18
129:24 235:8

**Furthermore**
101:3

**futile**
222:1

**future**
79:20 300:11

**FY**
176:9

**G**

**G-E-N**
217:17

**Gary**
243:18

**gather**
176:7

**Geday**
74:7 75:13

**Genc**
102:7,10 213:22 214:3,
16,23 215:1,2,23 217:8,
17

**gene**
218:22

**general**
42:8 44:6,17 89:6 90:8
208:14

**generally**
33:1 54:9 62:17 119:19
191:6,7

**getting**
65:18 90:23 180:20
196:1 208:8,14 235:22

**Gigamon**
212:1 213:1,13,20
214:8,13,22 217:19
218:10

**Gigamund**
216:8

**Gil**
158:2 170:4

**give**
11:3,12,13 14:14 31:13,
17,18 46:11 55:9,11
59:25 65:5 71:13 72:12
92:4 96:8 114:1,2
115:16 116:10 119:17
120:9 141:3 193:16
197:20,22 205:25
212:22 227:17 232:23
234:22 267:10 281:6

**given**
65:21 162:22 166:10,15
178:25 184:7,12,13
185:11 186:25 196:20
198:2 205:1 220:20
225:4 227:4 236:21
257:3 261:21 269:6

**giving**
65:19 173:10

**Global**
10:1

**Gmail**
15:4,9 277:11

**go**
14:18 23:22 26:14 34:4
35:14 36:2 38:24 40:2
41:7 43:15 48:23 49:2
50:23 55:19 57:6,9 58:2
61:10 62:21 69:9 70:22
71:20 72:25 73:10,24
81:17 85:18 87:16
98:16 99:3 100:21
118:13 119:22 121:1
145:4,5 150:9 155:2
161:6 175:15,23
178:11,14 182:3 184:18
191:8 193:6 194:4,7,12
204:8 212:21 224:22
229:9 231:16 236:17
237:9 239:4,6 240:11
242:8,9,12 249:24
250:16 254:15 272:14
273:25 276:9 277:5,20
278:16,19 281:10,13
282:17 283:21 284:2,3
285:10 286:1,8 292:3
294:23,24 296:4
298:14,16

**goal**
41:25 155:17 197:12

**goals**
195:16

Confidential
MAURO BOTTA - 09/25/2018
i20

**goes**
78:24 92:1 94:2

**Goh**
76:5,10 78:8

**going**
11:9 32:20 34:20 54:14
55:19 56:8,12 57:6
62:5,14,25 65:20 70:13
72:9 80:18 87:12 89:11,
12,14 90:7 92:6 94:6,22
95:1 99:3 101:18
105:25 115:6 120:18
121:22 124:19 125:16,
22,24 136:17 141:12
144:2 151:25 152:5,20
153:25 154:14,15
155:11 159:10 161:8
163:17 166:4 171:24
172:5,6 178:18 183:9
186:18 191:11,19 192:5
193:6,16 194:9 202:16
209:2 210:17 212:20
225:5 226:18,22
236:16,24 237:23,25
238:22 242:12 249:18
251:14 253:5,14 254:21
255:1 280:3 282:15,16,
17,18,23,24,25 283:1,2,
3,5,15,17,21,24 284:7,
8,10,11,25 285:3,13
297:23 299:2 303:1

**gold**
294:4

**good**
9:20 10:8 220:19
289:13

**gotten**
151:22 259:13

**gray**
189:12,18,19,25 190:9

**greater**
176:5,22 177:8,19

**Gregg**
209:4,9

**grievances**
210:21 211:11

**gross**
175:7,9,12 267:3

**group**
75:9,16 131:16,19

142:6 259:16 266:1,2,4,
8,9,19

**groups**
266:3,6,11,13

**GSI**
170:2,4

**GSI10**
170:22

**GSI2**
170:18

**GSI4**
170:17

**guarantee**
258:17

**guess**
31:13,16,24 68:11
87:20 186:3,19 209:20
234:10 239:21 247:7

**guessing**
54:24

**guidance**
34:13 35:1 42:4 155:20
156:6 167:7 233:7

**guide**
33:10,16 39:9,13 41:21
48:19

**guided**
26:13

**guidelines**
233:2

**Gupta**
132:13,20 133:1,4,6,7,
12,18,21 136:2 160:17

**guy**
198:7 243:21

**guys**
188:19 198:4

**H**

**H-A-L-T**
129:2

**H-E-A-L-Y**
153:19 229:3

**H-E-A-T-L-E-A-Y**
151:13

**H-O-R-A-N**
129:4

**Haavardtun**
96:1 102:6,9 107:13
207:7,8,18 209:4,5
210:19 211:7 212:10

**hadn't**
179:8

**half**
20:8,20

**Halterman**
129:2

**hand**
33:1,2 101:18 109:15

**handed**
46:2,10 55:24 92:23
109:10

**handing**
74:1

**handled**
244:10

**handling**
215:6

**Hangout**
277:12

**happen**
227:20

**happened**
132:16 151:3 153:2,17
179:6 180:15 182:25
187:1,2 190:3,10 231:3,
21,22 232:13,20

**happening**
151:7 184:12,14 185:11

**happy**
96:8

**hard**
260:24 261:1

**harmed**
272:18

**Harmonic**
95:8,9,12 97:3 99:11
105:7 106:22 107:8
108:17,21 110:6,16,25
111:4,8,19 112:5 113:1,
10,21 114:14,18 121:4,

15 183:9,13,17,23
184:7,10,24 186:1
199:24 201:11 202:7
207:5,12,19,20,22
208:9,15 209:4,6,10,19
211:8,22 212:11 213:15
214:10

**Hasegawa**
124:18,21

**hasn't**
302:9

**haven't**
87:18 144:25 190:23
212:12 244:13 280:10

**he'd**
220:10

**he's**
18:12,15 87:14 170:12,
18,19 207:9 215:16
217:18,20 231:19 273:9
282:19 284:25 299:10

**he/she**
49:13

**head**
10:24 209:23 231:2

**header**
91:8 106:11

**heading**
34:4 40:25

**headless**
188:21

**heads-up**
236:22

**Healy**
153:19 154:6,12,25
156:25 157:3 158:5,7,
19,24 159:6 202:18
205:14,16,20,25 206:6,
10,13,20,24 229:3,19
230:9,16 231:13,25
236:5

**hear**
159:14 205:17 224:7

**heard**
174:6 192:22,24 230:13
256:2

**heart**

DX1649-324

Confidential
MAURO BOTTA - 09/25/2018

i21

296:1

**heated**
220:2

**Heatley**
151:10,12

**held**
158:23

**hell**
192:5

**help**
130:23 165:13 244:10

**helped**
126:21 160:13 271:12

**helping**
90:14

**Hennigan**
9:21

**Here's**
280:14

**hesitant**
289:6

**Hewitt**
246:24 247:1,3 256:20,
25 258:1

**hey**
268:15

**Hi**
76:15

**Hicks**
131:5,13,18 132:5

**hidden**
91:25 93:7

**high**
263:12

**higher**
175:10,12 201:22
263:15

**highest**
223:14

**history**
249:9,12 250:2,18,22
251:15,17 252:2

**hold**
27:5 229:12 234:20

**Holding**
72:1

**holiday**
269:10

**honestly**
29:6 35:7 191:10
192:25 195:4 206:9
224:5 230:2

**hoping**
300:8

**Horan**
129:3,4,21 130:2

**hotline**
50:6,11 168:22

**hour**
20:8,19 244:4 284:7,14,
15

**hours**
20:8 171:19,23 267:5
281:10

**HR**
153:6 213:4,7,8 268:13

**Hueston**
9:20,21 10:6,7 11:21
12:11 13:1,9,18 14:6,
13,22 15:16 16:6,16,21
17:3,16,18 20:5 21:25
22:4,10,17 23:4,16
24:4,23 25:13 26:1
28:3,13,24 31:20 32:19,
24 35:5 36:1 37:1,8
38:18,24 39:4 40:21
41:22 42:23 44:23
45:17,21 46:1,14,16,20,
24 47:2,4 48:11,21
50:4,9,17,20,23 51:3
52:4 55:18,23 58:1,24
59:3,20 60:4,13 61:24
62:4,10,14,17,23 63:5,
10 64:3,13,20 65:7,10,
13,17,23 66:1,15 67:1,
14 68:1,20,23 69:3,23
70:3 71:1,4,20,24 73:2
74:1,5 75:1,24 76:3
77:17 78:3,13,16 81:16
84:3,12,23 85:2,5 86:18
87:2,8,15 88:1 89:14,19
90:1,6,13,18,21 92:4,
10,14,21,22 93:12,15
94:14,21 95:6 96:10,13
98:5,23 99:3,8 101:12,

16,23 105:10,13,17,23
106:2 109:1,4,9,14,16
110:11,21 111:13
112:1,10,14,17,21,22
113:4,12,19 114:12
115:4,13,19,24 116:8,
16 119:18 120:2,6
121:8 125:5,14,21
127:6 129:14,18 130:22
131:3 134:6 139:8,14
140:6,15 141:1,6,9,11,
14,22 142:2,12 143:2,6
144:2,5 146:10 151:14
157:18 161:6,20,23
162:4,5 167:23 168:4,
17 169:7,11,14 171:6,
10 175:14 178:17,19
179:23 184:1,8 185:7
186:12,17 187:21,23
188:3,4 189:8 191:11,
15 193:17,20 198:19
208:19,23,24 212:3,6,
16,19 213:9 215:9
238:19 239:12,16
240:11,15 241:2,9,14
242:18,19 243:12,16
244:1 246:6,9 250:6
254:1 261:3 262:1
263:22 270:20 271:17
272:5,9,11,16 273:1,14,
18 276:18 277:5,9
279:9,13,20,22 280:1,5,
18 281:2,3,19 282:12,
15 283:5,8,13,18,20,23,
25 284:3,6,13,16,21,24
285:12,18 286:3,10,24
287:10 288:19 289:24
290:5,12,16,21 291:15
292:8,13 294:20 295:1,
6,7 297:10,22 298:9,10,
15,24 299:12,16 301:3,
12 302:8,15,18,21
303:5

**human**
192:3,12 213:8

___

I

**I'D**
109:10 161:18

**I'LL**
39:10 62:5 70:14 72:22
157:17 228:19 234:22
242:12 274:9 295:4

303:11

**I'M**
11:7,9 16:17 18:14
19:16,17 26:8,21 27:9
29:8,9 34:20 37:13
39:11 48:6,17 62:5,11
65:20 70:13 72:4,8 74:1
77:21 78:9 83:25 87:9,
19,21 88:10 89:11,12
90:7 91:8,9 92:23 94:6
96:8 100:7 101:18
105:20,24,25 106:14,15
109:20 110:13 111:18
112:2,12 113:6,7
114:13 115:6,7 116:22
117:2 120:17 121:5
122:17 125:22 127:16
139:16 141:2,11 144:2,
13 147:2,6 163:25
169:25 170:18 174:18,
22 178:17 179:24 183:9
186:15 191:11,19
193:6,7 194:9 202:10,
25 203:4 206:19 209:2,
16,18 210:17 212:20
214:5,22 219:18 222:25
227:13,23 231:6 233:15
234:10 242:2,12 245:2,
3 249:18 250:7 251:14
253:2 254:5 259:5
268:1 270:11,19 272:15
273:19 276:12 278:4
279:4 280:3 281:10
282:15,17 283:1,2,20,
23 285:13 289:6 291:6,
25 292:6 295:8 297:15,
16,23,25 299:21

**I'VE**
46:2 51:4 55:24 65:21
71:8 92:23 109:10
169:15 209:16 214:7
239:8,17 241:4,15
256:2 273:20 299:17

**I-E-R-G-A-L-L-I-N-I**
124:12

**idea**
225:5 274:18 289:13

**identification**
32:22 39:2 45:23 51:1
55:21 69:1 71:22 74:3
76:1 78:14 85:3 89:16
92:12 93:13 96:11 99:6
101:21 105:15 109:7

120:4 129:16 131:1
134:4 143:4 161:11
169:12 171:8 191:13
193:18 208:17 212:4
239:14 240:13 241:12
243:14 246:7 250:4
261:23 273:16 277:7
299:14

**identified**
57:16 87:21 91:20 94:9
97:14,16 98:7 101:6
128:14 149:15,16
162:16 279:5,15 280:14
281:14 291:18 297:24

**identify**
86:19 87:3 91:14
116:12 119:12 197:12
254:6

**ifs**
292:23 293:4,5

**Ill**
129:3,5 158:2,3

**illegal**
197:3,10 199:2

**immaterial**
213:19 214:13

**impact**
25:6 86:10 175:9
226:23 234:2

**impacting**
211:11 228:13

**Impacts**
107:23

**impatient**
190:13,21 191:8 192:4,
23 193:1

**imperiled**
289:18

**implication**
107:21 148:6

**implications**
171:4

**imply**
283:12

**important**
37:23

**improper**
65:8,19,21 82:11
112:11,12 204:21,25
283:12

**improve**
195:17 197:12

**improvement**
188:10,14

**in-person**
20:2

**inaccurate**
77:14 182:1,22 217:6

**include**
37:18 60:6 61:2 204:11,
16 236:11 298:21

**included**
43:25 51:15 70:19
118:1 148:9,12 149:16
197:13 235:7

**includes**
241:25 242:25

**including**
42:5 45:5 47:19 51:16
54:8 76:6 103:9 112:3
199:16 202:10

**income**
150:15 172:12

**incompetence**
150:20 287:1,25 289:19

**incompetent**
203:7,10 276:7 286:6,
11,20 290:2 302:10

**inconsistent**
226:15 233:7

**incorrect**
190:25

**independence**
114:19 123:20,23 169:5

**independent**
21:21 22:6,14,22 205:4
208:13

**independently**
136:6,12 232:24

**indicate**
67:5,8 233:1

**indicated**
158:5

**indicates**
61:18 69:13 210:24

**indicating**
132:3 211:17

**indication**
146:19

**indirect**
120:20,24 121:22
122:12

**individual**
91:4 93:1 235:14
296:16 297:3,7

**individually**
27:3,7

**individuals**
76:6

**industry**
88:8 273:11 275:16,19,
21 276:10 277:1

**inform**
224:8 245:25

**informal**
138:9 139:9,22 147:12,
16,19 186:4,6,14,21,23

**Informally**
147:11

**information**
19:7,11 77:12 123:5,21
133:4 141:5 213:18
214:12 254:10,12

**informed**
202:16 207:6 226:17
241:20

**informing**
207:11 245:23

**Ingrid**
9:19 19:24 20:23

**inherent**
172:23

**initial**
122:6,8

**initially**
158:5 173:22

**initials**
103:10

**initiatives**
225:9 234:18

**Innovium**
122:4 125:10

**input**
136:23

**inquired**
149:5,8

**inquiry**
175:2 221:18

**inserted**
175:24 248:10

**insist**
62:20

**inspection**
79:5,15

**inspections**
83:21 84:9

**instance**
128:12 149:19 185:24
298:20

**instructed**
132:13 134:1 197:9,11
283:10

**instrument**
127:19 128:6,7,14
135:4

**integrated**
23:24 24:2

**integrity**
107:23 167:21 168:5
187:15

**intend**
11:2

**intent**
301:1

**interact**
35:25 89:1,3,6

**interacting**
34:14

**interaction**
34:8 35:18

**DX1649-326**

**interactions**
211:3

**interest**
145:11

**interested**
164:5

**interesting**
230:21

**internal**
23:3,5,6,7,18 24:14
103:24 104:21 114:5,22
134:18 135:12 139:7
181:4,20 196:23 252:15
265:16

**interpret**
227:25

**interrupt**
11:11 62:14

**interview**
291:4,7

**interviewing**
291:17

**introduce**
45:21 191:11

**inventory**
142:6 149:5,6 209:23,
24 210:15 215:21
216:17 217:10

**investigate**
172:18

**investigation**
119:6 299:7

**invite**
240:3

**inviting**
160:21,22

**invoice**
269:2

**invoices**
267:4,16 268:12,14,16,
23

**involve**
50:6

**involved**
27:11 75:17 83:20 84:8
105:8 121:19,25 122:4

123:25 126:17,19
128:24 163:22,23 164:3
210:5

**involvement**
51:12

**involving**
251:6

**irrelevant**
213:18 214:12

**isn't**
86:11 265:24 293:1

**isolation**
160:12

**issuance**
263:18 264:2

**issue**
27:12 28:12,22 33:15
71:15 75:19 80:8,14
81:23 97:4,11,14,15,17,
23 105:9 114:5 118:2
127:8 142:6 145:19,23
147:3 148:24 149:5,10,
20 150:12 156:24
169:10 170:23 173:4
177:18 189:17,24 208:6
215:6,13 220:11 221:8
263:19 268:12 280:20
281:5,12,15,24 300:10

