# DX1701

United States District Court

Northern District of California

San Francisco Division

*Mauro Botta vs. PricewaterhouseCoopers LLP, et al.*

(Civil Case No: 3:18-cv-2615)

Expert Report of Jason S. Flemmons, CPA, CFE, CFF

February 1, 2019

1

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-1**

# Table of Contents

I.   **EXPERT DISCLOSURES** ........................................................................................3
    A. Nature of Assignment ................................................................................3
    B. Qualifications and Prior Testimony ..........................................................4
    C. Documents, Materials, and Data Considered ...........................................6

II.  **SUMMARY OF OPINIONS** ..............................................................................6

III. **BASIS FOR OPINIONS AND ANALYSIS** .......................................................7
    A. PwC reasonably concluded that a control deficiency related to Cavium's accounting for a new financing arrangement did not constitute a material weakness as of December 31, 2013 ...........................................................................................8
    B. While I am not aware of evidence demonstrating that Cavium received or adopted PwC's accounting memorandum, had PwC provided its memorandum to management it would not constitute unethical practice or violations of professional standards .........................................................................................17
    C. PwC reasonably concluded that the aggregated effect of Cavium's internal control deficiencies identified as of December 31, 2014 did not constitute a material weakness .....................................................................................20
    D. The sampling procedures utilized during PwC's audit of service and support revenue were reasonable and complied with applicable professional standards ............29
    E. Botta does not demonstrate that the competence of Harmonic's finance department presented a material weakness, and PwC reasonably concluded that the aggregated effect of the identified control deficiencies did not constitute a material weakness, as of December 31, 2015 ...........................................................................36

IV. **SIGNATURE AND RIGHT TO MODIFY** ............................................................39

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-2**

## I.  **EXPERT DISCLOSURES**

### A.  **Nature of Assignment**

1.  This report is submitted for use in the captioned matter.  I have been engaged by Hueston Hennigan LLP, counsel for PricewaterhouseCoopers LLP ("PwC" or "the Firm"), in connection with the captioned matter.

2.  I understand that Mauro Botta ("Plaintiff" or "Botta"), a former PwC employee, filed a complaint (the "Botta Complaint") on May 3, 2018 against PwC and seven of its current and former partners ("Defendants").[1]  Plaintiff made various allegations related to certain audit and other work performed by PwC in which Plaintiff was involved pertaining to three of PwC's audit clients.  Specifically, Plaintiff's allegations relate to a peer review of Covad Communications Group, Inc., and audit work for both Cavium, Inc. ("Cavium") and Harmonic Inc. ("Harmonic"), which I understand are referred to in the Botta Complaint as "Company A", "Company B" and "Company C", respectively.  Plaintiff is seeking relief for Defendants' alleged violations of various federal and state laws related to Plaintiff's termination of employment with PwC.

3.  I have been asked by counsel to evaluate Plaintiff's claims related to PwC's audit work for Harmonic and Cavium and to assess whether such work and conclusions complied with applicable professional standards.

---

[1] See In re Mauro Botta v. PricewaterhouseCoopers LLP, et al., complaint dated May 3, 2018, Civil Case No: 3:18-cv-2615.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-3**

### B.    Qualifications and Prior Testimony

4.    I am a Senior Managing Director in the Investigations and Accounting Advisory practice of Ankura Consulting Group, LLC ("Ankura"), where I specialize in complex accounting, auditing, and financial reporting matters.  I have over 20 years of experience as an auditor, regulator, forensic accountant and accounting consultant.  I provide a broad range of expert and consulting services involving corporate investigations, accounting advisory, auditor liability, fraud examination, dispute resolution, and other services.  I am a Certified Public Accountant ("CPA"), a Certified Fraud Examiner ("CFE"), and am credentialed by the AICPA as Certified in Financial Forensics ("CFF").

5.    Prior to joining Ankura in May 2016, I was a Senior Managing Director in the Forensic Accounting and Advisory Services practice at FTI Consulting, Inc., from December 2012 to May 2016.

6.    Before that, I served for 12 years in the Division of Enforcement's Office of Chief Accountant at the Washington, D.C. headquarters of the U.S. Securities and Exchange Commission ("SEC").  During my tenure at the SEC, I was employed in four positions of increasing responsibility, ultimately as the Deputy Chief Accountant of the SEC's Division of Enforcement.  My roles entailed supervising and performing numerous accounting and financial reporting investigations involving SEC registrants, senior executives, external auditors, and other third parties.  I routinely consulted with SEC enforcement teams across the country to assess auditors' compliance with professional standards, including the standards of the Public Company Accounting Oversight Board ("PCAOB"), and advised

4

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

SEC enforcement teams regarding which matters to recommend enforcement actions under the SEC's Rules of Practice.[2]

7.      In addition, I co-chaired the Division of Enforcement's Cross Border Working Group, which coordinated numerous investigations involving accounting and auditing matters concerning issuers and auditors located in foreign jurisdictions.

8.      Before my service at the SEC, I performed and supervised forensic accounting and litigation support engagements, including auditor liability matters, as a manager in PwC's Financial Advisory Services practice.  Before that, I worked in the Audit and Business Advisory Services practice of Price Waterhouse LLP, where I performed financial statement audits of both publicly-traded and privately-held companies in a variety of industries located in the United States and overseas.

9.      In 2015, I was appointed to the ten-member Executive Committee of the American Institute of Certified Public Accountants ("AICPA") Forensic and Valuation Services section.  This Committee is responsible for establishing all standards and guidance for practitioners in the forensic accounting and valuation services industry, including those that are CFFs or Accredited in Business Valuations.  Since 2012, I have also been one of the five members of AICPA's Fraud Task Force, which provides fraud detection, investigation, and prevention information to AICPA members.  I am a frequent speaker at SEC enforcement, accounting, and forensic accounting conferences.  A copy of my curriculum vitae, which includes my prior testimony and all publications I have authored or co-authored in the past ten years, is attached as Exhibit 1 to this report.

---

[2] Specifically, the *Suspension and Disbarment* provisions of Rule 102(e) which provide the SEC with authority to permanently or temporarily bar an accountant from appearing or practicing before the SEC for engaging in improper professional conduct.

5

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

### C.  Documents, Materials, and Data Considered

10.  In performing this engagement, I, and Ankura staff members working under my direct supervision, considered the documents, testimony transcripts and other data set forth in Exhibit 2 to this report.  The opinions and conclusions throughout this report are based on a review of the documents, testimony transcripts, and other data I considered, as well as my knowledge, training, and experience.

11.  My firm bills fees and expenses in this matter based on hourly rates and expenses incurred. Ankura is being compensated for my time at a rate of $790 per hour.  No portion of my firm's compensation is dependent on my conclusions or the outcome of this matter.

12.  I performed this engagement in accordance with the AICPA Statement on Standards for Consulting Services No. 1 – *Consulting Services: Definitions and Standards* ("SSCS No. 1")[3] and the AICPA Code of Professional Conduct.[4]

## II.  SUMMARY OF OPINIONS

*PwC's Audits of Cavium for Fiscal Years December 31, 2013 and 2014*

**A. PwC reasonably concluded that a control deficiency related to Cavium's accounting for a new financing arrangement did not constitute a material weakness as of December 31, 2013.**

**B. While I am not aware of evidence demonstrating that Cavium received or adopted PwC's accounting memorandum, had PwC provided its memorandum to management it would not constitute unethical practice or violations of professional standards.**

---

[3] SSCS No. 1 is also referred to in codified form as Consulting Services Section 100, or CS Section 100.

[4] The AICPA Code of Professional Conduct was revised effective December 15, 2014 and is codified in ET Sections 0.100.010 through 3.400.100.

6

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

C. **PwC reasonably concluded that the aggregated effect of Cavium's internal control deficiencies identified as of December 31, 2014 did not constitute a material weakness.**

*PwC's Audit of Harmonic for Fiscal Year December 31, 2015*

D. **The sampling procedures utilized during PwC's audit of service and support revenue were reasonable and complied with applicable professional standards.**

E. **Botta does not demonstrate that the competence of Harmonic's finance department presented a material weakness, and PwC reasonably concluded that the aggregated effect of the identified control deficiencies did not constitute a material weakness, as of December 31, 2015.**

III. **BASIS FOR OPINIONS AND ANALYSIS**

*PwC's Audits of Cavium for Fiscal Years December 31, 2013 and 2014*

13.  The Botta Compliant raises allegations concerning PwC's audit work for Cavium in connection with PwC's year-end audits for fiscal years December 31, 2013 and 2014.[5] Cavium is a provider of highly integrated semiconductor processors that enable intelligent networking, communications, storage, video and security applications.[6]

14.  Botta served as the senior manager on the Cavium audits for the years ended December 31, 2012, 2013 and 2014, and reported to the engagement partner, Tye Thorson ("Thorson").[7] Botta was first assigned to the Cavium engagement during PwC's quarterly review for the

---

[5] Botta Complaint at par. 28-44.
[6] PwC national office accounting consultation on convertible debt memorandum dated February 21, 2014 ("Cavium Accounting Consultation Memo").
[7] Deposition of Mauro Botta, September 25, 2018, at p. 88.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-7**

second quarter of fiscal year December 31, 2012.[8]  PwC has been the auditor of Cavium since at least 2007.[9]

15.    Botta alleges that PwC's conclusions concerning Cavium's internal controls during the 2013 and 2014 audits were inaccurate related to the company's treasury, income taxes and technical accounting functions.[10]  The Botta Complaint also alleges that PwC engaged in unethical conduct by sharing certain documentation with Cavium during the audit.[11]  Botta also makes broad allegations relating to PwC's conclusion as to the competency of Cavium's accounting and finance staff.[12]

A.    **PwC reasonably concluded that a control deficiency related to Cavium's accounting for a new financing arrangement did not constitute a material weakness as of December 31, 2013.**

16.    The Botta Complaint alleges that Cavium entered into a contract in 2013 and "had no idea that the contract signed was a derivative."[13]  Botta claims that this failure presented a material weakness in Cavium's internal controls as of December 31, 2013.

17.    On or about May 2012, Cavium made an initial debt investment in Xpliant, Inc. ("Xpliant"), an entity that was developing a new chip technology that Cavium planned to incorporate into its next generation chip.[14]  This debt investment was convertible into equity of Xpliant under certain conditions.[15]  Cavium subsequently entered into additional

---

[8] *Id.*

[9] See PwC's audit report dated March 10, 2008 included with Cavium's Form 10-K for the year-end December 31, 2007.

[10] Botta Complaint at par. 37-38; Exhibit 27 to Deposition of Mauro Botta, September 25, 2018 (PwC_B00000390 - PwC_B00000398).

[11] Botta Complaint at par. 35-37.

[12] *Id* at par. 34-38; Exhibit 27 to Deposition of Mauro Botta, September 25, 2018 (PwC_B00000390 - PwC_B00000398).

[13] Botta Complaint at par. 34.

[14] Cavium Accounting Consultation Memo.

