**HUESTON HENNIGAN LLP**
John C. Hueston, State Bar No. 164921
*jhueston@hueston.com*
Moez M. Kaba, State Bar No. 257456
*mkaba@hueston.com*
Joseph A. Reiter, State Bar No. 294976
*jreiter@hueston.com*
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898
Attorneys for Defendant
PricewaterhouseCoopers LLP

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURO BOTTA, | Case No. 3:18-CV-2615-AGT |
| Plaintiff, | **DEFENDANT PRICEWATERHOUSECOOPERS LLP'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| PRICEWATERHOUSECOOPERS LLP, | |
| Defendant. | Judge:   Hon. Alex G. Tse |

1

# TABLE OF CONTENTS

2

Page

3

INTRODUCTION ....................................................................................... 1

4

BACKGROUND ......................................................................................... 8

5

I.     Relevant Auditing Standards ................................................... 8

6

II.    PwC's Audit Process.................................................................. 9

7

III.   Plaintiff's Tenure and History of Performance Issues at
8      PwC ........................................................................................... 11

9      IV.    Plaintiff Initiates a "Crusade" against the Auditing Industry
       and Devises "Project Genesis" to "Blow up" PwC by Filing
10     an SEC Complaint.................................................................... 15

11     V.     Plaintiff's Actions Demonstrate That His SEC Complaint
       Is Meritless ............................................................................. 16

12            A.     2012 and 2013 Cavium Audits ................................... 16

13            B.     2014 Cavium Audit.................................................... 18

14            C.     2015 Harmonic Audit ................................................ 20

15     VI.    Plaintiff Admits to Serious Misconduct and False
16            Statements ............................................................................ 21

17     VII.   PwC Terminates Plaintiff on Account of His Misconduct ................. 23

18     VIII.  The SEC and Other Government Entities Take No
       Enforcement Action after Investigating Plaintiff's
19     Complaints ............................................................................. 23

20     IX.    Plaintiff Tries to "Blow up" His Subsequent Employers ..................... 24

21     X.     Plaintiff Suffers No Emotional Distress as a Result of His
       Termination from PwC ............................................................ 26

22     PROPOSED FINDINGS OF FACT ........................................................27

23     I.     Plaintiff's Tenure at PwC........................................................ 27

24     II.    Plaintiff's SEC Complaint ...................................................... 28

25     III.   PwC's Termination of Plaintiff's Employment ...................... 29

26     IV.    Plaintiff's Subsequent Employments .................................... 30

27     PROPOSED CONCLUSIONS OF LAW.................................................. 31

28

PWC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-CV-2615-AGT

1

2

Page

3

I.   Plaintiff Has Not Established Liability on His Remaining
     Claims.................................................................................................31

4

     A.   Plaintiff Has Not Established That PwC Retaliated
          Against Him in Violation of the Sarbanes-Oxley Act..............31

5

          1.   Plaintiff Has Not Established a Prima Facie
               Case of Retaliation .........................................................32

6

7

          2.   PwC Has Shown by Clear and Convincing
               Evidence That It Terminated Plaintiff for
               Legitimate, Non-Retaliatory Reasons .............................35

8

9

     B.   Plaintiff Has Not Established That PwC Retaliated
          Against Him in Violation of Labor Code § 1102.5 ...................36

10

          1.   Plaintiff Has Not Established a Prima Facie
               Case of Retaliation Under Labor Code
               § 1102.5 ...........................................................................36

11

12

          2.   PwC Has Shown by Clear and Convincing
               Evidence That It Terminated Plaintiff for
               Misconduct ......................................................................38

13

14

     C.   Plaintiff's Whistleblower Claims Are Barred Under
          the Doctrine of Unclean Hands.................................................39

15

16

     D.   Plaintiff Has Not Established That PwC Breached
          His Employment Agreement .....................................................40

17

II.  Plaintiff Is Not Entitled to Any Remedies He Seeks ..........................41

18

     A.   Plaintiff Is Not Entitled to Economic Damages........................41

19

     B.   Plaintiff Is Not Entitled to Emotional Distress
          Damages.....................................................................................43

20

21

     C.   Plaintiff Is Not Entitled to Reinstatement ................................44

22

     D.   Plaintiff Has Not Presented Clear and Convincing
          Evidence Justifying Punitive Damages .....................................44

23

CONCLUSION...............................................................................................45

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Adler v. Fed. Republic of Nigeria,*

5
    219 F.3d 869 (9th Cir. 2000) ............................................................................. 39

6

*Allen v. Admin. Rev. Bd.,*

7
    514 F.3d 468 (5th Cir. 2008) ............................................................................. 34

8

*Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,*

9
    96 Cal. App. 4th 1017 (2002) ....................................................................... 7, 45

10

*Amusement Art, LLC v. Life is Beautiful, LLC,*
    2016 WL 6998566 (C.D. Cal. Nov. 29, 2016) .......................................... 39, 40

11

12

*Boyd v. Accuray, Inc.,*
    873 F. Supp. 2d 1156 (N.D. Cal. 2012) ........................................................... 35

13

14

*Cantu v. United States,*
    2015 WL 4720580 (C.D. Cal. Aug. 7, 2015) ............................................. 6, 42

15

*Costa v. Nat'l Action Fin. Servs.,*

16
    634 F. Supp. 2d 1069 (E.D. Cal. 2007) ...................................................... 6, 43

17

*Davis v. Farmers Ins. Exch.,*

18
    245 Cal. App. 4th 1302 (2016) .................................................................. 38, 39

19

*Dixon v. City of Coeur d'Alene,*

20
    2012 WL 2923149 (D. Idaho July 18, 2012) ................................................. 42

21

*DSAM Glob. Value Fund v. Altris Software, Inc.,*

22
    288 F.3d 385 (9th Cir. 2002) ........................................................................... 33

23

*Dyer v. Workers' Comp. Appeals Bd.,*
    22 Cal. App. 4th 1376 (1994) ..................................................... 5, 41, 42, 43

24

25

*Ellenburg v. Brockway, Inc.,*
    763 F.2d 1091 (9th Cir. 1985) ........................................................................ 40

26

27

*Erhart v. BofI Holding, Inc.,*
    269 F. Supp. 3d 1059 (S.D. Cal. 2017) ...................................................... 4, 32

28

TABLE OF AUTHORITIES (cont.)

Page(s)

*Escriba v. Foster Poultry Farms,*
 793 F. Supp. 2d 1147 (E.D. Cal. 2011)............................................................ 45

*Fitzgerald v. El Dorado Cnty.,*
 94 F. Supp. 3d 1155 (E.D. Cal. 2015)............................................................ 37

*G. D. Searle & Co. v. Superior Court,*
 49 Cal. App. 3d 22 (1975)............................................................... 7, 13, 45

*Guitron v. Wells Fargo Bank, NA,*
 619 F. App'x 590 (9th Cir. 2015).......................................................... 3, 35

*Harp v. Charter Commc'ns, Inc.,*
 558 F.3d 722 (7th Cir. 2009)............................................................ 31, 32, 34

*Hartford Underwriters Insurance Company v. Jobber's Wholesale, Inc.,*
 2015 WL 12765462 (C.D. Cal. July 13, 2015) ............................ 23, 25, 26, 27

*Henderson v. Sec. Nat. Bank,*
 72 Cal. App. 3d 764 (1977) ............................................................... 44

*In re Ceridian Corp. Sec. Litig.,*
 504 F. Supp. 2d 603 (D. Minn. 2007) ..................................................... 34

*Jones v. Home Fed. Bank,*
 2010 WL 255856 (D. Idaho Jan. 14, 2010).............................................. 45

*Kim v. Boeing Co.,*
 487 F. App'x 356 (9th Cir. 2012).......................................................... 3, 35

*Kress v. PricewaterhouseCoopers LLP,*
 2013 WL 140102 (E.D. Cal. Jan. 10, 2013)....................................... 17, 21, 22

*Love v. Motion Indus., Inc.,*
 309 F. Supp. 2d 1128 (N.D. Cal. 2004) ................................................. 37

*Mathieu v. Norrell Corp.,*
 115 Cal. App. 4th 1174 (2004) (dismissing .............................................. 45

*Matter of Gross v. Bd. Of Educ. of Elmsford Union Free Sch. Dist.,*
 78 N.Y.2d 13 (1991)..................................................................... 5, 41

1

TABLE OF AUTHORITIES (cont.)

2

Page(s)

3
4
*McKennon v. Nashville Banner Pub. Co.*,
   513 U.S. 352 (1995) ......................................................... 44

5
6
*Mokler v. Cnty. of Orange*,
   157 Cal. App. 4th 121 (2007).......................................... 36

7
8
*Morgan v. Regents of Univ. of Cal.*,
   88 Cal. App. 4th 52 (2000).......................................... 3, 38

9
*Murillo v. Rite Stuff Foods, Inc.*,
   65 Cal. App. 4th 833 (1998).......................................... 44

10
11
*Nance v. Time Warner Cable, Inc.*,
   433 F. App'x 502 (9th Cir. 2011)................................. 4, 33

12
13
*Nazif v. Computer Scis. Corp.*,
   2015 WL 3776892 (N.D. Cal. June 17, 2015) .................... 4, 32, 33

14
15
*Nejadian v. Cnty. of Los Angeles*,
   40 Cal. App. 5th 703 (2019)........................................... 37

16
17
*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
   112 F. Supp. 3d 83 (S.D.N.Y. 2015)............................... 40

18
19
*Pac. Gas & Elec. Co. v. Superior Court*,
   24 Cal. App. 5th 1150 (2018)........................................ 45

20
21
*Patten v. Grant Joint Union High Sch. Dist.*,
   134 Cal. App. 4th 1378 (2005)................................... 36, 38

22
*Piscitelli v. Friedenberg*,
   87 Cal. App. 4th 953 (2001).......................................... 44

23
24
*Raad v. Fairbanks N. Star Borough Sch. Dist.*,
   323 F.3d 1185 (9th Cir. 2003).................................... 34, 38

25
26
*Rabkin v. Oregon Health Scis. Univ.*,
   350 F.3d 967 (9th Cir. 2003).......................................... 44

27
28
*Reddy v. Mediscribes, Inc.*,
   2020 WL 2220202 (C.D. Cal. Feb. 18, 2020).................. 40

PWC'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
Case No. 3:18-CV-2615-AGT

TABLE OF AUTHORITIES (cont.)

Page(s)

*Rielly v. D.R. Horton, Inc.*,
　　2008 WL 4330299 (C.D. Cal. Sept. 17, 2008)....................................3, 31, 34

*Sangster v. United Air Lines, Inc*.,
　　633 F.2d 864 (9th Cir. 1980)....................................................................41, 42

*Scott v. Phoenix Sch., Inc.*,
　　175 Cal. App. 4th 702 (2009)........................................................7, 8, 9, 11, 45

*Stanchfield v. Hamer Toyota, Inc*.,
　　37 Cal. App. 4th 1495 (1995)................................................................5, 41, 42

*Teutscher v. Woodson*,
　　835 F.3d 936 (9th Cir. 2016).....................................................................7, 9, 44

*Toscano v. Greene Music*,
　　124 Cal. App. 4th 685 (2004)...........................................................................42

*Trimmer v. U.S. Dept. of, Lab.*,
　　174 F.3d 1098 (10th Cir. 1999)........................................................................35

*Van Asdale v. Int'l Game, Tech.*,
　　577 F.3d 989 (9th Cir. 2009)...........................................................31, 32, 33, 35

*Wallender v. Canadian Nat'l Ry. Co*.,
　　2015 WL 10818741 (W.D. Tenn. Feb. 10, 2015) ...........................................36

*Weingand v. Harland Fin. Sols., Inc*.,
　　2012 WL 3537035 (N.D. Cal. Aug. 14, 2012)................................................31

*Wittig v. CSX Transp., Inc.*,
　　2017 WL 2177342 (S.D. Ga. May 17, 2017)..................................................36

*Young v. Bank of Am.*,
　　141 Cal. App. 3d 108 (1983)......................................................................6, 43

**Statutes**

15 U.S.C. § 7213............................................................................................... 8

18 U.S.C. § 1514A(a)(1)................................................................................. 32

1

## TABLE OF AUTHORITIES (cont.)

2

Page(s)

3

Cal. Civ. Code § 3294 ........................................................................................... 7, 45

4

Cal. Lab. Code § 98.6 ................................................................................................. 2

5

Cal. Lab.Code § 1102.5 ................................................................................... 2, 36, 38

6

Cal. Lab. Code § 1102.6 .................................................................................... 36, 38

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's Pretrial Scheduling Order, Dkt. 138, Defendant PricewaterhouseCoopers LLP ("PwC") respectfully submits these Proposed Findings of Fact and Conclusions of Law.

## INTRODUCTION

Plaintiff Mauro Botta is a former Senior Manager in PwC's Assurance Practice whom PwC terminated for serious misconduct. During an internal investigation, Plaintiff stated during two separate interviews with PwC's outside counsel and representatives of PwC's Office of General Counsel that Plaintiff had fabricated a control and falsified audit documentation in connection with the annual audit of a client's internal control over financial reporting. Because Plaintiff asserted twice that he had violated his professional and ethical obligations, PwC immediately terminated his at-will employment.

