# EXHIBIT 1

CONFIDENTIAL

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4                    --o0o--
5  MAURO BOTTA,
6             Plaintiff,
7     vs.                      Case No:   3:18-cv-2615
8  PRICEWATERHOUSECOOPERS
   LLP, LAURA BUSTAMANTE,
9  TYE THORSON, ROBERT
   HEATLEY, STIG HAAVARDTUN,
10 ERGUN GENC, TIMOTHY
   CAREY and STEVE MCCANN,
11
                Defendants.
12
   _____/
13
14
15                  CONFIDENTIAL
16         DEPOSITION OF ROBERT HEATLEY
17              December 6, 2018
18              1292 Lincoln Avenue
19           San Jose, California 95125
20                  10:00 a.m.
21
22
23
24  Reported by:  CARI VALLO
                  California CSR No. 6484
25                Registered Professional Reporter

CONFIDENTIAL

Page 2

```
 1                      APPEARANCES
 2      For the Plaintiff:
 3      DEREK SMITH LAW GROUP, PLLC
        One Penn Plaza
 4      Suite 4905
        New York, New York 10119
 5      (212)587-0760
        BY:   ALEXANDER G. CABECEIRAS, ESQ.
 6            alexc@dereksmithlaw.com
 7
 8      For the Defendants:
 9      HUESTON HENNIGAN, LLP
        523 West 6th Street
10      Suite 400
        Los Angeles, California 90014
11      (213)788-4340
        BY:   JOSEPH ALAN REITER, ESQ.
12            jreiter@hueston.com
13
14      Also Present:  Mauro Botta; Geoff Ezgar
15
16
17
18
19
20
21
22
23
24
25
```

1                              INDEX
2                        EXAMINATION BY COUNSEL
3                                                              PAGE
4          Examination by Mr. Cabeceiras                        4
5          Examination by Mr. Reiter                           44
6
7
8
9                           E X H I B I T S
10                                                             PAGE
11
    Exhibit 18    2/22/15 emails with attached PwC              15
12                Audit 4730; nine pages
13  Exhibit 19    2/22/15 email from Timothy Scott              21
                  to Tye Thorson and Robert Healey;
14                one page
15  Exhibit 20    2/23/15 email from Tye Thorson                24
                  to Robert F. Heatley, Timothy
16                Scott, and Kevin Healy; one page
17  Exhibit 21    3/1/15 email from Tye Thorson                 28
                  to Timothy Scott and others,
18                with attached "Control Environment
                  Memo"; 10 pages
19
    Exhibit 22    3/2/15 email from Tye Thorson                 33
20                to Gilbert Simonetti and others;
                  one page
21
    Exhibit 23    4/28/17 US SEC letter to                      40
22                PricewaterhouseCoopers c/o
                  Theodore Senger; 21 pages
23
24
25

Page 22

1  rather urgent Cavium issue?
2       A.   Yes, we did.
3       Q.   Do you recall where that was?
4       A.   Where?  It was -- my recollection, it was a
5  conference call.
6       Q.   Were you physically in PwC's office at that time
7  in San Jose?
8       A.   I can't recollect where I was geographically.  I
9  may well not have been in California at the time.
10      Q.   And just to clarify, who was on the call?
11      A.   My recollection is that it was myself, Tye
12 Thorson, and Tim Scott.
13      Q.   And what was discussed on the call, if you can
14 recall?
15      A.   The procedures that we go through when there is a
16 potential difference in professional judgment between two
17 members of the engagement team.
18      Q.   Can you define for me what those procedures are?
19      A.   As a firm, we have an internal policy to address
20 circumstances where two members of an engagement team may
21 have a different view or interpretation of a matter.
22      Q.   And when there is that different view on a matter,
23 what happens?
24      A.   In this situation, the decision was made to
25 perform a consultation with the PwC national office.

