# EXHIBIT 2

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3              SAN FRANCISCO DIVISION
4
    MAURO BOTTA,                    )
5                                   )
              Plaintiff,            )
6                                   )
          vs.                       ) Case No.
7                                   )
    PRICEWATERHOUSECOOPERS, LLP,    ) 3:18-cv-2615
8   LAURA BUSTAMANTE, TYE THORSON,  )
    ROBERT HEATLEY, STIG HAAVARDTUN,)
9   ERGEN GENC, TIMOTHY CAREY and   )
    STEVE MCCANN,                   )
10                                  )
              Defendants.           )
11                                  )
12
              Confidential, Pursuant to Protective
13
                      Order
14
          DEPOSITION OF STIG HAAVARDTUN
15
              SAN JOSE, CALIFORNIA
16
              January 9, 2019
17
                  10:10 a.m.
18
19
20
    REPORTED BY:
21  Theresa Nadeau, CSR No. 10526
22
23
24
25

CONFIDENTIAL

Page 2

1         IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3           SAN FRANCISCO DIVISION

4

  MAURO BOTTA,                   )

5                           )

            Plaintiff,      )

6                           )

        vs.               ) Case No.

7                           )

  PRICEWATERHOUSECOOPERS, LLP,   ) 3:18-cv-2615

8  LAURA BUSTAMANTE, TYE THORSON,  )

  ROBERT HEATLEY, STIG HAAVARDTUN,  )

9  ERGEN GENC, TIMOTHY CAREY and    )

  STEVE MCCANN,               )

10                         )

           Defendants.     )

11                         )

12

13

14

15

16

17

18

19

20        Deposition of STIG HAAVARDTUN, taken on behalf

21  of Plaintiff, at the offices of Pricewaterhousecoopers,

22  LLP, 488 South Almaden Boulevard, 18th Floor, San Jose,

23  California, at 10:10 a.m. on Wednesday, January 9, 2019,

24  before Theresa Nadeau, Certified Shorthand Reporter No.

25  10526.

CONFIDENTIAL

Page 3

```
 1                    A P P E A R A N C E S
 2
    FOR THE PLAINTIFF:
 3
            DEREK SMITH LAW GROUP, LLC
 4          One Penn Plaza, Suite 4905
            New York, California 10119
 5          (212) 587-0760
            BY:  ALEXANDER G. CABECEIRAS, ESQ.
 6              alexc@dereksmithlaw.com
 7  FOR THE DEFENDANTS:
 8          HUESTON HENNIGAN, LLP
            523 West Sixth Street, Suite 400
 9          Los Angeles, CA  90014
            (213) 788-4340
10          BY:  JOSEPH A. REITER, ESQ.
                jreiter@hueston.com
11
12  Also present:  Geoff Ezgar
13
                            --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 4

```
 1                    I N D E X
 2    WITNESS
 3    STIG HAAVARDTUN
 4    Examination by:                      Page
 5     Mr. Cabeceiras                        5
 6     Mr. Reiter                           83
 7
 8
 9                  E X H I B I T S
10    Number        Description                      Page
11    Exhibit 34    E-mail chain, PwC_B00000135-137    31
12    Exhibit 35    E-mail chain, PwC_B00000598-605    34
13    Exhibit 36    E-mail chain, PwC_B00000606-608    42
14    Exhibit 37    E-mail chain, PwC_B00000609        47
15    Exhibit 38    E-mail from Chris Walter to various  49
                    recipients, PwC_B00000120
16
      Exhibit 39    E-mail from Stig Haavardtun to James Martin,  52
17                  PwC_B00000123
18    Exhibit 40    E-mail chain, Mauro Botta/Stig Haavardtun,  53
                    PwC_B0000615
19
      Exhibit 41    E-mail from Gregg Lakritz to Stig Haavardtun,  66
20                  PwC_B00005932-33
21    Exhibit 42    E-mail chain with attached excerpts from  76
                    performance review, PwC_B00001886-1894
22
23                      --oOo--
24
25
```

David Feldman Worldwide
A Veritext Company
800-642-1099                                    www.veritext.com

CONFIDENTIAL

                                              Page 5

1                   SAN JOSE, CALIFORNIA

2        WEDNESDAY, JANUARY 9, 2019, 10:10 a.m.-2:15 p.m.

3

4                     STIG HAAVARDTUN,

5               a witness herein, after having been

6               administered the oath by the court

7               reporter, was examined and testified

8               as follows:

9

10                  E X A M I N A T I O N

11   BY MR. CABECEIRAS:

12       Q.   Good morning, Mr. Haavardtun.  Can you

13   pronounce your name for me, first of all, so I don't

14   butcher it.

15       A.   It's Haavardtun.

16       Q.   Haavardtun.  May I call you Stig?

17       A.   Yeah.  That's fine.

18       Q.   Okay.  Stig, my name's Alex Cabeceiras.  I

19   represent Mauro Botta in his claim against PwC.  You've

20   been called here to testify as a witness today.

21            Just so we understand how this is going to

22   operate, it is a telephone deposition, so I ask that you

23   pause before you answer any of my questions.  That way

24   you can ensure that, A, I've gotten my full question

25   out, and, B, allowed your counsel to object should he

```
                                          Page 31
 1   did Mr. Botta raise any concerns to you about prior

 2   audits of Harmonic?

 3           MR. REITER:  Vague as to concerns.

 4           THE WITNESS:  His comment was about the 2014

 5   audit, not any prior audits.

 6           MR. CABECEIRAS:  Could we go off the record for

 7   a minute here?

 8           MR. REITER:  Yes.

 9           (Break taken.)

10           MR. CABECEIRAS:  Let's go back on.  Counsel, if

11   you could hand the witness what's been marked for him as

12   Exhibit 1.

13           (Off-the-record discussion.)

14           (Plaintiff's Exhibit 34 was marked for

15           identification.)

16   BY MR. CABECEIRAS:

17      Q.   Stig, please review the document and let me

18   know when you're done reviewing it.

