# EXHIBIT 4

CONFIDENTIAL

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

    MAURO BOTTA,

5

                Plaintiff,

6

7       -vs-                         No. 3:18-cv-2615-RS

8   PRICEWATERHOUSECOOPERS, LLC,

    LAURA BUSTAMANTE, TYE

9   THORSON, ROBERT HEATLEY,

    STIG HAAVARDTUN, ERGUN GENC,

10  TIMOTHY CAREY, AND STEVE

    MCCANN,

11

                Defendants.

12                         /

13        DEPOSITION OF TYE THORSON

14              CONFIDENTIAL

15          SAN JOSE, CALIFORNIA

16        FRIDAY, NOVEMBER 9, 2018

17

18

19

20

21  Reported by: NINA PAVONE, CSR NO. 7802

22

23

24  JOB NO. 150958

25

CONFIDENTIAL

1

2               FRIDAY, NOVEMBER 9, 2018

3                      10:03 A.M.

4

5

6

7       Deposition of TYE THORSON,

8     held at PricewaterhouseCoopers, LLC, 488 S.

9     Almaden Boulevard, #1800, San Jose, California, before

10    Nina Pavone, a Certified Shorthand Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1                    A P P E A R A N C E S

2

3     FOR THE PLAINTIFF:

4              DEREK SMITH LAW GROUP

5              One Penn Plaza

6              New York, NY 10119

7              BY:  ALEXANDER CABECEIRAS (Via Telephone)

8                   ATTORNEY AT LAW

9

10

11

12    FOR THE DEFENDANTS:

13             HUESTON HENNIGAN

14             523 West 6th Street

15             Los Angeles, CA 90014

16             BY:  JOHN HUESTON

17                  JOE REITER

18                  ATTORNEYS AT LAW

19

20

21

22

23    ALSO PRESENT:  Geoffrey M. Ezgar,

24             Office of the General Counsel PwC

25             Mauro Botta (Via telephone)

CONFIDENTIAL

Page 4

1

2

3          IT IS HEREBY STIPULATED AND AGREED

4   by and between the attorneys for the

5   respective parties herein, that filing and

6   sealing be and the same are hereby waived.

7          IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to the form

9   of the question, shall be reserved to the

10  time of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be sworn to

13  and signed before any officer authorized

14  to administer an oath, with the same

15  force and effect as if signed and sworn

16  to before the Court.

17

18

19

20                    - oOo -

21

22

23

24

25

CONFIDENTIAL

Page 32

1    Q.   Mr. Thorson, what does a PFF stand for?

2    A.   You know, I forget what PFF stands for.  I

3    believe it was an evaluation form that we would do.

4    Let me just read this in context right here.

5         Essentially, a PFF was his review that he

6    received, it appears to be on eSilicon, his

7    performance review.

8    Q.   And was eSilicon -- I assume was a PwC client

9    at the time?

10   A.   I believe it was.

11   Q.   Were you a partner assigned to the eSilicon

12   engagement?

13   A.   No.

14   Q.   In the third paragraph, Ms. Bustamante

15   appears to say, "Tye and Sameer, will this impact your

16   filings?"  Is that correct?

17   A.   That's what the sentence says, yes.

18   Q.   What filings is she referring to?

19        MR. HUESTON:  Objection.  Foundation.  Calls

20   for speculation.

21        You can answer if you can.

22        THE WITNESS:  I believe she was referring to

23   my Cavium filing that Mauro was my senior manager on.

24   I'm not sure what the other filing was.

25   BY MR. CABECEIRAS:

CONFIDENTIAL

Page 33

1    Q.  Around this time in February of 2014, did

2  Mauro ever indicate to you that he wanted to step

3  down?

4          MR. HUESTON:  Objection.  Vague as to step

5  down.

6          THE WITNESS:  I'm not -- I assume that step

7  down means leave the firm.

8          MR. HUESTON:  Well, don't assume anything.

9          THE WITNESS:  Okay.

10  BY MR. CABECEIRAS:

11    Q.  I'm happy to rephrase.  At any time around

12  February of 2014, did Mauro ever indicate to you that

13  he wanted to quit working for PwC?

14    A.  I do not recall.

15    Q.  Do you recall Mr. Botta ever telling you he

16  wanted to quit working at PwC?

17    A.  Yes.

18    Q.  When do you recall him saying this to you?

19    A.  I don't recall specific times or dates.  I

20  know he -- he -- he either threatened or tried to quit

21  on a number of occasions that I'm aware of.  I don't

22  know how many times it actually happened, but

23  certainly over the course of a number of years, Mauro

24  and I had frequent conversations and some of those

25  would be on his intention to leave the firm.

CONFIDENTIAL

Page 34

1    Q.  I know you can't say specifically how many

2  times, but could you approximate for me?

3    A.  No, I really can't.  I think it was a couple

4  that I remember him talking to me about, but he

5  certainly may have tried to leave many more times than

6  that.  But the times that I'm aware of, there were at

7  least a couple, two or three at least.

8    Q.  Mr. Thorson, did you ever encourage Mauro to

9  actually quit PwC?

10    A.  I don't think I would encourage Mauro to

11  quit.  I don't recall any times trying to encourage

12  him to quit.

13    Q.  Do you recall encouraging Mauro to stay at

14  PwC?

15    MR. HUESTON:  Objection.  Vague.  Vague as to

16  time.

