# EXHIBIT 5

CONFIDENTIAL

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4
 5   MAURO BOTTA,                         )
                                          )
 6        Plaintiff,                      )
                                          )
 7           vs.                          ) No. 3:18-cv-2615
                                          )
 8   PRICEWATERHOUSECOOPERS LLP, LAURA    )
     BUSTAMANTE, TYE THORSON, ROBERT      )
 9   HEATLEY, STIG HAAVARDTUN, ERGUN      )
     GENC, TIMOTHY CAREY and STEVE        )
10   MCCANN,                              )
                                          )
11        Defendants.                     )
     ─────────────────────────────────── )
12
13
14
15       CONFIDENTIAL DEPOSITION OF TRACI E. NELSON
16                    San Jose, CA
17                  January 16, 2019
18                     9:05 a.m.
19
20
21   Reported by:
     SUSAN F. MAGEE, RPR, CCRR, CLR
22   CSR No. 11661
23
24
25
```

CONFIDENTIAL

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   MAURO BOTTA,                        )
                                        )
6        Plaintiff,                     )
                                        )
7          vs.                          ) No. 3:18-cv-2615
                                        )
8   PRICEWATERHOUSECOOPERS LLP, LAURA   )
    BUSTAMANTE, TYE THORSON, ROBERT     )
9   HEATLEY, STIG HAAVARDTUN, ERGUN     )
    GENC, TIMOTHY CAREY and STEVE       )
10  MCCANN,                             )
                                        )
11       Defendants.                    )
    _____ )
12  _____

13

14

15          CONFIDENTIAL DEPOSITION OF TRACI E. NELSON,

16  Volume I, taken on behalf of Plaintiff at

17  488 South Almaden Boulevard, Suite 1800, San Jose, CA

18  95110, beginning at 9:05 a.m. and ending at 11:53 a.m.

19  on Wednesday, January 16, 2019, before Susan F. Magee,

20  RPR, CCRR, CLR, Certified Shorthand Reporter No. 11661.

21

22

23

24

25

CONFIDENTIAL

Page 3

```
1    APPEARANCES:

2         For the Plaintiff:

3              DEREK SMITH LAW GROUP, PLLC

4              One Penn Plaza

5              Suite 4905

6              New York, NY 10119

7              (212) 587-0760

8              BY:  ALEXANDER G. CABECEIRAS, ESQ.

9                   (Appearing telephonically)

