# DX1139

Message

| | |
|---|---|
| **From:** | mauro.x.botta@us.pwc.com [mauro.x.botta@us.pwc.com] |
| **Sent:** | 11/26/2016 9:09:38 PM |
| **To:** | mauro_botta@libero.it |
| **Subject:** | mail |
| **Attachments:** | _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png; _.png |

**Mauro Botta**

PwC | Senior Manager
Office: +1 408 464 5438
Email: mauro.x.botta@us.pwc.com
PricewaterhouseCoopers LLP
488 Almaden blvd suite 1800 San Jose CA 95110
http://www.pwc.com/us

         

rec2004.doc  rec2005.doc  rec2006.doc  rec2007.doc  rec2008.doc  rec2009.doc  rec2010.doc  rec2011.doc  rec2012.doc  rec2013.doc



rec2014.doc

   

rec2015.doc  Address Book.xlsx  Attachment D.docx  Attachment.docx

 

CG Employee Bonus Plan - Client Serving Manager to Sr Manager (2016-2017).pdf   Connor Group  - Cost.pdf



Connor Group - CA At-Will Employment, Confidential Information, etc. Argeement.pdf

      

film.txt  History of Events A.docx  History of Events.docx  Mauro Botta Offer Letter (Locked).pdf  Outline.docx  PB 2.docx  PB.docx

  

Preliminary document.pdf  Signed Letter.PDF  Vacation planner.xlsx

  

PerNatale.xls  recensioni.xls  rec2016.doc

PwC_B00000748

**DX1139-1**

# DOCUMENT
# PLACEHOLDER

Document Provided Natively

Confidential



3979 Freedom Circle,
Suite 700
Santa Clara, CA 95054

September 8, 2016

Mauro Botta
88 East San Fernando St. Apt#1308
San Jose, CA 95113

Dear Mauro:

On behalf of Connor Group ("Company"), I am pleased to extend an offer to you to join the Company with the title of Senior Manager in our Silicon Valley office. We are confident that you will be a great asset to the Company and believe that you will find working with us to be personally and professionally rewarding.

The terms of your offer are as set forth below:

1.     **Salary.** You will be paid an initial base salary of $195,000.00 per year ("Base Salary"). Your Base Salary will be paid pro-rata on a semi-monthly basis, less deductions as required by law, and will be paid in accordance with the Company's normal payroll procedures. You are also eligible to participate in the Company's employee bonus plan. Your performance, salary and annual bonus will be reviewed annually.

2.     **Start Date.** Subject to fulfillment of any conditions imposed by this letter agreement, you will commence this new position with the Company on ~~October 3, 2016~~ (the "Start Date").
JANUARY 11, 2017

3.     **Benefits.** As a full-time employee, you will be eligible for all fringe benefits that are currently available to other Company employees in your office, including medical and dental insurance, in accordance with the Company's benefit plans. The Company periodically reviews the benefits it offers and may add, eliminate or modify benefits on a prospective basis at any time.

4.     **Expense Reimbursement.** You will be reimbursed for out-of-pocket business expenses in accordance with the Company expense reimbursement policy.

5.     **At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement.** Your acceptance of this offer and commencement of employment with the Company is contingent upon the execution, and delivery to an officer of the Company, of the Company's At-Will Employment, Confidential Information, Invention Assignment, And Arbitration Agreement, a copy of which is enclosed for your review and execution ("Confidentiality Agreement"), prior to or on your Start Date.

6.     **At-Will Employment.** Your employment with the Company will be on an "at will" basis, meaning that either you or the Company may terminate your employment at any time for any reason or no reason, without further obligation or liability.

7.     **Introductory Period.** Your first ninety (90) days of employment with the Company are considered an introductory period ("Introductory Period"). During this Introductory Period, the Company will evaluate your performance, and you can evaluate the Company as well. The Company may release you at any time during this period if your work habits, attitude, attendance, or performance do not measure up to the Company's standards, or for any other reason. Your employment remains "at will" through the Introductory Period and thereafter. At the end of the Introductory Period, your supervisor will discuss your job performance with you. This review will be similar to the normal job performance review held for regular full-time or part-time employees. During the course of the discussion, you are encouraged to give your comments and ideas as well. Completion of the Introductory Period does not guarantee continued employment for any specified period of time, nor does it require an employee be discharged only for "cause."

Confidential

PwC_B00000750

8.   **Return of Company Property.**   Any company property issued to you, such as computer equipment, accounts, software, files, keys, or company credit cards must be returned at the time of your separation. You will be responsible for any lost or damaged items.

9.   **Undivided Loyalty.**   You agree to the best of your ability and experience that you will at all times loyally and conscientiously perform all of the duties and obligations required of and from you pursuant to the express and implicit terms hereof, and to the reasonable satisfaction of the Company. During the term of your employment, you further agree that you will not directly or indirectly engage or participate in any business that is competitive in any manner with the business of the Company. Nothing in this letter agreement will prevent you from: (1) accepting speaking or presentation engagements in exchange for honoraria or from serving on boards of charitable organizations, and (2) owning no more than one percent (1%) of the outstanding equity securities of a corporation whose stock is listed on a national stock exchange.

10.   **No Conflicting Obligations.**   You understand and agree that by accepting this offer of employment, you represent to the Company that your performance will not breach any other agreement to which you are a party and that you have not, and will not during the term of your employment with the Company, enter into any oral or written agreement in conflict with any of the provisions of this letter or the Company's policies. You are not to bring with you to the Company, or use or disclose to any person associated with the Company, any confidential or proprietary information belonging to any former employer or other person or entity with respect to which you owe an obligation of confidentiality under any agreement or otherwise. The Company does not need and will not use such information and we will assist you in any way possible to preserve and protect the confidentiality of proprietary information belonging to third parties. Also, we expect you to abide by any obligations to refrain from soliciting any person employed by or otherwise associated with any former employer and suggest that you refrain from having any contact with such persons until such time as any non-solicitation obligation expires.

11.   **Entire Agreement.**   This letter, together with the Confidentiality Agreement attachment, sets forth the entire agreement and understanding between you and the Company relating to your employment and supersedes all prior agreements and discussions between us. This letter may not be modified or amended except by a written agreement, signed by an officer of the Company, although the Company reserves the right to modify unilaterally your compensation, benefits, job title and duties, reporting relationships and other terms of your employment. This letter will be governed by the laws of the State of California without regard to conflict of laws provision.

This offer of employment and your actual employment with the Company pursuant to this letter are contingent upon (i) processing and verification by the Company to its satisfaction of your application, references and background check (including a criminal background check, credit history, education verification and salary history); and (ii) your providing the Company with the legally required documentary evidence of your identity and eligibility for employment in the United States. As a Company employee, you also will be expected to abide by all Company rules and policies, including those set forth in the Company Employee Handbook as published from time-to-time.

We are very enthusiastic about the prospect of your joining us and hope you will accept our offer. Should you have any questions concerning the Company or our offer, please call me.

2

PwC_B00000751

**DX1139-4**

To indicate your acceptance of the Company's offer, please sign and date this letter in the space provided below and return it, along with a signed and dated copy of the Confidentiality Agreement.

Sincerely,

**CONNOR GROUP, INC.**


By:_____
Name:  James Neesen
Title: Managing Partner


**EMPLOYEE**

The foregoing is hereby accepted and agreed:

Sign: _____

Full Legal Name: MAURO BOTTA

Date: 10 / 6 / 2016

3

PwC_B00000752

**DX1139-5**

**Attachment A**

CONNOR GROUP
AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,
INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

4

Confidential

PwC_B00000753

**DX1139-6**

**EXHIBIT A**

**CALIFORNIA LABOR CODE SECTION**
**2870**

(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   (1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   (2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

5

Confidential

PwC_B00000754

# IrriSmart

### Irrigation efficiency with smart technologies

Table of content

*IrriSmart*.................................................................................................................................................*1*

    1. Excellence..............................................................................................................................................2

    2 Impact....................................................................................................................................................4

Confidential

PwC_B00000755

**DX1139-8**

## 1. Excellence

### 1.1 Objectives

In many locations of the world, overexploitation by a range of economic sectors poses a threat to water resources and demand often exceeds availability. Consequently, problems of water scarcity are widely reported, with reduced river flows, lowered lake and groundwater levels and the drying up of wetlands becoming increasingly commonplace.

Agriculture is a significant user of water in Europe, accounting for around 24% of total water use. However, this share varies markedly, and can reach up to 80% in parts of southern Europe, where irrigation of crops accounts for virtually all the agricultural water use. Italy, Spain, France, Greece, Romania and Portugal contribute almost 84% of the total irrigated area across EU-27 (Siebert et al., 2013). Other part of the first world, such as California in the United States of America, are experiencing abnormally drought conditions especially in the last decade. California has experienced one of the driest four-consecutive years (2012-2015) in the past century. While the current water year (2016) is considered to be dry to normal, depending on location, prolonged drought conditions and legacy problems have resulted in continued reduction in groundwater supplies, and in some cases, permanent impacts on aquifers due to land subsidence.

The European Environmental Agency (EEA, 2012) identified several topics to address the water use efficiency in agriculture: improving irrigation efficiency, modification of agricultural practices, reusing wastewater, tackling illegal water use. Improving water efficiency is the uppermost topic: it can be accounted either with technological measures (i.e. the conversion from open channels to pressurised pipe network) or with the calculation of the correct amount of irrigation water for each crop (i.e. using software and environmental data to run irrigation management models). This is the main challenge for saving water in agriculture. Closely related to this aspect, is the deficit irrigation (DI) strategy for dry regions, where water is often the limiting factor for crop cultivations. Deficit irrigation is an optimization strategy in which irrigation is applied during drought-sensitive growth stages of a crop, while outside these periods, irrigation is limited or even unnecessary if rainfall provides a minimum supply of water (Geerts and Raes, 2009). This technique could lead to a variable amount of yield loss compared to the use of optimal irrigation amounts, but it can be the only way to manage crops in arid or semi-arid regions.

Water scarcity, increase of water use costs and environmental sustainability concerns helped us to focus the attention mainly on water saving techniques, either improving the distribution network or realising sophisticated monitoring stations in field. Nevertheless, most farmers actually do not take into account real crop needs in term of irrigation.

The main objective of this proposal is to realise a web-GIS based Decision Support System (DSS) that will help to optimize the water consumption required for crops irrigation at farm level. Besides the advantages for the environment, the decrease of water consumption will lead to a significant reduction of costs for the farmers. The DSS will couple a modelling core to sensor instrumentations collecting environmental data and farm technicians will use it directly by the means of a web site.

This goal will be achieved in particular in arid or semi-arid lands evaluating:

- irrigation requirements, calculating the amount of water strictly needed for an optimal yield, avoiding losses and preserving water for the future and
- water stress degree tolerable by high-value crops, where water stress can be very useful to improve the quality of the resulting product or to save a greater amount of water.

The project here described provides a further step beyond because it couples advanced crop-soil modelling systems to real-time environmental and crop data acquired directly on field through in-situ observations. The proposed solution will be available as a service; each user will be able to manage all the farm fields and will receive advices on the calculated amount of irrigation water to use in each field (also called plot) on a day-by-day basis, having the ability to manage all fields from a single web site.

### 1.3 Concept and approach

Amigues et al. (2006) affirm, "because of contrasting effects and the rainfall variability, only a crop-soil-weather management simulation model can take into account this climatic variability and all the contradictions of the crop growing context, allowing evaluating what saving strategies can be used". We propose a new decision support system (DSS) to evaluate strategies of irrigation water saving and efficiency improvement at farm level. The DSS will be realised by a water balance modelling system coupled with sensors that will acquire real-time data of the most sensitive variables on the field. The user will use the web application to set the farm fields data, keep under control the crops status and receive the estimated irrigation advice on a daily basis for each field under control. All data will be manageable using GIS technology through the web site (WebGIS).

2

PwC_B00000756

**DX1139-9**

The cornerstone of the proposed system is the model-sensors integration, which allows feeding the system with real-time calculation of key variables of the model and very accurate measures from different kind of sensors: soil moisture and meteorological sensors.

Water balance evaluations can be improved by integrating data from sensors in different media. The first step acquires data from meteorological sensors directly installed in the farm, while the second step acquires the soil moisture data observed by sensors with those simulated by the model and fitting a data assimilation algorithm on the input parameters of the model within a given range. The trend of soil moisture over a predefined period will give important information on the behaviour of the plant until the start of the water stress period. The comparison between model forecasts and sensors data is important to have a more precise view of the water status of soil-plant system and then to be able to apply desired water stress strategies that allow water saving at the same level of production or quality.

The proposed solution will be available to customers through the subscription to an annual **service**, which will be deployed providing an account to the web portal of the DSS and a series of professional advices for the installation and use of sensors. Through the web portal, farmers will manage input data for all the farm fields and will receive advices on the calculated amount of irrigation water to be used in each field on a day-by-day basis.

The key points of the proposed system are:

- a water balance model core which forecasts the irrigation amount in each field by the means of several sub-models for each environmental compartment; it will take into account pedology, weather, crop phenological stages and irrigation methods applied;
- an online adaptation of the soil moisture model making use of real-time data from soil moisture sensors;
- a complete and user-friendly graphical user interface (GUI) which will help the farm fields management.

**Current stage of development of innovation.** As mentioned above, the DSS will be a web GIS application based on two main objects: a modelling core and a set of sensors and instruments. During the past three years, we implemented, in collaboration with the Department of Agronomy and Environmental Sciences (DISAA) of the University of Milan (Italy), a prototype of a water balance model for irrigation, which take into account all the aspects of the crop-soil-weather system. In particular, it implements the calculation of the potential evapotranspiration parameter (using three different methods of increasing complexity and data requirement), the crop transpiration, the evaporation from soil, the impact of the canopy, the root uptake from crops, contributions from groundwater. It has been tested in two regions of Central Italy and validated by two scientific papers. We will couple the modelling system with soil moisture sensors. The accuracy level of sensors for the measurement of soil moisture is very high, and at the same time, their cost is very low. Another advantage associated with the use of soil moisture sensors is that since installed underground, they will not interfere the periodic soil operations in the farm. Whereas soil is a heterogeneous matrix, in every point of evaluation, at least 3 sensors will be installed in order to calculate an average and apply a statistical control of the data. During the calibration phase of the software, a Scholander chamber (Fereres and Goldhamer, 2003; Moriana et al, 2012) will be also used: this instrument allows to directly assess the plant water status, and will be used to calibrate the moisture sensors.

The web based interface coupled with GIS will be a new development expressly implemented for the DSS, but it can count on nearly a decade of experience of Informatica ambientale in the design and implementation of environmental and territorial software. Some of our realisations are listed in the "Member of the consortium section".

*1.4 Ambition*

**Novelty of the business innovation project.** The real novelty of the innovation project is the tight coupling of models and instrumental data to determine the correct irrigation water requirements for all the plots of a crop-growing farm. Interactions by the two systems, after a calibration period, will be completely automated for most of the time. Furthermore, the DSS will be able to estimate the intentional water stress (and subsequently the irrigation deficit to achieve) in order to improve the quality of the yield for selected crops such as vineyard. As indicated in the paragraph "Current stage of development of innovation", in this project we intend to use two different sensors that are currently used to manage irrigation following two different procedures. As specified before, both have technical and logistic limitations that sometime can negatively affect the reaching of the result. In this sense, the coupling of the two technologies will allow us to overcome the limitations of each of them.

A successful market introduction of the novel system could bring high opportunities to us and to the customer's farms; no other coupled model-sensors systems are market available and the first experimentations in the field are demonstrating a very good response of the system in terms both of water saving and control of plant water stress. Its application in real farms will lead to significant cost savings and environmental benefits (counted as

3

PwC_B00000757

**DX1139-10**

externalities). On the other side, a not well planned market introduction could bring technological and commercial risks. Increase of sensors costs in the future, problem arisen by the user approach to the graphical user interface (GUI) of the system, difficulties on reaching customers due to a wrong marketing plan, the emergence of new competitors (probably due to our lack of innovation) are the main risks we should face in the feasibility study.

**Project comparison with competitors: advantages, state of the art, and market available feature**.

The scientific community developed models of irrigation requirement since the 1940s. These models have been adopted, developed and applied to several hydrological problems, not least the irrigation sector. The current developments refer to the implementation of the Penman-Monteith equation of potential evapotranspiration, the interaction of water with the crop and the movement (percolation, erosion, drainage) of water in soil. All of these sub-models can be found in the proposed system. Several irrigation requirement software has been developed and are commercially or freely available such as CropWat from FAO (a list of available software is on the IRRISOFT web site, 2014), but no one can count on the interaction of the instrumentation (soil humidity sensor and pressure chamber) as we propose.

Remote sensing is another way to determine the water stress used by several competitors, but at the current stage of development, it works at basin level and cannot provide detailed information at farm level.

On the instrumentation side, sensors for the measure of plant water status (such as the Zim-Probe of the Yara Zim Plant technologies) are at the moment the most accurate available: they are used only for research purposes and due to the excessive cost and difficulty of management cannot be (at the moment) widely used by all kinds of farms. For this reasons, our proposed solution takes into account a well-established instrumentation such as the soil moisture sensors (together with Scholander chamber only during the calibration sessions of the software).

All the technologies from competitors here presented are expensive and cannot be used by small and medium size farms. Our proposal is specifically developed to reduce customer costs as much as possible in order to be affordable for farms of every size.

**Improvement potential over time.** The modularity of the proposed solution is an important peculiarity, because it can be updated to new scientific and technological discoveries without upset all the system. The near future will consolidate some new ways to determine the crop water content, such as the use of photogrammetry (i.e. with infrared camera mounted on a drone) or new kind of instrumentation to define the water potential of leaves. This new knowledge could be easily incorporated into the system and could become part of it in a relative easy way.

