# DX1649

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MAURO BOTTA

          Plaintiff,

 vs.                          Case No.  3:18-CV-02615-RS


PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

          Defendants.
--------------------------------/




                    ---oOo---

              ** CONFIDENTIAL **

      VIDEOTAPED DEPOSITION OF MAURO BOTTA

         Tuesday, September 25, 2018

                    ---oOo---




Reported by:
LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
California CSR No. 10523

Job No. NY-191159

**DX1649-1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MAURO BOTTA

          Plaintiff,

 vs.                          Case No.  3:18-CV-02615-RS


PRICEWATERHOUSECOOPERS LLP, LAURA
BUSTAMANTE, TYE THORSON, ROBERT
HEATLEY, STIG HAAVARDTUN, ERGUN GENC,
TIMOTHY CAREY and STEVE MCCANN

          Defendants.
--------------------------------/




          VIDEOTAPED DEPOSITION OF MAURO BOTTA,

taken at WINSTON & STRAWN LLP, 101 California

Street, 38th Floor, San Francisco, California,

on Tuesday, September 25, 2018, at 9:05 a.m., before

Lorrie L. Marchant, California Certified Shorthand

Reporter, RMR, CRR, CCRR, CRC.

**DX1649-2**

```
 1                    A P P E A R A N C E S

 2

 3    Appearing as counsel on behalf of Plaintiff:

 4              INGRID M. EVANS, Esquire
                EVANS LAW FIRM, INC.
 5              3053 Fillmore Street, #236
                San Francisco, CA 94123
 6              (415) 441-8669
                ingrid@evanslaw.com
 7

 8    Appearing as counsel on behalf of Defendants:

 9              JOHN C. HUESTON, Esquire
                YEGOR FURSEVICH, Esquire
10              JOSEPH A. REITER, Esquire
                HUESTON HENNIGAN, LLP
11              523 West 6th Street, Suite 400
                Newport Beach, CA 92660
12              (213) 788-4340
                jhueston@hueston.com
13              yfursevich@hueston.com
                jreiter@hueston.com
14

15    Also present:

16              Ralna Ramse, Videographer

17                      ---oOo---

18

19

20

21

22

23

24

25
```

**DX1649-3**

```
1                    I N D E X

2              INDEX OF EXAMINATION

3   EXAMINATION BY                              PAGE

4    MR. HUESTON                                 10

5                    ---oOo---

6      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

7      EXHIBIT        DESCRIPTION               PAGE
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled "2023 Manager," PwC_B00002625 - PwC_B00002629 | 32 |
| Exhibit 2 | Document entitled "2710 Resolving Differences in Professional View Among Personnel Assigned to an Audit Engagement," PwC_B00008300 - PwC_B00008303 | 39 |
| Exhibit 3 | PCAOB document entitled "AS 1215:  Audit Documentation" | 45 |
| Exhibit 4 | Document entitled "2570 Manager Review Responsibilities," PwC_B00008290 | 51 |
| Exhibit 5 | Document entitled "Engagement Leader and Manager Checklist, PwC_B00006158 - PwC_B00006168 | 55 |
| Exhibit 6 | PwC document entitled "Covad Communications Group, Inc., Valuation Specialist Completion Memorandum:  Valuation Procedures Performed Re: Acquisition of MegaPath as of August 20, 2010 and Speakeasy as of August 25, 2010 in Accordance with ASC 805, 'Business Combinations,'" PwC_B00001536 - 00001543 | 69 |

**DX1649-4**

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2     EXHIBIT        DESCRIPTION                      PAGE

 3    Exhibit 7       Memo to CCGI Holding Corporation  71
                      - 12/31/2011 Audit File from
 4                    Mauro Botta, dated 2/29/2012,
                      subject:  Deferred Revenue
 5                    Acquired in 2010 Analysis (Bates
                      stamps illegible)
 6
      Exhibit 8       e-mail correspondence, dated      74
 7                    3/23/2012, subject: Covad -
                      Deferred Revenue 2010,
 8                    PwC_B00001527

 9    Exhibit 9       e-mail correspondence, dated      76
                      7/24/2012, subject: Peer Review
10                    Notification - CCGI Holding
                      Corporation - Week of August 13
11                    - your input required,
                      PwC_B0000732 - PwC_B0000737
12
      Exhibit 10      e-mail correspondence, dated      78
13                    4/27/2013, subject: Performance
                      Note, PwC_B0000361 -
14                    PwC_B0000363 and PwC_B0000169

15    Exhibit 11      e-mail correspondence, dated      85
                      4/27/2013, subject: Performance
16                    Note, PwC_B0000336 -
                      PwC_B0000338
17
      Exhibit 12      Oversized blowup of spreadsheet   89
18                    entitled "Individual Control
                      Deficiencies - Summary," first
19                    page

20    Exhibit 13      Oversized blowup of spreadsheet   92
                      entitled "Individual Control
21                    Deficiencies - Summary," second
                      page
22
      Exhibit 14      Oversized blowup of spreadsheet   93
23                    entitled "Individual Control
                      Deficiencies - Summary," third
24                    page

25    Exhibit 15      Amended Complaint                 96
```

**DX1649-5**

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2     EXHIBIT          DESCRIPTION                      PAGE

 3    Exhibit 16     e-mail correspondence, dated          99
                     3/21/2016, subject: Harmonic -
 4                   SLA Memo for review,
                     PwC_B0000635
 5
      Exhibit 17     PwC memo to Harmonic, Inc.,           99
 6                   dated 12/31/2015, PwC_B00000636
                     - PwC_B00000644
 7
      Exhibit 18     e-mail correspondence, dated         101
 8                   1/28/2016, subject: Sab 99 -
                     harmonic, PwC_B00000598
 9
      Exhibit 19     e-mail correspondence, dated         101
10                   1/24/16, subject: SAB 99
                     Analysis of Daily Convention
11                   Impact on 2014 and 2015 Income
                     Statements and Balance Sheets,
12                   PwC_B00000599 - PwC_B00000605

13    Exhibit 20     e-mail correspondence, dated         105
                     2/12/2016, subject: Harmonic -
14                   notes from this morning's
                     discussion - action required,
15                   PwC_B00000609

16    Exhibit 21     Harmonic document entitled           105
                     "Discussion - 2/11/16,"
17                   PwC_B00000607 - PwC_B00000608

18    Exhibit 22     Screenshot                           109

19    Exhibit 23     Complaint to the SEC, Reference      120
                     Number:  TCR1478218903573,
20                   PLAINTIFF 0030 - PLAINTIFF 00178

21    Exhibit 24     e-mail correspondence, dated         129
                     2/24/2014, subject: Cavium,
22                   PwC_B00000481 - PwC_B00000482

23    Exhibit 25     e-mail correspondence, dated         131
                     2/2/2014, subject: The memo,
24                   sorry for the delay :-),
                     PwC_B00007392 - PwC_B00008250
25
```

Confidential
MAURO BOTTA - 09/25/2018                          Page 7

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2      EXHIBIT         DESCRIPTION                        PAGE

 3    Exhibit 26    e-mail correspondence, dated      134
                    2/21/2014, subject: Accounting
 4                  memo attached - DRAFT,
                    PwC_B00001570 - PwC_B00001577
 5
      Exhibit 27    e-mail correspondence, dated      143
 6                  2/22/2015, PwC_B00000390 -
                    PwC_B00000398
 7
      Exhibit 28    e-mail correspondence, dated      161
 8                  3/2/2015, subject: consultation
                    memo
 9
      Exhibit 29    e-mail correspondence, dated      169
10                  3/2/2015, subject: tax memo
                    gsiii comments.docx,
11                  PwC_B00006366 - PwC_B00006371

12    Exhibit 30    e-mail correspondence, dated      171
                    3/2/2015, subject: Revised TC
13                  and Clean, PwC_B00006239 -
                    PwC_B00006246
14
      Exhibit 31    e-mail correspondence, dated      191
15                  8/7/2016, subject: Capitolo 17!!

16    Exhibit 32    e-mail correspondence, dated      193
                    7/8/2011, subject: Capitolo
17                  12..., PwC_B00000562 -
                    PwC_B00000572
18
      Exhibit 33    Document entitled "Case Detail    208
19                  Report:  2016-0714,"
                    PwC_B00005915 - PwC_B00005940
20
      Exhibit 34    Document entitled "Case Detail    212
21                  Report:  2017-0323,"
                    PwC_B00005963 - PwC_B00005984
22
      Exhibit 35    e-mail correspondence, dated      239
23                  6/23/2017, subject: You're
                    Invited:  xLos 'Path to
24                  Partnership' informational
                    webcast, PwC_B00000080
25
```

**DX1649-7**

Confidential
MAURO BOTTA - 09/25/2018                    Page 8

```
 1      INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

 2      EXHIBIT         DESCRIPTION                     PAGE

 3     Exhibit 36     e-mail correspondence, dated       240
                      6/28/2017, PwC_B00000209
 4
       Exhibit 37     e-mail correspondence, dated       241
 5                    6/30/2017, subject: Infiniti
                      Wars, PwC_B00008218 -
 6                    PwC_B000008220

 7     Exhibit 38     e-mail correspondence, dated       243
                      7/11/2017, subject: Invitation:
 8                    Mauro & Gary Catch-Up @ Tue Jul
                      11, 2017 8:30 - 9 am,
 9                    PwC_B00000056 - PwC_B00000057

10     Exhibit 39     e-mail correspondence, dated       246
                      7/27/2017, subject: Feedback
11                    need - please reply and help.
                      Thanks!, PwC_B000000245 -
12                    PwC_B00000247

13     Exhibit 40     e-mail correspondence, dated       250
                      11/26/2016, subject: mail,
14                    PwC_B000000748 - PwC_B00000797

15     Exhibit 41     Employment Offer Letter to Mauro   261
                      Botta from Armanino, dated
16                    7/28/2017, PLAINTIFF 0099 -
                      PLAINTIFF 00101
17
       Exhibit 42     Document entitled "Chat with       273
18                    brian.dalton@gmail.com,"
                      PLAINTIFF 00710 - PLAINTIFF
19                    00713

20     Exhibit 43     Document entitled "Gmail Hangout   277
                      with Mario Piergallini,"
21                    PLAINTIFF 00661 - PLAINTIFF
                      00664
22
       Exhibit 44     e-mail correspondence, dated       299
23                    2/12/2018, subject: Mauro

24                         ---oOo---

25
```

**DX1649-8**

Confidential
MAURO BOTTA - 09/25/2018                          Page 23

```
 1   fair representation of the financial statements and        09:21:42
 2   related footnote and to express an opinion on the
 3   public companies for internal controls.
 4          BY MR. HUESTON:
 5      Q.   Okay.  And you mentioned "internal              09:21:57
 6   controls."  What do you mean when you say "internal
 7   controls"?  What are internal controls?
 8          MS. EVANS:  Overbroad.
 9          THE WITNESS:  They are controls that
10   management of the company should have in place to      09:22:08
11   prevent and detect material misstatement to its
12   financial statements.
13          (Reporter clarification.)
14          THE WITNESS:  Material misstatements to the
15   financial statements.                                  09:22:28
16          BY MR. HUESTON:
17      Q.   And how does an external auditor evaluate
18   the effectiveness of internal controls?
19          MS. EVANS:  Overbroad.  Calls for a legal
20   conclusion.  Speculation.                              09:22:39
21          THE WITNESS:  It is a judgmental process.
22   There is a framework in place that you go through to
23   evaluate.  It's part of the whole of the process.
24   That is why the audit is defined as integrated audit
25   for public companies.                                  09:22:58
```

**DX1649-23**

```
 1              (Reporter clarification.)                09:23:05

 2              THE WITNESS:  Is defined as integrated

 3    audit for public companies.

 4              BY MR. HUESTON:

 5      Q.   And I just want to make sure I got your      09:23:15

 6    testimony right.

 7              You said it's a judgmental process or a

 8    judgment process?

 9      A.   The evaluation of the controls and their

10    deficiencies is a judgmental process.  It requires  09:23:27

11    professional judgment.

12      Q.   Thank you.

13              And are there -- well, and in evaluating a

14    company's internal controls, at times as an external

15    auditor, you would find deficiencies in those        09:23:43

16    controls; right?

17      A.   Yes.

18      Q.   And are there varying levels of

19    deficiencies?

20      A.   Yes.                                          09:23:56

21      Q.   And what are they?

22              MS. EVANS:  Overbroad.

23              BY MR. HUESTON:

24      Q.   You can answer.

25      A.   Control deficiency is the lowest level of     09:24:00
```

**DX1649-24**

```
1   severity.  Then there is significant deficiency, and    09:24:06
2   then there is material weakness.
3       Q.   All right.  And what is a controlled
4   deficiency?  How would you define that?
5       A.   It's a control that did not operate as         09:24:19
6   designed, but for which the impact is either
7   mitigated or does not necessarily cause a --
8   material misstatements to the financial statements.
9       Q.   Okay.  And what is a significant
10  deficiency?                                              09:24:38
11          MS. EVANS:  Overbroad.  Calls for a legal
12  conclusion.
13          BY MR. HUESTON:
14      Q.   You can answer.
15      A.   That's the -- it's the middle category.        09:24:42
16  And it is something that is more severe than the
17  control deficiency, but does not rise to the level
18  of a material weakness.
19      Q.   And then what is a material weakness?
20          MS. EVANS:  Overbroad.  Calls for a legal        09:25:03
21  conclusion.
22          THE WITNESS:  Material weakness is a
23  deficiency in the control or set of controls that
24  could cause a material misstatement in the financial
25  statements.                                             09:25:17
```

1          BY MR. HUESTON:                              09:25:19

2      Q.   And how do external auditors determine what

3   constitutes a control deficiency, significant

4   deficiency, or a material weakness?

5      A.   There is a framework that PwC had in place.   09:25:34

6   Other firms also.

7      Q.   And what was that framework?

8      A.   It is a framework.  I'm not sure what you

9   mean by "what is the framework."

10      Q.   Well, you said PwC had a framework.  What    09:25:49

11   do you -- explain.  What is the framework that

12   you're referring to?

13      A.   It's a flow chart, guided flow chart, with

14   boxes that you go through as you evaluate the

15   deficiency, that series of steps that you need to    09:26:02

16   address to evaluate those deficiencies.

17      Q.   Okay.  And did the flow chart have a name?

18      A.   I don't believe there was a name.  I think

19   it was assessment framework for controlled

20   deficiencies, but I do not recall the exact name.    09:26:27

21      Q.   And in using the flow -- I'm sorry.

22   Scratch the question.

23          In using the flow chart, you, as an

24   external auditor, needed to bring your judgment to

25   bear in determining whether something ultimately was  09:26:43

1  a control deficiency, a significant deficiency, or a          09:26:46

2  material weakness; right?

3      A.   Not individually.  There was a collective

4  decision from the audit engagement team.

5      Q.   Did you not -- well, let me -- hold on one          09:27:03

6  second.

7           Okay.  You said not individually.  There

8  was a collective decision from the engagement team.

9           And what I'm focusing on, in the collective

10  decision from the engagement team that you would be          09:27:37

11  involved with, there would be an exercise of

12  judgment.  This would be the judgmental issue that

13  you cited earlier; right?

14      A.   Yes.

15      Q.   And it requires professional judgment to          09:27:48

16  determine whether a particular deficiency amounts to

17  a material weakness; right?

18      A.   Yes.

19      Q.   And it also requires judgment to determine

20  whether several smaller deficiencies could aggregate          09:28:08

21  to a material weakness; right?

