# DX1676

Message

Lorrie L Marchant  CSR# 10523  RMR  CRR  CCRR  CRC

**EXHIBIT  27**

WITNESS  **Mauro Botta**
CASE  **Botta v  PricewaterhouseCoopers**
CASE No.: 3:18-CV-02615-RS
DATE  Tuesday September 25  2018

| | |
|---|---|
| **From:** | mauro.x.botta@us.pwc.com [mauro.x.botta@us.pwc.com] |
| **Sent:** | 2/22/2015 2:05:14 PM |
| **To:** | tye.thorson@us.pwc.com |
| **Subject:** | re: |
| **Attachments:** | _.png |

Tye,

please see below


PB.docx

Thanks

Mauro.

**Mauro Botta**

PwC | Senior Manager
Office  +1 408 464 5438
Email  mauro x botta@us pwc com
PricewaterhouseCoopers LLP
488 Almaden blvd suite 1800 San Jose CA 95110
http://www.pwc.com/us

Confidential

PwC_B00000390

**DX1676-1**

**PwC Audit 4730**

"Deficiencies also need to be aggregated across components of internal control to evaluate whether the combination of deficiencies result in a significant deficiency/significant deficiencies or material weakness(es). Our understanding of the root cause(s) of the failure of a control may result in the identification of additional deficiencies in the other components of internal control or that an existing deficiency has a greater severity"

- A root cause analysis of multiple deficiencies related to the design of controls may be an indicator that a significant deficiency or material weakness exists in the Risk Assessment component of internal control. Management's risk assessment process is the critical starting point in designing controls to mitigate risks of misstatement. Therefore, multiple design deficiencies, whether related or unrelated to the same account or disclosure, may be an indicator that the risk assessment process is not designed or operating effectively.
- Multiple deficiencies related to the operating effectiveness of controls, whether related or unrelated to the same account or disclosure, may be an indicator that a significant deficiency or material weakness exists in the monitoring activities component of internal control (specifically, Principle 16: Conducts ongoing and / or separate evaluations for clients that use the COSO Framework (2013)). Effective monitoring activities should detect and correct operating deficiencies in internal controls  The existence of multiple operating deficiencies may indicate that controls in this component of internal control are not designed or operating effectively.

**Control Mapped on principle 16:**

12.03.03 - The Audit Committee meets with the CFO and auditors to review financial reporting, internal controls, audit plans, compliance with all rules, regulations, and FAS pronouncements and requirements. At least one committee member is a financial expert.

**Evaluation framework Box 3:**

"Just because there is not a financial statement misstatement does not mean that there were controls to prevent it. With magnitude, we need to consider what "could" go wrong as a result of the deficiency. We need to assess the deficiency and identify what transactions or balances are impacted by the deficiency which will determine the potential impact or the magnitude.

**Box 3: Is the magnitude of the potential misstatement, which is at least reasonably possible (considering qualitative and quantitative factors), material to either the interim or annual financial statements?**

**If yes, Box 5: Do compensating controls exist and operate effectively, at a level of precision sufficient to prevent or detect a misstatement that could be material to either interim or annual financial statements? If No -> Material Weakness.**

**Significant Deficiency assessment occurs only in 2 cases:**

**When Box 3 is No and Box 4 (deficiency important enough to merit attention) is Yes and Box 6 (prudent official conclude is not an MW) is No. If Box 3 is NO, and Box 5 is NO, it is a Material Weakness**

Issue/Concerns: Lack of transparency/competency (Path A), lack of sufficient resources to perform effective controls on tax and treasury functions (Path B)

Possible Root Causes:

Pervasive lack of competency in the finance department, specifically CAO, Controller, SEC Reporting Manager, Director of Technical accounting in identifying, documenting and assessing accounting implications of technically complex transactions (Path A)

Lack of competency/resources to perform effective review in tax provision and treasury functions (Path B)

Date of my joining on the Engagement Q1 2012

**Summary facts**

**2012**

**Q2**

Variable Interest Entity was not disclosed to the auditors, its location was not disclosed and they represented that they didn't have control/oversight on the ledgers of the Company. After significant effort from us was discovered that the company had access to books and records, the entity was located on the top floor of their building. Although the agreement was included in the list of the many key agreements, management did not disclose to us the entity or its structure until we found the above mentioned facts. We also found an agreement whereby the Company was directing R&D efforts of the VIE which resulted in the VIE being consolidated. Management in that occasion not only did not consider VIE assessment before such contract was found but was also unaware that one of the officials in the company signed such contract. When brought to the attention of the audit committee in the quarter of its consolidation, Q3, a member of the AC made the statement that was surprised that we as auditors did not ask to consolidate the entity earlier than when we suggested it (q3).

