# DX1677

**Sent:** Mon, 02 Mar 2015 22:12:07 -0500
**From:** mauro.x.botta@us.pwc.com
**To:** jonas.ng@us.pwc.com
**Subject:** Fw: consultation memo
Attachment

**EXHIBIT 28**
Lorrie L Marchant CSR# 10523 RMR CRR CCRR CRC
WITNESS: Mauro Botta
CASE: Botta v PricewaterhouseCoopers
CASE No.: 3:18-CV-02615-RS
DATE Tuesday September 25, 2018

Mauro Botta

PwC | Senior Manager
Office: +1 408 464 5438
Email: mauro.x.botta@us.pwc.com
PricewaterhouseCoopers LLP
488 Almaden blvd suite 1800 San Jose CA 95110
http://www.pwc.com/us


----- Forwarded by Mauro Botta/US/ABAS/PwC on 03/02/2015 07:11 PM -----


From: Tye Thorson/US/ABAS/PwC

To: Mauro Botta/US/ABAS/PwC@Americas-US

Date: 03/02/2015 06:57 PM

Subject: consultation memo

---


Cavium Consultation memo- Aggregation FINAL.docx


Tye Thorson
Assurance Partner
San Jose, CA
408-460-5977 cell
408-817-5789 office

# Evaluating Internal Control Deficiencies Consultation Memo

Note: This optional template has been developed to assist engagement teams and can be used to document their evaluation of internal control deficiencies. This template is aligned with the principles of likelihood and magnitude included in PCAOB Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 5") and will facilitate an effective and efficient consultation on the evaluation of "close calls" or material weakness(es) to be communicated in an integrated audit (AS 5 or AT 501) and PCAOB non-integrated audits. The template is suggested for formal consultations. The concepts included in this template may also be useful in the evaluation of control deficiencies identified in private company audits under AICPA AU-C 265, *Communicating Internal Control Related Matters Identified in an Audit*. The template is not a replacement for reading the applicable literature, PwC Audit sections (principally PwC Audit 4700), and the internal Practice Aid for Evaluating Control Deficiencies ("Practice Aid").

*For consultations with National Auditing Services, Methods and Tools (ASM&T"), the following documents are subject to the consultation:*

- *PwC deficiency aggregation evaluation memo (herein)*

*The template is to be used by engagement teams to document their evaluation and conclusions when evaluating a control deficiency or deficiencies and possible material weakness or material weaknesses, in accordance with the consultation requirements in PwC Audit 4711 with ASM&T. This format does not replace management's evaluation and documentation of their considerations and conclusions regarding the deficiency. In fact this should serve as our wrap memo that focuses where we document our audit evidence related to management's assertions in their evaluation.*

| | | |
|---|---|---|
| ***Entity Name:*** | Cavium Inc. | ***February 24, 2015*** |
| ***Partner:*** | Tye Thorson | |
| ***Manager:*** | Mauro Botta/Mayank Gupta | |
| ***Office:*** | San Jose | |

**Purpose of Memo**

The engagement team is consulting with ASM&T on the aggregation of Cavium's control deficiencies and significant deficiencies for the year end December 31, 2014. To understand the background on the individual deficiencies, ASM&T has been provided the SAD, and accompanying memos on the individual deficiencies and significant deficiencies. The engagement team is consulting with ASM&T at the request of the engagement leader (EL) and the quality review partner (QRP) as to whether or not a material weakness exists in the aggregate in the control environment.

### Background of Cavium

Cavium, Inc. ("Cavium" or "the Company") has been a client of the PwC San Jose office for more than 10 years; having gone public in 2007. Cavium is a fabless semiconductor company (outsources their manufacturing). The EL has served in such capacity for the past four years, first signing the 2011 accounts. The EL on the account when the Company went public and who rolled off after having spent five years on the account was Kevin Elek, a partner in the SJ office.

Cavium is a semiconductor company and has been consistently growing its revenues over the past 4 years. Through 2011, the Company had acquired 7 companies, two of which occurred in 2011. Since then, the Company has been focusing on internally managing its growth. The Company is a relatively simple Company, particularly after the sale of a software business unit at the beginning of 2013. Revenues are generally PO based with very little complexity in their arrangements (ie. no multiple elements, etc). Much of the complex non-routine transactions center around acquisition accounting and the related follow on transactions including impairments, restructurings, etc.

