# JX4

TCR Submitted Successfully - Reference Number: TCR1478218903573

## Tell us about your complaint

**Please select the option that best describes your complaint**

Material misstatement or omission in a company's public filings or financial statements, or a failure to file

**Please select the specific category that best describes your complaint**

Audit

**Provide additional details about your complaint:**

See "outline" file uploaded

**Are you having or have you had difficulty in getting access to your funds or securities?**

No

**Did you suffer a loss?**

No

**Is the alleged conduct ongoing?**

Yes

**Has the individual or firm acknowledged the alleged conduct?**

No

**What is the source of your information? You may select more than one**

Conversations; Internal business documents;

**Have you taken any action regarding your complaint? You may select more than one**

Complained to firm; Complained to other regulator;

**Who did you contact and what action did you take?**

See "outline" file. Also I did have a 45 minute chat with an FBI agent in San Francisco in October 2016 outlining the general topics of my complaint, however the FBI agent said it was not the type of fraud they'd be in charge to follow up on, so I did call the SEC whistleblower hotline because it seemed the more appropriate agency to handle this matter.

## Who are you complaining about?

**Are you complaining about an individual or a firm?**

Firm

**Select the title that best describes the individual or firm that you are complaining about:**

Other

**For Other Firm, please specify:**

Audit Firm

**If you are complaining about an entity or individual that has custody or control of your investments, have you had difficulty contacting that entity or individual?**

No

**Firm Name:**

PLAINTIFF 00209

PwC LLP

**Street Address:**

488 Almaden Blvd.

**Address (Continued):**

Suite 1800

**City:**

San Jose

**State / Province:**

California

**Zip / Postal Code:**

95110

**Country:**

USA

**Telephone:**


**Are you or were you associated with the individual or firm when the alleged conduct occurred?**

Yes

**How are you or were you associated with the individual or firm you are complaining about?**

Currently Employed

# Products involved

**Select the type of product involved in your complaint:**

Other

**Please select the category that best describes your security product:**

Other

**For other, please provide more information:**

Audits of Financial Statements

# About you

**\*Are you submitting this tip, complaint or referral pursuant to the SEC's whistleblower program?**

Yes

**\*Are you submitting this tip, complaint or referral anonymously? Being able to contact you for further information or clarification may be helpful.**

No

**\*\*Are you represented by an attorney in connection with your submission?**

PLAINTIFF 00210

No

**Submitter Information**

**Title:**
Mr.

**\*\*First Name:**
Mauro

**\*\*Last Name:**
Botta

**Street Address:**
88 East San Fernando Street

**Address (Continued):**
Apt. 1308

**City:**
San Jose

**State / Province:**
California

**Zip / Postal Code:**
95113

**Country:**
USA

**Home Telephone:**
408-282-4959

**Work Telephone:**
408-817-5094

**Mobile Telephone:**
408-464-5438

**Email Address:**
siskodlg@gmail.com

**What is the best way to contact you?**
Phone

**Select the profession that best represents you:**
Auditor

# Whistleblower Declarations

**\*1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of the Department of Justice, the Securities and Exchange Commission, the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the

PLAINTIFF 00211

Office of Thrift Supervision, the Public Company Accounting Oversight Board, any law enforcement organization, or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?

No

**\*2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. §78c(a)(52))?**

No

**\*3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**

Yes

**\*4. Are you submitting this information pursuant to a cooperation agreement with the SEC or another agency or organization?**

No

**\*5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**

No

**6. If the answer to any of questions 1 through 5 above is 'yes,' please provide details.**

See "outline" document uploaded

**\*7a. Are you submitting this information before you (or anyone representing you) received any investigative request, inquiry, or demand that relates to the subject matter of your submission from the SEC, Congress, or any other federal, state, or local authority, any self regulatory organization, or the Public Company Accounting Oversight Board?**

Yes

**\*8a. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**

No

**\*9a. Did you acquire the information being provided to us from any person described in questions 1 through 8?**

No

**10. Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity, and explain the basis for your belief that your identity would be revealed if the documents were disclosed to a third party.**

The "outline" documents details company's names and facts and specifics. Given my status of current employee in the very firm I am filing a complaint against, I do have concerns that if not

PLAINTIFF 00212

adequately protected I could be target of adverse consequences, as well as those whose concerns reported to me in confidence I am now reporting to you, for which I'd hope the same confidence can be applied. Being a very small valley that relies on relationship and reputation, if my identity were to be disclosed it'd be extremely difficult for me and the others to find suitable employment in the area.

**\*I declare under penalty of perjury under the laws of the United States that the information contained in this submission is true, correct, and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.**

Agree

PLAINTIFF 00213

I have been employed by PwC LLP since 1999. After 5 years in Italy I worked in San Jose since 2004 and I am currently employed in that office as Senior Manager 7.

The matters that I am reporting in this form are both from direct and indirect evidence. For direct evidence the source is either in the engagement I worked on (and in its work papers) or in meetings and conversations I had with partners in this office, while for indirect matters, I'd also like to report the outlines based on several conversations occurred with other personnel involved in other engagements that reported those matters to me in relation to these audits.

