# JX28

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
esarrett@gmail.com
408.230.2652

Dear Mr. Reiter and Mr. Stein,

Please find the following documents regarding Mauro Botta:

- Case conceptualization
- Case notes
- Emails
- My office policies form
- Statement of Account
- POGO article
- Letter regarding dates of sessions
- HIPAA release

There are a handful of text messages (3 or 4) regarding arriving a couple of minutes late for an appointment, but I can't figure out how to print them. Please advise if that is absolutely necessary, and I will figure that out.

Sincerely,

Ed Sarrett

Case Conceptualization for:

Mauro Botta

**Demographic Info:**

Mauro Botta is a 40- year old white male who lives in San Jose, CA and is originally from Italy. He emigrated here a number of years ago and had worked as an auditor for PricewaterHouse Cooper for a number of years before his employment there was terminated.

**Presenting Problem, getting into therapy:**

Since being fired, he reports having suffered a good deal of anxiety with some physical symptoms: sleeplessness, accelerated heart rate, excessive worry, depressed mood and anger. He was referred for psychotherapy by his physician, Dr. Anthony Saglimbeni.

**Family:**

Mauro reports nothing unusual in his family history. Parents moved around in Italy a couple of times which resulted in Mauro having to adapt to new school settings and being in classes with older students. He reports good relationships with both parents and his brother. Parents provided him with a loving and caring upbringing. He goes to visit them in Italy regularly every year for several weeks and is in frequent contact with them via phone/computer.

**Red Flags:**

There is no suicidality or violent ideation toward himself or others. There is no substance abuse. He uses alcohol in moderation. No other drugs. There is no reported history of physical, sexual or emotional abuse. There are no previously diagnosed psychiatric disorders.

**Mental Status:**

Mauro's general appearance is completely normal. He shows a normal range of emotions. He looks like his age, is of normal stature, is always well-groomed, demonstrates good hygiene and is appropriately dressed. There are no visible tattoos or piercings. There are no unusual facial gestures, tics nor inappropriate facial expressions that are incongruent with what he is describing. His body and skin appear to be completely normal. When he reports feeling tired, he looks it.

Sarrett000002

Engagement with Interviewer (me):

Eye contact is always appropriate.  He always answers questions with candor and he is remarkably consistent and congruent in his descriptions of feelings when talking about work, leisure time or some other topic of interest to him. Affect and appearance are normal.

Motor:

No unusual motor activity.

Speech:

Expression is normal, fluent; comprehension is normal.  Native Italian speaker but speaks fluent English with a recognizable Italian accent.

Formal Thought Disturbances:

None.  Very logical, coherent, no word salad, no flight of ideas, very insightful, intelligent.

Mood:

In all sessions shows a range of emotions appropriate for the context of the moment – work, family, friends, dating, social activities, movies.

Thought Content:

There is worry, rumination about work future (lawsuit), what seems to be reasonable anxiety and concern about being "blackballed" in his industry for having been a whistleblower.

Perceptions:

No hallucinations, no suicidal ideation.

Insight:

Not sure about insight regarding why previous employers are behaving as they are although very conscious of why partners wouldn't want him to return.  Impulse control is normal, motivation to work, get things done, have a social life are good.

Defenses:

Good sense of humor, has been willing to hold nothing against former employers, very willing to field "tough" questions, not afraid to take a look at his own foibles, imperfections.

Sarrett000003

No serious neurotic or immature defenses:  no isolation, displacement, reaction formation, regression, etc.

Cognitive distortions:

None.  Doesn't seem to engage in all-or-nothing thinking, overgeneralizing, mind-reading, catastrophizing, etc.

DSM Diagnosis

Adjustment Disorder with mixed anxiety and depressed mood      309.28 (F43.23)

- A. Development of emotional problems in response to be fired from job.
- B. #2 – significant impairment in social, occupational, or other important areas of functioning.
- C. The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.

Assess from Theory:

Transactional Analysis would about how strong the NP (Nurturing Parent) part of his Parent Ego State is.  It seems as though the CP is most dominant and holds Mauro to a strict adherence to his internalized values, religious norms, gentlemanly code of conduct and that makes it difficult for Mauro to respond differently in environments where he perceives those values as compromised (not that his acting in this manner is a bad thing; it is, however, counter-cultural and not the norm!).

From Satir:  communication style analysis:  tries to be a leveler, taking self, other and context into account, doesn't always take into account feelings of other or anticipate consequences of his "leveler" communication in certain contexts, which makes it difficult for him to understand people's reactions who are less direct and blunt.

Goals:

Help Mauro cope with difficult feelings, stress, anxiety, anger that have been a consequence of his being fired.

Interventions:

Reflective listening, validating feelings, motivational interviewing techniques designed to elicit strengths and own ideas of how to cope well.

Treatment Plan:

Continued therapy appointments as long as client finds them helpful.  Continued monitoring of sad feelings to assess for depth of depression, monitoring of anxious

Sarrett000004

feelings and whether or not they continue to interfere with daily functioning, happiness, work, diet, sleep, exercise.

Conclusion:

Mauro Botta is functioning well given what an ordeal the firing and lawsuit have been.

Sarrett000005

Mauro Botta

Sept 20, 2017

Met client for first time.  Speaks English very well although with Italian accent.  Reports feeling anxious about the future after being let go from job.  Reported symptom of occasional accelerated heart rate and worry about his reputation.  Sad about losing job, feels very unfairly treated.  Described symptoms of panic. Worked as an auditor for well-known auditing company and encountered unethical/illegal auditing practices and blew the whistle. Worries a lot about what will happen with a lawsuit he will bring.  Very heightened sense of right and wrong, adheres very strictly to his value system.  Reports that he "has to do the right thing", but wishes to return to employment with company.

Prays the rosary every day, attends mass regularly, plays tennis and is physically active. Diet and sleep are OK for now.

No diagnosis yet.  Next appointment 9/27/2017

Sept 27, 2017

Used session to find out more about move to the US.  Reported being enamored of the classic age of American cinema.  Mentioned Cary Grant as an important icon for him. Reports anxiety as not that debilitating although definitely aware.  Reports that "I just don't get it" referring to company's letting him go, having trouble understanding not wanting him to act in an ethical manner.  Still thinking constantly about being let go and being re-instated.

Diet, exercise are just OK, sleep not easy, not complete.  Some feelings of fatigue.

- Tentative diagnosis:  Adjustment Disorder with anxiety and depressed mood.

- Symptoms include a combination of depression and anxiety.

Meets criteria:

- Having emotional or behavioral symptoms within three months of a specific stressor occurring in your life

- Experiencing more stress than would normally be expected in response to a stressful life event and/or *having stress that causes significant problems in your relationships, at work or at school (being fired from job)*

Next appointment 10/4/2017

Sarrett000006

Oct 4, 2017

M reports having a hard time with work situation. Reported more information, hard to follow for me the explanation of the ins and outs of the auditing business. Reports finding it helpful to get together with friends to de-brief what is happening in his life.

Client looks tired, stressed.

Work situation weighing on him, worried about the future, strong desire to be re-instated at company. Has a hard time understanding the behaviors of others who don't act according to a stricter sense of right and wrong.

Encouraged continued attempts to "center" or soothe himself with prayer and spiritual practices. Continue to play tennis, continue to socialize with friends.

Next appt. is 10/11/2017.

Oct 11, 2017

Heard more of story about coming to the US, some family information. Parents still alive and living in northern Italy. Goes home to visit them every year at Christmas time for 3 weeks. Has a brother who lives there also. Describes himself as more like mom than dad, can be very excitable but then storm passes. Brother and father are more contained in the expression of their emotions. Used to work for same company in Italy but really explored options for working here in the US and ended up in San Jose. Has loved living in the US and doesn't regret having moved here at all. Realized a life-long dream in coming here. Hates the level of corruption in Italy and thinks it's much better here.

Explored whether or not he missed living in Italy, missed his family, etc. Reports that not at all, very happy that he moved to the US and is able to keep in touch with them regularly with chatting, etc.

Picks and chooses very carefully which topics he discusses with parents since he doesn't want them to worry, nor does he want them telling him what to do.

Isn't so comfortable in the world of feelings, doesn't find feelings very useful at times.

Next appt. 10/18/2017

Oct 18, 2017

Tough week for client, exploring options for advancing lawsuit with Dept. of Labor and SEC. Having difficulty not ruminating about uncertainty of his future.

Wants publicity for lawsuit so that the wrongs can be corrected. Doesn't seem to allow the notion of potential harm to career to outweigh adherence to what he thinks is right.

Sarrett000007

While client reports worrying about this constantly, it doesn't seem to interfere with his job performance.

Taught breathing exercise to get to a state of mindfulness in the moment.  M is open to it. Will check next week to see how it went.

Next appt. 10/25/2017

Oct 25, 2017

Another tough week.  Client reported that he tried breathing exercises a couple of times and they seemed to be helpful.

Explained idea of trying to stay in the present moment.  Confirmed again that praying the rosary is helpful for him and that he feels calmer after doing so.  Explored importance of his faith life again.  Client wondered that if he hadn't gone into his current line of work, would the priesthood have been an option.  Validated that it would seem to align very well with his moral compass.  Once again made the connection between moral compass, worldview and Star Trek and why the show, the movies and the conventions are so important to him.

