1  INGRID M. EVANS, ESQ. (SBN 179094)
   **EVANS LAW FIRM, INC.**
2  3053 Fillmore Street #236
   San Francisco, CA 94123
3  Phone: (415) 441-8669
   Fax: (888) 891-4906
4  Ingrid@evanslaw.com

5  ALEXANDER G. CABECEIRAS, ESQ.
   **DEREK SMITH LAW GROUP, PLLC**
6  One Penn Plaza, Suite 4905
   New York, New York 10119
7  Phone: (212) 587-0760
   Fax: (212) 587-4169
8  alexc@dereksmithlaw.com
   *Pro Hac Vice*

9

   *Attorneys for Plaintiff*
10

                 **IN THE UNITED STATES DISTRICT COURT**
11            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                      **SAN FRANCISCO DIVISION**
12

13  | MAURO BOTTA, | Case No. 3:18-cv-02615-AGT |
    |---|---|
    | Plaintiff, | |
14  | vs. | **PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF** |
15  | | |
16  | PRICEWATERHOUSECOOPERS LLP, | Trial Date:   February 22, 2021 |
    | | Time:          8:30AM |
17  | Defendant. | Courtroom:   Courtroom A, 15th Floor, United States District Courthouse, 450 Golden Gate Ave., San Francisco, CA 94102 |
18  | | Judge:         The Hon. Alex G. Tse |

19

20

21

22

23

24

                                      0

Case No.  3:18-cv-002615-AGT          PLAINTIFF'S POST-TRIAL BRIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EVANS LAW FIRM, INC.

# TABLE OF CONTENTS

I.   INTRODUCTION...............................................................................................1

II. LEGAL ARGUMENTS.......................................................................................7

    A. Defendant Pricewaterhousecoopers Llp Violated California Labor Code Sections 1102.5 & 98.6.........................................................................................................7

    B.  Defendant Pricewaterhousecoopers Llp Wrongfully Terminated Mauro In Violation Of Public Policy............................................................................................17

    C.  Defendant Pricewaterhousecoopers Llp Violated The Sarbanes-Oxley Act By Terminating Plaintiff's Employment For Engaging In Protected Activity..........................................18

    D.  Defendant Pricewaterhousecoopers Llp Breached Mauro's Employment Contract...............26

III. DAMAGES.....................................................................................................26

IV. CONCLUSION.................................................................................................27

# TABLE OF AUTHORITIES

**Statutes**

15 U.S.C. § 7211...............................................................................................17

18 U.S.C. § 1514A(a)(1)(A)..............................................................................18

18 U.S.C. § 1514A(c) (Sarbanes-Oxley)...........................................................27

18 U.S.C. § 1514A............................................................................................25

29 C.F.R. § 1980.104(b)(1)(iv).........................................................................21

29 C.F.R. § 1980.104...................................................................................21,25

Cal. Labor Code § 1102.5(b)............................................................................12

Cal. Labor Code §1102.6.................................................................................11

California Labor Code § 1102.5.......................................................................27

i

California Labor Code § 98.6……………………………………………………...27

California Labor Code Section 1102.5(b)……………………………………………7

Fed. R. Evid. 201(c)(2)…………………………………………………………...11n.12

Sarbanes-Oxley, 18 U.S.C. § 1514A(a)(1)…………………………………………19

Sarbanes-Oxley, 18 U.S.C. §1514A……………………………………………7n.11

SEC 17 CFR Part 210……………………………………………………………23n.15

Under Federal Rule of Evidence 201…………………………………………...11n.12

**Cases**

*Canupp v. Children's Receiving Home of Sacramento*, 181 F. Supp. 3d 767, 792 (E.D. Cal. 2016…………………………………………………………………………………5n.5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)…………………………………...5n.5

*Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1378 (N.D.Ga.2004)………………..5n.5

*Cordell v. PICC Lines Plus LLC*, 2016 U.S. Dist. LEXIS 121708, at *37 (N.D. Cal. Sept. 8, 2016)…..27

*Dauth v. Convenience Retailers, LLC*, No. C 13-00047 MEJ, 2013 WL 5340396, at *3 (N.D. Cal. Sept. 24, 2013)……………………………………………………………………17

*Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988)………………………11n.12

*Erhart v. BofI Holding, Inc.,* 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017)…………………19,20

*Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 666, 254 (1988)……………………………17

*Gardenshire v. Housing Authority*, 85 Cal.App.4th 236, 237 (2000)………………………27

*Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 263 (5th Cir. 2014)……………………25

*Junger v. John V. Dinan Assocs., Inc.*, 164 A.D.3d 1428, 1430, 84 N.Y.S.3d 574, 577 (N.Y. App. Div. 2018)………………………………………………………………………26

*Leznik v. Nektar Therapeutics, Inc.,* ALJ Case No.2006–SOX–00094, 2007 WL 5596626, at *8 (Nov. 16, 2007)…………………………………………………………………………5n.5

EVANS LAW FIRM, INC.

*Leznik v. Nektar Therapeutics, Inc.,* ALJ Case No.2006–SOX–00094, 2007 WL 5596626, at *8 (Nov. 16, 2007)(citing *Deremer v. Gulf Coast,* ALJ Case No.2006–SOX–2 at 61–62 (June 29, 2007)..........21

*Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013).....................25

*Morgan v. Regents of Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 666 (Cal. Ct. App. 2000).....................21

*People v. Parker*, 235 Cal. App. 2d 86, 92, 44 Cal. Rptr. 900 (Ct. App. 1965).............................21

*Phillips v. St. Mary Reg'l Med. Ctr.*, 96 Cal. App. 4th 218, 226, 116 Cal. Rptr. 2d 770, 775 (2002)......17

*Scott v. Phoenix Schools, Inc.*, 175 Cal.App.4th 702, 708-709 (2009)......................................17

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)...26

*Stevens v. Superior Court*, 16 Cal.4th 880, 889-90 (1997)...............................................17

*Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 176–77 (1980)..............................................17

*Tides v. Boeing Co.*, 644 F.3d 809, 814 (9th Cir. 2011..........................................18n.14

*Troyk v. Farmers Group, Inc.,* 171 Cal.App.4th 1305, 1352 (2009)........................................27

*U.S. Ecology, Inc. v. State of California*, 129 Cal.App.4th 887, 909 (2005)..................................27

*U.S. ex rel. Macias v. Pacific Health Corp.*, 2016 U.S. Dist. LEXIS 140760, at * 32 (C.D. Cal. Oct. 7, 2016...........................................................................................................27

*Van Arsdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009).................4n.6,18,18n.14,20, 21,25

*Vélez v. Thermo King,* 585 F.3d 441 (1st Cir. 2009)........................................................25

*Wiest v. Lynch*, 15 F. Supp. 3d 543, 558 (E.D. Pa. 2014).....................................................21

**Other Authorities**

CACI 2430....................................................................................................17

TABLE OF CONTENTS AND TABLE OF AUTHORITIES

EVANS LAW FIRM, INC.

## I. INTRODUCTION

Mauro Botta has over twenty years professional experience in auditing publicly held companies, thirteen of which were spent with PwC in the United States (2004-2017), where he rose to Senior Manager. Vol. 1, 96:22-99:4 (Mauro's tenure at PwC summarized). He was considered a good auditor who identified valid concerns and issues during the auditing process. *See* Appendix 5. Vol. 6,1028: 18 (Thorson testimony: "I think Mauro is a good auditor in a lot of cases"); 1142: 3 (Thorson: Mauro "had done a good job" on tough audits). Vol. 6, 1010:10 (Ozdemir Testimony: Mauro's "questions were valid"); Vol. 6, 1028:18; Vol. 7, 1291:3-4 ,1333:11-14 (Stig Haavardtun: "my main feedback was I liked the fact that Mr. Botta is asking a lot of questions"). Mauro spoke honestly, and bluntly and shared his insights with superiors. Vol. 2: 219:14-15 (Therapist Sarrett testimony: "[Mauro] values speaking bluntly and honestly"); Vol. 7, 1259:10-13 (Healy testimony: "when Mauro identified issues, he'd be the first person in my office to share insights on a whole host of matters to help me think about').

Ethics and honesty are important to Mauro. Appendix 5; Vol. 6 1165:24-1166:2 (Marco Botta Testimony that honesty and ethics are important to Mauro: Mauro prides himself as honest and ethical); Vol. 2: 219:14-15 (Therapist Sarrett testimony: "[Mauro] values speaking bluntly and honestly"); 2, 194: 16-18 (Therapist Sarrett's testimony that ethical concerns are important to Mauro).[1] As Kevin Healy testified, Mauro was open about his insights. Vol. 7, 1259:10-13. In keeping with his openness, Mauro never denied that he had suggested a control for Cavium. He avowed that it was his suggestion. Vol. 2, 7-8 (Mauro testified that he "explained" to Walter Brown[2] "the sequence of events…including the suggestion, the conversation with Tye…and the fact that the $10 million threshold was my suggestion"). But neither of the persons involved in determining and incorporating the control – Tye Thorson and Mauro – ever claimed Mauro "fabricated" a control. Vol. 9:1525:22 (Walter Brown

---

[1] Mr. Sarrett also testified that Mauro valued ethics "extremely" (Vol. 2, 190:24-25); that Mauro is devout and adheres strictly to his religious beliefs (Vol. 2, 191:18-11); that Mauro has "a very strong sense of right and wrong" (Vol. 2, 194:1-6); and that truth is "a primary motivation for him." (Vol. 2, 2, 194:6).

[2] Mr. Brown's testimony was not as definitive as his declaration dated January 31, 2019. During his testimony Mr. Brown could not recall what words Mauro had used (Vol. 9, 1501:18-23, 1523:2-8 and 1527:9-20), and acknowledged that he had the date the Cavium memorandum wrong. Vol. 9, 1537:7-25.

1

testimony that Mauro never used the word "fabricate" or said he lied); Vol. 6, 1106:25-1107:8 (Thorson testimony: "That was – that was not a fabrication.  That was a draft that I thought was a good number that we validated the next day with the CAO.")

Nevertheless, PwC transformed Mauro's control "suggestion"[3] into a "fabrication" or lie in order to fire him.  The fabrication or lie became a pretext that does not hold up.  *See* Appendix 4.  Mauro first introduced that idea of a control while working with his superior, PwC Partner Tye Thorson, on the Cavium engagement. Vol. 1069:20-23 (Thorson testimony $10 million control was "the number we put into the memo and that was based on, *from my perspective*, my best guestimate of what the CAO would look at").  Mr. Thorson adopted Mauro's suggestion and confirmed it with Cavium. Vol. 6, 1087:20-23 (Thorson testimony that he discussed implementation of the $10 million threshold the next day with Cavium CAO Suzy Seandel).

After Mauro filed an SEC complaint, PwC changed this narrative to make it look like the control was a "fabrication" by Mauro.[4]  PwC brought in outside counsel and created a sophisticated subterfuge for firing Mauro.  *See* Appendix 4.  The "fabrication" story required only a top executive's sign-off without speaking with Mauro or anyone involved in the Cavium engagement.  Vol. 9, 1599:12-13 (Mark Simon testimony: "I did not deem there was a need to."); *Id.* 1602:6 ("I did not speak to anyone.").  Mauro, who had seen his suggestion as a saving moment on a big engagement was instead branded as a liar and cheat.  He was never given the chance to explain himself again once PwC resolved on its pretext.  To protect their story, PwC did not even bother asking Mauro's own boss about what happened.  Vol. 6, 1123:12-14 (Tye Thorson has "no recollection" of anyone at PwC consulting him prior to August 2017 relating to firing Mauro). That was not accidental; PwC was not about to let any inconvenient truth (like that Mauro's boss had approved the control and the client had accepted and confirmed it) get in the

---

[3] Adopted by the Engagement Leader Thorson.  Vol. 6, 1069:20-23.

[4] The fact that Mauro may have posed the original control suggestion – or as Attorney Brown testified (Vol.1501:22) "created" it – does **not** mean it was fabricated, as untrue or a subterfuge.  Indeed, Mauro and Mr. Thorson both testified openly about how the idea of the control came up, and how it was discussed, approved, incorporated, and confirmed. Vol. 5, 829:7-11(Mauro's testimony); Vol. 1069:20-23 (Thorson testimony).  Whether the control was "created", suggested," "made" or even "fabricated" is semantics.  The reality is that Mauro was removed from the Cavium engagement by April 2015, and had no involvement with Cavium again. Vol.2 , 293:9-16 (Mauro testimony re removal from Cavium).

2

way of the party line. Partner/Cavium Engagement Leader Tye Thorson was not involved in the decision to terminate Mauro and to this day does not understand why Mauro was fired. Vol. 6, 1106:18-20; 1121:22-1122:3.

The pretextual firing was the last retaliatory act PwC took against Mauro after a history of his raising concerns internally about possible violations and standards, protected activity under both California and federal law. Cal. Labor Code §§ 98.6 and 1102.5(b); *Cardenas v. M. Fanaian D.D.S., Inc.*, 240 Cal.App.4th 1167, 1175 (2015) (Section 1102.5 claim stands on its own and does not require proof of a violation"); *Phillips v. St. Mary Reg'l Med. Ctr.*, 96 Cal. App. 4th 218, 226 (2002)(wrongful termination in violation of public policy);18 U.S.C. § 1514A (Sarbanes-Oxley);*Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 1001-1002 (9th Cir. 2009).

PwC relied on this pretext to get rid of Mauro despite the fact that Mauro's beliefs of possible accounting laws and standards were reasonable. *See* Appendix 2. Testimony demonstrated that the complex issues Mauro raised were up for different opinions, and called for individual judgment. For example, Defendant's expert Jason Flemmons testified that auditing standards "leave room for judgment and interpretation of indicators that can...create a range of judgments considering those factors." (Vol. 8, 1396:1-3). Moreover, Defendant's expert stated that the issues raised by Mauro on the Cavium audit were "complex" (Vol. 8, 1404:17-19). The issues Mauro raised often called for National Office consultation and "close call" procedures precisely because of their complexity. Vol. 8, 1406:16-18 (Defense Expert testimony: a close-call procedure used where "an assessment has been done and it's not entirely clear what the conclusion should be"). Mauro invariably raised difficult and complex issues where reasonable views could differ on how to resolve those issues. Stig Haavardtun, Partner on the Harmonic engagement, testified that "he liked the fact that Mr. Botta [asked] a lot of questions......good questions" (Vol. 7, 1291:3-8).[5]  When Mauro voiced his view (raising the issue for the first time by any auditor at PwC) that statistical analysis (sampling) was required on the Harmonic engagement, the

---

[5] Mr. Botta did raise a number of complaints over the years, but he had received high performance ratings (Tier 1 and 2) prior to 2017 (Tier 3). Vol. 5, 824:11-19. In the past whenever Mauro had tried to resign to go somewhere else, PwC talked him out of it to keep him at PwC. Vol 5, 957:1-5 (Traci Nelson testimony).

3

National Office agreed with him. Vol. 7, 1336:7-19 (Haavardtun testimony). Defendants did not show through expert or fact testimony that Mauro's beliefs were unreasonable.[6]

Because Mauro never hid anything and was quite open about the issues he uncovered, PwC knew he was engaged in protected activities and resorted to a pretext for firing him:

1. **PwC was aware of Mauro's protected activities (*see* Appendix 1).** After being retaliated against for *internal* protected activity[7], Mauro **told** his superiors he intended to raise his concerns with the SEC. (Vol. 3, 378:5-21 (Mauro told PwC Partner Carey he "would consider going to the SEC about it"); Vol. 5, 877:3-10 (Mauro told Human Resources Director he was "going external" about his concerns); Vol. 5, 863:19-20, 867:23-868:1 (Mauro made complaints to PwC Ethics Office regarding

---

[6] The fact that the SEC closed its file without enforcement action against PwC is not determinative on the question of Mauro's reasonable belief. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 1001-1002 (9th Cir. 2009). Significantly, the PCAOB (Public Company Accounting Oversight Board) opened its own investigation of Mauro's complaints following the SEC decision not to prosecute an enforcement action. Vol. 8, 1485:8-12 (Testimony of Walter Brown: "Q. And do you recall when the PCAOB opened an investigation into Mr. Botta's allegations? A.: My recollection is that it was sometime in 2018 after we had been notified by the SEC that it had closed its investigation.")).

[7] Including:
• Raising questions about control deficiencies at Cavium. (Thorson: Vol. 6, 1043:25-1044:2 ("Q. And it was reasonable to get to the bottom of [Cavium's] aggregation issue; right? A.: Yes, it was."))
• Raising concerns about transparency at Cavium (Vol. 6, 1026:8-10 (Thorson testimony: "Q.: In 2012…Mauro brought up issues relating to transparency at Cavium, did he not? A.: Yes.")
• Raising questions about Cavium's accounting treatment of a convertible security. (Vol. 6, 1027:3-5 Thorson Testimony that Mauro brought up "Xpliant" convertible securities issues).
• Raising questions about revenue recognition problems at Harmonic. (Haavardtun: Vol. 7, 1291:3-8, "[I] liked the fact that Mr. Botta [asked] a lot of questions……good questions").
• Raising questions about the competence of Cavium accounting officers. (Vol. 2, 241:22-242:6; 79:6-246:10; 83:20-24).
• Mauro was encouraged by Partner/Engagement Leader Thorson to put his concerns about Cavium's aggregate deficiencies in a memorandum. Vol. 6, 1031:14-16 (Thorson testimony).
• Raising questions of PwC independence in violation of PCAOB standards. (Vol. 6, 1122:4-6 (Thorson testimony: "Q. And you agree PwC's job is to remain independent of the companies they are auditing, right? A.: Absolutely."); Vol. 8, 1394:20 (Defendant's expert Jason Flemmons' testimony that maintaining independence is "certainly" a priority).
• Raising questions about internal control issues. Vol. 6, 1043:22-1044:2 (Thorson testimony: "Q.: And you agreed you needed to get to the bottom of this aggregation issue; right? A.: That's correct.")
• Identifying for his superiors the material weaknesses in Cavium audits. Vol. 6, 1032:18-20 (Thorson Testimony: "Q.: But just so we're clear, a material weakness can occur in the aggregate, right? A: Absolutely.").

4

PwC retaliation for raising concerns); Vol. 3, 408:20-409:5 (Mauro's lawyer sent PwC a letter about Mauro's concerns about retaliation for going to the SEC.  The law does not require that the individual who actually fired the employee be aware of the protected activity[8]; it is enough under *Leznik* that **a single person *in a supervisory role knows of or suspects the engaging in protected activity.***  Human Resources Director Traci Nelson testified that a number of partners and other PwC personnel in the San Jose Office and National Office were aware of Mauro's retaliation claims before August 2017. Vol. 5, 897:1-898:10 (Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]). PwC's Office of General Counsel was aware of Mauro's retaliation claims too.  Vol. 5, 899:13 (Nelson testimony: "yes, they may have been involved and that would be pretty typical").  Moreover, Mauro hired his own attorney, Jason Brown, who wrote to the Office of General Counsel of PwC on two occasions before Mauro was terminated. Mauro's attorney represented Mauro at both interviews conducted by Walter Brown and PwC's outside counsel. Vol. 9, 1504:20-22 (Walter Brown testimony:  "Q.: [You knew that you were not representing [Mauro] correct?  A.:  That's correct.").  The second letter Mauro's attorney sent to Mr. Brown (PX209) made reference to Mauro's reporting "unethical and illegal practices."  Vol. 9, 1508:6-7 (Walter Brown testimony).[9]  As Judge Seeborg noted in his June 27, 2019 denying PwC's motion for summary

---

[8] *Canupp v. Children's Receiving Home of Sacramento*, 181 F. Supp. 3d 767, 792 (E.D. Cal. 2016) (quoting *Ferretti v. Pfizer Inc.*, No. 11-CV-04486, 2013 WL 140088, at *10 (N.D. Cal. Jan. 10, 2013)("circumstantial facts" can show that "at least one person" involved in the employment decision knew that plaintiff had or might engage in protected activity ). "Once an employee's supervisor has actual knowledge of the protected activity, that knowledge is attributed to the ultimate decision-maker." *Leznik v. Nektar Therapeutics, Inc.*, ALJ Case No.2006–SOX–00094, 2007 WL 5596626, at *8 (Nov. 16, 2007)(citing *Deremer v. Gulf Coast*, ALJ Case No.2006–SOX–2 at 61–62 (June 29, 2007); *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1378 (N.D.Ga.2004)("**To permit an employer to simply bring in a manager to be the 'sole decision-maker' for the purpose of terminating a complainant would eviscerate the protection afforded to employees by Sarbanes–Oxley**."))(emphasis added).

[9] As Judge Seeborg noted in his June 27, 2019 denying PwC's motion for summary judgment, "PwC does not contend, nor could it, that its employees and attorneys involved in responding to the SEC inquiry would have lacked any basis to suspect Botta was the "whistleblower" who triggered the investigation." [Dkt.107]. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) cited by Judge Seeborg.

