INGRID M. EVANS, ESQ. (SBN 179094)
**EVANS LAW FIRM, INC.**
3053 Fillmore Street #236
San Francisco, CA 94123
Phone: (415) 441-8669
Fax: (888) 891-4906
Ingrid@evanslaw.com

ALEXANDER G. CABECEIRAS, ESQ.
**DEREK SMITH LAW GROUP, PLLC**
One Penn Plaza, Suite 4905
New York, New York 10119
Phone: (212) 587-0760
Fax: (212) 587-4169
alexc@dereksmithlaw.com
*Pro Hac Vice*

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MAURO BOTTA,<br><br>                    Plaintiff,<br><br>    vs<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>        Defendant.<br><br><br>Proposed findings of fact and conclusions of law | Case No. 3:18-cv-02615-AGT<br><br>**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date:   February 22, 2021<br>Time:         8:30AM<br>Courtroom:   Courtroom A, 15th Floor, United States District Courthouse, 450 Golden Gate Ave., San Francisco, CA 94102<br>Judge:        The Hon. Alex G. Tse |

*EVANS LAW FIRM, INC.*

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

Plaintiff Mauro Botta hereby submits the following Proposed Findings of Fact and Conclusions of Law.

# I.   PROPOSED FINDINGS OF FACT
## A.   UNDISPUTED/STIPULATED FACTS.

Plaintiff requests that the Court adopt the Undisputed/Stipulated Facts set forth in the stipulated Joint Pre-Trial Statement and Order dated February 1, 2021 (Dkt. 141):

1. In 2004, Mauro began working at PwC's San Jose, CA office as a Senior Associate in PwC's Assurance Practice.

2. On or around July 1, 2010, Mauro became a Senior Manager in PwC's Assurance Practice.

3. On August 17, 2017, PwC terminated Mauro's employment.

4. PwC is a duly registered public accounting firm.

5. At times, PwC serves as an independent external auditor to some companies covered by the Sarbanes-Oxley Act.

6. In November 2016, Mauro filed a confidential Tip, Complaint, or Referral ("TCR") with the United States Securities and Exchange Commission ("SEC Complaint").

EVANS LAW FIRM, INC.

7.     On October 25, 2017, Mauro filed a "Charge of Whistleblower Retaliation Under 18 U.S. Code § 1514A" against PricewaterhouseCoopers LLP with the Department of Labor.

**B. ADDITIONAL PROPOSED FINDINGS OF FACT.**

In addition, Plaintiff asks that the Court find the following:

1. In or around 2012, PwC assigned Plaintiff, along with other employees to audit publicly traded Company B.  . Trial evidence:  Vol. 1, 111:9-14 (Mauro Botta Testimony). *See* Appendix 5.

2.  Tye Thorson was the Engagement Leader/Partner for the Audit Engagement Team for PwC's audit engagement by public Company B. Trial evidence:  Vol. 6, 1025:11-20 (Thorson Testimony).

3. Tye Thorson was responsible for issuing audit opinions rendered by PwC in connection with the audits of public Company B.  Trial evidence:  Vol. 6, 1023:17-24.

4. Plaintiff expressed concerns to Tye Thorson, as Engagement leader/Partner, that there was a lack of transparency between PwC and publicly traded Company B.  Trial evidence:  Vol. 1, 114:15-115:2, 116:10-25, 141:1-142:25, 143:1-25, 144:1-11 (Mauro Botta Testimony); Vol. 6, 1026:7-10 (Thorson Testimony).

EVANS LAW FIRM, INC.

5. Plaintiff expressed concerns to Tye Thorson, as Engagement Leader/Partner, that publicly traded Company B had a number of complex accounting events and control deficiencies that may have affected its financial statements and disclosures.  PX170 (PwC B0000598-605 Plaintiff comments on Company C SAB 99); PX 172 (PwC B0000636-664 December 31, 2015 Memo on Company C). Trial evidence: Vol. 1, 114:15-115:2, 116:10-25, 117:1-25, 118:1-5, 120:5-25,  121:1-25, 122:1-25, 123:1-17, 124:9-25, 125:1-7, 125:23-25, 126:1-25, 127:1-7, 128:5-23, 132:10-25, 133:1-4, 135:1-21,  141:1-142:25, 143:1-25, 144:1-11, 155, 13-25, 156:1-25 (Mauro Botta Testimony); Vol. 6, 1025:21-24, 1026:11-17, 1032:1-17, 1043:7-1044:2, 1048:18-1049:23, 1056:6-13 (Thorson Testimony).

6. Plaintiff outlined his concerns regarding publicly traded Company B's audits to Tye Thorson on February 22, 2015.  *See* JX10 (2/22/2015 Email from M. Botta to T. Thorson). Trial evidence:  Vol. 1, 157:8-25, 158:1-21 (Mauro Botta Testimony); Vol. 2, 240:12-25, 241:11-242:6, 251: 2-252:1 (Mauro Botta Testimony); Vol. 6, 1029:19-23 (Thorson Testimony). *See* Appendix 2 (Reasonableness) and Appendix 3 (Material Weakness).

EVANS LAW FIRM, INC.

7. Tye Thorson informed Plaintiff that the issues outlined in Plaintiff's February 22, 2015 memo "had the potential of causing some issues with [Company B] and the timing of their filing [with the SEC]." Trial evidence:  Vol. 2, 254:25-255:25, 256:1-2 (Mauro Botta Testimony); Vol. 6, 1040:2-1041:6 (Thorson Testimony); JX10 (2/22/2015 Email from M. Botta to T. Thorson).

8. When Tye Thorson received Mauro's memorandum dated February 22, 2015 Thorson forwarded the memorandum to PwC's Quality Review Partner Robert F. Heatley and PwC's Regional Risk Management Partner Timothy Scott.  JX8 AND 9 (Thorson forwarding Mauro's email to Messrs. Scott and Heatley).  Trial evidence:  Vol. 6, 1034:9-24, 1035:19-21, 1036:12-21 (Thorson Testimony).

9. Mauro and Tye Thorson discussed a $10 million internal control for Company B and Tye Thorson confirmed with the company's Chief Accounting Officer that the control had been implemented.  *See* Appendix 4. Thorson Testimony: Vol. 6, 1068:3-25, 1069:1 to 25, 1070:1-11, 1072: 11 to 25, 1073:1 - 5, 15- 25; 1074:1-13, 1087:2-13, 24-25; 1088:1-5, 1100:5-16; 1101:25, 1102:1 to 10, 1106: 18- 25, 1107: 1- 2, 6- 8;1125: 15-25, 1126:1- 5.  Walter F. Brown Testimony: Vol. 9, 1529: 22- 25, 1530:1-7, 1540: 13-22.  Mauro Botta Testimony: Vol 2.

EVANS LAW FIRM, INC.

279:15-25, 280:1-15, 281: 2- 25, 282:1-25, 283: 1- 12, 284: 1-18, 285: 2 to 25, 286: 1-12.

10.   Tye Thorson, Timothy Scott and Robert Heatley escalated Plaintiff's February 22, 2015 to PwC's National Office.  Trial evidence:  Vol. 6, 1043: 7-21 (Thorson Testimony).

11.   Within a few months after Plaintiff sent his February 22, 2015 memorandum to Tye Thorson and Thorson forwarded it to Messrs. Heatley and Scott and PwC's National Office, PwC removed Plaintiff from the engagement for Company B.  Trial evidence:  Vol. 2, 292:5-25, 293:1-20, 294:10-24, 295:14-22, 296:12-20 (Mauro Botta Testimony); Vol. 6, 1120:11-25, 1121:1-8 and 13-25, 1122:1-3 (Thorson Testimony)

12.  Traci Nelson, Human Resources Assurance Leader at PwC, was aware of Plaintiff's removal from Company B's Engagement Team following his February 22, 2015 memorandum.

13.  In October 2015, PwC assigned Plaintiff to work on the audit engagement team for PwC's client publicly traded Company C under PwC Partner Stig Haavardtun. Trial evidence:  Vol. 2, 301:7-302:2 (Mauro Botta Testimony); Vol. 7, 1289:6-1290:2 (Haavardtun Testimony).

EVANS LAW FIRM, INC.

14.  Company C had been a client of PwC since the mid- to early 1990s. Trial evidence:  Vol. 7, 1330:9-12 (Haavardtun Testimony).

15.  In December 2015 Plaintiff told Mr. Haavardtun that the accounting convention used on Company C's audit for amortizing service revenue was problematic.  Trial evidence:  Vol. 2, 303:6-304:2 (Mauro Botta Testimony); Vol. 7, 1334:8-1335:5 (Haavardtun Testimony).

16.  Haavardtun identified as a control deficiency the amortization of service revenue issue that Plaintiff had identified.

17.  Plaintiff identified and raised numerous other control deficiencies at Company C with Stig Haavardtun, the Engagement Leader/Partner for the work during his brief tenure as senior manager of Company C's audit engagement team. Trial evidence:  Vol. 2, 305:13-22, 306:8-25, 307:1-308:4, 318:6-21, 321:10-322:19, 323:2-25, 324:20-325:25, 326:1-25, 327:1-10, 330:5-23 (Mauro Botta Testimony); Vol. 7, 1306:2-7, 1308:11-23, 1309:2-12, 1314:9-15, 1334:2-7 (Haavardtun Testimony).

18.  On March 21, 2016, Plaintiff wrote a memorandum to regarding the revenue recognition problems he identified with respect to Company C. Trial evidence: Vol. 2, 321:4-322:19 (Mauro Botta Testimony); Vol. 7, 1308:1-1309:12 (Haavardtun Testimony).

19.  After consulting with Traci Nelson, Tim Carey and Kevin Healey, Stig
Haavardtun rolled Plaintiff off as senior manager on its Company C
audit engagement team in the first quarter of 2016.  Trial Evidence:
Vol. 5, 864:17-19 (Nelson Testimony); Vol. 7, 1342:4-21 (Haavardtun
Testimony); Vol. 7, 1224:3-15 (Healy Testimony).

20.  In or around April 2016 Defendant PwC stopped offering Plaintiff
new auditing engagements to work on. Plaintiff will testify to at trial to
the shut off in new assignments for him on engagements beginning in
this time period. *See* Mauro's Utilization Rates for 2015, 2016 and 2017
at PX 178-180. Trial Evidence:  Vol. 3, 2-9 (Mauro Botta Testimony);
Vol. 3, 466:14-17, 468:23-25 (Mauro Botta Testimony); Vol. 5, 875:1-6
(Nelson Testimony).

21.  In or around April 2016, Plaintiff's "utilization rate" began to drop.
Trial Evidence:  PX 178 (2015 US Client Utilization % 70.1);  PX 180
(2016 US Client Utilization % 46.0); PX 179 (2017 US Client
Utilization % 54.2).

22.  On or about April 27, 2016 Plaintiff spoke with Traci Nelson of
PwC's Human Resources Department and informed her that PwC was
retaliating against him and she instructed Plaintiff to raise the retaliation
issue with PwC's Ethics Office.  Trial Evidence:  Vol. 5, 896:20-22,

EVANS LAW FIRM, INC.

863:7-21, 865:16-22, 866:9-19, 866:12-24,867:23-868:21 (Nelson

Testimony); Vol. 3, 378:5-25, 379:1-380:20 (Mauro Botta Testimony).

23.  On or about October 26, 2016 Timothy Carey and Kevin Healey

demanded that Plaintiff meet with them at which meeting Carey told

Plaintiff he was to "stop speaking about your situation, otherwise it

would be easy to fire you." Trial evidence:  Vol. 3, 390:5-25, 391:1-22

(Mauro Botta Testimony).

24.  In or around October 2016, Plaintiff brought in a new client, Company

D, to PWC as a consulting project for PwC.  Trial evidence:  Vol. 3,

382:20-25, 383:1-384:9, 384: 7-15, 386:2-9 (Mauro Botta Testimony).

25.  Plaintiff was not staffed on the Company D engagement nor did PwC

consult with Plaintiff regarding staffing for the project.  Trial evidence:

Vol. 3, 387:3-25, 388:1-18 (Mauro Botta Testimony).

26.  It was customary at PwC for any employee who brought business into

the firm to be staffed on any projects performed for the client. Trial

evidence:  Vol. 3, 387:3-25 (Mauro Botta Testimony).

27.  In November 2016, Plaintiff filed a confidential Tip, Complaint, or

Referral ("TCR") with the United States Securities and Exchange

Commission ("SEC Complaint").  *See* Undisputed/Stipulated Fact No.

EVANS LAW FIRM, INC.

6 from Joint Pre-Trial Statement and Order (Dkt.141).  Trial evidence:

Vol. 3, 399:9-15 (Mauro Botta Testimony).

28.  Mauro had a reasonable belief/reasonable cause to believe that PwC

was violating laws, regulations and/or standards governing the audits

and filed financial information of publicly traded companies. See

Appendix 2 (Reasonableness); TRACI NELSON TESTIMONY: Vol. 5,

920:21-25, 921:1-5; MAYANK GUPTA TESTIMONY: Vol. 5, 961, 22- 23; TYE

THORSON TESTIMONY: Vol. 6, 1028: 11- 19, 1031: 18-21, 1043:7- 25, 1044: 1

and 2, 1048:18-25, 1049: 1- 23,1056: 6- 13, 1141: 17-25,   1142:1-8, 1146: 7- 19;

KEVIN HEALY TESTIMONY 1204: 14- 25, 1205: 11206: 12-21, 21

1250:23-25, 1251: 1- 13, 1259: 7- 13; STIG HAAVARDTUN TESTIMONY:1290:3-9, 1290:

23-25, 1291: 1-23, 1295: 6- 12,1296:7- 17, 1322: 15-25, 1323: 1, 1324: 13- 25, 1325:1-14.

1330:9- 24; JASON S. FLEMMONS TESTIMONY:  1408:1-12, 1411:14-19, 1416:11-17;

WALTER F. BROWN TESTIMONY: 1484: 23- 25, 1485, 1- 12; EXHIBIT JX 2-7; EXHIBIT

PX 105-18; EXHIBIT PX 105-21; EXHIBIT PX 105-27; MAURO BOTTA TESTIMONY:

Vol. 3, 400: 22-25, 401:1-3: Vol. 2, 304: 3-5, 253:15-22, 265:20-24, 265: 5, 266

1- 2.

29.  On or about April 28, 2017, the SEC sent a letter to PwC regarding an

investigation of PwC captioned *In the Matter of Certain*

*PricewaterhouseCoopers Audits* (MSF-4149). JX20 (Letter from US

SEC to PwC re In the Matter of Certain PricewaterhouseCoopers

EVANS LAW FIRM, INC.

Audits (MSF-4149). Trial evidence:  Vol. 9, 1456:6-16 (Walter Brown

Testimony); JX20 (In the Matter of Certain PricewaterhouseCoopers

Audits (MSF-4149).

30.  The April 28, 2017 SEC letter concerned PwC's work for Company B

and referred to issues raised in Plaintiff's February 22, 2015 memo

regarding PwC's audit engagement of Company B. *See* JX20

(4/28/2017 Letter from US SEC to PwC) and JX 10 (Mauro's

2/22/2015 Memorandum).  Trial evidence:  JX20 (In the Matter of

Certain PricewaterhouseCoopers Audits (MSF-4149)

31.  On or about May 9, 2017 Parul Abhani of PwC's Tax Department

forwarded a Document Preservation Notice issued by the SEC with

respect to PwC's documents related to the 2013 and 2014 audits and

reviews of publicly traded Company B and asked Plaintiff, "Do you

know anything about this?" PX 109 5/9/2017 SC Preservation Notice

PwC forwarded to Mauro.  Trial evidence:  Vol. 3, 405:8-15 (Mauro

Botta Testimony); PX109.

32.  On August 17, 2017, PwC terminated Mauro's employment. *See*

Undisputed Stipulated Fact No. 3 from Joint Pretrial Statement and

Order (Dkt. 141).  Trial evidence:  Vol. 3, 440:20-441:25, 442:1-24

(Mauro Botta Testimony); Vol. 5, 893:15-17 (Nelson Testimony).

EVANS LAW FIRM, INC.

EVANS LAW FIRM, INC.

