UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURO BOTTA,<br><br>        Plaintiff,<br><br>    v.<br><br>PRICEWATERHOUSECOOPERS LLP,<br><br>        Defendant. | Case No. 18-cv-02615-AGT<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

     A bench trial was held in this employment case. The undersigned presided and now explains why judgment will be entered for the defendant, PricewaterhouseCoopers LLP (PwC).

## BACKGROUND

     Public companies pay PwC to audit their financial statements and their internal controls over financial reporting.[1] The firm's audits serve a well-recognized "public watchdog function," *United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984) (simplified), because participants in the capital markets rely on the results in deciding where to invest their money. To further this watchdog function, the Securities and Exchange Commission (SEC) and the Public Company Accounting Oversight Board (PCAOB) have issued detailed auditor independence rules. *See, e.g.*, SEC Regulation S-X, 17 C.F.R. § 210.2-01; PCAOB Rules § 3 Pt. 5, Ethics and Independence, https://pcaobus.org/about/rules-rulemaking/rules/section_3. The rules seek to reduce conflicts of interest, which may naturally arise given that auditors are paid for their work by the companies they audit. *See generally* Te-Kuang Chou, *An Examination of the Mechanism and Legal*

---

[1] Internal controls are procedures that companies use to prevent and detect errors in their financial statements. If a company requires its accounting staff, each month, to cross-check corporate bank balances against records of deposits and withdrawals, that cross-check would be an internal control. PwC audits internal controls to confirm that they're in place and operating effectively. (*See* Tr. 106:22–107:12, 1281:18–1282:12.)

*Regulation Assuring Audit Independence*, 12 U.C. Davis Bus. L.J. 225, 226–36 (2012).

Mauro Botta was a PwC auditor for close to two decades when, in November 2016, he filed a confidential complaint with the SEC. There he alleged that PwC was prioritizing profits and client satisfaction over compliance with auditor independence standards. More specifically, he detailed his work as a senior manager on two audit engagements, for Cavium Inc., from 2012 to 2015, and for Harmonic Inc., from 2015 to 2016. He claimed that during those engagements he identified accounting errors and internal-control deficiencies that his supervisors willingly overlooked in order to retain Cavium's and Harmonic's business.

The SEC investigated Botta's allegations, but ultimately chose not to take action against PwC; it never proved—nor even claimed—that PwC violated auditor independence rules.[2] The SEC's decision isn't on review here. At issue instead is whether PwC unlawfully retaliated against Botta. It is undisputed that PwC fired Botta on August 17, 2017, while the SEC's investigation was ongoing. And Botta insists that his whistleblower complaint contributed to PwC's action.

Botta also alleges that during the two-and-a-half-year period before he was fired, PwC retaliated against him on six other occasions—removing him from three audit engagements (for Cavium Inc., Harmonic Inc., and Gigamon Inc.), underutilizing him, choosing not to staff him on business he helped bring to the firm, and threatening to fire him for making complaints. He also asserts that PwC breached his employment agreement by terminating him without notice.

Evidence for and against his claims was introduced at trial and will be assessed next.

\\
\\

---

[2] The SEC is one of numerous government bodies that declined to take action against PwC based on Botta's allegations. After the SEC declined to prosecute, Botta appealed to the SEC's Office of Inspector General. He also filed complaints with the California Board of Accountancy, the County of Santa Clara's District Attorney, the California Department of Fair Employment and Housing, the California Department of Justice, the U.S. Department of Labor, U.S. Senator Dianne Feinstein's Office, and former U.S. Senator Kamala Harris's Office. None of these entities took any enforcement action against PwC. (*See* Tr. at 758:2–771:3.)

# FINDINGS OF FACT

A. <u>Termination</u>

The timing of Botta's termination was the best evidence in support of his contention that his SEC complaint contributed to PwC's decision to fire him. He filed his complaint in November 2016. The SEC then interviewed him and, on April 28, 2017, notified PwC that it had opened an investigation into the firm's 2013 and 2014 audits of Cavium (a subset of the audits Botta had flagged). Four months later, on August 17, 2017, PwC fired Botta. By that time, Botta had worked for PwC for seventeen years, suggesting that the firm valued his services. So the fact that he was fired in relatively short order after he filed his complaint hints at a connection between the complaint and his termination. (*See* Dkt. 218 at 2 ¶¶ 3, 6; Tr. at 96:21–22, 98:9–11, 99:1–2, 402:21–404:17, 1455:20–1457:2; JX20-1 to -9.)