**issued**
49:17 83:19 84:7 181:5,
21 237:7 252:16

**issues**
36:14 71:11 81:19
101:4 122:13 124:7,16
127:11 128:15,21
139:18 140:4,7,9 146:7
148:2 152:15,21 159:21
160:2 171:4 195:24
196:16 205:3 208:5
210:8,9,18,25 211:18
252:6 256:11,14 271:2
279:5,15 280:15

**it's**
14:18 15:7 23:23 24:7
25:5,15 26:13 33:18
39:22 46:19,20 47:2
58:24 72:10 73:8 78:24
88:13 90:13 93:2 94:20
96:16 99:21 100:6
102:3,6 106:16 109:5,

22 112:12 115:14 119:5
125:15 129:10 131:8
135:21 137:7 141:15
148:11 162:4,9 171:16,
23 174:10 178:25
181:25 182:21 190:24
192:21 193:13,14,15
201:15,17 203:2,4
205:10 206:14 210:23
216:15 217:5 234:13
237:8,9 242:2 251:2,13
252:22 254:7,17 264:23
265:13,17 267:12
268:12 270:19 272:10
273:8,21 277:18 279:12
280:12 282:3 284:10,
15,16,19 288:6,15
292:24 293:9 296:19
298:1 302:20

**Italian**
15:7,10 190:21 191:18,
21 192:4,12,15 194:2
198:7 242:9 243:3

**italiano**
192:10

**Italy**
199:16 241:17

**item**
57:7 64:9,16 65:2 66:11
217:11

**itemized**
124:16

**items**
53:4 57:3 92:25 172:11
173:7 214:3

**its**
23:11 32:14 135:16
136:7 144:17 146:2

---

**J**

**January**
102:3 118:12 264:16
267:18 277:18 282:6,11

**job**
34:16 179:9,11,15,19,
21 198:5 240:5 258:20,
24 260:3,6 266:18
267:2 299:10 300:13
301:5

**jobs**
196:20

**Joe**
9:22

**John**
9:20 129:3,4,6,21 130:2

**joint**
32:9

**Jose**
10:12 85:14 153:21
191:23,24 213:5,8
238:8

**judge**
112:20

**judgment**
24:8,11 26:24 27:12,15,
19 81:3 83:5,11,14
147:10 189:19,20

**judgmental**
23:21 24:7,10 27:12
59:25

**July**
76:6,22 77:2,4 193:21
244:3 262:4,12

**June**
56:1 60:17 225:14,16,
19 227:4 228:11 229:15
233:12 239:19 240:17
241:19,20 242:3

**jury**
272:20

**justifying**
293:12

**Justin**
215:18 216:2

---

**K**

**K-N-A-U-S-S**
124:1

**Karen**
170:6

**Kateeva**
241:1

**Kay**
197:7

DX1649-327

**keep**
11:25 12:5 19:7 120:18
198:5 210:13 217:15
218:1,10 231:2 274:10

**keeps**
239:21

**Keith**
240:16,18

**kept**
12:21 188:18

**Kevin**
124:18,21 153:19
156:25 202:18 205:14,
16,20 229:3 246:24
247:1

**kicked**
243:4

**kicking**
241:22 242:22

**kind**
21:4 88:7,9,11 209:23
247:8 248:3 265:12
270:9 287:11

**Knauss**
124:1

**knew**
49:20 156:6 208:16
222:19 230:12 236:23
237:2

**know**
11:8 45:16 61:14 81:19
83:13,14 93:11 94:1
112:9 133:1 136:2
143:24 146:13,17
159:13 163:16 167:7
174:22 178:20 189:1
200:21 201:16 202:25
211:24 218:6 226:21
227:13,22 232:15
237:24 242:9 249:22
255:20,23,25 261:13
263:7 268:11,13,25
269:1,18 270:17 288:9,
17,24 303:6

**knowing**
133:20 256:16

**knowledge**
18:17 115:17 254:11
269:11 288:7 302:7

**known**
104:17 144:10,12,13

**KP**
170:2,5,6

**KPMG**
259:8 275:7,10

**Kyle**
95:21

L

**Labor**
12:9,13,16,20 13:5
15:22 16:8,13 17:20
117:7,8 119:9,12

**lack**
107:22 145:24

**lacks**
210:3

**Ladiwala**
85:7,11

**laid**
225:12,20 226:19
227:16,18 243:4 244:25

**Lakritz**
209:4,9

**land**
85:17

**language**
52:17 85:22,24 118:5
172:7,25 174:9,11,14
175:24 176:13,18
177:17 180:18 196:1
211:4 213:25 248:10
300:19

**large**
30:10 31:2 89:13

**Laura**
78:25 79:4

**law**
10:21 50:13 111:16,22
112:5,6 113:10 115:1,9,
21 116:4,12 117:15,24
119:11 299:25

**laws**
110:7,17 111:8,15,19
112:2,9,13,16 113:1

115:18 117:13 139:1,
11,17 272:20

**lay**
228:24 229:2 230:17
231:14 232:10

**layoff**
229:19 239:25 240:7
245:8 246:18 260:3

**lead**
67:23 68:5,13,18 76:23
78:6,9 95:14

**leader**
29:19,23 30:3,8,13,23
31:1 32:17 37:19 38:1
43:4,10 44:8,14,20
49:14 51:13 53:9,14
54:16,21 55:4,14,25
57:3 58:7 60:16 64:7
75:12 88:20 102:9
111:3 126:6 137:13
138:14,24 142:18
153:6,7,21 165:18
166:9,20 209:8 213:5,8
217:18,23 220:8 243:25
256:1

**leaders**
256:7

**leading**
53:19 55:10 76:11
83:21 84:9

**leads**
135:24

**learn**
236:2 295:11

**learned**
122:13 235:23

**learning**
226:25

**lease**
142:7,9 148:4,6

**leave**
19:7 132:14 133:5,12
144:2 224:23 228:3,5
294:7,9

**leaving**
258:6

**led**
175:5 211:21

**Ledezma**
99:18 101:14

**Lee**
74:7 75:4,7

**left**
133:18,22 224:23
264:19 275:7

**legal**
21:24 22:9,15,23 23:19
25:11,20 28:8,19 49:10,
25 110:9,18 111:11
112:8 113:2,11,15
115:2,11 116:6,14
119:13 139:2,12 140:1
167:17 168:1,10 169:2
196:25 197:16,19
272:1,7,10,24

**legitimately**
190:1

**let's**
14:23 15:3 32:19 34:4,
22 35:14 36:2 37:21
38:24 40:22 41:7 43:3,
15 47:5 48:23 49:2
50:23 55:19 57:7,9 58:2
60:14 61:5,10 63:6 69:9
70:22 71:20 73:10,24
94:21 99:3 100:2 103:3
106:7 110:22 119:22
121:1 122:25 130:22
135:22 136:18 143:2
145:4,5 148:1 150:9
152:17 155:2 161:6
175:15 178:11,14 191:8
193:8 202:14 204:5,7
207:4 212:21 214:5
222:12 225:10 231:16
238:19 239:12 244:20
249:24 251:3 254:15
260:2 273:14,25 275:3
277:5,20 278:15 299:12

**letter**
56:5 179:1 269:16

**letters**
265:8

**level**
24:25 25:17 77:1 172:9,
10,22 174:1 180:11
182:24 221:4 263:12,15
287:5

DX1649-328

**levels**
24:18 37:10 174:16,25

**leveraging**
102:20

**liaison**
158:6

**light**
172:20

**likewise**
11:11 126:15,24 178:8

**limited**
301:25

**line**
62:19 93:10 103:18
108:12 123:3 194:13,17
217:13 274:1 301:15

**lines**
175:23 192:2 194:12
242:5 252:12

**list**
76:21 147:23 149:22,23
197:21 218:14 239:7
265:24

**listed**
70:16 77:12 99:17,23
107:10 122:2 208:1

**listen**
48:10 297:16

**listing**
91:11,15 92:25 93:17

**lists**
69:10 91:7

**little**
161:18 232:15 269:19

**LLP**
9:8 260:8,12

**loathe**
273:11 275:15

**local**
232:22 244:11

**Logitech**
259:8,9,11

**London**
239:10

**long**

20:6,17 33:24 141:12
173:14 199:10,12,13
260:17 273:10 274:10

**longer**
228:7

**look**
34:7 43:3 46:12 58:2
60:14 61:2 79:11 94:4,8
109:11 129:24 136:18
140:24 143:2,7 173:11,
13 201:18 220:11,21
221:8 240:5 252:5
253:2 275:3 281:7

**looked**
118:17 220:19 221:20

**looking**
61:17 72:8 106:3
109:17 136:14 146:20
171:18,21 193:15
206:14 235:17 295:8

**looks**
59:1 91:22

**loop**
163:13

**Lorrie**
10:1

**lost**
161:21 292:5,17

**lot**
161:16 292:23 293:4,5

**love**
246:1

**loved**
246:4

**low**
172:23

**lowered**
235:8

**lowering**
237:18

**lowest**
24:25 223:15

**lunch**
125:15 205:21

**M**

**magnitude**
175:5

**main**
34:16 169:10 208:6
213:13 214:8

**major**
210:9

**making**
50:6 90:15 130:14
132:8 246:4

**man**
187:14 277:1,22,24

**management**
23:10 34:9,15 35:18,25
135:3 137:14 138:15,24
145:23 165:19 166:9,20
179:1

**management/team**
37:25

**manager**
29:4,7,13,16,25 30:14,
17,22 32:16 33:13,23
34:6,12,25 35:2,9,11,
12,16 37:3,12,14,16
40:15 42:17 43:4,9
44:12 48:24 49:20,23
51:5,7,11,22 52:6,9,15,
20 53:9,14,19 54:16,21
55:4,7,10,14,25 56:5,10
57:4 60:16 61:12 63:12,
18 64:7 67:20,23 68:6,
13,18 69:10,15 75:15
76:11,23 77:2 78:6,9
85:13,14 88:23 95:11,
14,20 99:17 106:19
111:4 126:6 131:15
132:13 134:15 165:19
209:24 219:2,3 221:4
261:19 263:25 264:4,8
265:21,23

**managers**
30:11 31:3,7 35:8 83:20
84:8 223:18 224:23
226:3,18,23 228:14
231:10 233:2

**managers/senior**
83:19 84:7

**manipulation**
107:22

**manually**
210:6

**manufactures**
218:22

**mapped**
266:4

**March**
74:13 75:7,11 144:24
169:17 171:12 200:1
213:10

**Marchant**
10:1

**Marco**
18:5

**Marcum**
290:24 291:12

**margin**
267:3

**Mario**
124:9 125:4 276:23
277:12,16

**mark**
17:13 32:20 38:25
50:23 55:20 71:21 85:2
89:14 92:6 96:10 99:4
109:4 129:14 171:7
212:3 246:6 255:23,25
282:15 299:12

**marked**
32:22 33:6 39:2 45:23
50:1 55:21 69:1 71:22
74:1,3 76:1 78:14 85:3
89:16 90:16 92:12
93:13,16 96:11 99:6,10
101:21 105:15 109:7
120:4 129:16 131:1
134:4 143:4 161:11
169:12 171:8 191:13
193:18 208:17 212:4
239:14 240:13 241:12
243:14 246:7 250:4
261:23 273:16 277:7
299:14,18

**market**
153:20 220:8

**Marketing**
123:4

**DX1649-329**

**marking**
68:20 75:24 78:13
92:23 101:19 241:10

**marks**
94:24 95:3 238:25
302:24

**Massachusetts**
148:4

**Mastin**
73:19

**match**
93:10 94:19 210:4

**material**
23:11,14 25:2,8,18,19,
22,24 26:4 27:2,17,21,
25 28:7,18 96:4,23
97:2,6,25 98:7,11,12,
20,25 103:23 104:12,22
105:2 108:17,22 111:24
113:22,24 126:1,25
127:3 150:13,19 159:18
162:17 172:17 173:5
217:12

**materials**
14:1 15:12,19 19:3

**math**
144:25

**Matt**
153:6

**matter**
9:7 44:8 49:17 59:24
60:1,2,10,11 80:23,25
82:8,19 83:2 85:19,24,
25 86:3,7 98:3 158:7
163:15 219:25 249:9
250:22

**matters**
31:3 37:23 44:2 45:5
47:19 58:3,8 59:21
60:6,18,25 61:2 66:19
83:20 84:8

**Mauro**
9:6,7 10:4,11 99:14
106:4,8 107:3 108:8
129:20 213:13,14 214:9
216:2,7 299:18 300:7
303:1

**Mauro's**
210:14 300:12

**mauro.x.botta@us.**
**pwc.com**
101:25 251:19

**mauro_botta@libero.**
**it**
250:10

**MB**
103:9,12

**MB27**
104:5

**Mccann**
297:11,18,24 298:2,3
299:6 301:22

**Mccann's**
301:17

**mean**
12:16 13:2 23:6 26:9
28:8,19 55:2 58:22 73:7
78:4 84:1 88:8,9 93:10
94:17 95:10 102:22
108:11 154:19 156:12
180:9,15 188:24 195:5
201:15 227:8,14,25
276:12 280:21,23,25
281:6 296:14