[15] See memo from 2012 year-end audit workpapers, *Cavium, Inc. ("Cavium") – Consolidation Assessment of Xpliant, Inc.*, at p. 1.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

agreements with Xpliant for additional financing, voting interests, and real estate licensing fees.[16]

18.   Xpliant's financial results were included in Cavium's consolidated financial statements given relevant accounting requirements pertaining to variable interest entities ("VIE").[17]

19.   In the third quarter of 2013, Xpliant entered into an additional financing agreement under which it issued a convertible note with the Parikh Family Trust ("Parikh") for $1.4 million.[18]  The convertible note reflected a loan to Xpliant from Parikh that under certain conditions could be converted into equity of Xpliant.

20.   Shortly thereafter, in the fourth quarter of 2013, Parikh approached Xpliant with the intent of negotiating an exchange of the convertible note for a convertible security, which resulted in Xpliant converting its debt investment into an equity investment.[19]  This new agreement resulted in the issuance of a convertible security to Parikh for $2.9 million, the cancellation of the existing $1.4 million convertible note, and a payment of $1.5 million by Parikh to Xpliant.  The convertible security contained embedded derivatives[20] that did not exist in previous agreements.  The net effect of this transaction was that Xpliant essentially agreed to issue equity instead of debt in exchange for an additional $1.5 million.

21.   Both the extinguishment of the convertible note and issuance of the convertible security required further evaluation to determine what, if any, accounting implications were

---

[16] *Id.*

[17] *Id* at p. 2-3.  Cavium concluded that it met the criteria as "primary beneficiary" due to the size of its investment relative to other investors, Cavium possessing an option to purchase all of Xpliant's assets and Cavium's debt investment being secured by a lien on Xpliant's assets.

[18] Cavium Accounting Consultation Memo.

[19] *Id.*

[20] Relevant accounting standards define an embedded derivative as "Implicit or explicit terms that affect some or all of the cash flows or the value of other exchanges required by a contract in a manner similar to a derivative instrument."  (Accounting Standards Codification Master Glossary).

9

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

triggered by the embedded derivatives.[21] This transaction raised technical accounting questions during the year-end audit for 2013 as to the appropriate manner to account for this transaction. Cavium drafted an accounting analysis and provided it to PwC.[22]

22. Given the complexity of the relevant accounting at issue, the PwC engagement team performed a more detailed accounting analysis and consulted PwC's national office when assessing the company's accounting for the transaction.[23]

23. PwC concluded that Cavium's accounting was correct but that the analysis undertaken by the company was not robustly documented.[24] Specifically, PwC noted that the agreement between Xpliant and Parikh entered into in the fourth quarter of 2013 was identified by Cavium but the accounting analysis was inadequate. PwC concluded that this issue constituted a control deficiency as of December 31, 2013 and documented the following in its workpapers:

> "Subsequent to Q4'13 contract review, management identified that the analysis of one of the contract -Xpliant convertible equity security agreement was incomplete. Management determined subsequently to the control activity that the equity security has derivative features which are required to be reviewed. Thus, noted the accounting analysis was not complete for contract matrix as of Q4'13."[25]

---

[21] As mentioned above, Xpliant is a consolidated entity of Cavium. Thus, Xpliant's financing arrangements with Parikh were reported on Cavium's consolidated financial statements.
[22] Cavium memorandum, *Accounting for Convertible Notes and Convertible Security of Xpliant*, dated February 21, 2014 (PwC_043969 – PwC_043971).
[23] Cavium Accounting Consultation Memo. Note that PwC's national office is comprised of senior technical advisors that provide consultations on complex accounting and auditing matters that arise on audit engagements.
[24] Thorson response to Botta Summary Memo. (PwC_B00001662 – PwC_B00001676 at PwC_B00001669).
[25] FY 2013 SAD. See deficiency number 4.

10

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

*Applicable Standards and Analysis*

24. Relevant auditing standards provide three different levels of severity for control deficiencies: 1) deficiency, 2) significant deficiency, and 3) material weakness.[26]   A deficiency is the least severe of internal control issues and "exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis." All deficiencies should be communicated by the auditor to management and the audit committee should be informed when that communication has occurred.[27]

25. A significant deficiency is "a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting."[28]   Any significant deficiencies identified must be communicated to the audit committee in writing.[29]   Significant deficiencies are not required to be disclosed in public filings.

26. A material weakness is "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[30]   Unlike significant deficiencies, material weaknesses must be disclosed to both the audit committee and in a company's public filings.  In addition, the existence of a material weakness renders a company's internal control over financial

---

[26] PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, ("AS No. 5") at par. A3, A7, A11.
[27] *Id* at par. 81.
[28] *Id* at par. A11.
[29] *Id* at par. 80.
[30] *Id* at par. A7.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

reporting to be ineffective.  When this occurs, auditors are required to issue an adverse opinion as to the effectiveness of internal control.[31]

27.     AS No. 5 states "The auditor must evaluate the severity of each control deficiency that comes to his or her attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of management's assessment."[32]

28.     AS No. 5 describes factors that should be considered by auditors when evaluating the severity of control deficiencies, including whether a material weakness exists. Specifically, AS No. 5 identifies the following as indicators of material weaknesses in internal control over financial reporting: (i) identification of fraud, whether or not material, on the part of senior management;[33] (ii) restatement of previously issued financial statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.[34]

29.     AS No. 5 states "When evaluating the severity of a deficiency, or combination of deficiencies, the auditor also should determine the level of detail and degree of assurance that would satisfy prudent officials in the conduct of their own affairs that they have

---

[31] *Id* at par. 90.
[32] *Id* at par. 62.
[33] *Id* at footnote 14 which states "for purposes of this indicator, the term "senior management" includes the principal executive and financial officers signing the company's certifications as required under Section 302 of the Act as well as any other members of senior management who play a significant role in the company's financial reporting process."
[34] *Id* at par. 69.

12

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with generally accepted accounting principles."[35]

30.     Auditors are also required to use their judgment in interpreting the results of audit testing and evaluating audit evidence.[36]   Crucially, there is no bright line distinguishing a significant deficiency from a material weakness.   To the contrary, SEC guidance emphasizes that this is an area of significant judgment.   The SEC has declared, "[w]e believe *judgment is imperative* in determining whether a deficiency is a material weakness and *that the guidance should encourage management to use that judgment.*" [37]

31.     The framework that is widely accepted by the SEC, public companies and auditors by which to perform and evaluate internal control assessments is the Committee of Sponsoring Organizations of the Treadway Commission, Internal Control-Integrated Framework ("COSO Framework").[38]   PwC's audit opinion for Cavium's fiscal year 2013 financial statements references this framework.[39]   The COSO Framework states:

> "...deciding whether an internal control deficiency is a material weakness requires both a detailed understanding of the relevant facts and circumstances and a *considerable amount of judgment*. Accordingly, a judgment that a material weakness exists cannot be made in the abstract.   A particular situation may be deemed a material weakness for one entity but not for another, depending on the industry, the products or services being produced or the presence of other controls, to name just a few reasons. Because of differences in control systems established to achieve financial reporting objectives and facts and circumstances related to a particular situation for an entity, examples may be the best way to illustrate how

---

[35] *Id* at par. 70.
[36] PCAOB Interim Auditing Standard AU 230, Due Professional Care in the Performance of Work, at par. 11.
[37] Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934" (issued 6/20/07) at 71 (emphasis added), *available at* https://www.sec.gov/rules/interp/2007/33-8810.pdf.
[38] Committee of Sponsoring Organizations of the Treadway Commission, Internal Control-Integrated Framework (1992 and 1994).
[39] See PwC's audit report dated February 24, 2014 included with Cavium's Form 10-K for the year-end December 31, 2013.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

management can know a material weakness when it sees it. Several such examples are presented to illustrate the thought process one might go through."[40]

32.  The COSO Framework continues:

"Although the material weakness threshold is the relevant one for public reporting on internal control, the reader should not expect any easy answer to the question, "How do I know a material weakness when I see one?" Unfortunately, the process of making that determination cannot be expressed in only quantitative terms. *Considerable judgment* is needed that takes into account all of the facts and circumstances in a particular case. The concepts of both materiality and material weakness have long been debated. While the discussion here will not end the debate, it may provide some additional guidance."[41]

33.  Both Botta and Thorson acknowledged that this accounting issue was a highly technical matter.  For example, Botta states during his deposition "It was a very complex instrument that, even per our national [office], they stated that they did not come across such an instrument before."[42]

34.  Using their judgment, the PwC engagement team sought to consult with PwC's national office with respect to the relevant accounting treatment.  Both the PwC engagement team and PwC's national office concluded that Cavium correctly accounted for the transaction.[43]

35.  In determining whether this deficiency constituted a material weakness, the following criteria was evaluated by PwC: (i) is the likelihood of a misstatement resulting from the deficiency at least reasonably possible; (ii) is the magnitude of the potential misstatement, which is at least reasonably possible (considering quantitative and qualitative factors) material to either the interim or annual financial statements; (iii) is the deficiency important enough to merit attention by those responsible for oversight of the company's financial reporting; and (iv) would a well-informed, competent and objective individual; (i.e.

---

[40] COSO Framework at p. 144 (emphasis added).
[41] *Id* at p. 142 (emphasis added).
[42] Deposition of Mauro Botta, September 25, 2018, at p. 128
[43] Thorson response to Botta Summary Memo (PwC_B00001662 – PwC_B00001676 at PwC_B00001669).

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-14**

prudent official) conclude the deficiency is a material weakness.[44]   These criteria are consistent with the requirements included AS No. 5.

36.   PwC exercised reasonable professional judgment on this complex issue in concluding that the identified control deficiency did not rise to the level of a material weakness.  First, the accounting treatment applied by Cavium was deemed to be correct by PwC's national office.  Second, when considering whether a prudent official would conclude that this deficiency was a material weakness, as required by AS No. 5, PwC believed that the likelihood of this issue recurring was low, which supported the conclusion that a material weakness did not exist.  PwC's year-end 2013 SAD stated:

> "the analysis of non-revenue contracts are unlikely to cause a material weakness as the Company generally does not enter into non standard or complex terms for the contracts."[45]

37.   Importantly, Botta signed off on the SAD and other workpapers relating to the internal control audit work performed by him and the rest of the PwC audit team.[46]  Given Botta's role as senior manager on the engagement, his sign-offs are significant.  PwC's policies require that managers are responsible for ensuring that "all work is appropriately and completely performed and reviewed" and that "the work performed, and the evidence obtained, supports the conclusions reached and the opinion given."[47]  PwC's policies also require that the senior manager "Be satisfied that the work performed and the supporting documentation is in accordance with professional and Firm requirements."[48]  Managers

---

[44] FY 2013 SAD.
[45] Id.
[46] Id.  Examples of other related workpapers signed off on by Botta include the engagement leader and manager checklist, the Cavium Accounting Consultation Memo and the Audit Results Communications to the Audit Committee.
[47] PwC policy 2023 at p. 4.
[48] PwC policy 2570.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

represent that these policies have been complied with by signing off on corresponding representations in the engagement leader and management checklist, which Botta signed off on for the Cavium 2013 audit.[49]

38.   To the extent Botta disagreed with the conclusions concerning the severity of the control deficiency, not only was Botta prohibited from signing off on the conclusions reached, but PwC's policies also contained guidance on how managers should address any differences of opinions encountered on their engagements:

> "In applying due professional care, each engagement team member has a responsibility to bring to the attention of appropriate persons, disagreements or concerns the engagement team member might have with respect to accounting and auditing issues that he or she believes are of significance to the financial statements or our report regardless of how those disagreements or concerns may have arisen… If there is an unresolved difference of opinion regarding important matters between audit team members, or between the manager/team members and the engagement leader, the Firm's policy on resolving differences in professional opinion should be followed…"[50]

39.   The policy continues:

> "Where the unresolved difference relates to a concern that there is failure to comply with appropriate professional, regulatory and legal requirements or PwC's own systems of quality control, and which a team member considers he/she cannot discuss with the engagement leader, the team member may follow the Firm's whistle blowing processes. The audit report should not be issued until the matter is resolved."[51]

40.   PCAOB Auditing Standards contain similar requirements:

> "The auditor must document significant findings or issues, actions taken to address them (including additional evidence obtained), and the basis for the conclusions reached in connection with each engagement.  Significant findings or issues are substantive matters that are important to the procedures performed, evidence obtained, or conclusions reached, and include, but are not limited to, the following: …Disagreements among members of the engagement team or with others consulted on the engagement about final conclusions reached on significant accounting or auditing matters, including the basis for the final resolution of those disagreements.