For years before his termination, numerous PwC partners, staff, and clients had complained about Plaintiff's lack of leadership, judgment, and interpersonal and communication skills. Although Plaintiff demonstrated accounting knowledge and some technical skills, he struggled to meet the expected capabilities of a Senior Manager on a consistent basis. PwC devoted substantial resources to help Plaintiff succeed, but he refused to internalize feedback or implement changes. Ultimately, PwC removed Plaintiff from several engagements at the request of its clients who had grown increasingly frustrated with Plaintiff's unprofessional behavior.

Rather than take responsibility for his actions, Plaintiff decided to launch a self-described "crusade" against PwC and the auditing profession at large in an attempt to "blow up" firms like PwC. To that end, Plaintiff filed a whistleblower complaint against PwC with the U.S. Securities & Exchange Commission ("SEC"). In that complaint, Plaintiff alleged that the accounting departments of certain publicly traded companies that PwC audited were incompetent and accused PwC of lacking independence and objectivity. After thoroughly investigating Plaintiff's allegations,

the SEC declined to bring an enforcement action.[1]

Shortly after the SEC notified Plaintiff of its decision, Plaintiff initiated this lawsuit against PwC and seven of its partners, claiming that his termination was in retaliation for his alleged whistleblowing to the SEC.  Plaintiff asserted four whistleblower retaliation claims under the Sarbanes-Oxley Act ("SOX"), California Labor Code § 1102.5, California Labor Code § 98.6, and for wrongful termination in violation of public policy, as well as two peripheral claims for breach of contract and defamation.  On October 9, 2018, the Court dismissed all claims against the individual Defendants and Plaintiff's defamation claim against PwC.  Dkt. No. 67.

The Court should now reject Plaintiff's remaining claims and enter judgment in PwC's favor.  The evidence that PwC terminated Plaintiff's employment for legitimate, non-retaliatory reasons and that Plaintiff is not a *bona fide* whistleblower is overwhelming.  Even if it were not, undisputed facts show that Plaintiff did not suffer any economic loss and is not entitled to the damages or equitable relief that he seeks.

<u>Plaintiff Cannot Prove Liability</u>.  Plaintiff cannot establish any of the primary elements of his claims:

*First*, the evidence unequivocally shows that PwC terminated Plaintiff for legitimate reasons.  Plaintiff represented on two separate occasions during an internal investigation that he had fabricated a client's internal control and falsified audit documentation during an audit.  Plaintiff cannot dispute this.  He made the exact *same* representations in his SEC complaint and drafts of the SEC complaint.  Plaintiff also

---

[1] The SEC is one of a dozen government bodies that declined to take action against PwC based on Plaintiff's allegations.  After the SEC declined to prosecute, Plaintiff appealed to the SEC's Office of Inspector General.  Plaintiff also made complaints to the California Board of Accountancy, the Public Company Accounting Oversight Board, the FBI, the County of Santa Clara District Attorney, the California Department of Fair Employment and Housing, the California Department of Justice, the U.S. Department of Labor, U.S. Senator Elizabeth Warren's Office, U.S. Senator Dianne Feinstein's Office, and former U.S. Senator Kamala Harris's Office.  None of these entities took any enforcement action against PwC.

admitted in his discovery responses that he cannot recall what he said during his interviews with PwC's outside and in-house counsel. In light of Plaintiff's statements, PwC concluded that Plaintiff had necessarily engaged in misconduct justifying his termination. There is no question that Plaintiff's admissions that he violated his ethical and professional duties constitute a legitimate, non-retaliatory reason to terminate his employment. *See, e.g.*, *Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590, 591 (9th Cir. 2015) (affirming judgment against SOX whistleblower claim; finding employee's misconduct satisfied defendants' burden of presenting clear and convincing evidence of a non-retaliatory termination); *Kim v. Boeing Co.*, 487 F. App'x 356, 357 (9th Cir. 2012) ("Boeing presented clear and convincing evidence of its belief that Kim had been insubordinate and was subject to discharge on that basis[.]").

*Second*, Plaintiff cannot prove that the person who made the termination decision knew of Plaintiff's alleged whistleblowing to the SEC. Because Plaintiff asserted that he had engaged in serious misconduct, PwC elevated the issue to the Managing Partner of the U.S. Assurance Practice, Mark Simon, who immediately decided to terminate Plaintiff's employment. At that time, Mr. Simon did not know that Plaintiff had filed an SEC complaint. Mr. Simon had never worked with or interacted with Plaintiff, and Plaintiff has admitted that he did not discuss his allegations with Mr. Simon and did not know if anyone else had. No retaliation claim can succeed under these circumstances. *See, e.g.*, *Rielly v. D.R. Horton, Inc.*, 2008 WL 4330299, at *7 (C.D. Cal. Sept. 17, 2008) ("[I]t is not enough that someone in the company was aware of Plaintiff's complaints. Instead, Plaintiff must make a showing that the person who actually made the decision to fire him knew[.]"); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 73 (2000) (affirming dismissal where "all of the actual decision makers" "affirmatively stated in their declarations" that they had no knowledge of the plaintiff's protected activities).

*Third*, Plaintiff cannot demonstrate that he engaged in protected activity—an essential element of each whistleblower claim he asserts. Under Labor Code § 1102.5,

Plaintiff must prove that he reasonably believed that PwC had violated the law. Plaintiff's burden on his SOX claim is even higher, as it requires a reasonable belief that PwC engaged in *shareholder fraud*. *Nazif v. Computer Scis. Corp.*, 2015 WL 3776892, at *5–6 (N.D. Cal. June 17, 2015). Plaintiff's own actions show that he never held such a belief. In his role as a Senior Manager at PwC, Plaintiff expressly approved and signed off on each of the audits underlying his allegations. If Plaintiff disagreed with PwC's audit conclusions—as he now claims—Plaintiff had a professional and ethical obligation to document that disagreement in writing or remove himself from the audit. The fact that he did not do so, and instead provided his official sign off on the audits, demonstrates that he expressly agreed with the engagement team's audit conclusions and proves that he never believed PwC had any intent to defraud shareholders or violated any law. *See Nance v. Time Warner Cable, Inc.*, 433 F. App'x 502, 504 (9th Cir. 2011) (affirming dismissal of SOX claim where plaintiff certified in a letter that "he did not believe [] there had been any fraudulent activity"). Moreover, even if Plaintiff could prove that he subjectively believed that PwC engaged in shareholder fraud or otherwise violated the law, he cannot establish (as he must) that such a belief would have been objectively reasonable. *See Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017). As PwC witnesses will show—including the former Deputy Chief Accountant of the SEC's Division of Enforcement, Jason Flemmons—no reasonable auditor could have concluded that PwC violated the law, let alone engaged in shareholder fraud, by reaching the conclusions that Plaintiff now claims are incorrect.

Plaintiff's breach of contract claim is derivative of his whistleblower claims and fails for similar reasons. FAC ¶¶ 75, 108–11. Because PwC terminated Plaintiff for misconduct, PwC owed Plaintiff no notice and had the right to terminate his at-will employment agreement at any time. And even if Plaintiff could show that PwC breached a contractual obligation, his contract claim would still fail for lack of damages. As Plaintiff has admitted, he had already accepted a new job—with the same

salary, same benefits, and same title—*before* PwC terminated him, and Plaintiff had the option to start his new job *before* his termination date.  Because Plaintiff could have avoided missing a single paycheck, he has suffered no cognizable damages.  *See Matter of Gross v. Bd. Of Educ. of Elmsford Union Free Sch. Dist*., 78 N.Y.2d 13, 19 (1991) ("Petitioner was free to reject the employment for personal reasons, but she cannot now be heard to say that she is entitled to recover the amount of back pay she would have earned during that time had she accepted it.").

   Plaintiff Is Not Entitled to the Remedies He Seeks.  Independent of any liability issues, Plaintiff cannot obtain any legal or equitable relief.  Plaintiff primarily requests four categories of remedies: (1) economic damages; (2) emotional distress damages; (3) reinstatement; and (4) punitive damages.  None of these remedies is appropriate here.

   *First*, Plaintiff is not entitled to any economic damages because he did not lose any wages as a result of his termination.  *See Dyer v. Workers' Comp. Appeals Bd*., 22 Cal. App. 4th 1376, 1386 (1994) ("[A]ny . . . award for lost wages must be reduced by such sums as the employee earned or might reasonably have earned during the relevant period.") (internal citation omitted).  Plaintiff had accepted a new job offer with the same title and salary even before PwC terminated him, and Plaintiff started his new employment a few weeks after his termination.  Since then, Plaintiff has been unable to maintain steady employment, and cycled through four employers in the last four years, due in large part to the same behavioral issues that he demonstrated at PwC.  But Plaintiff has consistently earned a salary and benefits commensurate with what he earned at PwC.  To the extent Plaintiff did experience a decrease in earnings, such losses were due to his own choices and failures, not PwC's decision to terminate him.  *See Stanchfield v. Hamer Toyota, Inc*., 37 Cal. App. 4th 1495, 1502–03 (1995) ("[W]here[] . . . the employee was fired from a substantially similar position for cause, any amount the employee with reasonable effort could have earned by retaining that employment should be deducted from the amount of damages which otherwise would

have been awarded[.]").

Plaintiff attempts to overcome this obvious flaw in his damages theory by claiming that he would have made partner at PwC but for his termination.  Not only does the evidentiary record contradict this position factually, Plaintiff's speculative assertions fail as a matter of law.  *See, e.g.*, *Cantu v. United States*, 2015 WL 4720580, at *35 (C.D. Cal. Aug. 7, 2015) (declining to award damages for future lost wages after a bench trial because "[the plaintiff's] assertions that he has 'missed out on th[e] opportunity' for elevation to foreman status because of his injuries from the accident . . . are speculative and not properly awarded as damages").  Regardless, Plaintiff had an opportunity to make partner at his subsequent employers and mitigate all of his claimed damages.

*Second*, the record refutes Plaintiff's self-serving testimony that he suffered emotional distress.  *See Costa v. Nat'l Action Fin. Servs.*, 634 F. Supp. 2d 1069, 1078 (E.D. Cal. 2007) (holding that a plaintiff seeking damages for emotional distress "must demonstrate more than transitory symptoms . . . and unsupported self-serving testimony").  Plaintiff's own medical records demonstrate that he suffered no emotional distress because of his termination.  Plaintiff's therapist has concluded that Plaintiff is "functioning well," and his physician found no signs of "depression, anxiety, or stress, suicidal ideations or plans."  Nor has Plaintiff received any medication or treatment for any alleged emotional distress.  To the contrary, Plaintiff has continued to work full time following his termination from PwC and his social media posts are overwhelmingly positive.  Plaintiff cannot recover emotional distress damages in these circumstances.  *See Young v. Bank of Am.*, 141 Cal. App. 3d 108, 114 (1983) ("In order to recover damages for emotional distress[,] the injury suffered must be severe, i.e., substantial or enduring as distinguished from trivial or transitory.").

*Third*, Plaintiff is not entitled to the equitable remedy of reinstatement to his former position at PwC.  It is undisputed that Plaintiff told PwC's outside counsel and

1  PwC that he fabricated a control and falsified audit documentation.  Regardless of

2  whether Plaintiff fabricated an internal control in PwC's work papers (or "just" lied

3  about it), PwC cannot trust or rely on, and therefore cannot employ, an auditor who

4  claimed that he had engaged in gross misconduct.  Moreover, as numerous emails,

5  diary entries, and messages show, Plaintiff harbors significant hostility and

6  antagonism toward PwC and its partners.  Even before PwC terminated Plaintiff's

7  employment, he boasted to colleagues that he had resigned from PwC (and then

8  retracted his resignation) on more than *ten* separate occasions.  And Plaintiff's hatred

9  for PwC has only increased following his termination.  Plaintiff launched an extensive

10  media campaign criticizing PwC, filed countless complaints with every government

11  agency he can think of, and has directly called for the termination of numerous PwC

12  partners.  Because Plaintiff has irreparably damaged the employment relationship, he

13  cannot obtain reinstatement.  *See Teutscher v. Woodson*, 835 F.3d 936, 951 (9th Cir.

14  2016) ("The factors that determine whether a reinstatement award is appropriate

15  include whether excessive hostility or antagonism between the parties renders

16  reinstatement practically infeasible[.]") (internal quotations omitted).

17      *Fourth*, Plaintiff is not entitled to punitive damages because he cannot show by

18  "clear and convincing" evidence that PwC acted with "oppression, fraud, or malice."