1      Q.   Who actually made the decision to consult the
2  national office in this particular case?
3      A.   My recollection, it was a mutual decision that
4  that was the appropriate next step.
5      Q.   In this particular case, what was the fundamental
6  disagreement about?
7           MR. REITER:  Objection.  Vague.
8           If you understand the question, you can answer.
9           THE WITNESS:  Well, Mauro had documented a
10 position that he felt that there may be a material
11 weakness, and my understanding, the purpose of the
12 consultation was to evaluate the facts and determine
13 whether or not that was an appropriate conclusion or not.
14 BY MR. CABECEIRAS:
15     Q.   Do you recall what specifically the material
16 weakness was that Mauro had identified?
17     A.   I don't believe there was a material weakness.
18     Q.   Okay.  But do you recall what Mauro believed to be
19 a material weakness?
20          MR. REITER:  So calls for speculation.  Object as
21 to form, and the document speaks for itself.
22          THE WITNESS:  Mauro had documented his concerns in
23 the memo you presented as Exhibit 18.
24 BY MR. CABECEIRAS:
25     Q.   So you stated before that the decision was made to

Page 24

1  reach out to the national office on this issue.  Is that
2  accurate?
3      A.  Yes.
4      Q.  Did you reach out to the national office?
5      A.  No.
6      Q.  Do you know who did?
7      A.  So my role is the independent quality review
8  partner.  The engagement team reached out and initiated the
9  national office consultation.
10     Q.  And who makes up the engagement team?
11     A.  The engagement team comprised Tye Thorson as
12 engagement partner, Mauro Botta as engagement senior
13 manager, Mayank Gupta as engagement manager, and my role
14 was quality review partner.
15     Q.  Do you know, out of those people you just listed,
16 who actually reached out to the national office on this?
17         MR. REITER:  Calls for speculation.
18         THE WITNESS:  No.
19 BY MR. CABECEIRAS:
20     Q.  I'll give you what we can mark as 20.  Please
21 review it.  Let me know when you're done.
22         (Exhibit 20 marked for identification.)
23         (Witness reviews document.)
24         THE WITNESS:  Yes.
25 BY MR. CABECEIRAS:

1  Q. With these annual audits, do you prepare any kind
2  of document on behalf of the company?
3       MR. REITER: Object to form.
4       THE WITNESS: No. My role -- my role was the
5  quality review partner, so my involvement is relatively
6  limited.
7       In the context of the total audit hours, I have a
8  relatively modest number of hours allocated to perform the
9  responsibilities that I have to fulfill my QRP role. The
10 audit itself is executed by the engagement team, led by the
11 engagement leader, Tye, and the engagement senior manager,
12 Mauro.
13 BY MR. CABECEIRAS:
14  Q. If you have any knowledge, does the engagement
15 team prepare any kind of document on behalf of the company
16 at the end of these audits?
17  A. The engagement team prepares an audit opinion that
18 is signed by PwC, but that is a PwC document that's then
19 signed and provided to the company and gets filed with the
20 Securities and Exchange Commission. The company's
21 financial statements are prepared by the company.
22  Q. But you don't personally sign off on the audit
23 opinions themselves? Is that accurate?
24  A. The audit opinion is signed by the engagement
25 leader on behalf of PricewaterhouseCoopers LLP.

1  Q. In the case of Cavium, did you review the audit
2  opinions?
3  A. Absolutely.
4  Q. If you -- well, withdrawn, withdrawn.
5  MR. CABECEIRAS: Mark this as 22.
6  (Exhibit 22 marked for identification.)
7  BY MR. CABECEIRAS:
8  Q. Please review, and let me know when you're done.
9  A. (Witness reviews document.)
10  Yes.
11  Q. Do you remember receiving this email?
12  A. Yes.
13  Q. At that time, was it your understanding that Mauro
14  did not disagree with any of the conclusions as to the
15  Cavium audit?
16  A. Yes, and I also had a direct conversation with
17  Mauro in which I asked him directly whether there were --
18  whether he had any concerns with regard to any of the
19  conclusions reached pertaining to the Cavium engagement and
20  whether there were any areas that he felt, in his
21  professional opinion, the engagement team should consider
22  any audit procedures or other evaluation prior to the
23  finalization and signing of the audit opinion.
24  And Mauro assured me that, in his professional
25  opinion, he was comfortable with the nature, time, and