19      A.   Okay.  I've looked at it.

20      Q.   Thank you.  Stig, who is Laura Bustamante?

21      A.   Laura Bustamante is a partner in the PwC audit

22   group in San Jose.

23      Q.   It appears here she writes, "Stig says he

24   sealed the deal."  Is that an accurate reflection?

25           MR. REITER:  Object to form.  Are you asking
```

CONFIDENTIAL

Page 32

```
 1    him if that's what the document says?
 2              MR. CABECEIRAS:  Yes.
 3              THE WITNESS:  Well, that's what it says.
 4    BY MR. CABECEIRAS:
 5        Q.   At any time in 2014 did you speak to Mr. Botta
 6    about him staying at PwC and not quitting or taking a
 7    new job?
 8        A.   I had a discussion about him thinking about
 9    leaving PwC, yes.
10        Q.   Do you remember when this was specifically?
11        A.   I don't.
12        Q.   Do you remember what was specifically discussed
13    between you and Mr. Botta?
14        A.   I believe I asked Mauro what he wanted to do,
15    what his ideal job was.
16        Q.   Do you remember Mr. Botta's response?
17        A.   I think he described something similar to his
18    current job as an auditor, that that's what he wanted to
19    do.
20        Q.   Did anybody at PwC ask you to speak to
21    Mr. Mauro or Mr. Botta about his resignation?
22        A.   I don't remember whether I spoke to him because
23    someone asked me or whether Mauro reached out to me.  I
24    don't remember.
25        Q.   At any time during your conversation with
```

1    Mr. Botta, did you encourage him to stay at PwC?

2        A.    After he had said that his, like, preferred

3    work was to be an auditor, I encouraged him to remain

4    with an audit firm, and I may have encouraged him to

5    stay with PwC since that was the audit firm he was

6    currently with.

7        Q.    And do you remember speaking to Ms. Bustamante

8    about your conversation with Mr. Botta?

9        A.    I don't remember that discussion, but it would

10    have been natural that I talked to her about it.

11        Q.    And can you clarify why it would have been

12    natural?

13        A.    Laura was the head of the semiconductor audit

14    group at the time, and I believe Mauro was in that

15    group.

16        Q.    After you spoke to Mauro about his, we'll just

17    say, general employment, did you have any follow-up

18    conversations with him about the same topic?

19            MR. REITER:  I'm going to object to form and

20    misstates testimony as to conversation about general

21    employment, and for that reason I'll object as vague as

22    well.

23            THE WITNESS:  From after we had worked together

24    on Micron, Mauro reached out to me from time to time to

25    get general coaching and advice on how things were going

Page 34

1    for him.  Not uncommon to do that but, yes, he reached
2    out to me every now and then.
3    BY MR. CABECEIRAS:
4       Q.   And if you can recall during those times, what
5    kind of advice was Mauro seeking from you?
6       A.   I don't remember the details of it so it would
7    be me speculating.  It would be basically about how his
8    work was going, but I just don't remember the details.
9    I'm sorry.
10            MR. CABECEIRAS:  Counsel, I'll ask that you
11   hand the witness what's been marked as Exhibit 2 and we
12   can mark it as 35.
13            (Plaintiffs' Exhibit 35 was marked for
14            identification.)
15   BY MR. CABECEIRAS:
16      Q.   Stig, if you could please review the document
17   once you have it and let me know when you've finished.
18   It is long, so please take your time.
19      A.   Okay.  There's part of this document where the
20   text is too small for me to read it, so --
21      Q.   Oh, okay.
22      A.   So if you ask about some of it, we may -- I
23   think Joe's bringing it up on his computer.
24            MR. REITER:  Let's go off the record for one
25   second.

CONFIDENTIAL

Page 40

1    audit finding?

2        A.   We ultimately concluded it was not an audit

3    finding.

4        Q.   And do you recall when that conclusion was

5    reached?

6        A.   I don't remember exactly, but it must have been

7    before we completed the audit.

8        Q.   And before that conclusion was reached, did you

9    reach out to the national office to gain a better

10   understanding?

11       A.   Not on the topic of whether it was an audit

12   finding or not.

13       Q.   Do you have any knowledge as to whether

14   Mr. Botta reached out to the national office on the same

15   topic?

16       A.   On whether it was an audit finding?

17       Q.   Correct.

18       A.   I don't know.  I don't know if he did.  It

19   would be very unusual for him to reach out without my

20   knowledge.  The question may have -- the question may

21   have come up in broader discussion about something else,

22   but I don't remember that specific discussion.

23       Q.   Thank you.  So in December of 2015 did

24   Mr. Botta tell you face to face the accounting

25   convention used on the Harmonic audit was not analyzed

CONFIDENTIAL

Page 41

1   properly for materiality impacts?

2           MR. REITER:  I'll object to form and lacks

3   foundation.

4           THE WITNESS:  I don't remember if it was a

5   face-to-face discussion, but I remember Mauro talking to

6   me with some questions around the convention used for

7   amortizing service revenue.

8   BY MR. CABECEIRAS:

9       Q.   And after learning about Mr. Botta's concerns,

10  did you notify anybody at PwC about his concerns?

11      A.   I don't remember if I did in 2015.  I

12  ultimately talked to others later on, but I don't

13  remember if I did in 2015.

14      Q.   Did Mauro ever share with you his concern that

15  Harmonic had inadequate revenue recognition in the

16  2014-2015 audit?

17      A.   So I'm not sure I fully understand the

18  question.  Mauro raised a question around the

19  amortization method for service revenue.  It was a

20  question that I agreed we needed to look into, so I'm

21  not sure I fully understand the rest of the question.

22      Q.   That's fine.  At one point did you ever

23  instruct Mr. Botta with respect to the Harmonic

24  engagement to review 60 contracts?

25      A.   I did not instruct Mr. Botta to review 60

```
 1    contracts.