17    THE WITNESS:  Over the course of my

18  relationship with Mauro starting in 2012 up until the

19  time he left the firm, I wanted to help Mauro develop

20  and when he told me he would be leaving, in some cases

21  I know I suggested some other things he could do for

22  PwC that may not be in the direct audit areas,

23  thinking he might be interested in something else.

24    MR. CABECEIRAS:  Counsel, could you please

25  hand the witness what's been marked for you as

CONFIDENTIAL

Page 35

1    Exhibit 16 and mark it as Plaintiff's 4.

2            (Whereupon, Exhibit 4 was marked for

3    identification.)

4    BY MR. CABECEIRAS:

5        Q.  Mr. Thorson, if you can review the document

6    that's been marked as Plaintiff's 4 and let me know

7    when you're finished reviewing it.

8        A.  Okay, I've read this.

9        Q.  This appears to be an e-mail from a Johan

10   Furstenberg, Laura Bustamante, with yourself and a

11   Christopher Smith cc'd.

12           Is that an accurate depiction?

13       A.  Yes, that appears to be what I'm looking at.

14       Q.  Mr. Thorson, who is Christopher J. Smith?

15       A.  He's a partner at PwC.

16       Q.  Did Mr. Smith work on the Cavium audit?

17       A.  No, not that I'm aware of.

18       Q.  And who is Johan Furstenberg?

19       A.  Johan Furstenberg is a former partner at PwC.

20       Q.  I apologize for mispronouncing his name.

21           Was Johan ever assigned to work on the Cavium

22   engagement?

23       A.  I believe he worked on the Cavium engagement

24   for at least one year.

25       Q.  Do you recall what year that was?

CONFIDENTIAL

Page 42

1    lines of a given quarter, I would speak to him a

2    couple of times to -- at least two to higher.

3        Q.   Can you repeat that last sentence for me?

4        A.   Yeah, I would meet with Art at least two

5    times a quarter.

6        Q.   And would you provide information to Art?

7        A.   We would have a discussion.  It's possible I

8    provided information.

9        Q.   Would you provide Art updates on how a

10   particular audit was going?

11           MR. HUESTON:   Objection.  Vague as to going.

12           THE WITNESS:   It's possible I could provide

13   him an update on how an audit was progressing.

14   BY MR. CABECEIRAS:

15       Q.   Did Mr. Chadwick ever mention Mr. Botta?

16           MR. HUESTON:   Objection.  Vague as to time.

17           THE WITNESS:   In 2012 audit, he did mention

18   Mr. Botta.

19   BY MR. CABECEIRAS:

20       Q.   And in 2012, what did Mr. Chadwick say about

21   Mr. Botta?

22       A.   It's possible we had a lot of discussions.

23   One of the discussions was that he wanted Mauro

24   removed from the engagement for the 2013 audit.

25       Q.   When you say you had a lot of discussions,

CONFIDENTIAL

Page 43

1 are you, just so the record is clear, are you saying

2 you had a lot of discussions about Mr. Botta?

3    A.  I said it's possible.  I don't remember them.

4 But normally, I had very few discussions about

5 Mr. Botta with the CFO.

6    Q.  Can you approximate for me what very few

7 means?  Less than five times?  More than five times?

8    A.  I only remember talking to the CFO about --

9 specifically about Mauro's performance one time, but

10 there may have been more than that.  At least one

11 time.  I'm talking about in the 2012 time frame.

12    Q.  The one time you can specifically recall,

13 what did you share about Mauro's performance?

14    A.  I wanted Mauro to stay on the job, so I

15 believe I shared with him that Mauro can take a little

16 bit of warming up to get used to, but that Mauro's

17 intentions were good and that it would be in the best

18 interest of both him and myself if Mauro, in my

19 opinion, remained on the account and I asked him to

20 give it a shot and trust me for the 2013 audit.

21    Q.  So just to clarify, you told Mr. Chadwick

22 this in response to him asking that Mr. Botta be

23 removed?

24    A.  Yes.

25    Q.  Why, at that time, did you want Mr. Botta on

CONFIDENTIAL

Page 44

1  the account?

2       A.   Mr. Botta's a good auditor and I liked him.

3       Q.   Now, you had this conversation in response to

4  what Mr. Chadwick had said.  Can you tell me what

5  Mr. Chadwick told you that made you, I'm going to use

6  the term stick up for Mauro or keep Mauro on the

7  project?

8       A.   I don't remember the specifics.  It wasn't

9  from Mauro's direct interaction with Mr. Chadwick.

10       It was reported up through his people, I

11  believe, they weren't excited about working with

12  Mauro.  It was -- that was the general gist of the

13  conversation and his comments to me.

14       Q.   During this 2012 audit, did Mauro have

15  regular communication with Mr. Chadwick?

16       MR. HUESTON:  Objection.  Vague.

17       THE WITNESS:  I wouldn't call it regular.

18  I'm not sure if Mr. Botta communicated with

19  Mr. Chadwick regularly.  Certainly we were in meetings

20  together, but I don't know that I would consider it a

21  regular level of communication.

22  BY MR. CABECEIRAS:

23       Q.   You mentioned that Mr. Chadwick's people

24  would kind of complain up the chain about working with

25  Mr. Botta.

CONFIDENTIAL

Page 49

1    Q.   Okay, thank you.

2         Mr. Thorson, the document appears to be an

3    e-mail sent from Mauro to you dated February 22nd,

4    2015 with an attachment titled PB.