10                  alexc@dereksmithlaw.com

11

12        For the Defendants:

13             HUESTON HENNIGAN, LLP

14             523 West Sixth Street

15             Suite 400

16             Los Angeles, CA 90014

17             (213) 788-4536

18             BY:  JOSEPH A. REITER, ESQ.

19                  jreiter@hueston.com

20

21        Also Present:

22             GEOFF EZGAR, In-house Counsel

23             MAURO BOTTA (Appearing telephonically)

24                       --o0o--

25
```

CONFIDENTIAL

Page 4

1                          **I N D E X**

2      **CONFIDENTIAL DEPOSITION OF TRACI E. NELSON**

3      **Volume I**

4      **EXAMINATION BY**                              **PAGE**

5      **BY MR. CABECEIRAS**                               **7**

6                          --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 26

1    withdraw.

2          Do you remember when these conversations took

3    place?

4        A.  Approximately -- I believe that was in 2016.  I

5    just don't recall exact timing.

6        Q.  And as a result of having conversations about

7    Harmonic with Mr. Botta, did you ever escalate the

8    matter to anybody at PwC?

9          MR. REITER:  Object to form.

10         THE WITNESS:  On that particular matter, that

11   would have -- that was escalated through our office of

12   ethics.

13         BY MR. CABECEIRAS:

14       Q.  Okay.  Did you contact the office of ethics on

15   behalf of Mr. Botta?

16       A.  I'm trying to recall whether or not -- it's a

17   little vague in my memory in terms of whether or not

18   I -- I reached out and escalated that or Mauro did on

19   his own.

20       Q.  Sorry, Ms. Nelson.  Are you still trying to

21   think or was that your answer?

22       A.  That was my answer.

23       Q.  Oh, okay.

24       A.  I can't recall exactly whether or not I did or

25   Mauro did on his own.

CONFIDENTIAL

1    Q.  The complaint that was brought up to the office

2    of ethics, whoever brought it up, do you recall what

3    that complaint was about?

4    A.  My recollection of Harmonic was that he was

5    frustrated and didn't agree with the ultimate

6    recommendation to remove him from the account, and he

7    did not agree with the feedback that was provided to

8    him.

9    Q.  Was he upset or did his complaint contain

10   anything else?

11          MR. REITER:  Object to form.

12          THE WITNESS:  I mean --

13          MR. REITER:  I think the document speaks for

14   itself.

15          THE WITNESS:  Yeah.  Those are the two pieces

16   of it that I recall.

17             MR. CABECEIRAS:  Joe, which document are

18   you referring to?  I'm sorry.

19          MR. REITER:  Well, I'm going to object.  It

20   lacks foundation that there was a complaint.  And I'm

21   referring to an ethics file would speak for itself.

22          BY MR. CABECEIRAS:

23   Q.  Ms. Nelson, I'm going to turn your attention

24   back to Exhibit 50.  It says in your first sentence the

25   new senior manager was Tania.

CONFIDENTIAL

1          At that point in October of 2016, did Tania

2    have any background in pharmaceuticals?

3          A.  I cannot remember exactly which clients she

4    worked on, but I understand she was part of that

5    industry group and that team and credentialed in pharma.

6          Q.  And when you say "industry group," does PwC

7    have a specifically defined industry group for folks who

8    have experience in pharmaceuticals?

9          A.  Yes.  For the most part, our practice is made

10   up of employees that work on technology clients, but

11   we've got a defined group of individuals who work on

12   pharmaceuticals and biotech.

13          MR. CABECEIRAS:  Okay.  Counsel, if you can

14   hand Ms. Nelson what's been marked for us as

15   Attachment B.  We can mark it 51.

16          (Exhibit 51, 2/9/17 Conversation Entry,

17   PwC_B00005965, marked for identification.)

18          BY MR. CABECEIRAS:

19          Q.  Ms. Nelson, if you can review the document, let

20   me know when you're done.

21          A.  Okay.  I've reviewed it.

22          Q.  Great.  First, who is Justin Wallace?

23          A.  Justin Wallace is one of the office of ethics

24   and compliance representatives.

25          Q.  Okay.  And is Mr. Wallace based in San Jose?

1   acronym for?

2        A.   I believe it would be chief accounting officer.

3        Q.   And was Harmonic's CAO fired?

4             MR. REITER:   Lacks foundation.   Calls for

5   speculation.

6             THE WITNESS:   Yeah.   I -- I don't recall

7   exact -- I mean, that's why we have the office of ethics

8   to investigate these matters.   I didn't get that deeply

9   involved in all the pieces and don't recall all the

10  specifics.

11            BY MR. CABECEIRAS:

12       Q.   Okay.   What about the 25 issues?   You know, the

13  writer of this which appears to be Justin Wallace, "On

14  Harmonic, I ID'd 25 issues," assuming that it was

15  Mr. Mauro who brought up these issues, do you have any

16  idea what these issues are?

17            MR. REITER:   Compound.   Lacks foundation.   I'd

18  like to point out that these are -- what appear to be