On the software side, an idea for the future is a tablet edition of the Graphical User Interface, which could interact with the server side even in mobility. From the modelling point of view, Informatica ambientale constantly collaborates with the main Italian Universities in the field of Agronomy and Environmental Sciences, and this give us access to the state-of-the art about models of the crop-soil-weather systems.

## 2 Impact

### 2.1 Expected impact

### a) Users/Market

**User needs to be targeted.** In the second half of 2015 and at the beginning of 2016, we conducted several surveys to farmers of different locations in Italy. The main scope of the survey was to identify the real benefits of the system for the final users and surprisingly we had to add several benefits to the two initially foreseen. We thought to:

- save irrigation water both for saving the resource for future needs and for economic purposes, and
- calculate and apply Deficit Irrigation (DI) technique, useful in very critical situations such as in arid or semi-arid territories; as for economic purposes, DI allows to improve the quality of the final yield in some quality crops; for example, in wine growing farms achieving a controlled water stress in certain phenological stages leads to a lower yield but a higher level of sugar in berries, and thus a better quality of them for wine production.

But targeted users tell us of other possible benefits, such as:

- the indirect economic savings on electric costs, due to the less amount of water to be extracted and distributed from owned water wells: in some cases, these costs are well over the hypothetical usage fee of the proposed system;
- a well organised management of the farm fields on the irrigation point of view, with the possibility to have an eye on all the plots and judge when and where intervene; this aspect is enormously facilitated by the use of web-GIS and responsive user interfaces, with alarms sent via SMS or email.

**Economic benefit for users and their possible investment into the service**. Three types of economic benefits may arise from the use of the system for irrigation efficiency improvement we propose, according to the type of users

4

PwC_B00000758

who purchase it and in particular by their geographical position. Farms located in areas served by good irrigation intakes may benefit from the irrigation water or electric savings by not paying the water that would be unnecessarily wasted because in excess. Farms whose land falls in arid or semi-arid climates, may also preserve water for future droughts, being also able to choose whether to maintain the yield or use a Deficit Irrigation in case of particularly dry periods. In this case, there is not only an economic saving on the amount of water used, but they can be confident to reach the desired level of yield in areas subject to environmental strict constraints. Finally, farms in which valuable crops are cultivated need constant supervision on water status of the plant; they can count on accurate measurements in real time in order to intervene on irrigation amounts to reach the needed water stress. Such a control can be really useful to maintain the quality of the final yield to the desired level. We already implemented an early survey for involved stakeholders in Italy such as sensor manufacturers, irrigation plant manufacturers and agronomists. We asked if they would be interested in the new system we are going to develop and we received enthusiastic answers in particular from the technicians of the Central and Southern part of Italy, where drought problems and water scarcity is more relevant. Moreover, we analysed the annual consumption of irrigation water and the relative costs for several typical farms in three countries (see following table). We selected them because water scarcity is relevant, but at the same time, local soil and climatic conditions are favourable for the production of very high quality of agricultural products such as production of wine in the Napa Valley and in south Italy (Sicily). We compared the proposed service cost of our system with the irrigation water costs saved by each farm on a ten years' basis. As can be seen the turnover is always extremely positive for the farm yet now, and more and more in the future when irrigation water costs will increase sensibly due to the climate change influence. We have carried out this assessment considering as highly likely a savings of irrigation water due to the use of our system never less than 25%. The following table illustrates some of cases we analyzed. We will develop further the analysis in the feasibility study assessment. Figures are approximated values: they should be specified during the feasibility study assessment.

| SPECIES | Mean farm area (Ha) | Water volume per Hectare (mc/Ha * y) | Water cost per M3 (€/mc) | Total water annual cost (€) | Water savings (%) | A: 10 years water saving (€) | B: Total Service costs for 10 years | Farm savings in 10 years | B/A ratio |
|---|---|---|---|---|---|---|---|---|---|
| 1 - Sicily (Italy) - Citrus | 20 | 5000 | € 0.18 | € 18,000 | 25% | 45.000,00 | 18.100,00 | 26.900,00 | 40% |
| 2 - Sicily - Vineyard | 60 | 2000 | € 0.18 | € 21,600 | 25% | 54.000,00 | 21.650,00 | 32.350,00 | 40% |
| 3 - Napa Valley (California)- Vineyard | 100 | 2000 | € 0.07 | € 14,000 | 25% | 35.000,00 | 21.650,00 | 13.350,00 | 62% |
| 4 - Tunisia - Tomato | 30 | 4000 | € 0.20 | € 24,000 | 25% | 60.000,00 | 18.100,00 | 41.900,00 | 30% |

As clearly indicated in the table, the B/A ratio shows the ratio between the 10 years cost of our service and the savings from the water not consumed by the farmer in 10 years due to the use of our system. It is possible to observe that for example for the production of tomato in 30 Ha farms in Tunisia (row 4) the cost of our service is just 30% of the money saved by the farmer, with a consistent part of the savings in favour of the farm. As further analysis, it is important to highlight 2 points:

- in our assessment, we have not yet considered the **energy costs** needed for pumping and distribute the irrigation water in different plots. This cost will be assessed case by case because it is extremely dependent on the spatial disposition of the different plots and location of the water sources. This cost will be added to the cost of water and then will increase the values in column A, making the use of our system even more economically convenient; the methodology to calculate the energy costs will be developed during the feasibility study;

- the feasibility study will introduce a special index that will also take into account the increase in value of the final agricultural product obtainable by the application of a DI (deficit irrigation) (condition of plant growth easily achievable through the use of our software and sensors). Example: increase in content of polyphenols in extra virgin olive oil through controlled application of water stress.

**Type of market.** The target farm is a medium to big farm with several plots in different environmental conditions, where the control of irrigation is somewhat difficult if carried out only by the farmer experience (and this is the usual condition). In this case, entrepreneurs could afford the annual fee knowing that returns in term of water and energy savings are well beyond the amount paid for the system. The sustainability of the annual fee will be well described to the end user because it is the value-added item that can turn the attention of the general business owner, beyond the environmental benefit that serves the community.

After an initial testing period we will propose a customised version of the DSS for small size farms, which could be scaled down to manage information from one sensor.

5

The size of the potential market is virtually related to crop farms in areas with water scarcity during one or more periods of the crop season: every farm of the Southern Europe belt will be a potential customer of our system.

**Main competitors and solutions.**

| Manufacturer of irrigation systems | they have software solutions realised ad-hoc for their products (for example software for the dimensioning and verification of irrigation systems), simpler than the proposed solution and targeted to just one irrigation method or product (Netafim Ltd, Ewing Irrigation Products Inc., Orbit Irrigation Products Inc.); |
|---|---|
| Sensors manufacturer | (such as Spectrum technologies, Vegetronix, Irrometer, Skye Instruments, Pessl Instruments, Campbell Scientific etc.) They have developed technologies to measure the water status of soil and plant. The approaches are valid but they manifest some limits, in particular, they are not coupled with water balance models and therefore they cannot be as accurate as should be. Models here proposed are dynamically calibrated with sensors for the measure of water status of soil and plant: this in order to overcome the typical limitations of the two approaches. |
| Software houses or research teams | provide software tools calculating the irrigation requirements using simple modelling systems; we have no knowledge of tools that couple water balance models at farm level and sensors data from the field. The feasibility study will be useful to deepen these aspects. |

**Most relevant market segments for the first introduction.** Since our company is established in Italy, we envisage proposing our solution to Italian customers, in particular in the Central and South part of Italy, where we have direct contacts with important winegrowers' farms such as Planeta and Tasca d'Almerita in Sicily and Sella & Mosca in Sardinia.

Initial introduction of our service will be intended to relevant agricultural farm which have both the need to save irrigation water and to assure a constant control over crop stress for quality yields. This is due to the fact that important national farms are very often the flagship for the introduction of new technologies and are sufficiently proactive to understand in advance the benefits that will arise. An initial survey has been realised in 10 big winegrower farms and all their agronomists expressed very positive interest in such a tool. Once introduced on the market with relevant use cases we will be able to parameterise and adapt the cost of our service to different farm dimensions and it will be proposed to small and middle-sized farms, which will benefit from the value for money we will be able to offer.

**Market barriers.** Several barriers could be foreseen, in particular due to the target users. The final system will be simplified at the best, but it will maintain a certain level of complexity, having to represent a complex argument. The website interface will be user-friendly designed but users probably will experience an initially high learning curve that in some cases could be an obstacle. We will face a moderately high initial cost for sensor equipment, and therefore we should be able to settle these expenses in the medium term. At last, since the system will be initially available to farmers over Italy, we should be able to put in place rapidly a sales network with at least an agent in each relevant region; this could delay the deployment of the system due to the recruitment phase of trained people.

**Targeted users.** We intend to reach two segments of customers: on one hand those which need to assure crop yield, saving as much as irrigation water is possible, on the other hand those who need to control the crop quality acting on the water stress (i.e. fine-tuning the irrigation water amounts). The former represents potentially every kind of farm, especially in the areas of Southern Europe and California; the latter are relevant farms with specialised crop (such as grapevine). It is worth to note, for example, that European programs for rural development 2014-2020 guarantees economical support (Reg. UE n. 1305/2013, art. 46) only if the investment can produce water savings varying from 5% to 25% of initial consumption. Thus, farmers could invest in our service with the real possibility that the CAP (Common Agricultural Policy) of the European Union could refund part of the cost of our service. This testify the absolute importance of the water saving argument in EU, which almost every year adopts new rules and regulations to achieve a sustainable water use in agriculture.

**Key stakeholders for commercial exploitation.** We have collaborations with several associations and institutions:

- the Association of Agronomists of Milan Province and the Federation of Agronomists of Sicily Region: they are absolutely interested in our solution and are available as intermediaries for the dissemination and experimental phases;
- Association and unions of farmers expressed keen interest and are awaiting to see the potentialities of the final solution;

6

PwC_B00000760

**DX1139-13**

- the experimental phase will be completed in collaboration with four Italian universities, located at different latitudes: two in the temperate climate (University of Milan, Department of Agricultural and Environmental Science and University of Milano-Bicocca, Department of Environment and Earth Science), one in Central Italy (University of Sassari, Department of Agriculture) and the latter in the South Italy (University of Palermo, Department of Agricultural Science and Forestry);
- main fairs of the agronomy sector are one of the best showcases for industries; we intend to participate to at least the three major fairs per year in Italy during the implementation phase (phase 2) of our solution.

**b) Company**

The project take part to the two pillars of Informatica ambientale: Agronomy and Environmental Science. We developed several software tools and web portal in the fields of irrigation, pesticide fate, fertiliser use and crop grow modelling. The proposed project continues on the line of our mission and will be a spearhead in the field of irrigation water saving. In order to face the challenges of this project, our SME had to change some strategies, starting from our vision of the innovation in agriculture and the need to acquire competences from external sources, such as Academia and professional services. We will focus our attention on this tool and the enormous possibilities it could offer, in terms of expandability and scalability to the user. For example, the software could incorporate, in a second time, a fertigation tool useful aimed at rationalizing the use of chemical inputs (fertilization) and reduce the environmental impact of the crops in open fields and in greenhouse environment, or it could use infrared satellite maps to identify water stress areas.

**Expected growth potential of the solution**. We would like to obtain a good visibility of our service within the first two years from the start of commercialisation. We expect to be one of the main actors in the field of irrigation efficiency in the next future, especially if we could be very reactive to acquire the new scientific and technological improvement. A well-done business plan will help us to structure the human and material resources to address the market demand over time.

Informatica ambientale strongly believes to the solution here presented. We estimate that (after the transitional period) an average number of 500 farms, each using an annual contract, will use the DSS. This will result in an annual turnover of about 1.5 million Euros per year. New employees will be hired, both to manage the software part of the DSS and to assist the farm with the field measurements. A rough estimate referred to the annual turnover is of about three technicians (computer scientists and agronomists) within Informatica ambientale premises and five agronomists for the fieldwork distributed in the Italian territory. The Return on investment is expected within three years from the start of the commercialisation, when we figure out to reach a half of the annual turnover at steady state. Profits will stand at a figure of around 500.000 Euros per year. All the above figures refer to the commercialisation of the DSS in Italy. As stated in other part of this document, we plan to expand the market to other countries sensitive to water saving such as, in Europe, in France, Spain, Greece as well as other countries of the Mediterranean basin and United States.

*2.2 Measures to maximized impact*

**a) Dissemination and exploitation of results**

We plan to make commercialisation of the solution by our own. At the beginning of the commercialisation, we estimate that two technicians at full time will be dedicated to dissemination and stewardship to farms. At standard time, all the technicians in the field will have commercialisation and marketing responsibilities for their own area.

First dissemination activities will be done during the experimental phase in collaboration with the Italian Universities cited in the key stakeholder section. In this case, scientific papers will be prepared to describe the system and the experimental results. Moreover, we are planning to present our solution in technical events, such as agronomic fairs (at least the three major in Italy at the beginning), or contacting the agronomists associations for face-to-face meetings and presentations. The latter would be one of the greatest opportunity to bring to direct users the functionalities of the system, collecting requirements and desiderata from the main stakeholders. Another option is the use of advertisement spaces in specialised magazines or web sites, but the economic feasibility will be discussed on the business plan.

**b) Intellectual property**

Informatica ambientale has already begun the initial steps for the implementation of an international trademark. The realisation of a proprietary logo has been already committed to a professional designer and the process of protect it with an European level trademark will be soon initiated.

The further step to protect the solution will be acquired in the feasibility study: we will negotiate a professional in order to identify the best solution of our needs taking into account the international scope of the project.

7

**DX1139-14**

*References*

Amigues, J. P., Debaeke, P., Itier, B., Lemaire, G., Seguin, B., Tardieu, F., Thomas, A. (eds), 2006. Sécheresse et agriculture. Réduire la vulnérabilité de l'agriculture à un risque accru de manque d'eau. Expertise scientifique collective, Rapport, Institut national de la recherche agronomique (INRA), France.

EEA, 2012. Towards efficient use of water resources in Europe. Report 1/2012. European Environmental Agency, Copenhagen K, Denmark. ISSN 1725-9177

Fereres, E., Goldhamer, D., 2003. Suitability of stem diameter variation and water potential as indicator for irrigation scheduling of almond trees. Journal of Horticultural Science and Biotechnology 78, 139–144.

IRRISOFT web site, 2014, http://www.vl-irrigation.org/cms/index.php?id=417&type=7, last visited 09 December 2014

Moriana, A., Pérez–López, D., Prieto, MH, Ramírez–Santa–Pau, M., Pérez–Rodriguez, J.M. 2012. Midday stem water potential as a useful tool for estimating irrigation requirements in olive trees. Agric. Water Manage. 112:43–54.

Siebert, S., Henrich, V., Frenken, K., Burke, J., 2007. Update of the Digital Global Map of Irrigation Areas to Version 5. Universitat Bonn, Bonn, Germany and the Food and Agriculture Organization of the United Nations, Rome, Italy.

8

PwC_B00000762

**DX1139-15**

**Whole Leadership – Partial at Level**

*Written Comments:*

"Mauro has numerous strengths in areas such as the understanding of audit methodology, commitment to quality, strong work ethic supporting his teams and engagement. While these strengths were observed on Harmonic, there were also performance gaps related to building strong relationships, creating the PwC experience for both the client and team, implementing EPQ methodology and basic project management of the audit. Mauro's weaknesses in these areas had a significant impact on this engagement."

*Verbal Comments*

Positive: Mauro was focused on audit quality, asked a lot of good questions

Development: Mauro needs to achieve a more balanced approach not focused only on the dimension of quality, did not provide client and team a PwC experience, did not implement EPQ principles with asking WT type questions in January and raised issued like cap. Threshold, inventory reserves, while revenue testing sample had issues for a Q1 sample.

Reply: EPQ was not possible due to my arrival in October and PwC experience had to be subordinated to performance of basic audit procedures which were missing when I arrived. The relationship of team and management was built upon lack of audit procedures, which is demonstrated by their reaction to my questions that were never asked before according to the replies received by the company. The EL lacked knowledge of critical estimates, as well as the team, which resulted in having to perform WT type questions in January. Project management was multiple times escalated to the EL including status on open items, resource needs which was discussed with op leader before field work started due to the staffing situation and pressure that was put on me (2 job no manager at the same time, one with sox implementation and 2 MW, and Harmonic which was missing significant basic audit procedures from prior years.). Revenue sample failed from Q2 and those tests were reviewed by me on timely basis upon staff completed it and CN were addressed throughout fieldwork given the lack of coaching the team received up to my arrival). The audit effort was made challenging by the conduct of the EL who pushed back on asking questions, reminded me that "important client of the firm sit on the board of this client", and removed questions I was asking forcing me to re-add them at night when my team was asking why he was removing them.

**Business Acumen – At Level**

**Technical Capabilities – At Level (except issues management partial at level)**

*Written Comments:*

Mauro had significant challenges closing out issues. He raised several good questions during the audit, but in almost every case he was not able to bring the matter to closure.
Mauro did not effectively anticipate staffing needs, which hindered the timely completion of the audit. He initially opposed bringing on additional staff and managers, but in the end three additional senior managers were needed to get the work done."

*Verbal Comments*

Mauro raised very good questions but could not close them, should have prioritized them, for instance revenue and consultation memo. Although EL assigned areas such as SAD to another SM, Mauro should have prioritized to focus on these documents. He should also challenge himself for his conclusions.

Reply: Each Issue was identified and closed by me, identified and escalated timely on the board of the audit room. The documentation was outsourced, but not the resolution. I had to step in several times escalating to national to stop the EL from reaching an incorrect audit conclusion (Revenue, control on revenue and SAD documentation). I did not refuse staffing help, which was discussed with Heatley even before fieldwork started upon resignation of Nick turner.