22      A.   Yes.

23      Q.   And you would agree that reasonable

24  auditors sometimes disagree as to whether there is a

25  material weakness in a company's controls; right?          09:28:20

DX1649-014

```
1    deposition, generally the court reporter will hand      09:34:25
2    you the official exhibit, and then I will hand a
3    separate copy to your attorney.
4         A.    Thank you.
5         Q.    So directing your attention to what has now   09:34:34
6    been marked as Exhibit 1, you recognize this as --
7    well, let me ask you.
8              Do you recognize this document?
9         A.    It does appear to be an extract from our
10   audit guide.                                            09:34:48
11        Q.    And this is, in fact, PwC audit standard
12   2023, which outlines the responsibilities of the
13   manager?
14        A.    I wouldn't characterize that PwC about the
15   standards, that PwC only can issue audit standards.    09:35:03
16   This is PwC audit guide.
17        Q.    Okay.  And are you familiar with this
18   document and this standard as it's set forth in
19   Exhibit 1?
20        A.    What is your definition of "familiar"?       09:35:27
21        Q.    Well -- well, let me ask you, are you
22   familiar with what's set forth here under "2023
23   Manager"?  Have you read this document before?
24        A.    I may have a long time ago.  So that is why
25   I asked you what's the definition of "familiar."       09:35:53
```

DX1649-33

```
 1      Q.   Okay.  Sitting here today, do you recall     09:35:56
 2   having reviewed it before?
 3      A.   Yes.
 4      Q.   Okay.  Let's go under the first heading
 5   called "Definition of Role."  And under "Definition  09:36:09
 6   of Role," the document states that "the manager" --
 7   if you look at the last bullet -- "takes the primary
 8   responsibility for interaction with client
 9   management."
10           Do you see that?                             09:36:28
11      A.   Yes.
12      Q.   And so when you were a senior manager,
13   consistent with this guidance, you took primary
14   responsibility for interacting with client
15   management; correct?                                 09:36:40
16      A.   For the job that I was the main contact, I
17   believe that is accurate.  As far as Micron, for
18   example, I would not think that that was my primary
19   responsibility within an engagement team.
20      Q.   Right.  I'm not going to be -- okay.  So     09:37:00
21   just for clarity, I wouldn't be talking about
22   Micron.  So let's put Micron to the side.  It will
23   be for the engagements other than Micron.
24           So the engagements other than Micron, under
25   "Definition of Role," where it starts "the manager," 09:37:13
```

```
 1   this defined in those bullets the guidance for you        09:37:17

 2   as the engagement manager; correct?

 3           MS. EVANS:  Overbroad.  Vague and

 4   ambiguous.  Unintelligible.

 5           BY MR. HUESTON:                                    09:37:26

 6       Q.   You can answer.

 7       A.   I do not recall, honestly, if there was a

 8   section for senior managers.  So if there was, then

 9   I would apply under the senior manager roles.

10   Because, again, depending on the structure of an          09:37:46

11   engagement, you can have the manager that is primary

12   responsibility as much as the senior manager if you

13   have both.

14       Q.   All right.  Well, let's just go back to

15   that last bullet, under "Definition of Role."             09:37:56

16           As senior manager, you would agree that you

17   would take the primary responsibility for

18   interaction with client management, other than the

19   Micron Technology work that you did; correct?

20           MS. EVANS:  Overbroad.  Vague and                 09:38:10

21   ambiguous.

22           THE WITNESS:  Again, this is subjective.

23   "Primarily responsibility" can be read in many ways.

24   I would say that it was part of my responsibility to

25   interact with management.                                 09:38:23
```

```
 1   the page?                                          09:44:01

 2       A.   Yes.

 3       Q.   Were you also familiar with Section 2711

 4   The Resolution Process, while you were at PwC?

 5       A.   I became familiar, as I said, during the  09:44:12

 6   Cavium audit.

 7       Q.   Okay.  Let's go to the next page.  The

 8   second paragraph that starts with "the firm does not

 9   expect."

10            Do you see that?                           09:44:24

11       A.   Yes.

12       Q.   And specifically it states:

13            "The firm does not expect

14            professionals to accept a position that

15            they cannot agree with."                   09:44:34

16            And you understood that was the position of

17   PwC; right?

18            MS. EVANS:  Overbroad.  Vague and

19   ambiguous.

20            THE WITNESS:  I understood what was written 09:44:48

21   in the audit guide.

22            BY MR. HUESTON:

23       Q.   All right.  And it says -- it continues.

24            "In all cases, when a difference of

25            professional views occurs, the goal of     09:44:55
```

```
 1            the resolution process is to resolve the     09:44:57
 2            difference.  If this cannot be achieved,
 3            the dissenting party should consider the
 4            guidance in the documentation
 5            requirements section below, including the    09:45:07
 6            requirement as set forth therein to
 7            discuss the documentation of the
 8            difference with the office of general
 9            counsel and consider whether such
10            difference of views is so significant        09:45:19
11            that the professional considers it
12            necessary to remove himself or herself
13            from the engagement."
14            You were familiar with the provision that I
15     just read; correct?                                 09:45:30
16        A.   Yes.
17        Q.   And as senior manager, then, you understood
18     that you were not required to accept a position that
19     you disagreed with; right?
20            MS. EVANS:  Overbroad.  Vague and            09:45:42
21     ambiguous.
22            THE WITNESS:  Yes.
23            BY MR. HUESTON:
24        Q.   And you also understood that if you could
25     not accept a position, you could remove yourself     09:45:53
```

```
 1   from the engagement; right?                          09:45:55

 2       A.   Yes.

 3       Q.   Now, let's look further.  You see No. 2,

 4   "Differences Between Manager and Engagement Leader,"

 5   further on the page.                                  09:46:09

 6            Do you see that?

 7       A.   Yes.

 8       Q.   And this section describes the procedure

 9   for resolving differences between a manager and an

10   engagement leader; correct?                          09:46:18

11       A.   Yes.

12       Q.   And you were familiar with this procedure;

13   correct?

14       A.   Yes.

15       Q.   Okay.  Let's go now to 2713 which is on     09:46:27

16   the -- starts at the bottom of the next page.

17   "Documentation Requirements."

18            Do you see that?

19       A.   Yes.

20       Q.   And then turning to the next page under     09:46:41

21   that same section, it states:

22                "Differences of professional view

23                that still exist after completing the

24                resolution process set forth in PwC Audit

25                2711 should be documented and included   09:46:58
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 44

```
 1              in, or cross-referenced to, the              09:47:01

 2              documentation of significant matters.

 3              However, prior to concluding that a

 4              difference of professional views still

 5              exists, consultation is required among        09:47:12

 6              the office of general counsel, the

 7              dissenting party, or parties, and the

 8              engagement leader regarding the matter

 9              and the documentation of the difference."

10         Q.   Do you see that?                              09:47:25

11         A.   Yes.

12         Q.   And as senior manager, then, you understood

13    that if you continued to disagree with an engagement

14    leader, even after the resolution process that was

15    described in Section 2711, you had the obligation to    09:47:35

16    document the disagreement after a consultation with

17    the office of general counsel; correct?

18         A.   Yes.

19         Q.   And you also had a duty to document any

20    disagreements with the engagement leader; right?        09:48:01

21              MS. EVANS:  Overbroad.  Vague and

22    ambiguous.

23              BY MR. HUESTON:

24         Q.   You can answer.

25         A.   If those were not resolved, yes.              09:48:16
```

**DX1649-44**

Confidential
MAURO BOTTA - 09/25/2018                    Page 45

```
 1      Q.   Okay.  And so you understood that      09:48:22
 2  disagreements among members of the engagement team
 3  or with others consulted on the engagement about
 4  final conclusions reached on significant accounting
 5  or auditing matters, including the basis for the    09:48:34
 6  final resolution of those disagreements, if an
 7  engagement team member disagrees with the final
 8  conclusions reached, he or she should document that
 9  disagreement.
10          You understood that; correct?            09:48:49
11      A.   Yes.
12      Q.   That was, in fact, a PCAOB audit
13  documentation requirement; right?
14          MS. EVANS:  Calls for speculation.
15  Overbroad.  Vague and ambiguous.                09:49:03
16          If you know.
17          BY MR. HUESTON:
18      Q.   You can answer.
19      A.   I would not recall the source, but what you
20  stated is -- appears correct.                    09:49:11
21          MR. HUESTON:  All right.  Introduce the
22  document as Exhibit 3 to the deposition.
23          (Marked for identification purposes,
24           Exhibit 3.)
25  ///
```

```
 1            BY MR. HUESTON:                          09:49:27
 2       Q.   I've handed you, as Exhibit 3 PCAOB
 3  AS 1215: Audit Documentation, with subsections.
 4            Do you see that?
 5       A.   Yes.                                     09:49:49
 6       Q.   Are you familiar with AS 1215, the audit
 7  documentation section?
 8       A.   I may have read it, but I can't say that I
 9  am.
10       Q.   I think I handed you the wrong copy.  I   09:50:09
11  annotated that.  Let me give you this copy back.
12            MS. EVANS:  Doesn't look like it, but you
13  can check it out.
14            MR. HUESTON:  No?  All right.
15            MS. EVANS:  I just wrote on it.           09:50:18
16            MR. HUESTON:  Oh, you did.  Well, then
17  we'll --
18            MS. EVANS:  I just wrote the Exhibit 3.
19  It's not a big deal.
20            MR. HUESTON:  It's okay.  It's all right.  09:50:24
21  We'll move on.
22            MS. EVANS:  Yeah, I don't see any of your
23  writing on here.
24            MR. HUESTON:  All right.
25            MS. EVANS:  Do you want to make sure that  09:50:31
```

```
 1      A.   Yes.                                     09:51:45

 2      Q.   And you understand that was a requirement

 3   of the PCAOB; right?

 4      A.   As I stated, I can't say that I was

 5   familiar with this particular document.  As it is   09:51:54

 6   and I'm reading now, I understand it.

 7      Q.   Okay.  So you recognize this, then, as a

 8   requirement by the PCAOB; right?

 9           MS. EVANS:  Misstates his testimony.

10           Listen to his question.                  09:52:10

11           BY MR. HUESTON:

12      Q.   You can answer.

13           Now that you have the document before you,

14   this refreshes your recollection that this is, in

15   fact, a requirement of the PCAOB; right?         09:52:17

16           MS. EVANS:  Misstates his testimony.

17           THE WITNESS:  I'm reading this now, that

18   this is from the PCAOB, and I believe it to be

19   consistent with what PwC guide said that I was

20   familiar with.                                   09:52:40

21           BY MR. HUESTON:

22      Q.   All right.  You can put that aside.

23           Let's go back to Exhibit 1 in your pile.

24   And this is "Section 2023 Manager."

25           Do you have that before you?             09:53:08
```

```
 1     A.   Yes.                                      09:53:09

 2     Q.   Let's go to page 5 of that document.  There

 3  is, in fact, a section that starts with the bolded

 4  words "differences of opinion"; right?

 5     A.   Yes.                                      09:53:34

 6     Q.   And in the third paragraph down, it starts:

 7              "Where the unresolved difference

 8              relates to a concern that there is

 9              failure to comply with appropriate

10              professional, regulatory and legal    09:53:46

11              requirements or PwC's own systems of

12              quality control, and which a team member

13              considers he/she cannot discuss with the

14              engagement leader, the team member may

15              follow the firm's whistleblowing       09:53:59

16              processes.  The audit report should not

17              be issued until the matter is resolved."

18              Do you see that?

19     A.   Yes.

20     Q.   And as senior manager, you knew about this 09:54:08

21  procedure; correct?

22     A.   Yes.

23     Q.   So as a senior manager, if you thought that

24  there was a failure to comply with professional,

25  regulatory, or legal requirements, you would follow 09:54:18
```

```
 1   the firm's whistleblowing processes; correct?        09:54:21

 2        A.   Yes.

 3             MS. EVANS:  Overbroad.

 4             BY MR. HUESTON:

 5        Q.   And you understood those processes would    09:54:31

 6   involve making a complaint to PwC's hotline; right?

 7             MS. EVANS:  Overbroad.  Vague and ambiguous

 8   as to time.

 9             BY MR. HUESTON:

10        Q.   You can answer.                             09:54:48

11        A.   Hotline ethics office.

12        Q.   Okay.  So if you, in fact, thought somebody

13   was actually violating the law, you would follow

14   PwC's whistleblowing policies; correct?

15             MS. EVANS:  Overbroad.  Vague and ambiguous  09:55:09

16   as to time and --

17             BY MR. HUESTON:

18        Q.   While at PwC.

19             MS. EVANS:  Same objections.

20             BY MR. HUESTON:                             09:55:15

21        Q.   You can answer.

22        A.   Yes.

23             MR. HUESTON:  Let's go to what we will mark

24   as Exhibit 4.

25   ///
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 51

```
 1              (Marked for identification purposes,      09:55:36

 2         Exhibit 4.)

 3         BY MR. HUESTON:

 4    Q.   I've placed before you PwC Section 2570

 5   Manager Review Responsibilities.                     09:56:07

 6         Do you recognize Section 2570 entitled

 7   "Manager Review Responsibilities"?

 8    A.   Yes.

 9    Q.   The first sentence of the first paragraph

10   reads:                                               09:56:25

11              "The manager, with appropriate

12              involvement and oversight by the

13              engagement leader, is responsible for

14              determining that the audit documentation

15              included in the final record of work      09:56:34

16              performed, including the work of

17              specialists, has been performed and

18              reviewed in accordance with professional

19              and firm standards."

20         Do you see that?                               09:56:45

21    A.   Yes.

22    Q.   So as senior manager, you were responsible

23   for reviewing the documentation showing what work

24   was performed; correct?

25              MS. EVANS:  Overbroad.  Vague and         09:56:58
```

**DX1649-51**

```
 1   ambiguous.                                            09:56:59

 2           THE WITNESS:  I was one of the resources

 3   that was performing this activity, yes.

 4           BY MR. HUESTON:

 5       Q.   Right.  You were -- when it refers to "the   09:57:08

 6   manager," you were the senior manager; right?

 7       A.   Yes.

 8       Q.   Okay.  So you wouldn't argue, then, when it

 9   says the responsibilities of the manager, what's

10   described there and that I read to you, in fact,     09:57:22

11   described your responsibilities, in part; right?

12       A.   Yes.

13       Q.   Okay.  Toward the bottom of the page, you

14   see it starts, before there are three bullets:

15           "The manager is required to                   09:57:36

16           electronically sign-off"?

17           Do you see that language?

18       A.   Yes.

19       Q.   It states:

20           "The manager is required to                   09:57:44

21           electronically sign-off the following

22           EGAs."

23           And "EGA" is evidence-gathering activity;

24   is that right?

25       A.   I actually don't recall the exact acronym.  09:57:57
```

| | | |
|---|---|---|
| 1 | We always called them "EGAs." | 09:57:59 |
| 2 | Q.   All right.  But it describes the three | |
| 3 | things below; right?  Is that right:  The three | |
| 4 | bulleted items -- | |
| 5 | A.   Yes. | 09:58:10 |
| 6 | Q.   -- beneath it? | |
| 7 | A.   Yes. | |
| 8 | Q.   The first one is: | |
| 9 | "Engagement leader and manager audit | |
| 10 | planning affirmation." | 09:58:16 |
| 11 | Right? | |
| 12 | A.   Yes. | |
| 13 | Q.   And explain, what was your understanding of | |
| 14 | "the engagement leader and manager audit planning | |
| 15 | affirmation"?  What is that? | 09:58:27 |
| 16 | A.   It is an EGA where the engagement team | |
| 17 | summarizes the planning activities being performed | |
| 18 | and the -- the attestation from both the department | |
| 19 | and the leading manager that planning was done. | |
| 20 | Q.   The planning for the audit? | 09:58:53 |
| 21 | A.   Yes. | |
| 22 | Q.   Okay.  And that occurs before the actual | |
| 23 | audit commences; right? | |
| 24 | A.   It should.  Not always. | |
| 25 | Q.   And what steps would you typically take | 09:59:05 |

```
 1  before signing off on this EGA?                        09:59:09

 2      A.   Review the planning EGAs.

 3      Q.   And what other documents besides the

 4  planning EGAs would you review in order to sign off

 5  on that EGA?                                            09:59:25

 6      A.   That is a bit broad, because the structure

 7  of the core papers has evolved over the years,

 8  including this EGA.  I do not recall when they put

 9  it in.  But generally, yes, planning EGAs are the

10  one that are the subject of this affirmation.          09:59:46

11      Q.   That you would review before signing off on

12  the planning affirmation; right?

13      A.   Yes.

14      Q.   Okay.  And then going to the second one, it

15  saws:                                                  10:00:00

16           "Engagement leader and manager

17           checklist."

18           Do you see that?

19      A.   Yes.

20      Q.   And please describe your understanding of     10:00:04

21  the engagement leader and manager checklist.

22      A.   As I said before, throughout the years,

23  this has evolved.  There were several checklists.

24  This one, I would be guessing what they refer to is

25  the completion checklist.                              10:00:26
```

```
 1      Q.   When you refer to a "completion checklist,"     10:00:35
 2   what do you mean by that?
 3      A.   It is a checklist in the completion section
 4   of the database that engagement leader and manager
 5   would sign off.                                          10:00:48
 6      Q.   And what time period during your tenure as
 7   senior manager do you recall signing off on what
 8   you've described as a completion checklist?
 9      A.   I can't give you the time period because it
10   is possible that I was leading manager even prior to    10:01:08
11   2010.  So I can't give you the exact years.
12      Q.   Well, from 2010 to the time of your
13   termination, in following the EGAs, you would sign
14   off, for an engagement leader and manager checklist,
15   on something you call a completion checklist; right?    10:01:26
16   Is that fair?
17      A.   Yes.
18           MR. HUESTON:  Okay.
19           Okay.  So let's go to what we're going to
20   mark as Exhibit 5.  Right?  Next exhibit, Exhibit 5.    10:01:44
21           (Marked for identification purposes,
22           Exhibit 5.)
23           BY MR. HUESTON:
24      Q.   I've handed you, as Exhibit 5, a document
25   that's entitled "Engagement Leader and Manager          10:02:08
```

```
 1   Checklist," and it has a date of June 2013.          10:02:11

 2          Do you see that?

 3      A.   Yes.

 4      Q.   And were you, while you were at PwC,

 5   familiar with this engagement letter and manager      10:02:20

 6   checklist?

 7      A.   Yes.

 8      Q.   And, in fact, going to page 11 of this

 9   document, this particular one you signed as the

10   engagement manager; correct?                          10:02:39

11      A.   I can see this printout.  I signed it.

12      Q.   All right.  And then going back to page 1,

13   and continuing on to page 2, there is an explanation

14   of the checklist and a description of areas

15   requiring a detailed review.                          10:03:08

16          Do you see that?

17      A.   Can you point to the sections you're

18   referring?

19      Q.   Sure.  At the top of the page, it says:

20          "This checklist is organized into the          10:03:21

21          following sections."

22          Do you see that?

23      A.   Which page are you on?  Sorry.

24      Q.   First page.  Top of the page.

25      A.   Oh, first.  Yes.                               10:03:29
```

```
 1        Q.   Okay.  And you understood on this page, and      10:03:32

 2   on the next page, page 2, there was a description of

 3   checklist items which the engagement leader and

 4   manager would sign off on; right?

 5        A.   Yes.                                             10:03:46

 6        Q.   And we're not going to go through every

 7   item on this checklist, but let's just take a couple

 8   of examples.

 9             If we go to the section on page 8 -- let's

10   turn to page 8 of the document.  There's a              10:04:01

11   Section 12 called "Evaluating Control Deficiencies."

12             Do you see that?

13        A.   Yes.

14        Q.   Before signing off on this EGA, you would

15   ensure that any control deficiencies have been          10:04:14

16   identified and evaluated on a document called

17   "Summary of Aggregate Deficiencies" or "SAD"; right?

18        A.   Yes.

19        Q.   Okay.  And you would ensure that

20   compensating controls have been sufficiently            10:04:29

21   documented, considered, and tested when relying on

22   such controls; right?

23             MS. EVANS:  Overbroad.  Vague and

24   ambiguous.

25             THE WITNESS:  Yes.                             10:04:42
```

1           BY MR. HUESTON:                               10:04:44

2      Q.   Now let's go to page 10, and look at the

3  Section 16, entitled "Significant Matters."

4           Do you see that?

5      A.   Yes.                                          10:04:54

6      Q.   And before signing off on the EGA, you and

7  the engagement leader would confirm that all

8  significant matters, such as control deficiencies,

9  have been documented; right?