**Q3**

The Company sold a group of assets to a private company named Open Silicon for a total of $3.2 million. The Company did not produce any evidence of assessment of collectability though accounted for the full $3.2 million as a receivable. After inquiry the company was able to produce half page screenshot from D&B Database after which they concurred to write off the entire amount of the receivable and recognize the payments on a cash basis.

PwC_B00000392

***At the end of the 2012 year the following controls were on the SAD:***

2.05.05 - On a transactional basis, the CAO and/or the Corporate controller and /or CFO initials the hard copy request as evidence of review and approval of the wire, for wires with the amounts over than $100,000.00, then both of the CFO and CAO's or corporate controllers signatures are required. The CAO or the corporate controller reviews the wire transfer and all the back-up, logs in with her user name and approves the wire in the on-line banking system.

5 wires over $100,000 were not properly approved by a second signature. The control was remediated by year-end.

8.04.05 - Monthly, the Controller (effective July 2012) and HR reconciles the Equity Edge Termination Report and HR Help Desk Tickets for terminations/Oracle listing of terminations to ensure accuracy and completeness. The CAO reviews and signs the reconciliation. In addition, the Controller/CAO reviews the quarterly releases of RSUs to ensure no releases were made to terminated employees that were processed in Equity Edge prior to the release upload.

Noted in Q2, there were new grants given to employees that were terminated by the date of vesting and resulted in overstatement of stock-based compensation expense. Control was remediated by year end

12.11.03 - The Finance organization ensures that accounting implications from all non-revenue related agreements are considered. Quarterly, the CAO obtains and reviews a list of non-revenue agreements maintained by internal/external legal counsel as well as underlying agreements to confirm that all related accounting adjustments and disclosures have been recorded or disclosed. The control is evidenced by sign-off on the reviewed list of non-revenue agreements.

Refer above for xpliant, Control deemed remediated at year end

04.01.04 - The Sr. Accountant prepares a roll forward of the tax accounts, including beginning balances in each tax account and checks activity for the month (payments, refunds, adjustments) to verify only the proper tax activity is being booked to the tax accounts (i.e., tax receivable, deferred tax assets, deferred tax liabilities, income tax payable). This is reviewed and approved via signature by the Controller/Asst Controller.

The company did not properly write off certain NOLs that were recorded during their acquisition of W&W during 2007 that expired unutilized (due to IRC Section 382 limitations) in 2010. Remediated by year-end

04.01.06: On a quarterly basis, Deloitte prepares the income tax provision based on information provided by the Controller/Tax Director. The Tax Director works closely with Deloitte throughout the preparation process and performs a detailed review of the tax provision. The Controller performs a high-level review of the tax provision and evidences her review and approval by signing on the ETR and the tax provision recommended by the Tax Director.

Confidential

**DX1676-4**

As part of the year-end substantive audit procedures, we noted the following: The Company should have been utilizing the mid-quarter convention for fixed asset depreciation. The Company finalized an R&D credit FIN 48 analysis after completing the 2011 R&D study in 2011; however the provision model estimated the 2012 California reserve at 15% which did not reflect the new reserve information estimated from the R&D study (should have been at 30%).

04.03.01 - Quarterly, the Tax Director and Deloitte collaborate to prepare or update the FIN 48 uncertain tax positions and excess tax benefits schedule. The Controller reviews the UTB positions and the excess tax benefit schedules and provide recommendation to holds discussions with the CFO, if appropriate. The Controller approves the disclosure and evidences her review by signing off the 10Q, 10K.

Aggregation of tax deficiencies resulted in an SD on 2012 SAD

### 2013

### Q1

The Company entered into a new building in Massachusetts and did not perform thorough accounting analysis and implication of potential build-to-suit lease. After our significant involvement and heavy assistance a memo was produced by the Company.