### Internal control environment

The Company is a 404-reporting company and as such, PwC has been doing integrated audits since just after their IPO. The Company outsources their internal control testing to a well-known third party firm – SOA Projects, who reports directly to the AC and meets with them periodically to report on their control work. SOA Projects has been doing the work at the Company since before the EL started on the account. The Company establishes its controls, documents them and assesses the testing results of SOA Projects and the Company prepares its final SAD.

Over the years, the Company has consistently demonstrated their ability to close their accounting records timely and without significant errors as evidenced by the fact there have been no restatements and no material out-of-period adjustments that have required a consultation in accordance with our internal policies and no material SUM items. The Company utilizes the services of third parties for complex areas including taxes (Deloitte for provision work while another consultant is engaged for transfer pricing and international structuring work); valuation work – as needed (acquisitions, fair value of notes/debt) E&Y; technical accounting matters – as needed (The Connor Group). The Company and PwC have regular dialogue on control design, accounting technical matters and other areas necessary to ensure transparency.

The following is a summary of items from the SAD – Deficiency Log – included in PwCs workpapers from 2012 to 2014.

|      | # deficiencies | # SDs | # unremed CDs | # unremed SDs | # repeats from PY unremed |
|------|----------------|-------|---------------|---------------|---------------------------|
| 2012 | 17             | 2     | 5             | 1             | 0                         |
| 2013 | 6              | 0     | 4             | 0             | 0                         |
| 2014 | 11*            | 2     | 6*            | 1             | 0                         |

\* includes 4 deficiencies from SSAE 16 reports which have not historically been posted to the SAD

The above table shows that there are few SDs for the past three years and no repeats on outstanding unremediated deficiencies. Most of the deficiencies relate to operating effectiveness. The Company has been very responsive in remediating control deficiencies, whether design or operating deficiencies as evidenced by the fact that there are no deficiencies that remain unremediated year after year or beyond a year

Following are the SUM items and out-of-period adjustments over the years:

**2012** – No MWs, 3 items on YE SUM - (I/S impact - $225k); two were balance sheet reclasses; materiality is $2.1 million; de minimus is $160k; one audit adjustment reported in Q3 2012 (Xpliant);

**2013** – No MWs, 2 items on YE SUM – (I/S impact - $347k); other one was I/S reclass item; materiality is $1.2 million; de minimus is $120k; no audit adjustments;

**2014** – No MWs, 0 items on SUM; materiality is $1.6 million; de minimus is $160k; one audit adjustment – balance sheet reclass for $1 million + tax footnote adjustments;

Most items posted to the SUM or that result in an audit adjustment have been relatively insignificant above de minimus but below PM, and typically closer to the former.

**Accounting Department Personnel**

The accounting department is composed of a number of individuals with backgrounds in public accounting and with many years in private industry. The Company is very stable in terms of its accounting personnel. Following is a summary of the accounting personnel and their relevant background and experiences:

| Name | Title | Big 4 (years) | CPA | Yrs Industry | Yrs Cavium | Ttl Yrs |
|---|---|---|---|---|---|---|
| Suzy Seandel | Chief Accounting Officer | Deloitte (5) | Y | 16 | 9 | 21 |
| Joy Wu | Controller | KPMG (4) | Y | 14 | 8 | 18 |
| Li Li | Tax Director (started Jan 2015) | KPMG (8) | Y | 4 | 0 | 12 |
| Ralph Fuentes | SEC reporting manager | PwC (8) | Y | 5 | 5 | 13 |
| Tiffany Nguyen | Assistant controller | PwC (4) | Y | 4 | 4 | 8 |
| Anu Donthi | Director of Revenue | KPMG (3) | Y | 14 | 7 | 17 |

The Company recognizes that certain unique and or complex transactions may require incremental assistance and will, as necessary reach out to specialist third parties for that specific assistance. When looking at the matters of interest that we have reported to the Audit Committee (AC) over the past three years, management has been able to independently reach appropriate accounting positions on the items. Following are the significant items discussed in our audit committee reports over the past several years:

| Year | Significant/complex accounting events |
|---|---|
| 2011** | 2 Acquisitions*, Impairments |
| 2012 | Escrow settlement - acquisition; restructurings; sale of business unit (Econa 5) sold to OS<br>Impairment analysis - triggering event driven; Xpliant VIE accounting and related<br>Annual goodwill analysis (impairment taken)*; intangible impairment*; DTA impairment |
| 2013 | Sale of business unit (MV); changed reportable segment; settlement accrual; Amazon order |
| 2014 | Xpliant note valuation*; Xpliant acquisition of noteholders; Samsung NRE |