Within the document, items reported in italic are excerpts from written documentation for which I added the source at the beginning of each citation

### SECTION 1 - Directly observed

1) Cavium Inc. (2012 – 2014)

I was leading Senior Manager on this public engagement and since the beginning I started to notice episodes involving the audit, the Company's management and how those were documented. After raising each time these episodes to the engagement leader ("EL"), after 3 years of accumulation of episodes, combined with the magnitude of the 2014 events, I decided to advocate the paragraph in our guide that allows professional disagreement within Senior Manager and EL because I was not comfortable with our behavior. The detailed list of episodes summarized below is known to the office and the firm National Office. For 2012 and 2013 none of these events were documented consistently as audit adjustment. Due to my disagreement, 2014 events were documented in the work papers as audit adjustments.

Document shared with Partner, Quality Review Partner ("QRP"), National Office, Risk Management

Source: Written memorandum submitted in February 2015

*2012*

*Q2*

*A Variable Interest Entity ("VIE") was not disclosed to the auditors, its location was not disclosed and management represented that they didn't have control/oversight on the ledgers of this entity. After significant effort from my team, it was discovered that Cavium had access to books and records and the entity was located on the top floor of their building. The trigger to inspect the building was from one agreement that Cavium had with this entity (Xpliant) that stated the address for both companies, and the address was the same for both entities. Although the agreement was included in the list of the many key agreements provided to us, management did not disclose to us the entity or its structure until we found the above mentioned facts and asked them about it. We also found an agreement whereby the Company was directing Research and Development ("R&D") efforts of the VIE which resulted in the VIE being consolidated. Management in that occasion not only did not consider VIE assessment before such contract was found but was also unaware that one of the officials in the Company signed such contract. When brought to the attention of the Audit Committee ("AC") in the quarter of its consolidation, Q3, a member of the AC made the statement that was surprised that we as auditors did not ask to consolidate the entity earlier than when we suggested it (Q3).*

*Q3*

*The Company sold a group of assets to a private Company named Open Silicon for a total of $3.2 million. The Company did not produce any evidence of assessment of collectability though accounted for the full $3.2 million as a receivable. After inquiry the Company was able to produce half page screenshot from Dun & Bradstreet Database after which*

PLAINTIFF 00214

*they concurred with our assessment to write off the entire amount of the receivable and recognize the payments on a cash basis.*

## 2013

### Q1

*The Company entered into a new building in Massachusetts and did not perform thorough accounting analysis and implication of potential build-to-suit lease. After our significant involvement and heavy assistance a memo was produced by the Company.*

### Q2

*The Company sold an initial shipment to Amazon for their new product yet failed to read in the agreement that there was a clause to cancel or return up to 5,000 units. In May the Company signed a revised agreement with the cancellation of such provisions, yet the initial entry and the provision in the agreement were not identified.*

*The Company did not notify us that they built over $3.9 million of inventory that they were not certain to sell and only upon our procedures and inquiry to the Chief Financial Officer ("CFO") agreed to write off the whole inventory amount.*

### Q4

*The VIE issued a convertible security that required complex technical accounting and we also consulted on it. The Company failed to even identify that the security issued was not an ordinary notes payable and accounted for it the identical way as the other instrument and was unable to produce memo or documentation surrounding the instrument nor hired a consultant to perform such evaluation.*

## 2014

### Q1

*During the first quarter we noted that the VIE issued over 11 million stock options to its employees during prior year. The Company failed to properly review such minutes and was unaware of such awards.*

### Q3

*The Company did not update the tax provision computation for the final book amortization amount (as disclosed in the 10-K) when the late book accounting adjustments were made. As a result, $3M (gross) of book amortization was not reflected in tax provision computation.   Since this late adjustment information was available at time of the filing of the 10 K, the Company concluded that this true up was an error This true up resulted in reclassification between two noncurrent deferred tax assets balances ($1.87 million-tax effected) with no impact to the balance sheet presentation (i.e., net noncurrent deferred tax assets did not change) and only impacted the presentation in the summary of deferred taxes included in the income tax footnote.*

*Sub part F income- The Company did not record sub-part F income of 1.8M (gross) in the income tax computation for FY 2013. At the time of computation, the Company did not consider additional facts (Indian entity made a check-the-box election effective July 1, 2013) which existed at time of provision and which had an impact on the Subpart F income recognition computation*

*On October 29 the Controller was victim of a phishing email scam and overrode wire transfer controls to perform a payment of approximately $500,000 to a vendor who did not appear in the Company's list, based upon emails from the Chief Executive Officer (" CEO") and CFO who she thought were genuine. On October 31 morning the Controller became aware the email was fraudulent when notified the CFO for confirmation of payment. The Company filed form 10-Q on October 31 around 10.30 am.*

*After the filing the Company notified us about the wire transfer error, representing not only in the rep letter but also verbally that they became aware of the issue after the filing. Subsequent procedures proved that the Chief Accounting Officer ("CAO") and Controller and CFO were aware before the filing of the 10-Q. The Company did not perform any investigation at the time and filed the 10-Q 4 days before the last day to file and in open market.*

PLAINTIFF  00215

*The CFO represented that the Company was going to tighten up their processes requiring signatures, despite that in the Company's narratives and controls, the references to 2 signatures being required was present since 2012.*

### Year-End

*The Controller invested $1 million in a 1 year term deposit in Taiwan and upon us inquiring about its classification as cash she mentioned she was not aware that this was a 1 year term deposit and called the bank immediately to cancel the deposit. Both the CAO and the Controller tried to make the position that the subsequent cancellation was sufficient reason to consider the deposit as cash.*