Next appt. 11/1/2017

Nov 1, 2017 through Nov 29, 2017

Spent a lot of time trying to understand:  family dynamics, especially around expression of feelings, relationships with father, mother and brother, differences between Italy and the US and why there was such a strong attraction to move here, greater sense of "moral compass", for example how hypocritical it is for mafia to be so religious and how the church tolerates/tolerated that, how there have been no romantic attachments for Mauro – feeling as though if he had family commitments he might have to sacrifice some of his adherence to values and be less inclined to self-advocate strictly according to his value system.

Assessed for diet, sleep and exercise – not always sleeping well, spends lots of time thinking about work situation.

Next appt. 12/6/2017

Dec. 6, 2017

Client reports that it was another eventful week.  Diet OK, not sleeping enough.  Looks tired.

Talked about upcoming trip to Italy to visit family for Christmas.

Sarrett000008

Parents are concerned about him and lawsuit, feel that the way he wants to stick to his principles is worrisome for them. Sometimes M doesn't tell them everything that is happening since he doesn't want them to worry.

Intervention: wondered whether parents want to know what is going on with their children even if it's worrisome?

Response: Not convinced that sharing would be worth it, too difficult for them to hear about, doesn't wish to make things harder for them.

Still want him to monitor diet, exercise, sleep if possible.

Still maintaining a good social life with friends.

Next appt. Dec. 13

December 13, 2018

Talked about plans for Christmas with family in Italy. M reported looking forward to going, but also feels obligated to go. Still in touch with friends who work for his company in Italy.

Still in touch with some of his "kids".

Spent time talking about his car. Seems to have become loyally attached to his car, has associations with it, spends money to keep it running well even though it's older.

Intervention: wondered if some time away will help him think less about lawsuit? Response: yes and no but mostly no since it seems impossible to escape thinking about it.

Next appt. Jan 8 2018

January 8, 2018

Good trip to Italy, happy to be back. Looks a little less tired. Spent time with mother, father and brother.

Spent time talking about a board game they played where dad and brother argued. Observed that he and mother are more alike, get emotions out and are done with it, unlike brother and father who get angry with each other and seem to hold on to it for a while, unable to resolve easily, wait for some time to pass and let it blow over.

M had hard time understanding this way of communicating about feelings – what's the point of not being direct? Next appt. Jan 24

Sarrett000009

January 24, 2018

M reports having a hard time with the work and work places he's had to pick up since being let go by previous company. Has a hard time finding meaning in it, missing his workmates and his "kids", the team he was instrumental in creating. Showed me "personality" evaluation", reported that he felt it was pretty accurate about him, wanted to know what I thought. I agreed.

M is very blunt and direct, which are qualities not everyone always appreciates. He has a hard time understanding why this is so since he really values the clarity of what he communicates to partners and doesn't understand why they don't feel similarly about his directness.

Reports that his team of "kids" really appreciates his clarity with and support for them and always feels that his openness and lack of interest in "hierarchy" are conducive to creating an effective team.

Next appt. Feb 7

February 7, 2018

Began spending time with M's fascination with American movies and the TV show Star Trek. Has thought very deeply about the America portrayed in the Golden Age of American Cinema, and in Star Trek. Admires Cary Grant and other actors and films, thinks Cary Grant is the way a man ought to be in the world. Really admires the vision for the future, human connections, values, relationships portrayed among the crew of Star Trek. The way the team/crew works, the personalities and sense of humor, camaraderie, are all experienced very positively by M.

Talked about some of the experiences he's had of going to conventions, photo ops with actors, hearing different actors and others involved at talks they have given. Definitely a Trekkie.

Definite mood swings, more upbeat, when talking about movies, culture, comparing United States and Italy.

Next appt. Feb 28

February 28, 2018

S: Can't stop thinking about lawsuit, determined to keep fighting.
O: Seems tired, but not at all ready to throw in the towel

A: Doesn't meet critieria for GAD or Major Depression but does feel anxious and depressed. Still very affected (hurt) by having been fired and is having a hard time understanding it, adjusting to it, has hard time sleeping. Still socializing with friends, had been taking tennis lessons.

Sarrett000010

**JX28-10**

I:  Asked again about the advantages that would come if he "settled" the suit.
R:  No way, cannot back down from the principle of the thing.  Wants to be reinstated since he was fired unjustly, not for poor work performance.  Wants to return to work with his "kids", his team.

P:  Keep providing a safe place for M to share feelings of frustration, anger and sadness. Keep assessing for signs of clinical depression or anxiety.

Next appt. March 7

March 7, 2018

Conceptualization from Transactional Analysis:

P:  strong, controlling (critical) parent – strong sense of duty, obligation (not to parents necessarily, nor to bosses who don't do the right thing), doing the right thing, religious faith, attendance at mass (even when on the road).  Not as strong NP (Nurturing Parent) – not as compassionate toward self (self-protection) not high on his list of priorities if it means sacrificing adhering to values.

A:  very analytical, Adult in TA is this way

C:  Adapted, Free or Rebellious:  adapted in terms of preparing himself for a career that aligns with values very harmoniously, free in the sense of what he tries to create with his non-hierarchical approach to working with and leading teams, rebellious in terms of response concerning adherence to a status quo he cannot support (e.g. whistleblowing). Rebellious in the sense of leaving Italy to come fulfill his dream of living in America.

Plan:  work on NP

Next appt. March 14

March 14, 2018

S:  Has not enjoyed work environments in jobs he's had to get after leaving previous job.
O:  Seems tired, frustrated

A:  Recounts weekly progress of new developments in work situation, thinks about it constantly.  Dealing with this is a grind that during some weeks he seems to handle better than others.

I:  Does it ever seem like it's too much to keep carrying on the fight?
R:  No, he's as determined as ever, cannot abandon what he knows is the right thing to do.

Plan:  Keep on checking for depressive, anxious signs, symptoms.  Keep on inquiring about health:  diet, sleep and exercise.

Next appt. March 21

Sarrett000011

March 21, 2018

Conceptualization from Satir, with simultaneous goal of working on NP:



For M to be acting congruently (taking all of these into account), he would have to be interacting with a congruently acting other party. M can take own needs, desires, values into account (and they clearly align with values he has), but cannot take the other's position, values, etc. into account in the context of a workplace and a role which need to have the values he espouses.

How to cope when other party doesn't act congruently. Satir: the problem isn't the problem, it's the coping.

Plan: for work on NP, M will continue to practice breathing, praying rosary, going to mass, playing tennis, socializing with friends to keep some sort of balance and sanity in his life.

Next appt. March 28, 2018
March 28, 2018

Assessed for diet, sleep, exercise – not sleeping as well as would be good.

Recounted more about progress of lawsuit, more of unsatisfying work he's been doing. M's life has a routine: work (unsatisfying), work on lawsuit (frustrating, drudgery), staying connected with friends (getting support, having fun), with lawsuit dominating much of his waking life.

Has related over several sessions about having contacted different govt. entities, etc. to further his cause, not my world, hard to keep track of each one and their significance in this process.

Interventions include: validating feelings of frustration, anger, sadness – joining.
Response: reports feeling the benefit of having someone to talk to and explore this with.

Next appt. April 11, 2018

Sarrett000012

April 11, 2018

S:  Busy week.
O:  Looks normal, no more or less stressed than usual
A:  Still constant in his desire to bring the suit, still hopes for reinstatement.
I:  Validated feelings, reflective listening, open-ended questions, affirmations about
persistence, adherence to convictions.
P:  Provide consistent high quality listening to support M as he goes through this lawsuit.

Next appt.  April 18

April 18, 2018

I:  What is so appealing about Star Trek?  (seems to be a line of questioning which allows
him to open up more about relationships, emotions)
R:  A envisioning of what is best about humankind, the ability to be heroic, to be
connected to and appreciate a diverse world(s).

Another attempt to understand better M's inner world.  There is nothing "Trekkie" weird
about his love of Star Trek.  It seems totally in line with his Christian/Catholic values of
truth-seeking, honesty, integrity, loyalty, care for others.

Next appt. April 25

April 25, 2018

S:  More details about lawsuit, other activities during the week.
O:  Seems to be keeping an even keel throughout the week.
A:  Doing OK dealing with stressors of lawsuit.  No decrease in resolute desire to pursue
lawsuit to the end.  No desire to settle.
P:  Follow client's lead in terms of content of sessions, use MI techniques to foster an
environment of whatever changes the client wishes to pursue.  None at the moment.

May 2, 2018

Continued to monitor feelings, mood about events in his life.  Continue to monitor diet,
sleep and exercise.  Continues to cope with stress of situation.

May 9, 2018 and May 16, 2018

Concern about brother's well-being – perhaps dealing with depression.  Not sure how to
proceed to support him, not sure what to tell parents.  Got some of his information about
brother's emotional state from brother's partner.  Not sure if brother would be angry with
M trying to help more indirectly.  Not sure if concern is to do with fear of brother's
reaction to knowing M was speaking to partner without his knowing or just discomfort
with communicating about feelings in ways he isn't used to in his family context.

Sarrett000013

May 23, 2018 and May 30, 2018

Spent some time talking about the POGO (Project on Govt. Oversight) piece where M's situation is highlighted in some detail. M felt good about this exposure and how it has led to interest in his case and in his cause (more important to him) on the part of others in the world of auditing/oversight.

M very focused on progress of case. When there is "movement" he seems energized.

Intervention: what did it mean that the professor in the article described what was going on as "very disturbing"?