Case No.  3:18-cv-002615-AGT          PLAINTIFF'S POST-TRIAL BRIEF

judgment, "PwC does not contend, nor could it, that its employees and attorneys involved in responding to the SEC inquiry would have lacked any basis to suspect Botta was the "whistleblower" who triggered the investigation." [Dkt.107].

    2. **PwC used a pretext for firing Mauro.** Once PwC realized Mauro was a whistleblower, the firm created a pretext for firing him – that he told Walter Brown he fabricated a control. However, the Cavium Engagement Leader at PwC, Tye Thorson, testified there was no fabrication:

> Q. Let me ask you this: The $10 million threshold that was written in these various documents we've reviewed, that wasn't a fabrication, was it?
> MR. HUESTON: Objection. Vague and Argumentative.
> THE COURT: I'm going to allow it. Let's hear the answer.
> THE WITNESS: **That was – that was not a fabrication. That was a draft that I thought was a good number that we validated the next day with the CAO.** (Vol. 6, 1106:25-1107:8) (emphasis added).

PwC never spoke with Tye Thorson, Cavium's Engagement Leader Partner. (Vol. 6, 1123:12-14 (Tye Thorson has "no recollection" of anyone at PwC consulting him prior to August 2017 relating to firing Mauro); 6, 1124:8-11("no one asked for [Thorson's] opinion whether" Mauro should be terminated). Walter Brown testified that Mauro did not use the word "fabricate" and further that "[i]f the control actually existed, then it wouldn't have been created..." (Vol. 9 1525:22). Mauro testified that during the interviews of him he never said he fabricated a control or that he had lied. Vol. 5, 828:25-829:4.[10]

    Moreover, if Mauro had truly fabricated a control, there would have been an upheaval in the Cavium engagement and revised memoranda and reports to disclose any such fabrication. Tye Thorson testified that "If I knew something was fabricated...that would be unacceptable to me." Vol. 6, 1126:4-5. Cavium never filed an 8-K disclosing any fabrication or material falsity, which it would have done if a control had been fabricated to cover up a material weakness. Vol. 6, 1126:15-18 (Thorson testimony). There was no press release by Cavium or PwC relating to an unreliable audit opinion. Vol. 6:1126:19-23. Thorson, as the PwC Partner on the Cavium engagement, signed the firm's opinion letter giving Cavium permission to include the audit opinion in its financial statements. Vol. 6, 1129:18-19. There

---

[10] As Mauro testified: "I explained to [Walter Brown] the sequence of events....including the suggestion, the conversation with Tye over Sametime, and the fact that the $10 million threshold was my suggestion in – that I put in that proposed draft memo that needed to be discussed." Vol. 5, 829:7-11. Mr. Brown does not recall exactly what Mauro told him about Mauro's discussion with Thorson. Vol. 9, 1540:17-18.

6

was no corrective action required under "keeping current procedures" to correct what would have been a material falsity had any control been fabricated. Vol. 6, 1128-2-5 (Thorson testimony: "Q. And was there any keeping current procedure done with respect to falsities for the March 2nd, 2015 audit opinion that you signed? A.: Not that I'm aware of."). None of the steps that would have been required had the control been really fabricated were followed. The fact that there was no issued correction or other disclosure/corrective steps taken make it highly unlikely that any fabrication occurred. As the Defendant's expert testified, "The finding of a material weakness does require disclosure." Vol. 8, 1395:18-19. Mr. Simon even testified that PwC's investigation of the supposed fabrication never established whether a face control was actually created or not. (Vol. 9, 1576:1-3 ("**I think it was inconclusive. I think we were not able to conclude either way as to whether a fake control was actually created or not.**")(emphasis added)). *See* Appendix 4.

## II. LEGAL ARGUMENT

### A. DEFENDANT PRICEWATERHOUSECOOPERS LLP VIOLATED CALIFORNIA LABOR CODE SECTIONS 1102.5 & 98.6

*First,* Mauro demonstrated at trial that he had "reasonable cause" (California Labor Code Section 1102.5(b))[11], that there were potential legal and accounting regulation violations going on at PwC:

- **In the Cavium and Harmonic engagements**. (Vol. 7, 1291:3-4 (Stig Haavardtun: "my main feedback was I liked the fact that Mr. Botta is asking a lot of questions"); Vol. 1, p. 121:2-11("Because in each of those categories [deficiencies in Cavium audit] we were talking about amounts that were above our materiality."); Vol. 2, 253:19-22 ("Because based on my professional opinion as I articulated in that memorandum, there was significant concerns but as I mentioned individually or in the aggregate that a reasonable auditor could have concluded [a material weakness] was a possibility."); Vol. 5, 965:5-7 (Gupta Testimony :Mauro raised the phishing scam, deficiencies and complaints about the Cavium audit); Vol. 6, 1010:10 (Ozdemir Testimony: "[Mauro's] questions were valid.')

- **Earlier Cavium audits.** (Vol 1., 156:8-12 ("Q: In February of 2015, looking back on all these internal control issues…were you concerned that these issues in the aggregate amounted to a material weakness? A: Yes."). Importantly, he shared those concerns with Tye Thorson, the Engagement Leader. (Vol. 1, 156:13-14).

- **Competency concerns**. "One was on competence of the Finance Department given the occurrence of a lack of technical ability to identify unusual transaction," or "there was a material weakness in the aggregation of the company controller given that [during the 2014

---

[11] And/or a "reasonable belief" under Sarbanes-Oxley, 18 U.S.C. §1514A. *See* Appendix 2.

audit] we had issues in all of her areas." (Vol 1., 156:16-23); Mauro further was concerned that "given the events that occurred in our audit findings in 2014, my personal opinion, professional opinion, was that there was a material weakness on the Cavium's internal controls with two possible root causes: Competence in the Finance Department or in the aggregate in the person of the company's controller." *Id.* Mauro held these beliefs based off the phishing scam, the evaluation of controls, various meetings he had with Cavium's Chief Accounting Officer, questionable filings of a form 10-Q, repeated failure on Cavium's part to spot and evaluation issues in transactions that were unusual, Cavium not understanding the implications of an agreement with X-pliant, among other reasons outlined in his TCR form. (Vol. 2, 241:22-242:6; 79:6-246:10; 83:20-24).

- Subjectively, Mauro believed it was reasonable for PwC to evaluate competency questions from prior years. ("*If you question the competence of the person that is there in 2014 but was also there in prior years, we would have been asked the question: Why wasn't there an issue in prior years? Because competency is not something that you turn on or off like a switch. So if there was a concern that I believed there was in 2014, I believe we needed also to address how did we dealt with that and how did we dealt with issues that existed in prior years. Context to me was very important to be clear on this.*" [Vol. 2, 78:9-17]).

- **Material weaknesses.** Defendant's expert Jason Flemmons testified that there are no "bright lines" in judgments on material weaknesses and that there is "certainly a range of professional conclusions" on the issue of what is a material weakness.  (Vol. 8, 1395:13). Mauro had several internal discussions regarding his concerns with other PwC employees. (Vol. 1, 156:13-14 ("We had several conversations throughout the audit…and I was advocating to Mr. Thorson that I believed the company had a material weakness of two possibilities.").

- **Concerns about lack of independence**. Mauro's belief regarding Defendant's lack of independence in conduct of its audit engagements was reasonable given that he had personally been removed from two audits, at the client's request, after raising concerns. (Vol. 2, 293:9-10 (removed from Cavium engagement); 2, 294:15-17(told he "was being rolled off at the CFO request"); Vol. 2, 295:17-19 (Thorson told Cavium Mauro "wanted to give them a material weakness"); Vol. No. 2 293:11-13 ("I was kicked out after the first quarter of 2015, the first quarterly review.");; Vol. 2, 332:15-16 ("I was kicked out immediately after year-end" on Harmonic engagement). Indeed, these acts of retaliation confirmed for Mauro that there was a real lack of independence that need to be reviewed by SEC, and became a part of his submission.  *See* JX10.

- Mauro actually raised his concerns relating to a material weakness at Cavium internally prior to reporting to the SEC. (*see* JX10). In the record before the Court, no one at PwC responded to Mauro that his views were unreasonable at the time he raised them internally.

- Subjectively, Mauro believed the issues he raised in his TCR Report (*see* JX4) were reasonable based on his first-hand experience working on the Cavium and Harmonic audits, as well as other audits he had worked on directly over his 18 years at Defendant. (Vol. 3, 401:1-3("[these were] issues that I had raised as part of my experience; and in my

8

professional opinion given the context that occurred, it was a reasonable conclusion by me");
JX10, outlining all of Mauro's direct and indirect experience).

- Mauro believes, to this day, that Defendant violated its independence obligations. (Vol.2,
  296:23-25 ("I believe it was improper for letting a company determine who should be on the
  audit team that audits them. To me, it does not seem to be very independent.") Vol. 5, 827:7-
  9 ("Q.: Mr. Botta, sitting here today do you feel that PwC violated its independence
  obligations? A.: Yes.").

- Mauro believed Defendant's integrity was at risk. (Vol. 2, 259:14-21 (Q. Why did you feel
  PwC's integrity may have been at risk? A. I believe that if the conclusion would have been
  that we had a material weakness in 2014, for those reasons I believe…we needed to address
  questions that we could have been asked by an inspector: How did we conclude and what
  work did we do in prior years.").

- Mauro's concerns relating to independence were reasonable in that, Stig Haavardtun (partner
  on the Harmonic engagement) told Mauro that Defendant could not issue a material
  weakness on Harmonic because, if they did, Defendant would not be "market competitive."
  (Vol. 2, 238:5-25). Mauro's superior did not challenge the reasonableness of the concern,
  only its business implications. Mauro was reasonable in being more concerned about the
  quality of the Harmonic audit than staying "market competitive." (*Id.*).

- Over the course of Mauro's almost 20-year career as an auditor, he formed a reasonable
  belief regarding what was and was not a material weakness. Vol. 1.,. 121:2-11 ("Because in
  each of those categories [costs, receivables] we were talking about amounts that were above
  our materiality…Materiality is a notion that, as an auditor, you must establish. It drives the
  scope of your audit. And there is a framework to assess that that can be either quantitative, if
  it's a straightforward type of an analysis, or it can require complex judgment and
  consultation within our firm."); Vol. 6, 1010:10 (Ozdemir Testimony: Mauro's "questions
  were valid"). PwC Partner Kevin Healy testified that "There's no black-and white conclusion
  on material weaknesses. A lot of professional judgment in reaching that answer." Vol. 7,
  1266:4-6.

- Mauro was considered by PwC Partners to be a "good auditor." (Vol. 6, 1028:18; Vol.
  7:1224:21). He was told by PwC partners to continue to raise questions. (Vol. 7, 1333:11-
  14). Partner Kevin Healy staffed Mauro on a project that was "highly complex with
  numerous adjustments, material weaknesses, and technical matters." Vol. 7, 1265:1-9.

- Mauro's superior asked him to summarize the "complex" concerns he had in a memo. (Vol.
  6, 1030:15-16). As soon as Mauro presented his concerns regarding deficiencies in the
  Cavium engagement, local PwC partners forwarded those concerns to the National Office for
  consideration. (Vol. 6, 1048:17). Mauro's immediate superior on the engagement, Partner
  Tye Thorson, agreed with some of the statements in Mauro's memo of concerns (which
  Mauro repeated when he submitted his TCR to the SEC. Vol. 6, 1049:20-21. (Thorson: "I
  agreed with some of the statements in Mauro's document, that's correct.").

9

- Mauro's superiors had multiple communications about his concerns.  (Vol. 6, 1053:19-22. (Thorson: "Q.: After the consultation begins, you have multiple communications with folks in PwC's National office regarding these aggregate control deficiencies, right? A: Yes.")). Partner Kevin Healy testified that even where local partners disagreed with Mauro a national consultation was appropriate to "get the answer right." Vol. 7, 1206:16-17.

- Defendant's expert testified that independence of auditors, Mauro's concern reported to the SEC, is a priority. Vol. 8, 1394:3-4 (Defendant's expert testifies that auditor independence is required by the SEC and PCAOB); 1394:20 (Defendant's expert testimony that maintaining independence is "certainly" a priority); Vol. 6, 1122:4-6 (Thorson testimony: "Q. And you agree PwC's job is to remain independent of the companies they are auditing, right?  A.: Absolutely."). According to Defendant's expert, the independent judgment of an auditor is " a central part of what an auditor does throughout an audit."  Vol. 8, 1394:25-1395:1 (Flemmons' testimony).

- Mauro was removed from two audits after raising issues relating to the very audits he was removed from at the companies' request. Thus, **it is objectively reasonable for an employee, who has been kicked off *two* audits immediately after raising concerns relating to a material weakness, to believe Defendant may lack independence when conducting their audits.** (*See* Vol. 2, 293:9-10; 294:15-17). This is particularly reasonable when assessing Mauro's beliefs regarding the Cavium audit in that Defendant's partner informed Cavium that Plaintiff wanted to issue a material weakness against them and then, was removed from the audit. (Vol. 2 295:17-19; 293:11-13). Thereafter, Mauro was removed from the Cavium engagement. (Vol. 2, 293:9-10). Mauro was the only senior manager removed from Cavium. (Vol. 6, 1125:10-14). Mauro's objectively reasonable beliefs were further shaped after being removed from the Harmonic audit. (Vol. 2, 332:15-16 ["I was kicked out immediately after year-end."]). Mauro was kicked off Harmonic immediately after year-end, and conspicuously after Harmonic had filed their 10-K for the year. (Vol. 2, 332:14-24). It was further objectively reasonable for Mauro to question Defendant's independence when he was told, directly, that because of Harmonic's complaints, Mauro was being kicked off the job. (Vol. 2, 333-10-14). Comparatively, no one else was removed from the Harmonic audit, just Mauro. (Vol. 2, 333:22-23). Because Mauro raised concerns relating to both audits, because he was the only manager or senior manager removed from those audits, and because both removals were at the request of the companies, Mauro—as an objectively reasonable person—began to believe Defendant may lack independence in their audits. Any objectively reasonable person could form a good faith belief that Defendant were not adhering to their independence obligations.

- Mauro's specific complaints regarding both Cavium and Harmonic were based on objectively reasonable grounds in that **a material weakness can occur in the aggregate**. (Vol. 6, 1032:18-20 (Thorson Testimony: "Q.: But just so we're clear, a material weakness can occur in the aggregate, right? A: Absolutely."); Vol. 2, 243:11-24 ("So if you have, for example, 10 controls that failed, you could consider those as 10 separate deficiencies; but if you need – you need to understand what is the root cause, what lead those 10 controls to fail. And once you understand that, if there is a common cause for some or all of those controls to

10

fail, then you need to evaluate the severity of those failures in the aggregate combining them all together.")). In fact, Defendant is responsible for determining if an aggregate deficiency amounts to a material weakness. (Vol. 6, 1032:4-9 (Thorson agrees that "if there is an aggregate control deficiency, your job as an auditor would be to determine if these aggregate deficiencies created a "material weakness".)). Thus, it is more than reasonable for Mauro to do his job and determined if an aggregate deficiency amounts to a material weakness.

- Defendant evaluated Mauro's concerns relating to Cavium under their "close call" policy suggesting Mauro's concerns were objectively reasonable. (JX17; Vol 6., 1049:24-1051:17(discussion of close call procedures applied after Mauro's Cavium memo); 6, 1057:10-21(close call requirements are a PwC rule)).

- The Engagement Partner on the Cavium audit agreed that Defendant needed to get to the bottom of internal control issues Mauro raised and it was reasonable to get to the bottom of those issues. (Vol. 6, 1043:22-1044:2 ("Q.: And you agreed you needed to get to the bottom of this aggregation issue; right? A.: That's correct.")) The Engagement Partner on the Cavium audit agreed with some of the issues Mauro brought up internally. (Vol 6., 1049:17-21(Thorson: "I agreed with some of the statements in Mauro's document, that's correct.")).

- The fact that the SEC actually investigated Mauro's TCR, including by propounding six single-spaced pages of document requests on Defendant (in response to which PwC produced over 200,000 documents), and conducting interviews is, in and of itself, proof of an objectively reasonable complaint. (i.e., *if Mauro's concerns were so unreasonable, why would the SEC bother to investigate?*) (*see* Vol. 3, 401:9-13; 402:17-404:17, SEC interviewing Mauro regarding Cavium and Harmonic).

Defendant did not present clear and convincing evidence under Cal. Labor Code §1102.6 (and never raised as a separate affirmative defense in pleadings [Dkt. 73][12]) that Mauro's beliefs were unreasonable.   Indeed, Defendant retained its expert Jason Flemmons to only review five discreet subjects related to **PwC's** Conduct and issue two opinions based on those subjects. Vol. 7, 1353:14-21 ((1) "an assessment and audit of Cavium's internal controls and that their conclusion that no material weaknesses existed was reasonable in connection with their December 31, 2014, audit" and (2) that sharing an accounting memorandum "is not a violation of professional auditing standards."). The subject

---

[12] Plaintiff requests that the Court take judicial notice of Defendant's Answer dated November 12, 2018 [Dkt. 73].   Under Federal Rule of Evidence 201 it is proper for the court to take judicial notice of court records, including pleadings. Fed. R. Evid. 201(c)(2)(a court "must take judicial notice if a party requests it and the court is supplied with the necessary information").   Judicially noticed facts include matters of public record such as pleadings and other court documents. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir. 1988) (judicial notice of court proceedings).

11

areas reviewed and these two opinions are irrelevant to Mauro's retaliation claims – they do not address

the reasonable of *Mauro's* views (the basis of his protected activity) of the underlying conduct of the

audits.  The question in this case is whether or not Mauro acted based on a reasonable belief of

violations not – at the end of the day – whether PwC's assessment was valid..Mr. Flemmons even

testified that the issues Mauro identified left room for judgment calls.  That is, were susceptible to

equally reasonable, though differing, opinions. Significantly, Mr. Flemmons stated that auditing

standards "leave room for judgment and interpretation of indicators that can…create a range of

judgments considering those factors."  (Vol. 8, 1396:1-3).  Moreover, Defendant's expert stated that the

issues raised by Mauro on the Cavium audit were "complex" (Vol. 8, 1404:17-19). Stig Haavardtun,

Partner on the Harmonic engagement, testified that "he liked the fact that Mr. Botta [asked] a lot of

questions……good questions" (Vol. 7, 1291:3-8).13  When Mauro voiced his view (raising the issue for

the first time by any auditor at PwC) that statistical analysis (sampling) was required on the Harmonic

engagement, the National Office agreed with him. Vol. 7, 1336:7-19 (Haavardtun testimony).

Defendants did not show though expert or fact testimony that Mauro's beliefs were unreasonable.

   ***Second***, Defendant knew or suspected that Plaintiff had "or may" (Cal. Labor Code § 1102.5(b))

disclose information to the SEC, a "law enforcement agency" under Cal. Labor Code § 1102.5(b):

- **Mauro told Defendant's partners he was going to blow the whistle to the SEC.** (Vol. 3, 378:5-21("I told [Partner Tim Carey] that I would have considered to go to the SEC about it.")). *See* Appendix 1.

- Mauro told Defendant's Human Resource he was going "**external**" and that he was getting a "**lawyer**." (Vol. 5, 877:3-10). *See* Appendix 1.

- Mauro's whistleblower TCR to the SEC discussed Cavium extensively. (Vol. 3, 400:8-9("Q.: Did you discuss Cavium in this TCR?  A.: Yes."); JX4).

---

13 Mr. Botta did raise a number of complaints over the years, but he had received high performance ratings (Tier 1 and 2) prior to 2017 (Tier 3). Vol. 5, 824:11-19. In the past whenever Mauro had tried to resign to go somewhere else, PwC talked him out of it to keep him at PwC.  Vol 5, 957:1-5 (Traci Nelson testimony).

12

- The SEC notifies Defendant *only* that they are seeking documents from Cavium 2013 and 2014 audit. ("… the [SEC] preservation notice was in relation to Cavium and particularly the years of '13 and '14; and to me it was—as soon as I got that, I realize that essentially the SEC kind of ousted my identity to PwC because it was obvious. [Vol. 3, 408:6-9]). As part of his normal investigation process, Mr. Brown would have asked Mauro if there were other audits he wished to discuss but he did not "remember doing that, but it would have been my practice to do that."  Vol. 9, 1522:3-16. *See* Appendix 1.

- The SEC sought information from the exact audits that Mauro complained about his in "PB," memorandum. (JX 10, see JX10-5 "2013" and JX-6 "2014"; Vol. 3, 408:10-13).

- Mauro brought up repeated issues on the Cavium audit as far back as 2012. (Vol. 6, 1025:25-1026:2, 1026:11-17 (Thorson: "Q.: In 2012…Mauro brought up issues relating to transparency at Cavium, did he not?  A.: Yes."). *See* Appendix 1.