33. Mauro did not fabricate a control.  *See* Appendix 4 (Fabrication or Lie); Vol. 6, 1106:25-1107:8 (Thorson Testimony: "[The $10 million threshold control] was – that was not a fabrication.  That was a draft that I thought was a good number that we validated the next day with the CAO."); Vol. 6, 1123:12-14 (Tye Thorson has "no recollection" of anyone at PwC consulting him prior to August 2017 relating to firing Mauro); Vol. 6, 1124:8-11(Thorson Testimony: "no one asked for [Thorson's] opinion whether" Mauro should be terminated); Vol. 9 1525:22 (Walter Brown Testimony: Mauro did not use the word "fabricate" and further that "[i]f the control actually existed, then it wouldn't have been created…"): Vol. 5, 828:25-829:4 (Mauro Botta Testimony: during the interviews of him he never said he fabricated a control or that he had lied.). MAURO BOTTA TESTIMONY: Vol 3, 439: 4- 14, 436: 8-25, 437: 1- 10; Vol. 4 653:14- 25, 654:1-25.

## B.  PROPOSED CONCLUSIONS OF LAW

### 1.  FIRST CAUSE OF ACTION:

Sarbanes-Oxley Act (SOX). Plaintiff meets the burden of proving by a preponderance of the evidence under *Van Arsdale v. Int'l Game Technology*, 577 F.3d

989, 996 (9th Cir. 2009) the elements of wrongful retaliation/termination1 under SOX by showing:

a. Plaintiff was "discharged[d], demote[d], suspend[ed], threaten[ed], harass[ed], or in any other manner discriminated against …in the terms and conditions of employment" 18 U.S.C. § 1514A(a); *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009). *See* Undisputed/Stipulated Fact No. 3 from stipulated Joint Pre-Trial Statement and Order ("On August 17, 2017, PwC terminated Mauro's employment.") (Dkt. 141).

b. Plaintiff "provide[d] information…regarding any conduct which [he] reasonably believed constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," 18 U.S.C. § 1514A(a)(1); *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009); *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1072 (S.D. Cal. 2017) ("[t]he plaintiff, therefore, 'can have an objectively reasonable belief of a violation' even if the plaintiff 'fails to allege, prove, or approximate specific elements of fraud, which would be required under a fraud claim against the defrauder directly''). See Undisputed/Stipulated Fact No. 6 in Joint Pre-Trial Statement and Order (Dkt. 141)("In November 2016, Mauro filed a confidential Tip, Complaint, or Referral ("TCR") with the United States Securities and Exchange Commission ("SEC Complaint")").

c. Plaintiff communications to his employer with respect to the audit engagements for Companies B and C "definitively and specifically" related to one of the listed categories of fraud or securities violations under 18 U.S.C. § 1514A. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 997 (9th Cir. 2009), *citing with approval Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008)("[a]n employee need not cite a code section

---

[1] It is undisputed that on October 25, 2017, Mauro filed a "Charge of Whistleblower Retaliation Under 18 U.S.C. § 1514A" against PricewaterhouseCoopers LLP with the Department of Labor. *See* Undisputed/Stipulated Fact No. 7 in Joint Pre-trial Statement and Order.

he believes was violated" to trigger the protections of § 1514A). PX 121 (PwC B00001645 Plaintiff February 24, 2015 Email to T. Thorson); PX122 (PwC B00001646 Thorson Outlook Call Invitation) PX 123 (PLAINTIFF 1890 (Plaintiff email to Thorson); PX 124 and 125 (PwC B00008224-8236 February 24, 2015 Consultation Memo); PX170 (PwC B0000598-605 Plaintiff comments on Company C SAB 99); PX 172 (PwC B0000636-664 December 31, 2015 Memo on Company C).

d. The information referred to in subparagraphs (b) and (c) above was provided to "a Federal regulatory or law enforcement agency." *See* Undisputed/Stipulated Fact No. 6 in Joint Pre-Trial Statement and Order (Dkt. 141)("In November 2016, Mauro filed a confidential Tip, Complaint, or Referral ("TCR") with the United States Securities and Exchange Commission ("SEC Complaint")").

e. The activities described in subparagraphs (b), (c) and (d) above constitute protected activity by Plaintiff. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009) (protected activity under Sarbanes Oxley is "provid[ing] information….regarding any conduct which the employee reasonably believes constitutes a violation of a listed law"), citing with approval Welch v. Chao, 536 F.3d 269, 276 (4th Cir. 2008)("[a]n employee need not cite a code section he believes was violated" to trigger the protections of § 1514A), A belief is reasonable even if mistaken or even if ultimately no actual fraud was found to exist. *Van Arsdale, supra*, 577 F.3d at 1001-1002.

f. Defendant PwC "knew or suspected, actually or constructively," that Plaintiff was engaged in said protected activity. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 1002-1003 (9th Cir. 2009)(knowledge may be inferred from meetings with those in "supervisory authority" over the employee when the meetings relate to the subject matter of the protected activity). JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Trial evidence:  Vol. 3, 378:5-2 (Mauro Botta Testimony); Vol. 5: 877:3-10 (Mauro Botta Testimony); Vol. 5, 897:1-898:10 (Nelson Testimony: Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR

- 13 -

EVANS LAW FIRM, INC.

directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]): Vol. 5, 899:13 (Nelson Testimony: "yes, they may have been involved and that would be pretty typical"); PX 209 (Mauro's attorney's July 5, 2017 letter to PwC)

g.  Plaintiff's protected activity was a contributing factor to the unfavorable action taken against him in termination or employment. *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009)(that protected activity is a contributing factor may be inferred from the proximity between an employee's meeting with superiors regarding protected activity and his termination), applying 29 C.F.R. § 1980.104(b)(1)(iv)("[t]he circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse decision").  PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Vol. 3, 378:5-21 (Mauro told PwC Partner Carey he "would consider going to the SEC about it"); Vol. 5, 877:3-10 (Mauro told Human Resources Director he was "going external" about his concerns); Vol. 5, 863:19-20, 867:23-868:1 (Mauro made complaints to PwC Ethics Office regarding PwC retaliation for raising concerns); Vol. 3, 408:20-409:5 (Mauro's lawyer sent PwC a letter about Mauro's concerns about retaliation for going to the SEC).  Vol. 5, 897:1-898:10 (Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]). PwC's Office of General Counsel was aware of Mauro's retaliation claims too.  Vol. 5, 899:13 (Nelson testimony: "yes, they may have been involved and that would be pretty typical").

h.  Defendant has not met its burden of proving by clear and convincing evidence that "it would have taken the same adverse employment action in the absence of [Mauro's] protected activity." *Van Arsdale v. Int'l Game Technology*, 577 F.3d 989, 996 (9th Cir. 2009).  Under California law, the burden of clear and convincing evidence, required Defendant to introduce evidence "sufficiently strong to command the

PLTFF AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF

EVANS LAW FIRM, INC.

unhesitating assent of every reasonable mind." *In re Angelia P*., 28 Cal.3d 908, 919 (1981).

i.  Plaintiff is entitled to "all relief necessary to make the employee whole" including but not limited to reinstatement, the amount of front and back pay with interest, lost earning capacity, and "compensation for special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees."  Plaintiff will demonstrate at trial that he is entitled to damages in an amount which will be shown at trial and includes but is not limited to lost wages, front and back pay with interest, reinstatement with the same seniority, lost earning capacity, civil penalties for wrongful termination, punitive damages, attorneys' fees and expenses and a money judgment for mental pain, anguish, emotional distress and injury to reputation.  18 U.S.C. § 1514A(c). Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

**2. SECOND CAUSE OF ACTION: VIOLATION OF CALIFORNIA WHISTLEBLOWER PROTECTION ACT (CAL. LABOR CODE § 1102.5).**

Plaintiff demonstrates by a preponderance of the evidence under Section 1102.6 of the California Labor Code the elements of a wrongful retaliation under Section 1102.5 of the California Labor Code by showing:

EVANS LAW FIRM, INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

a.  Defendant believed that Plaintiff might disclose or had disclosed to the SEC that PwC and two of its publicly traded clients (Company B and Company C).  Cal. Labor Code § 1102.5(b)2; *Collier v. Superior Court*, 228 Cal.App.3d 1117 (1991); *Garcia v. Rockwell Int'l Corp.*, 187 Cal.App.3d 1556 (1986); *Diego v. Pilgrim United Church of Christ*, 231 Cal.App.4th 913, 921 (2014)(Labor Code applies not only to employees "who actually notify the agency of the suspected violations but also against employees who the employer suspects of such notifications");CACI 4603:  JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Trial evidence:  Vol. 3, 378:5-2 (Mauro Botta Testimony); Vol. 5: 877:3-10 (Mauro Botta Testimony); Vol. 5, 897:1-898:10 (Nelson Testimony: Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]): Vol. 5, 899:13 (Nelson Testimony: "yes, they may have been involved and that would be pretty typical"); PX 209 (Mauro's attorney's July 5, 2017 letter to PwC)

b. Plaintiff had reasonable cause to believe that the information he disclosed to the SEC disclosed a violation of a federal statute or noncompliance with a federal law or regulation. Cal. Labor Code § 1102.5(b)( "if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of

---

2 "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

EVANS LAW FIRM, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13

EVANS LAW FIRM, INC.

14
15
16
17
18
19
20
21
22
23
24
25
26
27

whether disclosing the information is part of the employee's job duties"); *Cardenas v. M. Fanaian D.D.S., Inc.*, 240 Cal.App.4th 1167, 1175 (2015)(Section 1102.5 claim stands on its own and does not require proof of a violation"); CACI 4603:  PwC B00000390-398 (Plaintiff's memorandum re Company B deficiencies); *See* Undisputed/Stipulated Fact No. 3 from Joint Pretrial Statement and Order (Dkt. 141): Plaintiff's SEC TCR November 2016.  MAURO BOTTA TESTIMONY: Vol 2, 296: 18 -25, 297: 1-9; JX 4-19.

    c.  On August 17, 2017, PwC terminated Mauro's employment.  *See* Undisputed/Stipulated Fact No. 3 from Joint Pretrial Statement and Order (Dkt. 141).

    d.  Plaintiff's disclosure of information to the SEC was a contributing factor to Defendant's decision to discharge him. Cal. Labor Code §§ 1102.5(b) and 1102.6 (employee demonstrates by "a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee"); CACI 4603; JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Vol. 3, 378:5-21 (Mauro told PwC Partner Carey he "would consider going to the SEC about it"); Vol. 5, 877:3-10 (Mauro told Human Resources Director he was "going external" about his concerns); Vol. 5, 863:19-20, 867:23-868:1 (Mauro made complaints to PwC Ethics Office regarding PwC retaliation for raising concerns); Vol. 3, 408:20-409:5 (Mauro's lawyer sent PwC a letter about Mauro's concerns about retaliation for going to the SEC).  Vol. 5, 897:1-898:10 (Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]). PwC's Office of General Counsel was aware of Mauro's retaliation claims too.  Vol. 5, 899:13 (Nelson testimony: "yes, they may have been involved and that would be pretty typical").

    e.  Defendant has not demonstrated "by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the

employee had not engaged in activities protected by Section 1102.5." Cal. Labor Code § 1102.6.  Under California law, the burden of clear and convincing evidence, required Defendant to introduce evidence "sufficiently strong to command the unhesitating assent of every reasonable mind." *In re Angelia P.,* 28 Cal.3d 908, 919 (1981).

f.  Plaintiff was harmed as a result of Defendant's decision in an amount which will be shown at trial and includes but is not limited to lost wages, front and back pay with interest, reinstatement with the same seniority, lost earning capacity, civil penalties for wrongful termination, punitive damages, attorneys' fees and expenses and a money judgment for mental pain, anguish, emotional distress and injury to reputation.  CACI 4603. Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

g.  Defendant's conduct was a substantial factor in causing Plaintiff's harm. CACI 4603. Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. Plaintiff will also present testimony from Marco Botta regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY

- 18 -

Evans Law Firm, Inc.

TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

### 3. THIRD CAUSE OF ACTION: RETALIATION UNDER LABOR CODE SECTION 98.6.

Plaintiff demonstrates by a preponderance of the evidence under Section 1102.6 of the California Labor Code the elements of a wrongful retaliation under Section 98.6 of the California Labor Code by showing:

a. Defendant believed that Plaintiff might disclose or had disclosed to the SEC that PwC and two of its publicly traded clients (Company B and Company C). Cal. Labor Code § 98.6(a)("A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment because the employee or applicant engaged in any conduct delineated in this chapter, including the conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing with Section 1101) of Part 3 of Division 2…"); JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Trial evidence:  Vol. 3, 378:5-2 (Mauro Botta Testimony); Vol. 5: 877:3-10 (Mauro Botta Testimony); Vol. 5, 897:1-898:10 (Nelson Testimony: Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]): Vol. 5, 899:13 (Nelson Testimony: "yes, they may have been involved and that would be pretty typical"); PX 209 (Mauro's attorney's July 5, 2017 letter to PwC)

b. Plaintiff had reasonable cause to believe that the information he disclosed to the SEC disclosed a violation of a federal statute or noncompliance with a federal law or regulation. Cal. Labor Code § 1102.5(b)( "if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties");Cardenas v. M.

EVANS LAW FIRM, INC.

Fanaian D.D.S., Inc., 240 Cal.App.4th 1167, 1175 (2015)(Section 1102.5 claim stands on its own and does not require proof of a violation"); PwC B00000390-398 (Plaintiff's memorandum re Company B deficiencies); TRACI NELSON TESTIMONY: Vol. 5, 920:21-25, 921:1-5; MAYANK GUPTA TESTIMONY: Vol. 5, 961, 22- 23; TYE THORSON TESTIMONY: Vol. 6, 1028: 11- 19,1031: 18-21, 1043:7- 25, 1044: 1 and 2, 1048:18-25, 1049: 1- 23,1056: 6- 13, 1141: 17-25, 1142:1-8, 1146: 7- 19; KEVIN HEALY TESTIMONY 1204: 14- 25, 1205: 11206: 12-21,1250:23-25, 1251: 1- 13, 1259: 7- 13; STIG HAAVARDTUN TESTIMONY:1290:3-9, 1290:   23-25, 1291: 1- 23, 1295: 6- 12,1296:7- 17, 1322: 15-25, 1323: 1, 1324: 13- 25, 1325:1-14.   1330:9- 24; JASON S. FLEMMONS TESTIMONY:  1408:1-12, 1411:14-19, 1416:11-17; WALTER F. BROWN TESTIMONY: 1484: 23- 25, 1485, 1- 12; EXHIBIT JX 2-7; EXHIBIT    PX 105-18; EXHIBIT PX 105-21; EXHIBIT PX 105-27; MAURO BOTTA TESTIMONY:Vol. 3, 400: 22-25, 401:1-3: Vol. 2, 304: 3-5, 253:15-22, 265:20-24, 265: 5, 266:1- 2.

     c.  On August 17, 2017, PwC terminated Mauro's employment. See Undisputed/Stipulated Fact No. 3 from Joint Pre-Trial Statement and Order (Dkt. 141).

     d.  Plaintiff's disclosure of information to the SEC was a contributing factor to Defendant's decision to discharge him. Cal. Labor Code §§ 1102.5(b) and 1102.6 (employee demonstrates by "a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee");  JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff). Vol. 3, 378:5-21 (Mauro told PwC Partner Carey he "would consider going to the SEC about it"); Vol. 5, 877:3-10 (Mauro told Human Resources Director he was "going external" about his concerns); Vol. 5, 863:19-20, 867:23-868:1 (Mauro made complaints to PwC Ethics Office regarding PwC retaliation for raising concerns); Vol. 3, 408:20-409:5 (Mauro's lawyer sent PwC a letter about Mauro's concerns about retaliation for going to the SEC).  Vol. 5, 897:1-898:10 (Partners Carey, Heatley, Haavardtun, and Scott and Ethics and HR directors and

EVANS LAW FIRM, INC.

1  personnel Matt Steele, Mauro's direct HR manager, Shawna Hewitt [San Jose HR

2  Manager], and Steven Kessler and Patricia Lin [ both of PwC's Ethics Office]). PwC's

3  Office of General Counsel was aware of Mauro's retaliation claims too.  Vol. 5, 899:13

4  (Nelson testimony: "yes, they may have been involved and that would be pretty

5  typical").

6      e.  Defendant has not demonstrated "by clear and convincing evidence that the

7  alleged action would have occurred for legitimate, independent reasons even if the

8  employee had not engaged in activities protected by Section 1102.5."  Cal. Labor Code §

9  1102.6.  Under California law, the burden of clear and convincing evidence, required

10  Defendant to introduce evidence "sufficiently strong to command the unhesitating assent

11  of every reasonable mind."  *In re Angelia P.*, 28 Cal.3d 908, 919 (1981).