This hint of a connection wasn't bolstered by other evidence, however, and PwC offered a different, persuasive side of the story. Walter Brown testified that PwC retained him as outside counsel in response to the SEC's investigation and that he interviewed PwC employees, including Botta, who had worked on the 2013 and 2014 Cavium audits. (When retained, Brown was a partner at Orrick, Herrington & Sutcliffe LLP; at the time of trial, he was a partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP.) Brown testified that in two separate interviews, Botta admitted that during the 2014 Cavium audit, he had documented as existing an internal control that he had created and that Cavium didn't actually have in place. This admission was conveyed to Mark Simon, the managing partner of PwC's U.S. audit practice; and Simon testified that, as he saw it, Botta had either fabricated an internal control or lied about doing so, both grounds for immediate termination. Simon promptly fired Botta in response. (*See* Tr. at 1455:14–1473:2, 1563:5–7, 1572:1–1574:4.)

At trial, Botta argued that PwC's stated reason for firing him was spurious, because he didn't fabricate an internal control or tell Walter Brown that he had. On this disputed factual issue, PwC's evidence was more persuasive. Walter Brown had a firm recollection of what Botta said during the interviews in question. Botta's statements stuck with him, he explained, because he

3

was shocked by the admission and held a second interview to confirm it. Botta testified about the interviews, but his recollection was poorer. He testified that he didn't tell Brown that he had "fabricated" an internal control, but he couldn't remember exactly what he said instead. (*See* Tr. at 828:24–829:11, 841:6–11.) He also wouldn't admit or deny whether he told Brown that he had created an internal control during Cavium's 2014 audit. (*See* Tr. at 841:12–842:18.) Brown's clearer recollection was more credible than Botta's.

Even more persuasive, Brown's testimony was corroborated by Botta's own writing. In two documents that Botta admitted to authoring before the interviews, he wrote that PwC's opinion on the 2014 Cavium audit "was able to be issued thanks to me creating a control the day before the filing of the form 10-K which was never documented nor discussed with the Company." (DX1139-44, -48.) These written statements track closely to what Brown said Botta told him. The narrative consistency bolstered Brown's credibility.

Did Botta actually create and document an internal control that didn't exist at Cavium? Some evidence suggested that he didn't. Ty Thorson, the PwC partner who oversaw the 2014 Cavium audit, testified that the control in question "had existed for years." (Tr. at 1069:1–1070:11.) And Mark Simon testified that PwC's internal investigation was "not able to conclude either way as to whether a fake control was actually created or not." (Tr. at 1575:21–1576:3.) What matters, though, isn't whether Botta created an internal control, but whether he said that he did: Simon testified that either creating an internal control during an audit or lying about doing so would violate PwC policy. On this critical issue, Brown testified that, yes, Botta did tell him that he had created and documented an internal control that didn't exist, and Brown's testimony was believable and confirmed by Botta's own writing.[3]

It's possible, of course, that multiple factors contributed to PwC's decision to fire Botta; and if one of those factors was Botta's SEC complaint, PwC could be liable for retaliation. But other than the temporal proximity between his SEC complaint and his termination, no evidence

---

[3] Botta argued that he was treated differently than Ty Thorson, who wasn't terminated. But no evidence suggested that Thorson ever said that he had created and documented an internal control that didn't exist.

introduced at trial supported that the former contributed to the latter.

Walter Brown and Mark Simon both testified that before Botta was fired, they didn't know he had filed a whistleblower complaint, or even suspect that he had done so. Simon also testified that it was his decision alone to fire Botta, and that he acted for no reason other than that Botta had admitted to creating and documenting an internal control that didn't exist. (*See* Tr. at 1460:3–6, 1473:19–1474:2, 1508:25–1509:2, 1514:1–16, 1558:6–1559:7, 1579:19–1581:14.)