**meaning**
137:13 138:23 231:3,7

**means**
74:20

**meant**
10:25 104:12 150:3
154:23 189:3 203:4,24
235:3 285:17 287:18
296:17

**measurement**
81:2,11,14 82:24 83:4

**Media**
94:25 95:4 161:14
238:21 239:1 302:25

**medical**
269:20 270:7,9

**medications**
271:7

**meet**
19:16,19,22 20:1,6
236:16 261:13

**meeting**

20:2,11 107:12,16
108:1 122:16,23 123:2,
4 149:9 158:24 159:9,
14 160:4,5 225:18,21
226:1 227:4 228:10,23
229:1,21 231:24
233:12,15 235:6,13
236:5,9,14,15,19,24
237:1,3,9,23 246:23,25
247:2,3,6,11,14

**meeting/conference**
159:2

**meetings**
183:19 225:8

**mega**
220:8

**Megapath**
74:21,24

**Megapath's**
76:17

**Meixuan**
76:5,10 78:8

**member**
36:9,12 45:7 47:22
49:12,14 95:23 187:4,
16 189:23 190:8 215:17
225:24

**members**
37:5,24,25 45:2 47:15
95:16 97:13 130:7

**memo**
69:16 70:19 71:10,25
72:6,8,9,11,16,19,23
73:3,6,11 79:4 80:9,13,
15,17 81:1 83:3 99:11,
17,20,23 100:25 101:13
102:24 103:4 104:23
128:4,12,22 130:8,19
131:7,8,10,23 132:2,4,
7,9,18,21,22 133:2,5,
12,18,22 134:9,18,20,
21,24 135:6,8,12,16,23,
25 136:7,10,23 137:3
142:21 143:10,13,17,
18,19,22 144:6,10
145:5,6 147:23 150:10
151:2,5 152:10,15
162:1,8,10,15,20,25
164:18 165:1,10 166:4
169:17,18,21 170:14,
17,21 171:15,20,24

172:5,21 173:16
178:14,22 179:6,25
198:2

**memo's**
134:25

**memorandum**
127:14 132:14 154:24
159:21

**memorized**
96:6 156:12 190:23

**mention**
239:22 247:25

**mentioned**
23:5 114:20 209:5
210:24 211:1 218:13
228:17 239:9 246:1
288:2 292:1 295:9

**mentioning**
248:4

**message**
107:4 108:9

**messages**
230:12,14

**met**
19:17,21,24 229:22

**methodology**
73:18

**Micron**
32:7,13,14 34:17,22,23,
24 35:19 121:23 122:20

**Micrus**
259:4

**middle**
25:15 62:11 194:7,8,13
209:3

**midyear**
237:13,17

**Milan**
158:2

**million**
146:22,23 149:4
172:11,18 173:22
175:7,8 176:5,22 177:9,
19

**mind**
120:18 137:6 188:22

DX1649-330

mine
248:16,18 301:1

mine
58:25 273:7

mine's
102:20

minimum
231:1

minus
267:5

minute
62:8

minutes
94:23 162:22

misconduct
247:17,24 248:5,16
257:14,17,25

misleads
77:19 78:1,4

mispronounce
194:9

missing
93:9 94:2 105:20

misstatement
23:11 25:24

misstatements
23:14 25:8

Misstates
20:4 48:9,16 64:17
67:24 84:21 115:23
301:10

mistake
59:2 78:9 216:20

mister
294:4

mitigated
25:7

model
73:16,18

moment
31:18 60:9 72:21 90:8
100:10 122:25 176:17
177:4 229:14 230:15
249:19 252:5 273:5

Monday
144:22 151:9 152:4

monetary
272:18

monitor
9:12

month
89:7

months
144:11,14 196:7 222:19
228:9,11 278:3,7,22

months'
227:11

morning
9:20 10:8 210:2

morning's
106:22

Moss
259:6,7

move
46:21 148:1 157:19
173:4 178:18 247:8
251:4

moving
58:11 91:9 123:19
124:6,15 142:13 170:11
254:14

MP
74:15,19,21

Mrinal
131:6,17 132:5

multibillion
30:10

multibillion-dollar
31:2,8

multiple
30:11 31:3,7 32:5
100:14 189:16 274:25

MW
104:11,13

___

N

name
10:9 18:3 26:17,18,20
32:3 61:13 69:11,21
70:16 72:7 76:24 99:13,
24 101:14 123:13
124:2,11,24 129:6

159:3 229:14 243:22
249:13,17 256:2 265:6
270:12,13 286:17,18
298:1

named
132:13 146:22 241:1

names
229:6 232:23

Nancy
129:3,4 158:3 217:18

national
97:11,13,15,24 98:24
107:13 114:8,25 116:3
119:21 127:15,19
128:4,6,12,17,21,25
129:9 130:7 136:23
147:20 152:10 157:23
159:4 160:20,23,25
161:2,25 162:6,7,14,24
164:24 165:6 173:4,10
174:4 178:13 182:17
229:13 231:19 232:21
243:21 255:13

native
90:4

nature
193:3

NC
79:18 80:2

NC'
79:15

near
191:22

nearby
229:22

necessarily
25:7 28:7,18 30:12
254:6

necessary
42:12 156:2 297:6

need
10:24 21:25 26:15
65:14 135:15 140:25
141:19 157:15 210:11
220:21 232:22 246:3
284:6 292:23 298:18
303:4

needed

26:24 37:11 104:24
173:8 197:12 198:4
226:9 230:24 231:1
240:5 294:13

needs
104:9 212:21 295:22

negative
301:21 302:3

Nelson
213:3 219:8,12 225:22
233:12 239:18 256:21
257:16 258:3

Nelson's
212:25

network
106:20

never
65:21 135:12 152:13
180:23 181:8,22 189:15
190:15 192:22 193:11
198:14,23 199:7 213:23
214:17 252:18 283:10

new
148:4 193:16

news
206:13 234:15

night
152:1,2,6 154:11 173:2
180:1,4,11,19 182:18
255:14

nod
10:24

noise
245:3

non-compliant
79:14 80:7,10 83:21
84:9

noon
125:15

Nope
86:8,12 97:12 240:9
270:5 281:2 294:19

normal
161:21,22

normally
296:9,20

**Northern**
9:9

**note**
78:20 79:1,4,8,9 83:18,
23 84:6 85:8,18,25
86:10,14,20 87:12
107:2 138:4,18 142:10
143:23 147:12 148:17
149:3 150:6 165:25
166:7,13,18,24 185:14,
20

**noted**
93:18,24 126:1,25
140:4 148:2,3 171:4
174:1,2 182:13 247:17
255:9

**notes**
21:14 81:25 106:22
107:8,10,12,18 108:1,4,
5,11,13 127:22 128:1
216:2

**notice**
227:11 260:3

**noticing**
251:5,16

**notified**
119:5 213:22

**notify**
149:3

**noting**
127:8

**notion**
188:20

**November**
117:21 250:8 251:18

**numb**
248:3

**number**
12:14 29:17,21 76:5
123:1,6,21 124:17
191:17 193:22 224:18,
22 227:2 237:4 250:12
258:8,17 272:9,15
293:11 296:1

**numbering**
114:1,3

**numbers**
89:24 90:2 103:9

**Numeral**
129:5 158:3

**numerous**
284:18

---

**O**

**O-N**
158:2

**O-U-C-E-T**
123:13

**oath**
10:16

**object**
280:3 289:23

**objection**
65:8,22 112:11

**objections**
50:19 65:19 87:24
141:12 187:25 279:21,
24 282:14

**objectivity**
114:19

**obligation**
37:15 40:8,15 44:15

**observe**
286:25

**observed**
120:14,23 121:10
286:22 287:4

**obstructive**
284:21

**obtain**
123:5,21 264:20

**obtained**
58:13,20 59:6,15 176:2,
20 177:7,9,13

**obtaining**
176:15 274:24

**obviously**
85:16 173:24 174:21

**occasions**
258:8

**occur**
128:21 176:6 272:21
292:23

**occurred**
176:10 232:11

**occurrences**
64:25 66:8

**occurring**
184:7

**occurs**
41:25 53:22 155:17

**October**
117:12,21

**offer**
221:19 258:21 259:4,13
260:11 262:3,6 263:5,
24 264:12 275:11

**offered**
163:20 221:7 230:21
244:10 258:19

**offers**
258:24 259:19 260:3,6
274:25 275:1 291:1,4,7

**office**
42:8 44:6,17 50:11
85:14 117:7,16 118:7,9,
12 127:15 128:17 129:9
153:21,23 160:20
163:16 164:24 165:6
173:4 215:17 225:22
228:1 229:23 232:23,25
236:18 247:20

**officer**
208:4 209:10 243:25
245:12

**offices**
232:22

**official**
33:2

**OGC**
159:4

**Oh**
46:16 56:25 58:17
215:5 291:13

**okay**
10:13 11:6,16 12:15,19
13:2,10 14:7 15:6,8,12
17:4,9 18:1,8,10 19:1
20:6,9,24 22:5,13 23:5
25:9 26:17 27:7 29:3
31:6,23 33:17 34:1,4,20

36:2 38:19,24 39:10,14,
22 40:2,22 41:7 43:15
45:1 46:20 47:3,14 48:7
50:12 52:8,13 53:22
54:14 55:18,19 57:1,19
60:5 61:25 63:15 65:23
67:19,22 68:20 69:9
70:22 71:9,20 72:7,16,
21 73:10 75:17,21,24
76:13,21 77:11 78:7
79:11 81:17,25 84:19
85:15,23 88:4 89:11,24
90:5,15 91:3,14 94:21
95:7,17,24 96:2,8,17
97:2,10 98:17 99:13,16,
22 100:10,12,13 101:18
102:11,18 103:3 105:5,
10 106:11,21 107:2,17
108:13,16 109:23 110:1
111:2 114:24 116:19
117:4,10,13,18 118:15,
19 119:22 120:2,11,17
122:22 123:5,19 124:6,
15,19,23 125:6,9,14
126:15,21,24 127:13
128:9,20 129:12,24
130:17,22 131:4,20
132:2,11,21 133:11,17
134:17,21,24 135:5,11,
15 136:5,17 137:11
138:3,13 139:21 141:23
142:3,13,24 144:16
145:16 147:12,22 148:1
149:10,14,18 150:9,24
151:18,25 152:3,8,13
153:2,17 155:2 156:14,
19 157:3,15 158:9,15,
19 159:7,16,20 160:1,
18,24 161:6 162:14,23
164:4,8,21 165:22,25
166:18 167:2 168:18,
21,25 169:11,15 171:6,
24 172:3 174:7,14
175:23 176:17 177:16
180:13,22 181:18
182:1,22 184:13,17
185:12,24 186:3,6,13,
23 187:10,17 188:9
190:12,17 191:11
192:2,14,17 193:2,14
194:1,4,7,12 195:9,23
196:2,14 199:2 200:2
201:12,19,24 202:6,14
203:17,20 204:15
205:10 206:4,23 207:4

DX1649-332

208:7 210:1,22 211:13,
16,21 212:7 214:19
215:12 216:14,25 218:8
219:8,14 220:6,9,23,25
221:7,17 222:6 223:4,
11 224:21 225:18,25
227:17,24 228:3,6,19
229:8,17 230:14 231:6,
13,23 232:2,9 233:6,9
234:4,9 235:2,19 236:1,
5,9,13,23 237:9,19,23
238:2,13,19 239:12
240:10 242:12 243:3,8
244:20 245:11,13
246:6,17 247:5,10,13,
23 249:7,11,24 250:21
251:3,10 252:1,11
253:9,14 254:5 256:3,6,
13,25 257:5,10,15,24
258:3,5 259:7,11,18,23
260:18 262:8,15,21
263:4 264:8,24 265:12
266:21 268:5,18
269:21,25 270:3,12,25
271:6,24 272:17 273:6,
10,14,19 275:3 276:5,
25 278:1,15 282:5
283:3 284:17 285:3,13
286:4 287:15 288:20,23
291:1,16 292:17 293:15
294:2,21,25 295:2,23
299:12,17 300:4 301:13
302:9,19,24

**old**
13:3

**on-site**
89:10

**once**
137:12 258:2 267:21
268:1,14 283:11

**ones**
94:2 140:12,13 142:10
188:22 202:2 259:19
269:20 276:1 290:25
291:10

**ongoing**
196:22

**online**
109:18,20,22 201:15

**open**
146:22 257:4

**opened**
153:23

**operate**
25:5

**operator**
9:13

**opinion**
22:25 23:2 29:1,24 36:4
37:23 38:3 49:4 114:5
127:4 139:5,6 167:8
168:14 181:4,20 185:19
190:1 221:17 252:14
292:12 301:20

**opinions**
190:9

**opportunity**
159:16 292:21

**opposed**
189:25

**opposite**
234:18

**option**
154:11,18,21,23 156:14
184:17,18,25

**options**
154:9,13 157:2,12

**oral**
11:1,3

**order**
54:4 89:15 92:11 96:10
101:5 104:25 105:10
109:5 129:14 191:12
223:19 228:20 239:13

**orders**
303:4

**organization**
231:5

**organized**
56:20

**origin**
119:21

**original**
69:20,22 72:5,15 79:10
85:22 93:3 143:17
144:23 169:23 170:1
193:3,25 194:23 244:13
253:3 269:1

**originally**
144:17 186:21

**Orrick**
299:24 300:4

**ou**
106:15

**outcome**
182:8 255:4

**outline**
253:20

**outlined**
226:13

**outlines**
33:12

**outside**
116:4 295:11

**overbroad**
11:18 12:22 13:6,16
15:15 16:3,15,19 21:24
22:8,15,23 23:8,19
24:22 25:11,20 28:2,11,
21 35:3,20 37:6 38:14
40:19 41:18 42:20
44:21 45:15 50:3,7,15
51:25 57:23 59:17,23
60:7 61:21 64:1,11 65:4
66:13,23 67:10 69:17
77:16 83:24 84:10,22
86:15,21 87:5,13 94:12
98:1 101:9 108:25
110:9,19 111:11 113:3,
16 114:9 115:2,15
116:7 119:14 125:3
127:2 139:2,13 140:1,
10 141:25 144:1
167:17,25 168:10
169:2,9 183:25 184:3
187:19 188:1 197:23
215:8 271:15 276:15
281:17 282:9 290:10
298:13,23 302:4