---

[49] PwC_B00006158 – PwC_B00006168 at pp. 10-11.
[50] PwC's policy No. 2023, *Manager*, at p. 5 (Differences of Opinion).
[51] *Id.*

16

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

If an engagement team member disagrees with the final conclusions reached, he or she should document that disagreement." [52]

41.   Finally, PwC's policies provide that "the firm does not expect professionals to accept a position that they cannot agree with" and provides an option for removing oneself from the engagement.[53]  Botta also acknowledges that he could have used the firm's whistleblower process.[54]  Despite his acknowledgement of these policies, Botta elected not to document disagreement with PwC's final conclusions, not to remove himself from the engagement and not to utilize the firm's whistleblower policies at the time of the audit.[55]

42.   Botta's complaint offers no compelling evidence to support his claim that a material weakness should have been issued.  To the contrary, PwC's evaluation of the internal control deficiency discussed above was reasonable and complied with applicable professional standards.  By signing off on audit completion documents, and not documenting any disagreements with PwC's conclusions, Botta represented that PwC performed its work in accordance with professional standards and PwC policy.

**B.**   **While I am not aware of evidence demonstrating that Cavium received or adopted PwC's accounting memorandum, had PwC provided its memorandum to management it would not constitute unethical practice or violations of professional standards.**

43.   Botta alleges that in connection with PwC's 2013 audit and its analysis of Cavium's accounting for the embedded derivative contract discussed above, Thorson instructed another audit manager, Mayank Gupta ("Gupta"), to provide PwC's written accounting analysis to Cavium by "leav[ing] it on a [cubicle]" at Cavium so that the company could

---

[52] PCAOB Auditing Standard No. 3, *Audit Documentation*, at par. 12(d).
[53] PwC policy no. 2710, *Resolving Differences*, at p. 2.
[54] Deposition of Mauro Botta, September 25, 2018, p. 50.
[55] *Id* at pp. 155-156.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-17**

"find the memo and make it their own."[56]  Botta suggests that this constituted "unethical practice."[57]

44.     As a threshold point, both Cavium and PwC produced separate memoranda related to the accounting for the contract.  The company's analysis was provided to PwC on or around February 21, 2014 and consisted of less than three pages.[58]  In contrast, PwC's memorandum consists of 12 pages and bears no resemblance in form or content to Cavium's analysis.[59]  I am not aware of evidence indicating that Cavium was provided with, or adopted, PwC's analysis.  In fact, Botta acknowledged in sworn testimony that he was not aware of whether Gupta actually provided PwC's memorandum to Cavium.[60]

45.     Despite the stark differences between the two memoranda, I have considered whether any violations of professional standards would have occurred had PwC provided its analysis to Cavium.  Specifically, given Botta's reference to alleged "unethical practice," I have evaluated Botta's allegation through the lens of the auditor independence standards which are part of the ethics standards that apply to auditors.

### *Applicable Standards and Analysis*

46.     PCAOB Interim Ethics Standard, ET Section 101 ("ET 101"), states "A member in public practice shall be independent in the performance of professional services as required by standards promulgated by bodies designated by Council."[61]  ET 101 identifies certain activities or services that either impair or do not impair an auditor's independence.  One

---

[56] Botta Complaint at par. 35-36.
[57] *Id* at par. 37.
[58] Cavium memorandum, *Accounting for Convertible Notes and Convertible Security of Xpliant*, dated February 21, 2014 (PwC_043969 – PwC_043971).
[59] Cavium Accounting Consultation Memo. This memo appears to have been finalized on or around February 24, 2014.  See PwC_B00000483 -B00000485.
[60] Deposition of Mauro Botta, September 25, 2018, at p. 133.
[61] ET 101 at par. 1.

18

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

such activity that would impair independence is "preparing source documents or originating data, in electronic or other form, evidencing the occurrence of a transaction (for example purchase orders, payroll time records, and customer orders)."[62]   A footnote attached to this provision elaborates further on what is meant by "source documents":

> "The documents upon which evidence of an accounting transaction are initially recorded.  Source documents are often followed by the creation of many additional records and reports, which do not, however, qualify as initial recordings.  Examples of source documents are purchase orders, payroll time cards, and customer orders."[63]

47.   The SEC's auditor independence requirements contain similar prohibitions.  Specifically, Rule 2-01 of Regulation S-X indicates that non-audit services such as "preparing or originating source data underlying the audit client's financial statements" would impair an auditor's independence.[64]

48.   Based on the independence standards cited above, the mere action of an auditor sharing a written accounting analysis with its client would not violate the ethics standards that apply to auditors.  Such an analysis does not constitute a "source document" as defined by ET 101 because it does not constitute evidence upon which the initial recording of the transaction was based.  Rather, the memorandum was prepared by PwC during the 2013 audit, well after the initial accounting for the transaction was recorded by Cavium.  At most, and even assuming PwC's memorandum was provided to Cavium, this document was consistent with the type of "additional record" that ET 101 describes as not qualifying as supporting initial recordings because it followed the preparation of source documents

---

[62] *Id* at par. 5.
[63] *Id* at footnote 4.
[64] Rule 2-01(c)(4)(i)(C) of Regulation S-X.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

that gave rise to the transaction and the initial recording, such as the underlying financing agreement.

49.    PwC's internal independence policies also acknowledge the permissibility of auditors providing accounting advice to clients, such as "providing recommendations on the application of accounting standards."[65]  These policies also contain an extract to a speech given by a former board member of the PCAOB stating "…Auditors have long advised public companies on accounting issues and on internal control matters…auditor-management free and open communications concerning financial reporting and internal control issues are still permissible."[66]  I am not aware of any evidence suggesting that had the memorandum been provided to management that it was for any other purpose than to provide the type of accounting advice that is permitted by applicable professional standards and PwC's policies.

**C.     PwC reasonably concluded that the aggregated effect of Cavium's internal control deficiencies identified as of December 31, 2014 did not constitute a material weakness.**

50.    The Botta Complaint alleges "Cavium's internal controls were failing, inadequate, and not accurate." [67]  While no further detail is provided in the complaint, in a memorandum sent to Thorson on February 22, 2015 ("Botta Summary Memo"), Botta outlines various alleged internal control issues at Cavium that he concluded aggregated to a material weakness related to the competence of the Company's finance department with respect to income taxes, treasury and technical accounting functions.[68]

---

[65] Extract from PwC Independence Website, SOPS Title: 420 *Accounting Advice and Opinions*, at 420.1-2i.
[66] *Id* at Appendix 420.6-1.
[67] Botta Complaint at par. 37.
[68] Exhibit 27 to Deposition of Mauro Botta, September 25, 2018 (PwC_B00000390 to PwC_B00000398).

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

51.     As support for these claims, Botta summarizes various deficiencies that were identified by PwC during the 2014 audit, as well as during the previous 2012 and 2013 audits, related to these three functions.  Many of the deficiencies pertaining to the 2012 and 2013 audits, which were signed off on by Botta, were noted by Botta as having been remediated well before the 2014 audit.[69]  This appears to be consistent with the absence of many previously identified deficiencies on PwC's SAD schedule for the 2014 audit.[70]

52.     In response to the Botta Summary Memo, Thorson drafted a detailed memorandum that addressed the specific items raised by Botta.[71]  In addition, the PwC audit team engaged in a formal consultation with PwC's national office to evaluate the conclusion that the aggregated effect of the unremediated deficiencies as of December 31, 2014 audit did not constitute a material weakness.[72]

53.     The tax-related deficiencies identified by PwC in 2014 primarily related to the calculation and support of Cavium's deferred tax balances disclosed in its financial statement footnotes.[73]  The specific control deficiency pertained to the lack of precision involved during the Controller's review of the tax provision and related financial statement footnotes.

54.     The control deficiencies surrounding the treasury function stemmed from Cavium having fallen victim to a phishing scam in October 2014, which involved an employee impersonation and a fraudulent request to wire Cavium funds to an overseas bank

---

[69] *Id.*
[70] Cavium SAD FY 2014.
[71] PwC_B00001662 – B00001676.
[72] PwC_B00008224 – B00008236.
[73] Cavium SAD FY 2014.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

account.[74]   Cavium's Controller received what she thought was an email from the CFO instructing the wire of funds to an overseas bank account.   As the email appeared to be legitimate, the Controller complied with the instructions included in the email.   Two days later, when the Controller requested supporting documentation, it was determined that the Company had been defrauded.

55.   Botta's claims related to Cavium's technical accounting function appear to be based on Botta's belief that Cavium's Chief Accounting Officer and Technical Accounting Manager were not sufficiently qualified to serve in these positions.

*Applicable Standards and Analysis*

56.   As discussed above, AS No. 5 is the governing standard for independent audits of internal control over financial reporting.   In evaluating the severity of control deficiencies, AS No. 5 requires auditors to determine whether such deficiencies constitute a material weakness and provides certain indicators to consider in that assessment.[75]   Relevant standards also emphasize the significant degree of judgment that is entailed in determining whether a control deficiency rises to the level of a material weakness.[76]

57.   Importantly, audits of internal control over financial reporting are performed ***as of*** the date specified in management's assessment, which is the fiscal year-end date for the current year under audit.[77]   Accordingly, the scope of audit opinions relating to the effectiveness

---

[74] Memo from Joy Wu/Suzy Seandel to Cavium File for Q4 FY 14, *Evaluation under Auditing Standard AS 5 regarding internal* control, dated February 20, 2015.
[75] AS No. 5 at par. 62 and 69.
[76] *Id* at par. 81.   See also the COSO Framework and Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934" (issued 6/20/07) at p. 71 (emphasis added), *available at* https://www.sec.gov/rules/interp/2007/33-8810.pdf.
[77] AS No. 5 at par. 3.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

of internal control is limited to the state of internal controls *__as of__* the current fiscal year end.

58.    For this reason, when reporting on the effectiveness of internal controls, auditors are not required to consider previous internal control deficiencies that have been remediated or otherwise no longer exist as of the current reporting period.   Botta appears to have overlooked this fundamental concept by improperly factoring in deficiencies pertaining to 2012 and 2013 that had been remediated before December 31, 2014 as a basis for claiming that Cavium's internal control issues aggregated to a material weakness as of December 31, 2014.