19  Cal. Civ. Code § 3294.   To meet this standard, Plaintiff must prove that PwC

20  committed an "evil" act.  *G. D. Searle & Co. v. Superior Court,* 49 Cal. App. 3d 22,

21  31 (1975); *see also Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96

22  Cal. App. 4th 1017, 1048–50 (2002) (plaintiff must prove defendant had an "evil

23  motive" and its conduct has "the character of outrage frequently associated with

24  crime").  But Plaintiff has not presented any evidence—let alone clear and convincing

25  evidence—that PwC engaged in any "evil" conduct.  At most, Plaintiff contends that

26  PwC terminated him for a retaliatory purpose.  But "termination for an improper

27  reason" is "insufficient to support a finding of despicable conduct, because such [an]

28  action is not vile, base[,] or contemptible."  *Scott v. Phoenix Sch., Inc.*, 175 Cal. App.

4th 702, 716 (2009).

For all these reasons, PwC respectfully requests that the Court enter Judgment in PwC's favor on all of Plaintiff's remaining claims.

## BACKGROUND

PwC is one of the largest professional services firms in the United States.  One of the many services PwC provides is integrated audits of the financial statements and internal control over financial reporting of publicly traded companies that report to the SEC.  When conducting such audits, PwC reaches independent opinions on whether a company's financial statements have been prepared in accordance with generally accepted accounting principles and obtains reasonable assurance as to whether those statements are free of material errors.  PwC also opines as to whether the company maintained, in all material respects, effective internal control over financial reporting. At the conclusion of the audit, PwC presents its opinions in a report filed with the SEC.

## I.     Relevant Auditing Standards

Under SOX, the Public Company Accounting Oversight Board ("PCAOB") is responsible for promulgating standards that govern external audits of publicly traded companies.[2] 15 U.S.C. § 7213.  As relevant here, those standards provide that auditors must determine whether "one or more material weaknesses exist" in the company's "internal control over financial reporting."  AS 2201.02-03.  "Internal control[s]" are policies and procedures that company personnel implement and perform to prevent or detect material errors in the company's financial statements.  *Id.* at App. A5.  A "material weakness" in internal controls exists when there is a "reasonable possibility that a material misstatement of the company's . . . financial statements will not be prevented or detected on a timely basis."  *Id.* at A7 (emphasis omitted).

---

[2] The PCAOB auditing standards ("AS") are available at
https://pcaobus.org/Standards/Auditing/Pages/default.aspx.

When testing a company's internal controls, auditors most commonly find deficiencies that are less severe than a material weakness. Auditors can classify such deficiencies as either "control deficiencies" or "significant deficiencies," depending on their severity. *See id.* 2201.62, A11. When encountering such deficiencies, auditors must evaluate whether, individually and in the aggregate, they amount to a material weakness. *Id.* at A7. If they do not, auditors must still report any significant deficiencies to the company's audit committee. *Id.* at 2201.80-81.

## II.    PwC's Audit Process

As the PCAOB recognizes—and Plaintiff admits—audits of companies' internal control over financial reporting involve a high degree of professional judgment. *Id.* at 1015.11; DX 1649 at 24:9–11. Auditors must exercise judgment in determining whether, among other things, a deficiency in a company's internal controls exists, whether that deficiency creates a "reasonable possibility" of an error in the company's financial statements, whether that error could be "material," and, if not, whether the deficiency is nonetheless significant enough to warrant the audit committee's attention. AS 1015.11; 2201.62, A7, A11.

PwC implements numerous policies and procedures to assist its auditors in applying auditing standards across all audits. A PwC partner (the "Engagement Leader") leads each audit engagement and supervises a combination of Senior Managers, Managers, and/or Associates in executing the audit. Another PwC Partner (the "Quality Review Partner") evaluates significant judgments made by the engagement team and the related conclusions reached. Other senior auditors at the firm—including a "Risk Management Partner" and, as discussed below, expert auditors from PwC's national office—are available to assist the engagement team with any difficult issues that may arise.

At the conclusion of the audit, the Engagement Leader, Quality Review Partner, and other senior members of the audit team (including Senior Managers) electronically sign off on multiple "Evidence Gathering Activities," known as "EGAs." DX 1649 at

51:11–52:12; DX 1653; DX 1654.   A team member's signature on those EGAs represents their affirmation that the engagement team has (1) identified and appropriately documented all deficiencies in internal controls; (2) completed all audit work and documentation in accordance with the auditing standards; and (3) obtained appropriate evidence to support the conclusions of the audit.   DX 1654; DX 1649 at 55:19–59:16, 61:5–9.

Because audits require professional judgment, disagreements may arise among audit team members when evaluating a company's internal controls.   Auditors have an affirmative obligation under PCAOB auditing standards to voice such disagreements, *see* AS 1215.12(d), and PwC expressly encourages its auditors to do so, DX 1651-1. If a disagreement arises, the audit team must follow specific PwC policies to resolve it.   DX 1651.   The resolution process differs depending on the nature of the disagreement and may include a consultation with PwC's national office.   DX 1651-2.

The PwC national office helps resolve these disagreements and supports a consistent and accurate application of PCAOB's auditing standards and PwC's auditing guidance across PwC audits.   When the national office is called on to resolve a disagreement among audit team members, it assigns a team of experienced auditors and subject matter experts to evaluate independently the issue causing the disagreement and determine how to resolve it.

If an audit team member continues to disagree with the national office's conclusion after the consultation is complete, that individual has a professional and ethical obligation—pursuant to both PCAOB auditing standards and PwC policy—to document their disagreement in the audit work papers.   AS 1215.12(b); DX 1651-3–4; DX 1649 at 44:12–45:11.   If the PCAOB determines that an auditor has violated PCAOB auditing standards, that auditor may be subject to a variety of disciplinary actions, including permanent suspension from public accounting roles and monetary fines.   AS 5300(a).

Team members also can remove themselves from the engagement altogether or follow PwC's internal whistleblowing process if they believe that there has been a failure to comply with professional, regulatory, or legal requirements.  DX 1650-5; 1651-2; DX 1649 at 42:24–43:2, 49:6–50:22.  As PwC's Code of Conduct emphasizes, employees are always encouraged to "speak up" and voice their concerns if they "experience or witness something that does not feel right."  DX 1181-14.  PwC expressly "encourages an open process in which professionals should be actively involved resolving [any issues] encountered in the course of audit engagements."  DX 1651-1.

## III.   Plaintiff's Tenure and History of Performance Issues at PwC

Plaintiff Mauro Botta was born in Italy and worked for a PwC network firm in Milan before moving to San Jose and joining PwC's Assurance Practice as a Senior Associate in 2004.  Dkt. 141 at 13.  Plaintiff had satisfactory technical auditing skills for a Senior Associate and Manager.

In 2010, PwC promoted Plaintiff to Senior Manager.  *Id*.  Senior Managers have important technical and non-technical responsibilities during audits.  Senior Managers "assist in the design of the audit strategy and plan," "supervise its execution by the engagement team," "review the quality of fieldwork and its documentation" and, as discussed above, sign off on the relevant EGAs and "determin[e] that the audit documentation . . . has been prepared, reviewed, and archived in accordance with professional [f]irm standards."  DX 1650.  A Senior Manager's non-technical responsibilities are equally important.  Senior Managers are expected to "[h]elp[] build, brief and coach the team" and have "primary responsibility for interacting with client management."  *Id.*; DX 1649 at 34:12–19.

Plaintiff struggled to perform consistently the increased responsibilities and additional skills expected of a Senior Manager.  Although Plaintiff did meet expectations at times, and sometimes received positive reviews, his supervisors also documented    serious    shortcomings    in    Plaintiff's    leadership,    communication,

interpersonal skills, project management, and professional judgment.  *See* Ex. 1 at 36:4–16, 38:8–11; Ex. 2 at 55:1–13, 82:15–22; DX 1238.  As a Senior Manager, Plaintiff was expected to gain these skills and address areas needing improvement; instead, Plaintiff's deficiencies worsened as time went on.  Because of Plaintiff's inconsistent performance, and failure to improve his client communication, project management, and judgment, Plaintiff was never a candidate for PwC partner.  Ex. 3 at 41:12–24; 43:7–21.

Even Plaintiff recognized this fact.  In March 2013—years before Plaintiff's alleged whistleblowing—Plaintiff asked for help "to improve [his] situation," "understand what [it] is that [he was] missing," and learn if "there [was] realistic consideration of [Plaintiff] as a partner in the future or if [he had] already been pretty much discounted at [that] point."  DX 1052.  Likewise, in early 2014, Plaintiff resigned from PwC based on "the belief that he . . . cannot be successful here in the long run."  DX 1240-1.

In response to Plaintiff's resignation, PwC encouraged Plaintiff to stay and tried to help him improve his performance.  PwC assigned him a career coach and, in May 2014, Plaintiff solicited candid and unfiltered feedback from several PwC partners to help him understand his performance issues.  JX 2.  The surveyed partners noted—again, before Plaintiff's alleged whistleblowing—that Plaintiff had a "negative" communication style; often failed to find solutions to problems and instead engaged in a "headless chicken type act"; needed to "spend more time at his clients" to "develop his client relationships"; and had a "black and white" auditing approach even though audits require significant professional judgment.  JX 2-4–7.  Characteristically, after receiving this feedback, Plaintiff again resigned.  DX 1180.

This was part of a larger pattern.  When PwC tried to help Plaintiff improve, he reacted defensively by blaming others.  In fact, Plaintiff threatened to resign from PwC on at least *ten* separate occasions, generally after receiving constructive criticism or feedback identifying areas for improvement.  DX 1649 at 258:5–17; Ex. 2 at 32:5–

33:6, Ex. 4 at 33:15–34:7; DX 1037; DX 1111.  Each time, PwC encouraged Plaintiff not to make hasty decisions, but to be thoughtful about his career.  Even *after* his alleged whistleblowing, PwC encouraged Plaintiff not to resign but to work through any issues he had.  DX 1649 at 259:23–260:1; DX 1182.

Despite PwC's support, Plaintiff's behavior worsened in the years leading up to his termination.  In April 2016, for example, a PwC partner noted in a performance review that Plaintiff had "performance gaps related to building strong relationships . . . and basic project management," including "significant challenges closing out issues."  DX 1238.  These performance issues led to Plaintiff failing to complete an audit on time, requiring PwC to bring in at least five additional auditors to finish the audit before the SEC reporting deadline.  Ex. 2 at at 55:17–56:19.  Despite the extraordinary action taken to salvage an audit Plaintiff was mismanaging, Plaintiff accepted no fault.  He instead blamed the "lack of basic . . . training" of his PwC colleagues, the lead PwC partner on the audit, and the client (*i.e.*, everyone but Plaintiff).  DX 1139-16, 23, 26.

Plaintiff's client communication skills and professional judgment also progressively deteriorated.  For example, Plaintiff sent less experienced staff to a client's accounting group to relay messages that their work was not "good enough" and did not meet "[Plaintiff's] standards" instead of meeting with the client himself to explain the issues and information that Plaintiff demanded.  Ex. 2 at 59:19–61:15.  This "caused significant client frustration" and delay.  *Id.* at 59:19–61:15, 55:1–13; DX 1238.

Most significantly, Plaintiff refused to accept different points of view, even though his profession required a substantial degree of judgment.  When clients or other PwC employees disagreed with Plaintiff, he accused them of "incompetence" or labeled them "criminals" based on nothing more than his disagreement with their accounting judgments.  Plaintiff made one long-tenured accountant of a client "feel like a criminal" and caused her to "walk out of a meeting and resign."  DX 1238, JX 37.  The client's Chief Accounting Officer told PwC that he had received "dozens" of

similar complaints about Plaintiff from other employees.  JX 37.  Notably, Plaintiff repeated this same pattern of behavior at his subsequent employers.  DX 1583; DX 1584.

Plaintiff's unprofessional behavior toward clients was a serious problem that threatened to undermine the integrity of PwC's audits.  Open communication between a client and an auditor is essential for quality audits.  Ex. 2 at 63:11–18; Ex. 4 at 62:23–63:4.  Auditors cannot do their job effectively without full and transparent conversations with clients to obtain an understanding of the relevant facts and circumstances and to obtain access to all necessary information.  Auditors must build effective communication with their clients.  Plaintiff repeatedly failed to do so.

Because of these and other problems, PwC removed Plaintiff from two audit engagements.[3]  DX 1649 at 202:14–22, 207:4–208:16; Ex. 2 at 57:9–19; 63:6–24; Ex. 4 at 43:8–24, 112:8–22.  Still, hopeful that Plaintiff could overcome his performance issues, PwC continued to try to help him.  Although Plaintiff's behavioral issues made it more difficult, PwC continued to find Plaintiff other audits and appropriate projects to work on—including a new and important firm initiative named the "Center of Excellence" and an audit engagement for DASAN Zhone Solutions.  But Plaintiff refused to take these assignments seriously.[4]

---

[3] In 2017, a third client requested Plaintiff's removal from an audit engagement due to Plaintiff's improper behavior.  Ex. 5 at 33:15–34:14; DX 1649 at 213:10–215:4.  PwC kept Plaintiff on the engagement team, however, and tried to provide counseling.

[4] Plaintiff has alleged that PwC retaliated against him by failing to staff him on a project for Pacific Biosciences, Inc. after removing him from the two audits discussed above.  FAC ¶ 62–65.  As evidence will show, however, PwC staffed a Senior Manager with a pharmaceutical background—which Plaintiff did not have—and that decision had nothing to do with Plaintiff's alleged whistleblowing.  Plaintiff understood this.  When a PwC partner volunteered to look into the staffing decision, Plaintiff told him to not raise the issue.  DX 1649 at 221:7–14.