Page 34

1  extent of the work that was done and the documentation of
2  the conclusions.
3      Q.  Do you remember when you had that conversation
4  with Mr. Botta?
5      A.  I believe right shortly prior to the filing of the
6  financial, so early March 2015.
7      Q.  Did Mr. Botta agree entirely with --
8      A.  Yes.  Mr. Botta stated that, at that point, he was
9  comfortable that the matters he had previously addressed
10 had been appropriately evaluated and resolved and that he
11 had no outstanding concerns.
12     Q.  At that point, did anybody else on the engagement
13 team have any outstanding concerns that you were aware of?
14     A.  Not to my knowledge.
15     Q.  Was there ever a point where Mauro was no longer,
16 to your knowledge, working on the Cavium audits?
17     A.  I believe at some point he rotated off the Cavium
18 engagement team.
19     Q.  Can you recall why he was rotated off?
20     A.  No.  I was not involved in that decision.
21     Q.  Do you know an Art Chadwick?
22     A.  I don't personally know Art Chadwick, but I
23 believe he's a member of the Cavium management team or
24 board.
25     Q.  Have you ever spoken to Art Chadwick directly?

1      A.   No.
2      Q.   Other than the Cavium audit, were you ever a
3   quality review partner on an audit in which Mauro was on
4   the engagement team?
5      A.   Not to my recollection.
6      Q.   So besides Cavium, have you ever, I guess, worked
7   directly with Mr. Botta?
8      A.   I can't recollect another situation where Mauro
9   was a member of the audit engagement team.
10     Q.   As a quality review partner, you testified you
11  review the engagement team's work, correct, in a certain
12  capacity that you were describing?
13     A.   So my responsibility was to fulfill the
14  obligations of the quality review partner, both consistent
15  with the PCAOB standards, as this was an engagement that
16  was subject to PCAOB regulations, and internal PwC
17  policies.
18     Q.   Did you hold any opinions as to Mauro's
19  professional abilities at that time?
20          MR. REITER:  Vague as to time.
21  BY MR. CABECEIRAS:
22     Q.   I can clarify.  During the Cavium audits in around
23  2014 to 2015.
24     A.   Mauro was one of the senior managers in our
25  practice.  He was generally viewed as not one of our higher

1  performers at the time and had certain strengths and
2  certain development points, similar to some of his other
3  peers who were also not high performers.
4      Q.  Do you recall what those development points were?
5      A.  I believe that -- again, I don't believe I ever
6  wrote a performance appraisal on Mauro directly because he
7  never worked for me directly.
8          But I did participate in meetings when Mauro's
9  performance was summarized by others, and generally, the
10 development areas pertained to his interpersonal skills,
11 his communication skills, his management of issues, and a
12 viewpoint that at times, that he was maybe -- jumped to a
13 conclusion quickly with regard to matters and then was --
14 found it challenging to stand back and reassess all of the
15 facts to evaluate whether that, indeed, was an appropriate
16 conclusion or not.
17     Q.  And if you can recall, who would summarize his
18 performance?
19     A.  I don't -- I don't recollect.  It was always a
20 partner who was independent from the partners that a senior
21 manager was directly working with would be responsible for
22 reviewing all of the feedback that had been provided on the
23 individual and providing a readout as part of the customary
24 performance appraisal process.
25     Q.  Do you recall specifically what conclusions Mauro