 2            MR. CABECEIRAS:  Okay.  Joe, you can hand the

 3    witness what's been marked for you as Exhibit 3, and

 4    we'll mark it as 36.

 5            (Plaintiff's Exhibit 36 was marked for

 6            identification.)

 7    BY MR. CABECEIRAS:

 8       Q.   Stig, if you could review once you have it, let

 9    me know when you're done.

10       A.   Okay, I've looked through the document.

11       Q.   Great.  Stig, who is Anna Watson?

12       A.   Anna Watson is a senior manager in what's

13    called the chief auditor group.

14       Q.   And is she based in San Jose?

15       A.   She's based in San Jose, yes.

16       Q.   And was she a senior manager assigned to the

17    Harmonic audit?

18       A.   No.  She was in a support group called the

19    chief auditor group.

20       Q.   And what kind of support did her group provide?

21       A.   Group provided support around audit methodology

22    question.

23       Q.   And do you know who Gilbert Simonetti is?

24       A.   Yeah.  Gil Simonetti is a partner.  I don't

25    remember whether he was in the chief auditor group or if
```

CONFIDENTIAL

Page 43

1    he was in the national methodology group at the time.  I

2    think he may have been in the national methodology, but

3    I don't remember for sure.

4        Q.   And this appears to be an e-mail reflecting --

5    well, within an attachment, though it's from a

6    discussion.  Do you remember having a discussion with

7    you, Mr. Botta, Anna Watson and Gil?

8        A.   I remember having the discussions with them on

9    this topic.  Whether it was one discussion or multiple

10   discussions, I don't remember, but I do remember having

11   discussions with both of them on this topic.

12       Q.   Do you recall if these discussions occurred

13   before or after Mr. Botta sent you his comments on the

14   SAB99 memo?

15       A.   I don't remember whether they were before or

16   after.  Just looking at the date, it looks like they're

17   after, but I don't remember.

18       Q.   And do you recall where any of these

19   discussions physically took place?

20       A.   No.

21           MR. REITER:  And lacks foundation that there

22   were discussions.

23           THE WITNESS:  No.  No.  I think they may have

24   been phone conversations, but I don't --

25   BY MR. CABECEIRAS:

1      Q.   Did you, I'll say, enlist the help of Anna

2  Watson or enlist the support of Anna Watson in this

3  matter?

4      A.   I did reach out to Anna to ask her to help on

5  this, yes.

6      Q.   Did you also reach out to Gil to help out on

7  this matter?

8      A.   Yes, I did.

9      Q.   And why at that time did you feel you needed

10  Anna's help or support in this matter?

11      A.   So I think there were -- there were questions

12  around -- so Mauro had asked some questions around

13  whether sampling methodology was allowed for quantifying

14  this or whether you had to go and basically redo every

15  transaction or the company would have to go and redo

16  every transaction.

17          So I thought that sampling was okay, but since

18  Mauro had raised this question, I felt it was prudent to

19  talk to national methodology to get advice on whether it

20  was okay and how to go about doing -- for the company to

21  do that sampling.

22      Q.   And when you say sampling, what specifically

23  were you looking to sample?

24      A.   So we weren't sampling.  It was the company

25  that was doing a sample to identify the impact of this

CONFIDENTIAL

Page 45

1    accounting convention for the amortization of service

2    revenue.

3        Q.   And do you have any knowledge as to how

4    Harmonic went about sampling?

5        A.   So I think Harmonic originally went through and

6    looked at 60 transactions.  I think they ultimately

7    expanded to about a hundred transactions, and then they

8    took the impact of those hundred transactions and they

9    did what's called extrapolation to the rest of the

10   population.

11       Q.   And at that time in February 2016 did you feel

12   Harmonic -- that 60 transactions was an adequate sample?

13       A.   I didn't know, which is why we consulted with

14   national.

15       Q.   And I know you talked about why you needed the

16   support of Anna.  Why did you feel at that time you

17   needed the support of Gil as well?

18       A.   So Anna and Gil both worked in the same group.

19   Anna's a senior manager, Gil is a partner, so they were

20   cooperating on this thing.

21       Q.   And did they ever share with you their

22   conclusions on the issue?

23       A.   So they concluded that sampling was

24   appropriate.  They also concluded that the company

25   needed to sort of do a statistical analysis to support

CONFIDENTIAL

Page 46

1    the sample size.

2        Q.    Did they ever conclude that sampling of 60

3    transactions was appropriate?

4        A.    They didn't comment on the sample size.  There

5    needed to be a statistic analysis done to identify it.

6        Q.    And to your knowledge did Harmonic do a

7    statistical analysis?

8        A.    Yes.  Harmonic actually hired a statistician to

9    help them come up with a statistically valid sample.

10       Q.    Besides seeking the support of Anna and Gil,

11   did you reach out to anybody else at PwC on this

12   specific issue?

13       A.    So I talked to Ergen Genc who is the quality

14   review partner on the engagement.

15       Q.    And do you recall when you spoke to him?

16       A.    I don't know for sure.  It was in either

17   December or January.  It was before I reached out to Gil

18   and Anna.

19       Q.    And did he share with you his opinions on the

20   issue?

21       A.    We discussed the issue, and I believe he agreed

22   that it was prudent to talk to national on it.

23       Q.    Stig, at any time during this debate -- well,

24   withdraw it.

25             At any time during this issue with revenue

CONFIDENTIAL

Page 47

1    recognition at Harmonic, did you ever tell Mr. Botta you

2    have to be careful, there are important clients on the

3    board of Harmonic, one of which is Wells Fargo?

4        A.   I don't remember saying that in conjunction

5    with this issue.

6        Q.   Do you remember saying that to Mr. Botta at

7    all?

8        A.   I don't remember using that exact phrase.

9        Q.   To your knowledge is there a board member on

10   Harmonic's board who is also on Wells Fargo's board?

11       A.   Yes, there is.

12       Q.   At that time in early 2016 did you have any

13   concerns of losing Harmonic as a client?

14       A.   No.  No, I didn't.

15       Q.   Up until that point -- and I do apologize if

16   it's been asked and answered, but I'm just not sure, how

17   long had Harmonic been a client of PwC's?

18       A.   I don't know exactly.  I think they'd been a

19   client since the mid or early '90s.

20           MR. CABECEIRAS:  Okay.  Counsel, if you could

21   hand the witness what's been marked for us as Exhibit 4

22   and, Miss Court Reporter, if you could mark it as 37.

23           (Plaintiff's Exhibit 37 was marked for

24           identification.)

25           MR. REITER:  You said Exhibit 4?

CONFIDENTIAL

Page 48

1    BY MR. CABECEIRAS:  Exhibit 4, correct.

2        Q.   Stig, if you could just review and let me know

3    when you're done.

4        A.   Okay.  I read this.

5        Q.   At any time did Mr. Botta say to you that he

6    was okay with how Harmonic was dealing with the

7    situation we were just discussing?

8        A.   So he ultimately said he was okay with the

9    audit and the work that had been done on the audit.  I

10   don't remember if he had specific discussion on this

11   topic or not, but it was my understanding that Mauro was

12   okay with where we were heading, but --