5         Do you know what PB stands for, if anything?

6    A.   No, I don't -- I don't recall if that stands

7    for anything formally.  May have been Mauro's naming

8    convention for the document.

9    Q.   And based on your review of the document,

10   what appears to be the purpose of the document?

11        MR. HUESTON:  Objection.  Foundation.  Calls

12   for speculation.

13        THE WITNESS:  I believe -- I believe this is

14   a document that Mauro sent me in response to a

15   discussion that we had on whether or not there was a

16   material weakness in the 2014 audit to Cavium.

17   BY MR. CABECEIRAS:

18   Q.   And you said this was in response to perhaps

19   a discussion you had with Mr. Botta; is that correct?

20   A.   That's correct.

21   Q.   When did you have a discussion with Mr. Botta

22   that you just referred to?

23   A.   I believe the discussion, and I'm basing it

24   on the date in this e-mail from Mr. Botta to me, was

25   one or two days before.  So probably the 20th or the

CONFIDENTIAL

Page 50

1    21st of February.

2         Q.   And when did this discussion take place?

3         A.   I don't recall.

4         Q.   Do you recall if it was at PwC's office in

5    San Jose?

6         A.   I don't.  I believe it was in person.  That's

7    about all I can remember, having a face-to-face

8    discussion with Mauro on this one.  But again,

9    that's...

10        Q.   And if you can remember, what did Mauro share

11   with you during that face-to-face discussion?

12        A.   Mauro shared with me that he believed there

13   was a material weakness at Cavium based on aggregation

14   of controlled deficiencies.  And I had told him I

15   wanted to understand his point of view better and

16   asked him to put it down in writing.

17        Q.   Did you agree at this time with Mauro that

18   there were material weaknesses?

19        A.   My initial evaluation was that there were not

20   material weaknesses or a material weakness at Cavium,

21   but I also wanted to hear Mauro's point of view and

22   understand why he thought there may be one.

23        Q.   Turning to the third page in the exhibit,

24   what's marked PwC_B00000392, can you turn there?

25        A.   Yes.

CONFIDENTIAL

Page 51

1      Q.   The second paragraph down says

2   "Issue/concerns:   Lack of transparency/competency,

3   (Path A) lack of sufficient resources to perform

4   effective controls on tax and treasury functions."

5         Mr. Thorson, are these the kind of material

6   weaknesses that Mr. Botta brought up in your

7   conversation?

8         MR. HUESTON:   Objection.   Foundation.

9         THE WITNESS:   I'm not sure that I would

10  characterize Mauro saying that these were material

11  weaknesses.   I think Mauro shared a view there was a

12  material weakness here relating to aggregating a

13  number of issues together.

14  BY MR. CABECEIRAS:

15     Q.   What were those issues?

16     A.   The issues are laid out in this memo that

17  Mauro has put together.

18     Q.   And just so we are clear on the timeline,

19  this e-mail was written in February of 2015 about the

20  Cavium's 2014 audit; is that correct?

21     A.   That's correct.

22     Q.   Now, for each Cavium audit that you worked

23  on, did you have to sign an opinion?

24     A.   Yes, for each Cavium audit, PwC signed an

25  audit opinion for all the years that I was the audit

CONFIDENTIAL

Page 61

1   was being shared between the auditors or with the

2   auditors, excuse me?

3       A.   It was the lack of forthrightness with the

4   auditors that Mauro brought up with this complaint

5   that was a concern of mine.   Mauro referred to it as

6   the lack of communication in his conclusion at the end

7   of this document.   That was concerning.   Tone at the

8   top and ethics of top level management, when I hear

9   that, I get concerned.   And I wanted to -- I talked to

10  Bob about it.

11      Q.   During the 2014 audit, did Cavium disclose to

12  you that -- I'll call it the phishing incident?

13      A.   Yes.

14      Q.   So this wasn't something that Mr. Botta

15  learned after the fact?

16      A.   No, this was not.

17      Q.   Have you seen -- as a partner, have you seen

18  a manager, senior manager, raise these kinds of issues

19  before?

20          MR. HUESTON:   Objection.   Vague.

21          THE WITNESS:   Yeah, I've -- I've certainly

22  seen these kind of issues raised on engagements and

23  whether it was by a staff or senior manager or senior

24  manager, I don't recall, but certainly, I've seen

25  issues like this raised before.

CONFIDENTIAL

Page 62

1   BY MR. CABECEIRAS:

2       Q.  Have you seen, before Mauro, a manager or

3   senior manager, questioning -- questioning the

4   trustworthiness of a client?

5       A.  I don't recall.

6       Q.  Do you recall if a manager or senior manager

7   has raised an issue of trustworthiness with the client

8   in a written document such as the one Mauro sent to

9   you?

10          MR. HUESTON:  Objection.  Vague.

11          THE WITNESS:  Yeah, it's -- I don't recall.

12  It certainly could have happened, but I don't recall.

13  BY MR. CABECEIRAS:

14      Q.  Were you upset that Mauro added into this

15  document some items that, as you said, were concerning

16  to you?

17      A.  No.  I wasn't concerned that he put them in

18  the document.  I was concerned at the nature of the

19  items themselves.

20      Q.  What was wrong -- why were you concerned with

21  the nature of the items?  I'm not sure what that

22  means.