19  comments made by Mr. Botta that were put into writing,

20  not comments that Ms. Nelson or Mr. Wallace made.

21            THE WITNESS:   Yeah.   I'll just add that I don't

22  have an audit background, and I -- you know, they're

23  probably very technical in nature, so I -- I wouldn't

24  have the specifics on all that.

25            MR. CABECEIRAS:   Okay.   Counsel, if you can

1   hand the witness what's been marked for us as

2   Attachment C as in cat.

3            And we can mark it 52.

4            (Exhibit 52, 3/7/17 Conversation Entry,

5   PwC_B00005966, marked for identification.)

6            THE WITNESS:  Okay.  I've read it over.

7            BY MR. CABECEIRAS:

8       Q.  Great.  Do you remember calling Mr. Wallace on

9   March 7, 2017, to update him with respect to Mr. Botta?

10      A.  Looking at the document and the time frame, I

11  mean, it looks familiar.  I don't -- yes, I recall it.

12      Q.  Okay.  And the second paragraph you say,

13  Gigamon is -- or at least what was transcribed what you

14  said -- well, I'll withdraw.

15           Do you remember telling Mr. Wallace in that

16  call that Gigamon asked Mr. Botta to be rolled off?

17      A.  Yes, I do recall that.

18      Q.  Okay.  How did you learn that Gigamon wanted

19  Mr. Botta to be rolled off?

20      A.  Thinking back on it, I would have likely

21  learned that from the partner on Gigamon, Ergun Genc.

22      Q.  Okay.  You didn't have any direct communication

23  with anybody at Gigamon; right?

24      A.  No.  No contact with the client.

25      Q.  When did Ergun share this information with you,

1    if you can recall?

2         A.  I'd be relying on the entry date of this

3    document.  I don't recall, but it was in that March of

4    '17, probably, time frame.

5         Q.  And did Ergun call you with this information?

6         A.  I don't recall if he called me or stopped by my

7    office and had a conversation about it directly.

8         Q.  Do you remember generally when Ergun shared

9    with you?

10        A.  Generally I recall that the client was

11   frustrated with how they felt they were being treated

12   and Mauro's communication style and were looking for --

13   looking to have him rolled off and have another senior

14   manager put on the account.

15        Q.  Did Ergun at that point share with you how

16   Mr. Botta was pressing Gigamon?

17        A.  We would have -- yeah.  Thinking back on it, I

18   mean, we will have -- there would have been some -- some

19   detail in terms of what Ergun had understood from the

20   client and some details related to his performance on

21   that account.

22        Q.  The document that's been marked Exhibit 52, you

23   know it says, Similar to Harmonic - not teaming with the

24   client; over-scrutinizing of work; and audit steps,

25   pressing the client for irrelevant information.

1              Did Ergun give you any examples of how

2    Mr. Botta was scrutinizing Gigamon?

3         A.  I mean, that would be a generalization from me

4    because I -- because I don't have the audit background

5    and don't get into the technical nature of matters.  I

6    don't recall the absolute specifics, more the behavioral

7    portion of it in terms of them just being very

8    frustrated, them feeling like they were always on the

9    defensive, not comfortable in terms of how that

10   relationship was working.

11        Q.  And the third paragraph of this document, "OGC

12   is involved - Lauren Kim and Lori Lynn Phillips."

13              Did you reach out to OGC at that time?

14              MR. REITER:  And I'm going to counsel the

15   witness not to disclose any communications she had with

16   OGC as those are privileged.

17              MR. CABECEIRAS:  Counsel, I'm sorry.  Are you

18   instructing her not to answer?

19              MR. REITER:  I'm going to instruct her not to

20   disclose the substance of any communication she had with

21   OGC.

22              BY MR. CABECEIRAS:

23        Q.  Okay.  And Ms. Nelson, just to clarify, I don't

24   know any conversations you had with OGC at all.  Please

25   don't tell me any conversations you had with in-house

Page 49

1    about Mr. Botta?

2         A.  I -- I don't recall all the contacts I had with

3    Patty.  They were the ones handling any open

4    investigation that was going on at the time and may have

5    reached out to me.

6         Q.  And in April 2016, was there an open

7    investigation occurring with respect to any complaints

8    made by Mr. Botta?

9              MR. REITER:  Object to form.  Calls for

10   speculation.

11             THE WITNESS:  Yeah.  I mean, relying on this

12   document and what I'm reading and my recollection,

13   there -- I mean, there were -- there likely was an

14   open -- you know, how you define an open investigation

15   at the time.

16             BY MR. CABECEIRAS:

17        Q.  I'm sorry.  Can you repeat that?  I just didn't

18   really hear you.

19        A.  Yeah.  Can you repeat the question one more

20   time?  I'm just trying to make sure I understand the

21   question.

22             MR. CABECEIRAS:  Ms. Court Reporter, can you