**Global Acumen – Partial at Next Level**

*Verbal Comments*

Positive: Mauro possesses world global knowledge more than most, I'd encourage to focus on the business side of such world knowledge.

PwC_B00000763

**Relationship – Not at Level**

*Written Comments:*

"Mauro did not invest sufficient time in building relationships. Instead of working directly with client, he communicated through more junior staff. This led to inefficient and poor communication that caused significant client frustration. One example of the reaction to Mauro involved the head of manufacturing accounting. Her frustration with the audit ultimately led her to walk out of a meeting and resign. Her complaints was that PwC lacked sensitivity and reasonableness. "

*Verbal Comments*

Mauro did not invest sufficient time with the client, there was already significant noise in Q3, audit procedures recomputed for the entire year on allocation, time spent on fully amortized assets that was not understood by the company, the director of cost acc and ops felt treated like a criminal and I was unreasonable. CAO and Dir. Rev. said I hardly spoke and was confrontational.

Reply: The Q3 noise was never communicated to me, on the contrary the discussion was positive and I was encouraged "to keep the EL honest" this can be verified also with my coach who did not report to me issue in mid-year. Had I known on timely basis I could have tried to remediate or improve the matter. The EL recognized when he advised me to be more present I acted upon it in the time I had available. I did not use junior staff but 2nd and 3rd year senior who also according to the EL worked well with the Company. Even when I attended those meetings I had them lead the meeting and there were no instances where the senior could not articulate the question. During the meeting in question, the EL made a comment "This is the sloppiest work I've seen" and I simply asked for supporting evidence so I don't see how he could prove my comment was the trigger for her reaction. After filing I was complimented by the same resources for my POV and competence.

Confidential

PwC_B00000764

**Context**

I started the Harmonic engagement with the Q3 review in the second half of October, while doing another 12.31 year-end in SOX implementation with 2 MW to remediate. Right after the Q3 review no managers were assigned to either engagements until December when I was given an exp. Hire manager in Gigamon without Sox or US audit experience. When I stated to the C&N team leader my concern on ability to perform effectively on both jobs I was told I'd have led by example and that other jobs too were sharing the load. When Avago was provided as example, being also the job who relocated my recurring manager and the first exp. Hire I asked to the C&N leader how an exp. Hire in a 5 manager job is the same as the only leading manager in a public, to which the previous concept I was to lead by example was reiterated.

Right after I rolled on Harmonic, I noticed that despite be Mid October, areas normally completed by that time, such as planning, Q1 and Q2 revenue testing (non-stat) was not done and upon planning sign off I notified the EL that rework will have needed to be done on the walkthroughs because there were significant pieces missing (i.e. level of precision of controls).

During Q3 review I demonstrated my whole leadership skills by working with the company and assisting them effectively throughout the issuance of convertible debt and comfort letter while liaising with specialists to ensure timely completion and doing consultation with national and risk management for one of the adjustments I noted during the review. During the performance discussion, the EL mentioned he was fully satisfied with my performance and I'd continue to "keep him honest". No reference to company's management complaints or noise was brought to my attention. What instead I witnessed was 5 adjustments related to prior Q, one of which referred to prior year related to restricted cash, to which the CAO reaction was to state in a meeting with me and the EL that "You were ok with this last year, now u say you're not, I don't feel I can trust you anymore".

In January the manager at harmonic who assisted me during the Q3 review quit and the Op Leader, Robert Heatley, called me to inform me I was being assigned another exp. Hire with no US audit experience on Harmonic as well. In the call he notified me that additional resources would have been made available to me in mid-february (he referred to 2/3 managers) right after most public would have filed. I accepted the conditions proposed to me by the Op Leader. During January before fieldwork start I met with the team and realized that 2014 Db had significant issues in terms of both coaching, audit documentation and procedures and documentation. The team was unable to respond to the findings that emerged during the review of the workpapers, so as a result we drafted very detailed work plan and questions to ask to try to remediate the gaps existing.

Upon the beginning of the fieldwork I had to split time with Gigamon (who was filing 20 days earlier than Harmonic) and Harmonic and I also had to spend 2 morning a week at the hospital for spinal related issues of which the EL was aware. Having finalized in detail the questions we had to ask on each area, I prioritized Gigamon, keeping track of status with my Harmonic team spending at least one day a week there up to the ER of Gigamon and discussing with my manager and lead senior the status.

My Harmonic team started quickly to notify me that the company was not delivering items and was doing significant push back, of which I notified the EL. Furthermore there were personal references to

me in emails from the company and in meeting as "new player" by the company and that I was not knowing their processes and controls. Also the team notified me that the company was having key contacts going on PTO on a weekly basis. When I notified the EL of the fact we were not receiving items or responses (as demonstrated by the open item lists that was circulated daily), the EL responded that was instead a blessing that we did not have contacts on site that we needed, because they were tired and once back we'd have benefited from it. Furthermore the EL kept referring to the company and to my team that this was a tough audit, creating the impression that we were performing more than what we should have, while instead we were simply doing an audit. I made very clear to the EL that these comments were undermining our efforts and creating frictions and I made such comment in presence of the QRP who concurred in the meeting that this was not a tough audit, but just an audit.

My repeated requests to the EL to talk to the CFO to notify that the company and the CAO were not assisting and cooperating were not followed timely and when finally the 12b-25 occurred not only the CFO stepped in and each item was delivered in days and the company asked us questions to clarify on items, but he also asked back the company's CAO as to how could they not know items we were asking and our questions were fair during an AC.

Had the EL escalated much more promptly the issue and the gravity of risking the deadline as I asked, the delays could have been avoided because we would have received answers and documentation on time as proven by the delivery time once the CFO got involved with the urgency I requested much earlier.

Given the time available and as the EL stated in his feedback, for asking the questions we drafted in the work plan, which included WT type question of understanding, I did rely on the 2 seniors (2nd and 3rd year) who worked with the company before, and as the EL said had no issues working with management, and also told them that if there were issues in understanding to let me know and I'd have gotten involved. The Company approach was not to respond to questions and at first attempt to push back stating we never asked such questions since we audited them, then to state we were being unreasonable because now was January and kept asking to speak to the EL. As further example of the EL inability to understand the severity of the status and the need to escalate above the CAO, after a meeting where I explained to him the issues and status, as a reply he sent email to the team saying we're trailing in EGA prepared since last year rather than being responsive of the delays and issues I was stating.

Furthermore in status meetings with the company the EL apologized to the Company for what was happening rather than supporting the effort of the audit and that these questions needed to be answered more timely. At that moment I notified the QRP that the EL not only was not supporting the audit, was resisting in us asking questions and we were at risk of missing the deadline.

The situation that presented given this context was that I had 8 weeks to perform a job on a company that was given a pwc experience that consisted of lack of basic questions and training on both sides of what an audit really entailed, including the EL, so I exercised my leadership and I tried to help my team by also etting them use my name as requestor to add more support from the top, because I foresaw that the relationship for the reasons noted above was having frictions that the EL was not helping to resolve and I deemed my job was to shield my team from any possible personal frustration from the company, approach that proved to work. This course was chosen given I could not always be there, managers were

promised to me in mid Feb only by Heatley and I considered the existing team be ideally placed to bridge the questions we were asking now with what we never asked before.

EPQ methodology was not possible to apply given when I rolled on to the engagement and the fact we had to do the entire audit including understanding of processes in 8 weeks which the EL failed to properly review and supervise up to the point I rolled on. As further evidence I noticed that the EL was not aware of the basic processes surrounding areas of estimates, including revenue aspects such as system limitation and use of conventions, for which I had to assume the leader role in teaching what an audit was, in teaching my team what taking responsibility and protect the team meant and assuming EL functions in making decisions on technical level highlighted below and training also the EL in basic concept such as when a fixed asset should start to be depreciated, of which I had to provide written evidence to convince him of this concept.

During the entire audit I provided an EL example of leadership to my team and as example on top of coaching on all areas (including revenue where for instance the 2nd year senior was surprised I reviewed the folder with the contracts) I also demonstrated and reiterated to them that our job is to audit and we would be done when we are done. The EL when announced the 12b-25 to the team used the exact same words to the team. I also taught them that they should not be accepting no explanations from supervisor just because he says so and how to document and to audit.

As noted above, when I noted lack of support from the EL for the company's delivery and issue resolution, I escalated promptly my concerns to the QRP and MAL. The QRP told me he would have spoken to the EL to make him understand that the deadline of end of Feb given the work that had to be done was not feasible.

On the technical side I had to step in 3 times to stop the EL from making incorrect auditing calls:

1) On the deferred revenue sampling issue the EL accepted the company approach of haphazard 60 samples, and after my push back that I could not find rationale on this approach he asked the company to do few more, which resulted in 13 additional. Upon reiteration of my doubts I had to advocate par. 2713 to the EL and QRP because I was not comfortable this approach was adequate. The EL in the meeting warned me that we should be mindful that "important people sit on the board of this company" and quoted Wells Fargo as one of the account. I reported this comment to the QRP as highly inappropriate and putting pressure on us to close the audit without asking all the questions we'd ask, to which the EL kept referring to "bigger fish to fry". Upon conversation with national it was proven that the EL was not correct and a statistical sample had to be told to the company. I was also often pushed back from asking question, referring to non-existing guidance such as the one that the EL said that if I found an issue in one sample didn't mean there could be a pervasive issue, referring to the inability of the company to interpret a term in foreign language. To the timely review comment, I instead timely reviewed revenue samples as the team completed them by also providing detailed notes, Q1 was reviewed in December by me and notes had to be addressed throughout March by the team. The EL is incorrect in stating Q1 sample caused the issue in our supplemental sample, q2 was the sample which was prepared only end of January and reviewed by me right away in February.

2) On the control assessment, EL, QRP and SM assigned spent days to work on the identification of flux as compensating control, despite my opposition. For 2 times I provided comments to the

PwC_B00000767

memo, yet the EL and SM worked on their own and for 2 times I was put in a call with national where I had to say I could not agree with the conclusion because I was not given any document to review. One objection related to the level of precision of the flux, to which the EL said that if was too low for the error, we could just raise the threshold, adding also that if an error is noted above the threshold does not mean the control has an issue. Such statement was made in presence of me, QRP and SM. National struck down the flux as compensating control corroborating my view. Aside from this I asked specifically to be present when the SM and Partner were asking the company on the threshold because me and the Exp. Sr. already witnessed a meeting where the EL fed the company which answer to give to our question on fully depreciated assets, and I wanted to be sure that the questions were asked in an open form. Without explanation I was not part of the meeting with the CAO.

3) On the redaction of the SAD that was presented after EL, QRP, SM and Aux partner agreed, I had to step in because the document missed basic auditing standard concepts, such as documentation of root causes and definition of could factor. Such observation were agreed by the auxiliary partner in a meeting with me on Monday before filing date.

Auditing wise overall I noted dozens of issues resulting from the lack and/or incorrect understanding of the processes by the eng. Team and EL (i.e. revenue conventions, warranty which was solved in a call when the EL asked the CAO in my presence point blank how did the warranty accrual work at Harmonic) and as pointed out several times to EL and QRP, almost all the issues noted were existing since prior year, and some in prior years.

Issues management wise, I was able to close all the issues identified, which resulted in SUM entries written by me on the board of the audit room, and I also identified all Control issues and out of period. I escalated each issue immediately as noticed and due to the numerous issues of the audit, the mere documentation of them was transitioned to others but that does not mean closing an issue.

I also prioritized the work because the documentation of the issues could be done by the relief team while the review of the procedures and test results on higher risk areas was not efficient if done by someone just coming in; furthermore given that the knowledge of processes and issues was not known by team, company and EL, my main priority was to keep reviewing to find out what else we did not know that could have resulted in more risk. The issue management was also made difficult by the attitude of the EL that was removing questions we needed to ask and forcing me to put them back on the list at night when I was arriving. An example was even involving an audit adjustment on royalty accrual that was initially removed by the EL as issue and resulted in the staff to state with the whole team present that she agreed with me that this was an issue but she didn't care anymore. At the end I put back the accrual and ended up as SUM item.

On the relationship front, the dir. Of cost accounting and the FP&A complimented me after the filing for providing them lot of good points and ideas and providing fresh perspective, and as example she asked for my help in assessing if I could recommend a resource to help her in cost accounting. In the meeting where she stood and left, the EL made a statement "sorry in case you get offended but this is the sloppiest work I've seen" and once the company started to explain the process my only participation in the meeting was when I asked them to provide the support for the meeting invites, at which she stood

by in tears and left. I believe there is no proof that my single question was what triggered the reaction vs the comment made by the EL. Also to note that the dir. was suffering from health issues, lost staff and was assigned acquisition work on top by the CAO, so the audit compressed timeline was another element that piled on top.

The EL stated I didn't invest time in meeting them, however he also stated upon him suggesting me to chaperon more he did note the improvement, the sufficiency of it was due to the time I had available and he also stated that the previous team never had issues in dealing with the company's contacts. This statement is also contradictory because if the existing team per the EL never had issues and I had them be the main contacts, I could not then be responsible for the relationship being damaged, given that I had the 2 lead seniors asking the questions. Even when I went with them, I still let them lead the meeting to assess their performance and there were no instances where the question was not clear, while instead emerged that the Company lacked training in even producing basic schedules to support their balances (i.e. off-book liability).

Further, no credit in the evaluation has been given for coaching, among which the exp. Senior that the EL credited me for creating opportunity sufficient enough to support him for promotion to manager, while the prior year he stated he didn't have much interaction with him. Also, as evidence of business acumen, thanks to my audit, the company's management was given additional 8 resources to hire, part also due to acquisition, but also due to the questions we asked which highlighted how the finance staff was cut too much by management. The very same dir. Of cost accounting told me she appreciated the help in providing her additional resources.

In relation to Q3 feedback, no such noise was communicated to me, without which I could not take proper corrective actions and my ability to correct upon feedback was evidenced by the EL when he advised me to be more present in meetings, I did so with the time allowed.

As far as reference to the time spent, the situation was also made more challenging by tasks provided to me by the EL which required significant effort which were then ignored without explanation. For instance the EL asked me to go back to each of the 300+ sample and compile a list of all order entry issues noted and then at the end he ignored my work and did not note such control in the Sad simply stating he did not believe was an issue.

**Whole Leadership – Partial at Level**

*Written Comments:*

"Mauro has numerous strengths in areas such as the understanding of audit methodology, commitment to quality, strong work ethic supporting his teams and engagement. While these strengths were observed on Harmonic, there were also performance gaps related to building strong relationships, creating the PwC experience for both the client and team, implementing EPQ methodology and basic project management of the audit. Mauro's weaknesses in these areas had a significant impact on this engagement."

*Verbal Comments*

Positive: Mauro was focused on audit quality, asked a lot of good questions

Development: Mauro needs to achieve a more balanced approach not focused only on the dimension of quality, did not provide client and team a PwC experience, did not implement EPQ principles with asking WT type questions in January and raised issued like cap. Threshold, inventory reserves, while revenue testing sample had issues for a Q1 sample.

Reply: EPQ was not possible due to my arrival in October and PwC experience had to be subordinated to performance of basic audit procedures which were missing when I arrived. The relationship of team and management was built upon lack of audit procedures, which is demonstrated by their reaction to my questions that were never asked before according to the replies received by the company. The EL lacked knowledge of critical estimates, as well as the team, which resulted in having to perform WT type questions in January. Project management was multiple times escalated to the EL including status on open items, resource needs which was discussed with op leader before field work started due to the staffing situation and pressure that was put on me (2 job no manager at the same time, one with sox implementation and 2 MW, and Harmonic which was missing significant basic audit procedures from prior years.). Revenue sample failed from Q2 and those tests were reviewed by me on timely basis upon staff completed it and CN were addressed throughout fieldwork given the lack of coaching the team received up to my arrival). The audit effort was made challenging by the conduct of the EL who pushed back on asking questions, reminded me that "important client of the firm sit on the board of this client", and removed questions I was asking forcing me to re-add them at night when my team was asking why he was removing them.

**Business Acumen – At Level**

**Technical Capabilities – At Level (except issues management partial at level)**

*Written Comments:*

Mauro had significant challenges closing out issues. He raised several good questions during the audit, but in almost every case he was not able to bring the matter to closure.
Mauro did not effectively anticipate staffing needs, which hindered the timely completion of the audit. He initially opposed bringing on additional staff and managers, but in the end three additional senior managers were needed to get the work done."

*Verbal Comments*

Mauro raised very good questions but could not close them, should have prioritized them, for instance revenue and consultation memo. Although EL assigned areas such as SAD to another SM, Mauro should have prioritized to focus on these documents. He should also challenge himself for his conclusions.

Reply: Each Issue was identified and closed by me, identified and escalated timely on the board of the audit room. The documentation was outsourced, but not the resolution. I had to step in several times escalating to national to stop the EL from reaching an incorrect audit conclusion (Revenue, control on revenue and SAD documentation). I did not refuse staffing help, which was discussed with Heatley even before fieldwork started upon resignation of Nick turner.

**Global Acumen – Partial at Next Level**

*Verbal Comments*

Positive: Mauro possesses world global knowledge more than most, I'd encourage to focus on the business side of such world knowledge.

Confidential

PwC_B00000770

**DX1139-23**

**Relationship – Not at Level**

*Written Comments:*

"Mauro did not invest sufficient time in building relationships. Instead of working directly with client, he communicated through more junior staff. This led to inefficient and poor communication that caused significant client frustration. One example of the reaction to Mauro involved the head of manufacturing accounting. Her frustration with the audit ultimately led her to walk out of a meeting and resign. Her complaints was that PwC lacked sensitivity and reasonableness. "

*Verbal Comments*

Mauro did not invest sufficient time with the client, there was already significant noise in Q3, audit procedures recomputed for the entire year on allocation, time spent on fully amortized assets that was not understood by the company, the director of cost acc and ops felt treated like a criminal and I was unreasonable. CAO and Dir. Rev. said I hardly spoke and was confrontational.