10     A.   Yes.                                          10:05:11

11     Q.   And then moving to page 11, Section 19, is

12 entitled "Conclude on Sufficiency of Audit Evidence

13 Obtained and Documented."

14          Do you see that?

15     A.   I don't see 19.                               10:05:26

16     Q.   Sorry.

17     A.   Oh, beginning of the page?

18     Q.   Yeah.  Top of the page 11, there's No. 19,

19 titled "Conclude on Sufficiency of Audit Evidence

20 Obtained and Documented."                              10:05:36

21          Are you with me?

22          MS. EVANS:  No.  You mean the bottom of

23 page 10; correct?

24          MR. HUESTON:  Well, it's on page 11 of

25 mine.  It might be on the bottom of your page.  It     10:05:45

```
 1   looks like on the bottom of your page.  So my        10:05:45
 2   mistake.
 3            BY MR. HUESTON:
 4        Q.   So at the bottom of page 10, do you see the
 5   Section 19, "Conclude on Sufficiency of Audit         10:05:50
 6   Evidence Obtained and Documented"?
 7        A.   Yes.
 8        Q.   All right.  And before signing off on this
 9   EGA, you would confirm that all audit work has been
10   performed and audit documentation has been completed  10:06:02
11   in accordance with PwC's documentation standards;
12   correct?
13        A.   Yes.
14        Q.   And you would confirm that appropriate
15   evidence has been obtained to support the             10:06:14
16   conclusions of the audit; right?
17            MS. EVANS:  Overbroad.  Vague and
18   ambiguous.
19            THE WITNESS:  Yes.
20            BY MR. HUESTON:                               10:06:22
21        Q.   What is the significant matters EGA?
22            MS. EVANS:  Vague and ambiguous.
23   Overbroad.
24            THE WITNESS:  It is a matter that -- it is
25   judgmental.  I can't give you, like, exact case by    10:06:45
```

```
 1   case.  It is a matter that the audit team does         10:06:52
 2   create when there is a matter of particular
 3   significance.
 4           BY MR. HUESTON:
 5       Q.  Okay.  Would your assessment of significant     10:06:58
 6   matters include reviewing and signing off on an SAD?
 7           MS. EVANS:  Overbroad.
 8           THE WITNESS:  I recall that also evolved.
 9   I do not remember at the moment if the SAD was a
10   significant matter or there was an EGA called SAD       10:07:28
11   that says you should create a significant matter
12   called SAD.  So ...
13           BY MR. HUESTON:
14       Q.  Fair enough.  Let's look at Exhibit 5.
15           And just -- this Exhibit 5, entitled          10:07:38
16   "Engagement Leader and Manager Checklist" dated
17   June 2013, if we turn to page 20, Section 16,
18   "Significant Matters."
19           Do you see that?
20       A.  Slow down.  Which one?                          10:07:51
21       Q.  Sure.  You're on Exhibit 5.
22       A.  Yeah.
23       Q.  Turn to, I believe, page 10, No. 16.
24       A.  Yes.
25       Q.  It says "Significant Matters"; right?           10:08:00
```

```
 1      A.   Yes.                                           10:08:02

 2      Q.   And significant matters include -- look at

 3   the second bullet point -- the SAD; correct?

 4      A.   Yes.

 5      Q.   All right.  Let's talk about the SAD.         10:08:13

 6           What steps would you take typically before

 7   signing off on an SAD?

 8      A.   To review the content of the SAD and make

 9   sure I was comfortable with before signing off.

10      Q.   All right.  Now, let's go to the end of      10:08:34

11   page 11.  That's where you signed off there as the

12   engagement manager; right?

13      A.   I see this printout, and I see my name on

14   it.  I know I signed off Cavium database.  I cannot

15   say that this is an exact copy of what we were        10:08:59

16   using, the Cavium electronic web papers.

17      Q.   All right.  But looking at this, you have

18   no reason to doubt that, in fact, that indicates

19   your sign-off; right?

20           MS. EVANS:  Calls for speculation.  Vague    10:09:10

21   and ambiguous.  Overbroad.

22           THE WITNESS:  I would repeat my previous

23   answer.

24           BY MR. HUESTON:

25      Q.   Okay.  Can you recall not signing off on     10:09:22
```

```
 1   any particular engagement while at PwC?            10:09:23

 2           MS. EVANS:  Vague and ambiguous.

 3           THE WITNESS:  Not signing off what?

 4           BY MR. HUESTON:

 5     Q.   All right.  I'm going to just -- I'll      10:09:36

 6   scratch that question.

 7           When you --

 8           MS. EVANS:  Can we stop for a minute?  Can

 9   we take a restroom break?

10           MR. HUESTON:  Can I finish a couple of     10:09:43

11   questions, and then we can do?  I'm in the middle of

12   a couple of questions.

13           MS. EVANS:  I would prefer to do it now.

14           MR. HUESTON:  You're going to interrupt

15   my -- my questioning?                             10:09:50

16           MS. EVANS:  There's not a question pending.

17           MR. HUESTON:  Well, generally one is

18   enabled and allowed to finish the questions in a

19   line.  I have two or three questions.  If you

20   insist --                                         10:10:00

21           MS. EVANS:  Sorry.  I really have to go to

22   the restroom.

23           MR. HUESTON:  All right.  We'll take a

24   break.

25           THE VIDEOGRAPHER:  We're going off the     10:10:07
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 87

```
 1   a consequence, that I fought against it.              10:54:03

 2          BY MR. HUESTON:

 3      Q.   And other than that, can you identify any

 4   other consequences?

 5          MS. EVANS:  Overbroad.  Speculation.  Vague    10:54:11

 6   and ambiguous.

 7          THE WITNESS:  I can't speculate.

 8          BY MR. HUESTON:

 9      Q.   I'm not asking you to speculate.

10          Other than what you described, can you         10:54:19

11   recall any other consequences of the performance

12   note going in your file?

13          MS. EVANS:  Overbroad.  Speculation.  Vague

14   and ambiguous.  He's answered.

15          BY MR. HUESTON:                                10:54:30

16      Q.   You can go ahead.

17      A.   I will repeat the same answer.

18      Q.   Well, you haven't answered the question.

19   I'm entitled to get an answer.  If you can't recall,

20   that's fine.  I don't want you to guess.  But you've  10:54:39

21   identified one consequence, and I'm asking if you

22   recall any others.  And I am entitled to have an

23   answer to that.

24          MS. EVANS:  Same objections.

25   ///
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 88

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 10:54:52 |
| 2 | Q.   You may answer. | |
| 3 | A.   I don't recall. | |
| 4 | Q.   Okay.  You, while at PwC, were staffed on | |
| 5 | engagement teams for Cavium; correct? | 10:55:14 |
| 6 | A.   Yes. | |
| 7 | Q.   And what kind of company is Cavium? | |
| 8 | A.   You mean the industry or -- what do you | |
| 9 | mean, what kind of company? | |
| 10 | Q.   I'm just asking you about Cavium. | 10:55:25 |
| 11 | Can you describe what kind of company it | |
| 12 | is? | |
| 13 | A.   It's a public company in the semiconductor | |
| 14 | business. | |
| 15 | Q.   And when did you first begin working on | 10:55:36 |
| 16 | Cavium engagements at PwC? | |
| 17 | A.   In quarterly review 2012.  I believe it was | |
| 18 | Q2. | |
| 19 | Q.   And starting in 2012, who do you recall was | |
| 20 | the engagement leader on the engagement team? | 10:55:55 |
| 21 | A.   Tye Thorson. | |
| 22 | Q.   And during that time, you served as the | |
| 23 | senior manager for the Cavium audits; right? | |
| 24 | A.   Yes. | |
| 25 | Q.   During your audit work on Cavium, did you | 10:56:20 |

**DX1649-88**

```
 1   interact with Cavium's CFO, Art Chadwick?              10:56:23

 2       A.   Yes.

 3       Q.   And did you interact with Cavium's CAO,

 4   Suzy Seandel?

 5       A.   Yes.                                           10:56:34

 6       Q.   And, in general, how often did you interact

 7   with them?  A few times a week or a month?  Can you

 8   quantify?

 9       A.   I would say it depends.  When we were

10   on-site, several times during the week.                10:56:51

11       Q.   Okay.  I'm now going to place before you

12   what I'm going to represent -- because these are

13   large spreadsheets -- as the Cavium 2012 SAD.

14            MR. HUESTON:  And we're going to mark this

15   document as the next in order.                         10:57:33

16            (Marked for identification purposes,

17             Exhibit 12.)

18            MS. EVANS:  That's Exhibit 12?

19            MR. HUESTON:  Yes.

20            MS. EVANS:  Do we have an extra copy?         10:57:56

21            MR. FURESVICH:  Yeah.

22            MS. EVANS:  Thank you.  This was produced?

23            MR. FURESVICH:  Yes.

24            MS. EVANS:  Okay.  Do we have Bates numbers

25   on it?                                                 10:58:14
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 97

```
 1      A.   Yes.                                          11:18:03

 2      Q.   Okay.  And you believed that the material

 3  weaknesses with respect to the Harmonic audit

 4  related to the subledger accounting issue; right?

 5      A.   No.                                           11:18:18

 6      Q.   What did you believe the material weakness

 7  related to?

 8      A.   It was pervasive on competency of the

 9  finance department.

10      Q.   Okay.  And your engagement team did a        11:18:34

11  national consultation on that issue; right?

12      A.   Nope.

13      Q.   You consulted with national team members

14  with respect to the issue you identified; right?

15      A.   We consulted with national on one issue      11:18:48

16  that I identified.

17      Q.   And what issue was that?

18      A.   The accounting convention of deferred

19  revenue.

20      Q.   The accounting convention of deferred        11:18:57

21  revenue?

22      A.   Yes.

23      Q.   And is there another issue that you did not

24  consult with national on that you thought related to

25  a material weakness?                                  11:19:20
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 98

| | | |
|---|---|---|
| 1 | MS. EVANS:  Overbroad. | 11:19:23 |
| 2 | THE WITNESS:  We consulted on the deferred | |
| 3 | revenue matter, and that's the only consultation we | |
| 4 | did. | |
| 5 | BY MR. HUESTON: | 11:19:34 |
| 6 | Q.  Well, just so I understand it, at that time | |
| 7 | had you identified any material weakness, other than | |
| 8 | what you called the accounting convention of | |
| 9 | deferred revenue? | |
| 10 | A.  I did not say that the accounting of the | 11:19:46 |
| 11 | deferred revenue was a material weakness.  I stated | |
| 12 | I that I believe the material weakness was related | |
| 13 | to the competence of the finance department. | |
| 14 | (Reporter clarification.) | |
| 15 | MS. EVANS:  You started with "I do not | 11:20:02 |
| 16 | believe," and go ahead. | |
| 17 | THE WITNESS:  Okay. | |
| 18 | MS. EVANS:  Think about your answer. | |
| 19 | (Discussion off the record.) | |
| 20 | THE WITNESS:  I stated that the material | 11:20:07 |
| 21 | weakness was related to the competency of the | |
| 22 | finance department. | |
| 23 | BY MR. HUESTON: | |
| 24 | Q.  So did you, in fact, consult with national | |
| 25 | about what you felt was the material weakness, the | 11:20:50 |

Epiq Court Reporting Solutions - New York
1-800-325-3376                    www.deposition.com

**DX1649-98**

Confidential
MAURO BOTTA - 09/25/2018                    Page 99

```
 1    competency of the finance department?              11:20:55

 2       A.    No.

 3             MR. HUESTON:  Let's go -- we're going to

 4    put these two together as 16 and 17.  Mark the first

 5    document 16 and the attachment 17.                 11:21:34

 6             (Marked for identification purposes,

 7              Exhibits 16 and 17.)

 8             BY MR. HUESTON:

 9       Q.    You recognize Exhibit 16 as a cover e-mail

10    to you and others for what is marked as Exhibit 17, 11:22:06

11    the Harmonic SLA memo; right?

12       A.    The same as before.  These are printouts.

13       Q.    Okay.  And that's your name on the e-mail,

14    right, Mauro Botta?

15       A.    Yes.                                       11:22:24

16       Q.    Okay.  And turning your attention to the

17    memo itself, you're listed there as the manager,

18    with Susan Ledezma; right?

19       A.    Yes.

20       Q.    Do you recall reviewing this memo?         11:22:50

21       A.    I do not recall.  It's possible.

22       Q.    Okay.  But it would be your custom and

23    practice to review a memo with your -- that listed

24    your name on it, like here; right?

25       A.    The portion that I was responsible for,    11:23:13
```

DX1649-99

| | | |
|---|---|---|
| 1 | Q.   And you write: | 11:33:39 |
| 2 | "Anna, I am okay with the note | |
| 3 | attached.  I am Mauro Botta and I approve | |
| 4 | this message." | |
| 5 | That's what you wrote; right? | 11:33:47 |
| 6 | A.   Yes. | |
| 7 | Q.   And attached as the next exhibit, 21, are | |
| 8 | the notes, the Harmonic notes, reflecting a | |
| 9 | discussion on February 11th, 2016, with yourself and | |
| 10 | three others listed in the discussion notes; right? | 11:34:04 |
| 11 | A.   Yes. | |
| 12 | Q.   And these are notes of a meeting between | |
| 13 | you, Mr. Haavardtun, and Mr. Simonetti of national; | |
| 14 | right? | |
| 15 | A.   I believe Anna Watson was there during one | 11:34:22 |
| 16 | meeting as well. | |
| 17 | Q.   Okay.  And if you turn to the second page | |
| 18 | of the notes, you see at the top -- can you read | |
| 19 | that bullet point, the first bullet point at the | |
| 20 | top? | 11:34:41 |
| 21 | A.   "No implication of fraud, | |
| 22 | manipulation or lack of | |
| 23 | integrity.  Impacts consideration of | |
| 24 | risk." | |
| 25 | Q.   And that was one of the points discussed at | 11:34:50 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 108

```
 1   that meeting, according to your notes that you          11:34:52
 2   approved; right?
 3       A.   I do not recall that I am the one that took
 4   those notes.
 5       Q.   Those are the notes that you reference in      11:35:00
 6   your e-mail that we just went over in Exhibit 20,
 7   where you stated:
 8              "I am Mauro Botta and I approve this
 9              message."
10              Right?                                         11:35:11
11       A.   It does not mean that those were my notes.
12       Q.   The line before, you said:
13              "I am okay with the notes attached."
14              You wrote that; right?
15       A.   Yes.                                             11:35:19
16       Q.   Okay.  And you recall that the final
17   Harmonic SAD did not document any material
18   weaknesses.  You recall that; right?
19       A.   Sorry.  Can you repeat the question?
20       Q.   Sure.                                            11:35:38
21              The final Harmonic SAD in 2015, you recall
22   that that SAD did not document any material
23   weaknesses; correct?
24              MS. EVANS:  Calls for speculation.
25   Overbroad.                                                11:35:48
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 11:35:50 |
| 2 | Q.   You can answer. | |
| 3 | A.   Yes. | |
| 4 | MR. HUESTON:  Mark this as the next in | |
| 5 | order.  It's 23, is it? | 11:36:28 |
| 6 | THE REPORTER:  22. | |
| 7 | (Marked for identification purposes, | |
| 8 | Exhibit 22.) | |
| 9 | BY MR. HUESTON: | |
| 10 | Q.   So I've handed you a screenshot I'd ask you | 11:36:48 |
| 11 | to take a look at. | |
| 12 | MS. EVANS:  You're not passing me copies of | |
| 13 | documents anymore for some reason.  Thank you. | |
| 14 | MR. HUESTON:  You can just ask, and we'll | |
| 15 | hand you them if we forget to. | 11:37:05 |
| 16 | BY MR. HUESTON: | |
| 17 | Q.   Looking at Exhibit 22, do you recognize | |
| 18 | this as a screenshot from the PwC Aura Online | |
| 19 | workplace? | |
| 20 | A.   I'm actually not familiar with Aura Online. | 11:37:21 |
| 21 | Our work papers at the time were not documented in | |
| 22 | Aura Online.  It's regular Aura. | |
| 23 | Q.   Okay.  You recall that you reviewed and | |
| 24 | signed off on the SLA consultation; right? | |
| 25 | A.   Yes. | 11:37:38 |

```
 1      Q.   Okay.  And with that sign-off, you agreed    11:37:40

 2   with and approved the conclusion of that

 3   consultation; correct?