### Q2

The Company sold an initial shipment to Amazon for their new product yet failed to read in the agreement that there was a clause to cancel or return up to 5,000 units. In May the company signed a revised agreement with the cancellation of such provisions, yet the initial entry and the provision in the agreement were not identified.

The Company did not notify us that they built over $3.9 million of inventory that they were not certain to sell and only upon our procedures and inquiry to CFO agreed to write off the whole inventory amount

### Q4

The VIE issued a convertible security that required complex technical accounting and we also consulted on it. The Company failed to even identify that the security issued was not an ordinary notes payable and accounted for it the identical way as the other instrument and was unable to produce memo or documentation surrounding the instrument nor hired a consultant to perform such evaluation.

### *At the end of the 2013 year the following controls were on the SAD:*

8.04.05: (KEY & FRAUD) Monthly, the Controller and HR reconciles the Equity Edge Termination Report and Oracle listing of terminations to ensure accuracy and completeness. The CAO reviews and signs the reconciliation. In addition, the Controller/CAO reviews the quarterly releases of RSUs to ensure no releases were made to terminated employees that were processed in Equity Edge prior to the release upload.

PwC_B00000394

Noted Board of Director member, Anthony Pantuso, resigned on 9/24/13. As Anthony Pantuso had stock options granted to him in prior years, the Controller and CAO should have alerted Equity Edge of his termination to cease the vesting of his grants. However, the termination was not alerted in a timely manner and reported to Equity Edge on 12/9/13.

12.11.3 (KEY) The Finance organization ensures that accounting implications from all non-revenue related agreements are considered.  Monthly, the Asst Controller obtains and reviews a list of non-revenue agreements maintained by internal legal counsel as well as underlying agreements to confirm that all related accounting adjustments and disclosures have been recorded or disclosed.  The control is evidenced by sign-off on the reviewed list of non-revenue agreements by the CAO.

Subsequent to Q4'13 contract review, management identified that the analysis of one of the contract - Xpliant convertible equity security agreement was incomplete.  Management determined subsequently to the control activity that the equity security has derivative features which are required to be reviewed. Thus, noted the accounting analysis was not complete for contract matrix as of Q4'13.

In addition to the event named above, noted in Q1'13 the Company did not include a contract for the purchase of intangible asset in Q1'13. The accounting impact of the purchase was properly analyzed and booked by the Company, but the contract was missing from the list of non-revenue contracts.

## **2014**

### *Q1*

During the first quarter we noted that the VIE issued over 11 million stock options to its employees during prior year. The Company failed to properly review such minutes and was unaware of such awards.

### *Q3*

The Company did not update the tax provision computation for the final book amortization amount (as disclosed in the 10-K) when the late book accounting adjustments were made. As a result, $3M (gross) of book amortization was not reflected in tax provision computation.  Since this late adjustment information was available at time of the filing of the 10 K, the Company concluded that this true up was an error This true up resulted in reclassification between two noncurrent deferred tax assets balances (NOL DTA decrease and intangible DTA increase by $1.87 million-tax effected) with no impact to the balance sheet presentation (i.e., net noncurrent DTA did not change) and only impacted the presentation in the summary of deferred taxes included in the income tax footnote

Sub part F income- The Company did not record sub-part F income of 1.8M (gross) in the income tax computation for FY 2013. At the time of computation, the Company did not consider additional facts (Indian entity made a check-the-box election effective July 1, 2013) which existed at time of provision and which had an impact on the Subpart F income recognition computation

Confidential

On October 29 the Controller was victim of a phishing email scam and overrode wire transfer controls to perform a payment of approximately $500,000 to a vendor who did not appear in the company's list, based upon emails from CEO and CFO who she thought were genuine. On October 31 morning the Controller became aware the email was fraudulent when notified the CFO for confirmation of payment. The Company filed form 10-Q on October 31 around 10.30 am.

After the filing the Company notified us about the wire transfer error, representing not only in the rep letter but also verbally that they became aware of the issue after the filing. Subsequent procedures proved that the CAO and Controller and CFO were aware before the filing of the 10-Q. The Company did not perform any investigation at the time and filed the 10-Q 4 days before the last day to file.

The CFO represented that the company was going to tighten up their processes requiring signatures, despite that in the company's narratives and controls, the references to 2 signatures being required was present since 2012.