* incidates use of third party service providers
** PCAOB review of 2011 audit - focus areas included revenue and company controls, acquisitions and company controls, goodwill impairment and controls, stock-based compensation; IT controls; and journal entries and company controls; results were no findings on the engagement

The EL believes that the finance/accounting team are fully capable of understanding the accounting associated with the complex transactions mentioned above. They reach out regularly to the EL and other team members to discuss business and accounting matters, provide preliminary views on accounting matters, discuss technical guidance and update the conclusions reached on accounting matters.

Based on the above noted discussion on the technical qualifications of the accounting staff, , along with the results of his experiences for the past four years with the individuals, including the lack of significant contrary evidence to believe otherwise, there is not a concern related to

the competency of the accounting department personnel or in their ability to close the books timely, for either large/unusual transactions or for routine transactions. For this size of a Company, when considering the history of complex transactions and the qualifications above along with the lack of restatements or significant out-of-period adjustments and their willingness to remediate control deficiencies, the EL considers the team at Cavium as able to meet their required reporting obligations.

**Communication with the Auditors**

The Company is generally proactive in their dealings with us. The Company has demonstrated the ability to identify potential accounting issues (ie. out-of-period adjustments, restatements, significant audit adjustments/SUM items, etc),drawing appropriate conclusions on these issues.

At Cavium, the engagement leader meets regularly with the CFO and the CAO to discuss issues as they arise. When the EL initially took over the account in 2011, signing the audit for the year ended December 31, 2011, the Company had been involved in three recent acquisitions. The Company hires outside service providers to assist them in technical accounting matters, the purchase price allocation work and in other areas and did so for the acquisitions in 2010 and in 2011. The ELs experience has been that that the Company is proactive in reaching out to discuss matters of importance and to share their initial thoughts on accounting matters. They are receptive to our input on matters and generally come to the right conclusions on accounting matters. Examples include timely assessment of impairments, use of specialists when necessary for valuations (goodwill and acquisitions and fair valuing complex instruments), and accounting for the option to payoff the VIE notes and related VIE equity agreements in the current year). There is no historical evidence suggesting the Company reaches material incorrect accounting conclusions. Items recorded to the SAD have been appropriately evaluated each year.

Besides the acquisitions and some of the complex issues that go along with purchase accounting and the subsequent accounting, the Company has few complex transactions. They have a tax structure that is common to technology companies, with their IP located offshore. The accounting for companies with an offshore structure can get somewhat complex. The Company engages with Deloitte to prepare their tax provision and also engages with another third party consulting firm on international tax and transfer pricing issues. The Company also has a tax director that reports to the controller.

When the EL began working with the Company in 2011, there were no formal presentations by the Company to the auditors to kickoff a quarter. All communications were informal with the EL and EM. In the past three years, the Company began having kickoff meetings each quarter, sharing the quarterly results with the engagement team prior to beginning fieldwork. The Company continues to enhance their kickoff package which assists us to focus on issues when we start our procedures for the quarters or at year end as appropriate.

**Interactions with Audit Committee**

The Company has three representatives on its Audit Committee. PwC meets quarterly with them in person and communicates electronically or over the phone at least one other time per quarter. The dialogue with the AC is robust – particularly in executive sessions, and the Audit Committee is generally very engaging in the discussion and asks a lot of questions. Most questions come from Tony Thornley, the chairman of the AC, who was a former CFO of Qualcomm and is involved on several other boards of directors.

**Aggregation Analysis**

**Box 7: Are there multiple control deficiencies and/or significant deficiencies that should be considered in the aggregate (e.g., affect the same financial statement account or disclosure, relevant assertion, business unit, business process or component of internal control)? If yes, then go back to Box 2 and repeat evaluation for combination of deficiencies. If no, then the evaluation is complete.**

The engagement team has considered the nature of the individual unremediated control deficiencies (CD's) to determine if they aggregate to additional significant deficiencies (SD's) or a material weakness (MW) by significant account and disclosure, relevant assertion or component of internal control. There are eleven deficiencies documented on the SAD as follows (refer to the 2014 SAD for details of the individual items):