*Upon the morning of the Audit Committee the CAO represented to us in relation to the wire transfer control that as policy the wires were executed but approved and signed only after the facts. Upon inquiry as to why that was an acceptable practice the CAO pointed to the key control for wire approval highlighting the fact that the language of the control did not specify that the wires had to be approved before being processed.*

*During the audit committee private session we reiterated again (almost on a quarterly basis) that the accounting department is sloppy, in need as the Company expands of additional resources. The AC chair asked why the Company cancelled the deposit upon us asking.*

*Several calculation errors were noted by us during review of the income tax provision. The Controller represented in a meeting that there is no sufficient time or resources to perform a tight review in only 2 weeks and the Company has a full valuation allowance. The Company lost their tax director after Q3 and replaced it recently. We had at least 10 Journal entries the Company booked to correct these errors, with out of period and uncorrected misstatement in the deferred balances since 2012.*

*During one of our audit on warranty accrual we became aware that there was a non-written agreement with a key customer (CISCO) to return defective parts well outside normal warranty period, up to 3 or 4 years back, and though the amount appears to be below $150k, the CFO and CAO did not notify us about such verbal agreement. The agreement occurred when the assistant controller was on leave.*

*Furthermore in our asset group assessment the Sec reporting manager memo, reviewed by CAO failed to identify that the Company has only one group rather than two nor analyzed the criteria that define what an asset group is.*

*The controller presented a draft evaluation memo reviewed to assess control implication of the wire transfer control, however the title of the memo and references within also pointed to a tax control, so there was a copy/paste exercise that either was not reviewed before sharing with us or was overlooked as part of their procedures.*

*The CAO also failed to produce documentation on a key estimate regarding inventory costs to calculate the turn for management overhead and continued to assess repeatedly that was consistent with prior year as only source of support.*

*During analysis of the Company inventory write off for $1.6 million occurred in Q4, after repeated question related to the timing of such reserve the CAO produced 2 emails from the Vice President of sales mentioning timing of the decision and their budgeting process, however when requested to share both emails, one related to November timing (post Q filing) and one that was highlighting October (pre Q filing), the CAO only sent the November one.*

### <u>Conclusion</u>

*In my professional opinion the recurring episodes of lack of communication and in the case of the 10-Q filing, false representation on the timing as to when they became aware raises significant concern about the tone at the top and the ethic of the top level of management, as highlighted by the VIE, The wire transfer, the inventory write off facts noted above.*

*Additionally, based on the facts mentioned above it appears that in presence of one-off transaction the CAO and technical accounting manager do not possess the accounting skill or competence not only to identify unusual terms but also to form on their own or through hiring consultants and well-thought accounting position even on basic items such as collectability assessment for open silicon or knowing that a wire should be reviewed and approved before being processed.*

PLAINTIFF 00216

> *The 2014 audit has also 3 deficiencies in the 2 areas the controller is responsible for. Currently the Company's controller is responsible for Tax, Foreign investment, International Payroll, Equity. The deficiency in the wire transfer was rebutted by the Company with a list of all others wires above $500k processed by the Company. The fact that the Company processed all other wires to legitimate vendors does not constitute proof of any legitimacy nor effectiveness of controls, given that the controller overrode it and there are no compensating controls that caught it to address the safeguarding of assets. Moreover, from the list emerges that the averages size of the wire exceed $2 million which although not proof that such a wire would have been sent to non-Company vendors, represents an indication that a bigger amount might not have been seen as unusual. The Controller also reviewed bank reconciliations for Q3 which seemed to highlight a potential SOD problem as well.*
>
> *The Combination of the above mentioned facts, historical recurring of such episodes and failure in tax and wire controls already in 2012 and repeated now in 2014 would lead to believe that the Company's internal control are materially weak in the areas mentioned above. The full valuation allowance can be considered a mitigating factor although not completely, however the aggregation risk by root cause in the person of the Company's controller appears not to have been adequately compensated.*
>
> *For this reason I propose to issue a material weakness on the skill and competence of the finance department related to areas of income taxes, treasury and technical accounting.*

As a result of this document, National Office decided to document each of the 2014 episodes as audit adjustments and in the work paper of 2014 a document was attached that only included the 2014 events of my claims. 2012 and 2013 were not addressed. During the consultation the conclusion was to consider the outcome only as significant deficiency aggregated; such conclusion was achieved after a control over the tax footnote was documented, however such control was not noted during the walkthrough and constituted a documentation exercise thanks to which the Significant Deficiency conclusion was agreed upon by National; evidence of that is that this control was created the night before the filing of the 10-K. My document was not attached to the work papers.

When I raised my claims I was put under significant pressure by the market assurance leader ("MAL"), and the engagement partners, and I was told that had I pursued this path, most likely I would have never made partner. This quote has been subsequently repeated in other conversations I had after the facts.

As a result of this matter, the engagement leader communicated to the Company that I wanted to give them a material weakness after which the CFO asked for my removal from the engagement, leaving everyone else besides me there, including the controller and every other member of the engagement team. The firm accepted to remove me ignoring my claim that the competence of management would still constitute a significant risk. As additional fact I want to point out that Cavium regularly increases our fees by 3-5% and there were often minimum to no discussion, and in my experience the lack of discussion on fees is unusual and in proportion with other companies of the same size and industry our fees appear unusually high. Also the engagement leader per his own admission knew outside work the CAO and always defended her despite the evidence that challenged her competency. Part of the defense was referring to the statement that in this valley they're all like that and this level of competency is not unusual for companies in this valley.