Response: it means a lot not to always feel alone in this fight.

Next appt. June 6

June 6, 2018 and June 13, 2018

S: Same, lots of time ruminating about case
O: Not much change in appearance, affect, obvious that he's tired.
A: nothing new, still coping, still functioning, still going to work, even though hating it.
I: asked about dealing with work situations
R: clear that he has higher expectations for job satisfaction, competence of coworkers, ethical considerations of the places he works at.
P: Continue to support M and provide safe space for airing out hard feelings. Seems to benefit from having a non-judgmental and accepting place to do this since it's clear that what we talk about isn't about solutions.

June 20, 2018 and June 27, 2018

Spent more time exploring hurt of the experience of losing job, being escorted from the building. Idea of justice and fairness are very important to M. That people would not act honestly and with integrity is still very hard for him to accept/believe.

July 11, 2018 and July 18, 2018

Client looked a little fresher than last couple of weeks although reported feeling tired. Seemed to have a better frame of mind about work although still quite upset about how his boss got to be where she is in the company where he works now.

Talked about the idea of his asking whether or not something is normal or sane. Has brought this up a couple of times.
Intervention: no diagnosis of delusional thinking, etc. just a very consistently strict adherence to his value system and an inability to act in a manner untrue to it.

Reported on attempts to explore job market. Definitely feels "blackballed" by previous employer because of whistle blowing.

Sarrett000014

Reported beginning to have feelings for a coworker but not liking that this was the case because of the timing.

Treatment plan: continue to work on understanding feelings and their value, continue to encourage physical activity, diet, sleep to cope as well as possible with negative feelings. Continue to encourage mindfulness/prayer life. Continue to encourage social contacts/network.

Next appt. July 25

July 25, 2018

M looked tired but a little more upbeat than previous session. Reported having an eventful week – is it possible that previous employer might re-instate him?, which is what he would like above all else, but also experienced very angry feelings because company wants a couple of parts of the lawsuit dismissed – said very damaging things about him and his reputation which aren't true for M.

Asked about managing anger: played tennis but resigned to not being able to do anything about it, work situation – felt "impotent".

Spent time talking about movies, Star Trek series and how the later versions and the movies do not capture much of the spirit of the original. For M, very upbeat and hopeful view of humanity's potential. He is off to Las Vegas for Star Trek convention. Next appt. in 2 weeks.

August 8, 2018

Had usual great time at convention. Always seems to be an uplifting experience. When he has spoken about the conventions, it's always with a sense of appreciation and fascination with the phenomena of Star Trek.

I don't ever experience him as a mere groupie. He is encyclopedic in his knowledge of the series and the movies and the spin-offs and his affect changes for the positive when he speaks of it. He admits he's very much an idealist/optimist and the series/movies help him in some way to envision the best in people, in humankind and in the future. It seems to help him keep an upbeat frame of mind during this difficult time of the lawsuit and uncertainty in his professional life.

August 15, 2018

Very aware of attraction toward a coworker. Underscored again that he has no experience in this realm. Notices the attraction, but also feels that his involvement in the lawsuit doesn't make for great timing for a relationship.

Sarrett000015

August 22, 2018

Usual work woes, commute time, atmosphere at work, attraction toward woman not coming at a good time. Still maintaining a regular social life with friends. Seems to be holding up OK.

August 29, 2018

Sessions have fallen into a routine of M telling me about any new developments in the lawsuit. We also speak about work experiences, interactions with the woman he's interested in.
My interventions are almost always based on an opportunity I see in the conversation to help M process a feeling or feelings since his default is to not pay close attention to his own feelings. While he isn't a "placater" his preferred communication style is probably as the intellectualizer or being "superreasonable" and now allowing for the "illogic" of the feeling world, including his own.

September 5, 2018

Have had several interactions in the past few sessions about the value of feelings. Since he is very analytical and reasonable, in certain situations, it seems difficult for him to get to a place of self-compassion and his compassion toward others in the work setting goes toward the workers that are not in charge.

Sleep still not going so well.

Plan: continue with interventions that focus on a feeling and the meanings associated with that feeling or those feelings to help M become more fluent in the language of feelings. Continue to assess for diet, sleep, exercise, anxiety and depressive symptoms.

September 12, 2018

Diet and exercise are OK, sleep not as good. Still ruminating a lot about lawsuit.

September 19, 2018

Not satisfied at work, not hearing much about anxiety or depression. Seems to be able to get up and go to work, socialize with friends, but thinks constantly about the case.

September 26, 2018

Told me the story of demands of the "other side" in terms of providing messages, communications. Told of the tedium of gathering info, copying, collating, etc. Expressed frustration at the uselessness of the exercise of providing all those messages between friends and acquaintances, a lot of which had to do with his movie reviews and other info not connected to his work life.
I: Validated feelings, reflective listening

Sarrett000016

P: Continue to provide safe space to vent, get feelings validated. Check on levels of anxiety and depression.

October 3, 2018

Weekly update on lawsuit – frustration, disappointment, disillusionment.
Determined to stick it out. Still very motivated to follow through.

October 10, 2018

S: Feeling worn down, exhausted, not quite hopeless
O: Looks very tired, expresses frustration, but shrugs shoulders, gestures of resignation, mood can shift from pretty low during session to more upbeat depending on the topic (movies, social life, brother)
A: Pretty steady and consistent in carrying on, talking about different aspects of lawsuit, doing pretty well staying connected to friends.
October 17, 2018

Getting very interested in woman he's going out with. Made point again that the timing isn't good since his energies are taken up by work and lawsuit. Still very curious. Very new territory for him.

October 24, 2018

Talks more openly about attraction to woman, the newness of contemplating possibly being in a relationship.

October 31, 2018

Another date – has let her know how much he cares about her. Flowers, message of affection. No clear response from her.
I: patience? Get to know her better? Stages of relationships …
R: I'm not a very patient person (not comfortable in the realm of uncertainty)

November 7, 2018

Update on lawsuit – slow progres

November 14, 2018

M very animated about work situation, having to travel to Petaluma. Reports being very unhappy in work. Felt very positive about progress of lawsuit with upbeat reaction to lawyer's performance and disappointment about the way management at previous employer was dealing with him, which he learned during deposition.

Not sleeping well.

Sarrett000017

Described more about business dealings his brother was having back in Italy and more about he had helped to mediate differences between the parties involved.

Still very taken with woman he has been dating.  Describes himself as shy in his interactions with her but still assertive in his interactions at work and wondered about the meaning of that with him.  Definitely cites lack of experience in the realm of dating.

Next appt. Nov 28

November 28, 2018

S:  tired, confused
O:  seems tired, but not as run down as in other sessions

A:  in a confused state about the woman he's been dating, unsure about how to proceed give the newness of thinking about being in a relationship.

I:  Asked how he felt around her?
R:  quite taken, confused, new feelings, unsure what to say, learned that she is in an "unresolved previous relationship", and didn't know what that meant.

P:  Continue exploring feelings, thoughts about romantic relationships, continue to explore self-admitted impatience.  Continue to explore what it would mean if this relationship didn't pan out.

Next. Appt. Dec. 5, 2018

December 5, 2018

S:  not bad considering commute to Petaluma and back, disappointed in progress with lawsuit, losing motions, enjoyed long date with woman he's quite taken with.
O:  Seems tired, but in decent spirits, although clearly frustrated with situation with not knowing how to proceed with young woman.
A:  Coping well with disappointing moments re: the lawsuit, commute, this particular worksite not as bad as others, uncertain status of relationship – just friends or what?
I:  Asked if he had an idea about how to start conversation with woman about where the relationship is going?  Gave examples of "gentle start-up", "permission-asking" ways of beginning the conversation.
R:  Seemed to think that was a good idea
P:  Continue to validate feelings of frustration regarding progress of lawsuit, progress of relationship.  Discuss trip to Italy and possible ways of using it to de-stress and enjoy time with family.

Next appt. Dec 12

Sarrett000018

From: siskodig@gmail.com
Subject: Re: Voice mail for initial consultation
Date: October 2, 2017 at 10:20 AM
To: Sarrett, Ed esarrett@bcp.org



Perfect thanks for accomodating

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network

**From:** Sarrett, Ed
**Sent:** Monday, October 2, 2017 10:18 AM
**To:** Mauro Botta
**Subject:** RE: Voice mail for initial consultation

Hi, Mauro,

    How does Tuesday at 7 p.m. work?  Thanks.

Ed

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408-230-2652
esarrett@gmail.com
www.careparenting.net

**From:** Mauro Botta [mailto:siskodlg@gmail.com]
**Sent:** Monday, October 2, 2017 9:46 AM
**To:** Sarrett, Ed <esarrett@bcp.org>
**Subject:** Re: Voice mail for initial consultation

Ed,

there is a big meeting on my building on Wed evening 10/4, so I was hoping if we may do our session any other evening this week? Please let me know

Thanks!

Mauro.

On Tue, Sep 19, 2017 at 3:08 PM, Mauro Botta <siskodlg@gmail.com> wrote:

  I will bring a check

  Thanks!

Sarrett000019

On Tue, Sep 19, 2017 at 3:02 PM, Sarrett, Ed <esarrett@bcp.org> wrote:

Hi, Mauro,

    I am technically not a doctor, just for your information. I'm a Licensed Marriage and Family Therapist. I take cash or check, so sorry I am not yet equipped to take credit card payments. Thank you.