- Mauro was the **only employee** in 2013 to raise concerns relating to convertible securities at Cavium. (Vol. 6, 1028:25-1029:4 (Thorson: Q.: So within that same time frame we just discussed, really, Mauro was the only team member talking to you about the convertible securities issue at Cavium, right?  A.:  Right."); Vol. 1, 126:7-127:2 ("The fourth quarter of 2013 was another of those episodes that I recall."). *See* Appendix 1.

- Mauro was the **only employee** to raise concerns that led to a National Consultation on the Cavium audit. (Vol. 6, 1029:3-4 (Thorson: "Q.  Mauro was the only team member talking to you about the convertible securities issues at Cavium, right?  A.:  Right.")).

- Mauro was the **only senior manager or manager** between 2012 and 2017 removed from the Cavium audit. (Vol. 6, 1125:12-14(Thorson: "In 2012 through 2015 Mauro was the only …senior manager removed.").

- Defendant's partners were all well aware about Mauro's internal complaints and told Mauro his internal complaints were "rare" and that he was "putting the firm as risk" by raising internal complaints. (Vol. 2, 251:19 ("He [Partner Robert Heatley] told me that he saw the document that I sent to Tye, that it was **a big deal** what I wrote, and that I was putting the firm at risk…"); Vol. 2. 253:6 ("He told me that it was rare…")).

- The SEC sought information from Cavium's 2013 and 2014 audit, the same audits which were evaluated under a National Consultation that came about as a result of Mauro's internal complaint in JX10. (Vol 2., 258: 9-13("Q.: So that question was about 2012, but was the process you just described that you had to go through the same for 2013 on the Cavium audit?  A.:  Yes.  Q.: Was it the same for 2014?  A.:  Yes.")).

- When Mauro was "interviewed" by several PwC employees and outside counsel (*see* Vol. 3, 410:5-8 "There were several people there.  Mari Mazour was there.  Anna-Marie Vitale was there, Walter Brown from Orrick, Paul Rugani from Orrick, and I think there was also

13

someone taking notes."), with Mauro's whistle blower attorney present (*Id.,* 410:9-10("Q.: And was your attorney at that meeting? A.: Yes.")), Mauro was asked about his "PB" memo (JX10) at the first interview. He was asked to go through it and "recall [his] opinions about it." (Vol. 3, 415:2-4). Mauro was asked about his communication with Tye Thorson about the Cavium audit. (Vol. 3, 435:15-17("Q.: Did he ask you about the communications you had with Tye Thorson about Cavium? A.: Yes.")). Defendant asked Mauro about the internal controls at Cavium. (Vol. 3, 436:8-10). Defendant asked Mauro about his suggestions regarding the internal controls at Cavium. (Vol. 3, 436:11-13). *See* Appendix 1.

- Plaintiff retained Jason T. Brown as his attorney, **who is a whistleblower attorney**, and whose website reads "Whistleblower attorney." (Vol. 3, 406:21-407:2). *See* Appendix 1.

- On June 9, 2017, Mauro's whistleblower attorney reached out to Defendant. (JX6, Vol. 3, 407:8-12). Mauro's whistleblower attorney attended the first meeting to discuss Cavium with Defendant. (Vol. 3, 407:8-12). Walter Brown testified that Mauro's computer was imaged at this time as well.  Vol. 9, 1474:25-1475:1.

- In July of 2017, Mauro's whistleblower attorney made Defendant aware that Mauro was **fearful of retaliation by Defendant**. (Vol. 3, 408:20-409:5).

- Mauro made numerous complaints to Defendant's Ethics Office relating in complaints of retaliation at PwC. (Vol. 2, 335:20-10).

- When Mauro was terminated, he had an open ethics investigation pending. (Vol. 3, 440:1-3).

***Third***, Defendant "retaliated" against Mauro within the meaning of Cal. Labor Code §§ 98.6 and 1102.5 by the following specific acts which ultimately resulted in his termination:

- On August 17, 2017, Defendant terminated Mauro's employment. (Undisputed/Stipulated Fact No. 3 in Joint Pre-Trial Statement and Order [Dkt. 141])

- Defendant kicked Mauro off Harmonic audit. (Vol. 2, 332:14-24).

- Defendant kicked Mauro off the Cavium audit. (Vol. 2, 293:9-10).

- Defendant dropped Mauro's rating (Vol. 5, 824:11-19) and began to under-utilize Mauro and Mauro's utilization rate began to plummet. (Vol. 3, 388:10-15("Q.: So in, let's say, October of 2016, were you being fully utilized at PwC? A.: No."); Nelson Testimony: Vol.875:12 (Mauro brought up his low utilization rate).

- Defendant did not staff Mauro on PacificBio Science, Inc. despite the fact that Mauro pitched the job and brought in the business to Defendant. (Vol. 3, 385:8-15; 386:2-7("Q.: Were you included on the PacBio advisory engagement? A.: I was not.")).

- Defendant removed Mauro from the Gigamon audit. (Vol. 3, 396:13-16 (removed at the end of the 2016 audit)).

14

- PwC has retaliated against Mauro following his termination as well. Vol. 3, 443:14-20, 444:1-7, 444:21-25, 445:1-5, 445:18-20, 446:2-6, 458: 10-12 and  458:20-459:5

**Fourth**, evidence presented at trial demonstrated PwC retaliated against Mauro because he had "or may" disclose information to the SEC.  Plaintiff established the following retaliatory acts:

**Removal from the Cavium Audit**. Defendant kicking Mauro off the Cavium audit at the request of the client. (Vol. 2, 293:9-10). After the National Consultation on Cavium, Mauro was kicked off the Cavium audit. (Vol. 6 1120, 14-25). Without the Engagement Leader's (Thorson) involvement, Mauro was removed because Cavium requested it. (Vol. 6, 1121:1-4). To this day Mr. Thorson does not understand why Mauro was fired.  Vol. 6, 1106:18-20; 1121:22-1122:3.

**Removal from the Harmonic Engagement**. Mauro saw many issues on the Harmonic engagement, including questionable ethical practices. (Vol. 2, 318:10-21). Mauro brought issue up to Defendant's partners on the Harmonic audit. (Vol. 2, 319:10-14). Employees at Harmonic began complaining about Mauro. (Vol. 2, 312:23-313:5; DX1217).  Mauro was not violating any ethics standards when working on the Harmonic audit. (Vol. 2, 316:3-11).  Mauro was discouraged from bringing up auditing issues by Defendant's partners. (*see* Mauro being told: "I needed to be careful because there **were important clients of the firm sitting on the board of Harmonic and he mentioned Wells Fargo.**" [Vol. 2, 311:6-22]).  Defendant kicking Mauro off the Harmonic audit as a direct result of Harmonic complaining about him. (Vol. 2, 332:14-24). These complaints were unfounded, as Plaintiff's own team members thought Mauro was professional. (Vol. 6, 1010:2-10; 1011:8-14). Comparatively, no one else was removed from the Harmonic audit, just Mauro. (Vol. 2, 333:22-23). This is telling, as Harmonic complained about other employees but Mauro was the only employee removed.

15

**Threats, Blacklisting and Underutilization.**  Mauro made internal complaints relating to being removed from the Cavium and Harmonic audits. ("I told [a partner at Defendant's] that I felt that this was the continuation of what happened at Cavium and Harmonic, based also on the conversation that I had with Tim in May that he told me that I was hard to staff; and I told him that I felt I was being blacklisted from work, including the one that I was bringing in myself. [Vol. 3, 389:4-9]).  After being removed from the Harmonic audit, Plaintiff's utilization rate began to drop. (Vol. 3, 397:11-20; *see* PX 178, PX 179, PX 180).  Mauro was threatened for complaining about retaliation. (*See* Mauro's conversation with Defendant's partner: "And Tim said that I should have stopped spreading this negative narrative. He told me because my utilization was low, **it would have been easy to fire me and my concerns of blacklisting were bullshit**, I quote, and that at some point I should have started to trust them. I needed to start to trust them. [Vol. 3, 390: 18-23]).  After being removed from Cavium, Mauro's utilization rate dropped. (Vol. 3, 397:4-10; *see* PX 178, PX 179, PX 180; Vol. 3, 398:22-399:8).

**Removal from Gigamon.**  After raising similar issues while working on Gigamon, including finding two material weakness communicated to the company based on their revenue and investor, Defendant removed Plaintiff from the Gigamon audit. (Vol. 3, 393:18-22; 396:13-16).  In contrast, Mauro was staffed on the Zhone engagement (Healy testimony: Vol. 7, 1242:24) and not removed, even though PwC issued three material weaknesses there. (Healy testimony: Vol. 7, 1246:23). The difference is that Zhone did not complain about Mauro's questions. (Healy testimony: Vol. 7, 1251:10-11). The pattern is that Mauro is removed when a client complains.  That in itself demonstrates Mauro's concerns about PwC's independence were reasonable.

**Refusal to Staff Mauro on PacificBio Science**. Despite being underutilized, Defendant refused to staff Mauro on PacificBio Science ("PacBio"). (Vol. 3, 385:8-15; 386:2-7). Mauro complained to Nelson for not being put on PacBio (Vol. 3 387:3-388:9). Defendant refused to staff Mauro on PacBio

16

despite the fact that Mauro pitched the job and brought in the business to Defendant. (Vol. 3, 385:8-15; 386:2-7).

## B. DEFENDANT PRICEWATERHOUSECOOPERS LLP WRONGFULLY TERMINATED MAURO IN VIOLATION OF PUBLIC POLICY

"To support a wrongful discharge claim, the policy must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) substantial and fundamental." *Phillips v. St. Mary Reg'l Med. Ctr.*, 96 Cal. App. 4th 218, 226, 116 Cal. Rptr. 2d 770, 775 (2002). (See Generally *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 666, 254 (1988); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 176–77 (1980); *Dauth v. Convenience Retailers, LLC,* No. C 13-00047 MEJ, 2013 WL 5340396, at \*3 (N.D. Cal. Sept. 24, 2013).

Plaintiff hereby incorporates all the above-mentioned adverse employment actions and articulated policies relating to auditing standards governing Defendant's auditing practices. The auditing standards and investor/public protections enacted under Sarbanes-Oxley and the standards promulgated by the PCAOB created under the act serve an essential public purpose set forth in Section 101 of the Sarbanes-Oxley Act: "to protect the interests of investors and further the public interest in the preparation of **informative, accurate, and independent audit reports** for companies the securities of which are sold to, and held by and for, public investors." 15 U.S.C. § 7211(emphasis added). Mauro's concerns, first raised internally and then to the SEC when Defendant failed to take what Mauro reasonably believed was appropriate action were in furtherance of the public interest in "informative, accurate, and independent audit reports."  Serving the public interest is a "public policy" recognized by California courts in common law causes of action for wrongful termination in violation of public policy. *Stevens v. Superior Court*, 16 Cal.4th 880, 889-90 (1997) a policy is a "public policy" when it 'inures to the benefit of the public' rather than serving merely the interests of an individual); *Scott v. Phoenix Schools, Inc.*, 175 Cal.App.4th 702, 708-709 (2009) ("public policy" is at stake when the regulation at issue "enunciates a fundamental" public interest); CACI 2430.

---

17

## C. DEFENDANT PRICEWATERHOUSECOOPERS LLP VIOLATED THE SARBANES-OXLEY ACT BY TERMINATING PLAINTIFF'S EMPLOYMENT FOR ENGAGING IN PROTECTED ACTIVITY.[14]

*First*, Plaintiff engaged in protected activity:

It is an undisputed, stipulated fact that Plaintiff filed a confidential Tip, Complaint, or Referral ("TCR") with the United States Securities and Exchange Commission ("SEC Complaint"). *See* Undisputed/Stipulated Fact No. 7 in Joint Pre-Trial Statement and Order (Dkt. 141); "Toward the end of 2016 I submitted – I had a call with the SEC; and after the call, I submitted a [Tips, Complaints, and Referrals] form to the SEC." (Trail Transcript Volume 3., 34:12-13) (*See also* JX 4, Plaintiff's whistleblower tip to the SEC). Mauro therefore provided information to "a Federal regulatory or law enforcement agency," within the meaning of protected activities under Sarbanes-Oxley. 18 U.S.C. § 1514A(a)(1)(A). Defendant is a duly registered public accounting firm. (Undisputed/Stipulated Fact No. 4 in Joint Pre-Trial Statement and Order [Dkt. 141]). Mauro, as well as all other auditors who work for Defendant, are obligated to perform their auditing duties independently. (Vol. 2, 297:2-5). The Sarbanes-Oxley Act, among other investor protections, created the Public Company Accounting

---

[14] *Tides v. Boeing Co.*, 644 F.3d 809, 814 (9th Cir. 2011)("To make out a prima facie case, the plaintiff must show that: (1) he engaged in protected activity or conduct; (2) his employer knew or suspected, actively or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise an inference that the protected activity was a contributing factor in the unfavorable action. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009)."). Much of the evidence introduced by PwC in defense on these elements (**personal chats, journals, earlier drafts of documents such as "history of events"**) should not be considered because PwC failed to raise affirmative defenses that Mauro provided information to the SEC (Stipulated), that Mauro's beliefs were unreasonable, that the concerns he raised with the SEC were "definitively and specifically" related to the violations reportable under Sarbanes-Oxley, that Mauro's actions constituted protected activity, that he was terminated (Stipulated), and that he was harmed by the termination. Failure to raise these affirmative defenses at the pleading stages, bars PwC from presenting evidence with respect to those defenses at trial. *Matrix International Textile, Inc. v. Monopoly Textile, Inc.*, 2017 U.S. Dist. LEXIS 169462, at *6 (C.D. Cal. May 12, 2017) (excluding evidence for an affirmative defense ("unclean hands") where the affirmative defense was not plead by defendant); *McCoy v. Kazi*, 2010 U.S. Dist. LEXIS 150679, at *48 (C.D. Cal. Aug. 27, 2010) (Court struck evidence related to affirmative defense not raised in defendant's pleadings).

18

1   Oversight Board (PCAOB).  The PCAOB issues auditing standards and oversees the quality of public

2   company audits conducted by firms such as Defendant. (Vol. 1, 103:12-16). The law does not require

3   Mauro to have alleged a specific securities law violation. *Van Arsdale v. Int'l Game Technology*, 577

4   F.3d 989, 997 (9th Cir. 2009), *citing with approval Welch v. Chao*, 536 F.3d 269, 276 (4th Cir.

5   2008)("[a]n employee need not cite a code section he believes was violated" to trigger the protections of

6   § 1514A); *Erhart v. BofI Holding, Inc.,* 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017) ("[t]he plaintiff,

7   therefore, 'can have an objectively reasonable belief of a violation' even if the plaintiff 'fails to allege,

8   prove, or approximate specific elements of fraud, which would be required under a fraud claim against

9   the defrauder directly'").

10         Mauro's complaint to the SEC fell within the violations covered by Sarbanes-Oxley, 18 U.S.C. §

11   1514A(a)(1), because he cited to specific instances of Defendant's subversion or variances from

12   SEC/PCAOB auditing standards which resulted in inaccurate or misleading information being released

13   to the public. When blowing the whistle to the SEC, Mauro's concerns were expressly aimed at

14   Defendant's auditing practice for publicly traded companies:

15   - **"I deem that the auditing function in [Silicon Valley], due to the general low level of competence** of finance departments (even when composed by early hired ex big-4) **has turned into a factual**
16   **advisory position where independence is subordinated to maintain revenue and management happy to avoid to raise too many issues on the control side[.]"** (*see* JX 4-10
17   [emphasis added]);

18   - "[T]he numbers are being corrected, but **the public is deprived of an objective control opinion** on the competence and quality of the accounting department of those companies that we are
19   required to evaluate." (*Id.*).

20   - "I do not believe the role of an auditor is to act as defense attorney of management nor to find in every way possible how to avoid to issue them a material weakness, but simply to apply the rules
21   that we are required to operate in maintaining its independence." (*Id.*).

22   - "...risk of **collusion between auditors and management** in this valley, aimed to maintain a successful relationship based on a simple exchange, with management paying us the fees and
23   auditors picking and choosing what to call an audit issue to avoid to upset the very same
24   management that we are supposed to audit by issuing harsher control opinions, knowing that

19

Silicon Valley is an extremely closed valley where most finance personnel tends to move around frequently among companies. (JX 4-10) [emphasis added];

Mauro based his concerns on what he witnessed firsthand while working for Defendant. (*See* JX4-6). Mauro's concerns included Defendant's audit of Cavium and Harmonic, both publicly traded companies, and Defendant's removal Mauro from both audits to appease the client companies:

- "When I raised my concerns advocating the Company had a pervasive [Material Weakness] due to lack of competence and number of resources and the fact we had audit findings in virtually every area of the financials, I was given the market competitive rationale […] the [Engagement Leader] only stated that his predecessor partner thought this CAO was one of the best. I also warned the [Quality Review Partner] that he was not fulfilling his role as quality review partner, to which I was told by him that *"yes I've been given this feedback before but when I see a fellow partner in difficulty, I tend to side with him"."* (JX4-14).

- "As a result of the questions and the audit, I compiled the above document and conveyed my concern to my office leadership that the [Engagement Leader] was not qualified to remain on that engagement, and the firm decision was to remove me from the engagement, leaving the rest of the team on the job, despite that that is the same team that missed every item in the 2014 audit. Furthermore, negative evaluation on "relationship" was issued in my file and I was not allowed to be on other audit jobs (except Gigamon) from March 2016 until now." (JX 4-14).

- "The fact that in my last engagements **I raised significant number of issues and I was removed from those jobs**, while no repercussion on the teams that missed the issues before me was done, and that leadership refused to look for instance to 2014 work paper of Harmonic despite the concern the audit was non GAAS, raised the concern that there is not a willingness to try to change a system that has developed and has impacted our profession in this office." (emphasis added).

Mauro further reported to the SEC that due to Defendant's lack of independence in auditing the companies at issue, he was concerned that material weakness were continuing:

"The Company is now going through an acquisition in 2016, and based on my experience in the years I was there, given there has been no turnover nor additions to management, especially on the area of review controls, where we wrote most of the documentation despite all the evidence that existed was just a signature, I'd like to highlight the concern of competence in dealing with this transaction and what roles the audit team might be playing in this year audit. (JX4-10)."

Mauro's complaints to the SEC were based on his subjectively and objectively reasonable belief that violations of the law had occurred. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir.

20

1   2009); *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017).  The bases for

2   Mauro's beliefs are set out above at pp. 6-10.

3   Besides engaging in protected activity when he submitted a TCR to the SEC, Mauro engaged in

4   protected activity when he, through his whistleblower attorney, **complained about retaliation to**

5   **Defendant**. Plaintiff retained Jason T. Brown as his attorney, who is a whistleblower attorney, and

6   whose website reads "Whistleblower attorney," (Vol. 3, 406:21-407:2). On June 9, 2017, Mauro's

7   whistleblower attorney reaches out to Defendant. (JX6, Vol. 3, 407:8-12). Mauro's whistleblower

8   attorney attended the first meeting to discuss Cavium with Defendant. (Vol. 3, 407:8-12). In July of

9   2017, Mauro's whistleblower attorney made Defendant aware that Mauro was fearful of retaliation by

10  Defendant. (Vol. 3, 408:20-409:5). Mauro was then terminated the very next month. This temporal

11  proximity alone raises an inference that Mauro's assertion of his right not to be retaliated against and his

12  termination were causally connected. *Van Arsdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009)

13  ("The final element of a prima facie case under § 1514A is that "[t]he circumstances were sufficient to raise

14  the inference that the protected activity was a contributing factor in the unfavorable action.") (citing 29

15  C.F.R. § 1980.104(b)(1)(iv); *Morgan v. Regents of Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 666 (Cal. Ct.

16  App. 2000) (noting "the proximity in time between the protected action and allegedly retaliatory

17  employment decision").

18  ***Second***, Defendant knew or suspected (both actually or constructively) that Plaintiff had engaged

19  in protected activity.  ("Once an employee's supervisor has actual knowledge of the protected activity,

20  that knowledge is attributed to the ultimate decision-maker." *Leznik v. Nektar Therapeutics, Inc.*, ALJ

21  Case No.2006–SOX–00094, 2007 WL 5596626, at *8 (Nov. 16, 2007)(citing *Deremer v. Gulf*

22  *Coast*, ALJ Case No.2006–SOX–2 at 61–62 (June 29, 2007); 29 C.F.R. § 1980.104, stating that 18 U.S.C.

23  §1514A requires that a plaintiff present sufficient evidence "to give rise to an inference that the respondent

24

21

knew or suspected that the employee engaged in protected activity"; "[t]he

respondent knew or suspected that the employee engaged in the protected activity;" *Wiest v. Lynch*, 15

F. Supp. 3d 543, 558 (E.D. Pa. 2014); *People v. Parker*, 235 Cal. App. 2d 86, 92, 44 Cal. Rptr. 900 (Ct.

App. 1965) ("A corporation, of course, can acquire knowledge only through its officers and agents.

Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of

the corporation."). These facts are set forth above at pp. 11-12.

 *Third*, Plaintiff suffered an unfavorable personnel actions when Defendant did the following to

Plaintiff.  These facts are set forth above at pp. 12-13.

 *Fourth*, evidence presented at trial demonstrates that the protected activity was at a minimum a

contributing fact to unfavorable personnel action:

 As a starting point, without the filing of an SEC TCR, Defendant would not have interrogated

Plaintiff and would have never terminated him. Thus, as a direct and immediate result of Mauro

reporting to the SEC, Defendant terminated him. In addition, Mauro's many internal complaints (JX10),

including two issues that led to two national consultations (Vol. 6, 1029:3-4), Defendant made Mauro

their number one suspect as the SEC whistleblower during their investigation. This is underscored by

PwC's removal of Mauro from the Cavium audit (Vol. 2, 332:14-24; Vol. 2, 293:9-10).

 On August 17, 2017, Mauro was told he was being terminated for misconduct in conjunction with

the Cavium engagement. (Vol. 3., 441:16-19). Mauro believes, at his actual termination, Kevin Baldwin

referred to the Cavium "tax control." (Vol. 3, 441:22-23). Mauro is now being accused of creating a

false control on the very issue he originally complained about internally. (Vol. 2, 275:10-16). An

inference can be drawn that this reason is illegitimate because Mauro never lied, fabricated a control, or

engaging in any misconduct while working for Defendant—especially on the Cavium audit. (Vol. 3,

439:4-6). Defendant has alleged that Walter Brown said Mauro told him that he fabricated a control *or*

Case No.  3:18-cv-002615-AGT          PLAINTIFF'S POST-TRIAL BRIEF

1  lied about a control as the basis for termination. (*See* Declaration of Walter F. Brown Declaration, ECF

2  Dkt. No. 86-3; and Mark Simon Declaration, ECF Dkt. 86-2).

3      Mauro retained external counsel in June of 2017 after Defendant's Office of General Counsel

4  sought to meet with Plaintiff to discuss Cavium. (Vol. 3, 41:6-7). While being interviewed by Defendant

5  in response to the SEC's inquiry regarding Cavium, Mauro told Defendant's attorneys "that at the time

6  [my control] was a suggestion predicated on the discussion that I had with Tye Thorson; that that was

7  the documentation that would have reflected the control once he would have reassured me that Cavium

8  would have done it." (Vol. 3, 436:20-437:1).

9      Mauro explained to Defendant's attorneys who interviewed him the same information he

10  testified to surrounding DX1678 and DX1280 (Vol. 3, 437:2-7) which was as follows: Mauro received a

11  call from Tye Thorson on March 1, 2015, close to midnight. (Vol. 273:8-14). On the call, Tye Thorson

12  told Mauro there was a problem and that Defendant's National Office sent comments on one the memos

13  being drafted in response to Plaintiff's PB memo. (*Id.*, 273:16-21). Thorson expressed to Mauro that

14  Defendant's National Office felt they had a material weakness at Cavium (*Id.*). Thorson asked Mauro if

15  he had any proposed solutions to the problems posed by Defendant's National Office. (*Id.*; Vol. 2,

16  278:16-19). Thorson then sent Mauro DX1678.

17      Before communicating with Thorson, Mauro was not included on any prior conversations

18  between Tye Thorson and Defendant's National Office with respect to DX1678. (Vol. 2, 274: 18-20;

19  Vol. 6, 1062:2-5). And, at the time Mauro received DX1678, Plaintiff did not have communication with

20  Cavium because it was agreed between Mauro and Tye Thorson that Mauro would not speak with them

21  since he brought up issues relating to their internal controls in his PB memo. (Vol. 2, 281:14-19).

22

23

24

Case No.  3:18-cv-002615-AGT          PLAINTIFF'S POST-TRIAL BRIEF

After receiving DX1678 from Thorson, Mauro reviewed it and spoke to him on Sametime chat.[15]

Plaintiff explained to Thorson he reviewed DX1678 and had a reasonable solution so long as he does

exactly what Plaintiff told him, including speaking directly to Cavium personnel about the control. (Vol.

2, 280:4-7; 281:10-13; 284:2-5). Thorson told Mauro, "you got it." (Vol. 2, 281:5-9).

Plaintiff then sent an email with suggested edits (*see* DX1280) to Tye Thorson's original memo

(*see* DX 1678). Mauro added language to DX1280 as part of his proposed solution to address the

requestions Defendant's National Office had asked Tye. (Vol. 2., 283:10-12). Plaintiff's added language

to DX1280 suggested raising an internal control threshold from $7 million to $10 million. (Vol. 2,

285:7-20). When discussing this added language with Thorson, Mauro made clear that the only way to

find out if it would be acceptable is if Thorson had discussions with Defendant's National Office

relating to the suggestions. (Vol. 2, 286:7-9).

Thereafter, and despite extensive review of the language suggested by Mauro, no one from

Defendant's National Office ever reached out to discuss any Cavium thresholds with Plaintiff. (Vol. 2,

286: 7-9l; PX212, PX213, PX214). After sending his edits to DX1280, Plaintiff had no communication

with anyone in the National Office who was also consulted on DX1280. (Vol. 2, 284:6-18).

Despite claiming there was a lie, misstatement, or "fabrication" relating to Cavium's working

papers, Defendant did not take any steps to rectify this alleged blunder whatsoever by following up with

---

[15] Auditing companies are required to keep records for **seven years**. (*See* SEC 17 CFR Part 210, located at https://www.sec.gov/rules/final/33-8180.htm, in which the SEC declares, effective March 3, 2003, "*As mandated by section 802 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act" or "the Act"), we are amending Regulation S-X to require accountants who audit or review an issuer's financial statements to retain certain records relevant to that audit or review. These records include workpapers and other documents that form the basis of the audit or review, and memoranda, correspondence, communications, other documents, and records (including electronic records), which are created, sent or received in connection with the audit or review, and contain conclusions, opinions, analyses, or financial data related to the audit or review.*" Therefore, we ask the Court draw a negative inference against PwC for not complying with mandatory requirements and not allowing Plaintiff access to records that should have been preserved, not only for this litigation, but as is required by law.

Case No.  3:18-cv-002615-AGT          PLAINTIFF'S POST-TRIAL BRIEF

1    SEC filings or making public statements addressing the fabrications. (Vol. 6, 1126:7-1127:5). Despite

2    being accused of lying or fabricating on the Cavium audit, Cavium never filed a 8-K after Mauro was

3    terminated in August of 2017. (*Id.*).

4        Despite claiming there was a lie, misstatement, or "fabrication," no one at Defendant so much as

5    talked with Tye Thorson, Cavium's Engagement Leader Partner, prior to terminating Mauro. (Vol. 6,

6    1123:12-14; 1124:8-11). Additionally, Thorson took Mauro's suggested edits to DX1280 and

7    extensively reviewed them with Defendant's National Office. (PX212, PX213, PX214). Despite this,

8    Defendant never disciplined or terminated Thorson on the Cavium matter, despite Mr. Thorson having

9    final approval of the overall audit—including final approval of any suggested edits Mauro made. (Vol.

10   6, 1151:12-16). A reasonable fact finder has to ask: ***if Mauro shared the same information he shared***

11   ***with the Court, why wasn't Tye Thorson disciplined?*** The key difference between Tye Thorson and

12   Mauro is Tye Thorson never filed with the SEC or threatened to file with the SEC.

13       Additionally, Defendant has refused to commit to one particular reason for terminating Mauro.

14   (*See* Mark Simon Declaration, ECF Dkt. 86-2). Defendant's failure to commit to a reason for

15   terminating Mauro is alone is enough to draw an inference that Defendant's retaliatory motive may have

16   played a role in terminating Mauro. (*See Vélez v. Thermo King,* 585 F.3d 441 (1st Cir. 2009) "Shifting

17   Reasons" for employee's termination may lay the grounds for claim).

18       These facts, among others heard at trial, suggest that Mauro's protected activity was at least a

19   contributing factor to his termination. A "contributing factor" is "any factor, **which alone or in**

20   **combination with other factors**, tends to affect in any way the outcome of the decision. To be a

21   "contributing factor," the factor need not be the only factor affecting or influencing the decision, nor

22   must it be a significant, substantial, primary, or predominant factor. (*see* 18 U.S.C. § 1514A; 29 C.F.R. §

23   1980.104; *Van Arsdale v. Int'l Game Technology,* 577 F.3d 989, 996 (9th Cir. 2009) *applying* 29 C.F.R.

24

Case No.  3:18-cv-002615-AGT        PLAINTIFF'S POST-TRIAL BRIEF

§ 1980.104(b)(1)(iv)("[t]he circumstances were sufficient to raise the inference that the protected

activity was a contributing factor in the adverse decision"). *see also Lockheed Martin Corp. v. Admin.*

*Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013) "This element is broad and forgiving: the Board has

defined a 'contributing factor' as 'any factor, which alone or in combination with other factors, tends to

affect in any way the outcome of the decision.' . . . "[T]he contributing factor standard was 'intended to

overrule existing case law, which requires a whistleblower to prove that his protected conduct was a

'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to

overturn that action.'" (Citations omitted, collecting cases); *Halliburton, Inc. v. Admin. Review Bd.*, 771

F.3d 254, 263 (5th Cir. 2014). The Supreme Court in *St Mary's Honor Center v. Hicks,* has stated: "The

factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied

by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show

intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of

fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993).

### D. DEFENDANT PRICEWATERHOUSECOOPERS LLP BREACHED MAURO'S EMPLOYMENT CONTRACT

"The essential elements of a cause of action to recover damages for a breach of contract are: (1)

the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's

breach of its contractual obligations, and (4) damages resulting from the breach." *Junger v. John V.*

*Dinan Assocs., Inc.*, 164 A.D.3d 1428, 1430, 84 N.Y.S.3d 574, 577 (N.Y. App. Div. 2018). As per the

parties' contract, Plaintiff's contract is governed by New York law. (*see* JX 19, in which the parties

agree the terms of the contract will be governed "by the laws of the State of New Year regardless of

[Plaintiff's] practice location and irrespective of the principles of conflicts of law.")

Plaintiff and Defendant entered into an employment agreement. (*see* PX161, JX19; Vol. 1,

101:21-102:23). Pursuant to the employment agreement Plaintiff and Defendant entered into, Defendant

26

were required to provide Plaintiff with three months' notice prior to terminating him. (Vol. 1, 103:20-23; *see also* PX 161, JX19).

Plaintiff, at the time he was terminated, worked for Defendant for eighteen (18) years. (Vol. 1, 103:24-104:6). When Plaintiff was terminated, he was not provided three months' notice. (*Id.*).

When Defendant terminated Plaintiff on August 17, 2017, Defendant failed to provide Plaintiff with three months' prior notice. (Vol. 3, 447:22-25).

## III. DAMAGES

### A. Economic Damages

| | |
|---|---|
| **Lost wages (based on $185,000 annual salary (Vol. 3, 448:8)** | **$46,249.00** |
| Lost Bonuses ($15,472.59 x 4)(Vol 8,451:8-9) | **$61,890.36** |
| Interest on back pay and bonuses (10% per annum) | **TBD** |
| **Lost earning capacity (Vol. 3, 452:21-456:7)** | **TBD** |

**Retirement plan/401k contributions** (No 401k or employer contributions at subsequent employers: Vol. 3, 449:2-3 (Armanino);450:13-14 (SOAProjects); 451:10-12 (RoseRyan); 452:6-7(Engine Room).

| | |
|---|---|
| a. Mauro contributions (3% per annum (Vol. 3, 449:21)) | 46,560.00 |
| b. PwC Contributions (Vol. 3, 448:9-18) | 11,640.00 |
| **Three months' severance (Vol. 1, 104:4-6, Vol. 3, 448:6-10)** | **$46,249.00** |
| **Lost interest (C.C.P. Section 3289)** | 12,000.00 |
| **Therapy Bills (Vol. 3, 463:3-15)** | 15,600.00 |
| **Statutory Penalties** | |
| **Cal. Labor Code § 1102.5** | **TBD** |
| **Cal. Labor Code § 98.6** | **TBD** |

### B. Non-Economic Damages

Mauro suffers from adjustment disorder, mental suffering, insomnia, anxiety, depression, and suicidal ideations. (Vol. 3, 461:22-23; 463:23)[16]                                                                **TBD**

---

[16] Emotional distress awards are appropriate in whistleblower retaliation cases. *Cordell v. PICC Lines Plus LLC*, 2016 U.S. Dist. LEXIS 121708, at *37 (N.D. Cal. Sept. 8, 2016)("Emotional distress damages are recoverable for violations of Labor Code section 1102.5(b)."); *U.S. ex rel. Macias v. Pacific Health Corp.*, 2016 U.S. Dist. LEXIS 140760, at * 32 (C.D. Cal. Oct. 7, 2016 ("Emotional distress damages are warranted in whistleblower cases."); *Gardenshire v. Housing Authority*, 85

27

**C. Punitive Damages** TBD

**D. Reinstatement:**  Plaintiff also seeks reinstatement of employment by PwC in accordance with all applicable federal and State statutory and common law principles including but not limited to California Labor Code §§ 1102.5 and 98.6 and 18 U.S.C. § 1514A(c) (Sarbanes-Oxley) and *Troyk v. Farmers Group, Inc.,* 171 Cal.App.4th 1305, 1352 (2009); *U.S. Ecology, Inc. v. State of California*, 129 Cal.App.4th 887, 909 (2005).

**IV.  CONCLUSION**

Plaintiff, having met his burden of proof at trial, showing this Court that Defendant unlawfully retaliated against him for engaging in various protected activity, and Defendant, having failed to convince this Court by clear and convincing evidence otherwise, Plaintiff is entitled to judgment and damages against the Defendant.

Date: April 5, 2021

By:  /s/ Alexander G. Cabeceiras

Alexander G. Cabeceiras, Esq.
**DEREK SMITH LAW GROUP, PLLC**
*PRO HACE VICE TO BE SUBMITTED*
*alexc@dereksmithlaw.com*
1 Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760

Ingrid M. Evans, Esq. (SBN 179094)
**EVANS LAW FIRM, INC.**
3053 Fillmore Street #236
San Francisco, CA 94123
Phone: (415) 441-8669

*Attorneys for Plaintiff*

Cal.App.4th 236, 237 (2000)(emotional distress damages available for retaliatory termination cases brought under California Labor Code).

28

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

**BOTTA MAURO TESTIMONY (02/24/2021)**
**Vol. 3 Page 378 Lines 2 to 21**
**Q.** And what's Tim Carey's position?
**A.** At the time he was the new assurance leader in San Jose.
He took over from Kevin Healy who was promoted.
**Q.** Okay. And what did you talk to Tim Carey about?
**A.** I told him about the snapshot that I received. I told him
that I believe it was included false information. I told him
that I believe that Stig conduct at Harmonic was putting the
firm at risk, and I told him that I would have considered to go
to the SEC about it.
**Q.** And what did he say back to you, if anything?
**A.** He talked to me about my deployment and the fact that I
was hard to staff because my -- my idea of audits and the
firm's idea of an audit were different, and we started to
discuss about scheduling.
**Q.** Why at that time did you tell him you were going to go to
the SEC?
**A.** Because I believed that Mr. Haavardtun's conduct
represented a risk for the firm that I did not see
appropriately addressed at the time and I thought was my option
to use that.

**Vol. 3 Page 408 Lines 2 to 9**
**Q.** Mauro, at that time around June of 2017, were you fearful
that PwC was going to retaliate against you?
**A.** Yes.
**Q.** Why?
**A.** Because the preservation notice was in relation to Cavium
and particularly the years of '13 and '14; and to me it was --
as soon as I got that, I realized that essentially the SEC kind
of ousted my identity to PwC because it was obvious.

**Vol. 3 Page 408 Lines 14 to 22**
**Q.** So at that point why did you feel you needed to retain
outside counsel?
**A.** Because I thought that OGC and their job, based on my
understanding of the structure of the firm, they were there to
respond to the SEC and their concern was to protect the firm,
certainly not me.
**Q.** And your fear of retaliation, did you through Mr. Brown
ever make PwC aware of that?

0

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

**A.** Yes.

**Vol. 3 Page 409 Lines 21 to 23**
**Q.** And after reporting to the SEC, were you interviewed by PwC?
**A.** Yes.

**TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 863, Lines 7 through 21**
**Q.** Okay. Thank you.
And over your time working at PwC, you had multiple discussions with a Ms. Patricia Lin in PwC's Ethics Office; correct?
**A.** Yes.
**Q.** And you discussed with her multiple times Mauro's complaints of retaliation; is that right?
**A.** Patty Lin worked in the Office of Ethics, so as things were escalated in that direction, Patty was one of the individuals involved.
**Q.** I appreciate that. So is that a yes?
**A.** Yes, I interacted with Patty Lin.
**Q.** But specifically regarding Mauro's complaints of retaliation?
**A.** Yes.

**Vol. 5 Page 871, Lines 7 through 19**
**Q.** Okay. And you don't recall saying to Ms. Lin that Cavium got a lot of attention; right?
**A.** I may have said that. I mean, I know it received attention and was looked at, but I was not involved in that process.
**Q.** Okay. You continued to hear complaints from Mauro relating to retaliation through 2016; right?
**A.** Yes.
**Q.** And in April of 2016, there are multiple people notified of Mauro's complaints of retaliation, were there not?
**A.** When I heard the words "retaliation," any discussion I had with Mauro, I raised it with the Office of Ethics and that would have been the proper channel to take it to.

**Vol. 5 Page 874, Lines 17 through 25**
**Q.** Ms. Nelson, by October of 2016, Mauro had directly

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

complained to you he felt he was being discriminated against at
PwC; correct?
**A.** Yes, he may have used those words.
**Q.** Okay. And you recall sharing with Ms. Lin that Mauro felt
he was being discriminated against; right?
**A.** Again, if he used the word "retaliation,"
"discrimination," I would have escalated to the Office of
Ethics, which Patty Lin would have been appropriate.

**Vol. 5 Page 877, Lines 8 through 12**
**Q.** Okay. But he also would tell you he was going to a lawyer
directly to you; is that right?
**A.** He may have. I don't recall the specific conversations,
but he used that to kind of emphasize, you know, how frustrated
and worked up he was about something.

**Vol. 5 Page 886, Lines 10 through 12**
**Q.** Okay. You recall continuing discussing Mr. Botta's
complaints with Ethics in 2017, do you not?
**A.** I believe there was investigations that went into 2017.

**Vol. 5 page 907 Lines 13 through 20**
**Q.** Ms. Nelson, did you ever -- do you ever remember Mr. Botta
shying away from voicing a concern or fighting a crusade?
**A.** No. I mean, Mauro was one of the most vocal employees. I
mean, in my 24 years I have never seen someone as vocal as
Mauro.
I mean, just to kind of describe it a little bit. I mean,
he was the guy that in an all-hands meeting would stand up and,
you know, be the one to state his opinion. He never held back.


**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 page 1025 Lines 21 through 24**
**Q.** And Mr. Botta in 2012 raised some concerns with the Cavium
audit, did he not?
**A.** He raised some concerns, as he does on all of his audits
that I worked with him on.

**Vol. 6 page 1026 Lines 11 through 17**
**Q.** And Mauro at that time, 2012, expressed to you his
concerns that Cavium and Xpliant were physically located one

2

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

1    floor apart from each other in the same building; right?
     **A.** Yes.
2    **Q.** And he was further concerned that that wasn't shared with
     PwC by Cavium; right?
3    **A.** Yeah. He was concerned about that.

4    **Vol. 6 page 1032 Lines 1 through 17**
     **Q.** And 2012, right. And he's bringing up these issues with
5    audit opinions that have already been signed off on on behalf
     of PwC; right?
6    **A.** Which I thought was very unusual for this kind of an
     analysis, but yes, that's correct.
7    **Q.** But you would agree that if there is an aggregate control
     deficiency, your job as an auditor would be to determine if
8    these aggregate deficiencies created a material weakness;
     right?
9    **A.** That's correct, but you normally -- it's not even
     considered that you consider deficiencies from prior years when
10   you do an aggregation consideration.
     So Mauro had brought in 2012 and 2013 issues into this
11   memo, which was very unusual. I've never ever seen that before
     in all my time. And so I -- you know, once I got it, clearly I
12   needed to spend some time with Mauro to understand why he did
     what he did.
13
     **Vol. 6 page 1048 Lines 18 through 25, Page 1049 Lines 1 through 16**
14   **Q.** And ultimately you and Robert Heatley agreed it would be
     appropriate to consult with PwC's National office on the
15   aggregation issue because you believe it rose to the level of
     close call; is that right?
16   **A.** So initially Bob and I, Mr. Heatley and I did not think
     this rose to the level of close call which would trigger a
17   consultation. So we weren't concerned at all that we had an
     aggregation issue.
18   Mauro puts together a five-page memo two days before we're
     ready to file a financial statement that says there's all these
19   problems that -- frankly, I didn't agree with most of them.
     But there were all these problems, and given that -- given the
20   nature of it, I wanted to get some other eyes on it.
     And from my perspective, it was kind of an abundance of
21   caution that let's take it to National and have another set of
     eyes look at this to make sure, you know, if I'm missing
22

                                  3
23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

1    something or Bob is missing something; that we can have, you
2    know, the National office look at it and see what their views
     are. That was really the reason.
3    And the close call nature, that's a pretty judgmental
     area, and we both didn't think it was even a close call. But
4    we -- we probably called it that after we got Mauro's document
     to say, look, let's just move this along and have somebody else
5    put another set of eyes on it.