12      f.  Plaintiff was harmed as a result of Defendant's decision in an amount which

13  will be shown at trial and includes but is not limited to lost wages, front and back pay

14  with interest, reinstatement with the same seniority, lost earning capacity, civil penalties

15  for wrongful termination, punitive damages, attorneys' fees and expenses and a money

16  judgment for mental pain, anguish, emotional distress and injury to reputation.  Cal.

17  Labor Code 98.6(b)(1)("Any employee who is discharged, threatened with discharge,

18  demoted, suspended, retaliated against, subjected to an adverse action, or in any other

19  manner discriminated against in the terms and conditions of his or her employment

20  because the employee engaged in any conduct delineated in this chapter, including the

21  conduct described in subdivision (k) of Section 96, and Chapter 5 (commencing

22  with Section 1101) of Part 3 of Division 2, or because the employee has made a bona

23  fide complaint or claim to the division pursuant to this part, or because the employee has

24  initiated any action or notice pursuant to Section 2699 shall be entitled to reinstatement

25  and reimbursement for lost wages and work benefits caused by those acts of the

26  employer."). Plaintiff will present evidence at trial of all medical and therapeutic

27  expenses incurred and evidence of all economic and non-economic damages including

but not limited to pain and suffering, lost wages, lost earnings capacity, reputational

- 21 -

damages, among other damages. Plaintiff will also present testimony from Marco Botta regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

g.  Defendant's conduct was a substantial factor in causing Plaintiff's Harm. Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. Plaintiff will also present testimony from Marco Botta regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

**4.  FIFTH CAUSE OF ACTION: BREACH OF CONTRACT**.

 Plaintiff satisfies the elements of a breach of contract claim by showing:

a.  Defendant and Plaintiff entered into a contract on or about July 26, 2010. *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014); *Junger v. John V. Dinan Assocs., Inc.*, 164 A.D.3d 1428, 1430 (N.Y. App. Div. 2018); CACI 303; JX1 EMPLOYMENT AGREEMENT dated July 26, 2010.

b.  Plaintiff performed his contractual duties under the contract. *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014); *Consolidated World Investments, Inc. v.*

EVANS LAW FIRM, INC.

*Lido Preferred Ltd.,* 9 Cal.App.4th 373, 380 (1992); *Junger v. John V. Dinan Assocs., Inc.,* 164 A.D.3d 1428, 1430 (N.Y. App. Div. 2018); CACI 303.

c.   Defendant breached the contract by, among other things terminating Plaintiff's employment in a way that violated the contract including but not limited to failing to give Plaintiff three months' notice of termination and severance as specified in Section 5a of the Employment Agreement.  *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014); *Junger v. John V. Dinan Assocs., Inc*., 164 A.D.3d 1428, 1430 (N.Y. App. Div. 2018); 1 Witkin, Summary of California Law (10th ed. 2005) Contracts, § 847; CACI 303: JX1 EMPLOYMENT AGREEMENT dated July 26, 2010. *See* Undisputed/Stipulated Fact No. 3 in Joint Pre-trial Statement and Order ("On August 17, 2017, PwC terminated Mauro's employment.").

d.   Plaintiff was harmed as a result of Defendant's breach(es) in an amount which will be shown at trial in an amount which will be shown at trial and includes but is not limited to lost wages, front and back pay with interest, reinstatement with the same seniority, lost earning capacity, civil penalties for wrongful termination, punitive damages, attorneys' fees and expenses and a money judgment for mental pain, anguish, emotional distress and injury to reputation.  *Troyk v. Farmers Group, Inc.,* 171 Cal.App.4th 1305, 1352 (2009); *U.S. Ecology, Inc. v. State of California*, 129 Cal.App.4th 887, 909 (2005); *Junger v. John V. Dinan Assocs., Inc*., 164 A.D.3d 1428, 1430 (N.Y. App. Div. 2018); CACI 303. Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. Plaintiff will also present testimony from Marco Botta regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA

EVANS LAW FIRM, INC.

- 23 -

TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG

HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

     e.   Defendant's breach was a substantial factor in causing that harm. U.S. Ecology,

Inc. v. State of California, 129 Cal.App.4th 887, 909 (2005)("A proximate cause of loss

or damage is something that is a substantial factor in bringing about that loss or

damages."). Plaintiff will present evidence at trial of all medical and therapeutic

expenses incurred and evidence of all economic and non-economic damages including

but not limited to pain and suffering, lost wages, lost earnings capacity, reputational

damages, among other damages. Plaintiff will also present testimony from Marco Botta

regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA

TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7,

21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5,

461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD

SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY

TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7,

1328 lines 5 to 18.

## 5.  SIXTH CAUSE OF ACTION; WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY.

     Plaintiff satisfies the elements of a wrongful retaliation in violation of public

policy by showing:

     a.   Plaintiff engaged in protected activity under SOX and California Labor Code

Section 1102.5.  *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 87 (1998) ("[A]

employee need not prove an actual violation of law; it suffices if the employer fired him

for reporting his 'reasonably based suspicions' of illegal activity."); CACI 2430.  PwC

B00000390-398 (Plaintiff's memorandum re Company B deficiencies); *see*

Undisputed/Stipulated Fact No. 6 in Joint Pre-trial Statement and Order (Dkt. 141).

EVANS LAW FIRM, INC.

b.  Defendant discharged Plaintiff on August 17, 2017. CACI 2430. STIPULATED THAT PLAINTIFF'S EMPLOYMENT WAS TERMINATED ON AUGUST 17, 2017.

c.  Plaintiff's protected activity was a substantial motivating reason for his discharge. *Harris v. City of Santa Monica*, 56 Cal.4th 203, 232(2013); *Yau v. Allen*, 229 Cal.App.4th 144, 154 (2014); *Alamo v. Practice Management Information Corp.*, 219 Cal.App.4th 466, 479 (2013); 1 Wrongful Employment Termination Practice (Cont.Ed.Bar 2d ed.) Discrimination Claims, §§2.61-2.65, 2.87; California Civil Practice: Employment Litigation, §§ 2:20-2:21, 2.75 (Thomson Reuters); CACI 2430 and 2507. JX 20 (SEC April 27, 2016 Letter to PwC); PX109 (5/9/2017 Preservation Notice and Email to Plaintiff).

d.  Defendant's discharge of Plaintiff caused Plaintiff harm in an amount which will be shown at trial in an amount which will be shown at trial and includes but is not limited to lost wages, front and back pay with interest, reinstatement with the same seniority, lost earning capacity, civil penalties for wrongful termination, punitive damages, attorneys' fees and expenses and a money judgment for mental pain, anguish, emotional distress and injury to reputation.  Plaintiff will present evidence at trial of all medical and therapeutic expenses incurred and evidence of all economic and non-economic damages including but not limited to pain and suffering, lost wages, lost earnings capacity, reputational damages, among other damages. Plaintiff will also present testimony from Marco Botta regarding the harm Plaintiff incurred as a result of his termination. MAURO BOTTA TESTIMONY: Vol. 3: 224 21, 441: 24 and 25, 442 :1 and 2, 443: 14 to 20, 444: 1 to 7, 21 to 25, 445: 1 to 5, 18 to 20, 457: 18 to 25, 458 : 1, l,10 to 12, 20 to 25, 459: 1 to 5, 461:18 to 25, 462:1 to 10, 15 to 25, 463: 1 to 25, page 464: 1 to 8;  EDWARD SARRETT TESTIMONY AND MARCO BOTTA TESTIMONY; KEVIN HEALY TESTIMONY: Vol. 7 ,1256: 15 to 25; STIG HAAVARDTUN TESTIMONY: Vol 7, 1328 lines 5 to 18.

EVANS LAW FIRM, INC.

1  Dated: April 7, 2021                    Respectfully Submitted,

2

3

4  By: _Ingrid M Evans_

5  Ingrid M. Evans, Esq. (SBN 179094)
   **EVANS LAW FIRM, INC.**

6  3053 Fillmore Street #236
   San Francisco, CA 94123

7  Phone: (415) 441-8669

8  Alexander G. Cabeceiras, Esq.

9  **DEREK SMITH LAW GROUP, PLLC**
   *PRO HAC VICE*

10  alexc@dereksmithlaw.com

11  1 Penn Plaza, Suite 4905
    New York, New York 10119

12  Phone: (212) 587-0760

13

14  *Attorneys for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

- 26 -

EVANS LAW FIRM, INC.

1

### CERTIFICATE OF SERVICE

2

I hereby certify that a copy of the Plaintiff Mauro Botta's Amended Proposed Findings of Fact

3

and Conclusions of Law was filed electronically. Notice of this filing will be sent by e-mail to all parties

4

by operation of the court's electronic filing system or by facsimile to anyone unable to accept electronic

5

filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's

6

EM/ECF System.

7

8    Dated:  April 7, 2021                    _/s/ INGRID M. EVANS_

9                                                        INGRID M. EVANS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

EVANS LAW FIRM, INC.

- 27 -

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

**BOTTA MAURO TESTIMONY (02/24/2021)**
**Vol. 3 Page 378 Lines 2 to 21**
**Q.** And what's Tim Carey's position?
**A.** At the time he was the new assurance leader in San Jose.
He took over from Kevin Healy who was promoted.
**Q.** Okay. And what did you talk to Tim Carey about?
**A.** I told him about the snapshot that I received. I told him
that I believe it was included false information. I told him
that I believe that Stig conduct at Harmonic was putting the
firm at risk, and I told him that I would have considered to go
to the SEC about it.
**Q.** And what did he say back to you, if anything?
**A.** He talked to me about my deployment and the fact that I
was hard to staff because my -- my idea of audits and the
firm's idea of an audit were different, and we started to
discuss about scheduling.
**Q.** Why at that time did you tell him you were going to go to
the SEC?
**A.** Because I believed that Mr. Haavardtun's conduct
represented a risk for the firm that I did not see
appropriately addressed at the time and I thought was my option
to use that.

**Vol. 3 Page 408 Lines 2 to 9**
**Q.** Mauro, at that time around June of 2017, were you fearful
that PwC was going to retaliate against you?
**A.** Yes.
**Q.** Why?
**A.** Because the preservation notice was in relation to Cavium
and particularly the years of '13 and '14; and to me it was --
as soon as I got that, I realized that essentially the SEC kind
of ousted my identity to PwC because it was obvious.

**Vol. 3 Page 408 Lines 14 to 22**
**Q.** So at that point why did you feel you needed to retain
outside counsel?
**A.** Because I thought that OGC and their job, based on my
understanding of the structure of the firm, they were there to
respond to the SEC and their concern was to protect the firm,
certainly not me.
**Q.** And your fear of retaliation, did you through Mr. Brown

1

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

ever make PwC aware of that?
**A.** Yes.

**Vol. 3 Page 409 Lines 21 to 23**
**Q.** And after reporting to the SEC, were you interviewed by PwC?
**A.** Yes.

**TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 863, Lines 7 through 21**
**Q.** Okay. Thank you.
And over your time working at PwC, you had multiple discussions with a Ms. Patricia Lin in PwC's Ethics Office; correct?
**A.** Yes.
**Q.** And you discussed with her multiple times Mauro's complaints of retaliation; is that right?
**A.** Patty Lin worked in the Office of Ethics, so as things were escalated in that direction, Patty was one of the individuals involved.
**Q.** I appreciate that. So is that a yes?
**A.** Yes, I interacted with Patty Lin.
**Q.** But specifically regarding Mauro's complaints of retaliation?
**A.** Yes.

**Vol. 5 Page 871, Lines 7 through 19**
**Q.** Okay. And you don't recall saying to Ms. Lin that Cavium got a lot of attention; right?
**A.** I may have said that. I mean, I know it received attention and was looked at, but I was not involved in that process.
**Q.** Okay. You continued to hear complaints from Mauro relating to retaliation through 2016; right?
**A.** Yes.
**Q.** And in April of 2016, there are multiple people notified of Mauro's complaints of retaliation, were there not?
**A.** When I heard the words "retaliation," any discussion I had with Mauro, I raised it with the Office of Ethics and that would have been the proper channel to take it to.

2

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

**Vol. 5 Page 874, Lines 17 through 25**
**Q.** Ms. Nelson, by October of 2016, Mauro had directly complained to you he felt he was being discriminated against at PwC; correct?
**A.** Yes, he may have used those words.
**Q.** Okay. And you recall sharing with Ms. Lin that Mauro felt he was being discriminated against; right?
**A.** Again, if he used the word "retaliation," "discrimination," I would have escalated to the Office of Ethics, which Patty Lin would have been appropriate.

**Vol. 5 Page 877, Lines 8 through 12**
**Q.** Okay. But he also would tell you he was going to a lawyer directly to you; is that right?
**A.** He may have. I don't recall the specific conversations, but he used that to kind of emphasize, you know, how frustrated and worked up he was about something.

**Vol. 5 Page 886, Lines 10 through 12**
**Q.** Okay. You recall continuing discussing Mr. Botta's complaints with Ethics in 2017, do you not?
**A.** I believe there was investigations that went into 2017.

**Vol. 5 page 907 Lines 13 through 20**
**Q.** Ms. Nelson, did you ever -- do you ever remember Mr. Botta shying away from voicing a concern or fighting a crusade?
**A.** No. I mean, Mauro was one of the most vocal employees. I mean, in my 24 years I have never seen someone as vocal as Mauro.
I mean, just to kind of describe it a little bit. I mean, he was the guy that in an all-hands meeting would stand up and, you know, be the one to state his opinion. He never held back.

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 page 1025 Lines 21 through 24**
**Q.** And Mr. Botta in 2012 raised some concerns with the Cavium audit, did he not?
**A.** He raised some concerns, as he does on all of his audits that I worked with him on.

3

Case No.  3:18-cv-002615-AGT          APPENDIX 1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

**Vol. 6 page 1026 Lines 11 through 17**
**Q.** And Mauro at that time, 2012, expressed to you his concerns that Cavium and Xpliant were physically located one floor apart from each other in the same building; right?
**A.** Yes.
**Q.** And he was further concerned that that wasn't shared with PwC by Cavium; right?
**A.** Yeah. He was concerned about that.

**Vol. 6 page 1032 Lines 1 through 17**
**Q.** And 2012, right. And he's bringing up these issues with audit opinions that have already been signed off on on behalf of PwC; right?
**A.** Which I thought was very unusual for this kind of an analysis, but yes, that's correct.
**Q.** But you would agree that if there is an aggregate control deficiency, your job as an auditor would be to determine if these aggregate deficiencies created a material weakness; right?
**A.** That's correct, but you normally -- it's not even considered that you consider deficiencies from prior years when you do an aggregation consideration.
So Mauro had brought in 2012 and 2013 issues into this memo, which was very unusual. I've never ever seen that before in all my time. And so I -- you know, once I got it, clearly I needed to spend some time with Mauro to understand why he did what he did.

**Vol. 6 page 1048 Lines 18 through 25, Page 1049 Lines 1 through 16**
**Q.** And ultimately you and Robert Heatley agreed it would be appropriate to consult with PwC's National office on the aggregation issue because you believe it rose to the level of close call; is that right?
**A.** So initially Bob and I, Mr. Heatley and I did not think this rose to the level of close call which would trigger a consultation. So we weren't concerned at all that we had an aggregation issue.
Mauro puts together a five-page memo two days before we're ready to file a financial statement that says there's all these problems that -- frankly, I didn't agree with most of them. But there were all these problems, and given that -- given the

4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX  1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER

nature of it, I wanted to get some other eyes on it.
And from my perspective, it was kind of an abundance of
caution that let's take it to National and have another set of
eyes look at this to make sure, you know, if I'm missing
something or Bob is missing something; that we can have, you
know, the National office look at it and see what their views
are. That was really the reason.
And the close call nature, that's a pretty judgmental
area, and we both didn't think it was even a close call. But
we -- we probably called it that after we got Mauro's document
to say, look, let's just move this along and have somebody else
put another set of eyes on it.

**Vol. 6 page 1112 Lines 16 through 25, page 1113 Line 1**
**Q.** Okay. Part of the consultation policy with National
involved getting PwC's Office of General Counsel involved;
right?
**A.** The -- the requirement for when there is a disagreement
requires getting the OGC, Office of General Counsel, involved,
yes.
**Q.** Okay. And back again, we're staying in 2015, around seven
partners were informed of the issues Mauro had raised on the
Cavium's audit; right?
**A.** That's correct. That's -- around seven partners sounds
about right.