One could wonder how Brown wouldn't have known or suspected that Botta had gone to the SEC. As part of the internal investigation he led, Brown reviewed PwC memos that documented Botta's accounting concerns during the 2014 Cavium audit. It seems plausible that those memos could have led Brown to wonder whether Botta was behind the SEC's inquiry. Before Botta's first interview with Brown, Botta also retained counsel, an attorney whose law-firm website profile stated that his areas of expertise included employment and whistleblower litigation. This attorney either attended or dialed in to Botta's interviews with Brown, which again plausibly could have tipped off Brown to the fact that Botta was a whistleblower. (*See* Tr. at 406:1–407:2, 1503:22–1504:19, 1511:5–1513:25, 1538:5–1539:4.)

Brown, however, testified that the connection between Botta and the SEC's investigation wasn't so clear. He testified that the SEC didn't tell him why it was investigating the 2013 and 2014 Cavium audits—the SEC didn't reveal, for example, that it had received a whistleblower complaint, nor did it identify Botta. Brown also testified that he didn't recall reading Botta's attorney's law-firm profile, or otherwise learning or suspecting that Botta had retained counsel who specialized in protecting whistleblowers. Finally, Brown testified that he knew Botta had approved a memo, at the end of the 2014 Cavium audit, that documented the resolution of accounting concerns he had previously raised. This may have suggested that Botta was satisfied with the end result of the audit, lessening the likelihood that he would have stood out as a prime candidate to file a whistleblower complaint. (*See* Tr. at 1460:3–6, 1473:19–1474:2, 1491:14–24, 1503:22–1504:19, 1506:1–1509:24, 1514:1–16, 1538:5–15, 1555:20–1556:4, 1559:3–4.)

Brown's testimony was credible. He didn't know or suspect that Botta had gone to the

SEC. But even if Brown had known, a link between this knowledge and Botta's termination was also missing. It was Simon (not Brown) who decided to fire Botta, and Simon had no reason to suspect that Botta was a whistleblower: Simon was a high-level PwC official, he wasn't directly involved in responding to the SEC's investigation, and he didn't review the PwC memos documenting Botta's accounting concerns. Brown, meanwhile, testified that he wasn't involved in the decision to fire Botta and never discussed the prospect with Simon. (*See* Tr. at 1557:21–1558:5.) So even if Brown knew Botta was a whistleblower, it wasn't proven that Brown acted upon this information by advocating, directly or indirectly, for Botta's discharge.

In argument, Botta suggested that Simon was a decisionmaker in name only, and that behind the scenes, someone at PwC wanted to see him fired because he was a whistleblower. This wasn't proven. Simon testified that he learned about Botta's statements to Brown (which formed the basis for Simon's decision to fire Botta) during a conference call with in-house counsel and with members of PwC's risk management and partner-affairs divisions. (*See* Tr. at 1572:1–5, 1582:14–1584:10.) Botta didn't call any of these call participants as witnesses, or introduce any evidence about them. There's nothing in the record suggesting that he even tried to identify them during discovery. On this record, it would be entirely speculative to conclude that these individuals knew about Botta's SEC complaint *and* that the complaint contributed to their decision to tell Simon what Botta had said to Brown. Botta did testify that he told certain supervisors, an HR employee, and two members of PwC's ethics office that he was considering "going external" or taking his complaints to the SEC. (Tr. at 378:5–382:16, 391:18–22.) But he didn't prove that any of these PwC employees communicated with Simon about him, so there's no basis for concluding that they set in motion his termination, much less that they did so because of his SEC complaint.

Botta, in the end, simply didn't put forward enough evidence to prove that his SEC complaint contributed to PwC's decision to fire him. The temporal proximity between his complaint and his termination generated suspicion, but at trial that suspicion wasn't confirmed.

B.  Removal from PwC Audits

During the two-and-a-half-year period before Botta filed his whistleblower complaint,

PwC permanently removed him from two audit engagements (for Cavium and Harmonic) and temporarily removed him from a third (for Gigamon). (*See* Tr. at 293:9–16, 332:14–17, 396:2–16.) At trial, Botta argued that PwC did so because he had identified accounting errors in these companies' financial reports. PwC proved that this was not why Botta was removed.