**overly**
219:15,22

**oversight**
51:12

**owner**
269:8

**Ozdemir**
95:18

**P**

**P-L-U-N-E-T-T**
170:6

**P-O-G-O**
17:8

**p.m.**
125:20 161:9 239:2
244:3 274:1 277:21
278:19 285:4,7 303:2,
12

**Pacific**
218:17,19 219:1,3,9
220:12 221:9 222:7,9,
14,24

**pack**
294:7,9

**package**
263:6

**page**
36:2 39:21,22 40:23
41:1,7 43:5,16,20 47:11
49:2 52:13 56:8,12,13,
19,23,24 57:1,2,9,10
58:2,11,17,18,23,24,25
59:1,4 60:17,23 61:11
69:9,10 70:15,22,25
71:1 73:10 78:18,24
80:18 92:15 96:17
100:3,5,6,11 103:14,15
107:17 121:7,9 130:1,3
145:5 147:22,23 148:2
155:11 170:11,12,17,21
171:25 172:5 178:14
191:20,21 194:7 209:2
212:17,24 242:4,5,14,
20 253:11,14 254:15,19
273:25 277:20 278:19
299:22,24

**pages**
141:4 175:15 194:4
212:21 242:10,11

**paging**
140:20

**paid**
263:10 264:4 267:15
268:3,14

**paper**
69:7 93:3 147:16

Confidential
MAURO BOTTA - 09/25/2018                                    i30

**papers**
54:7 61:16 69:20,25
70:12,14 72:5,15
109:21 138:23 139:25
140:9 147:13,20 150:22
162:10 166:1,5,25
183:24 184:10,14,24
185:13,15 296:11 297:2

**paragraph**
36:7 37:21 39:18,23
40:4 41:8 49:6 51:9
71:6 79:12 80:1 96:18
117:1 146:20 150:9
155:12 156:12,13
170:11 171:25 194:8
210:22 216:6,16 252:12
254:22 263:17

**parameter**
201:14,17

**Pardon**
90:1

**paren**
155:23

**part**
12:17 23:23 32:10
35:24 52:11 80:12 91:2
111:2 127:4 130:10,12
145:25 159:14 163:18
172:8 178:25 190:3
211:9 240:2 263:5
267:11 268:22 299:1

**participate**
122:6,9 157:23

**participating**
160:5

**particular**
27:16 30:3 48:5 56:9
60:2 62:1 64:22 66:5
123:23 128:16 180:17
215:6 217:11 271:10,19

**particularly**
203:6 208:3

**parties**
19:3 44:7

**partner**
29:22,23 75:5 95:11
96:1 129:9 149:18,21
151:16 152:14,21,25
154:5 196:24 197:2,13,
15 198:3,14,23 199:5

205:23 209:7,8 217:18,
20 220:24 221:1,2,3,7,
18 223:20 224:4,10
226:6,8 241:24 242:24
243:25 262:16 266:19
286:13,16 288:3,4,6,24
289:2,5,8 290:2 292:6,
20,22 293:1,7

**partners**
188:20 197:2 198:12
223:25 224:2 230:12
245:21 251:6 261:21
288:8,16,20 298:17

**partnership**
233:4 240:3 293:5,12

**party**
42:3 44:7 155:20 159:1

**pass**
301:6

**passage**
190:22 193:5,6

**passing**
109:12

**pasted**
94:3

**Path**
240:3

**patience**
192:13,16,18

**pattern**
190:4

**pause**
82:20 122:25 210:17

**payable**
267:14

**paying**
269:1

**payout**
267:22 268:9

**payouts**
267:25

**payroll**
102:17

**pays**
267:16

**pazienza**
192:10

**PCAOB**
45:12 46:2 47:7 48:3,8,
15,18 187:3 295:15,24
296:2

**PCOB**
17:25 21:8 239:8

**peer**
75:22 76:16,18,20 81:3,
20 82:4 83:6,11

**peers**
196:20 288:1

**penalized**
196:18

**penalty**
10:18 183:3 254:9
255:18

**pending**
62:16

**people**
122:13 124:7 156:15
160:5 193:22 195:24
233:19 265:7 275:25
276:6 295:21 296:14
298:5,18 299:2

**percent**
201:10,13,22 267:11,13
270:19

**percentage**
200:16 267:3,7

**percentages**
267:9

**perform**
148:5 160:6 296:9

**performance**
78:20,25 79:3,7,9
83:18,23 84:6 85:8,17,
25 86:10,20 87:11
136:4 199:4 205:7,13
207:22 223:5,10 235:7,
15,24 236:3,7,11
237:17,20,24 238:3,6
239:11 285:14 290:6
296:15

**performed**
51:16,17,24 53:17
59:10

**performing**
52:3 172:15

**period**
30:18 31:9 38:21 55:6,9
67:17,20 81:2,11,14
82:24 83:4 103:25
119:2,3 125:25 258:20
260:7 274:24

**perjury**
10:18 183:3 254:9
255:18

**person**
29:17 196:22 205:2
217:10 224:6 232:5
247:4 256:20

**personal**
14:7,10,20,24 15:8,13
16:1 86:24 198:11
250:9 251:24 289:7

**personally**
121:19,25 122:4 164:23
297:7

**persons**
36:11 297:20

**perspective**
81:9 82:2,17,22 127:23
146:16

**pertinent**
123:21 125:6

**pervasive**
97:8

**Peter**
74:7 75:13

**pharma**
219:4 222:8,16,22
223:1

**pharmaceutical**
218:19

**Philadelphia**
124:12

**Phillips**
299:24

**phone**
19:25 159:3,5 163:1,21
225:24 232:3,5

**phonetic**
197:7

DX1649-334

Confidential
MAURO BOTTA - 09/25/2018

i31

**phrased**
280:21

**physical**
268:17

**physically**
270:2

**pick**
163:21

**picked**
188:21 196:8

**Piergallini**
124:9 125:4 276:23
277:12,16 278:2,6

**pile**
48:23 63:7

**pipeline**
226:4,6,8 233:3

**place**
9:14 23:10,22 26:5
89:11 94:16 123:17

**placed**
51:4 69:4 169:15
239:17 241:15 299:17
300:9

**Placing**
208:20

**plaintiff**
9:19 96:19 120:12

**Plaintiff's**
120:20 121:16 253:9,24
254:8,15 262:9

**plan**
263:3 264:3,4,9 289:4,
12

**planned**
144:17,23

**planning**
53:10,14,17,19,20 54:2,
4,9,12 289:9

**please**
9:17 10:2,9 11:3 18:4
22:19 28:15 54:20
65:12 66:2 71:5 102:12
121:7 124:10 129:15
136:18 141:3 143:9,24
162:2 165:13 253:18
280:3 285:10 289:23

295:5 297:21 303:4

**Plunkett**
170:6,8

**plus**
94:18

**POGO**
17:2,8,10,21 239:8

**point**
56:17 61:3 68:6 96:4,22
107:19 118:20 164:5
195:17 198:12 199:10
220:19 221:14,15 222:4
236:14 237:14 274:8
275:12 276:16 282:16

**pointing**
117:1 188:10

**points**
63:16 107:25 142:22,23
208:2

**policies**
50:14 199:3 232:13
234:6,25 235:12

**policy**
38:1 147:15 263:12

**poor**
146:19

**portion**
99:25 172:6

**position**
41:14,16 42:18,25 77:9,
13,20 78:1,5 84:15
113:6 114:25 150:24
155:14 189:22

**positions**
257:4 275:22,24,25
276:5,6

**positive**
85:13 270:19

**possess**
18:18

**possession**
13:13

**possibilities**
166:16

**possibility**
231:4 262:21

**possible**
28:5,23 29:2 55:10
72:20 73:8 75:20 99:21
129:10 166:13 173:11
193:13,14 195:22
201:16 218:12 219:12
251:1,2,4,13 252:22
276:17 277:4 292:24

**possibly**
131:15 230:8 231:9

**potential**
148:6 262:24

**Power**
123:15

**practice**
99:23 128:15 282:7

**practices**
271:12,20 285:21,24

**pre-leveling**
245:20

**preacher**
193:3

**precise**
145:19

**precision**
29:10 172:9,10,11,22
174:1,16,25 180:12,14

**precisions**
182:24

**predefined**
265:24

**prefer**
62:13

**premises**
228:6 247:22

**prepare**
19:15,22 21:1,18
126:21 160:13

**prepared**
67:7 73:18 91:1 128:4
135:16 136:6,13 143:13
146:15 161:4 195:9
249:1 250:1 284:1,3
297:3

**preparer**
91:2

**preparing**
90:9,24 126:17,20
128:11 137:9 160:11,18

**prescribe**
271:18

**prescribed**
271:6,9

**prescribing**
271:21

**present**
20:11,14 123:2 160:23,
25

**presentation**
222:18

**presented**
220:20

**pressing**
213:17 214:11

**pressure**
64:12,23 66:6 111:17
126:12 154:3 157:3
165:1,9,24 166:10,15
184:16

**pressured**
64:19 67:3,13 86:24
110:4 157:5,6,8,9
165:20 166:2 183:13,17
289:10,11

**pressuring**
165:14

**presumed**
210:9

**pretextual**
244:25

**prevent**
23:11

**preview**
236:22

**previous**
61:22 76:16 114:20
291:23

**previously**
164:17 285:10

**Price**
243:18,20 244:23 245:5

DX1649-335

**Pricewaterhousecoo pers**
9:7

**primarily**
35:23 80:22 82:7

**primary**
34:7,13,18 35:11,17

**principle**
298:17

**print**
132:14

**printed**
47:8

**printout**
56:11 61:13 69:21 70:9
72:4 74:10 76:25 85:21
93:2 94:6 96:16 101:11,
15 102:4,6 104:19
106:6 120:10 134:23
143:16 162:9 169:22,
23,25 171:16 193:24
244:14 246:12 262:5

**printouts**
93:4 99:12

**prior**
44:3 55:10 84:16 101:7
103:25 138:1

**Privacy**
14:16 279:8,18 280:4,
17 281:18 282:8 285:25
286:7,21 287:8 289:22
290:3,9,15,19 291:11

**private**
146:22

**privilege**
294:23

**privileged**
297:14

**probable**
251:4

**probably**
17:12 31:22 82:12
207:14 209:24 261:14

**problem**
246:4 280:20,24 282:1

**problems**
279:1,3,15 280:15

**procedure**
43:8,12 49:21 173:22

**proceed**
221:13

**process**
23:21,23 24:7,8,10
40:24 41:4 42:1 43:24
44:14 155:8,18 163:12,
18 164:3 232:16 291:16
293:5

**processes**
49:16 50:1,5

**processing**
136:23

**produced**
89:22 90:4 262:10
273:20 277:11 296:11

**producing**
146:24

**product**
295:18 298:22 299:4

**production**
90:3

**products**
148:16,18

**profession**
189:20

**professional**
24:11 27:15 28:9,20
36:8 38:2 39:19 40:3,7
41:25 42:11 43:22 44:4
49:10,24 51:18 139:1
155:16 156:1 168:7,19,
23,25 189:20

**professionals**
41:14 155:14

**prohibited**
257:14

**project**
32:9 222:10 265:25
267:6 268:10,13 286:23
287:4 289:12 293:16,25
301:8

**projects**
32:6,8,14 264:23 266:5
289:17 300:21

**prolonged**
284:24

**promotion**
29:7

**prompted**
132:7

**proper**
234:19

**properly**
210:4 293:6,8,9,10

**proposal**
177:21 230:19,21,22
231:7 263:23

**propose**
150:12

**proposed**
177:18

**proposing**
245:19

**protected**
205:3

**prove**
198:9

**provide**
195:2 253:18

**provided**
149:18 156:15 225:25
281:23 282:2

**providing**
207:18

**provision**
42:14 148:19

**PTO**
269:18

**public**
23:3,25 24:3 88:13
240:24 251:7 261:7,12,
14

**pulled**
201:11

**punitive**
273:3 292:1

**purchasing**
148:17

**purpose**
74:12 159:8,13 237:1

**purposes**
32:22 39:2 45:23 51:1
55:21 69:1 71:22 74:3
76:1 78:14 85:3 89:16
92:12 93:13 96:11 99:6
101:21 105:15 109:7
120:4 127:24 129:16
131:1 134:4 143:4
161:11 169:12 171:8
191:13 193:18 208:17
212:4 239:14 240:13
241:12 243:14 246:7
250:4 261:23 273:16
277:7 299:14

**pursue**
166:17

**pursued**
282:20

**purtroppo**
194:9

**push**
189:21

**put**
34:22 48:22 54:8 73:24
99:4 101:17 105:5
120:2 166:15 171:6
173:23 178:17 186:20,
22,24 222:12 240:10
241:9 244:20 246:17
248:19 249:3,8,10
273:20 283:7,8 284:17

**putting**
64:21,24 66:4,7 112:24
113:13 122:12 151:23
160:15 181:18 250:7
262:2 273:19 277:10

**Pwc**
9:21,22,24 11:24 12:1,
4,6,21 13:3,10,15,22
14:1 15:12 16:2,7 18:18
19:2 21:20 22:5 26:5,10
29:4,13 30:20 33:11,14,
15,16 36:22 38:6,10,12
39:6,9,10,13,14 41:4,17
43:24 48:19 50:18 51:4
56:4 62:1 70:8 74:8
88:4,16 106:9 109:18
116:3 117:5,24 118:4
122:13 123:7 147:15

151:8 155:6 156:6,14,
21 167:7 168:12,18,22
169:1 179:8 187:11,13,
18 188:11,15 189:24
190:5 192:22,24 194:25
195:24 199:3,10,14,16,
19 202:11,20 204:22
205:6,11 207:2 209:13
211:1,17,25 215:17
217:21 218:14 220:23
221:1,2,3,7 223:4,17
224:8,17 225:13,20
228:4,23 229:2 232:13
234:6,25 235:12 237:7
238:14 241:17 245:12
246:2,11 247:16 249:3,
15,20,23 250:8 251:18
256:1,11,17,23,24
257:4 258:6,18,25
259:14,24 260:3 269:21
272:19 274:14 276:3
293:3,17,21,25 294:10,
15 295:12,20,22 296:9
300:4,6,10,11,20,21
301:1 302:1,2

**Pwc's**
49:11 50:6,14 59:11
114:7,25 127:14

---

**Q**

**Q1**
148:3 202:5

**Q2**
88:18 145:7,10 148:15

**Q3**
146:20

**Q4**
149:2,11,20

**QRP**
29:22 83:15 102:10
151:10,12,15

**qualifications**
298:18

**qualify**
226:13

**quality**
29:22 49:12 151:15

**quantify**
89:8

**quarter**
267:15

**quarterly**
88:17 264:5

**question**
11:2,10,13 12:2 21:23
22:1 26:22 28:15 29:9
48:10 62:6,16 65:12,14
66:1 75:6,10,13 87:18
90:20 108:19 110:13,23
112:23 116:5,22 125:9
135:10 137:22 141:15
144:3 152:23 164:14
166:6 174:8 176:13
177:3,11,12 203:3
213:2 219:18 222:11,25
225:7 234:21,22 244:22
245:2 249:2 279:12
280:12,14,21 282:4
291:24 293:23 297:17,
21,23 298:3,11