59.    The tax issue related to an error in the prior year 2013 tax footnote disclosure, not an error on the face of the financial statements.[78]   The root cause of the error related to Cavium applying a higher materiality threshold for reviewing balances that are for disclosure only. Importantly, Cavium had also recorded a full offsetting reserve (valuation allowance) against the tax balance at issue, which reduced the net balance of this item to zero.

60.    PwC also noted that Cavium's tax director resigned in the fourth quarter of 2014, which created a "resource constraint that did not enable the Corporate controller to perform a review that would have captured material disclosure-only related errors."[79]

61.    Based on the above, PwC concluded that because the root cause of the error was of the nature to present a reasonable possibility of a misstatement in the footnotes, the control deficiency was determined to be a significant deficiency.[80]   However, given that this issue did not affect the face of the financial statements and that the tax footnote was deemed

---

[78] Cavium SAD FY2014.
[79] *Id.*
[80] *Id.*

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

**DX1701-23**

insignificant to a market participant, PwC determined that this deficiency was not a material weakness.[81]  PwC's conclusion properly considered the factors of AS No. 5, such as the nature of the financial statement accounts or disclosures involved, and the perspective of a "prudent official."[82]

62.     PwC also concluded that there were two deficient controls surrounding payables (which relate to Botta's treasury function claims) that contributed to Cavium's exposure to the phishing scam.[83]   The first deficiency related to the Controller releasing funds after obtaining only one approval signature, contrary to Cavium's policy for requiring multiple approval signatures for wire transfers over $100,000.[84]   The second control deficiency arose from the wire transfer being sent to a vendor that was not on Cavium's approved vendor list.[85]

63.     PCAOB Auditing Standards indicate that multiple control deficiencies affecting the same financial statement account balance should be evaluated collectively to determine whether a material weakness exists.[86]   When considering the severity of this phishing issue, PwC consulted with its national office.   In its consultation memorandum, PwC noted that the financial statements were not misstated and that other mitigating controls enabled the company to identify the issue within two days of the wire transfer and recover the funds.[87] In addition, the incident was determined to be an isolated case, which was consistent with the results of PwC's testing of sample wires subsequent to the phishing scam, including

---

[81] *Id.*
[82] AS No. 5 at par. 65 and 70.
[83] Cavium SAD FY2014.
[84]*Evaluating Internal Control Deficiencies Consultation Memo* ("Cavium Phishing Consultation Memo"), dated February 24, 2015, at p. 4.
[85] *Id.*
[86] AS No. 5 at par. 65.
[87] Cavium Phishing Consultation Memo, at p. 5.

24

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

testing of related controls.[88]  The amount of the transfer was also considered immaterial to Cavium's financial statements.[89]  PwC concluded that the two control deficiencies aggregated to a significant deficiency as of December 31, 2014 which was reported to Cavium's audit committee.[90]

64.    PwC properly considered the criteria provided by AS No. 5 in evaluating the severity of the control deficiencies.  For example, PwC identified that the phishing scam did not create a misstatement on the company's financial statements and that a prudent official would not consider the issues to be a material weakness.[91]  As a result, PwC reasonably concluded that these deficiencies did not constitute a material weakness.

65.    In response to Botta's claims surrounding Cavium's technical accounting capabilities, the PwC audit team initiated a formal consultation with PwC's national office during the evaluation of the aggregated effect of the identified control deficiencies, including the three categories of issues cited in the Botta Summary Memo.[92]

66.    In its consultation memorandum, PwC noted that the accounting department was comprised of many individuals with deep backgrounds in public accounting and private industry as follows:[93]

---

[88] Id.

[89] Id.

[90] Id.  As the phishing scam occurred in October 2014, around the time of the filing of Cavium's Form 10-Q for the third quarter of 2014, this issue was a fourth quarter event and did not affect Cavium's financial statements or internal control certifications for the third quarter of 2014.  Similarly, this fourth quarter event did not impact PwC's interim review of Cavium's third quarter financial statements.  Accordingly, Cavium did not have an obligation to disclose this issue to PwC prior to filing its 10-Q for the third quarter.

[91] Id.

[92] Evaluating Internal Control Deficiencies Consultation Memo ("Cavium Aggregation Consultation Memo") dated February 24, 2015 (PwC_B00008224 – PwC_B00008236).

[93] Id at PwC-B00008226.

25

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

| Name | Title | Big 4 (Years) | CPA | Years in Industry | Years at Cavium | Total Years |
|------|-------|---------------|-----|-------------------|-----------------|-------------|
| Suzy Seandel | Chief Accounting Officer | Deloitte (5) | Y | 16 | 9 | 21 |
| Joy Wu | Controller | KPMG (4) | Y | 14 | 8 | 18 |
| Li Li | Tax Director (started Jan. 2015) | KPMG (8) | Y | 4 | 0 | 12 |
| Ralph Fuentes | SEC Reporting Manager | PwC (8) | Y | 5 | 5 | 13 |
| Tiffany Nguyen | Assistant Controller | PwC (4) | Y | 4 | 4 | 8 |
| Anu Donthi | Director of Revenue | KPMG (3) | Y | 14 | 7 | 17 |

67. PwC also observed that Cavium appropriately retains third-party specialists when needed for complex transactions and that PwC is consulted on technical accounting matters as appropriate.[94]  For these reasons, PwC concluded that there was "not a concern related to the competency of the accounting department personnel" or their ability to properly evaluate and report unusual or routine transactions.[95]

68. As noted above, the tax and phishing issues had been classified by PwC as significant deficiencies.  The potential aggregated effect of these two significant deficiencies, coupled with a less severe control deficiency related to the classification of cash, were considered in the national office consultation.  PwC concluded that these issues did not aggregate to a material weakness.[96]  PwC's conclusion properly considered the criteria provided by AS No. 5, which are specifically referenced in the consultation memorandum.  For example, PwC's belief that a prudent official "would not conclude the deficiency is a material weakness," no indication of fraud by management and that the external financial reporting function was effectively overseen.[97]

---

[94] Id.
[95] Id at PwC_B00008227.
[96] Id at PwC_B00008236.
[97] Id at PwC_B00008234 - PwC_B00008235.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

69.     Significantly, prior to the release of PwC's audit report, Botta expressly agreed with the facts and conclusions presented in the national office consultation memorandum.[98]  Botta also signed off on the Engagement Leader and Manager Checklist.[99]  As discussed above, had Botta disagreed with the conclusions, both PCAOB Standards and PwC policy would have required him to document his disagreement in the workpapers and not to sign off on the SAD and various audit completion documents in support of the release of PwC's audit report.

70.     On or around November of 2016, well after the conclusion of the 2014 Cavium audit, Botta called the SEC's whistleblower hotline and submitted a compliant that included the allegations outlined in the Botta Complaint.[100]  The SEC subsequently launched an investigation of PwC's audits of Cavium for the years-ended December 31, 2013 and 2014.[101]  Following its investigation, the SEC informed PwC of its decision to terminate the matter without any enforcement action.[102]

71.     The SEC's investigation and its decision to close the matter without any action is significant.  Based on my previous 12 years of experience in the SEC's Division of Enforcement in which I oversaw precisely these kinds of investigations, whistleblower complaints are given significant scrutiny and attention by the SEC.  Such complaints, particularly those involving large U.S. accounting firms, are thoroughly investigated to evaluate the merits of the allegations and whether violations of the securities laws, including professional standards applicable to auditors, have occurred.  When the SEC staff

---

[98] PwC_B00001747.
[99] PwC_B00006158 – PwC_B00006168.
[100] SEC TCR submission reference number TCR1478218903573.  PLAINTIFF 0030 – 0034; PLAINTIFF 00165 – 00178.
[101] SEC document request dated April 28, 2017.
[102] SEC termination letter dated February 20, 2018.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

identifies such violations, recommendations are made to the Commission to file enforcement action. The SEC's termination letter provides substantial evidence that the SEC staff concluded that PwC did not violate professional standards or the securities laws.

### *PwC's Audit of Harmonic for Fiscal Year December 31, 2015*

72.  The Botta Complaint raises additional allegations about PwC's work for another audit client, Harmonic, in connection with PwC's December 31, 2015 year-end audit.[103] Harmonic designs, manufactures and sells video and cable infrastructure products and system solutions. The Company's main business is to sell complex hardware equipment to cable operators, broadcast and media companies, satellite and telecommunications Pay-TV service providers and streaming new media companies, which is typically sold with a service and maintenance agreement.[104]

73.  This was Botta's first year on the Harmonic audit engagement.[105] Botta served as the lead senior manager on this audit and reported to the engagement partner, Stig Haavardtun ("Haavardtun").[106] Harmonic has been audited by PwC since at least 1996.[107]

74.  Botta's primary allegation appears to relate to the sampling approach utilized during PwC's audit testing of Harmonic's service and support revenues (maintenance revenue).[108] The

---

[103] Botta Complaint at par. 45–58.
[104] Harmonic 2015 national office consultation memo ("SLA Consultation Memo").
[105] Deposition of Stig Haavardtun, January 9, 2019, at p. 25.
[106] Deposition of Mauro Botta, September 25, 2018, at p. 95.
[107] See PwC's audit report dated January 21, 1997 included with Harmonic's Form 10-K for the year-end December 31, 1996.
[108] Botta Complaint at par. 47–52.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

Botta Complaint also makes broad allegations related to PwC's conclusions as to the competency of Harmonic's accounting and finance staff.[109]

### D. The sampling procedures utilized during PwC's audit of service and support revenue were reasonable and complied with applicable professional standards.

75. During the 2015 audit, PwC performed audit procedures to test Harmonic's revenues that were reported from sales of various products and services. Harmonic recognized revenue from product sales upon delivery to customers whereas service revenue was recognized on a straight-line basis over the period (generally one year) in which the services were performed.[110]

76. Harmonic's method of performing its straight-line calculation for service revenue involved utilizing a model that recognized a full month of revenue for each customer agreement regardless of when the service contract started during the month. Under this convention, contracts that began on the 15th day of the month, for example, resulted in twice the amount of revenue being recorded in the first month of service than should have been recognized had the company calculated revenue based on contractual days instead of months.

77. Harmonic's fiscal quarter-ends in 2015 did not match calendar month-ends such that its fiscal quarters ended two to three days after a calendar month.[111] During the closing process for the first quarter of 2015, Harmonic management identified that the unique nature of these quarterly reporting periods in 2015 would result in an extra month of

---

[109] Botta Complaint at par. 9; Deposition of Mauro Botta September 25, 2018, at p. 97. The Botta Complaint also makes broad allegations concerning PwC's audit of Harmonic's inventory and alleged unethical behavior by Defendants. However, given the lack of information provided in the Botta Complaint with respect to these specific allegations, additional information is necessary to perform further analysis. I reserve the right to modify or supplement my report if additional information becomes available.

[110] Harmonic Inc Form 10-K for the year ended December 31, 2015.