**IV.     Plaintiff Initiates a "Crusade" against the Auditing Industry and Devises "Project Genesis" to "Blow up" PwC by Filing an SEC Complaint**

Plaintiff responded to PwC's feedback on his poor performance and his removal from audit engagements by making baseless accusations against PwC and its partners. He first made a series of complaints to PwC's Office of Ethics and Business Conduct challenging his evaluations and assignments.  *See, e.g.*, Ex. 5 at 27:1–8, 50:6–51:1. Each time, PwC investigated Plaintiff's allegations and concluded that they were "unsubstantiated."  *Id.* at 56:14–20.  Plaintiff even apologized to one PwC Partner about whom he had complained—Stig Haavardtun—and acknowledged there was no basis for an investigation.  *Id.*; Ex. 2 at 71:24–72:5.

Then, in November 2016, Plaintiff submitted a Tip, Complaint, or Referral to the SEC ("SEC Complaint").  Dkt. 141 at 13; JX 4.  Plaintiff discussed his reasons for filing the SEC Complaint in a "book" he wrote about his life.  Referring to PwC as a "mafia," Plaintiff wrote about his "battles" against PwC.  DX 1630-37.  "In an effort to find a solution to" his "problems," Plaintiff (a devout *Star Trek* fan who wore *Star Trek* costumes to work events and edited PwC work papers under the pseudonym "James T. Kirk") developed a "personal project [he] baptized as 'Genesis', in *Star Trek's* honor."  *Id*. (emphasis added).  "Project Genesis" apparently refers to a *Star Trek* device capable of causing a "genetic explosion that would reduce the surface of a planet to its elementary particles."[5]

When Plaintiff drafted his SEC Complaint, he admitted in writing that Project "Genesis," *i.e.*, his desire to destroy PwC, was his "only reason" for continuing to work at PwC.  Ex. 7.  Later, Plaintiff would admit that he is on a personal "crusade" against the entire auditing industry in the Silicon Valley, that his goal is to "bl[ow] up" auditing firms like PwC, and that his idea of how to conduct an audit is "too utopia to find it in reality."  DX 1539; DX 1692.

---

[5] *See* http://www.startrek.com/database_article/project-genesis.

**V.      Plaintiff's Actions Demonstrate That His SEC Complaint Is Meritless**

The primary allegations in Plaintiff's SEC Complaint relate to the audits PwC conducted for two companies: Cavium, Inc. and Harmonic, Inc.  *See* FAC ¶¶ 28–58 (Company B and C); DX 1672.  At bottom, Plaintiff claims that PwC incorrectly concluded that Cavium and Harmonic did not have "material weaknesses" in their internal controls.  DX 1649 at 111:18–24, 113:20–23, 150:19–25.  Plaintiff alleges that PwC refused to issue material weaknesses because the PwC partners lacked independence and objectivity.  *Id.* at 114:16–20, 168:25–6.

Plaintiff is incorrect, and his own actions disprove his allegations.  As the trial evidence will demonstrate, at the time of each of the audits at issue, Plaintiff *expressly agreed* that no material weaknesses existed and signed off on all relevant EGAs affirming that PwC had appropriately evaluated and documented all control deficiencies.

**A.      2012 and 2013 Cavium Audits**

Plaintiff joined the Cavium engagement team in 2012 as Senior Manager who was responsible for, among other things, designing and supervising the execution of the Cavium audits.  DX 1649 at 88:15–21.  PwC concluded that none of the identified control deficiencies rose to the level of a material weakness during the 2012 or 2013 audits.  Plaintiff agreed with that assessment and signed EGAs certifying, among other things, that his team had properly evaluated and documented all control deficiencies and had completed all audit work and documentation in accordance with the auditing standards.  DX 1270.

Although Plaintiff's SEC Complaint mentions the 2012 and 2013 audits, it lists only internal control deficiencies and issues that the client and PwC had already evaluated during those years.  DX 1672-6–7.  Plaintiff did not disagree with his engagement team's conclusions or allege that Cavium had a material weakness.  *Id.* Plaintiff did not claim otherwise during his deposition and admitted that "[t]here was

1    no material weakness as part of our control opinion for [2012 and] 2013 audit[s]."  DX

2    1649 at 125:22–127:5.

3         Plaintiff's complaint merely alleges that Cavium inadequately analyzed the

4    appropriate accounting treatment for a convertible security during the 2013 Cavium

5    audit.  FAC ¶ 34.  As Plaintiff has admitted, however, the issue was "very complex"

6    and required a consultation with PwC's national office.  DX 1649 at 127:7–128:8.

7    PwC ultimately concluded that this issue amounted to—at most—a control deficiency

8    and not a material weakness or even a significant deficiency.  Plaintiff expressly agreed

9    with that conclusion.  *Id.* at 126:15–128:8, 137:11–18.

10        Plaintiff also alleges that, during the same audit, the Engagement Leader, Tye

11   Thorson, acted improperly by instructing a PwC employee to share with Cavium a

12   memo analyzing how to account for the convertible security discussed above.  FAC

13   ¶ 36.  Although Plaintiff has no evidence that PwC shared the memo with Cavium,

14   nothing in the auditing standards or the law would have prohibited PwC from doing

15   so.  *See, e.g.*, *Kress v. PricewaterhouseCoopers LLP*, 2013 WL 140102, at *8 (E.D.

16   Cal. Jan. 10, 2013) ("[T]he auditor independence rules do not prohibit PwC from

17   advising management on matters relating to the client's financial statements.").[6]

18   Indeed, by the time Mr. Thorson made the alleged request, Cavium management had

19   independently identified the error and brought it to PwC's attention, and PwC

20   subsequently analyzed the error and documented it as a deficiency.  It would have been

21   appropriate for PwC to explain to Cavium the accounting guidance considered in

22   PwC's analysis.

23

24

25
_____

26   [6] The PCAOB has directly addressed this issue and confirmed that Plaintiff's belief is mistaken.  *See*
     PCAOB, *The "State of the Union" of the PCAOB* (Nov. 16, 2004), *available at*
27   https://pcaobus.org/news-events/speeches/speech-detail/the-state-of-the-union-of-the-pcaob_129
     ("Auditing Standard No. 2 is not intended to erect a wall of silence between auditors and clients.
28   Auditors have long advised public companies on accounting issues and on internal control matters;
     Auditing Standard No. 2 does not preclude that kind of advice and discussion.")

1

### B.    2014 Cavium Audit

2      The majority of Plaintiff's allegations in his SEC complaint about the Cavium

3 engagement concern the 2014 audit.  DX 1672-7–9.  Near the end of the 2014 audit,

4 Plaintiff informed Mr. Thorson (the Engagement Leader) that Plaintiff believed a

5 material weakness existed in Cavium's controls.  DX 1672-7-9; DX 1649 at 142:13–

6 19, 150:9–18.  Plaintiff knew about these alleged issues for "weeks, if not months,

7 beforehand," yet he waited until the very end of the audit—just days before Cavium's

8 SEC reporting deadline—to raise them with anyone.  DX1649 at 144:9–145:3.

9      To better understand Plaintiff's concerns, Mr. Thorson asked Plaintiff to

10 document them in a memo, which Plaintiff produced on February 22, 2015.  DX 1649

11 at 143:7–17; 1676.  In that memo, Plaintiff asserted that Cavium's financial department

12 was incompetent.  DX 1676-8–9.  But as PwC's witnesses will explain, the examples

13 of "incompetence" Plaintiff identified did not support his conclusion under the

14 auditing standards.  DX 1649 at 150:9–151:1; DX 1676-8–9.

15     After reviewing Plaintiff's memo and discussing its reasoning with Plaintiff,

16 Mr. Thorson disagreed that Cavium's accounting department was incompetent or that

17 a material weakness existed.  Ex. 5 at 81:25–86:9.  Accordingly, Mr. Thorson followed

18 PwC policy for resolving his disagreement with Plaintiff, which required a

19 consultation with either the engagement team's Quality Review Partner (Robert

20 Heatley) or a Risk Management Partner (Timothy Scott).  DX 1651-2.  Mr. Thorson

21 consulted with both.  Ex. 5 at 73:10–15, 79:9–11.  Both Mr. Heatley and Mr. Scott—

22 who had a combined 60 years of auditing experience—disagreed with Plaintiff and

23 agreed with Mr. Thorson.  Ex. 5 at 50:19–22, 81:23–83:9; Ex. 1 at 23:15–17.

24     Because the Engagement Leader, the Quality Review Partner, and the Risk

25 Management Partner all reached the same conclusion, PwC policy did not require any

26 additional consultations to move forward with the audit.  DX 1651-2.  Nonetheless,

27 Messrs. Thorson, Heatley, and Scott decided to initiate a formal consultation with

28 PwC's national office.

The national office assigned a team of expert auditors unaffiliated with the Cavium engagement to independently examine Plaintiff's allegations.  A senior PwC partner, Gil Simonetti, whose involvement Plaintiff had expressly requested because he "trusted Mr. Simonetti to get to the fair conclusion," led the national office consultation.  DX 1649 at 157:22–158:22.

After thoroughly examining the engagement team's conclusions and underlying facts, Mr. Simonetti and other members of the national office agreed with Messrs. Thorson, Heatley, and Scott that no material weaknesses existed in Cavium's internal controls.   DX 1649 at 161:24–162:19; DX 1677.   Plaintiff had three separate conversations with Mr. Thorson, Mr. Heatley, and Mr. Simonetti to discuss the national office's assessment.  During these conversations, Plaintiff *expressly agreed* with the national office's and the rest of the audit team's conclusion and indicated that the national office consultation had resolved all of his concerns.  Ex. 5 at 93:10–96:25; Ex. 1 at 33:13–34:14; DX 1649 at 164:12–165:11.

Shortly thereafter, Plaintiff signed off on all relevant EGAs, formalizing his agreement that no material weaknesses existed in Cavium's internal controls.   DX 1649 at 165:17–167:14, 168:21–24; DX 1270.  If Plaintiff truly believed that Cavium had a material weakness (as he alleges now), PCAOB auditing standards and PwC policy required him to document his disagreement.  AS 1215.12(b); DX 1651 at 8302–03; 1649 at 44:12–45:11.  He did not do so.

Recognizing the significance of this evidence, Plaintiff has asserted, for the first time in this case, that he felt "pressured" to sign off because he was concerned about his career prospects at PwC.  But no one asserted any alleged pressure.  Plaintiff has already admitted that the leader of the national consultation, Mr. Simonetti, never pressured him to agree with PwC's conclusion.  DX 1649 at 165:9–16.  Plaintiff's own imagination invented any "pressure" he supposedly felt, since PwC policies encourage employees to speak up and PwC absolutely prohibits retaliation against auditors who do so.  DX 1651-2.  In any event, Plaintiff had a professional and ethical obligation to

- 19 -

document his disagreement regardless of any supposed "pressure" he felt, AS 1215.12(d), and he could have avoided such "pressure" altogether by asking to withdraw from the audit.  He did neither.

### C.  2015 Harmonic Audit

The second audit engagement Plaintiff's SEC Complaint focuses on is the 2015 year-end audit of Harmonic.  Again, Plaintiff claimed that the entire accounting department at Harmonic was "incompetent."  And again, Plaintiff based his conclusion on a few internal control deficiencies and his disagreements with Harmonic's professional financial staff, while ignoring facts flatly contradicting his conclusions. DX 1649 at 98:6–22; DX 1672-10–14.

Importantly, at no point during the Harmonic audit did Plaintiff disagree with the company's or his team's conclusion that no material weaknesses existed.  Just the opposite: Plaintiff signed off as the reviewing Senior Manager on all relevant EGAs, affirming that PwC had appropriately evaluated and documented all deficiencies in Harmonic's internal controls.  DX 1649 at 108:16–109:3, 110:22–111:5.  Plaintiff also verbally informed the Engagement Leader (Stig Haavardtun) that Plaintiff did not have concerns about the team's conclusions.  Ex. 2 at 48:5–12.  It is telling that Plaintiff accused Harmonic's accounting department of incompetence only *after* Harmonic employees complained about Plaintiff's chronic communication failures and other behavioral issues.