Page 37

1   would jump to?
2          I mean as identified by you.  You said that, you
3   know, that his performance was summarized.  One of the
4   things was that he would jump to conclusions quickly.
5          Can you think of any particular instances in which
6   somebody may have provided specific feedback on that point?
7      A.   So I participated in meetings at which Mauro's
8   performance was summarized, but as I stated previously,
9   Mauro was never a senior manager or a manager on one of my
10  engagements where I was the lead engagement partner.
11         And to my recollection, I -- I can't remember
12  writing a performance review with regard to Mauro's
13  performance on an audit engagement myself.
14     Q.   Okay.  But you testified before that when his
15  performance was summarized, people would say that he would
16  jump to conclusions quickly.  Is that accurate?
17     A.   Yes, that's my recollection of the -- one of the
18  development points for Mauro.
19     Q.   Can you recall, at this point, what specific
20  conclusions Mauro would jump to?
21     A.   No.
22     Q.   Do you recall the independent partners who would
23  make these assessments?
24     A.   It was our customary process where each of us as
25  partners would be allocated the files for other senior

Page 38

1  managers, and we would perform -- we would reach out and
2  gather the information, both for the purposes of providing
3  the assessment and the annual performance reviews.
4      Q.  You also mentioned that in addition to development
5  points, there were some strengths that were shared.  Can
6  you recall specifically what strengths were shared with
7  you?
8      A.  I can't recollect all of the specifics -- clearly,
9  this was several years ago now -- but I think there was a
10 general consensus that, in certain dimensions, Mauro had
11 good technical accounting skills.
12     Q.  Can you recall any other specifics?
13     A.  No.
14     Q.  Do you remember telling Mr. Botta that the
15 document that he sent to Mr. Thorson was a big deal?
16     A.  No.
17         MR. REITER:  Lacks foundation.
18 BY MR. CABECEIRAS:
19     Q.  Do you remember stating to Mr. Botta that he was
20 putting PwC at risk?
21         MR. REITER:  Lacks foundation.
22         THE WITNESS:  No.
23 BY MR. CABECEIRAS:
24     Q.  Do you remember telling Mr. Botta that what he did
25 was unprecedented?

Page 39

1          MR. REITER:  Same objection.
2          THE WITNESS:  No.
3    BY MR. CABECEIRAS:
4       Q.  When you learned that Mr. Botta had written
5    Mr. Thorson, outlining Cavium deficiencies, were you upset
6    over that?
7       A.  I was surprised that it -- my role as the quality
8    review partner is as an individual independent from the
9    engagement partner.
10          And it's customary that in similar circumstances,
11   the engagement senior manager would potentially reach out
12   to me directly, as the quality review partner, to share
13   areas of concern or areas where there might be a difference
14   in viewpoint between different members of the engagement
15   team.
16          So I was just -- I was surprised that he had not
17   called me and reached out to me directly.
18      Q.  Working on the Cavium engagement, had he
19   previously reached out to you with any concerns directly?
20      A.  Not to my --
21          MR. REITER:  Object --
22          THE WITNESS:  -- not to my recollection.
23   BY MR. CABECEIRAS:
24      Q.  Were you working for PwC in April of 2017?
25      A.  Yes.

Page 46

1          CERTIFICATE OF REPORTER.
2          I, CARI VALLO, a Certified Shorthand Reporter of
3   the State of California, duly authorized to administer
4   oaths, do hereby certify:
5          That the foregoing proceedings were taken before
6   me at the time and place herein set forth; that any
7   witnesses in the foregoing proceedings, prior to
8   testifying, were duly sworn; that a record of the
9   proceedings was made by me using machine shorthand, which
10  was thereafter transcribed under my direction; that the
11  foregoing transcript is a true record of the testimony
12  given.
13         Further, that if the foregoing pertains to the
14  original transcript of a deposition in a Federal case,
15  before completion of the proceedings, review of the
16  transcript [ ] was [x] was not requested.
17         I further certify I am neither financially
18  interested in the action nor a relative or employee of any
19  attorney or party to this action.
20         IN WITNESS WHEREOF, I have this date subscribed my
21  name:
22         Dated:  December 20, 2018
23
24                         *Cari Vallo* (signature)
25                 CARI VALLO, RPR, CSR NO. 6484