13       Q.   Prior to seeking the support of Anna Watson,

14   had you had to seek her support out on other audit

15   issues prior to this?

16       A.   I probably have talked to Anna on other audit

17   issues, either on Harmonic or other jobs in the past.

18   It was not uncommon for me to reach out to the chief

19   auditor group either before or after, but I don't

20   remember any specific instances of it.

21       Q.   And what about for Gil?  Prior to this had you

22   reached out to him for any kind of support?

23       A.   I don't think I had consulted with Gil prior to

24   this.

25            MR. CABECEIRAS:  Counsel, if you could hand the

Page 49

1   witness Exhibit 6, and we can mark it as 38.
2            (Plaintiff's Exhibit 38 was marked for
3            identification.)
4   BY MR. CABECEIRAS:
5       Q.   Stig, please review and let me know when you're
6   done.
7       A.   Yeah.  I looked at this.
8       Q.   Great.  Stig, who is James Martin?
9       A.   I believe that James Martin is a manager or
10  senior manager in the national methodology group,
11  although I don't know that for sure.
12      Q.   And do you know who Chris J. Walter is?
13      A.   I don't.
14      Q.   And the subject matter is the request for a
15  formal consultation related to Harmonic, Inc. has been
16  assigned to James Martin.  Did you make a request for a
17  formal consultant -- or consultation, excuse me, related
18  to Harmonic, Inc.?
19      A.   So this is just a system-generated e-mail.
20  Mauro, myself and Ergen had discussed the need to do a
21  consultation with regards to the control implication of
22  the revenue -- revenue amortization matter.
23      Q.   The revenue what matter?  I'm sorry, I didn't
24  hear that last part.
25      A.   The amortization convention for service

CONFIDENTIAL

Page 50

1    revenue.

2        Q.   When you had that conversation, could you at

3    that point identify any control deficiencies at

4    Harmonic?

5            MR. REITER:  Object to form.

6            THE WITNESS:  There was a control deficiency

7    with regards to this amortization, and we had to

8    evaluate what type of deficiency it was.

9    BY MR. CABECEIRAS:

10       Q.   Did you at any time not want to or feel like

11   you needed to evaluate that deficiency?

12           MR. REITER:  So, compound.  Object to form.  If

13   you understand.

14           THE WITNESS:  We're required to evaluate all

15   deficiencies.  It's part of the audit.

16   BY MR. CABECEIRAS:

17       Q.   Did you ever tell Mr. Botta that many companies

18   in Silicon Valley have material weaknesses, that we have

19   to let those weaknesses slide?

20       A.   No, I did not make that statement.

21       Q.   Besides the control deficiencies or deficiency

22   you just described, did Mr. Botta ever bring up anything

23   he perceived to be a control deficiency with respect to

24   the Harmonic engagement?

25           MR. REITER:  Object to form.

Page 51

1          THE WITNESS:  There were numerous deficiencies

2     that were identified that all got evaluated as part of

3     the completion of the audit.

4     BY MR. CABECEIRAS:

5          Q.   Do you recall what those deficiencies were?

6          A.   No.  I would have to go back and look at what's

7     called the SAB document that lists out all the

8     deficiencies.  I remember some of them, but I don't

9     remember all.

10         Q.   Could you share with me some of the ones you do

11    know?

12         A.   I can, but it would be -- it won't be complete

13    list.  It would be -- I know there were some with

14    regards to like some accruals and there was some with

15    regards to some inventory.  I think there may have been

16    one with warranty and some with related bank account,

17    but I would have to go back and look at the SAB document

18    to identify that.

19              MR. CABECEIRAS:  Could we go off the record for

20    a second?

21              MR. REITER:  Yep.

22              (Lunch break taken.)

23              MR. CABECEIRAS:  Counsel, could you hand the

24    witness what's been marked for our purposes as Exhibit

25    8.  We can mark it as 39.

1    his schedule and performance.  Did you and Mr. Botta

2    ever meet with respect to Mr. Botta's schedule and

3    performance?

4         A.   Yes, we did.

5         Q.   Do you recall when that meeting took place?

6         A.   I don't remember exactly when.  I think it was

7    a few weeks after this because I remember it being after

8    having finalized the performance evaluation.

9         Q.   And do you remember where you guys met?

10        A.   I believe we met in the PwC office.

11        Q.   And do you remember when in relation to this

12   e-mail you had submitted the performance review

13   evaluation?

14        A.   I think it was a couple of weeks after this.  I

15   don't remember exactly when it was.

16        Q.   And when you met, did you discuss what Mauro

17   brought up in this e-mail, what was talked about?

18        A.   So we discussed his performance on the

19   engagement and we discussed the decision that it was

20   best for everyone that he did not continue on the

21   engagement.

22        Q.   And at that time did you have an opinion as to

23   his performance on the engagement?

24        A.   Yeah.  I completed a performance evaluation at

25   that point.

CONFIDENTIAL

Page 55

1    Q.   Can you recall if you thought Mauro did a good

2    job on --

3    A.   I thought that Mauro had done a good job in

4    raising questions and that he had shown good knowledge

5    about accounting and audit methodology.

6         I thought that he had done a less good job when

7    it comes to resolving these questions and that we needed

8    to bring in a lot of additional staff to help resolve

9    questions that he weren't able to resolve.

10        And I thought that he had done a actually

11   particularly poor job with regard to his interaction

12   with the client and his professionality and sort of

13   courtesy when it comes to dealing with the client.

14   Q.   And I may have misheard you.  Did you say you

15   thought he did a bad job with bringing in additional

16   staff?

17   A.   We had to bring in additional staff because he

18   weren't able to resolve or answer the questions that he

19   had brought up.

20   Q.   And who are you referring to when you say

21   additional staff?

22   A.   So we brought in two additional senior managers

23   and I believe a number of other managers and senior

24   associates.  I don't remember the names of all of them,

25   but it was a pretty large team towards the end of the

CONFIDENTIAL

1   audit.

2       Q.   So you said about two additional senior

3   managers.  And do you recall how many other managers

4   were actually brought on?

5       A.   I don't remember the exact staff level.  I

6   thought we brought on like more than five additional

7   people.

8       Q.   You know, in general, is that unusual to bring

9   more senior managers or managers on to a project?

10      A.   I think it's fairly unusual, yes.  It's not

11  like it's never happened, but it's not very common.

12      Q.   And were these additional staff members brought

13  on to raise concerns that Mr. Botta had specifically

14  about the Harmonic engagement?

15           MR. REITER:  Object to form.

16           THE WITNESS:  They were brought on to close out

17  some of the questions that Mauro had brought up and to

18  finish additional audit work that had not been completed

19  during the normal time.

20  BY MR. CABECEIRAS:

21      Q.   Do you recall what audit work was incomplete?

22      A.   I don't remember in detail.  I know there was a

23  lot of revenue testing that was incomplete.  I think

24  there were testing with regards to inventory.  I think

25  there were testing with regards to effectiveness of

CONFIDENTIAL