23      A.  Well, in our profession, it's important that

24  the people we work with have integrity, that our

25  clients have integrity, that we have integrity and

CONFIDENTIAL

Page 63

1  when somebody makes an accusation about top level

2  management not having integrity, I think any partner

3  at any firm would have concerns about that particular

4  issue if, in fact, it's true.

5      Q.   Prior to Mauro --

6          MR. HUESTON:  Hold on, Counsel.  Can we --

7  before you start your next question, to keep things

8  moving along, we've just had someone come in with a

9  lunch menu so we can just order and have food come in

10 and take a minimal break, which I'm sure you will

11 appreciate.  So --

12         MR. CABECEIRAS:  Do you want to go off the

13 record?

14         MR. HUESTON:  Yes, let's go off the record

15 for five minutes and then we'll go back on.

16         (Whereupon, a break was taken.)

17         MR. CABECEIRAS:  Could you please read back

18 my last complete question?

19         (The record was read by the Reporter.)

20         MR. CABECEIRAS:  Thank you.

21 BY MR. CABECEIRAS:

22     Q.   Mr. Thorson, prior to Mr. Botta sending you

23 this document, in your experience as a partner, have

24 you ever seen another manager or senior manager accuse

25 a top level manager of not having integrity?

CONFIDENTIAL

Page 64

1        MR. HUESTON:  I'm going to object.  Vague as

2   to terms.

3        THE WITNESS:  Can you repeat that one more

4   time or rephrase it?

5   BY MR. CABECEIRAS:

6     Q.  Sure.  You referred earlier that you were

7   concerned because, like you said, in any profession or

8   in any auditing circle, integrity matters, right?

9        MR. HUESTON:  I'm going to object.  Vague,

10  again, and this is calling for confidential

11  information.

12       MR. CABECEIRAS:  I'm not sure where the

13  confidential information is.

14       MR. HUESTON:  It would derive from other

15  engagements or audits that are not subject to this

16  action and would otherwise be confidential.

17  BY MR. CABECEIRAS:

18    Q.  Mr. Thorson, you mentioned that what was

19  concerning to you was the accusation of a top level

20  manager against their integrity; is that correct?

21    A.  I believe it was top level management and any

22  integrity issues with our clients, top level

23  management, yes.

24    Q.  Prior to Mr. Botta raising this concern, in

25  your professional experience, have you seen a manager

CONFIDENTIAL

Page 72

1  Q.  So at that time, you didn't have any

2  outstanding concerns with the 2014 Cavium audit?

3      MR. HUESTON:  Objection.  Vague.

4      THE WITNESS:  We were in the process of

5  completing the audit, so I don't remember if I had any

6  concerns about completing the audit at that point in

7  time.

8  BY MR. CABECEIRAS:

9  Q.  Okay.  And I am referring to the 2014 -- did

10 I say 2015?

11 A.  I think you said 2014, but I don't...

12 Q.  Okay, well, I apologize.  I was referring to

13 the 2014, which I believe you stated, and correct me

14 if I'm wrong, that the audit opinion had already been

15 signed; is that correct?

16 A.  So at the timing of this memo that Mauro sent

17 to me, the audit opinion had not been signed for 2014.

18 It had been signed for 2013 and 2012.

19 Q.  I'm going to refer to the document that Mauro

20 sent you as the memo, okay?

21 A.  Okay.

22 Q.  Did you -- well, withdrawn.

23     Do you know a person named Mayank Gupta?

24 A.  Yes.

25 Q.  And who is Gupta?

CONFIDENTIAL

Page 73

1    A.   He's -- he was a manager on the Cavium

2    account.

3    Q.   Did you ever instruct Gupta to print out the

4    memo that plaintiff wrote and leave it at Cavium?

5    A.   Not -- not -- no, I never instructed Mayank

6    to print out the memo which is, again, as we defined

7    it, Mauro's Exhibit 7, I never instructed Mayank that

8    I can recall to print that out.  I don't think he was

9    made aware of the memo -- of the memo, at least by me.

10   Q.   Okay.  Going back to what's been marked

11   Plaintiff's 8, did you at one point in time speak to

12   Timothy Scott and Robert Heatley about what Mauro had

13   sent to you?

14   A.   Yes, I -- yes, we had -- we did have a

15   discussion about the memo or about the document.

16   Q.   Just to be clear, the document that Mauro

17   forwarded to your e-mail on February 22nd, 2015?

18   A.   That's correct.

19   Q.   And when did this meeting take place?

20   A.   I don't recall.  Based on this information

21   you've sent me, it looks like it probably occurred the

22   next morning and, given the time frame, it was most

23   likely the next morning.

24   Q.   And if you can recall, do you remember where

25   the meeting took place?

CONFIDENTIAL

Page 74

1    A.  No, I don't recall.  I'll say it was either a

2    call or a meeting, I don't know which, just to make

3    sure.

4    Q.  Okay.

5    A.  Make it clear.

6    Q.  Okay.  Do you remember both Scott and Heatley

7    being part of this meeting, whether it was on call or

8    in person?

9    A.  I don't remember if Heatley was on the call

10   or not.  I know Tim was.  I don't know if Heatley was.

11   I just can't remember.

12   Q.  Okay.  What was discussed between you and

13   Tim?

14   A.  At this point, I don't specifically recall

15   what we talked about.  Anything else would be

16   speculation.