23   please read the question back.

24             (Record read.)

25             MR. REITER:  Same objections.

CONFIDENTIAL

Page 50

1    THE WITNESS:  Yeah.  I -- my understanding is
2    that there was.  I don't know -- I can't recall without
3    looking at this document the time frames that
4    investigations were opened and closed and investigated.
5        BY MR. CABECEIRAS:
6        Q.  Were there multiple investigations open over
7    the course of Mr. Botta's career at PwC?
8        A.  Yes.  There were -- there were multiple.
9        Q.  Not relying on the document in front of you,
10   can you recall all of the investigations?
11       MR. REITER:  Object to form.
12       THE WITNESS:  Yeah.  I -- where I was involved
13   and what I recall is he was -- I mean, he spoke to me
14   about -- we talked about Harmonic and the fact that he
15   didn't agree with the feedback.  And I believe he -- I
16   either escalated or gave him the opportunity, if he
17   needed to have it investigated and talk further, that he
18   take it to ethics.
19       I believe the Gigamon investigation was a
20   result of him not agreeing with the feedback and, you
21   know, I believe he -- Mauro opened an investigation
22   related to Gigamon.
23       But there were -- Mauro was -- Mauro had
24   contact, you know -- I -- I'm trying to recount this.  I
25   mean, there were -- yeah.  I think that's the best of my

1    recollection on those two.

2            BY MR. CABECEIRAS:

3        Q.   Okay.   And on or around April 2016, did you

4    have any communication with Justin Wallace about

5    Mr. Botta?

6        A.   Yeah.   I know I talked to Justin and we see it

7    in the documentation.   I didn't recall the specific

8    date, but yes, I would have talked to Justin.

9        Q.   Turning your attention to the document in front

10   of you.   The fourth complete paragraph says that, "Mauro

11   raised retaliation."

12            Do you remember telling Ms. Lin that Mauro

13   raised retaliation?

14       A.   I mean, it's vaguely familiar.   I guess there

15   were -- he used that term so, kind of loosely, to get

16   attention on areas where he was really frustrated and

17   emotional.   And, you know, I'm -- in my profession when

18   words like that are used, that's why we have the avenues

19   like office of ethics to escalate them to.   So, you

20   know, that definitely would have been a reason to get

21   them involved and probably -- yeah.   I'll stop with

22   that.

23       Q.   Right.   So do you recall saying that to

24   Ms. Lin?

25       A.   I -- yeah.   I mean, it sounds familiar.   I'm --

1    you know, these aren't my words in the document, so, you

2    know, whether I used that or it was described as that,

3    but that's likely -- that is my recollection that

4    that -- that word was used.

5        Q.  Okay.  And you mentioned he would use the word

6    "retaliation" in areas he was frustrated with; is that

7    accurate?

8        A.  Yes.  I mean, I just remember Mauro using what

9    I use -- refer to as kind of trigger words to get

10   attention on things and was very emotional and -- yeah.

11   I mean, I'm sure that word was used, or I believe that

12   word was used.

13       Q.  If you can recall, what things was Mauro trying

14   to get, as you described, attention to or on?

15       A.  I mean --

16           MR. REITER:  Calls for speculation.

17           THE WITNESS:  Yeah.  I mean, where I focus as

18   an HR person is really on, you know, performance

19   feedback and -- I mean, that aspect of it.  I mean,

20   whether or not there were other things shared, I -- I

21   don't know whether or not -- I believe he -- in a couple

22   of these situations he definitely disagreed with the

23   feedback he was getting and didn't agree with reasons as

24   to why he was being rolled off of accounts.  So yeah, I

25   definitely remember because of my involvement from an HR

1    being withheld opportunities?

2         A.   Those are not -- those are not my words.

3    Those -- you know, not how I would describe it, so yeah.

4         Q.   Do you remember telling Ms. Lin that Mauro

5    feels like he's being withheld opportunities?

6         A.   Yeah.  I don't specifically recall, but I'd be

7    relying on this document to describe that.

8         Q.   Turning away from the document in front of you,

9    do you remember anything else from the conversation you

10   had with Ms. Lin towards the end of April 2016 regarding

11   Mr. Botta?

12             MR. REITER:  Object to form.

13             THE WITNESS:  Yeah.  Nothing specifically.

14             MR. CABECEIRAS:  Counsel, can you hand the

15   witness what's been marked for our purposes as

16   Attachment H as in Harry.  We can mark it as 56.

17             (Exhibit 56, 6/12/17 Conversation Entry,

18   PwC_B00005983, marked for identification.)

19             BY MR. CABECEIRAS:

20        Q.   Ms. Nelson, please review it.  Let me know when

21   you're done.

22        A.   Okay.  I've reviewed it.

23        Q.   Great.  This appears to be an entry note from

24   Mr. Wallace.

25             Do you recall having a meeting with Mr. Wallace