Reply: The Q3 noise was never communicated to me, on the contrary the discussion was positive and I was encouraged "to keep the EL honest" this can be verified also with my coach who did not report to me issue in mid-year. Had I known on timely basis I could have tried to remediate or improve the matter. The EL recognized when he advised me to be more present I acted upon it in the time I had available. I did not use junior staff but 2nd and 3rd year senior who also according to the EL worked well with the Company. Even when I attended those meetings I had them lead the meeting and there were no instances where the senior could not articulate the question. During the meeting in question, the EL made a comment "This is the sloppiest work I've seen" and I simply asked for supporting evidence so I don't see how he could prove my comment was the trigger for her reaction. After filing I was complimented by the same resources for my POV and competence.

Confidential

**Context**

I started the Harmonic engagement with the Q3 review in the second half of October, while doing another 12.31 year-end in SOX implementation with 2 MW to remediate. Right after the Q3 review no managers were assigned to either engagements until December when I was given an exp. Hire manager in Gigamon without Sox or US audit experience. When I stated to the C&N team leader my concern on ability to perform effectively on both jobs I was told I'd have led by example and that other jobs too were sharing the load. When Avago was provided as example, being also the job who relocated my recurring manager and the first exp. Hire I asked to the C&N leader how an exp. Hire in a 5 manager job is the same as the only leading manager in a public, to which the previous concept I was to lead by example was reiterated.

Right after I rolled on Harmonic, I noticed that despite be Mid October, areas normally completed by that time, such as planning, Q1 and Q2 revenue testing (non-stat) was not done and upon planning sign off I notified the EL that rework will have needed to be done on the walkthroughs because there were significant pieces missing (i.e. level of precision of controls).

During Q3 review I demonstrated my whole leadership skills by working with the company and assisting them effectively throughout the issuance of convertible debt and comfort letter while liaising with specialists to ensure timely completion and doing consultation with national and risk management for one of the adjustments I noted during the review. During the performance discussion, the EL mentioned he was fully satisfied with my performance and I'd continue to "keep him honest". No reference to company's management complaints or noise was brought to my attention. What instead I witnessed was 5 adjustments related to prior Q, one of which referred to prior year related to restricted cash, to which the CAO reaction was to state in a meeting with me and the EL that "You were ok with this last year, now u say you're not, I don't feel I can trust you anymore".

In January the manager at harmonic who assisted me during the Q3 review quit and the Op Leader, Robert Heatley, called me to inform me I was being assigned another exp. Hire with no US audit experience on Harmonic as well. In the call he notified me that additional resources would have been made available to me in mid-february (he referred to 2/3 managers) right after most public would have filed. I accepted the conditions proposed to me by the Op Leader. During January before fieldwork start I met with the team and realized that 2014 Db had significant issues in terms of both coaching, audit documentation and procedures and documentation. The team was unable to respond to the findings that emerged during the review of the workpapers, so as a result we drafted very detailed work plan and questions to ask to try to remediate the gaps existing.

Upon the beginning of the fieldwork I had to split time with Gigamon (who was filing 20 days earlier than Harmonic) and Harmonic and I also had to spend 2 morning a week at the hospital for spinal related issues of which the EL was aware. Having finalized in detail the questions we had to ask on each area, I prioritized Gigamon, keeping track of status with my Harmonic team spending at least one day a week there up to the ER of Gigamon and discussing with my manager and lead senior the status.

My Harmonic team started quickly to notify me that the company was not delivering items and was doing significant push back, of which I notified the EL. Furthermore there were personal references to

PwC_B00000772

me in emails from the company and in meeting as "new player" by the company and that I was not knowing their processes and controls. Also the team notified me that the company was having key contacts going on PTO on a weekly basis. When I notified the EL of the fact we were not receiving items or responses (as demonstrated by the open item lists that was circulated daily), the EL responded that was instead a blessing that we did not have contacts on site that we needed, because they were tired and once back we'd have benefited from it. Furthermore the EL kept referring to the company and to my team that this was a tough audit, creating the impression that we were performing more than what we should have, while instead we were simply doing an audit. I made very clear to the EL that these comments were undermining our efforts and creating frictions and I made such comment in presence of the QRP who concurred in the meeting that this was not a tough audit, but just an audit.

My repeated requests to the EL to talk to the CFO to notify that the company and the CAO were not assisting and cooperating were not followed timely and when finally the 12b-25 occurred not only the CFO stepped in and each item was delivered in days and the company asked us questions to clarify on items, but he also asked back the company's CAO as to how could they not know items we were asking and our questions were fair during an AC.

Had the EL escalated much more promptly the issue and the gravity of risking the deadline as I asked, the delays could have been avoided because we would have received answers and documentation on time as proven by the delivery time once the CFO got involved with the urgency I requested much earlier.

Given the time available and as the EL stated in his feedback, for asking the questions we drafted in the work plan, which included WT type question of understanding, I did rely on the 2 seniors (2nd and 3rd year) who worked with the company before, and as the EL said had no issues working with management, and also told them that if there were issues in understanding to let me know and I'd have gotten involved. The Company approach was not to respond to questions and at first attempt to push back stating we never asked such questions since we audited them, then to state we were being unreasonable because now was January and kept asking to speak to the EL. As further example of the EL inability to understand the severity of the status and the need to escalate above the CAO, after a meeting where I explained to him the issues and status, as a reply he sent email to the team saying we're trailing in EGA prepared since last year rather than being responsive of the delays and issues I was stating.

Furthermore in status meetings with the company the EL apologized to the Company for what was happening rather than supporting the effort of the audit and that these questions needed to be answered more timely. At that moment I notified the QRP that the EL not only was not supporting the audit, was resisting in us asking questions and we were at risk of missing the deadline.

The situation that presented given this context was that I had 8 weeks to perform a job on a company that was given a pwc experience that consisted of lack of basic questions and training on both sides of what an audit really entailed, including the EL, so I exercised my leadership and I tried to help my team by also etting them use my name as requestor to add more support from the top, because I foresaw that the relationship for the reasons noted above was having frictions that the EL was not helping to resolve and I deemed my job was to shield my team from any possible personal frustration from the company, approach that proved to work. This course was chosen given I could not always be there, managers were

promised to me in mid Feb only by Heatley and I considered the existing team be ideally placed to bridge the questions we were asking now with what we never asked before.

EPQ methodology was not possible to apply given when I rolled on to the engagement and the fact we had to do the entire audit including understanding of processes in 8 weeks which the EL failed to properly review and supervise up to the point I rolled on. As further evidence I noticed that the EL was not aware of the basic processes surrounding areas of estimates, including revenue aspects such as system limitation and use of conventions, for which I had to assume the leader role in teaching what an audit was, in teaching my team what taking responsibility and protect the team meant and assuming EL functions in making decisions on technical level highlighted below and training also the EL in basic concept such as when a fixed asset should start to be depreciated, of which I had to provide written evidence to convince him of this concept.

During the entire audit I provided an EL example of leadership to my team and as example on top of coaching on all areas (including revenue where for instance the 2nd year senior was surprised I reviewed the folder with the contracts) I also demonstrated and reiterated to them that our job is to audit and we would be done when we are done. The EL when announced the 12b-25 to the team used the exact same words to the team. I also taught them that they should not be accepting no explanations from supervisor just because he says so and how to document and to audit.

As noted above, when I noted lack of support from the EL for the company's delivery and issue resolution, I escalated promptly my concerns to the QRP and MAL. The QRP told me he would have spoken to the EL to make him understand that the deadline of end of Feb given the work that had to be done was not feasible.

On the technical side I had to step in 3 times to stop the EL from making incorrect auditing calls:

1) On the deferred revenue sampling issue the EL accepted the company approach of haphazard 60 samples, and after my push back that I could not find rationale on this approach he asked the company to do few more, which resulted in 13 additional. Upon reiteration of my doubts I had to advocate par. 2713 to the EL and QRP because I was not comfortable this approach was adequate. The EL in the meeting warned me that we should be mindful that "important people sit on the board of this company" and quoted Wells Fargo as one of the account. I reported this comment to the QRP as highly inappropriate and putting pressure on us to close the audit without asking all the questions we'd ask, to which the EL kept referring to "bigger fish to fry". Upon conversation with national it was proven that the EL was not correct and a statistical sample had to be told to the company. I was also often pushed back from asking question, referring to non-existing guidance such as the one that the EL said that if I found an issue in one sample didn't mean there could be a pervasive issue, referring to the inability of the company to interpret a term in foreign language. To the timely review comment, I instead timely reviewed revenue samples as the team completed them by also providing detailed notes, Q1 was reviewed in December by me and notes had to be addressed throughout March by the team. The EL is incorrect in stating Q1 sample caused the issue in our supplemental sample, q2 was the sample which was prepared only end of January and reviewed by me right away in February.

2) On the control assessment, EL, QRP and SM assigned spent days to work on the identification of flux as compensating control, despite my opposition. For 2 times I provided comments to the

PwC_B00000774

**DX1139-27**

memo, yet the EL and SM worked on their own and for 2 times I was put in a call with national where I had to say I could not agree with the conclusion because I was not given any document to review. One objection related to the level of precision of the flux, to which the EL said that if was too low for the error, we could just raise the threshold, adding also that if an error is noted above the threshold does not mean the control has an issue. Such statement was made in presence of me, QRP and SM. National struck down the flux as compensating control corroborating my view. Aside from this I asked specifically to be present when the SM and Partner were asking the company on the threshold because me and the Exp. Sr. already witnessed a meeting where the EL fed the company which answer to give to our question on fully depreciated assets, and I wanted to be sure that the questions were asked in an open form. Without explanation I was not part of the meeting with the CAO.

3) On the redaction of the SAD that was presented after EL, QRP, SM and Aux partner agreed, I had to step in because the document missed basic auditing standard concepts, such as documentation of root causes and definition of could factor. Such observation were agreed by the auxiliary partner in a meeting with me on Monday before filing date.

Auditing wise overall I noted dozens of issues resulting from the lack and/or incorrect understanding of the processes by the eng. Team and EL (i.e. revenue conventions, warranty which was solved in a call when the EL asked the CAO in my presence point blank how did the warranty accrual work at Harmonic) and as pointed out several times to EL and QRP, almost all the issues noted were existing since prior year, and some in prior years.

Issues management wise, I was able to close all the issues identified, which resulted in SUM entries written by me on the board of the audit room, and I also identified all Control issues and out of period. I escalated each issue immediately as noticed and due to the numerous issues of the audit, the mere documentation of them was transitioned to others but that does not mean closing an issue.

I also prioritized the work because the documentation of the issues could be done by the relief team while the review of the procedures and test results on higher risk areas was not efficient if done by someone just coming in; furthermore given that the knowledge of processes and issues was not known by team, company and EL, my main priority was to keep reviewing to find out what else we did not know that could have resulted in more risk. The issue management was also made difficult by the attitude of the EL that was removing questions we needed to ask and forcing me to put them back on the list at night when I was arriving. An example was even involving an audit adjustment on royalty accrual that was initially removed by the EL as issue and resulted in the staff to state with the whole team present that she agreed with me that this was an issue but she didn't care anymore. At the end I put back the accrual and ended up as SUM item.

On the relationship front, the dir. Of cost accounting and the FP&A complimented me after the filing for providing them lot of good points and ideas and providing fresh perspective, and as example she asked for my help in assessing if I could recommend a resource to help her in cost accounting. In the meeting where she stood and left, the EL made a statement "sorry in case you get offended but this is the sloppiest work I've seen" and once the company started to explain the process my only participation in the meeting was when I asked them to provide the support for the meeting invites, at which she stood

PwC_B00000775

by in tears and left. I believe there is no proof that my single question was what triggered the reaction vs the comment made by the EL. Also to note that the dir. was suffering from health issues, lost staff and was assigned acquisition work on top by the CAO, so the audit compressed timeline was another element that piled on top.

The EL stated I didn't invest time in meeting them, however he also stated upon him suggesting me to chaperon more he did note the improvement, the sufficiency of it was due to the time I had available and he also stated that the previous team never had issues in dealing with the company's contacts. This statement is also contradictory because if the existing team per the EL never had issues and I had them be the main contacts, I could not then be responsible for the relationship being damaged, given that I had the 2 lead seniors asking the questions. Even when I went with them, I still let them lead the meeting to assess their performance and there were no instances where the question was not clear, while instead emerged that the Company lacked training in even producing basic schedules to support their balances (i.e. off-book liability).

Further, no credit in the evaluation has been given for coaching, among which the exp. Senior that the EL credited me for creating opportunity sufficient enough to support him for promotion to manager, while the prior year he stated he didn't have much interaction with him. Also, as evidence of business acumen, thanks to my audit, the company's management was given additional 8 resources to hire, part also due to acquisition, but also due to the questions we asked which highlighted how the finance staff was cut too much by management. The very same dir. Of cost accounting told me she appreciated the help in providing her additional resources.

In relation to Q3 feedback, no such noise was communicated to me, without which I could not take proper corrective actions and my ability to correct upon feedback was evidenced by the EL when he advised me to be more present in meetings, I did so with the time allowed.

As far as reference to the time spent, the situation was also made more challenging by tasks provided to me by the EL which required significant effort which were then ignored without explanation. For instance the EL asked me to go back to each of the 300+ sample and compile a list of all order entry issues noted and then at the end he ignored my work and did not note such control in the Sad simply stating he did not believe was an issue.

PwC_B00000776

I have been employed by PwC LLP since 1999. After 5 years in Italy I worked in San Jose since 2004 and I am currently employed in that office as Senior Manager 7.

The matters that I am reporting in this form are both from direct and indirect evidence. For direct evidence the source is either in the engagement I worked on (and in its work papers) or in meetings and conversations I had with partners in this office, while for indirect matters, I'd also like to report the outlines based on several conversations occurred with other personnel involved in other engagements that reported those matters to me in relation to these audits.

Within the document, items reported in italic are excerpts from written documentation for which I added the source at the beginning of each citation

### *SECTION 1 - Directly observed*

1) Cavium Inc. (2012 – 2014)

I was leading Senior Manager on this public engagement and since the beginning I started to notice episodes involving the audit, the Company's management and how those were documented. After raising each time these episodes to the engagement leader ("EL"), after 3 years of accumulation of episodes, combined with the magnitude of the 2014 events, I decided to advocate the paragraph in our guide that allows professional disagreement within Senior Manager and EL because I was not comfortable with our behavior. The detailed list of episodes summarized below is known to the office and the firm National Office. For 2012 and 2013 none of these events were documented consistently as audit adjustment. Due to my disagreement, 2014 events were documented in the work papers as audit adjustments.

Document shared with Partner, Quality Review Partner ("QRP"), National Office, Risk Management

Source: Written memorandum submitted in February 2015

*2012*

*Q2*

*A Variable Interest Entity ("VIE") was not disclosed to the auditors, its location was not disclosed and management represented that they didn't have control/oversight on the ledgers of this entity. After significant effort from my team, it was discovered that Cavium had access to books and records and the entity was located on the top floor of their building. The trigger to inspect the building was from one agreement that Cavium had with this entity (Xpliant) that stated the address for both companies, and the address was the same for both entities. Although the agreement was included in the list of the many key agreements provided to us, management did not disclose to us the entity or its structure until we found the above mentioned facts and asked them about it. We also found an agreement whereby the Company was directing Research and Development ("R&D") efforts of the VIE which resulted in the VIE being consolidated. Management in that occasion not only did not consider VIE assessment before such contract was found but was also unaware that one of the officials in the Company signed such contract. When brought to the attention of the Audit Committee ("AC") in the quarter of its consolidation, Q3, a member of the AC made the statement that was surprised that we as auditors did not ask to consolidate the entity earlier than when we suggested it (Q3).*

*Q3*

*The Company sold a group of assets to a private Company named Open Silicon for a total of $3.2 million. The Company did not produce any evidence of assessment of collectability though accounted for the full $3.2 million as a receivable. After inquiry the Company was able to produce half page screenshot from Dun & Bradstreet Database after which*

they concurred with our assessment to write off the entire amount of the receivable and recognize the payments on a cash basis.

*2013*

*Q1*

The Company entered into a new building in Massachusetts and did not perform thorough accounting analysis and implication of potential build-to-suit lease. After our significant involvement and heavy assistance a memo was produced by the Company.

*Q2*

The Company sold an initial shipment to Amazon for their new product yet failed to read in the agreement that there was a clause to cancel or return up to 5,000 units. In May the Company signed a revised agreement with the cancellation of such provisions, yet the initial entry and the provision in the agreement were not identified.

The Company did not notify us that they built over $3.9 million of inventory that they were not certain to sell and only upon our procedures and inquiry to the Chief Financial Officer ("CFO") agreed to write off the whole inventory amount.

*Q4*

The VIE issued a convertible security that required complex technical accounting and we also consulted on it. The Company failed to even identify that the security issued was not an ordinary notes payable and accounted for it the identical way as the other instrument and was unable to produce memo or documentation surrounding the instrument nor hired a consultant to perform such evaluation.

*2014*

*Q1*

During the first quarter we noted that the VIE issued over 11 million stock options to its employees during prior year. The Company failed to properly review such minutes and was unaware of such awards.

*Q3*

The Company did not update the tax provision computation for the final book amortization amount (as disclosed in the 10-K) when the late book accounting adjustments were made. As a result, $3M (gross) of book amortization was not reflected in tax provision computation.   Since this late adjustment information was available at time of the filing of the 10 K, the Company concluded that this true up was an error This true up resulted in reclassification between two noncurrent deferred tax assets balances ($1.87 million-tax effected) with no impact to the balance sheet presentation (i.e., net noncurrent deferred tax assets did not change) and only impacted the presentation in the summary of deferred taxes included in the income tax footnote.