 4      A.   Pressured, but, yes.

 5      Q.   Now, at the time of the sign-off on this     11:38:20

 6   audit, you did not believe that Harmonic violated

 7   any laws; correct?

 8           MS. EVANS:  Calls for speculation.  Calls

 9   for a legal conclusion.  Overbroad.  Vague and

10   ambiguous.                                           11:38:32

11           BY MR. HUESTON:

12      Q.   You can answer.

13      A.   I'm sorry.  Can you repeat the question?

14      Q.   Sure.

15           At the time that you signed off on that      11:38:37

16   Harmonic audit, you did not think that Harmonic

17   violated any laws; correct?

18           MS. EVANS:  Calls for a legal conclusion.

19   Calls for speculation.  Overbroad.  Vague and

20   ambiguous.                                           11:38:47

21           BY MR. HUESTON:

22      Q.   Well, let me back up.  Let's take the

23   question off.

24           You recall that you also signed off on the

25   Harmonic SAD; right?                                 11:39:01
```

```
1      A.   Yes.                                          11:39:05

2      Q.   Okay.  So -- and as part of that, you would

3  also have signed off on the engagement leader and

4  manager checklist for the Harmonic audit; right?

5      A.   Yes.                                          11:39:21

6      Q.   All right.  So with reference to those

7  sign-offs, at the time that you did those sign-offs,

8  you did not think that Harmonic violated any laws;

9  right?

10          MS. EVANS:  Calls for speculation.  Calls    11:39:32

11  for a legal conclusion.  Overbroad.  Vague and

12  ambiguous.

13          BY MR. HUESTON:

14      Q.   You can answer.

15      A.   Violated any laws.  It depends how you       11:39:39

16  define "law."  But, again, I signed off under

17  pressure.

18      Q.   I'm just asking, did you think at the time

19  that Harmonic violated any laws?

20          MS. EVANS:  Calls for speculation.           11:39:58

21          THE WITNESS:  What's the definition of

22  "law"?  If you say audit standards, yes, I believe

23  that there were not -- they should have had a

24  material weakness.

25  ///
```

BY MR. HUESTON: 11:40:11

Q. I'm not -- when I say "laws," I'm not including audit standard.

So other than audit standards, did you believe that Harmonic violated any law, a criminal 11:40:23 law, a civil law, any law at all?

MS. EVANS: Calls for speculation. Calls for a legal conclusion. Vague and ambiguous. He doesn't know what laws are. He answered it fine.

MR. HUESTON: Well, no. You're doing a 11:40:34 speaking objection. That's improper.

MS. EVANS: I'm not. It's improper to ask him about laws --

MR. HUESTON: It is not --

MS. EVANS: -- when you're not asking about 11:40:38 specific laws.

MR. HUESTON: Well, no, I don't have to do that. And --

MS. EVANS: I will -- we'll take it up with the judge, then. 11:40:45

MR. HUESTON: That's fine.

BY MR. HUESTON:

Q. So the question to you, sir, at that time -- putting aside concerns about audit standards, did you believe at that time, in 2015, 11:40:52

| | |
|---|---|
| 1 | that Harmonic had violated any laws? | 11:40:55 |

1    that Harmonic had violated any laws?                    11:40:55

2            MS. EVANS:  Speculation.  Calls for a legal

3    conclusion.  Vague.  Ambiguous.  Overbroad.

4            BY MR. HUESTON:

5        Q.   You can answer.                                11:41:05

6        A.   I don't think I'm in a position to answer.

7        Q.   Well, did you think at the time -- I'm

8    asking for your best recollection of whether you

9    thought at the time, one way or the other, whether

10   there was a violation of law by Harmonic.             11:41:15

11           MS. EVANS:  Calls for a legal conclusion.

12           BY MR. HUESTON:

13       Q.   Putting aside a concern about audit

14   standards.

15           MS. EVANS:  Calls for a legal conclusion.     11:41:25

16   Speculation.  Overbroad.  Vague and ambiguous.

17           THE WITNESS:  I would have to speculate.

18   No.

19           BY MR. HUESTON:

20       Q.   And what audit standards did you believe      11:41:36

21   Harmonic violated in 2015?

22       A.   As I said, I believe they had a material

23   weakness.

24       Q.   And with that material weakness, what audit

25   standard or standards did you believe they violated?   11:42:05

| | | |
|---|---|---|
| 1 | A.   I can't give you the exact numbering. | 11:42:10 |

```
 1        A.    I can't give you the exact numbering.        11:42:10

 2        Q.    Can you give me a description of what that

 3    audit standard was without the exact numbering?

 4        A.    A standard that assesses the auditor

 5    responsibility to issue an internal control opinion     11:42:24

 6    and how to evaluate those deficiencies.

 7        Q.    And in 2015, did you believe that PwC's

 8    national team violated audit standards?

 9             MS. EVANS:  Overbroad.

10             You can answer.                                11:42:48

11             THE WITNESS:  Yes.

12             BY MR. HUESTON:

13        Q.    And I'm asking specifically with respect to

14    Harmonic.

15        A.    Yes.                                          11:42:55

16        Q.    And what is that?  What audit standards do

17    you believe they violated at that time with respect

18    to Harmonic?

19        A.    Independence, objectivity, and the others

20    that I mentioned in my previous response.               11:43:13

21        Q.    What are those others?

22        A.    Internal control evaluation and evaluation

23    of the deficiencies.

24        Q.    Okay.  And at that time, in 2015, was it

25    your position that PwC's national team, other than      11:43:40
```

```
 1   violating audit standards, violated some other law?     11:43:43

 2          MS. EVANS:  Overbroad.  Calls for a legal

 3   conclusion.

 4          BY MR. HUESTON:

 5      Q.   You may answer.                                  11:43:52

 6      A.   I'm not going to speculate.

 7      Q.   Well, I'm not asking you to speculate.

 8          Did you have a view then that they violated

 9   a law other than what you described as the violation

10   of audit standards?                                      11:44:03

11          MS. EVANS:  Calls for a legal conclusion.

12   Speculation.

13          BY MR. HUESTON:

14      Q.   It's just a "yes" or a "no."

15          MS. EVANS:  Overbroad.                            11:44:08

16          THE WITNESS:  I cannot give you an answer

17   because I do not have the full breadth of knowledge

18   of all the laws.

19          BY MR. HUESTON:

20      Q.   So you didn't have a view as to whether          11:44:17

21   they violated a law, one way or the other, in 2015;

22   is that right?

23          MS. EVANS:  Misstates his testimony.

24          BY MR. HUESTON:

25      Q.   You can answer.                                  11:44:26
```

```
 1   then with the then-partner Tina Knauss, K-N-A-U-S-S,    11:56:01
 2   last name.  And then Trudy Doucet, we discussed the
 3   topic.
 4        Q.   Anyone else with respect to Bluecoat?
 5        A.   No.  Not that I recall.                        11:56:18
 6        Q.   Okay.  Moving to Spansion, No. 3, who were
 7   the people who told you about the issues that you
 8   described with Spansion?
 9        A.   Mario Piergallini.
10        Q.   And for the court reporter, please spell      11:56:35
11   the last name.
12        A.   P, like Philadelphia, I-E-R-G-A-L-L-I-N-I.
13        Q.   Anyone else?
14        A.   Not that I recall, no.
15        Q.   Okay.  And moving to Avago/Broadcom, No. 4,   11:56:53
16   who did you speak to about the issues itemized under
17   number four?
18        A.   Kevin Hasegawa.  Vykintas Striuzas.
19        Q.   Okay.  That one I think you're going to
20   have to spell.                                           11:57:09
21        A.   Which one?  Kevin Hasegawa?
22        Q.   No.  The second one.
23        A.   Okay.  V, like Victor, Y-K-I-N-T-A-S is the
24   first name.  And then the last name is
25   S-T-R-I-U-Z-A-S.                                         11:57:31
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 125

```
 1      Q.   Anyone else?                              11:57:40

 2      A.   Let me just reread it.

 3           MS. EVANS:  Overbroad.

 4           THE WITNESS:  Mario Piergallini.

 5           BY MR. HUESTON:                            11:58:01

 6      Q.   Okay.  Anyone else pertinent to

 7  Avago/Broadcom that you spoke to?

 8      A.   Not that I remember.

 9      Q.   Okay.  And same question with respect to

10  No. 5, Innovium.                                   11:58:16

11      A.   Vykintas Striuzas.

12      Q.   Anyone else?

13      A.   No, not that I recall.

14           MR. HUESTON:  Okay.  Why don't we take our

15  lunch break now.  It's just about noon.            11:58:32

16           THE VIDEOGRAPHER:  We're going off the

17  record.  The time is 11:58 a.m.

18           (Recess taken, from 11:58 to 12:59.)

19           THE VIDEOGRAPHER:  We're back on the record

20  at 12:59 p.m.                                      12:59:01

21           BY MR. HUESTON:

22      Q.   Mr. Botta, I'm going to try to shortcut

23  some of this.

24           Going back to the 2012 Cavium audit, if I

25  can direct your attention to that time period, you 12:59:11
```

**DX1649-125**

Confidential
MAURO BOTTA - 09/25/2018                    Page 126

```
 1   recall that there were no material weaknesses noted     12:59:16

 2   in the audit for the 2012 Cavium audit; correct?

 3       A.   Correct.

 4       Q.   And as you did in the other audits, you

 5   reviewed and signed off on the 2012 engagement          12:59:30

 6   leader and manager checklist for Cavium; right?

 7       A.   Yes.

 8       Q.   And you also reviewed and signed off on the

 9   2012 SAD for Cavium as well; right?

10       A.   Yes.                                            12:59:48

11       Q.   And, Mr. Botta, do you claim that you

12   reviewed and signed off on those because of pressure

13   for 2012?

14       A.   Not at the time, no.

15       Q.   Okay.  And, likewise.  Let me just ask you     01:00:08

16   briefly about the 2013 Cavium audit.

17           You were also involved in preparing the SAD

18   in 2013 for Cavium; correct?

19       A.   I do not recall if I was involved in

20   preparing it or just reviewing it.                      01:00:37

21       Q.   Okay.  You would have either helped prepare

22   or reviewed it?

23       A.   Either, yes.

24       Q.   Okay.  And likewise, in 2013, there was no

25   material weakness noted in the audit for Cavium in      01:00:50
```

**DX1649-126**

Confidential
MAURO BOTTA - 09/25/2018                    Page 127

| | | |
|---|---|---|
| 1 | 2013; correct? | 01:00:54 |
| 2 | MS. EVANS:  Overbroad. | |
| 3 | THE WITNESS:  There was no material | |
| 4 | weakness as part of our control opinion for 2013 | |
| 5 | audit. | 01:01:04 |
| 6 | BY MR. HUESTON: | |
| 7 | Q.   Now, during the 2013 audit, do you recall | |
| 8 | noting a control deficiency with respect to an issue | |
| 9 | relating to XPliant? | |
| 10 | A.   I remember both years, 2012 and 2013, we -- | 01:01:34 |
| 11 | I had several discussions with Mr. Thorson on issues | |
| 12 | related to XPliant. | |
| 13 | Q.   Okay.  And specifically, do you recall | |
| 14 | crafting a consultation memorandum for PwC's | |
| 15 | national office to analyze an alleged control | 01:01:58 |
| 16 | deficiency with respect to Alliant -- I'm sorry, | |
| 17 | XPliant? | |
| 18 | A.   I recall we drafted a consultation with | |
| 19 | national for a financial instrument for XPliant, not | |
| 20 | for controls. | 01:02:13 |
| 21 | Q.   And do you recall that that related how to | |
| 22 | treat convertible security notes of XPliant from | |
| 23 | Cavium's perspective because XPliant and Cavium had | |
| 24 | been consolidated for accounting purposes? | |
| 25 | A.   But that was not the reason for the | 01:02:32 |

**DX1649-127**

```
 1   consultation, but we consulted on one of the notes,     01:02:33
 2   of how it should have been accounted.
 3        Q.   And what do you recall was the reason for
 4   the national consultation memo that you prepared?
 5        A.   It was technically a very complex            01:02:48
 6   instrument that, even per our national, they stated
 7   that they did not come across such an instrument
 8   before.
 9        Q.   Okay.  I understand.  I think you're
10   describing how it was technical, but what was the     01:03:06
11   reason that you recall for you preparing the
12   national consultation memo in that instance?
13        A.   In discussion with Mr. Thorson, I
14   identified that that was a complex instrument, and
15   it is common practice when there are issues of        01:03:24
16   particular significance of complexity, that you do
17   consult with national office for having experts to
18   validate what the audit engagement team is
19   asserting.
20        Q.   Okay.  And do you remember that, in fact, a  01:03:46
21   national consultation did occur on the issues you
22   raised in your memo?
23        A.   Yes.
24        Q.   And who was involved in that consultation
25   from national?                                        01:04:02
```

```
 1        A.   So to the best I recall, there was          01:04:09
 2   Steven Halterman.  H-A-L-T, like Toronto, E-R-M-A-N,
 3   like Nancy.  And I think John Horan III.  So John is
 4   John.  Then Horan is H-O-R-A-N, like Nancy.  And
 5   then there was like the Roman Numeral III after.      01:04:41
 6        Q.   What about John Althoff?  Does that name
 7   ring a bell?
 8        A.   It rings a bell as far as him being a
 9   national office partner.  I do not recall if we
10   consulted with him as well.  It's possible, but I     01:04:57
11   don't recall.
12        Q.   Okay.  Let me see if I can show you a
13   document that might refresh your recollection.
14             MR. HUESTON:  Mark that next in order,
15   please.                                               01:05:21
16             (Marked for identification purposes,
17             Exhibit 24.)
18             BY MR. HUESTON:
19        Q.   And Tab 24 is a two-page e-mail chain that
20   starts from you at the top, from Mauro Botta, to      01:05:40
21   John Horan, February 24th, 2014, Re: Forward Cavium.
22             Do you see that?
23        A.   Yes.
24        Q.   Okay.  And then below, if you look further
25   down in the e-mail chain, you can see an e-mail       01:05:59
```

```
 1      A.   I have no way of saying, because I do not      01:14:55

 2    know if Mr. Gupta ended up doing what Mr. Thorson

 3    said and what Mr. Thorson wrote also in the

 4    performance survey.

 5      Q.   Okay.  And, in fact, you do remember, both     01:15:06

 6    then and now, that Cavium had independently prepared

 7    its own memo on or about the same date,

 8    February 21st; right?

 9      A.   No.

10      Q.   Well, that's what the date of the memo is,     01:15:20

11    February 21st; correct?

12      A.   I cannot conclude it was independently

13    prepared.

14      Q.   Well, looking at Bates stamp 1575, that's

15    February 21st, 2014; right?                           01:15:31

16      A.   Yes.

17      Q.   Okay.  And going back to Exhibit 24, can we

18    turn back there, please.  Let's look at the date

19    here.  That e-mail at the top begins February 24th,

20    2014, doesn't it?                                     01:15:58

21      A.   Yes.

22      Q.   And these were changes that you acknowledge

23    processing to your memo with input by national;

24    right?

25      A.   Yes.                                           01:16:09
```

```
 1      Q.   And February 24th, if that date is a true     01:16:10
 2   and correct date from the e-mail, is 13 days later
 3   than the date of the Cavium memo that I just showed
 4   you at Bates stamp 1575.
 5      A.   February 21st versus February 24th is three   01:16:28
 6   days in my mind.
 7      Q.   Three days.  You've corrected me.  It's
 8   three days earlier than the revised version that you
 9   were preparing on February 24th; right, sir?
10      A.   Yes.                                           01:16:39
11      Q.   Okay.  And in 2013, with respect to the
12   Cavium audit, once again, you signed off on the 2013
13   Cavium EGAs, right, meaning the engagement leader
14   and management checklist; correct?
15      A.   Yes.                                           01:17:08
16      Q.   And you reviewed and signed off on the
17   Cavium 2013 SAD; correct?
18      A.   Yes.
19      Q.   And is it your testimony, sir, that you
20   were -- you disagreed with what you signed off on    01:17:22
21   with respect to the 2013 Cavium audit?
22      A.   What's the question?
23      Q.   Is it your testimony, sir, that you
24   disagreed with what you signed off on with respect
25   to the 2013 Cavium audit?                             01:17:43
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 138

1       A.   I disagreed in 2014 on the prior two years        01:17:46

2    and in 2014.

3       Q.   Okay.  But in 2013, when it was time for

4    you to sign off, you had no disagreement to note and

5    you, in fact, signed off; right?                          01:17:58

6       A.   We had several discussions with

7    Mr. Thorson.  There was no formal disagreement.

8       Q.   There was no formal disagreement.

9            Are you alleging there was an informal

10   disagreement?                                             01:18:15

11      A.   We had several discussions where we saw

12   things differently.

13      Q.   Okay.  But at the end, when it was time to

14   sign off on the SAD and the engagement leader and

15   management checklist, you did so for 2013; right?         01:18:26

16      A.   Yes.

17      Q.   All right.  And at that time you did not

18   note in any documentation in the audit that you had

19   any disagreements with Mr. Thorson or anyone else;

20   right?                                                    01:18:40

21      A.   Correct.

22      Q.   And at the time that you signed off on the

23   2013 Cavium audit papers, meaning the SAD and the

24   engagement leader and management checklist, you did

25   not believe at that time that Cavium violated any         01:18:58

Confidential
MAURO BOTTA - 09/25/2018                    Page 141

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 01:21:30 |
| 2 | Q.  No.  I'm just asking for your recollection. | |
| 3 | Can you give me that answer, please? | |
| 4 | MS. EVANS:  There's three pages of | |
| 5 | information. | 01:21:37 |
| 6 | MR. HUESTON:  Well, you're speaking and | |
| 7 | directing the witness. | |
| 8 | MS. EVANS:  No, no, no. | |
| 9 | BY MR. HUESTON: | |
| 10 | Q.  If you can't recall, sir -- | 01:21:41 |
| 11 | MR. HUESTON:  No.  You cannot -- I'm not | |
| 12 | going to allow you to do long speaking objections. | |
| 13 | MS. EVANS:  I have not done that. | |
| 14 | BY MR. HUESTON: | |
| 15 | Q.  It's a simple question about whether you | 01:21:47 |
| 16 | recollect what those disagreements were at the time | |
| 17 | that you signed off on the Cavium audit. | |
| 18 | MS. EVANS:  You can refer to the complaint | |
| 19 | if you need to review. | |
| 20 | THE WITNESS:  I will refer to the | 01:21:57 |
| 21 | complaint. | |
| 22 | BY MR. HUESTON: | |
| 23 | Q.  Okay.  Without referring to the complaint, | |
| 24 | can you think of anything? | |
| 25 | MS. EVANS:  Overbroad. | 01:22:02 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 142