*Year-End*

The Controller invested $1 million in a 1 year term deposit in Taiwan and upon us inquiring about its classification as cash she mentioned she was not aware that this was a 1 year term deposit and called the bank immediately to cancel the deposit. Both the CAO and the Controller tried to make the position that the subsequent cancellation was sufficient reason to consider the deposit as cash.

Upon the morning of the Audit Committee the CAO represented to us in relation to the wire transfer control that as policy the wires were executed but approved and signed only after the facts. Upon inquiry as to why that was an acceptable practice the CAO pointed to the key control for wire approval highlighting the fact that the language of the control did not specify that the wires had to be approved before being processed.

During the audit committee private session we reiterated again (almost on a quarterly basis) that the accounting department is sloppy, in need as the company expands of additional resources. The AC chair asked why the company cancelled the deposit upon us asking.

Several calculation errors were noted by us during review of the income tax provision. The Controller represented in a meeting that there is no sufficient time or resources to perform a tight review in only 2 weeks and the company has a full VA. The Company lost their tax director after Q3 and replaced it recently. We had at least 10 Journal entries the company booked to correct these errors, with out of period and uncorrected misstatement in the deferred balances since 2012.

During one of our audit on warranty accrual we became aware that there was a non-written agreement with a key customer (CISCO) to return defective parts well outside normal warranty period, up to 3 or 4 years back, and though the amount appears to be below $150k, the CFO and CAO did not notify us about such verbal agreement. The agreement occurred when the assistant controller was on leave.

PwC_B00000396

Furthermore in our asset group assessment the Sec reporting manager memo, reviewed by CAO failed to identify that the Company has only one group rather than two nor analyzed the criteria that define what an asset group is.

The controller presented a draft evaluation memo reviewed to assess control implication of the wire transfer control, however the title of the memo and references within also pointed to a tax control, so there was a copy/paste exercise that either was not reviewed before sharing with us or was overlooked as part of their procedures.

The CAO also failed to produce documentation on a key estimate regarding inventory costs to calculate the turn for management overhead and continued to assess repeatedly that was consistent with prior year as only source of support.

During analysis of the Company inventory write off for $1.6 million occurred in Q4, after repeated question related to the timing of such reserve the CAO produced 2 emails from the VP of sales mentioning timing of the decision and their budgeting process, however when requested to share both emails, one related to November timing (post Q filing) and one that was highlighting October (pre Q filing), the CAO only sent the November one.

**Conclusion**

In my professional opinion the recurring episodes of lack of communication and in the case of the Q filing, false representation on the timing as to when they became aware raises significant concern about the tone at the top and the ethic of the top level of management, as highlighted by the VIE, The wire transfer, the inventory write off facts noted above.

Additionally, based on the facts mentioned above it appears that in presence of one-off transaction the CAO and technical accounting manager do not possess the accounting skill or competence not only to identify unusual terms but also to form on their own or through hiring consultants and well-thought accounting position even on basic items such as collectability assessment for open silicon or knowing that a wire should be reviewed and approved before being processed.

The 2014 audit has also 3 deficiencies in the 2 areas the controller is responsible for. Currently the company's controller is responsible for Tax, Foreign investment, International Payroll, Equity. The deficiency in the wire transfer was rebutted by the company with a list of all others wires above $500k processed by the Company. The fact that the Company processed all other wires to legitimate vendors does not constitute proof of any legitimacy nor effectiveness of controls, given that the controller overrode it and there are no compensating controls that caught it to address the safeguarding of assets. Moreover, from the list emerges that the averages size of the wire exceed $2 million which although not proof that such a wire would have been sent to non-company vendors, represents an indication that a bigger amount might not have been seen as unusual. The Controller also reviewed bank reconciliations for Q3 (TO VERIFY YEAR END REVIEWER) which seems to highlight a potential SOD problem as well.

PwC_B00000397

The Combination of the above mentioned facts, historical recurring of such episodes and failure in tax and wire controls already in 2012 and repeated now in 2014 would lead to believe that the Company's internal control are materially weak in the areas mentioned above. The full valuation allowance can be considered a mitigating factor although not completely, however the aggregation risk by root cause in the person of the company's controller appears not to have been adequately compensated.

For this reason I propose to issue a material weakness on the skill and competence of the finance department related to areas of income taxes, treasury and technical accounting.

Confidential