1. Tax – 1 SD
2. Payables – 2 CD's – aggregate to SD – see separate memo
3. Cash – 1 CD
4. IT (SSAE 16) – 2 CD's
5. IT (access) – 1 CD
6. Payroll – 1 SD
7. Payroll (SSAE 16) – 1CD
8. Equity (SSAE 16) – 2 CD's

Significant Accounts, Disclosures and Relevant Assertions

Item 1 – Tax – The root cause of the tax errors of $3.3 million relate to the low level of precision (higher dollar value) used in management's review of the deferred tax balances that are disclosure only. Management has designed the control to achieve only a low level of precision for footnote only disclosures as the Company has a full valuation allowance on deferred tax assets and concluded based on its risk assessment that potential errors related to the imprecision of the control would result in reclassifications within the income tax footnote and not impact the balance sheet or income statement in 2014. Management believes this approach is sufficient to mitigate material errors, and that it is consistent with the design of the control. The exception did not impact the balance sheet, income statement or statement of cash flow but only the 2013 tax footnote disclosure. We have concluded that the errors identified in 2014 related to the 2013 tax footnotes are not material individually or in the aggregate, nor were there errors identified related to 2014. This deficiency does not aggregate with other significant accounts or disclosures.

Item 2 –Payables – As documented on the SAD, there were two controls that were deemed deficient due to a wire transfer that was processed in error. The root cause of the error was that the Company was the victim of a 3rd party criminal fraud in connection with a phishing scam in which she believed she had received email approval from both the CEO and CFO. The error was identified after 2 days through the Company's existing controls and as a result the Company is in the process of recovering the funds that were disbursed. The deficiency is the result of an unusual circumstance and is not deemed to be a fraudulent activity on the part of management. The financial statements themselves were not misstated as they appropriately reflected the accounting for the disbursement, although the funds were disbursed in error. The Company identified the issue with compensating controls within two days of the original wire transfer. These deficiencies are deemed to be control deficiencies that aggregate to an SD but do not aggregate with other significant accounts or disclosures.

Item 3 - Cash - The term deposit issue only impacted a reclass within the company's liquidity's captions and such reclassification would not or did not have a material impact on the company's financials. The deficiency was due to the fact that the Controller made a decision that the accounting treatment for the term deposit was reasonable given the materiality of the deposit. In considering the potential magnitude of the deficiency, it is important to note is the controller only has responsibility for the cash in Taiwan which totaled $1.5M and is not expected to exceed this amount. This amount as a reclassification is not significant. The Controller believed that the balance for classification (between cash and short term investments) was not material and therefore the rigor applied in her evaluation was commensurate with the risk.

Items 4, 7, 8 – SSAE 16 – These items relate to control deficiencies identified in service providers utilized by the Company. These deficiencies impact different accounts and disclosures and are not concentrated in one particular area. In addition, the Company has monitoring and review controls in place to address the various deficiencies identified in the control environment of its service providers.

Item 5 – IT – This item relates to the timely access removal of terminated employees outside the 3-day window. This deficiency does not have an impact on the other deficiencies as far as aggregation. The terminated employees only had access to HR Self Service with no access to the general ledger. Given no other IT related failures and insignificance of the deficiency, no additional consideration is given for aggregation.

Item 6 – Payroll – This relates to the approval of the salary of a new hire. This does not aggregate with the other identified deficiencies. This deficiency does not aggregate with other significant accounts or disclosures. The HR director approved the salary based on a verbal discussion with the CEO. The CEO or CFO must approve each hire. Root cause: oversight by HR director in documenting approval.

The aggregation of the above noted deficiencies would not present risk of aggregating across accounts, disclosures or assertions given that each of the exceptions is related to a different area (classification of cash, safeguarding of assets and disclosure). As we have determined that items 4-8 effectively have no potential magnitude exposure, we have concluded they have no impact

on other COSO components. As such, the remainder of our assessment documented below will be focused on taxes, the wire transfer and the cash reclassification, items 1, 2 and 3, respectively.

**Components of Internal Control**

As we have identified deficiencies in control activities, we have documented our consideration of the potential impact on other COSO components below.

Control Environment

Based upon the above noted deficiencies we considered whether there was a material weakness in the control environment overall as it relates to Principle 4: Demonstrates Commitment to Competence and Principle 1: Demonstrates Commitment to Integrity and Ethical Values. In particular consideration was given to the fact that several of the identified deficiencies related to areas directly under the supervision of the Company's Controller, Joy Wu.