I still assert that management does not possess sufficient competence especially for non-standard transactions and that as auditors we were drafting and making significant corrections to technical memos. The more clear example occurred in occasion of the technical instrument of the VIE that the Company did not even realize it signed. When I consulted with our National Office, Cavium management asked me to just share with them my memo with National Office so to make it become their memo.

PLAINTIFF 00217

After I refused, my manager told me that the partner asked him if he could print my memo and leave it on a cube so that management could find it. This has also been admitted by the same partner in a written survey that was done anonymously regarding my career, where the details included clearly led to me to identify that episode. What follows is the actual statement the partner wrote in that survey:

Source: Written survey received by me in 2014

> *"Our clients theoretically should do a lot of things and smart things – and in reality they are not always smart. You get used to that in Silicon Valley. As long as I get paid to help any type, we are all good. It is good to have a goal of getting them better, but they don't always react that way. On a client we have a technical thing that came up (very strong technically). We had to go to National Office on a matter that was complex. Mauro wrote a memo and national said was significant. Our client asked for help to do a write up. A Partner would just get to work and write the memo and figure out how to conclude our opinion. Mauro would not give them the memo. His position is that it is not our responsibility to do that. Our National Office said this is complicated – if it is complicated for us, how can we expect this little Company to nail this. Not sure if it is a sign of Mauro's level of maturity. As a partner you have to have the position that you want these guys to like you, you want a good audit and relationship, you'll just do it."*

The Company is now going through an acquisition in 2016, and based on my experience in the years I was there, given there has been no turnover nor additions to management, especially on the area of review controls, where we wrote most of the documentation despite all the evidence that existed was just a signature, I'd like to highlight the concern of competence in dealing with this transaction and what roles the audit team might be playing in this year audit.

   2) Harmonic Inc. (2015)

I started the Harmonic engagement with the Q3 review in the second half of October. Right after I rolled on Harmonic, I noticed that despite be Mid October, areas normally completed by that time, such as planning, Q1 and Q2 revenue testing (non-stat) was not done and upon planning sign off I notified the EL that rework will have needed to be done on the walkthroughs because there were significant pieces missing (i.e. level of precision of controls).

What follows is the outline of the events occurred on Harmonic, summarized in a document which was shared with the US technology leader.

Source: Written document sent to the Us Technology Leader and HR in March/April 2016

> *During Q3 review I immediately found 5 adjustments related to prior Q, one of which referred to prior year related to restricted cash, to which the CAO reaction was to state in a meeting with me and the EL that "You were ok with this last year, now u say you're not, I don't feel I can trust you anymore".*
>
> *In December, while I was on vacation, I had a call with the Revenue Director asking about how many accounting conventions the Company was using in revenue, and I asked them to quantify the impact of each. The last one mentioned referred to deferred revenue and the Revenue Director stated that such convention has always been there since inception and "for sure the impact was material". I alerted the engagement leader of the matter, who then met the CFO in January 2016.*
>
> *During January before fieldwork start I met with the team and realized that 2014 Audit work papers had significant issues in terms of both coaching, audit documentation and procedures. The team was unable to respond to the findings that emerged during my review of the work papers, so as a result we drafted very detailed work plan and questions to ask to try to remediate the gaps existing.*

PLAINTIFF 00218

*As I was splitting my time with another public job (Gigamon, which was implementing 404 and had 2 Material Weaknesses ("MW") to remediate), my Harmonic team started quickly to notify me that the Company was not delivering items and was doing significant push back, of which I notified the EL. Furthermore there were personal references to me in emails from the Company and in meeting as "new player" by the Company and that I did not know their processes and controls.*

*Also the team notified me that the Company was having key contacts going on leave on a weekly basis. When I notified the EL of the fact we were not receiving items or responses (as demonstrated by the open item lists that was circulated daily), the EL responded that was instead a blessing that we did not have contacts on site that we needed, because they were tired and once back we'd have benefited from it.*

*Furthermore the EL kept referring to the Company and to my team that this was a tough audit, creating the impression that we were performing more than what we should have, while instead we were simply doing an audit. I made very clear to the EL that these comments were undermining our efforts and creating frictions and I made such comment in presence of the QRP who concurred in the meeting that this was not a tough audit, but just an audit.*

*My repeated requests to the EL to talk to the CFO to notify that the Company and the CAO were not assisting and cooperating were not followed timely and when finally the 12b-25 occurred not only the CFO stepped in and each item was delivered in days and the Company asked us questions to clarify on items, but he also asked back the Company's CAO as to how could they not know items we were asking and our questions were fair during an AC.*

*Had the EL escalated much more promptly the issue and the gravity of risking the deadline as I asked, the delays could have been avoided because we would have received answers and documentation on time as proven by the delivery time once the CFO got involved with the urgency I requested much earlier.*

*During year-end we had to essentially perform and ask walkthrough type questions and the Company approach was not to respond to them immediately because often they did not know the answer and at first attempt to push back stating we never asked such questions since we audited them, then to state we were being unreasonable because now was January and kept asking to speak to the EL. As further example of the EL inability to understand the severity of the status and the need to escalate above the CAO with whom he had good relationship, after a meeting where I explained to him the issues and status, as a reply he sent email to the team saying we're trailing in number of steps prepared since last year rather than being responsive of the delays and issues I was stating.*