Ed Sarrett


Ed Sarrett
Personal Counselor
Student Life Center #215
Bellarmine College Prep
960 W Hedding St.
San Jose, CA 95126
408-537-9265
esarrett@bcp.org

**From:** Mauro Botta [mailto:siskodlg@gmail.com]
**Sent:** Tuesday, September 19, 2017 2:54 PM

**To:** Sarrett, Ed <esarrett@bcp.org>
**Subject:** Re: Voice mail for initial consultation

Doctor,

I am ok to pay for the session, then depending on your input you may hopefully assess what is the best course of action onwards. I hope I may pay via credit card, please confirm

Thanks!

On Tue, Sep 19, 2017 at 2:49 PM, Sarrett, Ed <esarrett@bcp.org> wrote:

Hi, Mauro,

    I don't need any documents. FYI, I don't take insurance and am therefore an out-of-network provider. If you are hoping to pay for the sessions ($150) with your medical insurance, I won't be able to help you, and you'll have to see a mental health provider who takes your insurance. Let me know what you would like to do. Thank you.

Ed Sarrett


Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303

Sarrett000020

**JX28-20**

1550 The Alameda, Suite 303
San Jose, CA 95126
408-230-2652
esarrett@gmail.com
www.careparenting.net

**From:** Mauro Botta [mailto:siskodlg@gmail.com]
**Sent:** Tuesday, September 19, 2017 2:29 PM
**To:** Sarrett, Ed <esarrett@bcp.org>
**Subject:** Re: Voice mail for initial consultation

Thank so much Doctor, tomorrow at 7.00 would work perfectly. I will be at your office at that time. Please let me know which documents I'd bring being initial visit.

Many thanks

Mauro

On Tue, Sep 19, 2017 at 2:26 PM, Sarrett, Ed <esarrett@bcp.org> wrote:

Hi, Mauro,

Thanks for your voicemail and email. I got the voicemail earlier but haven't been able to answer. I work as a school counselor during the day and see clients in my private practice after school hours and so have been busy all day here at school. I have time tomorrow at 5 p.m. or at 7 p.m. if one of those times would work for you. My contact info is below. Thanks.

Ed Sarrett

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408-230-2652
esarrett@gmail.com
www.careparenting.net

**From:** Mauro Botta [mailto:siskodlg@gmail.com]
**Sent:** Tuesday, September 19, 2017 2:24 PM
**To:** esarrett@gmail.com
**Subject:** Voice mail for initial consultation

Good afternoon Dr. Sarrett,

I received your name from my doctor, Anthony Saglimbeni, who referred me to you for consultation to  treat my condition, anxiety with physical symptoms due to unplanned work change after 18+ years.

Sarrett000021

work change after 18? years.

I left You a voice mail with my cell 408-464-5438, I hope I may schedule an initial session so that You may be able to help me through this time.

Many thanks in advance

Mauro Botta

Sarrett000022

From: **Mauro Botta** siskodig@gmail.com
Subject: Re: appt.
Date: October 9, 2017 at 10:12 AM
To: Sarrett, Ed esarrett@bcp.org



sound good, this wednesday at 7.00 works.

Thanks!!!

On Mon, Oct 9, 2017 at 10:08 AM, Sarrett, Ed <esarrett@bcp.org> wrote:

Hi, Mauro,

Sorry to bug you but I am writing to see if we can change back to Wednesday at 7:00. I'm having a little trouble scheduling the client I mentioned to you the other day. Please let me know if that's OK. Thanks.

Ed

Ed Sarrett, M.A.

Licensed Marriage and Family Therapist

1550 The Alameda, Suite 303

San Jose, CA 95126

408-230-2652

esarrett@gmail.com

www.careparenting.net

Sarrett000023

From: **Mauro Botta** siskodlg@gmail.com
Subject: Voice mail
Date: January 2, 2018 at 11:48 AM
To: Sarrett, Ed esarrett@bcp.org



Ed,

hi this is Mauro, happy new year, I hope you had a nice break. Please let me know if there're any issues with the form hipaa mentioned in my voice mail, and sorry for not be able to see you on the 10th but i'll have to be in NY, hopefully good news, but we'll see...

Thanks!

Mauro.

Sarrett000024



From:  siskodlg@gmail.com
Subject:  Re: Hipaa
Date:  January 3, 2018 at 12:47 PM
To:  Ed Sarrett esarrett@gmail.com

Thanks Ed,

Apologies if this upset you, i'm new to these things, I just answered the question
of my lawyer and relayed his messages, I wouldn't want this to hurt our work
together which for me is quite important

Mauro

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network

**From:** Ed Sarrett
**Sent:** Wednesday, January 3, 2018 9:41 PM
**To:** Mauro Botta
**Subject:** Re: Hipaa

Sure. I am working on the summary and can get it to them in the next day or so.

Ed

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408.230.2652
esarrett@gmail.com
Consejería en español

On Jan 3, 2018, at 12:33 PM, siskodlg@gmail.com wrote:

Understood Ed, may I forward your email to them so they know your position?

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.
  Original Message
From: Ed Sarrett
Sent: Wednesday, January 3, 2018 9:26 PM
To: siskodlg@gmail.com
Subject: Re: Hipaa

(i' x:

Sarrett000025

Hi, Mauro,

I got the request from them. I can let them know the dates of your appointments with me and share with them a summary of some of the things we talked about. I don't have anything in my notes specifically regarding your former employer. And I definitely would not want to be involved in any court proceeding or get subpoenaed for any reason as a result of your lawsuit. Attached in the HIPAA form for you to sign and get to them or give to me to get to them. Can you ask them why they want the information and how they plan to use it? I do not wish to have a 3-way conversation. Getting involved in lawsuits is not part of the job for me. Thanks.

Ed

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408.230.2652
esarrett@gmail.com
Consejeria en español

On Jan 3, 2018, at 12:01 PM, siskodig@gmail.com wrote:

Ed,

My attorneys say they'd like to view notes regarding my employment dispute, if they exist, please let me know if you'd be ok with this. I don't have more details, so for more insights as to what they'd like to see maybe a 3-prong call might be easier

Thanks

Mauro

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

Sarrett000026

From: **Mauro Botta** siskodig@gmail.com
Subject: Re: form
Date: January 6, 2018 at 11:20 AM
To: Ed Sarrett esarrett@gmail.com



Hi Ed,

I got back and dealing with bit of jetlag, I'll send u the form cc my attorney so u both have it. Your understanding is correct, it'll be the same form u have except i'll fix the birth date. Yes I wont be seeing you on the 10th, however if you'd have time on the 8th or the 9th might be quite useful to me so that I can run few things by you. Otherwise I'll see you on the 17th.

Thanks!

On Sat, Jan 6, 2018 at 11:14 AM, Ed Sarrett <esarrett@gmail.com> wrote:
> Hi, Mauro,
>
>    I'm waiting to get the signed HIPAA form from you before I send the letter to your attorney. If I understood correctly, I won't be seeing you on the 10th, correct? Hope you are doing well. Will I see you on the 17th? Thanks.
>
> Ed
>
> Ed Sarrett, M.A.
> Licensed Marriage and Family Therapist
> 1550 The Alameda, Suite 303
> San Jose, CA 95126
> 408.230.2652
> esarrett@gmail.com
> Consejería en español

Sarrett000027



From: **Mauro Botta** siskodig@gmail.com
Subject: Re: Today
Date: February 14, 2018 at 3:35 PM
To: Sarrett, Ed esarrett@bcp.org

I'll be able to make it, my boss is gone early, so I can take off around 5.15 and work from home after we meet.

Thanks!

On Wed, Feb 14, 2018 at 3:03 PM, Sarrett, Ed <esarrett@bcp.org> wrote:

Hi, Mauro,

If you could let me know no later than 6, that would be helpful. I have a client until then and wouldn't want to wait around. Thanks. Hope all is OK. Yes, you could pay for multiple sessions. Thanks.

Ed

P.S. I am taking next week off since I'll be on vacation from school.

Ed Sarrett

Personal Counselor

Student Life Center #215

Bellarmine College Prep

960 W Hedding St.

San Jose, CA 95126

408-537-9265

esarrett@bcp.org

**From:** Mauro Botta [mailto:siskodig@gmail.com]
**Sent:** Wednesday, February 14, 2018 1:48 PM
**To:** Sarrett, Ed <esarrett@bcp.org>
**Subject:** Today

Sarrett000028

Ed,

I am coming from south SF today so not sure yet if I can make it, however I'll try my best because there's stuff that i'd need your help to process that has happened. Will keep you posted. If I can make it, i don't have the check with me, may i pay u next time? otherwise I can try stop by an atm.

Onwards also for practicality I was wondering if I may prepay a bunch of sessions to avoid to bring one by one each time.

Please let me know

Thanks!

Sarrett000029

**JX28-29**

From: **Mauro Botta** siskodlg@gmail.com
Subject: Re: Documents
Date: November 8, 2018 at 10:48 AM
To: Sarrett, Ed esarrett@bcp.org



I had trouble sleeping last night, this morning I had to seek comfort from 2 friends in Italy, I fear isolation, if truly these people can visit anyone at any place to ask whatever they want and this is allowed, despite the embarrassment that it'll cost them despite having done nothing wrong, how could I blame them if they don't wanna speak to me again? Is there no end to how much must I endure for having done nothing wrong?