6    **Vol. 6 page 1112 Lines 16 through 25, page 1113 Line 1**
     **Q.** Okay. Part of the consultation policy with National
7    involved getting PwC's Office of General Counsel involved;
     right?
8    **A.** The -- the requirement for when there is a disagreement
     requires getting the OGC, Office of General Counsel, involved,
     yes.
9    **Q.** Okay. And back again, we're staying in 2015, around seven
     partners were informed of the issues Mauro had raised on the
10   Cavium's audit; right?
     **A.** That's correct. That's -- around seven partners sounds
11   about right.

12   **KEVIN HEALY TESTIMONY (03/02/2021)**
     **Vol. 6 page 1185 Lines 2 through 22**
13   **Q.** Okay. And so if you weren't working directly with him on
     engagements, how is it that you wound up spending as much time
14   as you did with Mr. Botta?
     **A.** Mauro was -- was always the first person in my office when
15   he had a point of view on a variety of matters. And I really
     appreciated him coming to me and sharing his insights and
16   thoughts on a variety of matters, whether it be how we should
     be thinking about new technical accounting pronouncements that
17   need to be adopted by our clients, whether there were
     observations on how companies were implementing system and
18   challenges.
     So Mauro was -- you know, he was a very frequent
19   contributor to me, and I had really an open-door policy and
     would make a lot of time for Mauro because he was really
20   proactive at sharing his points of view on things with me.
     **Q.** Okay. And did you always agree with the issues, concerns,
21   or items that Mr. Botta raised with you?
     **A.** No. No. But I would always be willing to discuss them
22
                                        4
23   Case No.  3:18-cv-002615-AGT            APPENDIX 1
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

1  and debate them with him and really listen to his point of view
   before making my recommendations on how we were going to move
2  the practice forward.

3  **KEVIN HEALY TESTIMONY (03/03/2021)**
   **Vol. 7 page 1232 Lines 22 through 25, Page 1233 Lines 1 through 11**
4  **Q.** Do you remember any issue coming up or Mr. Botta claiming
   that he was somehow blacklisted, and did you address that?
5  **A.** Yes. I mean, he did raise that he was blacklisted and we
   explained to him, this COE project was a strategic project, and
6  we were taking his time off of clients to work on this.
   Just to give some context here. The COE has evolved into
7  a -- today has multiple partners, multiple managing directors,
   multiple directors across the country working on our -- our
8  Center of Excellence project.
   So this was highly strategic and this was an opportunity
9  for Mr. Botta to be able to continue to progress within the
   firm. He was -- we were saying, like, we don't understand why
10 you say you're blacklisted. We're putting you on one of our
   most highly strategic projects, and he just wasn't -- he just
11 wasn't hearing it.

12 **Vol. 7 page 1245 Lines 15 through 24**
   **Q.** Okay. And let me see if I can get my timeline straight
13 here.
   So before you staffed him on the Zhone engagement, he in a
14 meeting with you was claiming that he felt he was being
   blacklisted and not getting enough client engagements; is that
15 right?
   **A.** That's correct.
16 **Q.** And then after you staffed him on the audit, he was
   complaining about that as well; is that right?
17 **A.** That's correct.

18 **WALTER F. BROWN TESTIMONY (03/08/2021)**
   **Vol. 9 page 1503 Lines 11 through 16**
19 **Q.** At the direction of your office, was Mr. Botta's hard
   drive taken away from him on June 14th, 2017, right after the
20 interview?
   **A.** I recall we imaged his laptop. I don't remember the
21 specifics of exactly when and exactly how we accomplished that,
   but I do recall we imaged his laptop.
22
                                    5
23 Case No.  3:18-cv-002615-AGT          APPENDIX 1
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

**Vol. 9 page 1503 line 25, page 1504 Lines 1 through 7**
**Q.** How did you learn he was represented?
**A.** I believe after we requested to interview him, we heard
from an employment lawyer that represented he was Mr. Botta's
counsel.
**Q.** In fact, the lawyer you heard from was a whistleblower
lawyer; right?
**A.** I don't recall that. I recall he was an employment
lawyer.

**Vol. 9 page 1507 Line 25, Page 1508 Lines 1 through 10**
**Q.** Okay. You were well aware at the time of the second
interview that Mauro had claimed numerous acts of retaliation
by reporting corporate wrongdoing against Pricewaterhouse;
correct?
**A.** I don't recall knowing that. I can obviously see this
letter that you put in front of me came in before the second
interview, I was copied on it, and it makes reference to
reporting unethical and illegal practices.
Sitting here today, though, I can't tell you what I
remember going into that second interview, but I have no reason
to believe I didn't receive this letter and didn't review it.

**Vol. 9 page 1513 Lines 2 through 9 and 17 through 21**
**Q.** And you understood before you interviewed Mauro the first
time that he had made numerous complaints about the 2013-2014
Cavium audits; correct?
**A.** I don't -- I don't recall if I knew that or not. I knew
that he had raised issues and that he had been asked to list
the issues, and this document reflects that. I don't recall
knowing that he had made numerous complaints, over what period
of time, if at all.
**Q.** And you knew from your review of the record that Mauro had
been the only Pricewaterhouse employee to make complaints about
the 2013 and 2014 Cavium audits; correct?
**A.** I don't -- I don't know. I don't recall knowing other
people who had made complaints.

**Vol. 9 page 1522 Lines 3 through 16**
**Q.** Did you ask Mauro in the interview if there were other
audit issues and complaints that he wanted to tell you about?

6

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

1   **A.** Which interview? In the first or the second interview?
    **Q.** In the first interview.
2   **A.** My recollection is that we used the document you recently
    showed me that he had prepared that listed the issues that he
3   was concerned about as the sort of guide to the first
    interview, if you will. It was a framework that allowed us to
4   ask him about issues that he had identified.
    I don't specifically recall, but it would be my practice
5   to ask the witness, in this case Mr. Botta, if there was
    anything else he wanted to tell us about. So I don't
6   specifically remember doing that, but it would have been my
    practice to that.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

**TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 920, Lines 21 through 25, Page 921 Lines 1 through 5**
**Q.** Now, Ms. Nelson, I think it's really important to be clear
here. Were you or did anyone ever say to you that they had an
issue with Mr. Botta asking a lot of questions of clients
during an audit?
**A.** It was never about asking questions or the number of
questions necessarily. It was just about his style and his
approach.
You know, I think individuals always felt like they were
on the defensive, and it felt unfair, and it felt really
aggressive.

**MAYANK GUPTA TESTIMONY (03/01/2021)**
**Vol. 5 Page 961, Lines 22 and 23**
**Q.** Okay. Was Mauro a good auditor on Cavium?
**A.** Yes.

**UMIT F. OZDEMIR TESTIMONY (03/02/2021)**
**Vol. 6 Page 1010, Lines 7 through 10**
**Q.** And were the questions that he asked that you were present
for, did you think that they were valid and good questions?
**A.** For my piece, again, for the only one -- I can only talk
for my piece. Yes, his questions were valid.

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1028, Lines 11 through 19**
**Q.** Okay. Given the complexities of the issues, right, and
given you had to consult with folks in National, it was
reasonable for you and Mauro to bring up these issues to PwC's
National office; right?
**A.** Of course.
**Q.** And, Mr. Thorson, you do consider Mauro a good auditor;
right?
**A.** I think Mauro is a good auditor in a lot of cases. In
some cases not so good.

**Vol. 6 Page 1031, Lines 18 through 21**
**Q.** So given you instructed him to draft this memo, you agree
it was reasonable for Mauro to actually draft it and send it to
you; right?
**A.** Of course.

0

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

**Vol. 6 Page 1043, Lines 7 through 25, Page 1044 Lines 1 and 2**
**Q.** Okay. So at that time when Mauro decides to continue with
his disagreement and the team decides to consult with National,
you actually felt that the auditing team needed to get to the
bottom of these issues Mauro brought up; right?
**A.** The auditing team needed to get to the bottom of whether
we had an aggregation issue.
The issues that Mauro brought up were not all related to
aggregation. They were related to prior years.
I spent the most times on dealing with those issues. I
knew about most of them. They were non-issues. We had agreed
in the past they were non-issues. So I was very surprised to
see them popping up in this memo.
So the engagement team was working on aggregating the
current year deficiencies to see if we had an issue and that's
what the consultation was for.
**Q.** And you agreed you needed to get to the bottom of this
aggregation issue; right?
**A.** That's correct.
**Q.** Okay. And it was reasonable to get to the bottom of that
aggregation issue; right?
**A.** Yes, it was.

**Vol. 6 Page 148 Lines 18 through 25, Page 1049, Lines 1 through 23**
**Q.** And ultimately you and Robert Heatley agreed it would be
appropriate to consult with PwC's National office on the
aggregation issue because you believe it rose to the level of
close call; is that right?
**A.** So initially Bob and I, Mr. Heatley and I did not think
this rose to the level of close call which would trigger a
consultation. So we weren't concerned at all that we had an
aggregation issue.
Mauro puts together a five-page memo two days before we're
ready to file a financial statement that says there's all these
problems that -- frankly, I didn't agree with most of them.
But there were all these problems, and given that -- given the
nature of it, I wanted to get some other eyes on it.
And from my perspective, it was kind of an abundance of
caution that let's take it to National and have another set of
eyes look at this to make sure, you know, if I'm missing
something or Bob is missing something; that we can have, you

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"

know, the National office look at it and see what their views
are. That was really the reason.
And the close call nature, that's a pretty judgmental
area, and we both didn't think it was even a close call. But
we -- we probably called it that after we got Mauro's document
to say, look, let's just move this along and have somebody else
put another set of eyes on it.
**Q.** So you said you didn't agree with most of the issues Mauro
raised, but that means you agreed with some of the issues Mauro
raised; right?
**A.** I agreed with some of the statements in Mauro's document,
that's correct.
**Q.** Okay.
**A.** Whether they were issues or not, I don't know.

**Vol. 6 Page 1056, Lines 6 through 13**
**Q.** So at that point the team was in agreement that there was
significant deficiencies at Cavium; is that correct?
**A.** Yes.
**Q.** Okay. You also write:
"We are consulting under our close call
requirements for aggregation."
Do you remember that email?
**A.** Yes, yes.

**Vol. 6 Page 1141, Lines 17 through 25, Page 1142 Lines 1 through 8**
**Q.** And, sir, did you remove Mr. Botta from the audit at that
time when they requested it?
**A.** No, I did not.
**Q.** Why not?
**A.** The -- so the CFO had approached me on removing him from
the account, and he had said that he -- just kind of bedside
manner, kind of style, wasn't something that they were warming
up to, and they wanted to replace him.
And I had -- I had asked Art, the CFO, if we could at
least keep him around for another year, while he had a chance
to get to know Mauro and get to know him better. I mean, at
the time I believed Mauro had done a good job. And, you know,
my view is he was a little bit like kind of a fine wine, where
it takes a little bit to get used to him, but...
And so the -- basically I think when I got done, I said:
Art, I'd like you to just trust me on this one. So Mauro

2

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1  remained on the account for the next -- obviously until 2015.

2  **Vol. 6 Page 1146, Lines 7 through 19**
   **Q.** And what was that consequence? What happened?
3  **A.** I was removed from all of my public accounts and all of my
   private accounts that I was the engagement partner on, as well
4  as any accounts I was the QRP on until the investigation by the
   SEC concluded.
5  **Q.** Okay. And did that -- how long was that period of
   removal, to your recollection?
6  **A.** It was approximately six months.
   **Q.** And in your view, did that removal during that six months
7  did that impact your practice?
   **A.** It impacted me personally. I got new clients, but I had a
8  lot of clients that were -- I was with for a long time. It
   didn't impact me financially, but it affected my work.

9

10 **KEVIN HEALY TESTIMONY (03/03/2021)**
   **Vol. 7 Page 1204, Lines 14 through 25, Page 1205 Line 1**
11 **Q.** Okay. What I want to ask you next is under PwC's existing
   rules, would that have been potentially the end of the matter?
12 **A.** It would. You know, our audit policy outlines that if
   there is a disagreement between team members and if the
13 Engagement Leader and Quality Review Partner discuss the matter
   and agree on it, then that would -- that would end the
14 disagreement at that point in time.
   However, I had -- I had met with Tye and shared that I
15 thought it would be -- it would be good to make sure that there
   was a good alignment of the facts; that everyone felt
16 comfortable with the process and the conclusion that -- that
   they consider going for a formal National consultation. And I
17 had a similar conversation with Mr. Botta as well.

18 **Vol. 7 Page 1206, Lines 12 through 21**
   **Q.** Okay. And you've just stated though that it was your
19 decision to go ahead and elevate this anyway; is that right?
   **A.** That is correct.
20 **Q.** And why did you decide to do that?
   **A.** I decided to do that because I wanted to make sure that we
21 got the answer right, and that -- that all parties felt heard,
   and all the facts were appropriately tabled and people were
22 comfortable that their voice was heard and that they had --

                                        3
23 Case No.  3:18-cv-002615-AGT          APPENDIX 2

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

there was a thorough vetting of the analysis. So that was just
my recommendation.

**Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**
**Q.** And, sir, why did you specifically highlight there and in
the last sentence "Mauro also lead all the interactions with
ASM&T related to the material weakness and related
disclosures..."? So why did you twice reference his work with
respect to identifying and communicating with respect to
material weakness? Why was that something you were bringing
out in the review?
**A.** I just thought that he did -- we sat down at the outside
of the engagement, we defined roles and responsibilities and
expectations very clearly, and I thought he did a nice job of
executing against the expectations that I outlined.
It was a very complex job. It's not easy to communicate
material weaknesses, especially for a company that had never
experienced them before, and I thought that he did, you know, a
nice job not only managing the client interaction but also
managing the firm interaction in the evaluation of those
conclusions.

**Vol. 7 Page 1259, Lines 7 through 13**
**Q.** Okay. Did you find that his spotting of this issue was
meaningful?
**A.** Yes. I mean, this is consistent with what I said
yesterday; that when Mauro identified issues, he'd be the first
person to my office to share insights on a whole host of
matters to help me think about, you know, how we shared more
broadly.

**STIG HAAVARDTUN TESTIMONY (03/03/2021)**
**Vol. 7 Page 1290, Lines 3 through 9**
**Q.** Okay. So let's focus initially on that first period, the
September-October period. How did his transition into the
engagement team go?
**A.** I think it went -- I think it went well. He clearly --
like, he came in with a lot of questions and he wanted to learn
and wanted to work with the team. So I was -- I was generally
happy in the initial phases of the Q3 work.

**Vol. 7 Page 1290 lines 23 through 25, page 1291, Lines 1 through 23**

4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Q.** Okay. And what was your reaction to Mr. Lakritz's, you
know, comments about just the number of questions Mr. Botta was
asking?
**A.** Yeah. So you always want your team to work well with a
client. So from that perspective, I wanted to understand; but
my main -- my main feedback was I liked the fact that Mr. Botta
is asking a lot of questions. Like, I -- like, this is an
opportunity to get someone with a fresh set of eyes to look to
see if there are things that can be done better.
So I -- I told Mr. Lakritz that I thought that Mr. Botta
asking questions, good questions, to learn the process was a
good thing and that I would help sort of making sure that
things get resolved; and that also obviously Mr. Botta got the
benefit of the knowledge that the people have been on the
engagement for a long time.
**Q.** Did you ever raise with Mr. Botta any of the concerns that
Mr. Lakritz was expressing early on in the audit?
**A.** Yeah. I think Botta had -- Mr. Botta had some sense that
there was a little bit of pushback on the client side so he
reached out to me just to check in, and I shared what I said.
I wanted him to ask questions. I wanted him to, like, make
sure that he thought about this and learned, like, looked at it
with fresh eyes.
And I basically said, like, that "I want you to continue
with this and if you run into trouble, I will help you get
things resolved and I will help you working with the client."

**Vol. 7 Page 1295, Lines 6 through 12**
**Q.** What did you say to him?
**A.** I said that I was still more than happy with him asking
questions and taking a fresh look, but he needed to have more
of the communication directly and he needed to spend more time
with the client. And I think I said something like it's common
courtesy that if you want to criticize someone's work, that you
do it in person; don't go through, like, intermediaries.

**Vol. 7 Page 1296, Lines 7 through 17**
**Q.** Mr. Haavardtun, did you have any problem with Mr. Botta
asking questions, even many questions, of the client?
**A.** Not at this time of the audit. Like, up till, like,
January when I'd given the feedback, I was more than happy with
him asking questions.

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1
2
3

Very late in the audit Mauro was -- sorry -- Mr. Botta was just throwing out things all over the place to try and find things that could sort of prove his point. So I felt that was a little bit overboard when it comes to the question asking, but at this point in the audit I got no problem with him asking questions.

4
5
6

**Vol. 7 Page 1322, Lines 15 through 25, page 1323 line 1**
**Q.** And the final point you make was his inability to close out issues. And just briefly describe what your concern was there.

7
8

**A.** Yeah. My concern there was that he had raised all these questions, many of them good questions, but he just couldn't close them out.

9
10

Like, he couldn't figure out what information was needed in order to reach a conclusion. He just asked for more and more and more without sort of a clear plan as to how to conclude whether any of this were significant or not. And, like, reality was that all of this ended up being relatively minor once it all got sorted out.

11

12

**Vol. 7 Page 1324, Lines 13 through 25, Page 1325, Lines 1 through 14**
**Q.** In fact, the very first narrative description you provide is:

13
14

"Mauro has numerous strengths in areas such as the understanding of audit methodology, commitment to quality, strong work ethic, supporting his teams and engagement."

15

Do you see that?
**A.** Yes. I stand by that.

16

**Q.** And then you identify some challenges.
Let's look at the second issue, "Issues Management," which

17

is your narrative on the bottom of this page.
Mr. Haavardtun, you -- you say here:

18

"Mauro had significant challenges closing out issues. He raised several good questions during the

19

audit, but in almost every case he was not able to bring the matter to closure."

20

So, Mr. Haavardtun, was your concern with the fact that Mr. Botta was raising questions of the client?

21

**A.** No. Certainly not in the beginning of the audit. Towards the end he was just throwing a lot of stuff at the wall. But

22
23
24

---

6

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1 | up til, like, the beginning of February, I liked the fact that
2 | he was bringing a fresh perspective and asking questions. That was helping us on identifying things we may not have looked at in the past as well.
3 | **Q.** Yeah. In fact, you were commending him on raising questions in this review?
4 | **A.** Yeah, yeah. Absolutely.

5 | **Vol. 7 Page 1330, Lines 19 through 24**
6 | **Q.** And you would agree that it was a good thing for Mauro, as the incoming senior manager responsible to oversee the full audit, to get a good feel for Harmonic's accounting practices;
7 | right?
8 | **A.** Yes. I think -- I think him getting acquainted with the practices and asking questions around that was a good thing.

9 | **JASON S. FLEMMONS TESTIMONY (03/04/2021)**
| **Vol. 8 Page 1408, Lines 1 through 12**
10 | **Q.** Okay. And do you agree that at least two control deficiencies documented by Mauro for the Cavium audit were
11 | concluded by Pricewaterhouse to be significant deficiencies?
| **A.** I recall there being two significant deficiencies related
12 | to the 2014 audit of Cavium.
| **Q.** And those were complaints that Mr. Botta had raised;
13 | correct?
| **A.** I don't recall him complaining about the fact that those
14 | were significant deficiencies.
| **Q.** Okay. But they were issues that he raised in the memo
15 | that you reviewed for your report; correct?
| **A.** I recall those issues were referenced in his memo.
16 |
| **Vol. 8 Page 1411, Lines 14 through 19**
17 | **Q.** Do you agree that the PCAOB standards underscore the importance of auditors exercising professional judgment when
18 | assessing sampling risk?
| **A.** Yes. Professional judgment is required in assessing
19 | sampling risk and judgment is required in many other facets of an audit.
20 |
| **Vol. 8 Page 1416, Lines 11 through 17**
21 | **Q.** Do you agree, Mr. Flemmons, that sampling requires reasonable judgment to determine an appropriate sample size?
22 |

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

**A.** Yes, I would agree with that.
**Q.** Okay. And there is a wide range of reasonable views on
this determination; correct?
**A.** To the extent those judgments are reasonable, yes, there
can be a wide range of judgments.