**KEVIN HEALY TESTIMONY (03/02/2021)**
**Vol. 6 page 1185 Lines 2 through 22**
**Q.** Okay. And so if you weren't working directly with him on
engagements, how is it that you wound up spending as much time
as you did with Mr. Botta?
**A.** Mauro was -- was always the first person in my office when
he had a point of view on a variety of matters. And I really
appreciated him coming to me and sharing his insights and
thoughts on a variety of matters, whether it be how we should
be thinking about new technical accounting pronouncements that
need to be adopted by our clients, whether there were
observations on how companies were implementing system and
challenges.
So Mauro was -- you know, he was a very frequent
contributor to me, and I had really an open-door policy and

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 1
TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

1   would make a lot of time for Mauro because he was really
proactive at sharing his points of view on things with me.
2   **Q.** Okay. And did you always agree with the issues, concerns,
or items that Mr. Botta raised with you?
3   **A.** No. No. But I would always be willing to discuss them
and debate them with him and really listen to his point of view
4   before making my recommendations on how we were going to move
the practice forward.

5

6   **KEVIN HEALY TESTIMONY (03/03/2021)**
**Vol. 7 page 1232 Lines 22 through 25, Page 1233 Lines 1 through 11**
7   **Q.** Do you remember any issue coming up or Mr. Botta claiming
that he was somehow blacklisted, and did you address that?
8   **A.** Yes. I mean, he did raise that he was blacklisted and we
explained to him, this COE project was a strategic project, and
9   we were taking his time off of clients to work on this.
Just to give some context here. The COE has evolved into
10  a -- today has multiple partners, multiple managing directors,
multiple directors across the country working on our -- our
11  Center of Excellence project.
So this was highly strategic and this was an opportunity
12  for Mr. Botta to be able to continue to progress within the
firm. He was -- we were saying, like, we don't understand why
13  you say you're blacklisted. We're putting you on one of our
most highly strategic projects, and he just wasn't -- he just
14  wasn't hearing it.

15  **Vol. 7 page 1245 Lines 15 through 24**
**Q.** Okay. And let me see if I can get my timeline straight
here.
16  So before you staffed him on the Zhone engagement, he in a
meeting with you was claiming that he felt he was being
17  blacklisted and not getting enough client engagements; is that
right?
18  **A.** That's correct.
**Q.** And then after you staffed him on the audit, he was
19  complaining about that as well; is that right?
**A.** That's correct.

20

21  **WALTER F. BROWN TESTIMONY (03/08/2021)**
**Vol. 9 page 1503 Lines 11 through 16**

22                              6

23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

1  **Q.** At the direction of your office, was Mr. Botta's hard
2  drive taken away from him on June 14th, 2017, right after the
   interview?
   **A.** I recall we imaged his laptop. I don't remember the
3  specifics of exactly when and exactly how we accomplished that,
   but I do recall we imaged his laptop.

4
   **Vol. 9 page 1503 line 25, page 1504 Lines 1 through 7**
5  **Q.** How did you learn he was represented?
   **A.** I believe after we requested to interview him, we heard
6  from an employment lawyer that represented he was Mr. Botta's
   counsel.
7  **Q.** In fact, the lawyer you heard from was a whistleblower
   lawyer; right?
8  **A.** I don't recall that. I recall he was an employment
   lawyer.
9
   **Vol. 9 page 1507 Line 25, Page 1508 Lines 1 through 10**
10 **Q.** Okay. You were well aware at the time of the second
   interview that Mauro had claimed numerous acts of retaliation
11 by reporting corporate wrongdoing against Pricewaterhouse;
   correct?
12 **A.** I don't recall knowing that. I can obviously see this
   letter that you put in front of me came in before the second
13 interview, I was copied on it, and it makes reference to
   reporting unethical and illegal practices.
14 Sitting here today, though, I can't tell you what I
   remember going into that second interview, but I have no reason
15 to believe I didn't receive this letter and didn't review it.

16 **Vol. 9 page 1513 Lines 2 through 9 and 17 through 21**
   **Q.** And you understood before you interviewed Mauro the first
17 time that he had made numerous complaints about the 2013-2014
   Cavium audits; correct?
18 **A.** I don't -- I don't recall if I knew that or not. I knew
   that he had raised issues and that he had been asked to list
19 the issues, and this document reflects that. I don't recall
   knowing that he had made numerous complaints, over what period
20 of time, if at all.
   **Q.** And you knew from your review of the record that Mauro had
21 been the only Pricewaterhouse employee to make complaints about

22
                                        7
23

24

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX 1**
**TESTIMONY MAURO BOTTA WAS THE WHISTLEBLOWER**

1  the 2013 and 2014 Cavium audits; correct?
   **A.** I don't -- I don't know. I don't recall knowing other
2  people who had made complaints.

3  **Vol. 9 page 1522 Lines 3 through 16**
   **Q.** Did you ask Mauro in the interview if there were other
4  audit issues and complaints that he wanted to tell you about?
   **A.** Which interview? In the first or the second interview?
5  **Q.** In the first interview.
   **A.** My recollection is that we used the document you recently
6  showed me that he had prepared that listed the issues that he
   was concerned about as the sort of guide to the first
7  interview, if you will. It was a framework that allowed us to
   ask him about issues that he had identified.
8  I don't specifically recall, but it would be my practice
   to ask the witness, in this case Mr. Botta, if there was
9  anything else he wanted to tell us about. So I don't
   specifically remember doing that, but it would have been my
10 practice to do that.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

8

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX  2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

**TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 920, Lines 21 through 25, Page 921 Lines 1 through 5**
**Q.** Now, Ms. Nelson, I think it's really important to be clear
here. Were you or did anyone ever say to you that they had an
issue with Mr. Botta asking a lot of questions of clients
during an audit?
**A.** It was never about asking questions or the number of
questions necessarily. It was just about his style and his
approach.
You know, I think individuals always felt like they were
on the defensive, and it felt unfair, and it felt really
aggressive.

**MAYANK GUPTA TESTIMONY (03/01/2021)**
**Vol. 5 Page 961, Lines 22 and 23**
**Q.** Okay. Was Mauro a good auditor on Cavium?
**A.** Yes.

**UMIT F. OZDEMIR TESTIMONY (03/02/2021)**
**Vol. 6 Page 1010, Lines 7 through 10**
**Q.** And were the questions that he asked that you were present
for, did you think that they were valid and good questions?
**A.** For my piece, again, for the only one -- I can only talk
for my piece. Yes, his questions were valid.

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1028, Lines 11 through 19**
**Q.** Okay. Given the complexities of the issues, right, and
given you had to consult with folks in National, it was
reasonable for you and Mauro to bring up these issues to PwC's
National office; right?
**A.** Of course.
**Q.** And, Mr. Thorson, you do consider Mauro a good auditor;
right?
**A.** I think Mauro is a good auditor in a lot of cases. In
some cases not so good.

**Vol. 6 Page 1031, Lines 18 through 21**
**Q.** So given you instructed him to draft this memo, you agree
it was reasonable for Mauro to actually draft it and send it to
you; right?

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX  2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1    **A.** Of course.

2    **Vol. 6 Page 1043, Lines 7 through 25, Page 1044 Lines 1 and 2**
    **Q.** Okay. So at that time when Mauro decides to continue with
3    his disagreement and the team decides to consult with National,
    you actually felt that the auditing team needed to get to the
4    bottom of these issues Mauro brought up; right?
    **A.** The auditing team needed to get to the bottom of whether
5    we had an aggregation issue.
    The issues that Mauro brought up were not all related to
6    aggregation. They were related to prior years.
    I spent the most times on dealing with those issues. I
7    knew about most of them. They were non-issues. We had agreed
    in the past they were non-issues. So I was very surprised to
8    see them popping up in this memo.
    So the engagement team was working on aggregating the
9    current year deficiencies to see if we had an issue and that's
    what the consultation was for.
10   **Q.** And you agreed you needed to get to the bottom of this
    aggregation issue; right?
11   **A.** That's correct.
    **Q.** Okay. And it was reasonable to get to the bottom of that
12   aggregation issue; right?
    **A.** Yes, it was.
13

    **Vol. 6 Page 148 Lines 18 through 25, Page 1049, Lines 1 through 23**
14   **Q.** And ultimately you and Robert Heatley agreed it would be
    appropriate to consult with PwC's National office on the
15   aggregation issue because you believe it rose to the level of
    close call; is that right?
16   **A.** So initially Bob and I, Mr. Heatley and I did not think
    this rose to the level of close call which would trigger a
17   consultation. So we weren't concerned at all that we had an
    aggregation issue.
18   Mauro puts together a five-page memo two days before we're
    ready to file a financial statement that says there's all these
19   problems that -- frankly, I didn't agree with most of them.
    But there were all these problems, and given that -- given the
20   nature of it, I wanted to get some other eyes on it.
    And from my perspective, it was kind of an abundance of
21   caution that let's take it to National and have another set of

22

23

24

2

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX  2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

eyes look at this to make sure, you know, if I'm missing
something or Bob is missing something; that we can have, you
know, the National office look at it and see what their views
are. That was really the reason.
And the close call nature, that's a pretty judgmental
area, and we both didn't think it was even a close call. But
we -- we probably called it that after we got Mauro's document
to say, look, let's just move this along and have somebody else
put another set of eyes on it.
**Q.** So you said you didn't agree with most of the issues Mauro
raised, but that means you agreed with some of the issues Mauro
raised; right?
**A.** I agreed with some of the statements in Mauro's document,
that's correct.
**Q.** Okay.
**A.** Whether they were issues or not, I don't know.

**Vol. 6 Page 1056, Lines 6 through 13**
**Q.** So at that point the team was in agreement that there was
significant deficiencies at Cavium; is that correct?
**A.** Yes.
**Q.** Okay. You also write:
"We are consulting under our close call
requirements for aggregation."
Do you remember that email?
**A.** Yes, yes.

**Vol. 6 Page 1141, Lines 17 through 25, Page 1142 Lines 1 through 8**
**Q.** And, sir, did you remove Mr. Botta from the audit at that
time when they requested it?
**A.** No, I did not.
**Q.** Why not?
**A.** The -- so the CFO had approached me on removing him from
the account, and he had said that he -- just kind of bedside
manner, kind of style, wasn't something that they were warming
up to, and they wanted to replace him.
And I had -- I had asked Art, the CFO, if we could at
least keep him around for another year, while he had a chance
to get to know Mauro and get to know him better. I mean, at
the time I believed Mauro had done a good job. And, you know,
my view is he was a little bit like kind of a fine wine, where

3

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1   it takes a little bit to get used to him, but...
    And so the -- basically I think when I got done, I said:
2   Art, I'd like you to just trust me on this one. So Mauro
    remained on the account for the next -- obviously until 2015.

3

    **Vol. 6 Page 1146, Lines 7 through 19**
4   **Q.** And what was that consequence? What happened?
    **A.** I was removed from all of my public accounts and all of my
5   private accounts that I was the engagement partner on, as well
    as any accounts I was the QRP on until the investigation by the
6   SEC concluded.
    **Q.** Okay. And did that -- how long was that period of
7   removal, to your recollection?
    **A.** It was approximately six months.
8   **Q.** And in your view, did that removal during that six months
    did that impact your practice?
9   **A.** It impacted me personally. I got new clients, but I had a
    lot of clients that were -- I was with for a long time. It
10  didn't impact me financially, but it affected my work.

11  **KEVIN HEALY TESTIMONY (03/03/2021)**
    **Vol. 7 Page 1204, Lines 14 through 25, Page 1205 Line 1**
12  **Q.** Okay. What I want to ask you next is under PwC's existing
    rules, would that have been potentially the end of the matter?
13  **A.** It would. You know, our audit policy outlines that if
    there is a disagreement between team members and if the
14  Engagement Leader and Quality Review Partner discuss the matter
    and agree on it, then that would -- that would end the
15  disagreement at that point in time.
    However, I had -- I had met with Tye and shared that I
16  thought it would be -- it would be good to make sure that there
    was a good alignment of the facts; that everyone felt
17  comfortable with the process and the conclusion that -- that
    they consider going for a formal National consultation. And I
18  had a similar conversation with Mr. Botta as well.

19  **Vol. 7 Page 1206, Lines 12 through 21**
    **Q.** Okay. And you've just stated though that it was your
20  decision to go ahead and elevate this anyway; is that right?
    **A.** That is correct.
21  **Q.** And why did you decide to do that?

22                                  4

    Case No.  3:18-cv-002615-AGT              APPENDIX 2
23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"

**A.** I decided to do that because I wanted to make sure that we
got the answer right, and that -- that all parties felt heard,
and all the facts were appropriately tabled and people were
comfortable that their voice was heard and that they had --
there was a thorough vetting of the analysis. So that was just
my recommendation.

**Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**
**Q.** And, sir, why did you specifically highlight there and in
the last sentence "Mauro also lead all the interactions with
ASM&T related to the material weakness and related
disclosures..."? So why did you twice reference his work with
respect to identifying and communicating with respect to
material weakness? Why was that something you were bringing
out in the review?
**A.** I just thought that he did -- we sat down at the outside
of the engagement, we defined roles and responsibilities and
expectations very clearly, and I thought he did a nice job of
executing against the expectations that I outlined.
It was a very complex job. It's not easy to communicate
material weaknesses, especially for a company that had never
experienced them before, and I thought that he did, you know, a
nice job not only managing the client interaction but also
managing the firm interaction in the evaluation of those
conclusions.

**Vol. 7 Page 1259, Lines 7 through 13**
**Q.** Okay. Did you find that his spotting of this issue was
meaningful?
**A.** Yes. I mean, this is consistent with what I said
yesterday; that when Mauro identified issues, he'd be the first
person to my office to share insights on a whole host of
matters to help me think about, you know, how we shared more
broadly.

**STIG HAAVARDTUN TESTIMONY (03/03/2021)**
**Vol. 7 Page 1290, Lines 3 through 9**
**Q.** Okay. So let's focus initially on that first period, the
September-October period. How did his transition into the
engagement team go?
**A.** I think it went -- I think it went well. He clearly --

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

1  like, he came in with a lot of questions and he wanted to learn
   and wanted to work with the team. So I was -- I was generally
2  happy in the initial phases of the Q3 work.

3  **Vol. 7 Page 1290 lines 23 through 25, page 1291, Lines 1 through 23**
   **Q.** Okay. And what was your reaction to Mr. Lakritz's, you
4  know, comments about just the number of questions Mr. Botta was
   asking?
5  **A.** Yeah. So you always want your team to work well with a
   client. So from that perspective, I wanted to understand; but
6  my main -- my main feedback was I liked the fact that Mr. Botta
   is asking a lot of questions. Like, I -- like, this is an
7  opportunity to get someone with a fresh set of eyes to look to
   see if there are things that can be done better.
8  So I -- I told Mr. Lakritz that I thought that Mr. Botta
   asking questions, good questions, to learn the process was a
9  good thing and that I would help sort of making sure that
   things get resolved; and that also obviously Mr. Botta got the
10 benefit of the knowledge that the people have been on the
   engagement for a long time.
11 **Q.** Did you ever raise with Mr. Botta any of the concerns that
   Mr. Lakritz was expressing early on in the audit?
12 **A.** Yeah. I think Botta had -- Mr. Botta had some sense that
   there was a little bit of pushback on the client side so he
13 reached out to me just to check in, and I shared what I said.
   I wanted him to ask questions. I wanted him to, like, make
14 sure that he thought about this and learned, like, looked at it
   with fresh eyes.
15 And I basically said, like, that "I want you to continue
   with this and if you run into trouble, I will help you get
16 things resolved and I will help you working with the client."

17 **Vol. 7 Page 1295, Lines 6 through 12**
   **Q.** What did you say to him?
18 **A.** I said that I was still more than happy with him asking
   questions and taking a fresh look, but he needed to have more
19 of the communication directly and he needed to spend more time
   with the client. And I think I said something like it's common
20 courtesy that if you want to criticize someone's work, that you
   do it in person; don't go through, like, intermediaries.
21

22                              6

23 Case No.  3:18-cv-002615-AGT              APPENDIX 2

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

**Vol. 7 Page 1296, Lines 7 through 17**
**Q.** Mr. Haavardtun, did you have any problem with Mr. Botta
asking questions, even many questions, of the client?
**A.** Not at this time of the audit. Like, up till, like,
January when I'd given the feedback, I was more than happy with
him asking questions.
Very late in the audit Mauro was -- sorry -- Mr. Botta was
just throwing out things all over the place to try and find
things that could sort of prove his point. So I felt that was
a little bit overboard when it comes to the question asking,
but at this point in the audit I got no problem with him asking
questions.