During all three engagements, the audited companies had complained about Botta's lack of rapport. They criticized his "bedside manner," his reluctance to consider "other's points of view," and his lack of "sensitivity," "reasonableness," and "empathy." (Tr. at 881:1, 1141:22, 1211:11, 1302:2.) One accountant at Harmonic said Botta made her "feel like a criminal." (Tr. at 1302:21–1303:1.) She even resigned because "she didn't want to deal with [him] anymore." (Tr. at 1304:7–8.) Her supervisor reported that he had "received dozens of complaints similar to [this] from virtually every area of the company." (Tr. at 1303:4–5.) At trial, an exchange between Botta and a former colleague (introduced into evidence) provided a window into his approach: Botta wrote that his plan was "to at least ridicule [Cavium] as much as I can." (Tr. at 624:6–7.)

PwC partners responded to these complaints. They tried to work with Botta and to reassure their clients, but ultimately, when Botta didn't change his approach, they permanently removed him from Cavium and Harmonic, and temporarily removed him from Gigamon. The lead audit partner in PwC's San Jose office (where Botta was based) testified that these decisions were based on his determination that a lack of mutual trust had developed, which threatened the success of future audits. (*See* Tr. at 880:23–881:2, 1141:5–1143:22, 1211:1–1214:5, 1216:8–1225:7, 1289:24–1305:14, 1318:6–1325:14.)

Evidence supported that Botta did flag potential accounting errors during the Cavium, Harmonic, and Gigamon audits. But Botta didn't prove that his doing so contributed to PwC's decision to remove him from the engagements. His supervisors credibly testified that they generally appreciated when he raised accounting concerns. (*See* Tr. at 1135:2–15, 1290:23–1291:12, 1295:6–12, 1296:7–17.) But as Stig Haavardtun, the lead partner on the Harmonic engagement put it, it wasn't that Botta "always asked questions" that was the problem, but rather that he "couldn't do it in a collaborative manner." (Tr. at 1304:19–20.)

7

Several other factors contributed to PwC's decision to remove Botta from Harmonic. Haavardtun testified that he recommended Botta's removal from the engagement because of his treatment of the client and PwC staff, his lack of phasing and general project management, his lack of coaching of team members, and his inability to close out issues. (*See* Tr. at 1320:21–24.) Haavardtun expanded upon these reasons at trial, with PwC offering other evidence to corroborate his testimony. Critically, the fact that Botta identified potential errors in Harmonic's financial reports wasn't among the factors considered. Nor was it among the factors considered when PwC removed Botta from the Cavium and Gigamon engagements.

C.   Utilization Rate

Botta's utilization rate—the proportion of his working hours spent on client-chargeable work—dropped after PwC removed him from Cavium and Harmonic. (*See* Tr. at 397:4–399:8; PX178, PX179, PX180.) At trial, Botta seemed to suggest that his career prospects were negatively impacted by this decline, but the evidence didn't support his contention.

The evidence showed that Botta's utilization rate declined because after Cavium and Harmonic, PwC staffed him on an internal project, its Center of Excellence. If this had been a dead-end role, then PwC's decision could have harmed Botta professionally. But the PwC partner who oversaw the Center for Excellence credibly testified that Botta's role was a "strategic" one, and that he told Botta the role would "not negatively impact him" and could even set him up for promotion. (Tr. at 1231:11–25, 1232:22–1235:22.) Botta didn't offer any evidence to refute this testimony.

Aside from the Center of Excellence, PwC also proved that it continued to staff Botta on audit engagements even after removing him from Cavium and Harmonic. He remained on the Gigamon engagement, except for when he was removed for a couple of weeks, and he was added to the Dasan Zhone engagement team. Although he had fewer client-chargeable hours after Cavium and Harmonic, due to his participation in the Center of Excellence, he continued to log a total number of working hours within the range of what PwC expected of him and other senior managers. (*See* Tr. at 388:10–13, 396:13–16, 397:4–17, 480:9–24, 679:13–21, 1232:7–11,

8

1236:1–24, 1242:13–1246:23.)