**questioning**
62:15

**questions**
62:11,12,18,19 90:7
144:1 160:2 183:10
189:4 200:25 253:17
282:22 283:1,14 285:1,
9 302:15

**quite**
183:11

**quota**
232:23

**quote**
119:17 190:21

**quoted**
214:1 215:2

---

**R**

**R&d**
145:13

**r-o-j-e-c-t-s**
265:2

**R-U-D**
123:12

**raise**
220:16 221:22

**raised**
81:20 82:4 128:22
142:17 145:2,5 152:15
156:24 196:16 256:14

**raising**
118:2 145:23,25 149:19
156:22 217:3

**Ralna**
9:13

**Raman**
205:15,22

**Ramse**
9:13

**range**
267:10,11

**rank**
75:15 85:13 131:14

**rankings**
293:11

**rate**
199:22 201:10,13,19

**rated**
79:14 235:24 236:7

**rating**
79:19 80:3 235:8
236:11,20,24 237:3,20

**ratings**
196:18 223:5,7,19
224:3,9,13,18 226:10
237:6

**rationale**
244:7,24 245:7

**re-create**
210:6

**re-leveling**
230:20 231:7

**reached**
45:4,8 47:18,23 135:17
162:24 187:5 268:24
300:14

**read**
33:23 35:23 42:15 46:8
52:10 66:3 71:8 72:25
77:23,24 101:10 102:25
104:19 107:18 119:17
140:17 159:23 173:19,
21 174:10,15 181:12

**reading**
48:6,17 159:24 242:1,2
298:7

**reads**
51:10

**real-time**
303:5

**realize**
94:4 254:6 267:17

**really**
62:21 153:14 203:11
230:4,5 244:25 263:3
265:24,25

**reapply**
257:3,10,23

**reapplying**
257:14

**reason**
61:18 69:25 77:11
84:19 109:13 127:25
128:3,11 150:12 208:16
218:4 256:6,13 262:11,
13 264:17 265:5 270:25
294:8,11

**reasonable**
27:23 73:21 82:12

**reasonableness**
210:4

**reasons**
159:17 176:9 205:25
206:2,3,6,7 207:17
225:25 227:4 269:25

**reassurance**
177:22

**reassurances**
180:20

**reassured**
156:25

**recall**
12:14,24 13:8 15:11,24
16:5 17:11 18:9,25
26:20 29:6 30:16 31:7,
19 32:2 34:1 35:7 45:19
52:25 54:8 55:7 60:8

Confidential
MAURO BOTTA - 09/25/2018

i34

61:25 67:15,17,18
68:10,13,15,17 69:6
70:19,21 71:12 72:16,
19,20 75:14,17,21 78:7,
10,11 79:7,9 80:7 81:24
82:3,4,21,23,24 85:11
87:11,19,22 88:3,19
90:24 91:1 99:20,21
105:6,8 108:3,16,18,21
109:23 110:24 117:9
124:5,14 125:13 126:1,
19 127:7,13,18,21
128:3,11 129:1,9,11
130:9,19,21 131:14
132:6,8,10,11,24
133:10,14,15,16,24
134:3,17,20,25 135:2,5,
9 140:12,21 141:10
142:11 144:20 148:14
149:1,13,19 151:7,9,18,
21,25 152:8 154:22
157:22 159:3,23 160:1
162:14 163:6 175:6
181:2,3 183:2,18 188:9,
13 189:11 190:16,20,22
191:6 192:25 193:10
195:4,15 197:22 198:1,
3,4,6,8 199:1 200:7,10,
18 201:3,4,9,21,24
202:13 203:12,15,17,
19,20 204:10,13,15,19
205:11,19 206:2,5,6,16,
21,22 207:3,11,13,17,
23 208:1 215:16,20,24
218:8,11,25 219:8,11,
13,14,20,25 220:1,9,15,
18 221:24 223:23 224:5
225:14,19 228:10
229:18,25 230:11,17
231:13,23 232:9 233:5
238:8,12 243:22
245:13,15,17,22
246:18,23,25 247:6,9
248:1,4,7 249:10,13,16,
19 250:3 251:1,12
252:21 256:1,5,21
257:9 258:4 259:1,6,17,
18 260:17,23 262:3,5,6,
14 263:1,6,9,11,14,16,
23 264:6,7 270:23
271:21,23 273:5,10,12
275:1 276:22,25 277:2
278:1,8,11 282:5,10
285:22 286:2,18
287:12,16 290:4,11,23,
25 291:14 296:1

**recalling**
214:25 246:15

**receivable**
146:24

**receive**
40:10 118:23 258:23,24
260:6 269:12

**received**
11:25 12:5 40:17 79:9
118:25 197:4 224:12,18
235:17 237:11 238:6,10
262:6 263:6 267:21,24
285:14 291:1,4,7

**receiving**
168:24

**recess**
63:2 95:2 125:18
161:10 238:24 285:5

**recognition**
222:18,21

**recognize**
33:6,8 47:6 48:7 51:6
69:4 71:25 92:24 96:14
99:9 106:8 109:17
120:7 130:6 162:7
169:19 295:24

**recollect**
76:20 117:2 141:16
193:7

**recollected**
76:19

**recollection**
29:11 32:2,15 48:14
64:24 66:7 71:9,14
72:23 73:5 74:19,21
80:10 86:6 90:8 96:9
113:8 118:5 129:13
131:21 140:19 141:2
147:21 181:15 191:3
194:20 205:9 211:15
215:11 217:7 221:25
222:3 224:1 249:19
251:10 257:22 258:16
273:15 286:15 288:21

**recommended**
271:3

**reconciliation**
93:21

**record**
11:4,10 39:1 51:15
63:1,3,9 66:3 68:25
77:24 92:7 95:1,5 98:19
105:14 125:17,19
130:24 161:7,9,15
174:9 178:16 179:13,22
191:16 204:9 214:6
238:23 239:1 242:15
265:4 279:25 282:16
283:1,4,5,7,9,17,21,24
284:13,18 285:4,6
295:5 296:21 303:1

**records**
150:7

**redacted**
17:1,4 239:11

**redo**
294:14

**reduce**
104:11,21 105:1

**reduction**
231:9 240:1

**reengaged**
73:17

**refer**
54:24 55:1 70:25
102:14 141:18,20 175:2

**reference**
30:25 38:6 70:15 80:7
108:5 111:6 118:4
209:14,19 211:12
236:11 242:21 299:23

**referenced**
123:2 177:24 179:5
180:16

**references**
118:5 198:17

**referencing**
248:9

**referring**
26:12 39:11 56:18
92:25 119:21 122:19
132:21 133:1 141:23
145:16 151:4 154:25
155:23 193:5 233:11
234:7 240:2 275:19,21

**refers**
52:5 76:18

**reflected**
268:17

**reflecting**
107:8 268:6

**reflects**
130:13

**refresh**
71:9,14 73:5,7 96:9
129:13 131:20 181:15
194:20 249:18 251:10
273:15

**refreshes**
48:14 72:22

**refuse**
282:22

**regard**
153:4 202:24 203:2
271:16

**regarding**
37:23 44:8 78:20,25
234:6

**regardless**
36:16

**regular**
109:22 303:9

**regulatory**
49:10,25 139:19 140:14
190:3

**reinstatement**
292:6

**Reiter**
9:22 162:3

**reiterated**
189:16

**related**
23:2 32:13 80:11,14
97:4,7,24 98:12,21
101:1,5 127:12,21
142:5 148:24 149:12,15
150:15 257:2

**relates**
49:8 80:8

**relating**
127:9

**relation**
76:15

DX1649-338

Confidential
MAURO BOTTA - 09/25/2018                                    i35

**relationship**
205:23 208:3

**Relationships**
208:5

**relevance**
16:3 279:11,19 280:4,
17 281:18 282:8 285:25
286:7,21 287:8 289:22
290:3,9,15,19 291:11

**relevant**
118:2 123:5 186:11
282:19

**rely**
294:12 295:22 298:19

**relying**
57:21 295:17 297:12,20
298:5,22 299:2

**remained**
231:4 240:21,24

**remember**
18:7 60:9 95:17 119:19
125:8 127:10 128:20
133:25 136:5 144:16
152:5 159:24 175:8
181:15,17 195:18 204:1
206:8,9 209:22,25
215:12 219:6 220:6,12
228:15,17,19 230:2,5
238:18 245:23 249:7,11
257:7 260:15,22 263:3
267:9,12 278:5,15

**remind**
297:23

**removal**
202:14 205:24 206:1
207:4,6 211:22

**remove**
42:12,25 154:20 156:2,
9 167:3,9 184:15,17,25
185:9,21 206:14 207:1

**removed**
179:9,15 184:20 185:17
199:24 201:24 202:17,
20 207:12,19,24 294:5

**removing**
205:2

**Renee**
299:24

**reopened**
302:20

**repeat**
12:2 21:23 22:1,19
28:15 61:22 65:12
77:21 87:17 90:19
93:25 100:22 103:1
108:19 110:13 116:22
219:18 234:21 245:2
278:4 291:6 297:21

**repeated**
65:14

**repercussions**
301:21,24 302:3

**replace**
204:22

**replied**
173:16,19

**reply**
258:2

**report**
30:12,13,22 31:1 36:16
49:16 95:24 117:10
168:22 208:25 212:8
261:20 266:15,17
288:24

**reported**
30:2,7 32:16 95:15
117:14 132:20

**reporter**
9:25 10:2 23:13 24:1
33:1 38:17 68:22 74:23
81:12 90:14 92:9 98:14
105:12 109:6 124:10
142:8 151:11 175:11
179:12 185:4 213:6
229:7 240:22 243:23
260:25 303:3

**reporting**
31:7

**represent**
9:18 64:8,15 66:20 69:6
70:13 89:12 94:6
143:21 251:14 281:5,
12,14,24

**representation**
23:1 94:7 178:25

**represented**
63:24 65:1 66:9 216:23

252:1

**representing**
169:25

**represents**
244:17 300:1

**reputation**
296:22 300:13

**request**
142:25 143:14 158:4,
10,19 211:22 213:23

**requested**
167:6 179:11,14,19,20
301:5

**requesting**
157:22 300:20

**requests**
210:5,14,15

**require**
177:12

**required**
42:18 44:5 52:15,20
63:18 106:23 295:16
296:3

**requirement**
42:6 45:13 48:2,8,15

**requirements**
42:5 43:17 49:11,25
155:21

**requires**
24:10 27:15,19

**requiring**
56:15

**reread**
66:1 77:22 96:7 125:2

**rescheduled**
236:15,17

**rescinding**
274:24

**resemble**
120:10

**resign**
258:9,19

**resignation**
258:9,19

**resolution**
40:24 41:4 42:1 43:24
44:14 45:6 47:20 155:8,
17 177:21

**resolve**
42:1 155:18 156:17
185:22

**resolved**
44:25 49:17 167:9

**resolving**
38:2 43:9 155:7

**resort**
196:6

**resources**
52:2 213:8

**respect**
36:13 72:18 82:15 97:3,
14 114:13,17 118:7
122:12 123:1,16 124:4
125:9 127:8,16 137:11,
21,24 149:20 151:8
168:6 209:6 214:7
219:1 227:5 287:21
299:21

**respond**
143:25

**responded**
154:10

**responds**
275:14

**response**
100:25 114:20 143:14
151:8 154:6 171:14
232:17

**responsibilities**
22:13,21 33:12 51:5,7
52:9,11 63:13 265:23
276:3 299:1

**responsibility**
34:8,14,19 35:12,17,23,
24 36:10 37:2 114:5

**responsible**
40:9,16 51:13,22 79:16
80:4,22 82:7 99:25

**rest**
32:15

**restatement**

DX1649-339

103:25

**restroom**
62:9,22

**restructuring**
226:3 228:13 232:21
233:1 234:20 235:25
236:21

**result**
79:15 103:24 254:22
301:22

**resulted**
79:18 80:2,3

**results**
154:16 235:12

**retain**
13:13

**retaliated**
153:13 196:3,5,10,12,
17 199:20 241:7 243:5
245:24

**retaliation**
119:20 156:21 196:8
240:8 245:1,9 256:22

**retaliatory**
218:14

**retention**
226:14

**retract**
152:9 259:23

**retracted**
259:16,22

**retracting**
154:13

**retraction**
154:19,23,24

**return**
19:10 148:18

**revenue**
70:20 72:1,17,24 73:6
74:8,15 75:19 80:8,12,
15 81:8,22 82:10 97:19,
21 98:3,9,11 134:15
222:17,21

**revenues**
70:23 71:6,11 101:2,3

**review**
21:1,4,14 29:22 37:21
51:5,7 54:2,4,11 56:15
61:8 63:12 71:5,7 72:21
73:17 75:22 76:17,18,
20 79:17 80:5 81:4,20
82:5 83:6 88:17 93:23
99:23 100:10 130:7
141:19 143:22 151:16
161:3 162:22 165:17
170:19 172:8,15 176:3,
21 177:7 181:14 191:1
195:10,13 197:20 206:7
212:18,22 246:3 253:3
287:23 296:10,11,24
297:2 299:2

**reviewed**
21:5,12 34:2 51:18
63:16 71:10,12 73:3
109:23 126:5,8,12,22
137:16 162:20 165:22
179:25 183:5 187:3
205:6 212:12 243:11

**reviewer**
91:2

**reviewing**
51:23 60:6 99:20
126:20 130:13 134:17,
20 191:3 195:12

**reviews**
40:17

**revised**
73:20 74:14 75:18
81:21 82:9 137:8
148:19 171:13,15,24

**revision**
172:4

**revolutionary**
193:4,9 194:22

**ridiculous**
284:19

**RIF**
224:22 225:3 239:22

**RIF'D**
241:4

**right**
19:8,12 20:1,9 24:6,16
25:3 27:2,13,17,21,25
28:9,25 29:1,5 30:4,24
32:11,19 34:20 35:14

37:5,16 39:12 40:8,12,
18 41:17,23 42:19 43:1
44:20 45:13,21 46:14,
20,24 47:8 48:3,8,15,22
49:4 50:6 52:5,6,11,24
53:2,3,11,23 54:12
55:15,20 56:12 57:4,17,
22 58:9 59:8,16 60:25
61:5,10,12,17,19 62:5,
23 63:25 64:9,16 65:3
66:12 67:4,9,20,23
68:24 69:11,16 70:1,13,
17,20 72:3,8,18 76:13,
19,24 77:2,6,9 79:1,5,8
80:9,15 81:9,23 82:3,6,
10,14 83:10,23 84:20
85:20,25 86:11 88:23
90:17,25 91:18 92:19
93:1,5,12,22 96:25
97:4,11,14 99:11,14,18,
24 100:23 101:8,13,14
102:1,3 103:8,10,12
104:4,13,22 105:3,11
106:5,9,24 107:5,10,14
108:2,10,14,18 109:24
110:25 111:4,6,9
115:22 116:21,25
118:21 119:6 120:8,21,
24 121:1,4,10,12,15
122:14 123:3,18 126:6,
9 130:12,15 132:5,15,
19,23 134:2,22,25
136:8,15,24 137:9,13
138:5,15,17,20 139:1,
11,25 140:18 142:14,
18,25 143:21 144:7,11,
18,24 145:2,14,17
146:3,25 147:3,24
148:7,10,13,21 149:2,7,
12,17 150:22,25 151:20
152:11 153:10,15 155:8
156:10,22 157:1,13,20
158:10,13,16 159:12
160:2,7,10,13 161:2
162:8,21 163:4,9 164:6,
10,19,25 165:7,10,19,
23 166:3,13,19 167:5,7,
10,12 168:19 169:21
170:8,14,17,20,24
171:2 173:1 174:16,19,
25 175:1,4 176:14
177:20,25 178:1,4,11,
20 180:2,18,19,23
181:10 183:7 184:15,19
185:1,10,18,22 186:4,