[111] Harmonic's fiscal quarters are based on 13-week periods.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

revenue (four months total) being recognized for contracts that began during this two to three day period after calendar quarter-end.[112]

78.    In response, during the first quarter of 2015, Harmonic began preparing detailed quarterly analyses to determine the amount of revenue that should be reversed and not recognized as revenue on its income statement, but rather recognized as a deferred liability on its balance sheet.  Harmonic performed two calculations each quarter in 2015, one high-level analysis and a second analysis based on more detailed calculations from specific samples of service agreements.[113]  The difference between both analyses for the first and second quarters was determined to be minimal, however the Company opted to record quarterly adjustments based on the more detailed second analysis which resulted in slightly larger impacts.  As a result, the company recorded quarterly adjustments in the first three quarters of 2015 ranging from $2.1 million to $2.9 million.  Management did not expect similar adjustments in future periods as they considered it to be a unique quarter-end timing issue in 2015.[114]

79.    In connection with Harmonic's calculation of deferred revenue based on selected samples of service agreements, management had initially used a sample size of 60 agreements and extrapolated the results of this calculation to the entire population of agreements.[115]  When the results of the initial sample revealed errors, management subsequently increased the sample size to 100 agreements. [116]

80.    On February 11, 2016, during PwC's 2015 year-end audit, both Haavardtun and Botta sought consultation with PwC's national office regarding the sample size used by the

---

[112] SLA Consultation memo.
[113] Id.
[114] Id.
[115] Deposition of Stig Haavardtun, January 9, 2019, at p. 45.  See also notes from national office consultation dated February 11, 2016 (PwC_B00000607 – PwC_B00000609).
[116] Id at p. 46.

30

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

company to calculate the revenue adjustment.[117]  Notes from this meeting sent by one of the national office representatives consulted, Anna Watson, contained a summary of the company's sampling and extrapolation methodology described above, including the company's use of a sample size of 100 agreements.[118]  The notes also indicate that if performing the analysis based on review of all agreements was not practical that the sample should be based on a "valid statistical sample."[119]

81.   Among other items, PwC's national office recommended to the PwC engagement team to (1) "compare management's sampling approach to a statistical sampling model to calculate the size of the sample, and the method of selecting the samples to test," and (2) "determine whether a control deficiency exists."[120]  Botta acknowledged his agreement with the facts presented to the national office and the proposed action steps.[121]

82.   While the company believed that its analyses identified all material adjustments, it was clear that this process did not capture *all* potential adjustments.[122]  Given the input from PwC's national office coupled with Harmonic management's decision to begin performing a daily revenue recognition model for all contracts in 2016, management performed a more detailed analysis by using a statistical sampling approach at year-end 2015.[123]

83.   This analysis resulted in an adjustment of approximately $780,000 at year-end 2015, which mostly reflected additional adjustments attributable to fiscal year 2014 and the first three

---

[117] *Id.*
[118] Email from Anna Watson attaching notes from national office consultation dated February 11, 2016 with Botta reply dated February 12, 2016 (PwC_B00000607 – PwC_B00000609).
[119] *Id* at PwC_B00000607.
[120] *Id.*
[121] *Id* at PwC_B00000609.  Botta reply email to Anna Watson in which he states "I am OK with the notes attached" and "I am mauro botta and I approve this message."
[122] SLA Consultation Memo.
[123] *Id.*

31

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

quarters of 2015 that were incremental to the adjustments previously recorded by the company under the prior sampling process.[124]  This adjustment was below the overall materiality level of $950,000 established by PwC for the 2015 audit, which PwC considers in evaluating the effect of misstatements on the financial statements and on PwC's audit opinion.[125]  Since the adjustment was lower than the overall materiality level it is an indication that the financial statement line items (i.e. deferred revenue/ revenue) and the financial statements taken as a whole were not materially misstated.

### *Applicable Standards and Analysis*

84.   PCAOB Auditing Standard No. 15 ("AS No. 15"), *Audit Evidence*, defines audit sampling as the application of an audit procedure to less than 100 percent of the items within an account balance or class of transactions for the purpose of evaluating some characteristic of the balance or class.[126]  Audit sampling is a fundamental aspect of performing financial statement audits.  Standard audit reports, which serve as the primary end-product provided to an audit client at the conclusion of an audit, specifically refer to audits being performed by examining evidence on a "test basis."[127]

85.   PCAOB Interim Auditing Standard AU 350 ("AU 350"), *Audit Sampling*, states:

> "There are two general approaches to audit sampling: nonstatistical and statistical. Both approaches require that the auditor use professional judgment in planning, performing, and evaluating a sample and in relating the evidential matter produced by the sample to other evidential matter when forming a conclusion about the related account balance or class of transactions. Either approach to audit sampling can provide sufficient evidential matter when applied properly."[128]

---

[124] *Id.*

[125] Materiality screen shot from FY 2015 YE audit database.  See also PwC Public Audit Guide 3400, *Determine materiality*. Note that PwC establishes several materiality levels for its audits, such as overall materiality, performance materiality and de minimis.

[126] AS No. 15 at par. 28.

[127] PCAOB Interim Auditing Standard AU 508, *Reports on Audited Financial Statements*.

[128] AU 350 at par. 3.

32

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

86.     Auditors select between these two methods based on their "relative cost and effectiveness in the circumstances."[129]  AU 350 also acknowledges that sampling is "well established in auditing practice" and that auditors very seldomly perform audit procedures by examining 100% of the data given the cost and time required and the ability to develop adequate conclusions based on tests of a portion of the population.[130]  By performing audit tests through sampling, AU 350 indicates that "sampling risk" is inherent in auditing, which is the risk that "the auditor's conclusions may be different from the conclusions he would reach if the test were applied in the same way to all items in the account balance or class of transactions."[131]  Accordingly, PCAOB standards underscore the importance of auditors exercising professional judgment when assessing sampling risk.[132]

87.     PCAOB Auditing Standards also provide examples of factors to consider when considering sample sizes.  For example, the maximum monetary misstatement that could exist without causing the financial statements to be materially misstated, also referred to as "tolerable misstatement."[133]  The process of determining which items should be examined by an auditor entails significant judgment[134] and can result in a wide range of reasonable views regarding appropriate sample sizes and when deciding which specific items within a sample size to select for testing.  The use of "haphazard and random-based selection" approaches, which are very common sampling methods suggested by the auditing standards,[135] also contributes to a wide spectrum of potential reasonable outcomes.

---

[129] *Id* at par. 46.
[130] *Id* at par. 7.
[131] *Id* at par. 10.
[132] *Id* at par. 12.
[133] *Id* at par. 18.
[134] *Id* at par. 21.
[135] *Id* at par. 24.

33

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

88.   Importantly, sampling is often iterative based on the results of initial tests.   PCAOB
      Auditing Standards provide that if the results of sampling reveal significant misstatements,
      the auditor should consider whether to modify the tests.[136]   PCAOB Auditing Standard No.
      9 ("AS No. 9"), *Audit Planning*, also clearly indicates that risk assessments and planning
      audit procedures "is not a discrete phase of an audit but, rather, a continual and iterative
      process that…continues until the completion of the current audit."[137]

89.   As discussed above, Harmonic management began its process by selecting 60 contracts.
      When management noted errors within the sample, they expanded the sample as necessary
      to achieve their desired level of confidence – in this case to a sample of 100 contracts.
      Ultimately, Harmonic engaged a statistician to come up with a statistically valid sample.[138]
      The following is an excerpt from the PwC engagement team's national office consultation
      memo which summaries the results of Harmonic's statistical sample:

> "In Q4'15 the Company prepared a transactional analysis by using statistical
> sampling to assess the impact on a more precise level.  The results of the statistical
> sampling using samples from 2015, derived a 95% confidence interval +/-$125
> thousand and 99% confidence interval  +/- $163 thousand.  The results of the 2014
> sample resulted in a 99% confidence interval +/- $63 thousand.   The analysis
> concluded that an adjustment of $780 thousand for the year was required in order
> to true up the December 31, 2015 deferred revenue balance based on the application
> of a daily revenue recognition convention instead of a monthly convention." [139]

90.   While the statistical sample yielded additional immaterial adjustments, it proved that
      Harmonic's prior quarterly analyses captured the required adjustments to correctly state
      the deferred revenue balance in all material respects.[140]   The national office consultation

---

[136] *Id* at par. 28.
[137] AS No. 9 at par. 5.
[138] Deposition of Stig Haavardtun, January 9, 2019, at p. 46.
[139] SLA Consultation Memo.
[140] *Id.*

34

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

memorandum considered both quantitative and qualitative materiality factors when concluding that the impact of the statistical sampling results were immaterial.

91.    The Botta Complaint suggests that Haavardtun was the source of the decision to select 60 contracts.[141]    However, based on my review of the national office consultation memorandum and the notes of the meeting with the national office, both of which were signed off on by Botta,[142] it appears that it was Harmonic, not PwC, that made the initial selection of 60 contracts as part of the company's own internal analysis.   Regardless of whether the initial sample size of 60 contracts was determined by Harmonic or PwC, the sampling methodology evolved during 2015 and at all times yielded materially equivalent and accurate results.

92.    Botta also claims that the initial selection of 60 contracts was arbitrary, could not be justified and that this somehow reflects incompetent practices.[143]   However, Botta takes no account of the iterative nature of sampling and audit planning as provided by the auditing standards.   Botta also does not appear to consider that such nonstatistical sampling is an appropriate testing method provided in the auditing standards.   The relevant standards also repeatedly refer to audit sampling requiring significant judgment, which can inherently result in a wide range of differing yet reasonable views.

93.    Accordingly, the sampling procedures utilized during PwC's 2015 audit were reasonable and consistent with PCAOB standards.   The company's sampling procedures evolved based on the results of initial testing.   Such expansion of sampling procedures is consistent

---

[141] Botta Complaint at par. 48-50.
[142] Screen print of Botta sign off on SLA Consultation Memo for 2015 audit; Email from Anna Watson attaching notes from national office consultation dated February 11, 2016 with Botta reply dated February 12, 2016 (PwC_B00000607 – PwC_B00000609).
[143] Id.

35

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

with the requirement in the auditing standards to modify testing when initial testing reveals significant misstatements.[144]  The identified adjustments were recorded by the company, thus Harmonic's financial statements were not misstated.[145]  In addition, the PwC engagement team obtained guidance from PwC's national office, which concurred with the conclusions.[146]

> **E.**    **Botta does not demonstrate that the competence of Harmonic's finance department presented a material weakness, and PwC reasonably concluded that the aggregated effect of the identified control deficiencies did not constitute a material weakness, as of December 31, 2015.**

94.   The Botta Complaint alleges that Harmonic had a "control failure" which is broadly described in the context of an alleged material weakness.[147]  While the Botta Complaint does not provide any further detail about the relevant control at issue, Botta indicates in his testimony that, similar to one of his allegations related to Cavium, he was alleging that a "pervasive" material weakness existed with respect to the competency of the finance department.[148]  However, Botta does not provide any further explanation to support his claim that Harmonic's finance function was incompetent such that a material weakness existed as of December 31, 2015.

95.   I am also unaware of any evidence that Botta or anyone else from the PwC audit team sought consultation from the national office relating to the aggregation of Harmonic's control deficiencies, unlike in the 2014 Cavium audit.  Botta confirmed in testimony that

---

[144] AU 350 at par. 28.
[145] SLA Consultation Memo.
[146] *Id.*
[147] Botta Complaint at par. 56.
[148] Deposition of Mauro Botta, September 25, 2018, at p. 97.

CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER

he did not initiate such a consultation with PwC's national office with respect to this alleged material weakness.[149]

96.    Despite the Botta Complaint lacking sufficient detail to fully understand or assess his claim, I reviewed the SAD for the Harmonic 2015 audit to evaluate the nature of the control deficiencies that were identified by PwC.[150]   No material weaknesses were noted by PwC. However, there were two significant deficiencies identified: one related to the service and support revenue issue described above, and an aggregated significant deficiency pertaining to the company's accounting conventions.   Given the similarity of the latter significant deficiency to the nature of Botta's broad allegation, I have assessed this further.

*Applicable Standards and Analysis*

97.    As discussed above, AS No. 5 is the governing standard for independent audits of internal control over financial reporting.   In evaluating the severity of control deficiencies, AS No. 5 requires auditors to determine whether such deficiencies constitute a material weakness and provides certain indicators to consider in that assessment.[151]   Relevant standards also emphasize the significant degree of judgment that is entailed in determining whether a control deficiency rises to the level of a material weakness.[152]   AS No. 5 indicates that multiple control deficiencies that affect the same financial statement account balance should be evaluated collectively to determine whether a material weakness exists.[153]

---

[149] *Id* at pp. 98-99.
[150] Given the lack of detail provided by Botta regarding this allegation, I reserve the right to supplement my analysis to the extent more information is provided.
[151] AS No. 5 at par. 62 and 69.
[152] *Id* at par. 81.   See also the COSO Framework and Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934" (issued 6/20/07) at p. 71 (emphasis added), *available at* https://www.sec.gov/rules/interp/2007/33-8810.pdf.
[153] AS No. 5 at par. 65.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

98.   The 2015 SAD shows that PwC evaluated whether the aggregated effect of seven deficiencies (six control deficiencies and the service and support revenue significant deficiency) presented a material weakness.[154] Each of the control deficiencies considered in the aggregation analysis affected different accounting areas, including cash, stock compensation expense, commissions, prepaid expenses, warranty provision and royalty accruals. However, the combined quantitative impact of the control deficiencies amounted to approximately $470,000.[155] This amount was below the overall materiality level of $950,000 set by PwC for the 2015 audit.[156] Accordingly, PwC concluded that the magnitude of a potential misstatement was not material to either the quarterly or annual financial statements. PwC also considered whether these known errors presented a risk that Cavium's internal controls would not prevent or detect a material misstatement and documented that "the potential magnitude of the misstatement [was] not expected to increase."[157]

99.   In addition, PwC considered whether "a well-informed, competent and objective individual (i.e., prudent official)" would conclude that the combination of the seven deficiencies resulted in a material weakness.[158] In response, PwC documented the following:

> "The combination of deficiencies is not deemed to be a material weakness. Based on our quarterly and year-end audit procedures, we did not identify fraud, intentional acts to misstate financial results nor restatement, or lack of oversight by senior management. We have evaluated these deficiencies against the indicators of a material weakness and note none of these specific possible indicators are present. In addition, there were no other qualitative factors that we identified that would lead us to conclude, or a prudent official, that this item is a material weakness. We have concluded that in agreegate (sic), these deficiencies result in a significant

---

[154] Harmonic 2015 SAD.
[155] Id.
[156] Screen print of materiality thresholds for the Harmonic 2015 year-end audit.
[157] Harmonic 2015 SAD.
[158] Id.

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

deficiency. This has been communicated to the Audit Committee as part of our 3/24/16 meeting."[159]

100.   The factors considered by PwC in reaching the above conclusion mirror the material weakness indicators outlined in AS No. 5.[160]   Accordingly, PwC considered the proper criteria when performing this evaluation.  I am also not aware of contradictory evidence in the audit workpapers or identified by Botta to suggest that PwC's conclusion was improper or unreasonable.

## IV.   SIGNATURE AND RIGHT TO MODIFY

101.   My opinions are based upon information available to me as of the date of this report.  It is possible that additional information may affect my opinions herein.  I reserve the right, in the event further information becomes available, to modify or supplement my analysis and opinions.

*****

Signed this 1st day of February 2019 in Washington, D.C.

Jason S. Flemmons, CPA, CFE, CFF

---

[159] *Id.*
[160] AS No. 5 at par. 69-70.

39

**CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**



ankura
COLLABORATION DRIVES RESULTS



1220 19th Street, NW, Suite 700
Washington, DC 20036

+1.202.524.8384 Direct

jason.flemmons@ankura.com

**EDUCATION**
BBA, Accounting, College of
William and Mary

**CERTIFICATIONS**
Certified Public Accountant

Certified Fraud Examiner

Certified in Financial Forensics

**AFFILIATIONS**
American Institute of Certified
Public Accountants ("AICPA")

AICPA Forensic and Valuation
Section Executive Committee

AICPA Forensic and Litigation
Services Fraud Task Force

Association of Certified Fraud
Examiners

Association of Securities and
Exchange Commission Alumni

## JASON FLEMMONS
### Senior Managing Director

### Former SEC Enforcement; Accounting Investigations & Expert Witness

Jason Flemmons is a Senior Managing Director at Ankura in the Washington, DC office. Jason has over 20 years of experience in forensic accounting, corporate investigations, and technical accounting and auditing matters. He provides a broad range of expert and consulting services involving accounting advisory, auditor liability, fraud examination, dispute resolution, and other services.

Prior to joining Ankura in 2016, Jason was a Senior Managing Director in the Forensic Accounting and Advisory Services practice at FTI Consulting.

Jason is the former Deputy Chief Accountant of the Securities and Exchange Commission's Division of Enforcement, where he supervised and performed numerous financial and accounting fraud investigations involving SEC registrants and other parties. During his 12 years of service in the Division of Enforcement, Jason advised on a wide variety of technical accounting, auditing, disclosure, and internal control matters. He also performed and managed cash-tracing investigations resulting from violations of the Foreign Corrupt Practices Act, asset misappropriations and Ponzi schemes. Jason co-chaired the Division of Enforcement's Cross-Border Working Group, which oversaw and coordinated numerous investigations involving issuers and auditors located in foreign jurisdictions. Jason worked closely with both SEC trial counsel and criminal prosecutors during the litigation of high-profile matters in civil and criminal forums.

Before joining the SEC, Jason was a manager in the Financial Advisory Services practice of PricewaterhouseCoopers where he supervised a variety of forensic accounting investigations. He also performed financial statement audits of both publicly traded and privately held companies in a variety of industries located in the US and overseas in PwC's Audit and Business Advisory Services practice.

In 2015, Jason was appointed to a three-year term on the Executive Committee of the AICPA's Forensic and Valuation Services section. The committee provides guidance and establishes standards for practitioners in the forensic accounting and valuation services industry, and serves as the AICPA's official voice on such matters. Jason also served on the AICPA's Forensic and Litigation Services Fraud Task Force from 2012 to 2017. Jason is a frequent speaker at SEC enforcement, accounting and forensic accounting conferences nationally and internationally.

**JASON FLEMMONS**

**Selected Professional Experience (2013-present)**

Accounting Expert/Consultant – SEC Matters

- **Investigation of Revenue Recognition Issues** - Retained by counsel for audit committee of pharmaceutical company to perform internal investigation of various revenue recognition practices. Led the document collection and review efforts, assisted counsel in drafting internal report and presented findings to the DOJ and SEC enforcement.

- **Investigation of Various Accounting Issues** - Retained as accounting expert and consultant by counsel for a large retailer in connection with an internal investigation relating to inventory reserves, loan loss reserves, asset impairments, MD&A disclosures and other miscellaneous revenues and expenses. Submitted expert report to SEC enforcement and participated in multiple meetings and presentations to the SEC's Denver regional office.

- **Asset Impairment Accounting Expert** - Retained as accounting expert and consultant by counsel for foreign private issuer based in China relating to accounting for impairment of long-lived assets. Participated in presentations to the SEC's Washington, DC office.

- **Investigation of Revenue Recognition Issues** - Retained as technical accounting consultant by counsel for a Fortune 10 company in connection with an investigation by the SEC's Chicago regional office involving revenue recognition and shipping practices.

- **Non-GAAP Measures Expert** - Retained by counsel for senior executive of large publicly-traded Real Estate Investment Trust in connection with criminal trial in the Southern District of New York.

- **Investigation of IFRS Issues** - Retained as technical accounting consultant in connection with an investigation by the SEC's Washington, DC office of a foreign private issuer relating to consolidation under International Financial Reporting Standards.

- **Financial Reporting and Audit Task Force Inquiry** - Retained as technical accounting consultant by counsel for a prominent pharmaceutical company in connection with an inquiry by the SEC's Financial Reporting and Audit Task Force relating to revenue recognition.

- **Investigation of Various Accounting Issues** - Retained as technical accounting consultant for a global vehicle manufacturer in connection with an investigation by the SEC's Chicago regional office relating to warranty reserves, deferred tax assets and segment reporting.

- **Investigation of Revenue Recognition Issues** - Retained as technical accounting consultant by counsel for a global information technology company in connection with an investigation by the SEC's Washington, DC office involving percentage of completion accounting and MD&A disclosures.

- **Investigation of Revenue Recognition Issues** - Retained as accounting expert by counsel for former CFO of an information technology division of a Fortune 150 company in connection with an investigation by the SEC's Fort Worth regional office involving principal-agent considerations.

- **Investigation of Acquisition-Related Reserves** - Retained as accounting consultant by private equity firm in connection with DOJ and SEC investigations of post-acquisition reserve adjustments by a portfolio company in the transportation industry.



2

- **Investigation of Revenue Recognition Issues** - Retained as technical accounting consultant by counsel for health care technology company in connection with an investigation by the SEC's Chicago regional office involving accounting for payments made by a vendor to a customer.

- **Investigation of Cost Accounting Issues** - Retained as technical accounting consultant by counsel for large aerospace company in connection with an investigation by the SEC's Washington, DC office.

- **Investigation of Revenue Recognition Issues** - Retained as technical consultant by counsel for large international software company in connection with an investigation by the SEC's Washington, DC office involving revenue recognition accounting for both hardware and software sales.

- **Investigation of Revenue Recognition Issues** - Retained by counsel for major defense contractor as technical accounting consultant in connection with an investigation by the SEC's Boston regional office involving percentage of completion accounting.

- **Investigation of Revenue Recognition Issues** - Retained by counsel for large pharmaceutical company as accounting consultant and expert to evaluate revenue recognition adjustments and to make multiple presentations to the SEC's Boston regional office.

- **Investigation of Various Accounting Items** – Retained by counsel for manufacturing company as forensic accounting consultant in connection with an investigation by the SEC's Washington, DC office involving reported earnings per share results.

- **Investigation of Revenue Recognition Issues -** Retained by counsel for audit committee of healthcare company as accounting consultant and expert to perform internal investigation of revenue recognition and contractual allowance practices in connection with an investigation by the SEC's Washington, DC office.

Accounting Expert/Consultant – Other Matters

- **Post-Acquisition Accounting Dispute** - Retained as accounting expert by counsel for large private equity firm in an international arbitration involving percentage of completion revenue recognition issues at portfolio company under International Financial Reporting Standards.

- **Audit Committee Investigation of Revenue Recognition and Other Issues** – Retained by counsel for manufacturing company to assist with internal investigation of whistleblower claims and related revenue recognition, accounts payable and intercompany accounting transactions.

- **Post-Acquisition Forensic Accounting** - Retained by counsel for private equity firm to perform forensic accounting and technical accounting evaluation of an acquired portfolio company suspected of providing materially misleading financial statements during purchase price negotiations.