Plaintiff also makes unsupported allegations with respect to one narrow issue that arose during the audit relating to an error in Harmonic's accounting of its deferred revenue.  In short, Plaintiff alleges that Mr. Haavardtun insisted on using an unduly small sample size of 60 contracts to estimate the effect of an error on Harmonic's revenue numbers, while Plaintiff asserted that the engagement team must review every single contract (hundreds of thousands in total).  FAC ¶¶ 48–52.  Plaintiff's allegations are false.  Mr. Haavardtun did not instruct Plaintiff to use a sample size of 60 contracts to estimate the error.  Ex. 2 at 41:21–42:1.  Regardless, the Harmonic engagement

1  team consulted with PwC's national office on this issue, and both the national office

2  and engagement team concluded that sampling was appropriate.  *Id.* at 42:5–46:9; JX

3  26.  Plaintiff expressly agreed with that conclusion, as well as the fact that Harmonic's

4  error did not constitute a material weakness in its controls.[7]  DX 1649 at 108:21–110:4;

5  DX 1671; DX 1116.

6  ## VI.    Plaintiff Admits to Serious Misconduct and False Statements

7         In  response  to  Plaintiff's  whistleblower  complaint,  the  SEC  initiated  an

8  investigation into PwC's 2013 and 2014 Cavium audits.  On April 28, 2017, in a letter

9  addressed to PwC's Assistant General Counsel, the SEC requested various documents

10  relating to the Cavium audits it was investigating.  JX 20.  PwC retained Orrick,

11  Herrington  &  Sutcliffe  LLP  ("Orrick")  to  conduct  an  internal  investigation  and

12  respond  to  the  SEC's  document  requests.   The  then-head  of  Orrick's  White  Collar

13  Criminal  Defense  practice,  Walter  Brown,  led  the  investigation.   Dkt.  85-06  ("Brown

14  Decl.") ¶ 2.

15         During that investigation, Mr. Brown and his team met with various individuals

16  who  worked  on  the  Cavium  audits  subject  to  the  SEC's  investigation.   Because

17  Plaintiff served as Senior Manager on those audits, Mr. Brown, other attorneys from

18  Orrick, and representatives from PwC's Office of General Counsel met with Plaintiff

19  for  two  interviews  on  June  14,  2017  and  July  21,  2017.   Brown  Decl. ¶ 3.   Each

20  interview lasted approximately three hours.  *Id.*

21         During the first interview on June 14, 2017, Plaintiff volunteered that he had

22  engaged in misconduct during the 2014 Cavium audit.  As Plaintiff explained, PwC's

23  national office team—which was conducting an independent assessment of Cavium's

24  controls  in  response  to  Plaintiff's  disagreement  discussed  above—had  raised  a

25  question  as  to  whether  one  of  Cavium's  internal  controls  was  sufficient  to  catch

26

27  ───────────────

   [7] Plaintiff makes a number of other inflammatory accusations, including claims that Mr. Haavardtun

28  told Plaintiff that PwC had to ignore material weaknesses at Harmonic.  FAC ¶¶ 50, 55, 57.  All of
   these allegations are false, as PwC will prove at trial.  Ex. 2 at 77:20–78:11, 50:17–20.

material tax disclosure errors.  Brown Decl., Ex. 1 at PwC_B00006240.  Plaintiff represented that he addressed the national office's concern by creating from whole cloth and then falsely documenting an internal control that *did not actually exist* at Cavium.  *Id.* ¶ 4, Ex. 1 at PwC_B00006240.  Specifically, Plaintiff said that he falsely wrote in PwC's work papers that Cavium had a control that required Cavium management to investigate fluctuations in the company's deferred tax balances if those fluctuations exceeded $10 million.  *Id.*, Ex. 1 at PwC_B00006240.  This fabrication constitutes serious misconduct in violation of Plaintiff's professional responsibilities.

Because Orrick and PwC wanted to understand Plaintiff's conduct more completely, they interviewed him again on July 21, 2017.  During that interview, Mr. Brown showed Plaintiff edits he had made to a March 1, 2015 memorandum that discussed certain Cavium internal controls.  Consistent with his first interview, Plaintiff stated several different times that his edits to the memorandum were fabrications that did not accurately describe, according to his understanding, the internal controls in place at Cavium at the time.  Rather, Plaintiff asserted that he had fabricated an internal control and falsely documented it.  *Id.* ¶¶ 5–6.

Importantly, Plaintiff made the same representations in his SEC Complaint and a draft SEC Complaint that he prepared.  Plaintiff's SEC Complaint describes a fake control that Plaintiff claimed to have created for Cavium.  Plaintiff wrote to the SEC that this control "was *created the night before the filing of the 10-K*," "was not noted during the walkthrough," and instead "constituted a documentation exercise."  DX 1649 at 254:14–255:19; DX 1672-9 (emphasis added).  A draft of this SEC Complaint that Plaintiff had prepared makes even more direct assertions that Plaintiff had fabricated a control.  Plaintiff wrote that the PwC audit opinion "was able to be issued thanks to *me* creating a control the day before the filing of the Form 10-K which was *never documented nor discussed with the [c]ompany*."  DX 1689-2 (emphasis added).

In sum, the overwhelming evidence proves that Plaintiff asserted during two separate interviews with PwC's outside counsel that he had fabricated a control and

falsified audit documentation.  Plaintiff cannot contest this.  Even if Plaintiff concocts an alternative explanation at trial, he has already admitted in response to PwC's Requests for Admission that he cannot recall what he said during his interviews.  *See Hartford Underwriters Insurance Company v. Jobber's Wholesale, Inc.*, 2015 WL 12765462, at *2 (C.D. Cal. July 13, 2015) ("Admissions made in requests for admission are binding and cannot be explained away or contradicted by other evidence.").

## VII.   PwC Terminates Plaintiff on Account of His Misconduct

In light of Plaintiff's statements that he had fabricated an internal control and audit documentation, PwC terminated Plaintiff for cause on August 17, 2017.  Although PwC had not completed its investigation, Plaintiff's statements required his termination.  Specifically, Plaintiff had either (a) fabricated a client's internal control and made false statements in PwC's working papers or (b) lied that he had done so during the course of an internal investigation.  Simon Decl. ¶ 6.  Either alternative constitutes misconduct requiring Plaintiff's termination.  *Id*.

The Managing Partner of PwC's U.S. Assurance Practice, Mark Simon, made the decision to terminate Plaintiff.  *Id.* ¶ 3.  At the time Mr. Simon made that decision, he *did not know* that Plaintiff had filed his SEC Complaint.  *Id.* ¶ 7.  Nothing in the record so much as suggests otherwise, and Plaintiff's interrogatory responses do not even identify Mr. Simon as one of the individuals who allegedly knew of Plaintiff's whistleblowing.  DX 1595-2–3.  Plaintiff further admitted at his deposition that he never spoke to Mr. Simon about his alleged whistleblowing and did not know whether anyone else had.  DX 1649 at 255:20–256:16.  In fact, Plaintiff indicated that he never even met Mr. Simon.  *Id.*

## VIII.  The SEC and Other Government Entities Take No Enforcement Action after Investigating Plaintiff's Complaints

At all times during the SEC's investigation, PwC provided its full cooperation and support.  Among other things, PwC produced responsive documents concerning

1  the audits at issue (PwC made seven document productions to the SEC) and complied

2  with the SEC's interview requests.  During the course of the investigation, the SEC

3  interviewed Plaintiff on four separate occasions.  In February 2018, the SEC closed its

4  investigation without taking any enforcement action.   DX 1524.   Plaintiff then

5  appealed unsuccessfully to the SEC Office of Inspector General.  DX 1643.

6      Since then, Plaintiff has continued his "crusade."  He petitioned to testify before

7  Congress about his beliefs regarding wide-spread regulatory failings and corruption.

8  Plaintiff also made similar complaints about PwC to the California Board of

9  Accountancy, the FBI, the PCAOB, the County of Santa Clara District Attorney, the

10  California Department of Fair Employment and Housing, the California Department

11  of Justice, the U.S. Department of Labor, U.S. Senator Elizabeth Warren's Office, U.S.

12  Senator Dianne Feinstein's Office, and former U.S. Senator Kamala Harris's Office.

13  DX 1631.  Like the SEC, none of these entities has taken any enforcement action

14  against PwC.

15  **IX.    Plaintiff Tries to "Blow up" His Subsequent Employers**

16      A few weeks before Plaintiff represented to Orrick that he had fabricated an

17  internal control, PwC informed him that he would not make partner at the firm.  PwC

18  did so pursuant to its "Friends of the Firm" program, which identified more than 140

19  Senior Managers with at least five years of experience who were "not in the partner

20  pipeline." Ex. 6 at 27:6–15; DX 1200.  PwC had many Senior Managers at the time

21  but was able to admit only a fraction of them to the partnership.  Those who were not

22  competitive   candidates   and   who   underperformed—including   Plaintiff—were

23  encouraged to find new employment, but the timing was flexible.  Ex. 6 at 29:23–

24  30:18; Ex. 5 at 71:5–73:19.  Ultimately, PwC terminated Plaintiff because of his

25  serious misconduct discussed above—not pursuant to the Friends of the Firm program.

26      Armanino LLP.  After learning of the Friends of the Firm program, but *before*

27  his termination for misconduct, Plaintiff accepted in writing an offer to join another

28  auditing firm, Armanino LLP.  DX 1047-11–13.  He held the same title that he had at

1  PwC: "Senior Manager" in Armanino's "Audit Department." *Id.* He also had the same
2  salary ($190,000), health benefits, a retirement plan, and an annual bonus opportunity.
3  *Id.* In other words, Plaintiff fully mitigated his alleged damages even before PwC
4  terminated his employment.

5  Plaintiff began working at Armanino on September 11, 2017, but abruptly
6  resigned only four months later. DX 1649 at 264:14–19. As Plaintiff told his co-
7  workers, he resigned because his "idea of audit is probably too utopia to find it in
8  reality and had [he] kept going [he would] have be (sic) always unhappy." DX 1539.
9  Plaintiff said that the entire auditing industry is corrupt, that he is "one man against an
10 entire system," and that he "blew up Armanino in less than two months." DX 1692-
11 2-3. Consistent with his conduct at PwC, Plaintiff also filed a complaint against
12 Armanino with the California Board of Accountancy. DX 1631.

13 SOAProjects, Inc. After leaving Armanino, Plaintiff joined an accounting and
14 advisory firm named SOAProjects, Inc. He held the same title of Senior Manager and
15 earned the same salary of $190,000. DX 1649 at 265:9–269:22. He also had health
16 insurance and other benefits, including a retirement plan and the opportunity to earn
17 quarterly bonuses. *Id.*; *see also* DX 1542-20–23.

18 On May 23, 2019, Plaintiff's employment at SOAProjects ended after
19 SOAProjects evaluated his performance and concluded that he had a number of
20 behavioral and interpersonal issues. Such issues had an "adverse effect on the overall
21 [] work environment," "resulted in a noticeable loss of trust with team members," and
22 "irreparably harmed the collaborative work environment." DX 1583, DX 1584.
23 (These behavioral problems are, of course, strikingly similar to those documented at
24 PwC.)

25 RoseRyan. After SOAProjects, Plaintiff obtained a new job as a Consultant at
26 an accounting and advisory services firm named RoseRyan, effective December 2,
27 2019. DX 1581. Plaintiff earned a salary of $165,000 and received full health benefits,
28

1  a retirement plan, and the opportunity to earn a bonus. *Id.* Plaintiff left RoseRyan less
2  than a year after joining the firm, in or around May 2020. *See* DX 1592.

3      Engine Room Consulting Services, Inc.    Today, Plaintiff works as an
4  "Account[ing]/Controller" at a company called Engine Room Services, Inc. DX 1592.
5  He earns a salary of $190,000 and receives full benefits. *Id.*; DX 1592-31.

6  **X.    Plaintiff Suffers No Emotional Distress as a Result of His Termination**
7  **from PwC**

8      Plaintiff claims that he has suffered emotional distress from being terminated
9  from PwC because he purportedly has had "suicidal ideations, a lack of a sense of
10  purpose and self-worth, depression, and feelings of isolation." DX 1595-5. His own
11  medical records demonstrate that these claims are false. In September 2017, shortly
12  after his termination, Plaintiff started regularly seeing a Marriage and Family
13  Therapist, Ed Sarrett. Mr. Sarrett has not observed any "suicidality," "violent ideation
14  toward himself or others," or "[signs of] isolation" in Plaintiff since September 2017.
15  JX 28-2–4. Plaintiff's physician records from December 12, 2017—approximately
16  four months after his termination—similarly state that he has had "[n]o depression,
17  anxiety, or stress, suicidal ideations or plans." DX 1492–243–44.

18      In fact, since Plaintiff's termination, Mr. Sarrett has found that Plaintiff's
19  "general appearance [has been] completely normal" and he "[has exhibited a] normal
20  range of emotions" and "motivation to work [and] get things done." JX 28-2–3.
21  Plaintiff has maintained an active "social life," has remained physically active, and has
22  engaged in some of his favorite hobbies. *Id.* For these reasons, Mr. Sarrett concluded
23  that Plaintiff is "functioning well" and "[d]oesn't meet criteria for [generalized anxiety
24  disorder] or [m]ajor [d]epression." *Id.* at 28-5, 28-10. Mr. Sarrett also has not
25  prescribed any medical treatment for Plaintiff and has no reason to refer Plaintiff to a
26  psychiatrist or psychologist. DX 1694 at 26:6–13.

27
28

# PROPOSED FINDINGS OF FACT

## I.    Plaintiff's Tenure at PwC

1.    In 2004, Plaintiff joined PwC's Assurance Practice in San Jose.  Dkt. 141 at 13.  He was promoted to Senior Manager in 2010 and held that position until his termination in August 2017.  *Id.*

2.    During Plaintiff's tenure as Senior Manager, PwC documented a number of issues with Plaintiff's behavior and performance, including issues relating to his lack of management, judgment, interpersonal, and communication skills.  *See, e.g.*, JX 2.