```
                                                Page 57
```

1     controls.  It was a fairly -- it was a fairly broad

2     array of work that still needed to be done when we

3     brought on additional resources.

4          Q.   And did that work need to be done for the audit

5     in that quarter or for audits past?

6          A.   It had to be done to complete the 2015 audit,

7     which was the one we were working on in February and

8     March of 2016.

9          Q.   Circling back to your conversation with Mauro

10    after he wrote this e-mail, you had said that it would

11    be best if he did not continue on the Harmonic

12    engagement.  Is that accurate?

13         A.   Yes.

14         Q.   Do you remember who specifically -- well,

15    withdrawn.

16              Did anybody ever ask you to remove Mr. Botta

17    from the Harmonic engagement?

18         A.   The controller at the client asked me for him

19    not to be on the Harmonic engagement, yes.

20         Q.   And when did the controller ask you that?

21         A.   He first raised concerns in October of 2015 and

22    he continued to raise concerns during January to March

23    of 2016.

24         Q.   And who was the controller in October of 2015?

25         A.   Greg Lakritz.

CONFIDENTIAL

1      Q.   And if you can recall in October of 2015, what

2    was Greg's first concern with respect to Mauro on the

3    Harmonic engagement?

4      A.   I don't remember the detail.  I think there was

5    a question that had been raised that it took a long time

6    to resolve, and I think he felt that Mauro wasn't sort

7    of responsive to discussions or points that Greg had

8    raised, but I don't remember the exact detail of it.  I

9    just remember that there were -- let's call it noise

10   already in October of 2015.

11     Q.   And did you speak to Mauro after Greg had

12   brought this issue up to you in October of 2015?

13     A.   I spoke briefly to him.  I'm not sure if I

14   mentioned that Greg had brought the issue up, but I told

15   him that he should continue to raise questions and that

16   I would deal with it if he got any pushback from the

17   client.

18     Q.   And going back to your meeting with Mr. Botta,

19   after Mr. Botta sent the e-mail that's been marked

20   Exhibit 40, did Mr. Botta tell you that he disagreed

21   with the performance evaluation you gave him?

22     A.   I don't know if he specifically said that he

23   disagreed, but he clearly wasn't happy with the

24   performance evaluation that I provided.

25     Q.   Were there aspects that he told you he was

CONFIDENTIAL

Page 59

1    unhappy with or disagreed with?

2         A.   I don't remember any specifics of the

3    discussion.

4         Q.   Do you recall --

5         A.   I think he agreed with the themes.  He thought

6    that may -- like the things he hadn't done well he

7    thought I had emphasized too much, and the things he had

8    done well he thought I hadn't emphasized enough.  I

9    don't think he disagreed with sort of the aspect.  He

10   thought -- he may have disagreed a little bit with the

11   weighting and the rankings that I provided.

12        Q.   Did Mr. Botta ask you to change the review at

13   all?

14        A.   I can't remember him asking me to do that.

15   It's possible that he did, but I can't remember.

16        Q.   Was that even an option?

17        A.   I wouldn't have changed it.  He can ask, but it

18   would have been my decision.

19        Q.   Got it.  And you said generally that the

20   controller at Harmonic had continued to brought things

21   up January through March of 2016.  Can you give me any

22   specific conversations you remember in which the

23   controller of Harmonic brought up issues he was having

24   with Mr. Botta during that time frame?

25        A.   Yeah.  There was a couple of meetings and I

CONFIDENTIAL

Page 60

1    think the themes were around his communication and like

2    the fact that -- like he had a lot of questions, he had

3    some criticism, but he never really went and talked to

4    the people at the Harmonic finance team.  He sort of

5    sent some -- he came in the evening and he talked to

6    some of the other staff members, and he sent the other

7    staff members out to basically tell people that their

8    work weren't good enough, didn't meet Mauro's standard.

9           So like he -- I think the controller's main

10   concern was he just -- like there's this guy who we

11   don't really see who comes and tells us that what we're

12   doing isn't good enough.  We would actually like to meet

13   him and understand his point of view rather than just

14   have some people come and tell us that he's not happy

15   with us.

16      Q.   And do you have any knowledge as to who these

17   staff members were that Mauro allegedly sent to voice

18   his unhappiness?

19      A.    I think most of it was -- there were two senior

20   associates on the job that I think were mostly the

21   people, but I think there may have been others as well,

22   but I think those two were the ones that did most of the

23   communication.

24      Q.   Besides that conversation, can you think of any

25   other conversations between you and the controller at

CONFIDENTIAL

Page 61

1   Harmonic in which the controller brought up some issues

2   with Mr. Botta?

3       A.   So I had numerous discussions with Greg

4   throughout the year-end audit about his, let's say,

5   concerns with Mauro.  I would say that was the main

6   theme of it.  Like there were -- there was especially a

7   person in the inventory group that felt very offended by

8   some of the messages that Mauro had sort of indirectly

9   delivered, and I also think that there was a lot of

10  rework being done mostly because like they didn't fully

11  understand the nature of what Mauro was asking and they

12  sort of guessed what they thought it was, and they ended

13  up actually doing a lot of wasteful work on the company

14  side.  That was part of the reason why the audit got

15  delayed.

16      Q.   You mentioned somebody in the inventory group

17  was upset.  Do you remember who that person was or know

18  who that person was?

19      A.   Yeah.  Her first name was Sally.  I think her

20  last name is Chu, C-h-u.

21      Q.   And do you have any knowledge as to why she was

22  upset with Mr. Botta?

23      A.   She felt that Mauro was sort of questioning the

24  quality of her work, and she had been there for a long

25  time and she obviously took pride in what she was doing

1    that she didn't quite understand what it was Mauro

2    thought that she was doing wrong.  She just got this

3    message it's not good enough, it's not good enough, that

4    she had to do a lot of work.  And even when she had

5    redone the work, that still wasn't good enough, which I

6    believe was because Mauro just hadn't explained what it

7    was he needed in order to sort of conclude on this

8    thing.

9              And I think she felt that he was sort of being

10   rude.  I think at one point I think I've seen an e-mail

11   where she said she felt as if he treated her like she

12   was a criminal or something like that.

13       Q.   Did you at any point -- I'll use the word

14   coach.  Like coach Mauro on how to deal or communicate

15   with Miss Chu?

16       A.   Yes.  I had a meeting with him in -- I think it

17   was in January, after I'd sort of gotten the first set

18   of -- let's call it complaints from Greg, talking about

19   how it was important that you meet in person, how it was

20   important that you explain the reason and the rationale

21   for the questions that you're asking, that you help the

22   client think through sort of what the information were

23   needed to provide in order to answer the questions.

24       Q.   Did you ever witness Mauro implement any of

25   your suggestions?

CONFIDENTIAL

Page 63

1      A.    I think he tried a little in the beginning, but

2  I did not see a lot of it.

3      Q.    Besides the controller at Harmonic, did anybody

4  else want Mr. Botta, to your knowledge, removed from the

5  Harmonic engagement?

6      A.    Well, I thought that he should be removed from

7  the Harmonic engagement.

8      Q.    We may have covered most of this information,

9  but why did you think he should be removed from the

10  Harmonic engagement?

11      A.    Because he had -- his sort of behavior had

12  created a very tense working relationship which made it

13  harder to get the work done, and I thought that for him

14  to continue out there would just -- like it would just

15  make it an unpleasant experience for both him and the

16  client, and it would be better for him to get to another

17  client where he could sort of start over fresh.  I also

18  was -- go ahead.  Sorry.

19      Q.    I'll let you finish.

20      A.    I also was unhappy with the fact that he hadn't

21  been able to get the audit done in any resemblance of

22  reasonable time, that it had taken forever to get the

23  audit done.  And I was concerned that this would be a

24  recurring issue, that we couldn't do the work in time.

25      Q.    Prior to -- well, withdrawn.

CONFIDENTIAL

Page 64