17   Q.  Well, please don't speculate, like we said.

18   A.  Yes.

19   Q.  Do you remember him being upset that Mauro

20   had wrote this Pw document?

21        MR. HUESTON:  Objection.  No foundation.

22        THE WITNESS:  I don't -- at the time when we

23   had this discussion, I don't remember that he was

24   upset or not.  I just don't have a recollection.

25        MR. HUESTON:  Counsel, our lunch has arrived,

CONFIDENTIAL

Page 78

1    A.  I said this had the potential of causing some

2  issues with the company and the timing of their

3  filing.

4    Q.  Is it your opinion that what Mauro did by

5  sending you this document was rare at PwC?

6    A.  I wouldn't characterize sending me the

7  document as rare.  I mean having a disagreement is the

8  way Mauro phrased this the day before, two days before

9  I asked him to put the memo together was rare.

10    Q.  You stated that you said to Mauro potentially

11  this could cause filing issues; is that correct?

12    A.  I -- I don't remember specifically what I

13  said, but it was something to that effect, that this

14  could cause an issue with the company's ability to

15  file by the required filing time frame.

16    Q.  And what was your concern about how this

17  would impact their ability to file?

18    A.  My concern was addressing the issues dealing

19  with any potential national office consultations that

20  may arise.  Clearly, what Mauro was doing was within

21  policy.  I supported Mauro's -- I supported following

22  our policy, frankly, and we needed to get to the

23  bottom of it.

24        So we just have work to do and I wanted to

25  make sure that it was clear that we were -- it was

CONFIDENTIAL

Page 79

1  going to take some time to deal with this issue.  It

2  may take a day.  I didn't know.  I've never dealt with

3  a formal disagreement, so...

4       Q.  So at this time, February 23rd, 2015, the

5  national office, PwC's national office, been alerted

6  of this issue?

7       A.  I don't believe they were as of 2-23-15.  I

8  certainly didn't alert them.

9           Now, some people -- Tim Scott is not what I

10  consider national office.  Tim Scott is our regional

11  risk management partner and he was notified.

12      Q.  What did you -- I'm sorry.

13          What do you consider national office?  Is it

14  specifically anybody working out of Washington, D.C or

15  something else?

16      A.  Generally, when I refer to national office,

17  it's the guys that deal with complex accounting or

18  auditing matters.  That's the way most of the partners

19  refer to national office, but it's -- yeah.

20      Q.  And just a few more and then I'll let you

21  guys eat.

22          To your knowledge, before you met with Mauro

23  for dinner, had Mr. Heatley met with Mauro to discuss

24  this issue?

25          MR. HUESTON:  Objection.  No foundation.

CONFIDENTIAL

Page 80

1  Calls for speculation.

2         THE WITNESS:  At the time I was not aware of

3  Mr. Heatley having a discussion with Mauro.

4  BY MR. CABECEIRAS,

5      Q.  Mr. Heatley didn't come up to you and say I'm

6  going to meet with Mauro and discuss this?

7      A.  I don't recall a discussion with Mr. Heatley

8  along those lines.

9         MR. CABECEIRAS:  Okay.  Off the record.

10         (Lunch recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1          AFTERNOON SESSION:

2  BY MR. CABECEIRAS:

3     Q.   Mr. Thorson, turning your attention back to

4  what's been marked as Plaintiff's Exhibit 9, you

5  stated that you met with Mauro and had dinner on

6  Monday, February 23rd, 2015; is that correct?

7     A.   That's correct.

8     Q.   At that meeting did Mr. Mauro indicate to you

9  that he was going to escalate this issue to the

10 national office?

11    A.   No, he did not indicate that, at least to my

12 recollection, that it was going to be escalated to the

13 national office.

14    Q.   Can you repeat that, please?

15    A.   No, I don't remember that.

16    Q.   But after that you said it was going to be

17 escalated?

18    A.   Well, we talked at dinner about next steps

19 with respect to this memo.  Mauro, my recollection

20 when we left dinner, was he was going to consider how

21 he wanted to move forward with what was starting to

22 appear to be a formal disagreement.

23    Q.   And was the disagreement between you and

24 Mauro?

25    A.   I would characterize it as a disagreement

Page 82

1  between Mauro and the engagement team.  Myself and Bob

2  Heatley had concluded that we didn't think we had a

3  material weakness; however, we have protocol and this

4  is part of the protocol that we have in the firm and I

5  was -- I was supportive of following protocol,

6  frankly.  I just didn't agree with a lot of the

7  factual content of the memo itself.  I just wanted to

8  make sure that we kind of understood what the next

9  steps were going to be.

10      Q.  And Mr. Thorson, who's on the engagement

11  team?

12      A.  When I refer to the engagement team, in terms

13  of a disagreement, the protocol that we have deals

14  with how does the partner feel about an issue, how

15  does the concurring partner feel about an issue, how

16  does a senior manager feel about an issue and

17  depending on who believes what in terms of the issues,

18  then we have various protocols we follow.

19          And in this case when I refer to the

20  engagement team, I was referring to Bob Heatley, the

21  QRP, and myself, who had concluded that this was not a

22  material weakness, even on an aggregation basis, based

23  on what was presented to me in writing by Mauro and I

24  wanted to further understand that night in the

25  discussion that Mauro and I had why he thought what he

CONFIDENTIAL

Page 83

1  thought because none of these issues were really new,

2  especially the prior year ones we already addressed,

3  he didn't raise any concerns about management

4  integrity.