```
                                             Page 56
```

1    and Mr. Botta around June 12, 2017?

2         A.  I vaguely recall, yeah.

3         Q.  Do you recall Mr. Wallace ever in your presence

4    advising Mr. Botta of findings in relation to the Zone

5    project?

6         A.  Yeah.  I mean, this, again, would have been,

7    you know, Justin on the phone likely with Mauro and I

8    talking about, you know, the investigation that was open

9    at the time.

10        Q.  Right.  Do you remember that conversation

11   taking place?

12        A.  I don't recall the specifics.  I mean, we've

13   talked about many different conversations, and . . .

14        Q.  Okay.  Do you recall a conversation in which

15   Mr. Wallace relayed to Mr. Botta any of the findings

16   with respect to the Zone project?

17        A.  Yeah.  I don't recall the specifics.  I -- I

18   mean, I only recall all of the open investigations being

19   unsubstantiated and that's what's in my mind.  I don't

20   remember the details.

21        Q.  Okay.  At any time did you gain an

22   understanding of what the findings with the Zone project

23   were?

24        A.  I do not remember the specifics of the Zone,

25   what was the -- what his -- what -- you know, what he

 1    was working with at the office of ethics to look into as

 2    it relates to that.

 3        Q.  Okay.  Do you recall a conversation in which

 4    Mr. Wallace advised Mr. Botta on a matter in relation to

 5    the 2014 Harmonic audit?

 6        A.  My best recollection of that was that Mauro had

 7    asked to have something -- I don't know the technical

 8    nature of it -- related to 2014 looked into, and they

 9    were handling that with him.  The office of ethics was

10    working with him on that.

11        Q.  Besides the office of ethics, was anybody else

12    at PwC working with him on that matter?

13            MR. REITER:  Calls for speculation.

14            THE WITNESS:  Yeah.  That all would have gone

15    through the office of ethics.  And whether or not they

16    would have engaged, I'm just not -- that's something

17    they handle independently.

18            MR. CABECEIRAS:  Okay.  Counsel, could you

19    please hand the witness what's been marked for us as

20    Attachment J and we can mark it as 57.

21            (Exhibit 57, E-mail String Containing 6/16/17

22    E-mail from Traci Nelson to Ergun Genc,

23    PwC_B00001609-PwC_B00001610, marked for identification.)

24    BY MR. CABECEIRAS:

25        Q.  Ms. Nelson, if you can please review it and let

Page 70

1    was still asking to have his ethics inquiries, like,

2    further investigated and reviewed by someone else in the

3    ethics organization, and Steve was involved in that

4    process.

5         Q.   Okay.  To your knowledge, with this particular

6    investigation, was there any one person assigned to lead

7    the investigation?

8              MR. REITER:  Calls for speculation.

9              THE WITNESS:  Yeah.  I'm not -- I mean, I don't

10   get involved in those details.  I mean, that will have

11   been organized by the office of ethics in terms of how

12   they handle those investigations.

13             BY MR. CABECEIRAS:

14        Q.   And for this particular conversation, did Steve

15   reach out to you, or did you reach out to him?

16        A.   I recall Steve reaching out to me.

17        Q.   In this document in the sixth line down it

18   says, "He also came to Traci with issues."

19             If you can recall, at that time what other

20   issues did Mr. Botta come to you with?

21             MR. REITER:  Object to form.

22             THE WITNESS:  Yeah.  Those -- I mean, there

23   were, you know, definitely times where Mauro was just

24   very emotional and would -- you know, I almost describe

25   as an emotional rant about all kinds of things that he,

CONFIDENTIAL

Page 71

1   you know -- I mean, it could have been as specific as an

2   e-mail he got that he didn't agree with on a policy the

3   firm was rolling out.

4           BY MR. CABECEIRAS:

5       Q.  And looking further down in the document it

6   states that "4 senior managers in San Jose were told

7   that their roles were eliminated.  This is out of 49

8   senior managers.  The 4 were not going to become

9   partner."

10          Do you remember saying that to Mr. Kessler?

11      A.  Yeah.  I mean, looking on the document I --

12   yeah.  I would have shared that.

13      Q.  Was Mauro one of those four senior managers

14   whose role was going to be eliminated?

15      A.  Yeah.  I don't -- I did not use or don't recall

16   using the word "eliminated."  It was part of the friends

17   of firm exercise we were going through as a firm in

18   terms of, I mean, having conversations with senior