Sub part F income- The Company did not record sub-part F income of 1.8M (gross) in the income tax computation for FY 2013. At the time of computation, the Company did not consider additional facts (Indian entity made a check-the-box election effective July 1, 2013) which existed at time of provision and which had an impact on the Subpart F income recognition computation

On October 29 the Controller was victim of a phishing email scam and overrode wire transfer controls to perform a payment of approximately $500,000 to a vendor who did not appear in the Company's list, based upon emails from the Chief Executive Officer (" CEO") and CFO who she thought were genuine. On October 31 morning the Controller became aware the email was fraudulent when notified the CFO for confirmation of payment. The Company filed form 10-Q on October 31 around 10.30 am.

After the filing the Company notified us about the wire transfer error, representing not only in the rep letter but also verbally that they became aware of the issue after the filing. Subsequent procedures proved that the Chief Accounting Officer ("CAO") and Controller and CFO were aware before the filing of the 10-Q. The Company did not perform any investigation at the time and filed the 10-Q 4 days before the last day to file and in open market.

PwC_B00000778

**DX1139-31**

*The CFO represented that the Company was going to tighten up their processes requiring signatures, despite that in the Company's narratives and controls, the references to 2 signatures being required was present since 2012.*

**Year-End**

*The Controller invested $1 million in a 1 year term deposit in Taiwan and upon us inquiring about its classification as cash she mentioned she was not aware that this was a 1 year term deposit and called the bank immediately to cancel the deposit. Both the CAO and the Controller tried to make the position that the subsequent cancellation was sufficient reason to consider the deposit as cash.*

*Upon the morning of the Audit Committee the CAO represented to us in relation to the wire transfer control that as policy the wires were executed but approved and signed only after the facts. Upon inquiry as to why that was an acceptable practice the CAO pointed to the key control for wire approval highlighting the fact that the language of the control did not specify that the wires had to be approved before being processed.*

*During the audit committee private session we reiterated again (almost on a quarterly basis) that the accounting department is sloppy, in need as the Company expands of additional resources. The AC chair asked why the Company cancelled the deposit upon us asking.*

*Several calculation errors were noted by us during review of the income tax provision. The Controller represented in a meeting that there is no sufficient time or resources to perform a tight review in only 2 weeks and the Company has a full valuation allowance. The Company lost their tax director after Q3 and replaced it recently. We had at least 10 Journal entries the Company booked to correct these errors, with out of period and uncorrected misstatement in the deferred balances since 2012.*

*During one of our audit on warranty accrual we became aware that there was a non-written agreement with a key customer (CISCO) to return defective parts well outside normal warranty period, up to 3 or 4 years back, and though the amount appears to be below $150k, the CFO and CAO did not notify us about such verbal agreement. The agreement occurred when the assistant controller was on leave.*

*Furthermore in our asset group assessment the Sec reporting manager memo, reviewed by CAO failed to identify that the Company has only one group rather than two nor analyzed the criteria that define what an asset group is.*

*The controller presented a draft evaluation memo reviewed to assess control implication of the wire transfer control, however the title of the memo and references within also pointed to a tax control, so there was a copy/paste exercise that either was not reviewed before sharing with us or was overlooked as part of their procedures.*

*The CAO also failed to produce documentation on a key estimate regarding inventory costs to calculate the turn for management overhead and continued to assess repeatedly that was consistent with prior year as only source of support.*

*During analysis of the Company inventory write off for $1.6 million occurred in Q4, after repeated question related to the timing of such reserve the CAO produced 2 emails from the Vice President of sales mentioning timing of the decision and their budgeting process, however when requested to share both emails, one related to November timing (post Q filing) and one that was highlighting October (pre Q filing), the CAO only sent the November one.*

**<u>Conclusion</u>**

*In my professional opinion the recurring episodes of lack of communication and in the case of the 10-Q filing, false representation on the timing as to when they became aware raises significant concern about the tone at the top and the ethic of the top level of management, as highlighted by the VIE, The wire transfer, the inventory write off facts noted above.*

*Additionally, based on the facts mentioned above it appears that in presence of one-off transaction the CAO and technical accounting manager do not possess the accounting skill or competence not only to identify unusual terms but also to form on their own or through hiring consultants and well-thought accounting position even on basic items such as collectability assessment for open silicon or knowing that a wire should be reviewed and approved before being processed.*

PwC_B00000779

*The 2014 audit has also 3 deficiencies in the 2 areas the controller is responsible for. Currently the Company's controller is responsible for Tax, Foreign investment, International Payroll, Equity. The deficiency in the wire transfer was rebutted by the Company with a list of all others wires above $500k processed by the Company. The fact that the Company processed all other wires to legitimate vendors does not constitute proof of any legitimacy nor effectiveness of controls, given that the controller override it and there are no compensating controls that caught it to address the safeguarding of assets. Moreover, from the list emerges that the averages size of the wire exceed $2 million which although not proof that such a wire would have been sent to non-Company vendors, represents an indication that a bigger amount might not have been seen as unusual. The Controller also reviewed bank reconciliations for Q3 which seemed to highlight a potential SOD problem as well.*

*The Combination of the above mentioned facts, historical recurring of such episodes and failure in tax and wire controls already in 2012 and repeated now in 2014 would lead to believe that the Company's internal control are materially weak in the areas mentioned above. The full valuation allowance can be considered a mitigating factor although not completely, however the aggregation risk by root cause in the person of the Company's controller appears not to have been adequately compensated.*

*For this reason I propose to issue a material weakness on the skill and competence of the finance department related to areas of income taxes, treasury and technical accounting.*

As a result of this document, National Office decided to document each of the 2014 episodes as audit adjustments and in the work paper of 2014 a document was attached that only included the 2014 events of my claims. 2012 and 2013 were not addressed. During the consultation the conclusion was to consider the outcome only as significant deficiency aggregated; such conclusion was achieved after a control over the tax footnote was documented, however such control was not noted during the walkthrough and constituted a documentation exercise thanks to which the Significant Deficiency conclusion was agreed upon by National; evidence of that is that this control was created the night before the filing of the 10-K. My document was not attached to the work papers.

When I raised my claims I was put under significant pressure by the market assurance leader ("MAL"), and the engagement partners, and I was told that had I pursued this path, most likely I would have never made partner. This quote has been subsequently repeated in other conversations I had after the facts.

As a result of this matter, the engagement leader communicated to the Company that I wanted to give them a material weakness after which the CFO asked for my removal from the engagement, leaving everyone else besides me there, including the controller and every other member of the engagement team. The firm accepted to remove me ignoring my claim that the competence of management would still constitute a significant risk. As additional fact I want to point out that Cavium regularly increases our fees by 3-5% and there were often minimum to no discussion, and in my experience the lack of discussion on fees is unusual and in proportion with other companies of the same size and industry our fees appear unusually high. Also the engagement leader per his own admission knew outside work the CAO and always defended her despite the evidence that challenged her competency. Part of the defense was referring to the statement that in this valley they're all like that and this level of competency is not unusual for companies in this valley.

I still assert that management does not possess sufficient competence especially for non-standard transactions and that as auditors we were drafting and making significant corrections to technical memos. The more clear example occurred in occasion of the technical instrument of the VIE that the Company did not even realize it signed. When I consulted with our National Office, Cavium management asked me to just share with them my memo with National Office so to make it become their memo.

PwC_B00000780

After I refused, my manager told me that the partner asked him if he could print my memo and leave it on a cube so that management could find it. This has also been admitted by the same partner in a written survey that was done anonymously regarding my career, where the details included clearly led to me to identify that episode. What follows is the actual statement the partner wrote in that survey:

Source: Written survey received by me in 2014

> *"Our clients theoretically should do a lot of things and smart things – and in reality they are not always smart. You get used to that in Silicon Valley. As long as I get paid to help any type, we are all good. It is good to have a goal of getting them better, but they don't always react that way. On a client we have a technical thing that came up (very strong technically). We had to go to National Office on a matter that was complex. Mauro wrote a memo and national said was significant. Our client asked for help to do a write up. A Partner would just get to work and write the memo and figure out how to conclude our opinion. Mauro would not give them the memo. His position is that it is not our responsibility to do that. Our National Office said this is complicated – if it is complicated for us, how can we expect this little Company to nail this. Not sure if it is a sign of Mauro's level of maturity. As a partner you have to have the position that you want these guys to like you, you want a good audit and relationship, you'll just do it."*

The Company is now going through an acquisition in 2016, and based on my experience in the years I was there, given there has been no turnover nor additions to management, especially on the area of review controls, where we wrote most of the documentation despite all the evidence that existed was just a signature, I'd like to highlight the concern of competence in dealing with this transaction and what roles the audit team might be playing in this year audit.

   2)   Harmonic Inc. (2015)

I started the Harmonic engagement with the Q3 review in the second half of October. Right after I rolled on Harmonic, I noticed that despite be Mid October, areas normally completed by that time, such as planning, Q1 and Q2 revenue testing (non-stat) was not done and upon planning sign off I notified the EL that rework will have needed to be done on the walkthroughs because there were significant pieces missing (i.e. level of precision of controls).

What follows is the outline of the events occurred on Harmonic, summarized in a document which was shared with the US technology leader.

Source: Written document sent to the Us Technology Leader and HR in March/April 2016

> *During Q3 review I immediately found 5 adjustments related to prior Q, one of which referred to prior year related to restricted cash, to which the CAO reaction was to state in a meeting with me and the EL that "You were ok with this last year, now u say you're not, I don't feel I can trust you anymore".*
>
> *In December, while I was on vacation, I had a call with the Revenue Director asking about how many accounting conventions the Company was using in revenue, and I asked them to quantify the impact of each. The last one mentioned referred to deferred revenue and the Revenue Director stated that such convention has always been there since inception and "for sure the impact was material". I alerted the engagement leader of the matter, who then met the CFO in January 2016.*
>
> *During January before fieldwork start I met with the team and realized that 2014 Audit work papers had significant issues in terms of both coaching, audit documentation and procedures. The team was unable to respond to the findings that emerged during my review of the work papers, so as a result we drafted very detailed work plan and questions to ask to try to remediate the gaps existing.*

PwC_B00000781

*As I was splitting my time with another public job (Gigamon, which was implementing 404 and had 2 Material Weaknesses ("MW") to remediate), my Harmonic team started quickly to notify me that the Company was not delivering items and was doing significant push back, of which I notified the EL. Furthermore there were personal references to me in emails from the Company and in meeting as "new player" by the Company and that I did not know their processes and controls.*

*Also the team notified me that the Company was having key contacts going on leave on a weekly basis. When I notified the EL of the fact we were not receiving items or responses (as demonstrated by the open item lists that was circulated daily), the EL responded that was instead a blessing that we did not have contacts on site that we needed, because they were tired and once back we'd have benefited from it.*

*Furthermore the EL kept referring to the Company and to my team that this was a tough audit, creating the impression that we were performing more than what we should have, while instead we were simply doing an audit. I made very clear to the EL that these comments were undermining our efforts and creating frictions and I made such comment in presence of the QRP who concurred in the meeting that this was not a tough audit, but just an audit.*

*My repeated requests to the EL to talk to the CFO to notify that the Company and the CAO were not assisting and cooperating were not followed timely and when finally the 12b-25 occurred not only the CFO stepped in and each item was delivered in days and the Company asked us questions to clarify on items, but he also asked back the Company's CAO as to how could they not know items we were asking and our questions were fair during an AC.*

*Had the EL escalated much more promptly the issue and the gravity of risking the deadline as I asked, the delays could have been avoided because we would have received answers and documentation on time as proven by the delivery time once the CFO got involved with the urgency I requested much earlier.*

*During year-end we had to essentially perform and ask walkthrough type questions and the Company approach was not to respond to them immediately because often they did not know the answer and at first attempt to push back stating we never asked such questions since we audited them, then to state we were being unreasonable because now was January and kept asking to speak to the EL. As further example of the EL inability to understand the severity of the status and the need to escalate above the CAO with whom he had good relationship, after a meeting where I explained to him the issues and status, as a reply he sent email to the team saying we're trailing in number of steps prepared since last year rather than being responsive of the delays and issues I was stating.*

*Furthermore in status meetings with the Company the EL apologized to the Company for what was happening rather than supporting the effort of the audit and that these questions needed to be answered more timely. At that moment I notified the QRP that the EL not only was not supporting the audit, was resisting in us asking questions and we were at risk of missing the deadline.*

*As further evidence I noticed that the EL was not aware of the basic processes surrounding areas of estimates, including revenue aspects such as system limitation and use of conventions, for which I had to assume the leader role in teaching what an audit was, in teaching my team what taking responsibility and protect the team meant and assuming EL functions in making decisions on technical level highlighted below and training also the EL in basic concept such as when a fixed asset should start to be depreciated, of which I had to provide written evidence to convince him of this concept.*

*During the entire audit I continued to see evidence of lack of proper review and supervision, example on revenue where for instance the 2nd year senior was surprised I reviewed the folder with the contracts versus just asking her if there were any issues. I also tried to constantly remind the team that we were done when we were done and I was admonished by EL and QRP that this was a negative attitude that I should not display.*

*During year-end audit we noted audit adjustments in virtually every line of the financial statements including cash, and none of the issues noted was generated from 2015, but was consequence of behaviors existing since prior years, which was to me evidence that 2014 was not an audit conducted according to professional standards. When I asked the EL why we weren't reopening 2014, I got told "not to go there".*

PwC_B00000782

**DX1139-35**

*I also noted that in my absence the EL was disposing of issues and findings that once I was coming there I had to re-put in the list of adjustments. One example of it was Royalty accrual, where the Company had a "general accrual" unable to substantiate. Only after my pushing back the EL agreed to put the adjustment back in the list.*

This is a short summary of all issues noted by area, documented in the work papers:

Cash – The Company was performing bank reconciliation for foreign banks at an earlier date than the Company's year-end without accounting for the cash

Investments – The Company did not have controls or understanding on the valuation methodology employed by the portfolio managers.

Accounts Receivable – The Company had both generic and specific reserve, and to avoid main accounts to be part of the general reserve, each of the big accounts was provided for specific reserve of $5k/$10k each without that these reserves had any support. Subsequently in Q1 2016 there was an out of period adjustment in this area due to negative balances never properly investigated and monitored

Inventory – The Company did not have proper understanding of the reserve for unowned inventory and could only produce details and breakdown of their balances after 7 weeks of research, evidence such detail was never asked before. Furthermore, the Company never properly monitored the cycle count program which had completeness issues since 2011 and never updated the count program timely, given that Q4 purchases were never counted in 2015, but only in 2016, which is when the next refresh of the cycle count program occurred. In relation to service inventory the Company amortization methodology was not supported for its reasonableness and based on discussion with the EL, it was PwC who came up with such methodology; the method amortized service inventory to P&L based on life cycle of the product, however there were no documentation on the control on how to monitor the useful life nor the fact that if a product never change its life for ½ years, no more charges occurred to P&L until the next change in stage. To audit this we had to develop our own straight line model, which the Company never developed to justify the reasonableness of its estimate, stating simply, was same as prior years. Furthermore for this inventory, the Company currently has no data to assess usage of these parts, which would allow computing a more accurate estimate. Similarly the Company had "general accrual" for inventory which took again weeks to receive details to support them

Warranty – The Company used a convention of 12 months despite most regions and resellers granted period above 12 months. Justification provided was that was same as prior years and the method was never assessed. Evidence of that is a call I Had with the CAO and the EL where the EL asked the CAO how did their warranty estimate worked, evidence we did not even know, and the CAO did not know either.

Fixed Assets – When I inquired as to why they had so many fully depreciated assets still in use, the Company said they never reassessed their depreciation rates, and in a meeting with me senior and the EL, we fed the Company which answer to give us that would have resulted in no issues. After few days we received an email with those exact words and the matter was considered closed.

Accruals – The Company had several unsupported general accruals, the main of which was royalty. When we asked support to the GL personnel, we were told that the Company didn't even know how many contracts they had out there subject to royalty and that the accrual provided seemed reasonable.

Equity – The Company ESPP plan provide for employees to increase and decrease their contribution yet no analysis of impact of modification was provided nor known by the Company.

PwC_B00000783

Revenue – During our test, in one of our samples there were payment terms in Spanish that the Company was unable to articulate its meaning (the terms were prepayment); to my request of expanding the scope to investigate if there were issues on knowledge of foreign orders, the EL discouraged me stating that was just one sample and he wouldn't have known what benefit such test would have resulted in. As part of our test, cut off errors and order entry errors emerged in several samples. When I brought to the attention to the EL, he said that these errors could have been covered by the sales return reserve which could have been used for each of those and re-provided the next quarter, yet such question was never asked to management and we essentially answered on behalf of them. Furthermore, the order entry control failure was removed last minute from the SAD by the EL without any explanation so to this date there are evidence in the work paper that such control should have failed but no evaluation of this control failure in the SAD. Additionally revenue had a list of conventions the biggest of which related to the amortization of deferred revenue, detailed below.

COGS – No stock based compensation was ever accounted as part of the costing, the Company was not even aware of the fact they needed to capitalize it

Controls – No level of precision was known for most controls, especially review controls.