```
 1              THE WITNESS:  I can think of some --      01:22:08

 2              BY MR. HUESTON:

 3      Q.   Okay.  Tell me.

 4      A.   -- that are in the complaint.

 5              The consolidations related to XPliant.  The   01:22:13

 6   inventory write-down issue.  The sales of a group of

 7   assets.  Build-to-suit lease.

 8              (Reporter clarification.)

 9              THE WITNESS:  Build-to-suit lease.

10              The convertible note.  There's other ones I   01:22:56

11   can't recall.

12              BY MR. HUESTON:

13      Q.   Okay.  So moving into 2014, you continue to

14   work on the Cavium engagement team; right?

15      A.   Yes.                                          01:23:22

16      Q.   And at the end of the 2014 Cavium audit,

17   you raised various concerns about Cavium to your

18   engagement leader, Tye Thorson; right?

19      A.   Yes.

20      Q.   And did, in fact, Mr. Thorson ask you to    01:23:34

21   write down your views in a memo?

22      A.   He asked me to document my points in bullet

23   points.

24      Q.   Okay.  And then you complied with his

25   request and created such a document; right?         01:23:47
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 143

```
 1     A.    Yes.                                          01:23:51

 2           MR. HUESTON:  And let's take a look at

 3   that.

 4           (Marked for identification purposes,

 5           Exhibit 27.)                                  01:23:56

 6           BY MR. HUESTON:

 7     Q.    So taking a look at Exhibit 27, this is an

 8   e-mail attachment from you to Mr. Thorson, "Tye,

 9   please see below," dated February 22nd, 2015, with

10   an attached memo.                                     01:24:33

11           Do you have that before you?

12     A.    Yes.

13     Q.    And this is the memo that you prepared in

14   response to his request for you to write down your

15   views; correct?                                       01:24:44

16     A.    This is a printout.  I can't tell you if it

17   was the original memo or not.

18     Q.    Well, it is a copy of your memo; correct?

19     A.    Unless I compare with my memo, I can't tell

20   you for certain.                                      01:24:57

21     Q.    All right.  Well, I represent it is a copy

22   of your memo.  If at some time in our review you

23   note something that doesn't appear to be authentic,

24   please let me know.

25           MS. EVANS:  He will only respond to          01:25:10
```

DX1649-143

Confidential
MAURO BOTTA - 09/25/2018                 Page 144

1    questions.  Overbroad.                              01:25:11

2             MR. HUESTON:  Well, I'm going to leave that

3    out there as a continuing question for you.

4             MS. EVANS:  And we will disagree with that.

5             BY MR. HUESTON:                            01:25:20

6        Q.   So you, in fact, e-mailed your memo on or

7    about February 22nd, 2015; right?

8        A.   Yes.

9        Q.   And as of that date, the concerns that you

10   expressed in your memo were known to you for weeks,  01:25:32

11   if not months, beforehand; right?

12       A.   But also known to Mr. Thorson.

13       Q.   I'm just asking if they were known to you

14   for weeks, if not months, beforehand.

15       A.   Yes.                                       01:25:45

16       Q.   Okay.  And you remember that Cavium

17   originally planned to file its 2014 10-K on

18   February 25th; right?

19       A.   Yes.

20       Q.   And do you recall the drop-dead deadline    01:25:58

21   for file Cavium's 2014 10-K?

22       A.   I believe it was the Monday after that

23   original Cavium planned filing.

24       Q.   So March 2nd sound about right?

25       A.   I haven't done the math.                   01:26:13

Confidential
MAURO BOTTA - 09/25/2018                    Page 145

```
 1      Q.   And you were aware of those deadlines when    01:26:17
 2  you raised your concerns to Mr. Thorson; right?
 3      A.   Yes.
 4      Q.   Let's go over some of the concerns you
 5  raised in the memo.  Let's go to the second page of   01:26:40
 6  the memo.  And there is a section that starts in
 7  bold "Summary Facts, 2012, Q2."
 8           Do you see that?
 9      A.   Yes.
10      Q.   And under Q2, you describe a variable        01:26:57
11  interest entity, VIE, that was not disclosed to the
12  auditors and that you later discovered an agreement
13  under which Cavium was directing R&D efforts of the
14  VIE; is that right?
15      A.   Yes.                                          01:27:17
16      Q.   Okay.  And the VIE entity you're referring
17  to here is XPliant; right?
18      A.   Yes.
19      Q.   And what is the precise issue with XPliant
20  that you were trying to describe?                      01:27:36
21      A.   In which --
22      Q.   In this entry.
23      A.   The issue that I was raising was management
24  lack of transparency and competency.
25      Q.   You were raising, in part, Cavium's failure  01:28:01
```

```
 1   to communicate the existence of the contract between    01:28:03
 2   Cavium and XPliant to its financial department;
 3   right?
 4       A.   We did find at the time that Cavium finance
 5   did not seem aware that that agreement was being         01:28:18
 6   signed.
 7       Q.   And that was one of your competency issues;
 8   correct?
 9            MS. EVANS:  Calls for speculation.
10            BY MR. HUESTON:                                 01:28:29
11       Q.   Well, was it?
12       A.   I wouldn't characterize that that was
13   competency, the fact that they did not know an
14   agreement was signed.  The competency was that there
15   was no analysis prepared, no consideration being        01:28:42
16   done from a VIE perspective.
17            The fact that they did not know that
18   somebody else signed the contract, that was
19   indication of poor controls within the company.
20       Q.   Looking at the next paragraph, Q3, there        01:29:00
21   you're stating that Cavium sold some assets to a
22   private company named Open Silicon for $3.2 million
23   and accounted for the full $3.2 million as a
24   receivable without producing evidence of
25   collectability; right?                                   01:29:18
```

```
 1      A.   I do not recall.                        01:32:16

 2      Q.   And right underneath that, under Q4, you

 3  note that Cavium did not notify your team that it

 4  was not certain it could sell $3.9 million in

 5  inventory.  Only after you inquired into this issue  01:32:37

 6  did the CFO agree to write off the whole inventory

 7  amount; right?

 8      A.   We inquired the company, and then

 9  Mr. Thorson had a meeting with the CFO.

10      Q.   Okay.  And this issue you've described    01:32:50

11  under Q4, you did not document a control deficiency

12  related to that in the 2013 Cavium SAD; right?

13      A.   I do not recall.

14      Q.   Okay.  You would agree that if you had

15  identified a control deficiency in 2013 related to  01:33:09

16  Cavium, you would have included it and identified it

17  as such in the 2013 Cavium SAD; right?

18      A.   Provided the partner was okay with that.

19      Q.   Do you recall raising, for instance, this

20  issue with respect -- what you described under Q4    01:33:32

21  with the partner and the partner telling you you

22  were not allowed to list it as a control deficiency?

23      A.   I did not say I was not allowed to list it

24  as a control deficiency, but it was the theme of

25  these engagement that every time I believe that we  01:33:48
```

```
 1   had an audit finding, Mr. Thorson was saying that it      01:33:52
 2   was not.
 3        Q.   So that meant you had a disagreement;
 4   correct?
 5        A.   Yes.                                             01:34:04
 6        Q.   And you did not note that disagreement in
 7   the audit records in 2013, did you?
 8        A.   I did not.
 9        Q.   Okay.  Let's go to the last paragraph of
10   the memo, at the very end.  You write, in the             01:34:23
11   conclusion section, you --
12               "For this reason I propose to issue a
13               material weakness on the skill and
14               competence of the finance department
15               related to areas of income taxes,            01:34:43
16               treasury, and technical accounting."
17               Correct?
18        A.   Yes.
19        Q.   And so in your view, a material weakness
20   based on the incompetence of the finance department       01:34:51
21   should have been documented in the 2013 audit work
22   papers; right?
23        A.   As well as '12 and '13.
24        Q.   Okay.  And that was your position at that
25   time; right?                                              01:35:05
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 151

```
 1      A.   Yes.                                      01:35:05

 2      Q.   Now, after you sent this memo to

 3  Mr. Thorson, what happened?

 4      A.   In what day are you referring to?

 5      Q.   Well, you sent the memo to Mr. Thorson, it  01:35:21

 6  appears, on the date of the cover e-mail, on

 7  February 22nd.  And what do you recall happening

 8  next with respect to a response from anyone at PwC?

 9      A.   I recall the Monday after I got the call

10  from the QRP, Bob Heatley.                         01:35:44

11           (Reporter clarification.)

12           THE WITNESS:  QRP.  Bob -- Robert Heatley,

13  H-E-A-T-L-E-A-Y [sic].

14           BY MR. HUESTON:

15      Q.   And when you say "QRP," that's the quality  01:36:02

16  review partner; correct?

17      A.   Yes.

18      Q.   Okay.  And what do you recall him stating

19  to you?

20      A.   I wrote it in the complaint.  As of right  01:36:12

21  now, I recall that he stated that I would have

22  gotten a call later in the day from Mr. Thorson, and

23  what I wrote was putting the firm at risk, and this

24  was unprecedented.

25      Q.   Okay.  And do you recall going to a dinner  01:36:35
```

```
1    the following night with a Mr. Thorson?          01:36:40

2         A.   I believe the dinner was the same night.

3         Q.   Okay.

4         A.   That Monday.

5         Q.   Do you remember going to dinner with    01:36:48

6    Mr. Thorson that night, then, February 23rd?

7         A.   Yes.

8         Q.   Okay.  And you recall him expressing to you

9    that you had a decision; you could either retract

10   the memo or escalate it to national for          01:37:01

11   consultation; right?

12        A.   That was one of the things that he told me.

13        Q.   Okay.  And Mr. Thorson never told you that

14   you would not make partner if you decided to

15   escalate the issues you raised in the memo, did he?  01:37:20

16        A.   At that dinner or ...

17        Q.   Well, let's start with at the dinner.

18        A.   At the dinner, I made the statement and he

19   did not disagree.

20        Q.   Well, he didn't say you're not going to   01:37:38

21   make partner if you decide to escalate the issues;

22   he didn't say that, did he?

23        A.   I believe I just answered that question.

24        Q.   Well, did he state words to the effect of

25   if you escalate this, you will not make partner?   01:37:52
```

| | | |
|---|---|---|
| 1 | that the professional considers it | 01:41:55 |
| 2 | necessary to remove himself or herself | |
| 3 | from the engagement." | |
| 4 | Do you see that? | |
| 5 | A.   Yes. | 01:42:01 |
| 6 | Q.   So you knew from PwC guidance that if you | |
| 7 | concluded that you had a difference of views so | |
| 8 | significant, after the consultation steps, you could | |
| 9 | decide to remove yourself from the engagement; | |
| 10 | right? | 01:42:16 |
| 11 | A.   The fact that I was familiar with the | |
| 12 | paragraph does not mean that I memorized every | |
| 13 | paragraph. | |
| 14 | Q.   Okay.  But that was an option that PwC | |
| 15 | provided in writing for people who felt that they | 01:42:25 |
| 16 | had a difference of views that was so significant, | |
| 17 | they were unable to resolve it; correct? | |
| 18 | A.   Yes. | |
| 19 | Q.   Okay.  Now, when you spoke with your career | |
| 20 | coach, Christopher Smith, he expressed to you that | 01:42:46 |
| 21 | you should not worry about fears of PwC retaliation | |
| 22 | when raising your concerns; right? | |
| 23 | A.   Yes. | |
| 24 | Q.   And when you raised the issue afterwards | |
| 25 | with Kevin Healy, he also reassured you that you, in | 01:43:00 |

| | | |
|---|---|---|
| 1 | fact, had three choices; right? | 01:43:05 |
| 2 | A.   He did tell me I had three options. | |
| 3 | Q.   Okay.  And Mr. Healy did not pressure you | |
| 4 | to make a specific choice, did he? | |
| 5 | A.   He pressured me to make a choice. | 01:43:17 |
| 6 | Q.   Which choice do you believe he pressured | |
| 7 | you to make? | |
| 8 | A.   I did not say that he pressured me to make | |
| 9 | a specific choice.  I just said that he pressured me | |
| 10 | to make a choice. | 01:43:28 |
| 11 | Q.   I see.  Make a choice amongst those three | |
| 12 | options, that you had to do something; is that | |
| 13 | right? | |
| 14 | A.   Yes. | |
| 15 | Q.   Okay.  Do you need a break? | 01:43:35 |
| 16 | A.   No, no.  Just top off water. | |
| 17 | MS. EVANS:  I'll get some more. | |
| 18 | BY MR. HUESTON: | |
| 19 | Q.   And then you did, in fact, choose to move | |
| 20 | forward with the escalation; right? | 01:43:47 |
| 21 | A.   Yes. | |
| 22 | Q.   And do you recall requesting anyone | |
| 23 | specifically from national to participate in the | |
| 24 | consultation? | |
| 25 | A.   Yes. | 01:43:56 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 158

```
1      Q.   And who was that?                        01:43:57

2      A.   Gil Simonetti III.  S-I-M, like Milan, O-N,

3  like Nancy, E-T-T-I, and then the Roman Numeral III.

4      Q.   And why did you request Mr. Simonetti?

5      A.   Because Mr. Healy initially indicated     01:44:18

6  Tim Scott -- that's Tim Scott -- as a liaison to

7  deal with this matter.  And I expressed to Mr. Healy

8  my concerns on having Mr. Scott assigned to that.

9      Q.   Okay.  So they agreed that Mr. Simonetti

10 would be assigned at your request; right?           01:44:37

11     A.   Yes.

12     Q.   And you viewed Mr. Simonetti as a

13 straight-shooter; right?

14     A.   Yes.

15     Q.   Okay.  So you trusted Mr. Simonetti to get  01:44:46

16 to the fair conclusion, right, as a

17 straight-shooter?

18     A.   At the time, yes.

19     Q.   Okay.  And Mr. Healy agreed to your request

20 to staff Mr. Simonetti on that consultation;        01:44:57

21 correct?

22     A.   Yes.

23     Q.   And later that the day Mr. Simonetti held a

24 meeting with you, Mr. Healy, and Mr. Thorson;

25 correct?                                            01:45:06
```

```
1        A.    There were other party.  Was a -- was a      01:45:09

2   meeting/conference call.  Mr. Simonetti was on the

3   phone with someone, that I don't recall the name,

4   but was also either national or OGC.  Those were on

5   the phone.  And then in the room there was myself,    01:45:22

6   Mr. Healy, and Mr. Thorson.

7        Q.    Okay.  Thank you.

8              And what did you understand the purpose of

9   that meeting and call to be?

10       A.    To discuss what was going on.               01:45:34

11       Q.    In fact, for you to tell your side of the

12  story; right?

13       A.    I did not know that was the purpose of the

14  meeting.  But part of the meeting, yes, was to hear

15  my side.                                               01:45:46

16       Q.    Okay.  And so you did get an opportunity to

17  explain all the reasons why you thought Cavium

18  deserved a material weakness; correct?