The Controller is responsible for Equity, International Payroll, International Investments and Income Taxes. As a result of our audit procedures, we noted deficiencies in 3 out of the 4 areas the Controller is responsible for.

Although the likelihood of a misstatement is at least reasonably possible, we do not believe the magnitude of such misstatement to be material to either interim or annual financial statements for the following reasons:

- Each deficiency is related to a different FSLI and/or account disclosure

- Although related to the same reviewer as a factor to aggregate such deficiencies, the exceptions that were noted were due to unusual one-off events and varying circumstances (i.e. the wire phishing fraud, the term deposit, the Company's approach to implementing a lower level of precision for items deemed to be low risk) and there was no indication of pervasive or underlying issues that manifested throughout the year in the areas and responsibilities of the Controller. We have considered that there is a similar root cause in both the tax (item 1) and the cash misclassification as they are both based on management's and / or the Controller's assessment that there was low risk of material misstatement to the financial statements, as such a lower level of precision (higher dollar value) was utilized. However, we have concluded that these are not indicative of an issue in the control environment and do not aggregate with each other, or with other deficiencies, as they relate to separate significant accounts and disclosures. Additionally, while there was a lower level of precision exercised, the rationale for each was different.

No significant impact was noted to the company's interim or annual financial statement due to the following reasons:

- The wire transfer was timely detected by the company's controls and the financial statements were properly reflecting the accounting of this transaction. This was not deemed to be a competency issue or lack of knowledge of the Company's operating procedures as the Controller believed she had appropriate approval as evidenced by the email, even though the email was subsequently determined to be fraudulent. The Controller was subject to a "wire-scam",

however, it was the Controller's own diligence and follow-up based on the Company's existing controls that allowed her to detect the fraudulent phishing scheme, by which the Company was able to timely detect the error and recover the erroneously disbursed funds. The Controller identified the error when she subsequently requested the documentation required to post the wire transfer to the Company's accounting records in accordance with the Company's existing controls over journal entries, which has been tested and is deemed to be operating effectively in accordance with our audit procedures.

Additionally, the erroneous disbursement by the Controller was not deemed to be an integrity or ethical issue as the Company took immediate action once the Controller identified the issue, at which time the Company contacted the Audit Committee Chair, PwC and the appropriate legal authorities (San Jose Police, FBI, Secret Service and Malaysian Authorities). In addition, it should be noted that:

1) The Company has a policy to rely on hard copy signatures and very few email requests are processed by the Company for wires; of all the wires over $1 million; all were based on manual approvals (ie. no emails) except the fundings of XPliant (the Company's consolidated VIE), which were approved via email.

2) Large wires ( >$1 million) to **new vendors** are virtually non-existent; in reviewing all wires >$1 million for all of 2014, all of them were to well-established suppliers (7 suppliers); to XPliant (its consolidated VIE); or to Trinet (for payroll and related fundings) – in other words – it would be highly unusual for the Company to make a **large** transfer to a new/unknown party – there were none of this type in all of 2014.

- The tax errors relate to the low level of precision used in management's review of the deferred tax balances that are disclosure only. Management has designed the control to achieve only a low level of precision for footnote only disclosures as the Company has a full valuation allowance on deferred tax assets and concluded based on its risk assessment that potential errors related to the imprecision of the control would result in reclassifications within the income tax footnote and not impact the balance sheet or income statement in 2014. The Controller was assigned on an interim basis to oversee and review the work of the Company's third-party tax consultant as the Company's Tax Director had left the Company in Q4 2014. Her assignment on an interim basis was deemed reasonable by the Company based on their engagement of a reputable Big 4 accounting firm to prepare their tax provision, as well as the fact that the Company deemed this to be a lower risk area due to the Company's full valuation allowance. The risk assessment exercised by the Company and the Controller are not viewed to be a lack of competency as they have engaged resources and designed procedures deemed to be appropriate based on their risk assessment determination. The Company as part of their review of the tax provision adopts a level of precision equal to $100 thousand and a level of precision of $1 million for items not affecting Balance Sheet or Income Statement. The $1million threshold for items not affecting the Balance Sheet or Income Statement failed to operate at that level of precision. As a compensating control, the CFO and CAO stated that they would consider material fluctuations above $10 million and investigate with support to the Company's controller. (See control 7.2.6). We have evidenced this level of precision (both the $100K for income statement or balance sheet impacting areas and the $10M compensating control for footnote changes) as documented in

our walkthrough procedures by observation of the level of items reviewed in connection with the tax provision review. We have tested this level of precision through our observation that all items exceeding the required thresholds in the provision have been addressed and corroborating explanations provided.