*Furthermore in status meetings with the Company the EL apologized to the Company for what was happening rather than supporting the effort of the audit and that these questions needed to be answered more timely. At that moment I notified the QRP that the EL not only was not supporting the audit, was resisting in us asking questions and we were at risk of missing the deadline.*

*As further evidence I noticed that the EL was not aware of the basic processes surrounding areas of estimates, including revenue aspects such as system limitation and use of conventions, for which I had to assume the leader role in teaching what an audit was, in teaching my team what taking responsibility and protect the team meant and assuming EL functions in making decisions on technical level highlighted below and training also the EL in basic concept such as when a fixed asset should start to be depreciated, of which I had to provide written evidence to convince him of this concept.*

*During the entire audit I continued to see evidence of lack of proper review and supervision, example on revenue where for instance the 2nd year senior was surprised I reviewed the folder with the contracts versus just asking her if there were any issues. I also tried to constantly remind the team that we were done when we were done and I was admonished by EL and QRP that this was a negative attitude that I should not display.*

*During year-end audit we noted audit adjustments in virtually every line of the financial statements including cash, and none of the issues noted was generated from 2015, but was consequence of behaviors existing since prior years, which was to me evidence that 2014 was not an audit conducted according to professional standards. When I asked the EL why we weren't reopening 2014, I got told "not to go there".*

PLAINTIFF 00219

> *I also noted that in my absence the EL was disposing of issues and findings that once I was coming there I had to re-put in the list of adjustments. One example of it was Royalty accrual, where the Company had a "general accrual" unable to substantiate. Only after my pushing back the EL agreed to put the adjustment back in the list.*

This is a short summary of all issues noted by area, documented in the work papers:

Cash – The Company was performing bank reconciliation for foreign banks at an earlier date than the Company's year-end without accounting for the cash

Investments – The Company did not have controls or understanding on the valuation methodology employed by the portfolio managers.

Accounts Receivable – The Company had both generic and specific reserve, and to avoid main accounts to be part of the general reserve, each of the big accounts was provided for specific reserve of $5k/$10k each without that these reserves had any support. Subsequently in Q1 2016 there was an out of period adjustment in this area due to negative balances never properly investigated and monitored

Inventory – The Company did not have proper understanding of the reserve for unowned inventory and could only produce details and breakdown of their balances after 7 weeks of research, evidence such detail was never asked before. Furthermore, the Company never properly monitored the cycle count program which had completeness issues since 2011 and never updated the count program timely, given that Q4 purchases were never counted in 2015, but only in 2016, which is when the next refresh of the cycle count program occurred. In relation to service inventory the Company amortization methodology was not supported for its reasonableness and based on discussion with the EL, it was PwC who came up with such methodology; the method amortized service inventory to P&L based on life cycle of the product, however there were no documentation on the control on how to monitor the useful life nor the fact that if a product never change its life for ½ years, no more charges occurred to P&L until the next change in stage. To audit this we had to develop our own straight line model, which the Company never developed to justify the reasonableness of its estimate, stating simply, was same as prior years. Furthermore for this inventory, the Company currently has no data to assess usage of these parts, which would allow computing a more accurate estimate. Similarly the Company had "general accrual" for inventory which took again weeks to receive details to support them

Warranty – The Company used a convention of 12 months despite most regions and resellers granted period above 12 months. Justification provided was that was same as prior years and the method was never assessed. Evidence of that is a call I Had with the CAO and the EL where the EL asked the CAO how did their warranty estimate worked, evidence we did not even know, and the CAO did not know either.

Fixed Assets – When I inquired as to why they had so many fully depreciated assets still in use, the Company said they never reassessed their depreciation rates, and in a meeting with me the senior and the EL, we fed the Company which answer to give us that would have resulted in no issues. After few days we received an email with those exact words and the matter was considered closed.

Accruals – The Company had several unsupported general accruals, the main of which was royalty. When we asked support to the GL personnel, we were told that the Company didn't even know how many contracts they had out there subject to royalty and that the accrual provided seemed reasonable.

Equity – The Company ESPP plan provide for employees to increase and decrease their contribution yet no analysis of impact of modification was provided nor known by the Company.

PLAINTIFF 00220

Revenue – During our test, in one of our samples there were payment terms in Spanish that the Company was unable to articulate its meaning (the terms were prepayment); to my request of expanding the scope to investigate if there were issues on knowledge of foreign orders, the EL discouraged me stating that was just one sample and he wouldn't have known what benefit such test would have resulted in. As part of our test, cut off errors and order entry errors emerged in several samples. When I brought to the attention to the EL, he said that these errors could have been covered by the sales return reserve which could have been used for each of those and re-provided the next quarter, yet such question was never asked to management and we essentially answered on behalf of them. Furthermore, the order entry control failure was removed last minute from the SAD by the EL without any explanation so to this date there are evidence in the work paper that such control should have failed but no evaluation of this control failure in the SAD. Additionally revenue had a list of conventions the biggest of which related to the amortization of deferred revenue, detailed below.

COGS – No stock based compensation was ever accounted as part of the costing, the Company was not even aware of the fact they needed to capitalize it

Controls – No level of precision was known for most controls, especially review controls.