On Thu, Nov 8, 2018 at 10:45 AM Sarrett, Ed <esarrett@bcp.org> wrote:

OK, Mauro.  Thanks for letting me know.  Hope you have a good week.


Ed


Ed Sarrett, M.A.

Licensed Marriage and Family Therapist

1550 The Alameda, Suite 303

San Jose, CA 95126

408-230-2652

esarrett@gmail.com

www.careparenting.net


**From:** Mauro Botta <siskodlg@gmail.com>
**Sent:** Thursday, November 8, 2018 10:36 AM
**To:** Ed Sarrett <esarrett@gmail.com>
**Cc:** alexc <alexc@dereksmithlaw.com>
**Subject:** Documents


Ed,


after conferring with my attorney, cc above, you may comply with the document request sent by them in your own due time as you see fit.


I apologize for the ways that has been delivered, in my country it doesn't work like that, but seems

Sarrett000030

here, anything is allowed and then is up to you to take years and pain to seek justice, interesting model.

Please reach out to Alex for questions as to what to deliver/how etc.

Sorry again

Mauro

Sarrett000031

From: **Mauro Botta** siskodig@gmail.com
Subject: Update
Date: November 29, 2018 at 8:52 AM
To: Ed Sarrett esarrett@gmail.com



Ed,

I talked to alex, he said you'd need to comply with the subpoena, however if u need more time u can reach out to them and let them know you need more time.

Please let me know if any updates occur

Thanks

Mauro

Sarrett000032



From: alexc@dereksmithlaw.com
Subject: RE: Mauro Botta
Date: January 7, 2018 at 9:53 AM
To: Ed Sarrett esarrett@gmail.com
Cc: Mauro Botta siskodlg@gmail.com

Wonderful. Thank you so much, Ed.

Alexander G. Cabeceiras, Esq.
**DEREK SMITH LAW GROUP, PLLC**
Attorneys at Law
*Employment Lawyers Representing Employees Exclusively*
Toll Free No. (800) 807-2209
DiscriminationAndSexualHarassmentLawyers.com (website)
Admitted NY, PA, NJ
NYC Office: 1 Pennsylvania Plaza, 49th Floor, New York, NY 10119 | (212) 587-0760
Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 | (215) 391-4790
NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625

CONFIDENTIALITY NOTE: The information contained in this transmission is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, do not read it. Please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

-------- Original Message --------
Subject: Re: Mauro Botta
From: Ed Sarrett <esarrett@gmail.com>
Date: Sun, January 07, 2018 12:46 pm
To: alexc@dereksmithlaw.com
Cc: Mauro Botta <siskodlg@gmail.com>

Hello, Alex,

Here you go. Best wishes.

Sincerely,

Ed Sarrett

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408.230.2652

Sarrett000033

**JX28-33**

esarrett@gmail.com
Consejería en español

> On Jan 4, 2018, at 9:06 AM, alexc@dereksmithlaw.com wrote:
>
> I appreciate that, Ed. Thank you!
>
> Alexander G. Cabeceiras, Esq.
> DEREK SMITH LAW GROUP, PLLC
> Attorneys at Law
> Employment Lawyers Representing Employees Exclusively
> Toll Free No. (800) 807-2209
> DiscriminationAndSexualHarassmentLawyers.com
<http://discriminationandsexualharassmentlawyers.com/> (website)
> Admitted NY, PA, NJ
> NYC Office: 1 Pennsylvania Plaza, 49th Floor, New York, NY 10119 | (212)
587-0760
> Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 |
(215) 391-4790
> NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625
> _____
> CONFIDENTIALITY NOTE: The information contained in this transmission is
privileged and confidential information intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination,distribution
or copying of this communication is strictly prohibited. If you have received this
transmission in error, do not read it. Please immediately reply to the sender
that you have received this communication in error and then delete it. Thank
you.
> _____
>
>
>
> -------- Original Message --------
> Subject: Re: Mauro Botta
> From: Ed Sarrett <esarrett@gmail.com ><mailto:esarrett@gmail.com>>
> Date: Thu, January 04, 2018 11:57 am
> To: alexc@dereksmithlaw.com <mailto:alexc@dereksmithlaw.com>
>
> Hello Alex,
>
> Thank you for your email. I am waiting for Mauro to send me the signed
HIPAA form, and once I have it, I will send you the letter outlining dates of
treatment and the one brief mention of his former employer in my notes. Thank
you.
>
> Ed Sarrett
>
> Ed Sarrett, M.A.

Sarrett000034

> Licensed Marriage and Family Therapist
> 1550 The Alameda, Suite 303
> San Jose, CA 95126
> 408.230.2652
> esarrett@gmail.com <mailto:esarrett@gmail.com>
> Consejería en español
>
>
>
>
>
>
>> On Jan 3, 2018, at 11:50 AM, alexc@dereksmithlaw.com
<mailto:alexc@dereksmithlaw.com> wrote:
>>
>> Hi Ed,
>>
>> My name is Alex Cabeceiras, I represent Mauro Botta in his dispute against
a former employer. Mauro has told me he reached out to discuss this with you.
>>
>> Please find attached Mauro's HIPAA Authorization Form.
>>
>> What we need from you, ideally, is simply a schedule reflecting Mauro has
treated with you and any notes/records that mention his former employer,
should they exists.
>>
>> If you have any questions please give me a call at (212) 587-0760.
>>
>> Best,
>>
>> Alex
>>
>>
>> Alexander G. Cabeceiras, Esq.
>> DEREK SMITH LAW GROUP, PLLC
>> Attorneys at Law
>> Employment Lawyers Representing Employees Exclusively
>> Toll Free No. (800) 807-2209
>> DiscriminationAndSexualHarassmentLawyers.com
<http://discriminationandsexualharassmentlawyers.com/> (website)
>> Admitted NY, PA, NJ
>> NYC Office: 1 Pennsylvania Plaza, 49th Floor, New York, NY 10119 | (212)
587-0760
>> Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103
| (215) 391-4790
>> NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625
>> _____
>> CONFIDENTIALITY NOTE: The information contained in this transmission is
privileged and confidential information intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination,distribution
or copying of this communication is strictly prohibited. If you have received this
transmission in error, do not read it. Please immediately reply to the sender

Sarrett000035

that you have received this communication in error and then delete it. Thank you.
>> _____
>>
>> <bottom.letterhead>
>> <HIPAA Authorization - Ed Sarrett.pdf>
>
> <bottom.letterhead>



Sarrett000036

Ed Sarrett, M.A.
Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
408.230.2652
esarrett@gmail.com

Office Policies and Procedures

The cost of therapy is $150 for a 50 minutes session.

All of the content of a session is confidential with the exception of the following:

    a. Child or elder abuse
    b. Danger to self
    c. Danger to others
    d. A court order requesting records

You can cancel an appointment if necessary as long as you do so with 24 hours notice. If you do not cancel within 24 hours, you will have to pay for the session even if you miss it.

I do not do phone consultations and only do therapy in person. You can make an appointment with me by calling 408.230.2652, and I will return the call usually within 24 hours.

Your signature below indicates that you understand and agree to the above-stated policies and procedures.

Signature _____    Date  3/20/17

Signature _____    Date _____

Name: MAURO BOTTA

Address: 88 E. SAN FERNANDO ST. #1308 - SAN JOSE - 95113

Phone: 408 464 5438

Email: SISKODLG@GMAIL.COM

Sarrett000037

**JX28-37**

auditor
year ago- October
whistleblower to SEC
end of June
got fired
dept. of labor / SEC not responding
↳ complained
accelerated heartbeat
reputation

Sarrett000038

# Ed Sarrett, M.A.

Licensed Marriage and Family Therapist
1550 The Alameda, Suite 303
San Jose, CA 95126
License #48759
Tel: 408.230.2652
esarrett@gmail.com

Statement of Account for:

Mauro Botta
88 East San Fernando St. #1308
San Jose, CA 95113

| Date | Service | CPT Code | Fee | Paid | Balance |
|------|---------|----------|-----|------|---------|
| 9/20/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 9/27/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/4/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/11/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/18/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/25/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/1/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/8/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/15/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/29/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 12/6/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 12/13/2017 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 1/8/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 1/24/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 2/7/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 2/14/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 2/28/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 3/7/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 3/14/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 3/21/2918 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 3/28/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 4/11/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 4/18/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |

Sarrett000039

| Date | Service | CPT Code | Fee | Paid | Balance |
|------|---------|----------|-----|------|---------|
| 4/25/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 5/2/2918 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 5/9/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 5/16/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 5/23/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 5/30/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 6/6/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 6/13/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 6/20/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 6/27/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 7/11/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 7/18/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 7/25/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 8/8/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 8/15/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 8/22/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 8/29/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 9/5/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 9/12/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 9/19/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 9/26/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/3/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/10/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/17/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/24/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 10/13/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/7/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/14/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 11/28/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
| 12/5/2018 | Individual Therapy | 90837 | $150 | $150 | $0 |
|  |  |  |  |  |  |

Sarrett000040

JX28-40

 PROJECT ON GOVERNMENT OVERSIGHT

# OUR WORK: Dive into POGO's library of publications exposing corruption and exploring solutions across the federal government.