**WALTER F. BROWN TESTIMONY (03/08/2021)**
**Vol. 9 Page 1484, Lines 23 through 25, Page 1485, Lines 1 through 12**
**Q.** Okay. Now, we can take that down.
We've heard testimony in this trial that Mr. Botta
complained to other government agencies about PwC. Are you
familiar with any other government agencies that may have
investigated Mr. Botta's allegations?
**A.** I am aware of one.
**Q.** And which one is that?
**A.** The Public Company Accounting Oversight Board.
**Q.** Known as the PCAOB?
**A.** That's right.
**Q.** All right. And do you recall when the PCAOB opened an
investigation into Mr. Botta's allegations?
**A.** My recollection is that it was sometime in 2018 after we
had been notified by the SEC that it had closed its
investigation.

**EXHIBIT JX 2-7**
Good side: He suspected the transaction his client were doing was goofy – he did not trust what they
were telling us. He stuck with it and found something and it turned out his suspicions were right. We got
to bottom if it. It was Mauro's skepticism that did that for us.

**EXHIBIT PX 105-18**
"Maura executed on a high quality integrated audit this year. Great coaching skills:
He proactively coached the second year manager to address his development needs from last year.
Excellent presentation skills: He takes the lead to present all audit materials to management and the AC.
Outstanding professional skepticism: Mauro applied professional skepticism (and related audit
documentation) very effectively which also demonstrated his great auditing skills."

**EXHIBIT PX 105-21**
11/24/14 – Ergun Genc
"Mauro transitioned onto the account in April. Engagement team had a significant turnover. He utilized
his network within SJ and built a strong team over a period of 3 months. He also addressed the turnover
on the client side; he built strong relations with the new hires and stayed connected with the controller

8

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

throughout to pro actively address matters that came up. For those matters he provided solutions and asked for fair fees which were agreed upon."

01/08/15 – Edward P. Jackson

"Extremely thorough review (maybe a little too thorough at times!) Great thing about Mauro is that he is very diligent and you know a review from him is meaningful and high quality."

03/18/15 – Ergun Genc

"Outstanding job! Our team looked up to Mauro for leadership, guidance and coordination. The client CEO and Controller see Mauro as the main PwC contact and are comfortable addressing matters with him. He spent significant effort on high quality audit, ensured all matters were addressed properly while providing coaching to the team and the client staff. He supported me in discussing two material weaknesses, and provided documentation/guidance to management to asssist them in their evaluation."

**EXHIBIT PX 105-27**

09/25/15 – Ergun Genc

"Mauro has been demonstrating fantastic leadership skills on this Year 1 404 account. He attended all walkthroughs to date to assess design of controls and documentation. He showcased the best practices to our team in terms of note taking, asking probing question and identifying the appropriate process owners, as well as demonstrating professional behavior throughout. His outstanding technical skills in auditing and accounting builds respect from the client and engagement teams. Very well done!".

**MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol. 3 Page 400 Lines 22 through 25, Page 401 Lines 1 through 3**
**Q.** Mauro, do you believe the issues you raised in JX4 were reasonable?
**A.** Yes.
**Q.** Why is that?
**A.** Because there were issued that -- issues that I raised as part of my experience; and in my professional opinion given the context that occurred, it was a reasonable conclusion by me.

9

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1030, Lines 5 through 21**
**Q.** Okay.
**A.** He had asked if I had looked at the SAD, which is kind of
our score sheet of internal control deficiencies. He had asked
me if I had considered whether we had a material weakness. I
said no. I went back and looked at it later the night that he
talked to me about it. I came back.
We talked about it the next day. He asked me if I thought
there was a material weakness around aggregation. And I said
no. And he says: That's a shame because I do. And he went on
to start talking about a lot of kind of aspects. And at that
point in time I said why don't you write this memo, because it
was starting to get complex.
So I don't -- at the time there was no complaints or, you
know, concerns. It was just that he had a position where he
thought we had an aggregation issue, and I had not seen it.
But I also wanted to understand it, so I asked him to write a
memo.

**Vol. 6 Page 1031, Lines 3 through 17**
**Q.** Okay. Thank you.
When Mauro brought up the aggregate deficiencies -- and
you may have touched on this briefly, but before he sent you
the memo, he shared his beliefs with you, and he believed there
was a material weakness at Cavium based on the aggregation of
control deficiencies; correct?
**A.** That's what he said, yes.
**Q.** And before this memo was sent to you in JX10, you actually
wanted to understand Mauro's point of view on the issues he had
brought up to you; right?
**A.** Of course.
**Q.** And you actually encouraged him to put his concerns about
the aggregation deficiencies in writing; right?
**A.** Yeah. I wanted him to write up why he thought there was
an aggregation, material weakness.

**Vol. 6 Page 1032, Lines 1 through 17**
**Q.** And 2012, right. And he's bringing up these issues with
audit opinions that have already been signed off on on behalf
of PwC; right?
**A.** Which I thought was very unusual for this kind of an

0

Case No. 3:18-cv-002615-AGT          APPENDIX 3

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"

1   analysis, but yes, that's correct.
    **Q.** But you would agree that if there is an aggregate control
2   deficiency, your job as an auditor would be to determine if
    these aggregate deficiencies created a material weakness;
3   right?
    **A.** That's correct, but you normally -- it's not even
4   considered that you consider deficiencies from prior years when
    you do an aggregation consideration.
5   So Mauro had brought in 2012 and 2013 issues into this
    memo, which was very unusual. I've never ever seen that before
6   in all my time. And so I -- you know, once I got it, clearly I
    needed to spend some time with Mauro to understand why he did
7   what he did.

8   **Vol. 6 Page 1056, Lines 6 through 13**
    **Q.** So at that point the team was in agreement that there was
9   significant deficiencies at Cavium; is that correct?
    **A.** Yes.
10  **Q.** Okay. You also write:
    "We are consulting under our close call
11  requirements for aggregation."
    Do you remember that email?
12  **A.** Yes, yes.

13  **KEVIN HEALY TESTIMONY (03/03/2021)**
    **Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**
14  **Q.** And, sir, why did you specifically highlight there and in
    the last sentence "Mauro also lead all the interactions with
15  ASM&T related to the material weakness and related
    disclosures..."? So why did you twice reference his work with
16  respect to identifying and communicating with respect to
    material weakness? Why was that something you were bringing
17  out in the review?
    **A.** I just thought that he did -- we sat down at the outside
18  of the engagement, we defined roles and responsibilities and
    expectations very clearly, and I thought he did a nice job of
19  executing against the expectations that I outlined.
    It was a very complex job. It's not easy to communicate
20  material weaknesses, especially for a company that had never
    experienced them before, and I thought that he did, you know, a
21  nice job not only managing the client interaction but also
    managing the firm interaction in the evaluation of those
22
                                    1
23  Case No.  3:18-cv-002615-AGT          APPENDIX 3
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"

1    conclusions.

2    **Vol. 7 Page 1266, Lines 2 through 12**

3    **Q.** You testified earlier that there was no black-and-white
judgment on material weaknesses. Do you remember that?

4    **A.** I said there was a lot of judgment. There's no
black-and-white conclusion on material weaknesses. A lot of
professional judgment in reaching that answer.

5    **Q.** And you would agree that to make a determination of a
material weakness requires professional judgment?

6    **A.** That's correct.

7    **Q.** And you encourage your auditors to use their professional
judgment in making that determination; correct?

   **A.** That's correct.

8

9    **JASON S. FLEMMONS TESTIMONY (03/03/2021)**
**Vol. 7 Page 1357, Lines 14 through 25**

10    **Q.** Mr. Flemmons, we've heard in this case about a
black-and-white approach of auditing versus the use of
judgment. Can you tell us what is the appropriate way to --

11    appropriate approach to an audit?

12    **A.** Well, with regard to, you know, the exercise of judgment,
that is required in pretty much everything that an auditor
does. There's very little that's black and white; and, you

13    know, when it comes to an assessment of internal controls, for
example, in determining whether or not a deficiency rises to

14    the level of a material weakness, that is -- that is something
where there are definitely no bright lines and requires an

15    extraordinary amount of judgment.

16    **JASON S. FLEMMONS TESTIMONY (03/04/2021)**
**Vol. 8 Page 1395, Lines 2 through 16**

17    **Q.** And do you agree there is no bright line in distinguishing
a significant deficiency from a material weakness?

18    **A.** I agree there are no bright lines. That said, there are,
you know, standards and criteria that are applicable in that

19    analysis, some of which we discussed yesterday.

   **Q.** And, in fact, SEC Guidelines emphasize that this is an

20    area of significant judgment; correct?

   **A.** Yes.

21    **Q.** Do you agree that there could be a range of professional
conclusions in any audit and all of those conclusions could

22

2

23    Case No.  3:18-cv-002615-AGT        APPENDIX 3

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"

1  comply with the professional standards?
   **A.** There are certainly a range of professional conclusions;
2  but I think, again, it boils down to whether the basis for
   those conclusions are considering the right standards and are
3  applying reasonable judgment.

4  **Vol. 8 Page 1396, Lines 5 through 7**
   **Q.** Do you agree that judgment is imperative in determining
5  whether a deficiency is a material weakness?
   **A.** Yes, I would agree with that.

6
   **Vol. 8 Page 1396, Lines 19 through 25, Page 1397 Lines 1 and 2**
7  **Q.** Would you agree that the auditors at PwC should have been
   encouraged to use their judgment?
8  **A.** I would agree that PwC auditors, like any auditing firm,
   would be encouraged to use reasonable judgment for sure.
9  **Q.** And the PCAOB standard uses the term "prudent," does it
   not?
10 **A.** My recollection of the PCAOB standard, if you're referring
   to Auditing Standard No. 5, refers to, I believe, a "prudent
11 official."

12 **Vol. 8 Page 1399, Lines 13 through 25, Page 1400, Lines 1 through 14**
   **Q.** In Audit Standard No. 5 that we just talked about, it
13 talks about the severity of a deficiency and using that in
   conjunction with a combination of deficiencies to determine
14 level of severity; is that correct?
   **A.** Yes, that language resides in Auditing Standard No. 5.
15 **Q.** Okay. And it does specifically say "combination of
   deficiencies"; correct?
16 **A.** Yes, I believe it uses that phrase.
   **Q.** Okay. And it says that:
17 "An auditor should determine a level of detail
   and degree of assurance that would satisfy a prudent
18 official" -- "a prudent auditor."
   Does it not?
19 **A.** It uses the phrase "prudent official," not "prudent
   auditor."
20 **Q.** Okay. And am I correct that it says that they need to
   determine the level of detail and degree of assurance that
21 would satisfy a prudent official; is that correct?
   **A.** Again, I don't have the standard in front of me. That
22

3

23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"**

1  sounds generally what the standard calls for.
   **Q.** And what do you interpret that to mean?
2  **A.** Well, that section relates to -- it advises auditors when
   evaluating the severity of a material weakness, you know, to,
3  you know, evaluate whether that deficiency, you know, presents
   a reasonable assurance that the internal controls would not
4  detect a material misstatement and whether the control
   structure would satisfy a prudent official in that regard.
5
   **Vol. 8 Page 1404, Lines 3 through 12**
6  **Q.** And do you agree that the determination of whether a
   deficiency arises to the level of a material weakness is a
7  judgmental process that is not necessarily always restricted to
   these criteria?
8  **A.** Well, as I said, those are four of the primary indicators.
   We've also talked about the, you know, general criterion with
9  regard to looking at it through the lens of a prudent official,
   and that criterion in combination with the other four that
10 we've talked about were criteria that were considered by the
   audit team.
11
   **Vol. 8 Page 1405, Lines 2 through 12**
12 **Q.** Okay. And PwC has a close-call protocol for handling
   these type of close-call situations; correct?
13 **A.** I recall they have policies and procedures regarding
   consultations with the National office on technical issues.
14 **Q.** Did you review those policies and procedures?
   **A.** I may have. I know that I obtained and reviewed some of
15 PwC's policies and procedures. I just don't recall if it was
   specific to this topic.
16 **Q.** Do you remember the technology "close call"?
   **A.** Yes. I believe that phrase appears on the National office
17 consultation template.

18 **MAURO BOTTA TESTIMONY (02/24/2021)**
   **Vol 3. Page 471 Lines 20 through 25**
19 **Q.** Sure. When you wrote your February 2015 memo, which
   you've testified about at length, this was one of the
20 allegations of you blowing a whistle; right, sir? That Cavium
   had a material weakness for incompetence?
21 **A.** After the allegation was that memo, yes.
   **Q.** Right.
22
                                    4

23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"

**Vol 3. Page 472 Lines 5 through 9**
**Q.** Okay. Sir, after you submitted this memo suggesting that
client Cavium should be assigned a material weakness for
incompetence, isn't it true, sir, you received a Tier 1 rating
in June of 2015?
**A.** I believe it's accurate.

**Vol 3. Page 477 Lines 1 through 8**
**Q.** And, sir, PwC actually issued Gigamon two material
weaknesses for that year; didn't it?
**A.** Yes.
**Q.** And, Mr. Botta, you'll agree with me that Gigamon because
of the finding of two material weaknesses, they had to disclose
those material weaknesses in its annual report to shareholders
that are filed with the SEC? You understood that; right?
**A.** Of course.

**Vol 3. Page 493 Lines 16 through 25, Page 494 Lines 1 through 6**
**Q.** And in 2016, the very next year, PwC took over the
engagement and issued two material weaknesses to Zhone; right,
sir?
**A.** I don't remember the number. I think there were two, but
I'm not hundred percent positive.
**Q.** Okay. Let me see if I can help refresh your recollection.
Zhone had, in fact, one material weakness because it
failed to maintain effective controls over its financial
closing process; right?
**A.** Yes.
**Q.** And another material weakness because it did not maintain
effective controls over the review of supporting information to
determine the completeness and accuracy of the accounting for
complex transactions; right?
**A.** I don't recall the language. I mean, if you have the SEC
filings, I can confirm to that for sure.

**MAURO BOTTA TESTIMONY (02/23/2021)**
**Vol 2. Page 252 Lines 12 through 20**
**Q.** Were you concerned at that time about challenging
previously issued opinions?
**A.** No. As I said, I put those prior years because to me
context mattered and I was concerned that if the conclusion

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

that we agreed upon for 2014 was that we would have had a
material weakness on competence, we would have needed to answer
the question related to prior years even though the same people
were there to also deal with the same type of unusual
transactions.

**Vol 2. Page 253 Lines 15 through 22**
**Q.** Okay. Do you believe then that you bringing up your
concerns of an aggregate material weakness were reasonable?
**A.** Yes.
**Q.** Why?
**A.** Because based on my professional opinion as I articulated
in that memorandum, there was significant concerns both as I
mentioned individually or in the aggregate that a reasonable
auditor could have concluded that that was a possibility.

**Vol 2. Page 326 Lines 21 through 25**
**Q.** Did you, Mauro, ever talk to Stig about issuing a material
weakness against Harmonic?
**A.** Yes.
**Q.** When was the first time you had that kind of conversation?
**A.** In I think it was around March.

**Vol 2. Page 330 Lines 5 through 8**
**Q.** Okay. What happened next with respect to you bringing up
issuing a material weakness on Harmonic?
**A.** Ergun told me that I was free to go back to Gigamon and
tell them that I was -- he was being the bad guy.

6

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1106, Lines 18 through 25, Page 1107 Lines 1 and 2, Lines 6 through 8**
**Q.** Do you understand the reason why PwC alleges they
terminated Mr. Botta?
**A.** No.
**Q.** You don't? Okay.
**A.** Based on the rules of evidence here, I've only heard
through my --
**Q.** Okay. That's fine.
Let me ask you this: The $10 million threshold that was
written in these various documents we've reviewed, that wasn't
a fabrication, was it?
**THE WITNESS:** That was -- that was not a fabrication.
That was a draft that I thought was a good number that we
validated the next day with the CAO.

**Vol. 6 Page 1125, Lines 15 through 25, Page 1126 Lines 1 through 5**
**Q.** Okay. And just a few more questions, Mr. Thorson.
Hopefully, we can wrap up.
If there was a fabrication in the Cavium audit, you would
agree PwC would need to take some steps to rectify that; right?
**MR. HUESTON:** I'm going to object to that. This is
not just a hypothetical, but it's vague as framed.
**THE COURT:** This witness has testified on whether or
not there was a fabrication, and I believe his testimony was
no.
So the question is had he -- had there been a fabrication,
what would have happened?
**MR. CABECEIRAS:** Correct, Your Honor.
**THE COURT:** If you can answer the question,
Mr. Thorson.
**A.** If I knew something was fabricated, you know, that would
be unacceptable to me.

**Vol. 6 Page 1128, Lines 2 through 5**
**Q.** Okay. And was there any keeping current procedure done
with respect to falsities for the March 2nd, 2015 audit opinion
that you signed?
**A.** Not that I'm aware of.

**Vol. 6 Page 1145, Lines 9 through 24**
**Q.** And let me show you another document. We'll go to JX4.
This is Mr. Botta's SEC Complaint, which he testified he

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1  authored. And we'll go to Page 9 of this document, middle of
   the Page 9, first full paragraph.
2  And I want to highlight, quote:
   "Such conclusion was achieved after a control
3  over the tax footnote was documented. However, such
   control was not noted during the walk-through and
4  constituted a documentation exercise thanks to which
   the Significant Deficiency conclusion was agreed upon
5  by National. Evidence of this is that this control
   was created the night before the filing of the 10-K."
6  Sir, have you ever made a claim like this to the SEC or to
   anybody?
7  **A.** No. This control was definitely not created the night
   before the filing of the 10-K.

8

9  **WALTER F. BROWN TESTIMONY (03/08/2021)**
   **Vol. 9 Page 1465, Lines 5 through 13**
10 **Q.** And, Mr. Brown, did Mr. Botta describe a monetary amount
   at which he set and created this control?
11 **A.** He did. So the control related to fluctuations in the tax
   footnote and the threshold created was, as I recall,
12 $10 million. Meaning that if there was a fluctuation in the
   tax footnote in excess of $10 million, then pursuant to the
13 control, the chief financial officer and the chief accounting
   officer would do additional review and additional work to
14 determine whether there was an issue.

15 **Vol. 9 Page 1467, Lines 22 through 25, Page 1468 Lines 1 through 14**
   **Q.** Well, why don't you just -- I'll get into some specifics,
16 but maybe you can describe your understanding at a high level
   of what this document was before we get into some specifics.
17 **A.** Sure. So as I mentioned earlier, the National office was
   conducting a review of the internal controls at Cavium. There
18 had been a complaint or an issue raised by Mr. Botta that
   various control deficiencies aggregated to a material weakness,
19 and so the National office was reviewing those issues and in
   the course of that review created a number of documents that
20 were going to be part of the package, if you will, of the
   review and one of those was a tax memo.
21 As I mentioned, this control related to the tax footnote.
   And at some point, as I recollect, the National office took out
22 from the tax memo the relevant section concerning this internal
   control and created a stand-alone document, and that became the
23 document that various people were looking at and editing and

2

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

reviewing over the course of that weekend; and that, I believe,
is what I have in front of me –

**Vol. 9 Page 1472, Lines 8 through 19**
**Q.** All right. Now, sir, we've heard testimony that Mr. Botta
in fact, and you've referenced this I think, initiated a
National office consultation because he had alleged that Cavium
had a material weakness due to competency, but you've
now described Mr. Botta telling you that he in fact was creating a
control to presumably help Cavium. Did you consider that
issue?
**A.** I did. It actually struck me as incongruent that at the
time that he was, you know, raising issues about control
deficiencies and a material weakness, he would be taking steps
to help solve a problem concerning it, a control deficiency,
and it struck me as inconsistent or incongruous.

**Vol. 9 Page 1501, Lines 18 through 23**
**Q.** And after the first interview on June 14th, you suspected
that he had fabricated a control; is that correct?
**A.** I don't know that I suspected. He had told us he had
fabricated a control, and the word I believe he used was -- I
can't remember the exact word, but I believe it was "created,"
"made up."

**Vol. 9 Page 1523, Lines 2 through 8**
**Q.** When you interviewed Mr. Botta, he never used the word
"fabricated," did he?
**A.** I don't recall if he used that word. I don't -- I'm
recalling today "created," "made up." I'm not sure the
exact -- the exact word he used.
**Q.** He never used the word "lied"?
**A.** I don't recall if he ever used the word "lied."

**Vol. 9 Page 1525, Lines 20 through 24**
**Q.** If the control actually existed, it would not have been
fabricated; would you agree with that?
**A.** If the control actually existed, then it wouldn't have
been created the night before the K was filed. I think -- I
think I would agree with that.