**Vol. 7 Page 1322, Lines 15 through 25, page 1323 line 1**
**Q.** And the final point you make was his inability to close
out issues. And just briefly describe what your concern was
there.
**A.** Yeah. My concern there was that he had raised all these
questions, many of them good questions, but he just couldn't
close them out.
Like, he couldn't figure out what information was needed
in order to reach a conclusion. He just asked for more and
more and more without sort of a clear plan as to how to
conclude whether any of this were significant or not. And,
like, reality was that all of this ended up being relatively
minor once it all got sorted out.

**Vol. 7 Page 1324, Lines 13 through 25, Page 1325, Lines 1 through 14**
**Q.** In fact, the very first narrative description you provide
is:
"Mauro has numerous strengths in areas such as
the understanding of audit methodology, commitment to
quality, strong work ethic, supporting his teams and
engagement."
Do you see that?
**A.** Yes. I stand by that.
**Q.** And then you identify some challenges.
Let's look at the second issue, "Issues Management," which
is your narrative on the bottom of this page.
Mr. Haavardtun, you -- you say here:
"Mauro had significant challenges closing out

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

issues. He raised several good questions during the audit, but in almost every case he was not able to bring the matter to closure."
So, Mr. Haavardtun, was your concern with the fact that Mr. Botta was raising questions of the client?
**A.** No. Certainly not in the beginning of the audit. Towards the end he was just throwing a lot of stuff at the wall. But up til, like, the beginning of February, I liked the fact that he was bringing a fresh perspective and asking questions. That was helping us on identifying things we may not have looked at in the past as well.
**Q.** Yeah. In fact, you were commending him on raising questions in this review?
**A.** Yeah, yeah. Absolutely.

**Vol. 7 Page 1330, Lines 19 through 24**
**Q.** And you would agree that it was a good thing for Mauro, as the incoming senior manager responsible to oversee the full audit, to get a good feel for Harmonic's accounting practices; right?
**A.** Yes. I think -- I think him getting acquainted with the practices and asking questions around that was a good thing.

**JASON S. FLEMMONS TESTIMONY (03/04/2021)**
**Vol. 8 Page 1408, Lines 1 through 12**
**Q.** Okay. And do you agree that at least two control deficiencies documented by Mauro for the Cavium audit were concluded by Pricewaterhouse to be significant deficiencies?
**A.** I recall there being two significant deficiencies related to the 2014 audit of Cavium.
**Q.** And those were complaints that Mr. Botta had raised; correct?
**A.** I don't recall him complaining about the fact that those were significant deficiencies.
**Q.** Okay. But they were issues that he raised in the memo that you reviewed for your report; correct?
**A.** I recall those issues were referenced in his memo.

**Vol. 8 Page 1411, Lines 14 through 19**
**Q.** Do you agree that the PCAOB standards underscore the importance of auditors exercising professional judgment when

8

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 2
TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

assessing sampling risk?
**A.** Yes. Professional judgment is required in assessing
sampling risk and judgment is required in many other facets of
an audit.

**Vol. 8 Page 1416, Lines 11 through 17**
**Q.** Do you agree, Mr. Flemmons, that sampling requires
reasonable judgment to determine an appropriate sample size?
**A.** Yes, I would agree with that.
**Q.** Okay. And there is a wide range of reasonable views on
this determination; correct?
**A.** To the extent those judgments are reasonable, yes, there
can be a wide range of judgments.

**WALTER F. BROWN TESTIMONY (03/08/2021)**
**Vol. 9 Page 1484, Lines 23 through 25, Page 1485, Lines 1 through 12**
**Q.** Okay. Now, we can take that down.
We've heard testimony in this trial that Mr. Botta
complained to other government agencies about PwC. Are you
familiar with any other government agencies that may have
investigated Mr. Botta's allegations?
**A.** I am aware of one.
**Q.** And which one is that?
**A.** The Public Company Accounting Oversight Board.
**Q.** Known as the PCAOB?
**A.** That's right.
**Q.** All right. And do you recall when the PCAOB opened an
investigation into Mr. Botta's allegations?
**A.** My recollection is that it was sometime in 2018 after we
had been notified by the SEC that it had closed its
investigation.

**EXHIBIT JX 2-7**
Good side: He suspected the transaction his client were doing was goofy – he did not trust what they
were telling us. He stuck with it and found something and it turned out his suspicions were right. We got
to bottom if it. It was Mauro's skepticism that did that for us.

**EXHIBIT PX 105-18**
"Maura executed on a high quality integrated audit this year. Great coaching skills:
He proactively coached the second year manager to address his development needs from last year.
Excellent presentation skills: He takes the lead to present all audit materials to management and the AC.

9

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX 2**
**TESTIMONY AND EXHIBITS REGARDING "REASONABLENESS"**

Outstanding professional skepticism: Mauro applied professional skepticism (and related audit documentation) very effectively which also demonstrated his great auditing skills."

**EXHIBIT PX 105-21**
11/24/14 – Ergun Genc
"Mauro transitioned onto the account in April. Engagement team had a significant turnover. He utilized his network within SJ and built a strong team over a period of 3 months. He also addressed the turnover on the client side; he built strong relations with the new hires and stayed connected with the controller throughout to pro actively address matters that came up. For those matters he provided solutions and asked for fair fees which were agreed upon."
01/08/15 – Edward P. Jackson
"Extremely thorough review (maybe a little too thorough at times!) Great thing about Mauro is that he is very diligent and you know a review from him is meaningful and high quality."
03/18/15 – Ergun Genc
"Outstanding job! Our team looked up to Mauro for leadership, guidance and coordination. The client CEO and Controller see Mauro as the main PwC contact and are comfortable addressing matters with him. He spent significant effort on high quality audit, ensured all matters were addressed properly while providing coaching to the team and the client staff. He supported me in discussing two material weaknesses, and provided documentation/guidance to management to asssist them in their evaluation."

**EXHIBIT PX 105-27**
09/25/15 – Ergun Genc
"Mauro has been demonstrating fantastic leadership skills on this Year 1 404 account. He attended all walkthroughs to date to assess design of controls and documentation. He showcased the best practices to our team in terms of note taking, asking probing question and identifying the appropriate process owners, as well as demonstrating professional behavior throughout. His outstanding technical skills in auditing and accounting builds respect from the client and engagement teams. Very well done!".

**MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol. 3 Page 400 Lines 22 through 25, Page 401 Lines 1 through 3**
**Q.** Mauro, do you believe the issues you raised in JX4 were
reasonable?
**A.** Yes.
**Q.** Why is that?
**A.** Because there were issued that -- issues that I raised as
part of my experience; and in my professional opinion given the
context that occurred, it was a reasonable conclusion by me.

Case No.  3:18-cv-002615-AGT              APPENDIX 2

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX  3
TESTIMONY REGARDING "MATERIAL WEAKNESS"**

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1030, Lines 5 through 21**
**Q.** Okay.
**A.** He had asked if I had looked at the SAD, which is kind of
our score sheet of internal control deficiencies. He had asked
me if I had considered whether we had a material weakness. I
said no. I went back and looked at it later the night that he
talked to me about it. I came back.
We talked about it the next day. He asked me if I thought
there was a material weakness around aggregation. And I said
no. And he says: That's a shame because I do. And he went on
to start talking about a lot of kind of aspects. And at that
point in time I said why don't you write this memo, because it
was starting to get complex.
So I don't -- at the time there was no complaints or, you
know, concerns. It was just that he had a position where he
thought we had an aggregation issue, and I had not seen it.
But I also wanted to understand it, so I asked him to write a
memo.

**Vol. 6 Page 1031, Lines 3 through 17**
**Q.** Okay. Thank you.
When Mauro brought up the aggregate deficiencies -- and
you may have touched on this briefly, but before he sent you
the memo, he shared his beliefs with you, and he believed there
was a material weakness at Cavium based on the aggregation of
control deficiencies; correct?
**A.** That's what he said, yes.
**Q.** And before this memo was sent to you in JX10, you actually
wanted to understand Mauro's point of view on the issues he had
brought up to you; right?
**A.** Of course.
**Q.** And you actually encouraged him to put his concerns about
the aggregation deficiencies in writing; right?
**A.** Yeah. I wanted him to write up why he thought there was
an aggregation, material weakness.

**Vol. 6 Page 1032, Lines 1 through 17**
**Q.** And 2012, right. And he's bringing up these issues with
audit opinions that have already been signed off on on behalf
of PwC; right?

1

Case No.  3:18-cv-002615-AGT            APPENDIX 3

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

1  **A.** Which I thought was very unusual for this kind of an analysis, but yes, that's correct.

2  **Q.** But you would agree that if there is an aggregate control deficiency, your job as an auditor would be to determine if

3  these aggregate deficiencies created a material weakness; right?

4  **A.** That's correct, but you normally -- it's not even considered that you consider deficiencies from prior years when

5  you do an aggregation consideration.
So Mauro had brought in 2012 and 2013 issues into this

6  memo, which was very unusual. I've never ever seen that before in all my time. And so I -- you know, once I got it, clearly I

7  needed to spend some time with Mauro to understand why he did what he did.

8

9  **Vol. 6 Page 1056, Lines 6 through 13**
**Q.** So at that point the team was in agreement that there was significant deficiencies at Cavium; is that correct?

10  **A.** Yes.
**Q.** Okay. You also write:

11  "We are consulting under our close call requirements for aggregation."

12  Do you remember that email?
**A.** Yes, yes.

13

14  **KEVIN HEALY TESTIMONY (03/03/2021)**
**Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**

15  **Q.** And, sir, why did you specifically highlight there and in the last sentence "Mauro also lead all the interactions with

16  ASM&T related to the material weakness and related disclosures..."? So why did you twice reference his work with

17  respect to identifying and communicating with respect to material weakness? Why was that something you were bringing

18  out in the review?
**A.** I just thought that he did -- we sat down at the outside

19  of the engagement, we defined roles and responsibilities and expectations very clearly, and I thought he did a nice job of

20  executing against the expectations that I outlined.
It was a very complex job. It's not easy to communicate

21  material weaknesses, especially for a company that had never experienced them before, and I thought that he did, you know, a

22  _____
2

23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

1  nice job not only managing the client interaction but also
2  managing the firm interaction in the evaluation of those
   conclusions.

3  **Vol. 7 Page 1266, Lines 2 through 12**
   **Q.** You testified earlier that there was no black-and-white
4  judgment on material weaknesses. Do you remember that?
   **A.** I said there was a lot of judgment. There's no
5  black-and-white conclusion on material weaknesses. A lot of
   professional judgment in reaching that answer.
6  **Q.** And you would agree that to make a determination of a
   material weakness requires professional judgment?
7  **A.** That's correct.
   **Q.** And you encourage your auditors to use their professional
8  judgment in making that determination; correct?
   **A.** That's correct.

9
   **JASON S. FLEMMONS TESTIMONY (03/03/2021)**
10 **Vol. 7 Page 1357, Lines 14 through 25**
   **Q.** Mr. Flemmons, we've heard in this case about a
11 black-and-white approach of auditing versus the use of
   judgment. Can you tell us what is the appropriate way to --
12 appropriate approach to an audit?
   **A.** Well, with regard to, you know, the exercise of judgment,
13 that is required in pretty much everything that an auditor
   does. There's very little that's black and white; and, you
14 know, when it comes to an assessment of internal controls, for
   example, in determining whether or not a deficiency rises to
15 the level of a material weakness, that is -- that is something
   where there are definitely no bright lines and requires an
16 extraordinary amount of judgment.

17 **JASON S. FLEMMONS TESTIMONY (03/04/2021)**
   **Vol. 8 Page 1395, Lines 2 through 16**
18 **Q.** And do you agree there is no bright line in distinguishing
   a significant deficiency from a material weakness?
19 **A.** I agree there are no bright lines. That said, there are,
   you know, standards and criteria that are applicable in that
20 analysis, some of which we discussed yesterday.
   **Q.** And, in fact, SEC Guidelines emphasize that this is an
21 area of significant judgment; correct?

22
   3
23 
   Case No.  3:18-cv-002615-AGT           APPENDIX 3
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"**

**A.** Yes.
**Q.** Do you agree that there could be a range of professional
conclusions in any audit and all of those conclusions could
comply with the professional standards?
**A.** There are certainly a range of professional conclusions;
but I think, again, it boils down to whether the basis for
those conclusions are considering the right standards and are
applying reasonable judgment.

**Vol. 8 Page 1396, Lines 5 through 7**
**Q.** Do you agree that judgment is imperative in determining
whether a deficiency is a material weakness?
**A.** Yes, I would agree with that.

**Vol. 8 Page 1396, Lines 19 through 25, Page 1397 Lines 1 and 2**
**Q.** Would you agree that the auditors at PwC should have been
encouraged to use their judgment?
**A.** I would agree that PwC auditors, like any auditing firm,
would be encouraged to use reasonable judgment for sure.
**Q.** And the PCAOB standard uses the term "prudent," does it
not?
**A.** My recollection of the PCAOB standard, if you're referring
to Auditing Standard No. 5, refers to, I believe, a "prudent
official."

**Vol. 8 Page 1399, Lines 13 through 25, Page 1400, Lines 1 through 14**
**Q.** In Audit Standard No. 5 that we just talked about, it
talks about the severity of a deficiency and using that in
conjunction with a combination of deficiencies to determine
level of severity; is that correct?
**A.** Yes, that language resides in Auditing Standard No. 5.
**Q.** Okay. And it does specifically say "combination of
deficiencies"; correct?
**A.** Yes, I believe it uses that phrase.
**Q.** Okay. And it says that:
"An auditor should determine a level of detail
and degree of assurance that would satisfy a prudent
official" -- "a prudent auditor."
Does it not?
**A.** It uses the phrase "prudent official," not "prudent
auditor."

4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

**Q.** Okay. And am I correct that it says that they need to determine the level of detail and degree of assurance that would satisfy a prudent official; is that correct?
**A.** Again, I don't have the standard in front of me. That sounds generally what the standard calls for.
**Q.** And what do you interpret that to mean?
**A.** Well, that section relates to -- it advises auditors when evaluating the severity of a material weakness, you know, to, you know, evaluate whether that deficiency, you know, presents a reasonable assurance that the internal controls would not detect a material misstatement and whether the control structure would satisfy a prudent official in that regard.

**Vol. 8 Page 1404, Lines 3 through 12**
**Q.** And do you agree that the determination of whether a deficiency arises to the level of a material weakness is a judgmental process that is not necessarily always restricted to these criteria?
**A.** Well, as I said, those are four of the primary indicators. We've also talked about the, you know, general criterion with regard to looking at it through the lens of a prudent official, and that criterion in combination with the other four that we've talked about were criteria that were considered by the audit team.

**Vol. 8 Page 1405, Lines 2 through 12**
**Q.** Okay. And PwC has a close-call protocol for handling these type of close-call situations; correct?
**A.** I recall they have policies and procedures regarding consultations with the National office on technical issues.
**Q.** Did you review those policies and procedures?
**A.** I may have. I know that I obtained and reviewed some of PwC's policies and procedures. I just don't recall if it was specific to this topic.
**Q.** Do you remember the technology "close call"?
**A.** Yes. I believe that phrase appears on the National office consultation template.

**MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol 3. Page 471 Lines 20 through 25**
**Q.** Sure. When you wrote your February 2015 memo, which

5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW – APPENDIX 3
TESTIMONY REGARDING "MATERIAL WEAKNESS"**

1  you've testified about at length, this was one of the
   allegations of you blowing a whistle; right, sir? That Cavium
2  had a material weakness for incompetence?
   **A.** After the allegation was that memo, yes.
3  **Q.** Right.

4  **Vol 3. Page 472 Lines 5 through 9**
   **Q.** Okay. Sir, after you submitted this memo suggesting that
5  client Cavium should be assigned a material weakness for
   incompetence, isn't it true, sir, you received a Tier 1 rating
6  in June of 2015?
   **A.**  I believe it's accurate.