D. Staffing on PacBio

Botta argued that due to the accounting errors he identified during the Cavium and Harmonic audits, PwC decided not to staff him on an advisory project for Pacific Biosciences of California Inc. (PacBio). Botta speculated about this link—because he found it unusual that he wasn't staffed on a project he had helped bring to PwC (he encouraged PacBio's assistant controller, a former colleague, to allow PwC to submit a bid for the work)—but he didn't prove, or even attempt to show, that the PwC officials who decided not to staff him on PacBio had any involvement in the Cavium or Harmonic audits or were otherwise aware of the issues he had raised during those audits. Nor did he offer evidence to corroborate his opinion that it was unusual for PwC not to offer him the opportunity to work on a project he had helped bring to the firm. (*See* Tr. at 383:14–387:23.)

PwC, on its end, credibly explained why it didn't assign Botta to PacBio. PacBio was a life-science company, PwC had a life-science group and Botta wasn't in it (he was in the firm's semiconductor group), and PwC decided to staff employees on PacBio who were in the life-science group. (*See* Tr. at 676:7–677:20, 939:21–942:23.) Botta did testify that he had previously audited a life-science company, but that was ten years before PacBio. (*See* Tr. at 382:20–383:13.) That PwC once staffed Botta on a life-science audit, a decade earlier, wasn't enough to establish that when PwC chose not to staff him on PacBio, and instead chose to staff employees who were in the firm's life-science group, PwC did so for pretextual reasons.

E. Threatened Termination

Botta testified that after he raised concerns about PwC's auditing practices, PwC partner Tim Carey, during an October 2016 meeting, threatened him and said "it would have been easy to fire" him. (Tr. at 390:2–23.) PwC partner Kevin Healy offered contrary testimony, stating that he was also at the meeting (Botta confirmed that Healy was there) and that Carey *didn't* threaten to fire Botta. (*See* Tr. at 1232:12–21.) On this disputed factual issue, the undersigned found Healy's testimony more credible than Botta's. Healy wasn't impeached, and his perception, memory,

narration, and sincerity all appeared sound. On the other hand, there were several inconsistencies between Botta's SEC complaint, which he filed under penalty of perjury, and his testimony—calling into question his truthfulness.

First, Botta told the SEC that when, in a memo, he had advocated for issuing a material weakness to Cavium, during the 2014 audit, he was "put under significant pressure by the market assurance leader" and "the engagement partners," and "was told that had I pursued this path, most likely I would have never made partner." (JX4-9.) At trial, Botta backtracked from this narrative. He admitted that contrary to his statements to the SEC, the market assurance leader "did not pressure [him] or suggest in any way that [he] should retract [his] memo." (Tr. at 522:11–15.) He also testified that the engagement leader "did not state . . . that if you escalate this, you will not make partner." (Tr. at 525:13–18.) This testimony didn't square with Botta's SEC complaint.

Second, Botta told the SEC that after PwC removed him from the Cavium and Harmonic engagements, he "was not allowed to be on other audit jobs (except Gigamon) from March 2016 until now." (JX4-14.) Botta filed his SEC complaint in November 2016. But at trial he admitted that in October 2016, PwC had staffed him on another audit engagement in addition to Gigamon, the Dasan Zhone engagement. (Tr. at 679:22–25.) Botta didn't share this fact with the SEC.

Third, Botta told the SEC that during Cavium's 2014 audit, a "control over the tax footnote was . . . created the night before the filing of the 10-K." (JX4-9.) At trial, Botta testified that this control wasn't created the night before, but rather that Cavium already "had this control and it operated efficiently." (Tr. at 653:25–654:2.) Whether the control was in place or not doesn't presently matter; what matters is that Botta said one thing to the SEC and another thing at trial.

None of these inconsistencies directly contradicted Botta's testimony about the October 2016 meeting between him, Kevin Healy, and Tim Carey. But they did cast doubt on his veracity. Conversely, there was no reason to doubt Healy's veracity. His version of the October 2016 meeting (i.e., that Carey didn't threaten to fire Botta for raising concerns about PwC's audit practices) will thus be credited.

10

F.     Employment Contract

During the relevant period, Botta's employment was governed by an agreement that he and PwC entered into in 2010. The agreement specified that Botta's employment was at-will, but that if PwC terminated him "for reasons other than professional, legal, ethical or Firm policy violations," it would provide him with advance notice. (JX19-2 ¶ 5(a).) It is undisputed that PwC didn't provide Botta with advance notice before firing him; so at trial, a question in dispute was whether PwC fired him for "professional, legal, ethical or Firm policy violations."