24 187:7 190:6,10,13
192:6,19,21 193:4,16,
23 194:2,18,24,25
195:10,13,15 196:12
198:24,25 199:19,20
200:6,14,19 201:4
202:7,21 203:7,12
204:7 206:17 207:17
208:20 209:1,12
211:19,23,25 212:14
213:24 214:21,24 215:3
216:16 217:13,21
218:1,13,15,20,23,24,
25 221:1,5,9,13,15,19,
23,25 222:23 223:12,17
224:7,12,13,23 225:16
226:14,17 227:3 228:22
229:20 230:3,7,10
231:10,16 233:23,25
234:7,12,25 235:4,24
236:25 237:2,4,7,21,25
238:3,10,11,13,15,19
240:1,6,8 241:3,4,7,9
242:5,18 243:1,6,9
244:12,18 245:1,9
246:2,11,13,14,21
248:12 249:12,15,20
250:2,10,13 251:11,19
252:3,7,20,23 253:1,11,
21,24 254:2,12,14,21
255:1,16,23 258:10
260:2 261:4 262:8
264:7,9,11,14 265:9
266:15,23 267:7 268:2
269:3,9,12 270:6,21
271:9 274:5,12,15,21,
25 275:8,12,17 276:7,
11,21 277:23 278:24
283:4 288:3,6,8,21
291:22 293:1,4,17
295:18,23 296:3,7,24,
25 297:3,7,13,20 298:2,
6,20,22 299:4,8 300:2,
23 301:9,15 302:10,11

**ring**
129:7 190:25 227:2

**rings**
129:8

**rise**
25:17 198:15,24

**risk**
107:24 151:23 205:1
210:5

DX1649-340

**risks**
172:23

**rivoluzionario**
194:18

**Rob**
225:23

**Robert**
151:12 233:13 266:20

**Robyn**
95:20

**role**
29:16 34:5,6,25 35:15
95:12 134:15 198:18
209:6

**roles**
35:9 76:22

**rolled**
213:14,21,23 214:9,18
216:8,11

**Roman**
129:5 158:3

**room**
159:5 247:20

**rough**
303:6,8

**roughly**
31:6 67:17 68:17
203:13 263:9

**roulette**
237:10

**routing**
195:4

**row**
93:10 293:11

**rows**
91:25 93:7 250:17

**rules**
139:1,10 167:16 168:7,
19,23,25 185:19,20
187:3

**run**
230:21

**Ryan**
225:7 231:12 245:11,
23,25 246:11

**résumé**
290:13,22 296:10,25

**résumés**
299:2,4

---

**S**

**S-A-R-R-E-T-T**
270:13

**S-I-M**
158:2

**S-O-A**
264:23

**S-T-R-A-S-S-E-R**
266:20

**S-T-R-I-U-Z-A-S**
124:25

**SAB**
102:12,15 103:4,6

**Sabotini**
197:7

**SAD**
57:17 60:6,9,10,12
61:3,5,7,8 67:7,8,9
89:13 90:9,24 92:15
108:17,21,22 110:25
126:9,17 137:17
138:14,23 147:3,24
148:10,13,25 149:12,17
160:6,11,16 161:4
165:23 166:8 179:2
183:13,17

**salary**
262:18 266:21

**sales**
142:6

**Sally**
209:15,19,20 210:2,24
211:1

**Sally's**
209:12

**Sameer**
85:7,11

**Sametime**
13:11,14

**San**
9:1,15 10:11,12 85:14

153:21 191:23,24
213:5,8 238:8

**Sarbanes-oxley**
21:22 22:7 266:1

**Sarrett**
270:13,22 271:1,4,6,9

**satisfied**
252:25

**saw**
138:11 231:4 257:3

**saws**
54:15

**saying**
78:8 133:25 136:1
150:1 170:18 228:19
229:19 232:9 235:21
279:4

**says**
41:23 52:9 56:19 60:11,
25 73:11,22 74:11
76:14 77:1 100:4,20,23
102:6 131:6 134:23
175:20 192:9 210:22
214:8 217:13 218:2,3
243:22,24 250:18,21
253:15 262:9 274:1,4
275:4

**scale**
223:7

**scheduled**
227:7

**score**
223:14

**Scott**
158:6,8 163:21 164:1,2,
5 262:16

**scratch**
26:22 62:6 75:6 249:2

**screening**
296:22

**screenshot**
109:10,18

**scrutinization**
213:16 214:11

**SE**
74:16,22 75:2

**Seandel**
89:4 172:14 175:3
176:2,20 177:6 178:9

**SEC**
21:8 117:6,19,23
118:13,17,19,23 119:1,
23,25 120:8 180:25
181:10 183:2,6,16,20
249:2,4,5,9,12,23
250:1,2,22 251:15
252:10 253:6

**second**
27:6 41:8 54:14 61:3
81:25 82:16 103:18
107:17 120:9,19 124:22
145:5 155:11 216:6
242:3 264:6,8 268:6,9,
22 273:25 278:19

**second-to-last**
73:14

**section**
35:8 36:3 38:22 39:11,
15 40:22 41:3 42:5
43:8,21 44:15 46:7
47:11 48:24 49:3 51:4,6
55:3 57:9,11 58:3,11
59:5 60:17 63:6,13
70:23 91:4 120:13,17,
19,23,24 121:2,3,22
123:17 145:6 150:11
155:7,8,21 175:16,21

**sections**
56:17,21

**security**
17:24 127:22 300:13
301:5

**see**
34:10 36:5,19 38:4,8
39:7,20,25 40:3,23,25
41:10 43:3,6,18 44:10
46:4,22 47:11,25 49:18
51:20 52:14,17 54:18
56:2,11,16,22 57:12
58:4,14,15 59:4 60:19
61:13 63:8,17,21 69:20,
21 70:10,24 72:5 73:12
74:9,10,17 76:8 78:21
79:21 81:5 83:8 85:9,21
91:6,9,11,15,16,19
93:2,4 100:4,7,18
102:12 103:5,6,8,16,19
104:2,6 106:10 107:18

DX1649-341

120:13,15 121:5,11,17
129:12,22,25 130:4,22
131:11 134:11 143:9
145:8 155:9 156:4
157:11 169:22 170:1
172:19 173:11 175:18,
20 185:8 187:21 191:25
192:1 193:24 194:10,15
211:4 216:4,9 233:20
239:23 242:6 249:21
250:19,23 251:8
253:12,20 254:24 262:8
271:3 273:14,23 274:2,
10 277:13 278:15,20
287:24 289:9 300:16
301:9

**seeing**
69:24 72:4 189:18
270:11,14,21 271:1

**seek**
118:12 160:24

**seeking**
118:16 271:24 272:6
291:25

**seen**
102:23 209:16 239:8,10
244:13

**selected**
75:22

**self-employed**
18:12

**self-evaluation**
195:9

**self-evaluations**
194:25 195:3

**sell**
149:4

**semiconductor**
88:13 153:6

**Senator**
117:6 118:11

**send**
132:7 171:16 173:9

**sending**
195:7,8 250:12 251:23

**senior**
29:4,7,13,16,25 30:11,
14,16,22 31:3,7 32:16

34:12 35:8,9,12,16
37:3,12,14,15 40:14
42:17 44:12 49:20,23
51:22 52:6 55:7 75:15
77:2 85:14 88:23 95:14,
18,19 106:19 131:16
205:22 219:2,3 221:4
223:18 224:22 226:3,
18,23 231:10 233:2
261:19 263:25 265:21,
23

**seniority**
226:4

**sensitivity**
210:3

**sent**
11:25 12:5 15:21 16:1
18:18 85:7 102:3 151:2,
5 154:24 169:20
171:19,20 173:18 250:8
263:7 290:13,22

**sentence**
39:18 40:2 51:9 73:14
74:11 80:21 81:17 84:5
251:3 252:11 255:1

**separate**
33:3 263:2

**September**
9:2,11 257:8 261:6,10

**sequence**
161:22

**sequencing**
218:23

**series**
26:15 272:20 296:8

**served**
29:4 88:22

**serves**
21:20 22:5

**service**
101:2

**services**
75:9,16

**sessions**
271:11

**set**
25:23 33:18,22 42:6

43:24 47:3 164:18
180:22 195:16

**sets**
266:6

**setting**
252:7

**settlement**
268:24

**seven**
47:11 77:5 281:10

**severe**
25:16

**severity**
25:1

**Shao**
95:19

**share**
17:9,19,23 18:6 287:14,
18

**shared**
16:12,24 207:21

**sharing**
207:23

**Shauna**
246:24 247:1,3 256:20,
25 257:19

**she's**
90:16 229:4 288:2,4
289:6

**sheet**
172:12

**shift**
94:17

**shock**
232:12 238:17

**shortcut**
125:22

**shortly**
184:20

**shoulders**
154:4

**shouldn't**
233:21

**show**
129:12 252:23 278:9

**showed**
137:3

**showing**
51:23

**shown**
17:1,7

**sic**
9:10 151:13 175:3
185:3 283:11

**sic]**
216:8

**sick**
269:22 270:1,2

**side**
34:22 135:9 159:11,15
268:24

**sign**
54:4 55:5,13 57:4 63:19
64:12,19 138:4,14
165:1,9,14,17 183:13,
17 184:14,16 185:13
260:21,23

**sign-off**
52:16,21 61:19 110:1,5
132:1 139:24

**sign-offs**
111:7

**signature**
63:24 64:7,14 65:1
66:9,19 67:8

**signed**
29:23 56:9,11 61:11,14
63:23 64:6,14,25 66:8,
18 69:14 80:25 83:3
109:24 110:15,24
111:3,16 126:5,8,12
137:12,16,20,24 138:5,
22 140:22 141:17
146:6,14,18 148:18
165:22,23 166:8,19,22
234:18 248:20,21
262:15

**significance**
36:15 60:3 128:16

**significant**
25:1,9 26:3 27:1 37:3
42:10 44:2 45:4 47:18
58:3,8 59:21 60:5,10,
11,18,25 61:2 66:18

91:23 93:6,19 94:10
100:15 155:25 156:8,16
162:17 182:9,15 186:7
255:5,11

**signify**
103:23

**signing**
54:1,11 55:7 57:14 58:6
59:8 60:6 61:7,9,25
62:3 140:8 166:23
167:5 184:23 209:8

**signs**
251:5,16

**Silicon**
146:22

**similar**
69:19 213:15 214:4,9
269:15,17

**Simon**
255:23,25 256:8,15

**Simonetti**
107:13 158:2,4,9,12,15,
20,23 159:2 160:1
162:23 163:1,4,8,10,20,
24 164:9,12,25 165:4,
12,13 170:4,8,10

**simple**
116:5 141:15 174:8
177:3 222:25

**simply**
166:19,21 174:24
189:13 301:7

**single**
74:11 159:23 190:23

**sir**
112:23 137:9,19,23
141:10 162:8 174:19
175:1 181:11,19 183:7
184:22 192:8,19 193:4
213:21 222:6 248:25

**sit**
191:10

**sitting**
13:2 34:1 135:11
140:20 179:4 205:10
206:8 268:18

**six**
171:23 194:4 250:16

**sixth**
100:3,6

**size**
30:10

**skill**
150:13 266:6

**SLA**
99:11 109:24

**Slow**
60:20

**SM**
241:22 242:23

**small**
265:2

**smaller**
27:20 288:15

**smartphone**
13:21

**Smith**
153:10 156:20 222:19
299:25

**SOA**
266:25 267:16 282:10

**SOAP**
264:25 265:7,8

**SOAPROJECTS**
264:22,24 265:9 266:9,
16 269:4,23 279:2,6,16
280:16 281:16 282:7
285:15,19,24 286:5,6,
12 287:25 288:9,21
290:1,7,18 292:22
293:1,15,20,24 298:22
301:21 302:9,13

**SOAPROJECTS'**
285:20

**sold**
146:21 148:16 268:10

**solution**
173:8,12,14 245:19
300:15

**somebody**
50:12 146:18 192:23
231:19 247:19 296:18

**soon**
192:5 230:1

**sorry**
26:21 56:23 58:16
62:21 75:6 77:21 90:19
91:8 92:10 100:5
108:19 110:13 116:22
122:17 127:16 131:7
132:2 147:7 163:25
170:15 192:15 208:23
219:18 227:13 234:21
240:23 241:10 245:2
255:24 261:15 278:4
285:17 291:6

**sort**
166:7 194:8 231:8
245:9

**sought**
270:7,10

**sound**
144:24 190:24 193:11
195:20 238:11

**sounds**
228:11 238:13 278:10
279:14

**source**
45:19 133:3

**SOX**
266:1,9,19

**Spansion**
122:3 124:6,8

**speak**
21:17 123:14,20 124:16
159:20 160:23,24
164:8,9,12 190:4
228:22 232:21 256:3
257:18

**Speakeasy**
75:3

**speaking**
65:8,19,22 112:11
141:6,12 164:5,23
165:5 196:15 231:23

**special**
32:9

**specialists**
51:17 73:17

**specific**
28:11 112:16 118:5
157:4,9 190:22 206:2,5,
7 249:16 263:1

**specifically**
19:5 41:12 79:25
114:13 127:13 157:23
215:24 223:23

**specifications**
225:11

**specifics**
206:10 248:1,2

**specified**
248:7

**speculate**
70:5 87:7,9 113:17
115:6,7 189:3 218:6
224:5 270:18 289:20
299:9 300:25

**speculating**
31:16 83:13,16 191:10
256:12

**speculation**
14:4 23:20 28:1,10,21
45:14 61:20 64:2 66:14
69:18 70:2 77:15 86:1,
15,21 87:5,13 108:24
110:8,19 111:10,20
112:7 113:2,16 115:12
116:7,14 118:22 119:13
135:21,22 139:13 146:9
168:1 188:2 263:13
270:17 272:13,25 279:7
288:18 289:22 292:11
297:9 298:12,23 300:24
302:4