- **Post-Acquisition Accounting Dispute** - Retained as accounting expert by counsel for manufacturing company in connection with a purchase price dispute involving revenue recognition issues.

- **Audit Committee Investigation of Percentage of Completion Accounting Issues** - Retained by counsel for audit committee of a global engineering and construction company to investigate the accounting and basis for estimates associated with a large contract.  Interviewed numerous employees and reported findings to the audit committee, management and outside auditors.



JASON FLEMMONS

- **Accounting Advisory for Insurance Company** - Retained as accounting consultant for privately-held insurance company to perform accounting and disclosure analysis of potential contingent liability related to reinsurance claims.

- **Post-Acquisition Accounting Dispute** - Retained as technical accounting expert for sellers of a foreign cable television and telephone service provider in connection with a post-acquisition dispute.

- **Plaintiff Class Action** - Retained as forensic accounting expert by lead plaintiffs in class action litigation to analyze margins on specific product lines and related public disclosures. Issued expert reports and provided deposition testimony.

- **Post-Acquisition Forensic Accounting** - Retained by counsel for large private equity firm to perform analyses of earnout calculations and related support related to divested portfolio company.

Auditor Liability

- **SEC and PCAOB Auditor Investigations** – Retained as accounting and auditing consultant by counsel for audit firm in connection with investigations by the SEC's and PCAOB's Washington, DC offices involving contingent liabilities, percentage of completion accounting, deferred tax assets, and other matters.  Performed detailed assessment of these issues for compliance with GAAP, PCAOB Auditing Standards and SEC rules and made multiple presentations to SEC and PCAOB enforcement staff.

- **SEC Auditor Investigation** - Retained as accounting expert and consultant by counsel for audit firm in connection with an investigation by the SEC's Denver regional office involving related party, auditor independence and other accounting and footnote disclosure topics.  Submitted expert report to the SEC during Wells process.

- **Auditor Independence Consultant** - Retained as technical consultant by counsel for large international oilfield services company in an auditor independence matter.

- **Audit Firm Defense Expert in Civil Litigation** - Retained as expert by counsel for audit firm defending a civil lawsuit filed by a former audit client.  Assisted counsel in developing accounting and auditing defenses in written briefs and participated in mediation.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigations by both the PCAOB and the SEC involving auditor independence and qualifications issues.  Assisted counsel in making presentations to the SEC's Boston regional office and to the Director of the SEC's Division of Enforcement during the Wells process.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a consultant in connection with investigation of audits of private equity funds by the SEC's Los Angeles regional office involving fair value accounting of investments and loans.  Participated in Wells presentation to SEC staff.

- **SEC Auditor Investigation** - Retained by counsel for auditing firm as a technical accounting and auditing consultant in connection with investigation by the SEC's Los Angeles regional office involving revenue recognition issues and compliance with PCAOB Auditing Standards.



- **Auditor Independence Consultant** - Retained by counsel for private equity firm to advise on potential auditor independence issues raised by its outside auditor. Prepared related submissions to the SEC's Office of Chief Accountant.

FCPA/Transactional Tracing

- **FCPA Investigation** - Retained by counsel for the special committee of a foreign private issuer in South America to perform an internal investigation of alleged payments made in violation of the Foreign Corrupt Practices Act.

- **Cash Tracing Investigation** - Retained by counsel representing a foreign national government to perform transactional testing and cash-tracing investigation in response to allegations of corruption made by a United Nations monitoring group.

- **Rebuttal Expert** – Retained as rebuttal expert by counsel for principal of management companies of large hedge fund complex in a bankruptcy proceeding in response to claims by Trustee seeking to claw back funds earned in an alleged Ponzi scheme. Submitted expert report in bankruptcy court and provided deposition testimony.

- **CTR Compliance** - Retained by counsel for privately-held company to perform cash-tracing analysis and to implement process for preparing and filing Currency Transaction Reports (CTRs) with the IRS and FINCEN. Assisted counsel in making presentations to the DOJ in connection with its related investigation.

- **Transactional Tracing** – Retained by counsel for registered investment advisor to perform tracing analysis of investor contributions, use of funds and withdrawals.

- **Cash Tracing Investigation** - Retained by counsel for owners of large food processor in South America to trace cash inflow and outflows from various bank and brokerage accounts located in various countries.

- **Cash Tracing Investigation** – Retained by counsel for large trust company to perform cash-tracing analyses to identify and summarize sources and uses of funds over a multi-year period.

- **Transactional Tracing** - Retained by counsel for private equity fund to perform tracing analysis of investor contributions, use of funds and withdrawals.

Fraud Expert

- **Fraud Expert in SEC Disclosure Case** - Retained as fraud expert by counsel for oil and gas issuer and its CEO in connection with an SEC administrative proceeding brought by the SEC's Washington, DC office. Performed an examination of the evidence underlying the SEC's fraud-related allegations and submitted expert report.

- **Fraud Expert in PCAOB Proceeding Against Auditor** - Retained as fraud expert by counsel for an audit engagement partner of a big-four public accounting firm in connection with a PCAOB administrative proceeding. Performed an examination of the impact of management fraud and submitted expert report to the PCAOB hearing officer.



**JASON FLEMMONS**

Internal Controls

- **Internal Controls and Forensic Accounting** – Retained by counsel for international fruit and vegetable producer as forensic accounting and internal controls expert in derivative civil litigation. Issued rebuttal expert report and provided deposition testimony.

- **SEC ICFR Investigation** – Retained as accounting consultant by counsel for a client of oil and gas issuer in connection with an investigation by the SEC's Ft. Worth regional office involving assessment of internal control over financial reporting.  Assisted counsel in preparing Wells submission and in Wells presentation to the Director of the SEC's Division of Enforcement.

- **ICFR Remediation Assessment** - Retained by counsel for large pharmaceutical company to assess remediation of material weaknesses and other deficiencies of internal controls over financial reporting.

- **Internal Controls Consulting** - Retained by counsel for publicly traded technology company to assist with the company's internal controls assessments and conclusions surrounding material weaknesses.

**Testimony Experience**

- Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Litigation, Case 08-01916-MD-MARRA/JOHNSON and related cases 07-60821-CIV-MARRA, 08-80421-CIV-MARRA, 08-80465-CIV-MARRA, 08-80508-CIV-MARRA, 08-80480-CIV-MARRA, 10-60573-CIV-MARRA, 10-80652-CIV-MARRA, 11-80404-CIV-MARRA, 11-80405-CIV-MARRA, 18-80248-CIV-MARRA, 17-81285-CIV-MARRA, 17-80475-CIV-MARRA (January 16, 2019)

- Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc., and PL Ltd., vs. Westford Special Situations Master Fund, L.P., et al, Court File No. 08-45257, Adv. No. 10-04396 (Nov. 13, 2018)

- Babak Hatamian, et al v. Advanced Micro Devices, Inc., et al, Case No. 4:14-cv-00226-YGR (Feb. 28, 2017)

- Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Litigation, Case 08-01916-MD-MARRA/JOHNSON and related cases Julin et al. v. Chiquita Brands Int'l, Inc., No. 08-20641-CIV-MARRA; Pescatore et al. v. Chiquita Brands Int'l, Inc., No. 09-80683-CIV-MARRA; Sparrow v. Chiquita Brands Int'l, Inc., No. 11-80402-CIV-MARRA (Dec. 21, 2016)

**Speaking Engagements**

- AICPA webcast: "Introduction to Forensic Standards – Proposed Statement on Standards for Forensic Services (SSFS1 1)" (Dec. 10, 2018)

- AICPA Forensic and Valuation Services Conference (Atlanta, Ga.): "Professional Standards for Forensic Engagements" (Nov. 6, 2018)

- Securities Docket – Securities Enforcement Forum (Washington, D.C.): "Financial and Accounting Fraud" (Nov. 1, 2018)

- University of Texas School of Law Government Enforcement Institute (Dallas, Texas): "Financial Fraud Enforcement Trends:  A Conversation with the SEC and DOJ" (Sept. 20, 2018)



6

**JASON FLEMMONS**

- Center for Professional Education (McLean, Va.), "SEC Enforcement Initiatives and Trends" (June 15, 2018)

- University of Texas School of Law Government Enforcement Institute (Houston, Texas): "Financial Fraud Enforcement: Public Companies, the SEC and the DOJ" (Oct. 26, 2017)

- SEC Hot Topics Institute (Dallas, Texas): "SEC Enforcement and Litigation, Including Ethical Issues" (September 14, 2017)

- Securities Docket Securities Enforcement Forum West (Palo Alto, Calif.): "Financial and Accounting Fraud" (May 10, 2017)

- AICPA Forensic and Valuation Services Conference (Nashville, Tenn.): "Focusing on the Standard of Care in Consulting Matters" (Nov. 8, 2016)

- University of Texas School of Law Government Enforcement Institute (Houston, Texas): "The Audit Committee and Government Enforcement: Where the Buck Stops" (Sept. 29, 2016)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2015" (Jan. 15, 2016)

- Practising Law Institute (via webcast): "Accounting Materiality: In Fraud or in Fair Weather" (Nov. 19, 2015)

- AICPA Forensic and Valuation Services Conference (Las Vegas, Nev.): "Forensic Lightning Round" (Nov. 10, 2015)

- American Bar Association 10th Annual National Institute on Securities Fraud (New Orleans, La.): "Financial Fraud: Still a Problem or Gone Forever?" (Oct. 1, 2015)

- Compliance, Governance and Oversight Council (Minneapolis, MN): "FCPA – Proactive Monitoring for Compliance & Risk Management" (Sept. 16, 2015)

- University of Texas School of Law Government Enforcement Institute (Dallas, Texas): "SEC and DOJ Financial Fraud Investigations" (May 13, 2015)

- "Key Issues Facing Board of Directors: New SEC Enforcement Initiatives and Corporate Governance Risks" (Dallas, Texas) (May 12, 2015)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2014" (Jan. 13, 2015)

- AICPA Forensic and Valuation Services Conference (New Orleans, La.), "Recent Trends in Regulatory Enforcement" (Nov. 10, 2014)

- University of Texas 2014 Government Enforcement Institute (Dallas, Texas): "Accounting Fraud: The SEC's New Game Plan" (May 22, 2014)

- New York County Lawyers Association (New York, N.Y.): "Professional Responsibility for Lawyers, Accountants and Compliance Professionals" (March 25, 2014)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2013" (Jan. 8, 2014)

- AICPA Forensic and Valuation Services Conference (Las Vegas, Nev.), "Anatomy of a Regulatory Investigation" (Nov. 10, 2013)



**JASON FLEMMONS**

- FTI Consulting and the Federal Bar Association (Washington, D.C.), "SEC Enforcement: Questions for the New Division Co-director on What Lies Ahead" (June 17, 2013)

- AICPA webcast: "Sorting through the FCPA – A Guide for Financial Professionals" (May 2, 2013)

- Association of Corporate Counsel (Houston, Texas), "Navigating Uncharted Water: Anticipating the Cold Winds of Dodd-Frank Enforcement" (Jan. 31, 2013)

- Securities Docket webcast: "SEC Enforcement – Key Developments in 2012" (Jan. 23, 2013)

- Center for Professional Education (McLean, Va.), "SEC Enforcement: The Current Landscape" (Sept. 21, 2012)