3.    Plaintiff's behavior and performance issues pre-date his alleged whistleblowing.

4.    Because of those performance issues, PwC removed Plaintiff from the Cavium and Harmonic audit engagements and gave him negative performance reviews.

5.    Plaintiff failed to establish by a preponderance of the evidence that his alleged whistleblowing was a contributing factor in PwC's decisions to give him negative performance reviews and remove him from the Cavium and Harmonic audit engagements.

6.    Alternatively, the Court finds by clear and convincing evidence that PwC gave Plaintiff negative reviews and removed him from the Cavium and Harmonic audit engagements for legitimate, non-retaliatory reasons.

7.    After removing Plaintiff from the Cavium and Harmonic audit engagements, PwC continued to staff Plaintiff on other audits and appropriate projects.

8.    Plaintiff failed to establish by a preponderance of the evidence that his alleged whistleblowing was a contributing factor in PwC's decision to not staff him on a project for Pacific Biosciences, Inc.

9.      Alternatively, the Court finds by clear and convincing evidence that PwC's decision to not staff Plaintiff on a project for Pacific Biosciences, Inc. was legitimate and non-retaliatory

10.     At no point in his career at PwC was Plaintiff a candidate to become a PwC partner.

## II.    Plaintiff's SEC Complaint

11.     In November 2016, Plaintiff filed a whistleblower complaint against PwC with the SEC.  Dkt. 141 at 13.

12.     In the SEC Complaint, Plaintiff primarily alleged that PwC failed to evaluate, conclude, and document material weaknesses in the internal controls of two companies—Cavium and Harmonic—during PwC's year-end audits of those companies' internal controls over financial reporting.  DX 1672.

13.     At the time of each of the audits at issue, Plaintiff expressly agreed in writing that no material weaknesses existed in the internal controls of Cavium and Harmonic.  DX 1270.  Had Plaintiff disagreed, he would have had a professional obligation to document that disagreement in the audit work papers.  AS 1215.12(d). He did not do so.

14.     During each of the audits at issue, PwC reached a reasonable conclusion that no material weaknesses existed in the internal controls over financial reporting of Cavium or Harmonic.  Plaintiff has presented no evidence that any auditor (including Plaintiff) disagreed, or that a reasonable auditor would disagree, with PwC's conclusions.

15.     Plaintiff failed to establish by a preponderance of the evidence that, at the time of each of the audits at issue, he in fact believed that PwC had violated any statute, rule, or regulation.  Plaintiff also failed to establish by a preponderance of the evidence that, at the time of each of the audits at issue, he reported his alleged belief to the government, a law enforcement agency, or a person at PwC with authority over Plaintiff or with authority to investigate, discover, or correct the alleged legal violation.

16.     Plaintiff failed to establish by a preponderance of the evidence that, at the time of each of the audits at issue, a reasonable auditor with the same training and experience as Plaintiff would have concluded that PwC violated a statute, rule, or regulation.

17.     Plaintiff failed to establish by a preponderance of the evidence that, at the time he filed the SEC Complaint, he in fact believed that PwC violated a statute, rule, or regulation in connection with the audits at issue.

18.     Plaintiff failed to establish by a preponderance of the evidence that, at the time Plaintiff filed the SEC Complaint, a reasonable auditor with the same training and experience as Plaintiff would have concluded that PwC violated a statute, rule, or regulation in connection with the audits at issue.

## III.     PwC's Termination of Plaintiff's Employment

19.     On August 17, 2017, PwC terminated Plaintiff's employment.  Dkt. 141 at 13.

20.     Plaintiff failed to establish by a preponderance of the evidence that his alleged whistleblowing was a contributing factor in PwC's termination decision.

21.     Alternatively, the Court finds by clear and convincing evidence that PwC terminated Plaintiff's employment for legitimate, non-retaliatory reasons.

22.     During two separate interviews, on June 14, 2017 and June 21, 2017, Plaintiff represented to PwC's outside counsel and representatives of PwC's Office of General Counsel that Plaintiff had documented an internal control that did not exist during the 2014 Cavium year-end audit.

23.     PwC determined that Plaintiff's statements warranted his termination because he had either (a) fabricated an internal control and made false statements in PwC's audit work papers or (b) lied that he had done so during the course of an internal investigation.   Either scenario constitutes a legitimate, non-retaliatory reason for Plaintiff's termination.

24. The Managing Partner of PwC's U.S. Assurance Practice, Mark Simon, made the decision to terminate Plaintiff.

25. Plaintiff failed to establish by a preponderance of the evidence that Mr. Simon knew of Plaintiff's whistleblower complaint to the SEC or that individuals with a retaliatory animus toward Plaintiff influenced Mr. Simon's termination decision.

26. Plaintiff failed to establish by a preponderance of the evidence that he suffered any emotional distress as a result of his termination from PwC.

27. Before his termination from PwC, Plaintiff displayed a significant amount of hostility, animosity, and antagonism toward PwC and his former supervisors. Since his termination, Plaintiff's antagonism toward PwC has only intensified. The Court finds by a preponderance of the evidence that the employment relationship between Plaintiff and PwC cannot be repaired.

## IV.   Plaintiff's Subsequent Employments

28. Prior to his termination from PwC, Plaintiff accepted an offer from Armanino LLP to work as a "Senior Manager" in Armanino's "Audit Department." DX 1047. While Plaintiff had the option of starting at Armanino before his termination date, he chose to delay his start date until September 11, 2017. At Armanino, Plaintiff earned the same annual salary he had earned at PwC at the time of his termination ($190,000) and received health benefits, a retirement plan, and an annual bonus opportunity. *Id.* In January 2018, Plaintiff voluntarily resigned from Armanino.

29. In February 2018, Plaintiff joined an accounting and advisory firm called SOAProjects, Inc. He held the same title of Senior Manager and earned the same salary of $190,000. DX 1542. He also had health insurance and other benefits, including a retirement plan and the opportunity to earn quarterly bonuses. *Id.* On May 23, 2019, Plaintiff's employment at SOAProjects ended "by mutual agreement" after SOAProjects evaluated his performance and concluded that he had a number of behavioral and interpersonal issues that had an "adverse effect on the overall [] work

1  environment," "resulted in a noticeable loss of trust with team members," and
2  "irreparably harmed the collaborative work environment." DX 1583, DX 1584.

3       30.    On December 2, 2019, Plaintiff obtained a job as a Consultant at an
4  accounting and advisory services firm named RoseRyan. DX 1581. Plaintiff earned
5  a salary of $165,000 and received full health benefits, a retirement plan, and the
6  opportunity to earn a bonus. *Id.* Plaintiff voluntarily ended his employment at
7  RoseRyan in or around May 2020.

8       31.    On June 1, 2020, Plaintiff began working as an
9  "Account[ing]/Controller" at Engine Room Services, Inc. DX 1592. He continues to
10 work at Engine Room Services to this day. *Id.* Plaintiff earns a salary of $190,000
11 and receives full benefits. *Id.*; DX 1592-31.

12 ## PROPOSED CONCLUSIONS OF LAW

13 **I.    Plaintiff Has Not Established Liability on His Remaining Claims[8]**

14      **A.    Plaintiff Has Not Established That PwC Retaliated Against Him in**
15           **Violation of the Sarbanes-Oxley Act**

16      1.    Courts use a "burden-shifting procedure" to assess whistleblower claims
17 brought under § 1514A of the Sarbanes-Oxley Act (SOX). *Van Asdale v. Int'l Game*
18 *Tech.*, 577 F.3d 989, 996 (9th Cir. 2009); *Harp v. Charter Commc'ns, Inc.*, 558 F.3d
19 722, 723 (7th Cir. 2009).

20      2.    The plaintiff bears the initial burden to establish "a prima facie case of
21 retaliatory discrimination." *Van Asdale*, 577 F.3d at 996. To make out a prima facie
22 case, the plaintiff "must prove by a preponderance of the evidence that (1) she engaged

23

24 _____

25 [8] Plaintiff's claims under Labor Code § 98.6 and wrongful termination are derivative of his SOX and
   Labor Code § 1102.5 claims. *See* FAC ¶¶ 101, 113; *Weingand v. Harland Fin. Sols., Inc.*, 2012 WL
26 3537035, at *7 (N.D. Cal. Aug. 14, 2012) (noting that Labor Code § 98.6 "can be applied only to
   conduct protected by the Labor Code" and the plaintiff's § 98.6 claim was predicated on alleged
27 "whistleblowing activity under §1102.5"); *Rielly v. D.R. Horton, Inc.*, 2008 WL 4330299, at *6 (C.D.
   Cal. Sept. 17,2008) ("Plaintiff's claim for wrongful termination violating SOX is essentially a
28 whistleblower claim under SOX."). The Court therefore analyzes only Plaintiff's SOX and Labor
   Code § 1102.5 claims. Because the Court concludes that the SOX and Labor Code § 1102.5 claims
   fail, the Labor Code § 98.6 and wrongful termination claims fail alongside them.

in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Harp*, 558 F.3d at 72.  If the plaintiff meets this initial burden, the burden shifts back to the employer to show by "clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." *Van Asdale*, 577 F.3d at 996.

       1.   <u>Plaintiff Has Not Established a Prima Facie Case of Retaliation</u>

     3.   Plaintiff has not established three essential elements of a prima facie case of retaliation under SOX.  Specifically, Plaintiff has not shown that (1)  he engaged in protected activity; (2) Mark Simon—the PwC partner who terminated Plaintiff—was aware of Plaintiff's alleged protected activity; or (3) Plaintiff's protected activity was a contributing factor in Mr. Simon's decision to terminate him.

     4.   *First*, Plaintiff has not shown that he engaged in protected activity because he did not "reasonably believe" that PwC violated any laws or regulations actionable under SOX.  *Nazif v. Computer Scis. Corp.*, 2015 WL 3776892, at *5 (N.D. Cal. June 17, 2015).  "As the term 'reasonably believes' indicates, this standard 'involves both a subjective component *and* an objective component.'" *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017) (emphasis added). Importantly, SOX requires that the alleged whistleblowing "relate to one of the listed categories of fraud or securities violations [in 18 U.S.C. § 1514A(a)(1)]." *Van Asdale*, 577 F.3d at 996–97.  For Plaintiff, this means he must have had both an objectively and subjectively reasonable belief that PwC engaged in "shareholder fraud." *Nazif*, 2015 WL 3776892, at **5–6.

     5.   Plaintiff has not presented evidence demonstrating his <u>subjective</u> belief that PwC had engaged in any illegal activity, let alone shareholder fraud.  At the time of each of the Cavium and Harmonic audits at issue, Plaintiff did not complain about any perceived legal violations to the government or anyone at PwC.  Although Plaintiff later alleged in his SEC Complaint that PwC failed to document material weaknesses

during those audits, his contemporaneous actions show that he did not, in fact, believe that any material weaknesses actually existed.  Indeed, Plaintiff signed off on all audits at issue as reviewing Senior Manager, thus confirming that his team had appropriately evaluated, concluded, and documented all internal control deficiencies.  For this reason alone, Plaintiff's SOX claim fails.  *See Nance v. Time Warner Cable, Inc.*, 433 F. App'x 502, 504 (9th Cir. 2011) (affirming dismissal of SOX claim where plaintiff certified in a letter that "he did not believe [] there had been any fraudulent activity"); *see also Burdette v. ExpressJet Airlines, Inc.*, ARB No. 14-059, ALJ No. 2013-AIR-16 (ARB Jan. 21, 2016) (dismissing retaliation claim because plaintiff's continued participation in complained-of program showed that he did not subjectively believe his complaints).

6.   Even if Plaintiff had established a subjective belief of illegal activity, he has not shown that his belief was <u>objectively</u> reasonable.  Because SOX requires that Plaintiff's alleged whistleblowing relate to shareholder fraud, his complaint "must at least approximate the basic elements of a claim of securities fraud"—*i.e.*, "include a material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation."  *Van Asdale*, 577 F.3d at 996–97.  Plaintiff has not made this showing.  At best, Plaintiff contends that PwC's decision to not conclude and document material weaknesses during the audits at issue was incorrect under the relevant auditing standards.  But the mere violation of an auditing standard does not amount to shareholder fraud—and therefore cannot satisfy Plaintiff's burden.  *See Nazif*, 2015 WL 3776892, at *6 (granting summary judgment on SOX whistleblower claim predicated on GAAP violations); *see also DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 387, 390 (9th Cir. 2002) (dismissing securities fraud claims predicated on a "seriously botched audit" and failure to recognize GAAP violations).[9]

---

[9] While Plaintiff has not proven any of the elements of shareholder fraud, notably absent from his
(Continued...)