```
1              Did you have to do anything in order to get
2    Mr. Botta removed from the Harmonic engagement?
3              MR. REITER:  Object to form.
4              THE WITNESS:  I had discussions about it with
5    HR and with some of the leaders in the office to make
6    sure we could identify another senior manager.
7    BY MR. CABECEIRAS:
8       Q.   Did you have to get approval in order to remove
9    Mauro from the Harmonic engagement?
10      A.   I ran the matter through the office, what I
11   considered to be the office leadership, and they -- I
12   believe they agreed with me.  It wasn't like I submitted
13   a thing for approval and I got approval.  It was more a
14   discussion.
15      Q.   And who did you discuss this with in office
16   leadership?
17      A.   I discussed it with Tim Carey, who was the
18   assurance leader, and Kevin Healy.
19      Q.   Do you recall when you had that conversation,
20   if it was conversation?  I should withdraw that
21   question.
22              Did you have this conversation with both
23   Mr. Carey and Mr. Healy together?
24      A.   I don't remember.  It may have been
25   individually.  I don't remember the details of the
```

CONFIDENTIAL

Page 70

1    to be unreasonable in terms of what Mr. Botta was

2    requesting?

3        A.    I don't remember the details, but I remember we

4    had a number of meetings to sort of walk through some of

5    the requests and explain why we were making the request

6    and what we were looking at.

7              So at this point I inserted myself in a lot of

8    the discussion to make sure that we were appropriately

9    explaining the background for the questions we were

10   asking.

11       Q.    And turning to the top of the page, do you know

12   who Patricia Lin is?

13       A.    I don't know who Patricia Lin is.

14       Q.    You know who Traci Nelson is; is that right?

15       A.    I know who Traci Nelson is, yes.  Oh, let me

16   phrase -- I don't remember who Patricia Lin is.  I may

17   have had -- yeah, I don't remember who she is.

18       Q.    Did Ms. Nelson ever make you aware that

19   Mr. Botta had complained to HR about your performance

20   evaluation?

21       A.    I don't know if it was Traci who made me aware,

22   but I was aware that he had complained.

23       Q.    Do you recall about when you became aware?

24       A.    It was sometime in April or May of 2016.

25       Q.    And were you ever asked to give a statement or

CONFIDENTIAL

Page 71

1    be interviewed with respect to Mr. Botta's complaint?

2        A.   Yes, I was.

3        Q.   And do you recall who interviewed you?

4        A.   I don't remember who -- I know it was someone

5    from ethics and compliance, but I don't remember their

6    name.

7        Q.   Do you recall where the interview took place?

8        A.   It was a phone interview.

9        Q.   Do you remember what this person asked you?

10           MR. REITER:  Object to form.

11           THE WITNESS:  They asked about the engagement

12   and the performance and my background and reasoning for

13   the performance evaluation.

14   BY MR. CABECEIRAS:

15       Q.   After you found out that this complaint was

16   made by Mr. Botta, it related to your performance

17   evaluation of him, did you ever reach out to Mr. Botta

18   directly and speak to him about this?

19       A.   I did not reach out.  He reached out to me a

20   little bit later.

21       Q.   Do you remember when?

22       A.   I want to say it was in either May or June of

23   2016.

24       Q.   And what did Mr. Botta say when he reached out

25   to you?

1      A.   He wanted to apologize for having initiated the

2   investigation and felt that HR may have taken his

3   comments about me retaliating a little bit out of

4   context, and that he didn't feel that I had done that

5   and therefore shouldn't have been investigated.

6      Q.   Did he say anything else?

7      A.   He probably did, but I don't remember.

8      Q.   Was this conversation by phone?

9      A.   I think this conversation was in person.   In

10   the PwC office.

11      Q.   Were you upset with Mr. Botta for making the

12   complaint at that time?

13      A.   I was dealing with it very factually.  Like I

14   can't say I was -- I can't say I was upset.  Like it was

15   just one more thing I had to deal with.  So, yeah, no, I

16   can't say I was upset about it.  It was just one thing I

17   needed to deal with.

18      Q.   Besides the interview we just talked about with

19   the unidentified person from either ethics or

20   compliance, did you have to talk to anybody else because

21   of Mauro's complaint?

22           MR. REITER:  Object to form.

23           THE WITNESS:  Not because of the complaint at

24   that point.  I think I -- I think there was some folks

25   from the same group who reached out to me like the

CONFIDENTIAL

Page 73

1    following year or something like that that I had to

2    repeat some of the discussions, but I think I had -- if

3    I remember right, in April, May, I had two discussions

4    with ethics and compliance regarding this.  So I had one

5    to kind of do an interview and the other to debrief me

6    on the result.

7    BY MR. CABECEIRAS:

8        Q.   And that was April or May of what year?

9        A.   '16.

10       Q.   And what was the overall result?

11       A.   The result, if I remember them right -- go

12   ahead.  Sorry.

13       Q.   Sorry.  The result as it was told to you.

14       A.   What I was told was that the complaints against

15   me had not been substantiated.

16       Q.   And you had mentioned the same group reached

17   out to you.  Do you remember who those folks were?

18       A.   I don't remember their names, but I believe it

19   was sometime the following year.

20       Q.   Did you ever speak to Ergen about the fact that

21   Mauro had opened this complaint against you?

22       A.   To who?

23       Q.   Ergen.

24       A.   I may have.  I don't remember.  I may have

25   mentioned to Ergen -- mentioned it to Ergen, but I don't