5        And I was a little surprised, like I said,

6  when you asked me if I was surprised, I was surprised

7  that those issues were being raised and I was

8  surprised they were being raised now at the time of

9  that dinner.

10     Q.  And you said there were protocols you were

11  following.  Are you referring to internal PwC

12  protocols or some external protocols?

13     A.  I'm referring to PwC protocols.

14     Q.  You stated there were next steps that you

15  discussed with Mr. Botta.

16        Do you recall what those next steps were?

17     A.  Well, when we left the dinner, Mauro wanted

18  to think about everything.  You know, Mauro kind of --

19  my belief on what he was going to think about was in

20  light of kind of our discussion and my questioning

21  just the factual accuracy of what was in the memo, do

22  you want to, you know, continue with the disagreement

23  or not was really the question and that was the way we

24  left the dinner.

25     Q.  Did you implore him to take specific steps of

CONFIDENTIAL

Page 84

1   any kind or specific stance with regard to the memo he

2   wrote?

3          MR. HUESTON:  Objection.  Misstates his

4   testimony.

5          THE WITNESS:  I did not.  Frankly, this was a

6   process that the firm has.  I support the process,

7   frankly.  It's good that we have these kinds of

8   processes in place and procedures to follow and I

9   wanted to make sure that the memo itself was something

10  that I understood and I was supportive of whatever

11  Mauro wanted to do.

12         I just wanted to let him know what next steps

13  were going to be for us or what they might entail

14  having not gone through a formal disagreement before.

15  BY MR. CABECEIRAS:

16     Q.  Do you remember around that same time,

17  February 2015, Mauro writing a memo on convertible

18  debt as it related to Xpliant?

19     A.  No.

20         MR. CABECEIRAS:  Counsel, if you could hand

21  the witness what I've had marked as Exhibit 6 for you,

22  if we could mark this document as Plaintiff's 10.

23         (Whereupon, Exhibit 10 was marked for

24  identification.)

25  BY MR. CABECEIRAS:

Page 85

1   Q.   Mr. Thorson, if you could review it and let
2   me know when you're finished.
3   A.   Okay, I've looked at the document.
4   Q.   Great.  The first part of this -- excuse me,
5   the top part is from you to Karen N. Plunkett; is that
6   accurate?
7   A.   Yes.
8   Q.   Who is Karen N. Plunkett?
9   A.   She was -- I believe she's a senior manager
10  in our -- what I'll characterize as our national
11  office.
12  Q.   Okay.  Was she based in DC?
13  A.   I don't know where she was based out of.
14  Q.   Did she work on the Cavium audit with you?
15  A.   As part of a consultation with the national
16  office, she worked on Cavium.
17  Q.   Did you refer this to her directly, this
18  issue?
19  A.   No, not directly.  She was -- she was
20  assigned to the Cavium account by some folks at
21  national.  I don't know how she got assigned, but she
22  was our main person that we worked with in our
23  consultation process as part of what we call the SAD
24  or the S-A-D.
25  Q.   I was going to ask you, is that an acronym

CONFIDENTIAL

Page 86

1    for something?

2        A.   Summary of aggregated deficiencies is what it

3    stands for, I believe.

4        Q.   And at the bottom of what's marked on the

5    right-hand corner as PwC 7679, it appears that Mayank

6    wrote you "Attached is the updated SAD reviewed by

7    Mauro."

8            Is that accurate?

9        A.   That appears to be what it says.

10       Q.   Do you remember reviewing what was attached?

11       A.   No.

12       Q.   Do you remember forwarding this audit to

13   Karen N. Plunkett?

14       A.   I don't remember that, but it appears I did

15   based on this e-mail.

16       Q.   Did you ever have to write a summary of

17   aggregated deficiencies before this?

18       A.   Summary of aggregated deficiencies are done

19   on every job, every audit that we do.  In some cases

20   they have control deficiencies within them and some

21   cases they don't.

22           But it's very common to have a SAD or a

23   summary of aggregated deficiencies on an audit

24   engagement.

25           MR. HUESTON:  Counsel, I want to note for the

CONFIDENTIAL

Page 87

1  record that Exhibit 10 does not actually have attached

2  to it the Cavium SAD.

3          MR. CABECEIRAS:  Correct.

4          MR. HUESTON:  Okay.

5  BY MR. CABECEIRAS:

6      Q.  Just so I know the general procedure, do all

7  bad reviews go up to the national office?

8      A.  Did you say bad or SAD?

9      Q.  SAD, S-A-D.

10          MR. HUESTON:  Vague as to time.  And no

11  foundation in terms of all.

12          THE WITNESS:  On my engagements, all of the

13  SADs do not go to the national office.

14  BY MR. CABECEIRAS:

15      Q.  So you testified that every audit job has a

16  summary of aggregated deficiencies, correct?

17      A.  That's correct.  It's possible that there

18  could be nothing in it, but yes, that's correct.

19      Q.  At what point in your experience do these

20  summaries make their way to the national office, if

21  ever?

22          MR. HUESTON:  Objection.  This is vague and

23  overbroad.

24          THE WITNESS:  Yeah, if an engagement leader

25  wants to send a SAD to the national office, it's

CONFIDENTIAL

Page 92

1   auditor group.  She worked for Tim Scott and she was

2   helping draft parts of our national office

3   consultation.