19   managers that were not on the partner pipeline, and

20   Mauro was aware of that given the conversation we had

21   had with him in the past, and we were doing our best to

22   make sure he understood and was clear with that feedback

23   and we were helping him look for an opportunity outside

24   of the firm.

25      Q.  Okay.  Was Mauro one of four individuals on the

Page 72

1   friend of the firm program in the San Jose office as it

2   was applied to senior managers?

3       A.  Yes, that's correct.

4       Q.  Of those four senior managers on the friend of

5   the firm -- I'll refer to it again as a list.  Were all

6   four of those senior managers ultimately let go by PwC?

7       A.  I believe because of the nature of how this

8   worked and the flexibility that there is -- I know of

9   one instance where there's a senior manager who is on a

10  very specific account and that's still contributing that

11  with the understanding that, you know, this is not -- I

12  guess the words I want to use, I mean, there was no

13  guarantee in that.  There was many different kind of

14  circumstances and situations with this program.

15      Q.  Okay.  So as of today out of the senior

16  managers on the friend of the firm list, there's only

17  one still working for the PwC San Jose office?

18      A.  Yeah.  That's what I -- that's what I believe.

19  This was something that I wasn't -- this was not part of

20  my focus area and what I was intimately involved in.  So

21  that is what I believe to be true.

22      Q.  The sentence under that says "Tim Carey" -- and

23  I believe that's spelled incorrectly -- "as market

24  assurance leader as to which senior managers would not

25  become partner."

1          Did you ever speak to Mr. Carey about Mr. Botta

2    not becoming a partner at PwC?

3          A.  Yeah.  There would have been, I mean,

4    conversations with Tim and other partners just as part

5    of the process in terms of reviewing our senior manager

6    group given there are very limited spots to become

7    partner.  So we would have had some conversation about

8    it over the years.

9          Q.  And do you recall any specific feedback

10   Mr. Carey gave you with respect to Mr. Botta becoming a

11   partner?

12         A.  I mean, the feedback would have been similar

13   to, you know, the feedback that he was given over the

14   years in terms of, you know, the challenges and the

15   concerns we had related to his ability to build/sustain

16   trusting relationships with clients and our people and

17   leadership, leadership style.  I mean, all the areas

18   that are really important and that we value in terms of

19   making partners in the firm.

20         Q.  We're all set with Exhibit 60.  There's

21   nothing -- you testified before that Mr. Botta would

22   come in to your office, and I think you used the term

23   become emotional and essentially air his grievances.

24          Is that a somewhat accurate reflection of what

25   we talked about earlier?

1        MR. REITER:  Asked and answered.  And I'll just

2   object to the extent that it does misstate prior

3   testimony.

4        THE WITNESS:  Yeah, you could -- yeah.

5   That's -- sounds accurate.

6        BY MR. CABECEIRAS:

7   Q.  During any of these conversations where Mauro

8   either went into your office or called you, did Mauro

9   ever share with you that he was going to report PwC or a

10  PwC employee to some kind of external agency?

11  A.  Yeah.  I don't -- I don't recall any specifics

12  on that.

13  Q.  Okay.  Do you recall Mr. Botta telling you he's

14  going to, quote, go external?

15       MR. REITER:  Lacks foundation.

16       THE WITNESS:  Yeah.  I mean, there were so many

17  times where Mauro threatened to quit, threaten to get an

18  attorney involved just in an emotional state that I -- I

19  mean, what I -- and many times I understood that as

20  trying to get just attention on himself and -- he's very

21  stylistic.

22       BY MR. CABECEIRAS:

23  Q.  I understand that and I appreciate that answer,

24  but I'm asking very specifically, do you remember him

25  saying I'm going to go external?

CONFIDENTIAL

Page 82

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken before me at

4    the time and place herein set forth; that any witnesses

5    in the foregoing proceedings, prior to testifying, were

6    administered an oath; that a record of the proceedings

7    was made by me using machine shorthand which was

8    thereafter transcribed under my direction; that the

9    foregoing transcript is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [ ] was [X] was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20   Dated: January 17, 2019

21

22

23

24        Susan F. Magee, RPR, CCRR, CLR

         CSR No. 11661

25