<u>Source: Written document sent to the Us Technology Leader and HR in March/April 2016</u>

*On the technical side I had to step in 3 times to stop the EL from making incorrect auditing calls:*

1) *On the deferred revenue sampling issue the EL accepted the Company approach of haphazard 60 samples, and after my push back that I could not find rationale on this approach he asked the Company to do few more, which resulted in 13 additional. Upon reiteration of my doubts I had to advocate again paragraph of professional disagreement to the EL and QRP because I was not comfortable this approach was adequate. The EL in the meeting warned me that we should be mindful that "important people sit on the board of this Company" and quoted Wells Fargo as one of the account. I reported this comment to the QRP as highly inappropriate and putting pressure on us to close the audit without asking all the questions we'd ask, to which the EL kept referring to "bigger fish to fry". Upon conversation with national it was proven that the EL was not correct and a statistical sample had to be told to the Company.*

2) *On the control assessment, EL, QRP and another Senior Manager ("SM") assigned spent days to work on the identification of flux as compensating control, despite my opposition. For 2 times I provided comments to the memo, yet the EL and SM worked on their own and for 2 times I was put in a call with national where I had to say I could not agree with the conclusion because I was not given any document to review. One objection related to the level of precision of the flux, to which the EL said that if was too low for the error, we could just raise the threshold, adding also that if an error is noted above the threshold does not mean the control has an issue. Such statement was made in presence of me, QRP and SM. National struck down the flux as compensating control corroborating my view. Aside from this I asked specifically to be present when the SM and Partner were asking the Company on the threshold because me and the experienced senior. already witnessed a meeting where the EL fed the Company which answer to give to our question on fully depreciated assets, and I wanted to be sure that the questions were asked in an open form. Without explanation I was not part of the meeting with the CAO.*

3) *On the redaction of the SAD that was presented after EL, QRP, SM and Aux partner agreed, I had to step in because the document missed basic auditing standard concepts, such as documentation of root causes and definition of could factor. Such observations were agreed by the auxiliary partner in a meeting with me on Monday before filing date. At the end no consultation was performed on the SAD and I was told that we could not issue an MW because "we would not have been market competitive" and also that "despite the adjustments were so many they would tend to offset each other signs wise". National itself stated that we generally see MW only in case of restatements or material adjustments, ignoring my claim that "the could" factor had to be assessed.*

PwC_B00000784

**DX1139-37**

After the revenue adjustment was noted, the EL kept saying that it was not an audit adjustment because resulted in the collaboration between auditors and management despite the evidence that it was an audit adjustment given they did not correct it before we noticed it and they were not even aware that the data in their systems were not correct.

When I raised my concerns advocating the Company had a pervasive MW due to lack of competence and number of resources and the fact we had audit findings in virtually every area of the financials, I was given the market competitive rationale. When I showed as example an AC report where the CAO disclosed a simple cash flow matter backwards to the AC, the EL only stated that his predecessor partner thought this CAO was one of the best. I also warned the QRP that he was not fulfilling his role as quality review partner, to which I was told by him that *"yes I've been given this feedback before but when I see a fellow partner in difficulty, I tend to side with him"*.

I just learned from the QRP that the CAO is being replaced this year, 2016. When I communicated to the EL that the QRP on the job (also EL on my other public, Gigamon) we had 2 MW for adjustments below de minimis because of the could factor, the QRP said I could have gone back to Gigamon and *"tell them he was being a bad guy"*.

As a result of the questions and the audit, I compiled the above document and conveyed my concern to my office leadership that the EL was not qualified to remain on that engagement, and the firm decision was to remove me from the engagement, leaving the rest of the team on the job, despite that that is the same team that missed every item in the 2014 audit. Furthermore, negative evaluation on "relationship" was issued in my file and I was not allowed to be on other audit jobs (except Gigamon) from March 2016 until now.

After my departure, in 2016 my replacement manager told me that she knew what I had to go through.

### SECTION 2 – Indirect Evidence and Tone at the Top

1)  Micron Technology (2016) – Independence

During a market team meeting occurred in early 2016, with all level of staff present, it was showed in the slide deck as example of best practices, a picture of the audit team in front of the CEO private jet. The presenter, one of the Senior Manager on the accounts, detailed the picture as example of great relationship with the Company because when the economy Alaska flight was cancelled, in order to allow the PwC team to attend an internal firm party, the CEO took the whole team on his private jet and flew down to San Jose area. In the meeting the QRP was present and he stated was unaware of this occurrence and clearly unhappy about it. This fact in itself would constitute by policy an independence issue both in fact and in appearance which should have been preemptively cleared with our independence office and reported to the audit committee. I do not know if such procedures were performed, I can only report the concern that not only this was highlighted in an all hands meeting but was also sighted as example of good behavior to follow. Thanks to the QRP, he did ask at least the question in the meeting if we followed with independence, however I believe this matter should be investigated to ensure such actions occurred. When I tried to raise the question to Audit Methodology I was told that it wasn't my problem so I shouldn't even raise the question.

2) Bluecoat (2016) - Independence

During the assessment if we could take BlueCoat as audit engagement, we were in communication with our team at BAIN Capital, in charge of the independence given the entity was part of their group at the time. Unbeknownst to the Bain team, we became aware that the VP of Tax of the Company is the wife of one of San Jose Tax Partners. The independence office concluded that PwC was independent and could audit Bluecoat despite that executive and its relationship, provided the audit partner would relocate to San Francisco, less than 1 hour from San Jose and most of the audit team was from that office.

I discussed my concern that how can the independence rule circumvented so easily in form by just opening or relocating someone less than 1 hour from the office and we become suddenly independent, to which I was replied that the independence rules are too strict and it was actually a sensible conclusion.


3) Spansion (2014)

In conversation with one of the managers on the account, he reported to me the poor status of documentation and understanding in our work papers and as example he pointed out to me that in the Journal entry memo documented in our work paper, a control was added to justify there was no control gap in that area, however he mentioned that in discussing with the senior such control was non existing, proved by the fact that in the memo each other control was linked to the related work paper while that control had no links and there was no other evidence within the work papers of its existence.


4) Avago/Broadcom (2014 – 2016)

I had several conversations over the years with managers of that engagement team. The issues reported to me started in conjunction with the LSI acquisition. As part of the purchase price accounting, the ex tax director and audit manager told me about significant adjustments required to the deferred taxes balances of LSI because they were never properly audited. Despite this finding, no quality or repercussions or actions were taken and the ex Senior manager of LSI even became the leading Senior Manager of the combined entity. In conjunction with that conversation, the same tax director expressed concerns on our independence on the account due to the fact that PwC performed the valuation of the shares value needed to support a tax balance. He even added that asked via email to the EL how was this allowed under independence and he did not receive conclusive answer to such question. Furthermore he expressed concerns as to the level of competence of the tax personnel at the Company and commented that we did not want to raise too much the point because we were also selling them significant tax advisory projects.

PwC_B00000786

When the senior manager resigned, and I asked to come on board, the then leading manager told me I'd have never been on the account because I'd have found too many things I would not have passed on. Later that year (2015) the manager who became leading manager resigned as well and in 4 months joined the Company. Based on conversations with the current manager, I was told that the role of the hired ex-leading manager was that of a financial analyst to avoid to incur in the cool off period independence rule, despite that such person had involvement in the audit. Furthermore, the current manager conveyed to me that the Company has made several acquisitions, has constantly grown significantly in size and everyone in the team knows that the Finance team is inadequate in size to support the Company current dimension but we don't want to say it to avoid to lose the account. Furthermore, the manager also reported to me that the Company especially for smaller acquisitions as example is not producing real documentation and that most of the Company's documentation on review controls is actually substantially made by the audit team.

    5)  Innovium (2016)

As example of AICPA audits, the same manager I talked to above, reported to me that the EL of the Broadcom account gave him also this start up to audit under AICPA. He reported to me that the CFO told him that "same as always" we would be the one computing the amount of stock based compensation for the Company to book because he had no idea. When I asked why he didn't report what is a violation of independence, he told me he didn't want to be the one to speak up given everyone is doing the same.

    6)  Tone at the top

In addition to those specific example reported, I'd like also to highlight as general tone at the top, other observations I had on the tone from leadership in the San Jose office.

During a recent manager retreat the Market assurance leader ("MAL") showed to us the priority we had to focus on. Quality was not mentioned in the slides and once the MAL realized that, he verbally added at the end that of course quality was also a priority. I was curious about that comment and I asked Audit Methodology why was mentioned that way, to which I was told that in order to show to the PCAOB that we always have quality as value, if was omitted by the slides, would have been sufficient to mention it verbally in the meeting to comply with the requirement. Additionally few partners I had conversations with told me that because PCAOB looks at their development plan, they've been cautioned not to write in there concepts around profitability or selling additional services to avoid to raise questions from the regulators, though factually that is still the priority, being San Jose at the bottom of the profitability chart in the US.

In fact, after the PCAOB enforced the notion of quality, the firm has made concerted effort to ensure the topic is mentioned in slides and material, to reinforce the word itself in our trainings. Conversely though, the firm is also continue to refer as Company's management as "client", reinforcing in my opinion, especially to the younger resources, that rather than being the object of our work, they're the ones whom we need to please, hence jeopardizing the independence that as a profession we should maintain. Evidence of this was told to me in my conversations to the MAL during the Harmonic events, when I was told that again "*we had to be market competitive and we can't issue MW when the other 3*

*aren't, otherwise we wouldn't be in business and that if we were to issue MW when we should, virtually most companies in the Valley and most private start-ups should have material weaknesses in the control opinions".*

An additional point I want to raise on quality is that during PCAOB inspections, in the kick off meeting, our internal policy is that the partner should be the only one who speaks, to demonstrate his involvement and understanding of the engagement. The fact that may not be known is that this fact occurs only after the team prints binders and walk the partner through for 2/3 weeks before the PCAOB comes, to teach him about processes and controls of the engagement, proof that the involvement that is believed by the regulators to occur, happens only once there is an inspection and the actual knowledge is mostly happening prior to the inspectors coming, rather than during the engagement. I've observed that happening during the internal inspections I was subject to and based on conversations with teams being inspected. Furthermore, currently our internal policy is that each partner is internally inspected every 3 years (now just raised to 4), however what our internal controls are missing is that leading managers are not regularly subject to inspections, so there can be cases of managers inspected every year, depending which partner they work with, and others never subject to inspection. I highlighted the need for our control to cover this because in each audit job the manager is the final and sole reviewer of ¾ or so of each audit step, yet despite my repeated requests no action was taken by leadership.

After the loss of Logitech for independence reasons, I questioned why the EL in the year before, which was investigated, and the QRP of that job are now respectively in National Office in Audit Methodology and in Risk Management, to which I never received an answer.

During a recent conversation with a National Office partner, I asked if Silicon Valley alone had such low quality in finance department, to which he stated that if we were to charge all we do for companies here our fees would have to be significantly higher because in this valley we do way more than is normally done in the rest of the country.

At a training last month on how to better document review controls on business combinations, one of the attendees, a sector leader, mentioned that *"we know that factually we have to manufacture most of the documentation because client don't have it or don't know how to do it or don't want to spend the money to do it"*. I was approached by a manager after the training surprised not about the assertion, but that it was stated so clearly and in those terms in such a venue.

Lastly, as further example that happens frequently in audit engagements here, is that auditors do become part of the Company's internal controls because they review and identify errors before the control occurs, so that such errors are fixed, not identified as audit adjustments and they cannot be evaluated for control implications because the documents provided were still "in draft". This has occurred for example right now during a Q review at Gigamon where significant items were missed by the tax provider in the deferred tax schedule, but the Company replied that the document was still in draft so this cannot constitute control deficiency.

Confidential

Also, in relation to our advisory group, where our role is to work with management, I was told that if we spot an area that we deem to be an error, it our job to report it to management but then is not up to us to ensure such errors are corrected. To my claim that what if management doesn't want to fix it and auditors don't spot it, how could we allow errors to exist, I was told is not part of our terms of engagement. I find difficult to reconcile that notion with the ethical standards that we're bound to even when we serve in advisory capacity.

Finally, as further example of the tone occurring in this office, I'd like to list additional statements contained in my performance survey issued by a pool of partners in San Jose:

<u>Source: Written survey received by me in 2014</u>

*"Mauro needs to understand and operate within the established system"*

*"Mauro does not trust any of his clients. It is great to have the skepticism, but as partner or senior manager, you have to know when to crank it down and just listen and get the job done"*

*"Mauro liked to refute things that people come up to him. His core personality is being a really good auditor, but that doesn't mean you can be a really good partner"*

*"Adapt – learn how to deal with client. Rise above it so he can become a trusted advisor to the client. The auditing profession in Italy is different. The client doesn't say no to us. If he were really responsible for bringing in the revenue and keeping clients, as partners are, he would have to adapt fast".*

*"The one thing he needs to get his clients out of trouble"*

PwC_B00000789

**Closing statement**

Based on the tone at the top conversations and evidence above, I deem that the auditing function in this valley, due to the general low level of competence of finance departments (even when composed by early hired ex big-4) has turned into a factual advisory position where independence is subordinated to maintain revenue and management happy to avoid to raise too many issues on the control side; the numbers are being corrected, but the public is deprived of an objective control opinion on the competence and quality of the accounting department of those companies that we are required to evaluate. The fact that in my last engagements I raised significant number of issues and I was removed from those jobs, while no repercussion on the teams that missed the issues before me was done, and that leadership refused to look for instance to 2014 work paper of harmonic despite the concern the audit was non GAAS, raised the concern that there is not a willingness to try to change a system that has developed and has impacted our profession in this office. Many qualified accountants leave because they say they're "tired to write stories" in reference to the amount of documentation that we write on controls. In several conversations with staff, when I asked why no one speaks up, the answer is always the same, fear of repercussion from a career perspective; given the example that I represent, where my career has been halted because I spoke up, and the fact that to become partner you need the support of those that you'd be supposed to speak up against, this firm has created an environment where it is not safe and certainly counterproductive to speak up on those matters. I do not believe the role of an auditor is to act as defense attorney of management nor to find in every way possible how to avoid to issue them a material weakness, but simply to apply the rules that we are required to operate in maintaining its independence, however the practice seems to suggest that that is not what an auditor is required to do in this valley, as noted by the partners themselves in the statements given to me by their survey.

The situation appeared not to be any better when we audit under AICPA standards, most start-ups do not possess the knowledge to account and document the complex equity transactions that they engage in, and by the existing rules, they should be noted as material weaknesses in their controls, yet such opinions are issued seldom.

Based on my experience, conversations with current and former employees and the evidence noted above, I'd like to recommend to the SEC to have an enforcement team to inspect a sample of audit jobs in the silicon valley office by conducting subpoena of original Company control documents to then compare them with what is documented in the audit work papers and to also conduct independent interviews to really assess the competence of most of the finance department key figures within such companies and assess if it was possible for such people to produce the documentation claimed to be done by them. This would provide additional evidence to the ones listed above regarding my personal concern regarding the risk of collusion between auditors and management in this valley, aimed to maintain a successful relationship based on a simple exchange, with management paying us the fees and auditors picking and choosing what to call an audit issue to avoid to upset the very same management that we are supposed to audit by issuing harsher control opinions, knowing that Silicon Valley is an extremely closed valley where most finance personnel tends to move around frequently among companies. By documenting that a finding is noted by management or that management is the author of their documentation in the work papers would never allow PCAOB inspector to realize that such findings were instead audit adjustments or fundamentally auditor-written memos, because is not part of the inspector mandate to subpoena original Company documents.

Confidential

History of Events – Employment matter

I started in San Jose in 2004

Consistently rated 2 up to 2013 (scale of 1 to 5 where 1 is the top rating). For 2014 and 2015 I was rated 1.

In 2014 performance year I was asked by the team leader of my office to upload a form in my file where I was deemed the manager accountable for a non-gaas audit finding in a peer review. The request came because the team leader compiled the related inspection form wrongly and by the time it got to my attention was already being sent to the national office. When I raise the point that it was not fair to have in my file something I did not have responsibility for, I was told that the form would not have had any impact on my 2014 rating and it was not "worth the political capital" to fight it.

As a result of the form I also had to submit another form where I had to list actions I had to take to remediate the quality issues that caused the finding in the peer review inspection.

During February 2014 on my public account I advocated paragraph of our guide to express disagreement with my partner on what was our professional judgement on the engagement where I was working on. I presented a summary (attachment B) of my findings involving past 3 years, and the consultation that followed awarded me the point that hadn't we consulted we'd have violated firm policies. Also, I challenged the opinion on internal controls which was able to be issued thanks to me creating a control the day before the filing of the form 10-K which was never documented nor discussed with the Company. When I disagreed with the partner, I told him that by doing this I was probably jeopardizing my chances to be partner. Despite our policy that foresee that we're encouraged to speak up, to this date that partner reminds me of my statement to state that that action did have consequences for my career.

As a result of that consultation I was professionally damaged because the partner lied to the company because instead of telling them we were risking to miss the filing to perform a required consultation, he instead said to them that I wanted to give them a material weakness. As a result the CFO asked for my removal from the engagement despite I was the one that avoided them the material weakness and found most of the issues and the firm agreed. In a meeting with my coach and the market assurance leader I was ensured once again that this episode as well would not have penalized me.

In May 2014 as part of the firm path for my growth, the executive coach assigned to me commissioned an anonymous survey to a group of partners with questions about me and feedback they had on me, in order to receive specifics on how to progress to partner, because up to that point I constantly received generic feedback such as "being black and white" and that "I caused noise in the system" and my repeated request for specific examples were unfulfilled.

Upon receipt of the survey (Attachment A) I read comments that referred to partnership as club and references to my national origin. As a result of the survey I presented my resignations, then retracted after discussion with the market assurance leader of the office that stated that there was a path for partner for me as well, but it'd have taken time to remediate the perception and the noise despite the policy of PwC states each year should be considered on its own, without carryforward effects. Also none of the feedback in the survey ever appeared in my written evaluations, which is to me evidence that for partnership admission there is a parallel process not documented nor accountable. In discussion with

my coach, he referred to the partnership process as a political campaign. Also, the executive coach responsible for the survey was criticized by the market assurance leader because the partners did not like the fact that I received their actual answers rather than a filtered summary of it.

In 2015 I was assigned on top of my regular public, an IPO and another public with same year-end of my other one, 12/31 and I reported to the op leader that with so many engagements was not possible to guarantee quality. In 2015 again I was rated 1 but yet again lack of specifics and reference to noise continued to be provided as feedback as to why my path to partner was going to be difficult.