19       A.    Yes.

20       Q.    Okay.  And did you speak about all the      01:45:55

21  issues you discussed in the memorandum you wrote to

22  Mr. Thorson?

23       A.    I do not recall if we read every single

24  words, but I do remember reading extensively from

25  it.                                                    01:46:09
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 160

1     Q.   Okay.  And you recall that Mr. Simonetti          01:46:10
2  asked questions of you about those issues; right?
3     A.   Yes.
4     Q.   And at the meeting, you and the other
5  people who were participating at the meeting decided    01:46:19
6  to perform a formal consultation on the 2014 SAD;
7  right?
8     A.   That was one of the decisions that came out
9  of that.
10    Q.   All right.  And did you, in fact, work on       01:46:34
11 preparing the 2014 SAD for the next several days?
12    A.   Not in isolation, but, yes.
13    Q.   Yeah.  You helped prepare it; right?
14    A.   Yes.
15    Q.   And who did you work with in putting that       01:46:46
16 SAD together?
17    A.   With Mr. Thorson and Mr. Gupta.
18    Q.   Okay.  And while you were preparing that
19 document, did you continue to communicate with the
20 national office?                                          01:47:01
21    A.   Only when Mr. Thorson was inviting me.
22    Q.   Inviting you to what?
23    A.   To speak to national with him present.
24    Q.   Okay.  Did you ever seek to speak to
25 national without him being present?                       01:47:18

DX1649-160

Confidential
MAURO BOTTA - 09/25/2018          Page 161

```
 1     A.   Not at that time.                            01:47:20

 2     Q.   All right.  And did the national team

 3   review and comment on the drafts that were being

 4   prepared now on this 2014 SAD?

 5     A.   Yes.                                          01:47:32

 6          MR. HUESTON:  Okay.  Let's go off the

 7   record.

 8          THE VIDEOGRAPHER:  We're going off the

 9   record.  The time is 1:48 p.m.

10          (Recess taken, from 1:48 to 2:01.)           01:48:33

11          (Marked for identification purposes,

12          Exhibit 28.)

13          THE VIDEOGRAPHER:  This is the beginning of

14   Media 3.  The time is 2:01, and we're back on the

15   record.                                             02:01:09

16          MS. EVANS:  We've had a lot of breaks, it

17   seems, because the exhibits have been unorganized.

18   So I'd appreciate we'd be a little more efficient

19   with the exhibits and breaks.

20          MR. HUESTON:  The exhibits have been taken    02:01:19

21   care of during normal break times, and we've lost no

22   time in the normal sequence of the deposition.

23          BY MR. HUESTON:

24     Q.   Mr. Botta, before you now is Exhibit 28,

25   and that is an e-mail with the national consultation  02:01:28
```

DX1649-161

Confidential
MAURO BOTTA - 09/25/2018                    Page 162

```
 1   memo.                                              02:01:35
 2           MS. EVANS:  Can I have Exhibit 28, please.
 3           MR. REITER:  Yes.
 4           MR. HUESTON:  It's in front of you.
 5           BY MR. HUESTON:                            02:01:45
 6       Q.   And this is, in fact, the national --
 7   you'll recognize this as a copy of the national
 8   consultation memo; right, sir?
 9       A.   It's a printout.  Same as before.  I can't
10   tell you if this is the memo of the work papers,     02:01:57
11   but --
12       Q.   But it appears to be?
13       A.   It appears to be.
14       Q.   Okay.  And you recall that the national
15   consultation memo concludes that the deficiencies    02:02:07
16   identified in the 2014 audit aggregate to a
17   significant deficiency, but not a material weakness;
18   correct?
19       A.   Yes.
20       Q.   And you reviewed this consultation memo on   02:02:19
21   the day of the filing; right?
22       A.   I was given 15 minutes to review it.
23       Q.   Okay.  Well, you spoke to Mr. Simonetti
24   about the conclusions the national team reached in
25   this memo, didn't you?                               02:02:34
```

Epiq Court Reporting Solutions - New York
1-800-325-3376                        www.deposition.com

**DX1649-162**

Confidential
MAURO BOTTA - 09/25/2018                    Page 163

1       A.   I have one phone call with Mr. Simonetti          02:02:35

2   where I just asked him if that is what he truly

3   believed, and he said, yes.

4       Q.   All right.  And is that all Mr. Simonetti

5   said?                                                      02:02:52

6       A.   Yes.  I believe, yeah.  I recall that was

7   the only thing he said.

8       Q.   And you called Mr. Simonetti because you

9   thought he was a straight-shooter; right?

10      A.   No.  I called Mr. Simonetti because I             02:03:07

11  expressed concern with Mr. Thorson, that throughout

12  the process of the consultation, I was not being in

13  the loop on several of the conversations that he was

14  having.

15          As a matter of fact, more than a few times,        02:03:27

16  I was not allowed in his office, and I did not know

17  what was going on.  So I told him that I was

18  concerned about that part of the process.

19          So I wanted at least one call with

20  Mr. Simonetti by myself.  Mr. Thorson offered first       02:03:40

21  to call Mr. Scott, and he didn't pick up the phone

22  because he also got involved, not to my approval,

23  but he got involved in nonetheless.  And then -- so

24  I called Mr. Simonetti.

25      Q.   I'm sorry.  You said you first tried to          02:03:59

```
 1   call Mr. Scott?                                    02:04:01

 2       A.   Mr. Thorson tried to call Mr. Scott because

 3   he got involved in the process again.

 4       Q.   Okay.  You didn't want -- you were not

 5   interested in speaking to Mr. Scott at that point;  02:04:11

 6   right?

 7       A.   I was not.

 8       Q.   Okay.  And so you didn't speak to him.  And

 9   it was your suggestion to speak to Mr. Simonetti;

10   right?                                             02:04:20

11       A.   Yes.

12       Q.   And you did speak to Mr. Simonetti?

13       A.   Yes.

14       Q.   And you chose the question to ask?

15       A.   Yes.                                      02:04:26

16       Q.   And you asked him, someone you had

17   previously described as a straight-shooter, whether

18   he truly believed in what was set forth in the memo;

19   right?

20       A.   Yes.                                      02:04:35

21       Q.   Okay.  And he said, yes, he did?

22       A.   He said that when he was talking to me, he

23   was not speaking personally, but he was expressing

24   the collective view of the national office.

25       Q.   All right.  And in that call Mr. Simonetti 02:04:50
```

```
 1   didn't pressure you to sign off on the memo;          02:04:53

 2   correct?

 3       A.   No.  Mr. Thorson did.

 4       Q.   Well, Mr. Simonetti, you were addressing

 5   him, and he was speaking, as you just said,           02:05:02

 6   collectively on behalf of the national office;

 7   right?

 8       A.   Yes.

 9       Q.   And he didn't pressure you to sign off on

10   the memo; right?                                      02:05:09

11       A.   No.

12       Q.   And you didn't tell Mr. Simonetti at that

13   time, "Mr. Simonetti, can you please help me.

14   Mr. Thorson is pressuring me to sign off, and I

15   don't want to"?                                       02:05:21

16       A.   No.

17       Q.   And, in fact, you did review and sign off

18   on the 2014 Cavium engagement leader and

19   management -- manager checklist; right?

20       A.   Again, I was pressured to do so, especially  02:05:44

21   after I got that survey.

22       Q.   Okay.  And you also signed off -- reviewed

23   and signed off on the 2014 Cavium SAD; right?

24       A.   Pressure to do so, yes.

25       Q.   Okay.  And you did not note in writing       02:06:02
```

```
 1  anywhere in the audit papers that you were either      02:06:07
 2  pressured to do so or otherwise disagreed with the
 3  findings of the audit; right?
 4      A.   I did ask Mr. Thorson if my memo was going
 5  to be attached in the audit work papers.               02:06:20
 6      Q.   Other than that question, did you, in fact,
 7  attempt to note any sort of disagreement to the
 8  findings that you otherwise signed off on in the SAD
 9  or the engagement leader and management checklist?
10      A.   Given the pressure I was under, I believe I   02:06:40
11  exhausted all the things that I felt I could do.
12      Q.   Well, one thing you could have done was to
13  note a disagreement; right?  That was possible;
14  correct?
15      A.   As I stated, given the pressure I was put     02:06:53
16  on, I believed I exhausted all the possibilities
17  that I could pursue.
18      Q.   Okay.  So you chose not to note any
19  disagreement and simply signed it, right, the
20  engagement leader and management checklist?            02:07:05
21      A.   I wouldn't characterize it as "simply
22  signed it."
23      Q.   Well, you didn't do -- other than signing
24  it, you didn't otherwise write or note any
25  disagreement in the audit work papers; correct?       02:07:16
```

| | | |
|---|---|---|
| 1 | A.   Correct. | 02:07:20 |
| 2 | Q.   Okay.  And let me just make sure I also | |
| 3 | understand.  You also chose not to remove yourself | |
| 4 | from the engagement -- from the audit instead of | |
| 5 | signing off on the audit; right? | 02:07:45 |
| 6 | A.   I requested to stay on the engagement. | |
| 7 | Q.   Right.  But you know, through PwC guidance, | |
| 8 | that if you have a difference of opinion that can't | |
| 9 | be resolved, you have a choice to remove yourself | |
| 10 | from the audit; right? | 02:08:01 |
| 11 | A.   Yes. | |
| 12 | Q.   And you chose not to exercise that right; | |
| 13 | correct? | |
| 14 | A.   Yes. | |
| 15 | Q.   And for the 2014 Cavium audit, what audit | 02:08:19 |
| 16 | rules do you believe Cavium violated? | |
| 17 |      MS. EVANS:  Overbroad.  Calls for a legal | |
| 18 | conclusion.  Vague and ambiguous. | |
| 19 |      You can answer. | |
| 20 |      THE WITNESS:  As I stated before, I believe | 02:08:34 |
| 21 | they violated in terms of integrity, transparency, | |
| 22 | competency. | |
| 23 |      BY MR. HUESTON: | |
| 24 | Q.   Anything else? | |
| 25 |      MS. EVANS:  Overbroad.  Calls for | 02:08:50 |

**DX1649-167**

```
 1   speculation.  Legal conclusion.                    02:08:50

 2           THE WITNESS:  I believe everything else

 3   that I wrote in the complaint.

 4           BY MR. HUESTON:

 5       Q.   Well, you said violate integrity,         02:09:05

 6   transparency, competency.  And with respect to that

 7   2014 audit, what audit professional rules did you

 8   believe Cavium violated other than what you've just

 9   described?

10           MS. EVANS:  Overbroad.  Calls for a legal  02:09:20

11   conclusion.  Vague and ambiguous.

12           THE WITNESS:  As I stated, I believe PwC

13   did violate standards.  Cavium was more the -- our

14   opinion on their controls.  So Cavium is not an

15   auditing firm, so I do not believe they can violate 02:09:41

16   auditing standards.

17           BY MR. HUESTON:

18       Q.   Okay.  So your view is in 2014, PwC

19   violated audit professional rules; is that right?

20       A.   '12 and '13 as well.                      02:09:50

21       Q.   Okay.  And in '12, '13, or 2014, did you

22   call the PwC ethics hotline to report violations of

23   the audit professional rules?

24       A.   No.  After receiving the survey, I did not.

25       Q.   Okay.  And what audit professional rules as 02:10:10
```

```
 1    of 2014 did you believe PwC had violated?              02:10:19

 2              MS. EVANS:  Overbroad.  Calls for a legal

 3    conclusion.  Vague and ambiguous.

 4              You can answer.

 5              THE WITNESS:  Standards of independence, in   02:10:28

 6    fact, and in appearance.

 7              BY MR. HUESTON:

 8        Q.   Anything else?

 9              MS. EVANS:  Overbroad.

10              THE WITNESS:  That was the main issue.        02:10:42

11              MR. HUESTON:  Okay.

12              (Marked for identification purposes,

13               Exhibit 29.)

14              BY MR. HUESTON:

15        Q.   Okay.  I've placed before you, as             02:11:40

16    Exhibit 29, an e-mail from Tye Thorson to yourself,

17    March 2nd, 2015.  Subject: Forward tax memo, with an

18    attached memo with comments.

19              And you recognize Exhibit 29 to be a e-mail

20    that Mr. Thorson sent to you with the attached draft    02:12:03

21    of a tax memo before Cavium's 10-K deadline; right?

22        A.   This is a printout.  I would have to see

23    the original.  This is a printout that has the

24    attachment.

25        Q.   And I'm representing this is a printout of     02:12:21
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 201

```
 1            Did you believe you were underutilized in      02:59:55

 2   2015?

 3       A.   2015, I do not recall I was underutilized.

 4       Q.   All right.  In 2016, do you recall whether

 5   you were underutilized?                                 03:00:10

 6       A.   Yes.

 7       Q.   And to what degree -- explain to me how you

 8   feel you were underutilized in 2016.

 9       A.   I believe, to the best I recall, my

10   utilization rate in 2016 was below 30 percent after     03:00:25

11   I was pulled off Harmonic.

12       Q.   Okay.  And how did you calculate a

13   30 percent utilization rate?

14       A.   It is a parameter that you can view on --

15   online.  It's not a calculation.  I mean, it's          03:00:36

16   possible that it is a calculation.  I don't know how

17   the system does it.  But it's a parameter, that you

18   can look it up.

19       Q.   Okay.  And what was your utilization rate

20   in 2017?                                                03:00:49

21       A.   I do not recall.

22       Q.   Well, was it higher than 30 percent?

23       A.   I believe so.

24       Q.   Okay.  Now, do you recall being removed

25   from any audits?                                        03:01:00
```

DX1649-201

Confidential
MAURO BOTTA - 09/25/2018                    Page 202

```
 1      A.   Yes.                                    03:01:01

 2      Q.   Which one or ones?

 3      A.   Cavium.

 4      Q.   When was that?

 5      A.   That was after Q1 of 2015.             03:01:11

 6      Q.   Okay.  Any others?

 7      A.   Harmonic.  Right after year-end of 2015.

 8      Q.   Any others?

 9      A.   No.

10      Q.   And I'm including your entire 15-year  03:01:31

11   tenure with PwC.

12           Are these the only two?

13      A.   These are the two that I recall.

14      Q.   Okay.  Now let's talk about removal from

15   the Cavium engagement team.                    03:01:44

16           Who informed you that you were going to be

17   removed from the Cavium engagement team?

18      A.   I believe it was Kevin Healy.

19      Q.   And you understood that you were being

20   removed because the CFO of Cavium asked PwC to do  03:02:02

21   so; right?

22      A.   Yes.

23      Q.   You didn't like the CFO, did you?

24      A.   In what regard?

25      Q.   I don't know.  I'm just asking.        03:02:16
```

DX1649-202

Confidential
MAURO BOTTA - 09/25/2018                    Page 203

| | | |
|---|---|---|
| 1 | Did you like him? | 03:02:17 |
| 2 | A.   In what regard?  It's a bit of a broad | |
| 3 | question. | |
| 4 | Q.   It's meant to be broad.  I'm just asking | |
| 5 | broadly. | 03:02:24 |
| 6 | A.   Not particularly. | |
| 7 | Q.   You thought he was incompetent; right? | |
| 8 | A.   No. | |
| 9 | Q.   You did not think the CFO of Cavium was | |
| 10 | incompetent? | 03:02:41 |
| 11 | A.   Not really, no. | |
| 12 | Q.   All right.  Do you recall how many | |
| 13 | arguments you had with him a year, roughly, while | |
| 14 | you were on the Cavium engagement? | |
| 15 | A.   I do not recall we had any arguments, him | 03:02:55 |
| 16 | and I. | |
| 17 | Q.   Okay.  You don't recall having any | |
| 18 | arguments with the CFO of Cavium at any time? | |
| 19 | A.   Not that I recall. | |
| 20 | Q.   Okay.  Do you recall having any arguments | 03:03:05 |
| 21 | with any other Cavium employees while on the | |
| 22 | engagement at any time? | |
| 23 | A.   Arguments as in, like, disagreements or ... | |
| 24 | Q.   Well, you seemed to understand what I meant | |
| 25 | by "arguments" before. | 03:03:23 |

Confidential
MAURO BOTTA - 09/25/2018                     Page 206

```
 1  he asked for your removal?                        03:05:54
 2      A.   I do not recall the specific reasons.  The
 3  reasons were told to me by Mr. Thorson.
 4      Q.   Okay.  Let me make sure I understand.
 5           You say "I don't recall the specific      03:06:08
 6  reasons," but do you recall that Mr. Healy did
 7  review some specific reasons; you just don't
 8  remember them, sitting here today?
 9      A.   I honestly do not remember if we went to
10  specifics or not with Mr. Healy.                   03:06:22
11      Q.   I suspect that -- well, let me just explore
12  this a bit.
13           If Mr. Healy was the one breaking the news
14  to you, that the CFO was looking to remove you, it's
15  fair to say you asked him why?                      03:06:37
16      A.   I do not recall.  As I said Mr. Thorson,
17  articulated right after the filing of the 10-K what
18  he told the company.  So --
19      Q.   I'm not asking about Mr. Thorson.  I'm
20  asking about the conversation with Mr. Healy.       03:06:55
21           Do you recall whether you asked him why?
22      A.   I do not recall.
23      Q.   Okay.  And subsequent to that discussion
24  with Mr. Healy, did you have a discussion with
25  anyone else asking, "Why?  Why is the CFO asking to  03:07:19
```

**DX1649-206**

```
 1   remove me?"  Did you have a discussion with anyone        03:07:23

 2   else at PwC?