In light of the considerations in this memo, we do not believe such level of precision to be unreasonable for disclosures with low inherent risks such as the tax footnote. The adjustments identified all relate to the 2013 footnote balances that were fixed in the 2014 provision by the Company.

- The term deposit issue only impacted a reclass within the company's liquidity's captions and such reclassification would not or did not have a material impact on the company's financials. The Controller is aware of the GAAP requirements to classify investments with original maturities greater than 3 months as investments, instead of cash equivalents The Controller understood the funds to be invested in a short-term interest bearing account, the terms of which allowed for early withdrawal of the funds with no loss of principal and only the loss of accrued interest to-date. The Controller noted that based her research, there was guidance and practice that has allowed for such funds to be classified as cash if there is no loss of principal, nominal loss of interest and can be cancelled on short notice. The Company typically has not invested cash and it appears the Company took a position based on guidance they reviewed and the consideration that the amount was immaterial to the financial statements overall and did not impact working capital or debt or deposit requirements. While this was an error, it was not material to the financial statements overall. The Controller deals with very little cash and applied a level of rigor in her procedures commensurate with the associated risk. Given the amounts involved, she believed that it was immaterial as to whether it was a term deposit or a savings account.

It should be noted that the controller only has the ability to approve such transactions in Taiwan where the entire cash balance is $1.5 million (including the term deposit, and the $1 million sits there as a deposit for regulatory purposes). All other cash is managed by the CAO.

The aggregation of these deficiencies would not present risk of netting given that each of the exceptions is related to a different area (classification of cash, safeguarding of assets and disclosure). In particular we have considered whether the errors identified in tax and treasury resulted in the determination of lack of competence as it relates to the Controller and have concluded that it does not given: 1) the Company had designed higher level review procedures based on their risk assessment that the risk of material misstatement in the area of taxes was low and 2) the misclassification in the area of treasury as the Controller had considered that there was guidance that indicated various practices occurred related to these types of term deposits and risk assessed the impact of the financial misstatements being misleading to an investor considering the immateriality of the $1 million deposit amount. We considered whether the combination of any of the deficiencies is deemed to be important enough to merit attention of the AC for the following considerations:

- The wire transfer "phishing scheme" has previously been concluded to be a significant deficiency important enough to merit attention. As this relates to a cash disbursement, we

considered whether this would be aggregated with the term deposit reclassification and concluded that it would not as there was not a common root cause of the deficiency as the root cause of the wire transfer error was based on a fraudulent external activity, while the term deposit reclassification was based on the Controller exercising a lower level of rigor in her review procedures commensurate with the risk of material misstatement.

- The term deposit misclassification is not deemed to be a significant deficiency individually, nor is it considered to aggregate to a significant deficiency when considered with the wire-transfer error (as discussed in the preceding paragraph), nor is it considered to aggregate with the tax significant deficiency.  As mentioned above, both items have common elements related to the decision to apply a higher level of materiality (lower level of precision) in executing their reviews over these specific items.  We do not believe this to be indicative of a pervasive issue in the control environment or risk assessment process. - The tax deficiency is deemed to be a significant deficiency as discussed above, but it is not considered to aggregate with the term deposit reclassification as discussed above. Additionally, the errors identified related to the 2013 footnote disclosures. We do not deem the failure of these controls to present a level of significance or pervasiveness to increase the risk of material misstatement. As noted in the magnitude assessment the root cause of these exceptions was driven by a combination of one-off events and the Company's approach to implementing a lower level of precision or rigor for items deemed to be low risk. The Company's business has been fairly consistent and stable since 2013 and the Company has already hired a new Tax Director to supplement the review of the income tax provision. The Director started in January 2015.

Furthermore no significant audit adjustments were noted as a result of these deficiencies.

We have considered the Company's historical environment which has consistently demonstrated their ability to close their accounting records timely and without significant errors as evidenced by the fact there have been no restatements and no material out-of-period adjustments that have required a consultation in accordance with our internal policies.