<u>Source: Written document sent to the Us Technology Leader and HR in March/April 2016</u>

*On the technical side I had to step in 3 times to stop the EL from making incorrect auditing calls:*

1) *On the deferred revenue sampling issue the EL accepted the Company approach of haphazard 60 samples, and after my push back that I could not find rationale on this approach he asked the Company to do few more, which resulted in 13 additional. Upon reiteration of my doubts I had to advocate again paragraph of professional disagreement to the EL and QRP because I was not comfortable this approach was adequate. The EL in the meeting warned me that we should be mindful that "important people sit on the board of this Company" and quoted Wells Fargo as one of the account. I reported this comment to the QRP as highly inappropriate and putting pressure on us to close the audit without asking all the questions we'd ask, to which the EL kept referring to "bigger fish to fry". Upon conversation with national it was proven that the EL was not correct and a statistical sample had to be told to the Company.*

2) *On the control assessment, EL, QRP and another Senior Manager ("SM") assigned spent days to work on the identification of flux as compensating control, despite my opposition. For 2 times I provided comments to the memo, yet the EL and SM worked on their own and for 2 times I was put in a call with national where I had to say I could not agree with the conclusion because I was not given any document to review. One objection related to the level of precision of the flux, to which the EL said that if was too low for the error, we could just raise the threshold, adding also that if an error is noted above the threshold does not mean the control has an issue. Such statement was made in presence of me, QRP and SM. National struck down the flux as compensating control corroborating my view. Aside from this I asked specifically to be present when the SM and Partner were asking the Company on the threshold because me and the experienced senior. already witnessed a meeting where the EL fed the Company which answer to give to our question on fully depreciated assets, and I wanted to be sure that the questions were asked in an open form. Without explanation I was not part of the meeting with the CAO.*

3) *On the redaction of the SAD that was presented after EL, QRP, SM and Aux partner agreed, I had to step in because the document missed basic auditing standard concepts, such as documentation of root causes and definition of could factor. Such observations were agreed by the auxiliary partner in a meeting with me on Monday before filing date. At the end no consultation was performed on the SAD and I was told that we could not issue an MW because "we would not have been market competitive" and also that "despite the adjustments were so many they would tend to offset each other signs wise". National itself stated that we generally see MW only in case of restatements or material adjustments, ignoring my claim that "the could" factor had to be assessed.*

PLAINTIFF 00221

After the revenue adjustment was noted, the EL kept saying that it was not an audit adjustment because resulted in the collaboration between auditors and management despite the evidence that it was an audit adjustment given they did not correct it before we noticed it and they were not even aware that the data in their systems were not correct.

When I raised my concerns advocating the Company had a pervasive MW due to lack of competence and number of resources and the fact we had audit findings in virtually every area of the financials, I was given the market competitive rationale. When I showed as example an AC report where the CAO disclosed a simple cash flow matter backwards to the AC, the EL only stated that his predecessor partner thought this CAO was one of the best. I also warned the QRP that he was not fulfilling his role as quality review partner, to which I was told by him that *"yes I've been given this feedback before but when I see a fellow partner in difficulty, I tend to side with him"*.

I just learned from the QRP that the CAO is being replaced this year, 2016. When I communicated to the EL that the QRP on the job (also EL on my other public, Gigamon) we had 2 MW for adjustments below de minimis because of the could factor, the QRP said I could have gone back to Gigamon and *"tell them he was being a bad guy"*.

As a result of the questions and the audit, I compiled the above document and conveyed my concern to my office leadership that the EL was not qualified to remain on that engagement, and the firm decision was to remove me from the engagement, leaving the rest of the team on the job, despite that that is the same team that missed every item in the 2014 audit. Furthermore, negative evaluation on "relationship" was issued in my file and I was not allowed to be on other audit jobs (except Gigamon) from March 2016 until now.

After my departure, in 2016 my replacement manager told me that she knew what I had to go through.

### SECTION 2 – Indirect Evidence and Tone at the Top

1) Micron Technology (2016) – Independence

During a market team meeting occurred in early 2016, with all level of staff present, it was showed in the slide deck as example of best practices, a picture of the audit team in front of the CEO private jet. The presenter, one of the Senior Manager on the accounts, detailed the picture as example of great relationship with the Company because when the economy Alaska flight was cancelled, in order to allow the PwC team to attend an internal firm party, the CEO took the whole team on his private jet and flew down to San Jose area. In the meeting the QRP was present and he stated was unaware of this occurrence and clearly unhappy about it. This fact in itself would constitute by policy an independence issue both in fact and in appearance which should have been preemptively cleared with our independence office and reported to the audit committee. I do not know if such procedures were performed, I can only report the concern that not only this was highlighted in an all hands meeting but was also sighted as example of good behavior to follow. Thanks to the QRP, he did ask at least the question in the meeting if we followed with independence, however I believe this matter should be investigated to ensure such actions occurred. When I tried to raise the question to Audit Methodology I was told that it wasn't my problem so I shouldn't even raise the question.

PLAINTIFF 00222

2) Bluecoat (2016) - Independence

During the assessment if we could take BlueCoat as audit engagement, we were in communication with our team at BAIN Capital, in charge of the independence given the entity was part of their group at the time. Unbeknownst to the Bain team, we became aware that the VP of Tax of the Company is the wife of one of San Jose Tax Partners. The independence office concluded that PwC was independent and could audit Bluecoat despite that executive and its relationship, provided the audit partner would relocate to San Francisco, less than 1 hour from San Jose and most of the audit team was from that office.