Home > Our Work > Articles > 2018 > PwC Whistleblower Alleges Fraud in Audits of Silicon Valley Companies

# PwC Whistleblower Alleges Fraud in Audits of Silicon Valley Companies

Topics: Government Accountability, Whistleblower Protections, Financial Sector

Related Content: Conflicts of Interest, Revolving Door, Financial Oversight, Securities and Exchange Commission (SEC)

G+   May 10, 2018 | David S. Hilzenrath



*(Photo: Shutterstock; Illustration by POGO)*

After more than a dozen years auditing technology companies in Silicon Valley, Mauro Botta took an extraordinary step: He decided to become a whistleblower.

He drafted an account of what he had seen and experienced as a senior manager at PwC, the accounting firm also known as PricewaterhouseCoopers. Then, in November 2016, he submitted it confidentially to a federal regulator, the Securities and Exchange Commission (SEC).

Under penalty of perjury, Botta described example after example of sloppy if not misleading bookkeeping and weak internal controls at businesses in the Valley.

Botta told the SEC that, when it came to their accounting, companies he observed generally had a "low level of competence." (He explained to the Project On Government Oversight that he was referring to small and mid-sized companies.)

Sarrett000041

Auditors like PwC are supposed to serve as independent watchdogs.

But the prime focus of Botta's whistleblower complaint wasn't the tech companies. It was something deeper and more far-reaching: the culture of auditing at PwC.

Botta alleged that, to keep corporate managers happy and to avoid losing their business, PwC was pulling its punches—trying not to flag too many problems with companies' internal controls.

He said he was concerned about "the risk of collusion between auditors and management in this valley . . . with management paying us the fees and auditors picking and choosing what to call an audit issue."

For instance, he said, one company—whose name is redacted in materials provided to POGO—made a series of mistakes.

First, its controller was duped by an email phishing scam. The controller wired money as directed by a phony email despite the fact that company policy required two signatures for such wire transfers—and despite the fact that the party the controller paid wasn't on the company's vendor list.

Second, the company neglected to disclose to the auditors its close relationship with a business "entity" that shared its address and performed research and development at its direction. The entity was not included in the company's financial statements until auditors raised the issue, he wrote. (Keeping the entity off the company's books would have reduced the company's reported expenses, Botta explained to POGO.)

Third, as Botta reported, the company apparently failed to notice that, when it sold a shipment of products, the buyer had a contractual right to return thousands of them. (That could affect the company's ability to record revenue from the sale, Botta clarified for POGO.)

PwC was pulling its punches—trying not to flag too many problems with companies' internal controls, Botta alleged.

Those were just some of the company's alleged problems.

Botta told the SEC that he proposed stating in PwC's audit report that the company had "a material weakness" in "the skill and competence of the finance department." Botta wrote that, in response, he "was put under significant pressure" by superiors at PwC and was told that if he pursued that path, it was unlikely he would be promoted to partner.

Then, the chief financial officer of the company PwC was auditing asked PwC to remove Botta from the audit—and PwC agreed, Botta wrote.

"The firm accepted to remove me ignoring my claim that the competence of management would still constitute a significant risk," Botta wrote.

The PwC veteran isn't alleging that a bunch of technology companies are reporting false profits. Rather, he's alleging that in many instances the numbers companies report are correct only because the outside auditors corrected them.

He argues that members of the public—including the shareholders who pay corporate executives—are entitled to that information, and he asserts that auditors have breached their duty by withholding it.

In a recently filed lawsuit, Botta alleges that PwC fired him in retaliation for standing up to "fraudulent," "deceptive," and "negligent" practices at the accounting firm and for reporting that conduct to the SEC.



4   61. On or about October 26, 2016, Defendants' TIMOTHY CAREY ("CAREY") demanded

Plaintiff meet with him and Defendants' Supervisor KEVIN HEALY ("HEALY") in his office

67. Specifically, Plaintiff disclosed to the SEC Defendants' fraudulent activities, gross incompetence, deceptive practices, material omissions, and other problems relating to audits of COMPANY A, COMPANY B, and others.

11   62. Thereafter, Plaintiff began to try to bring in his own business to Defendants to keep his

12   "utilization" rating high.

(Botta v PricewaterhouseCoopers Lawsuit, p. 10)

If Botta's take on auditing in Silicon Valley is on the mark, it's another in a history of reasons to doubt the auditors and the federal system charged with protecting investors. And it comes at a time when the Trump Administration is positioned to put its imprint on the obscure organization that regulates audit firms like PwC.

Douglas R. Carmichael, an accounting professor and former auditing regulator, told POGO that the picture Botta presented is "very disturbing."

In response to questions from POGO, PwC spokeswoman Sarah Tropiano provided a brief statement:

"The claims presented in the lawsuit are false. PwC maintains the highest ethical standards around our business and a robust code of conduct that protects whistleblowers. Mr. Botta's employment was terminated for legitimate business reasons, and we will demonstrate that in court."

"We decline to comment further at this point as we will litigate the matter in court," Tropiano wrote.

Sarrett000082

Douglas R. Carmichael, an accounting professor and former auditing regulator, told POGO that the picture Botta presented is "very disturbing."

If the facts are as alleged, Carmichael said, "I think it undermines the confidence in audit reports."

## The Watchdog's Duty

Auditors like PwC are supposed to serve as independent watchdogs. Investors, lenders and others rely on their work when putting money at risk—including, for instance, pension and retirement funds.

"This 'public watchdog' function demands that the accountant maintain total independence from the client at all times, and requires complete fidelity to the public trust," the U.S. Supreme Court stated in a 1984 decision.

Since the 1930s, the government has required publicly traded companies to obtain outside audits, which means the accounting firms that fill that role profit from a federally mandated franchise.

In addition to scrutinizing companies' finances, auditors are now responsible for reporting on companies' internal controls. Those can include accounting processes, information technology systems, and other checks and balances that guard against fraud and potentially affect the reliability of corporate financial statements.

The government required auditors to report on internal controls under the Sarbanes-Oxley Act of 2002, which was written in response to a wave of accounting scandals. Companies such as Enron and WorldCom had used accounting tricks to obscure their true financial condition, and auditors had failed to sound an alarm. When the truth emerged, the companies imploded, investors lost many billions of dollars, and workers' jobs evaporated.

The new auditing requirement generated more work—and more fees—for audit firms. In return, the public is supposed to be getting valuable information. The auditors' reports on internal controls can shed light on the character and competence of management and a company's vulnerability to financial fraud or error.

But Botta's story helps to illuminate a fundamental problem that the government has long condoned: Far from being independent, accounting firms are hired and paid by the companies they audit. That gives them powerful incentives to curry favor with the very corporate managers they have a duty to oversee.

In his complaint to the SEC and in his lawsuit, Botta alleged that a PwC partner advised him to let problems slide. The partner allegedly said that many Silicon Valley companies had material weaknesses, but if PwC cited them all, it wouldn't be able to compete with other audit firms.

The trust and responsibility that the government vests in audit firms assumes they will bite the hand that feeds them, and biting is not necessarily the best business model. It should come as no surprise if audit firms are interested in ingratiating themselves to their clients.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

Time and again, from the savings and loan crisis to the dotcom bubble, from Enron and WorldCom to the mortgage meltdown, the financial crisis, and countless other corporate scandals, accounting watchdogs helped lull the public into a false sense of security.

Botta's SEC filing warned of trouble in the heart of the information economy, the valley that symbolizes American innovation.

## Behind the Veil

Though auditing's built-in conflicts of interest may be obvious, they are seldom shown as clearly as in an internal PwC document Botta shared with the Project On Government Oversight. The document, dated May 2014, gave Botta feedback on his performance. It compiled comments from several PwC partners the firm had surveyed, showing in their anonymous words what it takes to become a PwC partner and how they expected PwC auditors to deal with clients.

The feedback included comments such as these:

"Build the relationships where the client would never want to leave PwC."

"As a partner you have to have the position that you want these guys to like you . . . ."

"If he were really responsible for bringing in the revenue and keeping clients, as partners are, he would have to adapt fast."

Sarrett000043

The May 2014 feedback survey suggested that the auditor needed the support of audit clients to advance at PwC.

"Until he gets the clients pounding the table for him, I don't think he'll ever make partner," the survey said.

Under auditing rules, auditors are not supposed to do the accounting for their clients. That would amount to auditing their own work. Their job is to opine on the client's work.

However, in his complaint to the SEC, Botta said that PwC frequently ends up doing clients' work for them and fixing problems rather than disclosing them. He said that, to compensate for technology companies' accounting weakness, auditors had assumed the role of advisors to management. Botta wrote that, at a PwC training session on documenting certain controls, a PwC sector leader said "we know that factually we have to manufacture most of the documentation because client [sic] don't have it or don't know how to do it or don't want to spend the money to do it."

The May 2014 feedback survey made similar points.

"[B]ecome a trusted advisor to the client," the survey advised.

"When you get to be a partner they need someone to confide in and trust who will look out for you."

In the survey, one partner recounted an episode in which Botta refused to prop up a client.

"Our client asked for help to do a write up," the partner recounted. "A Partner would just get to work and write the memo and figure out how to conclude our opinion. Mauro would not give them the memo. His position was that it is not our responsibility to do that."

(Botta told POGO the "write up" in question was apparently a technical memo the client was required to produce to support the way it accounted for a complex financial instrument.)

Auditors are supposed to be skeptical, and audits are supposed to be based on verification rather than trust. The May 2014 survey offered this feedback on Botta's mindset and approach:

"I don't think the way he develops his client relationships is very effective. He doesn't trust any of his clients."

"His core personality is being a really good auditor, but that doesn't mean you can be a really good partner."