**Vol. 9 Page 1532, Lines 6 through 10**
**Q.** If the control existed, that would mean that it had not
been fabricated; correct?

3

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1  **A.** I think that's probably right. If there was, in fact, an
internal control, this internal control that existed, then
2  there would be nothing to create or fabricate.

3  **Vol. 9 Page 1526, Lines 4 through 10**
**Q.** And there were other people other than Mauro editing the
4  document, DX1280; correct?
**A.** I'd have to go back and look at it. I recall there were
5  other people raising comments, asking questions. I can't
remember if there were edits, other than by Mr. Botta, to the
6  actual document. There may have been. I just can't tell you
that without looking at the document.

7

8  **Vol. 9 Page 1527, Lines 9 through 20**
**Q.** During the interview of Mauro, did it appear that there
was any awareness or acknowledgment by Mauro that he had done
9  something wrong?
**A.** Yes.
10 **Q.** Okay. Did he say that he had lied?
**A.** I don't recall if he used the word "lie."
11 **Q.** Did he say that he had done something wrong that he
shouldn't have done?
12 **A.** I don't recall the specific words he used when he
described the creation of this control, but the -- with the
13 tone and tenor of the -- of the discussion was that he knew it
was wrong.

14

15 **Vol. 9 Page 1527, Lines 21 through 25, Page 1528 Lines 1 through 8**
**Q.** Did anyone in the room from PwC or Orrick say to him: You
weren't supposed to do that. You're not allowed to create a
16 control.
**A.** I don't recall that we confronted him in that fashion.
17 Our goal was to gather information, and I don't know that we
took an adversarial confrontational approach with him. I don't
18 believe we did.
**Q.** Thank you.
19 You never told him that you thought he was lying or that
he did something wrong; correct?
20 **A.** I don't recall telling him in the interviews that I
thought he was lying or that he had done something wrong,
21 that's correct.

22 **Vol. 9 Page 1556, Lines 5 through 14**
**Q.** And my question was: Did you ask Mauro if the final
23
                                    4
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1  consultation memo contained false information?
**A.** I -- I can't remember if we specifically went through the
2  same language that had been the tax memo that was imported into
the final memo and asked him to confirm that separately.
3  **Q.** Did you ask Mauro Botta in any of the interviews if the
final work papers for the 2014 Cavium audit contained false
4  information?
**A.** I don't recall if I specifically asked him that precise
5  question.

6  **Vol. 9 Page 1529, Lines 22 through 25, Page 1530, Lines 1 through 7**
**Q.** When you interviewed Mauro, you did not ask Mauro if he
7  had discussed the $10 million threshold with Mr. Thorson at the
time that it was put into the memo; did you?
8  **A.** I believe -- I believe we asked him what discussions he
had with Mr. Thorson, yes.
9  **Q.** You didn't ask Mauro if Mr. Thorson and he created the
$10 million threshold together for the tax memorandum; did you?
10  **A.** I recall asking him whether he discussed the creation of
the control with Mr. Thorson.
11  **Q.** And he said yes; correct?
**A.** Correct.
12

**Vol. 9 Page 1540, Lines 13 through 22**
13  **Q.** In the interviews with Mauro, did he share with you that
Mr. Thorson gave him approval to add the $10 million control to
14  the tax memo?
**A.** He indicated to me that he discussed this with
15  Mr. Thorson. I don't recall if he used the word "approval,"
but he told me he discussed it with.
16  **Q.** And did he tell you that Mr. Thorson agreed that it was
good and he should add it?
17  **A.** I don't know, again, if he used the word "good," but he
told me that Mr. Thorson agreed with him to add this.
18

**Vol. 9 Page 1545, Lines 2 through 5**
19  **Q.** So you never discussed with Mr. Botta whether the
$10 million threshold had been tested?
20  **A.** I don't recall whether we discussed that issue with him or
not.
21

**Vol. 9 Page 1554, Lines 19 through 21**
22  **Q.** Did you tell the SEC that the control was already in
place?
23  

5
24  Case No.  3:18-cv-002615-AGT          APPENDIX 4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1   **A.** I did not.

2   **WALTER BROWN DECLARATION 17:26 (01/11/2019)**
    4. During the interviews, Mr. Botta stated that he had fabricated a Cavium
3   internal control that was not actually in place at Cavium at the time, and that he drafted
    audit documentation describing the fabricated control that he understood others were
4   relying on.
    5. During the July 17 interview, in particular, I discussed with Mr. Botta
5   edits he made to a March 1, 2015 memorandum discussing certain Cavium internal
    controls, a true and correct copy of which is attached as **Exhibit 1.**
6   6. Mr. Botta stated-at several different points during the interview-that
    edits he made to the memorandum were fabrications that did not accurately describe,
7   according to his understanding, the internal controls in place at Cavium at the time.

8   **MARK SIMON TESTIMONY (03/08/2021)**
    **Vol. 9 Page 1574, Lines 5 through 9**
9   **Q.** Okay. So at trial Mr. Botta has testified that he didn't
    create a fake control. If that were true, would that have
10  impacted your decision to terminate him in any way?
    **A.** No. Again, he said he did. And if he didn't, that means
11  he lied about doing so.
    **Vol. 9 Page 1575, Lines 6 through 25, Page 1576 Lines 1 through 3**
12  **Q.** When you made your decision to terminate Mr. Botta, did
    you consider calling Mr. Botta to ask him: Hey, did you make
13  up this fake control?
    **A.** I did not believe there was a need to.
14  **Q.** Why not?
    **A.** So we've got, I would say, very strong, good protocols and
15  processes around how we conduct investigations. And that
    protocol is the attorneys and our risk management folks go
16  through those protocols, determine what's necessary. They
    provide the leadership team with the update as to the results
17  of those investigations. And then based upon that, we would
    make a determination as to whether or not someone should be
18  terminated or the consequences of the issues.
    It's not my job to do the investigation, nor have I done
19  that in the past.
    **Q.** Did PwC investigate whether Mr. Botta had, in fact,
20  created a fake control?
    **A.** So we did do an investigation.
21  **Q.** And I don't want you to get into the details, Mr. Simon,
    but what was your understanding of PwC's conclusion?
22  **A.** I think it was inconclusive. I think we were not able to
23  conclude either way as to whether a fake control was actually

6

Case No.  3:18-cv-002615-AGT              APPENDIX 4

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4
TESTIMONY REGARDING "FABRICATION" OR "LIE"

1  created or not.

2  **Vol. 9 Page 1603, Lines 6 through 13**
   **Q.** Okay. Let's discuss that for a second.
3  You declared in your declaration that we reviewed before
   certain things about that. I'll pull it up quickly.
4  So you declared under penalty of perjury and submitted to
   the Court that you made the determination to violate -- or to
5  terminate Mr. Botta based off various obligations which
   prohibit the fabrication of audit evidence; is that correct?
6  **A.** Yeah, that's correct.

7  **Vol. 9 Page 1604, Lines 6 through 24**
   **Q.** Now, you say Mr. Botta either violated his duties or lied
8  right here; right?
   **A.** Yes.
9  **Q.** You do not use the words "Mr. Botta violated his duties
   and lied"; right?
10 **A.** (Witness examines document.) Yes. That's the way it's
   written, yes.
11 **Q.** Okay. You know, obviously the word "either" means
   presenting of two alternatives; right?
12 **A.** That's the way it's written, yes.
   **Q.** Okay. So using the word "either," you'd agree that means
13 PwC's reason for terminating Mr. Botta could just be one of
   those reasons; right?
14 **A.** Say the question again.
   **Q.** Sure. So using your words "either" and agreeing on the
15 definition before, you'd agree this means PwC's reason for
   terminating Mauro could be just one of those reasons according
16 to your statement in paragraph 6 of your declaration; right?
   **A.** Yes.
17

   **Vol. 9 Page 1606, Lines 1 through 11**
18 **Q.** Mr. Brown, what did you mean by using the words
   "either/or" in this declaration?
19 **A.** Mr. Brown?
   **Q.** Mr. Simon. Excuse me. Sorry. We have spent the
20 afternoon -- or morning with Mr. Brown.
   So, Mr. Simon, what did you mean exactly?
21 **A.** So Mr. Botta stated that he created a fake control. So if
   he did so, he violated his professional, legal, and ethical
22 duties and PwC policy, which would prohibit that happening or
   allow it to not be happening, or he lied about doing so. So in
23                              7

24 Case No.  3:18-cv-002615-AGT          APPENDIX 4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1 | either case, those are grounds for termination from the firm.

2 | **MARK SIMON DECLARATION 13:25 (01/31/2019)**
4.I based my decision to terminate Mr. Botta on statements that he had
3 | made during two interviews with Walter Brown, a Partner at Orrick, Herrington &
Sutcliffe LLP, conducted in response to an inquiry from the Securities and Exchange
4 | Commission ("SEC") into PwC's audits of the financial statements of Cavium, Inc.
for fiscal years 2013 and 2014.
5 | 5. Specifically, Mr. Botta stated that he had fabricated an internal control
during the fiscal year 2014 audit of Cavium and created false audit documentation that
6 | he understood others were relying on.
6. In light of Mr. Botta's statements, I made the determination that he could
7 | no longer be employed by PwC because he had either (a) violated his professional,
legal, and ethical duties and PwC policy, which prohibit the fabrication of audit
8 | evidence or documentation or (b) lied about his conduct. Both alternatives are
misconduct warranting Mr. Botta's termination.

9 |

10 | **MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol. 3 Page 439, Lines 4 through 14**
**Q.** In that second meeting did you use the word "fabrication"
11 | when talking to Mr. Brown about this suggested control?
**A.** No.
12 | **Q.** When you talked to Mr. Brown about the suggested control,
did Mr. Brown ever accuse you of lying?
13 | **A.** No.
**Q.** Did Mr. Brown every accuse you of fabricating the control?
14 | **A.** No.
**Q.** Did Mr. Brown indicate in any way that what you did with
15 | respect to that control was problematic?
**A.** No.
16 |

17 | **Vol. 3 Page 436 Lines 8 through 25, Page 437 Lines 1 through 10**
**Q.** Mauro, did Mr. Brown ask you about the internal controls
on Cavium?
18 | **A.** Yes.
**Q.** Did he ask you about your suggestion regarding the
19 | internal controls on Cavium?
**A.** Yes.
20 | **Q.** Okay. What did he ask you about your suggested internal
control on Cavium?
21 | **A.** He asked me to go through what led to that, and if at the
time that I recommended that suggestion, I knew or had
22 | discussions with Cavium about it, and if I knew that at the
time if the company did have that control implemented.

23 |
8

24 |

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4
TESTIMONY REGARDING "FABRICATION" OR "LIE"

1  **Q.** Okay. And how did you respond to that question, whether
you knew the control was implemented?

2  **A.** I told him that at the time mine was a suggestion
predicated on the discussion that I had with Tye Thorson; that

3  that was the documentation that would have reflected the
control once he would have reassured me that Cavium would have

4  done it.
**Q.** Okay. What else did you share with him about your

5  conversation with Tye Thorson as it relates to this control
suggestion, if anything?

6  **A.** The conversation that I had testified earlier about the
exchange on Sametime, where he told me that the 7 million, and

7  then I raised to the 10 million.
And the conversation that I had where we discussed if he

8  thought National was going to go for it, and I said one way to
find out. And that was the extent of the conversation.

9

10  **Vol. 3 Page 437 Lines 20 through 25, Page 438 Lines 1 through 10**
**Q.** What happened next with respect to your involvement in
PwC's investigation into the Cavium matter?

11  **A.** I was asked for a second meeting in mid July, I believe.
**Q.** Okay. And who attended that meeting? Was it the same --

12  I think -- actually, withdrawn, we went over that.
Did Mr. Brown at that meeting ask you questions again

13  about the $10 million threshold?
**A.** Yes.

14  **Q.** Okay. And can you describe for the Court what he asked
you about regarding the $10 million threshold?

15  **A.** My recollection is that there were analogous questions to
the ones that I just described in the first meeting -- excuse

16  me, in the first meeting regarding the threshold, my knowledge
about if it was already in place at the time that I suggested

17  it, if I had communications with Cavium, and those were the
questions.

18

19  **Vol. 4 Page 653 Lines 14 through 25, Page 654 Lines 1 through 25**
**Q.** Well, I just want to make sure. You did not personally

20  confirm with either of them that Cavium had this control;
right, sir?

21  **A.** Correct.
**Q.** All right. And your testimony is you believe that

22  Mr. Thorson was going to confirm the control; right?
**A.** I told him to do so. Otherwise, I would not have made

23  those edits.

24

9

Case No.  3:18-cv-002615-AGT          APPENDIX 4

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1   **Q.** Okay. And so it's your testimony you have no reason to
believe that he, in fact, didn't do so; right?
2   **A.** Correct.
**Q.** So you believe that Cavium had this control and it
3   operated efficiently; right, sir?
**A.** Yes.
4   **Q.** Okay. And, again, to make sure I'm following your
testimony today, this is not a control that you created; right,
5   sir?
**A.** It's a control activity that establishes two different
6   precision. It's a bit of a semantic, so.... Not sure how to
better clarify.
7   **Q.** Well, let me ask a different question.
Your testimony today here is that you did not makeup an
8   internal control; right?
**A.** I did not.
9   **Q.** Okay. And, in fact, you did not create this control or
make it up the night before Cavium filed its 10-K; right?
10  **A.** I did propose this suggestion the night before.
**Q.** Sir, you did not create a control that did not exist;
11  right?
**A.** I proposed a threshold; that when I proposed it, I didn't
12  know.
**Q.** Sir, you would never create a control that did not exist;
13  is that fair?
**A.** I would never create a control that would not exist.
14  **Q.** That did not exist. You wouldn't create one out of whole
cloth; right?
15  **A.** Not in the final work papers.

16  **Vol. 4 Page 655 Lines 13 through 16**
**Q.** Okay. Now, sir, let's -- in reference to you did not make
17  up an internal control, that's not what you told the SEC;
right, sir?
18  **A.**  No.

19  **Vol. 4 Page 661 Lines 11 through 15**
**Q.** And, sir, isn't it true that during those interviews, you
20  said you had created a control for Cavium?
**A.** I don't recall the exact words that I said.
21  **Q.** Okay.
**A.** I repeated the same facts that I testified already.

22

23                                          10

24  Case No.  3:18-cv-002615-AGT          APPENDIX 4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1

2 **TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 905, Lines 6 through 9**
3 **Q.** How often were you interacting with Mr. Botta while he was
at PwC?
4 **A.** I interacted with him very often. Probably more so, I
would say, than any other employee.

5
**Vol. 5 Page 907, Lines 13 through 20**
6 **Q.** Ms. Nelson, did you ever -- do you ever remember Mr. Botta
shying away from voicing a concern or fighting a crusade?
7 **A.** No. I mean, Mauro was one of the most vocal employees. I
mean, in my 24 years I have never seen someone as vocal as
8 Mauro.
I mean, just to kind of describe it a little bit. I mean,
9 he was the guy that in an all-hands meeting would stand up and,
you know, be the one to state his opinion. He never held back.

10
**Vol. 5 Page 908, Lines 11 through 16**
11 **Q.** Could you quantify how much time you were spending with
Mr. Botta?
12 **A.** Well, I mean, it would be -- it was hard to quantify. I
mean, I felt like at times it was a bit of a part-time job. I
13 never, you know, minded spending time with him, but it was a
lot of time I spent with Mauro talking with him.

14
**Vol. 5 Page 913, Lines 4 through 14**
15 **Q.** I think the third thing you mentioned -- in addition to
the formal coaches, the executive coach, you mentioned that he
16 also got informal advice from folks in the office.
Who in the office would make themselves available to
17 Mr. Botta to give him sort of informal coaching?
**A.** Well, I mean, I -- Tim Carey, as the assurance leader, was
18 available to him. I know they had conversations.
Kevin Healy, who was the assurance leader just prior to
19 Tim and also, you know, partner leader in the firm.
You know, there was -- and others. I mean, you know,
20 people made time for Mauro.

21 **Vol. 5 Page 957, Lines 1 through 5**
**Q.** Okay. And resignations were mentioned. Every time PwC
22 0

23

24

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1  received a resignation from Mauro, PwC attempted to keep him
employed at PwC; right?

2  **A.** Yeah. I think we really supported trying to find
opportunities to keep him.

3

4  **UMIT F. OZDEMIR TESTIMONY (03/02/2021)**
**Vol. 6, Page 1010, Lines 7 through 10**
**Q.** And were the questions that he asked that you were present

5  for, did you think that that they were valid and good questions?
**A.** For my piece, again, for the only one -- I can only talk

6  for my piece. Yes, his questions were valid.

7  **Vol. 6, Page 1011, Lines 8 through 14**
**Q.** Do you agree that Mauro was professional on the audit?

8  **A.** Again, I can only talk for my piece. I did not involve in
top management meetings. I did not involve in every part of

9  the audit. I only did one part, which is mainly inventory and
hosting, yes.

10  For my part I think he was fine. Yeah, he was. He was
professional for my part.

11

12  **TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6, Page 1025, Lines 21 through 24**
**Q.** And Mr. Botta in 2012 raised some concerns with the Cavium

13  audit, did he not?
**A.** He raised some concerns, as he does on all of his audits

14  that I worked with him on.

15  **Vol. 6, Page 1028, Lines 11 through 19**
**Q.** Okay. Given the complexities of the issues, right, and

16  given you had to consult with folks in National, it was
reasonable for you and Mauro to bring up these issues to PwC's

17  National office; right?
**A.** Of course.

18  **Q.** And, Mr. Thorson, you do consider Mauro a good auditor;
right?

19  **A.** I think Mauro is a good auditor in a lot of cases. In
some cases not so good.

20

21  **Vol. 6, Page 1032, Lines 1 through 17**
**Q.** And 2012, right. And he's bringing up these issues with

22

23

24

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  5
TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND
ETHICAL AUDITOR

1  audit opinions that have already been signed off on on behalf
   of PwC; right?
2  **A.** Which I thought was very unusual for this kind of an
   analysis, but yes, that's correct.
3  **Q.** But you would agree that if there is an aggregate control
   deficiency, your job as an auditor would be to determine if
4  these aggregate deficiencies created a material weakness;
   right?
5  **A.** That's correct, but you normally -- it's not even
   considered that you consider deficiencies from prior years when
6  you do an aggregation consideration.
   So Mauro had brought in 2012 and 2013 issues into this
7  memo, which was very unusual. I've never ever seen that before
   in all my time. And so I -- you know, once I got it, clearly I
8  needed to spend some time with Mauro to understand why he did
   what he did.

9

   **Vol. 6, Page 1041, Lines 23 through 25, Page 1042 Lines 1 through 11**
10 **Q.** And at dinner you discussed with Mauro what you felt were
   his options as it relates to the issues he brings up in the PB
11 memo; right?
   **A.** That was kind of the penultimate discussion at the end.
12 We felt like we had a good discussion about this issue and
   other things. Mauro and I had a good relationship I thought.
13 And Mauro shared his views. Mauro was not afraid to share
   his views. So he shared his views. And by the end, I think we
14 were both in about the same spot.
   It's just something needed to happen relatively quickly in
15 terms of his decision. We couldn't stew on it for weeks. This
   is something that we had to make the decision, either disagree
16 or not. If he disagreed, we've just got things we need to do
   according to PwC policy.

17

   **Vol. 6, Page 1063, Lines 24 through 25, Page 1064 Lines 1 through 7 and Lines 17 through 24**
18 **Q.** Okay. So to the extent the times may be off because it's
   Eastern versus Pacific time, we appreciate that and thanks for
19 clarifying for the record. That's going to be noted. Okay?
   Within that same time frame -- right? -- whatever time
20 zone we're working with, at one point you asked Mauro to help
   you out with this and see what he could do; is that right?
21 **A.** I asked Mauro to help, yeah. Mauro was a key person

22
                                          2
23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1  helping and responding to National office questions along with
Denise and several other people.
2  **Q.** Okay. But up until that point, Mauro had not made any
edits on the tax memo; right?
3  **A.** I don't know. I don't recall if he did or didn't. I
mean, Mauro was instrumental in responding to aspects of the
4  tax memo. Whether he edited them or somebody else edited them,
I don't know. He's the one that identified or raised a control
5  that he thought was a compensating control to me at one point
in time. He says, "We've got this other control."
6
**Vol. 6, Page 1068, Lines 3 through 25**
7  **Q.** Okay. That evening do you recall -- well, withdrawn.
You recall telling Mauro that evening -- or Mauro telling
8  you that evening he had a proposed fix to the comments outlined
by Gil and Karen that we just reviewed; right?
9  **A.** We discussed what -- the approach that we should take for
answering this memo -- answering Gil's comments. So there was
10  a part to this thing where Mauro said, "Hey, guys, I found the
compensating control that I think gives us coverage we need to
11  deal with National."
Mauro raised that to me. I said, "Good job. Let's move
12  forward with that as the compensating control."
National then comes back and says, "Well, we need a
13  precision level with this thing. That's where the profession
is starting to move. Let's see if we can get a little
14  precision on this thing."
And both Mauro and I didn't know what the precision was at
15  that point in time because we needed to talk to the client to
understand what their precision was. And so we talked about,
16  you know, how do we deal with taking this to National; and
ultimately it was decided that we would document a number in
17  there, send it to National, and the next day I would go talk to
the client about what the CAO and CFO's thresholds were when
18  they do this review.