7
   **Vol 3. Page 477 Lines 1 through 8**
8  **Q.** And, sir, PwC actually issued Gigamon two material
   weaknesses for that year; didn't it?
9  **A.** Yes.
   **Q.** And, Mr. Botta, you'll agree with me that Gigamon because
10 of the finding of two material weaknesses, they had to disclose
   those material weaknesses in its annual report to shareholders
11 that are filed with the SEC? You understood that; right?
   **A.**  Of course.
12
   **Vol 3. Page 493 Lines 16 through 25, Page 494 Lines 1 through 6**
13 **Q.** And in 2016, the very next year, PwC took over the
   engagement and issued two material weaknesses to Zhone; right,
14 sir?
   **A.** I don't remember the number. I think there were two, but
15 I'm not hundred percent positive.
   **Q.** Okay. Let me see if I can help refresh your recollection.
16 Zhone had, in fact, one material weakness because it
   failed to maintain effective controls over its financial
17 closing process; right?
   **A.** Yes.
18 **Q.** And another material weakness because it did not maintain
   effective controls over the review of supporting information to
19 determine the completeness and accuracy of the accounting for
   complex transactions; right?
20 **A.** I don't recall the language. I mean, if you have the SEC
   filings, I can confirm to that for sure.
21

22
                                    6
   Case No.  3:18-cv-002615-AGT           APPENDIX 3
23

24

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW – APPENDIX  3**
**TESTIMONY REGARDING "MATERIAL WEAKNESS"**

**MAURO BOTTA TESTIMONY (02/23/2021)**
**Vol 2. Page 252 Lines 12 through 20**
**Q.** Were you concerned at that time about challenging
previously issued opinions?
**A.** No. As I said, I put those prior years because to me
context mattered and I was concerned that if the conclusion
that we agreed upon for 2014 was that we would have had a
material weakness on competence, we would have needed to answer
the question related to prior years even though the same people
were there to also deal with the same type of unusual
transactions.

**Vol 2. Page 253 Lines 15 through 22**
**Q.** Okay. Do you believe then that you bringing up your
concerns of an aggregate material weakness were reasonable?
**A.** Yes.
**Q.** Why?
**A.** Because based on my professional opinion as I articulated
in that memorandum, there was significant concerns both as I
mentioned individually or in the aggregate that a reasonable
auditor could have concluded that that was a possibility.

**Vol 2. Page 326 Lines 21 through 25**
**Q.** Did you, Mauro, ever talk to Stig about issuing a material
weakness against Harmonic?
**A.** Yes.
**Q.** When was the first time you had that kind of conversation?
**A.** In I think it was around March.

**Vol 2. Page 330 Lines 5 through 8**
**Q.** Okay. What happened next with respect to you bringing up
issuing a material weakness on Harmonic?
**A.** Ergun told me that I was free to go back to Gigamon and
tell them that I was -- he was being the bad guy.

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX  4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6 Page 1106, Lines 18 through 25, 1107 Lines 1 and 2, Lines 6 through 8**
**Q.** Do you understand the reason why PwC alleges they
terminated Mr. Botta?
**A.** No.
**Q.** You don't? Okay.
**A.** Based on the rules of evidence here, I've only heard
through my --
**Q.** Okay. That's fine.
Let me ask you this: The $10 million threshold that was
written in these various documents we've reviewed, that wasn't
a fabrication, was it?
**THE WITNESS:** That was -- that was not a fabrication.
That was a draft that I thought was a good number that we
validated the next day with the CAO.

**Vol. 6 Page 1125, Lines 15 through 25, Page 1126 Lines 1 through 5**
**Q.** Okay. And just a few more questions, Mr. Thorson.
Hopefully, we can wrap up.
If there was a fabrication in the Cavium audit, you would
agree PwC would need to take some steps to rectify that; right?
**MR. HUESTON:** I'm going to object to that. This is
not just a hypothetical, but it's vague as framed.
**THE COURT:** This witness has testified on whether or
not there was a fabrication, and I believe his testimony was
no.
So the question is had he -- had there been a fabrication,
what would have happened?
**MR. CABECEIRAS:** Correct, Your Honor.
**THE COURT:** If you can answer the question,
Mr. Thorson.
**A.** If I knew something was fabricated, you know, that would
be unacceptable to me.

**Vol. 6 Page 1128, Lines 2 through 5**
**Q.** Okay. And was there any keeping current procedure done
with respect to falsities for the March 2nd, 2015 audit opinion
that you signed?
**A.** Not that I'm aware of.

**Vol. 6 Page 1145, Lines 9 through 24**
**Q.** And let me show you another document. We'll go to JX4.

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1  This is Mr. Botta's SEC Complaint, which he testified he
   authored. And we'll go to Page 9 of this document, middle of
2  the Page 9, first full paragraph.
   And I want to highlight, quote:
3  "Such conclusion was achieved after a control
   over the tax footnote was documented. However, such
4  control was not noted during the walk-through and
   constituted a documentation exercise thanks to which
5  the Significant Deficiency conclusion was agreed upon
   by National. Evidence of this is that this control
6  was created the night before the filing of the 10-K."
   Sir, have you ever made a claim like this to the SEC or to
7  anybody?
   **A.** No. This control was definitely not created the night
8  before the filing of the 10-K.

9  **WALTER F. BROWN TESTIMONY (03/08/2021)**
   **Vol. 9 Page 1465, Lines 5 through 13**
10 **Q.** And, Mr. Brown, did Mr. Botta describe a monetary amount
   at which he set and created this control?
11 **A.** He did. So the control related to fluctuations in the tax
   footnote and the threshold created was, as I recall,
12 $10 million. Meaning that if there was a fluctuation in the
   tax footnote in excess of $10 million, then pursuant to the
13 control, the chief financial officer and the chief accounting
   officer would do additional review and additional work to
14 determine whether there was an issue.

15 **Vol. 9 Page 1467, Lines 22 through 25, Page 1468 Lines 1 through 14**
   **Q.** Well, why don't you just -- I'll get into some specifics,
16 but maybe you can describe your understanding at a high level
   of what this document was before we get into some specifics.
17 **A.** Sure. So as I mentioned earlier, the National office was
   conducting a review of the internal controls at Cavium. There
18 had been a complaint or an issue raised by Mr. Botta that
   various control deficiencies aggregated to a material weakness,
19 and so the National office was reviewing those issues and in
   the course of that review created a number of documents that
20 were going to be part of the package, if you will, of the
   review and one of those was a tax memo.
21 As I mentioned, this control related to the tax footnote.
   And at some point, as I recollect, the National office took out
22 from the tax memo the relevant section concerning this internal

2

23

24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX  4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

control and created a stand-alone document, and that became the document that various people were looking at and editing and reviewing over the course of that weekend; and that, I believe, is what I have in front of me –

**Vol. 9 Page 1472, Lines 8 through 19**
**Q.** All right. Now, sir, we've heard testimony that Mr. Botta in fact, and you've referenced this I think, initiated a National office consultation because he had alleged that Cavium had a material weakness due to competency, but you've now described Mr. Botta telling you that he in fact was creating a control to presumably help Cavium. Did you consider that issue?
**A.** I did. It actually struck me as incongruent that at the time that he was, you know, raising issues about control deficiencies and a material weakness, he would be taking steps to help solve a problem concerning it, a control deficiency, and it struck me as inconsistent or incongruous.

**Vol. 9 Page 1501, Lines 18 through 23**
**Q.** And after the first interview on June 14th, you suspected that he had fabricated a control; is that correct?
**A.** I don't know that I suspected. He had told us he had fabricated a control, and the word I believe he used was -- I can't remember the exact word, but I believe it was "created," "made up."

**Vol. 9 Page 1523, Lines 2 through 8**
**Q.** When you interviewed Mr. Botta, he never used the word "fabricated," did he?
**A.** I don't recall if he used that word. I don't -- I'm recalling today "created," "made up." I'm not sure the exact -- the exact word he used.
**Q.** He never used the word "lied"?
**A.** I don't recall if he ever used the word "lied."

**Vol. 9 Page 1525, Lines 20 through 24**
**Q.** If the control actually existed, it would not have been fabricated; would you agree with that?
**A.** If the control actually existed, then it wouldn't have been created the night before the K was filed. I think -- I think I would agree with that.

3

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX  4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

**Vol. 9 Page 1532, Lines 6 through 10**
**Q.** If the control existed, that would mean that it had not been fabricated; correct?
**A.** I think that's probably right. If there was, in fact, an internal control, this internal control that existed, then there would be nothing to create or fabricate.

**Vol. 9 Page 1526, Lines 4 through 10**
**Q.** And there were other people other than Mauro editing the document, DX1280; correct?
**A.** I'd have to go back and look at it. I recall there were other people raising comments, asking questions. I can't remember if there were edits, other than by Mr. Botta, to the actual document. There may have been. I just can't tell you that without looking at the document.

**Vol. 9 Page 1527, Lines 9 through 20**
**Q.** During the interview of Mauro, did it appear that there was any awareness or acknowledgment by Mauro that he had done something wrong?
**A.** Yes.
**Q.** Okay. Did he say that he had lied?
**A.** I don't recall if he used the word "lie."
**Q.** Did he say that he had done something wrong that he shouldn't have done?
**A.** I don't recall the specific words he used when he described the creation of this control, but the -- with the tone and tenor of the -- of the discussion was that he knew it was wrong.

**Vol. 9 Page 1527, Lines 21 through 25, Page 1528 Lines 1 through 8**
**Q.** Did anyone in the room from PwC or Orrick say to him: You weren't supposed to do that. You're not allowed to create a control.
**A.** I don't recall that we confronted him in that fashion. Our goal was to gather information, and I don't know that we took an adversarial confrontational approach with him. I don't believe we did.
**Q.** Thank you.
You never told him that you thought he was lying or that he did something wrong; correct?
**A.** I don't recall telling him in the interviews that I thought he was lying or that he had done something wrong,

4

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1 | that's correct.

2 | **Vol. 9 Page 1556, Lines 5 through 14**
**Q.** And my question was: Did you ask Mauro if the final
3 | consultation memo contained false information?
**A.** I -- I can't remember if we specifically went through the
4 | same language that been the tax memo that was imported into
the final memo and asked him to confirm that separately.
5 | **Q.** Did you ask Mauro Botta in any of the interviews if the
final work papers for the 2014 Cavium audit contained false
6 | information?
**A.** I don't recall if I specifically asked him that precise
7 | question.

8 | **Vol. 9 Page 1529, Lines 22 through 25, Page 1530, Lines 1 through 7**
**Q.** When you interviewed Mauro, you did not ask Mauro if he
9 | had discussed the $10 million threshold with Mr. Thorson at the
time that it was put into the memo; did you?
10 | **A.** I believe -- I believe we asked him what discussions he
had with Mr. Thorson, yes.
11 | **Q.** You didn't ask Mauro if Mr. Thorson and he created the
$10 million threshold together for the tax memorandum; did you?
12 | **A.** I recall asking him whether he discussed the creation of
the control with Mr. Thorson.
13 | **Q.** And he said yes; correct?
**A.** Correct.
14 |

15 | **Vol. 9 Page 1540, Lines 13 through 22**
**Q.** In the interviews with Mauro, did he share with you that
16 | Mr. Thorson gave him approval to add the $10 million control to
the tax memo?
17 | **A.** He indicated to me that he discussed this with
Mr. Thorson. I don't recall if he used the word "approval,"
18 | but he told me he discussed it with.
**Q.** And did he tell you that Mr. Thorson agreed that it was
19 | good and he should add it?
**A.** I don't know, again, if he used the word "good," but he
20 | told me that Mr. Thorson agreed with him to add this.

21 | **Vol. 9 Page 1545, Lines 2 through 5**
**Q.** So you never discussed with Mr. Botta whether the
22 | $10 million threshold had been tested?
**A.** I don't recall whether we discussed that issue with him or

23 | 5
Case No.  3:18-cv-002615-AGT            APPENDIX 4

24 |

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - APPENDIX 4
TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1 | not.

2 | **Vol. 9 Page 1554, Lines 19 through 21**
**Q.** Did you tell the SEC that the control was already in
3 | place?
**A.** I did not.

4 |

**WALTER BROWN DECLARATION 17:26 (01/11/2019)**
5 | 4. During the interviews, Mr. Botta stated that he had fabricated a Cavium
internal control that was not actually in place at Cavium at the time, and that he drafted
6 | audit documentation describing the fabricated control that he understood others were
relying on.
7 | 5. During the July 17 interview, in particular, I discussed with Mr. Botta
edits he made to a March 1, 2015 memorandum discussing certain Cavium internal
8 | controls, a true and correct copy of which is attached as **Exhibit 1.**
6. Mr. Botta stated-at several different points during the interview-that
9 | edits he made to the memorandum were fabrications that did not accurately describe,
according to his understanding, the internal controls in place at Cavium at the time.

10 |

**MARK SIMON TESTIMONY (03/08/2021)**
11 | **Vol. 9 Page 1574, Lines 5 through 9**
**Q.** Okay. So at trial Mr. Botta has testified that he didn't
12 | create a fake control. If that were true, would that have
impacted your decision to terminate him in any way?
13 | **A.** No. Again, he said he did. And if he didn't, that means
he lied about doing so.
14 | **Vol. 9 Page 1575, Lines 6 through 25, Page 1576 Lines 1 through 3**
**Q.** When you made your decision to terminate Mr. Botta, did
15 | you consider calling Mr. Botta to ask him: Hey, did you make
up this fake control?
16 | **A.** I did not believe there was a need to.
**Q.** Why not?
17 | **A.** So we've got, I would say, very strong, good protocols and
processes around how we conduct investigations. And that
18 | protocol is the attorneys and our risk management folks go
through those protocols, determine what's necessary. They
19 | provide the leadership team with the update as to the results
of those investigations. And then based upon that, we would
20 | make a determination as to whether or not someone should be
terminated or the consequences of the issues.
21 | It's not my job to do the investigation, nor have I done
that in the past.
22 | **Q.** Did PwC investigate whether Mr. Botta had, in fact,

23 |

24 |

6

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - APPENDIX 4
TESTIMONY REGARDING "FABRICATION" OR "LIE"**

created a fake control?
**A.** So we did do an investigation.
**Q.** And I don't want you to get into the details, Mr. Simon,
but what was your understanding of PwC's conclusion?
**A.** I think it was inconclusive. I think we were not able to
conclude either way as to whether a fake control was actually
created or not.

**Vol. 9 Page 1603, Lines 6 through 13**
**Q.** Okay. Let's discuss that for a second.
You declared in your declaration that we reviewed before
certain things about that. I'll pull it up quickly.
So you declared under penalty of perjury and submitted to
the Court that you made the determination to violate -- or to
terminate Mr. Botta based off various obligations which
prohibit the fabrication of audit evidence; is that correct?
**A.** Yeah, that's correct.

**Vol. 9 Page 1604, Lines 6 through 24**
**Q.** Now, you say Mr. Botta either violated his duties or lied
right here; right?
**A.** Yes.
**Q.** You do not use the words "Mr. Botta violated his duties
and lied"; right?
**A.** (Witness examines document.) Yes. That's the way it's
written, yes.
**Q.** Okay. You know, obviously the word "either" means
presenting of two alternatives; right?
**A.** That's the way it's written, yes.
**Q.** Okay. So using the word "either," you'd agree that means
PwC's reason for terminating Mr. Botta could just be one of
those reasons; right?
**A.** Say the question again.
**Q.** Sure. So using your words "either" and agreeing on the
definition before, you'd agree this means PwC's reason for
terminating Mauro could be just one of those reasons according
to your statement in paragraph 6 of your declaration; right?
**A.** Yes.

**Vol. 9 Page 1606, Lines 1 through 11**
**Q.** Mr. Brown, what did you mean by using the words
"either/or" in this declaration?
**A.** Mr. Brown?

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW - APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

**Q.** Mr. Simon. Excuse me. Sorry. We have spent the afternoon -- or morning with Mr. Brown.

So, Mr. Simon, what did you mean exactly?

**A.** So Mr. Botta stated that he created a fake control. So if he did so, he violated his professional, legal, and ethical duties and PwC policy, which would prohibit that happening or allow it to not be happening, or he lied about doing so. So in either case, those are grounds for termination from the firm.

**MARK SIMON DECLARATION 13:25 (01/31/2019)**

4. I based my decision to terminate Mr. Botta on statements that he had made during two interviews with Walter Brown, a Partner at Orrick, Herrington & Sutcliffe LLP, conducted in response to an inquiry from the Securities and Exchange Commission ("SEC") into PwC's audits of the financial statements of Cavium, Inc. for fiscal years 2013 and 2014.

5. Specifically, Mr. Botta stated that he had fabricated an internal control during the fiscal year 2014 audit of Cavium and created false audit documentation that he understood others were relying on.