Mark Simon testified that he did indeed terminate Botta for violating "professional, legal and ethical duties, as well as PwC firm policy." (Tr. at 1573:20–23.) More specifically, Simon testified that Botta had either created and documented an internal control that didn't exist, or had lied about doing so. In either case, Simon explained that Botta's actions violated PwC's code of conduct. (*See* Tr. at 1573:24–1574:17.) Botta didn't offer any evidence to impeach Simon, and the undersigned found Simon to be a credible witness.

## CONCLUSIONS OF LAW

Botta put forward five legal claims at trial. Four were for retaliation or wrongful termination—respectively in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A; California Labor Code section 1102.5; California Labor Code section 98.6; and California public policy—and the fifth was for breach of contract. The resolution of all five claims largely follows from the factual findings already made.

A.     Sarbanes-Oxley (§ 1514A) Claim

Botta needed to prove that (i) he engaged in "protected activity," (ii) PwC took "adverse action" against him, and (iii) his protected activity was "a contributing factor" in the adverse action taken. 29 C.F.R. § 1980.109(a); *see also id.* § 1980.104(e)(2). He didn't do so.

Most of his theories of retaliation came up short on the "contributing factor" element. He didn't prove that filing a whistleblower complaint (possibly protected activity) contributed to his termination (adverse action). He also didn't prove that identifying potential accounting errors during PwC audits (possibly protected activity) contributed to his removal from those audits, or to

11

his exclusion from the PacBio project (adverse action).  PwC in each case proved that it acted for reasons unrelated to Botta's protected activity.  *See supra* pp. 3–9.[4]

The remainder of Botta's theories of retaliation failed on the "adverse action" element.  He didn't prove that the decline in his utilization rate was adverse to him because he didn't show that the decline "materially affect[ed] the terms, conditions, or privileges of employment."  *Mitchell-Matthews v. California*, No. 13-cv-02854-BLF, 2015 WL 1503498, at *11 (N.D. Cal. Apr. 1, 2015) (simplified).  PwC instead proved that the decline was the result of its decision to staff Botta on an internal project that could have benefited his career.  *See supra* pp. 8–9.  As for Tim Carey's threat to terminate Botta for challenging PwC's audit practices, Botta didn't prove that this "adverse action" actually occurred.  *See supra* pp. 9–10.

On the facts, Botta wasn't able to establish the elements of his § 1514A claim.

* * *

Legal arguments that Botta made in support of his § 1514A claim were also unpersuasive.  First, he argued that the temporal proximity between his SEC complaint and his termination was enough to establish a link between the two.  In earlier stages of litigation, temporal proximity between protected activity and adverse personnel action may be enough to keep a § 1514A claim afloat.  *See* 29 C.F.R. § 1980.104(e)(3) (explaining that temporal proximity may be considered in evaluating whether a plaintiff has established a prima facie case of retaliation).  But at trial, temporal proximity alone doesn't require a finding of retaliation.  Retaliation claims are context

---

[4] To engage in protected activity, an employee of a publicly-traded company, or an employee of a professional-services firm for a publicly-traded company, *see Lawson v. FMR, LLC*, 571 U.S. 429, 433 (2014), must share with an authority figure (e.g., with a supervisor, a federal regulatory agency, or a congressperson) facts that the employee reasonably believes constitute a violation of "section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders."  18 U.S.C. § 1514A(a)(1).

PwC argued that Botta did *not* engage in protected activity—not even when he filed his whistleblower complaint—because he didn't allege that PwC committed any of the listed forms of fraud, or allege that PwC violated any particular "rule or regulation" of the SEC.  PwC also argued that Botta didn't engage in protected activity because his allegations weren't objectively or subjectively reasonable.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000 (9th Cir. 2009) (articulating these requirements).  It's unnecessary to address these arguments because even if Botta engaged in protected activity, he didn't prove that this activity contributed to the adverse actions that PwC took against him.

specific and require the factfinder to consider all evidence in the record. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) ("[T]here is no set time within which acts necessarily support an inference of retaliation. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances."). Here, despite a relatively short, four-month gap between them, compelling evidence supported that Botta's SEC complaint didn't contribute to his termination. *See supra* pp. 3–6.