**speculations**
198:9

**speed**
196:1

**spell**
123:11 124:10,20

**spelling**
207:9

**spent**
217:10

**spoke**
125:7 153:19 156:19
162:23 188:6 256:8
257:20

**spoken**
256:17

DX1649-343

**spot**
269:6

**spreadsheets**
89:13

**stack**
155:3

**staff**
77:1 102:17 158:20
218:15 245:22

**staffed**
67:16,18 88:4 200:3,7,
12 212:1 300:20

**staffing**
212:10 222:7

**stages**
122:7,8

**stamp**
103:15 120:11 134:19
136:14 137:4 209:2
215:25 253:10

**stamped**
170:22 194:5 277:21

**stand**
287:13

**standalone**
31:11,12 199:4

**standard**
33:11,18 39:6,9 83:18
84:6 102:16 112:3
113:25 114:3,4 226:14
245:21 269:19 295:24
296:2

**standards**
33:15 51:19 59:11
111:22 112:4,25
113:14,20,25 114:8,16
115:1,10 116:4 118:1,3,
6 155:6 168:13,16
169:5

**start**
14:23 15:3 92:20
104:15,16 152:17
170:16 193:8 263:20
270:14,21

**started**
68:16 98:15 220:21
251:5 262:19 267:17
270:25 282:10,13

285:15

**starting**
88:19 121:9,23 238:7
252:11 282:5

**starts**
34:25 39:18,23 40:2
41:8 43:16 47:12 49:3,6
52:14 73:15 76:4
103:18 129:20 134:18
145:6 175:24 194:8,13
242:3 253:10 254:22

**state**
9:18 10:9 117:7 131:24
147:15 152:24 180:24
183:12 187:4 190:2
241:8 244:23 245:8
255:2 258:3 281:21
301:1

**stated**
45:20 48:4 80:1 98:11,
20 108:7 128:6 132:17
133:8 139:16 140:13
151:21 154:12 166:15
167:20 168:12 172:16
180:25 181:2 182:23
189:11 205:1 225:8
244:18 249:6 258:1
264:12 273:12 280:9,10
281:21 282:4

**statement**
72:12 83:10 84:13,17,
20 152:18 172:13
181:24 182:6,20
198:13,22 216:14 246:4
264:3 294:16 295:13
301:22 302:22

**statements**
23:1,12,15 25:8,25
36:16 104:1 197:13
263:18 291:24

**states**
9:8 34:6 36:7 40:6
41:12 43:21 47:14
52:19 76:23 77:4,7,8,
10,19,25 79:12 80:20
81:18 82:6,15,17 96:18
100:25 106:16 131:8
155:12 172:7 175:1
187:8 210:1 213:11
255:2

**stating**

146:21 151:18 153:24
173:3,15 181:3 190:20
219:14,20 234:17 278:1

**stay**
167:6 179:11,14,19,20
228:15,20 231:9 259:25

**stayed**
294:12

**Steel**
240:16,18

**Steele**
153:6

**steps**
26:15 53:25 61:6 156:8
213:17 214:11 296:8

**Steven**
129:2

**Stig**
96:1 102:6,9 103:2
209:4 210:2

**Stig's**
102:21

**stop**
62:8 65:9,20 191:23

**stored**
14:1 16:10 18:21
131:25

**story**
159:12

**straight**
268:22

**straight-shooter**
158:13,17 163:9 164:17
187:16

**stranger**
231:3

**Strasser**
266:20

**Street**
9:15 10:11

**strengths**
187:12

**Striuzas**
124:18 125:11

**struck**

295:4

**structure**
35:10 54:6 135:6,7
261:22

**structuring**
245:18

**struggling**
234:10

**stuff**
296:23

**subject**
54:10 72:1 74:8 85:8
106:21 131:6 134:9
169:17 171:13 209:12
297:11,19 298:4 299:18

**subjective**
35:22

**subledger**
97:4

**submission**
254:10,18

**submit**
258:9 291:8

**submitted**
118:24 119:1 140:17
181:13 249:5,22,25
254:4

**submitting**
132:4 249:7

**subsections**
46:3

**subsequent**
206:23

**subsequently**
228:22

**subsidiaries**
32:9,14

**substance**
233:22

**sudden**
154:3

**sued**
11:22

**suffer**
86:13

DX1649-344

Confidential
MAURO BOTTA - 09/25/2018

i41

**Sufficiency**
58:12,19 59:5

**sufficiently**
57:20

**suggest**
178:24

**suggested**
130:8,14

**suggesting**
197:14,18 283:14

**suggestion**
164:9

**suggests**
174:24

**suit**
271:25

**sum**
94:17,18

**summarily**
93:24

**summarizes**
53:17

**summary**
57:17 145:7 214:7
215:3 217:2

**superiors**
237:20 279:16 280:15
281:15 288:1

**supervisors**
188:9

**support**
59:15 172:18

**supporting**
21:7 176:7

**suppose**
292:24

**supposed**
90:11 236:16 237:13
299:10

**supposedly**
294:15

**sure**
11:7 12:3 22:20 24:5
26:8 28:16 31:21 46:25
56:19 60:21 61:9 83:25

90:10,15,22 92:7
105:21 108:20 110:14
116:23 118:10,17 121:5
122:17 167:2 170:18
177:1 181:14 188:19
196:9 204:2,8 206:4
209:16 214:5 219:19
235:19 245:4 253:2
261:16 276:12 278:5

**surprise**
225:3,5 233:19,21
234:7,12 235:4,10,14,
15

**surprised**
235:22,23 236:2,6

**survey**
136:4 165:21 168:24
188:17 197:4,5,6,9,11,
14,20 239:11

**Susan**
99:18 101:14

**suspect**
206:11

**Suzy**
89:4 172:14 176:2,20
177:6 178:9

**swear**
10:2

**SWORN/AFFIRMED**
10:5

**synonym**
205:4

**system**
195:5 201:17 277:23,24

**systems**
49:11 218:22

---

**T**

---

**Tab**
129:19

**table**
76:13

**take**
19:2,6 21:14 35:17
53:25 57:7 61:6 62:9,23
72:21 93:23 94:21
100:10 109:11 110:22

112:19 125:14 143:2
185:6 197:10 212:15,18
224:3,8 228:19 231:8
238:19 252:5 282:23
283:15,20 284:8,12

**taken**
63:2 65:18 95:2 125:18
161:10,20 185:3 238:24
269:22 284:18 285:5

**takes**
34:7

**talk**
17:14 19:14 61:5
202:14 204:7 207:4
228:23 229:1,20 251:15
296:14

**talked**
183:11 219:11,12
229:3,14 243:8 248:16
257:15 259:14 285:8

**talking**
16:17 34:21 105:24
164:22 170:19 200:24
219:8 259:5,6 292:2
297:25

**talks**
102:16

**tax**
73:19 169:17,21 170:13
171:2,5,15,20,24 172:9,
15,24 173:7 176:5,11,
23 178:21 179:6,25
182:11 247:25 255:7

**taxes**
150:15 170:20

**TC**
171:13

**team**
27:4,8,10 30:11 34:19
36:9,12 37:5,24 45:2,7
47:16,21 49:12,14
53:16 60:1 67:16 81:4
83:6,12 88:20 95:16,23
97:10,13 105:7 114:8,
25 116:3 128:18 131:9
142:14 149:3 161:2
162:24 187:4,16 189:23
190:8 202:15,17 205:7,
13 207:5,20,25 209:13
210:3,24 211:17 220:8

222:7 244:11

**team's**
66:21

**teaming**
213:15 214:10

**teams**
88:5

**technical**
128:10 150:16 266:12
268:12 286:13,16
287:9,11,15 288:2,4,5,
24 289:2,5,7 290:1

**technically**
128:5 187:14

**Technology**
32:7,13,14 35:19
121:23 122:20

**tell**
11:8 18:23 19:21 32:1
69:22 70:10 71:6 72:5,
13 79:10 83:16 85:22
86:4 92:1 93:8,22 94:1,
20 133:7 142:3 143:16,
19 153:22 157:2 159:11
162:10 165:12 212:13
218:11 230:4,13,19
231:20 236:20 237:13
247:13 256:25 257:5
276:17 289:12 292:15

**telling**
149:21 215:20 218:8
220:15 227:23 231:13
234:10 245:15 273:10
278:5

**ten**
199:15 224:17

**tendered**
258:19

**tenure**
55:6 202:11 204:17
238:15 258:13

**terminated**
11:24 12:4 225:1,2
248:25 249:1 256:22
257:13,16 260:4,16

**termination**
29:4,13 30:19 31:9
55:13 226:1 227:5
230:9 255:21 256:18

**DX1649-345**

Confidential
MAURO BOTTA - 09/25/2018

i42

257:1 260:12 264:17
269:21

**terms**
32:25 167:21 180:13
248:8 262:24 263:2,3,4
264:7 266:23

**tested**
57:21

**TESTIFIED**
10:5

**testifying**
10:15,20

**testimony**
20:4 24:6 48:9,16 64:17
67:24 84:21 115:23
137:19,23 180:5 183:14
185:8,15,25 205:11
211:14 220:4 287:17
293:9,13 301:10

**text**
73:11 230:12,14

**Thank**
11:16 24:12 32:11 33:4
71:2 89:22 91:18
109:13 159:7 174:7
192:14 302:23

**thanks**
181:6,21 182:15 252:16
255:11

**theme**
149:24

**themes**
189:11 208:6

**then-partner**
124:1

**therapist**
270:11

**therapist's**
270:12

**there's**
28:25 36:3 38:6 57:10
58:18 62:16 120:17,19
121:6,9,12,14 141:4
142:10 155:23 170:18,
22 175:16 191:23 192:8
227:24 237:14 250:17
274:1 288:5 299:19
301:4

**they're**
32:3 130:13 170:14
216:23 237:13 239:22
279:25

**thing**
11:7 73:1 163:7 166:12
185:16 190:23 265:6

**things**
10:23 53:3 138:12
152:12 166:11 231:3
281:5,12,14,24

**think**
17:13 26:18 34:18
46:10 65:5 85:17 93:7
98:18 105:11 110:16
111:8,18 113:6,7
124:19 128:9 129:3
141:24 142:1 173:21
175:9 183:12 188:3
195:7 198:8 203:9
204:25 213:4 220:7
221:14 229:4 257:19
258:6 269:5 297:14

**third**
19:3 39:17,23 49:6
66:19 80:20 91:6
170:12,21 242:4,14,20
277:20

**thorough**
148:5

**Thorson**
88:21 127:11 128:13
132:12,17,25 133:4,11
134:2 136:2,3 138:7,19
139:5,23 142:18,20
143:8 144:12 145:2
147:4 149:9 150:1
151:3,5,22 152:1,6,13
154:8,11,14,25 158:24
159:6,22 161:2,7,11
163:11,20 164:2 165:3,
14 166:4 169:16,20
171:12,15,20 173:3,13
174:20 176:16,24
177:22 180:21 182:4,25
206:3,16,19 212:9
248:23

**Thorson's**
147:10

**thought**
49:23 50:12 97:24

113:9 154:23 159:17
163:9 185:12 203:7
221:15 234:4 295:3

**threaten**
300:12 301:5

**threatened**
196:21

**three**
29:21 52:14 53:2,3
62:19 63:16 107:10
137:5,7,8 141:4 154:9,
12 157:1,2,11 194:12
196:7 200:10 223:21,22
224:3 226:5,9 227:11
241:24 242:25 250:16,
17 252:12 293:11

**threshold**
176:12

**throw**
198:11

**throwing**
188:19

**tier**
235:15,24 236:3,7,11
237:20,24 238:3,6

**tiers**
223:10,11,19 224:9,13,
19 226:10 237:6

**Tim**
158:6 220:6,10,23
221:1 225:6 231:12
245:11 246:11

**time**
9:12 12:23 13:7,14 16:2
20:1,7,18,19 22:19
30:18,19,25 31:9 33:24
38:11,21 50:8,16 55:6,
9,12 63:1 67:12,17,20
68:7,12 75:14 77:14
84:14,19 85:1 88:22
94:25 95:4 98:6 104:17
109:21 110:5,15 111:7,
18 112:24,25 113:7,9
114:17,24 116:12
117:21 118:20 119:2,3
123:25 125:17,25
126:14 132:9 135:2
138:3,13,17,22,25
139:11,24 140:8,22
141:16 143:22 146:4

147:9 149:25 150:25
153:8,20 154:22 158:18
161:1,9,14,22 165:13
171:21 173:17,20
177:14,16,23 178:9
184:23 186:25 187:11
189:22 190:10 193:2
195:23 199:5,11,16,17
200:4,17 203:18,22
204:12 205:18 209:11
211:13 212:18,22
213:4,7,21 214:20
217:10 220:9 222:6,12,
14 225:1,4 226:12,16,
19,21 227:10,15,20
229:15 234:11 238:5,
17,22 240:7,25 241:21
245:5 246:2 248:3,12,
20 258:5,18,20,24
259:23 260:7 268:3
274:14,23 276:16
282:13,20 283:22,23
284:16 285:19 286:4
290:17 302:13,16 303:1

**timeline**
130:23

**times**
24:14 31:6,10,15 67:3
89:7,10 153:25 161:21
163:15 189:16 190:7
238:9 239:10 258:12
267:24

**timing**
235:5 263:17

**Tina**
124:1

**tips**
271:12,19

**title**
153:20 209:22,25
215:16 220:8 256:2
261:11,17 265:20

**titled**
58:19

**today**
9:13,25 13:2 21:12,18
34:1 135:11 140:20
179:4 205:10 206:8
220:4 247:15 268:18
284:10,11

**Today's**
9:11

**told**
18:21 117:16 118:13
124:7 152:12,13 153:12
154:8 163:17 173:7,13,
15,24 174:4,5 189:5
196:23 197:1 205:14
206:3,18 210:2 214:16,
23 215:23,24 217:8
218:9 220:18 221:13,22
222:1 223:21,22 224:2
225:12,19 226:2,16,22
227:6,10,23 230:23,24,
25 231:2,20 232:11
238:2 240:4 241:3
243:11 246:20 247:1,2,
15 265:6 268:23 269:5
289:6 292:25 294:8,10,
17 295:11

**ton**
192:13,15,18

**tone**
120:21,25

**tools**
271:12,19

**top**
56:19,24 58:18 72:7
76:5 78:18 80:19
102:25 106:8,10,16
107:18,20 120:21,25
129:20 136:19 157:16
191:22 212:7 241:4
242:5,13,20 243:18
267:12 277:11