- American Law Institute (Chicago, Ill.), "Accountants' Liability: Litigation and Issues in the Wake of the Financial Crisis" (Sept. 14, 2012)

- Center for Professional Education (Shanghai, China), "SEC Enforcement Issues for Asia-Based Companies" and "Panel Discussion on U.S. Regulation" (June 18, 2012)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Chief Accountants' Panel (Feb. 25, 2012)

- Center for Professional Education 1st Annual SEC Reporting Conference (Beijing, China), "SEC Enforcement Update" (via webcast) (Dec. 16, 2011)

- Center for Professional Education (McLean, Va.), "SEC Enforcement Update" (May 24, 2011)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Enforcement Panel (Feb. 4, 2011)

- Center for Professional Education Conference on Revenue Recognition (Philadelphia, Pa.), "SEC Enforcement Actions Involving Revenue Recognition Issues" (Nov. 17, 2010)

- SEC Speaks – Practising Law Institute (Washington, D.C.), SEC Chief Accountants' Panel (Feb. 5, 2010)

- AICPA National Conference on Current SEC and PCAOB Developments (Washington, D.C.), "SEC Enforcement Update", Co-Presentation with the SEC's Division of Enforcement (Dec. 8, 2009)

- Asia Pacific Economic Cooperation: Financial Regulators' Seminar (Manila, Philippines), "Interview Techniques," "SEC Enforcement Jurisdiction," "Common Fraud Schemes," "Anatomy of SEC Auditor Investigations" and "Royal Ahold – An Accounting Fraud Case Study" (Oct. 19-21, 2009)

- AICPA National Forensic Accounting Conference (Orlando, Fla.), "Ask the Regulators" Panel (Sept. 23, 2009)

- Center for Professional Education (Monarch Beach, Calif.), "SEC Enforcement Update" (June 26, 2009)

- Center for Professional Education (Shanghai, China), "SEC Enforcement Update" (June 8, 2009)

- Baruch College (New York, N.Y.), "Current Developments at the SEC" (Auditor Liability) (April 30, 2009)

- George Washington University (Washington, D.C.), "Royal Ahold – An Accounting Fraud Case Study" (March 4, 2009)



**JASON FLEMMONS**

- Center for Professional Education (New York, N.Y.), "SEC Enforcement Update" (Dec. 17, 2008)

- Center for Professional Education (McLean, Va.), "SEC Enforcement Update" (Sept. 23, 2008)

- California Society of CPAs (Las Vegas, Nev.), "Anatomy of an Audit Failure" (May 15, 2008)

**Publications**

- Top SEC Enforcement Events of 2014, Securities Docket column (Feb. 19, 2015)

- SEC Enforcement Statistics for Fiscal 2014 – Up or Down? Securities Docket column (Jan. 21, 2015)

- AICPA Forensic & Valuation Services Practice Aid "Forensic Accounting – Fraud Investigations" (October 2014)

- Digging Into Dodd-Frank's Resource Extraction Disclosure Rules And Implementation Challenges, FTI Consulting Forensic And Litigation Consulting Insights (Spring 2013 issue)



**DX1701-48**

**Exhibit 2**

# Documents, Materials, and Data Considered

## 2012, 2013, and 2014 Cavium Workpapers

- Q2 2012 Listing of Agreements Signed During the Period
- Q2 2012 Perform General Inquiries and Consider Additional Review Procedures
- Q2 2012 SAD
- Q3 2012 Audit Committee Slide Deck
- Q3 2012 Audit Committee Report Update
- Q3 2012 Communicate with the Audit Committee or Those Charged with Governance
- Q3 2012 SAD
- Q2 – Q3 2012 Post all deficiencies in internal control to SAD
- Evaluation of uncorrected misstatements in Q2 & Q3 2012 Memorandum dated November 1, 2012
- Report to the Audit Committee of the Board of Directors dated November 7, 2012
- Memorandum from 2012 year-end audit workpapers, Cavium, Inc. ("Cavium") – Consolidation Assessment of Xpliant, Inc.
- FY 2012 Summary of Aggregated Deficiencies
- Q1 – Q3 2013 Post all deficiencies in internal control to SAD
- Q1 – Q3 2013 SAD
- Q2 2013 Audit Committee Slide Deck
- Q2 2013 Communicate with the Audit Committee or Those Charged with Governance
- FY 2013 Engagement Leader and Manager Checklist (PwC_B00006158 – PwC_B00006168)
- FY 2013 Summary of Aggregated Deficiencies
- Summary of Aggregated Deficiencies Combined Significant Matters and Consultation Template – FY 2013
- Cavium memorandum, Accounting for Convertible Notes and Convertible Security of Xpliant, dated February 21, 2014.  (PwC_043969 – PwC_043971)
- PwC national office accounting consultation on convertible debt memorandum dated February 21, 2014 (Cavium Accounting Consultation Memo)
- Report to Audit Committee 2.24.14
- February 24, 2014 email from Mauro Botta regarding National Consultation Memo (PwC_B00000483 – B00000485)
- Q3 2014 SUM
- Q3 2014 Summary of Identified and uncorrected misstatements
- Q3 2014 Communicate with the Audit Committee or Those Charged with Governance
- Q3 2014 Report to the Audit Committee
- Q3 2014 Tax Disclosure Significant Matter Template
- Q1 – Q3 2014 Post all deficiencies in internal control to SAD
- Combined Significant Matters and Consultation Template SAD FY 2014

**DX1701-49**

**Exhibit 2**

# **Documents, Materials, and Data Considered**

- Confirm Required Consultation Performed Template FY 2014
- Cavium Audit Committee Required Communication FY 2014
- FY 2014 Summary of Aggregated Deficiencies
- Memo from Joy Wu/Suzy Seandel to Cavium File for Q4 FY 14, Evaluation under Auditing Standard AS 5 regarding internal control, dated February 20, 2015.
- Evaluating Internal Control Deficiencies Consultation Memo dated February 24, 2015 (Cavium Phishing Consultation Memo)
- Evaluating Internal Control Deficiencies Consultation Memo (Cavium Aggregation Consultation Memo) dated February 24, 2015 (PwC_B00008224 – PwC_B00008236)
- March 2, 2015 Email from Tye Thorson regarding National Consultation Memo (PwC_B00001747)
- Screen prints of Botta sign-offs from 2012-2014 year-end audit and quarterly reviews

## **2015 Harmonic Workpapers**

- Harmonic 2015 National Office Consultation Memo ("SLA Consultation Memo")
- Materiality screen print from 2015 year-end audit
- FY 2015 Summary of Aggregated Deficiencies
- Screen prints of Botta sign-offs for 2015 audit
- FY 2015 Engagement Leader and Manager Checklist
- FY 2015 SLA Revenue Recognition Convention Significant Matter Audit Screen
- Final AC Communication 3.24.16
- Harmonic FY'15 AC report 03.23
- Lead Schedule- Deferred and Unearned revenue- Harmonic 2015 YE
- Revenue approach memo for 2015 audit
- Email from Anna Watson attaching notes from national office consultation dated February 11, 2016 with Botta reply dated February 12, 2016 (PwC_B00000607 – PwC_B00000609).
- Botta sign-off on "Understand and valuate internal control – control environment"

**Exhibit 2**

# Documents, Materials, and Data Considered

**PwC Policies**

- PwC policy 2023 – Manager – dated September 2013
- PwC policy 2023 – Manager – dated April 2014
- PwC policy 2023 – Manager - dated November 2014 (PwC_B00002625 – PwC_B0002629)
- PwC policy 2570 – Manager Review Responsibilities – dated September 2013 (PwC_B00008290)
- PwC policy 2570 – Manager Review Responsibilities – dated August 2014
- PwC policy 2710 – Resolving Differences in Professional View Among Personnel Assigned to an Audit Engagement (PwC_B00008300 – PwC_B00008303)
- PwC Policy 3400 - Determine Materiality
- Extract from PwC Independence Website, SOPS Title: 420 *Accounting Advice and Opinions*
- PwC Non-Audit Service Guidance
- PwC Code of Conduct (Undated)
- PwC 2011 Global Code of Conduct
- PwC 2012 Global Code of Conduct
- PwC 2014 Global Code of Conduct
- PwC Policy – 2010 Our Standards: The US Ethics & Compliance Companion to the Global Code of Conduct
- PwC Policy – 2014 Our Standards: Using Your Good Judgment
- PwC Policy – 2015 Our Standards: Using Your Good Judgment
- PwC Policy – 2017 Our Standards
- PwC Employment Practices Policy dated February 17, 2012
- PwC Employment Practices Policy dated April 1, 2014
- PwC Employment Practices Policy dated May 11, 2016
- PwC Reporting Concerns Policy dated January 21, 2013
- PwC Reporting Concerns Policy dated October 19, 2017
- PwC Reporting Concerns Policy dated November 27, 2017

**Authoritative Standards and Regulations**

- AICPA Code of Professional Conduct
- AICPA Statement on Standards for Consulting Services No. 1, *Consulting Services: Definitions and Standards*
- PCAOB Interim Audit Standard AU 230, *Due Professional Care in the Performance of Work*
- PCAOB Interim Auditing Standard AU 350, *Audit Sampling*
- PCAOB Interim Auditing Standard AU 508, *Reports on Audited Financial Statements*
- PCAOB Auditing Standard No. 3, *Audit Documentation*
- PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*

**DX1701-51**

**Exhibit 2**

# **Documents, Materials, and Data Considered**

- PCAOB Auditing Standard No. 9, *Audit Planning*
- PCAOB Auditing Standard No. 15, *Audit Evidence*
- PCAOB Interim Ethics Standard, ET Section 101
- Rule 2-01(c)(4) of Regulation S-X
- Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934" (issued 6/20/07)
- Committee of Sponsoring Organizations of the Treadway Commission, Internal Control-Integrated Framework (1992 and 1994)
- Accounting Standards Codification Master Glossary – Embedded Derivative

**Legal Filings and Depositions**

- Mauro Botta vs. PricewaterhouseCoopers LLP, et al., Complaint dated May 3, 2018, Civil Case No: 3:18-cv-2615
- Deposition of Mauro Botta dated September 25, 2018 and exhibits
- Deposition of Tye Thorson dated November 9, 2018 and exhibits
- Deposition of Stig Haavardtun, January 9, 2019 and select exhibits

**Regulatory Correspondence**

- SEC document request dated April 28, 2017
- SEC termination letter dated February 20, 2018
- SEC TCR submission reference number TCR1478218903573.  (PLAINTIFF 0030 – 0034; PLAINTIFF 00165 – 00178)

**Other**

- PwC Practice Aid for Evaluating Control Deficiencies dated July 2014
- Harmonic Inc. Form 10-K for the year ended December 31, 2015
- PwC Audit Report dated March 10, 2008 included with Cavium's Form 10-K for the year end December 31, 2007
- PwC Audit Report dated January 21, 1997 included with Harmonic's Form 10-K for the year-end December 31, 1996
- PwC's audit report dated February 24, 2014 included with Cavium's Form 10-K for the year-end December 31, 2013
- Botta Summary Memo emailed to Thorson on February 22, 2015 (PwC_B00000390 – PwC_B00000398)
- Thorson response to Botta Summary Memo (PwC_B00001662 – PwC_B00001676)