1    7.    *Second*, Plaintiff has presented no evidence that Mr. Simon knew of

2    Plaintiff's SEC Complaint or that any individuals with a retaliatory animus toward

3    Plaintiff influenced Mr. Simon's decision to terminate him.  Because Mr. Simon acted

4    as an independent decisionmaker—far removed from Plaintiff's whistleblowing

5    allegations—Plaintiff cannot establish a prima facie case of retaliation.  *See Rielly v.*

6    *D.R. Horton, Inc*., 2008 WL 4330299, at *1 (C.D. Cal. Sept. 17, 2008) ("[I]t is not

7    enough that someone in the company was aware of Plaintiff's complaints.  Instead,

8    Plaintiff must make a showing that the person who actually made the decision to fire

9    him knew."); *see also id.* at *7 (dismissing SOX whistleblower claim because "[the

10   decisionmaker] had no knowledge that Plaintiff had been complaining about the

11   savings reports.  Plaintiff cannot dispute this.  Plaintiff does not allege that he ever

12   made his complaints directly to [the decisionmaker].  Indeed, Plaintiff offers no

13   evidence that [the decisionmaker] was aware of his complaints").

14   8.    *Third*, Plaintiff has presented no evidence that his alleged protected

15   activity was a contributing factor in Mr. Simon's termination decision.  *Harp*, 558 F.3d

16   at 72.  As noted above, Plaintiff has failed to establish that Mr. Simon knew of his SEC

17   Complaint.  *See Raad v. Fairbanks N. Star Borough Sch. Dist*., 323 F.3d 1185, 1197

18   (9th Cir. 2003) (plaintiff could not prove retaliation with evidence that "most"

19   principals knew of her protected activity without evidence that the "particular

20   principals" who allegedly retaliated knew).  Moreover, as described below, PwC

21   terminated Plaintiff for legitimate, non-retaliatory reasons.[10]

22   _____

23   case is any evidence that PwC acted with scienter—that is, acted with an intent to defraud Cavium's
     or Harmonic's shareholders. *See, e.g.*, *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 480 (5th Cir. 2008)

24   (affirming dismissal of SOX claim when the plaintiff had no reasonable belief that the defendant
     acted had a "intent to deceive, manipulate, or defraud"); *see also In re Ceridian Corp. Sec. Litig.*,

25   504 F. Supp. 2d 603, 616 (D. Minn. 2007) ("The allegations in the complaint reek of incompetence,
     not fraud. . . . It is well established that, in the absence of evidence of fraudulent intent, GAAP

26   violations are insufficient as a matter of law to establish scienter.")

27   [10] Plaintiff has also failed to establish that his alleged whistleblowing was a contributing factor in
     any of the other alleged adverse employment actions PwC allegedly took against him  during his

28   employment, including  giving him negative performance reviews, taking him off two audit
                                                                        (Continued...)

2.     <u>PwC Has Shown by Clear and Convincing Evidence That It</u>
<u>Terminated Plaintiff for Legitimate, Non-Retaliatory Reasons</u>

9.     Even if Plaintiff had met his burden of establishing a prima facie case, PwC has shown "by clear and convincing evidence that it would have terminated [Plaintiff] even absent any protected activity." *Van Asdale*, 577 F.3d at 1005.

10.     Specifically, Plaintiff represented to PwC's outside counsel that he had fabricated an internal control and falsified audit documentation during the 2014 Cavium audit.   Given those representations, PwC concluded that Plaintiff's termination was warranted because he had either fabricated an internal control and falsified PwC's audit papers (as he said he did), or lied about having done so in the course of an internal investigation.   Either scenario constitutes a legitimate, non-retaliatory reason for Plaintiff's termination. *See Guitron v. Wells Fargo Bank, NA*, 619 F. App'x 590, 591 (9th Cir. 2015) (affirming summary judgment where employer proved a legitimate reason for termination by pointing to misconduct the employee had engaged in); *Kim v. Boeing Co.*, 487 F. App'x 356, 357 (9th Cir. 2012) ("Boeing presented clear and convincing evidence of its belief that Kim had been insubordinate and was subject to discharge on that basis.").

11.     To the extent Plaintiff argues that his SEC complaint disclosed his misconduct that provided the basis for PwC's termination decision, that argument fails. *See* Dkt. 141 at 6.  As an initial matter, PwC terminated Plaintiff because of what he said during his interviews with Mr. Brown and representatives of PwC's Office of General Counsel—not the allegations in his SEC complaint.  In any event, as Judge Seeborg correctly noted, "[o]f course, an employee who reports his or her own wrongdoing likely would not be insulated from termination merely by claiming 'whistleblower' status." Dkt. 107 at 5 n.2; *see also Trimmer v. U.S. Dept. of Lab.*, 174

---

engagements, and not staffing him on a project for Pacific Biosciences *Boyd v. Accuray, Inc*., 873 F. Supp. 2d 1156, 1170 (N.D. Cal. 2012) (dismissing SOX claim because protected activity was not a contributing factor in the adverse employment actions).

F.3d 1098, 1104 (10th Cir. 1999) ("[Whistleblower provisions] are not, however, intended to be used by employees to shield themselves from the consequences of their own misconduct or failures."); *Wittig v. CSX Transp., Inc.*, 2017 WL 2177342, at *3 (S.D. Ga. May 17, 2017) ("[A]n employee cannot immunize his own misconduct simply by reporting it and taking advantage of whistleblower protections."); *Wallender v. Canadian Nat'l Ry. Co.*, 2015 WL 10818741, at *17 (W.D. Tenn. Feb. 10, 2015) ("[W]histleblower statutes are not meant to protect employees who blow the whistle on their own misconduct.").

**B.    Plaintiff Has Not Established That PwC Retaliated Against Him in Violation of Labor Code § 1102.5**

12.    Like for SOX claims, courts decide § 1102.5 claims using a "burden-shifting analysis." *Mokler v. Cnty. of Orange*, 157 Cal. App. 4th 121, 138 (2007); *see also* Cal. Lab. Code §§ 1102.5, 1102.6.

13.    The plaintiff bears the initial burden of proving retaliatory discrimination "by a preponderance of the evidence." Cal. Lab. Code § 1102.6. To meet this burden, a plaintiff must show that: "(1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005); *see also* Judicial Council Of California Civil Jury Instruction 4603. If the plaintiff makes this initial showing, the burden shifts to the employer "to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in [protected] activities." Cal. Lab. Code § 1102.6; *see also* Judicial Council Of California Civil Jury Instruction 4604.

*1.    Plaintiff Has Not Established a Prima Facie Case of Retaliation Under Labor Code § 1102.5*

14.    Plaintiff has failed to establish two essential elements of a prima facie case under Labor Code § 1102.5: (1) a reasonable belief that he had disclosed a

1   violation of state or federal law; and (2) a causal link between his alleged
2   whistleblowing and his termination.

3       15.   *First*, Plaintiff has not established that he had "reasonably based
4   suspicions of *illegal activity*." [11] *Fitzgerald v. El Dorado Cnty.*, 94 F. Supp. 3d 1155,
5   1172 (E.D. Cal. 2015) (emphasis original); *Nejadian v. Cnty. of Los Angeles*, 40 Cal.
6   App. 5th 703, 719 n.13 (2019) ("[T]he trial court should make the legal determination
7   whether the specified activity would result in a violation of or noncompliance with a
8   statute, rule, or regulation."). All that Plaintiff has alleged is that PwC failed to
9   document material weaknesses during the audits of Cavium and Harmonic. As
10  discussed above, however, Plaintiff himself agreed with PwC's conclusions on those
11  audits and has presented no evidence suggesting that a reasonable auditor would have
12  reached a different conclusion.

13      16.   Regardless, to prevail on this claim, Plaintiff must do more than show a
14  reasonable belief that PwC reached the wrong conclusion during the at-issue audits.
15  As the PCAOB recognizes, audits of companies' internal controls involve a high
16  degree of professional judgment. AS 1015.11. Consequently, an audit violates
17  PCAOB standards only if it is so erroneous that it falls outside of the wide range of
18  acceptable judgment calls. AS 1015.03 (explaining that an auditor is not liable for
19  "pure errors of judgment"). Thus, an engagement team may conduct an audit fully "in
20  accordance with [PCAOB] standards" and still "not detect a material weakness in
21  internal control over financial reporting." AS 1015.10. Here, Plaintiff has presented
22  no evidence that he believed PwC's evaluation and conclusion on the severity of
23  control deficiencies during that audits at issue was so unreasonable that it violated

---

[11] Although California law does not require that a Plaintiff's whistleblowing relate to shareholder fraud, the unlawful conduct Plaintiff claims he reported to the SEC is PwC's purportedly "fraudulent" and "deceptive" practices. FAC ¶ 66. Consequently, Plaintiff must show that he reasonably believed PwC acted with an intent to defraud in order to prevail on his claims under California law. For the reasons explained above, he has not done so. In any event, as explained below, Plaintiff has failed to show that he had a reasonable belief that PwC engaged in any kind of illegal activity—fraudulent or otherwise. *See Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1134 (N.D. Cal. 2004) ("Section 1102.5(b) requires the disclosure of a state or federal violation.").

PCAOB's auditing standards.  Nor has Plaintiff presented any evidence to suggest that such a belief would have been reasonable under the circumstances.

17.     *Second*, Plaintiff has not shown a "causal link" between his alleged whistleblowing and his termination.  *Patten*, 134 Cal. App. 4th at 1384.  As discussed, the evidence demonstrates that PwC terminated Plaintiff for legitimate, non-retaliatory reasons.  For this reason alone, there is no "casual link" between Plaintiff's alleged protected activity and his termination.

18.     Moreover*,* "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."  *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 73 (2000).  Because Mr. Simon was not aware of Plaintiff's alleged whistleblowing and terminated Plaintiff because of the statements he made during PwC's internal investigation, Plaintiff's claim fails for this additional reason.  *See Morgan*, 88 Cal. App. 4th at 73 (affirming summary judgment where "all of the actual decision makers" "affirmatively stated in their declarations" that they had no knowledge of the plaintiff's protected activities); *Raad*, 323 F.3d at 1197 (plaintiff cannot prove retaliation with evidence that "most" principals knew of her protected activity without evidence that the "particular principals" who allegedly retaliated knew).

### 2.     *PwC Has Shown by Clear and Convincing Evidence That It Terminated Plaintiff for Misconduct*

19.     As the Court explained in rejecting Plaintiff's SOX claim, PwC has shown "by clear and convincing evidence" that it would have terminated Plaintiff even absent his alleged whistleblowing.  Cal. Lab. Code § 1102.6.  Accordingly, Plaintiff's claim under Labor Code § 1102.5 would fail even if Plaintiff could establish a prima facie case of retaliation.[12]

---

[12] This same showing defeats Plaintiff's wrongful termination claim.  Because PwC has shown by a preponderance of the evidence that it "would have made the same decision without the wrongful termination," Plaintiff may not recover damages on that claim.  *Davis v. Farmers Ins. Exch.*, 245
(Continued...)

1

2

**C.     Plaintiff's Whistleblower Claims Are Barred Under the Doctrine of Unclean Hands**

3     20.    Each of Plaintiff's whistleblower claims also fails under the equitable

4  doctrine of unclean hands.   To prevail on the unclean hands defense, a defendant must

5  demonstrate that "[1] that the plaintiff's conduct is inequitable and [2] that the conduct

6  relates to the subject matter of [the plaintiff's] claims."  *Amusement Art, LLC v. Life is*

7  *Beautiful, LLC*, 2016 WL 6998566, at *3 (C.D. Cal. Nov. 29, 2016) (citation omitted)

8  (alterations in original).   The defense applies to both equitable and legal causes of

9  action.  *See id.* (applying unclean hands to bar a claim under the Lanham Act); *Adler*

10 *v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) ("In California, the

11 unclean hands doctrine applies not only to equitable claims, but also to legal ones.").

12     21.    Here, PwC has established both elements of its unclean hands defense:

13     22.    *First*, PwC has shown that Plaintiff engaged in "inequitable" conduct by

14 representing to PwC's outside and in-house counsel, as well as to the SEC, that he had

15 fabricated a client's internal control and falsified audit documentation during an audit.

16 Regardless of whether PwC terminated Plaintiff for this reason, Plaintiff's

17 representations necessarily mean that he engaged in inequitable, fraudulent conduct—

18 *i.e.*, he either falsified audit documentation or lied about having done so.  *See, e.g.*,

19 *Amusement Art*, 2016 WL 6998566, at *3 (holding that misrepresentations to the

20 government constituted inequitable conduct).

21     23.    *Second*, Plaintiff's misconduct directly relates to the subject matter of his

22 claims.   At bottom, Plaintiff alleges that PwC retaliated against him for complaining

23 about certain audits.   At the same time, however, Plaintiff engaged in misconduct with

24 respect to the very audits about which he complained.   There is therefore a sufficient

25 nexus between Plaintiff's inequitable conduct and the subject matter of his claims.  *Id.*

26 ("'[P]recise similarity [of misconduct] is not required' to raise an unclean hands

27 _____

28 Cal. App. 4th 1302, 1320 (2016); *see also id.* at 1322 (holding that the same-decision defense "applies to claims of wrongful termination in violation of public policy").