```
 1      Q.   But at that time you were not the partner
 2   assigned to the Gigamon audit?
 3      A.   That's correct.
 4           MR. REITER:  Counsel, if you could hand the
 5   witness Exhibit 15, we can mark it -- I think we're at
 6   42.
 7           (Plaintiff's Exhibit 42 was marked for
 8           identification.)
 9   BY MR. CABECEIRAS:
10      Q.   Bit of a long document so please, Stig, review
11   it, let me know when you're done.
12      A.   Okay.  I've looked at the document.
13      Q.   Great.  Thank you.  I'm going to turn your
14   attention to the page marked 1888.
15      A.   Okay.
16      Q.   If you recall, there's a paragraph, the first
17   complete paragraph that begins, "Mauro has numerous
18   strengths in areas such as."  If you can recall, was
19   this paragraph what you wrote in Mr. Botta's performance
20   review?
21           MR. REITER:  I'm going to object to form and
22   object on the ground that the performance review speaks
23   for itself.
24           THE WITNESS:  I have to go and check if it's
25   the same that's in the performance review.  It doesn't
```

```
                                                       Page 77
```

 1   necessarily seem inconsistent, but I have to check.

 2           MR. REITER:  Okay.  Let's go off the record for

 3   a second.

 4           (Off-the-record discussion.)

 5   BY MR. CABECEIRAS:

 6       Q.   We can just go back on.

 7       A.   Okay.  Was there a question for me or were you

 8   going to ask another question?

 9       Q.   I'm going to ask another question.

10       A.   Okay.

11       Q.   What's been highlighted as the fourth full

12   paragraph down as a reply to the written comment, the

13   last paragraph -- the last sentence in that paragraph

14   reads, "The audit effort was made challenging by the

15   conduct of the EL who pushed back on asking questions,

16   reminded me that, quote, important client of the firm

17   sit on the board of this client and removed questions I

18   was asking forcing me to re-add them at night when my

19   team was asking me why he was removing them."

20           Stig, did you ever remind Mr. Botta that

21   important clients of Harmonic sit on the board of other

22   clients?

23           MR. REITER:  Object to form, lacks foundation.

24   I think it misstates the document as well.

25           THE WITNESS:  I did point out that there were

CONFIDENTIAL

Page 78

1    board members that sat on other clients and that as a

2    result we have to be sort of focused on doing a good job

3    with regard to this client.

4    BY MR. CABECEIRAS:

5        Q.   What would constitute a good job?

6        A.   An audit in accordance with the auditing

7    standard.  I think specifically I felt that there were

8    being made assertions that weren't sort of supported and

9    we weren't looking at all the facts and we had to have

10   the rigor of generating all the facts around some of the

11   issues.

12       Q.   And, Stig, you referred to auditing standard.

13   Is there a standard set of laws or guidelines that you

14   abide to when conducting these audits?

15       A.   There is a set of what's referred to as PCAOB

16   auditing standards which lay out the procedures you have

17   to do in various areas and kind of how you conduct an

18   audit.

19       Q.   The reply goes on in that sentence to say that

20   the EL removed questions that were being asked on the

21   Harmonic project.  Did you ever remove questions that

22   Mr. Botta was asking of Harmonic?

23       A.   So I don't remember the details.  It is

24   possible that I had removed questions because I thought

25   they were either already responded to or not necessary

CONFIDENTIAL

Page 79