4       Q.  The document that Mauro wrote, PB, did you

5   share this document with Simonetti?

6       A.  I don't recall sharing it with Simonetti.

7   But my understanding was that he did have the document

8   or did get the document.

9       Q.  How did you come to have that understanding?

10      A.  I believe either him or Tim Scott told me

11  that he, as well as a number of other partners at

12  national, got Mauro's document, the memo.

13      Q.  If you can recall, did you ever learn how

14  they obtained this memo, as in did anybody say to you

15  Mauro sent it to them or Robert sent it to them?

16          MR. HUESTON:  Objection.  Foundation.

17          THE WITNESS:  I specifically, when doing this

18  consultation, did not want to do the consultation

19  without people involved knowing what the entire

20  process included, which included Mauro's memo, and I

21  was told, I don't remember who, that the partners in

22  the national office had received a copy of this memo.

23          It was in part out of respect to Mauro that

24  he had raised the concern when we had our dinner,

25  because I asked him about why 12 and 13 were in there,

CONFIDENTIAL

Page 93

1  that he wanted whoever looks at this to have a

2  framework of what he was thinking.  So I thought it

3  was fair that they got this memo.

4       Q.  Just to be clear, I'm sorry if you're

5  repeating yourself, you did not actually send anybody

6  in the national office the memo?

7            MR. HUESTON:  Objection.  Asked and answered.

8            THE WITNESS:  That's correct.

9  BY MR. CABECEIRAS:

10      Q.  Within the e-mail that's been marked

11  Plaintiff's 11, you write "I just went through the

12  draft of the consultation with Mauro and he agrees

13  with the facts as written and, after hearing our

14  process, has decided not to disagree with the

15  conclusion."

16            First, did you meet with Mauro that day?

17  Withdrawn.

18            Did you go through the draft of the

19  consultation that day with Mauro?

20      A.  Yes.

21      Q.  Where did you go through the draft with him?

22      A.  In my office in San Jose.

23      Q.  About how long was that meeting?

24      A.  I would say half an hour, potentially 45

25  minutes.  I don't remember exactly.

CONFIDENTIAL

Page 94

1        Like I say in here, I discussed with Mauro

2   the process that we went through to deal with his

3   concern.  Along the way, I continually told him that

4   it was just something we had to get through.  It was

5   within his rights to do this.  He can have the

6   disagreement.  I, frankly, didn't really care about

7   that part of it at all.  It didn't bother me that he

8   was doing it.  I understood.

9        And so in order to make sure he understood

10  what we went through because he wasn't always in the

11  loop during this process, given the nature of the item

12  that Mauro raised, I had the discussion with Mauro and

13  I asked him to read the memo.

14       I asked him if he still wanted to disagree.

15  We were prepared to deal with a disagreement or not.

16  Didn't really matter to me one way or the other

17  because we were, at this point, done with our

18  consultation process.

19       But for the record, I wanted to know how

20  Mauro felt, and I explained what had happened.

21    Q.  Do you have any knowledge -- withdrawn.

22       It appears from your e-mail that Mauro agreed

23  with the facts as written?

24    MR. HUESTON:  Objection.  No foundation.

25  Calls for speculation as to what Mauro did or thought.

CONFIDENTIAL

Page 95

1          MR. CABECEIRAS:  I can rephrase.

2    BY MR. CABECEIRAS:

3      Q.  Your e-mail says, "I just went through the

4    draft of the consultation with Mauro and he agrees

5    with the facts as written."

6          Am I correct?

7      A.  That's correct, that's what I wrote.

8      Q.  Do you have any knowledge as to what would

9    happen with this consultation if Mauro disagreed with

10   the facts as written?

11         MR. HUESTON:  Objection.  No foundation.

12   Calls for speculation.

13         THE WITNESS:  We were prepared to wrap up our

14   audit as a result of this last item, which was the

15   consultation, at that point in time, regardless of

16   what happened with Mauro's decision.

17         We were prepared to put a piece of -- the

18   difference would have probably been one more piece of

19   paper in the audit file that explained there was a

20   disagreement and talked about how we would address it

21   in accordance with firm policy, we went through all

22   the proper steps that were required, which included

23   talking with our OGC, that was the primary step when

24   we have a disagreement that's required under our

25   policy.  OGC is our office of general counsel.

CONFIDENTIAL

Page 96

1    And depending if Mauro said I still disagree,
2  then I put that piece of paper in the file and we'd be
3  done.  If Mauro said, I'm fine with it, then I don't
4  put the piece of paper in the file and we're done.

5    So that was kind of the general gist of what
6  we were doing.  And because Mauro wasn't involved in
7  all aspects of it, I wanted to let him know what we
8  did, kind of in fairness to him, and the process and
9  to let him know that we -- we're serious about
10 listening to his concerns and we took it seriously,
11 did a national office consultation around the matters,
12 informed all the partners who were the key decision
13 makers at national as to what Mauro's concerns were.

14    I told Mauro that seven partners -- I think
15 it was seven, it might have been six or seven -- had
16 reviewed his memo.  Mauro seemed a little surprised.
17 I think Mauro's initial view when he sent the memo was
18 I had to keep it secret, but it's not the kind of
19 document that you can.