The op leader agreed to roll me off the ipo and maintain only 2 publics.

The year-end audit of the second public denoted multiple issues and as a result the partner not only issued an evaluation that contained gross inaccuracies (Attachment D), but he also lied to the Company as to the circumstances of my departure, stating to them and my team that I had other projects while instead I didn't.

When I complained about the evaluation, HR called ethics hotline to open an investigation, and despite my request in the initial call that I was ready to provide evidence, the ethics office did not request nor kept me informed of what was needed and after only a week they stated that they interviewed lot of people and there was no ground for retaliation. However not only they agreed the feedback was that I was a very good auditor but also notified me that the partner would not be allowed to sit in my evaluation meeting for this year.

As a result I compiled a summary of the events with few examples that occurred as part of what happened in the second public company (Attachment C)

Additionally I reported that despite the false statement issued by the partner to the company and to my team as to why I was rolled off, I also got told by the market assurance leader that because of what happened I was difficult to staff. Ethics hotline, despite I still do not have other jobs and only 1 public, spoke to the market assurance leader who said that he did not say such things, and decided to believe him and closed the investigation and mentioned that the reason for my not staffing on such job was due to "business reasons" never explained nor disclosed even to date. Factually 2 jobs quite important have been staffed by people more junior than me and one of which by a junior senior manager not even in my same industry.

Based on several conversations with ex-team member of one of those jobs, they told me that if I would go there we would likely lose the account because of what issues I could find that I would not be willing to document as non-issues.

I was told that such evaluation on this public will impact my rating, and given that to be considered for partner you need to have 1 rating for 3 consecutive years, this would cause significant damage to my professional career, on top of the lack of professional opportunities that I am being denied because of what occurred this year and still lack of example and specific events that would support the gossip/reputational feedback I keep getting. Given the new format of evaluation in PwC, based on verbal feedback and not written, assuming feedback occurs in conversations only, the only evidence of my performance and track record is visible in the graphic representation at the bottom of my other jobs which show a much different picture (attachment D). Even HR stated that this evaluation is quite out of the ordinary and uncharacteristic of my file.

History of Events – SEC matter

As noted above, in 2014 I started noticing signs of a concerning trend involving partners at this firm in my public engagement A

After the episodes narrated above, I started having discussions about our conduct on internal control opinion and I was told that probably many company in our portfolio should have a material weakness opinion, but if we're the only one to do so we'd be out of business.

The other trend that emerged is that our documentation inflates the activities and competence that company A had with the result that upon inspection, it would not be possible for inspectors to actually realize the level of competence and the number of audit adjustments issued in that audit, which were documented as "management findings" which do not need to be evaluated for control implications.

On most non-public jobs we prepare financial statements and assist management with entries that they cannot prepare, and by auditing standard this could constitute a material weakness in their controls within the finance department, yet very few and mostly those that are close to go IPO present such opinion.

Additionally as further concern to the tone at the top in the silicon valley office, when talking to a manager of another public company, he mentioned that he personally saw a critical memo including a control that did not exist, but that was documented to avoid to have to evaluate a significant control gap. The manager even reported that the memo had all the other controls with links to our documentation, except that single key control which was not linked to anything.

I also several conversations with the team of another public company, C, which involved possible independence violations, first when we performed the valuation of shares for tax purposes, who we then audited (for independence we should not audit our own work), but such company one year later hired the leading manager of the audit team before the cool-off period expired. To go around the independence requirement such company hired the resource by giving him a title that did not seem to belong to the finance department, yet factually such resource had significant involvement during the audit, constituting a possible independence violation. This is the same company where previous managers reported to me that we were being very lenient and for instance there were issues of understaffing that "everyone knows" but no one brings up for concern to lose the account.

The concerns continued with the behavior observed also in Company D, reported in the employment matter above, where the partner referenced to the fact that we should be careful not to be disruptive of

PwC_B00000793

the market by being the only firm to issue material weaknesses and we'd be mindful of who were the board member of the company.

The fact that even in trainings the firm refers to the management of the company as "client", led me to the concern that the audit firm in this office has now institutionalized a tone at the top that validates a significant conflict of interest:

The concern I have to which the 4 companies above are examples, is that auditors are paid by management, and in order to keep the account (because each partner is obviously rewarded based on how he managed its portfolio) we arbitrarily describe in our workpapers what should be audit findings as management findings to avoid to have to evaluate the control implications. Furthermore, the fact that companies often hire ex auditors in their finance department before they possess the level of skills needed, results in auditors having to fix items that should not be part of our job (i.e. most financial statements should be audited once management reviews them yet the auditor review and comment on them while they're still in draft form, voiding the possibility to assess management competency). Lastly, given that as shown above to make partner you need to support and not speak up to the leaders or criticize them, it is very common for peers and managers, as emerged in a myriad of day to day conversations, that there is a trend to also sign off or not sign off steps that are deemed not completely correct because in any case is "partner responsibility" and because you "need to keep your head down" if you want to progress.

I'd like to recommend to the SEC to have an enforcement team to inspect a sample of audit jobs in the silicon valley office by conducting subpoena of original company control documents to then compare them with what is documented in the audit workpapers and to also conduct independent interviews to really assess the competence of most of the finance department key figures within such companies. This would hopefully achieve to expose the collusion between partners and management aimed to maintain a successful relationship of management paying us the fees and auditors picking and choosing what to call an audit issue to avoid to upset the very same management that are supposed to audit. Again, by documenting that a finding is noted by management in the workpapers would never allow an inspector to realize that such findings were instead audit adjustments, because is not part of the inspector mandate to subpoena original company documents. An additional example of what I reported is also noticeable in the survey attached in attachment A when a partner wanted to print an audit memo and randomly leaving it on a cube so that management would find it and copy it and make it their own workpaper, rather than noticing the issue that management didn't have the competence to prepare rationale for their position.

Furthermore I'd like the SEC to sanction the firm for a flaw in its quality control program. Currently the firm inspect every partner once every 3 years, however a partner reviews only 25% of each step in an audit, while currently there is no program that regularly inspect the leading manager of the jobs, who are inspected only if they work for the partner who is inspected during that cycle. This has caused extreme disparity in quality control check of the managers (who reviews the remaining 75% of an audit) whereby some are reviewed each year, while others are never inspected or only once every few years.

I raised the concerns of tone at the top to my market assurance leader who in response said he would have escalated them, but to date no action nor response has been provided.

Confidential

History of Events – SEC matter

In 2014 I started noticing signs of a concerning trend involving partners at this firm in my public engagement A. During February 2014 on my public account I advocated paragraph of our guide to express disagreement with my partner on what was our professional judgement on the engagement where I was working on. I presented a summary of my findings involving past 3 years, and the consultation that followed awarded me the point that hadn't we consulted we'd have violated firm policies. Also, I challenged the opinion on internal controls which was able to be issued thanks to me creating a control the day before the filing of the form 10-K which was never documented nor discussed with the Company.

After the episodes narrated above, I started having discussions about our conduct on internal control opinion and I was told that probably many company in our portfolio should have a material weakness opinion, but if we're the only one to do so we'd be out of business.

The other trend that emerged is that our documentation inflates the activities and competence that company A had with the result that upon inspection, it would not be possible for inspectors to actually realize the level of competence and the number of audit adjustments issued in that audit, which were documented as "management findings" which do not need to be evaluated for control implications.

On most non-public jobs we prepare financial statements and assist management with entries that they cannot prepare, and by auditing standard this could constitute a material weakness in their controls within the finance department, yet very few and mostly those that are close to go IPO present such opinion.

Additionally as further concern to the tone at the top in the silicon valley office, when talking to a manager of another public company B, he mentioned that he personally saw a critical memo including a control that did not exist, but that was documented to avoid to have to evaluate a significant control gap. The manager even reported that the memo had all the other controls with links to our documentation, except that single key control which was not linked to anything.

I also several conversations with the team of another public company, C, which involved possible independence violations, first when we performed the valuation of shares for tax purposes, who we then audited (for independence we should not audit our own work), but such company one year later hired the leading manager of the audit team before the cool-off period expired. To go around the independence requirement such company hired the resource by giving him a title that did not seem to belong to the finance department, yet factually such resource had significant involvement during the audit, constituting a possible independence violation. Additionally the independence policy foresees in this case that "a PwC partner not involved in the engagement must review the first annual audit in which the former PwC partner or practice staff member is involved at the audit client to determine whether the engagement team maintained the appropriate level of skepticism when evaluating the representations and work of the former PwC partner or practice staff member". This is the same company where previous managers reported to me that we were being very lenient and for instance there were issues of understaffing that "everyone knows" but no one brings up for concern to lose the account.

Confidential

The concerns continued with the behavior observed also in Company D, where the partner referenced to the fact that we should be careful not to be disruptive of the market by being the only firm to issue material weaknesses and we'd be mindful of who were the board member of the company. The year-end audit of the this public company denoted multiple issues and as a result of lack of of inaccurate auditing procedures occurred in previous years.

Lastly, on another public Company, E, in an internal all hands training, it was advertised as example of good relationship, the fact that the audit team after missing their coach flight, accepted to fly with the CFO private jet back to San Jose to attend the firm internal party, despite this would constitute an independence violation both in fact and in appearance.

The fact that even in trainings the firm refers to the management of the company as "client", led me to the concern that the audit firm in this office has now institutionalized a tone at the top that validates a significant conflict of interest.

The concern I have to which the 4 companies above are examples, is that auditors are paid by management, and in order to keep the account (because each partner is obviously rewarded based on how he managed its portfolio) we arbitrarily describe in our workpapers what should be audit findings as management findings to avoid to have to evaluate the control implications. Furthermore, the fact that companies often hire ex auditors in their finance department before they possess the level of skills needed, results in auditors having to fix items that should not be part of our job (i.e. most financial statements should be audited once management reviews them yet the auditor review and comment on them while they're still in draft form, voiding the possibility to assess management competency). Lastly, given that as shown above to make partner you need to support and not speak up to the leaders or criticize them, it is very common for peers and managers, as emerged in a myriad of day to day conversations, that there is a trend to also sign off or not sign off steps that are deemed not completely correct because in any case is "partner responsibility" and because you "need to keep your head down" if you want to progress.

I'd like to recommend to the SEC to have an enforcement team to inspect a sample of audit jobs in the silicon valley office by conducting subpoena of original company control documents to then compare them with what is documented in the audit workpapers and to also conduct independent interviews to really assess the competence of most of the finance department key figures within such companies. This would hopefully achieve to expose the collusion between partners and management aimed to maintain a successful relationship of management paying us the fees and auditors picking and choosing what to call an audit issue to avoid to upset the very same management that are supposed to audit. Again, by documenting that a finding is noted by management in the workpapers would never allow an inspector to realize that such findings were instead audit adjustments, because is not part of the inspector mandate to subpoena original company documents. An additional example of what I reported is also noticeable in the survey attached in attachment A when a partner wanted to print an audit memo and randomly leaving it on a cube so that management would find it and copy it and make it their own workpaper, rather than noticing the issue that management didn't have the competence to prepare rationale for their position.

Furthermore I'd like the SEC to sanction the firm for a flaw in its quality control program. Currently the firm inspect every partner once every 3 years, however a partner reviews only 25% of each step in an audit, while currently there is no program that regularly inspect the leading manager of the jobs, who

are inspected only if they work for the partner who is inspected during that cycle. This has caused extreme disparity in quality control check of the managers (who reviews the remaining 75% of an audit) whereby some are reviewed each year, while others are never inspected or only once every few years.

I raised the concerns of tone at the top to my market assurance leader who in response said he would have escalated them, but to date after 3 months no action nor response has been provided.

nice girl? - Stack, Tone, Durbin
Fantastic Beasts and where to find them - Redmayne, Farrell, Depp
Lady be Good - Young
Honolulu - Young
Captive City - Forsyhte




3526 + independence memo
national memo, 3023 memo final


https://pwc.condecosoftware.com/FuncLinks/master.asp

GLOBAL ENTRY - Passengers

5582568186

US-US_SJ Assurance Market Teams

SJ RA Managers & Above

Daltanious$1 - Passport

Zeratul$1 - Paypal

Defiant$1 comcast

Regula$2 Ebay

Zeratul$1 Linkedin

Christian mingle - Wgenzol - kaawsdlg

gmail - Wgenzo$12


recgonize rev. step : 2 models {over time and point in time} Service - ratable/T&M.
std gives criteria, start with over time, if fail then u go point in time
over time if u have one of the 3:
1} benefit is deliv and cosnumed over time
2} if build asset that has no lalternative use (custom) and right to payment u recognize
as u build asset.

if asset is an iphone - i cant sell them to anyone else.

PwC_B00000798

**DX1139-51**

EKtagon111@yahoo.com
Defiant$1

Measure currency local to functional USD then historical for non-monetary
if functional is local then translate all and OCI and CTA

pw 884546

Passport: NCC1701A1701

Ebay: Beralios$1

How do I sign up for Reservationless Conferencing?
Call AT&T at 1-800-846-7959 (within the US) or 205-206-2324 (outside the US) and tell
the specialist that you want to sign up for PwC Reservationless Conferencing under the
PwC Branded Reservationless platform. Have the following information ready for the
specialist:

Name
GUID (Global User ID) e.g., jsmith001
Office telephone number
Mailing address (your wallet card will be sent here)
E-mail address
Fax number

PwC_B00000799

**DX1139-52**

## CONNOR GROUP
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

As a condition of my employment with Connor Group, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Connor Group At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

1. **AT-WILL EMPLOYMENT**

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF CONNOR GROUP. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2. **CONFIDENTIALITY**

A. *Definition of Confidential Information.* I understand that "**Company Confidential Information**" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii) becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or

Connor Group - CA Form At-Will Employment, Confidential Information, etc. Argeement_(palib1_6476116_1)

(iii) is in my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of Connor Group (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, Connor Group retains all Confidential Information as the sole property of Connor Group. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 2.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("**Associated Third Parties**"), their confidential or proprietary information ("**Associated Third Party Confidential Information**") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and

Confidential

PwC_B00000801

Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

3.   OWNERSHIP

A.   *Assignment of Inventions.* As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 3.G** below (collectively, "**Inventions**"), are the sole property of Connor Group. I also agree to promptly make full written disclosure to Connor Group of any Inventions, and to deliver and assign and hereby irrevocably assign fully to Connor Group all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to Connor Group of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.   *Pre-Existing Materials.* I will inform Connor Group in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including, without limitation, any such inventions that are subject to California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>) ("**Prior Inventions**") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without Connor Group's prior written permission. I have attached hereto as <u>Exhibit A</u>, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on <u>Exhibit A</u>, they will not materially affect my ability to perform all obligations under this Agreement.

Page 3 of 17

Confidential

PwC_B00000802

C. *Moral Rights.* Any assignment to Connor Group of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records.* I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of Connor Group at all times.

E. *Further Assurances.* I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 3.E** shall continue after the termination of this Agreement.

F. *Attorney-in-Fact.* I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to Connor Group in **Section 3.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF INVENTIONS (AS DEFINED UNDER **SECTION 3.A** ABOVE) TO CONNOR GROUP DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED HERETO AS **EXHIBIT B**). I WILL ADVISE CONNOR GROUP PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON <u>EXHIBIT A</u> TO PERMIT A DETERMINATION OF OWNERSHIP BY THE COMPANY. ANY SUCH DISCLOSURE WILL BE RECEIVED IN CONFIDENCE.

Confidential                                                                           PwC_B00000803

**DX1139-56**

4.   **CONFLICTING OBLIGATIONS**

A.   *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B.   *Prior Relationships.* Without limiting **Section 4.A**, I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

5.   **RETURN OF COMPANY MATERIALS**

A.   *Definition of Electronic Media Equipment and Electronic Media Systems.* I understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for my use directly by the company or by third-party providers on behalf of the company.

B.   *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to Connor Group, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of

Page 5 of 17

the foregoing items, including, without limitation, those records maintained pursuant to **Section 3.D**.

      C.  *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

      D.  *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

      E.  *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an audit to confirm my compliance with this **Section 5**, and I will certify in writing that I have complied with the requirements of this **Section 5**.

### 6.  TERMINATION CERTIFICATION

      Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as <u>Exhibit C</u>. I also agree to keep Connor Group advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

### 7.  NOTIFICATION OF NEW EMPLOYER

      In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

Confidential

PwC_B00000805

8.   **SOLICITATION OF EMPLOYEES**

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this **Section 8** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 2**.