 3       A.   Not that I recall.

 4       Q.   Okay.  Now, let's talk about the removal

 5   from the Harmonic team.                                   03:07:32

 6            Who informed you of that removal?

 7       A.   I believe it was Mr. Haavardtun.

 8       Q.   Mr. Haavardtun.

 9       A.   Do you want the spelling?  He's the one

10   before the --                                             03:07:48

11       Q.   When do you recall him informing you that

12   you would be removed from the Harmonic audit?

13       A.   I do not recall the exact date.  I believe

14   it was probably in April.

15       Q.   April of?                                        03:08:00

16       A.   April of 2016.

17       Q.   All right.  And what reasons do you recall

18   Mr. Haavardtun providing you to as to why you were

19   being removed from the Harmonic audit or the

20   Harmonic team?                                            03:08:16

21       A.   He shared with me his evaluation of my

22   performance on the Harmonic engagement.

23       Q.   And what do you recall him sharing with you

24   in trying to describe why you were being removed

25   from that engagement team?                                03:08:31
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 208

```
 1      A.   I recall that that evaluation listed      03:08:35
 2   several points, among which I did not develop an
 3   effective relationship with particularly the chief
 4   accounting officer.  I -- according to him, I did
 5   not bring issues to closure.  Relationships and   03:08:55
 6   issue closures were the two main themes.
 7      Q.   Okay.  Did he describe to you that in his
 8   view, you weren't getting along with the employees
 9   at Harmonic?
10      A.   Other -- yeah.  I would say that is a fair 03:09:20
11   characterization.
12      Q.   And aside from this characterization, did
13   you have an independent understanding that you were
14   not, in general, getting along well with the
15   employees of Harmonic that you were dealing with?  03:09:38
16      A.   Yes.  I knew the reason why.
17           (Marked for identification purposes,
18            Exhibit 33.)
19           BY MR. HUESTON:
20      Q.   All right.  Placing before you as         03:10:28
21   Exhibit 23 --
22           MS. EVANS:  33.
23           MR. HUESTON:  Sorry.  33.
24           BY MR. HUESTON:
25      Q.   -- case detail report.                    03:10:35
```

DX1649-208

```
 1          All right.  And what I want to do is turn      03:10:43
 2   you to Bates stamp page 5932.  And I'm going to draw
 3   your attention to the e-mail in the middle from a
 4   Gregg Lakritz at Harmonic to Stig Haavardtun.
 5          And you've mentioned Mr. Haavardtun.  What     03:11:17
 6   was his role with respect to Harmonic?
 7      A.   He was the engagement partner, the
 8   engagement leader, signing partner.
 9      Q.   And who was Gregg Lakritz?
10      A.   Chief accounting officer at Harmonic at the  03:11:32
11   time.
12      Q.   All right.  And the subject is "Sally's
13   feedback on PwC team."
14          Who did you understand the reference to
15   "Sally" to be?                                        03:11:42
16      A.   Actually, I'm not sure I've seen this
17   e-mail before.
18      Q.   I'm just asking you.  Who do you understand
19   the reference to "Sally" to be at Harmonic?
20      A.   My guess would be Sally Chu.                  03:11:55
21      Q.   And who is she?
22      A.   I don't remember her exact title.  She was
23   kind of the head of inventory.  One of the inventory
24   accountants.  The -- probably the inventory manager.
25   I don't remember her exact title.                     03:12:10
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 212

| | |
|---|---|
| 1 were also staffed on Gigamon audits? | 03:14:28 |
| 2    A.   Yes. | |
| 3         MR. HUESTON:  Mark this as 34. | |
| 4         (Marked for identification purposes, | |
| 5         Exhibit 34.) | 03:14:53 |
| 6         BY MR. HUESTON: | |
| 7    Q.   Okay.  Exhibit 34 begins at the top with a | |
| 8 case detail report.  And this is an ethics file in | |
| 9 your complaint against Mr. Thorson and | |
| 10 Mr. Haavardtun for not staffing you on Cavium and | 03:15:21 |
| 11 Harmonic; correct? | |
| 12    A.   I haven't reviewed this before, so I can't | |
| 13 tell you unless I read it. | |
| 14    Q.   All right. | |
| 15         MS. EVANS:  Take -- | 03:15:32 |
| 16         BY MR. HUESTON: | |
| 17    Q.   Well, let me have you turn to page 966. | |
| 18         MS. EVANS:  Take the time to review it. | |
| 19         BY MR. HUESTON: | |
| 20    Q.   Well, I'm not going to ask you about almost | 03:15:37 |
| 21 all the pages, so let's go to 966.  And if he needs | |
| 22 other document time to review, we can give it to | |
| 23 him. | |
| 24         But turning to page 966, here is an entry | |
| 25 that describes Traci Nelson's comments about your | 03:15:49 |

```
 1   engagement with Gigamon.                              03:15:53

 2           And my question to you is who is

 3   Traci Nelson?

 4      A.   At the time, I think she still was HR

 5   leader in San Jose.                                   03:16:08

 6           (Reporter clarification.)

 7           THE WITNESS:   HR.  At the time she was

 8   HR -- human resources leader in San Jose.

 9           BY MR. HUESTON:

10      Q.   And the date of this, March 7th, 2017, it     03:16:11

11   states:

12              "Traci called with an update to

13           Mauro Botta.  Gigamon, his main client,

14           is asking that Mauro be rolled off.

15           Similar to Harmonic, not teaming well         03:16:25

16           with the client.  Over scrutinization of

17           work and audit steps.  Pressing the

18           client for irrelevant information that

19           would be considered immaterial."

20           Were you aware that Gigamon was asking for    03:16:42

21   you to be rolled off the audit, sir, at the time?

22      A.   I was notified by Ergun Genc of their

23   request, but I was never rolled off.

24      Q.   All right.  Were you aware of these

25   concerns as they were captured in the language that   03:16:57
```

```
 1   I just quoted to you?                              03:17:01

 2      A.   This is not what I had the conversation

 3   with Mr. Genc.  One of the items was something

 4   similar.

 5      Q.   Well, I'm just -- let's make sure I have a 03:17:30

 6   clear record.

 7           I've asked you, with respect to the summary

 8   here, after it says "Gigamon, his main client, is

 9   asking that Mauro be rolled off, similar to

10   Harmonic, not teaming well with the client, over   03:17:43

11   scrutinization of work and audit steps, pressing the

12   client for irrelevant information that would be

13   considered immaterial," were you aware that Gigamon

14   had those concerns about your work on that

15   engagement?                                        03:17:57

16      A.   Mr. Genc told me that they had concerns.  I

17   disputed those concerns to him, and I was never

18   rolled off.

19      Q.   Okay.  So you were aware of these concerns

20   at the time?  You disputed them, but you were aware 03:18:09

21   of those concerns; right?

22      A.   I'm not aware that Gigamon said those

23   concerns.  That was what Mr. Genc told me.

24      Q.   All right.  But the concerns that you're

25   recalling from Mr. Dench --                         03:18:22
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 215

```
 1     A.   Genc.                                          03:18:23

 2     Q.   -- Genc are what I just quoted here from

 3  this document, right, in summary?

 4     A.   Some.

 5     Q.   Oh.  What were the other concerns?            03:18:31

 6     A.   The handling of a particular control issue.

 7     Q.   Anything else?

 8          MS. EVANS:  Overbroad.

 9          BY MR. HUESTON:

10     Q.   You may answer.                               03:18:54

11     A.   Not to my recollection.

12     Q.   Okay.  Do you remember having a

13  conversation with a Mr. Wallace about this issue?

14     A.   Yes.

15     Q.   Who is Mr. Wallace?                           03:19:12

16     A.   I do not recall his title, but he's a

17  member of the ethics office at PwC.

18     Q.   Justin Wallace?

19     A.   Yes.

20     Q.   And do you recall telling him that the       03:19:27

21  controller and inventory asked you to be off the

22  engagement?

23     A.   That is what Mr. Genc told me.  I do not

24  recall if I told that to Mr. Wallace specifically.

25     Q.   If we turn to Bates stamp 5971, the date is  03:19:46
```

```
 1    April 12, 2017.  Entry Type: Conversation.  Entered     03:19:51
 2    By: Justin Wallace.  Entry Notes: Mauro Botta -
 3    complainant.
 4           Do you see that?
 5    A.    Yes.                                               03:20:02
 6    Q.    Second paragraph:
 7              "Mauro said that he had just been
 8              rolled off Gigamund [sic]."
 9           Do you see that?
10    A.    Yes.                                               03:20:08
11    Q.    And controller -- so were you rolled off or
12    not, by the way?
13    A.    I was not.
14    Q.    Okay.  So that's a false statement?
15    A.    I do not believe it's accurate.                   03:20:19
16    Q.    All right.  And in the next paragraph:
17              "Controller and inventory had asked
18              me to be off the engagement and I was too
19              tough and that it felt like I was waiting
20              for them to make a mistake."                   03:20:30
21           Are these the concerns that you conveyed to
22    Mr. Wallace?
23    A.    They're not accurately represented in this
24    e-mail.
25    Q.    Okay.                                              03:20:45
```

1    of fact, I recall my conversation with Mr. Carey was    03:24:28

2    more heated.

3        Q.   So your view is that you were worked up

4    about it; is that your testimony today?

5        A.   I was very upset.                              03:24:39

6        Q.   Okay.  Do you remember -- who's Tim Carey?

7        A.   C-A-R-E-Y.  He is the -- now the -- I think

8    his title is market team leader for mega market.

9        Q.   Okay.  You recall at the time that

10   Tim Carey asked you if he'd like -- if you'd like     03:25:18

11   him to look into the issue of your not being

12   assigned to Pacific Biosciences?  Do you remember

13   that?

14       A.   Yes.

15       Q.   And do you recall telling him that you        03:25:31

16   would like him not to raise it or make a big deal

17   about it?

18       A.   I do recall that I told him that at this

19   point the firm would not have looked good had we

20   presented me to the engagement, given the engagement  03:25:49

21   was already started.  And I did not need him to look

22   into it because I believe that this was deliberate.

23       Q.   Okay.  Tim Carey was a PwC employee?

24       A.   Is a partner, not an employee.

25       Q.   Okay.  Even better.                           03:26:06

Confidential
MAURO BOTTA - 09/25/2018                    Page 221

```
 1          Tim Carey was a PwC partner; right?            03:26:09

 2     A.   He is a PwC partner.

 3     Q.   And he is a PwC partner.

 4          And that's a level above senior manager,

 5  right?                                                 03:26:18

 6     A.   Yes.

 7     Q.   Okay.  And this partner of PwC offered, on

 8  your behalf, to look into the issue of your not

 9  being assigned to Pacific Biosciences; right?

10     A.   Yes.                                           03:26:31

11     Q.   He volunteered to do so?

12     A.   Yes.

13     Q.   And you told him not to proceed; right?

14     A.   Yes.  I did not think it was any point.

15     Q.   He thought there was a point; right?           03:26:44

16     A.   I did not.

17     Q.   Okay.  But he expressed the opinion as a

18  partner that he could, in fact, make an inquiry, and

19  you declined his offer; right?

20     A.   He did ask me if he should have looked into    03:26:57

21  it.

22     Q.   And what you told him is don't raise it and

23  make a big deal; right?

24     A.   I do not recall I used those words.

25     Q.   All right.  And is it your recollection        03:27:15
```

DX1649-221

```
 1   that you told him that it was -- it would be futile      03:27:19

 2   or worthless to do so?

 3       A.   To the best of my recollection is that

 4   there was no point, and I felt that this was

 5   deliberate.                                              03:27:35

 6       Q.   Okay.  Sir, at the time that they were

 7   staffing the audit team at Pacific Biosciences, you

 8   did not have a background in pharma; correct?

 9       A.   Pacific Biosciences was not an audit

10   project.                                                 03:27:55

11       Q.   That's not the question I asked.

12            At the time -- let's just put it

13   differently.

14            At the time Pacific Biosciences was coming

15   in as a client, you did not have a background in         03:28:04

16   pharma; correct?

17       A.   I was familiar with their revenue

18   recognition because I did a presentation with

19   Chris Smith a few months before.  So I knew the

20   finance department, and I was familiar with the          03:28:18

21   revenue recognition.

22       Q.   But you didn't have a pharma background;

23   right?

24       A.   Pacific Biosciences is a --

25       Q.   I'm just asking a simple question.              03:28:29
```

```
 1   words; right?                                        04:24:40

 2       A.   I'm not sure how would the forensic look

 3   like, but if I had a chance to review the original

 4   file, I could confirm it, yes.

 5       Q.   And going back to Exhibit 23, that's your   04:25:02

 6   SEC complaint.

 7            Do you have that before you?

 8       A.   Yes.

 9       Q.   Okay.  And beginning at Plaintiff's Bates

10   stamp 32, it starts with "Whistleblower              04:25:30

11   Declarations," right, at the bottom of the page?

12            Do you see that?

13       A.   Yes.

14       Q.   Okay.  And going on to the next page, No. 6

15   says:                                                04:25:52

16            "If the answer to any of the

17            Questions 1 through 5 above is 'yes,'

18            please provide details."

19            And you wrote:

20            "See 'outline' document uploaded."          04:25:57

21            Right?

22       A.   Yes.

23       Q.   And that's attached beginning at

24   Plaintiff's 165; right?

25            MS. EVANS:  Vague and ambiguous.            04:26:09
```

Confidential
MAURO BOTTA - 09/25/2018                    Page 254

```
 1              BY MR. HUESTON:                          04:26:17

 2       Q.   That's your attachment to it; right?

 3       A.   Again, I would have to compare with what I

 4   submitted, but it appears.

 5       Q.   Okay.  That's all I'm asking, whether it   04:26:21

 6   appears.  I realize you can't identify necessarily

 7   if it's the exact document.

 8            And back on Plaintiff's 34, that's your

 9   declaration under penalty of perjury that the

10   information contained in this submission is true,   04:26:35

11   correct, and complete to the best of your knowledge,

12   information, and belief; right?

13       A.   Yes.

14       Q.   All right.  So moving to the attachment,

15   let's go to Plaintiff's page 168.                   04:26:50

16       A.   Still Exhibit 23?

17       Q.   Yep.  It's the attachment that you created

18   with the submission.

19            Are you on the page?

20       A.   Yes.                                       04:27:03

21       Q.   All right.  Going to the first full

22   paragraph that starts "As a result of this

23   document."

24            Do you see this?

25       A.   Yes.                                       04:27:11
```

DX1649-254

```
 1      Q.   All right.  So going to the next sentence,      04:27:12
 2   it states -- you state:
 3                "During that consultation, the
 4           conclusion was to consider the outcome
 5           only as significant deficiency            04:27:24
 6           aggregated.  Such conclusion was achieved
 7           after a control over the tax footnote was
 8           documented.  However, such control was
 9           not noted during the walk-through and
10           constituted a documentation exercise      04:27:35
11           thanks to which the significant
12           deficiency conclusion was agreed upon by
13           national; evidence of that is that this
14           control was created the night before the
15           filing of the 10-K."                      04:27:49
16           You wrote that; right?
17      A.   Yes.
18      Q.   And under penalty of perjury?
19      A.   Yes.
20      Q.   Do you know who made the decision to      04:28:05
21   accelerate your termination?
22      A.   I do not.
23      Q.   All right.  Do you know who Mark Simon is?
24      A.   Who?  Sorry?
25      Q.   Do you know who Mark Simon is?            04:28:16
```

1      A.   Some leader in PwC.  I don't recall the      04:28:19

2    title.  But I've heard the name.

3      Q.   Okay.  Did you ever speak to him about your

4    whistleblowing?

5      A.   Not that I recall.                           04:28:28

6      Q.   Okay.  Do you have any reason to believe

7    that any of the engagement leaders you worked with

8    spoke to Mr. Simon?

9      A.   About what?

10     Q.   About any of the alleged whistleblower        04:28:39

11   issues that you had brought to bear against PwC.

12     A.   I would be speculating.

13     Q.   Okay.  So you have no reason to believe

14   that anybody raised whistleblower issues with

15   Mr. Simon; correct?                                 04:28:54

16     A.   I would have no way of knowing.

17     Q.   Yeah.  So who at PwC have you spoken to

18   about the decision to accelerate your termination,

19   if anyone?

20     A.   Shauna Hewitt is the only person -- maybe     04:29:14

21   Traci Nelson -- that I recall we had contacts after

22   I was terminated.  But my claim of retaliation

23   whistleblower was communicated to PwC before, from

24   my attorneys to PwC attorneys.

25     Q.   Okay.  What did you tell Shauna Hewitt        04:29:38

1   about your termination?                          04:29:41

2       A.   The communication that I had related to

3   that was if I could reapply, given that I saw that

4   there were open positions at PwC.

5       Q.   Okay.  Did you tell her -- well, when did   04:29:59

6   you have that conversation?