We have considered the Controller's qualifications which include 18 years of accounting experience – 4 years at KPMG and 14 years in industry, the last 8 of which have been at Cavium. Based on the above noted qualifications and our historical experience with the Controller, there is not a historical or current concern related to her competency.  Based on the Company's designed organizational structure, the Controller has very specific responsibilities related to stock compensation, overseas offices, tax and miscellaneous other activities. The CAO has the broader responsibility for all areas of accounting and the financial statements overall.  Over the years, and we have worked with the Controller through many issues and transactions and we have never had any concerns about her technical abilities.  The EL has also discussed her competencies with the former engagement partner (Kevin Elek) who worked with her for several years and he had no concerns with her competence, technical or otherwise.

We have considered other key factors in Company's control environment overall which includes providing continued training programs, promoting an ethical "tone at the top" to promote competency and integrity throughout the organization and the Company's historical receptiveness to design control recommendations and timely responsiveness to the remediation

of control deficiencies as evidenced by the fact there are no deficiencies that remain unremediated year after year.

The engagement team has considered the guidance (AS 5.69) related to the judgment of a prudent official. The team has concluded that a well-informed, competent and objective individual would not conclude the deficiency is a material weakness for the items described in the magnitude assessment as well considering the following factors:

1) Identification of fraud on the part of senior management - The phishing scam was identified and caught after 2 days by the company's existing controls. This was not a management fraud.

2) Restatement of previously issued financial statements to reflect correction of a material error - None noted for this year or historically.

3) Identification of material misstatement that would not have been detected by the company's controls - The Company did not have any material adjustments nor uncorrected misstatements in its balance sheet or income statement or statement of cash flow. We have determined that these errors would not be considered material as the qualitative factors related to a footnote disclosure on tax amounts with a full valuation allowance outweigh the quantitative impact.

4) Ineffective oversight of the company's external financial reporting by the company's audit committee - Based on our interaction and frequent communication with the Audit committee, we deem the level of oversight at this Company to be adequate.

Risk Assessment

We have evaluated whether there is a reportable significant deficiency or material weakness in the Company's Risk Assessment considering the 2014 deficiencies and our historical experience with the Company. We have considered the following items and have determined that the Company has set appropriate objectives, processes and controls in place related to Risk Assessment as evidenced by:

- Effective entity-wide controls;
- The lack of identification of design deficiencies;
- Management's process for identifying areas of greater complexity that require their need to engage third-party experts (as evidenced in the above noted tax assessment);
- No evidence of fraud perpetrated by the Company, in particular the executive team.

We have also considered that while there was a significant deficiency related to an error in the 2013 tax footnote, management had designed the control to achieve only a low level of precision for footnote only disclosures as the Company has a full valuation allowance. As such, we do not deem this to be a pervasive issue of risk assessment issues as we determined the design to be reasonable and appropriate.

Information and Communication

We have evaluated whether there is a reportable significant deficiency or material weakness in Information and Communication considering the 2014 deficiencies and our historical

experience with the Company. We have considered the following items and have determined that the Company has set appropriate controls in place to produce quality information as evidenced by:

- The Company has consistently demonstrated their ability to close their accounting records timely and without significant errors;
- There have been no restatements;
- There have been no material out-of-period adjustments that have required a consultation in accordance with our internal policies;
- The Company has a process to determine complex areas that require the engagement third-party specialists;

Based on the above considerations we have concluded that the root cause of the deficiencies does not relate to information or communication.

<u>Monitoring Activities</u>

We have evaluated whether there is a reportable significant deficiency or material weakness in Monitoring Activities considering the 2014 deficiencies and our historical experience with the Company. We have considered the following items and have determined that the Company has set appropriate controls in place to evaluate and communicate deficiencies in a timely manner as evidenced by:

- There have been few significant deficiencies identified every year and no history of recurring outstanding unremediated deficiencies;
- The "wire-scam" was identified by the Company's internal controls;
- The Company took immediate action in contacting the Audit Committee Chair, PwC and the appropriate legal authorities once the wire scan was identified.

We have also considered the deficiencies identified in taxes and term deposits / investment and concluded the errors were a result of management's risk assessment considerations to apply a higher level of materiality, as such we conclude these deficiencies are not indicative of broader monitoring activities.

Based on the above noted considerations the team has concluded a material weakness does not exist when considering the identified deficiencies individually or in the aggregate as it relates to the Company's internal control over financial reporting.

**Conclusion**

Based upon the above noted considerations, evaluation of the deficiencies and the consultation on the deficiency aggregation with ASM&T, the engagement team has concluded that a material weakness does not exist as it relates to the Company's internal control over financial reporting or on the control environment overall.