I discussed my concern that how can the independence rule circumvented so easily in form by just opening or relocating someone less than 1 hour from the office and we become suddenly independent, to which I was replied that the independence rules are too strict and it was actually a sensible conclusion.

3) Spansion (2014)

In conversation with one of the managers on the account, he reported to me the poor status of documentation and understanding in our work papers and as example he pointed out to me that in the Journal entry memo documented in our work paper, a control was added to justify there was no control gap in that area, however he mentioned that in discussing with the senior such control was non existing, proved by the fact that in the memo each other control was linked to the related work paper while that control had no links and there was no other evidence within the work papers of its existence.

4) Avago/Broadcom (2014 – 2016)

I had several conversations over the years with managers of that engagement team. The issues reported to me started in conjunction with the LSI acquisition. As part of the purchase price accounting, the ex tax director and audit manager told me about significant adjustments required to the deferred taxes balances of LSI because they were never properly audited. Despite this finding, no quality or repercussions or actions were taken and the ex Senior manager of LSI even became the leading Senior Manager of the combined entity. In conjunction with that conversation, the same tax director expressed concerns on our independence on the account due to the fact that PwC performed the valuation of the shares value needed to support a tax balance. He even added that asked via email to the EL how was this allowed under independence and he did not receive conclusive answer to such question. Furthermore he expressed concerns as to the level of competence of the tax personnel at the Company and commented that we did not want to raise too much the point because we were also selling them significant tax advisory projects.

PLAINTIFF  00223

When the senior manager resigned, and I asked to come on board, the then leading manager told me I'd have never been on the account because I'd have found too many things I would not have passed on. Later that year (2015) the manager who became leading manager resigned as well and in 4 months joined the Company. Based on conversations with the current manager, I was told that the role of the hired ex-leading manager was that of a financial analyst to avoid to incur in the cool off period independence rule, despite that such person had involvement in the audit. Furthermore, the current manager conveyed to me that the Company has made several acquisitions, has constantly grown significantly in size and everyone in the team knows that the Finance team is inadequate in size to support the Company current dimension but we don't want to say it to avoid to lose the account. Furthermore, the manager also reported to me that the Company especially for smaller acquisitions as example is not producing real documentation and that most of the Company's documentation on review controls is actually substantially made by the audit team.

5) Innovium (2016)

As example of AICPA audits, the same manager I talked to above, reported to me that the EL of the Broadcom account gave him also this start up to audit under AICPA. He reported to me that the CFO told him that "same as always" we would be the one computing the amount of stock based compensation for the Company to book because he had no idea. When I asked why he didn't report what is a violation of independence, he told me he didn't want to be the one to speak up given everyone is doing the same.

6) Tone at the top

In addition to those specific example reported, I'd like also to highlight as general tone at the top, other observations I had on the tone from leadership in the San Jose office.

During a recent manager retreat the Market assurance leader ("MAL") showed to us the priority we had to focus on. Quality was not mentioned in the slides and once the MAL realized that, he verbally added at the end that of course quality was also a priority. I was curious about that comment and I asked Audit Methodology why was mentioned that way, to which I was told that in order to show to the PCAOB that we always have quality as value, if was omitted by the slides, would have been sufficient to mention it verbally in the meeting to comply with the requirement. Additionally few partners I had conversations with told me that because PCAOB looks at their development plan, they've been cautioned not to write in there concepts around profitability or selling additional services to avoid to raise questions from the regulators, though factually that is still the priority, being San Jose at the bottom of the profitability chart in the US.

In fact, after the PCAOB enforced the notion of quality, the firm has made concerted effort to ensure the topic is mentioned in slides and material, to reinforce the word itself in our trainings. Conversely though, the firm is also continue to refer as Company's management as "client", reinforcing in my opinion, especially to the younger resources, that rather than being the object of our work, they're the ones whom we need to please, hence jeopardizing the independence that as a profession we should maintain. Evidence of this was told to me in my conversations to the MAL during the Harmonic events, when I was told that again *"we had to be market competitive and we can't issue MW when the other 3*

PLAINTIFF 00224

*aren't, otherwise we wouldn't be in business and that if we were to issue MW when we should, virtually most companies in the Valley and most private start-ups should have material weaknesses in the control opinions*".

An additional point I want to raise on quality is that during PCAOB inspections, in the kick off meeting, our internal policy is that the partner should be the only one who speaks, to demonstrate his involvement and understanding of the engagement. The fact that may not be known is that this fact occurs only after the team prints binders and walk the partner through for 2/3 weeks before the PCAOB comes, to teach him about processes and controls of the engagement, proof that the involvement that is believed by the regulators to occur, happens only once there is an inspection and the actual knowledge is mostly happening prior to the inspectors coming, rather than during the engagement. I've observed that happening during the internal inspections I was subject to and based on conversations with teams being inspected. Furthermore, currently our internal policy is that each partner is internally inspected every 3 years (now just raised to 4), however what our internal controls are missing is that leading managers are not regularly subject to inspections, so there can be cases of managers inspected every year, depending which partner they work with, and others never subject to inspection. I highlighted the need for our control to cover this because in each audit job the manager is the final and sole reviewer of ¾ or so of each audit step, yet despite my repeated requests no action was taken by leadership.