In his complaint to the SEC, Botta said PwC had created an environment in which it was not safe to speak up. In the feedback survey, alluding to the highest score an employee could earn on a performance review, partners' comments included the following:

"When you are a 1 rated top performer/partner, you tow the party line."

## "An emotional Italian guy"

Botta, 40, grew up in Italy, joined PwC there in 1999, and transferred to the firm's San Jose office—which serves Silicon Valley—in 2004.

English is a second language for him, and he speaks with a pronounced accent.

In 2013, a PwC newsletter in Italy featured an autobiographical article by Botta describing his journey to America and his experience living and working in San Jose.



"Il Volo," a PwC Italy newsletter, featured Mauro Botta in 2013

"American culture, which may appear free, is in reality a bit repressed when you talk about work environment," Botta wrote, according to his own translation of the Italian. "Swamped with attorneys which sue for anything, American culture adapted itself into a sort of self-censorship which leads people in public not to talk about controversial topics," he added. "Speaking for myself, I am still living the American dream of individual freedom and this has led me to challenge a lot of taboos, starting from talking about any topic in public, to always voice my opinion in any possible occasion."

Sarrett000044

**JX28-44**

The May 2014 feedback survey described him as "quirky," noting his interest in Star Trek conventions, and it advised him to "keep it culturally appropriate."

Botta told the Project On Government Oversight that he's interested in Star Trek the way some people are interested in golf, and he said he has worn a Star Trek outfit to work on weekends to boost morale.

In answer to the question "What is preventing Mauro from being rated a top performer and/or progressing to partner?" the feedback survey described him as "an emotional Italian guy," a comment he has cited as evidence of ethnic bias.



But that was not the persona on display in telephone interviews or after he took a red-eye flight to Washington to meet with POGO one Saturday in April. Instead, he came across as methodical, firm in his professional convictions, and detail-oriented—consistent with other observations in the feedback survey.

Since early April, Botta has participated in a series of interviews with POGO. He also provided copies of various documents, including the feedback survey and his complaint to the SEC. He did so on condition that the material not be published until he had filed the lawsuit he was preparing against PwC. To protect client confidentiality, Botta redacted company names and the dollar amounts associated with accounting issues. He also redacted the names of PwC personnel, though some of them are named in his lawsuit.

People who submit tips and complaints to the SEC may be eligible for whistleblower rewards if their information leads to SEC enforcement actions.

The fact that Botta has not disclosed the names of the audit clients he described in his SEC complaint and lawsuit limits POGO's ability to investigate his allegations.

However, the May 2014 feedback survey shows PwC partners speaking in their own words.

The document's overall assessment of Botta was glowing.

"[Y]ou are widely respected and thought of as a tremendous asset to PwC," the introduction said.

Other comments backed that up.

"Dedicated, loyal, hard working."

"Strong set of values, high integrity, trust worthy, ability to call a spade a spade."

"Mauro has a very strong professional skepticism and it is a very good thing."

There was also this:

"He tends to be too black and white."

Mauro Botta takes an Oath of Allegiance during his naturalization ceremony to become a US citizen in 2011. (Photo courtesy of Mauro Botta)

"[H]e does not have a filter."

"He throws partners under the bus."

On a scale of 1 to 5, where 1 was the top rating, Botta received a rating of 1 for 2014 and 2015, he said. In time, as his standing at the firm declined, his rating fell to a 3, he said.

By his own account, he pressed disagreements with partners when he thought they were acting incorrectly, was cautioned that he was jeopardizing his career, and repeatedly resigned from the firm only to be talked into staying. Also by his own account, he was repeatedly taken off audits at the request of companies PwC was auditing.

Increasingly, he said, he found himself sidelined.

## A Professor's Perspective

Carmichael, a professor at the City University of New York's Baruch College, reviewed documents cited in this report at POGO's request. Carmichael has served as chief auditor at the Public Company Accounting Oversight Board (PCAOB), a regulatory body created in the aftermath of the Enron and WorldCom scandals to oversee corporate auditors. Earlier in his career, he was vice president for auditing at the American Institute of Certified Public Accountants, a professional organization. Carmichael noted that he has testified as an expert witness against PwC.

Carmichael said some of the conduct Botta described would be "just terrible."

The professor said he was especially troubled by the notion that PwC would let matters slide to remain competitive with other audit firms.

"That's the attitude that can result in a race to the bottom," he said.

In the feedback survey, "they seem to be saying he's not partner material because he's too aggressive about adhering to the standards," Carmichael said. "Certainly there are a good many of them that seem to be saying . . . 'We have to be willing to look the other way.'"

Carmichael said he was also troubled by an alleged effort to mislead inspectors from the oversight board. In his complaint to the SEC, Botta said priorities at the audit firm's Silicon Valley office included "profitability or selling additional services," a reference to selling PwC consulting services to companies the firm audits. Botta alleged that PwC partners told him they had been cautioned not to put those priorities in written plans to avoid raising questions from the regulators.

"That's very disturbing," Carmichael said.

Carmichael agreed that some of the problems Botta cited at companies PwC audited would rise to the level of material weaknesses warranting disclosure in audit reports.

Botta's narrative reminded Carmichael of an earlier era.

Sarrett000045

"That just goes back to a time in the 1970s, I would say, where auditors were allowing accounting that was clearly in violation of standards just because other firms had permitted the accounting and they couldn't be competitive any more if they insisted on the right accounting."

It also suggested a reversal of progress made since the creation of the oversight board, Carmichael said.

"If it's reflective of [a] firm-wide attitude and not an aberration of a particular office, it could seriously undermine the confidence that has been built up over that fifteen year period."

Lynn Turner, a former chief accountant at the SEC and former technology executive, said he witnessed a race-to-the-bottom dynamic in the 1990s when he was in charge of the nationwide high-tech audit practice at Coopers & Lybrand, one of the firms that merged to form PwC. Turner said accounting firms "jumped in the gutter together" and vied to be lenient with companies they audited.

"They didn't want to have a reputation amongst the venture capitalists"—who could influence the selection of auditors—"that they were a really diligent, tough auditor," Turner said.

## "Recurring Audit Deficiencies"

Botta's accusations add to a broader picture.

In November 2017, the PCAOB warned about the "number and significance of the recurring audit deficiencies" identified in its inspections.

"Deficiencies in audits of internal control over financial reporting continued to be the most frequent deficiencies identified by PCAOB inspectors in 2016, consistent with prior years' results," the auditing oversight board added.

PwC might be most famous lately for flubbing its role at the 2017 Academy Awards, but little-noticed reviews by that obscure regulator tell a more consequential story.

In a December 2017 report on its 2016 inspection of PricewaterhouseCoopers LLP, the oversight board said it looked at 56 PwC audit engagements and discovered deficiencies so serious that it appeared the favorable opinions PwC issued in 11 of those audits were unfounded.

Botta's accusations add to a broader picture.

Meanwhile, former oversight board employees and leaders of accounting firm KPMG stand accused of engaging in a criminal conspiracy. After KPMG fared poorly in oversight board inspections, it recruited employees from the board and then used them to get confidential information on which audits the board was planning to inspect, the Justice Department alleged in January 2018.

If the charges in the indictment are true, key personnel at one of the world's biggest accounting firms had corrupted the system meant to make accountants more accountable.

Some of the key players in the system today are themselves veterans of the accounting industry.

In December 2017, the SEC appointed a completely new slate of leaders to the oversight board. One of the five new board members, James G. Kaiser, joined the board from PwC, where he was responsible for "innovation in auditing," the SEC said. Kaiser had been with PwC for 38 years.

Many expect the oversight board's new leadership to take a much more hands-off approach to regulating auditing firms following showdowns over the last board chairman's efforts to strengthen accountability rules. "Obviously there has been some tension that has built up over the years, particularly between the firms, the business lobby and the board," Michael Shaub, an accounting professor at Texas A&M University, told The Wall Street Journal after the SEC made the appointments. "It looks like they are reconstituting it. It's literally a reset."

In the news release announcing the appointments, SEC Chief Accountant Wesley Bricker pronounced the new members "well qualified to lead the PCAOB."

Bricker, too, personifies the close ties between the accounting industry and its overseers. According to an official bio, he joined the SEC from PricewaterhouseCoopers LLP.

## Damages

A recent federal court ruling against PwC delivered a reminder of why audits matter.

Year after year, from 2002 through 2008, PwC issued so-called "clean" audit opinions on The Colonial BancGroup Inc., parent of Colonial Bank, which was one of the largest banks in the United States. Then, in 2009, amid the wider financial crisis, FBI agents raided Colonial, state regulators closed it, the FDIC stepped in, and the company sought bankruptcy protection.

The bank had been the victim of a long-running multi-billion dollar fraud, and PwC had missed it, the court recounted. A federal judge declared in December 2017 that the audit firm had been negligent.

The FDIC has asked the court to order PwC to pay damages of $625.3 million. PwC has argued that the FDIC is entitled to less than half that amount: $306.7 million.

In a February 2018 settlement with the Justice Department for allegedly failed audits of another company involved in the same fraud, auditor Deloitte & Touche agreed to pay $149.5 million. In a statement provided by Deloitte spokesman Jonathan Gandal, the firm defended its performance. "Deloitte & Touche is deeply committed to the highest standards of professionalism, and we stand behind this work that dates back over a decade," the firm said.