19  **Vol. 6, Page 1118, Lines 3 through 14**
**Q.** Okay. Cavium was internally inspected by PwC's Quality
20  Department in 2015; right?
**A.** Yes, I believe it was a 2014 audit that was inspected in
21  2015.

22
Case No.  3:18-cv-002615-AGT              APPENDIX 5
23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5
TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND
ETHICAL AUDITOR

1  **Q.** And about when was that inspection?
**A.** Probably July or August.
2  **Q.** Okay.
**A.** That's my recollection.
3  **Q.** And at that, if you can recall, Cavium was deemed a
compliant audit? The 2014 audit was deemed a compliant audit;
4  was it not?
**A.** Yes.

5

**Vol. 6, Page 1141, Lines 17 through 25, Page 1142 Lines 1 through 8**
6  **Q.** And, sir, did you remove Mr. Botta from the audit at that
time when they requested it?
7  **A.** No, I did not.
**Q.** Why not?
8  **A.** The -- so the CFO had approached me on removing him from
the account, and he had said that he -- just kind of bedside
9  manner, kind of style, wasn't something that they were warming
up to, and they wanted to replace him.
10  And I had -- I had asked Art, the CFO, if we could at
least keep him around for another year, while he had a chance
11  to get to know Mauro and get to know him better. I mean, at
the time I believed Mauro had done a good job. And, you know,
12  my view is he was a little bit like kind of a fine wine, where
it takes a little bit to get used to him, but...
13  And so the -- basically I think when I got done, I said:
Art, I'd like you to just trust me on this one. So Mauro
14  remained on the account for the next -- obviously until 2015.

15  **Vol. 6, Page 1149, Lines 17 through 22**
**Q.** And what did you understand him to mean when he wrote "I
16  wanted to salute you"?
**A.** I think it was a respectful appreciation and a way to say
17  good-bye. We did have a pretty good working relationship while
he was at PwC, and I looked at that as kind of a respectful
18  good-bye.

19  **MARCO BOTTA TESTIMONY (03/02/2021)**
**Vol. 6 Page 1161, Lines 2 through 16**
20  **Q.** Go ahead, Mr. Botta. Can you please describe for the
Court the emotion that you heard in your brother's voice?
21  **A.** Well, he was really sad. He didn't understand why he was

22

23

24

4

Case No.  3:18-cv-002615-AGT          APPENDIX 5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1  terminated, and the problem is that he -- he really loved and
loves his job so he was really, really in a bad state of mind.

2  **Q.** Thank you.
Were there -- did he talk to you about physical symptoms

3  he was experiencing as a result of the termination?

4  **A.** Well, he told me several times that even before his
termination he was really under heavy stress, and I could see

5  him under heavy stress all the time we talk before and also
after he was terminated.

6  And he was also suffering because he was started to -- not
to sleep very well. And so, yes, I saw him -- I could see him
under heavy stress.

7

8  **Vol. 6 Page 1165, Lines 16 through 25**
**Q.** Did Mauro tell you that he had been accused of fabricating
a control at Pricewaterhouse?

9  **A.** Yes, he told me that.

10  **Q.** Did he tell you how that affected him to be accused of
lying about a control?

11  **A.** Yes. He was really disappointed and angry because he
didn't do anything of that. He told me that he never did
anything of that.

12  **Q.** Does Mauro pride himself as an honest, ethical person?
**A.** Yes, he does.

13

14  **Vol. 6 Page 1166, Lines 19 through 22**
**Q.** How does your brother seem now, Mr. Botta?

15  **A.** As I said earlier, he is not happy. He is not happy with
his job and he really wanted to go back to work to what he was
at his job that he liked so much.

16

17  **KEVIN HEALY TESTIMONY (03/02/2021)**
**Vol. 6 Page 1185, Lines 2 through 22**

18  **Q.** Okay. And so if you weren't working directly with him on
engagements, how is it that you wound up spending as much time
as you did with Mr. Botta?

19  **A.** Mauro was -- was always the first person in my office when
he had a point of view on a variety of matters. And I really

20  appreciated him coming to me and sharing his insights and
thoughts on a variety of matters, whether it be how we should

21  be thinking about new technical accounting pronouncements that

22

23

24

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

need to be adopted by our clients, whether there were
observations on how companies were implementing system and
challenges.
So Mauro was -- you know, he was a very frequent
contributor to me, and I had really an open-door policy and
would make a lot of time for Mauro because he was really
proactive at sharing his points of view on things with me.
**Q.** Okay. And did you always agree with the issues, concerns,
or items that Mr. Botta raised with you?
**A.** No. No. But I would always be willing to discuss them
and debate them with him and really listen to his point of view
before making my recommendations on how we were going to move
the practice forward.

**Vol. 6 Page 1187, Lines 16 through 21**
**Q.** And, Mr. Healy, in your experience and as market assurance
leader, do all employees at PwC get to have an executive coach?
**A.** No. It's extremely rare. We do it generally for a
handful of partners; and over my tenure as a partner 20-plus
years, it's a handful of people below the partner level that
I'm aware of that have gotten executive coaching.

**Vol. 6 Page 1189 Lines 20 through 25, Page 1190, Lines 1 through 24**
**Q.** And when you learned that, Mr. Healy, did PwC take steps
to terminate Mr. Botta after he told you he was resigning to go
to another Big 4 accounting firm?
**A.** No. I mean, our normal practice is that when somebody's
going to a competitor, that when they resign, we immediately
would escort them out of the building, pay them for their
notice period, and let them go on their merry way.
But, you know, I felt that this was an emotional reaction
to the feedback, and I wanted to spend time with Mr. Botta to
understand why he was making the decision, what he thought he
was going to get at KPMG; that, you know, we were making an
investment in his development, we were interested in his
success, and wanted to hear -- hear the reasons why he was
thinking about leaving. And we spent a number -- had a number
of phone calls helping him think through that decision and
thought process.
**Q.** And, in fact, do you remember, you know, what times of day
or night you received and counseled Mr. Botta through those

6

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

phone calls?

**A.** It was -- you know, I was available to Mauro all day all the time whether it was evening or weekends. I remember one of these phone calls I was at my son's baseball game I was on the phone with Mauro. And, you know, daily when my kids were young, I was working crazy hours and I didn't spend many -- many days at their activities, but I remember vividly on the sideline spending time with him and then recommending other people within the firm that he should talk to as he's making his decision because I felt that he was making more of an emotional decision as opposed to a logical and practical decision at the time.

**KEVIN HEALY TESTIMONY (03/03/2021)**
**Vol. 7 Page 1206, Lines 12 through 21**
**Q.** Okay. And you've just stated though that it was your decision to go ahead and elevate this anyway; is that right?
**A.** That is correct.
**Q.** And why did you decide to do that?
**A.** I decided to do that because I wanted to make sure that we got the answer right, and that -- that all parties felt heard, and all the facts were appropriately tabled and people were comfortable that their voice was heard and that they had -- there was a thorough vetting of the analysis. So that was just my recommendation.

**Vol. 7 Page 1209, Lines 8 through 18**
**Q.** And by the way, what did you view your role to be at this stage?
**A.** So as part of policy, my role is not to be involved. My role was there really to support Mr. Botta.
You know, I wanted to make sure he felt that he had someone he could go to to act as a sounding board, because we had developed a trusting relationship over the prior -- prior number of years. And just wanted him to feel comfortable that he had somebody that was, you know, supporting him in his -- you know, as he was working through his thought process on this matter.

**Vol. 7 Page 1255, Lines 20 through 24**
**Q.** And he wrote, quote, "You've been nice to me," end quote.

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

1  And, sir, let me just ask you. Do you feel that you were,
in fact, nice to him during his tenure at the firm?
2  **A.** I was always very genuine to Mr. Botta and, yes, I think
there was a lot of mutual trust and respect between us.

3
**Vol. 7 Page 1243, Lines 14 through 21**
4  **Q.** Okay. And it was your decision as to who you wanted to
work personally with on this; right, sir? On the senior
5  manager position.
**A.** It was. I wanted an opportunity, because I've worked with
6  him kind of in an informal relationship for years and years,
that I wanted to see, you know, if I could help provide
7  coaching realtime on the job, whether I can also help him
continue to develop.

8
**Vol. 7 Page 1249 Line 25, Page 1250, Lines 1 through 5**
9  **Q.** All right. And, Mr. Healy, in your kind of grading
experience, you know, is this a higher grade, middling grade or
10  lower grade for the senior manager?
**A.** This is a positive -- positive snapshot. It's in that
11  kind of -- the bottom of the first quartile or the top of the
second quartile. This would be -- it's very positive.

12
**Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**
13  **Q.** And, sir, why did you specifically highlight there and in
the last sentence "Mauro also lead all the interactions with
14  ASM&T related to the material weakness and related
disclosures..."? So why did you twice reference his work with
15  respect to identifying and communicating with respect to
material weakness? Why was that something you were bringing
16  out in the review?
**A.** I just thought that he did -- we sat down at the outside
17  of the engagement, we defined roles and responsibilities and
expectations very clearly, and I thought he did a nice job of
18  executing against the expectations that I outlined.
It was a very complex job. It's not easy to communicate
19  material weaknesses, especially for a company that had never
experienced them before, and I thought that he did, you know, a
20  nice job not only managing the client interaction but also
managing the firm interaction in the evaluation of those
21  conclusions.

22
Case No.  3:18-cv-002615-AGT                 APPENDIX 5
23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

**Vol. 7 Page 1259, Lines 7 through 13**
**Q.** Okay. Did you find that his spotting of this issue was meaningful?
**A.** Yes. I mean, this is consistent with what I said yesterday; that when Mauro identified issues, he'd be the first person to my office to share insights on a whole host of matters to help me think about, you know, how we shared more broadly.

**Vol. 7 Page 1264, Lines 16 through 25, Page 1265 Lines 1 through 9**
**Q.** Okay. And you thought that Mauro asked reasonable questions in that audit?
**A.** I thought that he responded to coaching that I provided him at the beginning of the audit and that he spent -- we spent a lot of time hand in hand. I -- so we worked closely together. I can't -- I don't know every question that he asked and whether they were reasonable or not.
**Q.** You rated him very highly -- highly favorable on this engagement; correct?
**A.** That's right.
**Q.** And you agreed that the Zhone project was highly complex with numerous adjustments, material weaknesses, and technical matters?
**A.** Yep. Those are my words.
**Q.** And Mauro handled it professionally and correctly?
**A.** Yes, he did.
**Q.** And you said that he developed a trusting relationship with the CFO and the controller; correct?
**A.** That's correct.

**STIG HAAVARDTUN TESTIMONY (03/03/2021)**
**Vol. 7 Page 1288, Lines 13 through 19**
**Q.** And what did you think of Mr. Botta and your interactions with him?
**A.** I enjoyed working with Mr. Botta on Micron. I think he did -- I think he did a good job. He's a little bit of a character, which helps sort of when you're doing a lot of work together from an audit perspective. So I enjoyed my time with Mr. Botta on the Micron engagement.

9

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

**Vol. 7 Page 1290, Lines 3 through 9**
**Q.** Okay. So let's focus initially on that first period, the
September-October period. How did his transition into the
engagement team go?
**A.** I think it went -- I think it went well. He clearly --
like, he came in with a lot of questions and he wanted to learn
and wanted to work with the team. So I was -- I was generally
happy in the initial phases of the Q3 work.

**Vol. 7 Page 1322, Lines 15 through 25, Page 1323 Line 1**
**Q.** And the final point you make was his inability to close
out issues. And just briefly describe what your concern was
there.
**A.** Yeah. My concern there was that he had raised all these
questions, many of them good questions, but he just couldn't
close them out.
Like, he couldn't figure out what information was needed
in order to reach a conclusion. He just asked for more and
more and more without sort of a clear plan as to how to
conclude whether any of this were significant or not. And,
like, reality was that all of this ended up being relatively
minor once it all got sorted out.

**Vol. 7 Page 1324, Lines 13 through 20**
**Q.** In fact, the very first narrative description you provide
is:
"Mauro has numerous strengths in areas such as
the understanding of audit methodology, commitment to
quality, strong work ethic, supporting his teams and
engagement."
Do you see that?
**A.** Yes. I stand by that.

**ED SARRETT TESTIMONY (02/23/2021)**
**Vol. 2  Page 190, Lines 24 and 25**
**Q.** Okay. Does Mr. Botta value ethics?
**A.** Extremely.

**Vol. 2  Page 191, Lines 18 through 22**
**Q.** Mr. Sarrett, can you please describe for me if Mr. Botta
talked with you about right and wrong and what he thought was

10

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

right and wrong?
**A.** Yes. He's a devout Catholic and adheres strictly to his
religious beliefs. Goes to mass regularly.

**Vol. 2  Page 194, Lines 7 through 25, Page 195 Lines 1 through 6**
**Q.** Mr. Sarrett, did Mr. Botta talk to you about right and
wrong when he met with you on occasion?
**A.** Yes.
**Q.** Okay. And what did he tell you?
**A.** He has a very strong sense of right and wrong.
**Q.** Did he talk to you about any incidents of right or wrong
that he was experiencing as he came to talk to you?
**A.** Yes. I wouldn't know how to describe -- I don't
understand the whole world of PwC and auditing very well, but I
would say that he felt like when there was an ethical concern
for him, he was going to raise it. That was important to him
to not ignore it.
**Q.** Okay. Did he talk to you about that a lot?
**A.** Yes. Usually in most sessions there was some kind of
mention of the progress of the trial or something that at PwC
that would concern him. So I guess, yeah.
**Q.** Did he feel -- did he talk to you about that he felt it
was important to do the right thing and stand up for what he
believed in?
**A.** Absolutely.
**Q.** Did he talk to you about valuing ethics?
**A.** Definitely.
**Q.** Did he talk to you about valuing the truth?
**A.** Definitely. That seems to be a primary motivation for
him.

**MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol. 3 Page 328 Lines 20 through 22**
**Q.** Were you concerned in auditing Harmonic about Harmonic
shareholders?
**A.** I was concerning to protect them by doing a quality audit.

**Vol. 3 Page 461 Lines 18 through 25, Page 462 Lines 1 through 4**
**Q.** Okay. Mauro, has being retaliated against at PwC impacted
your well-being at all?
**A.** Yes.

11

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

**Q.** How so?
**A.** I suffered from -- suffer from anxiety, depression,
occasional suicidal thoughts. I lost some of the people that I
was working with that do not want to speak to me. Other people
that are willing to meet me ask me to meet in back alleys or
far away from the office, you know, when they are close to
where I live. And, in general, the fact that I am now known to
be someone that allegedly violated ethics, which has been
always the thing that I cared the most.

**EXHIBIT JX 2-3**
Client relationship – Mauro's unique style works for him there. He really connects with clients in a
positive way. An example of this is when a client was transitioning from public to private to merger; he
had to interact with 3 different management teams. There were also many different personalities
involved and the transition required a complete culture shift. Through and through there was Mauro,
dealing well with it all and forging close bonds with the clients. Mauro, in his way, made a positive
impact. The client still asks him about him today.

Clients really like him too. He is approachable and responsive.

Really good with people. He is a very good coach for our staff. Rolls up his sleeves with staff and
teaches them.

Dedicated, loyal, hard working

Strong set of values, high integrity, trust worthy, ability to call a spade a spade.

Mauro has very strong professional skepticism and it is a very good thing.

He is open and direct in a way that others aren't.

When Mauro is engaged and passionate, he gets it done and delivers excellent quality work.

His passion for our business and PwC.

He understands our business. He understands that we need to delpoy efficiently, record time, bill and
collect. He understands those KPIs for our business and owns them in a way that distinguishes him from
other senior managers.

Mauro is funny. Gets things done with humour and yet is aggressive about it. I really, really like him. He
is a great guy – funny as hell.

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

He is very involved and in the know. He stays connected and is proactive about it.

He is an amazing asset to the firm.

Very detail oriented.

**EXHIBIT JX 2-4**
I would always trust him getting an audit done right. All partners would wave his flag here- which is big in this world.

He has a great ability to audit things.

**EXHIBIT DX 1688-2**
3) As a response to the notification received as CRT, I suggested a solution to National on how to offer a path for the target of this restructuring, (aged senior managers not in the pipeline). For example, given I still love audit, I offered to relocate in other offices/LOSs and to even accept reduction in role and salary, and to my surprise the reply received was that the firm was "not interested in creating such precedent" despite they do so for international hires, again without providing explanations for the decision but only the mechanical reiteration that I needed to look for a job.
In light of what I mentioned, I'd like to ask you to embody another core value and suggest if you could "reimagine the possible" to reconsider the decision to fire tenured individuals that have no performance issues, are currently generating revenue and would love to stay and contribute to the point to accept a role and salary reduction. I like to believe and hope that in the One Firm vision there'd be room for them as well, especially in light of your most recent communications.
I'm obviously concerned that, if after reassurances that there are no changes, an entire class is being laid off, what would prevent future actions of this kind at other and more junior levels? Because that is the one precedent that this did create and I can hardly imagine that it was one that this firm should have been interested in (unlike my proposal).

**EXHIBIT DX 1697-6**
I: Asked again about the advantages that would come if he "settled" the suit.
R: No way, cannot back down from the principle of the thing. Wants to be reinstated since he was fired unjustly, not for poor work performance. Wants to return to work with his "kids", his team.

P: strong, controlling (critical) parent - strong sense of duty, obligation (not to parents necessarily, nor to bosses who don't do the right thing), doing the right thing, religious faith, attendance at mass (even when on the road). Not as strong NP (Nurturing Parent) – not as compassionate toward self (self-protection) not high on his list of priorities if it

13

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND**
**ETHICAL AUDITOR**

means sacrificing adhering to values.

**EXHIBIT DX 1696-3**
Transactional Analysis would about how strong the NP (Nurturing Parent} part of his Parent Ego State is. It seems as though the CP is most dominant and holds Mauro to a strict adherence to his internalized values, religious norms, gentlemanly code of conduct and that makes it difficult for Mauro to respond differently in environments where he perceives those values as compromised (not that his acting in this manner is a bad thing; it is, however, counter-cultural and not the norm!).

**EXHIBIT DX 1696-5**
Very
heightened sense of right and wrong, adheres very strictly to his value system. Reports that he "has to do the right thing", but wishes to return to employment with company.

**EXHIBIT DX 1697-2**
Wants publicity for lawsuit so that the wrongs can be corrected. Doesn't seem to allow the notion of potential harm to career to outweigh adherence to what he thinks is right.

**EXHIBIT DX 1697-5**
M reports having a hard time with the work and work places he's had to pick up since being let go by previous company. Has a hard time finding meaning in it, missing his workmates and his "kids", the team he was instrumental in creating. Showed me "personality" evaluation", reported that he felt it was pretty accurate about him, wanted to know what I thought. I agreed.

M is very blunt and direct, which are qualities not everyone always appreciates. He has a hard time understanding why this is so since he really values the clarity of what he communicates to partners and doesn't understand why they don't feel similarly about his directness.

Reports that his team of "kids" really appreciates his clarity 'With and support for them and always feels that this openness and lack of interest in "hierarchy" are conducive to creating an effective team.

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S POST-TRIAL BRIEF – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**EXHIBIT PX 105-27**

11/11/15 - Christopher J Smith

"Mauro has been active leveraging his network to drive opportunities for the firm in the non-audit space at multiple clients, which is something many of our senior managers don't spend a lot of time doing. This has lead to over $500k in opportunities for the firm. Mauro should think about whether he'd like to get more involved in the pitch and/or delivery on these opportunities"

11/20/15 - Tye Thorson

"Mauro represented the team in the recent ECR of Cavium. Mauro did an excellent job managing the entire ECR process, dealing with the issues, communicating all material areas needing communication to the review team and being the front person in virtually all areas. The review team had specific semiconductor experience and was asking tough questions of Mauro and the team which, at times were frustrating for Mauro. He rose above it, kept his cool and the results were compliant".

Case No.  3:18-cv-002615-AGT          APPENDIX 5

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Plaintiff Mauro Botta's Post-Trial Brief was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by facsimile to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's EM/ECF System.


Dated:  April 5, 2021                         */s/ INGRID M. EVANS*
                                                     INGRID M. EVANS