6. In light of Mr. Botta's statements, I made the determination that he could no longer be employed by PwC because he had either (a) violated his professional, legal, and ethical duties and PwC policy, which prohibit the fabrication of audit evidence or documentation or (b) lied about his conduct. Both alternatives are misconduct warranting Mr. Botta's termination.

**MAURO BOTTA TESTIMONY (02/24/2021)**
**Vol. 3 Page 439, Lines 4 through 14**

**Q.** In that second meeting did you use the word "fabrication" when talking to Mr. Brown about this suggested control?

**A.** No.

**Q.** When you talked to Mr. Brown about the suggested control, did Mr. Brown ever accuse you of lying?

**A.** No.

**Q.** Did Mr. Brown every accuse you of fabricating the control?

**A.** No.

**Q.** Did Mr. Brown indicate in any way that what you did with respect to that control was problematic?

**A.** No.

**Vol. 3 Page 436 Lines 8 through 25, Page 437 Lines 1 through 10**

**Q.** Mauro, did Mr. Brown ask you about the internal controls on Cavium?

**A.** Yes.

**Q.** Did he ask you about your suggestion regarding the

8

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - APPENDIX 4
TESTIMONY REGARDING "FABRICATION" OR "LIE"**

1  internal controls on Cavium?
**A.** Yes.
2  **Q.** Okay. What did he ask you about your suggested internal
control on Cavium?
3  **A.** He asked me to go through what led to that, and if at the
time that I recommended that suggestion, I knew or had
4  discussions with Cavium about it, and if I knew that at the
time if the company did have that control implemented.
5  **Q.** Okay. And how did you respond to that question, whether
you knew the control was implemented?
6  **A.** I told him that at the time mine was a suggestion
predicated on the discussion that I had with Tye Thorson; that
7  that was the documentation that would have reflected the
control once he would have reassured me that Cavium would have
8  done it.
**Q.** Okay. What else did you share with him about your
9  conversation with Tye Thorson as it relates to this control
suggestion, if anything?
10  **A.** The conversation that I had testified earlier about the
exchange on Sametime, where he told me that the 7 million, and
11  then I raised to the 10 million.
And the conversation that I had where we discussed if he
12  thought National was going to go for it, and I said one way to
find out. And that was the extent of the conversation.
13
**Vol. 3 Page 437 Lines 20 through 25, Page 438 Lines 1 through 10**
14  **Q.** What happened next with respect to your involvement in
PwC's investigation into the Cavium matter?
15  **A.** I was asked for a second meeting in mid July, I believe.
**Q.** Okay. And who attended that meeting? Was it the same --
16  I think -- actually, withdrawn, we went over that.
Did Mr. Brown at that meeting ask you questions again
17  about the $10 million threshold?
**A.** Yes.
18  **Q.** Okay. And can you describe for the Court what he asked
you about regarding the $10 million threshold?
19  **A.** My recollection is that there were analogous questions to
the ones that I just described in the first meeting -- excuse
20  me, in the first meeting regarding the threshold, my knowledge
about if it was already in place at the time that I suggested
21  it, if I had communications with Cavium, and those were the
questions.
22
23  ─────────────────────────────────
9
Case No. 3:18-cv-002615-AGT          APPENDIX 4
24

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW - APPENDIX  4
TESTIMONY REGARDING "FABRICATION" OR "LIE"

**Vol. 4 Page 653 Lines 14 through 25, Page 654 Lines 1 through 25**
**Q.** Well, I just want to make sure. You did not personally confirm with either of them that Cavium had this control; right, sir?
**A.** Correct.
**Q.** All right. And your testimony is you believe that Mr. Thorson was going to confirm the control; right?
**A.** I told him to do so. Otherwise, I would not have made those edits.
**Q.** Okay. And so it's your testimony you have no reason to believe that he, in fact, didn't do so; right?
**A.** Correct.
**Q.** So you believe that Cavium had this control and it operated efficiently; right, sir?
**A.** Yes.
**Q.** Okay. And, again, to make sure I'm following your testimony today, this is not a control that you created; right, sir?
**A.** It's a control activity that establishes two different precision. It's a bit of a semantic, so.... Not sure how to better clarify.
**Q.** Well, let me ask a different question. Your testimony today here is that you did not makeup an internal control; right?
**A.** I did not.
**Q.** Okay. And, in fact, you did not create this control or make it up the night before Cavium filed its 10-K; right?
**A.** I did propose this suggestion the night before.
**Q.** Sir, you did not create a control that did not exist; right?
**A.** I proposed a threshold; that when I proposed it, I didn't know.
**Q.** Sir, you would never create a control that did not exist; is that fair?
**A.** I would never create a control that would not exist.
**Q.** That did not exist. You wouldn't create one out of whole cloth; right?
**A.** Not in the final work papers.

**Vol. 4 Page 655 Lines 13 through 16**
**Q.** Okay. Now, sir, let's -- in reference to you did not make up an internal control, that's not what you told the SEC; right, sir?

10

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S AMENDED PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW - APPENDIX 4**
**TESTIMONY REGARDING "FABRICATION" OR "LIE"**

**A.** No.

**Vol. 4 Page 661 Lines 11 through 15**
**Q.** And, sir, isn't it true that during those interviews, you said you had created a control for Cavium?
**A.** I don't recall the exact words that I said.
**Q.** Okay.
**A.** I repeated the same facts that I testified already.

11

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**TRACI NELSON TESTIMONY (03/01/2021)**
**Vol. 5 Page 905, Lines 6 through 9**
**Q.** How often were you interacting with Mr. Botta while he was at PwC?
**A.** I interacted with him very often. Probably more so, I would say, than any other employee.

**Vol. 5 Page 907, Lines 13 through 20**
**Q.** Ms. Nelson, did you ever -- do you ever remember Mr. Botta shying away from voicing a concern or fighting a crusade?
**A.** No. I mean, Mauro was one of the most vocal employees. I mean, in my 24 years I have never seen someone as vocal as Mauro.
I mean, just to kind of describe it a little bit. I mean, he was the guy that in an all-hands meeting would stand up and, you know, be the one to state his opinion. He never held back.

**Vol. 5 Page 908, Lines 11 through 16**
**Q.** Could you quantify how much time you were spending with Mr. Botta?
**A.** Well, I mean, it would be -- it was hard to quantify. I mean, I felt like at times it was a bit of a part-time job. I never, you know, minded spending time with him, but it was a lot of time I spent with Mauro talking with him.

**Vol. 5 Page 913, Lines 4 through 14**
**Q.** I think the third thing you mentioned -- in addition to the formal coaches, the executive coach, you mentioned that he also got informal advice from folks in the office.
Who in the office would make themselves available to Mr. Botta to give him sort of informal coaching?
**A.** Well, I mean, I -- Tim Carey, as the assurance leader, was available to him. I know they had conversations.
Kevin Healy, who was the assurance leader just prior to Tim and also, you know, partner leader in the firm.
You know, there was -- and others. I mean, you know, people made time for Mauro.

**Vol. 5 Page 957, Lines 1 through 5**

1

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5
TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**Q.** Okay. And resignations were mentioned. Every time PwC received a resignation from Mauro, PwC attempted to keep him employed at PwC; right?
**A.** Yeah. I think we really supported trying to find opportunities to keep him.

**UMIT F. OZDEMIR TESTIMONY (03/02/2021)**
**Vol. 6, Page 1010, Lines 7 through 10**
**Q.** And were the questions that he asked that you were present for, did you think that they were valid and good questions?
**A.** For my piece, again, for the only one -- I can only talk for my piece. Yes, his questions were valid.

**Vol. 6, Page 1011, Lines 8 through 14**
**Q.** Do you agree that Mauro was professional on the audit?
**A.** Again, I can only talk for my piece. I did not involve in top management meetings. I did not involve in every part of the audit. I only did one part, which is mainly inventory and hosting, yes.
For my part I think he was fine. Yeah, he was. He was professional for my part.

**TYE THORSON TESTIMONY (03/02/2021)**
**Vol. 6, Page 1025, Lines 21 through 24**
**Q.** And Mr. Botta in 2012 raised some concerns with the Cavium audit, did he not?
**A.** He raised some concerns, as he does on all of his audits that I worked with him on.

**Vol. 6, Page 1028, Lines 11 through 19**
**Q.** Okay. Given the complexities of the issues, right, and given you had to consult with folks in National, it was reasonable for you and Mauro to bring up these issues to PwC's National office; right?
**A.** Of course.
**Q.** And, Mr. Thorson, you do consider Mauro a good auditor; right?
**A.** I think Mauro is a good auditor in a lot of cases. In some cases not so good.

2

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**Vol. 6, Page 1032, Lines 1 through 17**
**Q.** And 2012, right. And he's bringing up these issues with audit opinions that have already been signed off on on behalf of PwC; right?
**A.** Which I thought was very unusual for this kind of an analysis, but yes, that's correct.
**Q.** But you would agree that if there is an aggregate control deficiency, your job as an auditor would be to determine if these aggregate deficiencies created a material weakness; right?
**A.** That's correct, but you normally -- it's not even considered that you consider deficiencies from prior years when you do an aggregation consideration.
So Mauro had brought in 2012 and 2013 issues into this memo, which was very unusual. I've never ever seen that before in all my time. And so I -- you know, once I got it, clearly I needed to spend some time with Mauro to understand why he did what he did.

**Vol. 6, Page 1041, Lines 23 through 25, Page 1042 Lines 1 through 11**
**Q.** And at dinner you discussed with Mauro what you felt were his options as it relates to the issues he brings up in the PB memo; right?
**A.** That was kind of the penultimate discussion at the end. We felt like we had a good discussion about this issue and other things. Mauro and I had a good relationship I thought. And Mauro shared his views. Mauro was not afraid to share his views. So he shared his views. And by the end, I think we were both in about the same spot.
It's just something needed to happen relatively quickly in terms of his decision. We couldn't stew on it for weeks. This is something that we had to make the decision, either disagree or not. If he disagreed, we've just got things we need to do according to PwC policy.

**Vol. 6, Page 1063, Lines 24 through 25, Page 1064 Lines 1 through 7 and Lines 17 through 24**
**Q.** Okay. So to the extent the times may be off because it's Eastern versus Pacific time, we appreciate that and thanks for clarifying for the record. That's going to be noted. Okay? Within that same time frame -- right? -- whatever time

3

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

1  zone we're working with, at one point you asked Mauro to help
you out with this and see what he could do; is that right?
2  **A.** I asked Mauro to help, yeah. Mauro was a key person
helping and responding to National office questions along with
3  Denise and several other people.
**Q.** Okay. But up until that point, Mauro had not made any
4  edits on the tax memo; right?
**A.** I don't know. I don't recall if he did or didn't. I
5  mean, Mauro was instrumental in responding to aspects of the
tax memo. Whether he edited them or somebody else edited them,
6  I don't know. He's the one that identified or raised a control
that he thought was a compensating control to me at one point
7  in time. He says, "We've got this other control."

8  **Vol. 6, Page 1068, Lines 3 through 25**
**Q.** Okay. That evening do you recall -- well, withdrawn.
9  You recall telling Mauro that evening -- or Mauro telling
you that evening he had a proposed fix to the comments outlined
10  by Gil and Karen that we just reviewed; right?
**A.** We discussed what -- the approach that we should take for
11  answering this memo -- answering Gil's comments. So there was
a part to this thing where Mauro said, "Hey, guys, I found the
12  compensating control that I think gives us coverage we need to
deal with National."
13  Mauro raised that to me. I said, "Good job. Let's move
forward with that as the compensating control."
14  National then comes back and says, "Well, we need a
precision level with this thing. That's where the profession
15  is starting to move. Let's see if we can get a little
precision on this thing."
16  And both Mauro and I didn't know what the precision was at
that point in time because we needed to talk to the client to
17  understand what their precision was. And so we talked about,
you know, how do we deal with taking this to National; and
18  ultimately it was decided that we would document a number in
there, send it to National, and the next day I would go talk to
19  the client about what the CAO and CFO's thresholds were when
they do this review.

20

21  **Vol. 6, Page 1118, Lines 3 through 14**

4

22  Case No.  3:18-cv-002615-AGT            APPENDIX 5

23

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**Q.** Okay. Cavium was internally inspected by PwC's Quality Department in 2015; right?
**A.** Yes, I believe it was a 2014 audit that was inspected in 2015.
**Q.** And about when was that inspection?
**A.** Probably July or August.
**Q.** Okay.
**A.** That's my recollection.
**Q.** And at that, if you can recall, Cavium was deemed a compliant audit? The 2014 audit was deemed a compliant audit; was it not?
**A.** Yes.

**Vol. 6, Page 1141, Lines 17 through 25, Page 1142 Lines 1 through 8**
**Q.** And, sir, did you remove Mr. Botta from the audit at that time when they requested it?
**A.** No, I did not.
**Q.** Why not?
**A.** The -- so the CFO had approached me on removing him from the account, and he had said that he -- just kind of bedside manner, kind of style, wasn't something that they were warming up to, and they wanted to replace him.
And I had -- I had asked Art, the CFO, if we could at least keep him around for another year, while he had a chance to get to know Mauro and get to know him better. I mean, at the time I believed Mauro had done a good job. And, you know, my view is he was a little bit like kind of a fine wine, where it takes a little bit to get used to him, but...
And so the -- basically I think when I got done, I said: Art, I'd like you to just trust me on this one. So Mauro remained on the account for the next -- obviously until 2015.

**Vol. 6, Page 1149, Lines 17 through 22**
**Q.** And what did you understand him to mean when he wrote "I wanted to salute you"?
**A.** I think it was a respectful appreciation and a way to say good-bye. We did have a pretty good working relationship while he was at PwC, and I looked at that as kind of a respectful good-bye.

5

Case No.  3:18-cv-002615-AGT            APPENDIX 5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**MARCO BOTTA TESTIMONY (03/02/2021)**
**Vol. 6 Page 1161, Lines 2 through 16**
**Q.** Go ahead, Mr. Botta. Can you please describe for the Court the emotion that you heard in your brother's voice?
**A.** Well, he was really sad. He didn't understand why he was terminated, and the problem is that he -- he really loved and loves his job so he was really, really in a bad state of mind.
**Q.** Thank you.
Were there -- did he talk to you about physical symptoms he was experiencing as a result of the termination?
**A.** Well, he told me several times that even before his termination he was really under heavy stress, and I could see him under heavy stress all the time we talk before and also after he was terminated.
And he was also suffering because he was started to -- not to sleep very well. And so, yes, I saw him -- I could see him under heavy stress.

**Vol. 6 Page 1165, Lines 16 through 25**
**Q.** Did Mauro tell you that he had been accused of fabricating a control at Pricewaterhouse?
**A.** Yes, he told me that.
**Q.** Did he tell you how that affected him to be accused of lying about a control?
**A.** Yes. He was really disappointed and angry because he didn't do anything of that. He told me that he never did anything of that.
**Q.** Does Mauro pride himself as an honest, ethical person?
**A.** Yes, he does.

**Vol. 6 Page 1166, Lines 19 through 22**
**Q.** How does your brother seem now, Mr. Botta?
**A.** As I said earlier, he is not happy. He is not happy with his job and he really wanted to go back to work to what he was at his job that he liked so much.

**KEVIN HEALY TESTIMONY (03/02/2021)**
**Vol. 6 Page 1185, Lines 2 through 22**
**Q.** Okay. And so if you weren't working directly with him on engagements, how is it that you wound up spending as much time

6

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

1  as you did with Mr. Botta?
2  **A.** Mauro was -- was always the first person in my office when he had a point of view on a variety of matters. And I really
3  appreciated him coming to me and sharing his insights and thoughts on a variety of matters, whether it be how we should
4  be thinking about new technical accounting pronouncements that need to be adopted by our clients, whether there were
5  observations on how companies were implementing system and challenges.
6  So Mauro was -- you know, he was a very frequent contributor to me, and I had really an open-door policy and
7  would make a lot of time for Mauro because he was really proactive at sharing his points of view on things with me.
8  **Q.** Okay. And did you always agree with the issues, concerns, or items that Mr. Botta raised with you?
9  **A.** No. No. But I would always be willing to discuss them and debate them with him and really listen to his point of view
10  before making my recommendations on how we were going to move the practice forward.

11  **Vol. 6 Page 1187, Lines 16 through 21**
   **Q.** And, Mr. Healy, in your experience and as market assurance
12  leader, do all employees at PwC get to have an executive coach?
   **A.** No. It's extremely rare. We do it generally for a
13  handful of partners; and over my tenure as a partner 20-plus years, it's a handful of people below the partner level that
14  I'm aware of that have gotten executive coaching.