Second, Botta argued that his SEC complaint contributed to his termination because it started the chain of events that resulted in him losing his job. (His complaint triggered the SEC's investigation, which led to PwC's internal investigation, which prompted Walter Brown to interview him, at which point Botta told Brown that he had documented an internal control that didn't exist, which was the admission that PwC's Mark Simon relied upon in firing him.) The chain of events isn't the crucial point. In the retaliation context, a "contributing factor" is a factor that the employer considered in deciding to take adverse action. *See Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008) (noting that a "contributing factor" under § 1514A must tend to affect "the outcome of *the decision*") (emphasis added). Here, PwC proved that there was only one factor it considered in deciding to fire Botta—his violation of firm policy. His SEC complaint wasn't considered and so didn't "contribute" to PwC's decision to fire him.

Third, focusing again on the relationship between his SEC complaint and his termination, Botta asserted that if a "single person in a supervisory role" knew or suspected that he had filed the complaint, then that knowledge needed to be imputed to Mark Simon, the terminating official. A mandatory-imputation rule may apply at earlier stages of litigation, which are designed to weed out meritless claims, *see Leznik v. Nektar Therapeutics, Inc.*, No. 2006-SOX-00094, 2007 WL 5596626, at *1, 8 (ALJ Nov. 16, 2007) (applying a similar imputation rule on a motion for summary adjudication), but Botta hasn't cited to any authority applying such a rule at trial. If adopted, the rule would come close to establishing a strict liability standard: a supervisor's knowledge of protected activity could trigger liability for the employer even if the terminating

13

official knew nothing about the protected activity and wasn't influenced by the supervisor who did. Section 1514A is not a strict liability statute. It requires the plaintiff to prove retaliation by a preponderance of the evidence, *see* 29 C.F.R. § 1980.109(a), and makes no mention of irrefutable presumptions or imputations. Because Botta hasn't cited to any authority to support the application of this rule at trial, the Court declines to apply it.

Botta didn't prove that protected activity was a contributing factor in the adverse actions he alleged. As a result, judgment on his § 1514A claim will be entered for PwC.

B. Labor Code Claims

Under California Labor Code sections 98.6 and 1102.5, Botta needed to prove that there was a "causal link" between his "protected activity" and "an adverse employment action." *St. Myers v. Dignity Health*, 44 Cal. App. 5th 301, 314 (2019). For the reasons just discussed in evaluating his § 1514A claim, which had materially similar elements, he didn't meet this standard. Judgment on these claims will also be entered for PwC.

C. Public Policy Claim

To prevail here, Botta needed to prove that his termination "was substantially motivated by a violation of public policy." *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 154 (2014). Botta argued that when PwC fired him, there was a well-grounded public policy in favor of informative, accurate, and independent auditor reports. That may be true, but he didn't prove that PwC violated this policy, nor critically did he prove that his termination was substantially motived by a violation of this policy. To the contrary, PwC proved that it fired Botta solely because he violated *firm*, not public, policy. Judgment on this claim will be entered for PwC.

D. Contract Claim

To succeed on his contract claim, Botta needed to prove that PwC breached his employment agreement. He didn't do so. He argued that PwC breached the agreement by not providing him with advance notice before firing him, but the agreement didn't require PwC to provide notice if it terminated him for "professional, legal, ethical or Firm policy violations." (JX19-2 ¶ 5(a).) PwC proved that this clause applied: it terminated Botta for "Firm policy

violations." *See supra* p. 11. The lack of pre-termination notice wasn't a breach and judgment on this claim will also be entered for PwC.

## CONCLUSION

Botta didn't prove that PwC retaliated against him, wrongfully terminated him, or breached his employment agreement. Consistent with the findings made in this order, judgment on all claims will be entered for PwC.[5]

**IT IS SO ORDERED.**

Dated: July 26, 2021

_____
Alex G. Tse
United States Magistrate Judge

---

[5] PwC's motion to strike the supplemental brief that Botta filed following closing arguments (dkt. 224) is denied. The brief was considered but didn't affect the findings and conclusions set forth in this order.