**topic**
69:6 72:17 95:7 124:3
135:17 175:20 235:6
236:19 247:4 257:19,21

**topics**
244:5 252:9

**Toral**
95:22

**Toronto**
123:12 129:2

**total**
20:19 77:5 93:5,18
199:17 235:10

**totally**
65:8

**touch**
237:14 240:24

**tough**
216:19 217:9

**Traci**
212:25 213:3,12 219:8
225:22 233:12 239:18
256:21 257:16,18,19

**trailing**
237:15,17

**transaction**
75:8,16

**transactions**
210:7

**translation**
191:22 192:9,11 241:18
242:6,16

**transparency**
145:24 167:21 168:6

**treasury**
150:16

**treat**
81:1,8 82:1,16,22 83:3
127:22

**treated**
81:11

**treatment**
135:4 271:10,19,22

**trend**
251:6,16

**tried**
163:25 164:2 189:21
217:14,25 218:9

**trip**
191:23

**trouble**
188:18 198:6

**Trudy**
123:10 124:2

**true**
70:1,8 84:17,25 106:13
137:1 181:24 218:5
254:10

**Truilio**
290:24 291:12,21

**truly**
163:2 164:18

**trust**
198:15 274:9

**trusted**
158:15 198:18,24

**truth**
181:19

**truthful**
248:20

**truthfulness**
183:6

**try**
11:11 125:22 259:1

**trying**
18:14 145:20 207:24
219:2 283:22

**TS**
73:17

**Tuesday**
9:2

**turn**
32:19 40:22 57:10
60:17,23 63:6 95:7
100:2 101:24 103:3,14
107:17 120:11 136:18
175:15 183:9 187:10
191:19 209:1 212:17
215:25 243:12 299:21

**turnaround**
303:9

**turning**
43:20 47:5,10 63:11,15
96:17 99:16 100:7
139:21 212:24

**two**
15:1,2,13 20:8,19 28:6,
17 29:17 62:19 81:19
99:4 121:20 123:18,22
138:1 140:4 171:17
175:15 190:8 194:12
200:13,15 202:12,13
208:6 224:13,18 228:9,
11 229:17,24 230:8
242:8,10,11 247:7
250:16 269:24 278:3,7,
21 303:5

**two-page**

78:17 129:19

**Tye**
88:21 142:18 143:8
153:24 154:2 169:16
171:12

**type**
13:24 216:1 269:4
296:23

**typed**
106:10

**typically**
53:25 61:6 276:2

**Typo**
217:17

---

**U**

**U.S.**
199:15 224:17 238:14
243:24 245:12

**U.S.A.**
241:21 242:22

**ultimate**
29:10

**ultimately**
26:25 246:19

**ultimatum**
154:2,8

**umano**
192:9,12

**Umit**
95:18,20 210:13

**unable**
156:17

**unclear**
234:13

**uncovered**
210:8

**underneath**
131:18 149:2

**underscored**
172:6 174:10

**understand**
10:15 11:5,14 21:20
22:5 39:11 48:2,6 98:6
128:9 159:8 167:3

**DX1649-347**

Confidential
MAURO BOTTA - 09/25/2018
i44

170:2,19 196:9 203:24
204:2 206:4 209:14,18
211:6,10 227:14 248:9
280:11 281:22 287:18,
20 295:15 300:18

**understanding**
53:13 54:20 208:13
211:10,14 227:17
280:24

**understood**
10:24 19:5,10 36:21
41:16,20 42:17,24
44:12 45:1,10 50:5 57:1
85:23,24 86:9 154:21
202:19 211:16 226:9
297:18

**underutilized**
201:1,3,5,8

**underutilizing**
199:20

**unethical**
96:23

**unfounded**
198:10

**Unintelligible**
35:4

**Unit**
10:12 94:25 239:1

**United**
9:8

**units**
148:18

**unorganized**
161:17 284:19

**unprecedented**
151:24

**unreasonable**
172:22 210:16

**unresolved**
37:22 49:7

**untrue**
79:25 84:20 85:1

**update**
213:12

**updated**
102:13

**upfront**
219:17,24

**upload**
86:24

**uploaded**
253:20

**upset**
220:5

**use**
13:10,21,24 198:20
278:12

**Usta**
95:20

**utilization**
199:22 200:4,25
201:10,13,19

**utilized**
200:17,21,22,23 227:11
302:13

**V**

**vacation**
236:17,18

**Vague**
12:7,22 13:6,16 14:3,11
15:14 16:3,19 22:8
28:1,11,21 35:3,20
36:23 37:6 38:13 41:18
42:20 44:21 45:15 50:7,
15 51:25 57:23 59:17,
22 61:20 62:2 64:1,10
65:4 66:13,23 67:10
77:15 84:10,22 86:15,
21 87:5,13 94:12 110:9,
19 111:11 112:8 113:3,
16 116:7 139:3 140:2
167:18 168:11 169:3
184:3 186:9,16 187:19
188:1 197:23 253:25
272:2,8 281:17 289:21
298:12 302:4

**valid**
279:20,24

**validate**
128:18

**valuation**
73:20 74:15 75:19
81:21 82:9 96:5

**values**
245:18

**variable**
145:10

**various**
142:17

**varying**
24:18

**ventures**
32:9

**version**
17:1,4 131:22,25 132:1
133:2 137:8 179:1
191:21 239:11

**versus**
9:7 137:5

**Victor**
124:23

**video**
9:12,14

**VIDEOGRAPHER**
9:5,25 62:25 63:3 94:24
95:3 125:16,19 161:8,
13 238:21,25 285:3,6
302:24

**videotape**
9:5

**VIE**
145:11,14,16 146:16

**view**
43:22 115:8,20 116:2
150:19 154:9 164:24
168:18 186:6 189:13
200:2 201:14 204:21
208:8 220:3 235:11
289:18 302:12

**viewed**
158:12

**views**
40:10 41:25 42:10 44:4
142:21 143:15 155:16,
25 156:7,16 300:23
301:6

**violate**
168:5,13,15

**violated**
110:6,17 111:8,15,19

112:5 113:1,21,25
114:8,17 115:1,8,21
116:4,13 117:14 138:25
167:16,21 168:8,19
169:1 272:19

**violating**
28:8,19 50:13 115:1

**violation**
113:10 115:9 139:10

**violations**
117:24 119:11 168:22

**vision**
269:20

**voice-identify**
9:17

**Voltaire**
229:23

**Volume**
302:25

**volunteered**
221:11

**VP**
73:19

**Vykintas**
124:18 125:11

**W**

**W-A-R-D**
225:23

**wages**
292:5,17

**wait**
11:12 78:8 105:20

**waiting**
216:19 268:1

**walk**
228:1

**walk-through**
175:25 176:19 177:5
179:10 180:15 182:13
255:9

**walked**
236:15

**wall**
192:3

DX1649-348

**Wallace**
215:13,15,18,24 216:2,
22 217:4 218:8

**want**
14:12,18,21 24:5 39:17
46:25 70:5 82:20 87:20
90:10 91:3 93:21 95:7
105:21 118:10 164:4
165:15 177:2 187:10
196:9 198:20 204:2
207:9 209:1 265:3
274:18 284:17 295:2
300:6,25 301:14 303:6

**wanted**
163:19 196:24 197:1
198:9 232:15

**Ward**
225:23 233:13

**warranted**
85:18

**wasn't**
178:25 287:7

**waste**
283:22

**wasting**
283:23

**water**
157:16

**Watson**
106:5,17,18 107:15

**way**
113:9 115:21 116:2
120:12 133:20 136:1
155:5 174:5 175:4
196:11 216:12 232:20
234:1,15 244:21 246:22
247:11 256:16 269:5
272:18 274:23 275:15
280:22 288:8 293:4

**ways**
35:23

**we'd**
161:18

**we'll**
46:17,21 62:23 64:21
65:23 66:4 70:14 92:4,5
109:14 112:19 204:8
230:14 281:9,13

**we're**
32:20 47:2 55:19 57:6
62:25 63:3 68:23 89:14
90:14 92:6 94:22,25
95:4 99:3 105:11,18
125:16,19 161:8,14
172:2 186:18 193:16
238:22 239:1 282:16,
23,25 283:3,6,15,17,19,
21,24 284:1,7,8,9,10,14
285:3,6

**we've**
93:16 161:16,21 200:24
284:7,13

**weakness**
25:2,18,19,22 26:4
27:2,17,21,25 28:7,18
97:6,25 98:7,11,12,21,
25 103:23 104:12,22
105:2 111:24 113:23,24
126:25 127:4 150:13,19
159:18 162:17 173:5

**weaknesses**
96:4,23 97:3 108:18,23
126:1 187:17,21

**web**
61:16

**webcast**
240:3

**website**
47:9

**week**
18:24 89:7,10 225:7
230:3,5,8 234:18 235:6
270:11

**weeks**
18:24 144:10,14 260:16

**went**
108:6 117:16 118:11
153:23 206:9 223:11

**weren't**
208:8 226:23

**what's**
15:6 33:22,25 52:9 69:4
74:1 111:21 135:20
137:22 174:22 182:1,22
186:13 217:6 252:1
280:13,23

**whistle**

117:4,11,18 118:8,11
119:8,23

**whistleblower**
116:21,25 253:10
256:10,14,23

**whistleblowing**
49:15 50:1,14 196:3
256:4

**white**
188:16,24 189:2,6,14,
16

**who's**
18:3 65:18 220:6

**Whoa**
173:20

**Whoops**
68:23

**wildly**
190:24

**willing**
231:8

**witness**
10:3 11:20 12:8,24 13:8
14:5,20 16:5 17:1 22:3,
25 23:9,14,21 24:2
25:22 28:23 31:18
35:22 36:24 38:15
40:20 41:20 42:22
48:17 52:2 57:25 59:19,
24 60:8 61:22 62:3
64:12,19 67:12 69:19
71:3 74:24 81:13 83:25
86:17,23 87:7 90:15,19
92:18 98:2,17,20
101:10 111:21 113:17
114:11 115:16 119:15
125:4 127:3 139:4
140:3,12 141:7,20
142:1,9 151:12 167:20
168:2,12 169:5,10
175:12 179:14,20 184:6
185:5 186:10 198:1
213:7 239:7 240:23
243:24 261:1 263:15
270:18 271:16 272:4,15
276:16 279:12 282:10,
22 286:2,9,22 287:9
290:4,11,20 291:12
292:4 294:25 300:25
301:11 302:7

**witnessed**
122:15

**won't**
85:19,24 86:3,7

**word**
82:13 192:25 250:17
276:10,12,13,14,19,22
280:24

**words**
49:4 72:14 152:24
153:1 159:24 177:5
181:17,18 191:5 192:11
219:20,25 221:24
252:20,22 253:1 278:8,
12 301:4

**work**
12:6 35:19 51:15,16,23
59:9 69:7,20,24 70:12,
14 72:5,15 88:25 93:3
94:22 109:21 142:14
147:13,16,20 150:21
160:10,15 162:10
166:5,25 183:23
184:10,14,24 185:13,14
196:19,22 200:16
213:17 214:11,14 228:7
246:2,5 258:21 261:4,
10,17 263:20 266:5
267:5,6 268:7 279:17
280:16 281:16 286:4
287:23 290:7,17 293:19
294:12,14 296:11,12,13
297:2 298:6 299:4
302:1

**worked**
13:10 30:21 77:5
219:15,22 220:3 256:7
258:5,18,25 266:8
286:23 293:16,17,20
297:7

**working**
30:16 88:15 90:9,24
91:2 117:5 131:18
198:2 223:4,25 268:11
289:17 293:25 302:2

**workplace**
109:19

**works**
296:19

**worry**
156:21

**DX1649-349**

Confidential
MAURO BOTTA - 09/25/2018                                i46

**worthless**
222:2

**wouldn't**
33:14 34:21 52:8 70:5
85:25 86:1 146:12
154:7 166:21 173:21
174:21 191:10 195:20
218:6 259:13 288:17
295:19 297:5 300:25

**write**
86:3,7 102:11,18 104:8
107:1 142:21 143:14
148:15 149:6 150:10
166:24 195:21 239:19
240:6 241:6 244:3
252:13 274:7 275:5,14

**write-down**
142:6

**write-up**
83:19 84:7

**writes**
83:17 84:5 274:17
300:5

**writing**
46:23 72:16,19 83:2
85:23 156:15 165:25
185:14 186:20,22,24
190:17 196:24 197:4
260:18 282:6 299:25

**written**
41:20 101:11 289:14
301:11,13

**wrong**
46:10 198:10

**wrote**
46:15,18 72:11,23 73:6
80:9 85:15,20 86:4,9
105:2 107:5 108:14
136:3 151:20,23 159:21
168:3 177:4,14,16,21,
23 190:23 191:1,9
193:25 194:23 241:19
244:12 245:5 250:25
251:11,12,13 252:25
253:19 255:16 274:19
275:17 278:24 301:2,16

**X**

**XPLIANT**

127:9,12,17,19,22,23
142:5 145:17,19 146:2

**Y**

**Y-K-I-N-T-A-S**
124:23

**Y-U-K-O**
286:17

**yeah**
14:14 17:12 21:25
31:22 37:13 46:22
58:18 60:22 89:21 91:9
92:21 94:4 96:16 106:6
121:11 160:13 163:6
186:13 195:14 199:1
200:9 208:10 228:11
238:10 249:14 256:17
270:18 276:19 277:5
295:2,6

**year**
17:12 29:6 68:11,15
77:9 96:4 101:6,7
179:10 199:4 200:8,9
203:13 210:7,21 223:9
226:3 233:3 235:17,18
237:12 238:8,12 241:23
242:23 263:11

**year-end**
202:7 210:14

**years**
32:6,10 54:7,22 55:11
68:3,9 77:5,13 86:5
127:10 138:1 140:5
189:10 191:9 199:15
223:19 224:3,9,13,17
226:5,10 240:20 241:24
242:25

**Yegor**
9:23

**Yep**
254:17

**yeses**
91:13

**you'd**
193:11 220:10 225:19

**you'll**
39:11 120:13 162:7

**you're**
26:12 30:21 39:14
56:17 60:21 62:14
64:22 65:17 66:5 99:17
109:12 112:10,15
121:12 122:11 124:19
128:9 132:4,21 141:6
145:16 146:21 147:18
152:20 186:3 189:2
190:21 211:13,14
214:24 224:21 226:25
229:5 235:21 239:25
265:18 266:4 267:4,8
275:19 277:15 282:23,
24 283:22 284:11,20
292:9 298:7 302:12

**you've**
55:8 87:20 119:1,5
132:15 135:12 137:7
149:10 168:8 174:18
179:17 190:12 200:24
209:5 229:6 266:9
275:10 284:18 290:7,17
301:18

**Young**
259:12 290:24

**Yuko**
286:17

**Z**

**Zhone**
230:25

**DX1649-350**