1  defense."); *see also Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985)

2  ("[W]hat is material is . . . [that] the manner of dirtying [the plaintiff's hands] renders

3  inequitable the assertion of [the plaintiff's] rights against the defendants.").

4       24.    In sum, even assuming PwC retaliated against Plaintiff, "the balance of

5  equities weighs in favor of permitting [PwC] to assert the [unclean hands] defense."

6  *Amusement Art*, 2016 WL 6998566, at *6.

7       **D.    Plaintiff Has Not Established That PwC Breached His Employment**

8            **Agreement**

9       25.    New York law applies to Plaintiff's breach-of-contract claim.  JX 19 ¶ 16.

10  *See, e.g.*, *Reddy v. Mediscribes, Inc.*, 2020 WL 2220202, at *3 (C.D. Cal. Feb. 18,

11  2020) ("[T]he choice-of-law clause in the Employment Agreement is enforceable

12  under California law.").

13       26.    "Under New York law, to prevail on a breach of contract claim," the

14  plaintiff "must prove: [i] a contract; [ii] performance of the contract by one party; [iii]

15  breach by the other party; and [iv] damages."  *Nielsen Co. (U.S.), LLC v. Success Sys.,*

16  *Inc.*, 112 F. Supp. 3d 83, 97 (S.D.N.Y. 2015) (alterations original) (citations omitted).

17       27.    Plaintiff has not established two of these four elements: (1) Plaintiff has

18  not shown that PwC breached Plaintiff's employment agreement.; and (2) Plaintiff has

19  not shown any harm from the alleged breach.

20       28.    *First*, Plaintiff has not established that PwC "failed to perform its

21  obligation" under Plaintiff's employment agreement.  *Nielson*, 112 F. Supp. 3d at 97.

22  Plaintiff contends that PwC breached his employment agreement by failing to provide

23  three-months' notice before termination.  FAC ¶¶ 75, 108–11.  But because PwC

24  terminated Plaintiff for misconduct, PwC did not have to provide contractual notice,

25  JX 16 ¶ 5(a).

26       29.    *Second*, even if Plaintiff could show a breach, he has failed to prove that

27  the alleged breach harmed him.  Plaintiff had accepted a comparable job from a new

28  employer before PwC terminated his employment and had the option to start at that

job before PwC terminated him.  Any damage to Plaintiff flows from his voluntary choice to delay his start date, not PwC's alleged breach.  *See Matter of Gross v. Bd. of Educ. of Elmsford Union Free Sch. Dist.*, 78 N.Y.2d 13, 19 (1991) ("Petitioner was free to reject the employment for personal reasons, but she cannot now be heard to say that she is entitled to recover the amount of back pay she would have earned during that time had she accepted it.").

## II.     Plaintiff Is Not Entitled to Any Remedies He Seeks

30.     Even if Plaintiff could prove liability, he cannot recover his claimed monetary damages or equitable relief.  Plaintiff seeks four categories of remedies: (1) economic damages;  (2) emotional distress damages;  (3) reinstatement;  and (4) punitive damages.  None of these remedies is appropriate here.

### A.     Plaintiff Is Not Entitled to Economic Damages

31.     Employees have a duty to mitigate damages and "any award for lost wages must be reduced by such sums as the employee earned or might reasonably have earned during the relevant period." *Dyer v. Workers' Comp. Appeals Bd.*, 22 Cal. App. 4th 1376, 1386 (1994).  Employees therefore cannot recover for a "willful loss of earnings," including the failure to retain comparable employment.  *Id.*  This rule applies to both voluntary and involuntary terminations.  *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980); *Stanchfield v. Hamer Toyota, Inc.*, 37 Cal. App. 4th 1495, 1502–03 (1995) ("[W]here . . . the employee was fired from a substantially similar position for cause, any amount the employee with reasonable effort could have earned by retaining that employment should be deducted from the amount of damages which otherwise would have been awarded.").

32.     <u>Past Economic Damages</u>.  Plaintiff has not shown that he has suffered any economic damages.  He obtained a new job at Armanino with the same salary and benefits before PwC terminated his employment.  After he voluntarily left Armanino, he earned the same salary and received the same benefits at SOAProjects.  Today, Plaintiff continues to earn the same salary and benefits at his current employer, Engine

1  Room Consulting Services.  In these circumstances, Plaintiff cannot recover past
2  economic damages.  *See Dyer*, 22 Cal. App. 4th at 1386.

3       33.    To the extent Plaintiff seeks lost earnings during the time he worked at
4  RoseRyan (where he earned $25,000 less than at PwC) or was in between jobs, such
5  damages are not actionable because they are a result of Plaintiff's voluntary decision
6  to quit his employment at Armanino and his misconduct at SOAProjects.  *Sangster v.*
7  *United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980) ("Courts have long held that
8  back pay is not to be awarded when . . . [the plaintiff] voluntarily quit[] alternative
9  employment."); *Stanchfield v. Hamer Toyota, Inc*., 37 Cal. App. 4th 1495, 1502–03
10  (1995) ("[I]t is manifest that a jury, in deciding the reasonableness of a wrongfully
11  discharged employee's efforts to mitigate damages, may properly take into account
12  that employee's failure to retain comparable employment once it has been secured.").

13       34.    <u>Future Economic Damages</u>.  Plaintiff claims future economic damages
14  based on his allegation that Plaintiff would have made partner at PwC but for his
15  termination.  This claim fails for two independent reasons.

16       35.    *First,* Plaintiff has failed to support his allegation with any evidence other
17  than his own speculation.  As a matter of law, Plaintiff has not met his burden to prove
18  future damages.  *See Toscano v. Greene Music*, 124 Cal. App. 4th 685, 696 (2004)
19  (vacating damages award of lost wages "through retirement" because plaintiff's
20  contention that his employer would have "continued to employ him until the end of
21  his career" was "wholly conjectural"); *Cantu v. United States*, 2015 WL 4720580, at
22  *35 (C.D. Cal. Aug. 7, 2015) (declining to award damages for future lost wages after
23  a bench trial because "[the plaintiff's] assertions that he has 'missed out on th[e]
24  opportunity' for elevation to foreman status because of his injuries from the accident
25  . . .  are speculative and not properly awarded as damages"); *Dixon v. City of Coeur*
26  *d'Alene*, 2012 WL 2923149, at *9 (D. Idaho July 18, 2012) (granting remittitur because
27  "[t]he finding that Dixon would have been promoted to Captain . . . was based on
28  speculation and not upon evidence presented at trial").

36.   *Second*, PwC has established with undisputed evidence that Plaintiff was not a candidate for PwC partner at any point in his career due to his poor performance and documented behavioral issues.  Regardless, Plaintiff had an equal opportunity to make partner at his subsequent employers, including Armanino and SOAProjects.  *See Dyer*, 22 Cal. App. 4th at 1386.

### B.   Plaintiff Is Not Entitled to Emotional Distress Damages

37.   "In order to recover damages for emotional distress, the injury suffered must be severe, *i.e.*, substantial or enduring as distinguished from trivial or transitory." *Young v. Bank of Am.*, 141 Cal. App. 3d 108, 114, 190 (1983).  A plaintiff seeking damages for emotional distress therefore "must demonstrate more than transitory symptoms . . .  and unsupported self-serving testimony," but must support his claim with "corroborating testimony or medical or psychological evidence."  *Costa v. Nat'l Action Fin. Servs.*, 634 F. Supp. 2d 1069, 1078 (E.D. Cal. 2007).

38.   Plaintiff has not presented any such evidence and has relied exclusively on his self-serving testimony.  Indeed, Plaintiff's therapist has observed that Plaintiff is "functioning well," "[d]oesn't meet criteria for [generalized anxiety disorder] or [m]ajor [d]epression," and "has exhibited a complete and normal range of emotions" and "motivation to work and get things done."  JX 28-2–5, 10.  Plaintiff's physician similarly noted that Plaintiff has had "[n]o depression, anxiety, or stress, suicidal ideations or plans."  DX 1492-243–44.  Under these circumstances, Plaintiff is not entitled to any emotional distress damages.  *See Costa*, 634 F. Supp. 2d at 1078 (granting motion for summary judgment on emotional distress claim based on plaintiff's testimony that she was upset and angry because "unsupported self-serving testimony by a plaintiff is not sufficient," there were no corroborating witnesses or documents, and the plaintiff's alleged distress was merely "transitory in nature").

1

### C.   Plaintiff Is Not Entitled to Reinstatement

2

39.   "Reinstatement is an equitable remedy within the discretion of the trial

3  judge." *Rabkin v. Oregon Health Scis. Univ.*, 350 F.3d 967, 977 (9th Cir. 2003).  This

4  equitable remedy is not appropriate here for two independent reasons.

5

40.   *First*, Plaintiff's misconduct during his employment at PwC precludes

6  reinstatement.  Even in the absence of any alleged retaliation, Plaintiff either fabricated

7  a client's internal control and falsified audit documentation or lied about doing so

8  during an internal investigation.  As discussed above, PwC has credibly shown that it

9  cannot employ an auditor who engaged in such behavior.  Reinstatement is therefore

10 not a proper remedy.  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362

11 (1995) ("It would be both inequitable and pointless to order the reinstatement of

12 someone the employer would have terminated, and will terminate, in any event and

13 upon lawful grounds."); *see also Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th

14 833, 845 (1998) (denying reinstatement where the employee had made material

15 misrepresentations about her employment).

16

41.   *Second*, the "hostility [and] antagonism between the parties renders

17 reinstatement practically infeasible." *Teutscher v. Woodson*, 835 F.3d 936, 951 (9th

18 Cir. 2016).  Plaintiff has shown a significant amount of hostility and antagonism for

19 PwC that has only strengthened since he initiated this lawsuit.  Given this "complete

20 breakdown" in Plaintiff's relationship with PwC, the Court will not reinstate Plaintiff

21 to his position.  *Rabkin*, 350 F.3d at 978.

22

### D.   Plaintiff Has Not Presented Clear and Convincing Evidence

23

### Justifying Punitive Damages

24

42.   California courts have "recognized the disfavored nature of punitive

25 damage awards." *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 980 (2001).  Punitive

26 damages "should be granted with the greatest of caution . . . [and] only in the clearest

27 of cases." *Henderson v. Sec. Nat. Bank*, 72 Cal. App. 3d 764, 771 (1977).

28

1     43.    A plaintiff can obtain punitive damages only if she proves by "clear and
2 convincing evidence" that the defendant acted with "malice, fraud, or oppression."
3 *Pac. Gas & Elec. Co. v. Superior Court*, 24 Cal. App. 5th 1150, 1158 (2018) (citing
4 Cal. Civ. Code § 3294).  Neither negligence nor recklessness is enough to meet this
5 test; rather, courts require an "evil" act.  *G.D. Searle & Co. v. Superior Court,* 49 Cal.
6 App. 3d 22, 31 (1975) ("[S]ection 3294 views evil motive as the central, essential
7 factor in the malice which justifies an exemplary award."); *see also Am. Airlines, Inc.*
8 *v. Sheppard, Mullin, Richter & Hampton*, 96 Cal. App. 4th 1017, 1048–50 (2002)
9 (plaintiff must prove defendant had an "evil motive" and its conduct has "the character
10 of outrage frequently associated with crime").

11     Plaintiff has not presented any evidence—let alone clear and convincing
12 evidence—that PwC engaged in any "evil" conduct.  At most, Plaintiff contends that
13 PwC terminated him for a retaliatory purpose.  But "termination for an improper
14 reason" is "insufficient to support a finding of despicable conduct, because such an
15 action is not vile, base, or contemptible."  *Scott v. Phoenix Sch., Inc.*, 175 Cal. App.
16 4th 702, 705 (2009).  Punitive damages are therefore improper.  *See Escriba v. Foster*
17 *Poultry Farms*, 793 F. Supp. 2d 1147, 1168 (E.D. Cal. 2011) (dismissing punitive
18 damages claim where plaintiff could show "nothing more than the basic elements of
19 wrongful termination"); *Mathieu v. Norrell Corp.*, 115 Cal. App. 4th 1174, 1190–91
20 (2004) (dismissing punitive damages claim because even illegal termination did not
21 "constitute, oppression, fraud, or malice" warranting punitive damages).[13]

22                                    **CONCLUSION**

23     In light of the above findings of fact and conclusions of law, the Court ORDERS
24 and will enter Judgment in favor of Defendant PwC on all of Plaintiff's remaining
25 claims.

26

27 _____
[13]  As to Plaintiff's claim under federal law, SOX does not provide for an award of punitive damages
28 for whistleblower retaliation. *See, e.g.*, *Jones v. Home Fed. Bank*, 2010 WL 255856, at *5 (D. Idaho
Jan. 14, 2010).

1

2   Dated:  February 8, 2021                    HUESTON HENNIGAN LLP

3

4                                               By:   */s/ John C. Hueston*
                                                      John C. Hueston
5                                                     Moez M. Kaba
                                                      Joseph A. Reiter
6                                                     Attorneys for Defendant
                                                      PRICEWATERHOUSECOOPERS
7                                                     LLP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28