```
 1   to get to a conclusion.  So it's possible that I removed
 2   questions, but I don't know the details of it.
 3        Q.   Stig, do you have any idea of what the acronym
 4   CN stands for?
 5        A.   Where is this -- oh, there?  Yeah, CN probably
 6   stands for coaching note.
 7             MR. CABECEIRAS:  Go off the record for a
 8   second.
 9             (Break taken.)
10   BY MR. CABECEIRAS:
11        Q.   Back on the record.  Stig, did you actually
12   tell Mr. Botta he was being rolled off of the Harmonic
13   engagement?
14        A.   I believe I did, yes.
15        Q.   Was anybody else present when you spoke to
16   Mr. Botta?
17        A.   There may have been someone from HR there.
18        Q.   You don't recall who that person may have been?
19        A.   I think it was Matt Steele, but I don't know
20   for sure.
21        Q.   Stig, at one point was the Harmonic -- withdraw
22   it.
23             Were you ever asked to hand over documents
24   pertaining to Harmonic audits because of an SEC
25   investigation?
```

CONFIDENTIAL

Page 81

1    Mr. Botta had reported PwC to the SEC?

2         A.    I don't know exactly.  I think it was in early

3    2018.  It could have been late 2017, but I think it was

4    early 2018.

5         Q.    Do you recall who told you that Mr. Botta

6    reported PwC to the SEC?

7         A.    Tim Carey.

8         Q.    Do you remember what exactly Mr. Carey said to

9    you about that?

10        A.    I don't remember the details of that

11   discussion.

12        Q.    Do you recall where you were?

13        A.    I believe I was in the office.

14        Q.    The office in San Jose?

15        A.    Yeah.  The San Jose PwC office.

16        Q.    At that time when Mr. Carey told you, were you

17   surprised by that news?

18             MR. REITER:  Object to form.

19             THE WITNESS:  I'm not sure how to respond to

20   that.

21   BY MR. CABECEIRAS:

22        Q.    Did you have any sort of emotional reaction

23   when Mr. Carey told you that Mr. Botta had reported PwC

24   to the SEC?

25        A.    I took the information as though I knew that

1    information.  I'm not sure if I -- I wasn't shocked, but

2    it also wasn't something I was sure that Mauro would do.

3    So like it's somewhere in between those two.

4        Q.   Did you ever become aware that PwC had

5    terminated Mr. Botta?

6        A.   I received a message from Traci saying that

7    Mauro was no longer working for us.

8        Q.   Prior to receiving that message, did Ms. Nelson

9    ever talk to you about terminating Mr. Botta?

10       A.   No.

11       Q.   Did anybody at PwC prior to you receiving that

12   message talk to you or consult with you or otherwise ask

13   your opinion on terminating Mr. Botta?

14       A.   No.

15       Q.   Stig, do you think Mr. Botta's a competent

16   auditor?

17            MR. REITER:  Object to form.

18            THE WITNESS:  I think Mauro had some strengths

19   when it comes to auditing.  I also think he have some

20   weaknesses when it comes to executing and performing the

21   audit.  So I would say that he's competent on some area.

22   On other areas I think there's some challenges.

23            MR. CABECEIRAS:  Nothing else for me.  Counsel,

24   do you have any followups?

25            MR. REITER:  Just one.

CONFIDENTIAL

Page 83

1                    EXAMINATION

2   BY MR. REITER:

3       Q.   I have maybe one or two questions.

4   Mr. Haavardtun, just to clarify, were you aware before

5   Mr. Botta was terminated that he had filed a complaint

6   with the SEC regarding PwC?

7       A.   No.

8            MR. REITER:  That's all the questions I have.

9            MR. CABECEIRAS:  Okay.  Thank you.

10           MR. REITER:  While we're still on the record,

11  I'll note that pursuant to the parties' protective order

12  in this case, the entire deposition transcript will be

13  deemed confidential for a certain period of time during

14  which the parties will have the opportunity to designate

15  certain portions or the entire transcript confidential.

16  //

17           (Whereupon, the deposition of STIG HAAVARDTUN

18           concluded at 2:15 p.m.)

19                       --o0o--

20

21

22

23

24

25

CONFIDENTIAL

Page 85

REPORTER'S CERTIFICATE

1

2          I, THERESA NADEAU, CSR No. 10526, Certified

3     Shorthand Reporter, certify:

4          That the foregoing proceedings were taken

5     before me at the time and place therein set forth, at

6     which time the witness was put under oath by me;

7          That the testimony of the witness, the

8     questions propounded, and all objections and statements

9     made at the time of the examination were recorded

10    stenographically by me and were thereafter transcribed;

11         That a review of the transcript by the deponent

12    was requested;

13         That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15         I further certify that I am not a relative of

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18         I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21         Dated this 11th day of January, 2019.

22

23

24               THERESA NADEAU, CSR NO. 10526

25