20    I shared it with the seven partners, he
21 seemed to be surprised.  Mauro asked to have a call
22 after he read this memo.  And before he agreed or
23 decided, he had a call with I believe was Gil.  It
24 might have been Tim Scott.  I think it was Gil, and
25 came back and said, I agree with the conclusion.

CONFIDENTIAL

Page 97

1   BY MR. CABECEIRAS:

2       Q.  Just to clarify, you said that wasn't the

3   type of memo that could be kept secret.  Why is this

4   not the type of memo that could be kept secret?

5       A.  Anything related to the audit is really we're

6   required to keep a level of documentation on.  And

7   this was a key memo that was issued, so I had no other

8   choice other than to tell everybody about the facts

9   that I was dealing with at the time.

10      Q.  You go on to say in the e-mail "I know we

11  have some work left to complete the consultation, but

12  I wanted to let you all know, and thank all of you for

13  your extraordinary efforts in getting through a

14  consultation like this on very short order."

15          Is that a correct reflection of what's

16  written?

17      A.  Yes.

18      Q.  Prior to this, had you received consultations

19  from the national office?

20      A.  Had I received?

21      Q.  Or engaged in consultations with the national

22  office?

23      A.  Yes.

24      Q.  Was this consultation quicker than average?

25      A.  There's really no average on consultations

CONFIDENTIAL

Page 111

1    Mauro's performance on Cavium, so she may have seen it

2    that way.

3    BY MR. CABECEIRAS:

4        Q.  Since this lawsuit was filed, have you

5    communicated with Ms. Bustamante about the claims of

6    this lawsuit?

7        A.  I don't recall.

8        Q.  Have you texted Ms. Bustamante about this

9    lawsuit at all?

10       A.  I don't recall.

11       Q.  You've stated -- can you repeat what you said

12   about providing feedback?

13           MR. HUESTON:  I'm going to object that this

14   is vague.  Can you further define what you're asking

15   him about?

16           MR. CABECEIRAS:  Sure.  I can withdraw.

17   BY MR. CABECEIRAS:

18       Q.  At any time in 2014, were you asked to give a

19   review on Mr. Botta at PwC?

20       A.  I don't remember being asked to give him a

21   review.

22       Q.  Do you remember giving him a review in 2014?

23       A.  Yes.

24       Q.  Do you remember saying that Mauro is an

25   emotional Italian guy?

CONFIDENTIAL

Page 112

1      A.   I don't remember that.

2      Q.   Do you remember saying Mauro throws partners

3   under the bus?

4      A.   I don't remember that.

5      Q.   Do you remember writing what we deal with is

6   not perfect, you just have to suck it up?

7      A.   I don't remember that.

8      Q.   Was Mr. Botta ultimately removed from working

9   on the Cavium engagements?

10     A.   Yes.

11     Q.   When was that?

12     A.   Sometime in the middle of 2015.  I don't

13   remember the specific date or month even.

14     Q.   Do you recall why he was removed?

15     A.   I don't know all the specifics.  I don't

16   believe that I actually removed him, but -- I don't

17   remember why.

18          I know that the CFO had given some feedback

19   to the SRP as part of the SRP's annual review process

20   and that was in part a driver of it, but besides that,

21   there may have been other discussions that I wasn't

22   party to.

23     Q.   What's SRP an acronym for?

24     A.   Senior relationship partner.

25     Q.   And at that time, who was the senior

CONFIDENTIAL

1   relationship partner?

2       A.   Raman Chitkara.

3       Q.   Spell that for me.

4       A.   C-H-I-T-K-R-A, R-A-M-A-N.

5       Q.   And in 2015, you were still the partner on

6   the Cavium audit; is that correct?

7       A.   That's correct.

8       Q.   Did the SRP ever reach out to you to discuss

9   removing Mauro from the Cavium audit?

10      A.   I don't recall if it was the SRP or somebody

11  else.  I don't recall.

12      Q.   You testified earlier to at least one

13  conversation in which Mr. Chadwick seemed to want

14  Mr. Botta removed from the Cavium matter.

15           Is this the only conversation you had with

16  Mr. Chadwick in which he requested Mr. Botta be

17  removed?

18      A.   That's the only one I can recall.

19      Q.   Did you receive, through 2012 to 2015, any

20  other requests from any employee of either Cavium or

21  PwC seeking Mauro to be removed from the Cavium audit?

22      A.   Not that I can recall.

23      Q.   Mr. Thorson, who is Kevin Healy?

24      A.   Kevin Healy is a partner at PwC.

25      Q.   And who's Christopher Smith?

CONFIDENTIAL

Page 158

1      I, NINA PAVONE, a Certified Shorthand

2  Reporter, hereby certify that the witness in the

3  foregoing deposition was by me duly sworn to tell the

4  truth, the whole truth, and nothing but the truth in

5  the within-entitled cause;

6      That said deposition was taken down in

7  shorthand by me, a disinterested person, at the time

8  and place therein stated, and was hereafter

9  transcribed, by computer, into typewriting, under my

10  direction and supervision;

11      That before completion of the deposition

12  review of the transcript (x) was requested ( ) was

13  not requested.  If requested, any changes made by the

14  deponent (and provided to the reporter) are appended

15  hereto.

16      I further certify that I am not of counsel,

17  nor attorney for any of the parties in the foregoing

18  deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption, and that I am not related to any of the

21  parties hereto.

22  DATE: November 26, 2018

23      _____

24      NINA PAVONE, CSR. #7802

25