9.   **CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as <u>Exhibit D</u> hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

10.   **REPRESENTATIONS**

Without limiting my obligations under **Section 3.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

11.   **AUDIT**

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and

Confidential

PwC_B00000806

**DX1139-59**

delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

## 12. <u>ARBITRATION AND EQUITABLE RELIEF</u>

A. *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT OR RELATIONSHIP WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT OR RELATIONSHIP WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND PURSUANT TO THE ARBITRATION PROVISIONS SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 1280 THROUGH 1294.2 (THE "CCP ACT") AND CALIFORNIA LAW, AND SHALL BE BROUGHT IN MY INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF, REPRESENTATIVE OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING. NOTWITHSTANDING THE FOREGOING, I UNDERSTAND THAT I MAY BRING A PROCEEDING AS A PRIVATE ATTORNEY GENERAL AS PERMITTED BY LAW. FOR THE AVOIDANCE OF DOUBT, THE FEDERAL ARBITRATION ACT GOVERNS THIS AGREEMENT AND SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE CCP ACT AND CALIFORNIA LAW. **I AGREE TO ARBITRATE ANY AND ALL COMMON LAW AND/OR STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS RELATING TO EMPLOYMENT STATUS, CLASSIFICATION AND RELATIONSHIP WITH THE COMPANY, AND CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION, AND BREACH OF CONTRACT, EXCEPT AS PROHIBITED BY LAW. I ALSO AGREE TO ARBITRATE ANY AND ALL DISPUTES ARISING OUT OF OR RELATING TO THE INTERPRETATION OR APPLICATION OF THIS**

Page 8 of 17

Confidential

PwC_B00000807

**AGREEMENT TO ARBITRATE, BUT NOT DISPUTES ABOUT THE ENFORCEABILITY, REVOCABILITY OR VALIDITY OF THIS AGREEMENT TO ARBITRATE OR ANY PORTION HEREOF. WITH RESPECT TO ALL SUCH CLAIMS AND DISPUTES THAT I AGREE TO ARBITRATE, I HEREBY EXPRESSLY AGREE TO WAIVE, AND DO WAIVE, ANY RIGHT TO A TRIAL BY JURY. NOTWITHSTANDING THE FOREGOING, I UNDERSTAND THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF MY RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.** I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("**JAMS**"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE "**JAMS RULES**"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS <u>EXHIBIT E</u>. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, AND MOTIONS TO DISMISS AND DEMURRERS, APPLYING THE STANDARDS SET FORTH UNDER THE CALIFORNIA CODE OF CIVIL PROCEDURE. I AGREE THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, WHERE PROVIDED BY APPLICABLE LAW. I AGREE THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE AND THE CALIFORNIA EVIDENCE CODE, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN SANTA CLARA COUNTY, CALIFORNIA.

C. *Remedy.* EXCEPT AS PROVIDED BY THE CCP ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE CCP ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE OR PARTICIPATE IN COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

Confidential

PwC_B00000808

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I ACKNOWLEDGE AND AGREE THAT I HAVE RECEIVED A COPY OF THE TEXT OF CALIFORNIA LABOR CODE SECTION 2870 IN <u>EXHIBIT B</u>. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL*. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

13. <u>MISCELLANEOUS</u>

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California without regard to California's conflicts of law rules that may result in the application of the laws of any jurisdiction other than California. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in California for any lawsuit filed against me by the Company.

B. *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, Connor Group may assign this Agreement and its rights and obligations under this Agreement to any entity under its common control or successor to all or substantially all of Connor Group's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C. *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

Confidential

PwC_B00000809

D.   *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.   *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.   *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of Connor Group and me. Waiver by Connor Group of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: _____        _____
                                                Signature


                                                _____
                                                Name of Employee (typed or printed)

Witness:


_____
Signature


_____
Name (typed or printed)

Page 11 of 17

Confidential                                           PwC_B00000810

**DX1139-63**

## EXHIBIT A

### LIST OF PRIOR INVENTIONS
### AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

\_\_\_ No inventions or improvements

\_\_\_ Additional Sheets Attached

Date: _____

_____
Signature

_____
Name of Employee (typed or printed)

Confidential

PwC_B00000811

**DX1139-64**

## EXHIBIT B

### CALIFORNIA LABOR CODE SECTION 2870
### INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

"(a)      Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)      Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)      Result from any work performed by the employee for the employer.

(b)      To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

Page 13 of 17

Confidential

PwC_B00000812

## EXHIBIT C

## CONNOR GROUP TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to Connor Group, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me (solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 2** (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by _____ in the position of _____.

Date: _____       _____

                                               Signature

                                               _____

                                               Name of Employee (typed or printed)

Address for Notifications:                     _____

                                               _____

Page 14 of 17

Confidential                                               PwC_B00000813

**EXHIBIT D**

**CONNOR GROUP CONFLICT OF INTEREST GUIDELINES**

It is the policy of Connor Group to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees, and independent contractors must avoid activities that are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations that must be avoided:

1.    Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.    Accepting or offering substantial gifts, excessive entertainment, favors, or payments that may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.    Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.    Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.    Initiating or approving any form of personal or social harassment of employees.

6.    Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.    Borrowing from or lending to employees, customers, or suppliers.

8.    Acquiring real estate of interest to the Company.

9.    Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.    Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11.    Making any unlawful agreement with distributors with respect to prices.

12.    Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning. I understand that nothing in this Agreement is intended to limit employees'

Page 15 of 17

rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

Page 16 of 17

Confidential

PwC_B00000815

**DX1139-68**

[**EXHIBIT E**

**JUDICIAL ARBITRATION & MEDIATION SERVICES, INC.**

**EMPLOYMENT ARBITRATION RULES & PROCEDURES]**

[NOTE: SEE SECTION 13.B.]

[RULES AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/]

Page 17 of 17

Confidential

PwC_B00000816



| UnitedHealthcare Medical - Employee Contributions per Month - Effective January 1, 2015 | | | |
|---|---|---|---|
| | **Employee Only** | **Employee and Child(ren)** | **Employee and Spouse** | **Employee and Family** |
| **Select Plus PPO 20/250/80%** | $95.00 | $261.00 | $261.00 | $428.00 |
| **Select Plus PPO 20/500/80%** | $75.00 | $206.00 | $206.00 | $338.00 |
| **Select Plus PPO 30/1500/70%** | $50.00 | $138.00 | $138.00 | $225.00 |
| **Select Plus HSA 3000/80%** | $50.00 | $138.00 | $138.00 | $225.00 |
| **Select Plus PPO 30/3000/80%** | $10.00 | $28.00 | $28.00 | $45.00 |

| Principal Dental - Employee Contributions per Month - Effective January 1, 2015 | | | |
|---|---|---|---|
| **Employee Only** | **Employee and Child(ren)** | **Employee and Spouse** | **Employee and Family** |
| $20.00 | $44.00 | $44.00 | $65.00 |

| VSP Vision - Employee Contributions per Month - Effective January 1, 2015 | | | |
|---|---|---|---|
| **Employee Only** | **Employee and Child(ren)** | **Employee and Spouse** | **Employee and Family** |
| $4.00 | $6.00 | $6.00 | $7.00 |

DX1139-70

Prepared by KBI
Revised  11/18/2014

Confidential



## 2016-2017 Employee Bonus Plan
## for Manager and Senior Manager
## Client Service Professionals

2016 – 2017 BONUS PLAN



Confidential

PwC_B00000818

**DX1139-71**

## Table of Contents

Summary.................................................................................................................................3

Definitions ...........................................................................................................................3

Plan Term and Eligibility ....................................................................................................3

Standard Full-time Employee Hours...................................................................................4

Elements of the Plan – Managers and Senior Managers....................................................5

    Quantitative Bonus........................................................................................................5

    Qualitative Bonus .........................................................................................................6

Modification or Termination of the Plan............................................................................7

Benefits Unfunded ..............................................................................................................7

Benefits Nontransferable ....................................................................................................7

No Employee Rights ...........................................................................................................7

Severability .........................................................................................................................7

Responsibilities ...................................................................................................................8



Confidential                                                                PwC_B00000819

**DX1139-72**

## Summary

This document defines the terms of Connor Group's ("**CG**") 2016/2017 Employee Bonus Plan for Manager and Senior Manager Client Service Professionals (the "**Plan**"). The Plan applies to the bonus year starting April 1, 2016 and ending March 31, 2017.  Effective April 1, 2016, the Plan supersedes all previous and existing performance-based employee bonus arrangements for Connor Group Client Service Professionals.

Our objective is to deliver high quality and dedicated services to our clients enabling us to be the best in the markets we serve. We accomplish this objective by retaining professionals who consistently deliver high quality work and by rewarding professionals who provided dedicated client service.

*The objective of the Plan is to reward great corporate citizenship, quality performance, and dedicated client service that goes beyond the firm's expectations for a Client Service Professional, thus enabling each professional to be in control of his or her bonus compensation. The Plan aligns employees' bonus compensation with the firm's objectives.*

## Definitions

<u>Client Service Professional</u>: A Connor Group employee whose primary role is to provide Connor Group services to external clients.

<u>Bonus Year</u>: Period starting April 1, 2016 and ending March 31, 2017.

<u>Client Chargeable Hours</u>: Actual hours charged by a Client Service Professional to a client engagement.

<u>Sponsored Projects</u>:  Preapproved non-client projects.  These projects will be administered by an authorizing Partner as described more fully under the Qualitative Bonus.

<u>Salary</u>: Actual salary paid during the Bonus Year.

<u>HR Committee</u>: Connor Group leadership committee with authority to administer the Plan on behalf of Connor Group. HR Committee includes representatives of the People Team and business lines within Connor Group.

<u>POD</u>: A POD is a team of Client Service Professionals.  Each Client Services Professional is assigned to a POD ("Partner on Deck").  All Client Service Professionals that perform primarily M&A work are assigned to the M&A POD.  All Client Service Professionals that perform primarily FinOps work are assigned to the FinOps POD.  All other Client Services Professionals are assigned to PODs based on their office location:  (1) Tech Accounting - SF location; (2) Tech Accounting – Silicon Valley location; (3) Tech Accounting – Utah (or Middle America, MUSA) location; (4) Tech Accounting - NY location and (5) Tech Accounting - Europe.

## Plan Term and Eligibility

The Plan is effective during the Bonus Year. Except as noted herein, all payments under the Plan will be

3 | Page                           2016 – 2017 BONUS PLAN



**DX1139-73**

made on or about June 30, 2017 (the "**Payment Date**"). In all instances, any payments under the Plan are contingent on being a current employee with Connor Group with no communicated resignation as of the Payment Date.  CG offers both pregnancy disability leave (PDL) and paternity leave to employees.  Details regarding PDL and paternity leave can be found in the Employee Handbook. Employees who are on a CG-approved leave of absence on the Payment Date will become eligible for bonus payments after their return to regular employee service of at least 20 full-time equivalent working days (i.e., performing client-billable work).   No pro-rated bonus payments will be made to employees who are terminated (voluntarily or involuntarily) prior to the  Payment Date.

All Connor Group full-time salaried employees who are Client Service Professionals are eligible for  participation in the Plan. Part-time salaried employees who are Client Service Professionals are eligible to participate in the Plan on a pro-rated basis if their work arrangement provides for at least 50% of a typical full-time schedule. Hourly employees, independent contractors, interns, and partners  are not eligible to participate in the Plan. For new hires, participation in the bonus plan will be effective from the 1st day of the month following their start date and pro-rated accordingly.

Terms of bonus arrangements beyond March 31, 2017 will be defined in a future plan as determined by  the HR Committee.

## Standard Full-time Employee Hours

Below is a reconciliation for a standard full-time CG client serving professional. The hours are summarized as per the categories defined in the 2016-2017 SpringAhead Charge Code Guide.

| Description | Hours | Notes |
|---|---|---|
| Paid time off | 200 | 1 |
| POD specific codes | 90 | 2 |
| Firm general codes | 40 | 3 |
|  | 330 |  |
|  |  |  |
| Client billable codes and authorized project codes | 1,750 | 4 |
| Total | 2,080 |  |

1) For purposes of this calculation, paid time off includes flex time off, sick time off and maternity/paternity leave.
2) POD specific codes includes the following charge code categories: business development, people, POD sponsored activities, recruiting/interviewing/onboarding, and training.
3) Firm general codes includes the following charge code categories: administrative, firm meetings and unassigned.
4) Minimum hours to be incurred to be considered a full-time employee.

## Elements of the Plan – Managers and Senior Managers:

The Plan for Managers and Senior Managers includes the following elements:

4 | Page                                  2016 – 2017 BONUS PLAN



| Element | Description | Summary of Terms |
|---|---|---|
| **Quantitative Bonus** | Bonus earned based upon achievement of billed hours to clients. | **Quantitative Bonus:** up to 25% of Salary based on billed hours to clients throughout the Bonus Year. |
| **Qualitative Bonus** | Bonus earned based upon assessment of qualitative criteria defined below. | **Qualitative Bonus:** up to 7% of Salary with the possibility of an additional percentage based on assessment of qualitative factors by your POD leader. |

## *Quantitative Bonus*

Client Service Professionals will be eligible for a bonus based on billable hours worked.

Managers and Senior Managers that meet or exceed the 1,750 billable hours threshold will be paid a Quantitative Bonus, calculated based on reaching various billable hour milestones.  The Quantitative Bonus is calculated based on reaching billable hours milestones as a percentage of the Client Service Professional's Salary paid during the Bonus Year, in accordance with the following table:

| Bonus-Eligible Hours | Bonus Amount |
|---|---|
| 1750 | 5.00% |
| 1800 | 6.00% |
| 1850 | 7.00% |
| 1900 | 10.00% |
| 1950 | 13.00% |
| 2000 | 17.00% |
| 2065 | 18.75% |
| 2125 | 20.25% |
| 2180 | 22.00% |
| 2240 | 23.75% |
| 2300 | 25.00% |

We do not encourage Managers and Senior Managers to incur excessive billable hours during the Bonus Year. However, we recognize that if you do work extra hours above and beyond 2300, this is likely in response to urgent client needs throughout the year, and we want to provide a fair and equitable reward for your efforts and personal sacrifice.  Therefore, at the discretion of POD Leader, an additional bonus will be considered as part of the Qualitative Bonus and will include an evaluation of the quality of the hours incurred.

2016 – 2017 BONUS PLAN



Confidential                                                                                            PwC_B00000822

**DX1139-75**

Bonuses are earned only upon exceeding the applicable threshold. There are no pro-rated bonus amounts for landing between bonus thresholds.

Below are examples of Quantitative Bonus payment calculations.

> **Example 1:** 1,870 billable hours will result in payment of a Quantitative Bonus of 7% of the actual Salary paid during the Bonus Year.  If the Client Service Professional receives a Qualitative Bonus of 5% of Salary, then the total combined bonus paid will be an amount equal to  12% of the actual Salary paid.

> **Example 2:** 2,200 billable hours will result in payment of a Quantitative Bonus at the level of 22% of the actual Salary paid during the Bonus Year. If the Client Service Professional receives a Qualitative Bonus of 5% of Salary, then the total combined bonus paid will be an amount equal to 27% of the actual Salary paid.

Any Client Services Professional who is working at a more than half-time and less than full-time level pursuant to his/her employment agreement with Connor Group will be eligible for a Quantitative Bonus based on a pro-rated hours threshold. For example, a person whose employment agreement  contemplates a schedule of 60% of full-time will have threshold hours set at the standard threshold amounts multiplied by 60%.

Any Client Services Professional who joins the firm and is eligible to participate in the plan for a portion of the Bonus Year will have his/her threshold hours pro-rated based on the number of eligible months worked during the Bonus Year.

Client Services Professionals working full-time pursuant to an employment agreement who take paid pregnancy disability leave during the Bonus Year are eligible for a pro-rated Quantitative Bonus. The calculation will be based on the Salary earned during the Bonus Year (excluding any Salary paid as a pregnancy disability leave benefit). The hours threshold and bonus threshold amounts will be reduced pro-rata based on the number of complete months the employee worked full-time during the Bonus Year.

### Qualitative Bonus

Qualitative Bonus dollars will be allocated to each POD to be used as the bonus pool. POD leaders will use their discretion in allocating his/her qualitative bonus amounts to employees in their PODs.

The Qualitative Bonus will be evaluated by each POD Leader based on the following criteria: (1) value provided to the client and engagement team from client engagements and (2) value provided to the firm from Sponsored Projects. An Authorizing Partner ("Partner") must request your time to work on a Sponsored Project.  Additionally, the Partner must set up the approved charge code in SpringAhead in order for a CG professional to track time incurred.

6 | Page                                              2016 – 2017 BONUS PLAN



**DX1139-76**

*The Qualitative Bonus is in addition to the Quantitative Bonus.*

It is critical to Connor Group's success that Client Service Professionals submit timecards in a timely fashion. Timecards are due at the end of the day on each Monday for the previous week and expense reports are due within five days of the end of the month when incurred.   A Client Service Professional's Qualitative Bonus may be negatively affected in cases where the Client Service Professional consistently fails to submit timecards and expense reports when due.  A maximum of three combined exceptions for timecards and expense reports during the Bonus Year are allowed before the bonus payout may be affected.

## Modification or Termination of the Plan

Connor Group reserves the right to modify, suspend, or terminate all or any portion of this Plan at any time. For purposes of clarity and without limitation, should an acquisition or significant business initiative change the operating plan, any applicable performance goals may be modified or eliminated solely by Connor Group.

## Benefits Unfunded

No amounts awarded or accrued under this Plan will be funded, set aside, or otherwise segregated prior to payment. The obligation to pay the bonuses awarded hereunder will at all times be an unfunded and unsecured obligation of Connor Group. Plan participants will have the status of general creditors and must look solely to the general assets of Connor Group for the payment of his/her bonus awards.

## Benefits Nontransferable

No Plan participant will have the right to alienate, pledge, or encumber his/her interest in this Plan, and such interest will not (to the extent permitted by law) be subject in any way to the claims of the participant's creditors or to attachment, execution, or other process of law.

## No Employee Rights

No action of Connor Group in establishing the Plan, and no action taken under the Plan by Connor Group and no provision of the Plan itself will be construed to grant any person the right to remain in the employ of Connor Group or its affiliates for any period of specific duration. Rather, each employee is employed "at will," which means that either the employee or Connor Group or its subsidiaries may terminate the employment relationship at any time and for any reason, with or without cause.

## Severability

If any part or section of this Plan is declared invalid for any reason, the remaining parts not affected by the decision shall continue in effect.



Confidential                                                                        PwC_B00000824

**DX1139-77**

## Responsibilities

The HR Committee has complete authority to administer the Plan on behalf of Connor Group. Specifically, the HR Committee will make the final conclusions on any questions, clarifications and disputes regarding the meaning or the application of the provisions of the Plan.

HR Committee consists of:
Laurie Marchand (Committee Chair)
Jeff Pickett, Jim Neesen, Aleks Zabreyko, Jason Pikoos, and Nancy Dobbs.

Please direct questions to Human Resources.



Confidential

**DX1139-78**