7       A.   I don't remember the date, the exact date.

8   Must have been the end of August or September, but

9   that's the best I can recall.

10      Q.   Okay.  You asked her if you could reapply?   04:30:16

11      A.   Yes.

12      Q.   And what did she say?

13      A.   That due to the fact I was terminated for

14  misconduct, I was prohibited from reapplying.

15      Q.   Okay.  And you said you also talked to      04:30:28

16  Traci Nelson after you were terminated for

17  misconduct; correct?

18      A.   I believe I did speak to Traci on this same

19  topic, and Traci, I think, alerted Shauna.

20      Q.   When you said you spoke to her about the    04:30:46

21  same topic, what did you ask her?

22      A.   To the best of my recollection, I asked her

23  this fact, if I could reapply.

24      Q.   Okay.  Did you attempt to explain to her

25  why you felt you had not committed misconduct?       04:30:59

Confidential
MAURO BOTTA - 09/25/2018                    Page 258

```
 1      A.   I stated that to Ms. Hewitt in my e-mail    04:31:05
 2   reply once she said that.
 3      Q.   Okay.  Did you state that to Ms. Nelson?
 4      A.   I don't recall.
 5      Q.   Okay.  Now, in the time that you worked at   04:31:16
 6   PwC, did you ever think about leaving the company?
 7      A.   Yes.
 8      Q.   In fact, you, on a number of occasions,
 9   attempted to resign or submit your resignation;
10   right?                                              04:31:41
11      A.   Yes.
12      Q.   How many times did you do so during the
13   course of your tenure?
14      A.   I believe there were 10.
15      Q.   Might there have been 12?                   04:31:50
16      A.   My recollection was 10, but I do not
17   guarantee the exact number.
18      Q.   And during the time you worked at PwC and
19   you tendered your resignation or offered to resign,
20   during that time period, did you ever get a job     04:32:11
21   offer to work elsewhere?
22      A.   Yes.
23      Q.   And where did you receive -- from which
24   firms did you receive job offers during the time
25   that you worked at PwC?                             04:32:22
```

```
 1      A.   There were several.  I can try to recall        04:32:29

 2  them.

 3          So the very first was on a company called

 4  Micrus Endovascular.  Then there was an offer

 5  from -- I'm not talking chronologically.  I'm          04:32:48

 6  talking as I can recall them -- Moss Adams.

 7      Q.   Moss Adams.  Okay.

 8      A.   KPMG.  Deloitte.  BBO.  Logitech.  Did I

 9  say already Logitech?

10      Q.   No.                                            04:33:19

11      A.   Okay.  Logitech.

12      Q.   Ernst & Young?

13      A.   No, I wouldn't have gotten an offer from

14  them because I found out that PwC talked behind my

15  back to them.                                          04:33:39

16          Connor Group, but then they retracted it.

17          That's everyone I can recall.

18      Q.   Okay.  And of those that you can recall,

19  which ones -- which of those offers, if any, did you

20  accept?                                                04:34:14

21      A.   I believe I accepted all of them and then

22  retracted the acceptance.

23      Q.   Okay.  And each time you decided to retract

24  the acceptance, it was because PwC was convincing

25  you to stay; is that fair?                             04:34:31
```

| | | |
|---|---|---|
| 1 | A.   Yes. | 04:34:33 |
| 2 | Q.   All right.  So let's -- and did you get any | |
| 3 | job offers after your layoff notice from PwC but | |
| 4 | before you were finally terminated? | |
| 5 | A.   Yes. | 04:35:27 |
| 6 | Q.   And who did you receive job offers from | |
| 7 | during that period of time? | |
| 8 | A.   Armanino, LLP. | |
| 9 | Q.   Anyone else? | |
| 10 | A.   No. | 04:35:40 |
| 11 | Q.   And did you accept the offer from Armanino, | |
| 12 | LLP, before your actual termination? | |
| 13 | A.   Yes. | |
| 14 | Q.   When did you accept it? | |
| 15 | A.   I don't remember the exact date. | 04:35:57 |
| 16 | Q.   Well, weeks before you were terminated? | |
| 17 | A.   I don't recall it was that long. | |
| 18 | Q.   Okay.  You have an -- is that in writing, | |
| 19 | the acceptance? | |
| 20 | A.   Yes. | 04:36:13 |
| 21 | Q.   In an e-mail, or did you sign a document? | |
| 22 | A.   I don't remember if it was an e-mail.  I | |
| 23 | did sign the document.  I do not recall if it was | |
| 24 | through e-mail or hard copy. | |
| 25 | (Reporter clarification.) | 04:36:28 |

Confidential
MAURO BOTTA - 09/25/2018                    Page 261

```
 1             THE WITNESS:  Was through e-mail or hard    04:36:28

 2   copy.

 3             BY MR. HUESTON:

 4        Q.   All right.  And when did you begin work at

 5   Armanino?                                            04:36:43

 6        A.   September 11, 2017.

 7        Q.   And Armanino is another public accounting

 8   firm; correct?

 9        A.   Yes.

10        Q.   And when you began work in September, what  04:37:00

11   title did you have when you began?

12        A.   Actually, public accounting is an audit

13   firm.  I don't know if that's meet the definition of

14   public accountant.  Probably they do.

15             Sorry.  Can you continue.                  04:37:11

16        Q.   Sure.

17             What title did you have when you began work

18   there?

19        A.   Senior manager.

20        Q.   And who did you report to at Armanino?     04:37:19

21        A.   There were several partners, just given the

22   structure of the firm.

23             (Marked for identification purposes,

24             Exhibit 41.)

25   ///
```

| | | |
|---|---|---|
| 1 | BY MR. HUESTON: | 04:37:55 |
| 2 | Q.   Putting Exhibit 41 before you. | |
| 3 | Do you recall this as your employment offer | |
| 4 | from Armanino, dated July 28th, 2017? | |
| 5 | A.   This is a printout.  I recall that I | 04:38:18 |
| 6 | received an employment offer.  I do not recall the | |
| 7 | exact date. | |
| 8 | Q.   Okay.  Do you see down in the bottom right, | |
| 9 | this is -- says Plaintiff's 99.  This is actually | |
| 10 | produced from you. | 04:38:28 |
| 11 | So do you have any reason to doubt that | |
| 12 | this is dated July 28th, 2017? | |
| 13 | A.   I have no reason to doubt it.  I just | |
| 14 | didn't recall the date. | |
| 15 | Q.   Okay.  And this is signed by | 04:38:39 |
| 16 | Scott Copeland, partner? | |
| 17 | A.   Yes. | |
| 18 | Q.   And what was your salary at Armanino when | |
| 19 | you started? | |
| 20 | A.   190,000 per annum. | 04:38:54 |
| 21 | Q.   Okay.  Did you have the possibility of | |
| 22 | earning a bonus? | |
| 23 | A.   Yes. | |
| 24 | Q.   And what were the terms of potential bonus | |
| 25 | that you could earn? | 04:39:07 |

1      A.   Actually, I do not recall the specific          04:39:10

2    terms.  There was a separate document called "bonus

3    plan," and I really don't remember the terms.

4      Q.   Okay.  And was the bonus terms document

5    part of the employment offer?                          04:39:24

6      A.   I recall I received it as a package.  I

7    don't know if it was sent with this, but it was sent

8    to me.

9      Q.   And roughly what do you recall you could

10   earn as a bonus at Armanino?  If you were being paid   04:39:37

11   about 190,000 a year, what do you recall the bonus

12   policy to be, just at a very high level?

13         MS. EVANS:  Speculation.

14         If you recall.

15         THE WITNESS:  Well, at a higher level, I do       04:39:51

16   not recall the amount.  I recall, after I read this

17   paragraph, that it was based on the timing of

18   issuance of financial statements.  So if you were to

19   issue audited financials within 30 days from the

20   start of the field work, you would have been           04:40:09

21   eligible for -- for the bonus.

22         BY MR. HUESTON:

23     Q.   So do you recall the bonus proposal is

24   captured at No. 2 of the employment offer; namely:

25              "As senior manager, you will be             04:40:25

| | | |
|---|---|---|
| 1 | eligible for an annual bonus of up to | 04:40:28 |
| 2 | $13,000 per the 30-day issuance financial | |
| 3 | statement bonus plan, in addition to the | |
| 4 | manager bonus plan, both paid on a | |
| 5 | quarterly basis." | 04:40:42 |

1          eligible for an annual bonus of up to          04:40:28

2          $13,000 per the 30-day issuance financial

3          statement bonus plan, in addition to the

4          manager bonus plan, both paid on a

5          quarterly basis."          04:40:42

6     A.   I recall the first one.  The second one, I

7  do not recall the terms right now.

8     Q.   Okay.  The second one being the manager

9  bonus plan; right?

10    A.   Yes.          04:40:53

11    Q.   All right.  And what were your benefits?

12 Is it as stated in No. 3 of your employment offer?

13    A.   Yes.

14    Q.   All right.  When did your employment at

15 Armanino end?          04:41:21

16    A.   End of January 2018.

17    Q.   And what was the reason for the termination

18 or ending of your employment at Armanino?

19    A.   I left.

20    Q.   Did you obtain employment elsewhere?          04:41:42

21    A.   Yes.

22    Q.   And was that at SOAProjects?

23    A.   It's S-O-A Projects.

24    Q.   SOAProjects.  Okay.

25    A.   Many do call it SOAP.          04:41:52

| | | |
|---|---|---|
| 1 | Q.   It does say capital S, capital O, capital | 04:41:54 |
| 2 | A, capital P, and then r-o-j-e-c-t-s in small caps, | |
| 3 | in my defense.  I just want to say that for the | |
| 4 | record. | |
| 5 | A.   Yes.  I do believe that there is a reason | 04:42:07 |
| 6 | for that, that they told me there was a name thing. | |
| 7 | But that's why people often called it SOAP.  But it | |
| 8 | is, yes, capital letters up to the SOAP. | |
| 9 | Q.   All right.  So SOAProjects. | |
| 10 | Is that another auditing firm? | 04:42:20 |
| 11 | A.   No. | |
| 12 | Q.   Okay.  What kind of firm is it? | |
| 13 | A.   It's -- the best I can describe is | |
| 14 | accounting advisory. | |
| 15 | Q.   Accounting advisory. | 04:42:32 |
| 16 | A.   And internal controls as well.  They do | |
| 17 | also some IT consulting.  It's all consulting. | |
| 18 | Q.   You're still employed there? | |
| 19 | A.   Yes. | |
| 20 | Q.   What is your title? | 04:42:44 |
| 21 | A.   Senior manager. | |
| 22 | Q.   And what are your duties and | |
| 23 | responsibilities as a senior manager? | |
| 24 | A.   There isn't really a predefined list | |
| 25 | because it depends on the -- really on the project. | 04:42:58 |

```
 1   I am assigned to the SOX group, Sarbanes-Oxley        04:43:01

 2   group.

 3       Q.   Are you assigned to any other groups?

 4       A.   No.  You're assigned to one group, mapped.

 5   You can also work on projects belonging to other       04:43:14

 6   groups if they believe that you have the skill sets

 7   for it.

 8       Q.   Have you worked in any group other than the

 9   SOX group while you've been at SOAProjects?

10       A.   Yes.                                          04:43:25

11       Q.   What groups?

12       A.   Technical accounting.

13       Q.   Any other groups?

14       A.   No.

15       Q.   All right.  Who do you report to at          04:43:32

16   SOAProjects?

17       A.   I report to -- every engagement, I report

18   to a director, which changes depending on the job.

19   And we have one partner in the SOX group, which is

20   Robert Strasser, S-T-R-A-S-S-E-R.                      04:43:48

21       Q.   Okay.  And what is your current salary?

22       A.   180- -- 190,000, I believe.

23       Q.   All right.  And what are the terms of your

24   bonus eligibility?

25       A.   The bonus at SOA is -- the best I can         04:44:12
```

1    describe it is more like a commission.  So it is          04:44:18

2    based on if you bring in a job, then you get a

3    percentage of the gross margin that that engagement

4    invoices to the company that you're consulting with

5    minus the actual hours that you work on that              04:44:37

6    project, if you work on that project.

7         Q.   All right.  And what is the percentage that

8    you're entitled to?

9         A.   I do not remember the percentages.

10        Q.   Well, can you give me an estimate, a range?     04:44:48

11        A.   I believe 10 percent is part of the range.

12   I do not remember if it's the top end or the bottom

13   end.  I believe 10 percent is in there.

14        Q.   And when are the bonuses payable?

15        A.   They are paid the quarter after the company     04:45:08

16   pays the invoices that SOA bills them for.

17        Q.   So I realize you just started there in

18   January of 2018.

19        A.   February.

20        Q.   February.                                        04:45:28

21             So once -- have you received any bonus

22   payout yet?

23        A.   Yes.

24        Q.   How many times have you received bonus

25   payouts?                                                   04:45:37

1      A.    Once.  I'm waiting for another one.           04:45:39

2      Q.    All right.  And how much in bonus were you

3   paid out in that first time?

4      A.    400 bucks.

5      Q.    Okay.  And what do you anticipate the         04:45:49

6   second -- that's reflecting the beginning of your

7   work there.

8            What are you -- what are you anticipating

9   in your second bonus payout?

10      A.    So the project that I sold, I was not        04:45:58

11   working on it, so I do not know actually how many

12   invoices do the issue.  It's a technical accounting

13   project.  So I do not know the amount.  HR

14   communicates to me once the invoices have been paid,

15   and they just say, hey, this is the calculation.      04:46:14

16   These are the invoices.  This is the amount that

17   will be reflected in your physical check.

18      Q.    Okay.  And so sitting here today, do you

19   have an estimate of what you believe that next bonus

20   will be?                                              04:46:31

21      A.    I do not because there is -- it is not a

22   straight calculation, the second part, because I got

23   told that there were some disputes on the invoices

24   from the client side, and they reached settlement.

25   But I do not know how much did the client ended up    04:46:49

1   paying, and I do not know the amount of the original          04:46:53

2   invoice.

3       Q.   All right.  Are you eligible for any other

4   type of bonus at SOAProjects?

5       A.   I think the way that they told me, there             04:47:04

6   are spot bonus that are eligible to be given, but it

7   is completely discretionary to the discretion of the

8   owner.

9       Q.   All right.  Any other discretionary

10  bonuses, such as end-of-year or holiday bonuses?             04:47:15

11      A.   Not to my knowledge, no.

12      Q.   All right.  And you receive, I assume,

13  employment benefits as well?

14      A.   Yes.

15      Q.   And are they similar to what was described           04:47:26

16  in the employment letter for Armanino?

17      A.   Similar.  There are some differences, such

18  as, you know, the PTO or the -- the 401(k), I

19  believe, is a little different, but the standard

20  ones, medical, vision, dental, yes.                          04:47:44

21      Q.   Okay.  Since your termination from PwC,

22  have you taken any sick days at either Armanino or

23  SOAProjects?

24      A.   Maybe one or two.

25      Q.   Okay.  And what were the reasons for those          04:47:58

```
 1   sick days?                                           04:48:01

 2        A.   That I was physically sick.

 3        Q.   Okay.  Did you miss any days due to

 4   distress?

 5        A.   Nope.                                       04:48:12

 6        Q.   All right.  And since August of 2017, have

 7   you sought any medical attention?

 8        A.   Yes.

 9        Q.   What kind of medical attention have you

10   sought?                                              04:48:23

11        A.   I'm seeing a therapist every week.

12        Q.   Okay.  And what is the therapist's name?

13        A.   Ed, last name Sarrett, S-A-R-R-E-T-T.

14        Q.   When did you start seeing Mr. -- is it Dr.

15   or Mr.?                                              04:48:44

16        A.   I believe --

17             MS. EVANS:  If you know.  Speculation.

18             THE WITNESS:  Yeah, I will speculate.  I

19   believe it's Mr., but I'm not 100 percent positive.

20             BY MR. HUESTON:                            04:48:53

21        Q.   All right.  When did you start seeing

22   Mr. Sarrett?

23        A.   I don't recall the exact date.  I do

24   believe sometime in August 2017.

25        Q.   Okay.  And what was the reason you started  04:49:03
```

```
 1                    REPORTER CERTIFICATE

 2              I, LORRIE L. MARCHANT, Certified Shorthand

 3   Reporter, Certificate No. 10523, for the State of

 4   California, hereby certify that MAURO BOTTA was by

 5   me duly sworn/affirmed to testify to the truth, the

 6   whole truth and nothing but the truth in the

 7   within-entitled cause; that said deposition was

 8   taken at the time and place herein named; that the

 9   deposition is a true record of the witness's

10   testimony as reported to the best of my ability by

11   me, a duly certified shorthand reporter and a

12   disinterested person, and was thereafter transcribed

13   under my direction into typewriting by computer;

14   that request [  ] was [ X ] was not made to read and

15   correct said deposition.

16              I further certify that I am not interested

17   in the outcome of said action, nor connected with,

18   nor related to any of the parties in said action,

19   nor to their respective counsel.

20              IN WITNESS WHEREOF, I have hereunto set my

21   hand this 19th day of October, 2018.

22

23   _____

24        LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
               Certified Shorthand Reporter #10523

25
```

DX1649-304