After the loss of Logitech for independence reasons, I questioned why the EL in the year before, which was investigated, and the QRP of that job are now respectively in National Office in Audit Methodology and in Risk Management, to which I never received an answer.

During a recent conversation with a National Office partner, I asked if Silicon Valley alone had such low quality in finance department, to which he stated that if we were to charge all we do for companies here our fees would have to be significantly higher because in this valley we do way more than is normally done in the rest of the country.

At a training last month on how to better document review controls on business combinations, one of the attendees, a sector leader, mentioned that "*we know that factually we have to manufacture most of the documentation because client don't have it or don't know how to do it or don't want to spend the money to do it*". I was approached by a manager after the training surprised not about the assertion, but that it was stated so clearly and in those terms in such a venue.

Lastly, as further example that happens frequently in audit engagements here, is that auditors do become part of the Company's internal controls because they review and identify errors before the control occurs, so that such errors are fixed, not identified as audit adjustments and they cannot be evaluated for control implications because the documents provided were still "in draft". This has occurred for example right now during a Q review at Gigamon where significant items were missed by the tax provider in the deferred tax schedule, but the Company replied that the document was still in draft so this cannot constitute control deficiency.

PLAINTIFF 00225

Also, in relation to our advisory group, where our role is to work with management, I was told that if we spot an area that we deem to be an error, it our job to report it to management but then is not up to us to ensure such errors are corrected. To my claim that what if management doesn't want to fix it and auditors don't spot it, how could we allow errors to exist, I was told is not part of our terms of engagement. I find difficult to reconcile that notion with the ethical standards that we're bound to even when we serve in advisory capacity.

Finally, as further example of the tone occurring in this office, I'd like to list additional statements contained in my performance survey issued by a pool of partners in San Jose:

Source: Written survey received by me in 2014

> *"Mauro needs to understand and operate within the established system"*
>
> *"Mauro does not trust any of his clients. It is great to have the skepticism, but as partner or senior manager, you have to know when to crank it down and just listen and get the job done"*
>
> *"Mauro liked to refute things that people come up to him. His core personality is being a really good auditor, but that doesn't mean you can be a really good partner"*
>
> *"Adapt – learn how to deal with client. Rise above it so he can become a trusted advisor to the client. The auditing profession in Italy is different. The client doesn't say no to us. If he were really responsible for bringing in the revenue and keeping clients, as partners are, he would have to adapt fast".*
>
> *"The one thing he needs to get his clients out of trouble"*

PLAINTIFF 00226

**Closing statement**

Based on the tone at the top conversations and evidence above, I deem that the auditing function in this valley, due to the general low level of competence of finance departments (even when composed by early hired ex big-4) has turned into a factual advisory position where independence is subordinated to maintain revenue and management happy to avoid to raise too many issues on the control side; the numbers are being corrected, but the public is deprived of an objective control opinion on the competence and quality of the accounting department of those companies that we are required to evaluate. The fact that in my last engagements I raised significant number of issues and I was removed from those jobs, while no repercussion on the teams that missed the issues before me was done, and that leadership refused to look for instance to 2014 work paper of harmonic despite the concern the audit was non GAAS, raised the concern that there is not a willingness to try to change a system that has developed and has impacted our profession in this office. Many qualified accountants leave because they say they're "tired to write stories" in reference to the amount of documentation that we write on controls. In several conversations with staff, when I asked why no one speaks up, the answer is always the same, fear of repercussion from a career perspective; given the example that I represent, where my career has been halted because I spoke up, and the fact that to become partner you need the support of those that you'd be supposed to speak up against, this firm has created an environment where it is not safe and certainly counterproductive to speak up on those matters. I do not believe the role of an auditor is to act as defense attorney of management nor to find in every way possible how to avoid to issue them a material weakness, but simply to apply the rules that we are required to operate in maintaining its independence, however the practice seems to suggest that that is not what an auditor is required to do in this valley, as noted by the partners themselves in the statements given to me by their survey.

The situation appeared not to be any better when we audit under AICPA standards, most start-ups do not possess the knowledge to account and document the complex equity transactions that they engage in, and by the existing rules, they should be noted as material weaknesses in their controls, yet such opinions are issued seldom.

Based on my experience, conversations with current and former employees and the evidence noted above, I'd like to recommend to the SEC to have an enforcement team to inspect a sample of audit jobs in the silicon valley office by conducting subpoena of original Company control documents to then compare them with what is documented in the audit work papers and to also conduct independent interviews to really assess the competence of most of the finance department key figures within such companies and assess if it was possible for such people to produce the documentation claimed to be done by them. This would provide additional evidence to the ones listed above regarding my personal concern regarding the risk of collusion between auditors and management in this valley, aimed to maintain a successful relationship based on a simple exchange, with management paying us the fees and auditors picking and choosing what to call an audit issue to avoid to upset the very same management that we are supposed to audit by issuing harsher control opinions, knowing that Silicon Valley is an extremely closed valley where most finance personnel tends to move around frequently among companies. By documenting that a finding is noted by management or that management is the author of their documentation in the work papers would never allow PCAOB inspector to realize that such findings were instead audit adjustments or fundamentally auditor-written memos, because is not part of the inspector mandate to subpoena original Company documents.

PLAINTIFF 00227