Turner, the former chief accountant at the SEC, told POGO that, for a while, it appeared that auditing had improved. The scandals at companies such as Enron and WorldCom and the demise of their audit firm, Arthur Andersen, "shook a lot of people up," Turner said. But, as Turner sees it, the effect has been wearing off, and the quality of auditing "has slipped back . . . even to the point of where we were before."

PwC's recent difficulties stretch all the way to India, where, amid the fallout from a major accounting fraud, the audit firm's Indian affiliate in January 2018 was prohibited from auditing listed companies for two years.

Responding to the ban, the PwC India firm said there was "no intentional wrongdoing by PW firms" in the fraud, which took place almost a decade ago at a company

Sarrett000046

called Satyam. "We have however learnt the lessons of Satyam and invested heavily over the last nine years in building a robust and high quality audit practice," the firm added—apparently implying that it did not have a robust and high quality audit practice before the fraud.

PwC's recent problems also extend to Silicon Valley-based Facebook. In its role as a monitor for the Federal Trade Commission, *The New York Times reported*, PwC effectively gave Facebook's privacy protections a clean bill of health.

PwC effectively gave Facebook's privacy protections a clean bill of health.

"In our opinion, Facebook's privacy controls were operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information," PwC said in its assessment, which covered the two-year period ending February 11, 2017.

During that period, the *Times* reported, "Facebook was aware that a researcher based in Britain, Aleksandr Kogan, had provided Cambridge Analytica with private Facebook data from millions of users. Cambridge Analytica, which later worked for the Trump campaign, used the information to build psychological profiles of American voters before the 2016 election."

## Hitching a Ride

In 2017, after he filed his whistleblower complaint against PwC, Botta had a series of calls and meetings with officials from the SEC.

As Botta recounted, one official zeroed in on a scene Botta described in the complaint—an episode that, as Botta saw it, seemed to symbolize a breakdown of auditor independence.

During a PwC meeting in early 2016, Botta had written, staff members were shown a slide of a PwC audit team in front of a private jet. It was the aircraft of the CEO of a company PwC was auditing.

According to Botta, a PwC senior manager explained that when the flight the auditors were supposed to take was cancelled, the CEO "took the whole team on his private jet" and flew them to the San Jose area so they could make it to a PwC party.

According to Botta, the PwC senior manager displaying the picture presented it as an illustration of best practices—showing that the auditors had a great relationship with their client.

One PwC partner who witnessed that presentation was "clearly unhappy about it," Botta added.

It appeared Botta had gotten the SEC's attention. In an email dated February 22, 2017, a senior attorney in the SEC's Division of Enforcement thanked Botta for his time that day. The email suggested the SEC had opened a file; the subject line read, "In the Matter of PricewaterhouseCoopers Auditor Independence Inquiry (NY-09482)."

## Escorted from the Building

In the weeks that followed, Botta learned from PwC that that the SEC was looking into PwC's auditing of one of the companies named in his whistleblower complaint, Botta's lawsuit says.

manner discriminate against an employee in the terms and conditions of employment because of

lawful act done by the employee.

92. Defendants engaged in unlawful retaliatory employment practices prohibited by 18 U.S. Code § 1514A, by terminating and otherwise retaliating against Plaintiff because Plaintiff was and is a *bona fide* whistleblower.

and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is

(Botta v PricewaterhouseCoopers Lawsuit, p. 14)

PwC opened an internal probe and questioned Botta repeatedly, he said.

In June 2017, PwC supervisors told Botta that, as a result of a restructuring at the firm, he should look for a new job, the lawsuit says. Then, in August 2017, Botta was summoned to a meeting at which PwC Vice Chairman Kevin Baldwin and a human resources leader fired him, the lawsuit says. Botta was immediately escorted from the building, the suit says.

Botta told POGO that he was accused of falsifying work papers.

Sarrett000047

According to his lawsuit, PwC knew Botta was the whistleblower and gave a false reason for firing him.

SEC enforcement lawyers who communicated with Botta about his complaint referred POGO to the SEC's press office, where agency spokesman John Nester declined to comment. The SEC generally refrains from commenting on whether it has opened an investigation or on the status of its investigations, the agency's website explains.

However, in February 2018, Botta said, his attorney got a call from the whistleblower office at the SEC. The SEC official said the agency would not be pursuing an enforcement action against PwC.

Botta said he is awaiting written confirmation of that decision.

---

Project On Government Oversight (POGO)

1100 G Street, NW, Suite 500   Washington, DC 20005
Phone: (202) 347-1122   Fax: (202) 347-1116   Email:

Our Mission:

Founded in 1981, the Project On Government Oversight is a nonpartisan independent watchdog that champions good government reforms. POGO's investigations into corruption, misconduct, and conflicts of interest achieve a more effective, accountable, open, and ethical federal government.

POGO's SecureDrop available via Tor: http://dqeasamlf3jld2kz.onion





Sarrett000048

Ed Sarett, M.A.
Licensed Marriage and Family Therapist
#48759
1550 The Alameda, Suite 303
San Jose, CA 95126
408.230.2652
esarrett@gmail.com

January 3, 2018

Re:   Mauro Botta

To Whom It May Concern:

I have been working with Mauro Botta in weekly sessions since September 20, 2017. The dates of treatment are as follows:

| | |
|------|-------|
| 9/20 | 11/1 |
| 9/27 | 11/8 |
| 10/3 | 11/15 |
| 10/11 | 11/29 |
| 10/18 | 12/6 |
| 10/25 | 12/13 |

In my first entry in my notes, I mention that the presenting problem was anxiety with a couple of incidents of panic attacks, and that the principal stressor described by the client was the loss of his job as an auditor at PwC and a desire to return to work there. I make no other mention of his former employer in subsequent notes. Thank you.

Sincerely,

Ed Sarrett

Sarrett000049

**JX28-49**



OCA Official Form No.: 960
**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| **MAURO BOTTA** | **10/26/2018** | **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** |
| **Patient Address** | | |
| **88 East San Fernando Street, Apt 1308, San Jose, CA 95113** | | |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:
In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
   **Ed Sarrett- 1550 The Alameda, Suite 303, San Jose, CA 95126**

8. Name and address of person(s) or category of person to whom this information will be sent:
   **Alexander G. Cabeceiras, 1 Penn Plaza, 49th Floor, Suite 4905, New York, New York 10119**

9(a). Specific information to be released:
   ☐ Medical Record from (insert date) _____ to (insert date) _____
   ☑ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
   ☐ Other: _____

   Include: (Indicate by Initialing)
   _____ **Alcohol/Drug Treatment**
   _____ **Mental Health Information**
   _____ **HIV-Related Information**

**Authorization to Discuss Health Information**

   (b) ☐ By initialing here _____ I authorize **Dr. Ed Sarrett** _____
                 Initials                    Name of individual health care provider
   to discuss my health information with my attorney, or a governmental agency, listed here:
               **ALEXANDER G. CABECEIRAS, Esq.** _____
               (Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: <br> ☐ At request of individual <br> ☑ Other: *law suit* | 11. Date or event on which this authorization will expire: |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_____      Date: _____
Signature of patient or representative authorized by law.

\* **Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.**

AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA
[This form has been approved by the New York State Department of Health]

OCA Official Form No.: 960

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| MAURO BOTTA | 10/26/~~2000 197~~ | 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 |

Patient Address
88 East San Fernando Street, Apt 1308, San Jose, CA 95113

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT, except psychotherapy notes, and CONFIDENTIAL HIV* RELATED INFORMATION only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).

7. Name and address of health provider or entity to release this information:
Ed Sarrett- 1550 The Alameda, Suite 303, San Jose, CA 95126

8. Name and address of person(s) or category of person to whom this information will be sent:
Alexander G. Cabeceiras, 1 Penn Plaza, 49th Floor, Suite 4905, New York, New York 10119

9(a). Specific information to be released:
☐ Medical Record from (insert date) _____ to (insert date) _____
☒ Entire Medical Record, including patient history, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.
☐ Other: _____

Include: (Indicate by Initialing)
_____ Alcohol/Drug Treatment
_____ Mental Health Information
_____ HIV-Related Information

Authorization to Discuss Health Information
(b) ☐ By initialing here _____ I authorize Dr. Ed Sarrett
                    Initials                    Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:
ALEXANDER G. CABECEIRAS, Esq.
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☐ At request of individual<br>☒ Other: law suit | 1/3/19 |
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_Signature of patient or representative authorized by law._        Date: 1/2/18

* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.

Sarrett000051

## DECLARATION OF ED SARRETT

I, Ed Sarrett, do hereby declare and state:

1.      I am a marriage and family therapist practicing in San Jose, CA.  I have personal

knowledge of the facts set forth in this Declaration and, if called as a witness, could and would

testify competently to such facts under oath.

2.   ·   On November 6, 2018, Plaintiff and Defendants served me with a *Subpoena to*

*Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil*

*Action* on me in the above-entitled action (the "Subpoena").

3.      Documents were produced in response to the Subpoena on _Dec 4_____, 2018.

(collectively, the "Records").

4.      The Records are true and correct copies of business records that were prepared or

compiled by myself or personnel acting on my behalf in the ordinary course of business at or

near the time of the acts, conditions, or events recorded.  The Records were kept and maintained

in the course of regularly conducted business activity.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed on this _30_ day of _November 2018_ at _San Jose_, San Jose, CA.

_____
                                        Ed Sarrett

Sarrett000052