15  **Vol. 6 Page 1189 Lines 20 through 25, Page 1190, Lines 1 through 24**
   **Q.** And when you learned that, Mr. Healy, did PwC take steps
16  to terminate Mr. Botta after he told you he was resigning to go to another Big 4 accounting firm?
17  **A.** No. I mean, our normal practice is that when somebody's going to a competitor, that when they resign, we immediately
18  would escort them out of the building, pay them for their notice period, and let them go on their merry way.
19  But, you know, I felt that this was an emotional reaction to the feedback, and I wanted to spend time with Mr. Botta to
20  understand why he was making the decision, what he thought he was going to get at KPMG; that, you know, we were making an
21
22  Case No. 3:18-cv-002615-AGT          APPENDIX 5
23

7

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

1   investment in his development, we were interested in his
2   success, and wanted to hear -- hear the reasons why he was
    thinking about leaving. And we spent a number -- had a number
3   of phone calls helping him think through that decision and
    thought process.
4   **Q.** And, in fact, do you remember, you know, what times of day
    or night you received and counseled Mr. Botta through those
    phone calls?
5   **A.** It was -- you know, I was available to Mauro all day all
6   the time whether it was evening or weekends. I remember one of
    these phone calls I was at my son's baseball game I was on the
    phone with Mauro. And, you know, daily when my kids were
7   young, I was working crazy hours and I didn't spend many --
    many days at their activities, but I remember vividly on the
8   sideline spending time with him and then recommending other
    people within the firm that he should talk to as he's making
9   his decision because I felt that he was making more of an
    emotional decision as opposed to a logical and practical
10  decision at the time.

11  **KEVIN HEALY TESTIMONY (03/03/2021)**
    **Vol. 7 Page 1206, Lines 12 through 21**
12  **Q.** Okay. And you've just stated though that it was your
    decision to go ahead and elevate this anyway; is that right?
13  **A.** That is correct.
    **Q.** And why did you decide to do that?
14  **A.** I decided to do that because I wanted to make sure that we
    got the answer right, and that -- that all parties felt heard,
15  and all the facts were appropriately tabled and people were
    comfortable that their voice was heard and that they had --
16  there was a thorough vetting of the analysis. So that was just
    my recommendation.

17
    **Vol. 7 Page 1209, Lines 8 through 18**
18  **Q.** And by the way, what did you view your role to be at this
    stage?
19  **A.** So as part of policy, my role is not to be involved. My
    role was there really to support Mr. Botta.
20  You know, I wanted to make sure he felt that he had
    someone he could go to to act as a sounding board, because we
21

                                8
22  Case No.  3:18-cv-002615-AGT          APPENDIX 5
23

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

had developed a trusting relationship over the prior -- prior
number of years. And just wanted him to feel comfortable that
he had somebody that was, you know, supporting him in his --
you know, as he was working through his thought process on this
matter.

**Vol. 7 Page 1255, Lines 20 through 24**
**Q.** And he wrote, quote, "You've been nice to me," end quote.
And, sir, let me just ask you. Do you feel that you were,
in fact, nice to him during his tenure at the firm?
**A.** I was always very genuine to Mr. Botta and, yes, I think
there was a lot of mutual trust and respect between us.

**Vol. 7 Page 1243, Lines 14 through 21**
**Q.** Okay. And it was your decision as to who you wanted to
work personally with on this; right, sir? On the senior
manager position.
**A.** It was. I wanted an opportunity, because I've worked with
him kind of in an informal relationship for years and years,
that I wanted to see, you know, if I could help provide
coaching realtime on the job, whether I can also help him
continue to develop.

**Vol. 7 Page 1249 Line 25, Page 1250, Lines 1 through 5**
**Q.** All right. And, Mr. Healy, in your kind of grading
experience, you know, is this a higher grade, middling grade or
lower grade for the senior manager?
**A.** This is a positive -- positive snapshot. It's in that
kind of -- the bottom of the first quartile or the top of the
second quartile. This would be -- it's very positive.

**Vol. 7 Page 1250, Lines 22 through 25, Page 1251 Lines 1 through 13**
**Q.** And, sir, why did you specifically highlight there and in
the last sentence "Mauro also lead all the interactions with
ASM&T related to the material weakness and related
disclosures..."? So why did you twice reference his work with
respect to identifying and communicating with respect to
material weakness? Why was that something you were bringing
out in the review?
**A.** I just thought that he did -- we sat down at the outside

9

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

1
2  of the engagement, we defined roles and responsibilities and
   expectations very clearly, and I thought he did a nice job of
   executing against the expectations that I outlined.
3  It was a very complex job. It's not easy to communicate
   material weaknesses, especially for a company that had never
   experienced them before, and I thought that he did, you know, a
4  nice job not only managing the client interaction but also
   managing the firm interaction in the evaluation of those
5  conclusions.

6  **Vol. 7 Page 1259, Lines 7 through 13**
   **Q.** Okay. Did you find that his spotting of this issue was
7  meaningful?
   **A.** Yes. I mean, this is consistent with what I said
8  yesterday; that when Mauro identified issues, he'd be the first
   person to my office to share insights on a whole host of
9  matters to help me think about, you know, how we shared more
   broadly.
10

11 **Vol. 7 Page 1264, Lines 16 through 25, Page 1265 Lines 1 through 9**
   **Q.** Okay. And you thought that Mauro asked reasonable
   questions in that audit?
12 **A.** I thought that he responded to coaching that I provided
   him at the beginning of the audit and that he spent -- we spent
13 a lot of time hand in hand. I -- so we worked closely
   together. I can't -- I don't know every question that he asked
14 and whether they were reasonable or not.
   **Q.** You rated him very highly -- highly favorable on this
15 engagement; correct?
   **A.** That's right.
16 **Q.** And you agreed that the Zhone project was highly complex
   with numerous adjustments, material weaknesses, and technical
17 matters?
   **A.** Yep. Those are my words.
18 **Q.** And Mauro handled it professionally and correctly?
   **A.** Yes, he did.
19 **Q.** And you said that he developed a trusting relationship
   with the CFO and the controller; correct?
20 **A.** That's correct.

21

22

23

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

**STIG HAAVARDTUN TESTIMONY (03/03/2021)**
**Vol. 7 Page 1288, Lines 13 through 19**
**Q.** And what did you think of Mr. Botta and your interactions with him?
**A.** I enjoyed working with Mr. Botta on Micron. I think he did -- I think he did a good job. He's a little bit of a character, which helps sort of when you're doing a lot of work together from an audit perspective. So I enjoyed my time with Mr. Botta on the Micron engagement.

**Vol. 7 Page 1290, Lines 3 through 9**
**Q.** Okay. So let's focus initially on that first period, the September-October period. How did his transition into the engagement team go?
**A.** I think it went -- I think it went well. He clearly -- like, he came in with a lot of questions and he wanted to learn and wanted to work with the team. So I was -- I was generally happy in the initial phases of the Q3 work.

**Vol. 7 Page 1322, Lines 15 through 25, Page 1323 Line 1**
**Q.** And the final point you make was his inability to close out issues. And just briefly describe what your concern was there.
**A.** Yeah. My concern there was that he had raised all these questions, many of them good questions, but he just couldn't close them out.
Like, he couldn't figure out what information was needed in order to reach a conclusion. He just asked for more and more and more without sort of a clear plan as to how to conclude whether any of this were significant or not. And, like, reality was that all of this ended up being relatively minor once it all got sorted out.

**Vol. 7 Page 1324, Lines 13 through 20**
**Q.** In fact, the very first narrative description you provide is:
"Mauro has numerous strengths in areas such as the understanding of audit methodology, commitment to quality, strong work ethic, supporting his teams and engagement."

Case No.  3:18-cv-002615-AGT          APPENDIX 5

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

Do you see that?
**A.** Yes. I stand by that.

**ED SARRETT TESTIMONY (02/23/2021)**
**Vol. 2  Page 190, Lines 24 and 25**
**Q.** Okay. Does Mr. Botta value ethics?
**A.** Extremely.

**Vol. 2  Page 191, Lines 18 through 22**
**Q.** Mr. Sarrett, can you please describe for me if Mr. Botta
talked with you about right and wrong and what he thought was
right and wrong?
**A.** Yes. He's a devout Catholic and adheres strictly to his
religious beliefs. Goes to mass regularly.

**Vol. 2  Page 194, Lines 7 through 25, Page 195 Lines 1 through 6**
**Q.** Mr. Sarrett, did Mr. Botta talk to you about right and
wrong when he met with you on occasion?
**A.** Yes.
**Q.** Okay. And what did he tell you?
**A.** He has a very strong sense of right and wrong.
**Q.** Did he talk to you about any incidents of right or wrong
that he was experiencing as he came to talk to you?
**A.** Yes. I wouldn't know how to describe -- I don't
understand the whole world of PwC and auditing very well, but I
would say that he felt like when there was an ethical concern
for him, he was going to raise it. That was important to him
to not ignore it.
**Q.** Okay. Did he talk to you about that a lot?
**A.** Yes. Usually in most sessions there was some kind of
mention of the progress of the trial or something that at PwC
that would concern him. So I guess, yeah.
**Q.** Did he feel -- did he talk to you about that he felt it
was important to do the right thing and stand up for what he
believed in?
**A.** Absolutely.
**Q.** Did he talk to you about valuing ethics?
**A.** Definitely.
**Q.** Did he talk to you about valuing the truth?
**A.** Definitely. That seems to be a primary motivation for

12

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW – APPENDIX 5
TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND
ETHICAL AUDITOR

1  him.

2  **MAURO BOTTA TESTIMONY (02/24/2021)**
   **Vol. 3 Page 328 Lines 20 through 22**
3  **Q.** Were you concerned in auditing Harmonic about Harmonic
   shareholders?
4  **A.** I was concerning to protect them by doing a quality audit.

5  **Vol. 3 Page 461 Lines 18 through 25, Page 462 Lines 1 through 4**
   **Q.** Okay. Mauro, has being retaliated against at PwC impacted
6  your well-being at all?
   **A.** Yes.
7  **Q.** How so?
   **A.** I suffered from -- suffer from anxiety, depression,
8  occasional suicidal thoughts. I lost some of the people that I
   was working with that do not want to speak to me. Other people
9  that are willing to meet me ask me to meet in back alleys or
   far away from the office, you know, when they are close to
10 where I live. And, in general, the fact that I am now known to
   be someone that allegedly violated ethics, which has been
11 always the thing that I cared the most.

12 **EXHIBIT JX 2-3**
   Client relationship – Mauro's unique style works for him there. He really connects with clients in a
13 positive way. An example of this is when a client was transitioning from public to private to merger; he
   had to interact with 3 different management teams. There were also many different personalities
14 involved and the transition required a complete culture shift. Through and through there was Mauro,
   dealing well with it all and forging close bonds with the clients. Mauro, in his way, made a positive
15 impact. The client still asks him about him today.

16 Clients really like him too. He is approachable and responsive.

17 Really good with people. He is a very good coach for our staff. Rolls up his sleeves with staff and
   teaches them.
18
   Dedicated, loyal, hard working
19
   Strong set of values, high integrity, trust worthy, ability to call a spade a spade.
20
   Mauro has very strong professional skepticism and it is a very good thing.
21
   13

22 Case No.  3:18-cv-002615-AGT              APPENDIX 5

23

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT

**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX 5**
**TESTIMONY AND EXHIBITS REGARDING MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

He is open and direct in a way that others aren't.

When Mauro is engaged and passionate, he gets it done and delivers excellent quality work.

His passion for our business and PwC.

He understands our business. He understands that we need to delpoy efficiently, record time, bill and collect. He understands those KPIs for our business and owns them in a way that distinguishes him from other senior managers.

Mauro is funny. Gets things done with humour and yet is aggressive about it. I really, really like him. He is a great guy – funny as hell.

He is very involved and in the know. He stays connected and is proactive about it.

He is an amazing asset to the firm.

Very detail oriented.

**EXHIBIT JX 2-4**
I would always trust him getting an audit done right. All partners would wave his flag here- which is big in this world.

He has a great ability to audit things.

**EXHIBIT DX 1688-2**
3) As a response to the notification received as CRT, I suggested a solution to National on how to offer a path for the target of this restructuring, (aged senior managers not in the pipeline). For example, given I still love audit, I offered to relocate in other offices/LOSs and to even accept reduction in role and salary, and to my surprise the reply received was that the firm was "not interested in creating such precedent" despite they do so for international hires, again without providing explanations for the decision but only the mechanical reiteration that I needed to look for a job.
In light of what I mentioned, I'd like to ask you to embody another core value and suggest if you could "reimagine the possible" to reconsider the decision to fire tenured individuals that have no performance issues, are currently generating revenue and would love to stay and contribute to the point to accept a role and salary reduction. I like to believe and hope that in the One Firm vision there'd be room for them as well, especially in light of your most recent communications.
I'm obviously concerned that, if after reassurances that there are no changes, an entire class is being

14

MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

1
2    laid off, what would prevent future actions of this kind at other and more junior levels? Because that is the one precedent that this did create and I can hardly imagine that it was one that this firm should have been interested in (unlike my proposal).

3    **EXHIBIT DX 1697-6**
4    I: Asked again about the advantages that would come if he "settled" the suit.
R: No way, cannot back down from the principle of the thing. Wants to be reinstated
5    since he was fired unjustly, not for poor work performance. Wants to return to work with his "kids", his team.

6    P: strong, controlling (critical) parent - strong sense of duty, obligation (not to parents necessarily, nor to bosses who don't do the right thing), doing the right thing, religious
7    faith, attendance at mass (even when on the road). Not as strong NP (Nurturing Parent) – not as compassionate toward self (self-protection) not high on his list of priorities if it
8    means sacrificing adhering to values.

9    **EXHIBIT DX 1696-3**
Transactional Analysis would about how strong the NP (Nurturing Parent} part of his
10   Parent Ego State is. It seems as though the CP is most dominant and holds Mauro to a strict adherence to his internalized values, religious norms, gentlemanly code of conduct
11   and that makes it difficult for Mauro to respond differently in environments where he perceives those values as compromised (not that his acting in this manner is a bad thing;
12   it is, however, counter-cultural and not the norm!).

13   **EXHIBIT DX 1696-5**
Very
14   heightened sense of right and wrong, adheres very strictly to his value system. Reports that he "has to do the right thing", but wishes to return to employment with company.

15
16   **EXHIBIT DX 1697-2**
Wants publicity for lawsuit so that the wrongs can be corrected. Doesn't seem to allow the notion of potential harm to career to outweigh adherence to what he thinks is right.

17
18   **EXHIBIT DX 1697-5**
M reports having a hard time with the work and work places he's had to pick up since
19   being let go by previous company. Has a hard time finding meaning in it, missing his workmates and his "kids", the team he was instrumental in creating. Showed me
20   "personality" evaluation", reported that he felt it was pretty accurate about him, wanted to know what I thought. I agreed.

21

22                                              15

23

**MAURO BOTTA V. PWC, Case No. 3:18-cv-02615-AGT**
**PLAINTIFF MAURO BOTTA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – APPENDIX  5**
**TESTIMONY AND EXHIBITS REGARDING  MAURO BOTTA BEING A GOOD AND ETHICAL AUDITOR**

M is very blunt and direct, which are qualities not everyone always appreciates. He has a hard time understanding why this is so since he really values the clarity of what he communicates to partners and doesn't understand why they don't feel similarly about his directness.

Reports that his team of "kids" really appreciates his clarity 'With and support for them and always feels that this openness and lack of interest in "hierarchy" are conducive to creating an effective team.

**EXHIBIT PX 105-27**

11/11/15 - Christopher J Smith

"Mauro has been active leveraging his network to drive opportunities for the firm in the non-audit space at multiple clients, which is something many of our senior managers don't spend a lot of time doing. This has lead to over $500k in opportunities for the firm. Mauro should think about whether he'd like to get more involved in the pitch and/or delivery on these opportunities"

11/20/15 - Tye Thorson

"Mauro represented the team in the recent ECR of Cavium. Mauro did an excellent job managing the entire ECR process, dealing with the issues, communicating all material areas needing communication to the review team and being the front person in virtually all areas. The review team had specific semiconductor experience and was asking tough questions of Mauro and the team which, at times were frustrating for Mauro. He rose above it, kept his cool and the results were compliant".

Case No.  3:18-cv-002615-AGT             APPENDIX 5